# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**GARY W. RICH and**
**LAW OFFICE OF GARY W. RICH, L.C.,**

        **Plaintiffs/Counter-Defendants,**

**v.**                                     **Case No 1:12cv12**

**JOSEPH SIMONI,**

        **Defendant/Counter-Plaintiff,**

**GARY W. RICH and**
**LAW OFFICE OF GARY W. RICH, L.C.,**

        **Third-Party Plaintiffs,**

**v.**

**BARON AND BUDD, a professional**
**corporation; COCHRAN, CHERRY, GIVENS,**
**SMITH, LANE & TAYLOR P.C.; and**
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,**
**RAFFERTY & PROCTOR, P.A.,**

        **Third-Party Defendants.**

## PROPOSED FINDINGS OF FACT AND RECOMMENDATION FOR DISPOSITION

This case arises out of claims for compensation by Joseph Simoni, Ph.D., hereinafter referred to as Simoni, a non-licensed graduate of the West Virginia University College of Law, against Gary W. Rich, a licensed attorney at law, allegedly due as a result of work done over a number of years by Simoni on two successful civil litigations hereinafter referred to as the Philips case and the Spelter case.

Pending before the Court for decision are the thoroughly briefed cross motions for summary judgment filed by the parties. The motions are dispositive within the meaning of 28 U.S.C. §636(b)(1)(A) and are therefor subject to being decided by Proposed Findings of Fact and

Recommendation For Disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C).

# I.
## Plaintiffs' [Rich] Motion For Summary Judgment DE 193

A.    Plaintiffs' Contentions

    1.    Estoppel:  Simoni is estopped from asserting claims that are inconsistent with his own prior sworn testimony that he had not been promised any compensation for his services.

    2.    Laches:  Simoni's claims are barred by the doctrine of laches because:

        a.    he did not present his claimed hours in a timely manner so Plaintiffs could seek to have them paid by the lead law firms in accordance with Plaintiffs' agreements with those firms or

        b.    he did not present his claimed hours in a timely manner so they could be included in fee petitions to the Court.

    3.    Barred As Against Public Policy:  Simoni's claims are based on an alleged agreement to split or share legal fees and therefore barred by public policy.

B.    Defendant's [Simoni] Response DE 202 and Contentions

    1.    Issues of Fact:    Issues of fact preclude summary judgment in favor of Rich.

    2.    Estoppel: Estoppel should be denied because:

        a.    Simoni claims do not run contrary to his prior testimony.

            i.    His deposition testimony to the effect he was not promised money or gifts from "any of the plaintiffs firms in this case" was not referencing Rich, but instead was referencing the outside plaintiffs'

law firms.

     ii.     Simoni did not consider Rich as a plaintiff's counsel.

     iii.     There is a question of fact as to what was Simoni referring to when he answered the question with the term "Plaintiffs' firms" in it.

    b.     Simoni's affidavit attached to his response raises questions of material fact that preclude summary judgment.

    c.     Simoni's testimony did not mislead Rich.

    d.     Simoni's testimony was not an attempt to intentionally mislead the court to get an unfair advantage.

3.     Laches:   Simoni's claims against Rich are not barred by laches because:

    a.     Rich cannot prove unreasonable delay.

    b.     Rich cannot prove he suffered disadvantage [prejudice].

4.     Barred as against public policy:

    a.     Simoni is not seeking a percentage fee split.

    b.     Discussion of percentage fee split only formed the basis of Simoni's expectation of compensation.

    c.     Simoni's claims are based on "quantum meruit."

C.     Plaintiffs' Reply  De 208

1.     Estoppel:

    a.     Simoni's *post hoc* revelation by affidavit that he was not referring to Rich but instead to "plaintiffs firms" when he answered deposition questions is incredulous.

b. Simoni's answer of "no" to the question "Were there any promises of any money or gifts made to you concerning this litigation prior to the late summer of 2003?" contradicts his present assertion that he was referring only to "plaintiffs firms" because the affiliation with Levin did not start until 2003 and therefor he had to be talking about Rich.

c. In another section of his deposition Simoni testified he was not being paid by Rich or any other firm as a consultant in the Westinghouse and WVU cases.

d. Simoni's testimony was relied on by Judge Bedell in his discovery dispute ruling when he found Simoni to be a sociology professor at WVU and a volunteer "community activist who raised awareness of the potential claims arising from the environmental contamination in Spelter, West Virginia and encouraged potential plaintiffs to advance their claims."

2. Laches:

a. Simoni's discussions with Rich were only about an unlawful splitting of fees; both Simoni and Rich knew an agreement to split fees was unenforceable; and that discussions between Rich and Simoni about a future splitting of fees contingent on Simoni passing the bar and becoming a licensed attorney never materialized because Simoni failed to pass the bar examination.

b. Simoni never discussed being compensated on an hourly basis.

c. Simoni kept no contemporaneous time records; never discussed an hourly rate; and never sent any invoices

3. Barred by public policy:

    a.      Simoni's claim was never made for anything other than a fee split.

    b.      Simoni cannot now convert an unlawful fee arrangement into a lawful claim.

## II.
## Third-Party Defendants'[1] Motion For Summary Judgment DE 200

A.     Baren *et als* contentions:

    1.     Agreement between Rich and Simoni was for fee splitting and they knew it was unenforceable.

    2.     Simoni had no expectation of payment.

    3.     Statute of limitations has run on Simoni's claims based on agreement to split fees.

B.     Simoni's Response in Opposition DE 211

    1.     Discussions were about getting compensation and centered on fee split as a way to accomplish that goal.

    2.     Simoni had an expectation of payment.

    3.     Statute of limitations did not run because Simoni's claim is for wind up of joint venture or partnership using quantum meruit.

## III.
## Defendant, Counter-Plaintiff's [Simoni] Motion For Summary Judgment DE 194

A.     Simoni's Contentions:

    1.     There is no triable issue of fact with regard to the issue of whether Simoni is entitled to compensation from Rich.

---

[1]Third-Party Defendants will be referred to as "Baron *et als*" except where necessary to identify one or another of them. Third Party Defendants were granted leave to file a memorandum of law in support of summary judgment in favor of Rich. They did so arguing the statute of limitations defense pled by Rich in the answer but not argued by him in the motion for summary judgment.

      a.     Rich admits Simoni contributed to the Philips/Westinghouse and the Spelter lawsuits successes.

      b.     Rich admits not having an objection to paying Simoni lawfully for the contribution.

2.    Simoni does not now seek compensation based on an unlawful and unethical fee split but instead seeks reasonable compensation.

      a.     Fee splitting was never a viable option because Simoni was not licensed to practice law.

      b.     Simoni had a general understanding he would share the benefits from the two cases 50/50.

           i.     Benefits meant money.

           ii.     How much and what form were details he did not initially contemplate.

3.    There is no issue to be decided in the declaratory judgment action as there is no issue of splitting fees because to do so would be unethical and is prohibited by law.

      a.     Simoni's counterclaim against Rich does not seek a fee split.

      b.     Simoni's counterclaim seeks "compensation as a means to prevent the inequity that would otherwise result from the failure on the part of the Rich Parties to reasonably compensate Dr. Simoni after reaping the substantial benefits of his work and expertise."

      c.     Court by order [DE 29] dismissed any "claim purportedly based on implied agreement to split attorneys' fees as moot.

        d.      Simoni seeks compensation based on quantum meruit.

## IV.
## Facts

For the purpose of the within analysis, the undersigned takes the following facts in the light most favorable to Simoni.

Simoni, a Ph.D. in sociology, is a former professor in West Virginia University's Department of Sociology and Anthropology (DE 193-2, p. 14: 9-18, Complaint, DE 1, p. 3; Answer, DE 35, ¶. 3)[2].

Simoni attended and graduated from West Virginia University College of Law with a J.D. degree in 1994 or 1995 (Amended Counterclaim, DE 35, ¶ 1, DE 193-2, p.14: 20-25, DE 193-4, p. 16:1-3[3]).

---

[2]Citations are to the record on CM/ECF and to transcripts Appended hereto as Appendixes. During preparation of this report and recommendation, because of the limits counsel placed on the citations in their briefing and the fact that deposition testimonies are not ordinarily filed, in order to gain a more complete understanding of the facts, the undersigned magistrate judge drew from all sources.

[3]Simoni provided testimony under oath on two separate occasions. The first was a December 12, 2006 deposition in the Spelter case. During the deposition a discovery dispute arose. The issue in dispute was: Whether or not Simoni was a consultant for two firms investigating the Spelter case in 2002 and 2003 and therefore shielded by work product from being required to testify concerning matters during that period. The dispute filed by Du Pont was referred to a discovery commissioner by Harrison County Circuit Court Judge Bedell. A hearing was held on April 17, 2007. The discovery commissioner recommended and Judge Bedell Ordered Du Pont's motion to compel granted finding that: 1) during the time period involved Simoni "served as a community activist who raised awareness of potential claims arising from the environmental contamination in Spelter, west Virginia and encouraged potential plaintiffs to advance their claims" and 2) that Simoni's counsel who was also counsel for the Spelter plaintiffs had failed to carry the required burden of proving Simoni was a consultant (DE 193-2, p. 7). The second was his two day deposition in the instant litigation, to wit: June 11 and 12, 2013. Excerpts from each of the testimonies are attached as exhibits to each party's brief filed with respect to the pending motions. The undersigned has used some or all of the excerpts in the facts set forth herein.

During law school Simoni passed the course on professional responsibility (Simoni testimony Tr. 6-12-13, p. 15: 18-16.3). Simoni unsuccessfully sat for the bar exam four times (DE 193-4, p. 7:10-13). He did pass the MPRE (Multistate Professional Responsibility Exam) twice. *Id.* at p. 218:20- 219:2). The last time Simoni failed the bar exam was 2002 (DE 193-4, p. 8:1-7). He did not attempt to take it again after that date. Simoni is not now nor was he at any time pertinent to the facts of the within litigation licensed to practice law in West Virginia or any other state (*Id.* at p. 8:7-13, Complaint ¶¶ 11-12, Answer ¶¶ 11-12).

During law school Simoni learned from his ethics course that it was not ethical for a lawyer to split fees with a non-lawyer. Simoni knew this before 2002 (DE 194-3 p. 4 - 289:6-290:13).

Simoni met Gary Rich sometime in the mid 1990's in a courtroom where he was observing a friend or acquaintance, attorney Larry Harless, practice before the court (DE 194-3 p. 3-284:5-285:5).

While at West Virginia University (WVU), people spoke with Simoni about asbestos related problems at the school. Simoni spoke to Larry Harless about the asbestos problem and encouraged him to take a serious look at it (DE 200-2, p. 32:4-15).

Harless suggested getting attorney Gary Rich to meet with them on the asbestos problem. As a result, a meeting took place with Rich, Harless and Simoni either before November 1999 or in November 1999 at the Econo Lodge in Fairmont, West Virginia. Harless prepared an agreement for sharing of fees between Harless, Rich and Simoni. Simoni has no recollection of the document and did not know of its existence until he heard Rich mention it in his deposition in the instant case (Appendix-C, p. 223:23-p.224:9, DE 200-2, p. 10:22-24 and p. 11: 7-10).

At some point Harless decided not to be a part of the litigation because Rich and Simoni

wanted to bring in outside law firms (Appendix-C, p. 43:5-16).

At a November 1999 meeting held in Gary Rich's home, Rich consented to become involved in the WVU asbestos case. Simoni describes a working agreement he and Rich made. (Appendix-C, p. 35:18-p. 40:1, p. 42:11-p. 45: 9). Simoni testified it was his "understanding at that time was that we were agreeing to work on the case together, on the WVU asbestos case, and that we would share the benefits half/half, 50/50" (Appendix-C, p. 35:18-36:3, p.225:22-p.226:17). Simoni explains in his deposition that he expected to receive 50 per cent "of whatever Rich received" through Rich's contract agreement with Bob Sweeney of an out of state law firm and other lawyers involved in the WVU asbestos case (Appendix-C, p. 53:16-22)[4]. The only case they were involved in at that time was the WVU asbestos case (Appendix-C, p. 45:10-23). There was no discussion of a division of labor between Rich and Simoni during the meeting (Appendix-C, p. 45:24-46:3). The details of any agreement between Simoni and Rich were not clear in November 1999. Simoni testified he believed both Harless and Rich understood he was not a licensed attorney. (DE 200-2, p.13:1-3). Simoni knew and understood from his law school ethics course his taking and passing the MPRE that it was unethical for a lawyer to split fees with a non-lawyer and even though he held a JD as WVU law school graduate, he was not a licensed lawyer (Appendix-C, p. 289:18-24, p. 290:4-13).

As noted above, Rich and Simoni agreed to seek an outside firm with the resources to handle the WVU asbestos case.

Simoni thereafter made the contacts with prospective law firms (Appendix-C, p.40:21-p.42:4).

_____

[4]This understanding of the split must have been formulated by Simoni sometime after the meeting in Rich's house because Sweeney, the outside firm lawyer, had not yet been brought in to the WVU asbestos case.

As time went on Simoni brought to Rich's attention potential cases which later evolved in to the Westinghouse Philips case out of Fairmont, WV and the Spelter Smelter case arising out of Harrison County, WV.   Rich became involved in each of those cases.

In each of the cases, Simoni performed a similar roll.  Simoni researched on line for attorneys who may be able to investigate and prosecute such cases. Simoni met with representatives of each of the firms and went to the sites and meetings with the claimants in each of the cases.  Simoni met with the potential claimants in each of the cases.  Simoni drafted but did not sign correspondence to the attorneys in the cases.

In April 2002 during a meeting between Simoni and Rich which started in Rich's office and was moved outside to avoid the possibility of being under surveillance, Simoni testified Rich told him he was reducing Simoni's share "from 50 per cent to 20 per cent relative to both the WVU and Fairmont cases.  Simoni testified Rich was upset that Simoni had mentioned to students that they might have asbestos exposure claims.  Simoni considered Rich's reduction of the percentage as punishment (Appendix-C, p. 97: 22-p. 101:18, , p.227:15-24-p.228:7).

During his deposition, Simoni characterized his relationship with Rich as a joint venture over several cases (Appendix-C, p. 111:10-17, p.229:22-p.230:7).  Simoni rejected any suggestion that he was an outside consultant for Rich and never had any understanding that he was included as a consultant (Appendix-C, p.117:2-6 and p. 118:16-18).  He called himself a "working partner with Gary Rich" (Appendix-C, p. 117:6-7).

In the summer of 2002 Rich and Baron & Budd and Masry & Vititoe discussed a change of fee agreement between the outside attorneys and Gary Rich as the inside attorney.  Rich was not happy with the proposed change in his compensation (percentage of the overall contingency fee split

being proposed by the two outside firms). John Simoni, a New York lawyer and nephew of Joseph Simoni, represented Rich for a period of time in this dispute. During a meeting between Joe Simoni and John Simoni, Joe Simoni wrote a note indicating Rich and the out of town lawyers were discussing a 30% or a 20% fee split or some sort of buy down of Rich's interest in the cases existing at that point. Under the proposal whatever compensation Rich was to get, he (Rich) was to pay the taxes. After payment of the taxes he (Rich) "splits after tax dollar 50/50 as- - I think as payoff for consulting, investigation, organizing, client rapport, et cetera, not for practice of law" (Appendix-C, p. 122:13-p.124:15). Simoni's note further set out "the paid consultant, investigator, organizer, pays taxes on the amount received" (Appendix-C, p. 124:12-19)[5].

Later, In December 2002 during a trip to meet with Dan Marino, another attorney representing Rich in the fee dispute with Baron & Budd, Simoni and Rich stopped so Simoni could return a call to Baron & Budd. During the call Simoni was asked by a Baron & Budd attorney where he would stand if Rich was cut out. Simoni expressed his support for the people of Fairmont and for Rich. As a result Rich said he was going back to the 50/50 split (Appendix-C, p. 132:22-p.133:22, p. 230:17-p. 231:17).

A year later, on December 10, 2003, Simoni and Rich met in Waynesburg, PA and during a stop at a coffee shop Rich told Simoni he was changing the agreement from 50/50 split to 80/20 split. Simoni reacted by going outside and crying (Appendix-C, p. 148:17 - p. 152:6).

June 2005 on the rail trail path in Star City Riverfront Park, WV, Simoni conversed with Rich about honoring the 20 percent compensation for the work Simoni had done. Simoni interpreted

---

[5]This notation by Simoni seems to be a direct contradiction to his earlier protestation to any suggestion that he was an outside consultant (*supra* at Appendix-C, p.117:2-6 and p. 118:16-18).

his sticky notes made after the meeting to mean that: 1) Rich said he appreciated the role Simoni had played; 2) Rich said he could not have done it alone; 3) Rich said he would honor the 20 percent agreement; 4) Simoni might have to take his compensation as an employee of Rich's while in Florida buying property for Rich or Rich making loans to Simoni and then forgiving the debt. (Appendix-C, p. 152:20-p. 155:13). Simoni's expectation was that he would "Not be paid any compensation on the WVU case, the Fairmont case, or the Spelter case until all three cases had resolved" and if any one or all of them did not resolve in favor of the plaintiffs he would receive nothing for the case or cases that did not resolve favorably (Appendix-C, p. 158:16-p. 159:2 and p. 173:14-17). He later explained that "our understanding was that when one case settled out, then there would be an expectation of sharing of benefits (Appendix-C, p. 161: 10-20). Simoni never asked Rich for a compensation agreement in writing because he felt he and Rich had an agreement (Appendix-C, p. 168:11-19).

A few days after the June 2005 Star City meeting, Rich and Simoni met in Morgantown, WV outside of Rich's office near the Hotel Morgan. At that time Rich asked Simoni to look through his calendars for dates and work that Rich might have missed; Rich told Simoni that it didn't make much sense for Simoni to file time for the WVU asbestos case; and Rich talked more to Simoni about Dan Levitan, a Florida realestate developer through whom Simoni could work and get paid. (Appendix-C, p. 174:4-15).

According to Simoni the WVU asbestos case settled in January 2006 (Appendix-C, p. 160:10).

Within a period of six months around the January 2006 settlement of the WVU case, Simoni talked with Bob Sweeney about being compensated for the work he did in the WVU asbestos case

because "it appeared like [he] would not get anything from all of the work [he] did on the WVU asbestos case" (Appendix-C, p. 56:22-p. 58:11 )[6].

June 27, 2007 Simoni called Rich and talked to him about it being 17-18 months since the WVU asbestos case settled and he hadn't heard anything from Rich about the compensation he was due under their agreement. Rich denied Simoni had an agreement to share in the favorable outcome of the WVU asbestos case. Simoni asked Rich if what Rich had said was the extent of their agreement to which Rich said "yes" and Simoni told him that he knew how to get in touch with him and hung up (Appendix-C, p. 189:5-p. 193:13). Simoni testified "I didn't have any communication with him [Rich]. I don't recall further communication. I, mean there might have been some that I don't recall but..." (Appendix-C, p. 196:23-p.197:6).

Simoni gave a deposition in the Spelter case that started in December 2006 (Appendix-A). The deposition was continued in the summer of 2007 after a ruling by Judge Bedell on discovery disputes raised during the December 2006 session of the deposition[7]. During the summer of 2007

---

[6]Simoni was paid something out of the WVU asbestos case based on his invoice submitted to Sweeney and processed as part of the settlement.

[7]in the underlying state court Spelter case during a discovery deposition, Simoni, on advice of counsel representing him during a deposition, took the position he was not required to testify and his testimony, the scope of his testimony, and his duty to produce documents were limited to certain matters by the work product doctrine and the attorney-client privilege because he was a non-testifying consultant of the Masory firm and later the Levin firm.

The discovery dispute arising from Simoni's refusal to give deposition testimony relative to certain subject matters was argued before a state court discovery commissioner and decided by the presiding State Court Judge, the Honorable Thomas Bedell.

By order dated July 6, 2007, Judge Bedell adopted the discovery commissioner's Findings of Fact and Conclusions of Law and Granted DuPont's Motion To Compel (DE 193-3, Ex. B, p. 1-15). On page 9 of the Order, Judge Bedell made specific findings of fact of which findings 1, 2, 3, and 4 are pertinent to the analysis of the issue now before this Court. Those findings are set out verbatim as follows:

    1.    Dr. Joseph Simoni was an activist who was instrumental in rasing [sic] community awareness of the environmental contamination in Spelter, West Virginia, and he also located law firms to investigate and advance

the claims of persons who were damaged by the environmental contamination. His actions resulted in the filing of the complaint in the above referenced case.

2.  Although the Plaintiffs claim that Dr. Simoni's duties changed in the late summer of 2003 so that he became a consultant of Plaintiffs' counsel, the Plaintiffs have failed to prove that he actually served in that capacity. The Plaintiffs have failed to produce any document or agreement that supports this conclusion and have not identified with sufficient certainty the time at which he was engaged by Plaintiffs' counsel in the capacity as a non-testifying consultant. Further, the only duties outlined with any specificity are his assistance with experts, and the Plaintiffs have correctly recognized that these duties are an allowable topic of discovery.

3.  Although Dr. Simoni has been referred to as a non-testifying consultant, the Plaintiffs have not argued or submitted evidence to conclude that Dr. Simoni served as an expert, either as a testifying or non-testifying expert, within the meaning of Rule 702 of the West Virginia Rules of Evidence. Therefore, Rule 26(b)(4)(B) of the West Virginia Rules of Civil Procedure does not provide a basis to limit his deposition.

4.  Because the Plaintiffs have failed to prove that Dr. Simoni served as a consultant to Plaintiffs' counsel, the Plaintiffs have failed to establish that the attorney-client privilege or work-product doctrine shields documents or communications from disclosure or would otherwise limit the topic of Dr. Simoni's deposition. *See* Syl. Pt. 4, <u>Canady</u>, 194 W.Va. 431, 460 S.E.2d 677.

These as well as other findings made by Judge Bedell are supported by excerpts from the Simoni December 12, 2006 deposition in the Spelter case (all citations are to a digital copy of the deposition appended hereto as "Appendix-A").

1.  Mr. Medina: Before we begin, I need to make some announcements at the beginning of the deposition. ... Dr. Simoni is a non-testifying consultant to Levin, Papantonio, pertaining to Spelter matters, including Perrine and Drummond (Appendix-A, p. 5:17-22).

2.  In addition, Dr. Simoni was, during a portion of 2002, a non-testifying consultant to the Masry law firm pertaining to Spelter (Appendix-A, p. 6:3-6).

3.  In addition, Dr. Simoni is a non-testifying consultant to the Masry law firm pertaining to Westinghouse matters. This consulting relationship has existed since approximately 2000, and is continuing (p. 6:10-14).

4.  He indicated to me that he felt that that was a confidential, non-testifying consulting relationship, just like the work for Masry with respect to Spelter. He doesn't intend to testify about the Spelter work, nor the Westinghouse-related work. My instructions to him are with respect to the Spelter work. He, in his own obligation to the Masry firm and to the plaintiffs in the Westinghouse case, intends to keep confidentiality (Appendix-A, p. 16:12-22).

After a series of objections by counsel and sparring between counsel and Simoni over the meaning of certain words used in deposition questions, Mr. Medina provided the following clarification relative to instructions to Simoni on handling questions about his relationship with Rich:

> MR. MEDINA: The Masry relationship, we gave him an instruction on, and I can clarify with Dr. Simoni that we are not instructing him not to answer about any relationship with Gary Rich.Now, he may have some understanding about that, that we don't; but I have spoken with Mr. Rich, and Mr. Rich's position is they did not have a consulting relationship. So, we are not instructing Dr. Simoni not to answer those types of questions relating to those periods of time. I can talk about it with Dr. Simoni further off the record, but we're not instructing Dr. Simoni to not testify about his relationship with Mr. Rich, other than those periods of consulting (Appendix-A, p. 43:22-p. 44:13).

Simoni described his relationship with Rich as one of "collaboration" during a part of the involvement with Westinghouse and they claimed because of a consulting relationship with Masry, he could not testify:

> My collaboration with Mr. Rich,okay, at one point involved Westinghouse. So, at that – And, at that time, it was involved -- I was involved with a consulting relationship with Masry & Vititoe, which Mr. Medina has referred to before; and, so, at that – At that point, my understanding would be that Mr. Rich was part of that -- that legal team with which I had, you know, a consulting relationship with; and, so, I think that would be an area that would be covered by the privilege (Appendix-A, p. 47: 5-16).
>
> Q. Okay. Have you and Mr. Rich collaborated on litigation matters other than Westinghouse, WVU,and Spelter?
> A. On litigation matters?
> Q. Yes.
> A. And what were the ones you mentioned? WVU --
> Q. Westinghouse and Spelter.
> A. And Spelter. No (Appendix-A, p. 48:3-12).
>
> A. I think you asked me how I knew about – if I knew about Levin & Papantonio before Mr. Medina and Mr. Slickman came to Morgantown. And I said yes, Joseph Simoni December and you asked me how, and I said general online surfing law firms.
> Q. Okay. So, is it accurate to say that you and Mr. Rich were looking on the Internet for plaintiffs' law firms that specialized in environmental litigation?
> A. Yes (Appendix-A, p. 48:23-49:7).

Simoni first met with the Spelter group without Rich. At the second meeting, sometime in January 2001, Rich was with Simoni when they met with the people from Spelter who were interested in finding out more with respect to whether there were any future effects from the "pile."

At that meeting according to Simoni, he and Rich represented themselves to the Spelter group as follows:

> A. And I say "we," because he spoke some and I spoke some. You know, I told people that I was a – I was a faculty member at the University, and I was just there helping, that I wasn't a lawyer, and I didn't know -- you know, I didn't have any expertise or special knowledge having to do with environmental stuff.
>
> And Gary said the same thing, that – except that he was a lawyer, but that he didn't have any expertise in evironmental stuff, he -- he didn't have any legal practice experience with environmental stuff, you know, that he -- that wasn't anything that he -- that he had any expertise in.
>
> And what he told them, what was discussed, was that if they were interested, if they were interested, if they wanted to, what we hoped to be able to do, not -- no guarantees, but what we hoped to be able to do was to find a law firm out there who could come out, who would be willing to come out to that area, or come into that area and investigate and find out if there was a problem, and -- I guess come in and find out if there was a problem, and let them know if there was a problem that they needed to be concerned about.
>
> ....
>
> Q. Yeah. Was there a reason why you were telling the people in Spelter that you would have a plaintiffs' firm come in to investigate to see if there was, in fact, a problem, instead of environmental agencies, state or federal environmental agencies coming in to investigate to see if there was a problem?
>
> ...
>
> A. Yes.
>
> Q. What was the reason?
>
> A. The reason was that we both felt that an experienced firm that had the resources and the ability, experience to investigate such a matter, would provide the best protection for the people in the community (Appendix - A, p. 197:24 - 200:5).

With respect to compensation from the plaintiffs' firms in the Spelter, Westinghouse litigations Simoni testified:

> Q. Have you ever received any money or gift from any of the plaintiffs' firms in this litigation?
>
> A. No.
>
> Q. Have you ever received the promise of any money or gift from any of these plaintiffs' firms concerning this litigation?
>
> A. Well, as I'm understanding your question, that's an area that would involve communications with the law firms; and if I'm following this whole thing correctly, that would be part of my relationship – working relationship, and, therefore, would be a privileged area. I mean, unless I'm mistaken about that; but I think that's correct.
>
> Q. Were there any promises of any money or gifts made to you concerning this litigation prior to the late summer of 2003?

session of Simoni's deposition attorney Keith Givens made clear to Simoni that he was not representing Simoni in the deposition (Appendix-C, p. 201:1-p. 203:10). Feeling that he was being "left out to dry" and being "concerned about whether [he was] actually going to be - - whether the agreement's going to be held up in two-thousand - - in summer of 2007" Simoni told Givens of the Cochran law firm about his compensation deal with Rich (Appendix-C, p. 203:9-p. 2004:22).

---

A. No (Appendix-A, p. 58:19-59:10).

Q. Did you request a fee from plaintiffs' counsel, outside your consulting relationship with them?
A. A fee?
Q. Yes; a fee in connection with this litigation.
A. No (Appendix-A, p. 105: 6-12).

Q. We talked about whether or not you were paid any referral fees, or other fees, or given any money or gifts by the plaintiffs' counsel; but I haven't asked you whether or not anything has been
paid to any members of your family.
A. If it happened, they sure didn't tell me about it (Appendix-A, p. 105:13-19).

Q. Did you receive any compensation from Mr. Rich or anyone else in the Westinghouse and WVU cases?
A. No (Appendix-A, p. 188:1-4).

In response to the examiner question that Rich was a plaintiff's lawyer, Simoni explained:

A. I wouldn't term Mr. Rich a plaintiffs' lawyer. I would term him – I think his -- his major experience at the time, that I was aware of, was immigration law.
Q. He does plaintiffs' work, does he not?
A. Oh, he's been involved with plaintiffs' work.
Q. In fact, you mentioned he was involved in the asbestos work against West Virginia University; is that correct?
A. What I'm saying is, at the time that I met Mr. Rich, before the University asbestos case developed, what I understood was his legal practice was immigration law. So, I – That's why I -- I answered I wouldn't maybe necessarily term him to have been a plaintiffs' lawyer (Appendix-A, p. 202:6-22).

Givens later called Simoni at Simoni's request and told him how the fall 2007 trial of the Spelter case had come out (Appendix C, p. 207:15-p. 208:8).

Christian Campbell with the Cochran law firm sent an email to Simoni and others Simoni recognized as associated with the Spelter case requesting: "...please make sure you have submitted all final invoices to our office concerning the above-referenced case." Simoni did not send invoices of ask anyone if he should send invoices (Appendix-C, p.208:9- p. 211:17). However, Simoni did submit an invoice on behalf of his wife for assisting in property access work of the geologist (Appendix-C, p. 212:17-24).

Simoni did not maintain contemporaneous time records for any of the work he did on any of the three cases (Appendix-C, p. 172:6-14). Simoni testified Rich never told him to keep records and never suggested to him that he needed to keep records of the time he spent (Appendix-C, p. 171:21-23). Simoni testified Rich never told him he would have to rely on quantum meruit to get paid for work he was doing on the cases.

## VI.
## DISCUSSION

### A.    *Summary Judgment Standard*

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, a court reviews all evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). It must limit its inquiry solely to a determination of whether

genuine issues of triable fact exist.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has made this necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted).  The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment; rather, the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party.  See id. at 248-52.  When considering cross motions for summary judgment, as is the case here, the court "must review each motion separately on its merits 'to determine whether either of the parties deserves judgment as a matter of law.'"  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris, Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997).

The undersigned finds it unnecessary to discuss summary judgment further until the following two issues of law are resolved: 1) whether  West Virginia Rules of Professional Conduct 5.4(a) and (b) constitute a statement of public policy the violation of which constitutes a violation of law,  and 2) whether West Virginia law applies the date of discovery rule or the last work done rule as the date triggering the running of the statute of limitations on quantum meruit and related unjust enrichment claims.

**B.**     ***Statute of Limitations for Simoni's Quantum Meruit and Unjust Enrichment Claims***
   **1.**     ***Public Policy Enforceable As Law***

In their Memorandum in Support of their motion for summary judgment, Baron *et als* first

allege that the applicable statute of limitations bars all of Simoni's claims. (DE 200-1 at 12.) Specifically, they argue that as to Simoni's claim for quantum meruit, the five-year statute of limitations runs from the date Simoni last rendered services, and that the discovery rule is not applicable to save Simoni's claim. (Id. at 17.) Baron *et als* then state that even if the discovery rule applied, Simoni's quantum meruit claim would still be untimely. (Id. at 18.) Furthermore, they argue that Simoni's claim for unjust enrichment is duplicative of his quantum meruit claim and therefore is also untimely. (Id. at 22.)

In order to escape the possibility that his quantum meruit and unjust enrichment claims may be untimely, Simoni argues that a joint venture existed between himself and Rich. Specifically, Simoni claims that because a joint venture existed, the applicable statute of limitations allows him to bring those claims within five years from the cessation of the dealings in which he and Rich were interested. (DE 211 at 6-10.) He asserts that he had five years from the cessation of the Philips and Spelter cases within which to file his claims for compensation. Simoni further argues that the discovery rule is applicable to his quantum meruit claim. (Id. at 10-14.) He admits that unjust enrichment and quantum meruit are similar legal claims. (Id. at 17.)

The undersigned agrees with the parties that Simoni's quantum meruit and unjust enrichment claims are based upon an implied contract. Accordingly, a five-year statute of limitations applies. See W. Va. Code § 55-2-6. That code section provides:

> **Every action to recover money**, which is founded upon an award, or on any contract other than a judgment or recognizance, shall be brought within the following number of years next after the right to bring the same shall have accrued, that is to say: If the case be upon an indemnifying bond taken under any statute, or upon a bond of an executor, administrator or guardian, curator, committee, sheriff or deputy sheriff, clerk or deputy clerk, or any other fiduciary or public officer, within ten years; if it be upon any other contract in writing under seal, within ten years; if it be upon an award, or upon a contract in writing, signed by the party to be charged thereby, or by his agent, but not under seal, within ten years; **and if it be upon any**

**other contract, express or implied, within five years, unless it be an action by one party against his copartner for a settlement of the partnership accounts,** or upon accounts concerning the trade or merchandise between merchant and merchant, their factors or servants, where the action of account would lie, **in either of which cases the action may be brought until the expiration of five years from a cessation of the dealings in which they are interested together, but not after.**

Id. (emphasis added). If an action is brought by one partner against another for settlement of the partnership accounts, the limitations period "does not begin to run until the partners have ceased doing the business of the partnership together." Barker v. Smith & Barker Oil & Gas Co., 170 W. Va. 502, 508, 294 S.E.2d 919, 925 (W. Va. 1982).

The Supreme Court of Appeals of West Virginia has defined a "joint venture" as an "'association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied.'" Armor v. Lantz, 202 W. Va. 672, 677, 535 S.E.2d 737, 742 (2000) (quoting Syl. Pt. 2, Price v. Halstead, 177 W. Va. 592, 355 S.E.2d 380 (1987)). While the Supreme Court of Appeals has likened a joint venture to a partnership, see Price, 177 W. Va. at 595, 355 S.E.2d at 384, a "partnership relates to a general business . . . while [a] joint adventure relates to a single business transaction," Nesbitt v. Flaccus, 149 W. Va. 65, 74, 138 S.E.2d 859, 865 (1964); see also Armor, 202 W. Va. at 678, 535 S.E.2d at 743 (collecting cases). Because of the similarities between the two, they are "governed generally by the same basic legal principles." Armor, 202 W. Va. at 678, 535 S.E.2d at 743. Accordingly, the portions of W. Va. Code § 55-2-6 regarding the limitations period for actions involving the settlement of partnership accounts between partners applies to actions between joint venturers for the settlement of their accounts.

While the Supreme Court of Appeals has "never formulated any broad analytical test by

which to determine the existence of a joint venture," id., it has noted certain distinguishing features

essential to its creation:

> As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers. . . . To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise . . . . An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint adventure, and it has been held that, at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. It has also been held, however, that the sharing of losses is not essential, or at least that there need not be a specific agreement to share the losses, and that, if the nature of the undertaking is such that no losses, other than those of time and labor in carrying out the enterprise, are likely to occur, an agreement to divide the profits may suffice to make it a joint adventure, even in the absence of a provision to share the losses.

Pownall v. Cearfoss, 129 W. Va. 487, 497-98, 40 S.E.2d 886, 893-94 (1946) (citations omitted); see

also Cunningham v. Herbert J. Thomas Mem. Hosp. Ass'n, 230 W. Va. 242, 253, 737 S.E.2d 270,

281 (2012) (quoting Pownall). When determining whether a joint venture exists, the Supreme Court

of Appeals focuses "primarily upon the presence or absence of an agreement to share in the profits

and losses of an enterprise." Armor, 207 W. Va. at 678-79, 535 S.E.2d at 743-44. The existence

of a joint venture is "normally a question to be answered by the trier of fact." Id., 207 W. Va. at

678, 535 S.E.2d at 743.

The question of whether Rich and Simoni had entered into a joint venture led the

undersigned to consider whether such a joint venture, if it existed, is void as against public policy.

As noted above, in support of his motion for summary judgment, Rich argues that Simoni's claims

for compensation are an attempt to seek enforcement of an alleged agreement between Simoni and

Rich to share any legal fees recovered as a result of the prosecution of the Philips and Spelter cases.

(DE 193-1 at 13-17.) Rule 5.4(a) of the West Virginia Rules of Professional Conduct states that "[a]

lawyer or law firm shall not share legal fees with a nonlawyer" unless one of four exceptions, inapplicable here, applies. If Rich had made such an agreement with Simoni, it would have been in violation of Rule 5.4(a). If this violation serves to void their alleged agreement, then they could not have entered into a joint venture, given the "absence of an agreement to share in the profits" of the prosecution of the Spelter and Philips cases. Armor, 207 W. Va. at 678-79, 535 S.E.2d at 743-44.

In his attempt to frame the relationship between himself and Rich as a joint venture in order to make his claims timely under the joint venture/partnership exception contained in W. Va. Code § 55-2-6, Simoni has ignored Rule 5.4(b), which prohibits a lawyer from "form[ing] a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law." Although Rule 5.4(b) is silent as to joint ventures, the Supreme Court of Appeals has likened joint ventures to partnerships. See Price, 177 W. Va. at 595, 355 S.E.2d at 384. Accordingly, the undersigned finds that Rule 5.4(b) equally prohibits lawyers from entering into joint ventures with nonlawyers if any of the activities of the joint venture consist of practicing law. Cf. Bebo Construction Co. v. Mattox & O'Brien, P.C., 998 P.2d 475, 477 (Colo. Ct. App. 2000) (noting that joint venture between law firm and corporation violated Colorado Rule of Professional Conduct prohibiting partnerships between lawyers and nonlawyers if the activities constituted the practice of law).

The Supreme Court of Appeals has defined "the practice of law" as follows:

In general, one is deemed to be practicing law whenever he or it furnishes to another advice or service under circumstances which imply the possession of [or] use of legal knowledge and skill.

More specifically but without purporting to formulate a precise and completely comprehensive definition of the practice of law or to prescribe limits to the scope of that activity, one is deemed to be practicing law whenever (1) one undertakes, with or without compensation and whether or not in connection with another activity, to advise another in any matter involving the application of legal principles to facts,

purposes or desires; (2) one undertakes, with or without compensation and whether or not in connection with another activity, to prepare for another legal instructions of any character; or (3) one undertakes, with or without compensation and whether or not in connection with another activity, to represent the interest of another before any judicial tribunal or officer, or to represent the interest of another before any executive or administrative tribunal, agency or officer otherwise than in the presentation of facts, figures or factual conclusions as distinguished from legal conclusions in respect to such facts and figures.

State ex rel. Frieson v. Isner, 168 W. Va. 758, 767, 285 S.E.2d 641, 649 (1981) (citation and internal quotation marks omitted).  Importantly,

the practice of law is not limited to the conduct of cases before courts, but also includes services rendered outside court such as

the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition conveyancing, the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law.

Id., 168 W. Va. at 768-69, 285 S.E.2d at 650 (citations omitted).

Rich has testified that the "primary focus of his relationship with Simoni [was] litigation." (Appendix-B at 79:5-6.)  As to the WVU asbestos case, Rich did not deny that "Simoni interfaced with clients, Simoni found documents, Simoni helped you work on this case."  (Id. at 106:18-21.) Rich further admitted that "with respect to the Spelter litigation Doctor Simoni participated in one or more early meetings with potential clients from the Spelter area and he generally encouraged individuals to consider the possibility of litigation."  (Id. at 213:22-214:4.)  When asked if Simoni had participated in the preparation of the complaint in the Philips case, Rich stated that Simoni had looked at it and had "marked it up."  (Id. at 253:24-254:8.)  Likewise, Rich admitted that Simoni "did a lot of research . . . on the issue of moving the [Philips] case from circuit court to this mass litigation panel that West Virginia has."  (Id. at 486:23-487:1.)

Simoni's testimony also supports the undersigned's finding.  He stated that he reviewed

"drafts of motions or pleadings" in the Philips case. (Appendix-C at 266:3-4, 396:14-16.) Simoni also testified that he discovered the Spelter case, that he was "the major party with respect to all of the investigation," and that he was "involved with turning up documents from different sources, West Virginia DEP, different agencies and so forth." (Id. at 304:9-21.) He was involved in finding plaintiffs' firms to prosecute these cases and in holding periodic meetings with the plaintiffs to communicate about litigation proceedings. (Id. at 366:5-9, 367:12-16.) Simoni stated that he "certainly did some legal research on filing fees, on statute of limitations, West Virginia cases having to do with environmental issues." (Id. at 400:18-21.) Such activities are reflected in Simoni's reconstructed time summary. (See generally DE 200-4.)

Given this testimony, the undersigned finds that any alleged joint venture between Rich and Simoni primarily involved "the practice of law." Their ultimate goal was the prosecution of the Philips and Spelter cases, and every task Simoni did was in furtherance of that goal. It is irrelevant that Simoni did not sign or file any pleadings or motions and did not appear in court on behalf of the plaintiffs. Rather, the undersigned finds that the activities described above involved "action taken for [the plaintiffs in the Spelter and Philips cases] in matters connected with the law." Isner, 168 W. Va. at 768-69, 285 S.E.2d at 650 (citations omitted) (alteration in original). Because Simoni was not a licensed attorney (Complaint, DE 1, ¶¶ 11-12, Amended Counterclaim, DE 35, ¶¶ 11-12), such a joint venture violated Rule 5.4(b) of the Rules of Professional Conduct.

The Supreme Court of Appeals has not yet determined "whether violation of a rule of professional conduct constitutes a public policy violation." Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP, 231 W. Va. 577, __, 746 S.E.2d 568, 580 (2013) (Loughry, J., concurring) (hereinafter "Gaddy"). In Gaddy, the Supreme Court of Appeals considered whether the Circuit Court for Roane County had correctly granted summary judgment in favor of the

defendants. Id., 231 W. Va. at __, 746 S.E.2d at 571 (per curiam). As noted by the court, "[t]he controversy at the center of [the] case stem[med] from Gaddy's allegation that Bowles Rice, through Mr. Lane, agreed to give the petitioner one third of any recovery it received for pursuing claims against Columbia." Id., 231 W. Va. at __, 746 S.E.2d at 572. Prior to filing a motion for summary judgment, the defendants had filed a motion to dismiss, arguing that "the doctrine of illegality stood as a bar to the enforcement of the alleged fee-sharing agreement in view of the public policy violation indicated by the Rules of Professional Conduct." Id., 231 W. Va. at __, 746 S.E.2d at 573. The circuit court denied the motion to dismiss, id., stating:

> The court is of the opinion, then, that the *W. Va. Rules of Professional Conduct* do not amount to positive statements of the law or of public policy sufficient to render the alleged fee-sharing agreement between Gaddy and Defendants void and unenforceable. In other words, these words do not define "illegal conduct" but do define "unethical conduct" for which an attorney may be disciplined or sanctioned by the Supreme Court of Appeals.

Id., 231 W. Va. at __, 746 S.E.2d at 580 (Loughry, J., concurring). On appeal, the Supreme Court of Appeals affirmed the grant of summary judgment for the defendants. Id., 231 W. Va. at __, 746 S.E.2d at 571.

Justice Loughry wrote a concurrence in Gaddy in which Justice Davis joined. Id., 231 W. Va. at __, 746 S.E.2d at 579. In his concurrence, Justice Loughry found it "necessary to write separately to fault the majority for its absolute failure to recognize the critical need–as the body charged with the responsibility to both oversee and enforce this state's rules of professional conduct–to address the illegality of a fee-sharing agreement between a lawyer and a nonlawyer." Id. (Loughry, J., concurring). By not deciding whether the West Virginia Rules of Professional Conduct, Justice Loughry believed that "the majority did a serious disservice to both the bench and the bar of this state." Id.

As noted in the concurrence, several other states have determined that rules of professional conduct for lawyers provide "declarations of a state's public policy" with the force of law. Id., 231 W. Va. at __, 746 S.E.2d at 580 (citing Fields v. Ratfield, No. A132766, 2012 WL 5359775, at *9 (Cal. App. 2012); Cruse v. O'Quinn, 273 S.W.3d 766, 776 (Tex. App. 2008); Evans & Luptak, PLC v. Lizza, 251 Mich. App. 187, 650 N.W.2d 364, 370 (2002); Brandon v. Newman, 243 Ga. App. 183, 532 S.E.2d 743, 747 (2000); Albert Brooks Friedman, Ltd. v. Malevitis, 304 Ill. App. 979, 238 Ill. Dec. 46, 710 N.E.2d 843, 846 (1999)). In addition, the Supreme Court of Indiana has reasoned:

> The Rules of Professional Conduct, as enacted by this Court, contain both implicit and explicit declarations of public policy. The Indiana Rules of Professional Conduct exist, to a large extent, as a means of protecting the interests of the public as potential clients. . . . These Rules and this Court's willingness to enforce them help ensure that the public is well served by the bar. Forces that undermine the standards on which the Rules of Professional Conduct are founded disserve the public by weakening the client-lawyer relationship. . . . Certain of the Rules are explicit declarations of what an attorney can or cannot do. They are cast in the terms shall or shall not. . . . Some of these imperatives concern agreements that an attorney can or cannot enter into. The Rules at issue in this case (Rules 5.4(a) and 7.3(f)) are such imperatives. Rules 5.4(a) and 7.3(f) are explicit judicial declarations of Indiana public policy and, akin to contravening a statute, agreements in violation of these rules are unenforceable. . . .

Trotter v. Nelson, 684 N.E.2d 1150, 1153 (Ind. 1997) (internal quotations and citations omitted), abrogated on other grounds by Liggett v. Young, 877 N.E.2d 178 (Ind. 2007); see also Gaddy, 231 W. Va. at __, 746 S.E.2d at 581 (Loughry, J., concurring) (quoting Trotter, 684 N.E.2d at 1153). Likewise, the Supreme Court of Alaska has implicitly held that its state bar rules governing professional conduct have the force of law. See Citizens Coalition for Tort Reform, Inc. v. McAlpine, 810 P.2d 162, 164-71 (Alaska 1991). At least two other courts have determined that the rules governing fee sharing between lawyers and nonlawyers are statements of public policy. See Post v. Bregman, 349 Md. 142, 168, 707 A.2d 806, 818 (Ct. App. Md. 1998) (holding that Maryland "Rule 1.5(e) does constitute a supervening statement of public policy to which fee-sharing

agreements by lawyers are subject, and that the enforcement of Rule 1.5(e) is not limited to disciplinary proceedings"); Belli v. Shaw, 98 Wash. 2d 569, 577-78, 657 P.2d 315, 319 (1983) (en banc) (refusing to enforce fee-sharing agreement that violated Washington's counterpart to Rule 1.5 because the client had not approved the agreement and because the referring attorney had done little or no work on the case.

Several federal courts have discussed the enforceability of various states' rules of professional conduct as statements of public policy. In 1990, the Northern District of Ohio considered "whether a fee-splitting arrangement between attorneys is enforceable when the actual contribution of an attorney in the case differs substantially from the proportion of fees to which he would be entitled under the agreement." Dragelevich v. Kohn, Milstein, Cohen & Hausfeld, 755 F. Supp. 189, 191 (N.D. Ohio 1990). The court noted that this issue was "governed" by the applicable provision of the Ohio Code of Professional Responsibility, id., and held that enforcement of such an agreement would violate that provision, id. at 194. The Fifth Circuit Court of Appeals, applying Louisiana law, has refused to enforce an alleged agreement between a referring attorney and an attorney who completed the majority of a work on a case because to do otherwise would violate Louisiana's Code of Professional Conduct. In re P & E Boat Rentals, Inc., 928 F.2d 662, 664-65 (5th Cir. 1991).

More recently, the Eastern District of Kentucky encountered an arrangement substantially similar to the one alleged to have existed between Rich and Simoni. See generally Martello v. Santana, 874 F. Supp. 2d 658 (E.D. Ky. 2012). In that case, Martello, a licensed physician, sought "to enforce purported oral and written contracts pursuant to which she would be paid a percentage of the attorneys fees recovered by Santana and his law firm, in exchange for her introduction of Santana to her patients/potential clients and for her medical legal consultation work on those

patient's/client's cases." Id. at 666. The District Court found that such an arrangement was "expressly prohibited by the Kentucky Rules of Professional Conduct governing the practice of law." Id. Although Dr. Martello argued that the Kentucky Rules were not statements of public policy, the District Court agreed with Santana that "the Kentucky Supreme Court, through its rule-making powers and oversight of the Kentucky Bar Association, sets the public policy in dealings between lawyers and non-lawyers." Id. at 670. Accordingly, "the public policy determinations reflected by the Rules should not be any less highly regarded because they are carried out by Rules promulgated by the Supreme Court rather than statutes enacted by the Legislature." Id. Given this, the District Court found that the purported contracts between Dr. Martello and Santana were void as against public policy. Id. at 672. The Sixth Circuit Court of Appeals affirmed and agreed with the District Court that the Kentucky Rules were statements of public policy. Martello v. Santana, 713 F.3d 309, 310, 313-14 (6th Cir. 2013).

Again, although several courts have held that their respective rules of professional conduct are statements of public policy that have the force of law, the West Virginia Supreme Court of Appeals has not yet rendered a decision regarding this issue. See Gaddy, 231 W. Va. at __, 746 S.E.2d at 579-80 (Loughry, J., concurring).

If the alleged joint venture between Rich and Simoni is void as against public policy because it violates West Virginia Rule of Professional Conduct 5.4(b), then the "cessation of the dealings" savings provision contained in W. Va. Code § 55-2-6 is inapplicable to Simoni's quantum meruit and unjust enrichment claims.

### 2.   *Date of Discovery or Date of Last Rendition of Services*

The Court would then need to determine when Simoni's quantum meruit and unjust enrichment claims accrued. As noted above, Baron *et als* argue that Simoni's claim began to run

on the date he last rendered services (DE 200-1 at 13-17), while Simoni argues that the discovery rule applies to quantum meruit claims (DE 211 at 10-14). The Supreme Court of Appeals has not yet determined which of these rules applies to such claims.

Under the discovery rule, the statute of limitations does not begin to run until a plaintiff knows, or by the exercise of reasonable diligence should know: (1) that he or she has been injured; (2) the identity of the entity who breached a duty to act with due care; and (3) that the conduct of the entity has some causal relation to the injury. See Harris v. Jones, 209 W. Va. 557, 562, 550 S.E.2d 93, 98 (2001). This rule recognizes "the inherent unfairness of barring a claim when a party's cause of action could not have been recognized until after the ordinarily applicable period of limitation." Id. Usually, the issue of whether a claim is barred by the applicable limitations period is a question of fact for the jury. Id., 209 W. Va. at 563, 550 S.E.2d at 99.

"[W]hile most jurisdictions have not ruled explicitly on whether the discovery rule should apply in *quantum meruit* cases, those that have addressed the issue have chosen not to utilize the discovery rule, but rather to employ a 'last rendition of services' test." Baer v. Chase, 392 F.3d 609, 622 (3d Cir. 2004). As the Baer Court reasoned, "[t]he essence of a quasi-contract claim is not the expectancy of the parties, but rather the unjust enrichment of one of them. It therefore would be inappropriate to look at Baer's expectations of payment, rather that at the services he provided Chase." Id. at 623. The undersigned's research has revealed that several federal and state jurisdictions employ the "last rendition of services" test to determine when a quantum meruit or unjust enrichment claim has accrued. See, e.g., Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC, 857 F. Supp. 2d 1294, 1308-09 (S.D. Fla. 2012) (citing Davis v. Monahan, 832 So. 2d 708, 710 (Fla. 2002)) (noting that Florida law rejects "the application of the delayed discovery doctrine to unjust enrichment actions"); Radon Serv. Agreement Corp. v. Radon Serv. Agreement, Inc., No. 3:04-CV-

370, 2005 WL 2086010, at *2 (S.D. Ohio Aug. 26, 2005) (stating that "'the discovery rule' does not apply to unjust enrichment claims brought pursuant to Ohio law"); <u>Zic v. Italian Gov't Travel Office</u>, 149 F. Supp. 2d 473, 476 (N.D. Ill. 2001) (citing <u>Rohter v. Passarella</u>, 617 N.E.2d 46, 52 (1993)) (quantum meruit "cause of action accrues upon presentment and subsequent rejection of a bill for services, or as soon as the services were rendered"); <u>GSGSG, Inc. v. New York Yankees</u>, 862 F. Supp. 1160, 1171 (S.D.N.Y. 1994) (citing <u>Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff</u>, 638 F. Supp. 714, 722 (S.D.N.Y. 1986); <u>Cnty. of Broome v. Bd. of Educ.</u>, 317 N.Y.S.2d 486, 489 (Sup. Ct. 1971); <u>Martin v. Camp</u>, 219 N.Y. 170, 177, 114 N.E. 46 (1916)) (noting that "a cause of action for quantum meruit begins to run when the final service has been performed"); <u>News World Comms. v. Thompsen</u>, 878 A.2d 1218, 1225 (D.C. Ct. App. 2005) (noting that <u>Baer</u> "represents the generally accepted approach" and determining that unjust enrichment claim accrued when plaintiff's last service was rendered and she was informed that she would not be compensated).

Nevertheless, Simoni is correct that some jurisdictions have held that the discovery rule applies to quantum meruit and unjust enrichment claims. The Eastern District of New York has noted that under New York law, causes of action for unjust enrichment and fraud "must be brought within six years of the commission of the fraud, or two years from the date the fraud could have been discovered, whichever is later." <u>State Farm Mut. Auto. Ins. Co. v. Rabiner</u>, 749 F. Supp. 2d 94, 104 (E.D.N.Y. 2010). Likewise, the Northern District of California has noted that under California law, quantum meruit claims are "typically subject to a two-year statute of limitations, with the cause of action accruing upon the plaintiff's discovery of the loss or damage." <u>Guards Polo Club Holdings Ltd. v. Reid</u>, No. 11-1817 SC, 2011 WL 3473378, at *8 (N.D. Cal. Aug. 9, 2011) (citing Cal. Civ. P. Code § 339(1)); <u>see also</u> <u>Taiwan Civ. Rights Litig. Org. v. Kuomintang Bus. Mgmt. Comm.</u>, No.

C 10-00362 JW, 2011 WL 5023397, at *2 (N.D. Cal. Oct. 13, 2011). Indiana courts have explicitly stated that the discovery rule applies to quantum meruit claims. See King v. Terry, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004). Furthermore, Colorado courts have suggested that this rule applies to quantum meruit claims. See Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP, 293 P.3d 55, 59-62 (Colo. Ct. App. 2011) (holding that a "withdrawing attorney's claim in quantum meruit against former co-counsel laboring under a contingent fee agreement cannot accrue earlier than the time when recovery occurs in the underlying litigation" and that the plaintiff's claim "accrued when it knew or should have known of the recovery").

As noted above, the Supreme Court of Appeals has not yet determined whether quantum meruit and unjust enrichment claims accrue on the date services are last rendered or whether the discovery rule applies to such claims.

The undersigned notes that this Court's sister district, the Southern District of West Virginia, has provided some commentary on this issue as regarding unjust enrichment claims. Specifically, the Southern District has "declined to apply the discovery rule to quasi-contractual unjust enrichment claims" brought under West Virginia law. HSBC Bank USA, Nat'l Ass'n v. Resh, No. 3:12-cv-00668, 2013 WL 312871, at *7 (S.D. W. Va. Jan. 25, 2013); Stand Energy Corp. v. Columbia Gas Transmission Corp., No. Civ.A. 2:04-0867, 2006 WL 162988, at *1-2 (S.D. W. Va. Jan. 20, 2006).

## C.    *Certification of Questions of Law*

West Virginia has enacted the Uniform Certification of Questions of Law Act, W. Va. Code § 51–1A–1, et seq., which provides, in pertinent part:

> The supreme court of appeals of West Virginia may answer a question of law certified to it by any court of the United States . . . if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no

controlling appellate decision, constitutional provision or statute of this state.

W. Va. Code § 51–1A–3. The Supreme Court of Appeals has recognized that the purpose of this statute is "to provide foreign courts with the benefit of [the Supreme Court of Appeals'] determination of West Virginia law" and "to resolve ambiguities or unanswered questions" in the same. Abrams v. W. Va. Racing Comm'n, 164 W. Va. 315, 317-18, 263 S.E.2d 103, 106 (1980) (internal quotation marks omitted). Indeed, where West Virginia's "substantive law is clear, there is no need to obtain certification under W. Va. Code, 51–1A–1, et seq." Morningstar v. Black and Decker Mfg. Co., 162 W. Va. 857, 861 253 S.E.2d 666, 669 (1979).

The provisions of the Uniform Certification of Questions of Law Act are discretionary for both the certifying court and the Supreme Court of Appeals. Abrams, 164 W. Va. at 317, 263 S.E.2d at 105; see also Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974) ("[Certification's] use in a given case rests in the sound discretion of the federal court."). The certified question must "be pertinent and inevitable in the disposition of the case below," Hairston v. Gen. Pipeline Constr., Inc., 226 W. Va. 663, 672 n.5, 704 S.E.2d 663, 672 n.5 (2010) (internal quotation marks and citation omitted), as the Supreme Court of Appeals "will not consider certified questions not necessary to the decision of a case", Zelenka v. City of Weirton, 208 W. Va. 243, 245, 539 S.E.2d 750, 752 (2000) (citing Shell v. Metropolitan Life Ins. Co., 181 W. Va. 16, 380 S.E.2d 183 (1989)). To that end, "certification requires 'a sufficiently precise and undisputed factual record on which the legal issues can be determined. . . . [and that] such legal issues . . . substantially control the case.'" Zelenka, 208 W. Va. at 245, 539 S.E.2d at 752 (alteration in original) (quoting Bass v. Coltelli, 192 W. Va. 516, 522, 453 S.E.2d 350, 356 (1994)).

The undersigned finds that the issue of whether the West Virginia Rules of Professional Conduct are statements of public policy with the force of law is "pertinent and inevitable" to the

disposition of whether Simoni's quantum meruit and unjust enrichment claims were timely filed. See Hairston, 226 W. Va. at 672 n.5, 704 S.E.2d at 672 n.5. If Rich and Simoni did enter into a valid joint venture, the limitations period did not begin to run until the "cessation of the dealings in which they are interested together." W. Va. Code § 55-2-6. As noted above, the undersigned has found that the overall object of the alleged joint venture was the prosecution of the Philips and Spelter cases, which equates to the practice of law. (See Appendix-C, 111:10-17.) Rich and Baron *et als* collected their respective fees from settlement of the Philips case on January 24, 2008 and their respective fees from settlement of the Spelter case on January 27, 2011. (Answer, DE 35, ¶¶ 54, 111.) Given this, the undersigned finds that the "cessation of the dealings" between Rich and Simoni dates to January 27, 2011. Accordingly, if the "cessation of the dealings" provision contained in W. Va. Code § 55-2-6 applies to Simoni's claims, Simoni needed to file them within five years from January 24, 2008, which he clearly did by filing his first Answer and Counterclaim on April 16, 2012 (DE 14).

However, if the "cessation of the dealings" provision does not apply to Simoni's quantum meruit and unjust enrichment claims , the undersigned finds that the question of whether his claims accrued at the time he last rendered services or whether the discovery rule applies to such claims is dispositive as to whether they were timely filed. See Hairston, 226 W. Va. at 672 n.5, 704 S.E.2d at 672 n.5. As to the Spelter case, Simoni's reconstructed time summary, last updated on June 6, 2013, shows that he last rendered services on June 14, 2005.[8] (DE 200-4 at 39.) Given this, Simoni would have needed to file his quantum meruit and unjust enrichment claims for the Spelter case by

---

[8]Simoni's reconstructed time summary contains entries attributed to the Spelter case that are dated subsequent to June 14, 2005. (DE 200-4 at 22-24, 39.) He did not attribute any time to those entries. However, the undersigned finds that the tasks memorialized in those entries were primarily to help Rich with his fee dispute with the other plaintiffs' firms and were not done for the benefit of the prosecution of the Spelter case. (Appendix-C at 412:10-413:20.)

June 14, 2010.  See W. Va. Code § 55-2-6.  He filed them on April 16, 2012 (DE 14); accordingly,

if this approach applies, they would be barred by the applicable statute of limitations.  As to the

Philips case, Simoni's reconstructed time summary shows that he last rendered services on July 27,

2005.[9]  (DE 200-4 at 17.)  Given this, Simoni would have needed to file his quantum meruit and

unjust enrichment claims for the Philips case by July 27, 2010.  See W. Va. Code § 55-2-6.

Accordingly, if the "last rendition of services" test applies, Simoni's claims for quantum meruit and

unjust enrichment are untimely.

On the other hand, if the discovery rule applies to Simoni's quantum meruit and unjust

enrichment claims, the five-year limitations period did not begin to run until Simoni knew, or by the

exercise of reasonable diligence should have known, that he was allegedly injured by Rich.  See

Harris, 209 W. Va. at 562, 550 S.E.2d at 98.  As noted above, Simoni characterized his relationship

with Rich as a joint venture for the prosecution of several cases.  (Appendix-C at 111:10-17, 229:22-

230:7.)  These cases included the Spelter case, the Philips case, and the WVU asbestos case.

(Appendix-B at 43:10-22.)  Simoni explained that his understanding with Rich "was that when one

case settled out, then there would be an expectation of sharing of benefits."  (Appendix-C at 161:10-

20.)  On June 27, 2007, Simoni called Rich and stated that it had been 17-18 months since the WVU

asbestos case had settled and that he had not heard anything from Rich about the compensation he

was due under their agreement.  (Id. at 188:23-192:13.)  Rich denied that he and Simoni had such

an agreement.  (Id. at 192:14-19.)  Rich also stated that he had been told by Levin Papantonio not

_____

[9]Again, Simoni's reconstructed time summary contains entries attributed to the Philips
case that are dated subsequent to July 27, 2005. (DE 200-4 at 18-20, 23-34.)  However, he did
not attribute any time to several of these entries.  Furthermore, the entries dated from 2007-2009
reflect Simoni's communications with Sue Fullen, a plaintiff in the Philips case, regarding her
individual settlement and his research regarding legal malpractice claims against the Fairmont
plaintiffs' lawyers.  (Id. at 18-20.)  Accordingly, the undersigned finds that the tasks
memorialized in these entries were not done for the benefit of the prosecution of the Philips case.

to talk to Simoni about any of the cases.  (Id. at 194:5-9.)  Simoni testified that after the call on June 27, 2007, he had no further communication with Rich.  (Id. at 196:18-23.)

Given this, the undersigned finds that if the discovery rule applies to Simoni's quantum meruit and unjust enrichment claims, then the five-year limitations period began to run on June 27, 2007, the date when Simoni reasonably should have known that he would receive no compensation from Rich.  Although the Spelter and Philips cases had not settled by then, Rich denied that he and Simoni had any type of agreement regarding compensation and that he had been told not to talk to Simoni about any of the cases.  (Id. at 192:14-19, 194:5-9.)  These statements should have put Simoni on notice that he could not depend on Rich to provide him with compensation for his work on these cases.  Accordingly, if the discovery rule applies, Simoni would have needed to file his claims by June 27, 2012.  As previously noted, he first filed them on April 16, 2012 (DE 14).  Under this scenario, then, Simoni's claims for quantum meruit and unjust enrichment are not time-barred.

In sum, there is substantial authority from other jurisdictions suggesting that a state's rules of professional conduct governing the practice of law are statements of public policy that enjoy the same force of law as statutes passed by a legislature.  Likewise, there is substantial authority from other jurisdiction supporting the application of either the "last rendition of services" test or the discovery rule to determine when quantum meruit and unjust enrichment claims accrue. Nevertheless, there is no clear and controlling West Virginia precedent to guide this Court's decision on the pertinent issue raised by the pleading and pending motion for summary judgment.  Moreover, there is no clear and controlling West Virginia precedent to guide this Court in the preparation of instructions of law to be included in any jury charge if the case were to proceed to trial.  The undersigned believes that the resolution of these questions could have far-reaching legal implications for the State of West Virginia.

Accordingly, because no controlling West Virginia appellate decision, constitutional provision, or statute appears to address the questions presented in this matter, the factual record on these issues is sufficiently developed, and the resolution of these questions would be determinative as to the timeliness of Simoni's quantum meruit and unjust enrichment claims, the undersigned finds that certification to the Supreme Court of Appeals is appropriate under W. Va. Code § 51-1A-3. The undersigned therefore recommends that the District Court certify the following questions to the Supreme Court of Appeals:

1. Are the West Virginia Rules of Professional Conduct statements of public policy with the force of law equal to that given to statutes enacted by the West Virginia State Legislature?

2. Do claims for quantum meruit and unjust enrichment accrue: (a) on the date that services are last rendered or (b) when the provider of services knew or reasonably should have known that he would not be receiving compensation?

As resolution of the certified questions is necessary in order to efficiently proceed in this case, the undersigned further recommends that the District Court stay the entire case pending issuance of the certification order and resolution of the questions. Accordingly, because a stay of the entire case is proper pending the resolution of certified questions, the undersigned declines to propose a recommended disposition for the remaining issues raised in the parties' motions for summary judgment.

## VII.  RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the District Judge **CERTIFY** the following questions to the Supreme Court of Appeals:

1. Are the West Virginia Rules of Professional Conduct statements of public policy with the force of law equal to that given to statutes enacted by the West Virginia State Legislature?

2. Do claims for quantum meruit and unjust enrichment accrue: (a) on the date

that services are last rendered or (b) when the provider of services knew or reasonably should have known that he would not be receiving compensation?

The undersigned further **RECOMMENDS** that this entire matter be **STAYED** pending issuance of a certification order and resolution of these questions by the Supreme Court of Appeals.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

DATED: March 6, 2014

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

_____

LENORA PERRINE, et al.,

      Plaintiffs,

                       CIVIL ACTION NO. 04-C-296-2

vs.                 (Judge Thomas A. Bedell)

E.I. DU PONT DE NEMOURS AND COMPANY, et al.

      Defendants.

And,

TONYA LEE DRUMMOND, individually, as Personal
Representative of the Estate of DANNY THOMAS DRUMMOND,
and as next friend of DANIELLE GRACE DRUMMOND,

      Plaintiff,

                       CIVIL ACTION NO. 05-C-148-1

vs.                 (Judge Thomas A. Bedell)

E.I. DUPONT DE NEMOURS AND COMPANY, et al.,

      Defendants.

And,

DONALD R. MENENDEZ, et ux.,

      Plaintiffs,

                       CIVIL ACTION NO. 06-C-285-3

vs.                 (Judge Thomas A. Bedell)

E.I. DUPONT DE NEMOURS AND COMPANY, et al.,

      Defendants.

_____/

                Fort Lauderdale, Florida
                December 12, 2006
                9:16 a.m.

           — — — — — — — —

          VIDEOTAPE DEPOSITION
                OF
           JOSEPH A. SIMONI
        VOLUME 1 - Pages 1 - 167

```
 1    APPEARANCES:
 2    LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER &
      PROCTOR, P.A.
 3    By: STEVEN MEDINA, ESQ., and
          NED McWILLIAMS, ESQ., by telephone,
 4    Appearing on behalf of the Plaintiffs, Perrine and
      Drummond
 5
 6    WEST AND JONES
      By: JERRY JONES, ESQ., and
 7        PERRY JONES, ESQ.
      Appearing by telephone on behalf of the Plaintiffs,
 8    Perrine and Drummond
 9
10    ROBINSON & McELWEE, PLLC
      By: RICHARD W. GALLAGHER, ESQ. and
11        MARY E. SNEAD, ESQ.
      Appearing by telephone on behalf of T.L. Diamond &
12    Company, Inc., and Joseph Paushel
13
14    ALLEN, GUTHRIE, McHUGH & THOMAS, PLLC
      By: WM. SCOTT WICKLINE, ESQ.
15    Appearing on behalf of the Defendants E.I. DuPont De
      Nemours and Company, et al.
16
17    SQUIRE, SANDERS & DEMPSEY, L.L.P
      By: BRIAN M. McQUAID, ESQ.
18    Appearing on behalf of the Defendants E.I. DuPont De
      Nemours and Company, et al.
19
20    ALSO PRESENT:
21    WAYNE HOUSE, Videographer
22
23
24
25
```

1          Videotape Deposition of JOSEPH A. SIMONI, a

2     witness of lawful age, taken by the Defendant, for

3     purposes of discovery and for use as evidence in the

4     above-entitled cause, pursuant to notice heretofore

5     filed, before SUSAN J. STERNBERG, Certificate of Merit

6     Reporter and Notary Public, in and for the State of

7     Florida at Large, at 1100 Southeast 17th Street

8     Causeway, Fort Lauderdale, Florida.

9

10                         INDEX

11    WITNESS                                         PAGE

12    JOSEPH A. SIMONI

13    Direct Examination By Mr. Wickline                 7

14    Direct Examination (cont'd) By Mr. Wickline      171

15    Direct Examination (cont'd) By Mr. Wickline      316

16                        EXHIBITS

17    Defendant's 1 - Notice of deposition and order   60
      Defendant's 2 - Article                          86
18    Defendant's 3 - The Daily Athenaeum article     115
      Defendant's 4 - Notes from Spelter meeting      178
19    Defendant's 5 - E-mail                          320
      Defendant's 6 - E-mail                          369
20    Defendant's 7 - E-mail                          373
      Defendant's 8 - Quarterly inventory report of
21                     contaminated sites in
                       Broward County                 378
22    Plaintiff's 1 - Spokesman Review article        369
      Plaintiff's 2 - Mountaineer Spirit article      369
23    Plaintiff's 3 - Grievance Board decision        369

24

25

1    Thereupon, the following proceedings were had:

2         THE VIDEOGRAPHER:  Today is December

3    12th, 2006.  The time is 9:16 a.m.  We are at

4    1100 Southeast 17th Street Causeway, Fort

5    Lauderdale, Florida, for the taking of the

6    deposition of Joe Simoni in the matter of

7    Perrine vs. DuPont.  The court reporter is

8    Susan Sternberg; the videographer is Wayne

9    House.

10        Will everyone please state their

11    appearances for the record.

12        MR. WICKLINE:  Scott Wickline on behalf

13    of DuPont.

14        MR. McQUAID:  Brian McQuaid, Squire,

15    Sanders and Dempsey, also on behalf of DuPont.

16        MR. MEDINA:  This is Steve Medina on

17    behalf of plaintiffs in the Perrine and

18    Drummond case.

19        And I just want to clarify, I believe

20    this deposition was cross-noticed in the

21    Perrine case and the Drummond case and the --

22        MR. WICKLINE:  Menendez.

23        MR. MEDINA:  -- Menendez case.

24        MR. WICKLINE:  Correct.

25        MR. MEDINA:  And I think there's some

1          people on the phone that can identify

2          themselves.

3                  Ned, you want to identify yourself?

4                  MR. GALLAGHER:  Richard Gallagher on

5          behalf of T.L. Diamond and Joe Paushel.

6                  MR. McWILLIAMS:  Ned McWilliams on behalf

7          of the plaintiffs.

8                  MR. JERRY JONES:  Jerry Jones on behalf

9          of the plaintiffs.

10   Thereupon:

11                  JOSEPH A. SIMONI

12          a witness, being first duly sworn in the

13   above-entitled cause, testified under oath as follows:

14                  MR. MEDINA:  Before we begin, I need to

15          make some announcements at the beginning of the

16          deposition.

17                  First, I need to clarify, I am appearing

18          on behalf of plaintiffs in Perrine and

19          Drummond, and on behalf of the witness.

20                  Dr. Simoni is a non-testifying consultant

21          to Levin, Papantonio, pertaining to Spelter

22          matters, including Perrine and Drummond.

23                  This consulting relationship has existed

24          since late in the summer of 2003, and is

25          continuing.  Dr. Simoni is instructed not to

1          testify concerning any matters relating to this
2          consulting work.  In addition --
3                  In addition, Dr. Simoni was, during a
4          portion of 2002, a non-testifying consultant to
5          the Masry law firm pertaining to Spelter
6          matters.  He cannot recall the dates.
7          Dr. Simoni is instructed not to testify
8          concerning any matters relating to this
9          consulting work.
10                 In addition, Dr. Simoni is a
11         non-testifying consultant to the Masry law firm
12         pertaining to Westinghouse matters.  This
13         consulting relationship has existed since
14         approximately 2000, and is continuing.
15         Dr. Simoni does not intend to testify
16         concerning any matters relating to this
17         consulting work.
18                 Subject to these limitations, and any
19         other limitations that come to mind during the
20         course of the deposition, Dr. Simoni will be
21         allowed to testify as a fact witness in his --
22         in this deposition concerning facts he obtained
23         not relating to these consulting activities.
24                 He will not give opinions, nor will he
25         speculate, and he will not testify to facts or

1          materials he obtained relating to these

2          consulting activities.

3                Similarly, Dr. Simoni has no materials

4          subject to production or identification.  Any

5          materials he obtained would have been part of

6          these consulting activities.

7                That's my statement.

8                MR. WICKLINE:  Okay.

9                     DIRECT EXAMINATION

10       **Q.     (By Mr. Wickline) State your full name**

11   **for the record, sir.**

12       A.     Joseph A. Simoni.

13       **Q.     Okay.  And what is your date of birth?**

14       A.     November the 8th, 1941.

15                UNIDENTIFIED SPEAKER:  Folks, we can't

16   hear you.

17                MR. WICKLINE:  We'll try to speak up.

18       **Q.     Are you married?**

19       A.     Yes, I am.

20       **Q.     What's your spouse's name?**

21       A.     Jeannie.

22       **Q.     Okay.  Can you spell that, please?**

23       A.     She goes by Jeannie.  Emma Jean is her

24   actual official name.

25       **Q.     Okay.**

1          A.    Emma J.

2          Q.    And when were you married to --

3          A.    In '04, August of '04.

4          Q.    And were you married previously?

5          A.    Yes.

6          Q.    How many times?

7          A.    Once.

8          Q.    Okay.  And what's your prior spouse's

9    name?

10         A.    Patricia.

11         Q.    Patricia Simoni?

12         A.    Yes.

13         Q.    And Emma Jean's last name is Simoni?

14         A.    Yes.

15         Q.    And where does Patricia live?

16         A.    In Morgantown, West Virginia.

17         Q.    And when were you married to Patricia?

18         A.    1962.

19         Q.    And when did you divorce?

20         A.    1993.

21         Q.    Do you have children with Patricia?

22         A.    Yes.

23         Q.    What are their names?

24         A.    Suzanne Marie and Joanna Lynn.

25         Q.    And do you have children with Emma Jean?

1      A.    No.

2      **Q.    Does Emma Jean have children?**

3      A.    Yes.

4      **Q.    What are their names?**

5      A.    She has one -- one child.  Mark Norman is

6   his name.  He lives in Bridgeport, West Virginia.

7      **Q.    Okay.  And where do your daughters live?**

8      A.    Suzanne Marie lives in Charleston, West

9   Virginia; and Joanna Lynn lives in Chapel Hill, North

10  Carolina.

11     **Q.    And do you have grandchildren?**

12     A.    We have six together.  Emma --

13           Jeannie and I have six together.

14     **Q.    Okay.  What is your current home address?**

15     A.    4717 Grapevine Way, Davie, Florida.

16     **Q.    Okay.  When did you move to Davie,**

17  **Florida?**

18     A.    In October of '05.

19     **Q.    Where did you live previously?**

20     A.    I lived in Morgantown, West Virginia,

21  until August of '05; then lived with my dad in Cooper

22  City, Florida, for two months; and then moved to

23  Davie.

24     **Q.    Where did you live in Morgantown?**

25     A.    I lived in Morgantown on University

1    Avenue, 30 -- 3294 University Avenue.
2          **Q.    Where is Cooper City, Florida?**
3          A.    Cooper City is about 15 minutes east --
4    straight east of Davie.
5          **Q.    Okay.  And why did you decide to move to**
6    **Davie, Florida?**
7          A.    My father was living --
8          Oh, excuse me.  I'm sorry, I
9    misunderstood your question.  Why did --
10         The question is what again?
11         **Q.    Why did you decide to move to Davie,**
12    **Florida?**
13         A.    Oh, we were looking for a new home.  We
14    had come down to Florida and were looking for a new
15    home, and found one in Davie.
16         **Q.    Did you move out of West Virginia because**
17    **of any pollution or industry in the Morgantown area?**
18         A.    Our major reason --
19         I guess I would say our major reason for
20    moving was not that.
21         **Q.    Was that a factor?**
22         A.    Yes.
23         **Q.    Are you aware that West Virginia has a**
24    **fairly high natural background rate for certain heavy**
25    **metals like arsenic?**

1          MR. MEDINA:  Object; instruct the witness

2     not to answer.  This is --

3          This is far afield from fact questions

4     relating to periods of his non-consulting

5     activity.  It's in the area of opinion, and

6     he's instructed not to answer.

7     **Q.    Dr. Simoni, what are your areas of**

8  **expertise?**

9          MR. MEDINA:  Instruct you not to answer.

10         He is a non-testifying consultant.  He is

11    not going to testify about his area of

12    expertise, or what he's testified -- what he's

13    consulting about.  None of that do you have any

14    right to ask about.  He's instructed not to

15    answer.

16         MR. WICKLINE:  Steve, I can ask a lay

17    witness whether or not they're aware of the

18    natural background rates of any heavy metal

19    anywhere; and, as a lay witness, or a

20    layperson, they can either tell me yes or no.

21    I don't see how that implicates his expertise.

22         MR. MEDINA:  The instruction stands.

23         MR. WICKLINE:  So, you're instructing him

24    not to answer my question?

25         MR. MEDINA:  Right.

1           UNIDENTIFIED SPEAKER:  Folks, I'm sorry

2       to interrupt, but I don't know if you can

3       rearrange the speakerphone.  The typist -- the

4       court reporter's typing is actually drowning

5       out the sound of the voices.

6           MR. WICKLINE:  It can't be the court

7       reporter's typing.

8           UNIDENTIFIED SPEAKER:  Well, somebody's

9       typing, and it's drowning out the sound of the

10      voices.

11          UNIDENTIFIED SPEAKER:  I can't hear any

12      voices at all.

13          UNIDENTIFIED SPEAKER:  If there's

14      anything you can do with the speakerphone, we

15      would sure appreciate it.

16          UNIDENTIFIED SPEAKER:  If we could put it

17      right between the witness and whoever is asking

18      the questions --

19          MR. WICKLINE:  That's where it's at right

20      now.  It's probably --

21          MR. MEDINA:  Do you hear typing right

22      now?

23          UNIDENTIFIED SPEAKER:  No.  I can barely,

24      barely hear you guys right now.

25          MR. MEDINA:  You can barely hear us

1       speaking right now?
2               Well, I don't know what to do, other than
3       go off the record -- maybe the phone isn't
4       working after all -- and try to get a better
5       phone.
6               MR. WICKLINE:  It's up to you guys on the
7       phone.  What do you want to do?
8               UNIDENTIFIED SPEAKER:  Could you see if
9       there's some other phone, because we can't
10      hear.  I'm sorry for the inconvenience, but I
11      don't know what else to do.
12              MR. MEDINA:  Let's do it.  Let's see if
13      we can move --
14              Does that help any, or is that the same?
15              THE REPORTER:  We won't be able to hear
16      them.
17              MR. MEDINA:  Oh, okay.
18              All right.  Well --
19              MR. WICKLINE:  Are they still on?
20              Are you on the phone?
21              MR. MEDINA:  You're all still on the
22      phone, right?
23              UNIDENTIFIED SPEAKER:  Yeah.
24              MR. WICKLINE:  Okay.  Off the record.
25              THE VIDEOGRAPHER:  Going off the record,

1        the time is 9:27.

2              (Whereupon, a recess was taken.)

3              THE VIDEOGRAPHER:  Back on the record,

4        the time is 9:44.

5              MR. MEDINA:  I want to clarify the last

6        couple of objections.  I also want to --

7              I want to object to the form to the last

8        two questions, in addition to my prior

9        objections and instructions; and I also want to

10        clarify that Dr. Simoni can testify to what he

11        knows to be fact, without reference to his

12        non-testifying consulting experience.

13              If he learned something by working with

14        the plaintiffs, or developed some opinions

15        while working with the plaintiffs or their

16        lawyers, then he can't testify to that; but if

17        he had some sort of prior understanding of

18        fact, he can testify to that.

19              If it's something that's speculative, and

20        I believe when you're -- the way you asked

21        that --

22              Actually, both those last two questions

23        is not a matter of pure fact.  For instance, if

24        you want to ask him what his education was,

25        what classes he taught, specific facts like

1         that, then he can answer those kinds of
2         questions.
3               If you want to ask him specifically what
4         he knows about facts unrelated to his
5         non-testifying consulting work on arsenic, then
6         you can ask him about that; but this person is
7         being --
8               It's very unusual for a party to take a
9         non-testifying consultant's deposition.
10        Because he had some prior experience, separate
11        and apart from the consulting work, we're
12        allowing him to testify to fact issues
13        pertaining to that; but that's -- that is it.
14              MR. WICKLINE:  You mentioned the Masry
15        firm, Steve.  What firm is that?
16              MR. MEDINA:  That's a California law
17        firm.
18              MR. WICKLINE:  How do you spell Masry?
19              MR. MEDINA:  To the best of my knowledge,
20        M-A-S-R-Y; but I could be wrong.
21              MR. WICKLINE:  And he is a consultant for
22        the Masry firm?
23              MR. MEDINA:  That is the best of my --
24              That is my understanding.
25              MR. WICKLINE:  And he is a consultant for

 1          the Masry firm in connection with the

 2          litigation at Spelter?

 3                  MR. MEDINA:  No; Westinghouse.

 4                  MR. WICKLINE:  Oh, okay.

 5                  MR. MEDINA:  Yes, sir.

 6                  Yeah, I can go through my instructions

 7          again.  The -- my --

 8                  He has a relationship with the Masry

 9          firm, unrelated to Spelter, related to the

10          Westinghouse litigation that has been going on

11          since the year 2000.

12                  He indicated to me that he felt that that

13          was a confidential, non-testifying consulting

14          relationship, just like the work for Masry with

15          respect to Spelter.  He doesn't intend to

16          testify about the Spelter work, nor the

17          Westinghouse-related work.

18                  My instructions to him are with respect

19          to the Spelter work.  He, in his own obligation

20          to the Masry firm and to the plaintiffs in the

21          Westinghouse case, intends to keep

22          confidentiality.

23                  So, I indicated his intention to not

24          testify concerning any matters relating to that

25          consulting work for Masry.  I did not indicate

1    that the Masry law firm has any current
2    connection to Spelter.
3        MR. WICKLINE:  Okay.  And let me just
4    make sure I understand your objection with
5    respect to the Spelter litigation.
6        You are going to allow him to testify
7    concerning underlying facts, work he may have
8    done out at Spelter; but you are not going to
9    let him testify about any communications he may
10   have had with you or your firm or any of the
11   plaintiffs' lawyers.  Is that correct?
12       MR. MEDINA:  That's not -- that's not an
13   accurate statement.  What -- what -- he is
14   allowed --
15       He's not allowed to testify about any
16   facts that he obtained while being a
17   consulting -- a consultant for the plaintiffs
18   in the Spelter litigation, whether it's
19   Drummond or Perrine, for our law firm and the
20   law firms we are working with.  He's also not
21   allowed --
22       He's not going to touch, in other words,
23   any facts pertaining to the period of time
24   since the late summer of 2003, when he became a
25   consultant with our law firm.

1          Any work that he did pertaining to
2     Spelter as a non-testifying consultant, it's
3     inappropriate for him to be asked about his
4     work or facts that he obtained while being a
5     non-testifying consultant for plaintiffs, and
6     he will not be allowed to answer any questions
7     like that.
8          In addition --
9          MR. WICKLINE:  Okay.  Let me make sure --
10         MR. MEDINA:  -- with respect -- with
11    respect to the plaintiffs, he also was involved
12    with the Masry law firm, as I indicated, during
13    a portion of 2002.  That would have been work
14    product investigation by the Masry law firm,
15    and that would not be something that you can go
16    into.
17         MR. WICKLINE:  But that would have been
18    the lightings case, not Spelter.
19         MR. MEDINA:  No, sir.  No, sir.  Masry
20    law firm --
21         MR. WICKLINE:  He was doing work for the
22    Masry law firm in Spelter?
23         MR. MEDINA:  That's -- that's basically
24    what I said.
25         I said, in addition, Dr. Simoni was --

1          and this predated the consulting work for the
2          Levin, Papantonio firm pertaining to Spelter
3          matters -- he was involved in some consulting
4          in a portion of 2002 -- he cannot recall the
5          dates -- as a non-testifying consultant to the
6          Masry law firm, which ultimately has not become
7          involved in any Spelter matters, but was
8          involved in work product activity pertaining to
9          Spelter in 2002, which he is not going to
10         address, which is privileged, and nobody will
11         be addressing that.
12              MR. WICKLINE:  Is the Masry law firm of
13         counsel in any of the Spelter litigation?
14              MR. MEDINA:  No.
15              MR. WICKLINE:  Do we know what months or
16         days in 2002 that I am not allowed to question
17         him on?
18              MR. MEDINA:  No, sir.  You can ask him if
19         he can recall the dates of that work for
20         Spelter -- or, excuse me, for Masry law firm
21         pertaining to Spelter, and he will answer that
22         he cannot recall the dates; and he'll have to
23         do his best to divvy it up between facts that
24         he believes he obtained prior to the Masry work
25         or during the period between the Masry work and

1        when he became a consultant for Levin,

2        Papantonio.

3               MR. WICKLINE:  Okay.  And he became a

4        consultant for Levin, Papantonio in the late

5        summer of 2003?

6               MR. MEDINA:  Yes, sir.

7               MR. WICKLINE:  Is that correct?

8               MR. MEDINA:  Yes, sir.

9               MR. WICKLINE:  Do you have a month?

10               MR. MEDINA:  No, sir.

11               MR. WICKLINE:  Okay.

12               MR. MEDINA:  He'll have to give his best

13        understanding of that.  I have not --

14               I mean, I have not researched my records.

15        All I can tell you is the late summer at this

16        point in time.

17               MR. WICKLINE:  So, I'm allowed to ask him

18        any questions concerning his work at Spelter

19        prior to late summer 2003, with the exception

20        of the time that he was a consultant for the

21        Masry law firm, which was a portion of 2002

22        which we don't know the --

23               MR. MEDINA:  That's right.  Subject to

24        the restrictions that he's not going to give

25        opinions and he's not going to speculate, he

 1          can give fact witness information.

 2                 And we're probably going to have some

 3          disagreement, but I'm not going to allow you to

 4          turn this into some roving expedition of what

 5          he knows now in some general way, especially

 6          when it's approaching into expert areas; nor

 7          will I allow him to go into talking about his

 8          expertise.

 9                 He is here as an accommodation to give a

10          limited fact witness deposition.  You have a

11          right to ask about his work that was unrelated

12          to his periods of consulting activity; but with

13          respect to these periods of consulting activity

14          for the Masry firm during some portion of 2002,

15          and as of the late summer of 2003, going

16          forward, he's not going to talk about facts,

17          nor, of course, opinions, or any kind of

18          speculation.

19                 MR. WICKLINE:  Okay.  Can the folks on

20          the phone hear us okay?

21                 UNIDENTIFIED SPEAKER:  Great.

22                 UNIDENTIFIED SPEAKER:  Yes, sir.

23                 UNIDENTIFIED SPEAKER:  Yes.

24          **Q.    All right.  Dr. Simoni, are you aware**

25     **that there has been a wrongful death action initiated**

1    **by the widow of Danny Drummond against DuPont and**

2    **others related to the former zinc plant in Spelter?**

3              MR. MEDINA:  Okay.  That awareness --

4              Any awareness he had would be part of his

5         period of consulting activity.  That action was

6         filed, I believe, in 2005.  That would relate

7         to his consulting activities, so he's

8         instructed not to answer that.

9              He's not going to get into anything that

10        he would have -- any knowledge he would have

11        obtained subsequent to late summer of 2003,

12        period.

13             MR. WICKLINE:  I'm just asking him if

14        he's aware of the litigation.

15             MR. MEDINA:  I heard the question.

16             MR. WICKLINE:  That's a publicly filed

17        document.  You're not going to let me ask him

18        that?

19             MR. MEDINA:  That's correct; because, as

20        he sits here today, as a consulting expert

21        here, you don't have any right to ask him about

22        any knowledge that he has obtained since he's

23        been a consulting expert for us.  That would be

24        part of that knowledge.  You can't touch it.

25             If you disagree, that's your prerogative,

1          but we are instructing him not to answer.

2               MR. WICKLINE:  Okay.

3          **Q.    Dr. Simoni, can we agree that, just**

4     **definitionally speaking, when we are talking about --**

5     **or I'm talking about or make reference to the**

6     **litigation, or this litigation, that I'm talking**

7     **about, you know, the Drummond litigation, the Menendez**

8     **litigation, the Perrine litigation, for which this**

9     **deposition's been noticed?**

10              **Can we agree to that?**

11         A.    I'm not exactly sure what you're asking.

12         **Q.    I'm just trying to --**

13              **Instead of me saying -- having to say**

14    **every time, the Drummond litigation, the Perrine**

15    **litigation, the Menendez litigation, I just want to be**

16    **able to short-term it and say, the litigation that**

17    **we're here to talk about, which is all of the cases**

18    **arising out of the former zinc plant facility.**

19         A.    The only thing I can say about that is I

20    heard Mr. Medina refer to those at the beginning of

21    the session.

22         **Q.    Right.  But can it be understood that**

23    **when I'm talking about the litigation, or this**

24    **litigation that we're here to talk about today, and**

25    **for which this deposition is noticed, that that would**

1    **include all three of these cases; Drummond, Perrine,**
2    **and Menendez?**
3           A.    You want me to --
4                 You're asking me to acknowledge that when
5    you refer to "litigation," that you're referring to
6    those three --
7           **Q.    Those three cases --**
8           A.    Those three cases.
9           **Q.    -- collectively.**
10          A.    Well, I mean, I surely acknowledge that
11   when you mention "litigation," because you're telling
12   me that's what you're referring to.
13          **Q.    So, that's okay?**
14          A.    (No audible response.)
15          **Q.    Okay.  Are you serving as an expert**
16   **witness in any capacity in this litigation?**
17                MR. MEDINA:  Object to form; instruct you
18          not to answer.
19                I will represent to you he's not going to
20          be a testifying expert in this case, in any of
21          these cases.
22                MR. WICKLINE:  I was asking --
23                MR. MEDINA:  And, as I have indicated,
24          he's a non-testifying consultant.  He is not
25          serving as an expert.

1           MR. WICKLINE:  I was just asking the
2       witness whether he was serving as an expert
3       witness in any capacity in this litigation.
4           And you're not going to let me ask that?
5           MR. MEDINA:  That's right.  I've
6       clarified that for you, and I've indicated the
7       limited areas that you're going to be allowed
8       to question him as a fact witness in, and
9       about --
10          And you know that when I say he's a
11      non-testifying consultant, that means he's not
12      an expert in this litigation.  You know that.
13      You know, you know that.  That's what
14      non-testifying is, okay?
15          Now, I realize that you made a
16      misleading -- had a misleading telephone
17      conference with Dr. Simoni a couple of weeks
18      ago, where you maybe confused those terms; but
19      you're not going to confuse them here today,
20      and he's not going to testify about expertise,
21      because he's not here to testify about
22      expertise.
23      **Q.    Dr. Simoni, do you recall having a**
24  **telephone conversation with me to set up this**
25  **deposition, where you indicated to me that you were**

1    not an expert witness in this case, in this

2    litigation?

3            A.     You called my house.

4            Q.     Do you recall me calling your house to

5    try to schedule this deposition?

6            A.     Yes.

7            Q.     And do you recall telling me during that

8    conversation that you were not an expert witness in

9    this litigation?

10           A.     I remember you asking me a question --

11           Q.     Do you remember --

12           A.     -- about that.

13           Q.     Do you remember answering that you were

14   not an expert witness in this litigation?

15           A.     I think what I said to you, to the best

16   of my recollection, is something to the effect of, not

17   as far as I know.

18           MR. MEDINA:  And, for the record, you

19           know, I was not aware that you were talking to

20           Dr. Simoni.  If I was, I would have given him

21           some instructions to not talk to you, because

22           he's a -- as I've indicated, a non-testifying

23           consultant.  When --

24           It is highly unusual that opposing

25           counsel out of the blue contacts your

1          non-testifying consultant and starts to ask

2          them questions.

3              So, by him answering those questions, he

4          can recount what he stated to you, but I'm

5          not -- but that is not opening the door to

6          your, you know, further going into those kind

7          of things.

8              He can recount what he said, but that's

9          all he's going to talk about when it comes to

10          expertise, is that conversation he had with

11          you, that he shouldn't have been having,

12          because you had it without -- without notifying

13          counsel for Levin, Papantonio.

14              MR. WICKLINE:  For the record -- and

15          Mr. McWilliams is on the phone right now, and

16          he can refute it if he feels so inclined -- but

17          at least two members of DuPont's counsel had

18          asked the whereabouts, and asked to schedule

19          the deposition of Dr. Simoni, and was informed

20          that the Levin, Papantonio firm did not know

21          where he was located.

22              MR. MEDINA:  That's fine.  If you want to

23          hire a detective, and you want to do an -- you

24          know, an Accurate check, or whatever, and

25          figure out the guy's location, and to get

1          something served, you can do that; but that
2          doesn't give you permission to go and conduct
3          some sort of interview of a non-testifying
4          consultant.
5               So, I'm glad that the witness didn't
6          interchange information with you, because it
7          would have been inappropriate, and we object to
8          that conversation.
9               MR. WICKLINE:  Was there at any time you
10         disclosed him as a non-testifying or a
11         testifying expert, Mr. Medina?
12              MR. MEDINA:  I'm disclosing it right
13         today.  There's no need to disclose that.
14              MR. WICKLINE:  Okay.  Is it your position
15         that you had told me prior to me contacting
16         Dr. Simoni that he was an expert on behalf of
17         the plaintiffs in some capacity?
18              MR. MEDINA:  You never told us that an
19         attorney for your side was going to
20         cross-examine a non-testifying witness,
21         including Dr. Simoni, without letting us know.
22         You said you were going to try to --
23              You know, you had indicated that you
24         wanted to find him and get him served for a
25         deposition.

1            I might add, he didn't get served until
2      last night.  We are making him available.  He
3      didn't have his check, so he -- it wasn't an
4      effective subpoena in Florida; but, in any
5      event, he's here, we have always intended to
6      allow him to testify to facts not pertaining to
7      his periods of consulting activities.
8            So, we wouldn't prevent you from taking
9      the deposition, and we have cooperated in
10     making him available as I've indicated.
11           MR. WICKLINE:  Well, if you're taking the
12     position that because there is no check that it
13     was not an effective subpoena, then we can
14     produce a check very shortly.
15           MR. MEDINA:  He's here.  He's here.
16     We're not objecting.  If he had not been
17     subpoenaed, he would be here.  We have made him
18     available.
19           MR. WICKLINE:  So, you're not taking
20     issue with the efficacy of the subpoena; am I
21     correct?
22           MR. MEDINA:  Well, it is an ineffective
23     subpoena, but we're not taking issue with it.
24     That's right.
25           MR. WICKLINE:  And the subpoena also

1        requested documents.

2              MR. MEDINA:  And we are not producing

3        documents.  He is not producing documents,

4        because any -- any documents he had would be a

5        period of consulting work, as I instructed at

6        the beginning of the deposition.

7              MR. WICKLINE:  Okay.

8        **Q.    Dr. Simoni, are you serving as legal**

9   **counsel for any of the plaintiffs in this litigation?**

10       A.    No.

11       **Q.    Are you licensed to practice law in the**

12  **State of West Virginia?**

13       A.    No.

14       **Q.    Are you licensed to practice law in the**

15  **State of Florida?**

16       A.    No.

17       **Q.    Were you ever licensed to practice law in**

18  **the State of West Virginia?**

19       A.    No.

20       **Q.    Did you sit for the Bar exam?**

21       A.    Yes.

22       **Q.    I take it you didn't pass the Bar exam?**

23       A.    That's correct.

24       **Q.    How many times did you sit for the Bar**

25  **exam?**

```
 1          A.     Two times.
 2          Q.     Okay.  Are you represented by counsel as
 3   you sit here today?
 4          A.     I believe Mr. Medina indicated that at
 5   the beginning.
 6          Q.     He's your lawyer?
 7          A.     He represents me on this matter.
 8          Q.     Were you represented by counsel when we
 9   spoke by telephone last month?
10                 MR. MEDINA:  Object to form.
11          A.     I'm not sure --
12                 MR. MEDINA:  I've objected to --
13                 I've objected to form.  If you know
14          whether you --
15          A.     I'm not saying, I'm not sure that --
16   whether I was represented or not.
17                 MR. MEDINA:  Yeah; I mean, it's --
18                 I probably should be instructing you not
19          to answer; but go ahead and answer if you
20          understand it.
21          A.     Well, no, I don't understand your
22   question, actually, what you're asking.
23          Q.     Were you represented by legal counsel
24   when we spoke by telephone last month?
25                 MR. MEDINA:  Okay.  I object to form.
```

1              In the sense that he was --

2              MR. WICKLINE:  Okay.

3              MR. MEDINA:  -- since the summer of 2003,

4         one of our non-testifying consultants, he

5         was --

6              MR. WICKLINE:  Mr. Medina, I got your

7         objection.

8              MR. MEDINA:  -- part of our team.

9              MR. WICKLINE:  I got the --

10             MR. MEDINA:  Okay.  Well, I'm clarifying.

11        I don't want the witness to misunderstand.

12             MR. WICKLINE:  No speaking objections,

13        please.

14             MR. MEDINA:  Well, this is an unusual

15        situation, it is a ridiculous question, and

16        I'm --

17             You understand when I give -- when I

18        represent that I represent the witness, it's

19        for purposes of taking this deposition.  This

20        kind of question makes no sense.  It serves no

21        valuable purpose.

22             He was -- was, since the summer of 2003,

23        our non-testifying consultant.  You shouldn't

24        have been talking to him two weeks ago.  It's

25        one thing for you to get a detective to locate

1          him up, but you didn't have any right to

2          interview him.

3          **Q.    Dr. Simoni, can you answer the question?**

4          A.    What was the question?

5          **Q.    Were you represented by counsel when we**

6  **spoke last month?**

7                MR. MEDINA:  Object to form.

8          A.    No.

9          **Q.    Were you represented by counsel when you**

10 **were in Spelter, talking to area residents about the**

11 **former zinc plant?**

12               MR. MEDINA:  Object to form.

13               You are not to give any information about

14         your state of mind pertaining to any period of

15         time when you were a consulting expert for

16         Levin, Papantonio, beginning in the summer of

17         2003, or whenever you were a consulting --

18         consulting person working for the Masry firm.

19               So, if any other period of time you were

20         represented by an attorney, then you can

21         indicate that; but you can't indicate anything

22         about who was representing you, or what your

23         relationships were during periods of time that

24         I've indicated, beginning with the Levin,

25         Pap -- with the Masry time and the Levin,

1         Papantonio time.

2                 You understand?

3                 THE WITNESS:  I do.

4         **Q.    Can you answer the question, sir?**

5         A.    Could you repeat the question, please?

6         **Q.    Were you represented by counsel when you**

7     **were in Spelter, talking to area residents about the**

8     **former zinc plant?**

9                 MR. MEDINA:  Object to form, and same

10            instruction.

11        A.    I'm sorry, I -- that's part of the time

12    that I was involved as a consultant with -- with

13    Levin, Papantonio, and Masry & Vititoe.

14                MR. MEDINA:  If he's asking you to

15            include other periods, though, you can answer

16            about other periods; okay?

17                THE WITNESS:  I understand.

18        A.    Maybe you can clarify.  I'm not sure what

19    you want to do.

20        **Q.    Are you being paid by plaintiffs' counsel**

21    **to appear at your deposition here today?**

22        A.    No.

23        **Q.    How long have you known Gary Rich?**

24        A.    Approximately six years.

25        **Q.    And how did you come to know him?**

 1          A.     Through some friends, mutual friends.  He

 2     lives in Morgantown, I lived in Morgantown.

 3     Morgantown's a small town.

 4          **Q.     Okay.  Were you ever involved in**

 5     **litigation with him in the past?**

 6          A.     I don't believe I can speak to that.

 7          **Q.     Do you mean by that that you do not know,**

 8     **or there's some privilege that would preclude you**

 9     **from --**

10          A.     Yeah, I believe -- I believe that any

11     involvement I had with him with respect to litigation

12     would be privileged, that involvement.

13          **Q.     Were those matters in which he retained**

14     **you as an expert witness, either as a consulting**

15     **expert or a testifying expert?**

16               MR. MEDINA:  Object to form.

17               When you use the term "expert," I object

18          to that terminology.

19          **Q.     You can answer.**

20          A.     What was your question again?

21          **Q.     Were those matters in which Mr. Rich had**

22     **retained you as either a consulting or testifying**

23     **expert witness?**

24               MR. MEDINA:  Object to form.

25          A.     I would say no.

1      Q.    Then what is it that makes you feel that

2    that is privileged information that you cannot share

3    with me?

4              MR. MEDINA:  Object to form.

5      A.    I think you're asking an opinion about

6    that; and, as I understand it, I'm not here to --

7      Q.    I don't want you to give me opinions

8    about what your prior relationship was with Mr. Rich;

9    I'm just asking for the facts of, you know, was there

10   litigation matters in which you were involved with

11   Mr. Rich in the past.  That's a factual answer, yes or

12   no.

13             MR. MEDINA:  Object to form.

14     A.    Yes.

15     Q.    Were those cases that were filed?

16     A.    I cannot speak about anything to do with

17   that litigation, because it's privileged.

18     Q.    Okay.  But my question was, were they --

19   was it litigation --

20     A.    I can't speak --

21     Q.    -- where --

22     A.    I can't speak about what kind of

23   litigation it was.

24     Q.    I understand.  You need to let me finish

25   my question.

 1          A.      Okay.  I'm sorry.
 2          Q.      **Was it litigation where a complaint was**
 3   **filed in a public courthouse?**
 4          A.      Again, I'm not going to speak about what
 5   it was, or what I think it was, or -- because I
 6   believe that's protected by privilege, with respect to
 7   my -- my involvement with that.
 8          Q.      **And, as we sit here today, you can't tell**
 9   **me what privilege it is that would protect that?**
10          A.      Oh, I believe it was the same kind of
11   privilege that we're talking about with respect to
12   these other matters.
13          Q.      **Was Mr. Rich involved in the asbestos**
14   **litigation against WVU?**
15          A.      Yes.
16          Q.      **And is it fair to say that you were an**
17   **advocate for that litigation against WVU?**
18          A.      I don't know what you mean by "advocate."
19          Q.      **Is it fair to say that you supported that**
20   **litigation, the asbestos litigation, against West**
21   **Virginia University?**
22          A.      I'm not sure what you mean by "support."
23          Q.      **Well, what do you understand the word**
24   **"support" to mean, sir?**
25          A.      Well, I'm just trying to answer your

1    question.  I just want to be clear what you're asking.
2         **Q.    Well, tell me what you understand the**
3    **word "support" to mean.**
4         A.    What I understand the word "support" to
5    mean --
6              Are you asking my opinion of what
7    "support" means?  I'm not sure what you're asking me.
8         **Q.    I'm just trying to communicate with you,**
9    **Dr. Simoni.**
10        A.    And I'm trying to answer your question,
11   but I -- you know --
12        **Q.    Okay.**
13        A.    Are you asking me was I interested in --
14   in that matter?
15        **Q.    Well --**
16        A.    I'm not sure what you're asking.
17        **Q.    Let's start with that.  Were you**
18   **interested in that matter?**
19        A.    And the matter being?
20        **Q.    Were you interested in the matter of the**
21   **asbestos litigation against West Virginia University?**
22        A.    Yes.  I was working there.
23        **Q.    And were you in favor of the asbestos**
24   **litigation against West Virginia University?**
25        A.    And by "in favor," you mean did I

 1    think --

 2              Well, I'm not sure what you mean, was I

 3    in favor of it.  I don't -- I want to answer your

 4    question, but I don't know exactly what you mean.

 5         **Q.    Okay.  We went through "in favor of," we**

 6    **went through "support," "advocate."  Any of those**

 7    **words, Doctor.  Were you an advocate of that**

 8    **litigation, were you in support of that litigation,**

 9    **did you favor that litigation against West Virginia**

10    **University?**

11         A.    Okay.  Are you -- now I'm --

12              I'm still not crystal clear on what

13    you're asking me to answer.  I can say this:  That as

14    a member of the University community, if it were shown

15    that people in the University community were exposed

16    to asbestos, without protection, without notice, then

17    I would -- I would be not supportive of what the

18    University did, if that was the case.

19         **Q.    Dr. Simoni --**

20         A.    I'm not sure if that answers your

21    question, but --

22         **Q.    Dr. Simoni, is it your testimony that you**

23    **were not an outspoken advocate for the asbestos**

24    **litigation against West Virginia University?**

25         A.    I don't believe I said that.

1          **Q.    Okay.  Well, answer that question.**

2              MR. MEDINA:  Object to form.

3          **Q.    Were you or were you not an outspoken**

4     **advocate for the asbestos litigation against West**

5     **Virginia University?**

6          A.    I don't like to term myself as anything.

7     Some people might have seen it that way, I think it's

8     fair to say.

9          **Q.    Who do you know at the Levin, Papantonio**

10    **firm in Pensacola, Florida?**

11             MR. MEDINA:  Object to form.

12         A.    Who do I know?

13         **Q.    Yes.  What lawyers or paralegals?**

14             MR. MEDINA:  You can testify to your

15             knowledge of people that you knew prior to your

16             consulting relationship in the summer of 2003,

17             who you knew prior to then.

18         A.    Okay.  Well, I knew Mr. Medina; and I

19    knew, back at that time, a lawyer by the name of

20    Slickman (phonetic), James Slick -- Slickman, I think

21    was his last name.  Jan, that's how I knew him.

22         **Q.    Do you know how you spell Slickman?**

23         A.    I do not.  That's why I was little --

24         **Q.    And how long have you known Mr. Medina?**

25         A.    Well, I believe we met in early 2002, to

1    the best of my recollection.

2          Q.    How did you come to know him?

3          A.    He came to Morgantown with, at that time,

4    with Mr. Slickman, the other attorney I mentioned.

5          Q.    Do you know why he and Mr. Slickman came

6    to Morgantown?

7          A.    Yes.

8          Q.    Okay.  Why?

9          A.    Gary Rich contacted them and spoke with

10   them about their possible interest in exploring the

11   situation in Spelter at that time, and --

12                Well, I think that's correct.

13         Q.    You said "and."  Is there something you

14   want to add to that?

15         A.    No.

16         Q.    Prior to that time, had you known or

17   heard of the Levin, Papantonio firm, or Mr. Medina, or

18   Mr. Slickman?

19         A.    Prior to the time --

20                Are you asking prior to the time that

21   they came to Morgantown?

22         Q.    Correct.

23         A.    Yes.

24         Q.    How did you know them?

25         A.    To the best of my recollection, it was

1    through some online -- you know, looking at -- looking
2    at law firms online.
3          **Q.    Okay.  So, do I understand correctly that**
4    **you and Mr. Rich got on the Internet and looked for**
5    **plaintiffs' firms that specialized in environmental**
6    **cases?**
7          A.    I'm sorry, I can't speak to that.
8          **Q.    Why can't you speak to that?**
9          A.    Because it involves my -- what I would
10   call my general consulting relationship with Mr. Rich
11   at the time.
12         **Q.    Did you have a consulting -- Strike that.**
13         **Did you have a written consulting**
14   **agreement with Mr. Rich?**
15         A.    I'm sorry, I can't speak to that.
16         **Q.    You can't answer whether you have or you**
17   **haven't?**
18         A.    It's in that area of my --
19         I don't think it's proper for me to --
20         **Q.    Okay.  This is all prior to the summer of**
21   **2003, correct?**
22         A.    That's correct.
23         **Q.    And you are still refusing to testify?**
24         A.    Yes.  Well, to testify on that matter.
25   You're asking me about things I was doing with

1    Mr. Rich back at that time, I believe; at least that's
2    my understanding of your question.
3            **Q.    Were you being paid by Mr. Rich at that**
4    **period of time?**
5            A.    You're asking me about my -- what I
6    generally am terming a consulting relationship with
7    Mr. Rich; and now you're asking me, as I understand
8    it, to define that for you.
9            **Q.    Well, I'm asking, as a consultant, were**
10   **you being paid?**
11           A.    And I'm saying that anything to do with
12   my relationship with Mr. Rich, I believe, as I term
13   it, as a general consultant for him, would --
14           And I sort of think about it not for him,
15   but with him -- someone might say for him and with
16   him -- but I see it in the same general parameters as
17   I do my relationship with Levin & Papantonio now.
18           MR. WICKLINE:  Is it the position of the
19           plaintiff that there was a consulting
20           relationship prior to the summer -- late summer
21           of 2003?
22           MR. MEDINA:  The Masry relationship, we
23           gave him an instruction on, and I can clarify
24           with Dr. Simoni that we are not instructing him
25           not to answer about any relationship with Gary

1    Rich.

2          Now, he may have some understanding about

3    that, that we don't; but I have spoken with

4    Mr. Rich, and Mr. Rich's position is they did

5    not have a consulting relationship.  So, we are

6    not instructing Dr. Simoni not to answer those

7    types of questions relating to those periods of

8    time.

9          I can talk about it with Dr. Simoni

10   further off the record, but we're not

11   instructing Dr. Simoni to not testify about his

12   relationship with Mr. Rich, other than those

13   periods of consulting.

14        **Q.    Do I understand you correct, Dr. Simoni,**

15   **that you, on your own, are refusing to answer those**

16   **questions?**

17        A.    Well, I can only say -- if you --

18              No one's told me not to answer those

19   questions.

20        **Q.    Yes; but you're not answering them.  And**

21   **I'm asking you, are you going to continue to refuse to**

22   **answer those questions?**

23             MR. MEDINA:  Let me take a break and talk

24        to Dr. Simoni.

25             MR. WICKLINE:  Off the record.

1              THE VIDEOGRAPHER:  Going off the record,
2         the time is 10:22.
3           (Whereupon, a recess was taken.)
4              THE VIDEOGRAPHER:  Back on the record,
5         the time is 10:32.
6              MR. MEDINA:  I've spoken to Dr. Simoni.
7         I'm not going to go into our conversation,
8         because it's privileged; but I will tell you
9         that he is going to answer questions relating
10        to his relationship with Mr. Rich, to the
11        extent they're fact questions prior to the
12        Masry consulting relationship, or the Levin,
13        Papantonio consulting relationship that started
14        in late summer 2003.
15             So, I think if you go back over some of
16        that area, maybe the last two or three
17        questions, he would be able to answer parts of
18        that.  He's not going to give opinions, but he
19        can give you fact-type information.
20        Q.    Is that accurate, Dr. Simoni?
21        A.    Yes.  I apologize for the confusion that
22   I was having.  I'm not trying to not answer your
23   questions; I'm just trying to do what I -- you know,
24   what I believe is the right thing for me to do.
25        Q.    I understand.  As I recall, I had asked

1    **you about litigation that you had been involved in**

2    **with Mr. Rich in the past.**

3             A.    Yes, I remember.

4             **Q.    Okay.  Are you prepared to answer that**

5    **question now?**

6                    MR. MEDINA:  That's a misunderstanding.

7             The -- the -- what he's --

8             What I'm saying -- and he can answer for

9             himself, but I don't want there to be any

10            confusion -- the --

11            What I was talking about was with respect

12            to Spelter.  If he has some consulting

13            relationships pertaining to Westinghouse or

14            WVU, that's a different matter.  I'm not --

15            I'm not implying that he is not

16            maintaining that those are suddenly not

17            confidential anymore.  He's maintaining that

18            confidentiality as to Westinghouse and WVU.

19            I'm talking about Spelter, prior to Masry

20            or Levin, Papantonio consulting relationships,

21            to the extent it was factual related to

22            Spelter, not in those consulting periods, and

23            he can talk about that.

24            **Q.    Dr. Simoni, do you agree with what**

25    **Mr. Medina just said?**

```
 1          A.      Yeah.   I think I just need to add one
 2     thing --
 3          Q.      Sure.
 4          A.      -- with respect to Westinghouse that he
 5     mentioned before.  My collaboration with Mr. Rich,
 6     okay, at one point involved Westinghouse.  So, at
 7     that --
 8               And, at that time, it was involved -- I
 9     was involved with a consulting relationship with Masry
10     & Vititoe, which Mr. Medina has referred to before;
11     and, so, at that --
12               At that point, my understanding would be
13     that Mr. Rich was part of that -- that legal team with
14     which I had, you know, a consulting relationship with;
15     and, so, I think that would be an area that would be
16     covered by the privilege.
17               MR. MEDINA:  That's Westinghouse.
18               THE WITNESS:  At Westinghouse.
19               MR. MEDINA:  But not the Spelter --
20               THE WITNESS:  No; I'm saying with --
21               I'm just saying that that would -- that
22          the collaboration with Mr. Rich would involve
23          some of that period of time with Westinghouse,
24          with which I had a consulting relationship with
25          Masry & Vititoe, that -- on Westinghouse,
```

 1              that -- that Mr. Medina referred to, I think,

 2              in the beginning of the session.

 3          Q.    Okay.  Have you and Mr. Rich collaborated

 4      on litigation matters other than Westinghouse, WVU,

 5      and Spelter?

 6          A.    On litigation matters?

 7          Q.    Yes.

 8          A.    And what were the ones you mentioned?

 9      WVU --

10          Q.    Westinghouse and Spelter.

11          A.    And Spelter.

12              No.

13          Q.    You want us to --

14          A.    No; I'm all right.

15          Q.    Okay.

16          A.    Okay.  Thank you.

17          Q.    I think where we left off, we were

18      talking about your prior knowledge of the attorneys at

19      the Levin, Papantonio firm.  Do you recall that

20      discussion?

21          A.    I remember one question about that.

22          Q.    What question do you remember?

23          A.    I think you asked me how I knew about --

24      if I knew about Levin & Papantonio before Mr. Medina

25      and Mr. Slickman came to Morgantown.  And I said yes,

1    and you asked me how, and I said general online
2    surfing law firms.
3            **Q.    Okay.  So, is it accurate to say that you**
4    **and Mr. Rich were looking on the Internet for**
5    **plaintiffs' law firms that specialized in**
6    **environmental litigation?**
7            A.    Yes.
8            **Q.    And who contacted the lawyers at the**
9    **Levin, Papantonio firm?  Was it you, or Mr. Rich; or**
10   **both?**
11           A.    I cannot say.  I don't remember.
12           **Q.    Did you contact them by e-mail through**
13   **their website?**
14           A.    I have to say I don't remember.  It was
15   just so long ago, I just don't remember exactly how
16   that first contact was made.
17           **Q.    From that point until late summer of**
18   **2003, did you communicate at all with any of the**
19   **lawyers at Levin, Papantonio by e-mail?**
20               MR. MEDINA:  Just --
21               I don't know what you mean by "from that
22           point."  I'm not clear what time period you're
23           talking about.
24               MR. WICKLINE:  The initial contact.
25               MR. MEDINA:  I object to form.  I'm not

1              sure what you mean by "the initial contact."

2                   MR. WICKLINE:  Okay.  Let me back up,

3         then.

4              **Q.     When did you or Mr. Rich first contact**

5         **the lawyers at Levin, Papantonio?**

6              A.    I don't know.  I mean, if you're asking

7         me to give you a -- a -- you know, months and year

8         kind of thing, I just don't remember that.

9              **Q.     Was it prior to late summer of 2003?**

10             A.    The only thing I can tell you is that it

11        was -- it was prior to the beginning of '02, 2002,

12        when they came.

13             **Q.     Okay.**

14             A.    You know, reasonably deducting that --

15        that they came as a result of communications that, you

16        know, that were had; but I can't tell you exactly

17        when -- when those happened, or how they happened.  I

18        just do not recall.  I just don't -- don't know.

19             **Q.     And you understand when I'm talking about**

20        **the initial contact, I'm talking about the first time**

21        **you contacted or Mr. Rich contacted anyone at Levin,**

22        **Papantonio?**

23             A.    That's what I'm understanding by your

24        question.

25             **Q.     Was there any e-mail communications**

1    between you and the lawyers at Levin, Papantonio

2    between the period of the initial contact and late

3    summer of 2003?

4         A.    I'm sorry, could you repeat that, please?

5         Q.    Were there any e-mail communications

6    between you and the Levin, Papantonio firm between the

7    period of the initial contact and late summer of 2003?

8         A.    To the best of my recollection, I would

9    say yes.

10         Q.    Okay.  Do you know approximately how

11    often you communicated --

12         A.    No, I have no idea.

13         Q.    You need to let me finish my question.

14         A.    Oh, I'm sorry.

15         Q.    By the way, I didn't go over the

16    instructions prior to the deposition.  If you ever

17    need to take a break at any time during the

18    deposition --

19         A.    Thank you.

20         Q.    -- just ask me.

21         A.    Thank you.

22         Q.    It makes it easier on the court reporter

23    if you let me finish my questions --

24         A.    Yeah; I'm sorry.

25         Q.    -- before you -- before you answer; and

1    that I let you finish your answer before asking

2    another question.

3               And if you don't understand any of my

4    questions, let me know, and I'll try to rephrase them;

5    but I think you've been doing that already.

6               Was it your practice to communicate by

7    e-mail?

8         A.    No.

9         Q.    Were your e-mail accounts with West

10   Virginia University, or were they personal e-mail

11   accounts?  For example, Yahoo, or some other -- AOL?

12        A.    The best I can remember, they were --

13              I'm pretty sure they were e-mail accounts

14   that were set up by the University; and, then, after

15   you leave, like, you know, I left, that -- you don't

16   have that anymore.

17        Q.    Okay.  What happens to those e-mail

18   accounts when you leave?

19        A.    I do not know.

20        Q.    And did the lawyers at Levin, Papantonio

21   communicate with you by e-mail -- in other words, send

22   you e-mails -- during the period of the initial

23   contact and late summer of 2003?

24        A.    Did I ever --

25              If your question is, did I ever receive

1    an e-mail, you know --

2                MR. MEDINA:  I'm instructing you not to

3           talk about any periods of either the Masry

4           consulting relationship on Spelter, or the

5           Levin, Papantonio consulting relationship,

6           which I've defined many times to start in the

7           summer of 2003.

8                If you have any other recollection, then

9           you can talk about that.

10               THE WITNESS:  Yeah.

11          A.    And your question was, did I ever receive

12   an e-mail from --

13          **Q.    Correct.  Did you receive e-mails from**

14   **the Levin, Papantonio firm during the period between**

15   **the initial contact and late summer 2003?**

16          A.    Between the initial contact --

17               You're saying between 2002 -- early 2002,

18   say January of 2002, and the middle of '03?

19          **Q.    Correct.**

20          A.    That's the question?

21               With any -- with any --

22               I would say yes to your question.

23               MR. WICKLINE:  Mr. Medina, we would ask

24          that you produce all of those e-mails.

25               MR. MEDINA:  I'm not aware of any such

1              e-mails.  We'll be happy to check; and if we
2              can access any such e-mails, if any exist --
3                    I cannot recall any, despite the witness'
4              recollection, but we will be happy to check,
5              prior to our consulting relationship with
6              Mr. Simoni, if we have any e-mails to or from
7              Mr. Simoni.
8                    MR. WICKLINE:  Okay.
9         **Q.    Had you ever worked with the Levin,**
10   **Papantonio firm before?**
11        A.    No.
12        **Q.    Do you know any of the lawyers at the law**
13   **firm of Cochran, Cherry, Givens, Smith, Lane & Taylor**
14   **in Alabama?**
15        A.    Yes.
16        **Q.    Who do you know?**
17              MR. MEDINA:  To the extent that you
18        obtained that knowledge subsequent to your
19        consulting relationship on Levin, Papantonio,
20        you're instructed not to answer.
21        A.    I'm sorry.
22        **Q.    Okay.**
23              MR. MEDINA:  If you have some prior
24        knowledge of anybody with the Cochran firm,
25        including seeing Johnnie Cochran on TV prior to

1          your consulting work with Levin, Papantonio,
2          then you can talk about that.
3          **Q.    Other than seeing Johnnie Cochran on TV,**
4     **did you have any familiarity with any of the lawyers**
5     **at that firm prior to the late summer of 2003?**
6          A.    Not that I'm aware of.  I don't think so.
7          **Q.    Do you know any of the lawyers at the**
8     **Kennedy & Madonna firm?**
9               MR. MEDINA:  Same instruction.
10         A.    Do I know any of them?
11         **Q.    Yes.**
12              MR. MEDINA:  Again, the instruction, if I
13         have to repeat it, is, you can talk if you
14         had -- about prior knowledge --
15              THE WITNESS:  Right.
16              MR. MEDINA:  -- about Kennedy & Madonna,
17         prior to the consulting relationship.
18         A.    Is that your question?
19         **Q.    That's my question.**
20         A.    So, prior to --
21              Are you asking prior to the relationship?
22         **Q.    Well, my original question did not limit**
23    **it to the prior relationship.  Mr. Medina has**
24    **instructed you not to answer about any knowledge you**
25    **may have gained concerning Kennedy & Madonna after**

1    late summer of 2003.

2              So, now I'm asking the question, did you

3    have any knowledge of the lawyers at the Kennedy &

4    Madonna firm prior to late summer of 2003?

5         A.    No.

6         Q.    Okay.  Have you ever worked with or

7    consulted with the West & Jones firm in Clarksburg,

8    West Virginia?

9              MR. MEDINA:  Again, same instruction.

10             Prior to your consulting relationship, you can

11             testify if you had any knowledge of them.

12        A.    Is that what you are asking me, prior to?

13        Q.    Since Mr. Medina has instructed you not

14   to answer after late summer 2003, I will direct my

15   question to the time period prior to late summer 2003,

16   and your involvement with the West & Jones firm, if

17   any.

18        A.    None.

19        Q.    Have you ever worked with a defense firm

20   or a defense group on a litigation matter before?

21        A.    I can't say for sure.  I don't believe

22   so, but I can't say for sure.  I just can't recall

23   all -- you know, I don't think I ever --

24             When you say "worked with," are you

25   maybe --

 1          Well, I don't want to suggest your
 2    question for you.
 3          **Q.    How many different law firms have you**
 4    **worked with over your career?**
 5          A.    That's what I'm saying.  If you're
 6    talking about working with -- like we're talking
 7    about, you know, working with Levin & Papantonio, or
 8    working with Masry & Vititoe, you know, no.
 9              And I can't remem -- I can't remember any
10    connection, so --
11              I think it's generally no, but I'm not
12    going to say that there, you know, isn't something way
13    back there somewhere I had some connection with, that
14    I don't remember.
15          **Q.    As we sit here today, you have no**
16    **recollection of ever having worked with a defense firm**
17    **or a defense group on a litigation matter; is that**
18    **correct?**
19          A.    I would have to say that's correct, to
20    the best of my knowledge and recollection today, yeah.
21          **Q.    Is there a reason why?**
22          A.    A reason why?
23              MR. MEDINA:  If there's a -- would you
24        repeat the --
25              What was the prior question?  Can you go

1           up one?

2                   THE REPORTER:  Sure.

3           (Whereupon, the requested portion of the

4       record was read by the reporter as follows:)

5                   THE REPORTER:  As we sit here today, you

6               have no recollection of ever having worked with

7               a defense firm or a defense group on a

8               litigation matter; is that correct?

9                   MR. MEDINA:  Okay.  And then you asked

10              him, is there a reason why.

11                  THE REPORTER:  Is there a reason why?

12                  MR. MEDINA:  Again, he's here to testify

13              about facts.  If that's --

14                  If he has a factual answer to that

15              question, I'll allow him to answer it.

16          **Q.    Dr. Simoni, do you have a factual answer**

17      **to that question?**

18          A.    No, I don't.

19          **Q.    Have you ever received any money or gift**

20      **from any of the plaintiffs' firms in this litigation?**

21          A.    No.

22          **Q.    Have you ever received the promise of any**

23      **money or gift from any of these plaintiffs' firms**

24      **concerning this litigation?**

25          A.    Well, as I'm understanding your question,

1    that's an area that would involve communications with
2    the law firms; and if I'm following this whole thing
3    correctly, that would be part of my relationship --
4    working relationship, and, therefore, would be a
5    privileged area.  I mean, unless I'm mistaken about
6    that; but I think that's correct.
7         **Q.    Were there any promises of any money or**
8    **gifts made to you concerning this litigation prior to**
9    **the late summer of 2003?**
10        A.    No.
11        **Q.    Why did you insist upon only talking with**
12   **plaintiffs' counsel, and refuse to talk to me about**
13   **scheduling your deposition?**
14             MR. MEDINA:  Object to form.  You're
15             asking him why did he insist upon talking with
16             plaintiffs' counsel, and refuse to talk to you
17             about scheduling his deposition?
18             That's -- that's not a fact question, I
19             don't think, so he's instructed not to answer.
20        **Q.    Are you going to follow that instruction,**
21   **Dr. Simoni?**
22        A.    Yes.
23             MR. MEDINA:  And I'll tell you why;
24             because he has a consulting relationship with
25             us, okay, so he is not allowed to talk to you

 1              about things like that.  Okay?
 2                   MR. WICKLINE:  Let's get this marked.
 3              (Whereupon, Defendant's Exhibit Number 1 was
 4         marked for identification.)
 5              **Q.    Dr. Simoni, I'm now handing you what**
 6         **what's been marked deposition Exhibit Number 1.**
 7                   **And, for the record, this is the notice**
 8         **of your deposition, and the order entered by Judge**
 9         **Bedell, appointing a commissioner to facilitate**
10         **discovery from a Florida resident, as well as the**
11         **subpoena issued in this case by the Circuit Court of**
12         **Broward County, Florida.**
13                   **Have you seen that before, Dr. Simoni?**
14              A.    It was very late when I got into my home
15         last night, about 10:30, 11:00, and my wife told me
16         that there was a subpoena that had come; and I can't
17         remember if this material was part of that packet, it
18         was so late last night.  I would have to say --
19                   If you want a clear "yes" or "no," I
20         would have to say, no, I don't remember seeing it
21         before.
22              **Q.    An advance version of this was sent to**
23         **the Levin, Papantonio firm.  Did they share a copy**
24         **with you prior to that time?**
25              A.    I don't think I can answer that question.

1          MR. WICKLINE:  Mr. Medina?

2          MR. MEDINA:  You can --

3          To this limited extent, if you can

4     recall, if you did review this document at any

5     point in time prior to this deposition, you can

6     say "yes" or "no" if you did, if you recall.

7     A.   Well, I can just tell you I've not --

8          I didn't see anything about -- in

9     writing.  I didn't see anything in writing about the

10    deposition, you know, like from the court like this

11    is.

12         This is an order from the court, you're

13    saying?  Let me look at it again here.

14    **Q.   Well, there is an order from the court**

15    **attached --**

16    A.   Uh-huh.

17    **Q.   -- and the very last page, there is a**

18    **request for documents.**

19    A.   Right.  I believe -- I believe the order

20    part --

21         Yeah, I believe this was part of the --

22    the subpoena packet that I received last night.

23    **Q.   Okay.  But my question to you --**

24    A.   Now that I'm looking at, you know, the

25    order part.

 1                MR. MEDINA:  He wants to know, did you
 2          look at this list yesterday; and, if you did,
 3          if you can recall, then you can indicate you
 4          did.
 5                Yesterday, prior to when you got the
 6          subpoena, he wants to know, did we give this to
 7          you; and I'm not sure if we did or not.
 8     A.    Oh, no, I didn't -- let me -- let me --
 9          I think I know, maybe, where you're
10     going, because I remember seeing it last night.
11                Okay.  Let me look here.
12                Okay.  Are you wanting to refer to the
13     last page?
14     **Q.    Yes.**
15     A.    Okay.  Let me just look at the last page
16     and make sure it's the same thing I saw last night.
17                Yeah, this looks like a page in the
18     packet that came last night to my house.
19     **Q.    Okay.**
20     A.    I never --
21                If you're asking me if I ever saw it
22     before last night, no, I never saw this -- this list
23     before last night.
24     **Q.    Did any of the lawyers at Levin,**
25     **Papantonio, or any other plaintiffs' lawyers in this**

1    **case, discuss this list with you prior to last night?**

2              MR. MEDINA:  Okay.  He's instructed not

3         to answer any questions relating to substance

4         of conversations with counsel prior to this

5         deposition; or, for that matter, during any

6         period of this consulting relationship.

7         **Q.    Dr. Simoni, did you look for any**

8    **documents responsive to this subpoena?**

9              MR. MEDINA:  And you're instructed to

10        answer only as to any documents that would

11        relate to -- any documents you might have that

12        were obtained separate and apart from your

13        consulting work for Levin, Papantonio, or

14        Masry.

15             If you have any records separate and

16        apart from those consulting work, then you can

17        answer the question; but you -- you're

18        instructed not to answer it as to any documents

19        that you have obtained as part of your

20        consulting work.

21             MR. WICKLINE:  Steve, I think I'm

22        entitled to find out if the documents exist.

23        So, my question is, are there any documents out

24        there?

25             MR. MEDINA:  We're --

 1            MR. WICKLINE:  If you want to --

 2            If you want to fight about, later,

 3       whether or not there are classes of those

 4       documents, or a time period of those documents

 5       which he should not talk about, or not produce,

 6       then that's okay; but I'm entitled to know

 7       whether or not they exist.

 8            MR. MEDINA:  No, you're not.  This is

 9       a -- this is a non-testifying consultant.  You

10       have no right to any information about his

11       activities, or any information that he's

12       obtained as part of his consulting work.

13            You don't have any right to have him

14       identify it or produce it, and he's not going

15       to answer those questions.  He's instructed not

16       to.  If you want him to give information that

17       he might have collected outside of consulting

18       relationships, then he can give that

19       information, if he has any.

20            MR. McQUAID:  Steve, is it your position

21       that Rule 26 of the West Virginia Rules of

22       Civil Procedure act as an absolute total bar on

23       anything relating to the consulting privilege?

24            MR. MEDINA:  We're making this gentleman

25       available.  I'm not going to do my legal

1    argument with you, Mr. McQuaid.  We are making

2    him available, we are trying to accommodate.

3    I'm not going to make legal argument at this

4    point in time.

5         We are making him available to answer

6    fact questions, probably over and above what we

7    should have to do -- we probably shouldn't have

8    to do any of this -- but we are trying to let

9    you know about things that he obtained

10   extraneous to the consulting relationships.

11        And that's all I'm going to say about

12   that.

13        MR. McQUAID:  Just to clarify for the

14   discovery commissioner and Judge Bedell, is it

15   your position that Rule 26 acts as an absolute

16   and total bar on everything within his

17   possession, custody and control?

18        MR. MEDINA:  I'm not here to interpret

19   all aspects of Rule 26 doctrine and case law.

20   I've certainly carefully looked at it.  We feel

21   very comfortable that we are very appropriate

22   in our position that a consult -- a

23   non-testifying consultant --

24        First of all, you don't even have a right

25   to -- to the identification of a non-testifying

1    consultant.  You don't even have a right to
2    know who the person is.
3         But, in this instance, because he had
4    overlapping non-consulting information and
5    activities, he can testify to that -- any such
6    information and activities that doesn't relate
7    to the consulting information.  But that is our
8    position, and it is well supported, and we will
9    stand behind it.  And that's all I'm going to
10   answer, is what --
11        MR. McQUAID:  And you understand that we
12   have to make our record under United Hospital
13   vs. Videll (phonetic); and you are not going to
14   allow us to make that record.  Is that your
15   position?
16        MR. MEDINA:  You can show me the case
17   that you're referring to.  I don't have that
18   case at memory.
19        MR. McQUAID:  Have you read Rule 26, West
20   Virginia Rules of Civil Procedure?
21        MR. MEDINA:  Now you're getting -- you
22   know, it's bad --
23        I'm not going to be badgered by you,
24   Mr. McQuaid, okay?  If you want to --
25        MR. McQUAID:  It's a simple question.

1              MR. MEDINA:  That is absurd.

2              MR. McQUAID:  Okay.

3              MR. WICKLINE:  So, just so I understand,

4          Steve, the parameters that you're allowing me

5          to question this witness, I can ask him about

6          this document rider for any documents that he

7          has prior to late summer of 2003?

8              MR. MEDINA:  Other than any documents

9          that he might have pertaining to any consulting

10         work that he did for Masry's firm.

11             MR. WICKLINE:  Okay.

12         **Q.    Okay.  Dr. Simoni, with the caveat**

13    **that -- or instructions that Mr. Medina has provided,**

14    **I want to know whether or not you have made an effort**

15    **to look for any responsive documents, or any documents**

16    **responsive to this subpoena.**

17         A.    Have I made an effort since last night at

18    10:30, 11:00 at night?  Not since then, I have not

19    made an effort.  I went to bed.

20             MR. WICKLINE:  Let's go ahead and take a

21         break, because we're -- the tape's about --

22             THE VIDEOGRAPHER:  Going off the record,

23         the time is 11:03.

24         (Whereupon, a recess was taken.)

25             THE VIDEOGRAPHER:  Back on the record,

1          the time is 11:15.  This is Tape 2.

2          **Q.    Dr. Simoni, did you discuss the substance**

3  **of your testimony with Mr. Medina during the breaks?**

4               MR. MEDINA:  Object to form, and instruct

5          him not to answer.

6               I'm counsel to this witness and to the

7          plaintiffs, and we're not going to talk about

8          what we talked about on the breaks.

9          A.    Mr. Wickline, just --

10              MR. MEDINA:  Sir, you're instructed not

11         to answer.

12         A.    No; I just wanted to say, with respect to

13  just before the break, just before we took a break --

14         **Q.    Yes.**

15         A.    -- I was not trying to be flip about last

16  night.  It was just --

17              I mean, the fact is, you know, as I said,

18  I got in real late last night from another meeting I

19  had last night, and it just was real late, and that's

20  when I, you know, first saw that thing.  I wasn't

21  trying to be flip.  I just wanted you to understand

22  that.

23         **Q.    I understand.  I appreciate that.**

24              **Okay.  Let's go back to the last page of**

25  **Exhibit 1, which is the document request.**

```
 1          A.    Okay.

 2          Q.    And you understand that Mr. Medina has

 3    limited your testimony concerning the existence of any

 4    documents to the period prior to late summer 2003; is

 5    that correct?

 6               MR. MEDINA:  And also with respect to any

 7          time period of Masry consulting --

 8               THE WITNESS:  Right.

 9               MR. MEDINA:  -- on the Spelter project.

10          Q.    You understand that, sir?

11          A.    (No audible response.)

12          Q.    We need a verbal --

13          A.    I do.  I'm sorry.

14          Q.    Okay.  Dr. Simoni, take a look at Request

15    Number 1.  It requests any communications you have had

16    with any resident of or individual from the Harrison

17    County, West Virginia, communities of Spelter,

18    Hepzibah, Eric, Lambert's Run, Meadowbrook, Gypsy,

19    Seminole, Lumberport or Smith Chapel, about any aspect

20    of the operation of the former plant site at Spelter,

21    West Virginia, or the remediation of that site.

22               Did I read that correctly?

23          A.    I think so.

24          Q.    Okay.  Do you have any such documents

25    that were created or existed prior to late summer
```

1    **2003?**

2                    MR. MEDINA:  Again, the instruction must

3              exclude the period of any work or acquisition

4              of any information pertaining to your

5              consulting with Masry, as well, on the Spelter

6              project in 2002.

7              A.    The answer is no.

8              Q.    Okay.  Turning to Question Number 2, do

9    **you have any documents that were created or existed**

10   **prior to the late summer of 2003, or generated in**

11   **connection with your Masry consulting matter, that**

12   **pertain to research into or information gathered by**

13   **you on the effects or purported effects of the**

14   **operation of the former plant site at Spelter, West**

15   **Virginia, upon any of the surrounding Harrison County,**

16   **West Virginia communities?**

17             A.    I'm just reading that.  I just want to

18   make sure I'm -- you know, again, since I just saw

19   these briefly last night.

20                   No.

21             Q.    **You have no such documents?**

22             A.    No.

23             Q.    **Same question with respect to Number 3.**

24   **Again, for the period prior to late summer 2003, and**

25   **excluding any work for the Masry firm, do you have any**

1    documents that relate to the substance of any meetings

2    with Lenora Perrine, Carolyn Holbert, Waunona

3    Messinger, Rebecca Morlock, Anthony Beezel, Mary Ellen

4    Montgomery, Mary Luzader, Truman R. Desist, Larry

5    Beezel, Joseph Bradshaw, Danny Drummond and Tonya

6    Drummond, or others, about alleged contamination by

7    the operation of the former plant site at Spelter,

8    West Virginia?

9         A.    No.

10        Q.    Again, for the period prior to late

11   summer 2003, and excluding any work for the Masry law

12   firm, do you have any documents, are you aware of any

13   documents that were created or generated by you

14   relating to any aspect of the claims for damage to

15   real property or for medical monitoring or wrongful

16   death being asserted in the above-styled civil

17   actions?

18        A.    No.

19        Q.    Okay.  Dr. Simoni, your testimony is that

20   you do not have any of those documents in your

21   possession; is that correct?

22        A.    That's correct.

23        Q.    Were there any such documents that ever

24   existed, to your knowledge?

25             MR. MEDINA:  Again, with the same

1          instructions.  I mean, if it's about the period
2          prior to our consulting, excluding the Masry
3          consulting, then you can talk about existence,
4          or anything you know; subject to the fact that
5          it needs to be a fact, as opposed to an
6          opinion.
7     A.    Let me just --
8          I just, you know, want to be clear --
9     Q.    **Take your time.**
10    A.    -- what you're asking.
11         I believe what you're asking me --
12   correct me if I'm wrong --
13    Q.    **Sure.**
14    A.    -- is, do I remember there existing any
15   documents that would have preexisted the relationship
16   with Masry & Vititoe on Spelter; and, of course, the
17   relationship with Levin & Papantonio.  Is that right?
18   Is that --
19    Q.    **Either --**
20    A.    Pertaining to these four categories.
21    Q.    **Either preexisted those relationships, or**
22   **that were created or generated outside of those**
23   **relationships.**
24         MR. MEDINA:  Well, object.  I mean, if
25         you want to talk about periods of time prior to

1        Masry, or between Masry and Levin, Papantonio

2        consulting, if there was any period of time,

3        then you can talk about any information or

4        records that you have any knowledge of during

5        those periods of time.

6        A.    And are you asking if I have them now?

7        **Q.    No.  I'm asking --**

8        A.    If I ever had them?

9            Oh, I already answered no, that I don't

10   have any now.  And your question was?

11       **Q.    Did they ever exist?**

12       A.    Did they ever exist?

13            MR. MEDINA:  Again, it's the same

14        instruction.

15            THE WITNESS:  Right.

16            MR. MEDINA:  It's not during any of those

17        periods of consulting.

18            THE WITNESS:  Right.

19       A.    If you'll permit me just a minute, I just

20   want to go over the four categories, because I don't

21   want to be misleading in my answer.

22       **Q.    Dr. Simoni, you're entitled to take all**

23   **the time you need.**

24       A.    In trying to give what I believe is a

25   reasonable, fair answer to this, I would say there's a

1    possibility that way back before I left the
2    University, you know, in --
3              When I say "way back," before --
4    before --
5              When did I leave?  August of '05.  There
6    might have been some old, you know, papers, or
7    whatever, related to these categories; but that --
8              What happened to them is, when I cleaned
9    out my office, everything got dumped.  So, I mean,
10   that's --
11             I don't know if that's a precise answer
12   that you were looking for, but that's --
13             You know, I don't remember what they
14   would have been; but I don't want to sit here and say,
15   no, it's impossible, that they never existed.  I
16   just --
17             You know, I have no recollection of what
18   they would have been; and, as I say, in thinking about
19   all of those things that are here, I just know that
20   they were dumped.
21             If they existed, they would have been
22   dumped at the time that I left the University, when I
23   cleaned my office out in the spring and summer of '05.
24   That's the best I can tell you.
25        Q.   **And just to make sure I understand your**

1   **testimony, you're saying that there is a possibility**

2   **that there were at one time some documents that were**

3   **responsive to this subpoena, that existed outside of**

4   **your consulting relationship with the Levin,**

5   **Papantonio firm beginning in late summer 2003, and**

6   **your consulting relationship with the Masry firm**

7   **sometime during 2002; is that correct?**

8          A.    Yeah; what I'm saying, to give you an

9   example is, you know, is I might have -- I might

10  have --

11          I can't say that I did for sure, because

12  I don't remember; but I'm saying it's reasonable -- it

13  would have been reasonable for me maybe to --

14          Well, I think I can give you an example.

15      **Q.    Okay.**

16          A.    Maybe an example.

17          Prior to the consulting, you know,

18  relationships, I happened to have a meeting with a

19  Mr. Hando from the West Virginia Department of

20  Environmental Protection, local DEP, okay, and that --

21  in the area of north central West Virginia.  I don't

22  know what his full territory is, but --

23          And I remember speaking to him about

24  Westinghouse.  That was my purpose for going to -- you

25  know, to see him.  And I remember in that contact

 1      that, as we're talking about Westinghouse and the

 2      problems that he knew about, you know, regarding --

 3      you know, DEP connection with the Westinghouse area,

 4      he said to me --

 5              He said, you want to see something really

 6      bad -- and I'll never forget his words -- because he

 7      said to me, I've got 50 acres of contamination in

 8      Spelter.

 9              And I said, well, what are you talking

10      about, because -- because Spelter --

11              I knew Spelter, okay?  I knew of Spelter,

12      I knew people who lived in Spelter.

13              And I said, what are you talking about?

14              He said, well, we got this pile of

15      contamination over at the Spelter smelter plant site.

16      And he explained to me a little bit more about that,

17      and he said -- and he said, it's right outside the

18      plant, on the plant property there.  And he was giving

19      me this -- I don't know -- some idea of how far it

20      extended, and he said --

21              But he termed it, 50 acres of

22      contamination.  And, you know, maybe that day he might

23      have shown me something related to it, that pile, as

24      we --

25              You know, we were just talking, and he

1    might have -- he might have shown me something; but I
2    don't remember if he did.  You know, he might have
3    shown me some DEP report that they had on that
4    50 acres of contamination, but I don't -- I don't --
5              I can't say that that happened, but I
6    would say it wouldn't be unreasonable if that
7    happened.  But did I --
8              You know, can I tell you that I had those
9    doc -- you know, any documents from him, or anything
10   like that?  No, I can't.  I just --
11             I remember that -- that communication
12   about that, but -- but that's the extent of my
13   recollection of them.
14        **Q.    Okay.**
15        A.    So, I don't know if I'm answering your --
16             I don't know if I'm, you know, on your
17   question, or not; but that's the best I can do with
18   it.
19        **Q.    And, as I understand your testimony**
20   **earlier, to the extent such documents existed at one**
21   **time, or were in your possession at one time, those**
22   **have now been destroyed?**
23        A.    All of that would have been dumped when I
24   left my office in -- I want to say --
25             I guess I left my office as of August 1st

1   of '05; so, in the months before that.  My office was

2   a bit of a job to clean up, I must say, so it wasn't

3   something that was done overnight.

4            **Q.    Did you ask any of the plaintiffs'**

5   **counsel if they wanted those documents prior to you**

6   **destroying them?**

7            A.    No.

8            **Q.    Was it your thought that they had already**

9   **had the documents prior to you destroying them?**

10           A.    Was it my thought?

11           **Q.    Would you have --**

12                 **Let me just rephrase the question.**

13           A.    Yeah.

14           **Q.    Would you have destroyed documents**

15  **concerning ongoing litigation without feeling**

16  **confident that the plaintiffs' lawyers already had**

17  **copies in their files?**

18           A.    I would have to say no.

19                 MR. WICKLINE:  Mr. Medina, we would like

20           you to check your records for any documents

21           responsive to this subpoena, either in your

22           file or in the files of any of the other

23           plaintiffs' counsel, and produce those to us.

24                 MR. MEDINA:  We have no objection to

25           producing anything received from Mr. Simoni

1    that didn't relate to either of those

2    consulting relationships.  So, if we have

3    something, we'll provide it.

4         And we more than likely already have

5    provided it, probably years ago, but we'll

6    check.

7         MR. WICKLINE:  Well, if you have already

8    provided it, we would like to know what it was

9    you provided.

10         MR. MEDINA:  Yes, I think that's fair.

11    That's fine.

12    **Q.    Dr. Simoni --**

13         MR. MEDINA:  If we can -- if we can

14    interpret it.  I mean, this is amorphous.  I

15    don't know --

16         I mean, you know, we do investigative

17    work, this is a non-testifying consultant,

18    we're not going to allow him to testify about

19    his consulting work; but we have turned over a

20    vast amount of material from government

21    agencies, and -- and to the extent we can

22    identify for you something that was pertaining

23    to prior work of Mr. -- Dr. Simoni, prior to

24    when he was a consultant for us or the Masry

25    firm, or unrelated to the Masry time, then we

1          will do that.
2          Q.     Dr. Simoni, did you do anything to
3     prepare for your deposition today, other than speak
4     with your counsel?
5          A.     No.
6          Q.     Did you review any documents in
7     preparation for your deposition today?
8          A.     No.
9          Q.     Where are you originally from?
10         A.     You mean like where I was born?
11         Q.     Yes.
12         A.     Oh, I was born in New Haven, Connecticut.
13         Q.     Is that where you grew up?
14         A.     No.  I grew up in upstate New York.
15         Q.     And you've attended public school in
16    upstate New York?
17         A.     Public school.
18         Q.     Where did you get your undergraduate
19    education?
20         A.     University of Notre Dame; South Bend,
21    Indiana.
22         Q.     And what dates did you attend Notre Dame?
23         A.     1959 to 1963, as an undergraduate.
24         Q.     And what was your major or specialty?
25         A.     My major was political science.

1        **Q.    And did you earn a degree from Notre**
2  **Dame?**
3        A.    I did.
4        **Q.    What degree was that?**
5        A.    BA.
6        **Q.    Bachelor of arts in political science?**
7        A.    Right.
8        **Q.    And did you go to graduate school?**
9        A.    I did.
10       **Q.    Where did you go to graduate school?**
11       A.    Notre Dame, also.
12       **Q.    Okay.  And what dates did you attend**
13  **graduate school at Notre Dame?**
14       A.    I started in '66, I believe, and was
15  there until '70 -- '70 or '71.  I think it was '71
16  when I --
17            Yeah, '71 when I went to West Virginia,
18  took a job in West Virginia University in '71; and
19  finished the degree work at Notre Dame, and the
20  dissertation, and all of that, '73.
21       **Q.    Okay.  What is --**
22       A.    Received a Master's along the ways.  I
23  think it was in '70.
24       **Q.    What did you receive your Master's degree**
25  **in?**

```
 1          A.      Sociology.
 2          Q.      Okay.  And I understand that you did work
 3   toward a doctorate degree?
 4          A.      And received it in '73.
 5          Q.      Where was that?
 6          A.      Notre Dame, also.
 7          Q.      And what was the time period that you
 8   studied for your doctorate?
 9          A.      Well, it was that time period.  It was a
10   doctoral program which allowed you to pick up a
11   Master's along the way.
12                  So, I entered the doctoral program in
13   '66, and had the Master's conferred, I think, in '70;
14   and then finally finished the PhD in '73, after I had
15   already been at West Virginia for a year and a half or
16   two years.
17          Q.      I see.  And what is your doctoral degree
18   in?
19          A.      Sociology.
20          Q.      And did you have a doctoral thesis, or a
21   paper?
22          A.      Uh-huh, doctoral dissertation.
23          Q.      And what was that on?
24          A.      It had to do with -- with the influence
25   of interviewing methods on responses that you got from
```

1    people who were interviewed; otherwise, the

2    methodology --

3           It was a methodologically focused

4    dissertation, looking at the responses people were

5    giving about family planning at that time; because,

6    back at that time, there was a lot of money being

7    spent on family planning programs.  And the data that

8    was being generated, my dissertation hypothesized and

9    postulated, was misleading and possibly incorrect

10   because of the methods that were used to collect the

11   information.

12        **Q.    What sort of family planning issues are**

13   **you talking about?**

14        A.    Preferred family size, how people looked

15   at large families versus small families, and the

16   factors that -- that influenced people's preferences

17   for large or small families; that area.

18        **Q.    Okay.  And have you received any other**

19   **education?**

20        A.    I received a JD from West Virginia in --

21   I think it was '95, to the best of my recollection.

22        **Q.    Okay.  When you say --**

23        A.    I started law school in '90, going part

24   time, and I think it was '95 the actual -- December of

25   '95, maybe, the actual graduation date.

1          **Q.     Okay.  Now, do you also have an**
2    **anthropology degree?**
3          A.     No.  I studied -- I studied --
4                 Well, the answer is, no, I do not.
5          **Q.     Okay.**
6          A.     I have a doctorate in sociology, not
7    anthropology; but what I was going to say is, I
8    studied --
9                 I did my doctoral work under the
10   mentorship of an anthropologist, actually.  So, some
11   people would have termed me maybe more of a social
12   anthropologist than a sociologist, because of my
13   approach to -- you know, to my work that I did.
14         **Q.     Okay.  Did you teach anthropology and**
15   **sociology at West Virginia University?**
16         A.     I taught sociology.
17         **Q.     Now, have we discussed your complete**
18   **educational background?**
19         A.     Yeah, I'm fairly sure.
20         **Q.     Do you have what's called a curriculum**
21   **vitae?**
22         A.     You mean did I have when I was at the
23   University?
24         **Q.     Yes.**
25         A.     Yes.

1     **Q.    Do you have one now?**

2     A.    No.

3     **Q.    Have you published any articles?**

4     A.    Since I left the University?

5     **Q.    No; at any time.**

6     A.    Yes.

7     **Q.    How many articles have you published?**

8     A.    I couldn't tell you.  You would have to

9     look at my vitae.  I really don't -- really don't

10    remember.

11    **Q.    Several?**

12    A.    Yeah.

13    **Q.    Can you -- Strike that.**

14    **Are there any articles that you have**

15    **published that would relate in any way or have any**

16    **relevance to Spelter?**

17            MR. MEDINA:  Object; instruct him not to

18            answer.  That's opinion.

19            You can ask him about what articles he

20            published, and he can tell you what's in the

21            articles, if he can recall; but he's not going

22            to make qualitative comparisons and decide

23            things about what might, as a sociologist, be

24            relevant to Spelter or this litigation.  That

25            would be opinion related, it's not fact

1       related.

2           Q.      Are all of your articles that you have

3       published on the subject of sociology?

4           A.      Excuse me.  I think they would all be

5       considered sociological research.

6                   MR. WICKLINE:  Let's mark that as an

7                   exhibit.

8                   (Whereupon, Defendant's Exhibit Number 2 was

9       marked for identification.)

10          Q.      Dr. Simoni, I'm handing you what has been

11      marked as Exhibit 2.  Do you recognize that article?

12          A.      Yes.

13          Q.      And is this an article that you wrote in

14      conjunction with Mr. Ball?

15          A.      Yes.

16          Q.      What did you tell me earlier was your

17      middle initial?

18          A.      My middle initial officially is A, my

19      Social Security and --

20                  I had to get it changed, but I always

21      signed my name Joseph J, because it's Joseph Albert

22      John, my name; and I always used to sign --

23                  I've always signed Joseph J.  Even now,

24      with --

25                  My official name is Joseph A, if you

1    go -- you know, if you look at Social Security, and
2    I'm in Medicare now, I'm Medicare qualified, all of
3    that is, you know, Joseph A.  Passport, Joseph A,
4    which I just got a new passport.  So, all of that --
5    my new driver's license, and stuff, because that,
6    apparently, was what I needed to have in my official
7    records.
8            But I've always signed my name Joseph J,
9    as far as I can remember, as long as I can remember.
10   I've used the J when -- with my signature, my middle
11   name John, rather than the A.  I never liked Albert.
12   So, that's the way that was.
13           **Q.    So, are you Joseph John Albert Simoni?**
14           A.    Joseph Albert John.
15           **Q.    Okay.  And you say you had to change the**
16   **middle initial for some reason?**
17           A.    No, I didn't change it.  I just --
18           In order to get everything in sync when
19   we came to Florida, for driver's license and Social --
20           You know, I was approaching Social
21   Security age, and all that kind of stuff, or maybe I
22   had already been in --
23           I can't remember the dates that well.
24   But, to get everything in sync, we got the -- all the
25   official papers to have the Joseph A.

1          Q.     Okay.

2          A.     And -- but the J comes up just because

3     it's been my tradition to sign Joseph J.  And I used

4     it, as you can see, when I published.

5          Q.     Okay.  The title of the article is:  Can

6     We Learn From Medicine Hucksters?

7          A.     Uh-huh.

8          Q.     What is a huckster?

9               MR. MEDINA:  Object.  And this has

10          nothing to do with the facts in Spelter.  I'm

11          instructing him not to answer any -- providing

12          any interpretation of what any terms mean.  You

13          can --

14               It's probably going inappropriately far

15          afield to even append this to the deposition,

16          but I'm going to go ahead and allow you to ask

17          him pure fact questions pertaining to the --

18          the contents of this, but he's not going to

19          interpret any terms.

20          A.     What was your question again?

21          Q.     Well, my question was, what is a

22     huckster?

23          A.     Okay.  And --

24               MR. MEDINA:  And unless --

25          A.     -- I was instructed not to --

 1              MR. MEDINA:  Unless there's a part of
 2          this that provides a definition of "huckster,"
 3          you're not here to provide a definition of
 4          "huckster" for Mr. Wickline.
 5      **Q.    Well, you do, in fact, define or discuss**
 6  **hucksters in this article, right?**
 7              MR. MEDINA:  Okay.  Well, you point to a
 8          paragraph and a line, and then he'll tell you
 9          whether or not that's in there or not.  The
10          document speaks for itself.
11      A.    I'm not sure what you're asking me now.
12      **Q.    Well, you talk about hucksters.**
13      A.    Oh, you're asking me what a huckster is?
14      **Q.    Yes.**
15      A.    Okay.  Well, I would just refer you to
16  Page 175.  At the top of 175 there, it explains to you
17  what hucksters are.
18              MR. MEDINA:  And if you want to get a --
19          Mr. Wickline, if you want to get a
20          sociologist, and try to use him as an expert in
21          the Drummond and Perrine case, and talk about
22          definitions of medicine hucksters --
23              MR. WICKLINE:  Mr. Medina, your objection
24          is stated on the record.  I ask that you stop
25          the speaking objections.  I've let you go for

1          quite some time, but please stop.

2               MR. MEDINA:  This is inappropriate to be

3          talking about --

4               You're trying to build your case with

5          this person, to provide expertise that you're

6          perfectly free to go hire your own expert on;

7          but he's not going to sit here all day and talk

8          about his literature and help you make whatever

9          arguments that don't relate to the facts of

10         this case.  If he is --

11              If you want to talk about the facts of

12         work he did in Spelter, he can talk about that;

13         but we're not going to go very --

14              We're not going to go through every one

15         of his articles.

16     **Q.     Dr. Simoni, can you answer the question?**

17     A.     Which was?

18     **Q.     What is a huckster?**

19     A.     I think the --

20              I would just refer you to the article.

21     The answer is in the article.

22     **Q.     Okay.  Can you read to me the answer in**

23     **the article?**

24          A.     Top of 175, it says:  Medicine hucksters

25     are picturesque personalities with a gift of gab,

 1    ingenious, witty, and skillful in the use of synonyms.
 2    Their products run the gamut from virility stimulants
 3    and pomades for calluses to cure-all syrups.
 4              And then it talks about the serious side
 5    of the huckster work, and it --
 6              On the previous page, it gives you the
 7    kinds of settings they work in, and talks about
 8    medicine hucksters have --
 9              I'm referring to the last paragraph on
10    174.  It says:  Medicine hucksters have been operating
11    in Mexico for more than three-quarters of a century.
12    It talks about the history, predecessors of the
13    huckster, and how they set up in marketplaces and
14    places where there's a lot of public.  That's what it
15    explains in that paragraph.
16         Q.   Okay.
17         A.   And they provide health information, as
18    it says there.
19         Q.   You state --
20              If you take a look at the first page,
21    second paragraph, last sentence, you state that:  We
22    suggest that certain of the influence strategies
23    employed by the huckster may be adapted to the needs
24    of community health programs in developing societies.
25              Do you see that?

```
 1          A.    I see the wording, yes.
 2          Q.    Okay.  Was that your thesis for the
 3    article?
 4                MR. MEDINA:  Object.  The document speaks
 5          for itself.
 6                If you have a thesis that's in the
 7          article, that you can point him to, that's
 8          indicated as a thesis, but don't provide any
 9          interpretation of the article.  That's not a
10          fact question.
11          A.    I'm not answering on advice of counsel.
12          Q.    Was it your position that the medicine
13    huckster has any application to the American health
14    care system?
15                MR. MEDINA:  Object, and instruct the
16          witness not to answer.
17                It has nothing to do with the facts of
18          Spelter that this witness is going to be
19          entitled to testify about.  He's not going to
20          provide your sociological -- help you to
21          understand sociology.
22          Q.    Was this a peer-reviewed article?
23          A.    I do not remember.
24          Q.    Did you receive any comments on the
25    article?
```

1          A.    I don't remember that, either.
2          Q.    **If you take a look at Page 180, third**
3    **paragraph, third sentence, it says:  The initial**
4    **response to a proposal for this study by Mexican**
5    **health care administrators and Mexican research**
6    **personnel was laughter --**
7          A.    I mean --
8          Q.    **-- and a tendency to suggest that such**
9    **people cannot be taken seriously, certainly not as a**
10   **target for research.**
11         A.    You know, I'm sorry --
12               MR. MEDINA:  Where are you?
13         A.    -- I'm not following where you are.
14         Q.    **Paragraph 3 on Page 180.**
15         A.    Paragraph --
16         Q.    **Third sentence.**
17         A.    Oh, third full paragraph?
18         Q.    **Third full paragraph.**
19         A.    Oh, the last sentence there.
20         Q.    **Yeah.**
21               MR. MEDINA:  What's the question, does it
22         say that?  Yes, it says that.  Now let's move
23         on.
24         A.    I'm sorry, what was your question?
25         Q.    **Did the Mexican health care**

1   **administrators and Mexican research personnel laugh at**

2   **you when you proposed this research project?**

3          A.    I would just refer you to what the

4   article says.

5          **Q.    Okay.  Is that what the article says?**

6          A.    It says:  The initial response to a

7   proposal for this study by Mexican health care

8   administrators and Mexican research personnel was

9   laughter and a tendency to suggest that such people

10  could not be taken seriously, certainly not as a

11  target for research.

12         **Q.    Have you ever been a presenter or**

13  **panelist at any seminar or conference?**

14         A.    Yes.

15         **Q.    On what subjects?**

16         A.    Well, all sociologically related, having

17  to do with work that I was doing, or --

18               Your question was panelist or --

19         **Q.    Conference.**

20         A.    Sometimes I would chair sessions of --

21  for people who were presenting papers.  I wasn't

22  actually presenting a paper, but I would chair the

23  session; or sometimes I would serve as a commentator

24  for sessions on papers that other people were

25  presenting.

1      **Q.    Have you ever been a panelist or a**
2   **presenter at any seminar or conference that, to your**
3   **knowledge, was sponsored by the plaintiffs' bar?**
4          A.    By the plaintiffs' bar?  Not that I
5   recall.
6          **Q.    What is the study of sociology?**
7              MR. MEDINA:  Object; instruct the witness
8          not to answer.
9              That's not a fact question, that's a
10         definitional opinion question.  You can get
11         your own sociologist and do it on your own
12         time.  This witness is not going to -- not
13         going to be talking about those kind of things.
14         **Q.    Okay.  Are you an expert in toxicology,**
15   **Dr. Simoni?**
16         A.    Am I an expert in toxicology?
17         **Q.    Correct.**
18         A.    I've never heard that before.  Never --
19   never heard that suggested before.
20         **Q.    Well, I'm asking whether you consider**
21   **yourself an expert in toxicology.**
22             MR. MEDINA:  And, again, you can answer
23         about any knowledge that you might have that
24         would be a factual response to that question,
25         that would have been extraneous to your

```
 1              consulting for Levin, Papantonio, and Masry.
 2         A.    Let me just say that --
 3              Could you repeat --
 4              I'm sorry.
 5              MR. MEDINA:  You can't --
 6              He asked you if you were an expert in
 7         toxicology.
 8              THE WITNESS:  Right.
 9              MR. MEDINA:  And you cannot refer to
10         any --
11              In providing a factual response to that
12         question, if you understand it, you cannot
13         refer to any knowledge that you would obtain --
14         obtained during the periods of your consulting
15         work for Levin, Papantonio, or Masry.
16              THE WITNESS:  Right.
17         A.    If you're asking, generally speaking, do
18    I consider myself an expert in toxicology --
19         Q.    That's the question.
20         A.    No.
21         Q.    Would you defer to experts in toxicology
22    on toxicological matters?
23              MR. MEDINA:  Object; instruct the witness
24         not to answer.
25              That's not a fact question; that's purely
```

1              opinion or speculation, has nothing to do with

2              the facts in this case.

3          **Q.     Do you consider yourself an expert in**

4    **epidemiology, Dr. Simoni?**

5              MR. MEDINA:  Same instructions about any

6              epidemiological knowledge that you would have

7              obtained during your consulting periods, you

8              couldn't refer to that; but if you can answer

9              the question factually, without reference to

10             that knowledge source, if any, then you can

11             answer it.

12         A.     I would say no.

13         **Q.     Are you an expert in the field of**

14   **medicine?**

15             MR. MEDINA:  Same instructions.

16         A.     Same answer, no.

17         **Q.     Are you an expert in the field of soil or**

18   **dust science?**

19             MR. MEDINA:  Same instructions.

20         A.     No.

21         **Q.     Are you an expert in the field of**

22   **environmental science?**

23         A.     No.

24         **Q.     Are you an expert in the field of**

25   **economics or appraisal?**

1          A.    No.

2          Q.    **Are you currently employed, Dr. Simoni?**

3          A.    I am currently retired, thankfully.

4          Q.    **Do you have an office address here in**

5     **Florida?**

6          A.    I do not.

7          Q.    **What was your first job out of high**

8     **school?**

9          A.    First job out of high school.  You mean

10    full-time job?

11         Q.    **Yes.**

12         A.    Well, I don't think, actually, I had --

13               Well, yeah, out of high school, I don't

14    actually remember; but it probably is in my vitae

15    somewhere, or some reference to it, maybe.

16               I don't know.  I'm thinking maybe I put

17    something like that in there, but maybe not.  I don't

18    know.  I can't really pinpoint that for you at this

19    point.

20         Q.    **Can you tell me -- Strike that.**

21               **When did you start working for WVU?  Was**

22    **it '71, you said?**

23         A.    1971.

24         Q.    **Can you tell me what jobs you had between**

25    **high school and 1971?**

1          A.    Between high school and 1971?  Well, I

2    know I had -- I had some, you know, part-time jobs

3    going through college.

4          **Q.    Full-time jobs.  We'll limit it to that.**

5          A.    Full-time jobs.  I'm trying to think.

6    After high school, I went to college; and any jobs I

7    would have had during that period of time would have

8    been part time.  I did, you know, do some part-time

9    work going through college, like most -- a lot of

10   people do.

11              And, then, after college, I went to study

12   at Columbia University, and was not full-time

13   employed, as I can remember; all part-time work.  I

14   think until I graduated from --

15              Because then, after college, I was in the

16   Peace Corps, and came back from the Peace Corps and

17   was in graduate school.  So, I think until after

18   graduate school, to the best of my recollection right

19   now, I can't pinpoint for you full-time employment.  I

20   had a lot of part-time stuff, but I can't recall any

21   full-time stuff.

22          **Q.    That's fair.  When were you in the Peace**

23   **Corps?**

24          A.    '64 to '66.

25          **Q.    And where were you?**

1          A.     In Chile.

2          **Q.     Anywhere else?**

3          A.     No.

4          **Q.     What did you do in Chile?**

5          A.     I worked with communities in forming new

6     cooperative organizations and restructuring old ones;

7     credit co-op organizations.

8          **Q.     Okay.  And, so, you started at West**

9     **Virginia University in 1971, correct?**

10         A.     '71.

11         **Q.     Okay.  And that continued until?**

12         A.     August of '05.

13         **Q.     What was your first job at WVU?**

14         A.     Well, my job all the time at WVU was the

15    same.  I was a faculty member in the Department of

16    Sociology.

17         **Q.     Did you have any administrative**

18    **responsibilities at WVU, in addition to your teaching**

19    **responsibilities?**

20         A.     Oh, I had some committee -- you know,

21    intra-departmental committee responsibilities, which

22    were just typical come-with-the-job, so to speak, kind

23    of thing.  I was never a chairperson or -- you know,

24    if that's what you mean by "administration."

25         **Q.     Were you a full-time employee?**

1          A.    Yes.

2          **Q.    Were you a salaried employee?**

3          A.    Yes.

4                Could we possibly take a little break?

5                MR. WICKLINE:  We can take a break any

6          time you like, sir.

7                THE WITNESS:  I'm sorry.  I probably

8          shouldn't be consuming all this water, but

9          that's the way it is.

10                MR. MEDINA:  Off the record.

11                THE VIDEOGRAPHER:  Going off the record,

12          the time is 12:01.

13                (Whereupon, a recess was taken.)

14          (Whereupon, Mary E. Snead, Esq., substituted in

15     for Richard Gallagher, Esq.; and Perry Jones, Esq.,

16     substituted in for Jerry Jones, Esq.)

17                THE VIDEOGRAPHER:  Back on the record,

18          the time is 12:20.

19          **Q.    Dr. Simoni, can you tell me what**

20     **documents you have -- Strike that.**

21                **Can you tell me whether you have turned**

22     **over documents to plaintiffs' counsel?**

23                MR. MEDINA:  If -- Okay.  I'll allow him

24          to answer that question.

25          A.    Yes.

1        Q.    Have you turned over documents to
2    plaintiffs' counsel that existed or were created prior
3    to the late summer of 2003, excluding, of course, the
4    portion in 2002 for the work for the Masry firm?
5        A.    I don't know.
6             MR. MEDINA:  We indicated before,
7             Mr. Wickline, we'll cooperate to do the best we
8             can to figure out any such materials.
9        Q.    Was it your practice, when you sent
10   documents to plaintiffs' counsel, to send them under
11   cover of letter?
12            MR. MEDINA:  Okay.  If you're talking
13            about pertaining to his work during these
14            periods of time prior to our consulting
15            relationship, or not during the period of time
16            of the Masry firm, then he can answer what his
17            practice was; but he can't talk about his
18            practice of how he managed documents during
19            the -- during the consulting period.
20       A.    The question again was, please?
21       Q.    Was it your practice to send documents to
22   plaintiffs' lawyers in this case under cover of
23   letter?
24       A.    I'm being instructed, I believe, to --
25            MR. MEDINA:  No; you can talk about it if

 1          it's outside of the periods --
 2                  THE WITNESS:  I know.
 3                  MR. MEDINA:  -- of consulting.
 4                  THE WITNESS:  I understand.
 5                  MR. MEDINA:  Okay.
 6                  THE WITNESS:  But --
 7                  MR. MEDINA:  If there was any.
 8          A.      Yeah, that's --
 9                  I don't know.  I don't have any
10  recollection of doing that outside of the period of
11  consulting.
12          **Q.      Well, let me ask it this way, then:  Had**
13  **you sent documents outside the period of consulting,**
14  **would it have been under cover of letter?**
15          A.      Can you ask me that question once more,
16  please?  I'm sorry to ask you to do that.
17          **Q.      If you had sent documents to plaintiffs'**
18  **counsel outside the period of consulting for**
19  **plaintiffs' counsel, would you have sent those**
20  **documents -- or was it your practice to send such**
21  **documents under cover of letter?**
22          A.      Okay.  I'm just trying to understand --
23                  So, you're asking me a hypothetical, as I
24  understand it, if I would have sent documents before
25  the consulting time, how would I have sent them?  Is

1    that --
2              That's speculative, I think.
3              MR. MEDINA:  Well, if you can recall any
4         information on whether you would have had
5         transmittal letters, or anything like that,
6         with whatever documents you would have sent,
7         that's all he's trying to find out.
8              If you can't recall, then you can't
9         recall; but he's wanting to know what your
10        practice would have been.  So, I'll --
11             I'm not instructing you not to answer
12        that.
13        A.    Okay.  Well, let's see if I can clarify
14   for you.  I don't have any recollection of having sent
15   documents to counsel before the consulting time, all
16   right?
17             If I would have sent, I guess I -- you
18   know, I would have at my disposal one or two
19   different -- three, maybe, different ways of doing it.
20   Under cover of letter, as you suggested, would be one;
21   fax would be another.  I mean, I had those means at my
22   disposal.
23        Q.    What about e-mail?
24        A.    I don't remember ever using e-mail to
25   send documents, even after --

1          I shouldn't be talking about that, but I
2    don't remember ever using e-mail.  I would say e-mail
3    would not be, you know, the way it would have
4    happened.  Again, I'm telling you the best I can
5    remember.
6          **Q.    Did you request a fee from plaintiffs'**
7    **counsel, outside your consulting relationship with**
8    **them?**
9          A.    A fee?
10         **Q.    Yes; a fee in connection with this**
11   **litigation.**
12         A.    No.
13         **Q.    We talked about whether or not you were**
14   **paid any referral fees, or other fees, or given any**
15   **money or gifts by the plaintiffs' counsel; but I**
16   **haven't asked you whether or not anything has been**
17   **paid to any members of your family.**
18         A.    If it happened, they sure didn't tell me
19   about it.
20         **Q.    Okay.  Did -- Strike that.**
21              **Why did you leave WVU?**
22         A.    Retirement.  I had been there for 34
23   years, and...
24         **Q.    Did you leave under good terms?**
25         A.    Yes.

1          Q.    Is it fair to say that your relationship

2    with the administration at West Virginia University

3    under President Hardesty was contentious?

4          A.    I think it would be fair to say that.

5          Q.    Were you opposed to President Hardesty

6    being appointed president at WVU?

7          A.    Yes.

8          Q.    Were you aware that President Hardesty

9    was a Rhodes scholar?

10         A.    Yes.

11         Q.    Were you aware that President Hardesty

12   was from West Virginia?

13         A.    Yes.

14         Q.    Did you support the University of Idaho

15   president, Elizabeth Zinser, instead?

16         A.    I'm sorry, I don't remember her.  Was

17   she --

18              Well, I don't remember that name.

19         Q.    Let me just show you an article.  I don't

20   need to make it an exhibit.

21         A.    Could you tell me where this is from?

22   Does it say?  Does it indicate?

23         Q.    It says, Cowles Publishing Company.

24              MR. MEDINA:  Excuse me, where are you

25         seeing that?

1              MR. WICKLINE:  Second page.

2              MR. MEDINA:  Well, at the top,

3         Mr. Wickline, it says "Spokesman Review."  Is

4         that a newspaper in -- excuse me -- in Spokane,

5         that --

6              MR. WICKLINE:  That would be my

7         assumption.

8              MR. MEDINA:  Okay.

9     A.    Can I take a look at this for a minute,

10    please --

11    **Q.    You sure can.**

12    A.    -- just to understand completely what it

13    is?

14              MR. MEDINA:  You don't have a date on

15         this?  Do you have any idea what the date is?

16              Mr. Wickline, you don't know the date on

17         this?

18              MR. WICKLINE:  I don't.

19              MR. MEDINA:  It's not dated.

20              MR. WICKLINE:  Well, May 2nd, 1995.

21              MR. MEDINA:  Oh, yeah, okay, it is.

22         Thank you.

23    A.    Okay.

24    **Q.    My question to you, Dr. Simoni, is:  Is**

25    **it accurate that you were supporting the University of**

1    **Idaho president, Elizabeth Zinser, over David**

2    **Hardesty?**

3           A.    No; I believe this article says, and

4    probably accurately, that all I stated to someone was

5    that the -- was that the faculty seemed to be

6    preferring Zinser.

7           Q.    And that would include you?

8           A.    No; I think I was speaking, you know --

9           Q.    **But I'm just asking you what your opinion**

10   **was at the time, not what the article says.  Was your**

11   **opinion at the time that --**

12          A.    I can't --

13                Not knowing the time frame here, exactly

14   when this came out, I can't speak to that, and

15   probably shouldn't speak to it, because I don't know

16   that -- the time frame would have made a difference as

17   to my position with respect to the choices.

18          Q.    **Okay.  Did you know at the time that**

19   **University of Idaho president, Elizabeth Zinser, was**

20   **subject to a petition drive in Idaho to take away her**

21   **job?**

22          A.    I don't remember now that I did -- that I

23   was aware at that time.  So, it's possible way back

24   then that I might have been, but I don't remember

25   being aware of it.

 1        **Q.    And is it correct that --**

 2             **Do I understand what you're saying is**

 3    **that there was a time when you began supporting David**

 4    **Hardesty as president at WVU?**

 5        A.    That there was a time when I began

 6    supporting him?

 7        **Q.    Yes.**

 8        A.    There was a time --

 9             I wouldn't say it that way, no.

10        **Q.    How would you say it?**

11        A.    I would say that there was a time when I

12    had no reason to express any strong opposition to him.

13    I had worked with David on the same board of trustees

14    back in West Virginia between -- I think it was '88

15    and '92.

16             I was a member of the board of trustees,

17    and he was a member of the board, and we worked

18    together on a lot of common matters, board business;

19    and I knew him to be a very reasonable guy, and -- and

20    my experiences with him at that time was that he was

21    a -- you know, a fair person in his judgments.

22             And I didn't always agree with him on

23    board matters, but -- we didn't always vote the same,

24    but that's neither here nor there, I don't think.  You

25    know, I think --

 1            So, there was a period of time when I
 2    would not have, I think it's fair to say, expressed
 3    strong opposition to his candidacy.
 4         **Q.    Okay.  Let me show you this article.**
 5         A.    Uh-huh.
 6         **Q.    And if you'll turn to Page 2.**
 7         A.    This is '97?
 8         **Q.    Yes.**
 9         A.    Page 2.
10         **Q.    This is, for the record, the Mountaineer**
11    **Spirit, December 11th, 1997, publication.**
12         A.    Uh-huh.
13         **Q.    And, on Page 2, there's a reference to**
14    **you, one, two, three, four -- the fifth, sixth and**
15    **seventh paragraphs down.**
16         A.    Yeah; I'm going to have to read this from
17    the top to get a -- a remembrance of the context,
18    okay?
19         **Q.    Sure.**
20         A.    Okay.  I think I have a grasp of what
21    it's about, about what those paragraphs refer to.
22         **Q.    Okay.  Well, first of all, this is where**
23    **you're contending there was a conflict of interest**
24    **created at West Virginia University on the Faculty**
25    **Welfare Committee; is that correct?**

1           A.      Well, the article sort of speaks to that.

2           **Q.      Okay.  Here's my --**

3           **Or, strike that.**

4           A.      Speaks to that potential conflict.

5           **Q.      Okay.  If you look at the one paragraph**

6    **where you're first mentioned, it refers to you as**

7    **sociology and anthropology associate professor.**

8           **Do you see that?**

9           A.      Yes, I do.

10          **Q.      That's why I had asked about the**

11   **anthropology.**

12          A.      Oh.  Well --

13          Yeah, okay, now I understand your

14   question from back -- back a ways.  The name of our

15   department was Department of Sociology and

16   Anthropology.

17          **Q.      Okay.**

18          A.      But when --

19          To just clarify, when people receive

20   their contracts and appointments, it would say,

21   professor of sociology or professor of anthropology in

22   that department, which it was a joint department.

23   Many universities have joint departments, sociology

24   and anthropology.

25          **Q.      Okay.  All right.  I was confused about**

1   that.

2               MR. MEDINA:  You gave me two, sir.  I'm

3        going to give you one back.

4        **Q.    Dr. Simoni, I'm showing you now what is a**

5   **grievance board decision by -- Ricky Moore vs. the**

6   **Board of Trustees of West Virginia University.**

7               MR. MEDINA:  Are you --

8               Does this have a number?  I'm sorry.

9               MR. WICKLINE:  I haven't marked it as an

10       exhibit --

11              MR. MEDINA:  Okay.

12              MR. WICKLINE:  -- because I just have a

13       couple of discrete questions about it.

14       A.    Can I take a quick read here --

15       **Q.    Sure.**

16       A.    -- see what this is?

17             Okay.

18       **Q.    And I guess just for the record, to clear**

19   **it up, this is a decision where you were representing**

20   **Ricky Moore in a grievance against West Virginia**

21   **University, alleging that he had been improperly**

22   **required to submit a medical verification form in**

23   **requesting reimbursement of $5.**

24             **Is that correct?**

25       A.    Uh-huh.

 1          Q.    And --

 2          A.    Yes.  I'm sorry.

 3          Q.    And the administrative law judge denied

 4    that, right?

 5          A.    I don't actually remember the decision.

 6    Let me go back here.

 7                It says "denied."

 8          Q.    Let me ask you this:  Were you required

 9    to be licensed to practice law to represent --

10          A.    No.

11          Q.    Let me finish my question.

12          A.    Oh, I'm sorry.

13          Q.    That's okay.  It's -- I do it all the

14    time, as well.  Let me restate it.

15                Were you required to be licensed to

16    practice law to represent a grievant at these sorts of

17    hearings?

18          A.    No.

19          Q.    If you look on Page 5 --

20          A.    Yes.

21          Q.    -- it says:  Grievant was represented by

22    Joe Simoni, WVU, hyphen, ACE, comma, WVEA --

23          A.    Uh-huh.

24          Q.    -- correct?

25          A.    Yes.

1          Q.      What do those acronyms stand for?

2          A.      The WVU-ACE stands for the Association of

3     Concerned Employees.  Association of Concerned

4     Employees, ACE.  And the WVEA was the national

5     union -- state and national union that WVU-ACE was

6     affiliated with.

7                  MR. MEDINA:  Do you have any objection

8          to --

9                  We don't agree with the relevance of any

10         of these, except for maybe the notice of taking

11         deposition; but I just want the record to be

12         clear what you're doing in this deposition, so

13         I would like to have all these marked.

14                 If you don't want to do it as part of

15         your case, I'll do it as part of mine; but do

16         you have any objection to marking everything

17         you're referring to, so the record will be

18         clear?

19                 MR. WICKLINE:  I don't.

20                 MR. MEDINA:  Okay.  Is this the first one

21         we haven't marked?

22                 MR. WICKLINE:  I just didn't think they

23         were --

24                 MR. MEDINA:  Well, whatever your thought

25         process, I'm not trying to get into.  I just

1    want to know, can we identify it as part of

2    your case, or do you just want me to do that as

3    part of mine?

4            MR. WICKLINE:  Why don't we just wait and

5    do that as part of yours.

6            MR. MEDINA:  Okay.  Just for the record,

7    is this the first one that you haven't marked

8    for identification, or --

9            Because there was the -- the huckster --

10   medicine hucksters article.  Did you mark that

11   one?

12           THE REPORTER:  I would have to look at

13   these.

14           MR. MEDINA:  Okay.  Well, you've got two.

15   Okay.  So, the notice of deposition is 1,

16   medicine hucksters is 2.  And she doesn't have

17   the others marked.

18           Are they marked for identification, or

19   not, I just want to know, as part of your case,

20   because we'll keep the record clear on our case

21   if you don't want to.

22           MR. WICKLINE:  They are not.

23           We'll mark this one, then.

24   (Whereupon, Defendant's Exhibit Number 3 was

25   marked for identification.)

1          Q.     Dr. Simoni, I'm now showing you what's

2    been marked as Deposition Exhibit 3, which is a Daily

3    Athenaeum article dated November the 9th, 1999, with

4    the title, quote, I am tired of the Hardesty

5    Administration's lying, end quote.

6                 Do you see that?

7          A.     Yeah.  Let me --

8                 Can I read this -- this article?

9          Q.     Yes, you may.

10         A.     Okay.

11         Q.     What is The Daily Athenaeum?

12         A.     It was a student newspaper at WVU, West

13   Virginia University.

14         Q.     Did you publicly call WVU President

15   Hardesty and his administrators liars?

16         A.     Well, this article says I did, I think,

17   here somewhere.  It says -- the article says that --

18                I think the first part of Paragraph 2,

19   where it says, Simoni accused the University of lying

20   about a plethora of issues, quote, I am taking this

21   into action, I don't think I ever said that.

22                And then the rest of the quote, because I

23   am tired of the Hardesty administration's lying,

24   that's what the article says I said.

25         Q.     As we sit here today, do you disagree

1    with the article?

2                MR. MEDINA:  Object.  You're --

3                This is so far afield of anything having

4           relevance to Spelter, and it's getting into,

5           you know, his interpretation of these events a

6           long time ago, which is not a fact question, as

7           well; but I'll allow this answer, but this

8           can't continue to go on.

9       A.    I'm sorry, the question again, please?

10      Q.    **Do you disagree with what's being said in**

11   **the article, or attributed to you in the article?**

12      A.    I'm not sure what you're referring to

13   specifically.

14      Q.    **Well, is it or is it not true that you**

15   **felt that the Hardesty administration had lied about a**

16   **number of issues?**

17      A.    That's true.

18      Q.    **And is my reading of the article correct,**

19   **that you were unhappy about the WVU policy asking**

20   **employees to go through proper channels at WVU before**

21   **contacting political figures about fundraising**

22   **issues -- or funding issues, I should say.**

23      A.    I think it's fair to --

24                I'm not sure about the -- the point of

25   your question, the funding issues.  I think it's fair

    1     to say that I was unhappy with -- with the University

    2     attempting to curtail the free speech of members of

    3     the University community.

    4           **Q.      Who is Becky Lofstead?**

    5           A.      As I recall, Becky was --

    6                   I think it says here, doesn't it?

    7     Doesn't it say here who she was?  Let me see here what

    8     it says.

    9                   Director of news services at WVU, it

   10     says, on Page 2.

   11           **Q.      Okay.  According to the article, it says,**

   12     **she thought the matter should have been resolved**

   13     **through meetings and discussions, instead of a lawsuit**

   14     **against WVU.  Do you agree with that?**

   15           A.      I agree that that's what she said.

   16           **Q.      Do you agree that it would have been**

   17     **better to resolve that through meetings and**

   18     **discussions, instead of a lawsuit?**

   19                   MR. MEDINA:  That's an opinion, and I

   20                   instruct the witness not to answer.  It's so

   21                   completely irrelevant to this litigation that

   22                   it will be utterly apparent what a waste of

   23                   time it is.

   24           **Q.      She said your comments border on the line**

   25     **of slander.  Do you agree with that?**

1             MR. MEDINA:  Object; instruct the witness

2        not to answer.

3        **Q.    Have we covered all your employment and**

4   **training to the best of your knowledge?**

5        A.    I think --

6              I would say yes.

7        **Q.    Okay.**

8        A.    At least mentioned all of them.

9              MR. WICKLINE:  Okay.  I think we're out

10        of time on the tape, so we need to stop and

11        change the tape.

12             THE VIDEOGRAPHER:  Going off the record,

13        the time is 12:53.

14           (Whereupon, a recess was taken.)

15             THE VIDEOGRAPHER:  Back on the record,

16        the time is 1:08.

17        **Q.    Dr. Simoni, have you ever lived in**

18   **Spelter?**

19        A.    No.

20        **Q.    Have you ever recreated in Spelter?**

21        A.    No.

22        **Q.    Do you have any family members who live**

23   **in Spelter?**

24        A.    No.

25        **Q.    Prior to becoming interested in the zinc**

1   **smelter property in Spelter, did you have any friends**
2   **who lived there?**
3       A.    Yes.
4       **Q.    Who?**
5       A.    Well, my best friend in Spelter, whom I
6   met back in the 70's, was Joe Vazquez.  And it was Joe
7   who introduced me to other folks who lived in Spelter.
8       **Q.    Now, was Joe your best friend, or was Joe**
9   **your best friend in Spelter?**
10      A.    Best friend in Spelter.
11      **Q.    Okay.  Were there other --**
12      A.    He happened to be the first person I met
13  in Spelter, of any, you know.
14      **Q.    Were -- did you have other friends in**
15  **Spelter prior to becoming interested in the zinc**
16  **smelter property in Spelter?**
17      A.    Yes.
18      **Q.    And who were they?**
19      A.    Well, the names I'm not going to be able
20  to recall for you with any great skill.  I remember
21  Maria -- Maria, I think her first name was, and Mauro
22  Perez, P-E-R-E-Z.  They were old-timers,
23  Spanish-Americans that lived there.  I had --
24            The Menendez family.  Sergio Menendez and
25  his wife were, again, old-time Spanish-Americans whom

1    I knew in the 70's.

2            I'm trying to remember another friend,

3    Teano (phonetic), what his last name was.

4            What was Teano's last name?  I'm blocking

5    on it.

6        **Q.    Okay.  How do you spell Vazquez, Joe**

7    **Vazquez?  How do you spell his last name?**

8        A.    I think it was V-A-S-Q-U-E-Z.

9        **Q.    And you said Marie Emardo (phonetic)?**

10       A.    Marie and -- Maria, I think, was actually

11   her first name.  And Mauro was her husband's name,

12   M-A-U-R-O.  Perez was the last time.  P-E-R-E-Z, I

13   believe.

14       **Q.    And then Sergio Menendez?**

15       A.    Menendez.  Sergio Menendez.

16       **Q.    How do you spell Sergio?**

17       A.    S-E-R-G-I-O.

18           Now, let me think.  I think all of those

19   people passed away long before the Spelter matter, as

20   you talk about it, you know, came about.  I don't

21   remember when exactly, but sometime between the 70's

22   and 2000.

23       **Q.    So, Joe Vazquez, Marie and Mauro Perez,**

24   **and Sergio Menendez have passed away?**

25       A.    Yes.

1      Q.     And they each passed away before the --
2  each passed away before you got interested in the
3  environmental issues out at Spelter; is that correct?
4              MR. MEDINA:  Object to form.
5      A.     I'm quite sure --
6              I'm quite sure it was before -- before
7  2000, but I don't know exactly when they passed away.
8  I can't tell you that.
9      Q.     Now, did I understand you correctly -- or
10  perhaps I misunderstood you -- I thought you had
11  mentioned that Joe Vasquez had introduced you to some
12  folks.
13      A.     Yeah, like some of these others that I
14  just mentioned to you.
15      Q.     Oh, okay.
16      A.     Yeah.
17      Q.     Where did Joe Vazquez live in Spelter?
18      A.     I'm not sure if I'm going to be correct
19  in the designation of the homesite.  I know where it
20  is -- you know, visually, I know where it is.
21              He lived, I think, on the corner, the
22  intersection of C Street and B Street.
23      Q.     Okay.
24      A.     I think.
25      Q.     And how about Miss Perez?

1          A.    The Perez family lived on C Street.

2          **Q.    And --**

3          A.    I think I'm correct.

4          **Q.    And Mr. Menendez?**

5          A.    The Menendezes lived across the street

6     from the post office.  I'm trying to --

7                I think their front door might have faced

8     on C Street, also.  Well, no, I don't think that's

9     designated C Street.

10               I could just tell you it's across from

11    the post office, on a corner, and I'm not sure --

12               I don't remember exactly how the streets

13    are designated there.

14         **Q.    Now, you indicated that each of these**

15    **individuals had passed away before you became involved**

16    **with environmental issues at Spelter.  Were their**

17    **family members still living?**

18         A.    In Spelter, is that what you're asking?

19         **Q.    Yes.**

20         A.    Let's see.  Vazquez, no, to the best of

21    my knowledge and recollection.  Perez, no.  Teano

22    family, yes.

23               The answer to that is, yes, there were

24    family members still living there.

25         **Q.    Of which family?  You said Vazquez, no;**

1    **Perez, no; and you said the Teano family --**
2         A.    Teano's daughter still lives in Spelter.
3         **Q.    Okay.  What about Menendez?**
4         A.    And Sergio's daughter still lives in
5    Spelter.  Well, I say that with a bit of reservation.
6    My knowledge is that she was planning to move, but I
7    don't know if that's happened.  So, I can't tell you
8    for sure that she's there.
9         **Q.    What's the name of Sergio's daughter?**
10        A.    Sergio's daughter's name is Mary Rife.
11   But that wasn't Sergio's last name.  He was a
12   Spanish-American, and I'm kind of -- I'm kind of
13   thinking that it was a Menendez, too, but I don't --
14             I can't tell you for sure.  I'm kind of
15   remembering that it was --
16        **Q.    Rife?**
17        A.    -- the same last name.
18        **Q.    Rife, is that R-I-F-F-E?**
19        A.    I think it's one F.
20        **Q.    Okay.  And --**
21        A.    And that must have been her married name.
22        **Q.    Okay.  And Miss Perez's daughter, what**
23   **was her name?**
24        A.    Anita.
25        **Q.    And was Anita Perez and Miss Rife**

1    **involved in any way in the Spelter community meetings**

2    **on the -- concerning the zinc smelter?**

3                MR. MEDINA:  Object to the form; and

4           instruct the witness not to answer about any

5           community meetings during his periods of

6           consulting service.

7                But if you have any other community

8           meetings that you can -- that you have facts

9           about, you can talk about that.

10               THE WITNESS:  Prior to consulting, you're

11          asking?

12               MR. MEDINA:  Right.  Other than the

13          consulting periods, if there was any community

14          meetings that you have knowledge about, you can

15          talk about that.

16     A.    And your --

17               I'm sorry, I lost the question as I was

18    thinking about that.

19     **Q.    Was the daughter of Miss Perez, and the**

20    **daughter of Mr. Menendez, involved in any of the**

21    **community meetings or activities concerning the former**

22    **zinc plant in Spelter prior to your involvement as a**

23    **consultant with the plaintiffs' law firms?**

24     A.    The Menendez daughter, Anita, as she

25    would be known there - we say Anita, but Anita -- was,

 1      to the best of my knowledge, not.  To the best of my
 2      memory and recollection, not.
 3              The daughter of Teano and Maria -- now
 4      that I'm recalling, I think that was her name -- Mary
 5      Rife, to the best of my recollection, was.
 6          Q.    Okay.
 7          A.    By that I mean, I remember -- I have a
 8      memory of her -- seeing her, you know.
 9          Q.    Okay.  How did you first become aware of
10      the former zinc plant facility in Spelter?
11          A.    You know, I think I had mentioned that
12      earlier, but I'll go back to that.
13          Q.    With Mr. Hando?
14          A.    I was at the DEP office, and that's when
15      he told me about this 50 acres of contamination at the
16      site there.  And that was my first awareness of -- of,
17      you know, thinking about and becoming aware of
18      contamination there at Spelter.
19          Q.    Had you done any work in Spelter for any
20      reason prior to that time?
21          A.    In the 70's, I had -- I had done some
22      work looking at the -- the social and cultural history
23      of people who had come to Spelter.  Spanish-Americans
24      was the focus.
25          Q.    Did that result in any paper?

 1          A.      Uh-huh.   Yeah, I don't remember the --

 2                  I don't remember the titles or names, but

 3     I think I wrote one article specifically about that,

 4     about Spanish-Americans in West Virginia.

 5          Q.      **Was it published?**

 6          A.      To the best of my recollection, it was;

 7     but I --

 8                  You know, can I tell you where it was?

 9     You would have to look in my vitae --

10          Q.      **Okay.**

11          A.      -- to find that.

12                  MR. WICKLINE:  Is Mr. Medina willing to

13          provide that?

14                  MR. MEDINA:  I don't have his vitae.

15                  MR. WICKLINE:  Do you have any objection

16          to providing us a copy of your vitae?

17                  MR. MEDINA:  I mean, I don't know what

18          vitae you're referring to.  Are you talking

19          about a point in time --

20                  You're talking about his current vitae?

21          A.      I thought you had my vitae.  I'm sorry, I

22     thought you made reference to my resume or vitae,

23     whatever you called it.

24          Q.      **I asked you about it, but I do not have a**

25     **copy.**

1          A.    Oh.  I don't know if I have a copy of it.

2     When I say my "vitae," if you recall, you were asking

3     me about did I have one now.  You asked that question,

4     if I had a vitae or resume now.  And I don't.  I had

5     it when I was at the University, and --

6          Q.    **Did you retain an old copy?**

7          A.    I don't know.

8          Q.    **Would you mind looking and providing me a**

9     **copy?**

10         A.    I don't mind looking.  If I have it, I --

11    you know --

12              MR. MEDINA:  So, if you have an old copy,

13         we'll talk, and you'll give it to me, and we'll

14         give it to them.

15              THE WITNESS:  Right.

16         Q.    **And that article would appear on that**

17    **vitae?**

18         A.    Yes, if I was accurate when I did the

19    vitae.

20         Q.    **Was it --**

21              **Did you do just one article, or more than**

22    **one article?**

23         A.    You know, I don't actually remember.  I

24    would --

25              I don't actually remember whether it was

1   more than one.  It could have been more than one, but
2   I don't remember exactly.  It was just so long ago.
3          **Q.   And was it focused on the**
4   **Spanish-American community in Spelter?**
5          A.   I don't recall -- I don't recall whether
6   it was or not.  It --
7               I mean, I'm sure that was a point of
8   interest for me, as I was doing the work on
9   Spanish-Americans; but I don't recall whether I wrote
10  an article specifically on Spelter and
11  Spanish-Americans.
12         **Q.   Do you recall the title of the article?**
13         A.   I do not.
14         **Q.   If I wanted to find the article, or**
15  **articles, where would be the best place to look?**
16         A.   Probably the best place would be through
17  my department, my old department at the University.
18         **Q.   Okay.  And I think you mentioned your**
19  **first awareness of environmental concerns in Spelter**
20  **was during your conversation with Mr. Hando; is that**
21  **correct?**
22         A.   Yes.
23         **Q.   When was that conversation?**
24         A.   I can't recall.  I knew you were going to
25  ask me that.

1        **Q.    Do you have an approximate year?**

2        A.    I would have to say that it was maybe --

3    this is just pure guess, okay, please don't take this

4    as a clear recollection -- my best guess would be

5    maybe late -- or maybe --

6              I don't know.  Let me try to get my

7    calendar -- my old calendar back in mind for a second.

8              Maybe in '01, sometime in '01.  Early

9    '01, maybe; but that's a wild guess.

10       **Q.    Okay.**

11       A.    I don't -- I can't tell you.

12       **Q.    No; that's fair enough.**

13       **Did anyone living in Spelter contact you**

14   **to ask you to become involved prior to your**

15   **conversation with Mr. Hando?**

16       A.    No.

17       **Q.    Prior to going out to the Spelter**

18   **community to talk with residents, was there a time**

19   **when you were trying to educate and satisfy yourself**

20   **that there was, in fact, a problem in the Spelter**

21   **community with the former zinc plant property?**

22             MR. MEDINA:  I'm trying to understand the

23             question.  Prior to --

24             THE REPORTER:  Prior to going out to the

25             Spelter community to talk with residents, was

1             there a time when you were trying to educate

2             and satisfy yourself that there was, in fact, a

3             problem in the Spelter community with the

4             former zinc plant property?

5                   MR. MEDINA:  Object to form.

6                   And, you know, if you have a factual

7             position, then you can testify about that.

8                   THE WITNESS:  I hate to ask you to do

9             this, but could you repeat that, please, so I

10            can --

11            (Whereupon, the requested portion of the

12     record was read by the reporter as follows:)

13                  THE REPORTER:  Prior to going out to the

14            Spelter community to talk with residents, was

15            there a time when you were trying to educate

16            and satisfy yourself that there was, in fact, a

17            problem in the Spelter community with the

18            former zinc plant property?

19                  MR. MEDINA:  Object to the form of the

20            question.

21            A.    All I can tell you on that -- on that

22     matter that you're asking, is that Mr. Hando at the

23     DEP told me about what -- what his observations had

24     been, and what he knew about it.  I don't know if

25     that -- you know, I --

1          **Q.     What specifically were his observations?**

2               MR. MEDINA:  Object to form.

3          A.     I don't remember what his exact

4    observations were.  I just remember talking about it.

5    I remember him sort of piquing my interest by what he

6    told me about the 50 acres of contamination.  And I'm

7    sure we talked about it a little more that day, you

8    know.  I think I indicated that earlier, and -- but

9    what we --

10              What specifically we talked about, I

11   don't recall.

12         **Q.     Was his comments -- Strike that.**

13              **Were his comments limited to the smelter**

14   **property?**

15         A.     The site, the pile.  Yeah, we didn't talk

16   about -- we didn't talk about --

17              Well, that would have been the topic,

18   because that's where the pile was, the plant site.

19         **Q.     How long did you study the area before**

20   **you went out and started talking with residents in**

21   **Spelter?**

22              MR. MEDINA:  Object to form.

23         **Q.     Well, let me rephrase that.**

24              **How long did you study the environmental**

25   **issues before going out to talk to the Spelter**

1    residents?

2              MR. MEDINA:  Object to form.

3         A.   I don't know that I did any study.  I

4    would have to say, in terms of study, I don't -- I

5    can't say that there was study.

6         Q.   **So, just so I understand what you're**

7    **telling me, based upon Mr. Hando's comments concerning**

8    **the pile, you then went out and started meeting with**

9    **and trying to organize Spelter residents?**

10        A.   No.

11             MR. MEDINA:  Object to form.

12        Q.   **Okay.  What did I say that was incorrect?**

13        A.   Well, you said that based on his

14   comments, I then went out --

15             I think what you said, based on his

16   comments, taking his comments, I then went out and

17   tried to organize -- and I forget the rest of your

18   sentence.

19        Q.   **The Spelter residents.**

20        A.   The Spelter residents.  And I would say,

21   no, that's not correct.

22        Q.   **And I asked you what was incorrect about**

23   **it.  Are you telling me you did more than just accept**

24   **Mr. Hando's comments?**

25        A.   Yes.

 1          **Q.    Okay.  What more did you do?**

 2          A.    Well, as I told you, I knew some people

 3   from the area, so --

 4          **Q.    But they had already passed away by that**

 5   **point.**

 6          A.    Well, I think I told you not all of them

 7   had passed away.  You asked me about children.

 8          **Q.    Okay.  So, you went and spoke with the**

 9   **daughter of Maria Perez, and you spoke with the**

10   **daughter of Mr. Menendez?**

11          A.    I spoke --

12                To the best of my recollection, I spoke

13   by telephone with Anita Menendez, and told her, again,

14   to the best --

15                I don't remember specifically this

16   conversation, but I think we talked about what I had

17   been told, you know, at the DEP office, and, you know,

18   was wondering what she could tell me, what she knew

19   about it, because she lives there.  And, so, that's --

20                I think that was the next communication

21   that I recall.

22          **Q.    And was Anita Menendez the only one you**

23   **spoke with before going out to speak with Spelter**

24   **residents in person?**

25          A.    No.

1        Q.    Okay.  Who else did you speak with?
2        A.    Anita, as I recall, in that phone call,
3    suggested that I might want to talk to two other
4    people living there, whom apparently she knew, you
5    know, as living -- you know, living there in the
6    community.  So, I spoke to those two people next.
7        Q.    And who were those people?
8        A.    One was a fellow by the name of Ron
9    Brown, and the other was Willis Perrine.
10       Q.    Okay.  Where does Ron Brown live, or
11   where did he live at the time?
12       A.    Ron Brown lived -- and I believe still
13   lives -- on C Street.
14       Q.    And Willis Perrine?
15       A.    Also on C Street.
16       Q.    Okay.  Did you speak with anyone else
17   before going out and meeting with Spelter residents?
18       A.    Again, to the best of my recollection,
19   no.
20       Q.    Okay.  And, again, these conversations
21   would have been in approximately 2000, 2001?
22       A.    Yes, in that general time period, without
23   being able to specify any more than that.
24       Q.    Okay.  Tell me about your conversation
25   with Anita Menendez.  How did you --

 1          A.    Well, I told you already.  I -- I just

 2    talked with her about what I had heard.  Again, to the

 3    best of my recollection, I talked with her about the

 4    communication I had had at the DEP office, and, you

 5    know, just asked her, you know, sort of what her take

 6    on it was.

 7          Q.    **And what did she say?**

 8          A.    Oh, this is --

 9                I can't tell you specifically what she

10    said.

11          Q.    **Can you tell me generally what she said?**

12          A.    Very generally.

13          Q.    **Okay.**

14          A.    I remember her to say something along the

15    lines of -- of -- something along the lines that she

16    wasn't making too much of, you know, the problem with

17    the pile.  You know, she didn't -- or she didn't see

18    it as a big problem --

19          Q.    **Okay.**

20          A.    -- but that I might want to talk to these

21    two other people that I mentioned before.  That's

22    generally what I recollect about my communication with

23    her.

24          Q.    **Okay.**

25          A.    And, so, that's -- that was that.

 1        Q.     What about Ron Brown?  Tell me about your

 2   conversation with him.

 3        A.     My best recollection of Ron was, again, I

 4   just, you know, shared with him what the DEP office

 5   had told me; and then I think Ron said he was --

 6            He expressed more concern than Anita had.

 7   I think that's fair to say that, if I were to

 8   characterize it in any way.

 9            And that was the same kind of response I

10   got from Willis Perrine, just more of a concern

11   than -- more of an expression of concern than -- than

12   Anita Menendez had conveyed to me, my phone

13   communication with her.

14        Q.     And what concerns did Ron Brown express

15   to you?

16        A.     Just -- nothing specific, just --

17            Just that, you know, he was concerned

18   to -- I think he was concerned to --

19            Well, let me answer your question.  What

20   specific concerns did he express to me?  Is that --

21   what specific concerns?

22        Q.     Specific or general concerns.

23        A.     Yeah.  I don't remember.  I couldn't

24   really pinpoint --

25            I just recollect a -- sort of a tenor, a

1      general -- a general tenor of the conversation, the

2      communication.  I don't remember.  I couldn't tell you

3      any specific concerns either one of those two guys

4      conveyed to me, because I just don't recall.

5              **Q.    So --**

6              A.    But there was an expression -- a general

7      expression of concern.

8              **Q.    So, in each of these three conversations,**

9      **or telephone conversations, you're advising them that**

10     **Mr. Hando had reported that there are some**

11     **environmental problems on the property that may be**

12     **harmful to people's health?**

13             A.    No.

14             MR. MEDINA:  Object to form.

15             A.    No.

16             **Q.    If it wasn't a concern out of harm to**

17     **people's health, then why were you getting involved?**

18             A.    Why was I getting involved?

19             **Q.    Yes.**

20             MR. MEDINA:  Object to form.

21             A.    Well, I don't know that I was getting

22     involved, but I was following up on the communication,

23     again, that I had gotten in the DEP office; and I was

24     first just calling an old friend.

25             **Q.    Is it your testimony that Mr. Hando had**

1    asked you to follow up with the community?

2          A.    Definitely not.

3          Q.    Okay.  Did you follow up with the

4    community because you had a concern about their health

5    from the pile?

6          A.    I wondered about that area.

7          Q.    And did you communicate that to Miss

8    Menendez, Mr. Brown, and Mr. Perrine --

9          A.    No.

10         Q.    -- during your telephone conversation?

11         A.    Not to the best of my recollection.

12         Q.    But was the substance of your

13   conversation --

14               I mean, you must have told them that you

15   had called for a reason; is that correct?

16         A.    Oh, I told them exactly what -- exactly

17   why I was calling, because Anita Menendez had given me

18   their name, each of them, and --

19         Q.    And they must have asked why Anita gave

20   you their name.

21         A.    Well, they know --

22               They knew -- and know -- Anita, she's

23   lived in the community for years, and they've lived in

24   the community for years; and, so, they're not

25   strangers to each other.  I would assume they're not

1    strangers to each other, and assumed at that time they
2    were not strangers to each other.
3            So, I told them exactly, you know, that I
4    had called Anita because I had heard this, you know,
5    about the con -- 50 acres of contamination, which sort
6    of caught my attention, and --
7            And so I just told them I had called
8    Anita first because I, you know, knew Anita; and she
9    said I might want to talk with, you know, with each of
10   them.  So, that's why I was calling.
11       **Q.    And did Mr. Brown and Mr. Perrine agree**
12   **with you that there was contamination on the pile?**
13       A.    That there was contamination on the pile?
14       **Q.    Yes.**
15       A.    I don't think we talked about it in that
16   way, you know, so that I would have a sense of whether
17   they agreed or disagreed.
18       **Q.    Well, I thought you had told me that they**
19   **were more supportive.**
20       A.    No; I just said that they -- where Anita
21   Menendez appeared to be, in the conversation that I
22   had with her, to be more dismissive of the matter.
23       **Q.    So, Anita tended to be more dismissive of**
24   **the smelter property being a concern to the**
25   **environment and health, whereas Mr. Brown and**

 1      **Mr. Perrine tended to be more in agreement that it may**
 2      **be a concern to the environment and health; is that**
 3      **correct?**
 4              A.     I wouldn't want to characterize --
 5                     MR. MEDINA:  Object --
 6                     THE WITNESS:  I'm sorry.
 7                     MR. MEDINA:  Object to form.
 8              A.     I wouldn't want to characterize their
 9      expression, because I don't remember it.  I can just
10      give you a general sense that I had that they were not
11      as dismissive as Anita was.  That's what I remember.
12              **Q.     To the extent that -- Strike that.**
13                     **So, what you're telling me is that**
14      **Mr. Brown and Mr. Perrine were not dismissive of the**
15      **notion that the contamination on the pile was a hazard**
16      **to the environment and health?**
17                     MR. MEDINA:  Object to form.
18              **Q.     Is that what you're saying?**
19              A.     No; I think what I'm saying is that --
20                     What I'm saying is that I don't remember
21      from the tenor of the communications with the two
22      gentlemen that they would have suggested that it
23      wasn't anything to worry about; but I don't remember
24      more than that.
25              **Q.     So, if they're not dismissive of the**

1    **notion that there is nothing to worry about, then is**

2    **it not logical to conclude that they were open to the**

3    **idea that there is something to worry about?**

4          A.    I've told you all I can about what I

5    remember of that communication.  And, you know, you

6    might characterize it that way, but I don't know that

7    I would.  You know, I don't want to --

8                I don't want to be putting a label on

9    something that, you know, I would rather just tell you

10   what I remember about the communication with them.

11         **Q.    Tell me, again, specifically what**

12   **Mr. Hando's comments were about the environmental or**

13   **health hazards at the pile.**

14               MR. MEDINA:  Object to form.

15         A.    I think I've told you everything I

16   recollect.

17         **Q.    Okay.  Well, if you don't mind, would you**

18   **mind telling me again?**

19         A.    Well, I just remember that he --

20               Again, I hadn't even gone there to be

21   talking about Spelter.  We were talking about

22   Westinghouse and Fairmont.  And he said to me, you

23   know, you should see what I have --

24               Or maybe he didn't say it that way.  He

25   just -- the 50 acres of contamination is what I

1    remember him saying.  The actual context of the

2    sentences, I don't remember.

3         **Q.    Okay.**

4         A.    But he just --

5              And I said, what are you talking about?

6              And he said, well, over at the Spelter

7    smelter plant, there on the plant site, I got a pile

8    of 50 acres of contamination.

9         **Q.    Fifty acres of contamination with --**

10        A.    That was his terminology.

11        **Q.    You didn't let me finish my question.**

12   **Fifty acres of contamination of property with**

13   **hazardous substances?**

14             MR. MEDINA:  Object to form.

15        A.    What I remember is the terminology

16   "50 acres of contamination."

17        **Q.    And is that the same terminology that you**

18   **passed on to Miss Menendez, Mr. Brown, and**

19   **Mr. Perrine?**

20        A.    I don't remember actually using that same

21   language with -- with --

22        **Q.    Well, I thought you told me a moment ago**

23   **you passed along your conversation with Mr. Hando.**

24   **Are you changing that testimony now?**

25        A.    No.

1          MR. MEDINA:  Object to form.
2     A.    No, no.  I think what I'm saying is that
3 when I communicated with these people on the
4 telephone, I told them that I was told about
5 contamination in the pile at the plant site.
6     **Q.    Okay.**
7     A.    I can't recall -- and I wouldn't want to
8 say at this point -- that I specifically used that
9 terminology, because I may not have done that.
10    **Q.    Did you look at any documents to educate
11 yourself about the smelter property prior to going out
12 and meeting with residents?**
13    A.    I think you asked about a study before,
14 about before I met personally, and I can't remember
15 any study, because -- because --
16    **Q.    No; I'm asking you, did you review any
17 documents?**
18    A.    Documents?  Not to the best of my
19 recollection.  I don't recall doing that.
20    **Q.    Okay.  What was your understanding at the
21 time --**
22          **And, again, we're talking about before
23 you went out and met with the residents.  What was
24 your understanding at the time of the nature of any
25 hazards at the former zinc plant property?**

1              MR. MEDINA:  Object to form.
2         A.    What was --
3               I need to ask you to repeat that, please.
4         **Q.    I can repeat it.**
5               **What was your understanding at the time**
6    **of the nature of any hazards at the former zinc plant**
7    **property before you went out and met with residents?**
8               MR. MEDINA:  Object to form.
9         A.    I only knew at that time what Mr. Hando
10   had referred to.
11        **Q.    When you first learned about the former**
12   **zinc plant property in Spelter from Mr. Hando, did you**
13   **know the specific constituents or metals that were at**
14   **issue on the property?**
15        A.    I -- could you repeat that question,
16   please?  I'm sorry, I'm trying to think about it as
17   you're --
18               THE REPORTER:  Question:  When you first
19          learned about the former zinc plant property in
20          Spelter from Mr. Hando, did you know the
21          specific constituents or metals that were at
22          issue on the property?
23               MR. MEDINA:  Object to form.
24        A.    The best of my recollection, no; because
25   I don't remember that we got into any specifics, you

 1    know, at that time.

 2         **Q.    Was it your understanding, through**

 3    **general knowledge at the time, that any waste pile**

 4    **situated next to an industrial facility like a zinc**

 5    **smelter is likely to contain hazardous substances?**

 6              MR. MEDINA:  Object to form.

 7         A.    You know, I'm --

 8              I have to apologize; because as you were

 9    asking that question, I was thinking about the time

10    frame that you had asked me about before, and I lost

11    track of your question.

12         **Q.    That's okay.**

13         **(Whereupon, the requested portion of the**

14    **record was read by the reporter as follows:)**

15              THE REPORTER:  Was it your understanding,

16              through general knowledge at the time, that any

17              waste pile situated next to an industrial

18              facility like a zinc smelter is likely to

19              contain hazardous substances?

20              THE WITNESS:  Could you repeat it once

21              more, please?

22         (Whereupon, the requested portion of the

23    record was read by the reporter as follows:)

24              THE REPORTER:  Sure.

25              MR. MEDINA:  You're asking for his state

1           of mind as a matter of fact, what his

2           understanding was?

3                   MR. WICKLINE:  Yes.

4                   THE REPORTER:  Was it your understanding,

5           through general knowledge at the time, that any

6           waste pile situated next to an industrial

7           facility like a zinc smelter is likely to

8           contain hazardous substances?

9           A.    I would have to say no.

10          **Q.    Why is that?**

11                  MR. MEDINA:  Object to form.

12          A.    You're asking me an opinion now.

13          **Q.    No; I'm just asking you why.**

14                  THE WITNESS:  What does my counsel say?

15                  MR. MEDINA:  He's asking if you have --

16                  If you have a present recollection that

17          you had a -- that you had a factual belief

18          about anything that he's asking you about, then

19          you can go ahead and testify --

20          A.    Let me answer that --

21                  Yeah, I understand.  Let me answer the

22   question this way:  Because by that period of time --

23                  I think this is the best way I can answer

24   the question.  Because by that period of time I had

25   some experience with West Virginia University, a

1    problem with asbestos, and some experience with the

2    Westinghouse matter in Fairmont, West Virginia, one of

3    the things I learned from those two experiences is not

4    to presuppose anything about those kind of -- about

5    the kind of situation you just asked me about.

6              So, my general take on it would be, yeah,

7    there's a pile there; but, you know, until you are

8    able to know, through collection of some data, you

9    know, that's well --

10             I mean, you know, you're not --

11             I guess I learned not to presuppose.  I

12   guess that's the way I would answer it.

13        Q.    **Would you allow your children or**

14   **grandchildren to play on any waste pile sitting next**

15   **to any industrial facility?**

16             MR. MEDINA:  Object; and instruct him not

17        to answer.

18             MR. WICKLINE:  You're instructing him not

19        to answer that question?

20             MR. MEDINA:  Yes; I believe you heard me.

21        Q.    **Have you ever allowed your children or**

22   **grandchildren to play on any waste pile sitting next**

23   **to any industrial facility?**

24        A.    Not that I'm aware of.

25        Q.    **Is there a reason for that?**

1           MR. MEDINA:  Object to form; and instruct
2       you not to answer.
3       **Q.    Would you allow your children or**
4  **grandchildren to recreate on an industrial waste pile**
5  **after the property had underwent environmental**
6  **remediation under the supervision of state or federal**
7  **regulators?**
8           MR. MEDINA:  Object; and instruct you not
9       to answer.
10      **Q.    Have you ever allowed your children or**
11 **grandchildren to recreate on an industrial waste pile**
12 **after the property had been remediated under the**
13 **supervision of state or federal regulators?**
14      A.    Again, not that I'm aware of.
15      **Q.    Do you know the metals at issue in this**
16 **litigation as we sit here today?**
17          MR. MEDINA:  Object; and instruct you not
18      to answer.
19          You can only answer as to what you knew
20      extraneous to the consulting work, if you can
21      recall.
22          And object to the form of the question to
23      the extent there's not a point in time in the
24      question.
25      A.    So, could you ask that question again in

1    another way, maybe?

2         **Q.    Did you know the metals at issue in this**

3    **case prior to late summer 2003, and excepting out**

4    **Mr. Medina's instructions with respect to your**

5    **consulting work for the Masry firm?**

6         A.    I'm going to say no.  And I just want to

7    clarify something for you.

8         **Q.    Okay.**

9         A.    My best recollection is that the

10   beginning of my consulting with the Masry firm on the

11   Spelter matter was soon after -- or, I'm not sure of

12   the correct way to phrase this -- soon after, or not

13   long after -- to the best of my recollection I'm

14   telling you -- soon after, or not long after I had had

15   that communication with Mr. Hando.

16             I can't tell you the time frame, because

17   I don't remember it specifically; but it wasn't, to

18   the best of my recollection, a long time after.  So,

19   in terms of learning these things, I think the

20   learning process was -- took place as part of that

21   time when I was --

22             MR. MEDINA:  You're not allowed to

23        testify about anything you would have learned

24        as a consultant, whether it was from Masry or

25        Levin, Papantonio.  If you had some prior

1          knowledge, then you can testify to, as a matter
2          of fact --
3          A.    I had no prior knowledge that I'm aware
4     of.
5          **Q.    Did you and Mr. -- Strike that.**
6               **The Masry firm is a plaintiffs' firm,**
7     **correct?**
8          A.    Yes.
9          **Q.    Does the Masry firm do environmental**
10    **work, to your knowledge?**
11         A.    Yes.
12         **Q.    Was the Masry firm contacted by you and**
13    **Mr. Rich, or you or Mr. Rich, to get involved in the**
14    **Spelter matters prior to the Levin, Papantonio firm?**
15              MR. MEDINA:  I -- I'm about to instruct
16         him; but go ahead.
17              MR. WICKLINE:  I appreciate your
18         restraint, Mr. Medina.
19              MR. MEDINA:  Well, you know, you laugh if
20         you want.  It's a very serious matter.  We're
21         letting this guy be deposed by you; so, you
22         know, you laugh if you want, but we're trying
23         to do the right thing here.
24         A.    The question again, please?
25              MR. WICKLINE:  Can you read it back?

1          (Whereupon, the requested portion of the
2     record was read by the reporter as follows:)
3               THE REPORTER:  Was the Masry firm
4          contacted by you and Mr. Rich, or you or
5          Mr. Rich, to get involved in the Spelter
6          matters prior to the Levin, Papantonio firm?
7               THE WITNESS:  And you're telling me it's
8          okay to --
9               MR. MEDINA:  If you know a point in time,
10          if you have a clarifi --
11               Because you've talked about point in
12          time.  I'm not going to allow him to go into
13          what you would have discussed with them --
14               THE WITNESS:  I know.
15               MR. MEDINA:  -- any contacts with them,
16          because it would have been something that we're
17          instructing you to not talk about.
18          A.   Yes, to the best of my recollection.  You
19     know, we're talking about time lines back four, five
20     years ago.
21          **Q.   Were there any other plaintiffs' firms**
22     **that you and/or Mr. Rich contacted, other than the**
23     **Levin, Papantonio firm and the Masry firm, concerning**
24     **the environmental issues in Spelter?**
25          A.   Yes.

1           **Q.    What were the names of those firms?**

2           A.    There you go.  I do not remember the

3     names of the firms.

4           **Q.    Do you remember the locations of the**

5     **firms?**

6           A.    Yes.

7           **Q.    Where were the firms located?**

8           A.    One firm was located -- and this may have

9     been the only other one with respect to Spelter; there

10    may not be two or more, it may be just one -- I think

11    the one firm that I recall was located -- is located

12    in Norfolk.

13          **Q.    And how did you find that firm?**

14          A.    It had been one of the firms that we had

15    had some communication with back with respect to West

16    Virginia University and Westinghouse.

17          **Q.    It was one of the plaintiffs' firms in**

18    **the asbestos litigation?  Is that what you're saying?**

19          A.    No, it wasn't -- it wasn't involved in

20    that, but it was --

21               I think, as I recall, it was a firm that

22    we might have talked to back then; either -- I don't

23    remember clearly -- either with the West Virginia

24    University, about that matter, or about the

25    Westinghouse Fairmont matter.

 1          **Q.     Okay.**
 2          A.     And I'm trying to recall the name, and I
 3     just don't remember.
 4          **Q.     Do you recall the names of any of the**
 5     **lawyers in the Norfolk, Virginia, firm?**
 6          A.     No.
 7          **Q.     What was your goal or objective in**
 8     **deciding to become an activist for the Spelter**
 9     **community?**
10               MR. MEDINA:  I'm going to instruct you
11          not to answer.  That's not a fact question.
12               MR. WICKLINE:  It's not?
13               MR. MEDINA:  We're not going --
14               We're not going to go into opinions or
15          goal-type questions.  You can ask him the facts
16          of what he did, what he said.
17               MR. WICKLINE:  I'm asking him what his
18          intent was, what his objective was.  Is that
19          not factual, Mr. Medina?
20               MR. MEDINA:  No.
21               MR. WICKLINE:  It's not?
22               MR. MEDINA:  No.
23               MR. WICKLINE:  And you're instructing him
24          not to answer?
25               MR. MEDINA:  You heard me.

1    **Q.    Okay.  What specifically made you decide**
2    **to become an activist for the Spelter community?**
3          A.    Well, I would not necessarily agree with
4    your characterization, when you say "activist."
5          **Q.    How would you term it?**
6          A.    Well, I don't like to characterize my --
7                I let other people do that.
8          **Q.    Okay.  Well, can you --**
9          A.    Let me --
10         **Q.    Can you pick a better word?**
11         A.    Let me answer --
12               Let me answer your question, which was
13    what?
14         **Q.    My question was:  What specifically made**
15    **you decide to become an activist for the Spelter**
16    **community?**
17         A.    Made me decide.  I guess what I was about
18    way back then was about wondering whether there was
19    any harm to the people in the community; and I felt
20    like it was at least worth getting an answer to that
21    question; and I thought I could help -- because I've
22    worked with communities before, my Peace Corps
23    experience was all community related -- and I thought
24    I could help the people get an answer to the question.
25    And, so, I think that's what -- you know, I --

1           I thought as a responsible, you know,

2    University faculty member, sitting there in Morgantown

3    in his office every day, that maybe there was a

4    responsibility also that I had to people out there in

5    that community, at least help them get an answer to

6    the question.

7           **Q.    Did you think you could do that job**

8    **better than state or federal environmental regulatory**

9    **agencies?**

10          MR. MEDINA:  Object; and instruct you not

11       to answer.

12          Did you hear me?

13          Good.  You keep repeating yourself about

14       that.  I just want to make sure you heard me.

15          Go ahead.

16          MR. WICKLINE:  Mr. Medina, I don't

17       understand the hostility you're directing

18       toward me.  I was just asking a question.

19          Is it okay if I proceed?

20          MR. MEDINA:  Yes, sir.

21          MR. WICKLINE:  Thank you.

22          **Q.    Did you decide to become an activist for**

23    **any of the communities surrounding Spelter?**

24          A.    I'm not sure I should be answering that

25    question, because it --

1            MR. MEDINA:  Well, you can't talk about
2        any -- any participation with any --
3        A.    Let me say this.  Let me say this.  I did
4    not make any such decision, to the best of my
5    recollection, before the time of my consulting
6    relationship with Masry & Vititoe, and Levin,
7    Papantonio.
8        **Q.    Okay.  So, just to make sure I**
9    **understand, you did not decide to become an activist**
10   **for any communities other than Spelter prior to your**
11   **decision to become a consultant for the plaintiffs'**
12   **firms; is that correct?**
13       A.    Well, I mean --
14            MR. MEDINA:  And, again, you're
15       instructed not to talk about your thought
16       process with becoming a consultant for us --
17            THE WITNESS:  Right.
18            MR. MEDINA:  -- or for Masry firm.
19            If you had some sort of a position on
20       what you were involved in at that point in
21       time, prior to those consulting relationships,
22       then you can describe what specifically you
23       were focused on.
24            MR. WICKLINE:  Madame Court Reporter,
25       could you read back my question, please.

```
 1              (Whereupon, the requested portion of the
 2      record was read by the reporter as follows:)
 3                      THE REPORTER:  So, just to make sure I
 4              understand, you did not decide to become an
 5              activist for any communities other than Spelter
 6              prior to your decision to become a consultant
 7              for the plaintiffs' firms; is that correct?
 8              A.    I would answer that by simply saying that
 9      I had the same general concern that I had with respect
10      to the people in Spelter, getting an answer to their
11      question.
12                      I had that same general concern with --
13      as I recall, with the people who lived just on the
14      other side of the pile, and I -- I guess that's
15      another community.  It's people living close to the
16      pile, but it's another community, in your -- in your
17      terminology of communities.
18                      My general concern was, is there
19      anything -- you know, was there anything people living
20      near that pile needed to be concerned about.
21              Q.    You're familiar with the town of Spelter?
22              A.    Right.
23              Q.    What other towns did you become an
24      activist for prior to you becoming a consultant for
25      the plaintiffs' lawyers?
```

1            MR. MEDINA:  Object to form.
2       A.    Well, I'm just sharing with you what I
3  just said; and that is, I had a concern for people
4  living close to the pile at that time, and I thought
5  it was -- it was appropriate for them to be able to
6  find an answer to the question of whether the pile was
7  any problem for them.
8       **Q.    Okay.  I'm just asking the names of the
9  towns.**
10      A.    And - and --
11            Well, the town on the other side, to the
12  best of my recollection, is Erie, people just across
13  the water on the other side of the pile.
14      **Q.    Okay.  Any other towns?**
15      A.    That's -- at that --
16            At that period of time, that's -- because
17  those were the people living -- living there around
18  the -- you know, close to the pile, on each side of
19  it.
20      **Q.    Okay.  Spelter and Erie, then; correct?**
21      A.    To the best of my recollection, that's
22  what I was thinking about at the time.
23      **Q.    Okay.  Did you have any telephone
24  conversations with any people in Erie concerning the
25  pile?**

1          A.     I don't recall.

2          **Q.     Did you have any town meetings in Erie**

3  **concerning the pile?**

4          A.     No.

5          **Q.     Did you have any telephone conversations,**

6  **meetings in homes, or town meetings in any town other**

7  **than Spelter?**

8              THE WITNESS:  Sorry to ask you to repeat,

9          but I just want to be clear on it.

10     (Whereupon, the requested portion of the

11  record was read by the reporter as follows:)

12             THE REPORTER:  Did you have any telephone

13          conversations, meetings in homes, or town

14          meetings in any town other than Spelter?

15             MR. MEDINA:  Same --

16             You're not allowed to talk about the

17          periods of the consulting.

18          A.     No.

19          **Q.     We've talked about you meeting with**

20  **certain residents in Spelter in your role as an**

21  **activist for the community.  What I want to ask you**

22  **is, what other things did you do in your role as an**

23  **activist for the Spelter community, outside your**

24  **consulting work for the plaintiffs' lawyers?**

25             A.     What other things did I do?

1        Q.    Yes.

2        A.    Could we have her read back what you just

3   said, that whole thing, because I --

4              I'm sorry to ask you to do that.

5        (Whereupon, the requested portion of the

6   record was read by the reporter as follows:)

7              THE REPORTER:  We've talked about you

8              meeting with certain residents in Spelter in

9              your role as an activist for the community.

10             What I want to ask you is, what other things

11             did you do in your role as an activist for the

12             Spelter community, outside your consulting work

13             for the plaintiffs' lawyers?

14             MR. MEDINA:  So, you're asking him about

15             activities other than relating to the periods

16             of consulting.

17       A.    Given the way you asked that question,

18   I'm trying to think of, you know, clearly how you

19   asked it, and what the answer would be.  I would say

20   nothing.

21       Q.    Okay.  Did you meet with anyone at the

22   EPA?

23       A.    Not to the best of my knowledge at that

24   period of time, what you were talking about, before --

25   before the consulting.

1          Q.     Other than the one conversation with

2     Mr. Hando, did you meet or talk with anyone at the

3     West Virginia Department of Environmental Protection?

4          A.     I do not believe so.  Not in that period

5     of time.

6          Q.     Did you talk with news reporters?

7          A.     I don't recall ever doing that.  There's

8     only one possibility where that could have occurred,

9     but I don't remember doing it.

10          Q.     Did you talk with any representatives of

11    DuPont, T.L. Diamond, or Newsom Trucking?

12          A.     Did I talk with any representatives of

13    T.L Diamond, Newsom Trucking, or what was the third?

14          Q.     DuPont.

15          A.     I would have to say no.

16          Q.     Did you talk with any politicians?

17          A.     I don't believe about Spelter, during

18    that period of time.  I may have been talking with

19    politicians, but not about Spelter at that time.

20          Q.     So, other than talking with certain

21    residents in Spelter, and with plaintiffs' lawyers,

22    that's the sum and substance of your activities; is

23    that correct?

24          A.     To the best of my recollection.

25          Q.     Were any of the activist work you were

1    **doing for the Spelter community done at times when you**

2    **were on the time clock for WVU?**

3            A.      Are you asking me --

4                    MR. MEDINA:  Object to form.

5            A.      -- was I ever out in the Spelter

6    community --

7                    Well, I'm not sure what you mean by "the

8    time clock for WVU."  What do you mean by that?

9            **Q.      Were you out in the Spelter community, or**

10   **working on the Spelter smelter project, when you were**

11   **on the time clock or were supposed to be doing things**

12   **for West Virginia University?**

13                   MR. MEDINA:  Object to form.

14                   THE WITNESS:  Could I hear that once

15            more, please?

16                   THE REPORTER:  Were you out in the

17           Spelter community, or working on the Spelter

18           smelter project, when you were on the time

19           clock or were supposed to be doing things for

20           West Virginia University?

21           A.      Okay.  The time clock frame is, I would

22   have to say, a bit misleading.  The reason I say that

23   is, if I'm a faculty member at the University, which I

24   was, I have responsibilities for teaching and

25   research, and what they call community service; okay?

1              And, in my experience as a faculty

2    member, and knowing what other -- how other faculty

3    members conducted their activities, faculty members

4    were never limited or thought about their activities

5    in terms of whether they were being done on the

6    University time clock or not.

7              For example, you might be doing research,

8    you know, at -- at 3:00 in the morning or 3:00 in the

9    afternoon; or you might be doing one -- you know, you

10   might be teaching at strange hours.  You might have --

11   you might have teaching in the classroom which might

12   take place between nine and five, but then you also

13   might have teaching-related responsibilities that took

14   you outside of the classroom at strange hours.

15             So, the time clock was -- I guess it was

16   something that I never related to; and I don't think

17   faculty members at the University would ever relate

18   to.

19        **Q.    Were there any expectations at West**

20   **Virginia University that you would be working for the**

21   **University during the time periods of nine to five?**

22        A.    Were there expectations that I would be

23   working for the University between the hours of nine

24   to five?

25        **Q.    Yes.**

1         A.    I don't think the University was ever
2    concerned about whether I was in my office, doing
3    something in my office between nine and five, or I was
4    outside of my office doing something.  That's not --
5    it's not --
6              In the University community, it's not the
7    way we contemplated time with respect to our work.
8         Q.    **Was your work out at Spelter concerning**
9    **the former zinc plant in any way for the benefit of**
10   **West Virginia University?**
11             MR. MEDINA:  Object to form.
12        A.    Was it in any way for the benefit of the
13   University?
14        Q.    **Yes.**
15        A.    I can only answer that by saying, I think
16   that the University gains benefit by having faculty
17   members out working with people in communities.
18        Q.    **Did anyone at West Virginia University**
19   **suggest to you that you should go out and get involved**
20   **as an activist for the Spelter community in connection**
21   **with the former zinc plant?**
22        A.    No.
23        Q.    **Was anyone at West Virginia University**
24   **aware of your activities in the Spelter community?**
25        A.    Was anyone?

1          Q.    Yes.

2          A.    I can't say for sure.  I'm sure there

3    were times when I talked with faculty colleagues, you

4    know, about time I spent out in communities, not only

5    Spelter, but other communities; and I'm sure I

6    probably, you know, shared, for learning experience

7    with students, work that I was doing out in

8    communities.

9               One of the things we try to do is

10   bring -- bring our experience outside the classroom

11   inside into the classroom, and share that with

12   students.

13         **Q.    Were you required to disclose, under**

14   **ethical or contractual or your employment relationship**

15   **with West Virginia University, your activities out at**

16   **the Spelter community?**

17         A.    Was I required to, is that what you --

18         **Q.    Yes.**

19         A.    No.

20         **Q.    How many trips did you make to the**

21   **Spelter community to talk with residents?**

22         A.    I really would be amiss trying to give

23   you an answer to that question.

24         **Q.    Okay.  Let's go through --**

25               THE WITNESS:  Can we take a few-minute

1          break?

2                  MR. WICKLINE:  Sure.

3                  THE WITNESS:  Thank you.

4                  THE VIDEOGRAPHER:  Going off the record,

5          the time is 2:18.

6              (Whereupon, a recess was taken.)

7                  (Continued in Volume 2.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

2   _____

3   LENORA PERRINE, et al.,

4            Plaintiffs,

5                              CIVIL ACTION NO. 04-C-296-2

6   vs.                       (Judge Thomas A. Bedell)

7   E.I. DU PONT DE NEMOURS AND COMPANY, et al.

8            Defendants.

9   And,

10  TONYA LEE DRUMMOND, individually, as Personal

11  Representative of the Estate of DANNY THOMAS DRUMMOND,

12  and as next friend of DANIELLE GRACE DRUMMOND,

13           Plaintiff,
                                 CIVIL ACTION NO. 05-C-148-1
14  vs.                         (Judge Thomas A. Bedell)

15  E.I. DUPONT DE NEMOURS AND COMPANY, et al.,

16           Defendants.
    And,

17
    DONALD R. MENENDEZ, et ux.,

18
             Plaintiffs,

19                               CIVIL ACTION NO. 06-C-285-3
    vs.                         (Judge Thomas A. Bedell)

20
    E.I. DUPONT DE NEMOURS AND COMPANY, et al.,

21
             Defendants.

22  _____/

23                       Fort Lauderdale, Florida
                         December 12, 2006
24                       9:16 a.m.

                         - - - - - - - - -
25

1              VIDEOTAPE DEPOSITION

2                      OF

3                JOSEPH A. SIMONI

4          VOLUME 2 - Pages 168 - 312

5    APPEARANCES:

6    LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER &
     PROCTOR, P.A.

7    By: STEVEN MEDINA, ESQ., and
         NED McWILLIAMS, ESQ., by telephone,

8    Appearing on behalf of the Plaintiffs, Perrine and
     Drummond

9

10   WEST AND JONES
     By: JERRY JONES, ESQ., and

11       PERRY JONES, ESQ.
     Appearing by telephone on behalf of the Plaintiffs,

12   Perrine and Drummond

13

14   ROBINSON & McELWEE, PLLC
     By: RICHARD W. GALLAGHER, ESQ. and

15       MARY E. SNEAD, ESQ.
     Appearing by telephone on behalf of T.L. Diamond &

16   Company, Inc., and Joseph Paushel

17

18   ALLEN, GUTHRIE, McHUGH & THOMAS, PLLC
     By: WM. SCOTT WICKLINE, ESQ.

19   Appearing on behalf of the Defendants E.I. DuPont De
     Nemours and Company, et al.

20

21   SQUIRE, SANDERS & DEMPSEY, L.L.P
     By: BRIAN M. McQUAID, ESQ.

22   Appearing on behalf of the Defendants E.I. DuPont De
     Nemours and Company, et al.

23

24   ALSO PRESENT:

25   WAYNE HOUSE, Videographer

1          Videotape Deposition of JOSEPH A. SIMONI, a

2    witness of lawful age, taken by the Defendant, for

3    purposes of discovery and for use as evidence in the

4    above-entitled cause, pursuant to notice heretofore

5    filed, before SUSAN J. STERNBERG, Certificate of Merit

6    Reporter and Notary Public, in and for the State of

7    Florida at Large, at 1100 Southeast 17th Street

8    Causeway, Fort Lauderdale, Florida.

9

10                       INDEX

11                      Volume 2

12   WITNESS                                    PAGE

13   JOSEPH A. SIMONI

14   Direct Examination (cont'd) By Mr. Wickline      171

15

16                      EXHIBITS

17   Defendant's 4 - Notes from Spelter meeting      178

18

19

20

21

22

23

24

25

1        Thereupon, the following proceedings were had:
2                    THE VIDEOGRAPHER:  Back on the record,
3             the time is 2:32.
4                    MR. MEDINA:  Mr. Wickline, I'm going to
5             withdraw my objection and instruction when you
6             asked him about his goal.  If what you were
7             intending to ask was whether he had a present
8             sense and some sort of a mental impression of a
9             goal or goals at that point in time, then you
10            can ask him that, if it relates to the
11            formulation of a thought prior to and unrelated
12            to any of the consulting work that he did;
13            okay?
14                    MR. WICKLINE:  I'm sorry, are you asking
15            him a question?
16                    MR. MEDINA:  No; I'm letting you know
17            that I've withdrawn that objection and that
18            instruction --
19                    MR. WICKLINE:  Okay.
20                    MR. MEDINA:  -- about the goal.  I don't
21            know if you remember the question.
22                    DIRECT EXAMINATION (cont'd)
23            **Q.    (By Mr. Wickline) Dr. Simoni, what was**
24     **your goal or objective in deciding to become an**
25     **activist for the Spelter community?**

1          A.    Well, I -- as I explained in a previous

2     answer, I don't know that I would talk about it as a

3     goal or objective, but --

4                Yeah, maybe a goal.  I just thought it

5     was something that I, in my community role, could do,

6     and that would be to help people in the area there who

7     wanted to know if the pile of contamination was a

8     problem for them; you know, that they could get an

9     answer to that question.  And, so, just a question --

10               It was just a matter of helping them do

11    that.

12         **Q.    Did you and Mr. Medina discuss how to**

13    **answer that question during the break?**

14               MR. MEDINA:  Object to form; instruct you

15          not to answer about any discussions with

16          counsel.

17         **Q.    Do you feel you have achieved that goal?**

18               MR. MEDINA:  Object to form; instruct you

19          not to answer.

20         **Q.    When was your first visit to the Spelter**

21    **community to talk with residents?**

22         A.    I believe it was in December --

23               I believe it was in December of 2000.  It

24    was two or three months, maybe --

25               Well, I think that's when it was.  I

1    remember it sort of being a December time of year.  I
2    think that's when it was.
3            **Q.    Okay.  Did you call anyone to set up the**
4    **meeting?**
5            A.    Well, the meeting was a consequence of a
6    phone call that I had -- the phone calls that we
7    talked about earlier with Ron Brown and -- and --
8            **Q.    Willis Perrine?**
9            A.    Willis Perrine.  I asked them --
10           Given the general expression of concern
11   that I heard from them, you know, I asked them if they
12   were interested in trying to find out more about the
13   pile, you know, related to the community.
14           And I said -- I said, I can't do that for
15   you.  I mean, I can't give you an answer, I don't
16   know.  So, I don't have that expertise, I don't have
17   that knowledge, or whatever -- I don't remember my
18   exact words -- but --
19           But I said, if there are people in the
20   community who want to try to get an answer to that,
21   and find out if there's something to be worried about,
22   then, you know, maybe we can help you do that.
23           **Q.    And when you said, we may be able to help**
24   **you do that, who were you talking about?  Who was**
25   **"we"?**

1          A.    Well, you know, that's a good question,

2     because I think maybe in that initial conversation,

3     maybe I didn't use "we."  It turned out to be "we,"

4     but I might have said "I."  I think I can help you to

5     do that.

6          Q.    When did it turn out to be "we"?

7          A.    I don't remember the specific -- you

8     know, whether it was -- whether I said "I" or "we,"

9     but I think I probably said "I," because at that

10    point -- at that point, I think it would have been

11    "I."

12         Q.    When did it turn out to be "we"?

13         A.    Oh, that was after I had gone to Spelter,

14    they -- they said there was maybe, you know --

15               They said there were some people that

16    they thought would be interested in talking about

17    that; and, so, there was an initial meeting that --

18    where I went by myself and sat down with them and

19    explained to them the general idea that I had in mind

20    at the time of how we might get an answer to the

21    question.

22         Q.    When you say, it turned out to be "we,"

23    were you talking about you and Gary Rich?

24         A.    Yeah.  Eventually, yeah.

25         Q.    Okay.  Now, you said you had this first

1    **meeting with certain Spelter residents in December of**
2    **2000; correct?**
3            A.    To the best of my recollection, I think
4    it was a December meeting, and I don't think it was
5    into January.  I think it was December of 2000.  But,
6    again, I might be mistaken.
7            **Q.    And this phone call with Ron Brown and**
8    **Willis Perrine, how long before the meeting did you**
9    **have the phone call with them?  Was it within --**
10           A.    Within that month.  You know, within a
11   month -- within a 30-day period; maybe within a couple
12   of week period.  I don't remember exactly.
13           **Q.    So, possibly sometime in November or**
14   **December of 2000, you had the phone call with Ron**
15   **Brown and Willis Perrine; is that correct?**
16           A.    I can't really say, I don't recall; but
17   it wasn't too far before that.
18           **Q.    Okay.  And how long before the phone**
19   **calls to Anita Menendez, Ron Brown, and Willis**
20   **Perrine, did you have the conversation with Mr. Hando?**
21           A.    I don't recall.
22           **Q.    Was it --**
23           A.    I couldn't tell you.
24           **Q.    -- six months?**
25           A.    I don't have a sense of the time frame.

1        Q.    Was it within a couple months before the
2   telephone call?
3        A.    I don't want to say, because I don't
4   know.  I just --
5              I wish I could tell you, but I don't --
6   don't have any recollection of that time frame.
7        Q.    Well, when you --
8        A.    I don't think it was a year before, you
9   know.  In fact, I would say, you know, it most
10  definitely was probably not a year before; but to tell
11  you that it was a month before, or two weeks before,
12  or two months before, I just don't know.
13       Q.    Could it have been more than six months
14  before?
15       A.    I don't think so.
16       Q.    Okay.
17       A.    I don't think so.
18       Q.    So, probably somewhere between two and
19  six months prior to the phone conversations with Miss
20  Menendez, Mr. Brown, and Mr. Perrine, you had the
21  conversation with Mr. Hando.  Is that fair?
22       A.    I would say -- I would say close --
23  within a six-month period.  It might even have been a
24  three-month, but I just don't recall.  I don't recall
25  that time frame.

1          Q.     Okay.  So, that would have been --

2                 So, the conversation, if I'm counting

3     correctly, the conversation with Mr. Hando would have

4     been somewhere between perhaps May of 2000 and October

5     of 2000?

6                 MR. MEDINA:  Object to form.

7          Q.     Somewhere in that time frame?

8                 MR. MEDINA:  Object to form.

9          A.     What was it again?

10         Q.     The conversation with Mr. Hando --

11                If I did the math correctly, the

12    conversation with Mr. Hando would have been somewhere

13    between May of 2000 and October of 2000?

14                MR. MEDINA:  Object to form.

15         Q.     Is that fair?

16                MR. MEDINA:  Object to form.

17         A.     Again, I can't -- I can't pinpoint a time

18    frame.  I would say May would have been, you know, too

19    early for it to have occurred back in May; but, again,

20    I just can't --

21         Q.     Do you recall if the conversation with

22    Mr. Hando was in the summer, spring, fall?

23         A.     I don't.  I don't.

24         Q.     All right.  So, in December of 2000, you

25    met with residents of Spelter.  How many people were

1    at that meeting?

2         A.    And, you know, I'm -- I'm saying December

3    of 2000 --

4         **Q.    Uh-huh.**

5         A.    -- because --

6              Maybe you can refresh my memory for a

7    frame -- for a time frame.  If you could tell me when

8    the community meeting that occurred at the fire hall

9    was --

10        **Q.    Okay.**

11        A.    -- that would help me get a better handle

12   on that time frame.

13        (Whereupon, Defendant's Exhibit Number 4 was

14   marked for identification.)

15        A.    Okay.  So, that was April of '01?

16        **Q.    Okay.  Well, let's establish what this**

17   **is.  This is --**

18              **Exhibit 4, Dr. Simoni, which I'm handing**

19   **you now, is the notes taken by R.L. Williams**

20   **concerning the April 30, 2001, meeting that was held**

21   **by you and Mr. Rich at the Spelter Fire Department.**

22              **Does that refresh your recollection as to**

23   **when you had the meeting at the Spelter Fire**

24   **Department?**

25        A.    Well, you're telling me that these notes

1  were taken April 30th of '01; so, I'm assuming that's
2  the date of the meeting, right?
3      **Q.    That would be my understanding of these**
4  **notes.**
5      A.    So, if --
6          All I'm saying is, with respect to this
7  time frame we've been talking about, if -- if the
8  community meeting at the fire hall took place on
9  April 30th of '01, then I think I'm -- what I told you
10 is approximately correct.
11         I can't say it's crystal correct --
12 crystal clear correct, but the first meeting would
13 have been a few months before that, and, you know,
14 about that time frame of December.
15     **Q.    Okay.**
16     A.    That's -- so, that gives me a little more
17 confidence in what I told you --
18     **Q.    Okay.**
19     A.    -- you know.
20     **Q.    That's fair.  Now, okay, back to the**
21 **meeting in December of 2000 with the Spelter**
22 **residents.  Where did that meeting take place?**
23     A.    At Willis Perrine's house.
24     **Q.    Okay.  And how many people were present**
25 **at that meeting?**

1          A.    Okay.   To the best of my recollection,
2     there probably were less than ten people.
3          **Q.    Can you tell me the names of those ten**
4     **people?**
5          A.    No.   And I've got to --
6                I have to say something here, because --
7     and maybe my counsel needs to advise me on this --
8     it's close to this point where --
9                It's close to this point where I had a
10    consulting relationship on the Spelter matter with
11    Masry & Vititoe.   You know, I -- I -- or maybe I'm
12    mistaken about that.   I'm trying to think.
13         **Q.    I thought that was in 2002.**
14         A.    Yeah, that's what --
15               I'm thinking it was 2002.   It was after
16    the community meeting.
17         **Q.    That's been the testimony this morning.**
18         A.    Okay.  Scratch that.   I'm sorry.   I'm
19    just trying -- I'm trying to get these --
20               All right.   So, let's get back to your
21    question.
22         **Q.    Okay.**
23         A.    I mean --
24         **Q.    Can you tell me the names of the people**
25    **who were at the meeting in Willis Perrine's home in**

1    **December of 2000?**

2          A.    Names of people.  Well, Willis and his

3    wife.

4          **Q.    His wife is Lenora?**

5          A.    Lenora.  I believe Mr. Medina, Jesse

6    Medina, was there.

7          **Q.    The other Mr. Medina.**

8          A.    Right, the other Mr. Medina.

9          MR. MEDINA:  Very nice gentleman, but

10         we're not related.

11         A.    I think, as I recall, Mr. and

12   Mrs. Schafer were there.

13         **Q.    Do you know their first names?**

14         A.    You're pressing me now.  I want to say

15   maybe Bud and Barbara, but I -- I'm not absolutely

16   sure about Barbara.  That's just a -- maybe a good

17   guess.  I think they were there.

18               And Mary Rife was there, I think.  I

19   think I'm correct about that.  And there may have been

20   one or two other people, but I don't -- I can't --

21               I can't tell you with a degree of

22   confidence who that might have been, but there may

23   have been one or two other people.

24               What is that, a total of about six,

25   seven?

1      Q.      That's six.

2      A.      I know there was less than ten.

3      Q.      Was Ron Brown there?

4      A.      You know, I'm not absolutely sure if he

5   was at that first meeting, because Ron -- Ron had a

6   pretty hectic work schedule, as I recall, you know,

7   his -- his work responsibilities, he worked a lot of

8   overtime; and I don't recall whether he actually was

9   at that first meeting.  He might have been, but I

10  don't -- I can't tell you with any degree of

11  confidence that he was.

12     Q.      Was Anita Menendez at the meeting?

13     A.      No.

14     Q.      Okay.  Where does Mr. and Mrs. Schafer

15  live in Spelter?

16     A.      Oh, to the best of my recollection, they

17  live on 3rd or 4th Street, but I don't -- you know, I

18  can't tell you an address or anything.

19     Q.      How was it decided as to who would attend

20  this first meeting in December of 2000?

21     A.      I believe it was decided -- again, trying

22  to remember -- I believe it was decided that Willis

23  and/or Ron Brown just contacted a friend or two that

24  they knew, just to -- you know, whom they thought

25  might want to get together and talk about that matter.

1          Q.    Was it the thought that this group of

2     people were sort of the community leaders that would

3     be helpful in disseminating information --

4          A.    No.

5          Q.    -- that you provided?

6          A.    I'm sorry to interrupt you.

7               No, I never had that sense.

8          Q.    How long did the meeting last?

9          A.    Oh, maybe an hour, hour and a half.  I

10    couldn't tell you for sure.  It wasn't real long, and

11    it wasn't 15 minutes.

12         Q.    What time of day was the meeting?

13         A.    As I recall, it was in the --

14              That first meeting, I want to think late

15    afternoon or early evening.  I would say one of those

16    two; but, again, I couldn't tell you for sure.

17         Q.    Was it on a weekday or a weekend?

18         A.    I don't remember.

19         Q.    Was there an attendance or sign-in sheet?

20         A.    No.  And --

21              No.  No, there was not.

22         Q.    Okay.  You said "and."  Were you going to

23    add something to that?

24         A.    No.  I was just going to mention that at

25    any of the meetings that I ever attended, I don't ever

1    remember a sign-up sheet or a record of -- being taken

2    of who was there, or anything like that.

3           **Q.    Did you take anyone with you?**

4           A.    Not to the first meeting.

5           **Q.    Okay.  Did anyone assist you in your**

6    **activist work in Spelter?**

7           A.    Did anyone assist me?  No, I -- I would

8    say no.

9           **Q.    No one at WVU assisted you?**

10          A.    No.

11          **Q.    What was discussed at this meeting in**

12   **December of 2000 in the home of the Perrines?**

13          A.    Well, the idea that I've already related

14   to you, about what I would be doing there in the first

15   place -- and that is helping -- if they were

16   interested, helping them eventually get an answer to

17   the question of, is this pile next door that, you

18   know, apparently had some contamination in it, what's

19   the -- what's the problem for them, if there was any.

20          **Q.    Okay.  Did anyone ask you any questions?**

21          A.    I don't recall questions being asked.

22   I'm sure people asked a question or two, but I don't

23   recall what they were, or what might have been asked.

24          **Q.    Did you give any type of presentation?**

25          A.    I don't know what you mean by a

1    "presentation."

2         **Q.    Did you have any documents, posters --**

3         A.    No.

4         **Q.    -- anything of the sort?**

5         A.    Nothing like that.

6              All I said to them -- because I'm sure

7    you're going to ask me what I said to them -- all I

8    said to them was, you know, I'm not an expert, you

9    know, I can't -- I can't tell you anything; but I've

10   had some experiences -- relating back to West Virginia

11   University and Westinghouse and Fairmont -- I've had

12   some experiences, you know, which -- where I've

13   learned how you can get answers and find out if -- you

14   know, if there's something that you need to be

15   concerned about.

16             And, so, I -- I said that if they were

17   interested, my -- my recommendation to them would be

18   to meet with Gary Rich and talk more with him about

19   it; and so that's -- they --

20             You know, they decided, yes, let's do

21   that sometime in the future; and, so, that then led

22   to -- to Gary Rich going down with me the next time.

23   I think I was only alone at one meeting, the first

24   meeting.

25         **Q.    Was there anything in particular about**

1    **your prior experience at WVU with the asbestos**

2    **litigation and your prior experience with Westinghouse**

3    **that caused you to make the recommendation to these**

4    **folks that they should pursue or investigate this**

5    **further?**

6           A.    Was there anything from -- from my

7    experience with Westinghouse and the West Virginia

8    University situation which caused me to make the

9    recommendation?

10          **Q.    Yes.**

11          A.    Well, I don't -- I don't know if I would

12   have come --

13          Let me answer it this way:  I don't know

14   whether I would have come to make that recommendation

15   to them if I hadn't had the previous experience with

16   the other two cases developing.

17          **Q.    Why not?**

18          A.    I just -- I just -- you know, before --

19          Before West Virginia University, that

20   situation there with the asbestos, I had no ex --

21          I mean, I was a professor there at the

22   University, a sociologist, and I was community

23   oriented, but I didn't have any experience with

24   environmental stuff in communities.  I just -- you

25   know...

1          **Q.    So, it was your experience with the**
2    **environmental matters at WVU, with asbestos and with**
3    **Westinghouse and the other matter, that caused you to**
4    **make that recommendation that they should investigate**
5    **the contamination of the Spelter site further?**
6          A.    Oh, I didn't --
7                Well, I just learned -- it was a general
8    learning experience from West Virginia University and
9    the development of the Westinghouse case.  I just
10   learned things that, you know, that I had no idea of
11   before.  It was a -- just a general learning
12   experience for me, and --
13               And, so, that's why I said, if I hadn't
14   had that learning experience, I don't know that I
15   would have been making that recommendation to the
16   folks in the community at that time; but I felt it was
17   the right recommendation for them as people living in
18   a community, given what I had been learning over the
19   past couple of years from the other experiences.
20         **Q.    And did the Perrines, Mr. Medina, the**
21   **Schafers, and Miss Rife, take your recommendation or**
22   **agree with your recommendation?**
23         A.    Well, they -- they agreed that it made
24   sense to -- to get together more and talk about it
25   with Mr. Rich.

1          Q.     Did you receive any compensation from

2     Mr. Rich or anyone else in the Westinghouse and WVU

3     cases?

4          A.     No.

5          Q.     At the conclusion of the December 2000

6     meeting, did you and that group of residents plan a

7     future course of action?

8          A.     Okay.  I'm sorry, I was distracted in my

9     mind for a minute.  You're saying --

10               If you would, please, again.

11          (Whereupon, the requested portion of the

12     record was read by the reporter as follows:)

13               THE REPORTER:  At the conclusion of the

14               December 2000 meeting, did you and that group

15               of residents plan a future course of action?

16          A.     Only to try to get together for another

17     meeting, at which time Mr. Rich would come down from

18     Morgantown with me, down --

19               That was the general idea.

20          Q.     And was there any notion of inviting

21     additional residents at that point in time?

22          A.     As I recall, I don't think so.

23          Q.     In small communities like Spelter, did

24     the word tend to get out quickly about your

25     participation in that meeting in the Perrine home?

1           A.      I don't know.

2                   MR. MEDINA:  Object; instruct you not to

3           answer.  So, move to strike any response.

4           **Q.      When you were in Spelter for this visit**

5    **in December of 2000, did you see any adults or**

6    **children playing around the zinc plant property, or**

7    **the smelter property?**

8           A.      In December of 2000, at the time of the

9    first meeting --

10          **Q.      Yes.**

11          A.      -- that I -- where I attended that

12   meeting?

13                  Did I see anybody playing on the plant

14   property, is that what you're asking?

15          **Q.      Yes.**

16          A.      I'll say no, because I think that's the

17   right answer, correct answer; with one caveat, that

18   I'm not -- I don't know about the ownership of land,

19   the baseball field -- they had a baseball field

20   there -- and I might have seen children playing on the

21   baseball field, if it was a late afternoon, early

22   evening, fall --

23                  Or, it was December.  I don't know.  I

24   don't know.  I might have.  But I can't tell you for

25   sure, and I don't even -- I don't even --

1            I didn't know at that time if that was --
2    you know, if that was plant property.  I don't know if
3    the plant owned that or the community owned that; but
4    I might -- I might have seen some kids on the baseball
5    field.
6            **Q.    Okay.  Tell me about your next visit to**
7    **the Spelter community.  When was it?**
8            A.    Well, my guess would be -- not knowing
9    for sure, my guess would be that it was after the
10   holidays.  And how soon after the holidays, I just
11   don't know.
12           **Q.    How many meetings did you have in the**
13   **Spelter community between this December 2000 meeting**
14   **and the April 30, 2001, meeting?**
15           A.    At the firehouse?
16           **Q.    Yes.**
17           A.    My best guess at this point, thinking
18   back, would be maybe three.  Two or three.
19           **Q.    Okay.  So, you had a total of four or**
20   **five meetings in Spelter, two or three of which was**
21   **between the December 2000 meeting and the April 30,**
22   **2001, meeting.  Is that accurate?**
23           A.    Yeah, it would be -- my recollection at
24   this point is two or three from between the time of
25   the first meeting and the firehouse meeting.

 1              So, if you were counting the firehouse
 2      meeting as one of the meetings in the community, that
 3      would have been maybe the fourth or fifth.
 4              Q.      All right.  Can you give me your best
 5      estimate of the date of the second meeting --
 6              A.      No.
 7              Q.      -- in Spelter?
 8              A.      I wish I could.
 9              Q.      You indicated it was after the holidays.
10              A.      I think after the holidays, just because
11      of the holiday time, you know, recognizing that it's
12      difficult to get people together for a meeting with
13      the holiday activities.  So, my best guess is after
14      the holidays.
15              Q.      Was that meeting -- do you think it might
16      have been in January?
17              A.      I think.
18              Q.      Okay.
19              A.      Sometime in January.
20              Q.      And where was the second meeting?
21              A.      I think it was also at the -- all of the
22      meetings as I --
23              There were only meetings at the Perrines
24      house, that I remember --
25              Q.      Okay.

1          A.      -- before the firehouse meeting.

2          Q.      Okay.  So, the meeting at the Perrine

3     house in January of 2001 -- Strike that.

4                  Who was present at the meeting at the

5     Perrine house in January of 2001?

6                  MR. MEDINA:  Object to form.

7          A.      I don't know the answer to that.  I can

8     tell you -- I'm trying to be fair to you -- I can tell

9     you that, most probably, most of the people who were

10    at the first meeting were there.  And it wasn't a

11    large group.  Again, it was -- you know, I don't

12    remember it to be large, the second meeting.

13         Q.      Was it more --

14                 Were there more or fewer people than the

15    first meeting?

16         A.      I would say it was, you know,

17    approximately the same size, maybe a difference of two

18    or three on either side, more or less.  I don't

19    remember it as being, you know, large.

20         Q.      Okay.  Were --

21         A.      I don't remember it as being like 25, you

22    know, that kind of thing.

23         Q.      Were Lenora and Willis Perrine at that

24    meeting?

25         A.      I believe so.

1        Q.    Was Jesse Medina at the meeting?

2        A.    I think so.

3        Q.    Were Mr. and Mrs. Schafer at the meeting?

4        A.    I would say one of them probably was.  I

5    don't know -- I don't remember if both of them were.

6        Q.    Okay.  Was Mary Rife at the meeting?

7        A.    I think maybe yes, but I can't say

8    definitely.

9        Q.    Was Ron Brown at that meeting?

10       A.    Again, given Ron's work schedule --

11             You know, I sort of have a vague memory

12   that, you know, he either made the first one or the

13   second one, but I don't recall for sure; and I don't

14   think he was at both of them, but --

15       Q.    Okay.  Your best recollection is he was

16   either at the December or the January '01 meeting?

17       A.    One of the first two.

18       Q.    Anita Menendez, did she attend that

19   meeting?

20       A.    No.

21       Q.    Okay.  Can you recall anyone else

22   attending the January 2001 meeting?

23       A.    No.

24       Q.    Was Gary Rich at that meeting?

25       A.    Oh, yes.  I thought --

1              Yeah, I thought we had talked about that.

2     Yeah.

3          Q.    **Can you recall anyone else at the meeting**

4     **in January of 2001?**

5          A.    I can't recall individuals, but I --

6     again, I'm thinking there may have been two or three

7     people who were not at the first one; but I don't

8     recall who they might have been.

9          Q.    **Was Danny Drummond at that meeting?**

10         A.    Hmm.  You know, I do not remember.  I

11    can't -- could not say for sure that he was at that

12    meeting.

13         Q.    **Was he at one of these meetings?**

14         A.    Danny was at one of the meetings before

15    the fire hall, I'm pretty sure, but I don't -- again,

16    I don't --

17              I can't pinpoint which one that was.

18         Q.    **But he wasn't at the first meeting?**

19         A.    Not to the best of my recollection, he

20    wasn't.  I don't believe he was.  And he was one at --

21    he was -- he was --

22              To the best of my recollection, I would

23    say no to the first one, and yes at one of the other

24    three meetings before the fire hall; but I can't tell

25    you which.  I just don't recall.

1          **Q.    Okay.**

2          A.    I recall meeting Danny at one of those

3     meetings.

4          **Q.    Okay.  Was Tonya Drummond at the meeting?**

5          A.    No.

6          **Q.    Was she at any of the meetings?**

7          A.    I don't know if she attended the fire

8     hall meeting.  I don't know.

9          **Q.    Was Matthew Gump at the meeting?**

10         A.    I don't know who Matthew Gump is.  To the

11    best of my recollection, I just don't recall.

12         **Q.    Was Schafter Drummond at the meeting?**

13         A.    I think that's an uncle of Danny's.  Is

14    that an uncle of Danny's?

15         **Q.    Yes.**

16         A.    I don't believe he was ever at the early

17    meetings.  I mean, I don't remember that.  I don't

18    remember his being there.

19         **Q.    Okay.  Was Gary Rich at each of the**

20    **meetings that followed the initial meeting in December**

21    **of 2000?**

22         A.    I believe so.  To the best of my

23    recollection, I believe so.

24         **Q.    So, he would have been present when Danny**

25    **was there?**

1          A.    I think.  I think that's correct.

2          Q.    **Okay.  Now, I take it from your earlier**

3    **testimony, there wasn't a sign-in sheet or an**

4    **attendance sheet for the January 2001 meeting; is that**

5    **correct?**

6          A.    I don't recall that at any of those

7    meetings there was a sign-up sheet or --

8                You know, I don't recall.  Yeah, the

9    answer to that is no.

10         Q.    **Okay.  Did Gary give people his business**

11   **card at the January 2001 meeting?**

12         A.    Not that I remember.  I can't say that he

13   did.

14         Q.    **Did anyone ask for his business card at**

15   **the January 2001 meeting?**

16         A.    I don't know.  I mean, it may have

17   happened; but I don't remember it.

18         Q.    **Okay.  Did he provide his contact**

19   **information to the people attending any of these**

20   **meetings between January -- or December 2000 and**

21   **April 30, 2001?**

22         A.    To the best of my recollection, I do not

23   remember at any of those meetings Gary giving out a

24   business card to anyone.

25         Q.    **Did he explain who he was?**

1          A.      He explained who he was, that he was an

2     attorney.

3          **Q.      Did he explain that at the January 2001**

4     **meeting?**

5          A.      Well, I don't -- he would --

6                  Yeah; I mean, at any meeting he attended,

7     if there was someone new who didn't know him, he would

8     explain that.

9          **Q.      Okay.  What was discussed at the**

10    **January 2001 meeting?**

11         A.      To the best of my recollection on all of

12    these meetings -- because I know you're going to ask

13    me about the next one, too --

14         **Q.      Well, let's just take them one at a time,**

15    **if we can.**

16         A.      Okay.  If you want to take them one at a

17    time, that's fine.  At the January meeting, to the

18    best of my recollection -- that being the first

19    meeting that he was there --

20         **Q.      Gary?**

21         A.      Yeah.

22         **Q.      Or, so the record's clear, Gary Rich?**

23         A.      Right.  What we --

24                 And I say "we," because he spoke some and

25    I spoke some.  You know, I told people that I was a --

1   I was a faculty member at the University, and I was

2   just there helping, that I wasn't a lawyer, and I

3   didn't know -- you know, I didn't have any expertise

4   or special knowledge having to do with environmental

5   stuff.

6           And Gary said the same thing, that --

7   except that he was a lawyer, but that he didn't have

8   any expertise in environmental stuff, he -- he didn't

9   have any legal practice experience with environmental

10  stuff, you know, that he -- that wasn't anything that

11  he -- that he had any expertise in.

12          And what he told them, what was

13  discussed, was that if they were interested, if they

14  were interested, if they wanted to, what we hoped to

15  be able to do, not -- no guarantees, but what we hoped

16  to be able to do was to find a law firm out there who

17  could come out, who would be willing to come out to

18  that area, or come into that area and investigate and

19  find out if there was a problem, and -- I guess come

20  in and find out if there was a problem, and let them

21  know if there was a problem that they needed to be

22  concerned about.

23      **Q.     Was there a reason why you were telling**

24  **them that you would -- when I say "you," you and Gary**

25  **Rich -- were telling them that you would have a law**

1    **firm come in and investigate to see if there was a**
2    **problem, instead of government regulatory**
3    **environmental agencies coming in to tell them if there**
4    **was a problem?**
5                MR. MEDINA:  And you're asking him if he
6           had, at that point in time, a present sense
7           expression, that he has a current recollection
8           of, pertaining to that?
9                MR. WICKLINE:  You know, you can object
10          to form, and that would be fine.
11               MR. MEDINA:  Okay.  I want the record to
12          be clear.
13               Object to form.
14   A.     Okay.  Could you go over the question
15   once more, please?
16   **Q.     Yeah.  Was there a reason why you were**
17   **telling the people in Spelter that you would have a**
18   **plaintiffs' firm come in to investigate to see if**
19   **there was, in fact, a problem, instead of**
20   **environmental agencies, state or federal environmental**
21   **agencies coming in to investigate to see if there was**
22   **a problem?**
23               MR. MEDINA:  Object to form.
24   A.     Yes.
25   **Q.     What was the reason?**

1        A.    The reason was that we both felt that an

2   experienced firm that had the resources and the

3   ability, experience to investigate such a matter,

4   would provide the best protection for the people in

5   the community.

6        **Q.    In other words, they could get them a**

7   **bunch of money?**

8            MR. MEDINA:  Object to form.

9        **Q.    Was that the thought?**

10       A.    That's not what I said.  What I said was,

11  we felt that an experienced law firm, which had the

12  resources and was willing to come in and investigate

13  the potential problem, if there was -- you know, the

14  situation to see if there was a problem, would be the

15  best thing for the welfare and protection of the

16  people in the community.

17       **Q.    Well, government agencies come in to**

18  **investigate environmental issues, do they not?**

19       A.    They do.

20           MR. MEDINA:  Object to form.

21       **Q.    Okay.  And when a person hires a**

22  **plaintiffs' firm, that is usually to obtain money, is**

23  **it not?**

24           MR. MEDINA:  Object to form; and instruct

25           the witness not to answer.

1              This is not about some general

2         impressions.  If you have a question about his

3         impressions at that point in time, then you can

4         ask him about that.  It's not to give his views

5         about what plaintiffs' firms do in general.

6         **Q.    Was it your thought, Dr. Simoni, and Gary**

7    **Rich's thought, that the residents of Spelter might be**

8    **able to get some money out of this if they were to**

9    **hire an experienced, aggressive plaintiffs' firm like**

10   **the Levin, Papantonio firm?**

11        A.    Was that my thought?

12        **Q.    Yes.**

13             THE WITNESS:  Let me hear the question

14        once more, please.

15        (Whereupon, the requested portion of the

16   record was read by the reporter as follows:)

17             THE REPORTER:  Was it your thought,

18        Dr. Simoni, and Gary Rich's thought, that the

19        residents of Spelter might be able to get some

20        money out of this if they were to hire an

21        experienced, aggressive plaintiffs' firm like

22        the Levin, Papantonio firm?

23             MR. MEDINA:  Object to form.

24        A.    That was not my sense, if you're asking

25   me what my sense was at that time.

1          **Q.    Well, Mr. Rich --**

2          **I'm sorry, go ahead.**

3          A.    No; I'll let you ask.

4          **Q.    Mr. Rich is a plaintiffs' lawyer, is he**

5     **not?**

6          A.    I wouldn't term Mr. Rich a plaintiffs'

7     lawyer.  I would term him --

8          I think his -- his major experience at

9     the time, that I was aware of, was immigration law.

10         **Q.    He does plaintiffs' work, does he not?**

11         A.    Oh, he's been involved with plaintiffs'

12    work.

13         **Q.    In fact, you mentioned he was involved in**

14    **the asbestos work against West Virginia University; is**

15    **that correct?**

16         A.    What I'm saying is, at the time that I

17    met Mr. Rich, before the University asbestos case

18    developed, what I understood was his legal practice

19    was immigration law.  So, I --

20         That's why I -- I answered I wouldn't

21    maybe necessarily term him to have been a plaintiffs'

22    lawyer.

23         **Q.    Did anyone ask any questions at the**

24    **January 2001 meeting?**

25         A.    I'm not going to say no, but I don't

1    remember.

2         Q.    Did the group plan a future course of

3    action at the January 2001 meeting?

4         A.    There was just talk about having a third

5    meeting.

6         Q.    Okay.  Was there a sense within the group

7    at the January 2001 meeting that -- that everyone

8    needed to move forward and investigate the

9    environmental issues further?

10                MR. MEDINA:  Object to form.

11        A.    There was a sense, I think, on the part

12   of people in the community who were there, that -- let

13   me --

14        Q.    I'm sorry.

15        A.    To -- to investigate the possibility of

16   getting some help to look at the problem.  That's the

17   way I think they were --

18        Q.    So, in other words, they --

19        A.    -- thinking about it.

20        Q.    -- agreed with you that you and Mr. Rich

21   should go out and find the deep-pocket, aggressive

22   environmental plaintiffs' firm like the Levin,

23   Papantonio firm; is that right?

24        A.    No.  I think what they were agreeing to,

25   and were talking about, as I recall, was the idea of

1    someone, some entity, being willing to come into the

2    Spelter area and help them find out if they had any

3    serious matters to be concerned about.

4         **Q.    And that entity was this plaintiffs' firm**

5    **we were talking about earlier, is that correct?**

6         A.    Well, the entities that we discussed

7    were, again, as I recalled before, were experienced

8    law firms who had helped other communities with these

9    kinds of concerns, and had the -- not only the ability

10   to do it, but who were willing to.

11        **Q.    Okay.  Experienced plaintiffs' firms,**

12   **correct?  I mean, you weren't going to go out and**

13   **contact some defense firm to come in to investigate**

14   **this, were you?**

15        A.    Well, at that --

16             At that point, I would have to say to

17   you, in terms of a recollection, if we had discovered

18   a firm that you would label as a defense firm, that we

19   found to have had experience with communities in

20   environmental matters, helping people in a way that we

21   thought was helpful to the people in the community, I

22   don't think we would have dismissed looking at that

23   possibility.

24        **Q.    Was the Masry firm -- or is the Masry**

25   **firm a plaintiff or a defense firm?**

1          A.    I think you asked me that question

2    before, and I think I said plaintiffs' firm.

3          **Q.    Is the Levin, Papantonio firm a plaintiff**

4    **or defense firm?**

5          A.    Generally, I think it would be considered

6    as a plaintiffs' firm.

7          **Q.    And the same would be true for this**

8    **Norfolk, Virginia, firm that you contacted; is that**

9    **not correct?**

10         A.    I think that's true.

11         **Q.    When you were in Spelter for the January**

12   **2001 visit with the Spelter residents, did that**

13   **meeting take place during the weekday?**

14         A.    I do not recall.

15         **Q.    Do you recall the time of day?**

16         A.    Yes.  I -- I think, again, it was either

17   late afternoon, like 5:30 or six, or 6:30 or seven,

18   early evening.  I would say it probably was between

19   5:00 and 7:00, to the best of my recollection.

20         **Q.    So, about a two-hour meeting?**

21         A.    No, I don't know that it went two hours;

22   but in terms of when it began.

23         **Q.    Okay.  It began at five and ended about**

24   **seven?**

25         A.    Well, I don't know if -- if --

1           If it began at five, then it might have

2   finished at six or 6:30, or -- I don't remember the

3   meetings being long meetings.

4           **Q.    Okay.  Was there an agenda for the**

5   **meetings?**

6           A.    Well, we talked about what was discussed.

7           **Q.    I understand.  But was there like a**

8   **written agenda that someone had put together?**

9           A.    No.

10          **Q.    When you were in Spelter for the January**

11  **2001 meeting, did you observe any children or adults**

12  **recreating on the Spelter smelter property?**

13          A.    On the plant site, you're saying?

14          **Q.    On the plant site.**

15          A.    Again, I would have to say that same --

16  with that one caveat of if -- if the baseball field --

17          You know, the baseball field was used for

18  other things by kids, you know, it was a sports field,

19  and I -- in the past, I saw baseball games on it; but

20  then kids went on it for other reasons.

21          If I saw anybody, it was there, because

22  that's on the way -- as you come into town, it's on

23  the way to the Perrines' house, you pass the baseball

24  field.  So, if I had seen anyone, it was there; but I

25  can't remember whether I did or not.

1       **Q.    And when we say the "plant site," we're**

2   **talking about the facility where the actual zinc plant**

3   **was --**

4       A.    Yeah.

5       **Q.    -- as well as the tailings pile?**

6           THE REPORTER:  I'm sorry, as well as the?

7           MR. WICKLINE:  Tailings pile.

8       A.    The Tailings pile.  Yeah, the pile

9   itself.  I can tell you --

10          I just happen to remember this

11  experience.  I can tell you that one day I was coming

12  to one of these meetings, and I can't tell you which

13  one it was, but I was coming to one of these meetings

14  and there was a -- a young kid, maybe 11, 12, 13 years

15  old, maybe young teenager, who was walking along the

16  sidewalk, bouncing a basketball.

17          And I was just curious, so I put down my

18  window, and I said, are you going to play some

19  basketball?

20          And he said, yeah.

21          I said, where are you going to play?

22          And he said, oh, up on the -- up near the

23  baseball field there's a -- there's a basketball hoop

24  there, on --

25          I don't know if that was old plant

1    grounds, or what it was.  It was close to the plant,

2    you know, not far from that pond -- that reservoir

3    pond, and close to the plant.  But what struck me

4    about it was I wondered -- I wondered --

5            I didn't know at the time, but I wondered

6    about any potential danger to that kid just wanting to

7    go up and shoot some basketball hoops up there, you

8    know, whether that was a danger for him.  I wondered

9    about that.

10           Q.    Do you know the name of the kid?

11           A.    No, no.  It was just -- it was just --

12           I was going into town, and you were

13   asking me whether I had seen anybody.

14           Q.    Did you --

15           A.    And that -- I remember that -- that

16   scene.

17           Q.    Did you tell the kid that he shouldn't go

18   play on the playground because it might be

19   contaminated?

20           A.    No; I didn't know.  But I -- you asked

21   me --

22           Q.    But you suspected at that time, correct?

23           MR. MEDINA:  Object to form.

24           A.    You asked me if I wondered about that.  I

25   wondered about that, but I didn't know.

1          Q.    So, you didn't say to him something to
2     the effect of --
3          A.    No, I didn't say anything to him.
4          Q.    You need to let me finish my questions.
5          A.    Okay.  I'm sorry.
6          Q.    You didn't tell him that you were
7     concerned that that area may be contaminated --
8          A.    No.
9          Q.    -- so, therefore, he shouldn't play on
10    it?
11         A.    No, I did not mention anything.
12         Q.    Why not?
13         A.    Because I didn't know.
14         Q.    But you had a concern, did you not?
15              MR. MEDINA:  Object to form.
16         A.    I shared with you that already.
17         Q.    Okay.
18         A.    I think any reasonable person who -- who
19    had heard what I heard might have been -- had that --
20    might have had a concern, a reasonable concern.
21         Q.    Any reasonable person who heard what you
22    heard from Mr. Hando might have had that concern; is
23    that what you're saying?
24         A.    Yeah.
25              MR. MEDINA:  You're instructed not to

1          talk about your speculation about reasonable

2          people.

3                    THE WITNESS:  Okay.

4          **Q.    When was the next meeting?**

5          A.    I can't tell you for sure.  I think what

6     we said before -- what I said before is that there

7     were two or three between the time of the first

8     meeting and the April 30th fire hall meeting.

9          **Q.    Were they meetings once a month, like was**

10    **there a meeting in February and March, and then the**

11    **April meeting at the fire hall?**

12         A.    I think that's a fair idea.  Again, I

13    cannot tell you for sure, I do not remember, but I

14    think -- thinking about those meetings as happening

15    once a month is probably close to the case.

16         **Q.    The February 2001 meeting, did that occur**

17    **at the Perrine home?**

18         A.    Yeah.  As I said, all of the meetings I

19    remember occurred there.

20         **Q.    And who was at the February 2001 meeting?**

21         A.    I don't know all the people who were

22    there.

23         **Q.    Well --**

24         A.    Many of the same people who were at the

25    first and second meeting; and then there were some

 1    others, and I don't know who they were.  I couldn't
 2    tell you who they were.
 3          **Q.    Was Lenora and Willis Perrine there?**
 4          A.    To the best of my recollection, yes.
 5          **Q.    Was Jesse Medina there?**
 6          A.    I don't know for sure whether he was
 7    there.
 8          **Q.    Were the Schafers there?**
 9          A.    One of them, I would say.  Maybe --
10                You know, I don't know for sure.  One of
11    them maybe.
12          **Q.    I just want the best -- your best**
13    **recollection.**
14          A.    Yeah.
15          **Q.    Was Miss Rife there?**
16          A.    Again, possibly, but I cannot say for
17    sure.
18          **Q.    Ron Brown?**
19          A.    Again, Ron's work schedule, he may have
20    been there and he may not have been.  I just don't
21    remember.
22          **Q.    Anita Menendez?**
23          A.    No.
24          **Q.    Danny Drummond?**
25          A.    Danny was at a couple of meetings, but I

 1   don't remember which ones they were.

 2        **Q.    Okay.  Gary Rich?**

 3        A.    Gary, I think, was there with me.

 4        **Q.    Any new faces you can remember at the**

 5   **February '01 meeting?**

 6        A.    I remember there to be new faces, but I

 7   do not remember who they were.  I -- I couldn't begin

 8   to --

 9        **Q.    How many people were at the February 2001**

10   **meeting?  Was it a bigger crowd or smaller crowd?**

11        A.    Bigger.

12        **Q.    How many people do you think was there?**

13        A.    Maybe 20.

14        **Q.    All residents of Spelter?**

15        A.    To the best of my knowledge.

16        **Q.    And how long did that meeting last?**

17        A.    I don't remember.  They all were

18   somewhere between an hour and -- I would say an hour,

19   hour and a half in duration.

20        **Q.    What was discussed at the February 2001**

21   **meeting?**

22        A.    To the best of my recollection, the same

23   kind of thing that was discussed at the -- at the

24   January meeting, because there were folks who hadn't

25   been there before, and --

 1          Q.    Was there anything new to report during
 2    the February 2001 meeting?
 3          A.    Not that I recall.  I don't recall
 4    anything.
 5          Q.    Okay.  Do you recall any questions being
 6    asked during the meeting?
 7          A.    I don't.
 8          Q.    Was there a discussion as to the future
 9    course of action at the February 2001 meeting?
10          A.    Again, I would -- I would say the --
11                There was a discussion maybe, to the best
12    of my recollection, of having another meeting, you
13    know, sometime during the next month.
14          Q.    Okay.
15          A.    And that was the extent of any, you know,
16    planning, or anything like that, for, you know, what
17    was to come.
18          Q.    Okay.  Did you see anyone recreating on
19    the smelter property when you went to that meeting?
20          A.    On the plant site, you mean?  On the
21    pile, is that what you're talking about?
22          Q.    The whole -- anywhere on the plant site.
23          A.    I don't think I remember seeing anyone,
24    no.
25          Q.    Let's talk about the March 2001 meeting.

1    Who all was there?

2           A.    I don't recall.

3           Q.    Was it a bigger crowd?

4           A.    I would say about the same size as the

5    previous one.

6           Q.    Any new faces?

7           A.    There might have been, but there might

8    have been some faces from the first meeting -- I mean,

9    from the third meeting that we were talking about, the

10   February meeting, who were not at the March meeting,

11   and maybe a few new faces; but I -- I don't recall

12   people.

13          Q.    Was the March meeting about the same size

14   as the February meeting?

15          A.    My general recollection would be

16   somewhere between maybe 15 to 20 people.

17          Q.    Okay.

18          A.    But there might have only been, you know,

19   two new people.  I mean, I just don't know.  I

20   don't -- I can't recall that.

21          Q.    What was discussed at the March 2001

22   meeting?

23          A.    Same thing we had discussed with people

24   at the previous meetings.

25          Q.    Okay.

1           A.     Just making sure everyone was up to date

2    on, you know, what the idea was, and whether or not

3    they were interested in -- in participating in that

4    kind of thing.

5           **Q.     Were you and Mr. Rich reporting on your**

6    **progress in finding a plaintiffs' firm willing to take**

7    **the case?**

8                  MR. MEDINA:  Object to form.

9           A.     Were we reporting?  That might have

10   happened, but I can't remember specifically whether

11   that happened or not --

12          **Q.     Did you see --**

13          A.     -- because, you know, there might have

14   been a question like, you know, you talked to us

15   about, you know, helping us --

16                 There might have been this kind of

17   question, you know, you might have -- you were talking

18   about trying to find a firm, have you -- you know, is

19   there any firm that's expressed any interest, or

20   something like that.  You know, there might have been

21   that kind of exchange of communication; but can I tell

22   you for sure that happened, no.

23          **Q.     Was there any firm that had expressed any**

24   **interest at that point in time?**

25          A.     We're into --

1          Q.      March of 2001.

2          A.      March of 2001.  I can't say.  See, I --

3               I'm foggy on the time frame, the time

4    frame of when the communications with the firms

5    actually took place.  I just don't -- don't have a

6    clear time frame.

7               I mean, I can talk about when they came

8    in to look, you know, that kind of thing, but I

9    can't -- I don't have a clear time frame in mind about

10   when the communications -- initial communications

11   occurred with them.

12         Q.      Okay.  Let's take a look at what I think

13   is Exhibit 4, notes from the Spelter meeting.

14               THE WITNESS:  Before we do that, I'm

15          going to need a break.

16               MR. WICKLINE:  Okay.

17               THE WITNESS:  I'm sorry to keep doing

18          this, but it's nature.

19               MR. WICKLINE:  That's okay.

20               THE VIDEOGRAPHER:  Going off the record,

21          the time is 3:37.

22            (Whereupon, a recess was taken.)

23               THE VIDEOGRAPHER:  Back on the record,

24          the time is 3:50.

25         Q.      Dr. Simoni, did you learn from your 1970

1    study of the folks in Spelter that -- that Spelter was

2    a company town prior to 1950?

3         A.    What do you mean by "a company town"?

4         Q.    **A company-owned town.**

5         A.    A company-owned town?

6         Q.    **Well, let me back up.  You're familiar**

7    **with company towns in West Virginia, are you not?**

8         A.    Somewhat.  So, your question is, did I

9    know that --

10        Q.    **Were you aware that prior to 1950 that**

11   **Spelter was a company town?**

12        A.    And you're asking me did I -- was I aware

13   when?  Oh, did you say when I was doing work back in

14   the 70's?

15        Q.    **Well, let's start there.  Were you aware**

16   **when you did your work back in the 70's, did you come**

17   **to learn that Spelter was a company town prior to**

18   **1950?**

19        A.    Yes.

20        Q.    **Did you have any -- Strike that.**

21              **After talking with Mr. Hando, did you**

22   **have any particular concerns about Spelter because you**

23   **knew it was a company town?**

24        A.    No.

25        Q.    **Did you contact any plaintiffs' firms**

1    between the December 2000 community meeting in Spelter
2    and the April 30, 2001, meeting?
3            A.    I can't say now.  I don't remember.  I
4    think I said earlier that I don't remember the time
5    frame of those contacts.
6            Q.    Were you told by any of these plaintiffs'
7    firms that you contacted before you became a
8    consultant that you needed to make sure that you had a
9    sufficient number of people in Spelter signed up for
10   the litigation?
11           A.    No.
12           Q.    Was it your sense that the more people
13   you had on board with the litigation in Spelter, the
14   better?
15           A.    Was it my sense?
16           Q.    Yes.
17           A.    And what was the rest of the question?
18                 MR. WICKLINE:  Read it back, please.
19          (Whereupon, the requested portion of the
20   record was read by the reporter as follows:)
21                 THE REPORTER:  Was it your sense that the
22                 more people you had on board with the
23                 litigation in Spelter, the better?
24           A.    The better for?
25           Q.    The better for getting someone to take

1    **the case.**

2            A.    So, is your --

3                  I don't want to rephrase your question

4    for you, but is your question the --

5                  Well, I'm sorry.  Let me give you a

6    chance to read it back to me again.

7            (Whereupon, the requested portion of the

8    record was read by the reporter as follows:)

9                  THE REPORTER:  Was it your sense that the

10           more people you had on board with the

11           litigation in Spelter, the better?

12                  THE WITNESS:  Once more, please.

13                  THE REPORTER:  Was it your sense that the

14           more people you had on board with the

15           litigation in Spelter, the better?

16           A.    Yes.

17           **Q.    When you were out in Spelter between the**

18    **time period of December 2000 and April 30, 2001, did**

19    **you ever see the pile smoking?**

20           A.    Did I ever see the pile smoking between

21    December of 2000 and April of 2001?

22           **Q.    Yes.**

23           A.    I saw that at some time, but I can't

24    pinpoint that that was the time period.

25           **Q.    Did you see the pile smoking when you**

1    were back there -- Strike that.

2              Did you see the pile smoking in Spelter

3    when you were out in Spelter to do a study back in the

4    1970's?

5         A.    I don't recall.

6         Q.    Do you recall seeing the plant operate

7    out in Spelter?

8         A.    When?

9         Q.    Any time.

10        A.    I think back in the 70's, I might have

11   seen some general operation going on, but never paid

12   much attention to it.

13        Q.    After talking to Mr. Hando, was your

14   concerns about the contamination just related to

15   people getting on the pile, or substances getting into

16   the community, or both?

17             Strike that.  That wasn't worded very

18   well.

19        A.    I was just wondering --

20        Q.    After talking with Mr. Hando, were your

21   concerns just related to contamination on the pile, or

22   did you also have concerns that there may be

23   contamination in the ballpark we talked about earlier,

24   and in the community?

25        A.    Well, I think it raised the general

1     question in my mind of possible problems for the

2     community.

3          **Q.    Were you ever at Spelter prior to 1950?**

4          A.    No.

5          **Q.    Let's go to Exhibit 4.**

6          A.    Is this the --

7          **Q.    Yes; that's the April 30, 2001 --**

8          A.    May I read that?

9          **Q.    Yes, you may.**

10         A.    It's been around, but I haven't taken the

11    time to read it.

12               Okay.

13         **Q.    You had a chance to read Exhibit 4?**

14         A.    I did.

15         **Q.    Does that sound like a fair and accurate**

16    **summary of what transpired during the meeting on**

17    **April 30, 2001?**

18         A.    No.

19         **Q.    What do you disagree with?**

20         A.    Well, the first sentence says the purpose

21    of the meeting was information and preliminary

22    fact-finding.

23         **Q.    You disagree with that?**

24         A.    I don't know of any preliminary

25    fact-finding that was either intended or happened.  I

1    think it was information.
2         Q.    Okay.
3         A.    I don't recall any -- anything to do with
4    fact-finding.
5         Q.    Okay.  What about the next sentence?
6         A.    I'm not sure where that came from,
7    whether the person who wrote this had some sense of
8    that, or -- I don't know.
9         Q.    Do you recall that being discussed, or
10   anybody voicing those concerns?
11        A.    I don't.
12             MR. MEDINA:  Is there a question?
13             MR. WICKLINE:  Yeah, it's --
14             I was asking him what -- what in
15        Exhibit 4 he disagrees with.
16             MR. MEDINA:  Object to the form.
17             Object to the exercise.
18        Q.    You can answer.
19             Before we go on to that, do you have a
20   specific recollection that people at that meeting, or
21   some of the people at that meeting, did not raise
22   concerns that their health problems were related to
23   the slag pile?
24             MR. MEDINA:  Object to form.
25        A.    Do I have a recollection what?

1          **Q.    Do you know that those concerns were not**
2    **raised by residents of Spelter; that is, concerns**
3    **about their health problems being related to living**
4    **near the slag pile?**
5          A.    Well, my recollection is --
6                Wait a minute.  Let me take your question
7    once more.  I want to answer your question.  I'm
8    sorry.
9                Your question again, please?
10         **Q.    My question was:  Do you have a specific**
11   **recollection that certain residents of Spelter -- or**
12   **do you have a specific recollection that there were no**
13   **residents of Spelter who raised concerns that their**
14   **health problems were related to living near the slag**
15   **pile?**
16         A.    No.
17         **Q.    Okay.  What else about Exhibit 4?**
18         A.    I was going to ask you if you would want
19   to --
20                We sort of touched upon the first
21   paragraph.  If you would want to --
22         **Q.    Okay, let's go --**
23         A.    -- go piece by piece, and then you ask me
24   questions and --
25         **Q.    Okay.  Let's go over --**

1              Let's take a look at the second
2       paragraph.  Is there anything in that paragraph that
3       appears to you to be inaccurate or not a fair
4       characterization of what transpired during that
5       meeting?
6              A.     Let me just take another quick read here.
7              Q.     That's fine.
8              A.     Okay.  And your question about Paragraph
9       2 was?
10             Q.     Is there anything in Paragraph 2 that
11      appears to be inaccurate or not a fair
12      characterization of what transpired during the
13      meeting --
14             A.     No.
15             Q.     -- of April 30, 2001?
16             A.     No.
17             Q.     Okay.  Same question with respect to
18      Paragraph 3.
19             A.     Let me look at Paragraph 3.
20                    Well, I think there's a problem with the
21      first sentence in that paragraph.
22             Q.     Okay.  That sentence reads:  The
23      procedure they follow is to interview people, get them
24      to sign up; and, if there appears to be sufficient
25      data, approach law firms to take the case.

1          A.    Right.  I think the -- the sense that is

2     conveyed with the wording, "the procedure they follow

3     is to interview people, get them to sign up," suggests

4     some kind of interview procedure, which I never was a

5     part of.

6               And this "get them to sign up" suggests

7     some kind of very proactive kind of attempt to get

8     people to sign up, which I think is -- is not the

9     case -- was not the case in my experience.

10         **Q.    Okay.  Well, they wouldn't sign up with**

11    **you, they would sign up with Mr. Rich, is that**

12    **correct; he being a lawyer?**

13         A.    Well, if anyone would sign anything, it

14    wouldn't be with me.  It wouldn't --

15         **Q.    So, do you know if that was the procedure**

16    **that Mr. Rich followed?**

17         A.    I believe he never interviewed anybody.

18         **Q.    He was certainly at these meetings,**

19    **correct?**

20         A.    Yes, I've said that.

21         **Q.    Okay.**

22         A.    Except for the first one.

23         **Q.    Is there anything else in Paragraph 3 you**

24    **take issue with?**

25         A.    Paragraph 3?  No; just that first

 1    sentence.  I think that's incorrect.
 2         **Q.   Same question with respect to Paragraph**
 3    **4.**
 4         A.    Let's see.
 5              Well, understanding that this is the
 6    written account of this Mr. Williams, I must say that
 7    I don't remember -- recall making any specific
 8    reference to the chemicals.
 9         **Q.   Okay.  Do you have any notes, Dr. Simoni,**
10    **that would be a better memorialization of what**
11    **happened during that April 30, 2001, meeting?**
12         A.    I didn't take notes at the meeting, nor
13    do I know of any notes.
14         **Q.   Okay.  The sentence that reads, Joe**
15    **claims to have found some data in the office of a**
16    **government agency, indicating the presence of lead,**
17    **cadmium and arsenic; is that the information that you**
18    **obtained from Mr. Hando?**
19         A.    I -- to the best of my recollection, I
20    would say yes.
21         **Q.   And did you express concern during the**
22    **April 30, 2001, meeting, about children playing in the**
23    **community?**
24         A.    I don't recall whether I did or not.
25         **Q.   Is it possible that you did?**

1          A.     It's possible I did, because I have a
2     concern for children in communities.
3          **Q.     And that was a concern about children**
4     **playing in the community, as opposed to on the pile**
5     **itself, or both?**
6          A.     Well, I think that's a good -- that's a
7     good -- very good point that you're raising, because
8     the concern that I think I expressed, if I remember
9     correctly, if I did express any at that meeting, might
10    have been related to an observation that I made one
11    day when I was going into the post office in Spelter.
12              I happened to be in the town one day, and
13    went into the post office; and, as I was walking into
14    the post office, there were some children on a swing
15    set right next door to the post office, and I saw that
16    they were all wet, and I just said to them out of
17    curiosity -- I was curious -- I said, you know, you
18    kids are all wet, how did you get all wet.  It was
19    obvious that their clothes were all wet.
20              And they said, oh, we were swimming.
21              And I said, swimming?  Where were you
22    swimming?
23              And they said, oh, over in the pond.
24              Now, the pond they were referring to was
25    the pond on the -- on the plant site.  Some people

1    call it a reservoir pond or -- you know, it's right in

2    the -- like part of the plant site.  You probably know

3    it better than I do.  But, anyway, I thought, you

4    know, when --

5              When you made the reference to children

6    playing in the community, the apprehension or the

7    concern that I had for me, for myself, was related, I

8    think, to that experience where I saw those kids and

9    learned that they had been swimming in that pond that

10   was on the plant -- I think it's part of the plant

11   property, on the plant site.

12             And I said to them, I said, well, how did

13   you -- you know, how did you get in there?  Because at

14   the time that I saw them, there was a fence up, okay?

15             And they said, oh, we just crawled under

16   the fence.

17             You know, I thought to myself, well, you

18   know, that's what kids do, they crawl under fences to

19   do things like they did.

20             But, you know, relating back to your

21   question, after having that experience there, the

22   sentence says here, Joe expressed concern for children

23   playing in the community.  Well, in the community, I

24   don't think I was meaning, you know, away from the

25   plant site.  I think at that time I was meaning

1    something related to that observation I had made with
2    those children.
3         Q.    But I think you told me earlier, did you
4    not, Doctor, that your concern extended beyond the
5    plant site, you had concerns about contamination in
6    the community?
7         A.    I said I wondered -- I wondered if there
8    was a problem.
9         Q.    Wondered, or had concerns about whether
10   or not there was contamination in the community?
11        A.    But this -- this --
12              MR. MEDINA:  Object to form.
13        A.    What you're asking me about here in this
14   paragraph, I feel fairly sure, in thinking back and
15   recollecting on it, that it had to do with that
16   observation I made of the children who had been
17   swimming in the pond on the plant site.
18        Q.    Okay.  You indicated there was a fence
19   up, correct?
20        A.    At that time, yeah, because they told me
21   they had crawled under the fence.
22        Q.    Now, when did this conversation with
23   these children take place?
24        A.    I don't recall a specific time.  I just
25   remember it happening, and --

1          Q.     Was it back in the 1970's?

2          A.     No, no, no, no.  This was --

3          Q.     Well, your first time back to Spelter was

4     in December 2000, correct?

5          A.     Since 1970?  No.

6          Q.     Your first time back in Spelter --

7          A.     If I -- if I indicated that, that's not

8     true.

9          Q.     Okay.  Your first time --

10                If you'll let me finish my question.

11         A.     Sure.

12         Q.     Your first time back in Spelter after

13    talking to Mr. Hando and having a concern about

14    contamination on the site was in December of 2000,

15    correct?

16         A.     That, I believe, is correct, to the best

17    of my knowledge.

18         Q.     And you went to one-month meetings

19    between December of 2000 and April 30, 2001; correct?

20         A.     That's --

21         Q.     Once every month, you went to a meeting

22    in Spelter, between December of 2000 and --

23         A.     Once every month, I attended a meeting.

24         Q.     -- April of 2001; correct?

25         A.     I believe that's correct.

1          **Q.    Okay.  Were the kids swimming in the pond**
2    **in December of 2000?**
3          A.    I don't remember when that was.  All I
4    remember is that it was -- in the framework that
5    you've just suggested, time framework -- it was
6    sometime between my visit to the DEP office and
7    talking with Mr. Hando, and the time of the fire hall
8    meeting.  Now --
9          **Q.    Now, it would have been pretty cold**
10   **between December of 2000 and April of 2001, would it**
11   **not?**
12         A.    Generally speaking, I -- you might be
13   correct on that.
14         **Q.    I mean, the opportunity for you to see**
15   **those kids was either in December of 2000, January of**
16   **2001, February of 2001, and March of 2001?**
17         A.    Or April.
18         **Q.    Well, your April visit was April 30,**
19   **2001, was it not?**
20         A.    Right.  So, it might have been during the
21   month of April.  I don't remember when it was.
22         **Q.    You were out there for another meeting in**
23   **April?**
24         A.    Okay.  That's a good question to ask.
25   Thank you.

1            I have friends who lived in Spelter.  So,
2    I might have been in Spelter, and I couldn't tell you
3    the exact times, but -- but --
4            **Q.    I thought you told me that your friends,**
5    **Joe Vazquez, and others, had passed away at the time**
6    **all of this started.**
7            A.    Well, I'll give you a good example.
8    You've asked about Anita Menendez, right?
9            **Q.    Yes.**
10           A.    Okay.  I know that during those months, I
11   may have stopped -- because Anita and her family and I
12   go back -- back to the 70's.  I may have stopped
13   once -- at least once I know of, but maybe twice, and
14   her house is right near the post office.  But I
15   stopped to visit a couple of times with Anita.  I
16   think a couple of times.
17           **Q.    Do you get your mail at the Spelter post**
18   **office?**
19           A.    No, I do not.
20           **Q.    Why were you at the Spelter post office?**
21           A.    It just so happens that my wife's -- let
22   me see if I can get the relationship here -- my wife's
23   ex-brother-in-law is the postmaster in Spelter.
24           **Q.    What is his name?**
25           A.    I want to say Mike.

1        Q.      What's his last name?

2        A.      And I'm blocking on his last name.  But,

3    you know, I may be wrong about the first name.

4        Q.      Was it your habit to visit your wife's

5    ex-brother-in-law?

6        A.      When I was around Spelter, if the post

7    office was open, I would just stop by and say hello to

8    him.

9        Q.      Would you make a special trip to Spelter

10   to visit your wife's ex- --

11       A.      No.

12       Q.      -- brother-in-law?

13       A.      No, no.

14       Q.      So, again --

15       A.      But I can tell you why I might have -- if

16   you're wondering why I might have made a visit, for

17   example, to see Anita Menendez, a friend from many

18   years back, is because she and I have a common

19   interest in the social history, the cultural history

20   of the place; and I collected information about her

21   family, you know, back in the 70's.  And, so, from

22   time to time -- I don't want to say once a year or

23   twice a year -- but, from time to time we would have

24   phone communications about that, about the work that I

25   had done back in the 70's, and I --

1           My best recollection is that I may have

2    stopped in to visit with Anita, you know, and we

3    would, of course, talk about those kinds of things

4    during that period of time that you're referring to.

5        **Q.    Do you know when --**

6        A.    And, so, I'm thinking that it's very

7    possible that because she was so close to the post

8    office, that I might have gone over to say hello to

9    Mike, I think his first name is, and that's when I saw

10   the children.

11       **Q.    Do you know when the public swimming**

12   **pools open and when they close each year in West**

13   **Virginia?**

14       A.    I do not.  I think maybe Memorial Day,

15   and close Labor Day, but I don't -- I'm not sure about

16   that.

17       **Q.    And that's because of the weather, isn't**

18   **it?**

19       A.    Right.  All I said before is it's

20   possible that I may have made those observations in

21   April.  There might have been a warm time in April.  I

22   don't know.  I do not remember specifically when it

23   was, but I do remember making the observations.

24       **Q.    You would agree with me, would you not,**

25   **that it's generally a pretty cold time to go swimming**

1    **in West Virginia from December through April, would**

2    **you not?**

3           A.     Generally speaking, yes; but may I

4    respond to that?

5           **Q.     Sure.**

6           A.     If you have children who don't have

7    access to a swimming pool normally, and there is a

8    swimming -- what they considered to be a pond that

9    they could swim in, they might go into it earlier than

10   Memorial Day.

11          **Q.     Okay.  Now, this fence we're talking**

12   **about that was around the zinc plant property, was**

13   **that the fence that is there currently, that was**

14   **erected by DuPont as a part of the remediation of the**

15   **site?**

16                 MR. MEDINA:  Object to form.

17          A.     The question again, please.

18          **Q.     You indicated that there was a fence up**

19   **around the zinc plant property, correct?**

20          A.     That the children had crawled under.

21          **Q.     But the answer to my question is, there**

22   **was a fence up around the zinc plant property at that**

23   **time; correct?**

24          A.     To the best of my recollection, yes.

25          **Q.     Okay.  And that is the fence that was**

1    erected by DuPont as a part of the remediation of the

2    site, correct?

3           A.    That I do not know.

4           Q.    It's a fairly tall fence, is it not?

5           A.    I don't remember.

6           Q.    Do you recall warning signs on the fence?

7           A.    I recall that warning signs eventually

8    were put up, but I don't remember the time frame.

9           Q.    Okay.  So, despite the fact that there

10   was a fence up --

11          A.    And I --

12          Q.    -- and despite the fact that there were

13   warning signs up on the fence, you're telling me that

14   kids were still able to disregard the fence, disregard

15   the warning signs, and get onto the property?

16                MR. MEDINA:  Object to form.

17          Q.    Is that correct?

18                MR. MEDINA:  Object to form; lack of

19          foundation.

20          Q.    Is that your testimony?

21          A.    My testimony is --

22                MR. MEDINA:  Object to form; lack of

23          foundation.

24          A.    My testimony is, I do not know that the

25   children saw the signs, I don't remember where the

1    signs were; and my testimony is that children, in my

2    experience, sometimes go by signs and do the things

3    that children do.

4         **Q.    Children sometimes disregard fencing, and**

5    **children sometimes disregard warning signs, do they**

6    **not?**

7         A.    That's true.

8         **Q.    And despite the best efforts of all**

9    **concerned, children can sometimes get beyond those**

10   **security measures, can they not?**

11              MR. MEDINA:  Object.  Now you're asking

12         for his opinion.  He's instructed not to

13         answer.

14        **Q.    How many children were there?**

15        A.    Oh, I would say at least three, maybe

16   four.

17        **Q.    Okay.**

18        A.    They were all playing on one swing set.

19        **Q.    What were their approximate ages?**

20        A.    I don't recall.  I was -- well --

21              What were their approximate ages?  Maybe

22   seven to -- between the ages of seven and 12, 13

23   maybe; early teenager.

24        **Q.    Was it your sense that these kids lived**

25   **within the Spelter community?**

1         A.    Yes.

2         Q.    **Okay.  Do you know whose children they**

3   **were?**

4         A.    No, I do not.

5         Q.    **Do you know the names of any of the**

6   **children?**

7         A.    No.

8         Q.    **Were -- was it both boys and girls?**

9         A.    As I recall, both boys and --

10              I think there were both sexes

11   represented.

12        Q.    **Okay.  Do you remember how many of each?**

13        A.    No.

14        Q.    **Okay.  The fifth paragraph, is there**

15   **anything about that paragraph of Exhibit 4 from the**

16   **April 30, 2001, meeting, that appears inaccurate or**

17   **not a fair characterization of what transpired during**

18   **the meeting?**

19        A.    Well, as we spoke earlier, I think it may

20   have been the fourth or fifth meeting, not the third.

21        Q.    **Okay.**

22        A.    With respect to the -- each one having

23   larger attendance, I think I told you before that my

24   recollection was that the first two might have been

25   approximately the same --

1          Q.      Okay.

2          A.      -- in terms of attendance.

3                  The rest, I think, is approximately

4   correct.

5          Q.      Okay.  So, there were about 40 to 50

6   people in attendance at this meeting?

7          A.      I think so.

8          Q.      And WBOY, what is WBOY?

9          A.      It's a TV station in Clarksburg.  There

10  was a TV station there, but I can't tell you for sure

11  that it was WBOY.

12         Q.      Did you give an interview to the TV

13  station?

14         A.      I did not.

15         Q.      Did Mr. Rich?

16         A.      I don't know that he gave an interview.

17  I think he --

18                 As I recall, they may have asked him some

19  question; but I don't remember what that was, or, you

20  know, if he actually communicated with them.  I don't

21  know.

22         Q.      Do you know how WBOY -- or whoever the TV

23  station was -- found out about this meeting?

24         A.      I do not, no.

25         Q.      Were there any other news media at this

 1    **meeting?**

 2         A.    Not that I recall.  It's possible, but I

 3    don't recall it.

 4         **Q.    Okay.  Take a look at the sixth**

 5    **paragraph, and tell me if there's anything in that**

 6    **paragraph you disagree with or you think is not a fair**

 7    **characterization of what happened during the April 30,**

 8    **2001, meeting.**

 9         A.    Is this the paragraph that begins, when

10    Gary Rich spoke?

11         **Q.    Correct.**

12         A.    All right.  Let me read that again.

13               Well, if I could break that paragraph

14    down a little bit.

15         **Q.    Okay.**

16         A.    I think the paragraph down to the point

17    from -- down to the point of ending with the word

18    "enthusiasm," as I recall, is approximately, you know,

19    what occurred.

20         **Q.    Okay.**

21         A.    The next -- the next sentences, I'm not

22    sure where Mr. Williams got this from.  I don't

23    remember, and I don't believe that that ever happened.

24    Otherwise --

25               I guess what I'm saying is, I don't

1    believe and I don't remember that Gary Rich ever said

2    he wanted people to sign an agreement, or, that with

3    enough agreements, he can attract a firm with

4    expertise.  I mean, I don't know where that came from.

5    All I know is it's part of this account of

6    Mr. Williams.

7         **Q.    Is it possible that Mr. Williams heard**

8    **Mr. Rich say that outside your presence?**

9         A.    I don't think so, because I was there for

10   the whole meeting.

11        **Q.    Did people continue to talk after the**

12   **meeting had officially concluded?**

13        A.    You mean did the people who were at the

14   meeting continue to talk?

15        **Q.    Continue to mingle around.  Did Gary**

16   **continue to mingle around with people --**

17        A.    I don't --

18        **Q.    -- after the meeting had officially**

19   **concluded?**

20        A.    Well, I think, you know, it's normal for

21   people you know -- the meeting concludes, and you're

22   saying hello to, you know, somebody you know, maybe

23   you met them at a previous meeting; but that was the

24   extent of, you know, any communication.  I can't

25   remember --

1          I don't remember any communication other
2    than that.
3          Q.    So, Jesse Medina had given Mr. Rich flak
4    for his lack of enthusiasm?
5          A.    I think that's -- that's a fair -- fair
6    portrayal, I thought.
7          Q.    What specifically did Mr. Medina say?
8          A.    I don't remember what he actually said.
9    I just remember him being -- expressing the "flak," as
10   it's termed here by Mr. Williams, because Gary Rich
11   was not saying, you know --
12          He was not saying, you know, there's a
13   case here, you know, we know there's a case here, we
14   know there's a problem here.
15          What he was saying was the truth, that we
16   didn't know if there was a problem there, and -- and
17   that I think he might have said -- which I often heard
18   him say -- that, you know, he didn't have the
19   expertise to determine whether there was a problem,
20   and --
21          And I think Mr. Medina in Spelter there
22   perhaps wanted something to happen, you know, like
23   quickly, and he was a bit upset that -- that Gary Rich
24   was saying that, you know, before we can even know if
25   there's a problem, we're going to need -- need some

1    people to come in here and help us find out if there's
2    a problem.
3         **Q.    So, Mr. Medina was wanting to get the**
4    **lawsuit process started quicker; is that accurate?**
5              MR. MEDINA:  Object to form.
6         A.    I think what I just said is a more
7    correct characterization.
8         **Q.    And you don't remember any of his**
9    **specific comments?**
10        A.    Mr. Medina's specific comments?
11        **Q.    Yes.**
12        A.    No.  I just remember the general tenor,
13   and what it was about.
14        **Q.    Had anyone signed any agreements with**
15   **Mr. Rich at that point in time?**
16        A.    At the time of that meeting --
17        **Q.    Yes.**
18        A.    -- is that what you're saying?
19              Well, I know he --
20              There were no people at that meeting who
21   signed agreements -- to the best of my recollection,
22   who signed anything that night, who signed any
23   agreement with him that night.  I'm pretty sure that
24   was the case.
25        **Q.    Was there anybody who signed**

1    representation agreements with Mr. Rich at the

2    December 2000, January 2001, February 2001, or

3    March 2001, meetings?

4            A.    Yes.

5            Q.    Who?

6            A.    I don't know.  I couldn't tell you who,

7    but I remember that occurring.

8            Q.    It would have had to have been someone

9    who attended those meetings, is that correct?

10           A.    Yes.

11           Q.    Okay.  Would it have been the Perrines?

12           A.    I don't --

13                 I just said I don't remember exactly

14   who -- who would have signed.  I just remember that

15   there...

16           Q.    Okay.  Take a look at the seventh

17   paragraph of Exhibit 4, and let me know if that is --

18   or if there's anything you disagree with, or that you

19   do not think is a fair characterization of what

20   transpired during the April 30, 2001, meeting.

21                 MR. MEDINA:  Object to form.

22           A.    Okay.  The question again?  I think I

23   know what -- if you could just repeat it for me.

24           Q.    It's been the same question as I've

25   asked --

1          A.     Anything that's objectionable from my --

2          **Q.     Right.**

3          A.     -- knowledge and recall?

4                 I do not know where Mr. Williams came up

5     with the numbers, the 210, the 184, the normal

6     background.  I do not recall ever saying anything that

7     specific.

8          **Q.     Okay.**

9          A.     I don't believe I did.  And I believe a

10    more accurate representation of what I was saying

11    about that was that someone in the community had given

12    me a soil sample from their garden, and asked me to

13    have it looked at at the University; and I took it

14    to --

15                What would be that department's name?

16    Anyway, it's in the agricultural college, where the

17    soil scientists are.  And I took it to someone whom I

18    didn't know before, but I just went looking for a soil

19    scientist.  And I can't remember the name of that

20    professor right now, but it was -- he was a soil

21    scientist.

22                And he looked at the sample and he said

23    to me that he would advise the person who gave it to

24    me not to eat any underground vegetables grown in the

25    garden; and -- and that's what I related.  I related

1    that somebody in the community asked me to have a

2    sample from their garden, I took it to the University,

3    and the soil scientist told me to advise the person

4    not to eat anything out of his garden that grew

5    underground.

6              I think that -- I mean, what I'm just

7    relating -- is a more accurate representation than

8    what Mr. Williams has.

9         Q.    Okay.  Anything else?

10        A.    Let's see.  Not in that paragraph.

11        Q.    Okay.  All right.  Let's go back to this

12   soil sample.

13        A.    Uh-huh.

14        Q.    Are those the results of the soil sample

15   that was taken from the garden?

16        A.    I don't know.  I don't have any document

17   at this point, anything that the soil scientist gave

18   me.  I don't --

19              It's just very strange to me to think

20   that I would have been talking about --

21              I don't think I did talk about those

22   specifics.  Best of my recall, I didn't.  I don't know

23   where those numbers came from.

24        Q.    Okay.  So, a resident of Spelter

25   questioned you and Mr. Rich during this meeting about

1    **the impact of a nearby power plant stack; is that**
2    **correct?**
3              A.     At the firehouse meeting?
4              **Q.     Yes.**
5              A.     No, I don't think questioned --
6              As I recall, I don't think it was a
7    questioning of Mr. Rich and me; I think it was a
8    comment by someone that was at the meeting, like, you
9    know, how do we know -- if there is a problem here, it
10   might have been --
11             I'm just speculating now, if I may just
12   for a second.  The suggestion in the question was, if
13   there is a problem here, how do we know it's not from
14   the power plant.  It was that kind of a thing.
15             **Q.     And did you --**
16             A.     It wasn't any -- it wasn't --
17             I don't remember any direct questioning
18   of Mr. Rich or me about that.  It was just somebody
19   who had an idea; and, as part of the meeting, was
20   expressing that idea.
21             **Q.     Did you or Mr. Rich respond to that**
22   **inquiry?**
23             A.     Well, I do not remember specifically; but
24   I do know from my experience with Mr. Rich what he
25   would have said, is he would have said the same thing

1    that I suggested before.

2              He would have said, we don't know, first

3    of all, if there is a problem here, because that was

4    his theme during the meeting with the people at the

5    meeting; we don't know that there's a problem here.

6         **Q.    Did anybody else comment on the issue of**

7    **whether or not the stacks from the Harrison power**

8    **station may have caused contamination in the Spelter**

9    **community?**

10             MR. MEDINA:  Object to form.

11        A.    I have no knowledge of that.

12        **Q.    Okay.  When was the soil sample taken**

13   **that's referred to in this Paragraph 7?**

14        A.    I don't know.

15        **Q.    Who took it?**

16        A.    I don't know that, and I don't remember

17   who gave it to me.

18        **Q.    You don't remember who in the community**

19   **would have given you that soil sample?**

20        A.    Someone -- someone at one of the

21   meetings, I think, came up to me after the meeting and

22   said they had a soil sample from the garden.

23        **Q.    So, it had to be someone who attended one**

24   **of the four meetings prior to the April 30, 2001 --**

25        A.    To the best of my recollection.

1          Q.      You didn't let me finish.

2                  Would it have been Danny Drummond?

3          A.      I don't have a clue.

4          Q.      Would it have been the Perrines?

5          A.      I -- it -- it --

6                  I don't know.  I just don't -- I do not

7     know.

8          Q.      So, you don't know the protocol, or

9     whether proper protocol was followed in taking the

10    soil sample?

11         A.      All I know is what I told you.  I went to

12    the soil scientist, I asked him if he would take a

13    look at it, that someone down in the community had

14    asked if I could have it looked at at the University;

15    and he said he would.

16                 And what the protocol was, I don't -- I'm

17    not a soil scientist, I don't know.

18         Q.      Okay.  But you don't know what protocol

19    was followed by the resident of Spelter in taking the

20    soil sample either, do you?

21         A.      No.

22         Q.      Okay.

23         A.      Of course not.

24         Q.      How did the sample --

25                 How was the sample presented to you?

1           A.     Just as I told you.
2           Q.     **I mean, was it in a bag, was it in a**
3    **plastic container?**
4           A.     Oh, I'm sorry.
5           Q.     **Was it marked, was it dated?**
6           A.     I think it was in a baggie.
7           Q.     **Like a Ziploc bag that you put sandwiches**
8    **in?**
9           A.     Yeah, like a sandwich bag type of thing.
10          Q.     **And you were under the impression that**
11   **taking a soil sample under those conditions would be**
12   **appropriate?**
13          A.     Was I under the impression at that time?
14          Q.     **Yes.**
15          A.     Yes.
16          Q.     **Okay.  Do you know how deep the sample**
17   **was?**
18          A.     I have --
19                 No, I have no information about --
20          Q.     **How much dirt was in the baggie?**
21          A.     I don't recall.  I would be guessing at
22   this point.
23          Q.     **Was it full, was it half full, half**
24   **empty?**
25          A.     I -- I would be guessing.

1          Q.    Okay.  Do you have any idea where that
2    sample is today?
3          A.    No idea at all.
4          Q.    Okay.  Are you aware that these numbers
5    that are listed on Exhibit 4 for lead are within the
6    de minimis regulatory screening levels for lead?
7                MR. MEDINA:  No; you're asking him
8          contemporaneously something.
9                If you know something based on consulting
10         work that you've done, either for Masry or for
11         Levin, Papantonio, you can't talk about it; but
12         if you have some prior knowledge extraneous to
13         your consulting work, that you know some fact
14         about that, then you can address that.
15         A.    Sorry.  I'm following the guidance of my
16   legal counsel here.
17         Q.    So, you're -- that guidance, as you
18   understand it, is to not answer the question?
19         A.    Right.
20         Q.    Okay.
21                MR. MEDINA:  Well, the --
22                No; it's very clear what the instruction
23         was, is if he had some other unassociated
24         knowledge --
25         A.    Before the --

1            MR. MEDINA:  -- you know, not associated

2        with the consulting work, he could testify to

3        it.

4        A.    And what I'm saying is --

5        **Q.    You had no such knowledge other than**

6    **through the consulting work?**

7        A.    Remember, I'm not an environmental

8    scientist.

9        **Q.    I understand.**

10            **Now, back up in Paragraph 4, you**

11    **obviously knew from your conversation with Mr. Hando**

12    **that the metals at issue were lead, cadmium, and**

13    **arsenic.  Is there a reason why you only tested that**

14    **soil sample for lead?**

15            MR. MEDINA:  Object to form.

16        A.    I don't --

17            First of all, I don't remember

18    communications with Mr. Hando about the specific --

19    you know, lead, cadmium, arsenic.  I don't remember

20    those communications.  I don't --

21            If you asked me if I had them, I would

22    have to tell you I don't recall communicating.

23        **Q.    Well, you testified earlier in response**

24    **to Paragraph 4 that you --**

25        A.    But I said --

1    **Q.    -- that you did become aware of that**
2    **through your conversations with Mr. Hando.**
3              MR. MEDINA:  Object to form.
4         A.    No, I don't believe I said that.
5              MR. MEDINA:  Mischaracterization.
6         A.    I don't believe I said that.
7         **Q.    Is it your testimony here today that you**
8    **did not mention to the 40 or 50 people in attendance**
9    **at the April 30, 2001, Spelter Fire Department meeting**
10   **that the metals at issue, or the metals of concern,**
11   **according to the government agency, was lead, cadmium,**
12   **and arsenic?  Is that your testimony, sir?**
13        A.    My testimony is that I do not recall
14   mentioning the specific metals.  I do not recall doing
15   that, and I do not recall --
16        **Q.    But you were, in fact, aware of them at**
17   **that time; correct?**
18        A.    I -- I do not recall --
19              What I recall is getting information from
20   Mr. Hando about a pile over there at the site with
21   contamination, and I don't recall the communications
22   with him regarding any specifics of the metals.
23   Now --
24        **Q.    So, you --**
25        A.    So, what I'm suggesting is that my

1    recollection -- and, remember, we're talking about

2    five years ago, okay -- my recollection is that I

3    shared with the people at the meeting information

4    suggesting that there was contamination in the pile;

5    but I don't recall talking about specific metals.

6         **Q.    So, we're several months into this**

7    **process, you've already spoken to Mr. Hando, and your**

8    **testimony here today is that you only knew it was**

9    **contaminated, but that you never inquired as to what**

10   **it was contaminated with; is that correct?**

11        A.    No.  My testimony is that I have no

12   recollection, and do not recall mentioning specific

13   metals, contaminants, in the meeting at the fire hall.

14        **Q.    Okay.  But my question to you was,**

15   **whether you mentioned the specific metals in the**

16   **meeting at the fire hall, at least by that meeting you**

17   **knew what those specific metals were, did you not?**

18        A.    I may have.  I cannot tell you for sure

19   that I did.

20        **Q.    Okay.**

21        A.    I just do not recall that.

22        **Q.    Okay.  And my question was --**

23        A.    I don't recall the period of time at

24   which I became informed about the specific

25   contaminants that might have been in the pile.  I just

1    don't recall the time frame.

2         **Q.    And my question to you was, if, in fact,**

3    **you knew what the specific metals were, why did you**

4    **only have the soil tested for lead?**

5              MR. MEDINA:  Object to form.

6         A.    What --

7              I didn't have the specific sample

8    analyzed for anything specific.  All I did was, I

9    said, this is a sample --

10        **Q.    Tell me what's in it?**

11        A.    This is a sample from a garden, and the

12   residents asked me if I would have it checked here at

13   the University, could you take a look at it.  Now, I

14   don't -- my sus --

15             In trying to recollect all that, my gut

16   knowledge is that soil scientists, when they're asked

17   about that kind of thing, there's certain things

18   they're looking for; and if they're in West Virginia,

19   they're doing work, they know the soils, and, you

20   know, they look for certain things.

21        **Q.    So, is it fair to conclude from that that**

22   **the soil scientist did not find evidence of arsenic or**

23   **cadmium in that soil sample given to you from the**

24   **resident in Spelter?**

25             MR. MEDINA:  Object to form.

1          A.    I -- I would say it's not fair to

2     conclude that.  I don't know what -- I'm just --

3               All he told me, to the best of my

4     recollection, is he told me not -- he told me to

5     advise the resident not to eat anything growing

6     underground in his garden.

7          Q.    **What was the name of the soil scientist?**

8          A.    I -- if I heard the name again, I

9     probably would recognize it; but I --

10              And he's in the soil science department,

11    but I -- I do not remember the name.

12         Q.    **Did he give you a report of his findings?**

13         A.    He might have given me something, but I

14    don't remember what you would call it, or what it was;

15    and it was something that was given --

16              I know that I did not then --

17              I mean, I did not then take that and give

18    that to the resident.  All I did with the resident was

19    share what the advice was from the soil scientist.

20         Q.    **Did you give it to Mr. Rich?**

21         A.    I didn't give it to anybody, I don't

22    believe.

23         Q.    **You just --**

24               **What did you do, destroy it?**

25         A.    It might have been tucked in my file in

1    my office, and got dumped with everything else that
2    got dumped.
3           **Q.    Is that something you would have given to**
4    **the Levin, Papantonio firm?**
5           A.    Not necessarily.  Not necessarily,
6    because it was so early on, it might not have -- it
7    might not have been in --
8                 It might not have been in that.
9           **Q.    I'm going to go over a few names with**
10   **you, and ask you if any of these folks were the soil**
11   **scientists that you gave the sample to.**
12          **Dr. Jim Gorman?**
13          A.    No.
14          **Q.    Dr. Louis McDonald?**
15          A.    No.
16          **Q.    Dr. John Sencindiver?**
17          A.    No.
18          **Q.    S-E-N-C-I-N-D-I-V-E-R.**
19          A.    I know who that is, yeah.  No.
20          **Q.    Dr. Alan Sextone?**
21          A.    No.
22          **Q.    Dr. Jeffrey Skousen, S-K-O-U-S-E-N?**
23          A.    No.
24          **Q.    Dr. James Thompson?**
25          A.    No.

1          Q.    Dr. Eugenia -- Eugenia Yew --
2          A.    Woman?
3          Q.    Y-E-W-T-U-K-H-I-W.
4          A.    No.
5          Q.    Dr. Paul Ziemkiewicz,
6     Z-I-E-M-K-I-E-W-I-C-Z?
7          A.    No.
8          Q.    Dr. Simoni, I've just given you a list of
9     all the soil scientists at West Virginia University,
10    and you're telling me that none of those soil
11    scientists were the one that you gave --
12         A.    That's correct.
13         Q.    -- this soil sample to; is that correct?
14         A.    That's absolutely correct.
15         Q.    And that did not refresh your
16    recollection as to who?
17         A.    No.  I'm sorry, but it was not one of
18    those people.
19         Q.    Was it a man or a woman?
20         A.    It was a man.
21         Q.    Did this soil scientist test this soil
22    sample on West Virginia University time?
23         A.    I have no idea what he did with it.  I --
24               You asked me about protocol or procedure.
25    I have no idea.

1      **Q.    Did you tell anyone at any of these**
2  **plaintiffs' firms that you were going to destroy that**
3  **document before you destroyed it?**
4          A.    I don't know that --
5              MR. MEDINA:  Now you're asking him about
6          conversations with plaintiffs' counsel as part
7          of his consulting period.  He can't talk to you
8          about what he discussed with plaintiffs'
9          counsel as part of his consulting.
10             I'm not going to open the door, even
11         though I wouldn't mind, in some respects, given
12         the -- that type of a question; but we're not
13         going to open the door, and then you're going
14         to start talking about all our conversations as
15         part of his consulting.
16             So, I can't open the door at all on that.
17     **Q.    Dr. Simoni, did you destroy that document**
18  **before or after the Levin, Papantonio firm got**
19  **involved in this litigation?**
20         A.    I wouldn't characterize what might have
21  happened to the document as destruction.  I do not
22  remember what happened to the document.
23     **Q.    Okay.  And my question was --**
24         A.    And I don't even remember --
25             You know, we're talking about something

1    he gave me.  I don't know what it --
2            I don't even remember what it was.
3        **Q.    Okay.  But my question was, was it**
4    **destroyed, discarded -- however you want to**
5    **characterize it -- before or after the Levin,**
6    **Papantonio firm got involved in this case?**
7        A.    I truthfully cannot say.  I do not know.
8            MR. WICKLINE:  Mr. Medina, I would ask
9        that if you have that document, you produce it
10       forthwith.
11           MR. MEDINA:  We don't have that document.
12       I have no idea what that document is about.
13           MR. WICKLINE:  You know for a fact you do
14       not have it?
15           MR. MEDINA:  I've never seen anything
16       like that.  We don't have --
17           I know for a fact we don't have that
18       document.
19           MR. WICKLINE:  Do you know for a fact
20       that Mr. Rich does not have that document?
21           MR. MEDINA:  I know for a fact that
22       nobody associated with plaintiffs has that
23       document.
24           MR. WICKLINE:  Okay.  Let's take a break.
25           THE VIDEOGRAPHER:  Going off the record,

1         the time is 4:59.

2              (Whereupon, a recess was taken.)

3              THE VIDEOGRAPHER:  Back on the record,

4         the time is 5:13.

5              MR. MEDINA:  I'm looking for my

6         microphone.  I'm sorry.  Okay.  Thank you.

7              Just going back on the record, I want to

8         articulate and represent to the Court that I

9         can assure you that nobody with any plaintiffs'

10        firm in this case related to Drummond or

11        Perrine has counseled anybody to destroy any

12        documents or samples.  The --

13             If you will agree that if this witness

14        answers the question that you posed, that that

15        will not constitute a waiver of work product

16        relationship and confidentiality with this

17        witness as to -- as to, you know, other areas,

18        then we would allow him to make that limited

19        statement.  But we have to have that --

20             I guess we have to have that stipulation

21        with any other defendant, too, but we're -- we

22        are not in any way trying to stand in the way

23        of him answering that question; but we don't

24        have any choice unless defendants are willing

25        to agree that it's not a waiver.

1              MR. WICKLINE:  What was the question you

2      instructed him not to answer?  I'm not sure I'm

3      following you.

4              MR. MEDINA:  Okay.  Well, maybe we don't

5      have a --

6              Maybe I'm misunderstanding the dispute.

7      I thought that you asked the witness to state

8      whether he had had a discussion with Levin,

9      Papantonio about destruction of this document,

10     which may or may not even exist; and if you

11     asked such a question, then I believe that I

12     instructed him not to answer, and explained

13     that was with reluctance, because I would like

14     to have him be able to answer it; but we don't

15     want you to argue it's a waiver.

16             So, if it's not an issue, then that's

17     fine; but I'm trying to address and accommodate

18     your desire to have further colloquy on the

19     issue if you want to.

20             MR. WICKLINE:  So stipulated.

21             MR. MEDINA:  Okay.  Then, Mr. Simoni, you

22     can say -- ask whether you had any

23     conversations with --

24             MR. WICKLINE:  Well, I think you may want

25     to let me ask the questions.

```
 1                MR. MEDINA:  Okay.  Go ahead.
 2                MR. WICKLINE:  Okay.  Thank you.
 3                MR. MEDINA:  Mr. Gallagher, or Miss
 4        Snead, do you have the same stipulation?
 5                MS. SNEAD:  Yes, we would.
 6                MR. MEDINA:  Okay.  That's fine, then.
 7        Thank you.
 8            Q.    Dr. Simoni, we were talking about, if I
 9        recall correctly, this document that you received from
10        the soil scientist at West Virginia University.
11                Do you recall that discussion?
12            A.    Yes.
13            Q.    Okay.  And it was a document showing the
14        results of a soil sample which had been provided to
15        you by a resident of Spelter; is that correct?
16                MR. MEDINA:  Object to form.
17            A.    I don't recall what actually was on the
18        document.  I just don't recall.
19            Q.    Well, it must have had the results of
20        some testing, correct?
21            A.    It was something he gave me in connection
22        with his -- his -- his examination of that sample.
23            Q.    Okay.  And --
24            A.    It might --
25                You know, I don't know, it might have
```

1    been --
2              It's possible that it was some language
3    of instruction as to soil samples.  You know, since
4    I'm not in that area of his study, and wasn't in that
5    area of his study, I just don't recall what it was.  I
6    remember him giving me something, but I don't remember
7    what it was.
8         **Q.    Did you and Mr. Medina discuss this line**
9    **of questioning about soil samples during the break?**
10             A.    I don't think --
11             MR. MEDINA:  Okay.  Now you're asking him
12        to talk about what we discussed on the break,
13        and I'm objecting and instruct him not to
14        answer about what we talked about on the break.
15             MR. WICKLINE:  Okay.
16             MR. MEDINA:  Or any breaks.
17             MR. WICKLINE:  I understand.
18        **Q.    Dr. Simoni, is my understanding correct**
19    **that your testimony earlier was that you do not know**
20    **when you destroyed this document?**
21             A.    Yeah, I -- I don't -- well, I know --
22             Well, I say I know.  I better not say I
23    know, because I don't really know.
24             To the best of my knowledge and
25    recollection, that particular piece of paper, which

1    we're generically calling a document, was never shared

2    by me with Levin & Papantonio or Masry & Vititoe.  I

3    don't remember ever doing that.

4         **Q.    I don't think that was my question.**

5         A.    Well, all right.  What was your question?

6              THE REPORTER:  Dr. Simoni, is my

7         understanding correct that your testimony

8         earlier was that you do not know when you

9         destroyed this document?

10        A.    I don't like to think of it as destroying

11   the document; but what happened to the document, I do

12   not know, if that answers your question.

13        **Q.    Okay.  Is it -- Strike that.**

14             **Do you think you destroyed the document**

15   **as a part of the process of you relocating from**

16   **Morgantown, West Virginia, to Davie, Florida?**

17             MR. MEDINA:  Object to form.  Again, he's

18        not testified that he destroyed the document in

19        the sense that maybe you're referring to.

20             But you can go ahead and answer.

21        A.    I think the -- I think it's fair to say

22   that the document may have been lost when I made the

23   move from -- from Morgantown to South Florida.

24        **Q.    And was the Levin, Papantonio firm**

25   **involved in this litigation at the time you made the**

1      move from Morgantown, West Virginia, to Davie,

2      Florida?

3              A.      Yes.

4              Q.      Were you a consultant for the Levin,

5      Papantonio firm at the time you made the move from

6      Morgantown, West Virginia, to Davie, Florida?

7              A.      Yes.

8              Q.      Did the Levin, Papantonio firm ask for

9      any and all of your files prior to you making the move

10     from Morgantown, West Virginia, to Davie, Florida?

11                     MR. MEDINA:  Again, is this with the same

12             stipulation, this general line?

13                     MR. WICKLINE:  Yes.

14                     MR. MEDINA:  Is that okay with you, Miss

15             Snead?

16                     MS. SNEAD:  Yes, sir.

17                     MR. MEDINA:  Okay.  Thank you.

18             A.      All right.  I do not recall any specific

19     communication like that.

20             Q.      Did the Levin, Papantonio --

21             A.      You know, what I'm saying is, I don't

22     recall any specific communication of their saying,

23     well, you know, you're -- you're moving, you know,

24     make sure that, you know, we have everything that

25     we're supposed to have, or any communication like

1    that.  I don't remember that.

2           Q.    Again, when was your move?

3           A.    August of '05.

4           Q.    Okay.  Did the Levin, Papantonio firm

5    ever contact you and say, Dr. Simoni, we have received

6    written discovery from DuPont, requesting all testing

7    of samples and soil samples out in the Spelter area,

8    or the Spelter community, do you have any as a

9    consultant to this firm?

10          Did you ever have a conversation with

11   them like that?

12          A.    I don't recall that communication.

13          Q.    But your testimony following the break is

14   that you have not communicated with the Levin,

15   Papantonio firm, the Masry firm, the Rich firm, or any

16   other plaintiffs' law firm involved in this case

17   concerning the existence of this soil sample; is that

18   correct?

19          A.    That's the best of my recollection,

20   that's correct.

21          Q.    Dr. Simoni, I would like you to go back

22   and look at Exhibit 4 once again.

23          A.    Uh-huh.

24          Q.    Did you or did you not tell me earlier

25   that you had mentioned the soil sample at the meeting

1    of April 30, 2001?

2           A.    That's correct.

3           Q.    You did mention that?

4           A.    Yes.

5           Q.    And Mr. Rich was attending that meeting,

6    correct?

7           A.    Yes.

8           Q.    And Mr. Rich is one of the plaintiffs'

9    lawyers involved in this litigation, correct?

10          A.    That's correct.

11          Q.    Mr. Rich never had any conversation with

12   you to say, or to the effect that you need to preserve

13   that document; is that correct?

14          A.    I don't recall that communication.

15          Q.    Do you recall any communication from

16   Mr. Rich, indicating to you that that document would

17   be responsive to discovery that has been served in

18   either the Drummond case or the Perrine litigation?

19          A.    I don't --

20                Can you repeat that, please?  I just want

21   to make sure --

22          Q.    I think we've --

23                I'll just repeat it.  Do you recall

24   Mr. Rich contacting you at any point to tell you that

25   you need to produce that document in response to

1    written discovery from DuPont in this litigation?

2         A.    No.

3         Q.    And as a consequence of that failure to

4    tell you to preserve that document, you destroyed it

5    in connection with your move to Davie, Florida --

6              MR. MEDINA:  Object.

7         Q.    -- is that correct?

8              MR. MEDINA:  Object to form.  We didn't

9         know anything about this gentleman moving, or

10        when he was moving, or what documents he had.

11        So, that's --

12        A.    I would say your characterization is

13   incorrect.

14        Q.    Had you been notified by Mr. Rich, Levin,

15   Papantonio, or any other member of the plaintiffs' law

16   firms in this case, that you needed to preserve that

17   document, would you have done so?

18        A.    Of course.

19             MR. MEDINA:  Now, I represent to the

20        Court, despite this witness' recollection, that

21        we requested of this witness to provide us any

22        samples and any sample results; and, if he

23        didn't understand that, that's a

24        misunderstanding, but it was certainly our

25        intention to have requested that, and I can

1    represent that we would have requested it.  The

2    fact that he can't recall it, that's just --

3    that's his recollection.

4         MR. WICKLINE:  Did you request that

5    information from Dr. Simoni prior to him making

6    the move to Davie, Florida?

7         MR. MEDINA:  We have --

8         I did not specifically discuss this

9    sample or any other -- any other specific

10   samples, okay, this document; but we made a

11   general request to Mr. Simoni that if he had

12   any samples or any sample results, that he

13   should produce those to us.

14        MR. WICKLINE:  Would you like to

15   represent to the Court when you made that

16   request?

17        MR. MEDINA:  That would have been a

18   verbal request made over the course of our

19   consulting relationship.  I can't provide you a

20   date, but I can represent that to the Court,

21   yes, sir.

22        MR. WICKLINE:  But you have nothing in

23   writing to that effect?

24        MR. MEDINA:  That's correct.

25        THE WITNESS:  May I speak to that?  Am I

1          allowed to speak to that?
2                    MR. MEDINA:  Sure.
3          A.    As a result of listening to your back and
4    forth with Mr. Medina on this matter, I got refreshed,
5    and I do recall now Mr. Medina making that request of
6    me.  I don't remember when it was, but I remember him
7    at one point saying to me, now, you know, we need to
8    have everything that you have, okay?
9                    I do remember that.  I don't remember
10   when it was.
11         **Q.    And what --**
12         A.    It was sometime when I was in West
13   Virginia.  That's all I remember.
14         **Q.    And what did you do to comply with that**
15   **request, Dr. Simoni?**
16         A.    I thought I was giving him everything
17   that I had.
18         **Q.    What did you do --**
19                **What efforts did you make to search to**
20   **make sure that you provided him with everything that**
21   **you had?**
22         A.    Well, sort of thought through all of the
23   things that I, you know, had collected; and I think I
24   may have even sent some --
25                    I don't remember exactly, but I may have

1    even sent some things on, that maybe they didn't have

2    at that point when he asked me that.

3                But I remember clearly now, as you're

4    refreshing my memory as a result of your communication

5    with Mr. Medina, who is right here at the table, that

6    he did make that request of me, asking me to do that.

7    And I do --

8                You know, I cannot pinpoint a time for

9    you.  All I know, it was -- it had to be before I left

10   West Virginia.  It would not have been after,

11   afterwards.  That's --

12        **Q.    Okay.  Let's go to Paragraph 8.**

13        A.    Paragraph 8?  I'm sorry.

14        **Q.    Of Exhibit 4.  Is there anything --**

15        A.    What's the paragraph about?

16        **Q.    A tablet was circulated for people to**

17   **sign their name, provide phone number and nature of**

18   **illness.  I did not see many signatures, is what it**

19   **reads.**

20                **Do you recall a tablet being circulated?**

21        A.    I recall a tablet being circulated, but I

22   don't remember what was on it, you know, what people

23   were putting down, or what they were asked to put

24   down, whether they were asked to put down their name

25   or --

1           I don't remember that.

2       Q.     Okay.

3       A.     I have a vague recollection of a tablet

4   being circulated.  I don't even know -- I don't

5   remember who circulated it.

6       Q.     Who ended up with it?

7       A.     Don't know.

8       Q.     Did Mr. Rich end up with it?

9       A.     Not that I'm --

10          I mean, I don't know that.  I really

11  don't know who ended up with it.  I don't know who

12  circulated it, and I don't know who ended up with it.

13  I was just answering your question about whether I had

14  a recollection of such a tablet.  I do, that.

15      Q.     Is that another document that's been

16  destroyed?

17      A.     I don't know anything about it.  I never

18  had it.  I never -- I don't know.

19      Q.     Well, we've requested this document from

20  the plaintiffs' attorneys, and they have not produced

21  it.

22      A.     Well, I don't know anything --

23          Like I said, I don't know who circulated

24  it and who ended up with it.

25      Q.     Is there anybody who would have a reason

1    to circulate such a document, other than you and

2    Mr. Rich?

3            A.      I can't say.  I don't know that.

4            Q.      Would it have been in Mr. Rich's interest

5    in terms of -- Strike that.

6                    Would it have been in Mr. Rich's interest

7    to know who was in attendance at this meeting, and how

8    to contact them?

9            A.      I think I've answered the --

10                   I would be speculating on Mr. Rich's

11   interest, which I don't think is appropriate for me to

12   do.  I told you what I know about it.  I remember --

13                   I remember a tablet, and I remember it

14   being circulated, but I do not know who -- who

15   initiated the circulation, and who ended up with it,

16   and never saw it again.

17           Q.      Do you recall seeing any of the names or

18   any of the information that was contained on the

19   tablet?

20           A.      No.  That's what I just said, all I

21   remember is --

22                   You asked me if I remembered a tablet

23   being circulated.  Yes, I have a vague recollection of

24   that, but I don't know who was connected to it.

25                   MR. WICKLINE:  Mr. Medina, do you have

1          that document?

2                  MR. MEDINA:  I don't have any idea what

3          that's referring to.  If you have a request

4          that you've made --

5                  MR. WICKLINE:  I have.

6                  MR. MEDINA:  -- then we'll appropriately

7          respond to that.

8                  What request are you referring to?

9                  MR. WICKLINE:  I have sent you a request

10         for production of documents for that document.

11                 MR. MEDINA:  When did you do that?

12                 MR. WICKLINE:  It's probably been three

13         months ago or more.

14                 MR. MEDINA:  Okay.  I'm not familiar with

15         that request.  I have not --

16                 I do not see every piece of paper

17         that's -- that --

18                 I do not have familiarity with what

19         you're referring to.

20                 MR. WICKLINE:  I would ask that you

21         inquire into that further.

22                 MR. MEDINA:  I certainly will.

23                 MR. WICKLINE:  Thank you.

24         **Q.    How about the last paragraph; is that a**

25    **fair representation of what transpired or what was**

1  said?

2         A.    I don't really know anything about that.

3  I don't remember the fire -- I mean, I --

4               I don't know if this is a statement that

5  was made to Mr. Williams privately, because I don't

6  remember the fire chief making a statement at the

7  meeting.

8               I mean, I just take that last paragraph

9  as a representation from Mr. Williams as a result of

10 some communication that he had, maybe with the fire

11 chief, I don't know.

12        Q.    What was the name of the fire chief?

13        A.    I do not know.

14        Q.    Did he say to you or Mr. Rich in private

15 at any point in time that he did not support this

16 proceeding, that only provided the -- the fire

17 department as a place for the meeting?

18        A.    Not that I recall.  No, I don't remember

19 that.

20        Q.    Did he express to you and Mr. Rich his

21 concern about the motivation for personal gain and not

22 resolution of the problem?

23        A.    I do not recall any communications with

24 the fire chief.

25               MR. MEDINA:  I'm informed by

1           Mr. McWilliams that you did request the sign-in

2           sheets, that we don't have it, that Gary Rich

3           doesn't have it, and that we responded that we

4           don't have it; and, to the best of our

5           knowledge, no such document exists.

6                This is, apparently, in the past, prior

7           to this deposition.  That's all the information

8           I have at this point in time.

9      **Q.    Dr. Simoni, is it possible that the**

10  **sign-in sheet or the soil sampling could have went to**

11  **one of these other law firms that you were attempting**

12  **to shop this litigation to?**

13           MR. MEDINA:  Object to form.

14      A.    I do not know anything about what was

15  circulated.

16      **Q.    Okay.  My question is:  Is it possible**

17  **that the Masry law firm has that information?**

18      A.    Well, it seems to be getting into great

19  speculation on my part.  I don't know --

20           I don't have any knowledge of it.

21           MR. WICKLINE:  Mr. Medina, I would ask

22           that you check with these other plaintiffs' law

23           firms to see if there are documents responsive

24           to these prior requests, and let us know if

25           they were ever in their possession; and, if so,

 1          whether they had been destroyed or been

 2          retained.

 3                    MR. MEDINA:  We'll do that.

 4                    MR. WICKLINE:  Thank you.

 5          **Q.     Tonya Drummond testified in this case**

 6    **that she attended this April 30, 2001, meeting,**

 7    **Dr. Simoni.**

 8          A.     I'm sorry, I didn't hear the first part.

 9          **Q.     Tonya Drummond testified at a deposition**

10    **that she attended the April 30, 2001, meeting.  Do you**

11    **recall seeing her there?**

12          A.     No, I do not.

13          **Q.     Do you recall seeing Danny Drummond**

14    **there?**

15          A.     I do not.

16          **Q.     She testified that he attended the**

17    **meeting, as well.**

18          A.     Uh-huh.  I -- if you --

19                    If it's part of her deposition, I imagine

20    it's what she remembers.

21          **Q.     She indicated that you talked about the**

22    **environment.  What did you talk about the environment,**

23    **or what did you say about the environment?**

24          A.     I talked about --

25                    At the April 30th meeting?

1       Q.    Yes.
2       A.    I have no recollection of what I said
3  about the environment.
4       Q.    She indicated in her deposition that you
5  talked about cleaning up the community.  Do you recall
6  that?
7       A.    No.
8       Q.    Is that to say her recollection is
9  inaccurate?
10      A.    Is that to say her recollection is
11 inaccurate?
12      Q.    Yes.
13      A.    I'm not saying that.
14      Q.    Okay.  You may have said it, you just
15 don't recall.  Is that fair?
16      A.    I'm saying I have no recall of what I
17 said about the environment at the meeting.
18      Q.    Did you observe Mr. Rich handing out any
19 business cards during this April 30, 2001, meeting?
20      A.    I believe I already said no to that.
21      Q.    Okay.  What did Mr. Rich have to say
22 during the meeting?
23      A.    I think you already asked me that, or we
24 already talked about that.
25      Q.    We've talked about all of the --

1          **We've talked about the December, January,**
2  **February, and March meeting.  I have not asked you**
3  **what Mr. Rich said at the April 30, 2001, meeting.**
4          MR. MEDINA:  Object to form, and it is
5          asked and answered.  You have asked him that.
6          You can answer it again.
7          A.    He told the people at the meeting that he
8  didn't know if there was a problem, and he wasn't an
9  expert in that area; and, so, in order for -- in order
10 to get an answer to whether there was a problem or
11 not, he was going to have to get some help.
12 Generally, that was the message.  And he said --
13          You know, I think I remember him saying,
14 as I recall, that -- he was stating, you know, clearly
15 that he didn't know that there was a so-called case,
16 because he didn't know that there was a problem.
17         **Q.    Were you aware that Danny Drummond had**
18 **kidney cancer in early 2001?**
19         A.    I don't think I was aware in early 2001
20 that he had kidney cancer.
21         **Q.    When did you become aware that he had**
22 **kidney cancer?**
23          MR. MEDINA:  You cannot give any
24          information that you obtained as a consultant
25          to Levin, Papantonio, or the Masry firm.

1          A.     Right.  And, therefore, I can't answer

2     that.

3          Q.     **Lenora Perrine gave a deposition in this**

4     **litigation, Dr. Simoni, and she indicated that at one**

5     **of these community meetings at her home, or one of the**

6     **community meetings that we've talked about here, that**

7     **you mentioned to them -- quote, he just talked to us**

8     **about air pollution, you know, in the ground, you**

9     **know, what could be on our property, end quote.**

10              **Do you recall talking to --**

11         A.     Could you read that again, please?

12         Q.     **He just talked to us about air pollution,**

13    **you know, in the ground, you know, what could be on**

14    **our property.**

15              **Do you recall telling her that?**

16              MR. MEDINA:  Can you give me a page and

17         line, please?

18              MR. WICKLINE:  Sure.  It's Page 190, and

19         it continues over to 191 of her deposition

20         transcript.

21              MR. MEDINA:  Object to form.

22         A.     And your question is?

23         Q.     **Do you recall talking to her about air**

24    **pollution and pollution in the ground, and what could**

25    **be on their properties?**

1          MR. MEDINA:  Okay.  If any discussions
2     like that were -- transpired as part of a
3     consulting period, then --
4          MR. WICKLINE:  Well, we're talking
5     about --
6          MR. MEDINA:  -- then you can't talk about
7     that.
8          MR. WICKLINE:  We're talking about the
9     meetings that he had.
10          MR. MEDINA:  Okay.  Well, if they were
11     meetings that were held as part of the
12     consulting period, he can't talk about it.
13          MR. WICKLINE:  He was only consulting,
14     Mr. Medina, a portion of 2002, and late summer
15     of 2003.  This -- this --
16          These meetings at the Perrine home took
17     place in December of 2000 and early 2001.
18          MR. MEDINA:  Well, I don't have the
19     deposition in front of me that you're looking
20     to.  I don't know the context, I don't know the
21     time frame of meetings.
22          You know, we're not going to talk about
23     any meetings that we would have had with Miss
24     Perrine.  And if she inadvertently talked about
25     meetings that were of a confidential nature,

 1          then that was an inadvertent exclusion, and we

 2          object, and we're not about to discuss that.

 3                  But if it's something that would be a

 4          meeting that he was intending, that wasn't

 5          during -- attending, that wasn't during one of

 6          these consulting periods, then he can talk

 7          about it.

 8     Q.   Let me rephrase the question, Dr. Simoni.

 9          Do you recall having discussions with the

10     Perrines in December 2000 or early 2001 about air

11     pollution, pollution in the ground, and what could be

12     on their properties?

13     A.   When was -- when was this supposed to

14     take place?

15     Q.   She refers to it as one of these meetings

16     of Spelter residents.

17          MR. MEDINA:  Object to form.

18     A.   The answer to your question, do I recall,

19     is no.

20     Q.   Does that mean she is inaccurate, or you

21     just do not recall?

22          MR. MEDINA:  Object to form.

23     A.   Are you asking me if she's inaccurate?

24     Q.   Is she inaccurate, or do you just not

25     recall telling her that?

1          A.    Are you asking me two questions, or what?

2          Q.    **I'm asking you which is it, or if it's**

3   **something different.**

4                MR. MEDINA:  Object to form.

5          A.    I'm not clear what your question is,

6   seriously.

7          Q.    **Okay.  Miss Perrine testified in her**

8   **deposition that at one of these meetings you had at**

9   **her home, you talked about air pollution, you know, in**

10  **the ground, you know, what could be on our property.**

11         A.    Uh-huh.

12         Q.    **You've told me you don't recall talking**

13  **to her about that.  My question to you is:  Are you**

14  **testifying today that you simply cannot recall, or**

15  **that her recollection is inaccurate?**

16         A.    I'm testifying that I cannot recall.

17         Q.    **Thank you.**

18               **Do you know Truman Desist?**

19         A.    I do not.

20         Q.    **Okay.  Maybe this will reflect -- refresh**

21  **your recollection.  Mr. Desist testified in a**

22  **deposition that he makes homemade wine, and had given**

23  **you a glass of wine and a fifth of wine.**

24               **Do you recall that?**

25               MR. MEDINA:  That -- to the extent that

1       would have been during the consulting period,

2       don't respond.  You're instructed not to

3       respond.  If it was something not in a

4       consulting period, then you can respond.

5            MR. WICKLINE:  Well, I'll point out that

6       you did not -- or whoever was representing the

7       plaintiff at this deposition -- and that would

8       have been you -- did not object to that line of

9       questioning.

10           MR. MEDINA:  And the line of

11      questioning --

12           Read the question again.

13           MR. WICKLINE:  Question:  Have you ever

14      talked to an individual by the name of Joe

15      Simoni?

16           Answer:  Yeah.  Joe come one time down at

17      the house.  Yeah, I know -- I know Joe.  In

18      fact -- in fact, I gave him a can of pop, a

19      glass of wine, and a fifth of wine.

20           MR. MEDINA:  And there's no clear --

21      there is no -- I'm --

22           MR. WICKLINE:  There's no objection.

23           MR. MEDINA:  There's no clarity as to

24      what time period that is, so I would not

25      consider that to be a waiver of anything

 1              relating to any discussions with Truman Desist.
 2                   MR. WICKLINE:  Certainly it's a waiver as
 3              to that line of questioning, you would agree,
 4              would you not?
 5                   MR. MEDINA:  I'll think about it.  Go and
 6              continue, and let me think about it.
 7                   MR. WICKLINE:  Okay.
 8         **Q.    Another question of Truman Desist,**
 9    **Dr. Simoni.**
10              **Question:  Do you know why he was at the**
11    **house -- at your house in the spring of 2004?**
12              **Answer:  Well, he came down to get the**
13    **okay to soil test.**
14              **No objection, Mr. Medina.**
15              **Do you recall that?**
16         A.    That has to do with the time during which
17    I was consulting.  So, I think I would be instructed
18    not to answer.
19                   MR. MEDINA:  Well, we'll allow you to
20              answer the question about the wine, and the
21              question about the coming by to get Truman
22              Desist's permission to soil sample his
23              property.
24         A.    Okay.  Can we go back over those two
25    questions, please?

1        Q.      Yes.  Do you recall Truman Desist?

2        A.      I think I do.

3        Q.      Okay.  Do you recall him giving you some

4   homemade wine?

5        A.      I think I do.  I think --

6                Actually, I think I do.  My recollection

7   of it was it was not a fifth -- or maybe it was a

8   fifth.  It was not a wine bottle, it was a small --

9                That's what I recall.

10       Q.      Okay.  How was the wine, by the way?

11       A.      You know, I don't remember how that wine

12  was.  I don't remember whether my wife used it for

13  cooking, or what it was used for.  I don't think I

14  drank it.

15       Q.      Okay.  Did you do -- Strike that.

16               Did you seek permission from Mr. Desist

17  to do soil testing at his house in the spring of 2004?

18               THE WITNESS:  It's okay for me to answer?

19               MR. MEDINA:  You can answer this

20       question.

21       A.      Yes.

22       Q.      Okay.  Now, Mr. Desist testified that he

23  had already attended a meeting about this lawsuit.  Do

24  you recall him attending one of the meetings?

25               MR. MEDINA:  Okay.  Now, we're --

1              If he's talking about attending a meeting

2         in the lawsuit, that you attended during a

3         period of consulting, then you can't answer

4         that question.

5         **Q.    Okay.  Well, let me -- let me just show**

6    **you.   There was a question:  You received your first**

7    **contact from Mr. Simoni after you had already attended**

8    **a meeting?**

9              **Answer:  Yes.**

10             **Question:  About the lawsuit?**

11             **Answer:  Yes.**

12             **No objection by you.**

13        MR. MEDINA:  Okay.  Well, we're not

14        allowing you to get into conversations about

15        what transpired in any meeting about the

16        lawsuit, and he's instructed not to answer.

17        MR. WICKLINE:  Okay.  My question to him

18        was, however, had Mr. Desist attended a meeting

19        about the lawsuit prior to the soil testing in

20        the spring of 2004.  And you're instructing him

21        not to answer that?

22        MR. MEDINA:  Whether this person has any

23        knowledge about, at that point in time, there

24        had been a meeting that Mr. Desist attended

25        about the lawsuit, whether he has -- whether

1          this witness has any knowledge about whether

2          that -- that discussion with Mr. Desist was

3          after a meeting about the lawsuit at the

4          firehouse?  And that's the limited nature of

5          your question?

6               MR. WICKLINE:  What was my question?

7               MR. MEDINA:  Because I gathered that you

8          were asking about what transpired at the

9          confidential meeting at the firehouse

10         discussing the lawsuit, that we're not going to

11         allow this witness to talk about what was

12         discussed at the firehouse.

13              MR. WICKLINE:  Was Mr. Simoni -- or,

14         excuse me, Dr. Simoni -- at that meeting?

15              MR. MEDINA:  We're not going to discuss

16         who was in attendance at the meeting.

17              MR. WICKLINE:  All right.

18              MR. MEDINA:  Now, if he knows whether at

19         the time of the --

20              MR. WICKLINE:  You need to let her read

21         the question, so -- and then we can, you know,

22         talk about it.  She's trying to --

23              MR. MEDINA:  I apologize.

24              MR. WICKLINE:  The court reporter's

25         trying to read the question.

1              MR. MEDINA:  I did not realize that.

2         Thank you.

3              THE REPORTER:  Okay.  I'm going to have

4         to go back a couple of questions to get the --

5         (Whereupon, the requested portion of the

6    record was read by the reporter as follows:)

7              THE REPORTER:  Question:  Okay.  Well,

8         let me just show you.  There was a question:

9         You received your first contact from Mr. Simoni

10        after you had already attended a meeting?

11             Answer:  Yes.

12             Question:  About the lawsuit?

13             Answer:  Yes.

14             No objection by you.

15             Then, plaintiff's counsel said:  Okay.

16        Well, we're not allowing you to get into

17        conversations about what transpired in any

18        meeting about the lawsuit, and he's instructed

19        not to answer.

20             Question:  My question to him was,

21        however, had Mr. Desist attended a meeting

22        about the lawsuit prior to the soil testing in

23        the spring of 2004.  And you're instructing him

24        not to answer that?

25             MR. MEDINA:  If that's all you're asking

1              about, then he can answer that question.  He
2              can't talk about what transpired at that
3              meeting.
4         Q.    Dr. Simoni?
5         A.    Yes?
6         Q.    You have the question.
7              MR. MEDINA:  Do you need her to re-read
8         it?
9              THE WITNESS:  Yes, please.
10             MR. MEDINA:  Just that last paragraph.
11        (Whereupon, the requested portion of the
12   record was read by the reporter as follows:)
13             THE REPORTER:  My question to him was,
14             however, had Mr. Desist attended a meeting
15             about the lawsuit prior to the soil testing in
16             the spring of 2004.
17        A.    And my answer to that is, I do not know.
18        Q.    Okay.  Dr. Simoni, I'm going to read to
19   you an excerpt from the testimony of Jesse Medina.
20             On Page 110, Mr. Medina.
21             Question:  As to your knowledge, have any
22   soil samples been taken on your property in connection
23   with this case?
24             Answer:  I had a soil sample taken, sent
25   to West Virginia University, and they just gave me a

1    **paper back, tell me what I need.**

2              **Does that refresh your recollection as to**

3    **where you received -- or who you received this soil**

4    **sample from?**

5         A.    What I told you before was --

6              What I'm testifying is that I do not

7    remember where that soil sample came from.

8         **Q.    Was there more than one soil sample that**

9    **you provided or had tested at West Virginia --**

10        A.    No.

11        **Q.    -- University?**

12        A.    Not to my knowledge or recollection.

13        **Q.    Do you have any reason to believe that**

14   **Mr. Medina -- that is, Mr. Jesse Medina -- is**

15   **incorrect in his belief that he had a soil sample**

16   **taken that was sent to West Virginia University for**

17   **testing?**

18        A.    Now that you're -- now that you're

19   raising that --

20              What was your last question?

21        **Q.    Do you have any reason to believe that**

22   **Mr. Jesse Medina's understanding that he had given a**

23   **soil sample to you for testing at West Virginia**

24   **University is incorrect?**

25        A.    What --

1             I think there's some confusion there with
2    respect to his deposition.  So, I think it --
3             What was your question again you wanted
4    me to answer?
5        **Q.    Okay.  Jesse Medina believes, according**
6    **to his testimony in this litigation, that he gave you**
7    **a soil sample from his property for testing at West**
8    **Virginia University.**
9             **Do you know that it was not Jesse Medina**
10   **who gave you that soil sample?**
11       A.    Okay.  I need to --
12            I think I need to speak with you about
13   that for a minute, because it was -- or maybe not
14   speak with you, but just -- just to say that --
15            MR. MEDINA:  Well, if you --
16            THE WITNESS:  What I think you're
17        referring to has to do with communication with
18        Jesse Medina after my consulting started with
19        you; and, so, I mean, I don't know if you want
20        me to answer that.
21            MR. MEDINA:  Well, let's go off the
22        record, and we'll talk.
23       **Q.    I mean, did you have soil --**
24       A.    No, I --
25       **Q.    -- testing done at West Virginia**

1    **University after Mr. Medina became involved in this**

2    **case?**

3              A.    No.

4              MR. MEDINA:  Well, this --

5              I'm this witness' attorney, and he has a

6    right to consult with me.  I don't know what he

7    needs to talk about, and we'll discuss what we

8    talk about after we come back from a brief

9    recess, and --

10             MR. WICKLINE:  Okay.

11             MR. MEDINA:  -- I'll be happy to let him

12   talk about it; but I stand by my -- all my

13   prior representations.  Thank you.

14             THE VIDEOGRAPHER:  Going off the record,

15   the time is 5:57.

16        (Whereupon, a recess was taken.)

17             THE VIDEOGRAPHER:  Back on the record,

18   the time is 6:00.

19             MR. MEDINA:  If we could get a

20   stipulation, Mr. Wickline and --

21             Miss Snead, are you still on the line?

22             MS. SNEAD:  I am.

23             MR. MEDINA:  Okay.  If we could get a

24   stipulation that he can answer questions about

25   this conversation with Jesse Medina and this

1        soil sample, based on this discussion, without
2        constituting some broader waiver of this work
3        product confidential consulting relationship,
4        then we'll allow him to answer questions about
5        that.
6            MR. WICKLINE:  So stipulated, with the
7        understanding that I take issue with the
8        consulting representations, at any rate, but --
9            MR. MEDINA:  Okay.  Well, is that okay
10       with you, Miss Snead?
11           MR. WICKLINE:  But to the extent it
12       exists, then so stipulated.
13           MR. MEDINA:  Okay.  Well, thank you.
14           Miss Snead?
15           MS. SNEAD:  I certainly will concur --
16       we'll agree with Mr. Wickline.
17           MR. MEDINA:  Thank you, ma'am.
18           Okay.  Well, then he can answer
19       questions.
20       **Q.    Dr. Simoni, I'm not sure where we left
21  off.  We talked about Jesse Medina's testimony in this
22  case that he had provided you a soil sample for
23  testing at West Virginia University.  Do you recall --**
24       A.    Yes.
25       **Q.    -- us discussing that?**

1          A.     Yes, I recall.

2          **Q.     Okay.  Do you have any reason to believe**

3     **that Jesse Medina's testimony is inaccurate in that**

4     **regard?**

5          A.     Well, it's --

6                 I think his -- his intended meaning was

7     one thing.  What was conveyed was a little different.

8          **Q.     Okay.  Well, explain to me what you mean**

9     **by that.**

10         A.     Okay.  Back in -- I think it was sometime

11    in early -- early '05, maybe late winter '05, the

12    communication arose between Jesse and me.

13                He said to me, you know, I wonder if I've

14    got the right nutrients, you know, in my garden, like

15    potassium, or, you know, whatever nutrients you would

16    use in gardening; and he said, you know, how can I

17    find out.

18                And I said -- I said to him at that

19    point, I said, well, what I think would be a good

20    place for you to try to get some good advice is you

21    have a county extension service in West Virginia, and

22    if you would take a sample of your soil, take some of

23    your soil from your garden and have them look at it,

24    they could advise you what you needed to add or what

25    you needed to help things grow better in your garden.

1    That was the general idea.

2                 And, so, I said to him -- I said, if you

3    want, I'll try to stop by the extension office

4    sometime in Clarksburg, and I'll get you the envelope.

5                 And I might have even called for him and

6    asked the extension office what he would need to do,

7    and they might have told me, the best of my

8    recollection, is that he would need to get -- you

9    know, get an envelope from their office, and then

10   return that envelope with the sample in it to them,

11   and then they would get back in touch with him and let

12   them know what he needed, you know, to add in terms of

13   fertilizer, nutrients for the soil, to improve the

14   soil content.  That's what --

15                That's what I recall that was about.  And

16   so I -- I think I picked up --

17                As I recall, I think I picked up the

18   envelope for him, brought it to him.  And I can't

19   remember whether he sent it in or whether I actually

20   took it back.  I really just don't remember that part

21   of it.

22                But then he, in the future, got something

23   back from them, which I never actually saw, you know,

24   some kind of report back on what he needed to do; but

25   I don't --

1                  I never saw it, and I don't remember --
2          you know, I don't know that he --
3                  I don't remember him actually telling me
4          what it was they said.  I just don't recall that part
5          of it.  But that was the -- sort of the process that
6          occurred.
7                  And I think, as you reflect back on
8          his -- refer back to his deposition, I think that's
9          what he must have been talking about.
10                 MR. MEDINA:  And for the record --
11                 Are you through, Mr. -- Dr. Simoni?
12                 THE WITNESS:  Yes, I'm through.
13                 MR. MEDINA:  For the record,
14             Mr. Wickline, I don't have that Jesse Medina
15             deposition, nor was I there, but I -- but I am
16             being informed by people who were there on
17             behalf of plaintiffs that you might have
18             mischaracterized Mr. Medina's testimony, and
19             that he might have testified to the fact that
20             he had a sample taken not in connection with
21             the case, but to see what he needed to add to
22             his soil to get his plants to grow.
23                 So, to the extent you're
24             mischaracterizing anything, I object on that
25             basis, as well.

1           MR. WICKLINE:  Okay.

2           MR. MEDINA:  As well to form.

3           MR. WICKLINE:  Okay.  First of all, if I

4      misunderstood Mr. Medina's testimony, that's

5      one thing.  I wouldn't intentionally

6      mischaracterize anything.

7       **Q.    And I'll read -- I'll just read it to**

8  **you.  As to your knowledge --**

9           **Question:  As to your knowledge, have any**

10  **soil samples been taken of your property in connection**

11  **with this case?**

12           **Answer:  I had a soil sample taken, sent**

13  **to West Virginia University, and they just gave me a**

14  **paper back, tell me what I need.**

15           **Question:  And when did you do that?**

16           **Mr. Taylor:  He was asking about in**

17  **connection with this lawsuit.**

18           **Answer:  Oh, that was just my own.**

19           **Mr. Taylor:  Okay.**

20           **Answer:  He took it because he works down**

21  **there at Morgantown.  He took the samples -- sample**

22  **down there.**

23           **Question:  So, the individual you just**

24  **referred to, that's Professor Joe Simoni; right?**

25           **Answer:  Right.**

1              Question:  And what role did he have in
2    this soil sample that you referred to?
3              Answer:  I have no idea.  I told him to
4    take the sample.
5              Question:  And what was your -- what was
6    your purpose for asking Mr. Simoni to take the sample?
7              Answer:  Because they told me I had lead,
8    zinc, arsenic, whatever.  And then he goes on.
9              Now, he does go on to discuss that he
10   received some paper from WVU, that he took to a feed
11   store, and that -- and they indicated that he needed
12   to put something in his yard.
13        A.    Okay.  If I may.
14        Q.    Sure.
15             THE WITNESS:  I may?
16             MR. MEDINA:  If it's within the same
17        stipulation.
18             THE WITNESS:  Right.
19        A.    Okay.  The paper from the feed store, I
20   think what I remember him telling me is that he took
21   the report from the county extension service, okay,
22   and --
23        Q.    Not WVU?
24        A.    Well, WVU is --
25             The county extension service is part of

1    WVU.  But he may not have thought about it --
2             You know, I don't know what his thinking
3    was; but what I'm saying to you is, is he told me that
4    he was going to go --
5             I think he told me he was going to go by
6    Southern States, because Southern States, you know,
7    provides that kind of advice, and so forth, for people
8    who are -- who are growing gardens.  And I don't know
9    if that's what he meant when he said he took it to the
10   feed store.  Maybe he went somewhere else, I don't
11   know.
12        **Q.    Mr. Medina, Jesse Medina, testified at**
13   **Pages 112 and 113:**
14            **Question:  So, you still have the paper**
15   **from the University, and you still have the packaging**
16   **in which the material you bought from the feed store**
17   **came; is that right?**
18            **Answer:  Uh-huh.**
19            **Question:  Would you keep hold of those?**
20            **Answer:  Yes, I would.**
21        **I would like you to produce those for me,**
22   **please.**
23            MR. MEDINA:  Have you requested them?
24            MR. WICKLINE:  I'm requesting them now.
25            MR. MEDINA:  Okay.  Well, if you formally

1          requested them, in an appropriate way, we will
2          certainly appropriately respond and take that
3          up with Mr. Medina.
4               MR. WICKLINE:  Well, it's my position,
5          Mr. Medina, that we have outstanding discovery
6          for all soil testing in the community.
7               MR. MEDINA:  Again, what I said is, if
8          you have requested something --
9               MR. WICKLINE:  And I have so --
10              MR. MEDINA:  -- that would encompass
11         that --
12              I don't have it committed to memory what
13         all you have requested.  If what you have
14         requested would encompass that, then we will
15         appropriately respond.  And if he --
16              If there is some information that he has
17         that would be needed to supplement that, that
18         he disclosed in that deposition, that we
19         inadvertently didn't follow up on, then we will
20         certainly do that.
21              MR. WICKLINE:  Well, I ask you to
22         supplement your discovery responses by
23         producing that information.
24              MR. MEDINA:  If it --
25              It sounds like it would be supplementary

1              and appropriate; and, if that, indeed, is the
2              case, we'll go back and verify that, and we'll
3              take that up with Mr. Medina.  And if he has
4              any records, we'll produce them.
5                      MR. WICKLINE:  Thank you.
6                      Mr. Medina, I'm not going to mark this
7              because it's already been marked as an exhibit.
8                      With your permission, Mr. Medina, we'll
9              just go with the original exhibit number,
10             DuPont Exhibit 103.
11                     MR. MEDINA:  Yes, sir.
12                     MR. WICKLINE:  Is that fine with you?
13                     MR. MEDINA:  Yes, sir.
14         **Q.    Dr. Simoni, I'm handing you what's been**
15     **marked DuPont Exhibit 103.  Do you recognize that**
16     **document?**
17                     MR. MEDINA:  Okay.  This document, I'll
18             let him identify it, he can say if he
19             recognizes it or not; but this appears to be
20             something that would have been provided to him
21             subsequent to our period of his consulting with
22             us.  So, I don't know how --
23                     I don't know when this was produced, or
24             from whom, but I'm going to have to check into
25             that before I allow him to answer questions

1      about it.  Maybe you know the context of this.

2      Maybe I don't.

3              MR. WICKLINE:  It was information that --

4              It's handwritten notes that were provided

5      to Dr. Flowers, a testifying expert in this

6      litigation, as you know.

7              MR. MEDINA:  Okay.  Well, let's --

8              Again, I don't have any objection with

9      him identifying it, and then I'll see if I --

10             I need to study it and see what it's

11     about.  I -- I --

12             You're representing that it was Flowers'

13     deposition.  I can't recall.

14             You can identify -- or, I don't know

15     what --

16     **Q.    Dr. Simoni, I think the question is, do**

17 **you recognize the document which has been marked**

18 **Exhibit 103?**

19     A.    Yes.

20     **Q.    What is that document?**

21             MR. MEDINA:  I'm going to allow you to

22     answer questions about this, based on

23     Mr. Wickline's representation that it was used,

24     I guess, in the Flowers' deposition.  So, go

25     ahead.

1          A.    All right.  I --

2                As I recall, it was my attempt to get a

3    better understanding of the process that went on in

4    the smelter plant, when it was operating; and, so, I

5    was talking with Willis Perrine and Benny Quinones,

6    who is a friend of his, also lives there in Spelter.

7          **Q.    Are these your handwritten notes?**

8          A.    Yes.

9          **Q.    For the record, this is a two-page**

10   **document.**

11                **When were these notes taken?**

12         A.    Well, it says, week of February 7th, '05.

13   I'm assuming that's when it was -- when they were

14   taken.

15         **Q.    Who is Benny Quinon -- I'm sorry,**

16   **Quinones?**

17         A.    Quinones.

18         **Q.    Q-U-I-N-O-N-E-S?**

19         A.    Yeah.  Benny lives in Spelter.  He's a

20   resident of Spelter.

21         **Q.    Okay.  Did Benny attend any of these**

22   **meetings that we've talked about earlier today in the**

23   **Spelter community?**

24         A.    Yes, I think he did.

25         **Q.    Which meetings did he attend?**

1          A.    I don't know.  I would say, you know, out

2     of those meetings from December of -- of --

3          Q.    2000.

4          A.    -- 2000, until --

5          Q.    April.

6          A.    -- April of --

7          Q.    2001?

8          A.    Yeah.  He attended one or two of those

9     meetings, to the best of my recollection.

10         Q.    Okay.

11         A.    Could have been more, could have been

12    less.  I don't recall exactly.

13         Q.    Do you recall any comments by Benny at

14    any of those meetings?

15         A.    No, I do not.

16         Q.    Okay.  Why were you trying to get --

17         A.    Excuse me one second.  Can I just take a

18    closer look at this?

19         Q.    Sure.

20         A.    I'm sorry.

21               Okay.  I'm sorry.

22         Q.    Did Mr. Perrine work at the zinc plant

23    prior to 1950?

24         A.    Prior to 1950?

25         Q.    Yes.

1          A.     I don't know.

2          Q.     **Did Benny work at the zinc plant prior to**

3   **1950?**

4          A.     I don't know for sure, but I think yes.

5          Q.     **How old is Benny?**

6          A.     I don't know.

7          Q.     **Is he older or younger than you?**

8          A.     Older.

9          Q.     **Do you know if he worked for DuPont?**

10         A.     When would that have been?  When do you

11   mean?

12         Q.     **Well, DuPont sold the facility in 1950.**

13         A.     Yeah, I -- that's why I answered --

14                I think I answered, yes, I believe he did

15   work at the plant.

16         Q.     **Do you have a specific recollection of**

17   **him telling you that he worked for DuPont?**

18         A.     No; but I have a general recollection of

19   him telling me that he worked there before 1950.

20         Q.     **Do you know why you didn't place in your**

21   **notes anywhere that Benny worked for DuPont when it**

22   **owned and operated the zinc plant?**

23                MR. MEDINA:  Object to form.

24         A.     Yes.

25         Q.     **Okay.  Why is that?**

1          A.     Because the focus of my talking and

2     making the notes here, the focus was trying to

3     understand the process that they experienced with the

4     making of the -- of the zinc.

5          Q.     And why were you trying to get an

6     understanding of that process?

7          A.     At that time, I think it was just I

8     wanted to have a better understanding.  It was

9     something that I never really quite understood, and so

10    it was probably more curiosity and seeking of a little

11    knowledge that I didn't have at that point, to get a

12    better understanding of what the actual process was.

13    And these --

14               I always appreciated guys who, you know,

15    had the work experience, and who understood things

16    that I am not great at understanding, you know.

17         Q.     Is it your testimony that your interview

18    of these two individuals and trying to gain an

19    understanding of the zinc plant operations had nothing

20    to do with obtaining that information for one of

21    plaintiffs' experts?

22         A.     To the best of my recollection, it's what

23    I've already said.

24         Q.     Okay.

25         A.     I was wanting to understand it better,

1   and I think I just sat down with -- with Willis and

2   Benny one day; and I said, you know, explain to me,

3   because I really don't understand how that worked.

4   So, that's what they did.

5           MR. MEDINA:  And I would note for the

6       record -- and I don't have anybody's fax number

7       memorized -- but it looks like at the top

8       there's a fax number of 304 --

9           I don't know if that's the fax to

10      Dr. Flowers.  If that is the case, then that

11      would be -- if this reflects correctly when

12      these notes were taken --

13          Then there's another fax number,

14      March 17, 2004, which I don't understand; but

15      if these notes were taken the week of February

16      7th, 2005, that would be, you know, well over a

17      year before they were provided to Dr. Flowers,

18      if that is the way they were provided.  But,

19      again, I don't know, and I don't recall this

20      exhibit.  Maybe you know.

21          MR. WICKLINE:  Well, I can tell you about

22      the December 11th, 2006, fax number.  That's

23      where I had it faxed here last night.

24          MR. MEDINA:  Okay.  All right.  I don't

25      know when it was provided to Dr. Flowers.

 1          Q.    Dr. Simoni, the first page appears to be
 2    broken down into some categories that are separated by
 3    arrows.  Do you see that?
 4          A.    I do.
 5          Q.    Okay.  Let's start with the first
 6    category there.
 7               MR. MEDINA:  Let me make an inquiry, how
 8          much longer do you intend to be with this
 9          witness?  Because it's getting quite late, and
10          it's been a long day already, and we're not
11          going to anticipate agreeing to going on much
12          longer.
13               MR. WICKLINE:  Well, I've had plenty of
14          testimony from you today.  I'm trying to get
15          testimony from Dr. Simoni, and I think that has
16          slowed down the process.
17               MR. MEDINA:  Well, my question is, how
18          much longer do you anticipate needing?  Because
19          we'll decide whether this gentleman is going to
20          be able to go on; and, if not, whether we're
21          willing to accommodate some sort of
22          continuation.  Or do you want to discuss that
23          amongst yourselves?
24               MR. WICKLINE:  I don't know.  That
25          depends on how fast it goes.

1            MR. MEDINA:  Well, it's --

2            MR. WICKLINE:  I mean, I'm never good at

3       estimating.

4            MR. MEDINA:  Eastern time, it's 6:20, and

5       it's been the practice in these cases to limit

6       fact depositions to eight hours.  And if we're

7       going to exercise some leniency in that regard,

8       I want to know how much you're asking for.

9       Otherwise, I'll consult with the witness --

10           I have an engagement at 7:00 eastern

11      time, which I'm willing to perhaps be a little

12      bit late to; but if you're going to --

13           If you have a lot more to do, I'm

14      scheduled to go back, and I'm not scheduled to

15      be here tomorrow; so, we would have to figure

16      out another time to continue this.

17           MR. WICKLINE:  Well, what we have, Steve,

18      is there's been a lot of discussion between me

19      and you on issues, and objections; there's been

20      a lot of dead air time with Dr. Simoni looking

21      at documents, so --

22           MR. MEDINA:  Well, dead air time with

23      Dr. Simoni looking at documents is chargeable

24      to you.

25           And with respect to questions about the

1    medicine -- whatever it was, I think the Court

2    will see that you wasted an inordinate amount

3    of time this morning on totally extraneous

4    matters.

5         So, we're not willing to give you a lot

6    of indulgence, but I'm asking you to represent

7    about how much time you need.

8         If you don't know, then we'll go about

9    another 30 minutes, and that's it for today,

10   and we'll have to work on an accommodation of

11   some kind if we can reach an agreement; but

12   since you're not allowed -- since you're not

13   willing to tell me how much more time you want,

14   it makes it a little bit difficult to

15   accommodate you.

16        MR. WICKLINE:  Why don't we take a

17   five-minute break, and discuss where to go.

18        THE VIDEOGRAPHER:  Going off the record,

19   the time is 6:23.

20        (Whereupon, a recess was taken.)

21           (Continued in Volume 3.)

22

23

24

25

```
 1    IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA
 2   _____
      LENORA PERRINE, et al.,
 3           Plaintiffs,
                              CIVIL ACTION NO. 04-C-296-2
 4    vs.                     (Judge Thomas A. Bedell)
      E.I. DU PONT DE NEMOURS AND COMPANY, et al.
 5           Defendants.
      And,
 6    TONYA LEE DRUMMOND, individually, as Personal
      Representative of the Estate of DANNY THOMAS DRUMMOND,
 7    and as next friend of DANIELLE GRACE DRUMMOND,
             Plaintiff,
 8                            CIVIL ACTION NO. 05-C-148-1
      vs.                     (Judge Thomas A. Bedell)
 9    E.I. DUPONT DE NEMOURS AND COMPANY, et al.,
             Defendants.
10    And,

11    DONALD R. MENENDEZ, et ux.,

12           Plaintiffs,
                              CIVIL ACTION NO. 06-C-285-3
13    vs.                     (Judge Thomas A. Bedell)

14    E.I. DUPONT DE NEMOURS AND COMPANY, et al.,

15           Defendants.
      _____/
16                      Fort Lauderdale, Florida
17                      December 12, 2006
18                      9:16 a.m.
19                    - - - - - - - - -
20
21
22
23
24
25
```

1                    VIDEOTAPE DEPOSITION
                             OF
2                     JOSEPH A. SIMONI
                  VOLUME 3 - Pages 313 - 392
3        APPEARANCES:
         LEVIN, PAPANTONIO, THOMAS, MITCHELL, ECHSNER &
4        PROCTOR, P.A.
         By: STEVEN MEDINA, ESQ., and
5            NED McWILLIAMS, ESQ., by telephone,
         Appearing on behalf of the Plaintiffs, Perrine and
6        Drummond

7        WEST AND JONES
         By: JERRY JONES, ESQ., and
8            PERRY JONES, ESQ.
         Appearing by telephone on behalf of the Plaintiffs,
9        Perrine and Drummond

10       ROBINSON & McELWEE, PLLC
         By: RICHARD W. GALLAGHER, ESQ. and
11           MARY E. SNEAD, ESQ.
         Appearing by telephone on behalf of T.L. Diamond &
12       Company, Inc., and Joseph Paushel

13       ALLEN, GUTHRIE, McHUGH & THOMAS, PLLC
         By: WM. SCOTT WICKLINE, ESQ.
14       Appearing on behalf of the Defendants E.I. DuPont De
         Nemours and Company, et al.
15
         SQUIRE, SANDERS & DEMPSEY, L.L.P
16       By: BRIAN M. McQUAID, ESQ.
         Appearing on behalf of the Defendants E.I. DuPont De
17       Nemours and Company, et al.

18       ALSO PRESENT:
         WAYNE HOUSE, Videographer
19
20
21
22
23
24
25

1        Videotape Deposition of JOSEPH A. SIMONI, a

2   witness of lawful age, taken by the Defendant, for

3   purposes of discovery and for use as evidence in the

4   above-entitled cause, pursuant to notice heretofore

5   filed, before SUSAN J. STERNBERG, Certificate of Merit

6   Reporter and Notary Public, in and for the State of

7   Florida at Large, at 1100 Southeast 17th Street

8   Causeway, Fort Lauderdale, Florida.

9

10                          INDEX

11                        Volume 3

12   WITNESS                                        PAGE

13   JOSEPH A. SIMONI

14   Direct Examination (cont'd) By Mr. Wickline      316

15                        EXHIBITS

16   Defendant's 5 - E-mail                          320

17   Defendant's 6 - E-mail                          369

18   Defendant's 7 - E-mail                          373

19   Defendant's 8 - Quarterly inventory report of

20                    contaminated sites in

21                    Broward County                 378

22

23   Plaintiff's 1 - Spokesman Review article        369

24   Plaintiff's 2 - Mountaineer Spirit article      369

25   Plaintiff's 3 - Grievance Board decision        369

 1          Thereupon, the following proceedings were had:
 2                  THE VIDEOGRAPHER:  Back on the record,
 3          the time is 6:32.
 4                  DIRECT EXAMINATION (cont'd)
 5          **Q.    (By Mr. Wickline) Dr. Simoni, did you**
 6   **interview any other former employees of DuPont at**
 7   **the zinc plant?**
 8                  MR. MEDINA:  Okay.  We're --
 9                  Our position is that if it was consulting
10          work, to the extent -- to the limited extent we
11          have allowed him to talk about it, he can talk
12          about it; but we're not going to allow you to
13          talk about any consulting information that you
14          obtained.
15                  MR. WICKLINE:  Okay.  Mr. Medina, I'm
16          going to try to move things along.
17                  Dr. Simoni, with the caveat that anything
18          I ask you from here on out will be unrelated to
19          your involvement as a consultant for
20          plaintiffs' law firms, okay, can we just have
21          that understanding?
22                  Because I understand Mr. Medina's
23          objection, he's not going to allow us to get
24          into that, he's going to direct you not to
25          answer.  That will save you a bunch of

1           objections, and us all a lot of time,

2           Mr. Medina.

3                   MR. MEDINA:  Yes, sir.  And just for the

4           record, I've rescheduled my appointment and put

5           it off, but we can't be here more than 45 more

6           minutes.

7                   MR. WICKLINE:  I understand.

8                   MR. MEDINA:  Thank you.

9           **Q.     Dr. Simoni, the question was:  Have you**

10  **interviewed any other former employees of DuPont at**

11  **the zinc plant?**

12          A.     (No audible response.)

13          **Q.     Is that a "no"?**

14          A.     That's a "no."  I'm sorry.

15          **Q.     Can you interpret these notes for me,**

16  **which are DuPont Exhibit 103?  Can you tell me what's**

17  **being said, just go through them?**

18          A.     Well, to the best of my recollection,

19  Benny and Willis were telling me about the process by

20  which the -- the liquid zinc was produced; and, on the

21  second page, about how the -- I think how the dust --

22  how the zinc slabs -- this is --

23                  Both pages are about the zinc slabs, and

24  then the -- in the last years of the plant, my

25  understanding is they produced dust, zinc dust, and --

1    for paint, so forth.

2              And, so, these are the steps that they

3    were describing of getting in the ore -- on Page 1 --

4    how the ore was combined with the coal, and what they

5    called the binder or the lacquer; and then all of

6    that -- in recollecting this, I'm not quite sure now.

7    They said the --

8              I think the binder and the lacquer might

9    have been in separate bins.  The binder and lacquer

10   was in separate bins, or all of those things were in

11   separate bins, and they combined them to make the

12   pellets.  And they called that the pelletizing.

13             And then the pellets were handled by what

14   they call these roller machines, or a press, and

15   turned out the briquettes.  They had a

16   briquette-making machine that turned out briquettes,

17   which went on a belt to the vertical furnace at the

18   time, and the vertical furnace produced the liquid

19   zinc.  And the residue went on -- I think they said

20   went on a belt to the yard.  I think that's the

21   tailings that we all know about.

22        Q.    "No acid plant," what's that mean?

23        A.    I was looking at that.  I don't recall.

24   I don't recall what that meant.

25        Q.    All right.  Page 2.

 1          A.     Page 2, the --

 2                 I'm not quite sure, and I don't recollect

 3     that well the explanation at the time; but it appears

 4     that they had zinc coming back into the plant,

 5     hardened zinc, maybe slab or -- you know, zinc slabs,

 6     or in some form hardened; and then they had this Ajax

 7     machine which melted the zinc and went to the dust

 8     furnaces, and ended up producing the dust, which may

 9     have been collected in these big drums, to the best of

10     my recollection.

11          **Q.     Okay.**

12          A.     But different --

13                 These were just the steps in producing

14     the slabs and the dust.

15          **Q.     Okay.  Do you know if the process that's**

16     **described on Page 1 of Exhibit 103 was pre- or**

17     **post-1950?**

18          A.     I do not know.

19          **Q.     Okay.**

20          A.     It says -- it says on Page 2 that, before

21     '70, they did both slabs and dust; suggesting that

22     after 1970, I think, the understanding was that they

23     just did the dust.  But I'm not sure of that.

24                 MR. WICKLINE:  Let's get this marked.

25                 MR. MEDINA:  Ma'am, are you giving this

1       5?

2                    THE REPORTER:  Yes, 5.

3                    MR. MEDINA:  Thank you.

4            (Whereupon, Defendant's Exhibit Number 5 was

5       marked for identification.)

6            **Q.    Dr. Simoni, I'm handing you what's been**

7       **marked as Deposition Exhibit 5.  Can you take a look**

8       **at the first paragraph of that document?**

9            A.    I'm going to right now.

10           **Q.    Okay.**

11                   MR. MEDINA:  Can you represent some --

12                   While he's looking, can you tell me

13           anything about the date of this?

14                   MR. WICKLINE:  No, I can't.

15                   MR. MEDINA:  Was it before 2002?

16                   MR. WICKLINE:  I don't know.

17                   MR. MEDINA:  Well, if the document is

18           relating to a period where the consulting was

19           going on, then we're not going to allow him to

20           talk about the document.

21                   MR. WICKLINE:  Well, I'm just going to

22           ask him if he has any recollection.  If it

23           governs the period of when he was a consultant

24           for you, I would expect him to say, I can't

25           talk about it.

1          MR. MEDINA:  Okay.  That's fine.  I think
2      it's an earlier document that he can talk
3      about, but just in case.
4          **Q.    Have you read the first paragraph,**
5  **Dr. Simoni?**
6          A.    Yes, I've read the first paragraph.
7          **Q.    Do you recall a letter from attorneys**
8  **inviting residents of Spelter to join a class action**
9  **lawsuit?**
10         A.    I certainly do not.  And I --
11         **Q.    In any of your discussions with the**
12 **Spelter residents, did the subject come up in your**
13 **presence where Gary Rich or others were asking the**
14 **Spelter residents, or suggesting to Spelter residents**
15 **that they may seek property liens as a means of**
16 **financing the litigation?**
17         A.    I can say almost with a hundred percent
18 guarantee that such discussion never took place before
19 2002.  I -- I have no recollection of that.
20         **Q.    Okay.  And these are comments that are**
21 **being attributed to Anita Menendez, correct?**
22         A.    It appears that way, yeah.
23         **Q.    And she's a friend of yours?**
24         A.    Anita and I have known each other for a
25 long time.

1        **Q.    Okay.**

2        A.    I don't know if she considers me a

3 friend.  I consider her family to be good friends.

4        **Q.    There's a sentence there that says:  Joe**

5 **Simoni called her this weekend to ask if he could**

6 **visit to discuss, quote, the situation at Spelter,**

7 **close quote.**

8        **Do you recall making that call to her?**

9        A.    I think that might have been something I

10 referred to earlier in the deposition.

11        **Q.    I think you may have.**

12        **Did she mention to you anything about**

13 **property liens?**

14        A.    Not to my knowledge.

15        **Q.    Did she agree to --**

16        A.    But, you know, to tell you the truth,

17 you're asking me -- and I'm trying to recall to the

18 best of my recollection -- she may have -- and I can't

19 tell you, you know, a hundred percent rock solid

20 here -- but she may have mentioned to me having

21 received a letter from an attorney.

22        **Q.    Okay.**

23        A.    But I -- you know, I had no sense of what

24 it was related --

25        I mean, I don't even know if I saw it.

1       **Q.    Did she mention to you --**

2       A.    I just don't recall that.

3       **Q.    Did she mention to you --**

4       A.    And maybe she did mention it to me, but

5   I -- you know, I don't know anything about this letter

6   that she's talking about.

7       **Q.    Okay.  Did she make any mention to you**

8   **that the plaintiffs' lawyers were asking for liens**

9   **against the properties in Spelter as a means to**

10  **finance the class action litigation?**

11      A.    I don't think so.  I don't believe that

12  ever happened in our communication.

13      **Q.    Would it surprise you if the plaintiffs'**

14  **firms wanted liens to property that they deemed**

15  **contaminated and damaged?**

16          MR. MEDINA:  Object; and instruct you not

17      to answer.  That's calling for speculation.

18      **Q.    Dr. Simoni, have you had any**

19  **conversations with Carolyn Holbert?**

20      A.    Who is Carolyn Holbert?  I don't recall

21  the name offhand.

22      **Q.    What about Waunona Messinger?**

23      A.    Personal conversations?

24          MR. MEDINA:  And, again, I assume

25      you're --

```
 1              Are you staying with your --
 2              THE WITNESS:  Yeah.
 3              MR. MEDINA:  -- representation that
 4         you're not going into the consulting periods,
 5         that you're -- you're allowing him to talk
 6         about only times not consulting?
 7              MR. WICKLINE:  Mr. Medina, I've
 8         stipulated for the balance of this deposition
 9         that is the case.
10              MR. MEDINA:  Okay.  Thank you.
11         A.   I would say no.
12         Q.   Okay.  Rebecca Morlock, do you know her?
13         A.   Don't -- never had any contact with --
14    during the period you're asking about.
15         Q.   Okay.  Same question for Anthony Beezel.
16         A.   Anthony Beezel, I don't know for sure.
17    Can you tell me more about him?
18         Q.   He's one of the class representatives in
19    the class action lawsuit.  That's all I can really
20    tell you about him.
21         A.   I mean, see, my general recollection is
22    that there's a family --
23         Q.   There's a Larry Beezel and there is an
24    Anthony Beezel.
25         A.   Yeah, there's -- that's what I'm saying,
```

1    there's different ones.  I don't have --
2                I can't tell you that I had any
3    communication with -- is it Anthony you're asking
4    about?
5         Q.    Yes.
6         A.    Because I don't remem --
7                I remember a guy who had an auto place.
8         Q.    Larry Beezel.
9         A.    Yeah, that's Larry Beezel?  I think
10   I've --
11               He was the only Beezel that I remember
12   having communication with.
13        Q.    What were your communications with Larry
14   Beezel?
15        A.    Just -- he allowed us to use his restroom
16   at the -- allowed me to use his restroom when I was in
17   the area.
18        Q.    Okay.  Did Larry Beezel --
19        A.    In his business, you know.
20        Q.    I'm sorry.  Did Larry Beezel attend any
21   of these meetings in Spelter in December, January --
22   December of 2000, January of --
23        A.    Not that I'm aware of.  I don't remember
24   ever seeing him at a meeting.  I only saw him, as I
25   recall, at his place of business.

1          Q.    Okay.  What about Mary Ellen Montgomery,
2     did you have any conversations with her?
3          A.    I don't know who that is.
4          Q.    Mary Luzader, same question.
5          A.    Mary?
6          Q.    Luzader.
7          A.    I don't -- No, I can't say that I know
8     Luzaders --
9                Is she from the nearby area there?
10          Q.    She's from Seminole.
11          A.    I don't remember that.
12          Q.    Joseph Bradshaw?
13          A.    No.
14          Q.    Do you know Joseph Bradshaw --
15                MR. MEDINA:  Okay.  Other than --
16          Q.    -- a preacher?
17          A.    Are you talking about --
18                MR. MEDINA:  Other than the stipulations
19          that you've agreed to -- I just want to make
20          sure they're on the table -- if you don't --
21                If you have any knowledge extraneous to
22          the consulting periods.
23          A.    Yeah, I don't.  Extraneous to the
24     consulting period, no.
25          Q.    Did you use any documents, posters or

1    **slides during the April 30, 2001, meeting in Spelter?**

2        A.    Definitely not.

3        **Q.    Have you spoken to Dr. George Flowers**

4    **concerning this litigation?**

5        A.    Not during the time period in reference.

6        **Q.    Okay.  Have you spoken to Dr. George**

7    **Flowers as a consultant for plaintiffs' lawyers?**

8            MR. MEDINA:  Okay.  Now, I'm going to

9        instruct him not to answer, because now you're

10       going against your stipulation --

11           MR. WICKLINE:  Well, I'm making -- I'm

12       making it clear --

13           MR. MEDINA:  -- that you seem to have

14       articulated.

15           MR. WICKLINE:  Mr. Medina, I'm making it

16       clear in my question that it is in his role as

17       a consultant I'm asking the question.

18           MR. MEDINA:  Right.  And --

19           Okay.  And I'm instructing him not to

20       answer.

21           MR. WICKLINE:  Okay.  Even though

22       Dr. Flowers is a testifying expert, you're not

23       going to let me get into the conversations he

24       had with Dr. Flowers?

25           MR. MEDINA:  Yes, sir, that's correct.

1          MR. WICKLINE:  All right.  Would your
2     position be the same with respect to Dr. Kirk
3     Brown?
4          MR. MEDINA:  The only exception I would
5     make on Flowers would be if he had any
6     conversation with Flowers, with the limited
7     exceptions that we've made here, such as DuPont
8     103.  But to the extent that he had any
9     conversations with Flowers or Brown, and it was
10    while there was a -- consulting activities on
11    behalf of Mr. Simoni -- Dr. Simoni, then he
12    can't testify to that.
13         MR. WICKLINE:  Okay.  I'm going to ask
14    him about Dr. Flowers, Brown, Stewart,
15    Kilpatrick, Alan Witschi, Dr. Clark, Steven
16    Amter, Ben Ross, Dr. Werntz, and Dr. Kornberg;
17    and you would instruct him not to answer any
18    questions regarding any conversations he had
19    with any of those witnesses as a consultant for
20    the plaintiffs; is that correct?
21         MR. MEDINA:  Well, you make it seem so
22    reasonable.  I'll withdraw the objection.
23    **Q.    Okay.  How many conversations --**
24         MR. MEDINA:  You can answer questions
25    about your conversations with these testifying

 1          experts --
 2          Q.     How many --
 3                 MR. MEDINA:  -- to the best of your
 4          recollection.
 5          Q.     How many conversations have you had with
 6   Dr. George Flowers, Dr. Simoni?
 7          A.     Oh, many.
 8          Q.     How many times did you meet with him?
 9                 THE WITNESS:  I can answer?
10                 MR. MEDINA:  Yes, you can answer about
11          your conversations with testifying experts,
12          including Dr. Flowers.
13          A.     Okay.  I'm sorry, your question was?
14          Q.     How many times did you meet with
15   Dr. Flowers?
16          A.     Oh, many times.  I can't give you a
17   number.  I don't recollect a number.
18          Q.     What were the purpose of those meetings?
19                 MR. MEDINA:  Again, you're allowed to --
20                 Unless I instruct you, you can go ahead
21          and talk about testifying expert conversations.
22          A.     Okay.  I'm sorry, your question was?
23          Q.     What was the purpose of those meetings?
24          A.     I assisted Dr. Flowers with his site
25   access to properties.

 1          **Q.     Okay.  Who was present?**
 2          A.     And I worked with him, you know, on that
 3     site accessing, and his work.
 4          **Q.     Okay.  Who was present?**
 5          A.     Who was present?
 6          **Q.     During those meetings.  We'll start with**
 7     **the first one.  When was the first meeting you had**
 8     **with him?**
 9          A.     Oh, I couldn't tell you.  I couldn't tell
10     you when that was.
11          **Q.     Did all of your meetings with Dr. Flowers**
12     **relate to soil testing?**
13          A.     To soil testing and site access.
14          **Q.     Okay.  Was there reasons why he would**
15     **want to access sites, other than for soil testing?**
16          A.     Not that I'm aware of.
17          **Q.     Who was present during those meetings**
18     **with Dr. Flowers?**
19          A.     Who was present during those meetings?
20     He had a colleague that worked with him.
21          **Q.     Okay.**
22          A.     David Allison (phonetic), I believe.
23          **Q.     Did you have anyone with you?**
24          A.     I can't remember if at some time there
25     might have ever been; but my general recollection is

1  no, that -- that usually it was Flowers, Allison, and

2  I.

3         Q.    **Where did you do the sampling?**

4         A.    In all of the different communities that

5  were sampled.  And I'm sure you must know what those

6  are.

7         Q.    **Do you know what those are?**

8         A.    Well, generally, I do, yeah.

9         Q.    **Can you tell me generally?**

10        A.    I might make a mistake in giving you all

11  the names, but --

12              MR. MEDINA:  Okay.  Now you're asking him

13        to testify -- to summarize the sampling

14        locations.  That's beyond simply talking about

15        his conversations with Dr. Flowers, right?

16              MR. WICKLINE:  I don't think so.

17              MR. MEDINA:  Well, you're --

18              Yes, it is.  You're asking him now to

19        summarize -- or does he --

20              Are you asking him does he know all the

21        sample locations that Dr. Flowers tested --

22              MR. WICKLINE:  I asked him --

23              MR. MEDINA:  -- the almost thousand

24        locations?  You want him to give the locations?

25              MR. WICKLINE:  I asked him the towns

1            where he did the sampling.
2                   MR. MEDINA:  The towns where he did
3            the --
4                   Do you know the towns where he did the
5            sampling; that's your question?
6                   MR. WICKLINE:  That was my question.
7                   MR. MEDINA:  Okay.  Go ahead.
8            A.    Okay.  The towns where he did the
9     sampling, Spelter, Erie, Middlebrook, Hepzibah.  Is
10    that four so far?
11                  Lumberport, Seminole, Gypsy.  That's
12    seven so far?
13                  Lambert's Run.  And I'm leaving one out.
14           **Q.    Okay.  Just the best of your recollection**
15    **is fine.**
16                  **Did Dr. Flowers do any soil sampling**
17    **prior to April of 2001?**
18           A.    I don't believe so, no.
19           **Q.    Okay.  Dr. Flowers testified on Page 20**
20    **of his deposition that, in December of 2003, he did**
21    **some sampling, and there was a graduate student with**
22    **you.**
23           A.    Okay.
24           **Q.    Can you tell me who that was?**
25           A.    I'm blocking on his last name.  His first

1    name was Jared.  He was a graduate student in our
2    department at the University.
3            **Q.    Can you tell me his last name?**
4            A.    I wish I could.  I just don't remember.
5            **Q.    Okay.  If you recall his last name at any**
6    **time during this deposition, or after, will you notify**
7    **your counsel?**
8            A.    I sure will.
9            **Q.    Thank you.**
10           A.    I just can't recall it right now.
11           **Q.    Do you know where Jared is today?**
12           A.    I do not.  I don't know if he stayed at
13   the University for further work, or he left.  I don't
14   know.
15           **Q.    Was he in the sociology department?**
16           A.    He was in the sociology department.
17           **Q.    Why did you bring him with you?**
18           A.    Why?
19           **Q.    Why.**
20           A.    Because we needed some help, and --
21           **Q.    What sort of help did he provide?**
22           A.    Well, I don't know the specifics,
23   because --
24               Let me think about that, because I just
25   don't --

 1              I'm trying to recall actually what Jared
 2      did.  I think one of the things he did was drive a
 3      vehicle, you know, as we went around different
 4      properties.  I'm trying to recall.  I need to think
 5      about that more.  I haven't thought about that for a
 6      while, exactly what -- exactly what he did.
 7              **Q.    Did he take any notes, or was he provided**
 8      **with any documents?**
 9              A.    No.
10              **Q.    Did you take any notes?**
11              A.    No.  When you say "notes" --
12              **Q.    What do you understand "notes" to be,**
13      **sir?**
14              A.    Okay.  I took --
15                    Well, what we had was --
16                    MR. MEDINA:  Okay.  Now, you're --
17              I allowed you to question him about
18      conversations with Flowers, but if it's not a
19      subject that has to do with his conversation
20      with Flowers, then I'm going to instruct him
21      not to answer.  Any kind of --
22              Any kind of work that wasn't related to
23      actual discussions with a consulting expert, or
24      observations that a consulting expert would
25      have made in your presence, then, you know,

1          it's just not something that you can testify
2          about.
3              Q.    Did you show Dr. Flowers any of your
4      notes?
5              A.    Did I show Dr. Flowers any of my notes?
6              Q.    Yes; other than Exhibit 103.
7              A.    Oh --
8                    MR. MEDINA:  I would just object to the
9          form regarding Exhibit 103.  I don't know how
10         Dr. Flowers got that.
11             A.    I -- did I show --
12                   Your question is, again, did I show
13     Dr. Flowers any --
14             Q.    Any of your notes.
15             A.    Any of my notes.  I don't believe so,
16     actually.
17             Q.    Okay.  On Page 25 of Dr. Flowers'
18     deposition transcript, he testified:
19                   Question:  Were you in communication with
20     Mr. Simoni in advance of your visit to Harrison County
21     in December of 2003?
22                   Answer:  I would say that I had talked to
23     him about sending him sampling materials.  I mailed
24     them to his house in Morgantown.
25                   Sir, do you have those sampling

1    **materials?**

2          A.    Do I have them?

3          **Q.    Yes.**

4          A.    No.

5                MR. MEDINA:  And I can represent to you

6          anything that Dr. Flowers would have provided

7          to him, we would have provided to you.

8          **Q.    What did you do with those, Dr. Simoni?**

9          A.    The best of my knowledge, the sampling

10   materials were all used.

11               MR. MEDINA:  Okay.  You're talking

12         about --

13               Okay.  I don't know what he's referring

14         to when he says "sampling materials."

15               THE WITNESS:  I'm not sure what he means,

16         either.

17         **Q.    Did you retain --**

18         A.    I'm -- I'm assuming that what you mean is

19   the materials that were used to actually collect the

20   samples.

21         **Q.    Okay.  Did he send you any paperwork or**

22   **documents?**

23         A.    Did he send me paperwork?

24               MR. MEDINA:  That's my representation, is

25         that any paperwork that Dr. Flowers would have

1          provided to Dr. Simoni would have been provided

2          to you.

3          **Q.    Did he send you any paperwork or**

4  **documents, Dr. Simoni?**

5          A.    I don't recall that happening.  He talked

6  to me, we talked about areas...

7          **Q.    Did you obtain written consent from the**

8  **people in the testing areas for Dr. Flowers to do soil**

9  **sampling?**

10          MR. MEDINA:  If you obtained something

11          that you showed Dr. Flowers, then you can

12          testify to it; but if he's asking you about

13          something that wasn't shown to Dr. Flowers,

14          then you can't testify to it.  Okay?

15          THE WITNESS:  Would you repeat that,

16          please?

17          MR. MEDINA:  Yeah.  I'm allowing him to

18          question you about anything you've said or

19          showed Dr. Flowers; but he's -- if he's asking

20          you about something that would not have been

21          said or shown to Dr. Flowers, then you can't

22          testify to it.

23          A.    Okay.  And what was your question again?

24          **Q.    Did you obtain written consents from the**

25  **owners of the property where the soil testing was done**

1    that you shared or showed to Dr. Flowers?

2                MR. MEDINA:  And you understand my

3         instruction?

4                THE WITNESS:  Right.

5         A.    And, therefore, I believe I'm not able to

6    answer.

7         Q.    Did you obtain written consents that you

8    did not show to Dr. Flowers?

9                MR. MEDINA:  Okay.  That you cannot

10        answer.

11        Q.    Okay.  Did Dr. Flowers not -- Strike

12   that.

13             Did Dr. Flowers ask to see or to confirm

14   that you had, in fact, received written consent from

15   the property owners to test?

16             I'm asking you what Dr. Flowers asked

17   you.

18                MR. MEDINA:  Do you understand the

19        question, or do you want her to read it?

20                THE WITNESS:  I understand the question.

21                MR. MEDINA:  So, if Dr. Flowers asked you

22        something, you can talk about what he asked

23        you, if he did ask you something.

24        A.    Okay.  You're asking --

25             Your question is, did he ask me?

1          **Q.    Yes.**
2                THE WITNESS:  And I can answer that,
3          you're saying?
4                MR. MEDINA:  Yes.
5          A.    Okay.  No.
6                You're asking me, did he ask me if I
7    received written consent.  That was your question,
8    right?
9          **Q.    Yes.**
10         A.    And the answer to that is no.
11         **Q.    He went out and did soil testing on the**
12   **property of a number of people, and never asked to**
13   **verify that you had, in fact, received written consent**
14   **from them to test on their property?**
15               MR. MEDINA:  Object.
16         **Q.    Is that correct?**
17               MR. MEDINA:  Object to form; asked and
18         answered.
19         **Q.    Is that correct?**
20         A.    I believe I just answered that.
21         **Q.    Was that a "yes"?**
22         A.    Well, you asked me if he had asked me if
23   I had received written consent, and I said -- from
24   people where we were going to be sampling; and I said
25   no.

1        Q.    Did he ask you if you had received verbal
2    consent from the people where you were going to do
3    sampling?
4        A.    He asked, yes.
5        Q.    Did you ever tell him that you had
6    written consent from any of these people?
7        A.    No.
8        Q.    Did you help Dr. Flowers identify the
9    control area for his sampling?
10        A.    No.  Well, let me -- let me --
11              Let me go back to that one for a second.
12    What do you mean by "help"?
13        Q.    Did you help him identify the control
14    area in that --
15        (Whereupon, there was a brief interruption.)
16              THE WITNESS:  Oh, excuse me.  I'm sorry.
17        Let me make sure it's off.
18        Q.    Did you --
19        A.    Well, let me just ask my legal counsel
20    here if I -- if it's okay to go ahead and answer that.
21        Q.    Let me rephrase the question.
22              Did you help Dr. Flowers decide what
23    would be an appropriate control area for his sampling?
24              MR. MEDINA:  So, if you communicated
25        anything on that subject to Dr. Flowers, then

1           you can answer that question.

2           A.    I -- I helped him in that area by

3     assisting him in getting information about geological

4     formations in the control area that he eventually

5     used -- in the area where he eventually used as a

6     control.

7           **Q.    And where did you get the information on**

8     **the geological formations for that area?**

9                 MR. MEDINA:  Go ahead and answer it.

10          A.    From the West Virginia geological survey.

11          **Q.    Okay.  And you provided a copy of that to**

12    **Dr. Flowers?**

13          A.    Actually, I think what I did, if I

14    recall, is I made contact with the people out at the

15    geological survey office in Morgantown, who knew

16    about, you know, what he was wanting to know, and

17    simply put him in contact with them.

18                So, I don't -- I don't remember sending

19    him materials, but it was more of a -- making a

20    contact for him, so he knew where he could get that

21    information.

22          **Q.    Did -- did you or Dr. Flowers take**

23    **photographs of any of the sample locations?**

24          A.    I'm trying to recall.  I do not believe

25    so.  I don't remember doing that, unless my memory got

1    refreshed somehow to help me recall; but I don't
2    recall that.
3          **Q.    What did Dr. Flowers tell you he wanted**
4    **to know about the control area, or in order to**
5    **determine appropriate control area?**
6               MR. MEDINA:  Object to form.
7          A.    What did he tell me he wanted to know
8    about the control area?  Is that what --
9          **Q.    Or the proposed control area.**
10         A.    Well, I -- I don't remember that at all.
11   I don't remember.
12         **Q.    Why did he want the geological surveys?**
13         A.    I'm trying to -- I'm trying to relate to
14   your question.
15              MR. MEDINA:  You're asking him --
16         A.    I don't know.  I don't know -- you would
17   have to ask Dr. Flowers that one -- I don't know why
18   he wanted the geological survey information.
19         **Q.    Did he not tell you why he was wanting**
20   **that information?**
21         A.    What I recall is his asking me to find
22   out where we could get information about the
23   geological formations.  I went --
24              I went to the geological survey office,
25   and, you know, met some people out there who worked in

1    that area, and put him in contact with them.  And I
2    didn't worry about that after that, because he was
3    able --
4             You know, they were -- they were
5    scientists, and -- and he, of course, knows his work,
6    and they were able to work out whatever had to be
7    worked out.
8        **Q.    How many places were you told that you**
9    **couldn't sample?**
10            MR. MEDINA:  If these were communications
11           that you communicated to Dr. Flowers, then you
12           can talk about it; but not if it didn't relate
13           to a communication to Dr. Flowers.
14       A.    To the best of my recollection, less than
15   a handful.
16       **Q.    Did you have any other role in the**
17   **selecting of West Milford as the control area?**
18       A.    No.
19       **Q.    Was Mr. Medina, Mr. Rich, or any of the**
20   **other attorneys, present during the sampling?**
21            MR. MEDINA:  Now, if this relates to
22           something that Dr. Flowers would have observed
23           or heard, then you can go ahead and answer that
24           question.
25       A.    Yes.

1      **Q.    Do you recall any comments made by those**
2  **lawyers in the presence of Dr. Flowers?**
3      A.    Having to do with sampling, you're
4  asking?
5      **Q.    Or otherwise.**
6      A.    No.  I don't know what --
7            I'm not sure I'm understanding where
8  you're -- what you're asking about.  Did I hear
9  about --
10           Was I privy to any communications between
11  Dr. Flowers and any of the lawyers who might have been
12  present at the time he was sampling?
13     **Q.    Yes.**
14     A.    I assume I was, but I don't recall any
15  communications.
16     **Q.    Were they suggesting areas where he**
17  **should do sampling?**
18     A.    No.
19     **Q.    Did you suggest areas where he should do**
20  **sampling?**
21     A.    No.
22     **Q.    Did you take or handle any of the**
23  **samples?**
24     A.    Did I take or handle any of the samples?
25  No.

1          **Q.     Did you record any data?**

2          A.     Did I record data?

3                 MR. MEDINA:  You're asking him did he

4          record data that --

5                 MR. WICKLINE:  With Dr. Flowers.

6                 MR. MEDINA:  -- that Dr. Flowers would

7          have seen the results of such recording?

8                 MR. WICKLINE:  Okay.  Let me rephrase the

9          question.

10         **Q.     Dr. Simoni, did you record any data as**

11     **you were assisting Dr. Flowers in the soil sampling?**

12                MR. MEDINA:  Again, if you're asking him

13         about that Dr. Flowers would have seen, then

14         you can talk about what Dr. Flowers would have

15         seen.

16         A.     Yeah, we recorded the property that

17     was -- that was sampled.

18         **Q.     Where did you record that?**

19                MR. MEDINA:  Okay.  Again, if it's not

20         something that Dr. Flowers saw, then you're not

21         allowed to talk about it.

22                THE WITNESS:  I understand what you're

23         saying.

24         **Q.     Did Dr. Flowers see where the property**

25     **was where the sampling was taken?**

1           MR. MEDINA:  Object to the form.

2       **Q.    Did Dr. Flowers see any of the data that**

3   **you just testified to recording?**

4       A.    He was aware that I was recording where

5   he was sampling.

6       **Q.    And what happened to that -- those**

7   **records?**

8           MR. MEDINA:  Okay.  Again, if it's not

9           something --

10          If you didn't show him your records, and

11          you were keeping records, then you're not

12          allowed to testify about what records you kept

13          that he didn't see.  If he saw a record, then

14          you can talk about what he saw.

15          MR. WICKLINE:  Mr. Medina, Dr. Simoni has

16          been to law school; he's far more educated than

17          the rest of us here at this table.  I think he

18          gets it --

19          MR. MEDINA:  Okay.

20          MR. WICKLINE:  -- okay?

21          I don't think you need to keep coaching

22          him and telling him over and over again --

23          MR. MEDINA:  This is not coaching, and

24          this is a highly unusual situation to be taking

25          this -- taking a non-testifying consultant's

1          deposition.  And I'm not one to make speaking
2          objections, that's not been my intent here.
3          The --
4              These objections have been trying to keep
5          control over something that has to be
6          controlled, because there's confidentiality,
7          work product at issue.  So, I do not agree with
8          your characterization.
9              And this witness, I'll make such
10         instructions and objections as I see fit.  And
11         you've got about four or five minutes.
12     Q.    Dr. Simoni, do you know where those
13 records are?
14         MR. MEDINA:  Again, if it's -- if these
15         are records that Dr. Flowers would have seen
16         what was recorded, then you can answer that
17         question; but, if not, you can't answer the
18         question about what you would have done in your
19         consulting capacity that Dr. Flowers didn't see
20         the records.
21     Q.    Just to be clear, Dr. Simoni, you were
22 recording those records for Dr. Flowers, for his
23 convenience, were you not?
24         MR. MEDINA:  Object -- object to form.
25     A.    I don't think --

1                I don't believe I can answer that
2       question.
3                Q.    Were you recording those -- that data at
4       the direction of Dr. Flowers?
5                     MR. MEDINA:  Okay.  Again, if you
6                communicated anything --
7                A.    The answer --
8                     MR. MEDINA:  -- to Dr. Flowers, then you
9                can answer the question.  If you didn't
10               communicate or show him a document, then you
11               can't answer -- you can't answer questions
12               about what you did.
13               A.    I believe your question was, was I making
14      records at the request of Dr. Flowers.
15               Q.    Were you?
16               A.    No.
17               Q.    Did you communicate the information
18      contained within those records to Dr. Flowers?
19               A.    No.
20               Q.    Did he at any time see those records?
21               A.    To the best of my knowledge, he would
22      have observed me possibly making the records; but if
23      you're asking did he actually look at the records, I
24      would say no.
25                    MR. WICKLINE:  So, I take it you're

1           directing him not to answer the question?

2                  MR. MEDINA:  Yeah.  I mean, the fact that

3           the gentleman was out soil sampling, and that

4           Dr. Simoni was helping to get site access and

5           was taking notes, and that he might have seen

6           Dr. Simoni's hand moving, doesn't mean that he

7           saw what was being recorded, or observed the

8           results of such recording.

9                  So, absolutely, we instruct him not to

10          talk about those records unless he showed them

11          to Dr. Flowers or communicated on -- if he

12          communicated something, then he can talk about

13          what he communicated.

14          **Q.    Dr. Simoni, is it your practice to take**

15     **notes during conferences with expert witnesses?**

16                 MR. MEDINA:  Object; instruct you not to

17          answer.

18                 MR. WICKLINE:  You're instructing him not

19          to answer whether it is his practice to

20          maintain notes of conferences or telephone

21          conferences with expert witnesses?

22                 MR. MEDINA:  Yes, sir.

23                 MR. WICKLINE:  Okay.

24          **Q.    Dr. Flowers indicated that there was one**

25     **sample that was returned at the request of the**

1    **homeowner.  Do you recall that?**

2         A.    I'm not sure what you mean.

3         **Q.    He said there was -- one core was**

4    **returned at the homeowner's request, and was not**

5    **analyzed.**

6         A.    I don't recall that.

7         **Q.    Have you had any conversations with or**

8    **met with Dr. Kirk Brown?**

9         A.    I met Dr. Kirk Brown.

10        **Q.    When did you meet Dr. Kirk Brown?**

11        A.    That's a good question.  I want to say it

12   was in --

13             Let's see.  I left West Virginia in '05.

14   I'm not positive.  I'm thinking it might have been in

15   '04 or '05, but I don't recall for sure.

16        **Q.    What was the purpose of the meeting with**

17   **Dr. Brown?**

18             MR. MEDINA:  You can talk about your

19             conversations or communications with any

20             testifying expert, including Dr. Brown, to the

21             extent you communicated something.

22        A.    As I recall, Dr. Brown was doing some

23   sampling in the Spelter area when I met him.

24        **Q.    Okay.  Do you know what kind of sampling?**

25        A.    I may be incorrect.  I may be confusing

1    people.  So, I can't say for sure.

2         **Q.    Was your role with Dr. Brown similar to**

3    **the role with Dr. Flowers, in that you assisted in**

4    **obtaining access to sites for testing?**

5         A.    Yes.

6         **Q.    Did Dr. Brown provide you with any**

7    **information?**

8         A.    No.

9         **Q.    Did you provide Dr. Brown with any**

10   **information?**

11        A.    No.  My only communication with him was

12   to show him the sites where we had access.

13        **Q.    Did Jared participate in those site --**

14        A.    No.  Jared, no, no.

15        **Q.    Tell me what conversations you recall**

16   **having with Dr. Brown.**

17        A.    Oh, they were sort of general

18   conversations about the kind of work that he

19   specialized in, the kind of work that he did; because,

20   as I recall, Dr. Brown was there doing his work in the

21   Spelter area with a very tight time frame, and, you

22   know, the work had to get done, and he was not there

23   forever; and, so, it was --

24             Communication was, other than some

25   general conversation about his work, what kind of work

1    he did -- stemming from curiosity on my part, I
2    guess -- it was limited to his site access, and, you
3    know, and --
4              Other than that general conversation, I
5    didn't have much communication with him, even about
6    his -- the work that he was doing.  Just finding him
7    the access so that he could do his work is what
8    communication we had.
9         **Q.    Did you have any conversations with**
10   **Dr. Stewart or -- Strike that.**
11             **Did you have any conversations with**
12   **Dr. Flowers or Dr. Brown concerning the results of**
13   **their testing?**
14        A.    Well, when -- not with Dr. Brown, but
15   with Dr. Flowers, when he came back -- or, not when he
16   came back.  Maybe I didn't.  I'm trying to --
17             Let's see.  Dr. Flowers, I guess he -- I
18   guess he sent me a copy of his report.
19        **Q.    Okay.  Anything else?**
20        A.    That was -- I'm sure you have that.
21        **Q.    I do.**
22        A.    That's -- that's what I got from him, in
23   terms of communications about his results.
24        **Q.    Anything else?**
25        A.    No.

1          Q.    Okay.  Did you have any conversations or
2     any meetings with Dr. James Stewart?
3          A.    I don't remember who Dr. James Stewart
4     is.
5          Q.    Okay.  What about John Kilpatrick?
6          A.    And I don't relate to that name, either.
7          Q.    Alan Witschi, W-I-T-S-C-H-I?
8          A.    Yeah, I don't -- I don't have a
9     recollection of who that might be.
10          Q.    Dr. James Clark?
11          A.    James Clark?  No.
12          Q.    Steven Andrew?
13          A.    No.
14          Q.    Ben Ross?
15          A.    Ben Ross?  No.
16          Q.    Dr. Kornberg?
17          A.    Kornberg?
18          Q.    Kornberg.
19          A.    No.
20          Q.    Dr. Charles Werntz?
21          A.    Dr. Charles Werntz?  Can you tell me who
22     he is?
23          Q.    He is --
24          A.    I remember that name.
25          Q.    He is a doctor of osteopathy at West

 1   **Virginia University.**
 2        A.     Okay.  I never had any commun --
 3               Are you asking me if I ever had any
 4   communications with him?
 5        **Q.     Yes.**
 6        A.     No.
 7        **Q.     How do you know him?**
 8        A.     I thought I --
 9               That's why I was asking you -- I was
10   trying to remember -- it was a name that I heard as
11   someone being at West Virginia University, who was
12   consulting or serving as an expert on the case.
13        **Q.     Okay.**
14        A.     But I never had any communication.
15        **Q.     Did you ever have any communications with**
16   **DuPont about the zinc plant site, or the remediation**
17   **at the zinc plant site?**
18        A.     I don't recall any communication with any
19   DuPont representative about that.
20        **Q.     Did you ever attend any of the meetings**
21   **that DuPont had with the community in Spelter**
22   **concerning the remediation efforts?**
23        A.     No.
24        **Q.     Are you aware of the 1996 ATSDR, the lead**
25   **screening of children in the Spelter community?**

1          A.     I think I am.

2          **Q.     What do you know about it?**

3                 MR. MEDINA:  Again, only --

4                 We're back to your -- his stipulation

5          that you can't refer to anything you would know

6          about it from your consulting periods.

7                 THE WITNESS:  Right.

8          **Q.     I think the rest of my questions will be**

9   **subject to that stipulation, Dr. Simoni.**

10          A.     I'm trying to remember how I became aware

11   of that.  What was your question about it?

12          **Q.     Just what do you know about the 1996**

13   **ATSDR lead screening in children in the Spelter**

14   **community.**

15          A.     I'm trying to remember how I became aware

16   of that.  I think in, possibly, 2001 -- possibly -- I

17   can't -- I can't verify the time -- but I might have

18   had some communication with John Hando about that.  I

19   think he was aware of it, or he mentioned to me

20   something about --

21          **Q.     You mean in 2000?**

22          A.     Well, in that --

23                 No; I think it might have been after

24   that.

25          **Q.     Okay.  So, you had another meeting with**

 1    **John Hando sometime in --**

 2         A.    No, not meetings.  I don't remember them

 3    as meetings, but I -- you know, I talk with John from

 4    time to time.

 5         **Q.    What did he tell you about the ATSDR lead**

 6    **screening?**

 7         A.    I just remember his referring to a -- to

 8    some screening of children for lead.

 9         **Q.    Did he mention the results of that**

10    **screening?**

11         A.    I don't recall if he did.  He might have

12    referred me to the ATSDR report, or the ATSDR --

13    whatever it was.

14         **Q.    ATSDR?**

15         A.    Yeah.  That's --

16         **Q.    Do you recall going to look at it?**

17         A.    I don't recall when I looked at it.

18         **Q.    But you have looked at it?**

19         A.    I think some time in the -- way before;

20    yeah, I think.

21         **Q.    Did you ever discuss the results of the**

22    **ATSDR study with the residents of Spelter?**

23         A.    No.

24         **Q.    Why not?**

25              MR. MEDINA:  Object to form.  If you have

1        a conscious --

2            MR. WICKLINE:  This is all subject to

3        your stipulation, Steve.  I'm just trying to

4        move along.

5            MR. MEDINA:  Well, this is a different

6        issue.  If you had a --

7            He's not allowed to ask you about your

8        opinions in hindsight; but if you had a state

9        of mind where you consciously were not

10       discussing that, then you can go ahead and

11       answer that question.  But you're not trying

12       to --

13           You're not supposed to, today, based on

14       what you know now, try to figure out something

15       in hindsight and express an opinion.

16           THE WITNESS:  Right.

17       A.    And I have no recollection in a conscious

18   sense of why I would have or why I wouldn't have

19   related to your question.

20       **Q.    Okay.  So, as we sit here today, you do**

21   **not know why you chose not to discuss the ATSDR lead**

22   **screening of children with the residents of Spelter;**

23   **is that correct?**

24           MR. MEDINA:  Object to form.

25       A.    As we sit here today, I have no

1    recollection of -- of any reasoning back at that time.

2         **Q.    Okay.  Did you ever discuss the results**

3    **of the 1996 ATSDR lead screening with anyone at the**

4    **ATSDR?**

5         A.    No, I don't think so.  I don't think that

6    ever happened.

7         **Q.    Have you spoken with anyone at the**

8    **Harrison County Parks and Recreation Commission**

9    **concerning the former zinc plant property, the Spelter**

10   **ballpark, or the Rails-To-Trails?**

11        A.    Harrison County?

12        **Q.    Parks and Recreation Commission.**

13        A.    I don't know that I ever had --

14              I don't think I ever had any contact with

15   Harrison County Parks and Recreation.

16        **Q.    Have you spoken with anyone at the**

17   **Harrison County Board of Education concerning the**

18   **former zinc plant property or the Spelter ballpark?**

19        A.    No.

20        **Q.    Okay.  Have you spoken with anyone at the**

21   **Harrison County Commission concerning the former zinc**

22   **plant property, the Spelter ballpark, or the**

23   **Rails-To-Trails?**

24              THE WITNESS:  I have to --

25              MR. MEDINA:  He's already made his

1              stipulation.  So, if it was something not
2              related to your consulting, then you're
3              supposed to answer.  If it relates to
4              consulting, then you don't have to answer.
5         A.     Okay.  Let me just think of what we're
6    saying here.  Your question is, did I ever have any --
7         **Q.     Have you spoken with anyone at the**
8    **Harrison County Commission concerning the former zinc**
9    **plant property, the Spelter ballpark, or the**
10   **Rails-To-Trails?**
11        A.     Previous to my consulting?
12        **Q.     Yes.**
13        A.     No.
14        **Q.     Have you seen the former zinc plant**
15   **property since it has been remediated by DuPont?**
16             MR. MEDINA:  Okay.  Now, that question,
17        is that -- that has the same limitation?
18        Because it wasn't remediated prior to late
19        summer of 2003.  So, our --
20             I guess this is not part of the
21        stipulation.
22             MR. WICKLINE:  It's part of the
23        stipulation.  I mean, he can tell me that -- if
24        he saw it when he was a consultant, or he can't
25        answer because he was a consultant at that

 1            period of time.  Then he can --
 2                  MR. MEDINA:  Okay.  You can't answer --
 3                  You're directed not to answer with any
 4            information about observations you would have
 5            made during the period of your consulting; but
 6            if you had any prior observations of completion
 7            of -- of remediation, then you can answer it.
 8       A.      Remediation --
 9                  You're asking if I -- if I observed
10   remediation work?
11       **Q.    No.  I asked if you've seen the former**
12   **zinc plant property since it has been remediated by**
13   **DuPont.**
14                  MR. MEDINA:  Okay.
15       A.      Prior to 2002, I assume your question is
16   asking about that; and I was in the -- I was in the
17   Spelter area at times, you know, prior to 2002.  I
18   don't know about remediation, because I don't
19   recollect when that remediation work was actually
20   done.
21       **Q.    And your lawyer's instructed you not to**
22   **answer anything after 2002, is that correct?**
23                  MR. MEDINA:  Well, the instruction is the
24            same one we've had all day.  It's the time
25            period of late summer of 2003, forward, as

 1          relates to Levin, Papantonio.

 2                And then this Masry relationship, I don't

 3          know when that was, but if there --

 4                To the extent, if any, there was a gap

 5          between Masry, and Levin, Papantonio

 6          consulting, that's not prior to -- prior to the

 7          Masry relationship, then you could testify

 8          about that, if you saw anything in that gap, if

 9          any.

10          A.    To the best of my recollection, I did not

11   observe any -- any -- what I would call serious

12   remediation at the -- you know, at the plant site

13   before 2002.

14          **Q.    Have we pretty much discussed all of your**

15   **activities as an activist for the Spelter community,**

16   **other than your work as a consultant for the**

17   **plaintiffs' lawyers?**

18          A.    Well, you've asked me about a lot of

19   things.  I don't know what else there could be.

20          **Q.    Okay.  So, you think we've pretty much**

21   **got it covered?**

22          A.    Yeah, I...

23          **Q.    Did you ever tell anyone in the community**

24   **that they should have their soil tested for heavy**

25   **metals?**

1              MR. MEDINA:  Again, the same instruction
2         about your consulting period.  Any -- any
3         conversations or communications during that,
4         you can't talk about.
5         A.    I don't recall doing that.
6         **Q.    Okay.  Why not?**
7              MR. MEDINA:  Object to form.
8         A.    Why I didn't do that?
9         **Q.    Yes.**
10        A.    Because I basically operated with the
11   assumption that people with expertise eventually were
12   going to come in and look at what needed to be looked
13   at.
14        **Q.    Are you aware that people can have blood**
15   **or urine testing to determine if they have been**
16   **exposed to heavy metals?**
17              MR. MEDINA:  Okay.  Now, you're asking
18         him now today, or was he back in --
19              Okay.  Let me --
20              If it was something that didn't relate to
21         your consulting period, then you can answer
22         about it, if you -- as it relates to your
23         knowledge of blood or urine testing.
24        A.    I was not well informed; but, back before
25   2002, I had a general understanding of -- of that, you

 1    know, that blood could be analyzed --

 2         **Q.      Okay.**

 3         A.      -- but I was not -- I was not in any way

 4    well informed about all that.

 5         **Q.      Did you ever tell anyone in the community**

 6    **that they should have their blood or urine tested to**

 7    **see if they were being exposed to heavy metals?**

 8         A.      I'm pretty sure I did not.

 9         **Q.      Why not?**

10         MR. MEDINA:  And if you had a conscious

11         reason at the time, that you can recall at this

12         time, then you can testify to it; but you're

13         not supposed to, in hindsight, make something

14         up.

15         A.      I have no --

16         I can't give you a recollection right

17    now, a conscious sense of that at the time.

18         **Q.      Have you spent more than 277 days in the**

19    **Perrine -- or in the class area during your lifetime?**

20         A.      Have I spent more than 277 days?

21         **Q.      Yes.**

22         A.      I would generally say, not knowing for

23    sure, not; but I don't --

24         I would have to, you know, go back and

25    try to account for all that time; but I -- I would say

1    probably not.  That seems like a lot of days, 277

2    days.

3              **Q.    Would that be difficult for you to**

4    **determine?**

5              MR. MEDINA:  Object; instruct you not to

6         answer.

7              **Q.    Have you spent more than 277 days, not**

8    **just in Spelter, but in areas surrounding Spelter**

9    **where the soil and dust sampling was -- were done?**

10             A.    I would say the same, I would have no

11   idea about how many days I spent, but 277 days seems

12   to be a lot of days; and, so, my same answer that I

13   gave before.

14             **Q.    And I'm including the time period when**

15   **you were back there studying --**

16             A.    I understand.

17             **Q.    -- the Spelter residents, and doing a**

18   **research paper.**

19             **Would that change your answer?**

20             A.    I don't think so.

21             **Q.    Have you kept a log, or any --**

22             A.    No.

23             **Q.    -- anything to determine how long -- how**

24   **many days --**

25             A.    No.

1       Q.      -- you've spent in Spelter?

2       A.      No.

3       Q.      Okay.  Has anyone at these plaintiffs'

4    law firms had any discussions with you about whether

5    you might qualify to be a member of the class action?

6               MR. MEDINA:  Again, that would be clearly

7           something that would be within the consulting

8           period; so, you're instructed not to answer.

9       Q.      Would you have known anything further

10   about this litigation, Dr. Simoni, had I not contacted

11   you to take your deposition?

12              MR. MEDINA:  Okay.  I instruct you not to

13          answer.

14      Q.      Have you ever had your blood or urine

15   tested for heavy metal exposure because of the time

16   you spent around the former zinc plant in Spelter?

17      A.      Have I ever had my blood or urine --

18   because of the time I spent around --

19      Q.      Have you ever had your blood or urine

20   tested for heavy metal exposure because of the time

21   you spent around the former zinc plant in Spelter?

22      A.      No.

23      Q.      Why not?

24              MR. MEDINA:  Now, if you, during periods

25          unrelated to consulting, have a present

1           recollection that at that point in time you had
2           some thought process about whether or not to
3           get yourself tested for blood or urine, then
4           you can explain that; but if -- anything else,
5           you can't talk about.
6      A.    Your question is?
7      **Q.    Why not?**
8      A.    Why not?
9           MR. MEDINA:  Okay.  Same instruction.
10          THE WITNESS:  Right.
11     A.    Recollecting -- trying to recollect back,
12 I have no recollection of pondering that either way.
13     **Q.    Okay.  Has anyone ever suggested to you
14 that you should have your blood or urine tested for
15 heavy metal exposure because of the time you spent
16 around the former zinc plant in Spelter?**
17          MR. MEDINA:  Same instructions.
18          THE WITNESS:  We're talking about prior
19          to 2002?
20          MR. MEDINA:  Or during -- between Masry,
21          and Levin, Papantonio consulting, if you had
22          any conscious thoughts of that, that you can
23          presently recollect.
24     A.    No, I don't think anyone ever advised me.
25 Was that your question?

1          **Q.     Yes.**

2          A.     Or suggested to me that I should have

3     that done.

4          **Q.     Right.**

5          A.     No.

6          **Q.     Okay.  What about the time as a**

7     **consultant, has anyone ever suggested to you during**

8     **your time as a consultant for the plaintiffs' lawyers**

9     **that you should have your blood or urine tested for**

10    **heavy metal exposure because of the time you spent**

11    **around the former zinc plant?**

12              MR. MEDINA:  Instruct you not to answer.

13         **Q.     Have you ever asked any of your doctors**

14    **whether you should have your blood or urine tested for**

15    **heavy metal exposure because of the time you spent**

16    **around the former zinc plant in Spelter?**

17              MR. MEDINA:  Instruct you not to answer,

18              unless those conversations would have been

19              during your non-consulting periods.

20         A.     Instructed not to answer.

21              MR. MEDINA:  Okay.  If you had any

22              conversation with a doctor prior to consulting,

23              or during any gap that might have been between

24              Masry, and Levin, Papantonio, you can relate

25              that conversation, if any occurred, about

1          whether you might want to be tested for --
2          A.     I never had any communication during that
3     period.
4          **Q.     Okay.**
5               THE WITNESS:  And I'm going to have to
6          excuse myself again.
7               MR. WICKLINE:  Let me go ahead and get
8          that marked.
9               THE WITNESS:  I apologize, but that's --
10              MR. WICKLINE:  I'm very close to being
11         finished, Dr. Simoni.
12              MR. MEDINA:  Do you want to --
13              Do you have to take a break now?
14              THE WITNESS:  How close are --
15              How close?
16              MR. MEDINA:  He might have to take a
17         personal break, and I don't want to not allow
18         him to do that if he needs to.
19              MR. WICKLINE:  Probably 15 minutes or so.
20              THE WITNESS:  I need a break.
21              MR. MEDINA:  Well, then we're -- we're
22         way beyond the 6:15 --
23              MR. WICKLINE:  We've got a restroom here.
24              MR. MEDINA:  All right.  Let's take a
25         brief break.

1            THE VIDEOGRAPHER:  Going off the record,

2        the time is 7:39.

3            (Whereupon, a recess was taken.)

4        (Whereupon, Defendant's Exhibit Number 6 was

5    marked for identification.)

6        (Whereupon, Plaintiffs' Exhibits 1, 2 and 3

7    were marked for identification.)

8            THE VIDEOGRAPHER:  Back on the record,

9        the time is 7:44.

10       **Q.    Dr. Simoni, how did you identify the**

11   **property owners and the properties from whom you**

12   **wanted to obtain consents?**

13           MR. MEDINA:  Okay.  That would be --

14           You're instructed not to answer that,

15       unless it involved a communication --

16           To the extent there was communication

17       from either Dr. Flowers or Dr. Brown, or some

18       other testifying expert, then you can't talk

19       about it; but if they communicated to you

20       anything -- anything to you or you received

21       anything from them, then you can identify that.

22       **Q.    Dr. Simoni, did you obtain the consents**

23   **before Drs. Flowers and Brown came in to do testing?**

24           MR. MEDINA:  Object to form.  And if

25       you're asking him about whether he communicated

 1          something, then he can communicate it; but as
 2          to what he did, that wasn't communicated, he's
 3          not allowed to answer.  So, I don't know that
 4          he can answer that.
 5      **Q.    Dr. Simoni, can you tell me how the soil**
 6  **sampling locations were determined?**
 7          MR. MEDINA:  If something was
 8          communicated from a testifying expert, then you
 9          can indicate what it is that was communicated
10          to the best of your recollection.
11      A.    I'm not able to answer it.
12      **Q.    Can you tell me how the dust sampling**
13  **locations were determined?**
14          MR. MEDINA:  Same instruction.
15      A.    I'm not able to.
16      **Q.    Is that because you don't know, or is**
17  **that because you were a consultant for the plaintiffs'**
18  **law firms?**
19          MR. MEDINA:  Well, the instruction was,
20          is that he can talk about any communications
21          from those people as to any directions they
22          might have given, in answering your question.
23          So, if that's what you mean by "because you're
24          a consultant."
25          THE WITNESS:  The --

1              MR. MEDINA:  You're not allowed to talk
2         about anything other than what they
3         communicated to you; okay?
4              THE WITNESS:  Right.
5              MR. MEDINA:  So, if you don't have any
6         information that they didn't communicate with
7         you, then there's nothing you can say on that.
8              THE WITNESS:  Right.
9         A.    And your question was again?
10        **Q.    Was your answer -- or your non-answer to**
11   **the question of how Drs. Flowers and Brown determined**
12   **sampling locations because you were a consultant in**
13   **this case, or because you don't know?**
14             MR. MEDINA:  Okay.  You're instructed not
15        to answer that.  You can indicate anything they
16        communicated to you on those issues; but if it
17        wasn't a communication from them, you can't
18        talk about it.
19        A.    Dr. Flowers identified areas where he
20   wanted to sample.
21             MR. MEDINA:  If Dr. Flowers communicated
22        something to you, you can testify to it.
23             THE WITNESS:  That's what I just said.
24             MR. MEDINA:  Okay.
25        A.    That's what he communicated to me.

1              MR. WICKLINE:  What exhibit is that?

2              THE REPORTER:  Six.

3          **Q.    Dr. Simoni, I'm showing you what's been**

4    **marked as Deposition Exhibit 6, and I would like you**

5    **to take a look at the one, two, three, four -- fifth**

6    **full paragraph on this document here.**

7          A.    This document?

8          **Q.    Yes.  And the paragraph reads:  Re: river**

9    **sediment.  John Hando indicated that a WVU professor**

10   **and master's student were considering a river sediment**

11   **study at Spelter.  John agreed to dial us into this**

12   **study.  Of course, we would like the opportunity to**

13   **review, slash, comment, comma, and see the results.**

14              **Did I read that correctly?**

15              MR. MEDINA:  Object to your asking him

16              questions about a document without giving him

17              an opportunity to look at the whole document,

18              to the extent he needs to.

19         A.    Yeah; I'm not sure what this is.

20         **Q.    I'm just trying to speed things along a**

21   **little bit.  I'm not going to trick you; I'm just**

22   **going to ask you, did you have any conversations with**

23   **John Hando about conducting a river sediment study at**

24   **Spelter?**

25              MR. MEDINA:  Object to the form.

1              Q.      You can answer, sir.

2              A.      Well, what I can tell you is, to the best

3      of my belief and recollection -- and I think my

4      recollection is very correct on this one -- this

5      reference to a WVU professor and master's student was

6      not me.

7              Q.      Okay.  So, you did not have any plans to

8      do a river sediment study; is that correct?

9              A.      No.

10             MR. WICKLINE:  All right.  Let's mark

11     this one.

12             (Whereupon, Defendant's Exhibit Number 7 was

13     marked for identification.)

14             Q.      Dr. Simoni, we placed in front of you

15     what's been marked Deposition Exhibit 7, and it is an

16     e-mail; and I have just a question --

17             A.      Let me read it, please, first.

18             Q.      Okay, sure.

19             Are you finished reading that,

20     Dr. Simoni?

21             A.      Yes, I am.

22             Q.      The date of this e-mail is January the

23     26th, 2002; correct?

24             A.      That's correct.

25             Q.      Do you recall a meeting in Spelter prior

 1      to January 2002 that was attended by Mr. Medina?
 2              MR. MEDINA:  You said prior to January
 3      2002?
 4              MR. WICKLINE:  Yes.  Or during January of
 5      2002.  January or prior.
 6              THE WITNESS:  Let me just ask, that was
 7      during the time of my --
 8              MR. MEDINA:  You're allowed to talk about
 9      this.  This was prior to when you were retained
10      as a consultant by Levin, Papantonio, and this
11      meeting would not have involved Masry; so, you
12      can address this e-mail.
13              THE WITNESS:  Okay.
14              MR. MEDINA:  If you have any
15      recollection.
16      A.      Okay.  What is your question about?
17      Q.      Okay.  Do you recall a meeting of a
18      Spelter group of individuals claiming health problems
19      because of the smelter site sometime around January of
20      2002?
21              MR. MEDINA:  Object to the form.
22      A.      The characterization of the meeting, I
23      think, is not correct.  There was a meeting in, as I
24      recall, in -- at that period of time, at which --
25              And that meeting was attended by

1    Mr. Medina here, and Mr. Slickman, who I referred to
2    earlier on, way earlier on in the deposition.
3            **Q.    Was Mr. Medina working for the EPA or the**
4    **Levin, Papantonio firm at the time?**
5            A.    Well, there was confusion here,
6    obviously, in this memo.  Mr. Medina was working for
7    Levin & Papantonio at the time.
8            **Q.    Can you tell me the details of that**
9    **meeting?**
10           A.    It was, to the best of my recollection,
11   generally an opportunity for some of the people in the
12   community to meet Mr. Medina and Mr. Slickman, who
13   were coming in as an initial visit to the area, to
14   look at the Spelter matter.
15                 And it was, you know, an informational
16   meeting; who they were, and where they were from, and
17   probably a little explanation of the kind of work that
18   they did.  They were --
19                 You know, they were considered as one of
20   the groups that was coming in to look -- you know,
21   over the long period of time -- one of the groups that
22   was coming in to look at the Spelter situation.
23           **Q.    Was Mr. Medina introduced to the Spelter**
24   **residents as a former EPA lawyer?**
25           A.    No.  My best recollection of that is that

1    Mr. Medina, in introduction of himself, just mentioned
2    that part of his background was working for the EPA, I
3    believe, in Florida, to the best of my recollection.
4         **Q.    Are you the type of person who does**
5    **research prior to moving to an area, to satisfy**
6    **yourself that you're moving to a safe environment?**
7                   MR. MEDINA:  Okay.  If you have some sort
8              of, during your non-consultancy period,
9              formulated belief --
10                   MR. WICKLINE:  This has nothing to do
11             with his consulting.  This is just him
12             personally.
13                   MR. MEDINA:  Right.  Well, then this is
14             not about the facts of Spelter, so he's
15             instructed not to answer.
16                   You're conceding it's not about the fact
17             observations he had at Spelter, so he's
18             instructed not to answer.
19                   MR. WICKLINE:  It's relevant to Spelter.
20                   MR. MEDINA:  Well, you can't just go and
21             take a non-testifying consultant's deposition
22             on any subject --
23                   MR. WICKLINE:  He is also --
24                   MR. MEDINA:  -- you want.
25                   MR. WICKLINE:  He is also a fact witness

 1          in this case, Mr. Medina --
 2               MR. MEDINA:  I realize that.
 3               MR. WICKLINE:  -- okay?
 4               So, I can ask him questions as a fact
 5          witness in this case.
 6               MR. MEDINA:  Well, not --
 7               We're accommodating --
 8               MR. WICKLINE:  And you're precluding me
 9          from doing that.
10               MR. MEDINA:  If you want to repeat your
11          question, but I believe I'm satisfied with my
12          instruction; but why don't you read it again.
13               Will you read it again, just in case I
14          want to reconsider it?
15          (Whereupon, the requested portion of the
16     record was read by the reporter as follows:)
17               THE REPORTER:  Are you the type of person
18          who does research prior to moving to an area,
19          to satisfy yourself that you're moving to a
20          safe environment?
21               MR. MEDINA:  I'm very satisfied with that
22          instruction.  You're not allowed to answer that
23          question.
24          **Q.   Dr. Simoni, did you need to relocate to**
25     **Davie, Florida, for a particular reason, or could you**

 1    have moved anywhere you wanted to?

 2              MR. MEDINA:  Okay.  Now you're asking him

 3         about why he went to Davie, Florida, and that

 4         has nothing to do with -- nothing to do with

 5         the facts of Spelter; and he's instructed not

 6         to answer.

 7              MR. WICKLINE:  We'll mark this as an

 8         exhibit, please.

 9         (Whereupon, Defendant's Exhibit Number 8 was

10    marked for identification.)

11              MR. MEDINA:  What number are we on?

12              THE REPORTER:  Eight.

13         Q.    Dr. Simoni, I'm showing you what's been

14    marked as Exhibit 8 to your deposition, which I'll

15    represent to you is a quarterly inventory report of

16    contaminated sites in Broward County, Florida, dated

17    October 2006.

18              Have you ever seen this website or this

19    document before?

20              MR. MEDINA:  I'm instructing him not to

21         answer questions along this line.  It has

22         nothing to do with Spelter.

23         Q.    Dr. Simoni, there is an inventory of

24    contaminated sites in Broward County that is attached

25    to or made a part of Exhibit 8.

1           MR. MEDINA:  Okay.  If this relates to

2      questions on this document, he's not going to

3      be allowed to answer it.

4           MR. WICKLINE:  You're instructing him,

5      Steve --

6           MR. MEDINA:  Yes, sir.

7           MR. WICKLINE:  -- not to answer any

8      question I have about this document?

9           MR. MEDINA:  That's right.

10          MR. WICKLINE:  And the basis for that

11     instruction is?

12          MR. MEDINA:  Well, it's called, he's a

13     non-testifying consultant.  We've made a

14     limited accommodation relating to the facts

15     that he obtained prior to non-consulting work

16     in Spelter, and this is not within that

17     accommodation, and he's not allowed to talk

18     about it.  And that is the instruction.

19          MR. WICKLINE:  He is a fact witness to

20     what went on out in Spelter.  He had community

21     meetings in December of 2000, January,

22     February, March and April of 2001, where he was

23     talking to residents about their concern of

24     contamination at a site.

25          MR. MEDINA:  Okay.  You're way --

1          MR. WICKLINE:  So, I have a right to ask
2      him questions about where he lives now.
3          MR. MEDINA:  Okay.  That's the
4      instruction.  You're way over time, so you need
5      to move on, or we're just going to leave,
6      because you're way over time.  You're 40 --
7          You're almost 45 minutes over the time
8      that we agreed we would allow this --
9          MR. WICKLINE:  Most of that --
10         MR. MEDINA:  -- to be extended to.
11         MR. WICKLINE:  And the majority of that
12     time, Steve, has been you re-asking my
13     questions, objecting to my questions, restating
14     my questions, voicing objection after objection
15     after objection, even though I had provided
16     stipulations.
17         MR. MEDINA:  Okay.  You got one minute.
18     One minute, and then we're leaving.
19         MR. WICKLINE:  You're not going to let
20     him talk about anything on this document, is
21     that correct?
22         MR. MEDINA:  This gentleman, for the
23     record, is having trouble hearing, and that's
24     not our problem.  We're --
25         You've got one minute.

1          Q.    Dr. Simoni, are you a member of any

2     public interest groups?

3               MR. MEDINA:  You're not allowed to answer

4          questions about your current membership in

5          public interest groups.  That's your private

6          business, it has nothing to do with the facts

7          of Spelter.

8          Q.    Are you a member of any environmental

9     groups, Dr. Simoni?

10              MR. MEDINA:  Same instruction.

11         Q.    Dr. Simoni, do you have any ownership

12    interest in any businesses or companies?

13              MR. MEDINA:  Do you have -- currently

14         have any interest in any business or companies,

15         you're instructed not to answer, unless they're

16         in Harrison County, West Virginia.

17         Q.    Have you ever been a plaintiff in a

18    lawsuit, Dr. Simoni?

19              MR. MEDINA:  If you --

20              You're instructed not to answer.

21              And, for the record, I'm going to --

22         because we're about to leave here -- and, for

23         the record, plaintiffs have Exhibits 1, 2 and

24         3, which I want, just in case we don't reach an

25         agreement here that counsel is going to honor

1          our request that this deposition is over, these
2          are Plaintiffs' Exhibits 1, 2 and 3 to this
3          deposition that I want appended.
4               Thank you.  So, wrap it up Mr. Wickline.
5     **Q.    Dr. Simoni, have you ever been a**
6  **defendant in a lawsuit?**
7               MR. MEDINA:  Okay.  You're instructed not
8          to answer.  It doesn't have anything to do with
9          Spelter.
10    **Q.    Dr. Simoni, have you ever been a fact**
11  **witness in any other lawsuit?**
12              MR. MEDINA:  If it has to do with
13         Spelter, you can talk about it.
14    **Q.    Have you been a fact witness in any other**
15  **lawsuit?**
16              THE WITNESS:  Am I instructed to answer?
17              MR. MEDINA:  Have you been a fact witness
18         in any other lawsuit, you can -- you can answer
19         that.
20    A.    No.
21    **Q.    Have you been an expert witness in any**
22  **other lawsuit?**
23    A.    An expert witness?  No.
24    **Q.    Have you been an expert consultant in any**
25  **other lawsuit?**

1            MR. MEDINA:  Okay.  That's

2       non-testifying-consultant-type questions, and

3       you're not allowed to go into that.  You're

4       instructed not to answer, and the deposition's

5       over.  You're over your time, and we're

6       leaving.

7            MR. WICKLINE:  Okay.  I just have a few

8       more questions.

9            MR. MEDINA:  How many few more questions?

10           MR. WICKLINE:  Probably a handful.

11           MR. MEDINA:  Okay.  Do your handful.

12       **Q.    Have you ever been arrested or convicted**

13  **of a crime, Dr. Simoni?**

14       A.    No.

15           MR. WICKLINE:  I would like to take a

16       five-minute break and talk with my co-counsel,

17       and then we can come back on the record.

18           THE VIDEOGRAPHER:  Going off the record,

19       the time is 8:02.

20           (Whereupon, a recess was taken.)

21           THE VIDEOGRAPHER:  Back on the record,

22       the time is 8:06.

23           MR. MEDINA:  Okay.  If he wants --

24           If you want to ask him about if he's been

25       a plaintiff or a defendant in any lawsuits, he

 1              can answer that.  Given the exigencies and the

 2              hour, and the fact that we're over, I think I

 3              would like to withdraw that objection to those

 4              questions.

 5                   So, have you been a plaintiff or

 6              defendant in a lawsuit --

 7                   Or you want to ask him, Mr. Wickline?

 8         **Q.    Dr. Simoni, have you been a plaintiff in**

 9    **any other lawsuit?**

10         A.    Yes.

11         **Q.    What litigation was that?**

12         A.    The West Virginia University asbestos

13    case --

14         **Q.    Who was --**

15         A.    -- which is a class action -- which was a

16    class action.

17         **Q.    Any other litigation where you've been a**

18    **plaintiff?**

19         A.    I don't recall any other.

20         **Q.    Is there any litigation where you --**

21         A.    Oh, wait a minute.  Yes, I'm sorry.

22         **Q.    Go ahead.**

23         A.    I'm sorry.  I was a plaintiff in a -- in

24    a case questioning the appointment of President

25    Hardesty to the presidency at West Virginia

 1  University.

 2       **Q.     Okay.  Who was the --**

 3            **Who was the plaintiff's lawyer in that**

 4  **case?**

 5       A.    The plaintiff's lawyer in that case was

 6  Larry Harliss (phonetic).

 7       **Q.    And who was the plaintiff's lawyer in the**

 8  **other litigation you had against WVU?**

 9       A.    Robert Sweeney; Cleveland, Ohio.

10       **Q.    Do you know any of the defense lawyers in**

11  **those two cases?**

12       A.    I don't remember.  Well, the defense --

13  the defense firm in the -- let me --

14            MR. MEDINA:  I mean, the West Virginia

15            asbestos litigation is a matter of public

16            record.  Could you find that out yourself,

17            Mr. Wickline?

18       **Q.    Was that litigation pending in the**

19  **Circuit Court of Mon County?**

20       A.    Which case?

21       **Q.    Either case.**

22       A.    Pending now?

23       **Q.    Was it at any time pending?**

24       A.    In Mon County?  As I recall, the -- the

25  complaint against -- or the complaint concerning the

1    presidency appointment had some period of time in Mon

2    County Court, best I remember; but I don't remember

3    the details.

4           **Q.     And the asbestos --**

5           A.     But I would have to think about that a

6    lot more.

7           **Q.     And where was the asbestos litigation?**

8           A.     The asbestos litigation was in Kanawha

9    County Circuit Court.

10          **Q.     And is that a complete list of the cases**

11   **in which you were a plaintiff?**

12          A.     I think.

13          **Q.     And have you given me -- Strike that.**

14                 **And are there any cases where you were a**

15   **defendant?**

16          A.     I don't have any recollection of anything

17   like that, where I was a defendant.

18                 MR. WICKLINE:  And I take it, Mr. Medina,

19          you're standing by your instruction for --

20          preventing him from responding to my questions

21          of cases where he was a fact witness?

22                 MR. MEDINA:  No.  I thought that he -- I

23          allowed him to answer that.  But, if I didn't,

24          then I will allow him to answer that.

25          **Q.     Can you tell me what other cases other**

 1  **than the Spelter litigation where you have been a fact**
 2  **witness?**
 3          A.    Where I've actually been a fact witness?
 4  I don't recall any.
 5          **Q.    Did you actually testify at deposition or**
 6  **at trial in the case against President Hardesty, or**
 7  **the case against West Virginia University?**
 8          A.    Did I actually testify?
 9          **Q.    Yes.**
10          A.    Yes, I believe I did, as I recall.
11          **Q.    Did you give a deposition in both cases?**
12          A.    I didn't give a deposition in either --
13  in either case.  Are you saying the --
14          **Q.    Did you testify at trial in both cases?**
15          A.    I remember testifying in Kanawha County
16  Court --
17          **Q.    Okay.**
18          A.    -- in the Hardesty case.
19          **Q.    Okay.**
20          A.    But I do not remember -- I don't believe
21  there was a deposition there.
22          **Q.    Okay.**
23          A.    And, in the University case, it was class
24  actions, and I was not ever deposed.
25          **Q.    Okay.**

1          A.     And, you know, I was not a witness at
2     trial, or hearing, or anything.
3               MR. WICKLINE:  Okay.  That's all the
4          questions I have at this time.  We, of course,
5          reserve the right to redepose Mr. Simoni on the
6          areas in which you have directed him not to
7          testify, Mr. Medina; and we also reserve the
8          right to redepose Mr. Simoni on any documents
9          that may have -- may be produced that should
10         have been produced earlier.
11              MR. MEDINA:  No stipulation.
12              Miss Snead, did you have any questions?
13              MS. SNEAD:  I do not.  Thank you.
14              MR. MEDINA:  Then plaintiffs have
15         Exhibits 1, 2 and 3, as previously mentioned.
16         Thank you.
17              THE VIDEOGRAPHER:  Going off the record,
18         the time is 8:11.
19            (Deposition concluded at 8:11 p.m.)
20
21
22
23
24
25

1          AND FURTHER DEPONENT SAITH NAUGHT

2

3          _____

4                    JOSEPH A. SIMONI

5

6    STATE OF FLORIDA

7    BROWARD COUNTY

8

9          SUBSCRIBED AND SWORN to before me this

10   day of              , 2006, at Broward County,

11   Florida.

12

13

14          _____

15          Notary Public, State of Florida at Large

16          Commission No:

17          My Commission Expires:

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF FLORIDA,   )

COUNTY OF BROWARD. )

        I, SUSAN J. STERNBERG, Certificate of Merit
Reporter and Notary Public in and for the State of
Florida at Large, do hereby certify that the
foregoing testimony was taken before me; that the
witness was duly sworn by me; and that the foregoing
pages constitute a true record of the testimony
given by said witness.

        I further certify that I am not a relative or
employee or attorney or counsel of any of the
parties, or a relative or employee of such attorney
or counsel, nor financially interested in the
action.

        Under penalties of perjury, I declare that I
have read the foregoing certificate and that the
facts stated herein are true.

        Signed this 18th day of December, 2006.


        _____
        SUSAN J. STERNBERG
        Certificate of Merit Reporter
        Notary Public, State of Florida at Large
        Commission No.: DD 487304
        My commission expires: February 1, 2010

**A**

**ability** 200:3
  204:9
**able** 13:15 23:16
  45:17 120:19
  135:23 148:8
  159:5 173:23
  198:15,16
  201:8,19
  236:14 262:14
  310:20 338:5
  343:3,6 370:11
  370:15
**above-entitled**
  3:4 5:13 170:4
  315:4
**above-styled**
  71:16
**absolute** 64:22
  65:15
**absolutely**
  181:15 182:4
  258:14 349:9
**absurd** 67:1
**accept** 133:23
**access** 54:2
  235:7 329:25
  330:13,15
  349:4 351:4,12
  352:2,7
**accessing** 330:3
**accommodate**
  65:2 262:17
  310:21 312:15
**accommodating**
  377:7
**accommodation**
  21:9 312:10
  379:14,17
**account** 226:6
  241:5 363:25
**accounts** 52:9
  52:11,13,18

**accurate** 17:13
  27:24 45:20
  49:3 107:25
  128:18 190:22
  221:15 243:4
  245:10 246:7
**accurately**
  108:4
**accused** 116:19
**ACE** 113:22
  114:4
**achieved** 172:17
**acid** 318:22
**acknowledge**
  24:4,10
**acquisition** 70:3
**acres** 76:7,21
  77:4 126:15
  132:6 140:5
  142:25 143:8,9
  143:12,16
**acronyms** 114:1
**act** 64:22
**action** 1:4,11,17
  21:25 22:5
  116:21 168:5
  168:13,19
  188:7,15 203:3
  213:9 313:3,8
  313:12 321:8
  323:10 324:19
  365:5 384:15
  384:16 390:16
**actions** 71:17
  387:24
**activist** 154:8
  155:2,4,15
  156:22 157:9
  158:5,24
  160:21,23
  161:9,11
  162:25 165:20
  171:25 184:6

**361:15
**activities** 6:23
  7:2,6 22:7
  29:7 64:11
  66:5,6 125:21
  161:15 162:22
  164:3,4 165:24
  166:15 191:13
  328:10 361:15
**activity** 11:5
  19:8 21:12,13
  22:5
**acts** 65:15
**actual** 7:24
  83:24,25 143:1
  207:2 308:12
  334:23
**adapted** 91:23
**add** 29:1 41:14
  47:1 183:23
  296:24 297:12
  298:21
**addition** 6:2,3
  6:10 14:8 18:8
  18:25 100:18
**additional**
  188:21
**address** 9:14
  19:10 98:4
  182:18 251:14
  262:17 374:12
**addressing**
  19:11
**administration**
  100:24 106:2
  117:15
**administratio...**
  116:5,23
**administrative**
  100:17 113:3
**administrators**
  93:5 94:1,8
  116:15

**adults** 189:5
  206:11
**advance** 60:22
  335:20
**advice** 92:11
  256:19 296:20
  301:7
**advise** 180:7
  245:23 246:3
  256:5 296:24
**advised** 366:24
**advising** 138:9
**advocate** 37:17
  37:18 39:6,7
  39:23 40:4
**affiliated** 114:6
**afield** 11:3
  88:15 117:3
**afternoon** 164:9
  183:15 189:21
  205:17
**age** 3:2 87:21
  170:2 315:2
**agencies** 79:21
  156:9 199:3,20
  199:21 200:17
**agency** 226:16
  253:11
**agenda** 206:4,8
**ages** 237:19,21
  237:22
**aggressive**
  201:9,21
  203:21
**ago** 25:18 32:24
  49:15 79:5
  117:6 129:2
  143:22 152:20
  254:2 275:13
**agree** 23:3,10
  46:24 109:22
  114:9 118:14
  118:15,16,25

**140:11 155:3
  187:22 234:24
  261:13,25
  286:3 295:16
  322:15 347:7
**agreed** 140:17
  187:23 203:20
  326:19 372:11
  380:8
**agreeing** 203:24
  310:11
**agreement**
  42:14 141:1
  241:2 243:23
  312:11 381:25
**agreements**
  241:3 243:14
  243:21 244:1
**agricultural**
  245:16
**ahead** 31:19
  67:20 88:16
  147:19 151:16
  156:15 202:2
  263:1 265:20
  304:25 329:20
  332:7 340:20
  341:9 343:23
  357:10 368:7
  384:22
**air** 281:8,12,23
  283:10 284:9
  311:20,22
**Ajax** 319:6
**al** 1:3,6,13,18
  2:15,18 168:3
  168:7,15,20
  169:19,22
  313:2,4,9,14
  314:14,17
**Alabama** 54:14
**Alan** 257:20
  328:15 353:7

**Albert** 86:21
  87:11,13,14
**alleged** 71:6
**alleging** 112:21
**ALLEN** 2:14
  169:18 314:13
**Allison** 330:22
  331:1
**allow** 17:6 21:3
  21:7 29:6
  58:15 66:14
  79:18 88:16
  101:23 117:7
  148:13 149:3
  152:12 261:18
  286:19 289:11
  295:4 303:25
  304:21 316:12
  316:23 320:19
  368:17 380:8
  386:24
**allowed** 6:21
  17:14,15,21
  18:6 19:16
  20:17 25:7
  59:25 82:10
  148:21 149:10
  150:22 160:16
  271:1 312:12
  316:11 325:15
  325:16 329:19
  334:17 345:21
  346:12 357:7
  370:3 371:1
  374:8 377:22
  379:3,17 381:3
  383:3 386:23
**allowing** 15:12
  67:4 288:14
  290:16 324:5
  337:17
**American** 92:13
**amiss** 166:22

**amorphous**
  79:14
**amount** 79:20
  312:2
**Amter** 328:16
**analyzed** 255:8
  350:5 363:1
**Andrew** 353:12
**and/or** 152:22
  182:23
**Anita** 124:24,25
  125:24,25,25
  134:13,22
  135:2,25 137:6
  137:12 139:17
  139:19,22
  140:4,8,8,20
  140:23 141:11
  175:19 182:12
  193:18 211:22
  232:8,11,15
  233:17 234:2
  321:21,24
**announcements**
  5:15
**answer** 11:2,6,9
  11:15,24 15:1
  18:6 19:21
  22:8 23:1
  24:18 31:19,19
  33:3 34:4,15
  35:19 36:11
  37:25 38:10
  39:3,13 40:1
  42:16 43:25
  44:6,15,18,22
  45:9,17,22
  46:4,8 51:25
  52:1 54:20
  55:24 56:14
  58:14,15,16
  59:19 60:25
  63:3,10,17,18

64:15 65:5
66:10 68:5,11
70:7 73:21,25
74:11 84:4
85:18 88:11
90:16,21,22
92:16 95:8,22
96:24 97:8,11
97:16 101:24
102:16 104:11
117:7 118:20
119:2 123:23
125:4 137:19
147:20,21,23
148:12,17,19
149:2,9,18,19
154:11,24
155:11,12,20
155:24 156:5
156:11 158:8
158:10 159:6
161:19 165:15
166:23 172:2,9
172:13,15,19
173:15,20
174:20 184:16
186:13 189:3
189:17,17
192:7 196:9
200:25 222:18
223:7 235:21
237:13 251:18
262:2,12,14
264:14 265:20
280:6,10 281:1
283:18 285:16
286:12,18,20
287:18,19
288:3,9,11,16
288:21 290:11
290:13,19,24
291:1,17,24
293:4,20

294:24 295:4
295:18 299:12
299:18,20,25
300:3,7 301:18
301:20 303:25
304:22 316:25
323:17 327:9
327:20 328:17
328:24 329:9
329:10 334:21
335:22 338:6
338:10 339:2
339:10 340:20
341:1,9 343:23
347:16,17
348:1,7,9,11
348:11 349:1
349:17,19
357:11 359:3,4
359:25 360:2,3
360:7,22
362:21 364:6
364:12,19
365:8,13
367:12,17,20
369:14 370:3,4
370:11 371:10
371:15 373:1
376:15,18
377:22 378:6
378:21 379:3,7
381:3,15,20
382:8,16,18
383:4 384:1
386:23,24
**answered** 73:9
202:20 274:9
280:5 307:13
307:14 339:18
339:20
**answering**
26:13 27:3
44:20 77:15

92:11 156:24
261:23 273:13
370:22
**answers** 39:20
185:13 261:14
265:12
**Anthony** 71:3
324:15,16,24
325:3
**anthropologist**
84:10,12
**anthropology**
84:2,7,14
111:7,11,16,21
111:24
**anticipate**
310:11,18
**anybody** 54:24
189:13 206:21
208:13 222:10
225:17 243:25
248:6 256:21
261:11 273:25
**anybody's** 309:6
**anymore** 46:17
52:16
**anyway** 228:3
245:16
**AOL** 52:11
**apart** 15:11
63:12,16
**apologize** 45:21
146:8 289:23
368:9
**apparent**
118:22
**apparently** 87:6
135:4 184:18
277:6
**appear** 34:21
128:16
**appearances** 2:1
4:11 169:5

314:3
**appeared**
  140:21
**appearing** 2:4,7
  2:11,15,18
  5:17 169:8,11
  169:15,19,22
  314:5,8,11,14
  314:16
**appears** 224:3
  224:11,24
  238:16 303:19
  310:1 319:3
  321:22
**append** 88:15
**appended** 382:3
**application**
  92:13
**appointed** 106:6
**appointing** 60:9
**appointment**
  317:4 384:24
  386:1
**appointments**
  111:20
**appraisal** 97:25
**appreciate**
  12:15 68:23
  151:17
**appreciated**
  308:14
**apprehension**
  228:6
**approach** 84:13
  224:25
**approaching**
  21:6 87:20
**appropriate**
  65:21 159:5
  250:12 274:11
  302:1 303:1
  340:23 342:5
**appropriately**

275:6 302:2,15
**approximate**
  130:1 237:19
  237:21
**approximately**
  6:14 34:24
  51:10 135:21
  179:10 192:17
  238:25 239:3
  240:18
**April** 178:15,20
  179:1,9 190:14
  190:21 196:21
  210:8,11 218:2
  219:18,21
  221:7,17
  224:15 226:11
  226:22 230:19
  230:24 231:10
  231:17,18,18
  231:21,23
  234:21,21
  235:1 238:16
  240:7 244:20
  248:24 253:9
  268:1 278:6,10
  278:25 279:19
  280:3 306:5,6
  327:1 332:17
  379:22
**area** 10:17 11:5
  11:11 33:10
  34:7 42:18
  45:16 47:15
  59:1,5 75:21
  76:3 83:17
  132:19 134:3
  139:6 172:6
  198:18,18
  204:2 209:7
  264:4,5 267:7
  280:9 325:17
  326:9 340:9,14

340:23 341:2,4
  341:5,8 342:4
  342:5,8,9
  343:1,17
  350:23 351:21
  360:17 363:19
  375:13 376:5
  377:18
**areas** 11:7 21:6
  25:7 261:17
  337:6,8 344:16
  344:19 364:8
  371:19 388:6
**argue** 262:15
**argument** 65:1
  65:3
**arguments** 90:9
**arising** 23:18
**arose** 296:12
**arrested** 383:12
**arrows** 310:3
**arsenic** 10:25
  15:5 226:17
  252:13,19
  253:12 255:22
  300:8
**article** 3:17,18
  3:22,22 86:11
  86:13 88:5
  89:6 90:20,21
  90:23 92:3,7,9
  92:22,25 94:4
  94:5 106:19
  108:3,10 110:4
  111:1 115:10
  116:3,8,16,17
  116:24 117:1
  117:11,11,18
  118:11 127:3
  128:16,21,22
  129:10,12,14
  315:23,24
**articles** 85:3,7

85:14,19,21
  86:2 90:15
  129:15
**articulate** 261:8
**articulated**
  327:14
**arts** 81:6
**asbestos** 37:13
  37:20 38:21,23
  39:16,23 40:4
  148:1 153:18
  186:1,20 187:2
  202:14,17
  384:12 385:15
  386:4,7,8
**asked** 14:20
  18:3 27:18,18
  45:25 48:23
  49:1 58:9 96:6
  105:16 111:10
  127:24 128:3
  133:22 134:7
  136:5 139:1,19
  144:13 146:10
  148:5 161:17
  161:19 171:6
  173:9,11
  184:21,22,23
  205:1 208:20
  208:24 213:6
  232:8 239:18
  244:25 245:12
  246:1 249:12
  249:14 252:21
  255:12,16
  258:24 262:7
  262:11 272:2
  272:23,24
  274:22 279:23
  280:2,5,5
  297:6 331:22
  331:25 338:16
  338:21,22

339:12,17,22
  339:22 340:4
  360:11 361:18
  367:13
**asking** 12:17
  22:13 23:11
  24:4,22 25:1
  26:10 31:22
  34:14 36:5,9
  38:1,6,7,13,16
  39:13 41:20
  42:25 43:5,7,9
  44:21 50:6
  52:1 55:21
  56:2,12 59:15
  62:21 72:10,11
  73:6,7 89:11
  89:13 95:20
  96:17 103:23
  108:9 117:19
  123:18 125:11
  128:2 131:22
  144:16 146:9
  146:25 147:12
  147:13,15,18
  154:17 156:18
  159:8 161:14
  163:3 171:14
  189:14 199:5
  201:24 208:13
  217:12 222:14
  229:13 237:11
  251:7 259:5
  264:11 272:6
  283:23 284:1,2
  289:8 290:25
  299:16 300:6
  311:8 312:6
  321:13 322:17
  323:8 324:14
  325:3 327:17
  331:12,18,20
  337:12,19

338:16,24
339:6 342:15
342:21 344:4,8
345:3,12
348:23 354:3,9
360:9,16
362:17 369:25
372:15 378:2
**aspect** 69:19
71:14
**aspects** 65:19
**asserted** 71:16
**assist** 184:5,7
**assisted** 184:9
329:24 351:3
**assisting** 341:3
345:11
**associate** 111:7
**associated** 252:1
260:22
**Association**
114:2,3
**assume** 139:25
323:24 344:14
360:15
**assumed** 140:1
**assuming** 179:1
305:13 336:18
**assumption**
107:7 362:11
**assure** 261:9
**Athenaeum**
3:18 116:3,11
**ATSDR** 354:24
355:13 356:5
356:12,12,14
356:22 357:21
358:3,4
**attached** 61:15
378:24
**attempt** 225:7
305:2
**attempting**

118:2 277:11
**attend** 80:22
81:12 182:19
193:18 305:21
305:25 325:20
354:20
**attendance**
183:19 196:4
238:23 239:2,6
253:8 274:7
289:16
**attended** 80:15
183:25 189:11
195:7 197:6
230:23 244:9
248:23 278:6
278:10,16
287:23 288:2,7
288:18,24
290:10,21
291:14 306:8
374:1,25
**attending**
193:22 196:19
268:5 283:5
287:24 288:1
**attention** 140:6
220:12
**attorney** 28:19
33:20 41:4
197:2 294:5
322:21 390:13
390:14
**attorneys** 48:18
273:20 321:7
343:20
**attract** 241:3
**attributed**
117:11 321:21
**audible** 24:14
69:11 317:12
**August** 8:3 9:21
74:5 77:25

100:12 267:3
**auto** 325:7
**available** 29:2
29:10,18 64:25
65:2,5
**Avenue** 10:1,1
**aware** 10:23
11:17 21:24
22:14 26:19
53:25 55:6
71:12 106:8,11
108:23,25
126:9,17
148:24 149:14
151:3 165:24
202:9 217:10
217:12,15
251:4 253:1,16
280:17,19,21
325:23 330:16
346:4 354:24
355:10,15,19
362:14
**awareness** 22:3
22:4 126:16
129:19
**a.m** 1:22 4:3
168:24 313:18

—————
**B**
**B** 122:22
**BA** 81:5
**Bachelor** 81:6
**back** 14:3 40:19
43:1 45:4,15
50:2 57:13
67:25 68:24
74:1,3 83:6
99:16 101:17
108:23 109:14
111:14,14
112:3 113:6
119:15 120:6
126:12 130:7

151:25 152:19
153:15,22
155:18 157:25
161:2 171:2
177:19 179:20
180:20 185:10
190:18 216:23
217:6,13,16
218:18 219:6
220:1,3,10
228:20 229:14
230:1,3,6,12
232:12,12
233:18,21,25
246:11 252:10
261:3,7 267:21
271:3 286:24
290:4 292:1
294:8,17
296:10 297:11
297:20,23,24
298:7,8 299:14
303:2 311:14
316:2 319:4
340:11 352:15
352:16 355:4
358:1 362:18
362:24 363:24
364:15 366:11
369:8 383:17
383:21
**background**
10:24 11:18
84:18 245:6
376:2
**bad** 66:22 76:6
**badgered** 66:23
**bag** 250:2,7,9
**baggie** 250:6,20
**balance** 324:8
**Ball** 86:14
**ballpark** 220:23
358:10,18,22

359:9
**bar** 30:20,22,24
64:22 65:16
95:3,4
**Barbara** 181:15
181:16
**barely** 12:23,24
12:25
**baseball** 189:19
189:19,21
190:4 206:16
206:17,19,23
207:23
**based** 133:7,13
133:15 251:9
295:1 304:22
357:13
**basically** 18:23
362:10
**basis** 298:25
379:10
**basketball**
207:16,19,23
208:7
**Becky** 118:4,5
**becoming**
119:25 120:15
126:17 157:16
158:24
**bed** 67:19
**Bedell** 1:5,12,17
60:9 65:14
168:6,14,19
313:4,8,13
**Beezel** 71:3,5
324:15,16,23
324:24 325:8,9
325:11,14,18
325:20
**began** 109:3,5
205:22,23
206:1
**beginning** 5:15

23:20 30:6
31:5 33:16,24
48:2 50:11
75:5 150:10
**begins** 240:9
**behalf** 2:4,7,11
2:15,18 4:12
4:15,17 5:5,6,8
5:18,19 28:16
169:8,11,15,19
169:22 298:17
314:5,8,11,14
314:16 328:11
**belief** 147:17
292:15 373:3
376:9
**believe** 4:19
14:20 22:6
31:4 35:6,10
35:10 37:6,10
39:25 40:25
43:1,12 45:24
56:21 61:19,19
61:21 72:11
73:24 81:14
102:24 108:3
121:13 135:12
148:20 162:4
162:17 172:22
172:23 181:5
182:21,22
192:25 194:20
195:16,22,23
225:17 230:16
230:25 240:23
241:1 245:9,9
253:4,6 256:22
262:11 279:20
292:13,21
296:2 307:14
323:11 330:22
332:18 335:15
338:5 339:20

341:24 348:1
348:13 376:3
377:11 387:10
387:20
**believes** 19:24
293:5
**belt** 318:17,20
**Ben** 328:16
353:14,15
**Bend** 80:20
**benefit** 165:9,12
165:16
**Benny** 305:5,15
305:19,21
306:13 307:2,5
307:21 309:2
317:19
**best** 15:19,23
19:23 20:12
26:15 41:1,25
51:8 52:12
57:20 74:24
77:17 83:21
99:18 102:7
105:4 119:4
120:5,8,9,10
123:20 126:1,1
126:5 127:6
129:15,16
130:4 134:12
134:14 135:18
136:3 137:3
139:11 144:18
145:24 147:23
150:9,13,18
152:18 157:4
159:12,21
161:23 162:24
175:3 180:1
182:16 190:17
191:4,13
193:15 194:19
194:22 195:11

195:22 196:22
197:11,18
200:4,15
205:19 211:4
211:12,12
212:15,22
213:11 226:19
230:16 234:1
235:24 237:8
243:21 246:22
248:25 256:3
264:24 267:19
277:4 297:7
306:9 308:22
317:18 319:9
322:18 329:3
332:14 336:9
343:14 348:21
361:10 370:10
373:2 375:10
375:25 376:3
386:2
**better** 13:4
118:17 155:10
156:8 178:11
218:14,23,24
218:25 219:11
219:15 226:10
228:3 264:22
296:25 305:3
308:8,12,25
**beyond** 229:4
237:9 331:14
368:22
**big** 136:18 319:9
**bigger** 212:10
212:11 214:3
**binder** 318:5,8,9
**bins** 318:9,10,11
**birth** 7:13
**bit** 76:16 78:2
124:5 163:22
240:14 242:23

311:12 312:14
372:21
**blocking** 121:4
233:2 332:25
**blood** 362:14,23
363:1,6 365:14
365:17,19
366:3,14 367:9
367:14
**blue** 26:25
**board** 3:23
109:13,16,17
109:18,23
112:5,6 218:13
218:22 219:10
219:14 315:25
358:17
**border** 118:24
**born** 80:10,12
**bottle** 287:8
**bought** 301:16
**bouncing**
207:16
**boys** 238:8,9
**Bradshaw** 71:5
326:12,14
**break** 44:23
51:17 67:21
68:13,13 101:4
101:5 167:1
172:13 216:15
240:13 260:24
264:9,12,14
267:13 312:17
368:13,17,20
368:25 383:16
**breaks** 68:3,8
264:16
**Brian** 2:17 4:14
169:21 314:16
**Bridgeport** 9:6
**brief** 294:8
340:15 368:25

**briefly** 70:19
**bring** 166:10,10
333:17
**briquettes**
318:15,16
**briquette-ma...**
318:16
**broader** 295:2
**broken** 310:2
**brother-in-law**
233:12
**brought** 297:18
**Broward** 3:21
60:12 315:21
378:16,24
389:7,10 390:4
**Brown** 135:9,10
135:12 137:1
137:14 139:8
140:11,25
141:14 143:18
173:7 175:7,15
175:19 176:20
182:3,23 193:9
211:18 328:3,9
328:14 350:8,9
350:10,17,20
350:22 351:2,6
351:9,16,20
352:12,14
369:17,23
371:11
**Bud** 181:15
**build** 90:4
**bunch** 200:7
316:25
**business** 109:18
196:10,14,24
279:19 325:19
325:25 381:6
381:14
**businesses**
381:12

## C

C 122:22 123:1
123:8,9 135:13
135:15 390:1,1
cadmium
226:17 252:12
252:19 253:11
255:23
calendar 130:7
130:7
California
15:16
call 42:10
116:14 135:2
163:25 173:3,6
175:7,9,14
176:2 228:1
256:14 318:14
322:8 361:11
called 26:3
84:20 127:23
139:15 140:4,7
297:5 318:5,12
322:5 379:12
calling 26:4
138:24 139:17
140:10 265:1
323:17
calls 173:6
175:19
calluses 91:3
cancer 280:18
280:20,22
candidacy 110:3
capacity 24:16
25:3 28:17
347:19
card 196:11,14
196:24
cards 279:19
care 92:14 93:5
93:25 94:7
career 57:4

carefully 65:20
Carolina 9:10
Carolyn 71:2
323:19,20
case 4:18,21,21
4:23 16:21
18:18 24:20
26:1 39:18
60:11 63:1
65:19 66:16,18
89:21 90:4,10
97:2 102:22
114:15 115:2
115:19,20
150:3 187:9
202:17 210:15
215:7 219:1
224:25 225:9,9
242:13,13
243:24 260:6
261:10 267:16
268:18 269:16
278:5 280:15
291:23 294:2
295:22 298:21
299:11 303:2
309:10 321:3
324:9 354:12
371:13 377:1,5
377:13 381:24
384:13,24
385:4,5,20,21
387:6,7,13,18
387:23
cases 23:17 24:1
24:7,8,21
36:15 42:6
186:16 188:3
311:5 385:11
386:10,14,21
386:25 387:11
387:14
categories 72:20

73:20 74:7
310:2
category 310:6
caught 140:6
cause 3:4 5:13
170:4 315:4
caused 186:3,8
187:3 248:8
Causeway 3:8
4:4 170:8
315:8
caveat 67:12
189:17 206:16
316:17
central 75:21
century 91:11
certain 10:24
91:22 160:20
161:8 162:20
175:1 223:11
255:17,20
certainly 65:20
93:9 94:10
225:18 269:24
275:22 286:2
295:15 302:2
302:20 321:10
certificate 3:5
170:5 315:5
390:5,18,22
certify 390:7,12
chair 94:20,22
chairperson
100:23
chance 219:6
221:13
change 87:15,17
119:11 364:19
changed 86:20
changing
143:24
channels 117:20
Chapel 9:9

69:19
characterizati...
155:4 224:4,12
238:17 240:7
243:7 244:19
269:12 347:8
374:22
characterize
137:8 141:4,8
142:6 155:6
259:20 260:5
chargeable
311:23
Charles 353:20
353:21
Charleston 9:8
check 27:24
29:3,12,14
54:1,4 78:20
79:6 277:22
303:24
checked 255:12
chemicals 226:8
Cherry 54:13
chief 276:6,11
276:12,24
child 9:5
children 8:21,25
9:2 134:7
148:13,21
149:3,10 189:6
189:20 206:11
226:22 227:2,3
227:14 228:5
228:22 229:2
229:16,23
234:10 235:6
235:20 236:25
237:1,3,4,5,9
237:14 238:2,6
354:25 355:13
356:8 357:22
Chile 100:1,4

choice 261:24
choices 108:17
chose 357:21
Circuit 1:1
60:11 168:1
313:1 385:19
386:9
circulate 274:1
circulated
272:16,20,21
273:4,5,12,23
274:14,23
277:15
circulation
274:15
City 9:22 10:2,3
civil 1:4,11,17
64:22 66:20
71:16 168:5,13
168:19 313:3,8
313:12
claiming 374:18
claims 71:14
226:15
clarifi 152:10
clarified 25:6
clarify 4:19 5:17
14:5,10 34:18
43:23 65:13
104:13 111:19
150:7
clarifying 32:10
clarity 285:23
Clark 328:15
353:10,11
Clarksburg
56:7 239:9
297:4
class 321:8
323:10 324:18
324:19 363:19
365:5 384:15
384:16 387:23

classes 14:25
  64:3
classroom
  164:11,14
  166:10,11
clean 78:2
cleaned 74:8,23
cleaning 279:5
clear 38:1 39:12
  49:22 60:19
  72:8 112:18
  114:12,18
  115:20 130:4
  160:9 179:12
  197:22 199:12
  216:6,9 251:22
  284:5 285:20
  327:12,16
  347:21
clearly 153:23
  161:18 272:3
  280:14 365:6
Cleveland 385:9
clock 163:2,8,11
  163:19,21
  164:6,15
close 158:15
  159:4,18
  176:22 180:8,9
  208:1,3 210:15
  234:7,12,15
  322:7 368:10
  368:14,15
closer 306:18
clothes 227:19
clue 249:3
coaching 346:21
  346:23
coal 318:4
Cochran 54:13
  54:24,25 55:3
cold 231:9
  234:25

collaborated
  48:3
collaboration
  47:5,22
colleague
  330:20
colleagues 166:3
collect 83:10
  336:19
collected 64:17
  233:20 271:23
  319:9
collection 148:8
collectively 24:9
college 99:3,6,9
  99:11,15
  245:16
colloquy 262:18
Columbia 99:12
combined 318:4
  318:11
come 6:19 10:14
  34:25 41:2
  60:16 126:23
  186:12,14
  188:17 198:17
  198:17,18,19
  199:1,18
  200:12,17
  204:1,13
  206:22 213:17
  217:16 243:1
  285:16 294:8
  321:12 362:12
  383:17
comes 27:9 88:2
come-with-th...
  100:22
comfortable
  65:21
coming 199:3,21
  207:11,13
  286:21 319:4

375:13,20,22
comma 113:22
  372:13
comment 247:8
  248:6 372:13
commentator
  94:23
comments 92:24
  118:24 132:12
  132:13 133:7
  133:14,16,16
  133:24 142:12
  243:9,10
  306:13 321:20
  344:1
commission
  358:8,12,21
  359:8 389:16
  389:17 390:23
  390:23
commissioner
  60:9 65:14
committed
  302:12
committee
  100:20,21
  110:25
common 109:18
  233:18
commun 354:2
communicate
  38:8 49:18
  52:6,21 139:7
  348:10,17
  370:1 371:6
communicated
  51:11 144:3
  239:20 267:14
  340:24 343:11
  348:6 349:11
  349:12,13
  350:21 369:19
  369:25 370:2,8

370:9 371:3,16
  371:21,25
communicating
  252:22
communication
  77:11 134:20
  136:4,22
  137:13 138:2
  138:22 142:5
  142:10 150:15
  153:15 215:21
  241:24 242:1
  266:19,22,25
  267:12 268:14
  268:15 272:4
  276:10 293:17
  296:12 323:12
  325:3,12
  335:19 343:13
  351:11,24
  352:5,8 354:14
  354:18 355:18
  368:2 369:15
  369:16 371:17
communicatio...
  17:9 50:15,25
  51:5 59:1
  69:15 141:21
  216:4,10,10
  233:24 252:18
  252:20 253:21
  276:23 325:13
  343:10 344:10
  344:15 350:19
  352:23 354:4
  354:15 362:3
  370:20
communities
  69:17 70:16
  100:5 155:22
  156:23 157:10
  158:5,17
  165:17 166:4,5

166:8 186:24
  188:23 204:8
  204:19 227:2
  331:4
community
  39:14,15 91:24
  118:3 125:1,5
  125:7,13,21
  129:4 130:18
  130:21,25
  131:3,14,17
  135:6 139:1,4
  139:23,24
  154:9 155:2,16
  155:19,23
  156:5 158:15
  158:16 160:21
  160:23 161:9
  161:12 163:1,6
  163:9,17,25
  165:6,20,24
  166:16,21
  171:25 172:5
  172:21 173:13
  173:20 178:8
  179:8 180:16
  183:2 186:22
  187:16,18
  190:3,7,13
  191:2 200:5,16
  203:12 204:21
  218:1 220:16
  220:24 221:2
  226:23 227:4
  228:6,23,23
  229:6,10
  237:25 245:11
  246:1 248:9,18
  249:13 267:8
  279:5 281:5,6
  302:6 305:23
  354:21,25
  355:14 361:15

361:23 363:5
375:12 379:20
**companies**
381:12,14
**company** 1:6,13
1:18 2:12,15
2:18 106:23
168:7,15,20
169:16,19,22
217:2,3,7,11
217:17,23
313:4,9,14
314:12,14,17
**company-own...**
217:4,5
**comparisons**
85:22
**compensation**
188:1
**complaint** 37:2
385:25,25
**complete** 84:17
386:10
**completely**
107:12 118:21
**completion**
360:6
**comply** 271:14
**con** 140:5
**conceding**
376:16
**concern** 137:6
137:10,11
138:7,16 139:4
140:24 141:2
158:9,12,18
159:3 173:10
209:14,20,20
209:22 226:21
227:2,3,8
228:7,22 229:4
230:13 253:10
276:21 379:23

**concerned**
114:3,3 137:17
137:18 158:20
165:2 185:15
198:22 204:3
209:7 237:9
**concerning** 6:1
6:8,16,22
16:24 17:7
20:18 55:25
58:24 59:8
69:3 78:15
125:2,21 133:7
152:23 159:24
160:3 165:8
178:20 267:17
327:4 352:12
354:22 358:9
358:17,21
359:8 385:25
**concerns** 129:19
137:14,20,21
137:22 138:3
204:9 217:22
220:14,21,22
222:10,22
223:1,2,13
229:5,9
**conclude** 142:2
255:21 256:2
**concluded**
241:12,19
388:19
**concludes**
241:21
**conclusion**
188:5,13
**concur** 295:15
**conditions**
250:11
**conduct** 28:2
**conducted**
164:3

**conducting**
372:23
**conference**
25:17 94:13,19
95:2
**conferences**
349:15,20,21
**conferred** 82:13
**confidence**
179:17 181:22
182:11
**confident** 78:16
**confidential**
16:13 46:17
282:25 289:9
295:3
**confidentiality**
16:22 46:18
261:16 347:6
**confirm** 338:13
**conflict** 110:23
111:4
**confuse** 25:19
**confused** 25:18
111:25
**confusing**
350:25
**confusion** 45:21
46:10 293:1
375:5
**conjunction**
86:14
**connected**
274:24
**Connecticut**
80:12
**connection** 16:1
17:2 57:10,13
70:11 76:3
105:10 165:20
263:21 269:5
291:22 298:20
299:10,17

**conscious** 357:1
357:17 363:10
363:17 366:22
**consciously**
357:9
**consent** 337:7
338:14 339:7
339:13,23
340:2,6
**consents** 337:24
338:7 369:12
369:22
**consequence**
173:5 269:3
**consider** 95:20
96:18 97:3
285:25 322:3
**considered** 86:5
205:5 235:8
375:19
**considering**
372:10
**considers** 322:2
**constituents**
145:13,21
**constitute**
261:15 390:10
**constituting**
295:2
**consult** 65:22
294:6 311:9
**consultant** 5:20
6:4,11 11:10
15:21,25 17:17
17:25 18:2,5
19:5 20:1,4,20
24:24 25:11
26:23 27:1
28:4 32:23
34:12 43:9,13
64:9 65:23
66:1 79:17,24
125:23 150:24

157:11,16
158:6,24 218:8
266:4 267:9
280:24 316:19
320:23 327:7
327:17 328:19
359:24,25
361:16 367:7,8
370:17,24
371:12 374:10
379:13 382:24
**consultants** 32:4
**consultant's**
15:9 346:25
376:21
**consulted** 56:7
**consulting** 5:23
6:2,9,13,17,23
7:2,6 11:13
14:12 15:5,11
16:13,25 17:17
19:1,3 21:12
21:13 22:5,7
22:20,23 29:7
30:5 33:15,17
33:18 35:14,22
40:16 42:10,12
42:13 43:6,19
44:5,13 45:12
45:13 46:12,20
46:22 47:9,14
47:24 53:4,5
54:5,19 55:1
55:17 56:10
59:24 63:6,13
63:16,20 64:12
64:17,23 65:10
66:7 67:9 69:7
70:5,11 72:2,3
73:2,17 75:4,6
75:17 79:2,19
96:1,14 97:7
102:14,19

103:3,11,13,18
103:25 104:15
105:7 125:6,10
125:13 149:20
150:5,10 157:5
157:21 160:17
160:24 161:12
161:16,25
171:12 180:10
251:9,13 252:2
252:6 259:7,9
259:15 270:19
282:3,12,13
283:6 285:1,4
286:17 288:3
293:18 295:3,8
303:21 316:9
316:13 320:18
324:4,6 326:22
326:24 328:10
334:23,24
347:19 354:12
355:6 359:2,4
359:11 360:5
361:6 362:2,21
365:7,25
366:21 367:22
376:11
**consuming**
101:8
**contact** 49:12,16
49:24 50:1,4
50:20 51:2,7
52:23 53:15,16
75:25 130:13
196:18 204:13
217:25 267:5
274:8 288:7
290:9 324:13
341:14,17,20
343:1 358:14
**contacted** 41:9
49:8 50:21,21

151:12 152:4
152:22 182:23
205:8 218:7
365:10
**contacting**
28:15 117:21
268:24
**contacts** 26:25
152:15 218:5
**contained** 146:5
146:19 147:8
**contained**
274:18 348:18
**container** 250:3
**contaminants**
254:13,25
**contaminated**
3:21 208:19
209:7 254:9,10
315:20 323:15
378:16,24
**contamination**
71:6 76:7,15
76:22 77:4
126:15,18
132:6 140:5,12
140:13 141:15
142:25 143:8,9
143:12,16
144:5 172:7
184:18 187:5
220:14,21,23
229:5,10
230:14 248:8
253:21 254:4
379:24
**contemplated**
165:7
**contemporan...**
251:8
**contending**
110:23
**content** 297:14

**contentious**
106:3
**contents** 88:18
**context** 110:17
143:1 282:20
304:1
**continuation**
310:22
**continue** 44:21
117:8 241:11
241:14,15,16
286:6 311:16
**continued**
100:11 167:7
312:21
**continues**
281:19
**continuing** 5:25
6:14
**contracts**
111:20
**contractual**
166:14
**control** 65:17
340:9,13,23
341:4,6 342:4
342:5,8,9
343:17 347:5
**controlled** 347:6
**cont'd** 3:14,15
170:14 171:22
315:14 316:4
**convenience**
347:23
**conversation**
25:24 26:8
27:10 28:8
45:7 129:20,23
130:15 134:16
135:24 137:2
138:1 139:10
139:13 140:21
143:23 162:1

174:2 175:20
176:21 177:2,3
177:10,12,21
229:22 252:11
267:10 268:11
294:25 328:6
334:19 351:25
352:4 367:22
367:25
**conversations**
63:4 135:20
138:8,9 159:24
160:5,13
176:19 253:2
259:6,14
262:23 288:14
290:17 323:19
323:23 326:2
327:23 328:9
328:18,23,25
329:5,11,21
331:15 334:18
350:7,19
351:15,18
352:9,11 353:1
362:3 367:18
372:22
**conveyed**
137:12 138:4
225:2 296:7
**convicted**
383:12
**cooking** 287:13
**Cooper** 9:21
10:2,3
**cooperate** 102:7
**cooperated** 29:9
**cooperative**
100:6
**copies** 78:17
**copy** 60:23
127:16,25
128:1,6,9,12

341:11 352:18
**core** 350:3
**corner** 122:21
123:11
**Corps** 99:16,16
99:23 155:22
**correct** 4:24
17:11 20:7
22:19 29:21
30:23 41:12,22
42:21,22 44:14
53:13,19 57:18
57:19 58:8
59:6 69:5
71:21,22 72:12
75:7 95:17
100:9 109:1
110:25 112:24
113:24 117:18
122:3,18 123:3
129:21 133:21
139:15 141:3
150:12 151:7
157:12 158:7
159:20 162:23
175:2,15
179:10,11,12
181:19 189:17
196:1,5 202:15
204:5,12 205:9
208:22 225:12
225:19 229:19
230:4,15,16,19
230:24,25
231:13 235:19
235:23 236:2
236:17 239:4
240:11 243:7
244:9 247:2
253:17 254:10
258:12,13,14
263:15,20
264:18 265:7

267:18,20
268:2,6,9,10
268:13 269:7
270:24 321:21
327:25 328:20
339:16,19
357:23 360:22
373:4,8,23,24
374:23 380:21
**correctly** 42:3
59:3 69:22
122:9 177:3,11
227:9 263:9
309:11 372:14
**counsel** 19:13
26:25 27:13,17
30:9 31:2,8,23
33:5,9 34:6,20
59:12,16 63:4
68:6 78:5,23
80:4 92:11
101:22 102:2
102:10 103:18
103:19 104:15
105:7,15
147:14 172:16
180:7 251:16
259:6,9 290:15
333:7 340:19
381:25 390:13
390:15
**counseled**
261:11
**counting** 177:2
191:1
**county** 1:1 3:21
60:12 69:17
70:15 168:1
296:21 300:21
300:25 313:1
315:21 335:20
358:8,11,15,17
358:21 359:8

378:16,24
381:16 385:19
385:24 386:2,9
387:15 389:7
389:10 390:4
**couple** 14:6
25:17 112:13
175:11 176:1
187:19 211:25
232:15,16
290:4
**course** 6:20
21:17 72:16
102:3 188:7,15
203:2 213:9
234:3 249:23
269:18 270:18
343:5 372:12
388:4
**court** 1:1 4:7
12:4,6 51:22
60:11 61:10,12
61:14 157:24
168:1 261:8
269:20 270:15
270:20 289:24
312:1 313:1
385:19 386:2,9
387:16
**courthouse** 37:3
**cover** 102:11,22
103:14,21
104:20
**covered** 47:16
119:3 361:21
**Cowles** 106:23
**co-counsel**
383:16
**co-op** 100:7
**crawl** 228:18
**crawled** 228:15
229:21 235:20
**created** 69:25

70:9 71:13
72:22 102:2
110:24
**credit** 100:7
**crime** 383:13
**cross-examine**
28:20
**cross-noticed**
4:20
**crowd** 212:10
212:10 214:3
**crystal** 39:12
179:11,12
**cultural** 126:22
233:19
**cure-all** 91:3
**curiosity** 227:17
308:10 352:1
**curious** 207:17
227:17
**current** 9:14
17:1 127:20
199:7 381:4
**currently** 98:2,3
235:13 381:13
**curriculum**
84:20
**curtail** 118:2
**custody** 65:17

———————
**D**
**dad** 9:21
**Daily** 3:18 116:2
116:11
**damage** 71:14
**damaged**
323:15
**Dame** 80:20,22
81:2,11,13,19
82:6
**danger** 208:6,8
**DANIELLE**
1:10 168:12
313:7

**Danny** 1:9 22:1
71:5 168:11
194:9,14 195:2
195:24 211:24
211:25 249:2
278:13 280:17
313:6
**Danny's** 195:13
195:14
**data** 83:7 148:8
224:25 226:15
345:1,2,4,10
346:2 348:3
**date** 7:13 83:25
107:14,15,16
179:2 191:5
215:1 270:20
320:13 373:22
**dated** 107:19
116:3 250:5
378:16
**dates** 6:6 19:5
19:19,22 80:22
81:12 87:23
**daughter** 124:2
124:4,9,22
125:19,20,24
126:3 134:9,10
**daughters** 9:7
**daughter's**
124:10
**David** 108:1
109:3,13
330:22
**Davie** 9:15,16
9:23 10:4,6,11
10:15 265:16
266:1,6,10
269:5 270:6
377:25 378:3
**day** 76:22 90:7
132:7 156:3
183:12 205:15

207:11 227:11
227:12 234:14
234:15 235:10
309:2 310:10
360:24 389:10
390:20
**days** 19:16
363:18,20
364:1,2,7,11
364:11,12,24
**DD** 390:23
**de** 1:6,13,18
2:15,18 168:7
168:15,20
169:19,22
251:6 313:4,9
313:14 314:14
314:16
**dead** 311:20,22
**death** 21:25
71:16
**December** 1:21
4:2 83:24
110:11 168:23
172:22,23
173:1 175:1,4
175:5,14
177:24 178:2
179:14,21
181:1 182:20
184:12 188:5
188:14 189:5,8
189:23 190:13
190:21 193:16
195:20 196:20
218:1 219:18
219:21 230:4
230:14,19,22
231:2,10,15
235:1 244:2
280:1 282:17
283:10 306:2
309:22 313:17

325:21,22
332:20 335:21
379:21 390:20
**decide** 10:5,11
85:22 155:1,15
155:17 156:22
157:9 158:4
310:19 340:22
**decided** 182:19
182:21,22
185:20
**deciding** 154:8
171:24
**decision** 3:23
112:5,19 113:5
157:4,11 158:6
315:25
**declare** 390:17
**deducting** 50:14
**deemed** 323:14
**deep** 250:16
**deep-pocket**
203:21
**defendant** 3:2
170:2 261:21
315:2 382:6
383:25 384:6
386:15,17
**defendants** 1:7
1:14,19 2:15
2:18 168:8,16
168:21 169:19
169:22 261:24
313:5,9,15
314:14,16
**Defendant's**
3:17,17,18,18
3:19,19,20,20
60:3 86:8
115:24 170:17
178:13 315:16
315:17,18,19
320:4 369:4

373:12 378:9
**defense** 56:19
56:20 57:16,17
58:7,7 204:13
204:18,25
205:4 385:10
385:12,13
**defer** 96:21
**define** 43:8 89:5
**defined** 53:6
**definitely** 139:2
176:10 193:8
327:2
**definition** 89:2
89:3
**definitional**
95:10
**definitionally**
23:4
**definitions**
89:22
**degree** 81:1,4,19
81:24 82:3,17
84:2 181:21
182:10
**Dempsey** 2:17
4:15 169:21
314:15
**denied** 113:3,7
**DEP** 75:20 76:3
77:3 126:14
131:23 134:17
136:4 137:4
138:23 231:6
**department**
75:19 100:15
111:15,15,22
111:22 129:17
129:17 162:3
178:21,24
253:9 256:10
276:17 333:2
333:15,16

**departments**
111:23
**department's**
245:15
**depends** 310:25
**DEPONENT**
389:1
**deposed** 151:21
387:24
**deposition** 1:23
3:1,17 4:6,20
5:16 6:20,22
15:9 21:10
23:25 25:25
26:5 27:19
28:25 29:9
30:6 32:19
34:21 51:16,18
59:13,17 60:6
60:8 61:5,10
63:5 80:3,7
88:15 114:11
114:12 115:15
116:2 169:1
170:1 277:7
278:9,19 279:4
281:3,19
282:19 284:8
284:22 285:7
293:2 298:8,15
302:18 304:13
304:24 314:1
315:1 320:7
322:10 324:8
332:20 333:6
335:18 347:1
365:11 372:4
373:15 375:2
376:21 378:14
382:1,3 387:5
387:11,12,21
388:19
**depositions**

311:6
**deposition's**
23:9 383:4
**describe** 157:22
**described**
319:16
**describing**
318:3
**designated**
123:9,13
**designation**
122:19
**desire** 262:18
**Desist** 71:4
284:18,21
286:1,8 287:1
287:16,22
288:18,24
289:2 290:21
291:14
**Desist's** 286:22
**despite** 54:3
236:9,12 237:8
269:20
**destroy** 256:24
259:2,17
261:11
**destroyed** 77:22
78:14 259:3
260:4 264:20
265:9,14,18
269:4 273:16
278:1
**destroying** 78:6
78:9 265:10
**destruction**
259:21 262:9
**details** 375:8
386:3
**detective** 27:23
32:25
**determine**
242:19 342:5

362:15 364:4
364:23
**determined**
370:6,13
371:11
**developed** 14:14
202:18
**developing**
91:24 186:16
**development**
187:9
**dial** 372:11
**Diamond** 2:11
5:5 162:11,13
169:15 314:11
**difference**
108:16 192:17
**different** 46:14
57:3 104:19,19
284:3 296:7
319:12 325:1
331:4 334:3
357:5
**difficult** 191:12
312:14 364:3
**direct** 3:13,14
3:15 7:9 56:14
170:14 171:22
247:17 315:14
316:4,24
**directed** 360:3
388:6
**directing** 156:17
349:1
**direction** 348:4
**directions**
370:21
**Director** 118:9
**dirt** 250:20
**disagree** 22:25
116:25 117:10
221:19,23
240:6 244:18

**disagreed**
140:17
**disagreement**
21:3
**disagrees**
222:15
**discarded** 260:4
**disclose** 28:13
166:13
**disclosed** 28:10
302:18
**disclosing** 28:12
**discovered**
204:17
**discovery** 3:3
60:10 65:14
170:3 267:6
268:17 269:1
302:5,22 315:3
**discrete** 112:13
**discuss** 63:1
68:2 89:5
172:12 264:8
270:8 283:2
289:15 294:7
300:9 310:22
312:17 322:6
356:21 357:21
358:2
**discussed** 84:17
152:13 184:11
197:9 198:13
204:6 206:6
212:20,23
214:21,23
222:9 259:8
264:12 289:12
361:14
**discussing**
289:10 295:25
357:10
**discussion** 48:20
213:8,11 262:8

263:11 289:2
295:1 311:18
321:18
**discussions**
118:13,18
172:15 282:1
283:9 286:1
321:11 334:23
365:4
**dismissed**
204:22
**dismissive**
140:22,23
141:11,14,25
**disposal** 104:18
104:22
**dispute** 262:6
**disregard**
236:14,14
237:4,5
**disseminating**
183:3
**dissertation**
81:20 82:22
83:4,8
**distracted** 188:8
**divorce** 8:19
**divvy** 19:23
**doc** 77:9
**doctor** 39:7
229:4 353:25
367:22
**doctoral** 82:10
82:12,17,20,22
84:9
**doctorate** 82:3,8
84:6
**doctors** 367:13
**doctrine** 65:19
**document** 22:17
61:4 67:6
68:25 89:10
92:4 246:16

259:3,17,21,22
260:9,11,12,18
260:20,23
262:9 263:9,13
263:18 264:20
265:1,9,11,11
265:14,18,22
268:13,16,25
269:4,17
270:10 273:15
273:19 274:1
275:1,10 277:5
303:16,17
304:17,20
305:10 320:8
320:17,20
321:2 348:10
372:6,7,16,17
378:19 379:2,8
380:20
**documents** 30:1
30:3,3,4 61:18
63:8,10,11,18
63:22,23 64:4
64:4 67:6,8,15
67:15 69:4,24
70:9,21 71:1
71:12,13,20,23
72:15 75:2
77:9,20 78:5,9
78:14,20 80:6
101:20,22
102:1,10,18,21
103:13,17,20
103:21,24
104:6,15,25
144:10,17,18
185:2 261:12
269:10 275:10
277:23 311:21
311:23 326:25
334:8 336:22
337:4 388:8

**doing** 18:21
42:25 52:5
94:17 103:10
104:19 114:12
129:8 144:19
162:7,9 163:1
163:11,19
164:7,9 165:2
165:4 166:7
184:14 216:17
217:13 253:14
255:19 265:3
341:25 350:22
351:20 352:6
362:5 364:17
377:9
**DONALD** 1:15
168:17 313:11
**door** 27:5 123:7
184:17 227:15
259:10,13,16
**Dr** 5:20,25 6:3,7
6:10,15,20 7:3
11:7 14:10
18:25 21:24
23:3 25:17,23
26:20 27:19
28:16,21 30:8
33:3 38:9
39:19,22 43:24
44:6,9,11,14
44:24 45:6,20
46:24 58:16
59:21 60:5,13
63:7 67:12
68:2 69:14
71:19 73:22
79:12,23 80:2
86:10 90:16
95:15 97:4
98:2 101:19
107:24 112:4
116:1 119:17

171:23 178:18
201:6,18
216:25 226:9
257:12,14,16
257:20,22,24
258:1,5,8
259:17 263:8
264:18 265:6
267:5,21 270:5
271:15 277:9
278:7 281:4
283:8 286:9
289:14 291:4
291:18 295:20
298:11 303:14
304:5,16
309:10,17,25
310:1,15
311:20,23
316:5,17 317:9
320:6 321:5
323:18 327:3,6
327:22,24
328:2,11,14,15
328:16,16
329:6,6,12,15
329:24 330:11
330:18 331:15
331:21 332:16
332:19 335:3,5
335:10,13,17
336:6,8,25
337:1,4,8,11
337:13,19,21
338:1,8,11,13
338:16,21
340:8,22,25
341:12,22
342:3,17
343:11,13,22
344:2,11 345:5
345:6,10,11,13
345:14,20,24

346:2,15
347:12,15,19
347:21,22
348:4,8,14,18
349:4,6,11,14
349:24 350:8,9
350:10,17,20
350:22 351:2,3
351:6,9,16,20
352:10,12,12
352:14,15,17
353:2,3,10,16
353:20,21
355:9 365:10
368:11 369:10
369:17,17,22
370:5 371:19
371:21 372:3
373:14,20
377:24 378:13
378:23 381:1,9
381:11,18
382:5,10
383:13 384:8
**drank** 287:14
**drive** 108:20
  334:2
**driver's** 87:5,19
**drowning** 12:4,9
**Drs** 369:23
  371:11
**Drummond** 1:9
  1:9,10 2:4,8
  4:18,21 5:19
  5:22 17:19
  22:1 23:7,14
  24:1 71:5,6
  89:21 168:10
  168:11,12
  169:8,12 194:9
  195:4,12
  211:24 249:2
  261:10 268:18

278:5,9,13
280:17 313:6,6
313:7 314:6,9
**drums** 319:9
**DU** 1:6 168:7
  313:4
**duly** 5:12 390:9
**dumped** 74:9,20
  74:22 77:23
  257:1,2
**DuPont** 1:13,18
  2:15,18 4:7,13
  4:15 22:1
  162:11,14
  168:15,20
  169:19,22
  235:14 236:1
  267:6 269:1
  303:10,15
  307:9,12,17,21
  313:9,14
  314:14,16
  316:6 317:10
  317:16 328:7
  354:16,19,21
  359:15 360:13
**DuPont's** 27:17
**duration** 212:19
**dust** 97:18
  317:21,25,25
  319:7,8,14,21
  319:23 364:9
  370:12

———————————

**E**
**E** 2:11 101:14
  169:15 314:11
  390:1,1
**earlier** 77:20
  86:16 126:12
  132:8 173:7
  196:2 204:5
  218:4 220:23
  229:3 235:9

238:19 252:23
264:19 265:8
267:24 305:22
321:2 322:10
375:2,2 388:10
**early** 40:25
  53:17 130:8
  177:19 183:15
  189:21 195:16
  205:18 237:23
  257:6 280:18
  280:19 282:17
  283:10 296:11
  296:11
**earn** 81:1
**easier** 51:22
**east** 10:3,4
**eastern** 311:4,10
**eat** 245:24 246:4
  256:5
**ECHSNER** 2:2
  169:6 314:3
**economics**
  97:25
**educate** 130:19
  131:1,15
  144:10
**educated** 346:16
**education** 14:24
  80:19 83:19
  358:17
**educational**
  84:18
**effect** 26:16
  209:2 268:12
  270:23
**effective** 29:4,13
**effects** 70:13,13
**efficacy** 29:20
**effort** 67:14,17
  67:19
**efforts** 237:8
  271:19 354:22

**eight** 311:6
  378:12
**either** 11:20
  35:14,22 53:3
  72:19,21 78:21
  79:1 93:1
  138:3 153:22
  153:23 192:18
  193:12,16
  205:16 221:25
  231:15 249:20
  251:10 268:18
  336:16 353:6
  366:12 369:17
  385:21 387:12
  387:13
**Elizabeth**
  106:15 108:1
  108:19
**Ellen** 71:3 326:1
**Emardo** 121:9
**Emma** 7:23 8:1
  8:13,25 9:2,12
**employed** 91:23
  98:2 99:13
**employee**
  100:25 101:2
  390:13,14
**employees**
  114:3,4 117:20
  316:6 317:10
**employment**
  99:19 119:3
  166:14
**empty** 250:24
**encompass**
  302:10,14
**ended** 205:23
  273:6,11,12,24
  274:15 319:8
**engagement**
  311:10
**entered** 60:8

82:12
**enthusiasm**
  240:18 242:4
**entities** 204:6
**entitled** 63:22
  64:6 73:22
  92:19
**entity** 204:1,4
**envelope** 297:4
  297:9,10,18
**environment**
  140:25 141:2
  141:16 278:22
  278:22,23
  279:3,17 376:6
  377:20
**environmental**
  42:5 49:6
  75:20 97:22
  122:3 123:16
  129:19 132:24
  138:11 142:12
  149:5 151:9
  152:24 156:8
  162:3 186:24
  187:2 198:4,8
  198:9 199:3,20
  199:20 200:18
  203:9,22
  204:20 252:7
  381:8
**EPA** 161:22
  375:3,24 376:2
**epidemiological**
  97:6
**epidemiology**
  97:4
**erected** 235:14
  236:1
**Eric** 69:18
**Erie** 159:12,20
  159:24 160:2
  332:9

especially 21:5
Esq 2:3,3,6,7,10
    2:11,14,17
    101:14,15,15
    101:16 169:7,7
    169:10,11,14
    169:15,18,21
    314:4,5,7,8,10
    314:11,13,16
establish 178:16
Estate 1:9
    168:11 313:6
estimate 191:5
estimating
    311:3
et 1:3,6,13,15,18
    2:15,18 168:3
    168:7,15,17,20
    169:19,22
    313:2,4,9,11
    313:14 314:14
    314:17
ethical 166:14
Eugenia 258:1,1
evening 183:15
    189:22 205:18
event 29:5
events 117:5
eventually
    174:24 184:16
    236:7 341:4,5
    362:11
evidence 3:3
    170:3 255:22
    315:3
ex 186:20
    233:10
exact 132:3
    173:18 232:3
exactly 23:11
    39:4 49:15
    50:16 108:13
    121:21 122:7

123:12 129:2
139:16,16
140:3 175:12
244:13 271:25
306:12 334:6,6
exam 30:20,22
    30:25
examination
    3:13,14,15 7:9
    170:14 171:22
    263:22 315:14
    316:4
example 52:11
    75:9,14,16
    164:7 232:7
    233:17
excepting 150:3
exception 20:19
    328:4
exceptions
    328:7
excerpt 291:19
exchange
    215:21
exclude 70:3
excluding 70:25
    71:11 72:2
    102:3
exclusion 283:1
excuse 10:8
    19:20 86:4
    106:24 107:4
    289:14 306:17
    340:16 368:6
exercise 222:17
    311:7
exhibit 60:3,6
    68:25 86:7,8
    86:11 106:20
    112:10 115:24
    116:2 178:13
    178:18 216:13
    221:5,13

222:15 223:17
238:15 244:17
251:5 267:22
272:14 303:7,9
303:10,15
304:18 309:20
317:16 319:16
320:4,7 335:6
335:9 369:4
372:1,4 373:12
373:15 378:8,9
378:14,25
Exhibits 3:16
    170:16 315:15
    369:6 381:23
    382:2 388:15
exigencies 384:1
exist 54:2 63:22
    64:7 73:11,12
    262:10
existed 5:23
    6:13 69:25
    70:9 71:24
    74:15,21 75:3
    77:20 102:2
existence 69:3
    72:3 267:17
existing 72:14
exists 277:5
    295:12
expect 320:24
expectations
    164:19,22
expedition 21:4
experience
    14:12 15:10
    147:25 148:1
    155:23 164:1
    166:6,10 186:1
    186:2,7,15,23
    187:1,8,12,14
    198:9 200:3
    202:8 204:19

207:11 225:9
228:8,21 237:2
247:24 308:15
experienced
    200:2,11 201:9
    201:21 204:7
    204:11 308:3
experiences
    109:20 148:3
    185:10,12
    187:19
expert 21:6
    22:20,23 24:15
    24:20,25 25:2
    25:12 26:1,8
    26:14 28:11,16
    33:15 35:14,15
    35:15,17,23
    89:20 90:6
    95:14,16,21
    96:6,18 97:3
    97:13,17,21,24
    185:8 280:9
    304:5 327:22
    329:21 334:23
    334:24 349:15
    349:21 350:20
    354:12 369:18
    370:8 382:21
    382:23,24
expertise 11:8
    11:12,21 21:8
    25:20,22 27:10
    90:5 173:16
    198:3,8,11
    241:4 242:19
    362:11
experts 96:21
    308:21 329:1
    329:11
expires 389:17
    390:23
explain 196:25

197:3,8 296:8
309:2 366:4
explained 76:16
    172:1 174:19
    197:1 262:12
explains 89:16
    91:15
explanation
    319:3 375:17
exploring 41:10
exposed 39:15
    362:16 363:7
exposure 365:15
    365:20 366:15
    367:10,15
express 109:12
    137:14,20
    226:21 227:9
    276:20 357:15
expressed 110:2
    137:6 215:19
    215:23 227:8
    228:22
expressing
    242:9 247:20
expression
    137:11 138:6,7
    141:9 173:10
    199:7
extended 76:20
    229:4 380:10
extension
    296:21 297:3,6
    300:21,25
extent 45:11
    46:21 54:17
    61:3 77:12,20
    79:21 141:12
    149:23 213:15
    241:24 284:25
    295:11 298:23
    316:10,10
    328:8 350:21

361:4 369:16
372:18
**extraneous**
65:10 95:25
149:20 251:12
312:3 326:21
326:23
**ex-brother-in-...**
232:23 233:5
**e-mail** 3:19,19
3:20 49:12,19
50:25 51:5
52:7,9,10,13
52:17,21 53:1
53:12 104:23
104:24 105:2,2
315:16,17,18
373:16,22
374:12
**e-mails** 52:22
53:13,24 54:1
54:2,6
**E.I** 1:6,13,18
2:15,18 168:7
168:15,20
169:19,22
313:4,9,14
314:14,16

___

**F**

**F** 124:19 390:1
**faced** 123:7
**faces** 212:4,6
214:6,8,11
**facilitate** 60:9
**facility** 23:18
126:10 146:4
146:18 147:7
148:15,23
207:2 307:12
**fact** 6:21 11:3
14:11,18,23
15:12 21:1,10
25:8 45:11

59:18 65:6
68:17 72:4,5
85:25 88:17
89:5 92:10
95:9 96:25
117:6 130:20
131:2,16 147:1
151:2 154:11
176:9 199:19
202:13 236:9
236:12 251:13
253:16 255:2
260:13,17,19
260:21 270:2
285:18,18
298:19 311:6
338:14 339:13
349:2 376:16
376:25 377:4
379:19 382:10
382:14,17
384:2 386:21
387:1,3
**factor** 10:21
**factors** 83:16
**facts** 6:22,25
14:25 15:4
17:7,16,23
18:4 19:23
21:16 29:6
36:9 58:13
88:10 90:9,11
92:17 97:2
125:8 154:15
376:14 378:5
379:14 381:6
390:19
**factual** 36:11
46:21 58:14,16
95:24 96:11
131:6 147:17
154:19
**factually** 97:9

**fact-finding**
221:22,25
222:4
**fact-type** 45:19
**faculty** 100:15
108:5 110:24
156:2 163:23
164:1,2,3,17
165:16 166:3
198:1
**failure** 269:3
**fair** 37:16,19
40:8 73:25
79:10 99:22
106:1,4 109:21
110:2 117:23
117:25 130:12
137:7 176:21
177:15 179:20
192:8 210:12
221:15 224:3
224:11 238:17
240:6 242:5,5
244:19 255:21
256:1 265:21
275:25 279:15
**fairly** 10:24
84:19 229:14
236:4
**Fairmont**
142:22 148:2
153:25 185:11
**fall** 177:22
189:22
**familiar** 158:21
217:6 275:14
**familiarity** 55:4
275:18
**families** 83:15
83:15,17
**family** 83:5,7,12
83:14 105:17
119:22 120:24

123:1,17,22,24
123:25 124:1
232:11 233:21
322:3 324:22
**far** 11:3 26:17
76:19 87:9
88:14 117:3
175:17 208:2
332:10,12
346:16
**fast** 310:25
**father** 10:7
**favor** 38:23,25
39:3,5,9
**fax** 104:21 309:6
309:8,9,13,22
**faxed** 309:23
**February**
210:10,16,20
212:5,9,20
213:2,9 214:10
214:14 231:16
244:2 280:2
305:12 309:15
379:22 390:23
**federal** 149:6,13
156:8 199:20
**fee** 105:6,9,10
301:10,16
**feel** 36:1 65:20
172:17 229:14
**feeling** 78:15
**feels** 27:16
**fees** 105:14,14
**fellow** 135:8
**felt** 16:12
117:15 155:19
187:16 200:1
200:11
**fence** 228:14,16
229:18,21
235:11,13,18

235:22,25
236:4,6,10,13
236:14
**fences** 228:18
**fencing** 237:4
**fertilizer** 297:13
**fewer** 192:14
**few-minute**
166:25
**field** 97:13,17
97:21,24
189:19,19,21
190:5 206:16
206:17,18,24
207:23
**fifth** 110:14
191:3 238:14
238:20 284:23
285:19 287:7,8
372:5
**Fifty** 143:9,12
**fight** 64:2
**figure** 27:25
102:8 311:15
357:14
**figures** 117:21
**file** 78:22
256:25
**filed** 3:5 22:6,16
36:15 37:3
170:5 315:5
**files** 78:17,22
266:9
**finally** 82:14
**finance** 323:10
**financially**
390:15
**financing**
321:16
**find** 28:24 63:22
104:7 127:11
129:14 153:13
159:6 173:12

173:21 185:13
198:16,19,20
203:21 204:2
215:18 243:1
255:22 296:17
342:21 385:16
**finding** 215:6
352:6
**findings** 256:12
**fine** 27:22 79:11
197:17 199:10
224:7 262:17
263:6 303:12
321:1 332:15
**finish** 36:24
51:13,23 52:1
113:11 143:11
209:4 230:10
249:1
**finished** 81:19
82:14 206:2
368:11 373:19
**fire** 178:8,21,23
179:8 194:15
194:24 195:7
210:8,11 231:7
253:9 254:13
254:16 276:3,6
276:10,12,16
276:24
**firehouse**
190:15,25
191:1 192:1
247:3 289:4,9
289:12
**firm** 6:5,11
15:15,15,17,22
16:1,9,20 17:1
17:10,19,25
18:12,14,20,22
19:2,6,12,20
20:21 21:14
27:20 33:18

40:10 41:17
48:19 49:9
51:6 53:14
54:10,13,24
55:5,8 56:4,7
56:16,19 57:16
58:7 60:23
67:10 70:25
71:12 75:5,6
79:25 102:4,16
150:5,10 151:6
151:6,9,12,14
152:3,6,23,23
153:8,11,13,21
154:5 157:18
198:16 199:1
199:18 200:2
200:11,22
201:9,10,21,22
203:22,23
204:4,13,18,18
204:24,25,25
205:2,3,4,6,8
215:6,18,19,23
241:3 257:4
259:18 260:6
261:10 265:24
266:5,8 267:4
267:9,15,15,15
267:16 277:17
280:25 375:4
385:13
**firms** 17:20 42:2
42:5 49:2,5
57:3 58:20,23
59:2 125:23
152:21 153:1,3
153:5,7,14,17
157:12 158:7
201:5 204:8,11
216:4 217:25
218:7 224:25
259:2 269:16

277:11,23
316:20 323:14
365:4 370:18
**first** 5:12,17
49:16 50:4,20
65:24 68:20
91:20 98:7,9
100:13 110:22
111:6 114:20
115:7 116:18
120:12,21
121:11 126:9
126:16 129:19
138:24 140:8
145:11,18
172:20 174:25
179:12 181:13
182:5,9,20
183:14 184:4
184:14 185:23
189:9 190:25
192:10,15
193:12,17
194:7,18,23
197:18 210:7
210:25 214:8
221:20 223:20
224:21 225:22
225:25 230:3,6
230:9,12 233:3
234:9 238:24
248:2 252:17
278:8 288:6
290:9 299:3
310:1,5 320:8
321:4,6 330:7
330:7 332:25
373:17
**fit** 347:10
**five** 152:19
164:12,21,24
165:3 190:20
205:23 206:1

254:2 347:11
**five-minute**
312:17 383:16
**flak** 242:3,9
**flip** 68:15,21
**Florida** 1:21 3:7
3:8 4:5 9:15
9:17,22 10:2,6
10:12,14 29:4
30:15 40:10
60:10,12 87:19
98:5 168:23
170:7,8 265:16
265:23 266:2,6
266:10 269:5
270:6 313:16
315:7,8 376:3
377:25 378:3
378:16 389:6
389:11,15
390:3,7,22
**Flowers** 304:5
304:12,24
309:10,17,25
327:3,7,22,24
328:5,6,9,14
329:6,12,15,24
330:11,18
331:1,15,21
332:16,19
334:18,20
335:3,5,10,13
335:17 336:6
336:25 337:8
337:11,13,19
337:21 338:1,8
338:11,13,16
338:21 340:8
340:22,25
341:12,22
342:3,17
343:11,13,22
344:2,11 345:5

345:6,11,13,14
345:20,24
346:2 347:15
347:19,22
348:4,8,14,18
349:11,24
351:3 352:12
352:15,17
369:17,23
371:11,19,21
**focus** 126:24
308:1,2
**focused** 83:3
129:3 157:23
**foggy** 216:3
**folks** 7:15 12:1
21:19 120:7
122:12 186:4
187:16 212:24
217:1 257:10
**follow** 59:20
139:1,3 224:23
225:2 302:19
**followed** 195:20
225:16 249:9
249:19
**following** 4:1
59:2 93:13
138:22 171:1
251:15 262:3
267:13 316:1
**follows** 5:13
58:4 131:12
146:14,23
152:2 158:2
160:11 161:6
188:12 201:16
218:20 219:8
290:6 291:12
377:16
**foregoing** 390:8
390:9,18
**forever** 351:23

forget 76:6
133:17
form 14:7 24:17
31:10,13,25
33:7,12 34:9
35:16,24 36:4
36:13 40:2,11
49:25 59:14
68:4 112:22
122:4 125:3
131:5,19 132:2
132:22 133:2
133:11 138:14
138:20 141:7
141:17 142:14
143:14 144:1
145:1,8,23
146:6 147:11
149:1,22 159:1
163:4,13
165:11 172:14
172:18 177:6,8
177:14,16
192:6 199:10
199:13,23
200:8,20,24
201:23 203:10
208:23 209:15
215:8 222:16
222:24 229:12
235:16 236:16
236:18,22
243:5 244:21
248:10 252:15
253:3 255:5,25
263:16 265:17
269:8 277:13
280:4 281:21
283:17,22
284:4 299:2
307:23 319:6
335:9 339:17
342:6 346:1

347:24 356:25
357:24 362:7
369:24 372:25
374:21
formally 301:25
formations
341:4,8 342:23
former 22:2
23:18 33:11
34:8 69:20
70:14 71:7
125:21 126:10
130:21 131:4
131:18 144:25
145:6,11,19
165:9,21 316:6
317:10 358:9
358:18,21
359:8,14
360:11 365:16
365:21 366:16
367:11,16
375:24
forming 100:5
formulated
376:9
formulation
171:11
Fort 1:21 3:8
4:4 168:23
170:8 313:16
315:8
forth 271:4
301:7 318:1
forthwith
260:10
forward 21:16
203:8 360:25
found 10:15
204:19 226:15
239:23
foundation
236:19,23

four 72:20 73:20
110:14 152:19
190:19 237:16
248:24 332:10
347:11 372:5
fourth 191:3
238:20
frame 108:13,16
146:10 150:16
163:21 175:25
176:6,25 177:7
177:18 178:7,7
178:12 179:7
179:14 216:3,4
216:6,9 218:5
236:8 255:1
282:21 351:21
framework
231:4,5
free 90:6 118:2
friend 1:10
120:5,8,9,10
121:2 138:24
168:12 182:23
233:17 305:6
313:7 321:23
322:3
friends 35:1,1
120:1,14 232:1
232:4 322:3
front 123:7
282:19 373:14
full 7:10 75:22
93:17,18
250:23,23
372:6
full-time 98:10
99:4,5,12,19
99:21 100:25
funding 117:22
117:25
fundraising
117:21

furnace 318:17
318:18
furnaces 319:8
further 27:6
44:10 186:5
187:5 203:9
262:18 275:21
333:13 365:9
389:1 390:12
future 185:21
188:7,15 203:2
213:8 297:22

━━━━━━━ G ━━━━━━━
gab 90:25
gain 276:21
308:18
gained 55:25
gains 165:16
Gallagher 2:10
5:4,4 101:15
169:14 263:3
314:10
games 206:19
gamut 91:2
gap 361:4,8
367:23
garden 245:12
245:25 246:2,4
246:15 248:22
255:11 256:6
296:14,23,25
gardening
296:16
gardens 301:8
Gary 34:23 41:9
43:25 174:23
185:18,22
193:24 195:19
196:10,23
197:20,22
198:6,24 201:6
201:18 212:2,3
240:10 241:1

241:15 242:10
242:23 277:2
321:13
gathered 70:12
289:7
general 21:5
42:10 43:13,16
49:1 135:22
137:22 138:1,1
138:6 141:10
146:3,16 147:5
148:6 158:9,12
158:18 173:10
174:19 187:7
187:11 188:19
201:1,5 214:15
220:11,25
243:12 266:12
270:11 297:1
307:18 324:21
330:25 351:17
351:25 352:4
362:25
generally 43:6
57:11 96:17
136:11,12,22
205:5 231:12
234:25 235:3
280:12 331:8,9
363:22 375:11
generated 70:10
71:13 72:22
83:8
generically
265:1
gentleman
64:24 181:9
269:9 310:19
349:3 380:22
gentlemen
141:22
geological 341:3
341:8,10,15

342:12,18,23
342:24
**George** 327:3,6
329:6
**getting** 66:21
117:4 138:17
138:18,21
155:20 158:10
203:16 218:25
220:15,15
253:19 277:18
310:9 318:3
341:3
**gift** 58:19,23
90:25
**gifts** 59:8
105:15
**girls** 238:8
**give** 6:24 20:12
20:24 21:1,9
28:2 32:17
33:13 36:7
45:18,19 50:7
62:6 64:16,18
73:24 75:8,14
112:3 128:13
128:14 141:10
166:22 173:15
184:24 191:4
196:10 201:4
219:5 232:7
239:12 256:12
256:17,20,21
280:23 281:16
312:5 329:16
331:24 363:16
387:11,12
**given** 26:20
105:14 139:17
161:17 173:10
187:18 193:10
242:3 245:11
248:19 255:23

256:13,15
257:3 258:8
259:11 284:22
292:22 370:22
384:1 386:13
390:11
**Givens** 54:13
**gives** 91:6
179:16
**giving** 76:18
83:5 196:23
264:6 271:16
287:3 319:25
331:10 372:16
**glad** 28:5
**glass** 284:23
285:19
**go** 13:3 16:6
18:15 21:7
28:2 31:19
45:7,15 51:15
57:25 67:20
68:24 73:20
81:8,10 87:1
88:16 89:25
90:6,13,14
113:6 117:8,20
126:12 147:19
151:16 152:12
153:2 154:14
156:15 165:19
166:24 199:14
202:2 203:21
204:12 208:7
208:17 221:5
222:19 223:22
223:23,25
232:12 234:25
235:9 237:2
246:11 257:9
263:1 265:20
267:21 272:12
286:5,24 290:4

293:21 300:9
301:4,5 303:2
303:9 304:24
310:20 311:14
312:8,17
317:17 329:20
332:7 340:11
340:20 341:9
343:23 357:10
363:24 368:7
376:20 383:3
384:22
**goal** 154:7 171:6
171:9,20,24
172:3,4,17
**goals** 171:9
**goal-type**
154:15
**goes** 7:23 300:8
310:25
**going** 11:11
13:25 16:10
17:6,8,22 19:9
20:24,25 21:2
21:3,15,16
22:9,17 24:19
25:4,7,19,20
27:6,9 28:19
28:22 37:4
44:21 45:1,7,9
45:18 57:12
59:20 62:10
64:14,25 65:3
65:11 66:9,13
66:23 67:22
68:7 75:24
79:18 83:23
84:7 85:21
88:14,16,18
90:7,13,14
92:18,19 95:12
95:13 99:3,9
101:11 110:16

112:3 119:12
120:19 122:18
129:24 130:17
130:24 131:13
132:25 134:23
135:17 144:11
150:6 152:12
154:10,13,14
167:4 171:4
183:22,24
185:7,22
197:12 202:25
204:12 207:18
207:21 208:12
216:15,20
220:11 223:18
227:11 242:25
257:9 259:2,10
259:13,13
260:25 261:7
280:11 282:22
289:10,15
290:3 291:18
294:14 301:4,5
303:6,24
304:21 310:11
310:11,19
311:7,12
312:18 316:12
316:16,23,24
320:9,19,19,21
324:4 327:8,10
327:23 328:13
334:20 339:24
340:2 356:16
362:12 368:5
369:1 372:21
372:22 379:2
380:5,19
381:21,25
383:18 388:17
**good** 105:24
156:13 174:1

181:16 227:6,7
227:7 231:24
232:7 296:19
296:20 311:2
322:3 350:11
**Gorman** 257:12
**gotten** 138:23
**government**
79:20 199:2
200:17 226:16
253:11
**governs** 320:23
**GRACE** 1:10
168:12 313:7
**graduate** 81:8
81:10,13 99:17
99:18 332:21
333:1
**graduated**
99:14
**graduation**
83:25
**grandchildren**
9:11 148:14,22
149:4,11
**Grapevine** 9:15
**grasp** 110:20
**great** 21:21
120:20 277:18
308:16
**grew** 80:13,14
246:4
**grievance** 3:23
112:5,20
315:25
**grievant** 113:16
113:21
**ground** 281:8,13
281:24 283:11
284:10
**grounds** 208:1
**group** 56:20
57:17 58:7

183:1 188:6,14 192:11 203:2,6 374:18
**groups** 375:20 375:21 381:2,5 381:9
**grow** 296:25 298:22
**growing** 256:5 301:8
**grown** 245:24
**guarantee** 321:18
**guarantees** 198:15
**guess** 10:19 77:25 104:17 112:18 130:3,4 130:9 148:11 148:12 155:17 158:14 164:15 181:17 190:8,9 190:17 191:13 198:19 240:25 261:20 304:24 352:2,17,18 359:20
**guessing** 250:21 250:25
**guidance** 251:15 251:17
**Gump** 195:9,10
**gut** 255:15
**GUTHRIE** 2:14 169:18 314:13
**guy** 109:19 151:21 325:7
**guys** 12:24 13:6 138:3 308:14
**guy's** 27:25
**Gypsy** 69:18 332:11

_____
**H**

**habit** 233:4
**half** 82:15 183:9 212:19 250:23 250:23
**hall** 178:8 179:8 194:15,24 195:8 210:8,11 231:7 254:13 254:16
**hand** 349:6
**handful** 343:15 383:10,11
**handing** 60:5 86:10 178:18 279:18 303:14 320:6
**handle** 178:11 344:22,24
**handled** 318:13
**Hando** 75:19 126:13 129:20 130:15 131:22 138:10,25 143:23 145:9 145:12,20 150:15 162:2 175:20 176:21 177:3,10,12,22 209:22 217:21 220:13,20 226:18 230:13 231:7 252:11 252:18 253:2 253:20 254:7 355:18 356:1 372:9,23
**Hando's** 133:7 133:24 142:12
**handwritten** 304:4 305:7
**happen** 207:10 242:22
**happened** 50:17

50:17 74:8 75:18 77:5,7 105:4,18 120:12 124:7 196:17 215:10 215:11,22 221:25 226:11 227:12 240:7 240:23 259:21 259:22 265:11 323:12 346:6 358:6
**happening** 210:14 229:25 337:5
**happens** 52:17 232:21
**happy** 54:1,4 294:11
**hardened** 319:5 319:6
**Hardesty** 106:3 106:5,8,11 108:2 109:4 116:4,15,23 117:15 384:25 387:6,18
**Harliss** 385:6
**harm** 138:16 155:19
**harmful** 138:12
**Harrison** 1:1 69:16 70:15 168:1 248:7 313:1 335:20 358:8,11,15,17 358:21 359:8 381:16
**hate** 131:8
**Haven** 80:12
**hazard** 141:15
**hazardous** 143:13 146:5

146:19 147:8
**hazards** 142:13 144:25 145:6
**health** 91:17,24 92:13 93:5,25 94:7 138:12,17 139:4 140:25 141:2,16 142:13 222:22 223:3,14 374:18
**hear** 7:16 12:11 12:21,24,25 13:10,15 21:20 156:12 163:14 201:13 278:8 344:8
**heard** 22:15 23:20 41:17 95:18,19 136:2 140:4 148:20 154:25 156:14 173:11 209:19 209:19,21,22 241:7 242:17 256:8 343:23 354:10
**hearing** 380:23 388:2
**hearings** 113:17
**heavy** 10:24 11:18 361:24 362:16 363:7 365:15,20 366:15 367:10 367:15
**hectic** 182:6
**held** 178:20 282:11
**hello** 233:7 234:8 241:22
**help** 13:14 90:8 92:20 155:21

155:24 156:5 172:6 173:22 173:23 174:4 178:11 203:16 204:2 243:1 280:11 296:25 333:20,21 340:8,12,13,22 342:1
**helped** 204:8 341:2
**helpful** 183:3 204:21
**helping** 172:10 184:15,16 198:2 204:20 215:15 349:4
**Hepzibah** 69:18 332:9
**heretofore** 3:4 170:4 315:4
**he'll** 19:22 20:12 89:8
**high** 10:24 98:7 98:9,13,25 99:1,6
**highly** 26:24 346:24
**Hill** 9:9
**hindsight** 357:8 357:15 363:13
**hire** 27:23 90:6 201:9,20
**hires** 200:21
**history** 91:12 126:22 233:19 233:19
**Hmm** 194:10
**Holbert** 71:2 323:19,20
**hold** 301:19
**holiday** 191:11 191:13

holidays 190:10
190:10 191:9
191:10,14
home 9:14 10:13
10:15 60:14
180:25 184:12
188:25 210:17
281:5 282:16
284:9
homemade
284:22 287:4
homeowner
350:1
homeowner's
350:4
homes 160:6,13
homesite 122:19
honor 381:25
hoop 207:23
hoops 208:7
hoped 198:14,15
Hospital 66:12
hostility 156:17
hour 183:9,9
212:18,18,19
384:2
hours 164:10,14
164:23 205:21
311:6
house 2:21 4:9
26:3,4 62:18
169:25 179:23
191:24 192:3,5
206:23 232:14
285:17 286:11
286:11 287:17
314:18 335:24
huckster 88:8
88:22 89:2,4
89:13 90:18
91:5,13,23
92:13 115:9
hucksters 88:6

89:6,12,17,22
90:24 91:8,10
115:10,16
hundred 321:17
322:19
husband's
121:11
hyphen 113:22
hypothesized
83:8
hypothetical
103:23

## I

Idaho 106:14
108:1,19,20
idea 51:12 76:19
107:15 142:3
174:19 184:13
187:10 188:19
203:25 210:12
215:2 247:19
247:20 251:1,3
258:23,25
260:12 275:2
297:1 300:3
364:11
identification
7:4 60:4 65:25
86:9 115:8,18
115:25 178:14
320:5 369:5,7
373:13 378:10
identified
371:19
identify 5:1,3
64:14 79:22
115:1 303:18
304:14 340:8
340:13 369:10
369:21
identifying
304:9
illness 272:18

imagine 278:19
immigration
202:9,19
impact 247:1
implicates 11:21
implying 46:15
impossible
74:15
impression
171:8 250:10
250:13
impressions
201:2,3
improperly
112:21
improve 297:13
inaccurate
224:3,11
238:16 279:9
279:11 283:20
283:23,24
284:15 296:3
inadvertent
283:1
inadvertently
282:24 302:19
inappropriate
18:3 28:7 90:2
inappropriately
88:14
inclined 27:16
include 24:1
34:15 108:7
including 5:22
28:21 54:25
329:12 350:20
364:14
inconvenience
13:10
incorrect 83:9
133:12,22
226:1 269:13
292:15,24

350:25
INDEX 3:10
170:10 315:10
Indiana 80:21
indicate 16:25
33:21,21 62:3
106:22 370:9
371:15
indicated 16:12
16:23 18:12
24:23 25:6,25
26:22 28:23
29:10 31:4
33:24 92:8
102:6 123:14
132:8 191:9
229:18 230:7
235:18 278:21
279:4 281:4
300:11 349:24
372:9
indicating
226:16 268:16
individual 69:16
285:14 299:23
individually 1:9
168:10 313:6
individuals
123:15 194:5
308:18 374:18
indulgence
312:6
industrial 146:4
146:17 147:6
148:15,23
149:4,11
industry 10:17
ineffective
29:22
influence 82:24
91:22
influenced
83:16

information
21:1 28:6
33:13 36:2
45:19 64:10,11
64:16,19 66:4
66:6,7 70:4,12
73:3 83:11
91:17 104:4
183:3 196:19
221:21 222:1
226:17 233:20
250:19 253:19
254:3 270:5
274:18 277:7
277:17 280:24
302:16,23
304:3 308:20
316:13 341:3,7
341:21 342:18
342:20,22
348:17 351:7
351:10 360:4
371:6
informational
375:15
informed 27:19
254:24 276:25
298:16 362:24
363:4
ingenious 91:1
initial 49:24
50:1,20 51:2,7
52:22 53:15,16
86:17,18 87:16
93:3 94:6
174:2,17
195:20 216:10
375:13
initiated 21:25
274:15
inordinate
312:2
inquire 275:21

**inquired** 254:9
**inquiry** 247:22
  310:7
**inside** 166:11
**insist** 59:11,15
**instance** 14:23
  66:3
**instruct** 11:1,9
  24:17 68:4
  85:17 92:15
  95:7 96:23
  118:20 119:1
  125:4 148:16
  149:1,8,17
  151:15 154:10
  156:10 172:14
  172:18 189:2
  200:24 264:13
  323:16 327:9
  328:17 329:20
  334:20 349:9
  349:16 364:5
  365:12 367:12
  367:17
**instructed** 5:25
  6:7 11:6,14
  22:8 30:5
  54:20 55:24
  56:13 59:19
  63:2,9,18
  64:15 68:10
  88:25 102:24
  157:15 209:25
  237:12 262:2
  262:12 285:2
  286:17 288:16
  290:18 360:21
  365:8 367:20
  369:14 371:14
  376:15,18
  378:5 381:15
  381:20 382:7
  382:16 383:4

**instructing**
  11:23 23:1
  31:18 43:24
  44:6,11 53:2
  88:11 104:11
  148:18 152:17
  154:23 288:20
  290:23 327:19
  349:18 378:20
  379:4
**instruction**
  11:22 34:10
  43:23 55:9,12
  56:9 59:20
  70:2 73:14
  171:5,18
  251:22 264:3
  338:3 360:23
  362:1 366:9
  370:14,19
  377:12,22
  379:11,18
  380:4 381:10
  386:19
**instructions**
  14:9 16:6,18
  26:21 51:16
  67:13 72:1
  97:5,15,19
  150:4 347:10
  366:17
**intend** 6:15
  16:15 310:8
**intended** 29:5
  221:25 296:6
**intending** 171:7
  283:4
**intends** 16:21
**intent** 154:18
  347:2
**intention** 16:23
  269:25
**intentionally**

  299:5
**interchange**
  28:6
**interest** 41:10
  110:23 129:8
  132:5 215:19
  215:24 233:19
  274:4,6,11
  381:2,5,12,14
**interested** 38:13
  38:18,20
  119:25 120:15
  122:2 173:12
  174:16 184:16
  185:17 198:13
  198:14 215:3
  390:15
**Internet** 42:4
  49:4
**interpret** 65:18
  79:14 88:19
  317:15
**interpretation**
  88:12 92:9
  117:5
**interrupt** 12:2
  183:6
**interruption**
  340:15
**intersection**
  122:22
**interview** 28:3
  33:2 224:23
  225:3,4 239:12
  239:16 308:17
  316:6
**interviewed**
  83:1 225:17
  317:10
**interviewing**
  82:25
**intra-depart...**
  100:21

**introduced**
  120:7 122:11
  375:23
**introduction**
  376:1
**inventory** 3:20
  315:19 378:15
  378:23
**investigate**
  186:4 187:4
  198:18 199:1
  199:18,21
  200:3,12,18
  203:8,15
  204:13
**investigation**
  18:14
**investigative**
  79:16
**inviting** 188:20
  321:8
**involve** 47:22
  59:1
**involved** 18:11
  19:3,7,8 34:12
  35:4 36:10
  37:13 46:1
  47:6,8,9
  123:15 125:1
  125:20 130:14
  138:17,18,22
  151:13 152:5
  153:19 157:20
  165:19 202:11
  202:13 259:19
  260:6 265:25
  267:16 268:9
  294:1 369:15
  374:11
**involvement**
  35:11,12 37:7
  56:16 125:22
  316:19

**involves** 42:9
**irrelevant**
  118:21
**issue** 29:20,23
  145:14,22
  149:15 150:2
  225:24 248:6
  252:12 253:10
  262:16,19
  295:7 347:7
  357:6
**issued** 60:11
**issues** 15:12
  83:12 116:20
  117:16,22,22
  117:25 122:3
  123:16 132:25
  152:24 200:18
  203:9 311:19
  371:16

---

**J**

**J** 3:5 8:1 86:21
  86:23 87:8,10
  88:2,3 170:5
  315:5 390:5,21
**James** 40:20
  257:24 353:2,3
  353:10,11
**Jan** 40:21
**January** 53:18
  175:5 191:16
  191:19 192:3,5
  193:16,22
  194:4 196:4,11
  196:15,20
  197:3,10,17
  202:24 203:3,7
  205:11 206:10
  212:24 231:15
  244:2 280:1
  325:21,22
  373:22 374:1,2
  374:4,5,19

379:21
**Jared** 333:1,11
  334:1 351:13
  351:14
**JD** 83:20
**Jean** 7:23 8:25
  9:2
**Jeannie** 7:21,23
  9:13
**Jean's** 8:13
**Jeffrey** 257:22
**Jerry** 2:6 5:8,8
  101:16 169:10
  314:7
**Jesse** 181:5
  193:1 211:5
  242:3 291:19
  292:14,22
  293:5,9,18
  294:25 295:21
  296:3,12
  298:14 301:12
**Jim** 257:12
**Joanna** 8:24 9:9
**job** 78:2 81:18
  98:7,9,10
  100:13,14
  108:21 156:7
**jobs** 98:24 99:2
  99:4,5,6
**Joe** 4:6 5:5
  113:22 120:6,6
  120:8,8 121:6
  121:23 122:11
  122:17 226:14
  228:22 232:5
  285:14,16,17
  299:24 322:4
**John** 86:22
  87:7,11,13,14
  257:16 353:5
  355:18 356:1,3
  372:9,11,23

**Johnnie** 54:25
  55:3
**join** 321:8
**joint** 111:22,23
**Jones** 2:6,6,7
  5:8,8 56:7,16
  101:15,16
  169:10,10,11
  314:7,7,8
**Joseph** 1:24
  2:12 3:1,12
  5:11 7:12 71:5
  86:21,21,23,25
  87:3,3,8,13,14
  87:25 88:3
  169:3,16 170:1
  170:13 314:2
  314:12 315:1
  315:13 326:12
  326:14 389:4
**judge** 1:5,12,17
  60:8 65:14
  113:3 168:6,14
  168:19 313:4,8
  313:13
**judgments**
  109:21

_____
**K**
_____
**Kanawha** 386:8
  387:15
**keep** 16:21
  115:20 156:13
  216:17 301:19
  346:21 347:4
**keeping** 346:11
**Kennedy** 55:8
  55:16,25 56:3
**kept** 346:12
  364:21
**kid** 207:14
  208:6,10,17
**kidney** 280:18
  280:20,22

**kids** 190:4
  206:18,20
  227:18 228:8
  228:18 231:1
  231:15 236:14
  237:24
**Kilpatrick**
  328:15 353:5
**kind** 21:17 27:6
  32:20 36:22
  37:10 50:8
  87:21 95:13
  100:22 124:12
  124:12,14
  137:9 148:4,5
  192:22 212:23
  215:4,16,21
  216:8 225:4,7
  225:7 247:14
  255:17 297:24
  301:7 312:11
  334:21,22
  350:24 351:18
  351:19,25
  375:17
**kinds** 15:1 91:7
  204:9 234:3
**Kirk** 328:2
  350:8,9,10
**knew** 40:15,17
  40:18,19,21
  48:23,24 76:2
  76:11,11,12
  109:19 121:1
  129:24 131:24
  134:2,18 135:4
  139:22 140:8
  145:9 149:19
  182:24 217:23
  252:11 254:8
  254:17 255:3
  341:15,20
**know** 12:2 13:2

13:11 19:15
20:22 23:7
25:10,12,13,13
26:17,19 27:6
27:20,24 28:21
28:23 31:13
34:25 35:7
36:9 37:18
38:11 39:4
40:9,12,22
41:2,5,24 42:1
45:23 47:14
49:21 50:6,7
50:14,16,18
51:10 52:4,15
52:19 53:1
54:12,16 55:7
55:10 56:23
57:7,8,12
61:10,24 62:1
62:6,9 64:6
65:9 66:2,22
67:14 68:17,20
70:18 72:4,8
74:2,6,11,13
74:17,19 75:9
75:17,22,25
76:2,3,19,22
76:25 77:2,8,9
77:15,16,16
79:8,15,16
84:13 87:1,3
87:20 93:11
98:16,18 99:2
99:2,8 100:20
100:23 102:5
103:2,9 104:9
104:18 105:3
107:16 108:8
108:15,18
109:21,25
115:1,19 117:5
120:13 121:20

122:7,19,20,20
124:7 126:8,11
126:17 127:8
127:17 128:1,7
128:11,23
130:6 131:6,24
131:25 132:8
133:3 134:17
134:17 135:5,5
136:5,5,16,17
137:4,17
138:21 139:21
139:22 140:3,4
140:8,9,16
142:5,6,7,9,23
145:13,20
146:1,7 148:7
148:8,9,10
149:15 150:2
151:19,22
152:9,14,19
155:25 156:1
158:19 159:18
161:18 164:8,9
166:4,6 171:16
171:21 172:2,7
172:8 173:11
173:13,16,22
174:1,8,14
175:10 176:4,9
176:9,12
177:18 178:2
179:13,19
180:11 181:13
182:2,4,6,17
182:24 184:18
184:25 185:8,9
185:12,14,20
186:11,13,18
186:25 187:10
187:14 189:1
189:18,23,24
190:1,2,2,11

191:11 192:7
192:11,16,19
192:22 193:5
193:11,12
194:10 195:7,8
195:10 196:8
196:16 197:7
197:12,25
198:3,3,10,21
199:9 200:13
205:21,25
206:17,18
207:25 208:2,5
208:8,10,20,25
209:13 210:21
211:1,6,10,10
213:13,15,16
214:18,19
215:2,13,14,15
215:17,18,20
216:8 217:9
221:24 222:8
223:1 225:15
226:13 227:17
228:1,2,4,13
228:17,18,20
228:24 232:10
232:13 233:3
233:21 234:2,5
234:11,22
236:3,24 238:2
238:5 239:16
239:20,21,22
240:18 241:4,5
241:20,21,22
241:22,24
242:11,12,13
242:13,14,16
242:18,22,24
242:24 243:19
244:6,17,23
245:4,18
246:16,22

247:9,9,13,24
248:2,5,14,16
249:6,7,8,11
249:17,18
250:16 251:9
251:13 252:1
252:19 255:19
255:20 256:2
256:16 257:19
259:4,25 260:1
260:7,13,17,19
260:21 261:17
263:25,25
264:3,19,21,22
264:23,23
265:8,12
266:21,23,23
266:24 269:9
271:7,23 272:8
272:9,22 273:4
273:7,10,11,11
273:12,17,18
273:22,23
274:3,7,12,14
274:24 276:2,4
276:11,13
277:14,19,24
280:8,13,14,15
280:16 281:8,9
281:13,13
282:20,20,22
284:9,10,18
285:17,17
286:10 287:11
289:21 291:17
293:9,19 294:6
296:13,14,15
296:16 297:9
297:12,12,23
298:2,2 301:2
301:2,6,8,11
303:22,23
304:1,6,14

306:1,1 307:1
307:4,6,9,20
308:14,16
309:2,9,16,19
309:20,25
310:24 311:8
312:8 318:21
319:5,15,18
320:16 322:2
322:16,19,23
322:25 323:5,5
324:12,16
325:19 326:3,7
326:14 330:2
331:5,7,20
332:4 333:11
333:12,14,22
334:3,25 335:9
336:13 341:16
341:16 342:4,7
342:16,16,17
342:25 343:4
344:6 347:12
350:24 351:22
352:3 354:7
355:2,5,12
356:3 357:14
357:21 358:13
360:17,18
361:3,12,19
363:1,24 370:3
370:16 371:13
375:15,19,20
385:10 388:1
**knowing** 108:13
164:2 190:8
363:22
**knowledge**
15:19 22:10,22
22:24 40:15
48:18 54:18,24
55:14,24 56:3
56:11 57:20

71:24 73:4
95:3,23 96:13
97:6,10 119:4
123:21 124:6
125:14 126:1
146:3,16 147:5
151:1,3,10
161:23 173:17
198:4 212:15
230:17 245:3
248:11 251:12
251:24 252:5
255:16 264:24
277:5,20
288:23 289:1
291:21 292:12
299:8,9 308:11
322:14 326:21
336:9 348:21
362:23
**known** 34:23
40:24 41:16
125:25 321:24
365:9
**knows** 14:11
15:4 21:5
289:18 343:5
**Kornberg**
328:16 353:16
353:17,18

———————
**L**
**label** 142:8
204:18
**Labor** 234:15
**lack** 236:18,22
242:4
**lacquer** 318:5,8
318:9
**Lambert's**
69:18 332:13
**land** 189:18
**Lane** 54:13
**language** 143:21

264:2
**large** 3:7 83:15
83:17 170:7
192:11,12,19
315:7 389:15
390:7,22
**larger** 238:23
**Larry** 71:4
324:23 325:8,9
325:13,18,20
385:6
**late** 5:24 17:24
20:4,15,19
21:15 22:11
43:20 45:14
49:17 50:9
51:2,7 52:23
53:15 55:5
56:1,4,14,15
59:9 60:14,18
67:7 68:18,19
69:4,25 70:10
70:24 71:10
75:5 102:3
130:5 150:3
183:14 189:21
205:17 282:14
296:11 310:9
311:12 359:18
360:25
**Lauderdale**
1:21 3:8 4:5
168:23 170:8
313:16 315:8
**laugh** 94:1
151:19,22
**laughter** 93:6
94:9
**law** 6:5,11 15:16
17:1,19,20,25
18:12,14,20,22
19:6,12,20
20:21 30:11,14

30:17 42:2
49:2,5 54:12
57:3 59:2
65:19 71:11
83:23 113:3,9
113:16 125:23
198:16,25
200:11 202:9
202:19 204:8
224:25 267:16
269:15 277:11
277:17,22
316:20 346:16
365:4 370:18
**lawful** 3:2 170:2
315:2
**lawsuit** 118:13
118:18 243:4
287:23 288:2
288:10,16,19
288:25 289:3
289:10 290:12
290:18,22
291:15 299:17
321:9 324:19
381:18 382:6
382:11,15,18
382:22,25
384:6,9
**lawsuits** 383:25
**lawyer** 31:6
40:19 198:2,7
202:4,7,22
225:12 375:24
385:3,5,7
**lawyers** 14:16
17:11 40:13
49:8,19 50:5
51:1 52:20
54:12 55:4,7
56:3 62:24,25
78:16 102:22
154:5 158:25

160:24 161:13
162:21 268:9
323:8 327:7
344:2,11
361:17 367:8
385:10
**lawyer's** 360:21
**lay** 11:16,19
**layperson** 11:20
**lead** 226:16
251:5,6 252:12
252:14,19
253:11 255:4
300:7 354:24
355:13 356:5,8
357:21 358:3
**leaders** 183:2
**learn** 88:6
216:25 217:17
**learned** 14:13
145:11,19
148:3,11
150:23 185:13
187:7,10 228:9
**learning** 150:19
150:20 166:6
187:8,11,14,18
**leave** 52:15,18
74:5 105:21,24
380:5 381:22
**leaving** 332:13
380:18 383:6
**led** 185:21
**LEE** 1:9 168:10
313:6
**left** 48:17 52:15
74:1,22 77:24
77:25 85:4
272:9 295:20
333:13 350:13
**legal** 30:8 31:23
47:13 64:25
65:3 198:9

202:18 251:16
340:19
**leniency** 311:7
**Lenora** 1:3 71:2
168:3 181:4,5
192:23 211:3
281:3 313:2
**letter** 102:11,23
103:14,21
104:20 321:7
322:21 323:5
**letters** 104:5
**letting** 28:21
151:21 171:16
**let's** 13:12,12
38:17 60:2
67:20 68:24
86:6 93:22
104:13 123:20
166:24 178:16
180:20 185:20
197:14 213:25
216:12 217:15
221:5 223:22
223:25 224:1
226:4 246:10
246:11 260:24
272:12 293:21
304:7 310:5
319:24 350:13
352:17 368:24
373:10
**levels** 251:6
**Levin** 2:2 5:21
19:2 20:1,4
27:13,20 33:16
33:24,25 34:13
40:9 41:17
43:17 45:12
46:20 48:19,24
49:9,19 50:5
50:21 51:1,6
52:20 53:5,14

54:9,19 55:1
57:7 60:23
62:24 63:13
72:17 73:1
75:4 96:1,15
150:25 151:14
152:6,23 157:6
169:6 201:10
201:22 203:22
205:3 251:11
257:4 259:18
260:5 262:8
265:2,24 266:4
266:8,20 267:4
267:14 269:14
280:25 314:3
361:1,5 366:21
367:24 374:10
375:4,7
**liars** 116:15
**license** 87:5,19
**licensed** 30:11
30:14,17 113:9
113:15
**lied** 117:15
**liens** 321:15
322:13 323:8
323:14
**lifetime** 363:19
**lightings** 18:18
**liked** 87:11
**limit** 55:22 99:4
311:5
**limitation**
359:17
**limitations** 6:18
6:19
**limited** 21:10
25:7 61:3 69:3
132:13 164:4
261:18 289:4
316:10 328:6
352:2 379:14

**line** 89:8 118:24
264:8 266:12
281:17 285:8
285:10 286:3
294:21 378:21
**lines** 136:15,15
152:19
**liquid** 317:20
318:18
**list** 62:2,22 63:1
258:8 386:10
**listed** 251:5
**listening** 271:3
**literature** 90:8
**litigation** 16:2
16:10 17:5,18
19:13 22:14
23:6,6,7,8,8,14
23:15,15,16,23
23:24 24:5,15
24:16 25:3,12
26:2,9,14 30:9
35:5,11 36:10
36:17,19,23
37:2,14,17,20
37:20 38:21,24
39:8,8,9,24
40:4 46:1 48:4
48:6 49:6
56:20 57:17
58:8,20,24
59:8 78:15
85:24 105:11
118:21 149:16
153:18 186:2
218:10,13,23
219:11,15
259:19 265:25
268:9,18 269:1
277:12 281:4
293:6 304:6
321:16 323:10
327:4 365:10

384:11,17,20
385:8,15,18
386:7,8 387:1
**little** 40:23
  76:16 101:4
  132:7 179:16
  240:14 296:7
  308:10 311:11
  312:14 372:21
  375:17
**live** 8:15 9:7,19
  9:24 119:22
  122:17 135:10
  135:11 182:15
  182:17
**lived** 9:20,21,25
  35:2 76:12
  119:17 120:2,7
  120:23 122:21
  123:1,5 135:12
  139:23,23
  158:13 232:1
  237:24
**lives** 9:6,8,9
  35:2 124:2,4
  134:19 135:13
  305:6,19 380:2
**living** 10:7
  123:17,24
  130:13 135:4,5
  135:5 158:15
  158:19 159:4
  159:17,17
  187:17 223:3
  223:14
**local** 75:20
**locate** 32:25
**located** 27:21
  153:7,8,11,11
**location** 27:25
**locations** 153:4
  331:14,21,24
  331:24 341:23

370:6,13
371:12
**Lofstead** 118:4
**log** 364:21
**logical** 142:2
**long** 34:23 40:24
  49:15 87:9
  117:6 121:19
  129:2 132:19
  132:24 150:13
  150:14,18
  175:8,18 183:8
  183:10 206:3
  212:16 310:10
  321:25 364:23
  375:21
**longer** 310:8,12
  310:18
**look** 61:13 62:2
  62:11,15 63:7
  67:15 69:14
  85:9 87:1
  91:20 93:2
  107:9 111:5
  113:19 115:12
  127:9 129:15
  144:10 203:16
  216:8,12 224:1
  224:19 240:4
  244:16 249:13
  255:13,20
  267:22 296:23
  306:18 320:7
  348:23 356:16
  362:12 372:5
  372:17 375:14
  375:20,22
**looked** 42:4
  65:20 83:14
  245:13,22
  249:14 356:17
  356:18 362:12
**looking** 10:13

10:14 42:1,1
49:4 61:24
74:12 83:4
126:22 128:8
128:10 204:22
245:18 255:18
261:5 282:19
311:20,23
318:23 320:12
**looks** 62:17
  309:7
**lost** 125:17
  146:10 265:22
**lot** 83:6 91:14
  99:9,20 109:18
  182:7 311:13
  311:18,20
  312:5 317:1
  361:18 364:1
  364:12 386:6
**Louis** 257:14
**Lumberport**
  69:19 332:11
**Luzader** 71:4
  326:4,6
**Luzaders** 326:8
**lying** 116:5,19
  116:23
**Lynn** 8:24 9:9
**L.L.P** 2:17
  169:21 314:15

---

**M**

**M** 2:17 169:21
  314:16
**machine** 318:16
  319:7
**machines**
  318:14
**Madame** 157:24
**Madonna** 55:8
  55:16,25 56:4
**mail** 232:17
**mailed** 335:23

**maintain** 349:20
**maintaining**
  46:16,17
**major** 10:18,19
  80:24,25 202:8
**majority** 380:11
**making** 29:2,10
  64:24 65:1,5
  136:16 187:15
  215:1 226:7
  234:23 266:9
  270:5 271:5
  276:6 308:2,4
  322:8 327:11
  327:12,15
  341:19 348:13
  348:22
**man** 258:19,20
**managed**
  102:18
**March** 210:10
  213:25 214:10
  214:13,21
  216:1,2 231:16
  244:3 280:2
  309:14 379:22
**Maria** 120:21
  120:21 121:10
  126:3 134:9
**Marie** 8:24 9:8
  121:9,10,23
**mark** 9:5 86:6
  115:10,23
  303:6 373:10
  378:7
**marked** 60:2,4,6
  86:9,11 112:9
  114:13,21
  115:7,17,18,25
  116:2 178:14
  250:5 303:7,15
  304:17 319:24
  320:5,7 368:8

369:5,7 372:4
373:13,15
378:10,14
**marketplaces**
  91:13
**marking** 114:16
**married** 7:18
  8:2,4,17
  124:21
**Mary** 2:11 71:3
  71:4 101:14
  124:10 126:4
  169:15 181:18
  193:6 314:11
  326:1,4,5
**Masry** 6:5,11
  15:14,18,22
  16:1,8,14,20
  16:25 17:1
  18:12,14,19,22
  19:6,12,20,24
  19:25 20:21
  21:14 33:18,25
  34:13 43:22
  45:12 46:19
  47:9,25 53:3
  57:8 63:14
  69:7 70:5,11
  70:25 71:11
  72:2,16 73:1,1
  75:6 79:24,25
  96:1,15 102:4
  102:16 150:5
  150:10,24
  151:6,9,12
  152:3,23 157:6
  157:18 180:11
  204:24,24
  251:10 265:2
  267:15 277:17
  280:25 361:2,5
  361:7 366:20
  367:24 374:11

**Masry's** 67:10
**master's** 81:22
  81:24 82:11,13
  372:10 373:5
**material** 60:17
  79:20 301:16
**materials** 7:1,3
  7:5 102:8
  335:23 336:1
  336:10,14,19
  341:19
**math** 177:11
**matter** 4:6
  14:23 31:7
  38:14,18,19,20
  42:24 46:14
  56:20 57:17
  58:8 63:5
  70:11 118:12
  121:19 131:22
  140:22 147:1
  148:2 150:11
  151:1,20
  153:24,25
  172:10 180:10
  182:25 187:3
  200:3 271:4
  375:14 385:15
**matters** 5:22 6:1
  6:6,8,12,16
  16:24 19:3,7
  35:13,21 36:10
  37:12 48:4,6
  96:22 109:18
  109:23 151:14
  152:6 187:2
  204:3,20 312:4
**Matthew** 195:9
  195:10
**Mauro** 120:21
  121:11,23
**ma'am** 295:17
  319:25

**McDonald**
  257:14
**McELWEE**
  2:10 169:14
  314:10
**McHUGH** 2:14
  169:18 314:13
**McQUAID** 2:17
  4:14,14 64:20
  65:1,13 66:11
  66:19,24,25
  67:2 169:21
  314:16
**McWILLIAMS**
  2:3 5:6,6
  27:15 169:7
  277:1 314:5
**Meadowbrook**
  69:18
**mean** 20:14
  24:10 31:17
  35:7 37:18,22
  37:24 38:3,5
  38:25 39:2,4
  49:21 50:1,6
  59:5 68:17
  72:1,24 74:9
  79:14,16 80:10
  84:22 88:12
  93:7 98:9
  100:24 104:21
  126:7 127:17
  129:7 139:14
  148:10 157:13
  163:7,8 173:15
  180:23 184:25
  186:21 195:17
  196:16 197:6
  204:12 213:20
  214:8,19 216:7
  217:3 231:14
  241:4,13 246:6
  250:2 256:17

273:10 276:3,8
283:20 293:19
293:23 296:8
307:11 311:2
318:22 322:25
324:21 336:18
340:12 349:2,6
350:2 355:21
359:23 370:23
385:14
**meaning** 228:24
  228:25 296:6
**means** 25:11
  38:7 104:21
  321:15 323:9
  336:15
**meant** 301:9
  318:24
**measures**
  237:10
**media** 239:25
**medical** 71:15
  112:22
**Medicare** 87:2,2
**medicine** 88:6
  89:22 90:24
  91:8,10 92:12
  97:14 115:10
  115:16 312:1
**Medina** 2:3 4:16
  4:16,23,25
  5:14 11:1,9,22
  11:25 12:21,25
  13:12,17,21
  14:5 15:16,19
  15:23 16:3,5
  17:12 18:10,19
  18:23 19:14,18
  20:6,8,10,12
  20:23 22:3,15
  22:19 23:20
  24:17,23 25:5
  26:18 27:22

28:11,12,18
29:15,22 30:2
31:4,10,12,17
31:25 32:3,6,8
32:10,14 33:7
33:12 34:9,14
35:16,24 36:4
36:13 40:2,11
40:14,18,24
41:17 43:22
44:23 45:6
46:6,25 47:10
47:17,19 48:1
48:24 49:20,25
53:2,23,25
54:17,23 55:9
55:12,16,23
56:9,13 57:23
58:9,12 59:14
59:23 61:1,2
62:1 63:2,9,25
64:8,24 65:18
66:16,21 67:1
67:8,13 68:3,4
68:10 69:2,6,9
70:2 71:25
72:24 73:13,16
78:19,24 79:10
79:13 85:17
88:9,24 89:1,7
89:18,23 90:2
92:4,15 93:12
93:21 95:7,22
96:5,9,23 97:5
97:15,19
101:10,23
102:6,12,25
103:3,5,7
104:3 106:24
107:2,8,14,19
107:21 112:2,7
112:11 114:7
114:20,24

115:6,14 117:2
118:19 119:1
122:4 125:3,12
127:12,14,17
128:12 130:22
131:5,19 132:2
132:22 133:2
133:11 138:14
138:20 141:5,7
141:17 142:14
143:14 144:1
145:1,8,23
146:6,25
147:11,15
148:16,20
149:1,8,17
150:22 151:15
151:18,19
152:9,15
154:10,13,19
154:20,22,25
156:10,16,20
157:1,14,18
159:1 160:15
161:14 163:4
163:13 165:11
169:7 171:4,16
171:20 172:12
172:14,18
177:6,8,14,16
181:5,6,7,8,9
187:20 189:2
192:6 193:1
199:5,11,23
200:8,20,24
201:23 203:10
208:23 209:15
209:25 211:5
215:8 222:12
222:16,24
229:12 235:16
236:16,18,22
237:11 242:3,7

| | | | | |
|---|---|---|---|---|
| 242:21 243:3,5 | 303:13,17 | 368:24 369:13 | 183:8,12,14 | 244:20 246:25 |
| 244:21 248:10 | 304:7,21 | 369:24 370:7 | 184:4,11 | 247:3,8,19 |
| 251:7,21 252:1 | 307:23 309:5 | 370:14,19 | 185:23,24 | 248:4,5,21 |
| 252:15 253:3,5 | 309:24 310:7 | 371:1,5,14,21 | 188:6,14,17,25 | 253:9 254:3,13 |
| 255:5,25 259:5 | 310:17 311:1,4 | 371:24 372:15 | 189:9,12 | 254:16,16 |
| 260:8,11,15,21 | 311:22 314:4 | 372:25 374:1,2 | 190:13,14,21 | 267:25 268:5 |
| 261:5 262:4,21 | 316:8,15 317:2 | 374:8,14,21 | 190:22,25,25 | 274:7 276:7,17 |
| 263:1,3,6,16 | 317:3,8 319:25 | 375:1,3,6,12 | 191:2,5,12,15 | 278:6,10,17,25 |
| 264:8,11,16 | 320:3,11,15,17 | 375:23 376:1,7 | 191:20 192:1,2 | 279:17,19,22 |
| 265:17 266:11 | 321:1 323:16 | 376:13,20,24 | 192:4,10,12,15 | 280:2,3,7 |
| 266:14,17 | 323:24 324:3,7 | 377:1,2,6,10 | 192:24 193:1,3 | 283:4 287:23 |
| 269:6,8,19 | 324:10 326:15 | 377:21 378:2 | 193:6,9,16,19 | 288:1,8,15,18 |
| 270:7,17,24 | 326:18 327:8 | 378:11,20 | 193:22,24 | 288:24 289:3,9 |
| 271:2,4,5 | 327:13,15,18 | 379:1,6,9,12 | 194:3,9,12,18 | 289:14,16 |
| 272:5 274:25 | 327:25 328:4 | 379:25 380:3 | 195:2,4,8,9,12 | 290:10,18,21 |
| 275:2,6,11,14 | 328:21,24 | 380:10,17,22 | 195:20 196:4 | 291:3,14 |
| 275:22 276:25 | 329:3,10,19 | 381:3,10,13,19 | 196:11,15 | 325:24 327:1 |
| 277:13,21 | 331:12,17,23 | 382:7,12,17 | 197:4,6,10,17 | 330:7 350:16 |
| 278:3 280:4,23 | 332:2,7 334:16 | 383:1,9,11,23 | 197:19 202:24 | 355:25 373:25 |
| 281:16,21 | 335:8 336:5,11 | 385:14 386:18 | 203:3,5,7 | 374:11,17,22 |
| 282:1,6,10,14 | 336:24 337:10 | 386:22 388:7 | 205:13,20 | 374:23,25 |
| 282:18 283:17 | 337:17 338:2,9 | 388:11,14 | 206:11 210:4,8 | 375:9,16 |
| 283:22 284:4 | 338:18,21 | **Medina's** 150:4 | 210:8,10,11,16 | **meetings** 71:1 |
| 284:25 285:10 | 339:4,15,17 | 243:10 292:22 | 210:20,25 | 118:13,17 |
| 285:20,23 | 340:24 341:9 | 295:21 296:3 | 212:5,10,16,21 | 125:1,5,8,14 |
| 286:5,14,19 | 342:6,15 | 298:18 299:4 | 212:24 213:2,6 | 125:21 160:2,6 |
| 287:19,25 | 343:10,19,21 | 316:22 | 213:9,12,19,25 | 160:6,13,14 |
| 288:13,22 | 345:3,6,12,19 | **meet** 161:21 | 214:8,9,10,10 | 183:25 190:12 |
| 289:7,15,18,23 | 346:1,8,15,19 | 162:2 185:18 | 214:13,14,22 | 190:20 191:2 |
| 290:1,25 291:7 | 346:23 347:14 | 329:8,14 | 216:13 218:1,2 | 191:22,23 |
| 291:10,19,20 | 347:24 348:5,8 | 350:10 375:12 | 221:16,21 | 194:13,14,24 |
| 292:14,14 | 349:2,16,22 | **meeting** 3:18 | 222:20,21 | 195:3,6,17,20 |
| 293:5,9,15,18 | 350:18 355:3 | 68:18 75:18 | 224:5,13 | 196:7,20,23 |
| 293:21 294:1,4 | 356:25 357:5 | 133:8 135:17 | 226:11,12,22 | 197:12 206:3,3 |
| 294:11,19,23 | 357:24 358:25 | 144:12 160:19 | 227:9 230:21 | 206:5 207:12 |
| 294:25 295:9 | 359:16 360:2 | 161:8 170:17 | 230:23 231:8 | 207:13 210:9 |
| 295:13,17 | 360:14,23 | 173:4,5 174:17 | 231:22 238:16 | 210:14,18 |
| 298:10,13,14 | 362:1,7,17 | 175:1,4,8 | 238:18,20 | 211:25 214:24 |
| 299:2 300:16 | 363:10 364:5 | 178:1,8,20,23 | 239:6,23 240:1 | 225:18 230:18 |
| 301:12,12,23 | 365:6,12,24 | 179:2,8,12,21 | 240:8 241:10 | 244:3,9 248:21 |
| 301:25 302:3,5 | 366:9,17,20 | 179:22,25 | 241:12,14,18 | 248:24 281:5,6 |
| 302:7,10,24 | 367:12,17,21 | 180:16,25 | 241:21,23 | 282:9,11,16,21 |
| 303:3,6,8,11 | 368:12,16,21 | 182:5,9,12,20 | 243:16,20 | 282:23,25 |

283:15 284:8
287:24 305:22
305:25 306:2,9
306:14 325:21
329:18,23
330:6,11,17,19
353:2 354:20
356:2,3 379:21
**melted** 319:7
**member** 39:14
100:15 109:16
109:17 156:2
163:23 164:2
198:1 269:15
365:5 381:1,8
**members** 27:17
105:17 118:2
119:22 123:17
123:24 164:3,3
164:17 165:17
**membership**
381:4
**memo** 375:6
**Memorial**
234:14 235:10
**memorializati...**
226:10
**memorized**
309:7
**memory** 66:18
126:2,8 178:6
193:11 272:4
302:12 341:25
**Menendez** 1:15
4:22,23 23:7
23:15 24:2
120:24,24
121:14,15,15
121:24 123:4
124:3,13
125:20,24
134:10,13,22
135:25 137:12

139:8,17
140:21 143:18
168:17 175:19
176:20 182:12
193:18 211:22
232:8 233:17
313:11 321:21
**Menendezes**
123:5
**mental** 171:8
**mention** 24:11
183:24 209:11
253:8 268:3
322:12 323:1,3
323:4,7 356:9
**mentioned**
15:14 41:4
47:5 48:8
111:6 119:8
122:11,14
126:11 129:18
136:21 202:13
254:15 267:25
281:7 322:20
355:19 376:1
388:15
**mentioning**
253:14 254:12
**mentorship**
84:10
**Merit** 3:5 170:5
315:5 390:5,22
**message** 280:12
**Messinger** 71:3
323:22
**met** 40:25 120:6
120:12 144:14
144:23 145:7
177:25 202:17
241:23 342:25
350:8,9,23
**metal** 11:18
365:15,20

366:15 367:10
367:15
**metals** 10:25
145:13,21
149:15 150:2
252:12 253:10
253:10,14,22
254:5,13,15,17
255:3 361:25
362:16 363:7
**methodologic...**
83:3
**methodology**
83:2
**methods** 82:25
83:10
**Mexican** 93:4,5
93:25 94:1,7,8
**Mexico** 91:11
**microphone**
261:6
**middle** 53:18
86:17,18 87:10
87:16
**Middlebrook**
332:9
**Mike** 232:25
234:9
**Milford** 343:17
**mind** 6:19 33:14
128:8,10 130:7
142:17,18
147:1 174:19
188:9 216:9
221:1 259:11
357:9
**mine** 114:15
115:3
**mingle** 241:15
241:16
**minimis** 251:6
**minute** 73:19
107:9 188:9

223:6 293:13
380:17,18,25
384:21
**minutes** 10:3
183:11 312:9
317:6 347:11
368:19 380:7
**Mischaracteri...**
253:5
**mischaracterize**
299:6
**mischaracteri...**
298:18
**mischaracteri...**
298:24
**misleading**
25:16,16 73:21
83:9 163:22
**mistake** 331:10
**mistaken** 59:5
175:6 180:12
**misunderstand**
32:11
**misunderstan...**
46:6 262:6
269:24
**misunderstood**
10:9 122:10
299:4
**MITCHELL**
2:2 169:6
314:3
**moment** 143:22
**Mon** 385:19,24
386:1
**money** 58:19,23
59:7 83:6
105:15 200:7
200:22 201:8
201:20
**monitoring**
71:15
**Montgomery**

71:4 326:1
**month** 20:9 31:9
31:24 33:6
175:10,11
176:11 210:9
210:15 213:13
230:21,23
231:21
**months** 9:22
19:15 50:7
78:1 172:24
175:24 176:1
176:12,13,19
179:13 232:10
254:6 275:13
**Moore** 112:5,20
**Morgantown**
8:16 9:20,24
9:25 10:17
35:2,2 41:3,6
41:21 48:25
156:2 188:18
265:16,23
266:1,6,10
299:21 335:24
341:15
**Morgantown's**
35:3
**Morlock** 71:3
324:12
**morning** 164:8
180:17 312:3
**motivation**
276:21
**Mountaineer**
3:22 110:10
315:24
**move** 9:16 10:5
10:11,16 13:13
93:22 124:6
189:3 203:8
265:23 266:1,5
266:9 267:2

269:5 270:6
316:16 357:4
380:5
**moved** 9:22
378:1
**moving** 10:20
266:23 269:9
269:10 349:6
376:5,6 377:18
377:19
**mutual** 35:1
**M-A-S-R-Y**
15:20
**M-A-U-R-O**
121:12

_____
                    N
**name** 7:10,20,24
8:9,13 9:6
40:19,21 86:21
86:22,25 87:8
87:11 106:18
111:14 120:21
121:3,4,7,11
121:11 124:9
124:10,11,17
124:21,23
126:4 135:8
139:18,20
154:2 208:10
232:24 233:1,2
233:3 234:9
245:15,19
256:7,8,11
272:17,24
276:12 285:14
323:21 332:25
333:1,3,5
353:6,24
354:10
**names** 8:23 9:4
120:19 127:2
153:1,3 154:4
159:8 180:3,24

181:2,13 238:5
257:9 274:17
331:11
**national** 114:4,5
**natural** 10:24
11:18
**nature** 144:24
145:6 216:18
272:17 282:25
289:4
**NAUGHT**
389:1
**near** 158:20
207:22 223:4
223:14 232:14
**nearby** 247:1
326:9
**necessarily**
155:3 202:21
257:5,5
**Ned** 2:3 5:3,6
169:7 314:5
**need** 5:14,17
28:13 36:24
47:1 51:13,17
69:12 73:23
106:20 119:10
145:3 185:14
209:4 216:15
242:25,25
268:12,25
271:7 289:20
291:7 292:1
293:11,12
297:6,8 299:14
304:10 312:7
334:4 346:21
368:20 377:24
380:4
**needed** 87:6
158:20 198:21
203:8 218:8
269:16 296:24

296:25 297:12
297:24 298:21
300:11 302:17
333:20 362:12
**needing** 310:18
**needs** 72:5
91:23 180:7
294:7 368:18
372:18
**neither** 109:24
**Nemours** 1:6,13
1:18 2:15,18
168:7,15,20
169:19,22
313:4,9,14
314:14,17
**never** 28:18
62:20,22 74:15
76:6 87:11
95:18,18,19
100:23 164:4
164:16 183:7
220:11 225:4
225:17 254:9
260:15 265:1
268:11 273:17
273:18 274:16
297:23 298:1
308:9 311:2
321:18 324:13
339:12 354:2
354:14 368:2
**new** 10:13,14
80:12,14,16
87:4,5 100:5
197:7 212:4,6
213:1 214:6,11
214:19
**news** 118:9
162:6 239:25
**Newsom** 162:11
162:13
**newspaper**

107:4 116:12
**nice** 181:9
**night** 29:2 60:15
60:18 61:22
62:10,16,18,22
62:23 63:1
67:17,18 68:16
68:18,19 70:19
243:22,23
309:23
**nine** 164:12,21
164:23 165:3
**non-answer**
371:10
**non-consultan...**
376:8
**non-consulting**
11:4 66:4
367:19 379:15
**non-testifying**
5:20 6:4,11
11:10 14:12
15:5,9 16:13
18:2,5 19:5
24:24 25:11,14
26:22 27:1
28:3,10,20
32:4,23 64:9
65:23,25 79:17
346:25 376:21
379:13
**non-testifying...**
383:2
**Norfolk** 153:12
154:5 205:8
**normal** 241:20
245:5
**normally** 235:7
**Norman** 9:5
**north** 9:9 75:21
**Notary** 3:6
170:6 315:6
389:15 390:6

390:22
**note** 309:5
**notes** 3:18
170:17 178:19
178:25 179:4
216:13 226:9
226:12,13
304:4 305:7,11
307:21 308:2
309:12,15
317:15 334:7
334:10,11,12
335:4,5,14,15
349:5,15,20
**notice** 3:4,17
39:16 60:7
114:10 115:15
170:4 315:4
**noticed** 23:9,25
**notified** 269:14
**notify** 333:6
**notifying** 27:12
**notion** 141:15
142:1 188:20
**Notre** 80:20,22
81:1,11,13,19
82:6
**November** 7:14
116:3 175:13
**number** 60:3,6
69:15 70:8,23
86:8 112:8
115:24 117:16
178:13 218:9
272:17 303:9
309:6,8,13,22
320:4 329:17
329:17 339:12
369:4 373:12
378:9,11
**numbers** 245:5
246:23 251:4
**nutrients**

296:14,15
297:13

**O**

**oath** 5:13
**object** 11:1 14:7
24:17 28:7
31:10,25 33:7
33:12 34:9
35:16,17,24
36:4,13 40:2
40:11 49:25
59:14 68:4
72:24 85:17
88:9 92:4,15
95:7 96:23
117:2 119:1
122:4 125:3
131:5,19 132:2
132:22 133:2
133:11 138:14
138:20 141:5,7
141:17 142:14
143:14 144:1
145:1,8,23
146:6 147:11
148:16 149:1,8
149:17,22
156:10 159:1
163:4,13
165:11 172:14
172:18 177:6,8
177:14,16
189:2 192:6
199:9,13,23
200:8,20,24
201:23 203:10
208:23 209:15
215:8 222:16
222:17,24
229:12 235:16
236:16,18,22
237:11 243:5
244:21 248:10

252:15 253:3
255:5,25
263:16 265:17
269:6,8 277:13
280:4 281:21
283:2,17,22
284:4 285:8
298:24 307:23
323:16 335:8
339:15,17
342:6 346:1
347:24,24
349:16 356:25
357:24 362:7
364:5 369:24
372:15,25
374:21
**objected** 31:12
31:13
**objecting** 29:16
264:13 380:13
**objection** 17:4
32:7 78:24
89:23 114:7,16
127:15 171:5
171:17 285:22
286:14 288:12
290:14 304:8
316:23 328:22
380:14,14,15
384:3
**objectionable**
245:1
**objections** 14:6
14:9 32:12
89:25 311:19
317:1 347:2,4
347:10
**objective** 154:7
154:18 171:24
172:3
**obligation** 16:19
**observation**

227:10 229:1
229:16
**observations**
131:23 132:1,4
234:20,23
334:24 360:4,6
376:17
**observe** 206:11
279:18 361:11
**observed** 343:22
348:22 349:7
360:9
**obtain** 96:13
200:22 337:7
337:24 338:7
369:12,22
**obtained** 6:22
7:1,5 17:16
18:4 19:24
22:11,22 54:18
63:12,19 64:12
65:9 96:14
97:7 226:18
280:24 316:14
337:10 379:15
**obtaining**
308:20 351:4
**obvious** 227:19
**obviously**
252:11 375:6
**occur** 210:16
**occurred** 162:8
177:19 178:8
210:19 216:11
240:19 298:6
367:25
**occurring** 244:7
**October** 9:18
177:4,13
378:17
**offhand** 323:21
**office** 74:9,23
77:24,25 78:1

98:4 123:6,11
126:14 134:17
136:4 137:4
138:23 156:3
165:2,3,4
226:15 227:11
227:13,14,15
231:6 232:14
232:18,20
233:7 234:8
257:1 297:3,6
297:9 341:15
342:24
**official** 7:24
86:25 87:6,25
**officially** 86:18
241:12,18
**oh** 10:8,13 13:17
16:4 37:10
51:14 62:8
73:9 80:12
89:13 93:17,19
100:20 107:21
111:12 113:12
122:15 128:1
136:8 139:16
174:13 182:16
183:9 187:6
193:25 202:11
207:22 217:13
227:20,23
228:15 237:15
250:4 299:18
329:7,16 330:9
335:7 340:16
351:17 384:21
**Ohio** 385:9
**okay** 7:8,13,22
7:25 8:8 9:7
9:14,16 10:5
13:17,24 16:4
17:3 18:9 20:3
20:11 21:19,20

22:3 23:2
24:13,15 25:14
28:14 30:7
31:2,25 32:2
32:10 34:16
35:4 36:18
37:1 38:12
39:5,11 40:1
40:18 41:8
42:3,20 46:4
47:6 48:3,15
48:16 49:3
50:2,13 51:10
52:17 54:8,22
56:6 58:9
59:25 60:1
61:23 62:11,12
62:15,19 63:2
64:6 66:24
67:2,11,12
68:24 69:1,14
69:24 70:8
71:19 75:15,20
76:11 77:14
81:12,21 82:2
83:18,22 84:1
84:5,14 87:15
88:1,5,23 89:7
89:15 90:22
91:16 92:2
94:5 95:14
100:8,11
101:23 102:12
103:5,22
104:13 105:20
107:8,21,23
108:18 110:4
110:18,20,22
111:2,5,13,17
111:25 112:11
112:17 113:13
114:20 115:6
115:14,15

116:10 118:11
119:7,9 120:11
121:6 122:15
122:23 124:3
124:20,22
126:6,9 127:10
129:18 130:3
130:10 133:12
134:1,8 135:1
135:10,16,20
135:24 136:13
136:19,24
139:3 142:17
143:3 144:6,20
146:12 150:8
152:8 154:1
155:1,8 156:19
157:8 159:8,14
159:20,23
161:21 163:21
163:25 166:24
171:13,19
173:3 174:25
175:18 176:16
177:1 178:10
178:15,16
179:15,18,20
179:24 180:1
180:18,22
182:14 183:22
184:5,20 188:8
190:6,19
191:18,25
192:2,20 193:6
193:15,21
195:1,4,19
196:2,10,18
197:9,16
199:11,14
200:21 203:6
204:11 205:23
206:4 209:5,17
210:3 212:2

213:5,14,18
214:17,25
216:12,16,19
221:12 222:2,5
223:17,22,25
224:8,17,22
225:10,21
226:9,14
228:14 229:18
230:9 231:1,24
232:10 235:11
235:25 236:9
237:17 238:2
238:12,14,21
239:1,5 240:4
240:15,20
244:11,16,22
245:8 246:9,11
246:24 248:12
249:18,22
250:16 251:1,4
251:20 254:2
254:14,20,22
259:23 260:3
260:24 261:6
262:4,21 263:1
263:2,6,13,23
264:11,15
265:13 266:14
266:17 267:4
270:10 271:8
272:12 273:2
275:14 277:16
279:14,21
282:1,10 284:7
284:20 286:7
286:13,24
287:3,10,15,18
287:22,25
288:5,13,17
290:3,7,15
291:18 293:5
293:11 294:10

294:23 295:9,9
295:13,18
296:2,8,10
299:1,3,19
300:13,19,21
301:25 303:17
304:7 305:21
306:10,16,21
307:25 308:24
309:24 310:5
316:8,15,20
319:11,15,19
320:10 321:1
321:20 322:1
322:22 323:7
324:10,12,15
325:18 326:1
326:15 327:6,8
327:19,21
328:13,23
329:13,22
330:1,4,14,21
331:12 332:7,8
332:14,19,23
333:5 334:14
334:16 335:17
336:11,13,21
337:14,23
338:9,11,24
339:5 340:20
341:11 345:8
345:19 346:8
346:19,20
348:5 349:23
350:24 352:19
353:1,5 354:2
354:13 355:25
357:20 358:2
358:20 359:5
359:16 360:2
360:14 361:20
362:6,17,19
363:2 365:3,12

366:9,13 367:6
367:21 368:4
369:13 371:3
371:14,24
373:7,18
374:13,16,17
376:7 377:3
378:2 379:1,25
380:3,17 382:7
383:1,7,11,23
385:2 387:17
387:19,22,25
388:3
**old** 74:6 100:6
128:6,12
129:17 130:7
138:24 207:15
207:25 307:5
**older** 307:7,8
**old-time** 120:25
**old-timers**
120:22
**once** 8:7 103:15
146:20 163:14
199:15 201:14
210:9,15
219:12 223:7
230:21,23
232:13,13
233:22 267:22
**ones** 48:8 100:6
212:1 325:1
**one's** 44:18
**one-month**
230:18
**ongoing** 78:15
**online** 42:1,2
49:1
**open** 142:2
233:7 234:12
259:10,13,16
**opening** 27:5
**operate** 220:6

**operated** 307:22
362:10
**operating** 91:10
305:4
**operation** 69:20
70:14 71:7
220:11
**operations**
308:19
**opinion** 11:5
36:5 38:6 72:6
85:18,25 95:10
97:1 108:9,11
118:19 147:12
237:12 357:15
**opinions** 6:24
14:14 20:25
21:17 36:7
45:18 154:14
357:8
**opportunity**
231:14 372:12
372:17 375:11
**opposed** 72:5
106:5 227:4
**opposing** 26:24
**opposition**
109:12 110:3
**order** 3:17 60:8
61:12,14,19,25
87:18 280:9,9
342:4
**ore** 318:3,4
**organizations**
100:6,7
**organize** 133:9
133:17
**oriented** 186:23
**original** 55:22
303:9
**originally** 80:9
**osteopathy**
353:25

**outside** 64:17
72:22 75:3
76:17 103:1,10
103:13,18
105:7 160:23
161:12 164:14
165:4 166:10
241:8
**outspoken**
39:23 40:3
**outstanding**
302:5
**overlapping**
66:4
**overnight** 78:3
**overtime** 182:8
**owned** 190:3,3
307:22
**owners** 337:25
338:15 369:11
**ownership**
189:18 381:11

**P**

**packaging**
301:15
**packet** 60:17
61:22 62:18
**page** 3:11 61:17
62:13,15,17
68:24 89:16
91:6,20 93:2
93:14 107:1
110:6,9,13
113:19 118:10
170:12 281:16
281:18 291:20
310:1 315:12
317:21 318:3
318:25 319:1
319:16,20
332:19 335:17
**pages** 1:25
169:4 301:13

314:2 317:23
390:10
**paid** 34:20 43:3
43:10 105:14
105:17 220:11
**paint** 318:1
**panelist** 94:13
94:18 95:1
**Pap** 33:25
**Papantonio** 2:2
5:21 19:2 20:2
20:4 27:13,20
33:16 34:1,13
40:9 41:17
43:17 45:13
46:20 48:19,24
49:9,19 50:5
50:22 51:1,6
52:20 53:5,14
54:10,19 55:1
57:7 60:23
62:25 63:13
72:17 73:1
75:5 96:1,15
150:25 151:14
152:6,23 157:7
169:6 201:10
201:22 203:23
205:3 251:11
257:4 259:18
260:6 262:9
265:2,24 266:5
266:8,20 267:4
267:15 269:15
280:25 314:3
361:1,5 366:21
367:24 374:10
375:4,7
**paper** 82:21
94:22 126:25
264:25 275:16
292:1 299:14
300:10,19

301:14 364:18
**papers** 74:6
87:25 94:21,24
**paperwork**
336:21,23,25
337:3
**paragraph** 89:8
91:9,15,21
93:3,14,15,17
93:18 111:5
116:18 223:21
224:2,2,8,10
224:18,19,21
225:23,25
226:2 229:14
238:14,15
240:5,6,9,13
240:16 244:17
246:10 248:13
252:10,24
272:12,13,15
275:24 276:8
291:10 320:8
321:4,6 372:6
372:8
**paragraphs**
110:15,21
**paralegals**
40:13
**parameters**
43:16 67:4
**Parks** 358:8,12
358:15
**part** 7:5 22:4,24
32:8 34:11
47:13 59:3
60:17 61:20,21
61:25 63:19
64:12 83:23
89:1 99:8
114:14,15
115:1,3,5,19
116:18 150:20

203:11 225:5
228:2,10
235:14 236:1
241:5 247:19
259:6,9,15
265:15 277:19
278:8,19 282:2
282:11 297:20
298:4 300:25
352:1 359:20
359:22 376:2
378:25
**participate**
351:13
**participating**
215:3
**participation**
157:2 188:25
**particular**
185:25 217:22
264:25 377:25
**parties** 390:14
**parts** 45:17
**party** 15:8
**part-time** 99:2,8
99:13,20
**pass** 30:22
206:23
**passed** 121:19
121:24 122:1,2
122:7 123:15
134:4,7 143:18
143:23 232:5
**passport** 87:3,4
**Patricia** 8:10,11
8:15,17,21
**Paul** 258:5
**Paushel** 2:12 5:5
169:16 314:12
**Peace** 99:16,16
99:22 155:22
**peer-reviewed**
92:22

**pelletizing**
318:12
**pellets** 318:12
318:13
**penalties** 390:17
**pending** 385:18
385:22,23
**Pensacola** 40:10
**people** 5:1 39:15
40:7,15 76:12
83:1,4,14
84:11 93:9
94:9,21,24
99:10 111:19
121:19 126:23
134:2 135:4,6
135:7 136:21
144:3 155:7,19
155:24 156:4
158:10,13,15
158:19 159:3
159:12,17,24
165:17 172:6
173:19 174:15
177:25 179:24
180:2,4,24
181:2,20,23
183:2 184:22
187:17 191:12
192:9,14 194:7
196:10,19
197:25 199:17
200:4,16
203:12 204:20
204:21 210:2
210:21,24
212:9,12
214:12,16,19
214:23 218:9
218:12,22
219:10,14
220:15 222:20
222:21 224:23

225:3,8 227:25
239:6 241:2,11
241:13,16,21
243:1,20 248:4
253:8 254:3
258:18 272:16
272:22 280:7
298:16 301:7
337:8 339:12
339:24 340:2,6
341:14 342:25
351:1 362:11
362:14 370:21
375:11
**people's** 83:16
138:12,17
**percent** 321:17
322:19
**Perez** 120:22
121:12,23
122:25 123:1
123:21 124:1
124:25 125:19
134:9
**Perez's** 124:22
**perfectly** 90:6
**period** 17:23
19:25 22:5,12
30:5 33:14,19
43:4 47:23
49:22 51:2,7
52:22 53:14
56:15 63:6
64:4 69:4,7
70:3,24 71:10
72:1 73:2 82:7
82:9 99:7
102:15,19
103:10,13,18
110:1 135:22
147:22,24
159:16 161:24
162:4,18

175:11,12
176:23 219:18
219:24 234:4
254:23 259:7
282:3,12 285:1
285:4,24 288:3
303:21 320:18
320:23 324:14
326:24 327:5
360:1,5,25
362:2,21
364:14 365:8
368:3 374:24
375:21 376:8
386:1
**periods** 11:4
21:12,13 29:7
33:23 34:15,16
44:7,13 46:22
53:3 72:25
73:5,17 96:14
97:7 102:14
103:1 125:5,13
160:17 161:15
164:21 283:6
324:4 326:22
355:6 365:24
367:19
**perjury** 390:17
**permission** 28:2
286:22 287:16
303:8
**permit** 73:19
**Perrine** 1:3 2:4
2:8 4:7,17,21
5:18,22 17:19
23:8,14 24:1
71:2 89:21
135:9,14
137:10 139:8
140:11 141:1
141:14 143:19
168:3 169:8,12

173:8,9 175:8
175:15,20
176:20 188:25
192:2,5,23
210:17 211:3
261:11 268:18
281:3 282:16
282:24 284:7
305:5 306:22
313:2 314:5,9
363:19
**Perrines** 184:12
187:20 191:23
206:23 244:11
249:4 283:10
**Perrine's**
179:23 180:25
**Perry** 2:7
101:15 169:11
314:8
**person** 15:6
33:18 66:2
90:5 109:21
120:12 134:24
200:21 209:18
209:21 222:7
245:23 246:3
288:22 376:4
377:17
**personal** 1:9
52:10 168:10
276:21 313:6
323:23 368:17
**personalities**
90:25
**personally**
144:14 376:12
**personnel** 93:6
94:1,8
**pertain** 70:12
**pertaining** 5:21
6:5,12 15:13
17:23 18:1

19:2,8,21 29:6
33:14 46:13
67:9 70:4
72:20 79:22
88:17 102:13
199:8
**petition** 108:20
**PhD** 82:14
**phone** 5:1 13:3
13:5,7,9,20,22
21:20 27:15
135:2 137:12
173:6,6 175:7
175:9,14,18
176:19 233:24
272:17
**phonetic** 40:20
66:13 121:3,9
330:22 385:6
**photographs**
341:23
**phrase** 150:12
**pick** 82:10
155:10
**picked** 297:16
297:17
**picturesque**
90:25
**piece** 223:23,23
264:25 275:16
**pile** 76:14,23
132:15,18
133:8 136:17
139:5 140:12
140:13 141:15
142:13 143:7
144:5 146:3,17
147:6 148:7,14
148:22 149:4
149:11 158:14
158:16,20
159:4,6,13,18
159:25 160:3

172:7 173:13
184:17 207:5,7
207:8,8 213:21
219:19,20,25
220:2,15,21
222:23 223:4
223:15 227:4
253:20 254:4
254:25
**pinpoint** 98:18
99:19 137:24
177:17 194:17
219:24 272:8
**piquing** 132:5
**place** 129:15,16
150:20 164:12
179:8,22
184:15 205:13
216:5 229:23
233:20 276:17
282:17 283:14
296:20 307:20
321:18 325:7
325:25
**placed** 373:14
**places** 91:14
343:8
**plaintiff** 1:11
43:19 168:13
204:25 205:3
285:7 313:7
381:17 383:25
384:5,8,18,23
386:11
**plaintiffs** 1:4,16
2:4,7 4:17 5:7
5:9,18 14:14
14:15 16:20
17:11,17 18:5
18:11 28:17
30:9 34:20
42:5 49:5
58:20,23 59:12

59:16 62:25
68:7 78:4,16
78:23 95:3,4
101:22 102:2
102:10,22
103:17,19
105:6,15
125:23 151:6
152:21 153:17
157:11 158:7
158:25 160:24
161:13 162:21
168:4,18 169:8
169:11 199:18
200:22 201:5,9
201:21 202:4,6
202:10,11,21
203:22 204:4
204:11 205:2,6
215:6 217:25
218:6 259:2,6
259:8 260:22
261:9 267:16
268:8 269:15
273:20 277:22
298:17 308:21
313:3,12 314:5
314:8 316:20
323:8,13 327:7
328:20 361:17
365:3 367:8
369:6 370:17
381:23 382:2
388:14
**plaintiff's** 3:22
3:22,23 290:15
315:23,24,25
385:3,5,7
**plan** 188:6,15
203:2
**planning** 83:5,7
83:12 124:6
213:16

**plans** 373:7
**plant** 22:2 23:18
33:11 34:8
69:20 70:14
71:7 76:15,18
76:18 125:22
126:10 130:21
131:4,18
132:18 143:7,7
144:5,25 145:6
145:12,19
165:9,21 189:6
189:13 190:2,3
206:13,14
207:1,2,25
208:1,3 213:20
213:22 220:6
227:25 228:2
228:10,10,11
228:25 229:5
229:17 235:12
235:19,22
247:1,14 305:4
306:22 307:2
307:15,22
308:19 316:7
317:11,24
318:22 319:4
354:16,17
358:9,18,22
359:9,14
360:12 361:12
365:16,21
366:16 367:11
367:16
**plants** 298:22
**plastic** 250:3
**play** 148:14,22
207:18,21
208:18 209:9
**playground**
208:18
**playing** 189:6

189:13,20
226:22 227:4
228:6,23
237:18
**please** 4:10 7:22
32:13 34:5
51:4 90:1
102:20 103:16
107:10 117:9
130:3 131:9
145:3,16
146:21 151:24
157:25 163:15
188:10 199:15
201:14 218:18
219:12 223:9
235:17 268:20
281:11,17
286:25 291:9
301:22 337:16
373:17 378:8
**plenty** 310:13
**plethora** 116:20
**PLLC** 2:10,14
169:14,18
314:10,13
**point** 20:16 47:6
47:12 49:17,22
61:5 65:4 89:7
92:7 98:19
117:24 127:19
129:7 134:5
144:8 149:23
152:9,11
157:20 171:9
174:10,10
180:8,9 188:21
190:17,24
199:6 201:3
204:16 215:24
227:7 240:16
240:17 243:15
246:17 250:22

268:24 271:7
272:2 276:15
277:8 285:5
288:23 296:19
308:11 366:11
**policy** 117:19
**political** 80:25
81:6 117:21
**politicians**
162:16,19
**pollution** 10:17
281:8,12,24,24
283:11,11
284:9
**pomades** 91:3
**pond** 208:2,3
227:23,24,25
228:1,9 229:17
231:1 235:8
**pondering**
366:12
**PONT** 1:6 168:7
313:4
**pool** 235:7
**pools** 234:12
**pop** 285:18
**portion** 6:4
18:13 19:4
20:21 21:14
58:3 102:4
131:11 146:13
146:22 152:1
158:1 160:10
161:5 188:11
201:15 218:19
219:7 282:14
290:5 291:11
377:15
**portrayal** 242:6
**posed** 261:14
**position** 28:14
29:12 43:18
44:4 64:20

65:15,22 66:8
66:15 92:12
108:17 131:7
157:19 302:4
316:9 328:2
**positive** 350:14
**possession**
65:17 71:21
77:21 277:25
**possibility** 74:1
75:1 162:8
203:15 204:23
**possible** 41:10
108:23 221:1
226:25 227:1
234:7,20 240:2
241:7 264:2
277:9,16
**possibly** 83:9
101:4 175:13
211:16 348:22
355:16,16
**post** 123:6,11
227:11,13,14
227:15 232:14
232:17,20
233:6 234:7
**posters** 185:2
326:25
**postmaster**
232:23
**postulated** 83:9
**post-1950**
319:17
**potassium**
296:15
**potential** 111:4
200:13 208:6
**power** 247:1,14
248:7
**practice** 30:11
30:14,17 52:6
102:9,17,18,21

103:20 104:10
113:9,16 198:9
202:18 311:5
349:14,19
**pre** 319:16
**preacher** 326:16
**precise** 74:11
**preclude** 35:8
**precluding**
  377:8
**predated** 19:1
**predecessors**
  91:12
**preexisted**
  72:15,21
**preferences**
  83:16
**Preferred** 83:14
**preferring**
  108:6
**preliminary**
  221:21,24
**preparation**
  80:7
**prepare** 80:3
**prepared** 46:4
**prerogative**
  22:25
**presence** 226:16
  241:8 321:13
  334:25 344:2
**present** 2:20
  147:16 169:24
  171:7 179:24
  192:4 195:24
  199:6 314:18
  330:1,4,5,17
  330:19 343:20
  344:12 365:25
**presentation**
  184:24 185:1
**presented**
  249:25

**presenter** 94:12
  95:2
**presenting**
  94:21,22,25
**presently**
  366:23
**preserve** 268:12
  269:4,16
**presidency**
  384:25 386:1
**president** 106:3
  106:5,6,8,11
  106:15 108:1
  108:19 109:4
  116:14 384:24
  387:6
**press** 318:14
**pressing** 181:14
**presuppose**
  148:4,11
**pretty** 52:13
  182:6 194:15
  231:9 234:25
  243:23 361:14
  361:20 363:8
**prevent** 29:8
**preventing**
  386:20
**previous** 91:6
  172:1 186:15
  214:5,24
  241:23 359:11
**previously** 8:4
  9:19 388:15
**prior** 8:8 14:8
  14:17 15:10
  19:24 20:19
  28:15 36:8
  40:15,17 41:16
  41:19,20 42:20
  43:20 45:11
  46:19 48:18
  50:9,11 51:16

54:5,23,25
55:5,14,17,20
55:21,23 56:4
56:10,12,15
57:25 59:8
60:24 61:5
62:5 63:1,4
67:7 69:4,25
70:10,24 71:10
72:2,25 75:17
78:5,9 79:23
79:23 102:2,14
119:25 120:15
125:10,22
126:20 130:14
130:17,23,24
131:13 144:11
150:3,25 151:3
151:14 152:6
157:10,21
158:6,24
171:11 176:19
186:1,2 217:2
217:10,17
221:3 248:24
251:12 266:9
270:5 277:6,24
288:19 290:22
291:15 294:13
306:23,24
307:2 332:17
359:18 360:6
360:15,17
361:6,6 366:18
367:22 373:25
374:2,5,9
376:5 377:18
379:15
**private** 276:14
  381:5
**privately** 276:5
**privilege** 35:8
  37:6,9,11

47:16 64:23
**privileged** 19:10
  35:12 36:2,17
  45:8 59:5
**privy** 344:10
**proactive** 225:7
**probably** 12:20
  21:2 31:18
  65:6,7 79:5
  88:14 98:14
  101:7 108:4,15
  129:16 166:6
  174:9 176:10
  176:18 180:2
  192:9 193:4
  205:18 210:15
  228:2 256:9
  275:12 308:10
  364:1 368:19
  375:17 383:10
**problem** 130:20
  131:3,17
  136:16,18
  148:1 159:7
  172:8 184:19
  198:19,20,21
  199:2,4,19,22
  200:13,14
  203:16 224:20
  229:8 242:14
  242:16,19,25
  243:2 247:9,13
  248:3,5 276:22
  280:8,10,16
  380:24
**problems** 76:2
  138:11 221:1
  222:22 223:3
  223:14 374:18
**procedure**
  64:22 66:20
  224:23 225:2,4
  225:15 258:24

**proceed** 156:19
**proceeding**
  276:16
**proceedings** 4:1
  171:1 316:1
**process** 114:25
  150:20 157:16
  243:4 254:7
  265:15 298:5
  305:3 308:3,6
  308:12 310:16
  317:19 319:15
  366:2
**PROCTOR** 2:2
  169:6 314:4
**produce** 29:14
  53:24 64:5,14
  78:23 260:9
  268:25 270:13
  301:21 303:4
**produced**
  273:20 303:23
  317:20,25
  318:18 388:9
  388:10
**producing** 30:2
  30:3 78:25
  302:23 319:8
  319:13
**product** 18:14
  19:8 261:15
  295:3 347:7
**production** 7:4
  275:10
**products** 91:2
**professor** 111:7
  111:21,21
  186:21 245:20
  299:24 372:9
  373:5
**program** 82:10
  82:12
**programs** 83:7

91:24
**progress** 215:6
**project** 69:9
70:6 94:2
163:10,18
**promise** 58:22
**promises** 59:7
**proper** 42:19
117:20 249:9
**properties**
281:25 283:12
323:9 329:25
334:4 369:11
**property** 71:15
76:18 120:1,16
130:21 131:4
131:18 132:14
138:11 140:24
143:12 144:11
144:25 145:7
145:12,14,19
145:22 149:5
149:12 189:6,7
189:14 190:2
206:12 213:19
228:11 235:12
235:19,22
236:15 281:9
281:14 284:10
286:23 291:22
293:7 299:10
321:15 322:13
323:14 337:25
338:15 339:12
339:14 345:16
345:24 358:9
358:18,22
359:9,15
360:12 369:11
**proposal** 93:4
94:7
**proposed** 94:2
342:9

**protect** 37:9
**protected** 37:6
**protection**
39:16 75:20
162:3 200:4,15
**protocol** 249:8,9
249:16,18
258:24
**provide** 79:3
89:3 90:5
91:17 92:8,20
127:13 196:18
200:4 269:21
270:19 272:17
333:21 351:6,9
**provided** 67:13
79:5,8,9 183:5
263:14 271:20
276:16 292:9
295:22 303:20
304:4 309:17
309:18,25
334:7 336:6,7
337:1,1 341:11
380:15
**provides** 89:2
301:7
**providing** 88:11
96:11 127:16
128:8
**public** 3:6 37:3
80:15,17 91:14
170:6 234:11
315:6 381:2,5
385:15 389:15
390:6,22
**publication**
110:11
**publicly** 22:16
116:14
**published** 85:3
85:7,15,20
86:3 88:4

127:5
**Publishing**
106:23
**pure** 14:23
88:17 130:3
**purely** 96:25
**purported**
70:13
**purpose** 32:21
75:24 221:20
300:6 329:18
329:23 350:16
**purposes** 3:3
32:19 170:3
315:3
**pursuant** 3:4
170:4 315:4
**pursue** 186:4
**put** 12:16 98:16
206:8 207:17
236:8 250:7
272:23,24
300:12 317:4
341:17 343:1
**putting** 142:8
272:23
**P-E-R-E-Z**
120:22 121:12
**P.A** 2:2 169:6
314:4
**p.m** 388:19

_____
**Q**
**qualified** 87:2
**qualify** 365:5
**qualitative**
85:22
**quarterly** 3:20
315:19 378:15
**question** 10:9,10
11:24 19:16
22:15 25:8
26:10 31:22
32:15,20 33:3

33:4 34:4,5
35:20 36:18,25
38:1,10 39:4
39:21 40:1
43:2 46:5
48:21,22 50:24
51:13 52:2,25
53:11,20,22
55:18,19,22
56:2,15 57:2
57:25 58:15,17
58:25 59:18
60:25 61:23
63:17,23 66:25
67:5 70:8,23
73:10 77:17
78:12 88:20,21
90:16 92:10
93:21,24 94:18
95:9,10,24
96:12,19,25
97:9 101:24
102:20 103:15
107:24 111:14
113:11 117:6,9
117:25 125:17
128:3 130:23
131:20 137:19
143:11 145:15
145:18 146:9
146:11 147:22
147:24 148:19
149:22,24,25
151:24 154:11
155:12,14,21
155:24 156:6
156:18,25
157:25 158:11
159:6 161:17
166:23 171:15
171:21 172:9,9
172:13 174:1
174:21 180:21

184:17,22
199:14 201:2
201:13 205:1
215:14,17
217:8 218:17
219:3,4 221:1
222:12 223:6,7
223:9,10 224:8
224:17 226:2
228:21 230:10
231:24 235:17
235:21 239:19
244:22,24
247:12 251:18
254:14,22
255:2 259:12
259:23 260:3
261:14,23
262:1,11 265:4
265:5,12
273:13 277:16
281:22 283:8
283:18 284:5
284:13 285:12
285:13 286:8
286:10,20,21
287:20 288:4,6
288:10,17
289:5,6,21,25
290:7,8,12,20
290:20 291:1,6
291:13,21
292:20 293:3
299:9,15,23
300:1,5 301:14
301:19 304:16
310:17 317:9
324:15 326:4
327:16,17
329:13,22
332:5,6 334:17
335:12,19
337:18,23

338:19,20,25
339:7 340:21
341:1 342:14
343:24 345:9
347:17,18
348:2,9,13
349:1 350:11
355:11 357:11
357:19 359:6
359:16 360:15
366:6,25
370:22 371:9
371:11 373:16
374:16 377:11
377:23 379:8
**questioned**
246:25 247:5
**questioning**
247:7,17 264:9
285:9,11 286:3
384:24
**questions** 11:3
12:18 14:8,22
15:2 18:6
20:18 27:2,3
44:7,16,19,22
45:9,11,17,23
51:23 52:4
63:3 64:15
65:6 88:17
112:13 154:15
184:20,21
202:23 209:4
213:5 223:24
262:25 284:1
286:25 290:4
294:24 295:4
295:19 303:25
304:22 311:25
328:18,24
348:11 355:8
372:16 377:4
378:21 379:2

380:2,13,13,14
381:4 383:2,8
383:9 384:4
386:20 388:4
388:12
**quick** 112:14
224:6
**quicker** 243:4
**quickly** 188:24
242:23
**Quinon** 305:15
**Quinones** 305:5
305:16,17
**quite** 90:1 122:5
122:6 308:9
310:9 318:6
319:2
**quote** 116:4,5
116:20,22
281:7,9 322:6
322:7
**Q-U-I-N-O-N...**
305:18

─────────

**R**

**R** 1:15 71:4
168:17 313:11
390:1
**Rails-To-Trails**
358:10,23
359:10
**raise** 222:21
**raised** 220:25
223:2,13
**raising** 227:7
292:19
**rate** 10:24 295:8
**rates** 11:18
**reach** 312:11
381:24
**read** 58:4 66:19
69:22 90:22
110:16 112:14
116:8 131:12

146:14,23
151:25 152:2
157:25 158:2
160:11 161:2,6
188:12 201:16
218:18,20
219:6,8 221:8
221:11,13
224:6 240:12
281:11 285:12
289:20,25
290:6 291:12
291:18 299:7,7
321:4,6 338:19
372:14 373:17
377:12,13,16
390:18
**reading** 70:17
117:18 373:19
**reads** 224:22
226:14 272:19
372:8
**real** 68:18,19
71:15 183:10
**realize** 25:15
290:1 377:2
**really** 76:5 85:9
85:9 98:18
137:24 166:22
175:16 264:23
273:10 276:2
297:20 308:9
309:3 324:19
**rearrange** 12:3
**reason** 10:18,19
57:21,22 58:10
58:11 87:16
109:12 126:20
139:15 148:25
163:22 198:23
199:16,25
200:1 252:13
273:25 292:13

292:21 296:2
363:11 377:25
**reasonable**
73:25 75:12,13
109:19 209:18
209:20,21
210:1 328:22
**reasonably**
50:14
**reasoning** 358:1
**reasons** 206:20
330:14
**Rebecca** 71:3
324:12
**recall** 6:6 19:4
19:19,22 25:23
26:4,7 45:25
48:19 50:18
54:3 56:22
61:4,6 62:3
85:21 95:5
99:20 104:3,8
104:9 118:5
120:20 128:2
129:5,5,9,12
129:24 132:11
134:21 135:2
138:4 144:7,19
149:21 153:11
153:21 154:2,4
158:13 160:1
162:7 175:16
175:21 176:24
176:24 177:21
181:11 182:6,8
183:13 184:21
184:23 188:22
193:13,21
194:3,5,8,25
195:2,11 196:6
196:8 203:25
205:14,15
213:3,3,5

214:2,11,20
220:5,6 222:3
222:9 226:7,24
229:24 236:6,7
237:20 238:9
239:18 240:2,3
240:18 245:3,6
246:22 247:6
250:21 252:22
253:13,14,15
253:18,19,21
254:5,12,21,23
255:1 263:9,11
263:17,18
264:5 266:18
266:22 267:12
268:14,15,23
270:2 271:5
272:20,21
274:17 276:18
276:23 278:11
278:13 279:5
279:15,16
280:14 281:10
281:15,23
283:9,18,21,25
284:12,14,16
284:24 286:15
287:1,3,9,24
295:23 296:1
297:15,17
298:4 304:13
305:2 306:12
306:13 309:19
318:23,24
321:7 322:8,17
323:2,20
325:25 333:5
333:10 334:1,4
337:5 341:14
341:24 342:1,2
342:21 344:1
344:14 350:1,6

350:15,22
351:15,20
354:18 356:11
356:16,17
362:5 363:11
373:25 374:17
374:24 384:19
385:24 387:4
387:10
**recalled** 204:7
**recalling** 126:4
**receive** 52:25
53:11,13 81:24
92:24 111:19
188:1
**received** 58:19
58:22 61:22
78:25 81:22
82:4 83:18,20
263:9 267:5
288:6 290:9
292:3,3 300:10
322:21 338:14
339:7,13,23
340:1 369:20
**recess** 14:2 45:3
67:24 101:13
119:14 167:6
216:22 261:2
294:9,16
312:20 369:3
383:20
**recognize** 86:11
256:9 303:15
304:17
**recognizes**
303:19
**recognizing**
191:11
**recollect** 136:22
137:25 142:16
255:15 319:2
329:17 360:19

366:11,23
**recollecting**
229:15 318:6
366:11
**recollection**
26:16 41:1,25
51:8 53:8 54:4
57:16,20 58:6
74:17 77:13
83:21 99:18
103:10 104:14
123:21 126:2,5
127:6 130:4
134:12 135:18
136:3 137:3
139:11 144:19
145:24 147:16
150:9,13,18
152:18 157:5
159:12,21
162:24 175:3
176:6 178:22
180:1 182:16
190:23 193:15
194:19,22
195:11,23
196:22 197:11
197:18 199:7
204:17 205:19
211:4,13
212:22 213:12
214:15 222:20
222:25 223:5
223:11,12
226:19 234:1
235:24 238:24
243:21 248:25
254:1,2,12
256:4 258:16
264:25 267:19
269:20 270:3
273:3,14
274:23 279:2,8

279:10 284:15
284:21 287:6
292:2,12 297:8
306:9 307:16
307:18 308:22
317:18 319:10
320:22 321:19
322:18 324:21
329:4 330:25
332:14 343:14
353:9 357:17
358:1 361:10
363:16 366:1
366:12 370:10
373:3,4 374:15
375:10,25
376:3 386:16
**recommendat...**
185:17 186:3,9
186:14 187:4
187:15,17,21
187:22
**reconsider**
377:14
**record** 4:11 7:11
13:3,24,25
14:3 26:18
27:14 44:10,25
45:1,4 58:4
60:7 66:12,14
67:22,25 89:24
101:10,11,17
110:10 112:18
114:11,17
115:6,20
119:12,15
131:12 146:14
146:23 152:2
158:2 160:11
161:6 167:4
171:2 184:1
188:12 199:11
201:16 216:20

216:23 218:20
219:8 260:25
261:3,7 290:6
291:12 293:22
294:14,17
298:10,13
305:9 309:6
312:18 316:2
317:4 345:1,2
345:4,10,18
346:13 369:1,8
377:16 380:23
381:21,23
383:17,18,21
385:16 388:17
390:10
**recorded** 345:16
347:16 349:7
**recording** 345:7
346:3,4 347:22
348:3 349:8
**records** 20:14
63:15 73:4
78:20 87:7
303:4 346:7,10
346:11,12
347:13,15,20
347:22 348:14
348:18,20,22
348:23 349:10
**record's** 197:22
**recount** 27:4,8
**recreate** 149:4
149:11
**recreated**
119:20
**recreating**
206:12 213:18
**Recreation**
358:8,12,15
**redepose** 388:5
388:8
**refer** 23:20 24:5

62:12 89:15
90:20 94:3
96:9,13 97:8
110:21 298:8
355:5
**reference** 14:11
23:5 97:9
98:15 110:13
127:22 226:8
228:5 327:5
373:5
**referral** 105:14
**referred** 47:10
48:1 145:10
248:13 299:24
300:2 322:10
356:12 375:1
**referring** 24:5
24:12 66:17
91:9 114:17
117:12 127:18
227:24 234:4
265:19 275:3,8
275:19 293:17
336:13 356:7
**refers** 111:6
283:15
**reflect** 284:20
298:7
**reflects** 309:11
**refresh** 178:6,22
258:15 284:20
292:2
**refreshed** 271:4
342:1
**refreshing**
272:4
**refuse** 44:21
59:12,16
**refusing** 42:23
44:15
**refute** 27:16
**regard** 296:4

311:7
**regarding** 76:2
253:22 328:18
335:9
**regulators**
149:7,13
**regulatory**
156:8 199:2
251:6
**reimbursement**
112:23
**relate** 22:6
63:11 66:6
71:1 79:1
85:15 90:9
164:17 330:12
342:13 343:12
353:6 362:20
367:24
**related** 16:9
22:2 46:21
74:7 76:23
85:25 86:1
94:16 155:23
164:16 173:13
181:10 184:13
220:14,21
222:22 223:3
223:14 227:10
228:7 229:1
245:25,25
261:10 322:24
334:22 357:19
359:2
**relates** 171:10
343:21 359:3
361:1 362:22
379:1
**relating** 6:1,8,16
6:23 7:1 11:4
16:24 44:7
45:9 63:3
64:23 71:14

161:15 185:10
228:20 246:7
286:1 320:18
379:14
**relationship**
5:23 6:13 16:8
16:14 36:8
40:16 42:10
43:6,12,17,20
43:22,25 44:5
44:12 45:10,12
45:13 47:9,14
47:24 53:4,5
54:5,19 55:17
55:21,23 56:10
59:3,4,24 63:6
72:15,17 75:4
75:6 102:15
105:7 106:1
157:6 166:14
180:10 232:22
261:16 270:19
295:3 361:2,7
**relationships**
33:23 46:13,20
64:18 65:10
72:21,23 75:18
79:2 157:21
**relative** 390:12
390:14
**relevance** 85:16
114:9 117:4
**relevant** 85:24
376:19
**relocate** 377:24
**relocating**
265:15
**reluctance**
262:13
**remediated**
149:12 359:15
359:18 360:12
**remediation**

69:21 149:6
235:14 236:1
354:16,22
360:7,8,10,18
360:19 361:12
**remem** 57:9
325:6
**remember**
26:10,11,13
46:3 48:21,22
49:11,14,15
50:8 52:12
57:9,14 60:17
60:20 62:10
72:14 74:13
75:12,23,25
77:2,11 85:10
87:9,9,23
92:23 93:1
98:14 99:13
104:24 105:2,5
106:16,18
108:22,24
113:5 120:20
121:2,21
123:12 126:7
127:1,2 128:23
128:25 129:2
132:3,4,5
134:15 136:14
137:23 138:2
141:9,11,20,23
142:5,10,19
143:1,2,15,20
144:14 145:25
150:17 153:2,4
153:23 154:3
162:9 171:21
173:1,17 174:7
175:12 182:22
183:18 184:1
191:24 192:12
192:19,21

193:5 194:10
195:17,18
196:12,17,23
203:1 206:2,25
207:10 208:15
210:13,19
211:21 212:1,4
212:6,7,17
213:23 215:10
218:3,4 226:7
227:8 229:25
231:3,4,21
234:22,23
236:5,8,25
238:12 239:19
240:23 241:1
241:25 242:1,8
242:9 243:8,12
244:7,13,14
245:19 247:17
247:23 248:16
248:18 252:7
252:17,19
254:1 256:11
256:14 259:22
259:24 260:2
264:6,6 265:3
267:1 271:6,6
271:9,9,13,25
272:3,22 273:1
273:5 274:12
274:13,13,21
276:3,6,18
280:13 287:11
287:12 292:7
297:19,20
298:1,3 300:20
325:7,11,23
326:11 330:24
333:4 341:18
341:25 342:10
342:11 353:3
353:24 354:10

355:10,15
356:2,7 385:12
386:2,2 387:15
387:20
**remembered**
274:22
**remembering**
124:15
**remembers**
278:20
**remembrance**
110:17
**repeat** 34:5 51:4
55:13 57:24
96:3 131:9
145:3,4,15
146:20 160:8
244:23 268:20
268:23 337:15
377:10
**repeating**
156:13
**rephrase** 52:4
78:12 132:23
219:3 283:8
340:21 345:8
**report** 3:20 77:3
213:1 256:12
297:24 300:21
315:19 352:18
356:12 378:15
**reported** 138:10
**reporter** 3:6 4:7
13:15 51:22
58:2,4,5,11
115:12 130:24
131:12,13
145:18 146:14
146:15,23,24
147:4 152:2,3
157:24 158:2,3
160:11,12
161:6,7 163:16

170:6 188:12
188:13 201:16
201:17 207:6
218:20,21
219:8,9,13
265:6 290:3,6
290:7 291:12
291:13 315:6
320:2 372:2
377:16,17
378:12 390:6
390:22
**reporters** 162:6
**reporter's** 12:4
12:7 289:24
**reporting** 215:5
215:9
**represent** 24:19
32:18,18 113:9
113:16 261:8
269:19 270:1
270:15,20
312:6 320:11
336:5 378:15
**representation**
244:1 245:10
246:7 275:25
276:9 304:23
324:3 336:24
**representations**
294:13 295:8
**representative**
1:9 168:11
313:6 354:19
**representatives**
162:10,12
324:18
**represented**
31:2,8,16,23
33:5,9,20 34:6
113:21 238:11
**representing**
33:22 112:19

285:6 304:12
**represents** 31:7
**request** 61:18
68:25 69:14
105:6 270:4,11
270:16,18
271:5,15 272:6
275:3,8,9,15
277:1 348:14
349:25 350:4
382:1
**requested** 30:1
58:3 131:11
146:13,22
152:1 158:1
160:10 161:5
188:11 201:15
218:19 219:7
269:21,25
270:1 273:19
290:5 291:11
301:23 302:1,8
302:13,14
377:15
**requesting**
112:23 267:6
301:24
**requests** 69:15
277:24
**required** 112:22
113:8,15
166:13,17
**rescheduled**
317:4
**research** 70:12
86:5 93:5,10
94:1,2,8,11
163:25 164:7
364:18 376:5
377:18
**researched**
20:14
**reservation**

124:5
**reserve** 388:5,7
**reservoir** 208:2
228:1
**resident** 60:10
69:16 246:24
249:19 255:24
256:5,18,18
263:15 305:20
**residents** 33:10
34:7 130:18,25
131:14 132:20
133:1,9,19,20
134:24 135:17
144:12,23
145:7 160:20
161:8 162:21
166:21 172:21
175:1 177:25
179:22 188:6
188:15,21
201:7,19
205:12 212:14
223:2,11,13
255:12 283:16
321:8,12,14,14
356:22 357:22
364:17 375:24
379:23
**residue** 318:19
**resolution**
276:22
**resolve** 118:17
**resolved** 118:12
**resources** 200:2
200:12
**respect** 16:15,18
17:5 18:10,11
21:13 35:11
37:6,11 46:11
47:4 68:12
69:6 70:23
108:17 150:4

153:9,15 158:9
165:7 179:6
224:17 226:2
238:22 293:2
311:25 328:2
**respects** 259:11
**respond** 235:4
247:21 275:7
285:2,3,4
302:2,15
**responded**
277:3
**responding**
386:20
**response** 24:14
69:11 93:4
94:6 95:24
96:11 137:9
189:3 252:23
268:25 317:12
**responses** 82:25
83:4 302:22
**responsibilities**
100:18,19,21
163:24 164:13
182:7
**responsibility**
156:4
**responsible**
156:1
**responsive** 63:8
67:15,16 75:3
78:21 268:17
277:23
**rest** 116:22
133:17 218:17
239:3 346:17
355:8
**restate** 113:14
**restating** 380:13
**restraint** 151:18
**restrictions**
20:24

**restroom**
325:15,16
368:23
**restructuring**
100:6
**result** 50:15
126:25 271:3
272:4 276:9
**results** 246:14
263:14,19
269:22 270:12
345:7 349:8
352:12,23
356:9,21 358:2
372:13
**resume** 127:22
128:4
**retain** 128:6
336:17
**retained** 35:13
35:22 278:2
374:9
**retired** 98:3
**Retirement**
105:22
**return** 297:10
**returned** 349:25
350:4
**review** 3:22 61:4
80:6 107:3
144:16 315:23
372:13
**re-asking**
380:12
**re-read** 291:7
**Rhodes** 106:9
**Rich** 34:23
35:21 36:8,11
37:13 41:9
42:4,10,14
43:1,3,7,12
44:1,4,12
45:10 46:2

47:5,13,22
48:3 49:4,9
50:4,21 151:13
151:13 152:4,5
152:22 174:23
178:21 185:18
185:22 187:25
188:2,17
193:24 195:19
197:22 198:25
202:1,4,6,17
203:20 212:2
215:5 225:11
225:16 239:15
240:10 241:1,8
242:3,10,23
243:15 244:1
246:25 247:7
247:18,21,24
256:20 260:20
267:15 268:5,8
268:11,16,24
269:14 273:8
274:2 276:14
276:20 277:2
279:18,21
280:3 321:13
343:19
**Richard** 2:10
5:4 101:15
169:14 314:10
**Rich's** 44:4
201:7,18 274:4
274:6,10
**Ricky** 112:5,20
**rider** 67:6
**ridiculous** 32:15
**Rife** 124:10,16
124:18,25
126:5 181:18
187:21 193:6
211:15
**right** 11:14,25

12:17,19,21,24
13:1,18,22
20:23 21:11,24
22:21 23:22
25:5 27:15
28:12 29:24
33:1 45:24
48:14 55:15
61:19 64:10,13
65:24 66:1
69:8 72:17
73:15,18 76:17
81:7 89:6 96:8
96:16 99:18
104:16 111:25
113:4 125:12
128:15 151:23
157:17 158:22
177:24 179:2
180:20 181:8
187:17 189:17
191:4 197:23
203:23 225:1
227:15 228:1
231:20 232:8
232:14 234:19
240:12 245:2
245:20 246:11
251:19 265:5
266:18 272:5
281:1 289:17
294:6 296:14
299:24,25
300:18 301:17
305:1 309:24
318:25 320:9
327:18 328:1
331:15 333:10
338:4 339:8
355:7 357:16
363:16 366:10
367:4 368:24
371:4,8 373:10

376:13 379:9
380:1 388:5,8
**river** 372:8,10
372:23 373:8
**Robert** 385:9
**ROBINSON**
2:10 169:14
314:10
**rock** 322:19
**role** 160:20,22
161:9,11 172:5
300:1 327:16
343:16 351:2,3
**roller** 318:14
**Ron** 135:8,10,12
137:1,3,5,14
173:7 175:7,14
175:19 182:3,5
182:5,23 193:9
211:18
**Ron's** 193:10
211:19
**Ross** 328:16
353:14,15
**roving** 21:4
**Rule** 64:21
65:15,19 66:19
**Rules** 64:21
66:20
**run** 69:18 91:2
332:13
**R-I-F-F-E**
124:18
**R.L** 178:19

_____
**S**
**safe** 376:6
377:20
**SAITH** 389:1
**salaried** 101:2
**sample** 245:12
245:22 246:2
246:12,14
248:12,19,22

249:10,20,24
249:25 250:11
250:16 251:2
252:14 255:7,9
255:11,23
257:11 258:13
258:22 263:14
263:22 267:17
267:25 269:22
270:9,12
286:22 291:24
292:4,7,8,15
292:23 293:7
293:10 295:1
295:22 296:22
297:10 298:20
299:12,21
300:2,4,6
331:21 341:23
343:9 349:25
371:20
**sampled** 331:5
345:17
**samples** 261:12
264:3,9 267:7
267:7 269:22
270:10,12
291:22 299:10
299:21 336:20
344:23,24
**sampling**
277:10 331:3
331:13 332:1,5
332:9,16,21
335:23,25
336:9,14 337:9
339:24 340:3,9
340:23 343:20
344:3,12,17,20
345:11,25
346:5 349:3
350:23,24
364:9 370:6,12

371:12
**Sanders** 2:17
4:15 169:21
314:15
**sandwich** 250:9
**sandwiches**
250:7
**sat** 174:18 309:1
**satisfied** 377:11
377:21
**satisfy** 130:19
131:2,16 376:5
377:19
**save** 316:25
**saw** 62:16,21,22
68:20 70:18
206:19,21
219:23 227:15
228:8,14 234:9
236:25 274:16
297:23 298:1
322:25 325:24
345:20 346:13
346:14 349:7
359:24 361:8
**saying** 23:13
31:15 43:11
46:8 47:20,21
53:17 57:5
61:13 75:1,8
75:12 109:2
141:18,19,20
143:1 144:2
153:18 158:8
165:15 178:2
179:6 188:9
202:16 206:13
209:23 240:25
241:22 242:11
242:12,15,24
243:18 245:6
245:10 252:4
266:21,22

271:7 279:13
279:16 280:13
301:3 324:25
339:3 345:23
359:6 387:13
**says** 90:24 91:10
91:18 93:3,22
94:4,5,6
106:23 107:3
108:3,10 113:7
113:21 116:16
116:17,17,19
116:24 118:6,8
118:10,11
221:20 228:22
305:12 319:20
319:20 322:4
336:14
**scene** 208:16
**Schafer** 181:12
182:14 193:3
**Schafers** 187:21
211:8
**Schafter** 195:12
**schedule** 26:5
27:18 182:6
193:10 211:19
**scheduled**
311:14,14
**scheduling**
59:13,17
**scholar** 106:9
**school** 80:15,17
81:8,10,13
83:23 98:8,9
98:13,25 99:1
99:6,17,18
346:16
**science** 80:25
81:6 97:18,22
256:10
**scientist** 245:19
245:21 246:3

246:17 249:12
249:17 252:8
255:22 256:7
256:19 258:21
263:10
**scientists** 245:17
255:16 257:11
258:9,11 343:5
**Scott** 2:14 4:12
169:18 314:13
**Scratch** 180:18
**screening** 251:6
354:25 355:13
356:6,8,10
357:22 358:3
**search** 271:19
**second** 91:21
107:1 130:7
191:5,20
192:12 193:13
210:25 224:1
247:12 306:17
317:21 340:11
**security** 86:19
87:1,21 237:10
**sediment** 372:9
372:10,23
373:8
**see** 11:21 13:8
13:12 43:16
61:8,9 75:25
76:5 82:17
88:4 91:25
92:1 104:13
111:8 112:16
116:6 118:7
123:20 136:17
142:23 189:5
189:13 199:1
199:18,21
200:14 213:18
215:12 216:2
219:19,20,25

220:2 226:4
231:14 232:22
233:17 246:10
272:18 275:16
277:23 298:21
304:9,10 310:3
312:2 324:21
338:13 345:24
346:2,13
347:10,19
348:20 350:13
352:17 363:7
372:13
**seeing** 54:25
55:3 60:20
62:10 106:25
126:8 213:23
220:6 274:17
278:11,13
325:24
**seek** 287:16
321:15
**seeking** 308:10
**seen** 40:7 60:13
189:20 190:4
206:24 208:13
220:11 260:15
345:7,13,15
347:15 349:5
359:14 360:11
378:18
**selecting** 343:17
**seminar** 94:13
95:2
**Seminole** 69:19
326:10 332:11
**Sencindiver**
257:16
**send** 52:21
102:10,21
103:20 104:25
336:21,23
337:3

**sending** 335:23
341:18
**sense** 32:1,20
140:16 141:10
171:8 175:25
183:7 187:24
199:6 201:24
201:25 203:6
203:11 218:12
218:15,21
219:9,13 222:7
225:1 237:24
265:19 322:23
357:18 363:17
**sent** 60:22 102:9
103:13,17,19
103:24,25
104:6,14,17
271:24 272:1
275:9 291:24
292:16 297:19
299:12 352:18
**sentence** 91:21
93:3,16,19
133:18 221:20
222:5 224:21
224:22 226:1
226:14 228:22
322:4
**sentences** 143:2
240:21
**separate** 15:10
63:12,15 318:9
318:10,11
**separated** 310:2
**Sergio** 120:24
121:14,15,16
121:24
**Sergio's** 124:4,9
124:10,11
**serious** 91:4
151:20 204:3
361:11

**seriously** 93:9
94:10 284:6
**serve** 94:23
**served** 28:1,24
29:1 268:17
**serves** 32:20
**service** 125:6
163:25 296:21
300:21,25
**services** 118:9
**serving** 24:15,25
25:2 30:8
354:12
**session** 23:21
48:2 94:23
**sessions** 94:20
94:24
**set** 25:24 52:14
91:13 173:3
227:15 237:18
**settings** 91:7
**seven** 181:25
205:17,24
237:22,22
332:12
**seventh** 110:15
244:16
**sexes** 238:10
**Sextone** 257:20
**share** 36:2 60:23
166:11 256:19
**shared** 137:4
166:6 209:16
254:3 265:1
338:1
**sharing** 159:2
**sheet** 183:19
184:1 196:3,4
196:7 277:10
**sheets** 277:2
**shoot** 208:7
**shop** 277:12
**shortly** 29:14

short-term
23:16
show 66:16
106:19 110:4
288:5 290:8
335:3,5,11,12
338:8 346:10
348:10 351:12
showed 337:11
337:19 338:1
349:10
showing 112:4
116:1 263:13
372:3 378:13
shown 39:14
76:23 77:1,3
337:13,21
side 28:19 91:4
158:14 159:11
159:13,18
192:18
sidewalk 207:16
sign 86:22 88:3
224:24 225:3,6
225:8,10,11,13
241:2 272:17
signature 87:10
signatures
272:18
signed 86:21,23
87:8 218:9
243:14,21,22
243:22,25
244:14 390:20
signs 236:6,7,13
236:15,25
237:1,2,5
sign-in 183:19
196:3 277:1,10
sign-up 184:1
196:7
similar 351:2
Similarly 7:3

Simoni 1:24 3:1
3:12 4:6 5:11
5:20,25 6:3,7
6:10,15,20 7:3
7:12 8:11,13
11:7 14:10
18:25 21:24
23:3 25:17,23
26:20 27:19
28:16,21 30:8
33:3 38:9
39:19,22 43:24
44:6,9,11,14
44:24 45:6,20
46:24 54:6,7
58:16 59:21
60:5,13 63:7
67:12 68:2
69:14 71:19
73:22 78:25
79:12,23 80:2
86:10 87:13
90:16 95:15
97:4 98:2
101:19 107:24
112:4 113:22
116:1,19
119:17 169:3
170:1,13
171:23 178:18
201:6,18
216:25 226:9
258:8 259:17
262:21 263:8
264:18 265:6
267:5,21 270:5
270:11 271:15
277:9 278:7
281:4 283:8
285:15 286:9
288:7 289:13
289:14 290:9
291:4,18

295:20 298:11
299:24 300:6
303:14 304:16
310:1,15
311:20,23
314:2 315:1,13
316:5,17 317:9
320:6 321:5
322:5 323:18
328:11,11
329:6 335:20
336:8 337:1,4
345:10 346:15
347:12,21
349:4,14 355:9
365:10 368:11
369:10,22
370:5 372:3
373:14,20
377:24 378:13
378:23 381:1,9
381:11,18
382:5,10
383:13 384:8
388:5,8 389:4
Simoni's 349:6
simple 66:25
simply 158:8
284:14 331:14
341:17
sir 7:11 16:5
18:19,19 19:18
20:6,8,10
21:22 34:4
37:24 68:10
69:10 101:6
112:2 156:20
253:12 266:16
270:21 303:11
303:13 317:3
327:25 334:13
335:25 349:22
373:1 379:6

sit 30:20,24 31:3
37:8 57:15
58:5 74:14
90:7 116:25
149:16 357:20
357:25
site 69:20,21
70:14 71:7
76:15 126:16
132:15,18
143:7 144:5
187:5 206:13
206:14 207:1
213:20,22
227:25 228:2
228:11,25
229:5,17
230:14 235:15
236:2 253:20
329:24 330:3
330:13 349:4
351:13 352:2
354:16,17
361:12 374:19
379:24
sites 3:21
315:20 330:15
351:4,12
378:16,24
sits 22:20
sitting 148:14
148:22 156:2
situated 146:4
146:17 147:6
situation 32:15
41:11 148:5
186:8,20
200:14 322:6
346:24 375:22
six 9:12,13
34:24 175:24
176:13,19
181:24 182:1

205:17 206:2
372:2
sixth 110:14
240:4
six-month
176:23
size 83:14
192:17 214:4
214:13
skill 120:20
skillful 91:1
Skousen 257:22
slab 319:5
slabs 317:22,23
319:5,14,21
slag 222:23
223:4,14
slander 118:25
slash 372:13
Slick 40:20
Slickman 40:20
40:20,22 41:4
41:5,18 48:25
375:1,12
slides 327:1
slowed 310:16
small 35:3 83:15
83:17 188:23
287:8
smaller 212:10
smelter 76:15
120:1,16 125:2
132:13 140:24
143:7 144:11
146:5,18 147:7
163:10,18
189:7 206:12
213:19 305:4
374:19
Smith 54:13
69:19
smoking 219:19
219:20,25

220:2
**Snead** 2:11
101:14 169:15
263:4,5 266:15
266:16 294:21
294:22 295:10
295:14,15
314:11 388:12
388:13
social 84:11
86:19 87:1,19
87:20 126:22
233:19
**societies** 91:24
**sociological**
86:5 92:20
**sociologically**
94:16
**sociologist**
84:12 85:23
89:20 95:11
186:22
**sociology** 82:1
82:19 84:6,15
84:16 86:3
92:21 95:6
100:16 111:7
111:15,21,23
333:15,16
soil 97:17
245:12,17,18
245:20 246:3
246:12,14,17
248:12,19,22
249:10,12,17
249:20 250:11
252:14 255:4
255:16,22,23
256:7,10,19
257:10 258:9
258:10,13,21
258:21 263:10
263:14 264:3,9

267:7,17,25
277:10 286:13
286:22 287:17
288:19 290:22
291:15,22,24
292:3,7,8,15
292:23 293:7
293:10,23
295:1,22
296:22,23
297:13,14
298:22 299:10
299:12 300:2
302:6 330:12
330:13,15
332:16 337:8
337:25 339:11
345:11 349:3
361:24 364:9
370:5
**soils** 255:19
**sold** 307:12
**solid** 322:19
**somebody**
241:22 246:1
247:18
**somebody's**
12:8
**Somewhat**
217:8
**soon** 150:11,12
150:14 190:10
**sorry** 10:8 12:1
13:10 34:11
37:1 42:7,15
51:4,14,24
54:21 69:13
93:11,24 96:4
101:7 103:16
106:16 112:8
113:2,12 117:9
125:17 127:21
141:6 145:16

160:8 161:4
171:14 180:18
183:6 188:8
202:2 203:14
207:6 209:5
216:17 219:5
223:8 250:4
251:15 258:17
261:6 272:13
278:8 305:15
306:20,21
317:14 325:20
329:13,22
340:16 384:21
384:23
**sort** 14:17 28:3
43:14 83:12
111:1 132:5
136:5 137:25
140:5 157:19
171:8 173:1
183:2 185:4
193:11 223:20
271:22 298:5
310:21 333:21
351:17 376:7
**sorts** 113:16
**sound** 12:5,9
221:15
**sounds** 302:25
**source** 97:10
**South** 80:20
265:23
**Southeast** 3:7
4:4 170:7
315:7
**Southern** 301:6
301:6
**so-called** 280:15
**Spanish-Ame...**
124:12 129:4
**Spanish-Ame...**
120:23,25

126:23 127:4
129:9,11
**speak** 7:17 35:6
36:16,20,22
37:4 42:7,8,15
80:3 100:22
108:14,15
134:23 135:1
135:16 270:25
271:1 293:12
293:14
**SPEAKER** 7:15
12:1,8,11,13
12:16,23 13:8
13:23 21:21,22
21:23
**speakerphone**
12:3,14
**speaking** 13:1
23:4 32:12
75:23 89:25
96:17 108:8
231:12 235:3
347:1
**speaks** 89:10
92:4 111:1,4
**special** 198:4
233:9
**specialized** 42:5
49:5 351:19
**specialty** 80:24
**specific** 14:25
137:16,20,21
137:22 138:3
145:13,21
174:7 222:20
223:10,12
226:7 229:24
243:9,10 245:7
252:18 253:14
254:5,12,15,17
254:24 255:3,7
255:8 266:18

266:22 270:9
307:16
**specifically** 15:3
117:13 127:3
129:10 132:1
132:10 134:15
136:9 142:11
144:8 150:17
155:1,14
157:22 215:10
234:22 242:7
247:23 270:8
**specifics** 145:25
246:22 253:22
333:22
**specify** 135:23
**speculate** 6:25
20:25
**speculating**
247:11 274:10
**speculation**
21:18 97:1
210:1 277:19
323:17
**speculative**
14:19 104:2
**speech** 118:2
**speed** 372:20
**spell** 7:22 15:18
40:22 121:6,7
121:16
**Spelter** 3:18
5:21 6:5 16:2
16:9,15,16,19
17:2,5,8,18
18:2,18,22
19:2,7,9,13,20
19:21 20:18
22:2 33:10
34:7 41:11
46:12,19,22
47:19 48:5,10
48:11 53:4

69:9,17,20
70:5,14 71:7
72:16 76:8,10
76:11,11,12,15
85:16,24 88:10
90:12 92:18
117:4 119:18
119:20,23
120:1,5,7,9,10
120:13,15,16
121:19 122:3
122:17 123:16
123:18 124:2,5
125:1,22
126:10,18,19
126:23 129:4
129:10,19
130:13,17,20
130:25 131:3
131:14,17
132:21,25
133:9,19,20
134:23 135:17
142:21 143:6
145:12,20
150:11 151:14
152:5,24 153:9
154:8 155:2,15
156:23 157:10
158:5,10,21
159:20 160:7
160:14,20,23
161:8,12
162:17,19,21
163:1,5,9,10
163:17,17
165:8,20,24
166:5,16,21
170:17 171:25
172:20 174:13
175:1 177:25
178:21,23
179:21 180:10

182:15 184:6
187:5 188:23
189:4 190:7,13
190:20 191:7
199:17 201:7
201:19 204:2
205:11,12
206:10,12
212:14 216:13
217:1,1,11,17
217:22 218:1,9
218:13,23
219:11,15,17
220:2,3,7
221:3 223:2,11
223:13 227:11
230:3,6,12,22
232:1,2,17,20
232:23 233:6,9
237:25 242:21
246:24 248:8
249:19 253:9
255:24 263:15
267:7,8 283:16
305:6,19,20,23
321:8,12,14,14
322:6 323:9
325:21 327:1
332:9 350:23
351:21 354:21
354:25 355:13
356:22 357:22
358:9,18,22
359:9 360:17
361:15 364:8,8
364:17 365:1
365:16,21
366:16 367:16
372:11,24
373:25 374:18
375:14,22,23
376:14,17,19
378:5,22

379:16,20
381:7 382:9,13
387:1
**spent** 83:7 166:4
363:18,20
364:7,11 365:1
365:16,18,21
366:15 367:10
367:15
**Spirit** 3:22
110:11 315:24
**Spokane** 107:4
**spoke** 31:9,24
33:6 41:9
134:8,9,11,12
134:23 135:6
197:24,25
238:19 240:10
**spoken** 44:3
45:6 254:7
327:3,6 358:7
358:16,20
359:7
**Spokesman**
3:22 107:3
315:23
**sponsored** 95:3
**sports** 206:18
**spouse's** 7:20
8:8
**spring** 74:23
177:22 286:11
287:17 288:20
290:23 291:16
**Squire** 2:17 4:14
169:21 314:15
**stack** 247:1
**stacks** 248:7
**stand** 66:9 114:1
261:22 294:12
**standing** 386:19
**stands** 11:22
114:2

**start** 38:17 53:6
98:21 217:15
259:14 310:5
330:6
**started** 45:13
81:14 83:23
100:8 132:20
133:8 232:6
243:4 293:18
**starts** 27:1
**state** 3:6 4:10
7:10 30:12,15
30:18 33:14
91:19,21 114:5
146:25 149:6
149:13 156:8
170:6 199:20
262:7 315:6
357:8 389:6,15
390:3,6,22
**stated** 27:4
89:24 108:4
390:19
**statement** 7:7
17:13 261:19
276:4,6
**States** 301:6,6
**stating** 280:14
**station** 239:9,10
239:13,23
248:8
**stayed** 333:12
**staying** 324:1
**stemming** 352:1
**steps** 318:2
319:13
**Sternberg** 3:5
4:8 170:5
315:5 390:5,21
**Steve** 4:16 11:16
15:15 63:21
64:20 67:4
311:17 357:3

379:5 380:12
**Steven** 2:3 169:7
314:4 328:15
353:12
**Stewart** 328:14
352:10 353:2,3
**stimulants** 91:2
**stipulated**
262:20 295:6
295:12 324:8
**stipulation**
261:20 263:4
266:12 294:20
294:24 300:17
327:10 355:4,9
357:3 359:1,21
359:23 388:11
**stipulations**
326:18 380:16
**stop** 89:24 90:1
119:10 233:7
297:3
**stopped** 232:11
232:12,15
234:2
**store** 300:11,19
301:10,16
**straight** 10:4
**strange** 164:10
164:14 246:19
**strangers**
139:25 140:1,2
**strategies** 91:22
**street** 3:7 4:4
122:22,22
123:1,5,8,9
135:13,15
170:7 182:17
315:7
**streets** 123:12
**strike** 42:12
85:13 98:20
101:20 105:20

111:3 132:12
141:12 151:5
189:3 192:3
217:20 220:1
220:17 265:13
274:5 287:15
338:11 352:10
386:13
**strong** 109:12
110:3
**struck** 208:3
**student** 116:12
332:21 333:1
372:10 373:5
**students** 166:7
166:12
**studied** 82:8
84:3,3,8
**study** 93:4 94:7
95:6 99:11
132:19,24
133:3,4,5
144:13,15
217:1 220:3
264:4,5 304:10
356:22 372:11
372:12,23
373:8
**studying** 364:15
**stuff** 87:5,21
99:20,21
186:24 198:5,8
198:10
**subject** 6:18 7:4
20:23 72:4
86:3 108:20
321:12 334:19
340:25 355:9
357:2 376:22
**subjects** 94:15
**submit** 112:22
**subpoena** 29:4
29:13,20,23,25

60:11,16 61:22
62:6 63:8
67:16 75:3
78:21
**subpoenaed**
29:17
**SUBSCRIBED**
389:9
**subsequent**
22:11 54:18
303:21
**substance** 63:3
68:2 71:1
139:12 162:22
**substances**
143:13 146:5
146:19 147:8
220:15
**substituted**
101:14,16
**suddenly** 46:16
**sufficient** 218:9
224:24
**suggest** 57:1
91:22 93:8
94:9 165:19
344:19
**suggested** 95:19
104:20 135:3
141:22 231:5
248:1 366:13
367:2,7
**suggesting**
253:25 254:4
319:21 321:14
344:16
**suggestion**
247:12
**suggests** 225:3,6
**sum** 162:22
**summarize**
331:13,19
**summary**

221:16
**summer** 5:24
17:24 20:5,15
20:19 21:15
22:11 32:3,22
33:16 40:16
42:20 43:20,20
45:14 49:17
50:9 51:3,7
52:23 53:7,15
55:5 56:1,4,14
56:15 59:9
67:7 69:4,25
70:10,24 71:11
74:23 75:5
102:3 150:3
177:22 282:14
359:19 360:25
**supervision**
149:6,13
**supplement**
302:17,22
**supplementary**
302:25
**support** 37:22
37:24 38:3,4,7
39:6,8 106:14
276:15
**supported** 37:19
66:8
**supporting**
107:25 109:3,6
**supportive**
39:17 140:19
**supposed**
163:11,19
266:25 283:13
357:13 359:3
363:13
**sure** 12:15 17:4
18:9 23:11
31:11,15 34:18
37:22 38:7,16

39:2,20 47:3
50:1 52:13
56:21,22 58:2
62:7,16 70:18
72:13 74:25
75:11 84:19
89:11 105:18
107:11 110:19
112:15 117:12
117:24 122:5,6
122:18 123:11
124:8,14 129:7
132:7 146:24
150:11 156:14
156:24 157:8
158:3 163:7
166:2,2,5
167:2 181:16
182:4 183:10
183:16 184:22
185:6 189:25
190:9 193:13
194:11,15
210:5,13 211:6
211:10,17
215:1,22 218:8
222:6 229:14
230:11 234:15
235:5 239:10
240:22 243:23
254:18 262:2
266:24 268:21
271:2,20
281:18 295:20
300:14 306:19
307:4 318:6
319:2,23
324:16 326:20
331:5 333:8
336:15 340:17
344:7 350:2,15
351:1 352:20
363:8,23

372:19 373:18
**surely** 24:10
**surfing** 49:2
**surprise** 323:13
**surrounding**
70:15 156:23
364:8
**survey** 341:10
341:15 342:18
342:24
**surveys** 342:12
**sus** 255:14
**Susan** 3:5 4:8
170:5 315:5
390:5,21
**suspected**
208:22
**Suzanne** 8:24
9:8
**Sweeney** 385:9
**swim** 235:9
**swimming**
227:20,21,22
228:9 229:17
231:1 234:11
234:25 235:7,8
**swing** 227:14
237:18
**sworn** 5:12
389:9 390:9
**sync** 87:18,24
**synonyms** 91:1
**syrups** 91:3
**system** 92:14
**S-E-N-C-I-N-...**
257:18
**S-E-R-G-I-O**
121:17
**S-K-O-U-S-E-N**
257:22

_____
            **T**
_____
**T** 390:1,1
**table** 272:5

| | | | | |
|---|---|---|---|---|
| 326:20 346:17 | 101:13 119:14 | 264:12 278:22 | 57:6 59:11,15 | **teaching-relat...** |
| **tablet** 272:16,20 | 167:6 170:2 | 282:6,12,22 | 76:1,9,13,25 | 164:13 |
| 272:21 273:3 | 178:19 179:1 | 283:6 289:11 | 83:13 90:3 | **team** 32:8 47:13 |
| 273:14 274:13 | 184:1 216:22 | 289:22 291:2 | 95:13 102:12 | **Teano** 121:3 |
| 274:19,22 | 221:10 246:15 | 293:22 294:7,8 | 105:1 127:18 | 123:21 124:1 |
| **tailings** 207:5,7 | 248:12 261:2 | 294:12 316:11 | 127:20 132:4 | 126:3 |
| 207:8 318:21 | 291:22,24 | 316:11,13 | 132:20 142:21 | **Teano's** 121:4 |
| **take** 15:8 30:22 | 292:16 294:16 | 320:20,25 | 142:21 143:5 | 124:2 |
| 44:23 51:17 | 298:20 299:10 | 321:2 324:5 | 144:22 152:19 | **teenager** 207:15 |
| 67:20 69:14 | 299:12 305:11 | 329:21 338:22 | 161:24 162:18 | 237:23 |
| 72:9 73:22 | 305:14 309:12 | 343:12 345:14 | 162:20 173:24 | **telephone** 2:3,7 |
| 91:20 93:2 | 309:15 312:20 | 345:21 346:14 | 174:16,23 | 2:11 25:16,24 |
| 101:4,5 107:9 | 315:2 345:25 | 349:10,12 | 179:7 203:25 | 31:9,24 134:13 |
| 108:20 112:14 | 369:3 383:20 | 350:18 356:3 | 204:5 207:2 | 138:9 139:10 |
| 130:3 136:5 | 390:8 | 362:4 366:5 | 213:21 214:9 | 144:4 159:23 |
| 148:6 164:12 | **talk** 21:16 23:17 | 369:18 370:20 | 215:17 217:21 | 160:5,12 169:7 |
| 166:25 179:22 | 23:24 26:21 | 371:1,18 374:8 | 220:13,20 | 169:11,15 |
| 184:3 187:21 | 27:9 44:9,23 | 379:17 380:20 | 230:13 231:7 | 176:2 314:5,8 |
| 196:2 197:14 | 46:23 53:3,9 | 382:13 383:16 | 235:11 246:20 | 314:11 349:20 |
| 197:16 205:13 | 55:2,13 59:12 | **talked** 68:8 | 254:1,5 259:14 | **tell** 11:20 20:15 |
| 215:6 216:12 | 59:16,25 64:5 | 105:13 132:7 | 259:25 263:8 | 37:8 38:2 45:8 |
| 218:25 223:6 | 68:7 72:3,25 | 132:10 134:16 | 281:10,23 | 50:10,16 59:23 |
| 224:1,6,25 | 73:3 89:12,21 | 136:2,3 140:15 | 282:4,8 284:12 | 61:7 74:24 |
| 225:24 226:12 | 90:7,11,12 | 152:11 153:22 | 288:1 298:9 | 77:8 85:8,20 |
| 229:23 240:4 | 102:17,25 | 160:19 161:7 | 305:5 308:1 | 86:16 89:8 |
| 244:16 249:12 | 121:20 125:9 | 166:3 173:7 | 323:6 326:17 | 98:20,24 |
| 255:13 256:17 | 125:15 128:13 | 194:1 206:6 | 331:14 336:11 | 101:19,21 |
| 260:24 276:8 | 130:18,25 | 215:14 220:23 | 366:18 379:23 | 105:18 106:21 |
| 283:14 295:7 | 131:14 132:15 | 264:14 278:21 | **talks** 91:4,7,12 | 122:8 123:10 |
| 296:22,22 | 132:16,25 | 278:24 279:5 | **tall** 236:4 | 124:7,14 127:8 |
| 300:4,6 302:2 | 135:3 136:20 | 279:24,25 | **tape** 68:1 119:10 | 130:11 131:21 |
| 303:3 306:17 | 140:9 152:17 | 280:1 281:6,7 | 119:11 | 134:18 135:24 |
| 312:16 320:7 | 157:1,15 | 281:12 282:24 | **tape's** 67:21 | 136:9,11 137:1 |
| 334:7,10 | 160:16 162:2,6 | 284:9 285:14 | **target** 93:10 | 138:2 142:9,11 |
| 341:22 344:22 | 162:10,12,16 | 295:21 305:22 | 94:11 | 150:16 175:23 |
| 344:24 348:25 | 166:21 172:2 | 335:22 337:5,6 | **taught** 14:25 | 176:5,10 178:7 |
| 349:14 365:11 | 172:21 182:25 | **talking** 21:7 | 84:16 | 180:3,24 |
| 368:13,16,24 | 185:18 187:24 | 23:4,5,6,23 | **Taylor** 54:13 | 181:21 182:10 |
| 372:5 376:21 | 203:4 210:1 | 26:19 32:24 | 299:16,19 | 182:18 183:10 |
| 383:15 386:18 | 213:25 216:7 | 33:10 34:7 | **teach** 84:14 | 183:16 185:9 |
| **taken** 3:2 14:2 | 234:3 241:11 | 37:11 46:11,19 | **teaching** 100:18 | 189:24 190:6 |
| 45:3 67:24 | 241:14 246:21 | 48:18 49:23 | 163:24 164:10 | 192:8,8 194:24 |
| 93:9 94:10 | 251:11 259:7 | 50:19,20 57:6 | 164:11 | 199:3 207:9,11 |

| | | | | |
|---|---|---|---|---|
| 207:12 208:17 | 138:1 141:21 | 25:20,21 29:6 | 292:23 293:7 | 160:22,25 |
| 209:6 210:5,13 | 243:12 | 40:14 42:23,24 | 293:25 295:23 | 161:10 163:11 |
| 211:2 215:21 | **term** 35:17 40:6 | 44:11 56:11 | 302:6 330:12 | 163:19 166:9 |
| 232:2 233:15 | 43:12 155:5 | 58:12 66:5 | 330:13,15 | 187:10 206:18 |
| 239:10 240:5 | 202:6,7,21 | 79:18 92:19 | 337:8,25 | 228:19 234:3 |
| 244:6 252:22 | **termed** 76:21 | 131:7 147:19 | 339:11 351:4 | 237:2 255:17 |
| 254:18 255:10 | 84:11 242:10 | 150:23 151:1 | 352:13 362:15 | 255:20 271:23 |
| 259:1 267:24 | **terming** 43:6 | 252:2 328:12 | 362:23 369:23 | 272:1 296:25 |
| 268:24 269:4 | **terminology** | 331:13 335:1 | **thank** 48:16 | 308:15 316:16 |
| 292:1 299:14 | 35:18 143:10 | 337:12,14,22 | 51:19,21 | 318:10 334:2 |
| 309:21 312:13 | 143:15,17 | 346:12 361:7 | 107:22 156:21 | 361:19 372:20 |
| 317:16 320:12 | 144:9 158:17 | 363:12 371:22 | 167:3 231:25 | **think** 4:25 26:15 |
| 322:16,19 | **terms** 25:18 | 387:5,8,14 | 261:6 263:2,7 | 36:5 37:5 39:1 |
| 324:17,20 | 88:12,19 | 388:7 | 266:17 275:23 | 40:7,20 41:12 |
| 325:2 330:9,9 | 105:24 133:4 | **testifying** 24:20 | 278:4 284:17 | 42:19 43:14 |
| 331:9 332:24 | 150:19 164:5 | 28:11 35:15,22 | 290:2 294:13 | 45:15 47:1,15 |
| 333:3 340:5 | 204:17 205:22 | 284:14,16 | 295:13,17 | 48:1,17,23 |
| 342:3,7,19 | 239:2 274:5 | 292:6 304:5 | 303:5 317:8 | 52:5 55:6 |
| 351:15 353:21 | 297:12 352:23 | 327:22 328:25 | 320:3 324:10 | 56:23 57:11 |
| 356:5 359:23 | **territory** 75:22 | 329:11,21 | 333:9 382:4 | 59:6,19 60:25 |
| 361:23 363:5 | **test** 258:21 | 350:20 369:18 | 388:13,16 | 62:9 63:21 |
| 370:5,12 373:2 | 286:13 338:15 | 370:8 387:15 | **thankfully** 98:3 | 69:23 75:14 |
| 375:8 386:25 | 339:14 | **testimony** 39:22 | **theme** 248:4 | 79:10 81:15,23 |
| **telling** 24:11 | **tested** 252:13 | 68:3 69:3 | **thesis** 82:20 | 82:13 83:21,24 |
| 26:7 105:4 | 255:4 292:9 | 71:19 75:1 | 92:2,6,8 | 86:4 90:19 |
| 133:7,23 | 331:21 361:24 | 77:19 138:25 | **thing** 23:19 | 98:12 99:5,14 |
| 141:13 142:18 | 363:6 365:15 | 143:24 180:17 | 32:25 45:24 | 99:17 104:2 |
| 150:14 152:7 | 365:20 366:3 | 196:3 236:20 | 47:2 50:8,10 | 106:4 108:8 |
| 178:25 198:23 | 366:14 367:9 | 236:21,24 | 59:2 62:16 | 109:14,24,25 |
| 198:25 199:17 | 367:14 368:1 | 237:1 253:7,12 | 68:20 100:23 | 110:2,20 |
| 236:13 258:10 | **testified** 5:13 | 253:13 254:8 | 151:23 161:3 | 114:22 116:16 |
| 281:15 283:25 | 11:12 252:23 | 254:11 264:19 | 192:22 198:6 | 116:18,21 |
| 298:3 300:20 | 265:18 278:5,9 | 265:7 267:13 | 200:15 212:23 | 117:23,25 |
| 307:17,19 | 278:16 284:7 | 291:19 293:6 | 214:23 215:4 | 118:6 119:5,9 |
| 317:19 346:22 | 284:21 287:22 | 295:21 296:3 | 216:8 247:14 | 120:21 121:8 |
| **ten** 180:2,3 | 298:19 301:12 | 298:18 299:4 | 247:25 250:9 | 121:10,18,18 |
| 182:2 | 332:19 335:18 | 308:17 310:14 | 255:17 296:7 | 122:21,24 |
| **tend** 188:24 | 346:3 | 310:15 390:8 | 299:5 | 123:3,7,8 |
| **tended** 140:23 | **testify** 6:1,7,15 | 390:10 | **things** 27:7 | 124:19 126:4 |
| 141:1 | 6:21,25 11:11 | **testing** 263:20 | 42:25 60:1 | 126:11 127:3 |
| **tendency** 93:8 | 14:10,16,18 | 267:6 287:17 | 65:9 74:19 | 129:18 132:8 |
| 94:9 | 15:12 16:16,24 | 288:19 290:22 | 85:23 95:13 | 133:15 134:6 |
| **tenor** 137:25 | 17:6,9,15 | 291:15 292:17 | 148:3 150:19 | 134:16,20 |

137:5,7,18
140:15 141:19
142:15 144:2
144:13 145:16
147:23 150:19
153:10,21
155:25 156:7
161:18 164:16
165:1,15
172:25 173:2
174:2,4,9,10
175:3,4,5
176:8,15,17
179:9 180:12
181:11,17,18
181:19 183:14
185:23 188:22
189:16 191:10
191:15,17,21
193:2,7,14
195:13 196:1,1
202:8 203:11
203:17,24
204:22 205:1,2
205:5,10,16
209:18 210:5
210:12,14
212:3,12
213:23 216:12
218:4 220:10
220:25 222:1
224:20 225:1,8
226:1 227:6,8
228:8,10,24,25
229:3 232:16
234:9,14
238:10,19,23
239:3,7,17
240:6,16 241:9
241:20 242:5
242:17,21
243:6 244:19
244:22 246:6

246:19,21
247:5,6,7
248:21 250:6
262:24 264:10
265:4,10,14,21
265:21 268:22
271:23 274:9
274:11 279:23
280:13,19
286:5,6,17
287:2,5,5,6,13
293:1,2,12,16
296:6,10,19
297:16,17
298:7,8 300:20
301:5 304:16
305:24 307:4
307:14 308:7
309:1 310:15
312:1 317:21
318:8,19,20
319:22 321:1
322:9,11
323:11 325:9
331:16 333:24
334:2,4 341:13
346:17,21
347:25 355:1,8
355:16,19,23
356:19,20
358:5,5,14
359:5 361:20
364:20 366:24
373:3 374:23
384:2 386:5,12
**thinking** 74:18
98:16 124:13
125:18 126:17
146:9 159:22
180:15 190:17
194:6 203:19
210:14 229:14
234:6 301:2

350:14
**third** 93:2,3,16
93:17,18
162:13 203:4
214:9 238:20
**Thomas** 1:5,9
1:12,17 2:2,14
168:6,11,14,19
169:6,18 313:4
313:6,8,13
314:3,13
**Thompson**
257:24
**thought** 78:8,10
114:24 118:12
122:10 127:21
127:22 140:18
143:22 155:21
155:23 156:1
157:15 159:4
164:4 171:11
172:4 174:16
180:13 182:24
183:1 193:25
194:1 200:9
201:6,7,11,17
201:18 204:21
228:3,17 232:4
242:6 262:7
271:16,22
301:1 334:5
354:8 366:2
386:22
**thoughts** 366:22
**thousand**
331:23
**three** 24:1,6,7,8
45:16 104:19
110:14 138:8
172:24 190:18
190:18,20,24
192:18 194:6
194:24 210:7

237:15 275:12
372:5
**three-month**
176:24
**three-quarters**
91:11
**tight** 351:21
**time** 4:3 14:1,4
17:23 20:16,20
23:14 28:9
33:15,19,23,25
34:1,11 40:19
41:3,11,16,19
41:20 42:11
43:1,4 44:8
45:2,5 47:8,23
49:22 50:20
51:17 56:15
60:24 61:5
64:4 65:4
67:23 68:1
69:7 72:9,25
73:2,5,23
74:22 75:2
77:21,21 79:25
82:7,9 83:5,6
83:24 85:5
90:1 95:12
99:7,8 100:14
101:6,12,18
102:14,15
103:25 104:15
108:10,11,13
108:16,18,23
109:3,5,8,11
109:20 110:1
113:14 117:6
118:23 119:10
119:13,16
121:12 126:20
127:19 130:18
131:1,15
135:11,22

140:1 144:21
144:24 145:5,9
146:1,3,9,16
147:5,22,24
149:23 150:16
150:18,21
152:9,12,19
157:5,21 159:4
159:16,22
161:24 162:5
162:18,19
163:2,8,11,18
163:21 164:6
164:15,21
165:7 166:4
167:5 171:3,9
173:1 174:20
175:25 176:6
176:25 177:7
177:17 178:7
178:12 179:7
179:14 183:12
185:22 187:16
188:17,21
189:8 190:1,24
191:11 197:14
197:17 199:6
201:3,25 202:9
202:16 205:15
208:5,22 210:7
215:24 216:3,3
216:6,9,21,24
218:4 219:18
219:23,24
220:9 221:11
228:14,25
229:20,24
230:3,6,9,12
231:5,7 232:5
233:22,22,23
233:23 234:4
234:21,25
235:23 236:8

243:15,16
250:13 253:17
254:23 255:1
258:22 261:1,4
265:25 266:5
272:8 276:15
277:8 282:21
285:16,24
286:16 288:23
289:19 294:15
294:18 308:7
311:4,11,16,20
311:22 312:3,7
312:13,19
316:3 317:1
318:18 319:3
321:25 327:5
330:24 333:6
344:12 348:20
351:21 355:17
356:4,4,19
358:1 360:1,24
363:11,12,17
363:25 364:14
365:15,18,20
366:1,15 367:6
367:8,10,15
369:2,9 374:7
374:24 375:4,7
375:21 380:4,6
380:7,12 383:5
383:19,22
385:23 386:1
388:4,18
**times** 8:6 30:24
  31:1 53:6
  163:1 166:3
  232:3,15,16
  324:6 329:8,14
  329:16 360:17
**tired** 116:4,23
**title** 88:5 116:4
  129:12

**titles** 127:2
**today** 4:2 22:20
  23:24 25:19
  28:13 31:3
  34:21 37:8
  57:15,20 58:5
  80:3,7 116:25
  149:16 251:2
  253:7 254:8
  284:14 305:22
  310:14 312:9
  333:11 357:13
  357:20,25
  362:18
**told** 28:15,18
  44:18 60:15
  126:15 131:23
  132:6 134:2,6
  134:13,17
  136:1 137:5
  139:14,16
  140:3,7,18
  142:4,15
  143:22 144:4,4
  179:9,17
  197:25 198:12
  218:6 229:3,20
  232:4 238:23
  246:3 249:11
  250:1 256:3,4
  256:4 274:12
  280:7 284:12
  292:5 297:7
  300:3,7 301:3
  301:5 343:8
**tomorrow**
  311:15
**Tonya** 1:9 71:5
  168:10 195:4
  278:5,9 313:6
**top** 89:16 90:24
  107:2 110:17
  309:7

**topic** 132:17
**total** 64:22
  65:16 181:24
  190:19
**totally** 312:3
**touch** 17:22
  22:24 297:11
**touched** 223:20
**town** 35:3
  158:21 159:11
  160:2,6,6,13
  160:14 206:22
  208:12 217:2,3
  217:4,5,11,17
  217:23 227:12
**towns** 158:23
  159:9,14 217:7
  331:25 332:2,4
  332:8
**toxicological**
  96:22
**toxicology** 95:14
  95:16,21 96:7
  96:18,21
**track** 146:11
**tradition** 88:3
**training** 119:4
**transcript**
  281:20 335:18
**transmittal**
  104:5
**transpired**
  221:16 224:4
  224:12 238:17
  244:20 275:25
  282:2 288:15
  289:8 290:17
  291:2
**trial** 387:6,14
  388:2
**trick** 372:21
**tried** 133:17
**trip** 233:9

**trips** 166:20
**trouble** 380:23
**Trucking**
  162:11,13
**true** 117:14,17
  205:7,10 230:8
  237:7 390:10
  390:19
**Truman** 71:4
  284:18 286:1,8
  286:21 287:1
**trustees** 109:13
  109:16 112:6
**truth** 242:15
  322:16
**truthfully** 260:7
**try** 7:17 13:4
  26:5 28:22
  52:4 89:20
  130:6 166:9
  173:20 188:16
  296:20 297:3
  316:16 357:14
  363:25
**trying** 23:12
  37:25 38:8,10
  45:22,23 65:2
  65:8 68:15,21
  73:24 90:4
  99:5 103:22
  104:7 114:25
  121:2 123:6
  130:19,22
  131:1,15 133:9
  145:16 151:22
  154:2 161:18
  166:22 173:12
  180:12,19,19
  182:21 192:8
  215:18 255:15
  261:22 262:17
  289:22,25
  306:16 308:2,5

308:18 310:14
322:17 334:1,4
341:24 342:13
342:13 347:4
352:16 354:10
355:10,15
357:3,11
366:11 372:20
**tucked** 256:25
**turn** 21:4 110:6
  174:6,12
**turned** 79:19
  101:21 102:1
  174:3,22
  318:15,16
**Turning** 70:8
**TV** 54:25 55:3
  239:9,10,12,22
**twice** 232:13
  233:23
**two** 9:22 14:8,22
  27:17 31:1
  32:24 45:16
  82:16 104:18
  110:14 112:2
  115:14 135:3,6
  136:21 138:3
  141:21 148:3
  153:10 172:24
  176:11,12,18
  181:20,23
  182:23 183:16
  184:22 186:16
  190:18,20,24
  192:17 193:17
  194:6 205:21
  210:7 214:19
  238:24 284:1
  286:24 306:8
  308:18 372:5
  385:11
**two-hour**
  205:20

**two-page** 305:9
**type** 184:24
  250:9 259:12
  376:4 377:17
**types** 44:7
**typical** 100:22
**typing** 12:4,7,9
  12:21
**typist** 12:3
**T.L** 2:11 5:5
  162:11,13
  169:15 314:11

---

**U**

**Uh-huh** 61:16
  82:22 88:7
  110:5,12
  112:25 113:23
  127:1 178:4
  246:13 267:23
  278:18 284:11
  301:18
**ultimately** 19:6
**unassociated**
  251:23
**uncle** 195:13,14
**undergraduate**
  80:18,23
**underground**
  245:24 246:5
  256:6
**underlying** 17:7
**understand**
  17:4 31:20,21
  32:17 34:2,17
  36:6,24 37:23
  38:2,4 42:3
  43:7 44:14
  45:25 50:19
  52:3 66:11
  67:3 68:21,23
  69:2,10 74:25
  77:19 82:2
  92:21 96:12

103:4,22,24
107:12 109:2
111:13 122:9
130:22 133:6
147:21 156:17
157:9 158:4
206:7 251:18
252:9 264:17
269:23 308:3
308:25 309:3
309:14 316:22
317:7 334:12
338:2,18,20
345:22 364:16
**understanding**
14:17 15:24
20:13 43:2
44:2 47:12
50:23 58:25
144:20,24
145:5 146:2,15
147:2,4 179:3
226:5 264:18
265:7 292:22
295:7 305:3
308:6,8,12,16
308:19 316:21
317:25 319:22
344:7 362:25
**understood**
23:22 202:18
308:9,15
**underwent**
149:5
**unhappy** 117:19
118:1
**UNIDENTIFI...**
7:15 12:1,8,11
12:13,16,23
13:8,23 21:21
21:22,23
**union** 114:5,5
**United** 66:12

**universities**
111:23
**University** 9:25
10:1 37:21
38:21,24 39:10
39:14,15,18,24
40:5 52:10,14
74:2,22 80:20
81:18 84:15,23
85:4 99:12
100:9 106:2,14
107:25 108:19
110:24 112:6
112:21 116:13
116:19 118:1,3
128:5 129:17
147:25 153:16
153:24 156:2
163:12,20,23
164:6,17,20,21
164:23 165:1,6
165:10,13,16
165:18,23
166:15 185:11
186:8,19,22
187:8 198:1
202:14,17
245:13 246:2
249:14 255:13
258:9,22
263:10 291:25
292:11,16,24
293:8 294:1
295:23 299:13
301:15 333:2
333:13 354:1
354:11 384:12
385:1 387:7,23
**unreasonable**
77:6
**unrelated** 15:4
16:9 21:11
79:25 171:11

316:18 365:25
**unusual** 15:8
26:24 32:14
346:24
**upset** 242:23
**upstate** 80:14,16
**urine** 362:15,23
363:6 365:14
365:17,19
366:3,14 367:9
367:14
**use** 3:3 35:17
89:20 91:1
170:3 174:3
296:16 315:3
325:15,16
326:25
**usually** 200:22
331:1
**utterly** 118:22
**ux** 1:15 168:17
313:11

---

**V**

**vague** 193:11
273:3 274:23
**valuable** 32:21
**Vasquez** 122:11
**vast** 79:20
**Vazquez** 120:6
121:6,7,23
122:17 123:20
123:25 232:5
**vegetables**
245:24
**vehicle** 334:3
**verbal** 69:12
270:18 340:1
**verification**
112:22
**verify** 303:2
339:13 355:17
**version** 60:22
**versus** 83:15

**vertical** 318:17
318:18
**Videll** 66:13
**videographer**
2:21 4:2,8
13:25 14:3
45:1,4 67:22
67:25 101:11
101:17 119:12
119:15 167:4
169:25 171:2
216:20,23
260:25 261:3
294:14,17
312:18 314:18
316:2 369:1,8
383:18,21
388:17
**Videotape** 1:23
3:1 169:1
170:1 314:1
315:1
**views** 201:4
**Virginia** 1:1
8:16 9:6,9,20
10:16,23 30:12
30:18 37:21
38:21,24 39:9
39:24 40:5
52:10 56:8
64:21 66:20
69:17,21 70:15
70:16 71:8
75:19,21 81:17
81:18 82:15
83:20 84:15
100:9 106:2,12
109:14 110:24
112:6,20
116:13 127:4
147:25 148:2
153:16,23
154:5 162:3

163:12,20
164:20 165:10
165:18,23
166:15 168:1
185:10 186:7
186:19 187:8
202:14 205:8
217:7 234:13
235:1 255:18
258:9,22
263:10 265:16
266:1,6,10
271:13 272:10
291:25 292:9
292:16,23
293:8,25
295:23 296:21
299:13 313:1
341:10 350:13
354:1,11
381:16 384:12
384:25 385:14
387:7
**virility** 91:2
**visit** 172:20
189:4 190:6
205:12 231:6
231:18 232:15
233:4,10,16
234:2 322:6
335:20 375:13
**visually** 122:20
**vitae** 84:21 85:9
98:14 127:9,14
127:16,18,20
127:21,22
128:2,4,17,19
**Vititoe** 34:13
47:10,25 57:8
72:16 157:6
180:11 265:2
**voices** 12:5,10
12:12

**voicing** 222:10
380:14
**Volume** 1:25
167:7 169:4
170:11 312:21
314:2 315:11
**vote** 109:23
**vs** 1:5,12,17 4:7
66:13 112:5
168:6,14,19
313:4,8,13
**V-A-S-Q-U-E-Z**
121:8

___

## W

**W** 2:10 169:14
314:10
**wait** 115:4 223:6
384:21
**waiver** 261:15
261:25 262:15
285:25 286:2
295:2
**walking** 207:15
227:13
**want** 4:19 5:3
13:7 14:5,6,7,9
14:24 15:3
23:15 24:3
27:22,23 32:11
34:19 36:7
38:1 39:3
41:14 46:9
48:13 57:1
60:19 64:1,2
64:16 66:24
67:14 70:17
72:8,25 73:20
73:21 74:14
76:5 77:24
89:18,19 90:11
114:11,14
115:1,2,19,21
135:3 136:20

140:9 141:4,8
142:7,8 144:7
150:6 151:20
151:22 156:14
160:9,21
161:10 173:20
176:3 181:14
182:25 183:14
197:16 199:11
211:12 219:3
223:7,18,21
232:25 233:22
260:4 261:7
262:15,19,24
268:20 293:19
297:3 310:22
311:8 312:13
326:19 330:15
331:24 338:19
342:12 350:11
368:1,12,17
376:24 377:10
377:14 381:24
382:3 383:24
384:7
**wanted** 28:24
68:12,21 78:5
129:14 172:7
198:14 241:2
242:22 293:3
308:8 323:14
342:3,7,18
369:12 371:20
378:1
**wanting** 62:12
104:9 208:6
243:3 308:25
341:16 342:19
**wants** 62:1,6
383:23
**warm** 234:21
**warning** 236:6,7
236:13,15

237:5
**wasn't** 29:3
68:20 78:2
94:21 124:11
136:16 138:16
141:23 150:17
153:19,19
175:17 183:10
183:11 192:10
194:18,20
196:3 198:2,10
220:17 247:16
247:16 264:4
280:8 283:4,5
334:22 337:13
359:18 370:2
371:17
**waste** 118:22
146:3,17 147:6
148:14,22
149:4,11
**wasted** 312:2
**water** 101:8
159:13
**Waunona** 71:2
323:22
**way** 9:15 14:20
21:5 40:7
51:15 57:12
74:1,3 82:11
85:15 87:12
101:9 103:12
105:3 108:23
109:9 125:1
137:8 140:16
142:6,24
147:22,23
148:12 150:1
150:12 155:18
161:17 165:7,9
165:12 186:13
203:17 204:20
206:22,23

261:22,22
287:10 302:1
309:18 321:22
356:19 363:3
366:12 368:22
375:2 379:25
380:4,6
**Wayne** 2:21 4:8
169:25 314:18
**ways** 81:22
104:19 111:14
**WBOY** 239:8,8
239:11,22
**weather** 234:17
**website** 49:13
378:18
**week** 175:12
305:12 309:15
**weekday** 183:17
205:13
**weekend** 183:17
322:5
**weeks** 25:17
32:24 176:11
**welfare** 110:25
200:15
**went** 39:5,6
67:19 81:17
99:6,11 132:20
133:8,14,16
134:8 144:23
145:7 174:18
205:21 206:20
213:19 227:13
230:18,21
245:18 249:11
277:10 301:10
305:3 318:17
318:19,20
319:7 334:3
339:11 342:23
342:24 378:3
379:20

**weren't** 204:12
**Werntz** 328:16
353:20,21
**West** 1:1 2:6
8:16 9:6,8,20
10:16,23 30:12
30:18 37:20
38:21,24 39:9
39:24 40:4
52:9 56:7,8,16
64:21 66:19
69:17,21 70:14
70:16 71:8
75:19,21 81:17
81:18 82:15
83:20 84:15
100:8 106:2,12
109:14 110:24
112:6,20
116:12 127:4
147:25 148:2
153:15,23
162:3 163:12
163:20 164:19
165:10,18,23
166:15 168:1
169:10 185:10
186:7,19 187:8
202:14 217:7
234:12 235:1
255:18 258:9
258:22 263:10
265:16 266:1,6
266:10 271:12
272:10 291:25
292:9,16,23
293:7,25
295:23 296:21
299:13 313:1
314:7 341:10
343:17 350:13
353:25 354:11
381:16 384:12

384:25 385:14
387:7
**Westinghouse**
6:12 16:3,10
16:21 46:13,18
47:4,6,17,18
47:23,25 48:4
48:10 75:24
76:1,3 142:22
148:2 153:16
153:25 185:11
186:2,7 187:3
187:9 188:2
**Westinghouse...**
16:17
**wet** 227:16,18
227:18,19
**we'll** 7:17 54:1
79:3,5 99:4
102:7 115:20
115:23 128:13
128:13 275:6
278:3 286:19
293:22 294:7
295:4,16 303:2
303:2,4,8
310:19 312:8
312:10 330:6
378:7
**we're** 15:11 21:2
23:17,24 29:16
29:23 37:11
44:10 57:6
63:25 64:24
67:21 68:7
76:1 79:18
90:13,14 119:9
144:22 151:20
151:22 152:16
152:19 154:13
154:14 181:10
207:1 215:25
235:11 242:25

254:1,6 259:12
259:25 261:21
265:1 266:25
282:4,8,22
283:2 287:25
288:13 289:10
289:15 290:16
310:10,20
311:6 312:5
316:8,12
320:19 355:4
359:5 366:18
368:21,21
377:7 380:5,18
380:24 381:22
383:5 384:2
**we've** 160:19
161:7 179:7
268:22 273:19
279:25 280:1
281:6 305:22
328:7 360:24
361:20 368:23
379:13
**whereabouts**
27:18
**Wickline** 2:14
3:13,14,15
4:12,12,22,24
7:8,10,17
11:16,23 12:6
12:19 13:6,19
13:24 15:14,18
15:21,25 16:4
17:3 18:9,17
18:21 19:12,15
20:3,7,9,11,17
21:19 22:13,16
23:2 24:22
25:1 27:14
28:9,14 29:11
29:19,25 30:7
32:2,6,9,12

43:18 44:25
49:24 50:2
53:23 54:8
60:2 61:1
63:21 64:1
67:3,11,20
68:9 78:19
79:7 86:6 89:4
89:19,23 101:5
102:7 107:1,3
107:6,16,18,20
112:9,12
114:19,22
115:4,22 119:9
127:12,15
147:3 148:18
151:17,25
154:12,17,21
154:23 156:16
156:21 157:24
167:2 169:18
170:14 171:4
171:14,19,23
199:9 207:7
216:16,19
218:18 222:13
260:8,13,19,24
262:1,20,24
263:2 264:15
264:17 266:13
270:4,14,22
274:25 275:5,9
275:12,20,23
277:21 278:4
281:18 282:4,8
282:13 285:5
285:13,22
286:2,7 288:17
289:6,13,17,20
289:24 294:10
294:20 295:6
295:11,16
298:14 299:1,3

301:24 302:4,9
302:21 303:5
303:12 304:3
309:21 310:13
310:24 311:2
311:17 312:16
314:13 315:14
316:5,15 317:7
319:24 320:14
320:16,21
324:7 327:11
327:15,21
328:1,13
331:16,22,25
332:6 345:5,8
346:15,20
348:25 349:18
349:23 357:2
359:22 368:7
368:10,19,23
372:1 373:10
374:4 376:10
376:19,23,25
377:3,8 378:7
379:4,7,10,19
380:1,9,11,19
382:4 383:7,10
383:15 384:7
385:17 386:18
388:3
**Wickline's**
304:23
**widow** 22:1
**wife** 60:15
120:25 181:3,4
287:12
**wife's** 232:21,22
233:4,10
**wild** 130:9
**Williams** 178:19
226:6 240:22
241:6,7 242:10
245:4 246:8

| | | | | |
|---|---|---|---|---|
| 276:5,9 | 103:6 118:20 | **WM** 2:14 | 166:7 171:12 | 77:6 109:9 |
| **willing** 127:12 | 119:1 125:4,10 | 169:18 314:13 | 182:6,7 184:6 | 141:4,8 144:7 |
| 198:17 200:12 | 128:15 131:8 | **woman** 258:2,19 | 193:10 202:10 | 202:6,20 |
| 204:1,10 215:6 | 141:6 146:20 | **wonder** 296:13 | 202:12,14 | 225:10,14,14 |
| 261:24 310:21 | 147:14 152:7 | **wondered** 139:6 | 211:19 217:13 | 259:11,20 |
| 311:11 312:5 | 152:14 157:17 | 208:4,4,5,8,24 | 217:16 233:24 | 299:5 357:18 |
| 312:13 | 160:8 163:14 | 208:25 229:7,7 | 251:10,13 | **wrap** 382:4 |
| **Willis** 135:9,14 | 166:25 167:3 | 229:9 | 252:2,6 255:19 | **writing** 61:9,9 |
| 137:10 173:8,9 | 170:2,12 | **wondering** | 261:15 295:2 | 270:23 |
| 175:8,15,19 | 200:25 201:13 | 134:18 155:18 | 306:22 307:2 | **written** 42:13 |
| 179:23 180:25 | 210:3 216:14 | 220:19 233:16 | 307:15 308:15 | 206:8 226:6 |
| 181:2 182:22 | 216:17 219:12 | **word** 37:23 38:3 | 312:10 316:10 | 267:6 269:1 |
| 192:23 211:3 | 261:13,17 | 38:4 155:10 | 330:3 333:13 | 337:7,24 338:7 |
| 305:5 309:1 | 262:7 269:20 | 188:24 240:17 | 334:22 343:5,6 | 338:14 339:7 |
| 317:19 | 269:21 270:25 | **worded** 220:17 | 347:7 351:18 | 339:13,23 |
| **window** 207:18 | 287:18 289:1 | **wording** 92:1 | 351:19,20,22 | 340:6 |
| **wine** 284:22,23 | 289:11 291:9 | 225:2 | 351:25,25 | **wrong** 15:20 |
| 284:23 285:19 | 293:16 294:5 | **words** 17:22 | 352:6,7 360:10 | 72:12 233:3 |
| 285:19 286:20 | 298:12 300:15 | 39:7 52:21 | 360:19 361:16 | **wrongful** 21:25 |
| 287:4,8,10,11 | 300:18 310:9 | 76:6 173:18 | 375:17 379:15 | 71:15 |
| **winter** 296:11 | 311:9 315:2,12 | 200:6 203:18 | **worked** 54:9 | **wrote** 86:13 |
| **wish** 176:5 | 324:2 329:9 | **work** 6:2,9,17 | 56:6,19,24 | 127:3 129:9 |
| 191:8 333:4 | 336:15 337:15 | 15:5,11 16:14 | 57:4,16 58:6 | 222:7 |
| **withdraw** 171:5 | 338:4,20 339:2 | 16:16,17,19,25 | 100:5 109:13 | **WVEA** 113:22 |
| 328:22 384:3 | 340:16 345:22 | 17:7 18:1,4,13 | 109:17 155:22 | 114:4 |
| **withdrawn** | 347:9 355:7 | 18:21 19:1,8 | 182:7 307:9,17 | **WVU** 37:14,17 |
| 171:17 | 357:16 358:24 | 19:19,24,25 | 307:19,21 | 46:14,18 48:4 |
| **witness** 3:2,11 | 366:10,18 | 20:18 21:11 | 309:3 330:2,20 | 48:9 98:21 |
| 5:12,19 6:21 | 368:5,9,14,20 | 30:5 55:1 | 342:25 343:7 | 100:13,14,18 |
| 11:1,17,19 | 370:25 371:4,8 | 63:13,16,20 | **working** 13:4 | 105:21 106:6 |
| 12:17 21:1,10 | 371:23 374:6 | 64:12 67:10 | 14:13,15 17:20 | 109:4 113:22 |
| 24:16 25:2,3,8 | 374:13 376:25 | 70:3,25 71:11 | 33:18 38:22 | 116:12,14 |
| 26:1,8,14 28:5 | 377:5 379:19 | 79:17,19,23 | 57:6,7,8 59:4 | 117:19,20 |
| 28:20 32:11,18 | 382:11,14,16 | 81:19 82:2 | 98:21 163:10 | 118:9,14 163:2 |
| 34:3,17 35:14 | 382:17,21,23 | 84:9,13 90:12 | 163:17 164:20 | 163:8 184:9 |
| 35:23 47:18,20 | 386:21 387:2,3 | 91:5,7 94:17 | 164:23 165:17 | 186:1 187:2 |
| 53:10 54:3 | 388:1 390:9,11 | 96:15 99:9,13 | 375:3,6 376:2 | 188:2 300:10 |
| 55:15 67:5 | **witnesses** | 102:4,13 | **works** 299:20 | 300:23,24 |
| 68:6 69:8 | 328:19 349:15 | 126:19,22 | **worried** 173:21 | 301:1 372:9 |
| 73:15,18 92:16 | 349:21 | 129:8 149:20 | **worry** 141:23 | 373:5 385:8 |
| 92:18 95:7,12 | **Witschi** 328:15 | 150:5 151:10 | 142:1,3 343:2 | **WVU-ACE** |
| 96:8,16,23 | 353:7 | 160:24 161:12 | **worth** 155:20 | 114:2,5 |
| 101:7 103:2,4 | **witty** 91:1 | 162:25 165:7,8 | **wouldn't** 29:8 | **W-I-T-S-C-H-I** |

353:7

**Y**

**Yahoo** 52:11
**yard** 300:12
318:20
**yeah** 13:23 16:6
31:17 35:10
47:1 51:24
53:10 57:20
61:21 62:17
75:8 78:13
81:17 84:19
85:12 93:20
98:13 103:8
107:21 110:16
111:13 116:7
122:13,16
127:1 132:15
137:23 147:21
148:6 172:4
174:24,24
180:14 190:23
194:1,2 196:8
197:6,21
199:16 207:4,8
207:20 209:24
210:18 211:14
222:13 229:20
250:9 257:19
264:21 285:16
285:17 305:19
306:8 307:13
321:22 324:2
324:25 325:9
326:23 331:8
337:17 345:16
349:2 353:8
356:15,20
361:22 372:19
**year** 16:11 50:7
82:15 130:1
173:1 176:8,10
233:22,23

234:12 309:17
**years** 34:24 79:5
82:16 105:23
139:23,24
152:20 187:19
207:14 233:18
254:2 317:24
**yesterday** 62:2,5
**Yew** 258:1
**York** 80:14,16
**young** 207:14,15
**younger** 307:7
**Y-E-W-T-U-...**
258:3

**Z**

**Ziemkiewicz**
258:5
**zinc** 22:2 23:18
33:11 34:8
119:25 120:15
125:2,22
126:10 130:21
131:4,18
144:25 145:6
145:12,19
146:4,18 147:7
165:9,21 189:6
207:2 235:12
235:19,22
300:8 306:22
307:2,22 308:4
308:19 316:7
317:11,20,22
317:23,25
318:19 319:4,5
319:5,7 354:16
354:17 358:9
358:18,21
359:8,14
360:12 365:16
365:21 366:16
367:11,16
**Zinser** 106:15

108:1,6,19
**Ziploc** 250:7
**Z-I-E-M-K-I-...**
258:6

**$**

**$5** 112:23

**0**

**01** 130:8,8,9
178:15 179:1,9
193:16 212:5
**02** 50:11
**03** 53:18
**04** 8:3,3 350:15
**04-C-296-2 1** :4
168:5 313:3
**05** 9:18,21 74:5
74:23 78:1
100:12 267:3
296:11,11
305:12 350:13
350:15
**05-C-148-1** 1:11
168:13 313:8
**06-C-285-3** 1:17
168:19 313:12

**1**

**1** 1:25,25 3:17
3:22 60:3,6
68:25 69:15
115:15 315:23
318:3 319:16
369:6 381:23
382:2 388:15
390:23
**1st** 77:25
**1:08** 119:16
**10:22** 45:2
**10:30** 60:15
67:18
**10:32** 45:5
**103** 303:10,15

304:18 317:16
319:16 328:8
335:6,9
**11** 207:14
**11th** 110:11
309:22
**11:00** 60:15
67:18
**11:03** 67:23
**11:15** 68:1
**110** 291:20
**1100** 3:7 4:4
170:7 315:7
**112** 301:13
**113** 301:13
**115** 3:18
**12** 1:21 168:23
207:14 237:22
313:17
**12th** 4:3
**12:01** 101:12
**12:20** 101:18
**12:53** 119:13
**13** 207:14
237:22
**15** 10:3 183:11
214:16 368:19
**167** 1:25
**168** 169:4
**17** 309:14
**17th** 3:7 4:4
170:7 315:7
**171** 3:14 170:14
**174** 91:10
**175** 89:16,16
90:24
**178** 3:18 170:17
**18th** 390:20
**180** 93:2,14
**184** 245:5
**190** 281:18
**191** 281:19
**1941** 7:14

**1950** 217:2,10
217:18 221:3
306:23,24
307:3,12,19
**1959** 80:23
**1962** 8:18
**1963** 80:23
**1970** 216:25
230:5 319:22
**1970's** 220:4
230:1
**1971** 98:23,25
99:1 100:9
**1993** 8:20
**1995** 107:20
**1996** 354:24
355:12 358:3
**1997** 110:11
**1999** 116:3

**2**

**2** 3:17,22 68:1
70:8 86:8,11
110:6,9,13
115:16 116:18
118:10 167:7
169:4 170:11
224:9,10
315:24 318:25
319:1,20 369:6
381:23 382:2
388:15
**2nd** 107:20
**2:18** 167:5
**2:32** 171:3
**20** 212:13
214:16 332:19
**2000** 6:14 16:11
121:22 122:7
135:21 172:23
175:2,5,14
177:4,5,13,13
177:24 178:3
179:21 181:1

182:20 184:12
188:5,14 189:5
189:8 190:13
190:21 195:21
196:20 218:1
219:18,21
230:4,14,19,22
231:2,10,15
244:2 282:17
283:10 306:3,4
325:22 355:21
379:21
**2001** 135:21
178:20 190:14
190:22 192:3,5
193:22 194:4
196:4,11,15,21
197:3,10
202:24 203:3,7
205:12 206:11
210:16,20
212:9,20 213:2
213:9,25
214:21 216:1,2
218:2 219:18
219:21 221:7
221:17 224:15
226:11,22
230:19,24
231:10,16,16
231:16,19
238:16 240:8
244:2,2,3,20
248:24 253:9
268:1 278:6,10
279:19 280:3
280:18,19
282:17 283:10
306:7 327:1
332:17 355:16
379:22
**2002** 6:4 18:13
19:4,9,16

20:21 21:14
40:25 50:11
53:17,17,18
70:6 75:7
102:4 180:13
180:15 282:14
320:15 321:19
360:15,17,22
361:13 362:25
366:19 373:23
374:1,3,5,20
**2003** 5:24 17:24
20:5,19 21:15
22:11 32:3,22
33:17 40:16
42:21 43:21
45:14 49:18
50:9 51:3,7
52:23 53:7,15
55:5 56:1,4,14
56:15 59:9
67:7 69:4 70:1
70:10,24 71:11
75:5 102:3
150:3 282:15
332:20 335:21
359:19 360:25
**2004** 286:11
287:17 288:20
290:23 291:16
309:14
**2005** 22:6
309:16
**2006** 1:21 4:3
168:23 309:22
313:17 378:17
389:10 390:20
**2010** 390:23
**210** 245:5
**25** 192:21
335:17
**26** 64:21 65:15
65:19 66:19

**26th** 373:23
**277** 363:18,20
364:1,7,11

---
### 3

**3** 3:18,23 70:23
93:14 115:24
116:2 224:18
224:19 225:23
225:25 312:21
314:2 315:11
315:25 369:6
381:24 382:2
388:15
**3rd** 182:17
**3:00** 164:8,8
**3:37** 216:21
**3:50** 216:24
**30** 10:1 178:20
190:14,21
196:21 218:2
219:18 221:7
221:17 224:15
226:11,22
230:19 231:18
238:16 240:7
244:20 248:24
253:9 268:1
278:6,10
279:19 280:3
312:9 327:1
**30th** 179:1,9
210:8 278:25
**30-day** 175:11
**304** 309:8
**312** 169:4
**313** 314:2
**316** 3:15 315:14
**320** 3:19 315:16
**3294** 10:1
**34** 105:22
**369** 3:19,22,22
3:23 315:17,23
315:24,25

**373** 3:20 315:18
**378** 3:21 315:21
**392** 314:2

---
### 4

**4** 3:18 170:17
178:13,18
216:13 221:5
221:13 222:15
223:17 226:3
238:15 244:17
251:5 252:10
252:24 267:22
272:14
**4th** 182:17
**4:59** 261:1
**40** 239:5 253:8
380:6
**45** 317:5 380:7
**4717** 9:15
**487304** 390:23

---
### 5

**5** 3:19 113:19
315:16 320:1,2
320:4,7
**5:00** 205:19
**5:13** 261:4
**5:30** 205:17
**5:57** 294:15
**50** 76:7,21 77:4
126:15 132:6
140:5 142:25
143:8,16 239:5
253:8

---
### 6

**6** 3:19 315:17
369:4 372:4
**6:00** 294:18
**6:15** 368:22
**6:20** 311:4
**6:23** 312:19
**6:30** 205:17

206:2
**6:32** 316:3
**60** 3:17
**64** 99:24
**66** 81:14 82:13
99:24

---
### 7

**7** 3:13,20 248:13
315:18 373:12
373:15
**7th** 305:12
309:16
**7:00** 205:19
311:10
**7:39** 369:2
**7:44** 369:9
**70** 81:15,15,23
82:13 319:21
**70's** 120:6 121:1
121:21 126:21
217:14,16
220:10 232:12
233:21,25
**71** 81:15,15,17
81:18 98:22
100:10
**73** 81:20 82:4,14

---
### 8

**8** 3:20 272:12,13
315:19 378:9
378:14,25
**8th** 7:14
**8:02** 383:19
**8:06** 383:22
**8:11** 388:18,19
**86** 3:17
**88** 109:14

---
### 9

**9th** 116:3
**9:16** 1:22 4:3
168:24 313:18

**9:27** 14:1
**9:44** 14:4
**90** 83:23
**92** 109:15
**95** 83:21,24,25
**97** 110:7

# APPENDIX B

# In The Matter Of:

*Gary W. Rich and Law Office of Gary W. Rich, L.C. v. Joseph Simoni, et al.*

---

*Gary W. Rich*

*April 30, 2013*

---

*WV Depos*

*Colonial Gateway, Suite 119*

*Route 2 Box 406*

*Clarksburg, West Virginia 26301*

*304-566-7800*

Original File Gary Rich.prn

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

GARY W. RICH and
LAW OFFICE OF GARY W. RICH, L.C.,

    Plaintiffs/Counter-Defendants,

v.                    Civil Action No.:
                       1:12-cv-12-IMK

JOSEPH SIMONI,

    Defendant/Counter-Plaintiffs.

GARY W. RICH and
LAW OFFICE of GARY W. RICH, L.C.

    Third-Party Plaintiffs,

v.

BARON AND BUDD, a professional
corporation; COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.; and
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.;

    Third-Party Defendants.


VIDEOTAPED DEPOSITION OF GARY W. RICH


WV Depos
888-WV-DEPOS

VIDEOTAPED DEPOSITION OF GARY W. RICH

a witness herein, called for examination, taken pursuant

to the Federal Rules of Civil Procedure, by and before

Amy C. Harris, a Court Reporter and Notary Public in and

for the State of West Virginia, at the Best Western

Plus, 100 Lodgeville Road, Bridgeport, West Virginia

26330 on Tuesday, April 30, 2013 beginning at 10:08 a.m.

and continuing to Wednesday, May 1, 2013 beginning at

10:03 a.m.

APPEARANCES


Daniel Marino, Esquire
Marino Law, PLLC
910 17th Street, N.W., Suite 800
Washington, D.C. 20006
     Co-Counsel for Gary W. Rich and Law Office of
     Gary W. Rich, L.C.

E. Ryan Kennedy, Esquire
Robinson & McElwee, PLLC
140 West Main Street, Suite 300
Clarksburg, West Virginia 26301
     Co-Counsel for Gary W. Rich and Law Office of
     Gary W. Rich, L.C.

Christopher J. McCarthy, Esquire
Booth & McCarthy
Post Office Box 4669
Bridgeport, West Virginia 26330
     Counsel for Baron & Budd/Co-Counsel for
     Levin Papantonio

William F. Cash, III
Levin, Papantonio, Thomas, Mitchell, Rafferty &
Proctor, P.A.
316 South Baylen Street
Pensacola, Florida 32502
     Co-Counsel for Levin Papantonio


WV Depos
888-WV-DEPOS

APPEARANCES (cont.)


Angela J. Mason, Esquire
J. Farrest Taylor, Esquire
The Cochran Firm-Dothan, P.C.
163 West Main Street
Dothan, Alabama 36301
    Counsel for The Cochran Firm

Jeffrey M. Wakefield, Esquire
Caleb P. Knight, Esquire
Flaherty, Sensabaugh, Bonasso, PLLC
Post Office Box 3843
Charleston, West Virginia 25338
    Counsel for Joseph Simoni

ALSO PRESENT:
    Joseph Simoni - (not present on 5/1/13)
    Rebecca Foertsch, Veritas Legal Services

EXAMINATION

|                                   | Page |
|-----------------------------------|------|
| Examination by Mr. Cash           | 10   |
| Examination by Mr. Wakefield      | 182  |
| Examination by Ms. Mason          | 438  |
| Examination by Mr. McCarthy       | 535  |

| Reporter's Certificate | 564 |
|------------------------|-----|
| Errata Sheet           | 565 |

WV Depos
888-WV-DEPOS

EXHIBITS

Deposition Exhibit No. 1                    11
Deposition Exhibit No. 2                    63
Deposition Exhibit No. 3                    150
Deposition Exhibit No. 4                    156
Deposition Exhibit No. 5                    170
Deposition Exhibit No. 6                    200
Deposition Exhibit No. 7                    201
Deposition Exhibit No. 8                    236
Deposition Exhibit No. 9                    237
Deposition Exhibit No. 10                   242
Deposition Exhibit No. 11                   245
Deposition Exhibit No. 12                   247
Deposition Exhibit No. 13                   251
Deposition Exhibit No. 14                   255
Deposition Exhibit No. 15                   257
Deposition Exhibit No. 16                   262
Deposition Exhibit No. 17                   264
Deposition Exhibit No. 18                   270
Deposition Exhibit No. 19                   270
Deposition Exhibit No. 20                   288
Deposition Exhibit No. 21                   292
Deposition Exhibit No. 22                   439
Deposition Exhibit No. 23                   449
Deposition Exhibit No. 24                   457
Deposition Exhibit No. 25                   461

EXHIBITS (cont.)

WV Depos
888-WV-DEPOS

Deposition Exhibit No. 26      493
Deposition Exhibit No. 27      506
Deposition Exhibit No. 28      510
Deposition Exhibit No. 29      513
Deposition Exhibit No. 30      515
Deposition Exhibit No. 31      518
Deposition Exhibit No. 32      521
Deposition Exhibit No. 33      523
Deposition Exhibit No. 34      525
Deposition Exhibit No. 35      545
Deposition Exhibit No. 36      549
Deposition Exhibit No. 37      554

1                          -----

2                      PROCEEDINGS

3                          -----

4              VIDEOGRAPHER:  This is the video

5    deposition of Gary W. Rich, taken in the matter of

6    Rich v. Simoni, Third-Party Defendants; Baron and

7    Budd, a professional corporation; Cochran, Cherry,

8    Givens, Smith, Lane & Taylor, P.C.; and Levin,

9    Papantonio, Thomas, Mitchell, Rafferty & Proctor,

10   P.A.; filed in the United States District Court,

11   Northern District of West Virginia, Case

12   No. 1:12-CV-12-IMK.

13              This deposition is being held at the Best

14   Western Plus, 100 Lodgeville Road, Bridgeport, West

15   Virginia on Tuesday, April 30th, 2013.

16              My name is Rebecca Foertsch, the video

17   specialist from Veritas Legal Services located at

18   4 Smithfield Street, Tenth Floor, Pittsburgh, P.A.

19   15222.

20              Our court reporter is Amy Harris from

21   WV Depos with offices at Colonial Gateway Office

22   Park, Suite 119, Route 2 Box 406, Clarksburg, West

23   Virginia 26301.

24              We are going on the record at approximately

1    10:08 a.m.

2            Counsel will now state their appearances

3    for the record, after which our court reporter can

4    swear in the witness.

5            MR. CASH:  I'm Bill Cash representing

6    Levin Papantonio.

7            MS. MASON:  Angela Mason for The

8    Cochran Firm-Dothan, P.C.

9            MR. TAYLOR:  Farrest Taylor for The

10   Cochran Firm-Dothan, P.C.

11           MR. MCCARTHY:  Chris McCarthy, Baron &

12   Budd and also local counsel for Levin Papantonio.

13           MR. KENNEDY:  Ryan Kennedy, local

14   counsel for Gary Rich.

15           MR. KNIGHT:  Caleb Knight, Flaherty,

16   Sensabaugh, Bonasso, on behalf of Doctor Joe Simoni.

17           MR. WAKEFIELD:  Jeff Wakefield,

18   Flaherty, Sensabaugh, Bonasso, on behalf of Doctor

19   Simoni.

20           MR. MARINO:  Dan Marino, I'm here for

21   Gary Rich and the Law Office of Gary Rich.

22           COURT REPORTER:  Mr. Rich, will you

23   raise your right hand so I can swear you in?

24           MR. RICH:  Yes.

1                COURT REPORTER:  Do you solemnly swear

2  or affirm the testimony you're about to give in this

3  matter will be the truth, the whole truth, and

4  nothing but the truth?

5                MR. RICH:  Yes, I do.

6                COURT REPORTER:  Thank you.

7                -----

8                GARY W. RICH

9  a witness herein, having been first duly sworn was

10  examined and testified as follows:

11                -----

12                EXAMINATION

13  BY MR. CASH:

14      Q.  Mr. Rich, good morning.  My name is Bill

15  Cash.  I represent Levin Papantonio, and I'm taking

16  your deposition today.

17      A.  Good morning.

18      Q.  Good morning.

19        I'm sure you know how depositions work, so

20  I will skip all of the rules.

21      A.  Yes.

22      Q.  I'd like to ask if you got a chance to

23  review the deposition notice in this case.

24      A.  The deposition notice, I don't believe so.

1                          -----

2                    (Exhibit No. 1 marked for purposes of

3      identification.)

4                          -----

5      BY MR. CASH:

6          Q.   Okay.  I'm going to hand it to you now, and

7      I'm -- I've marked it as Exhibit 1.  The only thing I

8      really want to ask you about this, Mr. Rich, is, do

9      you see page 2 where it says, the deponent must

10     produce at the deposition any document he reviewed to

11     prepare for the deposition or to refresh his

12     recollection regarding any matter?

13         A.   I see that.

14         Q.   But you didn't see that prior to this

15     deposition?

16         A.   I didn't see this notice.  No.

17         Q.   Did you just not get it from your counsel?

18         A.   I'm not sure.  If I did, I didn't review

19     it.

20         Q.   Okay.  Did you review any documents to get

21     ready for this deposition today?

22         A.   I did.

23         Q.   And would you please tell us what they are.

24                    MR. MARINO:  I'm going to instruct the

1  witness not to answer that based on attorney work

2  product.

3              MR. CASH:  There's no basis for that

4  objection, Mr. Marino, because what he reviewed is

5  not privileged.

6              MR. MARINO:  Okay.  Do you have any

7  other questions for the witness?

8  BY MR. CASH:

9      Q.   I'm asking you what you reviewed to get

10  ready for this deposition today.

11             MR. MARINO:  Okay.

12             MR. CASH:  That's not a -- that's not

13  a privilege, that's not a privileged question.

14             MR. MARINO:  Okay.  The same

15  instruction.

16         If you have other questions, you should ask

17  them, okay?

18             MR. CASH:  All right.  I'm going to

19  reserve the right to get back to that.

20             MR. MARINO:  Okay.

21  BY MR. CASH:

22      Q.   But you didn't -- you didn't bring any

23  documents with you at all?

24      A.   I didn't.

1        Q.   Did your counsel bring any documents for

2  us?

3        A.   I don't know.

4        Q.   Mr. Rich, where were you born?

5        A.   Hammond, Indiana.

6        Q.   And what's your profession?

7        A.   Currently, I am involved in project

8  management.

9        Q.   Can you tell us what type of project

10  management?

11        A.   For a major oil company.

12        Q.   Which oil company?

13        A.   The Saudi Arabian National -- Saudi Arabian

14  Oil Company.

15        Q.   That's the oil company owned by the Kingdom

16  of Saudi Arabia?

17        A.   Correct.

18        Q.   And where are you living these days?

19        A.   In Dhahran, Saudi Arabia.

20        Q.   And are you still a United States citizen?

21        A.   I am.

22        Q.   How did you get this job?

23        A.   I simply applied.  Many years ago, I'd

24  worked for the Arabian American Oil Company, Aramco,

1   which hired me back in 1981, '82, and I worked for

2   Aramco for a number of years.  And the company was

3   eventually -- the shares were sold to the Saudi

4   Arabian government.  The company had been owned by

5   Standard Oil, Texaco, Exxon, and Mobil.  And this was

6   in the late '80s.  I was an employee at the time.

7       Q.   Have you been an employee of Aramco or the

8   Saudi oil company continuously since 1981?

9       A.   No.

10      Q.   Okay.  Can you tell us when you started and

11   stopped working for these companies?

12      A.   Well, I stopped -- I actually went to Saudi

13   Arabia in 1981.  It was with a service organization

14   to Aramco.  In 1982, I joined Aramco, and I worked

15   there until after the first Gulf War and left in

16   October 1991.

17          I rejoined the company.  I was actually

18   hired in December 2007, or the offer was received.  I

19   accepted it in December 2007, and I actually went

20   back to Dhahran in June of 2008.

21      Q.   And have you been living in Dhahran since

22   2008?

23      A.   Yes.

24      Q.   Do you have any family here in the United

1  States?

2      A.   I have daughters living here.

3      Q.   Okay.

4      A.   I have a mother who lives here.

5      Q.   Do you come back and forth between the

6  United States regularly?

7      A.   Usually, once a year.

8      Q.   Okay.  When did you get here this year?

9      A.   I arrived in the U.S. Sunday, I think it

10  was April 22nd.

11      Q.   And how long do you plan to stay in the

12  United States?

13      A.   I think my flight is scheduled to leave

14  around May 20th, something like that.  I'm not

15  exactly sure.

16      Q.   So you'll be available here in the United

17  States at least until that date if we needed to call

18  you back?

19      A.   Well, I'm going to be -- I have engagements

20  in other cities, but I think I would be available by

21  phone.

22      Q.   Do you have further plans to return to the

23  United States after you leave?  Do you have another

24  trip scheduled after this one?

1       A.    Not at this time.  But I have vacation

2   days.  I could come back.

3       Q.    And for what reasons do you come back to

4   the United States?

5       A.    I come back to go to the dentist, come back

6   to get my eyes examined, medical appointments, see my

7   children, see my mother, see friends.

8       Q.    Those children and that mother, can you

9   tell us who those people are and where they live?

10      A.    I can, yes.  My mother lives in Ripley,

11  West Virginia.  My -- I have a daughter who lives in

12  Los Angeles, California.  I have another daughter who

13  lives in Minneapolis, Minnesota, and I have another

14  daughter who lives in Rome, Italy.

15      Q.    And can you give us the names of these

16  family members?

17      A.    I can.  My mother's name is Sybil,

18  S-y-b-i-l.  My oldest daughter is Gillian Elizabeth

19  -- that's G-i-l-l-i-a-n -- Rich.  My second daughter

20  is Natalie Rich.  She lives in Minneapolis.  My

21  youngest daughter is April, and she lives in Rome.

22      Q.    Mr. Rich, in reviewing the documents that

23  you produced in this deposition, I -- in this action,

24  I notice there's a person named Theresa Rich.  Is

1    that --

2         A.    Yes.

3         Q.    -- a relative of yours?

4         A.    That's my wife.

5         Q.    Okay.  And where is she currently?

6         A.    She's in Morgantown.

7         Q.    Did she not move to Dhahran with you?

8         A.    Oh, yes.  She lives in Dhahran.

9         Q.    Okay.  So she came over with you for this

10   trip?

11        A.    Correct.

12        Q.    Are you still married?

13        A.    Yes.

14        Q.    Okay.  And is it -- is it safe to assume

15   she travels with you back and forth?

16        A.    Generally.  Sometimes she leaves earlier.

17        Q.    Do you maintain any property at all in the

18   United States?

19        A.    Property, yes.  I have a home.

20        Q.    Where is that?

21        A.    In Morgantown.

22        Q.    Okay.  Do you have any other properties in

23   the United States?

24        A.    I have a farm in Mason County, West

1    Virginia.  I have a building, a commercial building

2    on High Street in Morgantown.

3         Q.    That's your former law office?

4         A.    Yeah.  The law office was located there.

5         Q.    Okay.  Any other property in the United

6    States?

7         A.    No.

8         Q.    You told us you do project management for

9    this oil company.  Can you be more specific about

10   what your duties are?

11        A.    I am involved in negotiating contracts.

12   I'm involved in drafting contracts, doing

13   business-related activities.

14        Q.    Specifically what?

15        A.    Primarily involved in engineering and

16   design work.

17        Q.    For what?

18        A.    For anything that the Capital Program

19   requires.

20        Q.    Okay.  But specifically, what Capital

21   Program and what are you engineering or what are you

22   designing?

23        A.    Refineries, pipelines, civil type

24   construction, meaning buildings.

1      Q.   Do you have any technical training or

2  expertise in engineering?

3      A.   No.

4      Q.   Are you -- are you operating as an attorney

5  in this job?

6      A.   No.

7      Q.   What in your background qualifies you for

8  this position?

9      A.   Qualifies me -- well, I joined -- you know,

10  I went to Saudi Arabia pretty much straight after law

11  school, and I worked there in project management

12  initially, mainly doing contracts, drafting

13  contracts, negotiating contracts.  I spent about five

14  years doing that, basically learned on the job.  This

15  was in the early '80s.

16         And then I joined the corporate security

17  department of the company and was involved in

18  security issues for about five years.  Much of that

19  time was spent investigating malfeasance, wrongdoing,

20  mismanagement in contract -- in project management,

21  conflicts of interest, this sort of thing.

22      Q.   I guess I'm not understanding, and maybe

23  you can break it down for me.  You said for about

24  five years.  Which five years are we talking about?

1      A.   Which -- I'm not sure what you mean by
2  that.
3      Q.   Okay.  I think you just said that you had
4  been investigating malfeasance and contracts for
5  about five years.
6      A.   Yeah.  Okay.
7      Q.   Which --
8      A.   I --
9      Q.   -- five years?
10      A.   From 1985, '86, to about 1991.
11      Q.   Okay.  And who were the parties of these
12  contracts?
13      A.   Who were the parties?  Various
14  international contractors, some local contractors.
15  And that was just one of my duties.  There was
16  background checks on employees, looking at conflicts
17  of interest.
18      Q.   Okay.  So Aramco was a party to the
19  contracts, and other people were also parties; is
20  that -- is that right?
21      A.   Yes.
22      Q.   Okay.
23      A.   Yes.
24      Q.   And because of that work --

1        A.    That qualifies me for what I'm doing now?

2    Well, it gives me insight into what goes on in a

3    major oil company, and having been involved in

4    project management back in the early '80s, being

5    involved in drafting contracts, doing a lot of work

6    on the Aramco contracting manual, procedures,

7    policies of the company, and then being involved in

8    security work, I -- you know, I think that -- I think

9    I'm qualified for what I'm doing, yes, or at least

10   the company thinks I am.

11       Q.    Have you ever been a member of the United

12   States military, sir?

13       A.    I have not been.

14       Q.    And have you ever been employed by the

15   United States government?

16       A.    I have been.

17       Q.    And can you tell us which years and by

18   whom?

19       A.    After leaving the Aramco in 1991, I joined

20   the Department of State directly from there.  I had

21   met diplomats during the Gulf War because being in

22   security and being in Dhahran, we were under scud

23   bombardment, and I was a security warden during this

24   time for the company and I had to liaise with the

1   Department of State, the U.S. consulate in Dhahran

2   concerning the Scud missiles that were coming in on

3   us --

4        Q.   And --

5        A.   -- so --

6        Q.   Go ahead.

7        A.   So I met different people, and they

8   encouraged me to apply and join the Department of

9   State, which I did.

10       Q.   And what was your position there?

11       A.   I was a financial management officer.

12       Q.   Okay.  And that started in 1991?

13       A.   I believe so.  Yes.

14       Q.   And how long did that continue?

15       A.   About three years.  I left in 1994.

16       Q.   Were you still a financial management

17  officer at that time?

18       A.   I think I had different titles.  I was a

19  United States disbursing officer, a USDO.  I was an

20  FMO, financial management officer.  I may have been a

21  budget -- I think it may have been budget officer.  I

22  did different things.  I traveled to different

23  countries.

24       Q.   Did that job end in 1994?

1      A.   Well, I was due to be reassigned.

2      Q.   Okay.  Could you tell us about that?

3      A.   As a diplomat, one rotates every -- it

4  depends on the posting, but if it's a hardship or a

5  danger posting, you might leave after a year and a

6  half.  If it's a good assignment, by that I mean a --

7  say, a European assignment, you may be there three or

8  four years.  So my time was up after three years, and

9  it was due for me to move to another posting.  I

10  elected to resign.

11      Q.   Was that the end of your federal service?

12      A.   Yes.

13      Q.   Have you ever been employed by a contractor

14  to the government?

15      A.   No.

16      Q.   Never been indirectly employed by the

17  United States government?

18      A.   Not that I'm aware of.  I don't -- I'm

19  trying to think.  Indirectly employed by the U.S.

20  government with a contractor, I don't believe so.

21  No.

22      Q.   Have you ever had any work in the national

23  security apparatus for the United States?

24      A.   I'm not sure what you mean by that.

1       Q.   How do you define it?

2       A.   I don't.

3       Q.   You'll have to forgive my confusion here,

4  but I guess I feel like somebody would know if they

5  had worked for the national security --

6       A.   I've worked for the -- for the Department

7  of State.

8       Q.   Okay.  And this is -- this is the job you

9  already told us about as a financial management

10  officer?

11      A.   That's correct.

12      Q.   And if I'm hearing you --

13      A.   I was an accredited diplomat.

14      Q.   Okay.  Generally doing financial work,

15  though?

16      A.   Generally, yes.

17      Q.   Okay.  Were you an accountant?

18      A.   Not in that position.  I have an accounting

19  degree.

20      Q.   Okay.  And we can get into your -- I'd like

21  to get into your educational background in a minute,

22  if I can.

23          You don't consider the Department of State

24  job a national security position?

1          A.    Well, I had top secret clearance.  I dealt

2     with top secret issues.

3          Q.    Is your clearance shielding you from giving

4     any testimony here today?

5          A.    Depends on what you ask me.

6          Q.    Have I asked you anything already that you

7     have withheld because of your top secret clearance?

8          A.    No.

9          Q.    Are there things that I could ask you that

10    you wouldn't be able to disclose because they are top

11    secret?

12         A.    Possibly.

13         Q.    Can you give us an idea of generally what

14    those are?

15         A.    I can't.  In fact, just thinking, I'm not

16    sure what it might be that you would want to know

17    that would be relevant to the issue that we're here

18    to discuss today that would have anything to do with

19    national security.

20         Q.    Okay.  I'm just --

21         A.    I may be missing something, but I don't

22    know what it would be.

23         Q.    I'm trying to get an understanding of your

24    background, sir.  I know you the least of everybody

1  in this room, so I'm trying to figure out where

2  you're from.

3          Why don't you tell us where you went to

4  college?

5          A.   I went to West Virginia University.

6          Q.   And when did you graduate there?

7          A.   Undergraduate in 1976.

8          Q.   Okay.  Did you go to law school there?

9          A.   I did, yes.

10         Q.   And when did you graduate from there?

11         A.   1980.

12         Q.   Okay.  And when did you start your law

13  practice?

14         A.   Well, I did some things straight out of law

15  school with friends, but my view was to go overseas

16  and --

17         Q.   Did you get -- excuse me.  I --

18              Did you get your license right after

19  graduating?

20         A.   I did, yes.

21         Q.   Okay.  And then you went overseas to --

22         A.   Well, I was in Morgantown for about a year

23  before I left to go abroad.

24         Q.   Were you practicing law that year?

1      A.   I did.  I did a little bit of work, not
2  much.
3      Q.   Okay.  At some point, you started your own
4  firm; is that true?
5      A.   At some point when I came back from Saudi
6  Arabia -- or back from my work with the Department of
7  State.
8      Q.   And was that your first legal job --
9  full-time legal job here in the United States?
10     A.   Well, I had worked the year before -- the
11 year before I left for Saudi Arabia, in 1980 to '81.
12 I just did work with, I think, two or three people
13 that I'd gone to law school with.  I wouldn't say it
14 was -- it wasn't a law firm.  It was a loose
15 association.
16     Q.   I feel like I may be missing something in
17 chronology here.  If you -- if you finished working
18 in this loose association in 1981 and you left for
19 Saudi Arabia in 1991 --
20     A.   No, no.  I left --
21     Q.   Did I get -- did I get that wrong?
22     A.   -- in 1981 --
23     Q.   Excuse me.
24     A.   -- for Saudi Arabia.

1    Q.   That's my confusion.

2    A.   I was there until 1991 --

3    Q.   Okay.

4    A.   -- at which point I left.  I joined the

5    Department of State.  I was then posted to the

6    U.S. Embassy in Bonn, Germany, and that's where I was

7    living, although I did work throughout the Former

8    Soviet Union.

9    Q.   When you resigned from the Department of

10   State, did you say it was 1994?

11   A.   Correct.

12   Q.   And you were -- were you posted at Bonn at

13   that time?

14   A.   Correct.

15   Q.   Okay.  So then where did you move?

16   A.   To Pittsburgh, Pennsylvania.

17   Q.   And then what did you do there?

18   A.   I did some real estate work with a friend

19   of mine who -- he's in Morgantown.

20   Q.   Legal work?

21   A.   No.

22   Q.   Development?

23   A.   Yes.

24   Q.   Okay.  How long did that last?

1      A.   Oh, a number of years.  It continued on --
2  I don't know -- maybe 2000 or maybe a little longer.
3      Q.   When did you first go into practice as a
4  lawyer then?
5      A.   I think I started in late 1995.
6      Q.   Okay.  Did you start your firm at that
7  time?
8      A.   Yes.
9      Q.   Okay.  And that's the firm that's a party
10  to this case?
11      A.   Correct.
12      Q.   Okay.  And that was in 1995?
13      A.   I believe so.  It may have been 1996, 1995,
14  something like that.
15      Q.   And you opened it here in West Virginia?
16      A.   Correct.
17      Q.   Were you still living in Pittsburgh at the
18  time?
19      A.   No.  I had moved to Morgantown.
20      Q.   Okay.
21      A.   I believe.  It was close, but I had built a
22  home in Morgantown and had moved there.
23      Q.   And when did your practice close?
24      A.   Well, it officially hasn't closed.

1      Q.   Okay.  As I understand, you've basically

2  ceased operations, though.

3      A.   Correct.

4      Q.   Okay.  When did that happen?

5      A.   Well, I left in June 2008 for Saudi Arabia.

6  I had been winding the work down.  I wasn't taking

7  new work because I knew I was going back overseas.  I

8  mean, there were things being finished up.  I had

9  other attorneys finish things, referred cases to

10  other lawyers.  I wasn't doing any work from Saudi

11  Arabia.

12     Q.   So your professional corporation, Law

13  Office of Gary W. Rich, L.C., is still an active

14  corporation today?

15     A.   That's my understanding.

16     Q.   Okay.  Do you still consider it to be a

17  going concern?

18     A.   It's a legal entity.  I don't consider it a

19  going concern as far as making -- you know,

20  generating income.  No.

21     Q.   Okay.  So it's a legal entity, but it's

22  essentially inactive?

23     A.   Correct.

24     Q.   Okay.  Do you have a license from the City

1   of Morgantown to operate this business?

2       A.   I had a B&O license.  I paid my B&O taxes.

3   I'm no longer in the city.

4       Q.   Okay.  And I'm not familiar with what B&O

5   is, sir.

6       A.   Business and occupation tax.

7       Q.   Okay.  And that's a required tax to be paid

8   if you want to be an attorney in the city?

9       A.   Well, any business that's located within

10  the city limits.  Yes.

11      Q.   Okay.  And do you know whether that license

12  is active or not?

13      A.   It's not a -- I don't think it's a license.

14  It's simply a tax that's imposed on revenue that's

15  generated within the city limits.  I don't -- I'm not

16  sure what you mean by that.

17      Q.   Well, let me -- let me make it clearer, I

18  guess.  When was the last time you paid that tax?

19      A.   I don't know.  I'd have to talk to my

20  accountant, but it would've been relative to any

21  income that was generated -- and I even -- even after

22  I left the city limits, any income that was generated

23  from that office, what I considered to be, you know,

24  where the work was done in that office, I paid tax on

1  it, B&O tax.  Even though it's a grey area, my

2  accountant and I decided to be conservative and pay.

3      Q.  Now, the Spelter litigation was settled in

4  2010.

5      A.  Uh-huh.

6      Q.  Did you pay the B&O tax on your fees?

7      A.  Yes, indeed.

8      Q.  Are there any other partners to your law

9  office, the corporation?

10     A.  Partners, no.

11     Q.  Are there any investors in that

12  corporation?

13     A.  No.

14     Q.  Okay.  Your -- what's your role in the

15  corporation formally then?

16     A.  Well, I'm a solo practitioner.  I think,

17  from a legal standpoint, I'm the president.  I'm

18  different things.  My wife is -- I think I had to

19  have another person.  She's not a -- not a lawyer,

20  but I think she may be listed as the treasurer or

21  something to that effect.

22     Q.  Are there any assets to this corporation at

23  all?

24     A.  That the law firm owns?

1        Q.   Yeah.

2        A.   I don't think so at this point.  There may

3  be some like -- I think in the building there are

4  still maybe some office furniture.

5        Q.   Desk, fixtures, things like that?

6        A.   Desks, something like that.  Maybe a fax

7  machine is still sitting there.  I don't know.

8        Q.   Does your firm have any liabilities?

9        A.   Not that I'm aware of.

10       Q.   Does the firm currently maintain any

11  insurance?

12       A.   What sort of insurance?

13       Q.   Any insurance.

14       A.   The firm has a -- when I -- I'm not sure

15  what year it was, but when I was no longer actively

16  practicing law, I was able to get a tail.  You know,

17  I ceased operations.  I had -- I let the carrier know

18  that, you know, I had no more involvement in any

19  cases, and we decided that I would get a -- I think

20  it's called a tail.

21       Q.   And what does that mean?  What's a tail?

22       A.   Well, my understanding is that it covers me

23  for past acts.

24       Q.   Malpractice?

1     A.    Uh-huh.

2     Q.    Would that policy cover anything in this

3  case?

4     A.    I don't know.  I don't think I've

5  malpracticed, but I guess that's open to

6  interpretation.

7     Q.    Okay.  Have you essentially stepped into

8  the shoes of the corporation at this point?

9     A.    I don't know what you mean by that.

10     Q.    Okay.  I guess I'm trying to discern

11  something that's troubled me with the pleadings here.

12  In your third-party complaint against my client, the

13  Levin Papantonio law firm, you bring certain claims

14  against Levin Papantonio.

15     A.    Yes.

16     Q.    But in your third-party complaint, you make

17  no distinction at all between Gary Rich as an

18  individual and the Law Office of Gary Rich, which is

19  a corporation, so I'm trying to discern which party

20  is bringing the claims.

21     A.    Well, I think the intention was that both

22  parties were.

23     Q.    Okay.  So did you personally enter into a

24  contractual relationship with any party to this

1  action at all?

2      A.   Did I personally?  You mean as far as

3  signing the memorandum of understanding?

4      Q.   No, sir.  The memorandum of the under -- of

5  understanding, as I understand it, is a contract

6  between the Levin Papantonio firm, The Cochran Firm,

7  and your firm.  You've signed it as an officer of

8  your firm.

9           I guess what I'm asking is, do you have any

10  personal claims against my firm in your individual

11  capacity, or is everything in the name of your firm?

12      A.   Well, it's -- you know, the complaint that

13  was filed, I think, speaks for itself.

14      Q.   I'm asking you what the basis for those

15  claims would be.  Do you have any individual claims

16  against my firm?

17      A.   I'm not sure how to answer that question.

18      Q.   What about that question don't you

19  understand, sir?

20      A.   All of it.

21      Q.   Okay.  You understand that you've sued my

22  firm?

23      A.   That, I understand.

24      Q.   Okay.  And you sued your -- you sued my

1  firm in your individual capacity?

2      A.   I think it was both.

3      Q.   Right.

4      A.   As a legal entity, the L.C. and me, as an

5  attorney.

6      Q.   And what I'm trying to discern here is,

7  what's the difference between those parties?  Is

8  there -- is there a contractual relationship between

9  you individually and my firm that you are suing on?

10     A.   I should think that there is between both

11  entities, me as an individual attorney and as this

12  legal corporation, the L.C.

13     Q.   Okay.  And I assume you understood your own

14  answer.  I don't, and I'm sorry.  Can you explain it?

15     A.   I don't know how else to say it.

16     Q.   Okay.  What's the difference between the

17  relationship you have with --

18     A.   I don't think there is any difference.

19     Q.   Okay.  So you are the corporation for

20  purposes of this case; you individually are the same

21  as the legal office; is that true?

22     A.   I'm not sure.  I'm saying that there are

23  two parties.  One is an -- one is me as an individual

24  --

1              THE WITNESS:  Sorry.

2         A.    -- me as an individual.  The other is a

3    legal corporation.

4         Q.    Okay.  So you believe you do have claims as

5    an individual, but you can't tell us what they are?

6         A.    Well, I think that will be decided in due

7    course.

8         Q.    I hate to belabor this point, but this is

9    the time when I'm entitled to find out what they are,

10   and I'd like to know them.

11        A.    I think that there was an obligation -- an

12   obligation between the various firms here to

13   diligently pursue the litigation on behalf of our

14   clients, our mutual clients and there were certain

15   obligations with respect to paying bills and that's

16   now in question as far as who pays what.

17        Q.    Now, Mr. Rich, you understand those

18   obligations were set out in a memorandum of

19   understanding and all the parties to it have pleaded

20   they agreed they entered into that memorandum of

21   understanding.

22        A.    Yes.

23        Q.    And you're not individually a party to that

24   memorandum of understanding.

1          A.    I don't believe so.  I think I signed that

2     as an officer of the L.C.

3          Q.    Okay.  So you personally don't have any

4     claims arising out of the MOU?

5          A.    I shouldn't think so, but from a legal

6     standpoint, possibly I do, but that's -- and I -- and

7     I haven't looked at the MOU as of late.  I'm not sure

8     if I signed that as a member of the L.C. or if I

9     signed it as an individual.  I don't remember.

10          Q.    Did you just tell us you had not recently

11     reviewed the memorandum of understanding?

12          A.    That's right.

13          Q.    Okay.  So I can cross that off the list of

14     documents that you reviewed to get ready for this

15     deposition today?

16          A.    You can do whatever you want to.  I have

17     not reviewed it.

18          Q.    Okay.  When was the last time you reviewed

19     it?

20          A.    Probably, I would suspect, a year ago.

21          Q.    Okay.  I'm going to reiterate my request

22     here that you tell us which documents you did review

23     in preparation for this deposition.

24                    MR. MARINO:  Okay.  And I mean, I

1  think that's a question.  I'm going to instruct you
2  not to answer on the same basis as before.
3  BY MR. CASH:
4      Q.   Did you review documents in preparation for
5  this deposition?
6              MR. MARINO:  You can answer that yes
7  or no.
8      A.   Yes.
9      Q.   Did the documents that you reviewed assist
10  you in recollecting the events that gave rise to this
11  action?
12              MR. MARINO:  You can answer yes or no.
13      A.   Yes.
14      Q.   Did you recall anything after reviewing
15  those documents that you hadn't recalled immediately
16  prior to reviewing those documents?
17              MR. MARINO:  You can answer yes or no.
18      A.   No.
19      Q.   You had a full memory of everything that
20  you reviewed?
21      A.   No.
22      Q.   Which one is true, sir?  You don't -- you
23  --
24      A.   You're saying, did it help me remember --

1    did it help me remember --

2         Q.   I'm going to withdraw that question and ask

3    Mr. Marino.

4                   MR. CASH:  Can you state the basis for

5    this -- for this privilege assertion here?

6                   MR. MARINO:  I didn't assert a

7    privilege.

8                   MR. CASH:  You did earlier.

9                   MR. MARINO:  Okay.  Do you have any

10   other questions for the witness?

11                  MR. CASH:  My question was which

12   documents he reviewed for --

13                  MR. MARINO:  Okay.  He's not going to

14   answer that.

15                  MR. CASH:  Okay.  Are you instructing

16   him not to answer that?

17                  MR. MARINO:  I instructed him twice

18   not to answer it.

19                  MR. CASH:  And on what basis, sir?

20                  MR. MARINO:  I'm not going to argue

21   with you.  If you have other questions for the

22   witness, ask them.  Otherwise, we're leaving.  Okay?

23                  MR. CASH:  Do you have a privilege to

24   assert?

1                    MR. MARINO:  Anybody else have
2    questions for the witness?
3                    MR. CASH:  Mr. Marino --
4                    MR. TAYLOR:  We'd just like to know
5    your basis for --
6                    MR. MARINO:  Okay.  No.  I understand
7    that.
8                    MR. TAYLOR:  -- your objection,
9    because this is going to be the subject --
10                    MR. MARINO:  I make it a --
11                    MR. TAYLOR:  -- of a motion to compel
12    and so --
13                    MR. MARINO:  Well, I make it a
14    practice not to argue with counsel in depositions, so
15    --
16                    MR. CASH:  We're entitled to know what
17    the basis for this is.  If it's not a privilege, then
18    he has to answer the question.  If there is a
19    privilege, please assert it now or you're going to
20    waive it.
21                    MR. MARINO:  Do you have any other
22    questions for the witness?
23                    MR. CASH:  Okay.  We'll -- we're going
24    to move to compel on that question, and I think

1  you'll be back here for that.

2                    MR. MARINO:  Suit yourself.

3                    MR. CASH:  Okay.

4                    MR. MARINO:  Yeah.

5  BY MR. CASH:

6       Q.   Mr. Rich, did you -- did you review your

7  own document production as it was being produced?

8       A.   No.

9       Q.   Okay.  What did you do to find documents

10 that were produced in this case?

11      A.   Well, I took my attorney to a storage unit

12 that I have, and he took, at that point, the boxes in

13 both the Fairmont and Spelter cases that were clearly

14 labeled from the beginning of each case until around,

15 I think, 2006 or 2007.  It was at the point that Joe

16 moved to Florida.

17               Those are the documents that he took, and

18 this was back in, I think, the beginning of this --

19 well, I'm not sure now what year it was.  This is

20 2013.  This would've been in 2012, probably March or

21 so of 2012, I believe.

22               Subsequently, Dan came back to Morgantown

23 and collected the rest of the documents.  I was not

24 present.

1      Q.   Is there anything left in the Morgantown

2  office at all in terms of documents?

3      A.   Not that I'm aware of.

4      Q.   Okay.

5      A.   You mean pertaining to this -- to this

6  issue?  No, that I'm aware of.  There are other boxes

7  dealing with, you know, other cases, primarily

8  immigration cases, probably all immigration cases,

9  that I was handling.

10     Q.   Mr. Rich, there are -- there are a couple

11  different litigations at issue in this particular

12  action where Mr. -- Doctor Simoni was involved.  Can

13  you tell us just generally what they are?  Spelter is

14  one.  What's your understanding of the -- of the

15  cases that are involved in this action?

16     A.   Just Spelter and the Fairmont case,

17  Westinghouse/North Marion/Philips.

18     Q.   Okay.  But you worked with Doctor Simoni on

19  other litigations; didn't you?

20     A.   We worked together on the West Virginia

21  University asbestos case with Bob Sweeney, a lawyer

22  from Cleveland.

23          We also looked at a case in Reedsville, in

24  Preston County.  That case was -- you know, it was

1    deemed there wasn't a problem.

2           I think that's it.

3      Q.   Did you work on a case in a place called

4  Arthurdale?

5      A.   Yeah.  That's the Reedsville case.

6      Q.   Same area?

7      A.   That's what I'm calling it, Reedsville,

8  Arthurdale.

9      Q.   Okay.  What about Stanbridge?

10     A.   Stan Bridge?  I think there was a young

11  man, Stan Drige, S-t-a-n, D-r-i-g-e, I believe.

12     Q.   Okay.

13     A.   I believe it's Stan Ridge.

14     Q.   Stan Ridge, that's a person?

15     A.   It's a person, yes.

16     Q.   Okay.  And that's a case you worked on with

17  Doctor Simoni as well?

18     A.   Doctor Simoni introduced me and another

19  lawyer to this young man.

20     Q.   I guess where I'm going with this is, you

21  said there are other files left in your office, and

22  I'm curious whether any of those files would relate

23  to these other ligations, not Spelter, not Fairmont.

24  But are there documents there that relate to these

1   other litigations?

2        A.   I think with regard to West Virginia there

3   is probably retainer agreements.  I don't think

4   there's much.  That case is long over.  Bob Sweeney,

5   I think, would have the bulk of the files.

6             With regard to Reedsville, no case was ever

7   filed, not much was done.

8             With respect to Stan Ridge, Robert Sayre,

9   S-a-y-r-e, an attorney in Charleston, did the legal

10  work and the files would be in his office.

11       Q.   But in connection with these ligations, if

12  you were introduced to these cases or potential cases

13  by Doctor Simoni, would there be documents that he

14  provided to you relating to these litigations?

15       A.   I don't think related to Stan Ridge there

16  was anything.

17       Q.   You don't have any documents that he gave

18  you in connection with that?

19       A.   I don't believe so, not with Stan -- not

20  with regard to Stan Ridge.

21             With regard to Reedsville, I think there

22  were documents that Joe probably obtained from

23  different sources.  I don't know that I would have

24  any of those at this point.

1          Q.    Okay.   If you -- if you did and you

2     received them from Doctor Simoni, I -- we'd like to

3     know about them.   We've requested all your

4     communications with Doctor Simoni.   If these

5     documents bestow any relationship that you've had

6     with him, then we think they're relevant to our side

7     of this case.   Are there documents like that that we

8     could get?

9          A.    I would be surprised, but I can't

10     conclusively say, no, that there aren't any at this

11     point.   I think there were, but I don't know that I

12     would have them at this point.

13          Q.    Okay.   I appreciate the answer.

14               What was the nature of these cases?

15          A.    The West Virginia case was an asbestos

16     case.

17               The Reedsville/Arthurdale had to do with, I

18     believe, soil/water contamination, but it was unclear

19     as to who might be the entity polluting and if there

20     was any harmful situation because of this and it was

21     determined that there wasn't.

22          Q.    Did Doctor Simoni have a personal

23     relationship with these potential clients?

24          A.    A personal relationship?

1        Q.    Okay.  Did -- was he familiar with them?

2    Did he know them?

3        A.    I believe he did.

4        Q.    And that's how they came to you?

5        A.    Well, the asbestos case, which was my first

6    involvement in this sort of work, because I was

7    practicing law as an immigration attorney, Larry

8    Harless came to me, whom I helped occasionally with

9    different issues that he had, and he wanted me to

10   look at a potential case with him.  That was the

11   asbestos case.  And I did that.  Ultimately, he did

12   not get involved.

13            But that case led to the Westinghouse or

14   Fairmont case, and there was a client, George Fullen,

15   whose wife, Sue Fullen, had worked at the plant in

16   Fairmont.  Sue told me and Bob Sweeney repeatedly

17   about the number of deaths of her co-workers and

18   asked that we take a look at that.

19            A number of months went on, probably six

20   months from the time that this was first mentioned to

21   us, before I actually took a look.  Sweeney was not

22   interested because he's an asbestos litigator and

23   this had to do with, you know, toxins such as mercury

24   and arsenic, so he elected not to get involved.

1       Q.   And what was Doctor Simoni's role in
2   bringing these cases to you, and why did he come to
3   you personally, as opposed to somebody else?
4       A.   Well, it was Sue Fullen that first broached
5   the subject.  I don't believe it was Joe, although I
6   would say Joe was very helpful in getting documents
7   together and he, you know, has a way about him.
8            He's a -- I would say, a friendly fellow,
9   and he knew -- for example, George Fullen, who worked
10   for the university, Sue's husband, I think he was
11   known by George and trusted by him.
12      Q.   Did Doctor Simoni make the introduction for
13   you to those people, the Fullens?
14      A.   Well, I met them at the union hall.
15      Q.   Did he introduce you to them?
16      A.   He arranged for them to be at the union
17   hall.
18      Q.   Okay.  Did you -- did you know of them or
19   had you ever met them prior to his involvement?
20      A.   No.
21      Q.   So -- okay.  So he talked to them, and he
22   said, you should meet Gary Rich, an attorney?
23      A.   Well, this was with regard to -- he was the
24   union rep, as I understand it, and he had a number of

1   people there who were concerned about being exposed
2   to asbestos at the university.
3       Q.   Why did Larry Harless want to work with you
4   on these cases -- or this case?
5       A.   Because he and I are old friends.
6       Q.   Did you have any particular expertise in
7   this area of the law?
8       A.   None.
9       Q.   Have you developed all of your expertise in
10  environmental law through the prosecution of the
11  cases we've already talked about?
12      A.   Yes.
13      Q.   Have you been involved in any other
14  environmental case or product liability case other
15  than these cases?
16      A.   Well, product liability, pharmaceutical
17  cases, yes.
18      Q.   Okay.  What about environmental cases?
19      A.   Environmental, no.
20      Q.   What was your role in pharmaceutical
21  products liability cases?
22      A.   Very limited.  I did them with Farrest.
23      Q.   Okay.  When you -- when you said he was the
24  union rep, I was confused.  Was it --

1          A.    My understanding --

2          Q.    -- Fullen or Simoni?

3          A.    Pardon me?

4          Q.    Who was the union rep, Fullen or Simoni?

5          A.    Oh, Joe.

6          Q.    Okay.  All right.  I went through your

7    documents, and I -- and I saw that there are some

8    e-mails present in there, and I guess I want to ask

9    some questions about your use of e-mail to find out

10   where e-mails might be.

11              Do you remember when you got your first

12   e-mail address and when it was?

13         A.    I think in 1996.

14         Q.    Okay.  I have a couple different addresses.

15   I guess I'd like to know, can you tell us all the

16   e-mail accounts that you've ever used and when you

17   were using them?

18         A.    I'll try.  The first one was

19   garywrich@earthlink.net.  The second one was --

20         Q.    And when did you get that?

21         A.    I think in 1996.

22         Q.    Okay.

23         A.    The second one was, I think,

24   garywrich@adelphia.com, possibly or .net.  I don't

1  know when I got that.

2          And then Adelphia, I think, was acquired by

3  Comcast.  I don't know the year.  And then it became

4  garywrich.com -- or yeah, .com -- or comcast.com.

5      Q.   garywrich@comcast.com?

6      A.   Correct.  Yes.

7      Q.   Okay.  But you don't know when that

8  happened?

9      A.   I don't know when --

10     Q.   Somewhere --

11     A.   -- Adelphia acquired them, but --

12     Q.   In the merger?

13     A.   Yeah.

14     Q.   Okay.  Any others?

15     A.   And well, I have a -- I've had e-mail

16  addresses at the Department of State.

17     Q.   Can you tell us --

18     A.   And I think that was my first one.

19     Q.   That's the one that you said you had in

20  '96?

21     A.   No.  That would've been 1991.

22     Q.   Have you ever used those for business

23  purposes?

24     A.   The Department of State?

1        Q.   For purposes as an attorney and any --

2        A.   Definitely not.

3        Q.   -- anything relevant to this case.  Okay.

4        A.   Definitely not.  The Department of State

5 one, no.

6        Q.   Right.

7        A.   And I suspect the EarthLink one, no.

8 Adelphia, probably.  Comcast, definitely.

9        Q.   Any others?

10       A.   For this case?

11       Q.   At all.

12       A.   At all.  No.  I have a -- of course, I have

13 an account with Aramco.

14       Q.   All right.  Have you ever used that for

15 legal business?

16       A.   I don't believe so.

17       Q.   Have you ever used that account to

18 communicate with any of the people in this case, even

19 if it wasn't for legal reasons?

20       A.   Any of the people in this case?

21       Q.   For example, did you ever send a -- you

22 know, a happy birthday e-mail to Joe Simoni or

23 something like that, used that account?

24       A.   Oh, and I do have another account --

1          Q.    That's what I'm trying to figure out.

2          A.    Well, I'm trying to think.  I have -- well,

3     no, it's not an account.  It's still the Comcast

4     account.  From my home, I can log on to Comcast.

5     It's -- the provider is Aramco, but it's for personal

6     use.  I don't believe I've ever used my corporate

7     account for Aramco for non-Aramco business.

8          Q.    Okay.

9          A.    I don't believe so.

10         Q.    Well, I can -- I can shortcut it.  You

11    served initial disclosures in this case, and you

12    named people that might have information that could

13    have relevance to this action.  And I'm curious, have

14    you ever e-mailed any of those people from what we

15    would consider a work account, like the Aramco

16    account or the Doctor -- the Department of State

17    account, anything that might be relevant to this

18    case?

19         A.    Well, the Department of State, I didn't

20    know anything about these cases at that point, so I

21    can definitely say no.

22               With regard to Aramco, I don't believe I've

23    ever sent -- when you say, anyone in this case, any

24    of the defendants?

1      Q.   To make it easy on you, I'm referring to
2  the individuals that you stated in your initial
3  disclosures.
4      A.   I'm not sure I -- who I listed.
5      Q.   Did you sign that document?
6      A.   If it was required, I did.
7      Q.   Okay.  You don't recall whether you signed
8  --
9      A.   I'm saying, I don't recall.
10     Q.   Okay.  Did you draft your initial
11 disclosures?
12     A.   Did I draft them?  No.
13     Q.   Have you ever seen your initial
14 disclosures?
15     A.   Yes.
16     Q.   Okay.
17     A.   I'm just saying, I don't remember.
18     Q.   Okay.  When did you draft your initial
19 disclosures?
20     A.   I didn't draft them.
21     Q.   Okay.
22     A.   I did not draft them.  My attorneys did.
23     Q.   Okay.  Did you have anything to do with
24 putting them together?

1      A.   I reviewed them.

2      Q.   Okay.  When did you do that?

3      A.   When they sent them to me.

4      Q.   Okay.  Did you have any changes?

5      A.   Probably.  But I can't sit here today and

6 tell you what they were.

7      Q.   Do you stand by them today?

8      A.   Yes.

9      Q.   But you don't remember if you signed them

10 or not?

11     A.   If it was required, I signed them, the

12 interrogatories or -- yeah.

13     Q.   Okay.  Just to close it out, have we

14 discussed all the e-mail addresses you've had?

15     A.   You know, I had a client who I think did a

16 Gmail account for me.

17     Q.   And what was that?

18     A.   I don't know.  I never --

19     Q.   Do you still have it?

20     A.   I do have a Gmail account that my daughter

21 set up recently for me.

22     Q.   Who was the client that set up the Gmail

23 account?

24     A.   I think his name was Jung Chung.

1      Q.   And what type of client was that,
2  immigration?
3      A.   Yes.
4      Q.   Why did a client set up an account for you?
5      A.   Because I didn't know how to do it.
6      Q.   Did you use it?
7      A.   I don't think I ever used it.
8      Q.   And then your daughter set up a second
9  Gmail account for you.  And what's the name of that?
10      A.   I think it's garyrich414@gmail.com.
11      Q.   Okay.  You also produced documents showing
12  grich@yahoo.com.  Is that another account you've
13  used?
14      A.   I don't know that account.
15      Q.   Okay.  If I -- if I showed you documents
16  from your production with that address on it, would
17  you agree with me that's an account you've
18  maintained?
19      A.   I would be shocked if you have something
20  like that.  I don't know of any account with Yahoo.
21      Q.   Okay.  I can --
22      A.   I have a daughter who I think had a Yahoo
23  account, Natalie Rich, but I don't -- I don't have
24  any accounts.

1      Q.   Okay.  But she wouldn't be G. Rich.

2      A.   No.  She definitely would not.  Now, I have

3   a daughter, Gillian --

4      Q.   Could that be anybody else?

5      A.   -- with a G.

6      Q.   Okay.  Well, they're e-mails relating to

7   the litigations that are at issue here.

8      A.   Really?

9      Q.   And they look like they're written by you,

10  so --

11     A.   I don't know anything about Yahoo.

12     Q.   Okay.  All right.  Well, as to all these

13  accounts we've discussed, have you -- have you used

14  any of them -- any of the work accounts or any of the

15  personal accounts to e-mail with anyone at -- anyone

16  in connection with this case that you haven't yet

17  produced?

18     A.   Not that I'm aware of.

19     Q.   Okay.  We talked about how you have work

20  accounts, you have the Aramco account, and I know

21  it's old, but you had the Department of State

22  account.  Have you ever used those accounts that you

23  know with Doctor Simoni, even if it's not about this

24  case?

1        A.    No.

2        Q.    Have you used any of these accounts that

3    you know with anyone at my firm, the Levin Papantonio

4    law firm?

5        A.    You're saying the work accounts, you're

6    talking about Aramco and the Department of State?

7        Q.    Sure.

8        A.    I don't believe so.

9        Q.    Okay.  What about anyone at The Cochran

10   Firm?

11       A.    I don't believe so.  It's possible that I

12   could've sent something from my office to my home,

13   which I then might've sent on to Farrest.

14       Q.    Okay.  Did you produce those documents?

15       A.    I would think so.  Everything we had we

16   produced that I'm aware of.

17       Q.    Did you search these e-mail accounts

18   yourself to find the documents that were produced?

19       A.    On my Comcast account, yes.  And the other

20   accounts I don't have anymore.  There's definitely

21   nothing on my Aramco account that I'm aware of.

22       Q.    Which accounts do you currently use?

23       A.    Comcast.

24       Q.    That's it?

1      A.    That's it.

2      Q.    And Aramco?

3      A.    Well, yeah.  I have to use Aramco for work.

4      Q.    So those two?

5      A.    Yes.  Now, the Gmail account, I think I had

6  a couple e-mails from a friend just more like a test,

7  three or four e-mails.  That's it.

8      Q.    Have you ever exchanged any personal

9  e-mails with Doctor Simoni at all?

10      A.    Not that I can think of.  I can't say

11  conclusively no, but certainly -- oh, I -- probably

12  maybe 12, 13 years ago possibly, nothing in the last

13  five, certainly eight, nine years, I shouldn't think.

14            And if I did -- all the e-mails were put on

15  -- we didn't use Outlook, so all the e-mails every

16  month were copied to CD-ROMs which I gave to my

17  attorneys.

18      Q.    And who was in charge of that process to

19  save those files onto CD-ROM?

20      A.    My wife, Theresa.

21      Q.    Do you know whether the CDs that were

22  produced to us are the whole intact CDs or whether

23  there were things removed from those CDs in order to

24  make the production?

1      A.   I never removed anything from them.

2      Q.   I'm asking, do you know if anyone --

3      A.   I shouldn't think that anyone removed them.

4      Q.   Okay.

5      A.   They were just given to my attorneys.

6      Q.   Do you know?

7      A.   Do I know?

8      Q.   Sir, what I'm asking is, I have -- I have a

9 set of CDs that were produced to me in this

10 litigation, and I presume there is another set, the

11 original set that your attorney has.  I want to know

12 if they're the same.

13      A.   I have no way of knowing that.  I would --

14      Q.   You wouldn't --

15      A.   I would think that they would be.

16      Q.   But you don't know?

17      A.   I don't know.

18      Q.   All right.  You're not telling us they are?

19 You're not telling us they are, because you don't

20 know?

21      A.   Well, I would be surprised if they're not.

22      Q.   Okay.  I also understand you had a

23 PalmPilot.

24      A.   Correct.

1      Q.   Has that PalmPilot been located, or is it

2  still lost?

3      A.   It's lost.

4      Q.   Is it lost for good?

5      A.   I can't answer that question.

6      Q.   What happened to it?

7      A.   It was put in an envelope, documents that

8  -- notes that I had from primarily conversations with

9  Farrest and Angie, and these were mailed to my

10  attorneys.  My wife wrapped the Palm in bubble wrap,

11  inserted it in the middle of the package.  It's my

12  understanding it arrived and it wasn't in there.

13      Q.   Did the documents arrive?

14      A.   Yes.

15      Q.   So your belief is somebody opened the

16  package and stole the PalmPilot?

17      A.   I would think that's what happened.

18  Somebody removed it.

19      Q.   Do you know where that happened?

20      A.   I do not.

21      Q.   I understand you were sending it by DHL.

22      A.   Correct.

23      Q.   So this was a shipment from Saudi Arabia to

24  Mr. Marino's office?

1      A.    Correct.

2      Q.    You don't know where it happened along the

3    way?

4      A.    I would have no way of knowing.  Although,

5    we made inquiries.  We talked to DHL in Dhahran and

6    al-Khobar, and it's my understanding that my

7    attorneys did the same thing on their end, got the

8    same sort of information from both sides.

9      Q.    And we were told that as well.  We were

10    also told that there would be a number of materials

11    on that PalmPilot and that it contained meticulous

12    notes of appointments and events that might help us

13    in this litigation.  What was on that PalmPilot?

14      A.    I don't believe there was anything on there

15    other than the -- there may have been meetings

16    listed, but the timesheets contain everything and

17    more than my PalmPilot had.

18      Q.    I didn't hear you.

19      A.    The timesheets that have been produced

20    contained everything that would've been in the Palm

21    pertaining to these cases and more, because,

22    obviously, the timesheets were much more detailed.

23            The -- all the clients weren't in there,

24    the contacts, but I believe those have been

1   transferred over to my iPhone, but it didn't quite

2   work as far as the transfer.  I mean, the names are

3   there, the numbers.  That's sort of jumbled up.

4       Q.   Your lawyer handed me before this -- before

5   this deposition an undated memorandum to the file

6   from Tillman Finley which I'm going to mark as

7   Exhibit 2 to the deposition.

8                         -----

9                (Exhibit No. 2 marked for purposes of

10  identification.)

11                        -----

12  BY MR. CASH:

13      Q.   The only question I really want to ask you

14  here is, it says, G. Rich attempted to copy, slash,

15  download data from device, referring to the

16  PalmPilot.  When did you do that?

17      A.   Attempted to download?

18      Q.   Did you -- did you --

19      A.   I didn't attempt to download data.

20      Q.   Have you seen this memo?

21      A.   I did, yes.

22      Q.   Okay.  I guess someone showed it to you.

23      A.   But I don't know that's correct as far as

24  attempting to download, to copy, because --

1      Q.   Okay.  Well --

2      A.   -- I had no way to do that.

3      Q.   -- Mr. Rich, prior to this deposition and

4   off the record, Mr. Marino said you had reviewed that

5   memo and that it was true.  Is it not true?

6      A.   Well, I'm saying, looking at it now, as far

7   as attempting to download it -- well, I guess you

8   could say I attempted.

9           The port is broken.  Where you plug the

10  cable in is broken, so I couldn't download it, so I

11  guess that's an attempt, so yeah, I guess you could

12  say that's accurate.

13     Q.   All right.  Would you please take a minute,

14  review Exhibit 2, tell me what else in there might

15  not be true?

16     A.   What else might not be?  I'm saying it

17  depends on how you want to word this.

18     Q.   I guess I just want it to be worded

19  truthfully so that we can --

20     A.   Well, that's what I'm trying to --

21     Q.   -- understand what was done.

22     A.   Obviously, that's what we're here to do,

23  and I'm trying to do that.

24     Q.   Okay.

1          A.    When I said attempted to download it, I

2     didn't make much of an attempt because the port is

3     broken.  The cable cannot connect.

4          Q.    Did you look into the device, did you open

5     the device and turn it on and see what was in there?

6          A.    In the PalmPilot?

7          Q.    Yeah.

8          A.    Oh, yeah.  Of course.

9          Q.    Okay.  So you said, I'm sending you a

10     busted PalmPilot, no one can download any data off of

11     it because the --

12          A.    That's --

13          Q.    -- cable is broken, but I'm going to send

14     it to you by DHL anyway, and it was lost, and that's

15     pretty much what happened with the PalmPilot?

16          A.    That's right.

17          Q.    Would you review that, please and tell me

18     if there's any other inaccuracies in Exhibit 2?

19          A.    Well, I would say it's not other

20     inaccuracies, because, in retrospect, I did try to do

21     something with it, so it's not inaccurate or

22     inconsistent.

23          Q.    Okay.  I guess -- you're under oath.  I'm

24     just going to ask that you review that and tell us --

 1      A.    I'll --

 2      Q.    -- if there's anything in there that's not

 3 true.

 4      A.    I'll do it.

 5      Q.    Thank you.

 6           MR. WAKEFIELD:  May we go off the

 7 record for a second?  Can we take like about a

 8 five-minute break?  Only because I think I have to do

 9 what he's doing.

10           MR. CASH:  I was planning to, and

11 that's fine.  Yeah.

12           MR. WAKEFIELD:  Is that all right --

13           MR. CASH:  Let's do --

14           MR. WAKEFIELD:  -- to do that now?

15           VIDEOGRAPHER:  We're going off the

16 record.  The time is 11:10 a.m.

17                     -----

18                (Brief break)

19                     -----

20           VIDEOGRAPHER:  We're back on the video

21 record.  The time is 11:17 a.m.

22 BY MR. CASH:

23      Q.   Mr. Rich, we went off the record so you

24 could get a chance to review Exhibit 2.  And I'd like

1   to ask, is Exhibit 2 accurate?

2          A.    To the best of my knowledge.  I mean, there

3   are things here that -- obviously, I don't know if

4   C. Wands signed for the package.  You know, I'm not

5   sure what my attorneys did, but it looks to be as

6   best I can tell.

7          Q.    Of the things that are on Exhibit 2, what

8   did you personally do in terms of searching for

9   documents?  Can you go through and just tell us which

10  items that you did personally?

11         A.    Well, I met with Dan, and I was thinking it

12  was earlier in the year, but it was June 12 --

13  June 2012.  I was involved in that, and I showed Dan

14  the storage unit.

15               At that point, we didn't think that these

16  other boxes would be relevant.  And at that point, I

17  know I gave him some CD-ROMs with the e-mails for

18  specific years, so that's what I did.

19               I also sent the five yellow file folders

20  labeled 2007, '8, '9, '10, and '11 to him.

21         Q.    And you --

22         A.    Well, I didn't send it to him, but I got

23  those documents together.

24         Q.    You did that here in the United States?

1       A.   No.  I did that in Saudi Arabia.

2       Q.   Okay.  You took documents relating to this

3  litigation over to Saudi Arabia with you?

4       A.   I don't think I did.  There must've been

5  something in 2007, maybe it was an e-mail or

6  something, but 2008, '9, '10, '11, those were years

7  that I was in Saudi Arabia.  These were mainly --

8       Q.   Let me -- let me interrupt you and ask

9  again.  You took documents relating to this

10  litigation that you have produced in this litigation,

11  you flew them over to Saudi Arabia with you, and then

12  later produced them back as it's described on

13  Exhibit 2; is that what you're telling us?

14       A.   No.

15       Q.   So where -- if you didn't send those

16  documents from Saudi Arabia --

17       A.   No, I did send them from Saudi.  Those were

18  documents, mainly phone calls --

19       Q.   I'm trying to understand where the

20  documents were located.  So you did take them out of

21  the country, and then --

22       A.   No.

23       Q.   -- this litigation occurred and you sent

24  them back?

1       A.   I did not take them out of the country.

2                 MR. MARINO:  You keep misstating it.

3                 MR. CASH:  Okay.

4                 MR. MARINO:  He's told you twice.

5       A.   I did not take them out of the country.

6       Q.   Okay.

7       A.   I didn't move to Saudi Arabia with a

8  boxload of documents.

9       Q.   That's all I'm trying to ask.

10      A.   No.  Definitely not.

11      Q.   Okay.  So that's why -- when I said those

12  documents were still in the U.S. and you said no, I

13  think -- I think -- I think we've miscommunicated.

14  So where were they?

15      A.   Which documents, now?

16      Q.   The five yellow files we're talking about.

17      A.   They were in Saudi Arabia.

18      Q.   Okay.  You just said they weren't.

19      A.   No, I said they were in Saudi Arabia.  You

20  asked me if I took them there.  I did not take them

21  there.

22      Q.   Okay.

23      A.   I did not take them.

24      Q.   Okay.

1        A.   So I'm getting really confused --

2        Q.   I am -- I am --

3        A.   -- with your line of questioning.

4        Q.   I am too, and so I -- you know, I'm just

5 trying to understand.

6        A.   Well, it's very simple.

7        Q.   Okay.

8        A.   These were things that happened while I was

9 in Saudi Arabia.  I took notes on different calls

10 that I made.  It's very simple.

11       A.   Okay.

12       A.   I was in Saudi Arabia --

13       Q.   These are documents --

14       A.   -- in 2008.

15       Q.   Excuse me.

16          These are documents you generated while you

17 were there?

18       A.   Yes.

19       Q.   Okay.  I apologize.  I didn't --

20       A.   Yes.

21       Q.   I didn't understand that that's where they

22 were generated.

23       A.   I wasn't flying back to the States,

24 generating documents, hand-carrying them back there.

1      Q.  It didn't make sense --

2      A.  These were things that -- conversations I

3  had with Angela, Farrest, other people from Saudi

4  Arabia.

5      Q.  Okay.  I --

6      A.  And there may have been e-mails.

7      Now, some of -- the reason there might be a

8  2007 folder or a 2008 folder is because maybe there

9  were e-mails on the server from 2007 that I might've

10  printed out that were relevant to this case, so there

11  would be a file for 2007, but it was probably a

12  duplicate of what my attorneys already had.  I don't

13  know.

14      Q.  So if there was a file named 2007, you

15  generated it after 2007?

16      A.  Generated it?

17      Q.  You're saying --

18      A.  Printed it out.

19      Q.  Okay.

20      A.  Printed it out, probably.

21      Q.  Okay.

22      A.  But it would've been, you know, written

23  prior to that.  It would've been in 2007, at which

24  point I was still living in the United States.

1          Q.    And when did you print it out?

2          A.    Well, if it -- if I sent it from Saudi

3    Arabia, I would've printed it there --

4          Q.    Do you know --

5          A.    -- most likely.

6          Q.    We're talking about five files.  Do you

7    know when those files were printed out?

8          A.    No, I don't.

9          Q.    Well, I'm asking -- I understand that

10   they're not necessarily contemporaneous.  But just to

11   close this out, I'm trying to figure out, did you --

12   did you take a Sunday afternoon and go through all

13   your e-mail accounts and all your paper files and

14   make these five folders, or how did they come to be?

15         A.    First of all, I work on Sundays, so I

16   didn't do it on Sunday, but just over time.  I think

17   the bulk of what was sent from Saudi Arabia were my

18   notes on conversations with Angie, primarily Farrest

19   Taylor.  That was the bulk of those documents.

20              Now, there may have been e-mails that

21   Farrest sent me.  I know he sent me different things.

22   I think Angela may have sent me things.  I probably

23   printed those out.  I'm sure I printed them out if I

24   had such documents and sent them to Dan, not all of

1  them, though, because it would've been too much to

2  print.

3      And my wife sent all those documents -- we

4  didn't know how to copy them, you know, on a zip

5  drive or whatever it's called.  She simply just

6  forwarded all the documents, one after another, that

7  we had.

8      Q.   Those are documents located in your e-mail

9  account?

10     A.   Yes.

11     Q.   And for the record, which e-mail account is

12 that?

13     A.   That's the Comcast account, the only

14 account that I can remember using in the last -- I

15 don't know, since Comcast acquired Adelphia would be

16 the only account that I've used that I know about for

17 this sort of thing.

18     Q.   Did you have any other personal involvement

19 with the items on Exhibit 2 other than the things

20 you've told us about?

21     A.   No.

22     Q.   So everything else described on Exhibit 2

23 was performed by your attorneys?

24     A.   Well, or my wife.  It looks like she -- you

1  know, she sent the -- she's mentioned here.  She sent

2  the -- she's the one who mailed the package.  She's

3  the one who sent the e-mails.  There are other people

4  here, the DHL people I think.  Well, C. Wands is -- I

5  guess that's somebody that works for Dan.  I don't

6  know.  The annual reports, my accountant obtained

7  those.

8      Q.  Okay.

9      A.  So that's --

10     Q.  All right.  Thank you.

11         Let's talk about your relationship with Joe

12 Simoni.

13     A.  Okay.

14     Q.  When did you first meet him?

15     A.  It was late 1999.

16     Q.  And can you tell us the circumstances of

17 that meeting?

18     A.  Larry Harless took me to meet him.  He just

19 asked me to come along.

20     Q.  Larry Harless is an attorney in town?

21     A.  He was.  Yes.

22     Q.  And you told us earlier he's an old friend

23 of yours?

24     A.  Correct.

1       Q.  Okay.  Why did he tell you that he wanted

2  you to go along and meet Joe Simoni?

3       A.  I believe he just said Joe was a nice guy,

4  he's been -- I think he said he was the champion of

5  the working men and women of West Virginia, is how he

6  labeled him.

7       Q.  Why did you want to meet the champion of

8  the working men and women of West Virginia?

9       A.  I didn't necessarily want to.  He just

10  said, hey, give me a ride; let's go have lunch.  I

11  bought him lunch, I believe.  We went and we met Joe.

12       Q.  And he's here in the room now?

13       A.  Yes.

14       Q.  Okay.  Where did you have lunch?

15       A.  I don't remember at this point.  This was

16  maybe November 1999, 13, 14 years ago.  I don't

17  remember.

18       Q.  You don't remember what city it was?

19       A.  Well, it was in Morgantown.

20       Q.  Okay.  Do you -- do you recall whether this

21  was intended to be a personal social introduction or

22  whether this was supposed to be a business

23  relationship?

24       A.  I think -- I think Larry was more

1    interested in me buying him lunch.

2        Q.    Why is that, sir?

3        A.    Because he probably had no money at the

4    time.

5        Q.    Larry wanted you to buy Larry lunch?

6        A.    Yes.  Not Joe, but Larry, yeah.

7        Q.    Okay.  Why was Doctor Simoni involved with

8    you buying lunch for Larry Harless?

9        A.    I don't know that he was.

10        Q.    Okay.

11        A.    Larry said to me, as I remember -- I think

12    this is correct.  I mean, it's 13, 14 years ago, but

13    he simply said, hey, let's go have lunch; I want you

14    to meet a friend of mine.  Now, Joe did not have

15    lunch with us.

16            I think we went back to Larry's hotel room.

17    He was staying in probably the Econo Lodge.  I mean,

18    it would be someplace relatively inexpensive.  And I

19    believe Joe came to the motel, but I'm not certain of

20    that at this point.

21            It's -- I mean, this is a long time ago,

22    but I think all that Larry wanted me to do was buy

23    him lunch and meet a guy that he thought was, you

24    know, a good person.  That's all.

1     Q.    But you met Joe after lunch and not during

2     lunch?

3     A.    Joe did not, as I remember -- I mean, I may

4     be mistaken, but Joe -- I believe Larry and I had

5     lunch, we went to his hotel, his motel, and then met

6     -- I think Joe came there.  There may have even been

7     someone else who came.  I don't know at that point.

8     I wasn't paying that much attention to it.

9     Q.    What were your impressions of Doctor Simoni

10    when you first met him?

11    A.    I think he seemed like an engaging sort of

12    a fellow.  He was polite, down to earth, a nice guy.

13    Q.    Have those impressions changed at all?

14    A.    I would say overall I still believe that,

15    yes.

16    Q.    Is there any specific areas you don't --

17    A.    Well, I mean, I've had -- I don't always

18    agree with things that he's done, but overall, I

19    think Joe wants to do the right thing, I think he's a

20    helpful person, and I -- yeah, I agree with what

21    Larry Harless said.

22    Q.    How did your relationship with Doctor

23    Simoni develop after that?

24    A.    Well, this issue of the asbestos at West

1  Virginia kept cropping up.

2      Q.   Was that your next meeting that Doctor

3  Simoni came to you and talked to you about asbestos?

4      A.   I don't think -- I don't think Joe came to

5  me.  I think Harless and I, again, met with him.  And

6  Larry was wanting me to -- Larry seemed interested in

7  the case and was asking me if I wanted to get

8  involved.  I think I initially said, no, it's not

9  something I do.

10      Q.   Well, Doctor Simoni, did he bring the case

11  to Larry?

12      A.   He told Larry about it.  Yes.  It's my

13  understanding.  I don't know.  Someone else may have,

14  but Joe was -- it's my understanding Joe was the

15  founder of the union.

16      Q.   This was the union at West Virginia

17  University?

18      A.   That's my understanding.  Someone said

19  that.  And Joe -- and there was another professor,

20  Nadler, Sam Nadler, who was very vocal about asbestos

21  at the university.

22      Q.   So your second visit with Doctor Simoni,

23  you're talking about potential asbestos litigation?

24      A.   I don't know if it was the second visit

1    either.  The second visit could've been social or it

2    -- or even the first visit may have been asbestos.  I

3    don't know at this point, but it just sort of

4    evolved.

5        Q.   Was the primary focus of your relationship

6    with Simoni in these early years litigation?

7        A.   I would say.  Yeah.  Yes.

8        Q.   Was it -- was it your understanding his

9    role was to find cases and bring them to you for

10   litigation?

11       A.   No.  I wasn't interested in cases.

12       Q.   Okay.  You did look into this asbestos

13   case?

14       A.   I ultimately did.  Yes.  Harless went into

15   one of his -- I don't know if he was drinking heavily

16   at the time or had -- you know, he was in a depressed

17   state, but ultimately, he did nothing on this case,

18   the West Virginia case.

19       Q.   Did Doctor Simoni do anything on the West

20   Virginia case?

21       A.   Yes.

22       Q.   What did he do?

23       A.   What did he do?  He did a lot.  He

24   organized meetings at the union -- at the union

1  office.  He researched law firms.

2      Q.   Were you in regular contact with Doctor

3  Simoni on this case?

4      A.   On that case, quite a bit, yes.

5      Q.   Okay.

6      A.   But then Bob Sweeney got involved from

7  Cleveland, and of course, Robert Sweeney is a

8  top-flight asbestos litigator.

9      Q.   What was Doctor Simoni doing on the case if

10  you -- if you found a top-flight asbestos litigator?

11      A.   Well, Joe knew many of the -- of the

12  plaintiffs.  He knew the buildings.  He dealt with

13  the -- you know, he had the ear of the clients.  Of

14  course, it was a class action lawsuit, so I mean,

15  there were potentially thousands of people.  I'm not

16  saying Joe knew them all.

17      Q.   Did you communicate with clients through

18  Doctor Simoni?

19      A.   No.  I communicated directly with clients.

20      Q.   Then --

21      A.   They were my clients.

22      Q.   -- what was the function of Doctor Simoni

23  with regard to those clients then?

24      A.   Function?  Well, many of these people were

1   elderly, sickly.  Joe, I think, is a compassionate

2   person.  He was -- I think he gave them, you know,

3   moral support.

4        Q.   In connection with the case?

5        A.   I think probably in general.

6        Q.   Did you rely on him to communicate with the

7   clients?

8        A.   I wouldn't say I relied on him.

9        Q.   Did you talk about clients with Doctor

10  Simoni in the West Virginia case?

11       A.   I think he usually came to me and said, you

12  know, this person is troubled about this or that or

13  -- but there were lots of calls, people calling my

14  office because I was the -- one of the attorneys

15  involved, and the calls didn't go through Joe.

16       Q.   You're saying that they did go through Joe,

17  that he --

18       A.   I'm saying some of the calls.

19       Q.   Clients would call Joe, and then Joe would

20  call you or talk to you about that client?

21       A.   Not necessarily.

22       Q.   Did that happen?

23       A.   I mean, he might come by my office and say,

24  Bob called me last night, and he's concerned about

1  this or he's not feeling well or he doesn't know how

2  he's going to get to -- say, to a B reader; you know,

3  what do you think about that; he's very concerned

4  about it.

5              But I mean, there were people calling my

6  office.  My staff dealt with those calls.  I dealt

7  with them.  I didn't call Joe and say, you know, Tom

8  has called me and -- it wasn't like that.

9       Q.   But you did get information from clients

10 through Simoni?

11      A.    Information?  I'm not sure what you mean --

12      Q.    Okay.

13      A.    -- by information.

14      Q.    I can make it simpler.  You're -- I just

15 want to be clear on the record here.  You're saying,

16 clients would call Simoni, he -- they would talk to

17 them -- he would talk to them about litigation, and

18 then Simoni would turn around and call you and tell

19 you what the clients said?

20      A.    I don't think it was about litigation.  I

21 think it was just --

22      Q.    Talking about a B reader, is that not about

23 litigation?

24      A.    Well, that is.

1     Q.   Okay.

2     A.   That could be.  Yeah.

3     Q.   So that happened?

4     A.   That would be a concern.

5     Q.   Did that happen?

6     A.   I can remember one instance where that

7 happened.  I can't tell you other ones at this point.

8 I'm sure there were other things, but I can't give

9 you an example.

10    Q.   Okay.  So there were other things.  What --

11    A.   I suspect.

12    Q.   Okay.  Was he an employee of yours at that

13 time?

14    A.   He was not.

15    Q.   Why did you enter into this relationship

16 with him?

17    A.   Well, I took the case to go out and find

18 someone that could represent these people that had

19 been exposed to asbestos and found Robert Sweeney and

20 Sweeney did the work.  I mean, as far as -- as far as

21 bringing the action, funding it, it was Bob Sweeney.

22 It wasn't me.  I didn't have the expertise to do

23 that.

24    Q.   Who located Bob Sweeney?

1        A.    You know, I think Joe may have initially

2    spoken to him, but I -- I'm not certain of that at

3    this point.  I know I did research online, and it may

4    have been -- or we may have both found him at the

5    same time.  I mean, it was independently done.

6        Q.    Did you rely on Simoni to help you locate

7    attorneys for litigating that particular case?

8        A.    Did I rely on him?  No.

9        Q.    Did he --

10       A.    I didn't rely on him.

11       Q.    Did he help you?

12       A.    I would say he helped me, yes.

13       Q.    Did Simoni help you find law firms for

14   other cases?

15       A.    Well, he was involved in both Westinghouse

16   and the Spelter case.  Yes.

17       Q.    So he was involved in selecting litigation

18   firms --

19       A.    He wasn't selecting them.

20       Q.    Let me -- let me get a clear question in,

21   sir, if that's okay.

22            My question is, was Doctor Simoni involved

23   in helping you select firms to litigate these cases?

24       A.    He gave me names that he had found.  I

1    found names as well.  I did research myself on these

2    issues.

3           Q.   Did you follow up on the names he gave you?

4           A.   If I thought they were viable, yes.

5           Q.   Did some of those names lead to the firms

6    that are now in this case?

7           A.   I don't know.

8           Q.   What other professional relationship did

9    you have with Doctor Simoni beyond the things you've

10   discussed here?

11          A.   Professional?  I can't think of anything

12   else.

13          Q.   Have you and Doctor Simoni had a personal

14   relationship?

15          A.   I'm not sure what you mean by personal.

16          Q.   Were you friends?

17          A.   Well, Joe is a friendly guy.  I would say

18   it was friends.  Yes.

19          Q.   And as friends, what types of activities

20   would you engage in?

21          A.   Well, I don't know.  I mean, I don't think

22   -- I mean, I can remember having lunch with him,

23   talking about baseball, sports.  I can't -- I may

24   have taken him to a basketball game once possibly.

1      And I don't think we did much on a personal level.

2      The guy was busy all the time.

3           Q.   Did you ever, for example, go out to

4      dinner?

5           A.   We had lunch, possibly dinner.

6           Q.   Have you ever taken any trips with him?

7           A.   Yeah.  We went to Toronto.

8           Q.   And this was a -- as a personal trip?

9           A.   Yes.

10          Q.   What was -- what'd you do there?

11          A.   Met his relatives.

12          Q.   What year was that?

13          A.   I don't know.  2001, possibly.  I'm not

14     sure.

15          Q.   Have you taken any other trips with him?

16          A.   By trips, what do you mean, like --

17          Q.   I --

18          A.   -- out of the country or --

19          Q.   Any trip out of town.

20          A.   Out of town?  I've been to Charleston, West

21     Virginia with him.  I've been to Washington, D.C.

22     with him.

23          Q.   And these are personal trips?

24          A.   No.  I'd say these were business.

1      Q.    Okay.  Let's limit it to personal trips.
2  Have you -- other than the Toronto trip, have you
3  taken any other personal trip?
4      A.    Not that I can think of.
5      Q.    Have you ever had any holidays together?
6      A.    You know, I may have had maybe something at
7  Christmas, like a luncheon or something.  I don't
8  know if it was at his place or mine.  I seem to
9  recall something about Christmas.
10     Q.    Okay.  You had lunch -- you had lunch on
11  Christmas Day?
12     A.    Not the day, but maybe the day before, but
13  the theme was Christmas, I would say.
14     Q.    When was that?
15     A.    I have no idea.
16     Q.    What's your best estimate of when that
17  happened?
18     A.    2003 or '4, something like that or '2.  I
19  don't know.
20     Q.    Has he introduced you to anyone else other
21  than clients?
22     A.    Well, he -- I'm sure he has introduced me
23  to a number of people.  I mean, he's a very
24  well-known guy in Morgantown.  I can't tell you who.

1   I mean, it was just -- he's very engaging.  He knows

2   people.  I'm sure he has introduced me.

3        Q.   Let's talk about your business relationship

4   again.  Have you -- have you engaged in any business

5   ventures together?

6        A.   No.  We've talked about different things,

7   what we might do in the future, a few times, but I've

8   never -- business venture?  I think I bought vitamins

9   from him a few times, if that's a business venture.

10       Q.   Okay.  You don't consider the Spelter

11  litigation to be a business venture between you two?

12       A.   A business venture?  It would've been had

13  he become a licensed attorney and been associated.  I

14  would say that would be business.  Yeah.

15       Q.   Okay.  The Fairmont case, that's not a

16  business venture that you engaged in?

17       A.   It would be the same thing.

18       Q.   Okay.  And that's true for all the

19  litigations?

20       A.   Well, with WVU, he was a client.  I don't

21  think a client can be your partner or business

22  partner in a case.

23       Q.   Have you ever owned property with Joe

24  Simoni?

1    A.   Definitely not.

2    Q.   Have you ever discussed buying property

3  with him?

4    A.   We've talked about -- as I said earlier,

5  talked about different things.

6    Q.   Okay.  What --

7    A.   I don't remember specifically.

8    Q.   -- specific things have you talked about?

9    A.   He was moving to Florida.  I gave him the

10  name of a real estate consultant.  We talked about

11  property in Florida.  I don't -- I don't know where

12  he looked.  It was just in general.

13    Q.   Who was the real estate professional that

14  you just mentioned?

15    A.   Dan Levitan.

16    Q.   And where does he live?

17    A.   I don't know.

18    Q.   When was the last time you heard from Dan?

19    A.   Well, he lives in Florida, but the city, I

20  don't know.  Probably five to six, seven years ago.

21  I don't know.  Probably five years ago I may have

22  called him.

23    Q.   Okay.  You referred Simoni to him?

24    A.   Didn't refer him.  I simply mentioned his

1  name.  This is someone -- he was buying property.

2  This is someone -- or maybe even as a possible place

3  to work or live, this guy would be able to possibly

4  guide him.

5      Q.   Did you ever offer to buy property in

6  Florida?

7      A.   Did I ever offer to buy property in

8  Florida?  To who?

9      Q.   Anyone.

10     A.   Anyone.  No.

11     Q.   Never looked at buying property in Florida?

12     A.   I've only been to Florida once, and it

13 wasn't for property.

14     Q.   Never discussed buying property in Florida

15 for Simoni?

16     A.   For him?  Talked about what we might do

17 down there.

18     Q.   Okay.

19     A.   But it wasn't to buy something.  I know

20 nothing about that.  No.  That's why I suggested Dan

21 Levitan if he was buying something.

22     Q.   When you say you talked about what we might

23 do together down there, what are you -- what do you

24 mean by that?

1      A.    Eventually, we had talked about what might
2   -- what might be as far as, you know, if money was
3   made on these cases, if he became licensed, if he --
4   if he got something, a fee or maybe was compensated.
5   I believe there was something to that effect that we
6   talked about.

7      Q.    You talked about taking the money from the
8   fees in these cases and buying property for him?

9      A.    No.  Now, he -- no.  Not -- I wasn't buying
10  it for him.  I don't believe I ever said that.  It
11  was -- it was, this would be something that he might
12  want to invest in if he was moving to Florida and
13  assuming he ever got compensated or that anyone ever
14  got compensated.

15     Q.    You never -- you never made the offer to
16  buy property for Simoni?

17     A.    I think he may have talked about -- I don't
18  believe I ever made an offer.  No, I didn't make an
19  offer to buy him property.

20     Q.    Mr. Rich, I can't help but notice you're
21  equivocating here.  I guess I'm just curious whether
22  you think this happened or didn't happen.  If you can
23  --

24     A.    Well, there were conversations with him

1  about his moving to Florida.

2      Q.   Okay.  We're at your deposition, and I want

3  to hear about those conversations.

4      A.   Okay.  I can't remember --

5           MR. MARINO:  Wait for a -- just wait

6  for a question.

7           THE WITNESS:  Okay.

8  BY MR. CASH:

9      Q.   Why did you discuss him moving to Florida?

10     A.   Well, he was telling me he was moving to

11  Florida.

12     Q.   Okay.  Did you discuss buying property in

13  Florida?

14     A.   I think I told him that might be a good

15  investment for him.

16     Q.   Do you -- did you offer to buy property for

17  his use in Florida?

18     A.   No.

19     Q.   You never did that?

20     A.   No.

21     Q.   Okay.  You told me earlier that you talked

22  about what the future might hold.  What were some of

23  the other things your relationship might hold in the

24  future that you discussed with Simoni?

1          A.    I don't know at this point.

2          Q.    And --

3          A.    Just talked about different things.  I knew

4     he was -- oh, I think --

5          Q.    You can't answer that?

6          A.    What's that?

7          Q.    You don't know?

8          A.    I think there was one thing that we talked

9     about.  His -- in Toronto, we saw a advertising

10    company, or it was a mobile billboard.  We talked

11    about that.  In fact, I think we looked at different

12    companies that had this sort of advertising system.

13         Q.    Was the purpose to advertise litigation?

14         A.    No, no, no, no.  Just as a business.

15         Q.    You discussed starting a business outside

16    the law in Canada with Doctor Simoni?

17         A.    No.  Not in Canada.  We saw this company in

18    Canada.  We thought this was a novel idea.  That's

19    all.  We just -- I mean, we were just throwing out

20    things, like toying with ideas.

21         Q.    Were you -- were you contemplating going

22    into business using that idea here in the United

23    States?

24         A.    He and I thought it might be something that

1    would work here, but then the more I thought about

2    it, it's simply -- it was noise pollution because

3    this vehicle would -- or not noise pollution, but

4    visual pollution.

5         Q.   Like --

6         A.   You know, a moving sign, I thought, you

7    know, this doesn't -- I don't think this would really

8    be the thing I'd be interested in, but these were

9    just things that we talked about.

10        Q.   What other things like that did you talk

11   about?  These sound like future business ventures.

12   Did you have other future business ventures that you

13   contemplated?

14        A.   I can't think of anything.  There probably

15   were other things, but I can't think of anything at

16   this point.  But again, this was not seriously

17   considered.

18        Q.   Did you contemplate going into practice

19   with Doctor Simoni if he became licensed?

20        A.   I did, yes.

21        Q.   Did you discuss starting a firm together or

22   adding him to your firm?

23        A.   No.

24        Q.   How would you be practicing and where would

1  you be?

2      A.    My idea was to -- whether it'd be Joe or

3  Larry Harless, they would come get involved in these

4  cases and I would leave and go back overseas.

5      Q.    You contemplated additional environmental

6  cases?

7      A.    No.

8      Q.    Okay.  You said --

9      A.    I --

10     Q.    -- these cases.  What cases -- were you

11 referring to Spelter, Fairmont --

12     A.    The two cases, the Spelter and West -- and

13 Westinghouse.

14     Q.    So it's your testimony you contemplated

15 Simoni getting licensed and him becoming an attorney

16 of record in these cases and then you withdrawing to

17 go off to Saudi Arabia?

18     A.    Yes.

19     Q.    When did you have this contemplated?

20     A.    Oh, from the outset.  Whether it was he or

21 Larry Harless or both.

22     Q.    Was it -- was it your thought at that time

23 that you would share the fees from those cases?

24     A.    Share the fees with them?

1      Q.    With Simoni.

2      A.    If they became -- if he -- if he became a

3   licensed attorney or if Harless became involved, yes.

4      Q.    When did you have those conversations with

5   Simoni about sharing fees on these cases?

6      A.    Oh, at different times.

7      Q.    Okay.  When?

8      A.    Well, I don't know the exact dates.

9      Q.    When was the first time?

10      A.    Well, I know that when we initially looked

11  at the West Virginia case I thought he was an

12  attorney because Harless actually had drafted an

13  agreement that the three of us would share fees.

14      Q.    So when you -- when you first looked at the

15  West Virginia case, you contemplated sharing the fee

16  with Simoni?

17      A.    And Larry Harless.  I mean, it was their

18  case, not mine.

19      Q.    What about the Spelter litigation, when did

20  you contemplate sharing fees on Spelter?

21      A.    From the outset.  Because my goal was to go

22  overseas.  I had no expertise in this area.  I took

23  the cases to go out and find firms that could come in

24  and get the job done.  That's what my role was.

1      Q.   Okay.  Limiting it just to the Spelter

2   litigation, if you contemplated sharing fees with

3   Simoni, what were the contours of the fee sharing

4   going to be?

5      A.   Well, it depended on when he became

6   licensed and what he did.

7      Q.   Did you ever discuss any specifics at all

8   about this?

9      A.   Yeah.

10      Q.   Okay.

11      A.   There were percentages, but I don't

12   remember what they were.  It varied at different

13   times.

14      Q.   You don't remember any of the percentages?

15      A.   No agreement was reached, to my -- to my

16   way of thinking.

17      Q.   Well, I understand that's your position,

18   but I guess I'm asking, although you had multiple

19   conversations about this, you can't remember any of

20   the details of them?  And if you can, just tell us

21   what they were.

22      A.   I don't remember.

23      Q.   You don't remember how many times you

24   talked about that?

1     A.   Oh, it wasn't every day.  I mean, it may

2  have been ten times total, if that.

3     Q.   Over the whole course of the Spelter

4  litigation?

5     A.   And Westinghouse.  Yes.

6     Q.   Okay.  And since the beginning of those

7  litigations?

8     A.   I would say it's probably less than ten.

9     Q.   But you don't -- you can't recall?

10     A.   Well, I know the first agreement, which the

11  first -- when I say agreement, the document that was

12  drafted was 50 percent Harless, 25 percent me, and

13  25 percent for Joe.  I don't remember after that.  I

14  wasn't interested in the cases.

15     Q.   Do you still have that draft agreement?

16     A.   I never had it.  I looked it at.  I never

17  signed it.

18     Q.   Harless drafted it?

19     A.   I believe so.

20     Q.   Do you know if it still exists?

21     A.   I don't.

22     Q.   Do you know if Harless has it?

23     A.   He's deceased.

24     Q.   Do you know if Doctor Simoni has it?

1        A.    I don't know.

2        Q.    Are there any other draft agreements that

3    would cover fee splitting?

4        A.    With?

5        Q.    With Doctor Simoni.

6        A.    No.

7        Q.    That's the only one?

8        A.    That I'm aware of.

9        Q.    Okay.  And you did discuss splitting the

10   fees with him on all the litigations?

11       A.    Well, that was to -- that was to be

12   anything that we worked on.

13       Q.    So yes, you did discuss it on every one of

14   the litigations --

15       A.    No.  Not --

16       Q.    -- we talked about?

17       A.    -- specifically, not specifically.

18       Q.    Which ones specifically?

19       A.    No.  It was just in general.

20       Q.    So all -- as to all the work you were going

21   to do together in partnership you discussed splitting

22   the fees?

23       A.    Uh-huh.

24       Q.    At some point -- you told us you assumed

1    Simoni was a licensed attorney.  At some point, as it

2    says in the pleadings, you learned he was not a

3    licensed attorney.

4        A.   That's right.

5        Q.   When did that happen?

6        A.   I don't know the date.

7        Q.   What were the circumstances of you learning

8    he was not a licensed attorney?

9        A.   I think someone told me --

10        Q.   Who?

11        A.   -- that he had never passed the bar.  I

12    don't know.

13        Q.   Was it Simoni?

14        A.   I don't think it was.  I think I then asked

15    him.

16        Q.   What did he say?

17        A.   He said he hadn't.

18        Q.   And I want to pin you down.  I'd like to

19    know when you found that out.

20        A.   Well, I don't know.

21        Q.   You can't give a year?

22        A.   It was fairly early on, because I wouldn't

23    sign any sort of an agreement with him.

24        Q.   What year?

1       A.   Probably 2000, 2001.  I don't know for
2    sure.
3       Q.   Well, Simoni told you he wasn't a licensed
4    attorney in 2000 or 2001?
5       A.   Uh-huh.  Probably.
6       Q.   But you contemplated splitting fees with
7    him on the Spelter litigation at the outset of the
8    Spelter litigation?
9       A.   If he became licensed.
10      Q.   Okay.  So at the time you --
11      A.   He was --
12      Q.   -- realized that was --
13      A.   He was studying for the bar at that point.
14      Q.   That was after -- so you contemplated
15   splitting fees with him in 2002, when the Spelter
16   litigation started, when you started investigating
17   it; that was after you already knew he wasn't a
18   licensed attorney?
19      A.   Uh-huh.  Because he was studying for the
20   bar.
21              MR. MARINO:  Gary, try to verbal --
22   when you say -- you're saying uh-huh.
23              THE WITNESS:  Oh, I'm sorry.
24              MR. MARINO:  Just try to say yes or --

1            THE WITNESS:  I'm sorry.

2            MR. MARINO:  Okay.  That's all right.

3   BY MR. CASH:

4        Q.   Did you feel misled by Simoni when you

5   found out that he didn't pass the bar?

6        A.   I suppose.  He should've said to me, hey,

7   I'm not a licensed attorney.

8        Q.   When would you have expected him to say

9   that to you?

10       A.   Well, I think I would've said it at the

11  outset.  I would've said it, hey, I'm not licensed; I

12  can't be signing this agreement.

13       Q.   Did you have a reaction to him telling you

14  that?

15       A.   I don't recall.

16       Q.   So you talked to him about entering into a

17  co-counsel relationship?  Can we call it that?

18            MR. WAKEFIELD:  For what case?

19            MR. CASH:  All of it.  It sounds like

20  all the cases.

21            MR. WAKEFIELD:  All right.  Well --

22  BY MR. CASH:

23       Q.   Did you -- did you discuss being co-counsel

24  with Simoni on all of the cases that are at issue in

1   this litigation?

2        A.   When Harless and I were talking to him,

3   yeah, it was anything that we did.

4        Q.   Okay.  And at the time you had -- you

5   discussed this, Simoni has led you to believe he was

6   a licensed attorney?

7        A.   I'm not --

8                  MR. WAKEFIELD:  Object to form.

9        A.   I'm not saying Joe -- he led me to believe?

10  Are you suggesting that he was being underhanded?

11       Q.   I'm asking what your impression was.

12       A.   I don't think he was being underhanded.

13       Q.   Did you just fail to do due diligence in

14  researching whether he had a license or not?  Was it

15  your fault?

16                 MR. WAKEFIELD:  Object to the form.

17       A.   Well, he was talking about law school, he

18  was talking about different things, so I had no

19  reason to doubt him.

20       Q.   Who do you think was responsible for your

21  misunderstanding that Simoni had a license?

22       A.   I think it was mutual.

23       Q.   If you had proposed agreements to share

24  fees on cases that you ultimately did go forward and

1    work on, why didn't you enter into those agreements?

2    Why didn't you enter into those agreements if you

3    drafted them?

4        A.   I didn't --

5                MR. MARINO:   Object to the form.

6        A.   -- draft them.

7                MR. MARINO:   You're misstating the

8    evidence.

9    BY MR. CASH:

10       Q.   Okay.

11       A.   I did not draft the agreement.

12       Q.   Larry Harless drafted an agreement for you

13   --

14       A.   I believe it was Larry.

15       Q.   -- on the West Virginia University case,

16   the asbestos case?

17       A.   I believe it was Larry.  I may have looked

18   at it.  I may have suggested something.

19       Q.   Okay.  And if you had a draft agreement

20   worked out and you went forward with that case, why

21   didn't you sign the agreement?

22       A.   Well, because Harless didn't get involved.

23   He left the area.  He went into a -- I mean, he had a

24   mental problem.

1     Q.  When Harless left and Sweeney came in to

2  work on the case, did you believe you had an

3  agreement with Simoni at that time?

4     A.  Well, I knew at this time, I think, that

5  Joe was not a licensed attorney.

6     Q.  What was your understanding of the

7  relationship with him at that point then?  What

8  relationship did you -- did you have, if you had to

9  characterize it?

10     A.  He was a union organizer.  He was just a

11  helpful guy.  I mean, Joe, it's my understanding, was

12  an activist for the employees at West Virginia.  He

13  worked for 30 years doing grievances.

14     Q.  Well, so you drafted an agreement to split

15  the fees 50 percent, 25, and 25 to Simoni.

16              MR. MARINO:  Objection.

17  BY MR. CASH:

18     Q.  That was your draft.

19              MR. MARINO:  You misstated the

20  testimony.

21     A.  I didn't draft it.

22     Q.  That was Harless --

23     A.  I don't believe --

24     Q.  That was the draft that was on the table.

1        A.   I believe Larry did it.

2        Q.   Okay.  And Larry withdrew from the case?

3        A.   Well, it -- there was no case.

4        Q.   Okay.

5        A.   He just --

6        Q.   I understand.

7        A.   Withdrew, he --

8        Q.   Larry --

9        A.   He couldn't do it.  Mentally, physically,

10  he was not capable.

11        Q.   You didn't -- I understand.  But you didn't

12  go into a relationship with him, but you did go

13  forward and work on the case, true?

14        A.   I did, at his request.

15        Q.   Okay.  And you continued to work with

16  Simoni on the case?

17        A.   Uh-huh.

18        Q.   You told us Simoni interfaced with clients,

19  Simoni found documents, Simoni helped you work on

20  this case.

21        A.   Well, he helped -- he helped everyone.

22        Q.   Did -- was it your belief that Simoni was

23  just a volunteer and just working for free at that

24  point?

1      A.   Well, I know that Joe had worked for years

2   and not received any money.  That's what I was told

3   by Harless, by other people.  He had worked for years

4   doing grievances for employees.  He set up the union.

5   He's that kind of guy.

6      Q.   That's not responsive to my question, sir.

7   My question is, did you assume Simoni was going to

8   continue to do this work on this case for free or

9   not?

10      A.   Yeah, I thought he was, unless he got

11   licensed.

12      Q.   So you believed because he -- you say you

13   knew he didn't have a license, you believed he was

14   going to continue litigating the West Virginia

15   University asbestos case with you without pay --

16                 MR. MARINO:  Objection.

17   BY MR. CASH:

18      Q.   -- as a volunteer?

19                 MR. MARINO:  Objection.  Misstates the

20   testimony.

21            You can answer.

22      A.   Just like Sam Mallard did a lot of work on

23   the case, I didn't plan on paying him.

24      Q.   So --

1          A.   I don't think Bob Sweeney planned on paying

2     him.

3          Q.   Do you think Simoni had any anticipation he

4     was going to be paid on that case?

5          A.   I think Joe --

6               MR. MARINO:  Object to the form.

7          A.   I think Joe thought he would get licensed,

8     and then the question was, could he be paid at that

9     point?  That was not clear cut.

10         Q.   These other individuals, including Harless,

11    they told you that Simoni would work on grievances,

12    would work -- would do other sort of quasi-legal work

13    for clients without being paid at all because he's

14    just a helpful guy?

15         A.   Yeah.  He wasn't -- he wasn't acting as an

16    attorney.  He was a union representative at the

17    university.  That's my understanding.

18         Q.   Is it -- is it your understanding that he

19    served in that function without pay as a --

20         A.   That's my understanding.

21         Q.   -- as a volunteer?

22         A.   It may not be true.  I don't know.

23         Q.   Well, sir, do you know if he had had any

24    other relationship with Harless?

1       A.   Yeah.  I think he did work for Larry.

2       Q.   Do you know if it was legal work?

3       A.   I think he did legal research.  I think he

4  -- he did a lot of things for Larry.

5       Q.   Which clients of Larry's did he do that

6  work for?

7       A.   I have no idea.

8       Q.   Were they asbestos clients?

9       A.   No.  I shouldn't think -- I don't know.  I

10  don't know what the nature of these cases were.

11  Probably employment because Larry was an employment

12  -- that was his -- you know, I would say that was his

13  specialty, was employment law.

14       Q.   Did Harless pay Simoni for this work?

15       A.   I don't know.

16       Q.   Did Harless ever tell you that Simoni was

17  going to do it for free?

18       A.   I don't think we ever discussed it.

19       Q.   You and Harless never discussed

20  compensation for Simoni working?

21       A.   Well, we did, because he drafted the

22  agreement.

23       Q.   That's what I'm trying to get to.  So --

24       A.   Well, I've already said that, right?

1     Q.   Simoni has characterized the relationship

2  as a professional relationship.  Would you -- would

3  you agree with that or disagree with that?

4     A.   I said earlier it was professional and

5  somewhat friendly.  I mean, the guy is a -- is a nice

6  guy.

7     Q.   After you found -- is it -- just to be

8  clear, is it your testimony that after you found out

9  that he didn't have a license in around 2000 or 2001

10  that your understanding for all time going forward is

11  that he was going to be a volunteer and not be paid

12  unless he passed the bar?  Is that your position?

13     A.   Well, I talked to Sherri Goodman and -- who

14  is my ethics advisor, and it was unclear, even if he

15  became licensed, whether or not he would be able to

16  be paid because of his activities before being

17  licensed.

18          Is that, I guess, self-serving?  Is this

19  doing this knowing -- with the anticipation of

20  becoming a lawyer, doing things that a lawyer maybe

21  couldn't do, so there was some question, although she

22  thought that as an activist that he would be able to

23  get paid once he got licensed.

24          Or at some point, she came back and said,

1   well, I think this fellow could be paid on an hourly

2   basis.  And at some point, I said to him, get your

3   hours together.

4          Q.   When you got that advice, did you

5   communicate it to Simoni?

6          A.   Probably.  I'm sure I told him about --

7   yes.

8          Q.   You --

9          A.   I'm pretty certain.

10         Q.   -- conveyed the ethics opinion to him?

11         A.   Well, it wasn't -- when you say opinion,

12  this wasn't some formal opinion.  This was just me

13  and Sherri talking on the phone.

14         Q.   Well, now, Sherri Goodwin is an attorney

15  who is knowledgeable in the field of ethics?

16         A.   Correct, correct.

17         Q.   Did you consult her for her ethical advice

18  on how -- whether or not he could be compensated?

19         A.   That's what we were talking about.  Of

20  course.

21         Q.   So she did give you an opinion?

22              MR. MARINO:  You know, can I -- can I

23  just make a request?  One person speak at a time.

24              MR. WAKEFIELD:  Yeah.  You --

1          MR. MARINO:  You keep talking over the

2    witness.

3          MR. WAKEFIELD:  Yeah.  You talk over

4    him a lot.

5          MR. MARINO:  Just let him finish the

6    answer.

7          And Gary, if you could let him -- make sure

8    he's finished with the question before you start

9    answering him, okay?

10          THE WITNESS:  All right.

11          MR. MARINO:  Thanks.

12   BY MR. CASH:

13       Q.   She gave you an opinion on ethics, yes or

14   no?

15       A.   I wouldn't say it was a formal opinion.

16       Q.   Was it an opinion?

17       A.   It was an opinion, her opinion.

18       Q.   Did you convey her opinion to Doctor

19   Simoni, her opinion being that he might not be able

20   to get paid ethically?  Did you tell him that?

21          MR. MARINO:  Object to the form of the

22   question.  You've misstated the --

23       A.   I'm not sure.

24          MR. MARINO:  -- testimony again.

1      A.    I'm not sure.  Probably yes.  I would think

2  so.  I think he knew.  I mean, I don't -- I mean, he

3  had gone to law school.  I think he was pretty well

4  versed in these things, probably more so than me

5  because he had had classes in ethics, you know, at a

6  later date than myself.

7      Q.    Is it your testimony that --

8      A.    Or a more recent date, I should say.

9      Q.    I didn't mean to talk over you.

10      A.    Sorry.

11      Q.    No.  We're both doing it.  It's okay.

12            Is it your testimony then that Simoni

13  continued to work on you with cases in the hopes that

14  he would pass the bar and then maybe be entitled to

15  be paid later?

16      A.    I don't know what he was thinking.  I think

17  he was involved in cases -- I think that Joe had been

18  involved in numerous cases before he ever met me.

19      Q.    When you -- when you worked on cases

20  together, you --

21      A.    There weren't that many of them.  I mean,

22  cases, there is -- there is three cases.

23      Q.    Let me ask you this then.  When you --

24  let's pin it down.  When you talked to Goodman about

1  her ethical opinion, which case were we talking

2  about?

3      A.   We were talking about WVU initially.

4      Q.   Okay.

5      A.   Because I talked to her from the outset.

6      Q.   Did you consult her on other cases?  Did

7  you consult her on Spelter?

8      A.   Of course.

9      Q.   Did you consult her on Fairmont?

10     A.   Yes.

11     Q.   And all on the same topic of whether you

12  could pay --

13     A.   It was on numerous topics.

14     Q.   Did you consult with her on whether or not

15  Simoni could be paid from the fees from those cases?

16     A.   Yes.

17     Q.   And in each case, she gave you the same

18  opinion that she wasn't sure whether or not he could

19  be paid?

20         MR. WAKEFIELD:  Object to the form.

21  Misstates the testimony.

22     A.   These were not -- this was in general, Joe

23  and Joe's role.  This was in general.  I don't know

24  that we specifically talked about cases until the

1  end, specific cases.  We were just talking in

2  general.

3        Q.   When you told Simoni, go ahead and get your

4  hours together, what litigation were you referring to

5  then?

6        A.   I don't know, because I don't remember the

7  year.

8        Q.   You were --

9        A.   But in WVU, he became a client.  He was a

10 plaintiff, I should say, so therefore, he would not

11 be able to get a fee.  He knows that.  He was a

12 plaintiff.

13       Q.   Mr. Rich, you said you told Simoni, get

14 your hours together in preparation for possibly

15 applying for fees in a case?

16       A.   Well, documenting his work.

17       Q.   Okay.  To be paid?

18       A.   Yeah.  Because that would be his way of --

19 you know, I don't know what year it was.  But she

20 said, this is possibly one way he could be paid.

21       Q.   But you don't remember having -- you can't

22 remember with any specificity when the get your hours

23 together --

24       A.   No.

1      Q.   -- conversation happened?

2      A.   I have no idea.

3      Q.   You don't know what case it was?

4      A.   Well, no.  It may have just been in

5  general.

6      Q.   Was it -- was it after you found out he

7  didn't have a license?

8      A.   Well, of course.

9      Q.   Okay.  But you can't remember at all when

10  it was or which case it was with?

11      A.   No.

12      Q.   Okay.

13      A.   It may have not been dealing with a

14  specific case.

15      Q.   Was it in writing?

16      A.   No.

17      Q.   It was an oral conversation?

18      A.   Yes.

19      Q.   Were you planning to present it to anyone,

20  his hours?

21      A.   Well, I don't know that I told him to get

22  them together to give to me.  I was telling him to

23  document what he was doing.

24              MR. CASH:  I think we'll take a break

1    here.

2              VIDEOGRAPHER:  We're going off the

3    record.  The time is 12:08 p.m.

4              This ends Disc No. 1 in the deposition of

5    Gary Rich.

6                              -----

7                          (Lunch break)

8                              -----

9              VIDEOGRAPHER:  We are now going back

10   on the record.  The time is 1:05 p.m.

11             This begins Disc No. 2 in the deposition of

12   Gary Rich.

13   BY MR. CASH:

14        Q.   Mr. Rich, welcome back.

15        A.   Thank you.

16        Q.   I hope you got lunch.

17                  MR. MARINO:  Can I just put something

18   on the record?

19                  MR. CASH:  Sure.

20                  MR. MARINO:  You'd asked earlier about

21   my instruction to the witness, and I just wanted to

22   provide the authorities to you.

23             The leading case is Sporck v. Peil, and

24   it's Sporck, S-p-o-r-c-k, versus Peil, P-i-l, P-i- --

1  -e-i-l.  It's a 3rd Circuit case, 759 F.2d 312, and
2  that case is filed in this circuit.
3          A case called In re Allen, which is at
4  106 F.3d 582 and the jump site is 608.
5          There's a Southern District of West
6  Virginia case, Rhodes v. DuPont, 558 F.Supp.2d and
7  that's 660.
8          MS. MASON:  I'm sorry.  I can't
9  understand what you're saying.  You -- can you go
10  back to --
11          MR. MARINO:  I'll give you the -- I'll
12  give you the piece of paper --
13          MS. MASON:  All right.
14          MR. MARINO:  -- that has the --
15          MS. MASON:  Okay.
16          MR. MARINO:  -- citations on it.
17          And there's a -- you know, a few Florida
18  cases, no Alabama cases, but Florida cases going the
19  same way, so --
20          MR. CASH:  Well, we'll read that.
21          MR. MARINO:  -- I'll provide those to
22  you.
23          MR. CASH:  Are your instructions not
24  to answer based on a privilege?

1            MR. MARINO:  Read the cases.

2            MR. CASH:  Well --

3            MR. MARINO:  I think I stated the

4    objection was based on work product --

5            MR. CASH:  So that's --

6            MR. MARINO:  -- which I don't consider

7    a privilege.

8            MR. CASH:  Well, okay.  Attorney work

9    product --

10           MR. MARINO:  It's an immunity.

11           MR. CASH:  -- is not a privilege?

12           MR. MARINO:  It's not a privilege.

13           MR. CASH:  All right.  That's a new

14   one.

15           MR. MARINO:  Well --

16           MR. CASH:  But you've been doing this

17   longer than me.

18           MR. MARINO:  -- may be new to you.

19           MR. CASH:  As you -- as you've

20   mentioned many times, you're more experienced than I

21   am.

22           MR. MARINO:  I don't think I've ever

23   mentioned that, actually.

24           MR. CASH:  All right.  Are we ready to

1  go?

2            MR. MARINO:  I wouldn't --

3            THE WITNESS:  Yes.

4            MR. MARINO:  I don't know why you

5  would say something like that.  I've never said that

6  at all, ever.

7  BY MR. CASH:

8       Q.   Mr. Rich, have you ever made any --

9            MR. MARINO:  What?

10           MS. MASON:  You've put it in e-mails.

11           MR. MARINO:  Yeah?

12           MR. CASH:  Yeah.

13           MR. MARINO:  Okay.  I mean --

14           MR. CASH:  I thought we didn't argue

15  at depositions.

16           MR. MARINO:  Yeah.  Well, you seem to

17  want to argue, so --

18  BY MR. CASH:

19      Q.   Mr. Rich, have you made -- ever made any

20  payments to Doctor Simoni of any kind?

21      A.   I think I may have purchased vitamins from

22  him --

23      Q.   Okay.

24      A.   -- two or three occasions.  I doubt if the

1  amount is $100 total, if that.

2      Q.   Anything else?

3      A.   No.  And I may still owe him something on

4  that.  I don't know.  I think there was some issue

5  about vitamins and -- I seem to recall something

6  about that.

7      Q.   I don't believe that would exceed $75,000,

8  so you're --

9      A.   No.  It's definitely --

10     Q.   -- probably okay in this case.

11     A.   No.  I'm --

12     Q.   All right.

13     A.   I haven't purchased that many vitamins.

14     Q.   So you're probably okay.

15          Okay.  You told us that you found out that

16  Simoni did not have a law license from someone else?

17     A.   I believe so.  Yes.

18     Q.   And have you --

19     A.   Well, I believe that's -- I did say that,

20  and I believe that's correct.  Yes.

21     Q.   And you still -- you can't remember who

22  that was?

23     A.   I cannot.

24     Q.   Can you remember when it was at all?

1      A.   No.

2      Q.   Was it in the context of a case?

3      A.   No.  I think just talking in general to

4  someone.

5      Q.   Okay.  Was it -- I'm just curious where

6  that would come up.  You know, was it a cocktail

7  party?  Were you at the grocery store and you run

8  into somebody and they say, oh, by the way, Joe

9  Simoni doesn't have a license?  Or did it come up

10  more in the context of actually handling a case?

11      A.   There aren't any cases but these few.  It

12  may have even been Harless who said this to me, oh,

13  Joe is not -- he hasn't passed the bar.  It may have

14  been something like that.  I don't know.

15      Q.   Okay.  Can you tell us whether it was in a

16  professional capacity or personal capacity?

17      A.   That this comment was made?  It was

18  probably just in passing.  I mean, I don't go to

19  cocktail parties, so I don't think it was at a

20  cocktail party.

21      Q.   Okay.

22      A.   It may have just been walking down the

23  street, or it may have been I was with Larry.  It may

24  have been him.  I don't know.

1          Q.   Okay.  And you told us that when you found

2     this out you went to Simoni and you asked him about

3     it; is that -- is that what you said?

4          A.   I didn't -- I don't think I said that I

5     went to him.

6          Q.   Did --

7          A.   I think --

8          Q.   Did you ever bring it up with Simoni --

9          A.   Oh, I did.

10          Q.   -- after you found out?

11          A.   Yes.

12          Q.   Okay.  And did --

13          A.   But I --

14          Q.   Did you ask him --

15          A.   -- don't know that I made a beeline to him

16     and said, hey -- I don't remember.

17          Q.   Did you ask him if he was going to take the

18     bar?

19          A.   We -- I know we talked about his taking the

20     bar.

21          Q.   So after you found out he didn't have a

22     license, you discussed with him and you said, you

23     know, are you going to take the bar or not?  Did that

24     happen?

1        A.   I don't know if it -- if I directly asked
2   him that.
3        Q.   Did you have an understanding that he was
4   planning to take the bar?
5        A.   I knew at some point that he was taking it.
6   I know at some point that he took it at least once.
7   He may have taken it more than that.  I don't know.
8        Q.   Okay.  And I just want to put some
9   specificity around this.  So you found out he was
10  planning to take the bar logically after you found
11  out he hadn't passed the bar yet, true?
12       A.   Of course.  Yes.
13       Q.   Okay.  When?  When did you find out he was
14  going to take the bar?
15       A.   I don't know.
16       Q.   Was it immediately after you found out he
17  didn't have a license, or was it a year or two later?
18       A.    I don't believe it was a year later, but I
19  don't know that it was that day or that month or the
20  following month, but at some point, I knew he was
21  taking the bar.
22       Q.   So you had a conversation with Doctor
23  Simoni and you said, someone just told me that you
24  don't have a law license, and you didn't ask, are you

1    going to fix this and take the bar?  Is that what

2    happened?

3         A.   I don't believe I went to him and said,

4    someone told me.  I may have gone to him and said,

5    hey, Joe, are you a member of the bar?  I don't know

6    that I said, are you going to fix this?  I don't know

7    what there was to fix.  I had signed no agreement

8    with him.

9         Q.   So just out of the blue, you would've gone

10   to him and said, I've become aware you have not

11   passed the bar, and you don't recall saying, you

12   know, we've been working on cases for years and we've

13   been talking about --

14        A.   It wasn't years.

15        Q.   -- splitting fees, and we --

16        A.   This would've --

17        Q.   Let me finish my question.

18             What I'm trying to get to here is, you

19   didn't ask him whether he was going to pass the bar

20   in order for any of these agreements that you

21   proposed and you've discussed, are you telling me

22   that you never asked him whether he was going to pass

23   the bar?

24        A.   I think he may have just volunteered that

1  action.

2      Q.   So you didn't -- you don't think that you

3  asked him, will you pass the bar?

4      A.   I don't know at this point.  This probably

5  was ten years ago.  I don't know.  It was probably

6  longer than ten years ago.  It would've been at the

7  time of the West Virginia case.

8      Q.   Okay.  And that's the 2001 time frame?

9      A.   I think that was it --

10     Q.   Do you know --

11     A.   -- thereabouts.

12     Q.   Do you know all the times that Simoni has

13 ever taken the bar?

14     A.   I don't know.

15     Q.   You have -- you have no knowledge of when

16 he attempted to pass the bar?

17     A.   I can remember him telling me that he had

18 taken it and failed the bar.  I don't know the year.

19 I can remember that, you know, he seemed upset about

20 it.

21     Q.   When you found out that Simoni was a

22 non-lawyer, did you have any concern about sharing

23 confidential information with a person who was not an

24 attorney?

1       A.    Well, he was sharing information with me.

2   I don't know that I shared information with him.

3       Q.    You're telling us it was a completely

4   one-way communication; he would call you up and he

5   would say, I talked to client X today, and you would

6   just listen and then hang up the phone?  Is that what

7   happened?

8       A.    I don't know how many of those

9   conversations there were, but he was --

10      Q.    That's not what I'm asking.  What I'm

11  asking you is --

12                  MR. MARINO:  You know --

13  BY MR. CASH:

14      Q.    -- was --

15                  MR. MARINO:  -- you've got to let him

16  finish.

17                  MR. CASH:  He's not answering my

18  questions.  We can get through this faster --

19                  MR. MARINO:  Well, you still have to

20  let him --

21                  MR. CASH:  We can get through this

22  faster if there aren't interruptions from you or if

23  we can get answers to the questions.

24                  MR. MARINO:  Okay.  I think I've tried

1  not to interrupt.  But if you're not going to let him

2  answer the question, we're going to stop, okay?

3                MR. CASH:  I want to get answers to my

4  questions.

5                MR. MARINO:  All right.  If you

6  interrupt him again, we're going to have to stop.

7                MR. CASH:  Okay.

8  BY MR. CASH:

9      Q.   So my question, again, is, did you ever

10  communicate anything to Simoni about your work,

11  clients, your work product, anything at all?

12     A.   Probably, but I can't give you a specific

13  example.

14     Q.   Okay.  And if you did that and you knew he

15  wasn't an attorney, weren't you concerned you were

16  going to break the attorney/client privilege?

17     A.   There was that concern.  He attended -- he

18  attended many meetings, and this was after the

19  involvement of the outside counsel.

20     Q.   Referring to who?

21     A.   Bob Sweeney, for example.

22     Q.   Or --

23     A.   And it was determined that since he was a

24  union representative -- this is Sweeney's take on it,

1    as I recall -- that that wasn't an issue.

2          Q.   Did you ever -- did you ever bring that

3    issue up with Baron & Budd?

4          A.   I think they brought it up with me and said

5    that he was no longer to attend meetings.

6          Q.   It wasn't something coming from you; it was

7    coming from them?

8          A.   Well, it may have come from me, but I was

9    instructed them to tell him that.

10         Q.   I guess I want to just get some of your

11   story straight here, sir, and I'll try to be brief

12   and summarize where we've been already.

13              When you first met Simoni in the mid-'90s,

14   you believed he was a licensed attorney?

15         A.   I did not meet him in the mid-'90s.  I met

16   him probably in November 1999.  In the mid-'90s, I

17   was in Germany.

18         Q.   Okay.  Well, let's start over.  When you

19   met Simoni in 1999, you believed he was a licensed

20   attorney at that time?

21         A.   I did.

22         Q.   Okay.  And it never occurred to you that a

23   person who is a professor, who was a sociology

24   professor and working at a university might not have

1   a law degree?  You knew he wasn't a law professor.

2        A.   But he was talking about being in law

3   school --

4        Q.   Okay.

5        A.   -- about he and his daughter, I think, were

6   in the same class.

7        Q.   Okay.  All right.  So when you met him in

8   1999, you believed he was a licensed attorney?

9        A.   Yeah.  That -- I -- yes.  That's correct --

10       Q.   Okay.

11       A.   -- as I've stated earlier.

12       Q.   All right.  And you were agreeable to

13  working on litigation with him and splitting your

14  fees with him?

15       A.   I was agreeable to working with Larry

16  Harless, and as such, that would include Joe, as I

17  understood it.

18       Q.   Are you telling --

19       A.   I was reluctant initially to do so because

20  I wasn't interested in remaining in the U.S. for all

21  that much longer.

22       Q.   Are you telling us you were not agreeable

23  to splitting fees with Doctor Simoni?

24       A.   I was, yes.

1      Q.   Okay.  That was my question.

2      A.   Sorry.

3      Q.   Okay.  And in fact, you went forward with

4  Simoni and Harless talking about this, to the extent

5  that Harless drafted a fee agreement, where you would

6  split the fees between you and Simoni?

7      A.   That's correct.

8      Q.   Why didn't you sign that agreement?

9      A.   Because Larry at that point was not

10  physically or mentally able to proceed.  Things sort

11  of just languished.

12      Q.   Okay.  But if Larry wasn't available,

13  wasn't physically or mentally capable of making the

14  agreement, why were you negotiating the agreement

15  with Larry?

16      A.   Well, initially -- I didn't negotiate with

17  him.  He just told me, this is what the deal is; I

18  want you to help me.

19      Q.   He drafted an agreement?

20      A.   Yeah.  I think I may have helped him with

21  the wording.

22      Q.   Okay.  Have you seen that agreement?

23      A.   Have I seen it?  Well, of course, I've seen

24  it.

1      Q.   Okay.  But you told us earlier you no

2   longer have it?

3      A.   I saw it at the time that it was done.  I

4   helped him, I think -- I gave him a few, you know,

5   phrases to put in the agreement.

6      Q.   Okay.  So even though you negotiated the

7   agreement, you were amenable to negotiating the

8   agreement and helping him draft it, you chose not to

9   sign it?

10               MR. MARINO:  Objection.  You've

11   misstated the testimony.

12               You can answer.

13      A.   There was no negotiating.  I think I've

14   made that clear.  There were no negotiations.  Larry

15   said to me, I would like your help; someone has --

16   someone must step up and help these people, and I

17   need your help.  There was no negotiating.  He's a

18   friend of mine.  He just said, here's what I'm

19   prepared to do; I need your help.

20      Q.   Okay.  So he goes --

21      A.   So I wasn't taking advantage of him, that

22   the guy was mentally incompetent, you know, I'm

23   trying to negotiate a deal with him.  That was not

24   what was going on.

1        Q.   Okay, okay.  But so he goes to the trouble

2    of drafting an agreement with you which you don't

3    sign, true?

4        A.   That's right.

5        Q.   Okay.

6        A.   I may have seen it once, and then he -- the

7    guy disappeared.

8        Q.   Okay.  And then you and Doctor Simoni

9    continued to work on the West Virginia University

10   asbestos litigation anyway, true?

11       A.   Correct.

12       Q.   And then one day somebody comes up to you

13   or tells you somewhere -- and you can't remember who

14   it is -- that, by the way, Doctor Simoni doesn't have

15   a law license, true?

16       A.   Yes.

17       Q.   And you're -- you were surprised by that

18   because you had thought he did have a license, right?

19       A.   Right.

20       Q.   At that time, did you make it clear to

21   Doctor Simoni, hey, you can't get paid for your work

22   as an attorney; let's just shake hands and walk away

23   from each other at this point, because it would be

24   unethical for me to pay you fees in any case?  Did

1  you have that conversation with Doctor Simoni?

2            MR. WAKEFIELD:  Object to the form.

3       A.   Not to that extent.

4       Q.   Did you ever have a conversation like that

5  where you said, we can't split fees; we're going to

6  have to terminate our relationship here?

7       A.   I never said that to him.

8       Q.   No.  You kept working with Doctor Simoni on

9  different litigations for years after that; didn't

10  you?

11      A.   After what?

12      Q.   After you found out he wasn't an attorney.

13      A.   Correct.

14      Q.   Okay.  Now, you told us earlier that you

15  had to go to Sherri Goodwin, who is an expert on

16  ethics, to get an opinion as to whether it was good

17  practice to keep working with Doctor Simoni --

18            MR. MARINO:  Object to the --

19  BY MR. CASH:

20      Q.   -- is that true?

21            MR. MARINO:  Object to the form of the

22  question.  That misstated the testimony again.

23      A.   I didn't --

24            MR. MARINO:  You can answer.

1      A.   I didn't say that, but I did talk to Sherri
2   Goodman on numerous issues concerning all these
3   cases.
4      Q.   Did you talk to her about the ethical
5   implications of continuing to work with Joe Simoni?
6      A.   I don't know if I phrased it that way, but
7   I know I've spoken to her about his involvement.
8   Yes.
9      Q.   Now, earlier you told us that you got an
10  opinion from her as to West Virginia, true?
11     A.   I don't know that I said it was West
12  Virginia.
13     Q.   Okay.
14     A.   I had opinions from her like in general.
15  Can this man be paid --
16     Q.   Okay.  And earlier --
17     A.   -- how can this be?
18     Q.   Earlier you said you got an opinion as to
19  each one of the three cases, the West Virginia
20  University --
21     A.   No.  I don't think I said that.
22              MR. MARINO:  Well, objection.
23  BY MR. CASH:
24     Q.   You did not --

1           MR. MARINO:  You're misstating the

2  testimony again.

3  BY MR. CASH:

4       Q.   You did not get an opinion as to --

5       A.   Not --

6       Q.   -- the Spelter litigation in particular?

7       A.   Oh, with Spelter, at the end, yes, we were

8  talking to her.

9       Q.   Okay.  Did you --

10      A.   But --

11      Q.   -- get an opinion as to the Fairmont

12 litigation?

13      A.   I don't think so.

14      Q.   Did you need to get ethics opinions from an

15 ethics expert in order to figure out that you can't

16 split fees with a non-lawyer?

17      A.   No.

18      Q.   Now, you said earlier that Simoni was

19 probably a little sharper than you were on ethics

20 law, he had just completed law school and he'd taken

21 an ethics course more recently than you; is that

22 true?

23      A.   I didn't say he was sharper.  I said he had

24 had the course more recently than I had.  I don't

1    know that that makes him sharper, but certainly, he

2    was aware of the constraints.

3         Q.   You had full confidence he understood the

4    contours of ethics law and that he knew he couldn't

5    receive an attorney fee as a non-attorney?

6         A.   I can't say I had full confidence.  I don't

7    know what he was thinking.

8         Q.   Okay.  But it's clear in your mind that he

9    knew he couldn't receive a fee because he was a

10   non-lawyer?

11                  MR. WAKEFIELD:  Object to the form.

12                  MR. MARINO:  Object to the form --

13   BY MR. CASH:

14        Q.   Is that true?

15                  MR. MARINO:  -- of the question.

16        A.   I don't know what he thought.

17        Q.   Do you think, since he had had a recent

18   ethics course, that he would need an ethical opinion

19   to know that a fee split deal between a lawyer and a

20   non-lawyer is an illegal act?

21                  MR. WAKEFIELD:  Object to the form of

22   the question.  You're asking what somebody else

23   thinks.

24        A.   I don't know what -- I don't know.

1      Q.  Did you ever tell him that?

2      A.  Well, I think just in talking we both knew

3  that.  I mean --

4      Q.  So you --

5      A.  -- we knew that, but we're talking -- or

6  I'm talking to Sherri Goodman to see how can he be

7  paid, can he be paid?  Now, in the WVU case, he was

8  the union representative and he ultimately became a

9  plaintiff, so he could not be.  I think that's pretty

10  clear.  Now, whether he knew that, I don't know, but

11  I don't think he's the sort of fellow that wants to

12  do something that's unlawful.

13      Q.  But you --

14      A.  I don't think he would do that.

15      Q.  You told him, true or false, that Goodwin's

16  opinion was a non-lawyer cannot get a fee?

17            MR. WAKEFIELD:  Object to the form.

18      A.  Oh, I think I may have told him that at

19  some point.  I don't know that I initially told him

20  that.  I think -- I suspect that he knew that.

21      Q.  Did you tell him that?

22      A.  At some point, yes, I'm sure I did.

23      Q.  So your feeling was that Simoni was

24  essentially just doing all this legal work on a

1    gamble, a gamble that maybe he would get a license

2    and maybe it would be ethical to pay him for this

3    work, but if those things didn't come true, he was a

4    volunteer, but if they did come true, he could be

5    looking at splitting fees?

6         A.    Well --

7              MR. MARINO:  Object to the form of the

8    question.

9              You can answer if you understand it.

10        A.    Yeah, I'm not sure I do.

11             But I think Joe is the sort of guy that

12   would've worked on these cases no matter what because

13   he was there to help the people.  That's his career.

14   He's very active in community -- in communities,

15   various communities.  I don't know his full

16   background, but that's my understanding, that he

17   takes on causes.  He is motivated by -- you know, he

18   wants to provide assistance to people who can't

19   afford it.

20        Q.    You're telling us it was clear to Simoni

21   that there was a possibility he would not get paid?

22        A.    I don't know if it was clear to him or not.

23        Q.    All right.  Well, you told me earlier that

24   you told him that the ethics opinion was that a

1    non-lawyer couldn't get paid, and you told me that

2    everybody knows that a lawyer can't get -- a

3    non-lawyer can't get legal fees and you don't even

4    need an ethics opinion for that.  Do you remember

5    just saying that?

6                    MR. MARINO:  Object to the form of the

7    question.  You've misstated --

8        A.    That everyone knows?  I --

9                    MR. MARINO:  Wait a minute, wait a

10   minute.

11               You're misstating the testimony again.

12                   MR. WAKEFIELD:  Yeah.  And I object to

13   the form too.  It misstates what the law is.

14       A.    Well, I don't think everyone knows that,

15   and I don't think I said everyone does, and if I did,

16   I misspoke, because I'm sure there are people outside

17   this room, and possibly inside this room, that don't

18   know that.

19       Q.    You knew that?

20       A.    That's --

21                   MR. MARINO:  Object to the form of the

22   question.

23               You can answer.

24       A.    Did I know that?

1      Q.   You -- it was crystal clear to you that a
2  non-lawyer could not get a fee, true?
3      A.   A fee?
4      Q.   Yes.
5      A.   I thought so.  Yes.
6      Q.   Okay.  There was no doubt about that?
7      A.   Well, I don't know if there's a doubt.
8      Q.   Well, there is -- well, there is --
9      A.   Because I'll tell you --
10     Q.   What doubt is there?
11     A.   -- the doubt.
12     Q.   Okay.
13     A.   The doubt would be is he -- if he later
14  become -- became licensed --
15     Q.   Now, I'm asking you about --
16     A.   Well --
17          MR. MARINO:  You know, you've got to
18  let him answer the question.
19     A.   Oh, a non-lawyer?
20          MR. MARINO:  Wait a minute.
21       You know, can you -- only one person at a
22  time can talk, okay?  And you've got to let him
23  finish.  We're not going to have a deposition if you
24  keep interrupting him.

1          Why don't you -- wait for a question, Gary.

2    BY MR. CASH:

3          Q.   Was there any doubt at all that a

4    non-lawyer like Joe Simoni could not get an attorney

5    fee?

6          A.   It was pretty clear to me that he couldn't

7    if he remained unlicensed.

8          Q.   But yet, while this is going on, you know

9    that it's Simoni's belief that if he got licensed and

10   if it were ethical, perhaps he could get a fee?

11         A.   Perhaps.  Or quantum meruit, some hourly

12   rate.  In fact, I had this discussion with others.

13   And it was said to me, well, he's like any other

14   vendor; he should be able to get something.

15         Q.   Did you ever tell the Levin Papantonio law

16   firm that Simoni believed he could have an

17   expectation of splitting fees with you?

18                MR. MARINO:  Object to -- you're

19   misstating the testimony again.

20           You can answer if you understand him.

21         A.   I'm sorry.  Can you repeat the question?

22         Q.   Sure.

23           You just said you knew Simoni believed

24   there was a possibility that if he got licensed and

1  if it were ethical that he could be a participant in

2  a fee split arrangement with you, true?

3     A.   True.

4     Q.   Did you ever tell the Levin Papantonio law

5  firm that Simoni had a belief he could be possibly

6  splitting a fee with you?

7     A.   No.

8     Q.   Did you ever tell The Cochran Firm that

9  Simoni had a belief he could be splitting fees with

10  you?

11     A.   No.  I didn't think it was material.

12     Q.   Did you ever tell the Levin Papantonio law

13  firm that it was your plan someday to keep Harless

14  and Simoni in the case and you go off to Saudi Arabia

15  and leave the two of them running the show here?

16     A.   No.

17     Q.   And you never told that to The Cochran

18  Firm?

19     A.   No.

20     Q.   Now, you came to the Levin Papantonio law

21  firm in 2002 with the Spelter case, true?

22     A.   I believe that's the year.

23     Q.   All right.  And at that time, you knew

24  Simoni was in the picture and that he had a possible

1  expectation of a fee split at that time?

2      A.   Correct.

3                 MR. MARINO:  Object to the form of the

4  question.

5  BY MR. CASH:

6      Q.   But when you came to the Levin Papantonio

7  law firm, you didn't disclose that?

8                 MR. MARINO:  Object to the form of the

9  question.

10            You can answer if you understand.

11      A.   No, I did not.

12      Q.   Okay.  Now, you came to Levin Papantonio

13  approximately in January 2002?

14      A.   I don't know.

15      Q.   Okay.  You had meetings continuing into

16  2002 and 2003 continuing to discuss compensation with

17  Simoni; didn't you?

18      A.   I'm not certain.

19      Q.   Would you like me to show you your

20  pleadings where you say you did?  I got them.

21      A.   I'm sure you do.

22      Q.   Okay.

23      A.   If you like, but I take your word if you

24  say I did.

1        Q.   Well, let's just look at it.  Paragraph 41

2    of your answer, you say, plaintiffs --

3                 MR. WAKEFIELD:  Now, wait a minute.

4    BY MR. CASH:

5        Q.   -- that's you --

6                 MR. WAKEFIELD:  Wait a minute.  Can we

7    get access to the document first?

8                 MR. CASH:  Sure.  It's Pleading

9    No. 36.

10                 MR. MARINO:  Can you -- would you mind

11    showing it to the witness?

12                 MR. CASH:  I'm just going to read it

13    to him, Dan.

14                 MR. MARINO:  Well, I'd prefer you show

15    it to him so he can put it in context, rather than

16    you just reading selected parts.

17                 MR. CASH:  I'm going to do it my way.

18                 MR. MARINO:  Do it your way.  It's

19    your deposition.

20    BY MR. CASH:

21        Q.   All right.  Mr. Rich --

22                 MR. WAKEFIELD:  Which is it now?

23                 MR. CASH:  Paragraph 41 of

24    Document 36.

1    BY MR. CASH:

2         Q.   Now, you filed an answer in this case?

3         A.   Yes.

4         Q.   Okay.  And you -- and you filed a

5    third-party complaint against the Levin Papantonio

6    firm, The Cochran Firm, and Baron & Budd, right?

7         A.   Correct.

8         Q.   Okay.  And that's the document that you're

9    looking at here?

10                   MR. MARINO:  Who's looking at?

11        A.   I -- that -- I am assuming you're looking

12   at it.  I'm not looking at it.

13        Q.   Did you read your answer before it was

14   filed?

15        A.   Yes.

16        Q.   Okay.  All right.  So in your answer, you

17   say, plaintiffs -- and that's you, isn't it, you're a

18   plaintiff in this case?

19        A.   Correct.

20        Q.   -- admit that Doctor Simoni met with

21   Mr. Rich and others in his office in April 2002;

22   plaintiffs further admit that Mr. Rich discussed with

23   Doctor Simoni the potential for him to receive

24   compensation for his time as part of the fees

1   recovered in the case if Doctor Simoni became a

2   licensed attorney, if he did work on the case, if he

3   conducted himself in accordance with the Rules of

4   Professional Conduct, and if it was otherwise lawful

5   and ethical.  That's in your answer; isn't it?

6        A.   I believe it was.  Yes.

7        Q.   Okay.  Now, that's after you came to the

8   Levin Papantonio law firm, isn't it, April 2002?

9        A.   I believe so.

10       Q.   Did you tell the Levin Papantonio law firm

11  about this conversation?

12       A.   I did not.

13       Q.   Did you tell The Cochran Firm about this?

14       A.   I did not.

15       Q.   If we look ahead in this document, later it

16  says, plaintiffs admit that Mr. Rich --

17            MR. WAKEFIELD:  Where are you

18  referencing?

19            MR. CASH:  I'm sorry.  Paragraph 43.

20            MR. WAKEFIELD:  43?

21            MR. CASH:  Yeah.

22  BY MR. CASH:

23       Q.   If we -- if we look ahead to Paragraph 43,

24  you say, plaintiffs admit that Mr. Rich and Doctor

1    Simoni discussed the matter of his potential

2    compensation in 2003 in Waynesburg, Pennsylvania,

3    again with Mr. Rich stating that -- it goes on to say

4    if it were ethical, basically.

5              Did you discuss having compensation be paid

6    to Doctor Simoni in 2003 in Pennsylvania?  Is that

7    what you said in your answer?

8         A.   Yes.

9         Q.   Did you tell anyone about that

10   conversation?

11        A.   Anyone meaning?

12        Q.   Did you tell the Levin Papantonio law firm

13   about that?

14        A.   No.

15        Q.   Did you tell The Cochran Firm about that?

16        A.   No.

17        Q.   Later on in your answer, Doctor Simoni also

18   alleges that you had a meeting with Doctor Simoni in

19   Star City, West Virginia.  Do you recall that

20   meeting?

21        A.   I do.

22        Q.   Do you remember when that was?

23        A.   Not the specific date.  No.

24        Q.   Okay.  You said it was in June of 2005 in

1    your answer.

2                    MR. MARINO:   What are you referring to

3    now?

4                    MR. CASH:   It's Paragraph 52.

5    BY MR. CASH:

6        Q.   Do you remember that conversation?

7        A.   Some of it.  Yes.

8        Q.   Did you discuss compensation for Simoni at

9    that time?

10       A.   Yes.

11       Q.   Did you tell the Levin Papantonio law firm

12   about that?

13       A.   I did not.

14       Q.   Did you tell The Cochran Firm about that?

15       A.   I did not.

16       Q.   And that was over three years after you

17   first approached the Levin Papantonio law firm to

18   work on this same case; isn't it?

19       A.   Correct.

20       Q.   Were there other conversations after you

21   came to Levin Papantonio law firm after you started

22   the Spelter litigation where you discussed with

23   Doctor Simoni the potential of a fee split with

24   Doctor Simoni?

1       A.    Other than the ones you've just mentioned?

2       Q.    Other than the three that you pled and

3   swore to in your answer.

4       A.    I think there were a few others.  Yes.

5       Q.    Would you -- would you like to go over some

6   of them with me?

7                   MR. MARINO:  Does he have a choice?

8   I'd rather not go over them if we have a choice.

9                   MR. CASH:  Well, I'm curious about

10  them, so I think they're important.

11                  MR. MARINO:  Well, why don't you just

12  ask questions about them?  I mean, it's not like a

13  senate hearing or something.

14                          -----

15                  (Discussion off the record)

16                          -----

17                  (Exhibit No. 3 marked for purposes of

18  identification.)

19                          -----

20                  MR. MARINO:  Is this one copy?

21                  MR. CASH:  Ms. Mason has some copies.

22  BY MR. CASH:

23      Q.    This is --

24                  MR. MARINO:  Okay.  Wait a --

1    BY MR. CASH:

2          Q.   -- Exhibit 3 for the --

3                    MR. MARINO:  Just a second.  Let me

4    just see what we've got.  Is this a two-page

5    document?

6                    MR. CASH:  No, it's a one-page

7    document.

8                    MR. MARINO:  Okay.

9                    MR. CASH:  This is Exhibit 3 for the

10   record.

11                   MR. MARINO:  All right.

12                   MR. CASH:  It's Simoni412, and this

13   comes from the Simoni document production.

14                   MS. MASON:  I provided you with a

15   courtesy copy, Mr. Marino.

16   BY MR. CASH:

17         Q.   Now, Mr. Rich, have you seen this -- these

18   notes before?

19         A.   I have, yes.

20         Q.   When did you see these notes?

21         A.   I'm not sure.

22         Q.   Was it in preparation for this deposition?

23                   MR. MARINO:  You can answer that.

24         A.   Yes.

1        Q.   When did you see these notes?

2        A.   I stated earlier I don't know for sure.

3        Q.   All right.  This is -- this describes --

4  and these notes are from Joe Simoni; aren't they?

5        A.   I believe so.

6        Q.   Okay.  And you and I both got these in this

7  case through Joe Simoni's lawyers; didn't we?

8        A.   That's my understanding.  Yes.

9        Q.   And you see at the bottom there there's his

10  name and a page number that shows he's the one that

11  gave us these notes, right?

12        A.   Correct.

13        Q.   You know how that works.

14        Okay.  At the top here, what does that say

15  at the first line?

16        A.   At the top, it says, meeting with Gary,

17  4/2/02, 3:00 p.m.

18        Q.   Okay.  So this is -- this is a meeting

19  between you and Doctor Simoni on April 2nd, 2002?

20              MR. MARINO:  Objection.  Foundation.

21        You can answer it if you know what this is.

22        A.   I suspect that's what it is.  I don't know

23  for certain, but it would appear to be.

24        Q.   Is this the --

1          A.   We had so many meetings.

2          Q.   Is this the meeting that you pleaded to in

3     your answer that we went over?

4          A.   Are these notes from that meeting?  I can't

5     be certain of that.

6          Q.   Okay.  Well, that meeting was in April of

7     2002 also.  Do you think this is the same?

8          A.   Probably.

9          Q.   Do you remember this meeting?

10         A.   I think there was a meeting.  I can't tell

11    you the specifics of what was discussed at that

12    meeting.

13         Q.   Okay.  Well, do these notes help?  It looks

14    like here under Nancy it says, Spelter and Fairmont

15    both, and then later you can see where it says,

16    Spelter and then it says, Reedsville and then it

17    says, WVU.  And those are all different litigations

18    you worked on with Joe Simoni; aren't they?

19         A.   Correct.

20         Q.   All right.  Now, at the bottom here, what

21    is this here in this box that Doctor Simoni has

22    written?

23              MR. MARINO:  Objection.  Foundation.

24              You can answer it if you understand or know

1   what it is.

2        A.   Do you want me to read it?

3        Q.   Yes, I do.

4        A.   It says, 4:30 p.m., on street, said he was

5   cutting my share to 20 percent, said if I put him at

6   risk again he would come at me physically.

7        Q.   What does it mean here when Doctor Simoni

8   says he was cutting my share to 20 percent?

9                 MR. WAKEFIELD:  Object to the form.

10       A.   I suspect that that has to do with if he

11  becomes licensed that that's what I'd be willing to

12  give him.

13       Q.   Do you -- do you remember that, that that

14  was your deal, 20 percent?

15       A.   I don't recall it.  No.

16       Q.   Could this have been the deal?

17       A.   Could've been, yes.

18       Q.   Is this the 20 percent that Doctor Simoni

19  originally pleaded in this case?

20                 MR. WAKEFIELD:  Object to the --

21                 MR. MARINO:  Objection.  Foundation.

22       A.   Don't know.

23       Q.   It says here, if I put him at risk again he

24  would come at me physically.  Now, he, in this

1  sentence is you; isn't it?

2         MR. WAKEFIELD:  Object to the form.

3     A.   I'm assuming so.

4         MR. MARINO:  Objection.  Foundation.

5  BY MR. CASH:

6     Q.   Did you ever have a conversation with Joe

7  Simoni where you threatened to come at him

8  physically?

9     A.   I don't believe so.  No.

10    Q.   You don't think this happened as it's

11 written here?

12    A.   I don't think I ever threatened him.  I

13 know I was very upset with him at times.

14    Q.   Why were you upset with him at the time of

15 this meeting?

16    A.   I don't know.

17    Q.   Were you?

18    A.   I don't know.

19    Q.   You don't -- you don't recall physically

20 threatening your business partner?

21    A.   Wouldn't call him a business partner, and I

22 don't recall threatening him.  I don't -- I can't

23 remember threatening anyone.

24    Q.   Okay.  Well, it says here that there was a

1  deal for a 20-percent share.  Did you tell Levin

2  Papantonio after this time that you and Simoni had

3  discussed a 20-percent share?

4       A.   No.

5                 MR. WAKEFIELD:  Object to the form.

6  BY MR. CASH:

7       Q.   Did you tell that to Cochran?

8       A.   No.

9       Q.   All right.

10                          -----

11                 (Exhibit No. 4 marked for purposes of

12  identification.)

13                          -----

14  BY MR. CASH:

15       Q.   I'd like to show you another exhibit.  I

16  guess this will be Exhibit 4.  This is -- this is a

17  two-page exhibit.  I'd just like you to take a look

18  at it, and just to help you identify it again, there

19  -- that's -- the handwritten page is --

20                 MR. WAKEFIELD:  Wait a minute.  Wait.

21  BY MR. CASH:

22       Q.   -- page Simoni1338.

23                 MR. WAKEFIELD:  Let me see the copy

24  first before you start talking.

1          MR. CASH:  I'm just identifying it,

2    Jeff.

3    BY MR. CASH:

4         Q.   The handwritten page is Simoni1338, and I

5    want to show you the second page is a typewritten

6    page which is a transcription of the handwriting.

7    And I'll admit I prepared the transcription.  You can

8    use either one.  I would like to know if you could

9    take a look at this, and then let me know when you've

10   had a chance to look at it.

11        A.   Okay.  I've read it.

12        Q.   Okay.  Have you seen the handwritten page

13   before?

14        A.   I have.

15        Q.   And when did you see it?

16        A.   I'm not sure.

17        Q.   Was it in preparation for this deposition?

18        A.   Yes.

19        Q.   Are there other documents that you reviewed

20   in preparation for this deposition that would help us

21   move this along?

22                    MR. MARINO:  Object to the form of the

23   question.

24        A.   I don't know.

1          MR. MARINO:  You can answer if you
2     understand it.

3          A.   I don't know.

4          Q.   Okay.  Is it okay if we use the
5     transcription here, or would you like to use the
6     handwritten version?

7          A.   I --

8          MR. MARINO:  Object to the form of the
9     question.

10         A.   I prefer the transcription.

11         Q.   Me too.

12              Okay.  So this appears to be a letter from
13    Gary Rich -- or I'm sorry -- from Joe Simoni to you,
14    Gary Rich; is that true?

15         A.   I don't know if it's a letter or -- I've
16    not seen it until Joe produced this --

17         Q.   Okay.

18         A.   -- or someone produced it.  I had not seen
19    it before.

20         Q.   We know we got it from Simoni because of
21    the number at the bottom.

22         A.   I don't really see a number at the bottom,
23    but --

24         Q.   It's right here.

1      A.    Oh, there it is.  Yes, yes.

2      Q.    All right.  Well, this certainly does look

3  like a written communication, like a letter.  Are you

4  arguing with me that it's not a letter?  Your name is

5  at the top.  There's a date.  It's paragraphs.  It's

6  a communication from him to you.  True?

7      A.    I don't see a date on the transcription.

8  There's a date, April -- I don't know what it says --

9  April '02.

10      Q.    April '02.

11      A.    Okay.

12      Q.    Same month -- same month that you had --

13  the previous one we just looked at where you had the

14  20-percent share --

15      A.    Yes.

16      Q.    -- and he says you threatened to come at

17  him physically.  It's the same month, right?

18      A.    It appears so.  Yes.

19      Q.    Okay.  And we can go back to it, but if you

20  saw the previous document, he said that that

21  4:30 p.m. meeting was on the street.  Do you remember

22  that?

23      A.    Correct.

24      Q.    Okay.  And then this says here in the

1   letter on Exhibit 4, I'm deeply saddened and

2   disappointed in what transpired yesterday in our

3   meeting on Walnut Street.  Is this -- doesn't this

4   letter describe the same meeting?

5               MR. WAKEFIELD:  Object to the form.

6       A.   It appears to be.  Yes.

7       Q.   Okay.  So he writes here, addressing the

8   issues discussed, I am not in agreement with your

9   suggestion that we change the financial agreement we

10  made together last year; we agreed it would be 50/50,

11  and I do not wish to alter it in any way.  Do you see

12  that?

13      A.   I do.

14      Q.   Did you guys have a 50/50 arrangement?

15      A.   It may have been.

16      Q.   May have been or was?

17      A.   I don't know.

18      Q.   Okay.  When might you have negotiated a

19  50/50 arrangement?

20      A.   I wasn't negotiating with him.  I was

21  telling him --

22      Q.   Okay.

23      A.   -- if he became licensed and came into the

24  case -- there wasn't any negotiating.

1    Q.  You told him if he got licensed and if he

2    came into the case that it would be a 50/50 split on

3    the fees?

4        A.  Possibly, at that point in time.

5        Q.  What point --

6        A.  As --

7        Q.  -- was that?

8            MR. WAKEFIELD:  Objection.

9        A.  I don't know.

10       Q.  Who would know if not you?

11       A.  Possibly Joe.

12       Q.  Anybody else?

13       A.  Not that I can think of.

14       Q.  Any other witnesses to this?

15       A.  No.

16       Q.  Okay.  Did you have a discussion with him

17   in April 2002 about changing it from 50/50 to

18   something else?

19       A.  Well, there was a discussion about what the

20   percentage would be.

21       Q.  Can you tell us what that discussion was?

22       A.  I don't remember it.

23       Q.  You remember there was a discussion, but

24   you don't remember the discussion?

1          A.    No.  I remember looking at the dates, but I

2     don't know what transpired --

3          Q.    Okay.

4          A.    -- during that discussion.

5          Q.    Just 15 seconds ago you said there was a

6     discussion about the fee split.  Now you're saying

7     you don't remember the discussion.

8          A.    Well, I don't remember the specifics.

9                    MR. MARINO:  Objection.  That's not

10    what he --

11         A.    What I said was --

12                   MR. MARINO:  Gary, just a second.

13              You've misstated the testimony again, and

14    you're being argumentative, so I object to it.

15    BY MR. CASH:

16         Q.    Was there a discussion about the fee split?

17         A.    I --

18                   MR. MARINO:  When?  What are we asking

19    about now?  I mean, just --

20         A.    You're talking about the April meeting --

21         Q.    Absolutely.

22         A.    -- of 2002?

23         Q.    Of course.

24         A.    Yes.  I believe there was.

1      Q.   Okay.  Was that discussion to change it

2  from 50/50 to something else?

3      A.   I can't remember the specifics.

4      Q.   Okay.  And we reviewed Joe's note, the

5  previous document where he says, he was cutting my

6  share to 20 percent.

7      A.   No.  I -- of course.  I see that.

8      Q.   But you can't remember whether --

9      A.   That's accurate or not, I cannot.

10     Q.   I guess I have to -- I have to ask a full

11  question so I can get a complete answer.

12          You don't remember whether the discussion

13  in April 2002 actually was to cut it from 50/50 to

14  80/20?

15     A.   I have no recollection at this point.

16     Q.   Okay.  You know, in this -- in this letter

17  from Joe Simoni, he says -- it's at the -- if you

18  look at the fourth paragraph, the one that starts, I

19  was unaware, the last sentence there, he says, we are

20  both learning in this joint venture.  Do you see

21  that?

22     A.   Uh-huh.

23              MR. WAKEFIELD:  Object to the form.

24

1    BY MR. CASH:

2         Q.   What's he talking about there, Mr. Rich?

3                   MR. MARINO:  Objection.  Foundation.

4                   MR. WAKEFIELD:  Object to the form --

5    yeah.  Object to the form, as well.

6         A.   I seem to recall that I told him not to

7    call my house late at night and wake my children up.

8         Q.   Had he done that recently?

9         A.   Recently, meaning?

10        Q.   To this time.

11        A.   At this point in time, in 2002?

12        Q.   Yes.

13        A.   I can't remember whether he had or not.

14        Q.   Okay.

15        A.   But he has this in this document, so I'm

16   assuming it's accurate, but I have no recollection at

17   this point.

18        Q.   When he writes --

19        A.   It's ten years ago.

20        Q.   When he writes, we are both learning in

21   this joint venture, did you consider that you were a

22   joint venturer with him?

23        A.   I did not.

24        Q.   Did you ever tell him, hey, we're not in a

1  joint venture?

2      A.  I don't think he ever used that word.

3      Q.  Did you ever tell my client, the Levin

4  Papantonio law firm, about this 50/50 split?

5      A.  No.

6      Q.  Did you -- did you tell The Cochran Firm

7  about it?

8      A.  No.

9      Q.  Did you tell the Levin Papantonio law firm

10 that you were going to cut the split to 20 percent?

11     A.  No.

12     Q.  And did you tell that to Cochran?

13     A.  No.

14             MR. CASH:  Give me just one second.

15             THE WITNESS:  Sure.

16 BY MR. CASH:

17     Q.  All right.  Mr. Rich, I want to ask you a

18 few questions about your relationship with

19 Mr. Marino.  Can you tell us when he began

20 representing you?

21     A.  Offhand, I don't remember the year.

22     Q.  Was it in connection with any particular

23 event?

24     A.  Yes.

1        Q.    What was it?

2        A.    An issue I had with Baron & Budd and Masry

3    & Vititoe.

4        Q.    What was that issue?

5        A.    The fee split agreement or memorandum of

6    understanding between the firms.

7        Q.    And just so the people will understand,

8    which litigation are we talking about on this

9    particular one?

10        A.    The Westinghouse case.

11        Q.    Okay.  And what was -- what was the

12    substance of the dispute?

13        A.    Well, the -- I had signed an agreement with

14    Masry & Vititoe.  They subsequently brought in Tom

15    Girardi, a lawyer in California.  He then left --

16    like leaving -- he left the case, and I believe he

17    sold his interest to Baron & Budd.

18              And I didn't have a problem with that

19    because my agreement was that I received X percent --

20    I don't remember what it was -- of the fees.  And

21    they brought in Baron & Budd who said, no, that their

22    percentage was 75 percent, I believe and that's what

23    they would be taking.

24              And that exceeded the total of -- my fee

1    may have been 30 percent, and they were taking 75, so

2    that -- you know, that would add up to 105 percent,

3    so there was a problem.

4         Q.   So this was another litigation where you

5    felt like you were being squeezed on fees?

6         A.   Another one?

7         Q.   It's another litigation apart from the ones

8    at issue in this case.

9         A.   Right.  But feeling squeezed, I don't think

10   I ever felt squeezed before that.

11        Q.   So this new arrangement was going to reduce

12   the amount you would've earned?

13        A.   Well, of course.  I mean, if the total adds

14   up to 105 percent, something had to give.  And that

15   didn't include Masry & Vititoe's fee.

16        Q.   Is that when you came to hire Mr. Marino --

17        A.   It is.

18        Q.   -- to represent you in this matter, in the

19   matter involving the dispute surrounding the parties?

20        A.   Yes.

21        Q.   All right.  Okay.  How are you currently

22   paying Mr. Marino for his services in this case?

23        A.   In this case?  Hourly.

24        Q.   What's his rate?

1      A.    I don't know offhand.

2      Q.    Would you be willing to produce documents

3  supporting that number for us?

4      A.    Would I be willing to do so?  Do I have a

5  choice?

6      Q.    I'm just asking you if you'd do it.

7      A.    I don't see how it's relevant.

8      Q.    Well, in your complaint against Levin

9  Papantonio law firm and The Cochran Firm and Baron &

10  Budd is a demand for attorney fees and expenses

11  incurred in this litigation, so it's relevant because

12  you've asked us to pay Mr. Marino's fees and we would

13  like to know how they're computed so we can determine

14  how much they are.  Do you -- do you think that you

15  could produce that contract for us so that we can see

16  what it is?

17      A.    I think I could, yes.

18      Q.    Will you?

19      A.    If it's proper to do so.

20      Q.    Okay.  You don't have a problem doing it,

21  though?

22      A.    I'm not saying that.  I don't know if it's

23  proper.

24      Q.    Do you know how much you've paid to date?

1          A.    I do not.

2          Q.    Can you produce evidence of that?

3          A.    Can I produce evidence that I don't know

4    how much I've paid?

5          Q.    Have you -- have you made payments?

6          A.    Of course.

7          Q.    Okay.  So how do you make your payments?

8          A.    Whenever I get a bill, I pay it.

9          Q.    You write checks?

10         A.    Yes.

11         Q.    Okay.  So those checks would maybe reflect

12   the number of the amount of money that you've given

13   Mr. Marino to defend this case --

14         A.    Of course it --

15         Q.    -- to bring this case?

16         A.    Of course it would.

17         Q.    Okay.  All right.  I want to turn to the

18   memorandum of understanding.

19                   MR. CASH:  Are we up to Exhibit 5?

20                   MR. MARINO:  This is going to be 5?

21                   COURT REPORTER:  It is 5.

22                   THE WITNESS:  It's 5.

23                   MR. CASH:  Thank you.

24

1                              -----

2                    (Exhibit No. 5 marked for purposes of

3      identification.)

4                              -----

5      BY MR. CASH:

6           Q.   All right.  Mr. Rich, if you would, please

7      take a look at that and familiarize yourself with it.

8           A.   (Witness complies with request.)

9           Q.   Okay.  Mr. Rich, have you had a chance to

10     look at Exhibit 5?

11          A.   I've looked it over.  Yes.

12          Q.   Okay.  What is that?

13          A.   It's a memorandum of understanding between

14     the various firms involved in the Spelter litigation.

15          Q.   Is that an accurate copy of the memorandum

16     of understanding?

17          A.   Well, it's not the -- it was amended.  This

18     is not the amended copy, I don't believe.

19          Q.   Is that an accurate copy of the memorandum

20     of understanding?

21          A.   Of the one that was initially signed, I

22     believe so.

23          Q.   Okay.  Did you sign it?

24          A.   Yes.

1        Q.   What was the function of having this
2   memorandum of understanding?
3        A.   Well, to memorialize the -- how we would
4   prosecute the case, an executive committee, how we
5   would handle expenses, the fee split.
6        Q.   And it's a contract; isn't it?
7        A.   Yes.
8        Q.   It's a contract between your firm, Levin
9   Papantonio, and The Cochran Firm, right?
10       A.   Correct.
11       Q.   Okay.  Now, there are certain provisions in
12  this contract I'd like to draw your attention to.
13  Can you turn to page 3?
14       A.   Yes.
15       Q.   Okay.  If you'd look at Paragraph d there,
16  it says, associated counsel; doesn't it?
17       A.   Correct.
18       Q.   I just want to read you a sentence here and
19  then ask if you can -- if you can help us understand
20  it.  It says, with the approval of the EC.  Now,
21  what's the EC?
22       A.   The executive committee.
23       Q.   Okay.  And what was the executive
24  committee?

1    A.    Well, it was comprised of members from the

2    three firms.

3    Q.    Okay.  It's one person from each firm;

4    isn't it?

5    A.    Correct.

6    Q.    And you were one, right?  You were the only

7    -- you were the only person from your firm on the EC?

8    A.    Well, of course.  I'm the only attorney.

9    Q.    And there was an attorney from the Levin

10   Papantonio firm and an attorney from The Cochran

11   Firm?

12   A.    Yes.

13   Q.    A three-person committee?

14   A.    Correct.

15   Q.    Okay.  It says here, with the approval of

16   the EC, a party may associate counsel to assist that

17   party in the performance of its obligations under the

18   MOU.  Do you see that?

19   A.    I do.

20   Q.    And the MOU is this contract, right?

21   A.    Correct.

22   Q.    Okay.  So could any party have brought in

23   additional lawyers without the approval of the

24   executive committee?

1          A.    Reading this, it would appear no.

2          Q.    And this is an agreement you signed?

3          A.    Correct.

4          Q.    You negotiated on this agreement, in fact;

5     didn't you?

6          A.    Yes.

7          Q.    You helped draft this agreement?

8          A.    I helped draft it.

9          Q.    This isn't one that just was drafted and

10    was lost in a file; this is one you drafted and

11    signed and you actually have; right?

12         A.    Yes.

13         Q.    Okay.  So it says here, under this

14    agreement, we would have to get approval from the EC

15    to bring in additional lawyers, right?

16         A.    Yes.

17         Q.    Now, when you were having these discussions

18    we went over with Joe Simoni about him passing the

19    bar and potentially splitting fees with you, wouldn't

20    that qualify him as associate counsel if he was

21    helping you on the case?

22         A.    Yeah.  If he was licensed and I came

23    forward with him.  I don't think that would've been a

24    problem.

1      Q.   Okay.  But if you -- if you did use him for

2   legal work and if you did work with him in the

3   capacity of an attorney and you didn't get permission

4   from the EC, you would've violated this contract;

5   wouldn't you?

6      A.   Yes.

7      Q.   Did you ever get approval from the

8   executive committee to make Joe Simoni associate

9   counsel?

10     A.   Well, of course not.  He never became a

11   licensed attorney that I know of.

12     Q.   Okay.  Let's flip ahead to page 4.  If you

13   look at Paragraph b, it says, definition of fee or

14   expense award, right?

15     A.   Yes.

16     Q.   Okay.  Now, at the end of -- it was

17   contemplated at the end of this case there would be

18   an award from the court as to attorney fees and costs

19   for winning the Spelter case, right?

20     A.   Yes.

21     Q.   That's what this paragraph describes?

22     A.   Correct.

23     Q.   Okay.  If you look at the end, it says, all

24   parties agree to submit their time and expenses as

1  needed for court awards.  Do you see that?

2       A.    Yes.

3       Q.    Did you ever submit any time or expenses on

4  behalf of Joe Simoni?

5       A.    Definitely not.

6       Q.    If Joe Simoni was working for you and you

7  had an arrangement to pay Joe Simoni after he passed

8  the bar and you didn't submit that evidence of that

9  to the executive committee, you would've -- you

10  violated this provision; didn't you?

11      A.    If that had all come to pass, yes.

12      Q.    It's your contention in this case, by

13  filing a third-party complaint against the three law

14  firms, the Levin Papantonio firm, The Cochran Firm,

15  and Baron & Budd, essentially your contention is if

16  you have to pay Joe, then we have to pay you, true?

17  That's your -- that's the basis for your third-party

18  case?

19      A.    Your share, yes.  The pro rata share.

20      Q.    How do you compute the share?

21      A.    It would be based, in my mind, on the

22  percentages set forth in this agreement, which on --

23  relative to the fee split.

24      Q.    So if it's determined that Joe Simoni did

1  X amount of work, then the Levin Papantonio firm
2  should pay 37 1/2 percent of X?
3      A.   Yes.
4      Q.   And you will pay 25 percent of X?
5      A.   Well, yeah.  Of course, that doesn't take
6  in the accounting of the parties.  There were other
7  firms getting certain percentages as well.  I'm not
8  sure how it would be computed.
9      Q.   Okay.  Well, can you tell us?  What --
10     A.   I just said I don't know how it would be
11 computed.
12     Q.   What information would be needed to do
13 that?  I mean, can you -- are you referring to the
14 amended MOU?
15     A.   I don't think that would actually provide
16 us with anything.
17     Q.   Oaky.  Well, what facts or documents are
18 you going to rely on when you try to apportion
19 liability against us, the third-party defendants?
20     A.   I haven't thought of that at this point.
21     Q.   You've sued us, but you don't know what the
22 basis for our liability is going to be?
23     A.   Well, I just said, I think it's based on --
24 or I would expect it to be based on the percentages

1    set forth in the MOU.

2        Q.   And you'll live with that as a -- if it's

3    determined that you're liable to Joe Simoni, you're

4    going to live with the percentages in this agreement?

5        A.   If that's proper.

6        Q.   Okay.  And you can't tell what it would

7    take to determine whether that's proper or not right

8    now?

9        A.   That's right.

10       Q.   Okay.  I guess I'm just -- I'm just

11   troubled because I don't get to defend people a lot,

12   but I don't know what our liability is going to be if

13   you can't tell me how -- what math would you use?

14   Are you -- are you going to submit yourself to the

15   MOU, or is there going to be some other formula that

16   would satisfy you in this third-party lawsuit you

17   filed against my client?

18       A.   Well, I want to do what's fair and what's

19   proper, and if it's determined that these percentages

20   are the correct ones, then that's fine.

21       Q.   If somebody made an argument that the Levin

22   Papantonio law firm should pay more than its share

23   because it had more interaction with Professor

24   Simoni, Doctor Simoni than anybody else, would that

1  be fair?

2      A.   I could see where someone would argue that.

3  I haven't given any thought to it.

4      Q.   You're not arguing that today?

5      A.   I'm not arguing anything today.

6      Q.   Okay.  You don't know how you would

7  apportion liability?

8      A.   At this point, no.  Because I don't know

9  all the facts.

10      Q.   What facts are you looking for, sir, to

11  help figure that out?

12      A.   I'd have to know what Joe has done.  I

13  don't know what he did --

14      Q.   Is it -- is it your argument that --

15      A.   -- and who he did them for.

16      Q.   Is it your argument that if my firm spent

17  the most amount of time with Simoni we should have to

18  pay the most?

19      A.   That -- I could see one making that

20  argument.  I'm -- as I said earlier, I'm not saying

21  that today.  I haven't thought it through.  I haven't

22  given thought to that.

23      Q.   You're not fully aware of what Simoni has

24  done in this case?

1      A.    Of course not.

2      Q.    Okay.  Have you seen his time summary?

3      A.    I saw what he -- what he submitted.  Yes.

4      Q.    Did you have any disagreement with his

5  statements on the time summary?

6      A.    Yes.

7      Q.    Doesn't the memorandum of understanding

8  contemplate that all the parties are going to be

9  jointly liable if there are damages?  Did you read it

10  that way?

11      A.    Jointly liable if there are damages?  Well,

12  there's an indemnification clause in the MOU.

13      Q.    Are you --

14      A.    But --

15      Q.    -- asserting that clause in this

16  litigation?

17      A.    I believe it actually pertains to

18  malpractice is what I suspect.  And again, I'm not

19  here to render legal opinions.  I think I'm a fact

20  witness today, and I really haven't -- I haven't

21  looked at this MO -- MOU in quite some time.

22      Q.    All right.

23            MR. CASH:  I think we're going to take

24  a break here.

1            THE WITNESS:  All right.

2            VIDEOGRAPHER:  We're going off the

3    record.  The time is 2:03 p.m.

4                    -----

5            (Brief break)

6                    -----

7            VIDEOGRAPHER:  We're back on the video

8    record.  The time is 2:11 p.m.

9    BY MR. CASH:

10       Q.   Mr. Rich, I just had one last question for

11   you.  If you thought that the third-party defendants

12   in Spelter were incurring liabilities because they

13   were working with Doctor Simoni, did you ever

14   complain to them and say, hey, you're running up a

15   bill for Doctor Simoni and you're increasing our

16   liabilities to Doctor Simoni?

17            MR. MARINO:  Objection.  Assumes facts

18   not in evidence.

19            You can answer.

20       A.   Third-party -- I'm not sure what you mean

21   by that.

22       Q.   If you -- it's the basis for your

23   third-party complaint against Levin Papantonio and

24   The Cochran Firm, that their actions in this case led

1  to increased liabilities to Joe Simoni by virtue of

2  consuming his work product, his energies, his time.

3  That's your contention; isn't it?

4      A.  Yes.  And I didn't know what all was going

5  on there.

6      Q.  Did you ever complain to Levin Papantonio

7  or Cochran saying that those firms' efforts were

8  running up a bill to Simoni?

9      A.  No, I did not.

10      Q.  Did you ever tell those firms to stop

11  working with Simoni to cease the increasing

12  liabilities that you now assert against those firms

13  in this case?

14              MR. MARINO:  Object to the form of the

15  question.

16          You can answer.

17      A.  I did not.

18      Q.  Okay.

19              MR. CASH:  I think those are all the

20  questions I have for Levin Papantonio right now.

21  Thank you for your time, and I'd like to pass you to

22  Mr. Wakefield.

23

24

1                          -----

2                       EXAMINATION

3    BY MR. WAKEFIELD:

4        Q.   Good afternoon, Mr. Rich.  I've introduced

5    myself to you before.  I'm Jeff Wakefield.  I

6    represent Doctor Simoni.

7             You notice that Doctor Simoni is sitting

8    here this afternoon?

9        A.   I do.

10       Q.   Do you agree that Doctor Simoni is entitled

11   to reasonable compensation for the contributions he

12   made to the Spelter litigation?

13       A.   I think Joe is entitled if it's proper, if

14   it's legal.  I think he made a contribution.

15       Q.   And do you also agree that Joe Simoni is

16   entitled to reasonable compensation for the

17   contributions he made to the Philips/Westinghouse or

18   Fairmont litigation?

19       A.   I do.

20       Q.   I want to direct your attention, Mr. Rich,

21   to the declaratory judgment complaint that was filed

22   on behalf of you and the Law Office of Gary W. Rich

23   in the United States District Court for the Northern

24   District of West Virginia.

1      A.    Okay.

2                 MR. MARINO:   Thanks.

3      A.    Yes.

4      Q.    I want to direct your attention in

5   particular to Paragraph 11 of that complaint.

6      A.    Yes.

7      Q.    The first sentence of that paragraph

8   states, on various occasions, Plaintiff Rich and

9   other attorneys involved in the Fairmont litigation

10  and the Spelter litigation had discussions with

11  defendant about the possibility that he could be

12  compensated for his contributions to those cases.  Do

13  you see that?

14     A.    Yes.

15     Q.    And defendant, as referenced in

16  Paragraph 11, would be Joe Simoni?

17     A.    Correct.

18     Q.    Okay.  What other attorneys involved in the

19  Fairmont litigation had discussions with Joe Simoni

20  to your knowledge about the possibility that Simoni

21  could be compensated for his contributions to that

22  case?

23     A.    Well, I don't -- looking at this today, I'm

24  not sure why that would say with the defendant.  I

1   had discussions with other attorneys in both cases

2   concerning payments to him, but I'm not sure that

3   other attorneys did.  I don't know.

4          I mean, I know that there was conversations

5   between your -- well, I don't know this.  I've been

6   told there were conversations between you and members

7   of the other firms, so if that -- you know, I don't

8   know it for a fact, but that's my understanding.

9      Q.   As we sit here this afternoon, you're not

10   aware specifically of other attorneys involved in the

11   Fairmont litigation who had discussions with Joe

12   Simoni about being compensated; is that a fair

13   statement?

14      A.   Unless Cary McDougal of Baron & Budd did.

15   I don't know.

16      Q.   Did that person ever advise you that they

17   had discussions with Joe Simoni about being

18   compensated in the Fairmont litigation?

19      A.   When you say Joe Simoni, you mean yourself

20   as his representative?

21      Q.   Yes.  Anyone, either Mr. -- either Doctor

22   --

23      A.   Or your --

24      Q.   -- Simoni or someone acting on his behalf.

1      A.   On his behalf.  I'm not certain about

2  Baron & Budd.  I believe so, with regard to the other

3  firms in the Spelter case.

4      Q.   Okay.  And now, I want to limit my question

5  right now to just the Fairmont litigation.

6      A.   Yes.

7                   MR. WAKEFIELD:  Excuse me.

8  BY MR. WAKEFIELD:

9      Q.   The Baron & Budd firm was involved in the

10  Fairmont litigation?

11      A.   Correct.

12      Q.   To your knowledge, did any attorney for

13  Baron & Budd communicate with Joe Simoni about

14  Mr. Simoni or Doctor Simoni being compensated for his

15  contributions to that case?

16      A.   Well, I think Scott Summy of Baron & Budd

17  talked to Joe at one point about him working with

18  them.  I don't know the nature of -- I can't say

19  conclusively they talked about compensation.

20      Q.   How did you learn that that individual

21  spoke to Doctor Simoni?

22      A.   I think Joe told me.

23      Q.   Did Doctor Simoni tell you what it was that

24  individual said?

1          A.   He probably did, but I don't remember at

2     this point in time.

3          Q.   Did anyone at Baron & Budd ever tell you

4     that they had spoken to Doctor Simoni about

5     compensating him for his work in the Fairmont

6     litigation?

7          A.   I seem to recall that Cary McDougal was

8     talking in those terms, that should be compensated or

9     there -- is there a basis for compensating him?  He

10    seemed most concerned about it.

11         Q.   Okay.  I take it that -- is this someone

12    with Baron & Budd?

13         A.   Yes.

14         Q.   And my understanding, that this person on

15    behalf of Baron & Budd indicated that Doctor Simoni

16    should be compensated for the contributions he made

17    to the Fairmont litigation?

18         A.   Or that it should be taken into

19    consideration.

20         Q.   Did this individual ever indicate how much

21    compensation?

22         A.   No, did not.

23         Q.   Did anyone from the Masry Vitoe --

24         A.   Vititoe.

1      Q.    -- Vititoe firm ever tell you that they had

2   had discussions with Doctor Simoni about him being

3   compensated for his contributions to the Fairmont

4   litigation?

5      A.    No.

6      Q.    Did Doctor Simoni ever tell you that he had

7   had conversations with anyone at the Masry firm about

8   being compensated for his contributions to the

9   Fairmont litigation?

10      A.    No.

11      Q.    Did anybody in the Masry firm ever advise

12   you that they were of the belief that Doctor Simoni

13   should be compensated for his contributions to the

14   Fairmont litigation?

15      A.    I know there were people there who thought

16   that he was a key player in all this.

17      Q.    And who were those people?

18      A.    I would say Nancy Eichler thought that.

19      Q.    Anyone else?

20      A.    No other attorneys that I can think of.

21      Q.    Did Ms. Eichler ever advise you or tell you

22   that she felt that Doctor Simoni should be

23   compensated for his contributions to the Fairmont

24   litigation?

1     A.    I can't -- I just don't remember.

2     Q.    Okay.  Did --

3     A.    I wouldn't be surprised if that had been

4  said.

5     Q.    She certainly advised you or indicated to

6  you that she felt Doctor Simoni had in fact

7  contributed to that Fairmont litigation?

8     A.    I don't know if she quite said it like

9  that, but yes, I think that particular firm thought

10  that Joe was a valuable contributor and he had done

11  quite a bit of work for them, as I remember.

12     Q.    And was that communicated to you, that

13  Doctor Simoni had been a valuable contributor?  Was

14  that communicated to you on more than one occasion?

15     A.    Probably.

16     Q.    Do you recall having that discussion with

17  anyone at the Masry firm other than with Ms. Eichler?

18     A.    No.

19     Q.    What about Melissa Dutcher?

20     A.    Melissa Dutcher is not an attorney, but I

21  think she held Joe in high esteem.

22     Q.    Did she ever communicate with you about her

23  views of Joe's contributions to the Fairmont

24  litigation?

1      A.   I suspect she did, but I can't sit here and
2  tell you specifically, you know, when it was, what
3  she said, but I would think so.  Yes.
4      Q.   Okay.  Did anyone with Baron & Budd ever
5  say to you to the effect that they also felt that
6  Doctor Simoni was a substantial contributor to the
7  Fairmont litigation?
8      A.   I don't know that anyone has used the word
9  substantial.
10      Q.   Did anyone from Baron & Budd ever
11  communicate to you in a manner which led you to
12  believe that the person from Baron & Budd felt that
13  Doctor Simoni was a substantial contributor to the
14  Fairmont litigation?
15      A.   I'm sorry.  I -- could you repeat that?
16      Q.   Sure.
17           Did anyone at Baron & Budd ever say
18  anything to you which led you to believe that the
19  person at Baron & Budd felt that Doctor Simoni had
20  been a substantial contributor to the Fairmont
21  litigation?
22      A.   That's my impression, but I can't remember
23  anyone specifically stating that.
24      Q.   But it was an impression that you gathered

1    in discussions you had with Baron & Budd individuals,

2    correct?

3         A.   Yes.

4         Q.   Now, let's talk about the Spelter case.

5    Did any attorney working on the Spelter litigation

6    ever, to your knowledge, have discussions with Doctor

7    Simoni about compensating Doctor Simoni for his

8    contributions to that case?

9         A.   Well, I think that they had spoken to you

10   concerning this, but I don't know the nature of the

11   conversations.

12        Q.   Okay.  Let's be specific with a couple of

13   the firms involved in the Spelter case.  To your

14   knowledge, did anyone at the Levin firm ever

15   communicate with Doctor Simoni about whether he

16   should be compensated for his contributions to the

17   Spelter litigation?

18        A.   I believe so.  Yes.

19        Q.   Who at the Levin firm had those

20   communications?

21        A.   I know -- I don't know if it was Farrest or

22   if it was Ed Hill who also had received the letter

23   concerning payment.  I think all the firms had

24   received the letter, and it may have been that Ed

1  Hill was the person speaking on behalf of all the
2  firms.  I don't know.
3       Q.   Okay.  Did you have conversations with
4  Mr. Hill about whether Doctor Simoni should be
5  compensated?
6       A.   I've never spoken to Mr. Hill.
7       Q.   Backing up to the Levin firm specifically,
8  has anyone at the Levin firm ever told you that they
9  thought Doctor Simoni should be compensated for his
10 contributions to the Spelter litigation?
11      A.   I don't think they ever said that he should
12 be compensated, but Steve Medina said that Joe Simoni
13 was indispensable -- or no, that I was indispensable
14 and he was nearly indispensable is the way Steve put
15 it.
16      Q.   Okay.  And Mr. Medina, as I understand it,
17 was an attorney formerly with the Levin firm?
18      A.   Correct.
19      Q.   And he worked in the Spelter litigation; is
20 that correct?
21      A.   Yes, he did.
22      Q.   Did anyone else at the Levin firm ever
23 communicate to you that they felt that Doctor Simoni
24 was either indispensable, almost indispensable, or

1    had made substantial contributions to the Spelter

2    litigation?

3         A.    Offhand, I can't think of anyone.

4         Q.    Now, let's talk about The Cochran Firm for

5    a moment.  There are two attorneys from The Cochran

6    Firm that are present at this deposition; is that

7    right?

8         A.    Correct.

9         Q.    Did you work with both of those attorneys

10   in connection with the Spelter litigation?

11        A.    I did.

12        Q.    Mr. Taylor, did he ever communicate to you

13   that he thought Doctor Simoni should be compensated

14   for his contributions to the Spelter litigation?

15        A.    I don't believe so.

16        Q.    Did Mr. Taylor ever indicate to you that in

17   his view Doctor Simoni had made substantial

18   contributions to the Spelter litigation?

19        A.    I don't think Farrest ever said anything to

20   that effect.

21        Q.    Did anyone on behalf of The Cochran Firm

22   ever communicate to you that they held the belief

23   that Doctor Simoni should be compensated for his

24   contributions to the Spelter litigation?

1        A.    Yes.

2        Q.    Okay.  Who?

3        A.    Keith Givens.

4        Q.    When did Mr. Givens say that to you?

5        A.    It was the night before the mediation

6   session with DuPont.

7        Q.    Okay.

8        A.    And Farrest was at that meeting.

9        Q.    Okay.  Where was the meeting held?

10       A.    It was in a hotel room.

11       Q.    Okay.  At what hotel?

12       A.    Probably -- oh, my goodness.  It was in

13  Charleston at the -- I don't know.  One of the nicer

14  hotels.  If I -- if you named a few off, I could tell

15  you.

16       Q.    Okay.  Would it be the Embassy Suites?

17       A.    Yes.

18       Q.    Okay.  And this was the night before a

19  mediation in the Spelter case?

20       A.    Correct.

21       Q.    And was this the mediation that led to the

22  settlement of the Spelter case?

23       A.    It did not lead to the settlement.

24       Q.    Okay.  Was this a mediation that was held

1    after the Supreme Court decision in the Perrine case

2    and before the settlement of the Perrine case?

3         A.    It was before the trial, well before the

4    trial.  It was in June of --

5         Q.    Of --

6         A.    -- 2007, I think.

7         Q.    Okay.  And Mr. Givens indicated to you that

8    he thought that Doctor Simoni should be compensated

9    for the contributions he had made to the Spelter

10   litigation?

11        A.    I don't think Keith used the word

12   contributions.  I think what Keith said was, this guy

13   should be treated like any other vendor who has done

14   work.

15              And I responded saying, well, how can we do

16   that; this guy is a witness; his deposition -- I

17   don't know if his deposition had been noticed at that

18   point, but it was certain to us that it was imminent

19   unless the case settled, that Joe would be deposed.

20        Q.    Did you agree with Mr. Givens that there

21   ought to be a way to compensate Doctor Simoni for

22   what he had done in the case?

23        A.    I don't think I said, there ought to be a

24   way, because I didn't know.  I just said, if there

1  was a way, but I didn't -- I think I was rather

2  negative.  I think I said that at that point I didn't

3  see on what basis, that there was no -- I think I

4  used the word, there is no basis to compensate him.

5  Because we were looking at him being a

6  material witness.  Now, paying a witness, I think

7  that was a problem and I think the entire team deemed

8  that to be a problem.

9  Q.  Was it the impression that you gathered

10  from Mr. Givens' comments that Mr. Givens was of the

11  view that Doctor Simoni had made substantial

12  contributions to the Spelter litigation?

13  A.  I know Keith threw out some numbers.  In

14  fact, I think he said something like 100 to 120,000,

15  $150,000; the guy is a Ph.D. -- he's talking about

16  Joe being a Ph.D. -- he has a law degree.

17  And I may have said, well, he has a number

18  of degrees.  There was four or five degrees, as far

19  as that goes.  But --

20  And he said, well, that would -- the hourly

21  rate would be justifiable to have it -- I don't know

22  what amount he said as an hourly rate, but that's

23  what he said.  He said he should be treated like any

24  other vendor.

1     Q.  Did anyone else with The Cochran Firm

2 indicate to you that they thought Doctor Simoni

3 should be compensated for his contributions to the

4 Spelter litigation?

5     A.  Cochran Firm, as I recall, had -- unless

6 they were dealing with him directly, as Levin did

7 quite a bit, I don't know if they actually dealt with

8 him.

9          I can remember talking to Farrest and

10 Farrest saying that he had never met him, maybe he

11 saw him once at a distance, but he had never spoken

12 to him.

13          I don't think Angela knew him.  I don't

14 think -- I don't -- I don't Keith Givens had ever met

15 him.

16     Q.  Did Ms. Mason ever say to you that she

17 thought Doctor Simoni should be compensated for his

18 contributions to the Spelter litigation?

19     A.  I don't recall her saying anything like

20 that.

21     Q.  Is there anyone else at The Cochran Firm

22 with whom you dealt in connection with the Spelter

23 litigation other than Mr. Taylor, Mr. Givens, and

24 Ms. Mason?

1      A.    Any other lawyers or --

2      Q.    Yes, lawyers.  I should've qualified that.

3      A.    I'm trying to think.  There were other

4  lawyers, yes.

5      Q.    Can you name them for me?

6      A.    I'm at a loss right now.  I can't -- I

7  can't think who else I liaised with, but it was

8  primarily Farrest and Angela.

9      Q.    You made a statement a few moments ago that

10  it was the Levin firm that had the most interaction

11  with Doctor Simoni as compared to The Cochran Firm;

12  is that fair?

13      A.    Yes.

14      Q.    Do you know how frequently the Levin firm

15  interacted with Doctor Simoni?

16      A.    I don't.

17      Q.    Other than Mr. Medina, do you know who else

18  at the Levin firm may have interacted with Doctor

19  Simoni?

20      A.    I think Carol Moore did, who was their

21  chief investigator and paralegal.

22      Q.    Okay.  Did Ms. Moore ever talk to you about

23  her view of the contributions that Doctor Simoni had

24  made to the Spelter litigation?

1      A.   I can't remember anything specific, but I
2   would say that Carol, you know, thought Joe was a key
3   person.
4      Q.   That was -- that's the general impression
5   that you have based upon discussions that you
6   would've had with Ms. Moore?
7      A.   That's my impression.
8      Q.   Anyone else at the Levin firm other than
9   Mr. Medina or Ms. Moore with whom you may have had
10  communications and from which you formed an
11  impression as to their view of Doctor Simoni's
12  contributions to the Spelter litigation?
13     A.   Offhand, I can't say, but there probably
14  were.  I think he may have worked with one of the
15  young paralegals.
16     Q.   Do you know a Virginia Buchanan?
17     A.   Oh, yeah.  Virginia, I don't know that
18  Virginia ever interacted with Joe.  I suspect not.
19     Q.   Okay.  Did you have any communications with
20  her as to the contributions that Doctor Simoni made
21  to the Spelter litigation?
22     A.   I believe I did talk about what Joe had
23  done with her.
24     Q.   Did you -- did Ms. Buchanan ever make any

1  statements to you from which you gained the

2  impression that she thought that Doctor Simoni had

3  made substantial contributions to the Spelter

4  litigation?

5       A.   It's difficult for me to say at this point.

6  I don't think -- I think her interactions with Joe

7  were very limited, if any.

8       Q.   There was a time where Doctor Simoni was

9  deposed in the case, correct?

10      A.   Correct.

11      Q.   Were you present at his deposition?

12      A.   I was not.

13      Q.   Do you have an understanding that he was

14 represented at that deposition by the Levin firm?

15      A.   I believe so, but I can't conclusively say

16 that.

17                THE WITNESS:  Oh, are we marking -- is

18 this -- this one is number --

19                MR. MARINO:  Number --

20                THE WITNESS:  This would be 6, and

21 this would be --

22                MR. WAKEFIELD:  Yeah.

23                MR. MARINO:  Well, we didn't mark

24 this.

1          MR. WAKEFIELD:  We did not mark this,

2   and so for the purposes of keeping the record clear,

3   I'm going to mark the complaint --

4          THE WITNESS:  As 6.

5          MR. WAKEFIELD:  -- as Deposition

6   Exhibit No. 6.

7          MR. MARINO:  Okay.

8          THE WITNESS:  No.

9          MR. MARINO:  Yeah.  That's the

10  complaint right there.

11         MR. WAKEFIELD:  And then --

12         THE WITNESS:  Oh, you're marking the

13  complaint?

14         MR. WAKEFIELD:  Yes.

15         MR. MARINO:  Okay.

16                    -----

17         (Exhibit No. 6 marked for purposes of

18  identification.)

19                    -----

20  BY MR. WAKEFIELD:

21      Q.   And then what has also been distributed to

22  you, Mr. Rich, will be marked as Deposition Exhibit

23  No. 7.

24

1                          -----

2                 (Exhibit No. 7 marked for purposes of

3     identification.)

4                          -----

5     BY MR. WAKEFIELD:

6          Q.    In the right-hand corner, it says, Rich723.

7     Do you see that?

8          A.    I do.

9          Q.    And it is -- bears the style of the Perrine

10    case in the Circuit Court of Harrison County?

11         A.    Correct.

12         Q.    And you were counsel of record in that

13    case; is that right?

14         A.    Yes.

15         Q.    And you'll see that this is entitled,

16    Plaintiffs' Memorandum Brief in Opposition to

17    DuPont's Motion to Compel and for Sanctions Arising

18    from the Simoni Deposition.  Do you see that?

19         A.    I do.

20         Q.    Did you review this document before it was

21    filed in the Circuit Court of Harrison County?

22         A.    I don't think so.

23         Q.    Do you know who prepared this document?

24         A.    Probably Steve Medina, but I don't know

1   that.  I don't think I saw this until -- I can't be

2   certain, but I can tell you that I did not prepare

3   it.

4        Q.   I understand.

5        A.   I --

6        Q.   I want to direct your -- I didn't mean to

7   interrupt you, Mr. Rich.

8             I want to direct your attention, if you

9   would, to page 24.

10       A.   24.

11       Q.   Do you see where there are various

12  attorneys listed as representing the plaintiffs?

13       A.   Yes.

14       Q.   We see Perry Jones and Jerald Jones from

15  Clarksburg?

16       A.   I do.

17       Q.   And we see your name, Gary Rich, correct?

18       A.   Correct.

19       Q.   We see J. Farrest Taylor and Joseph D. Lane

20  of The Cochran Firm?

21       A.   Yes.

22       Q.   We see Steven Medina of the Levin firm?

23       A.   Yes.

24       Q.   And Kevin Madonna of Kennedy & Madonna; is

1  that right?

2      A.   Correct.

3      Q.   And those were the lawyers who in fact

4  appeared of record representing the plaintiffs?

5      A.   That's correct.

6      Q.   Okay.  And you understand that this was a

7  memorandum that was filed on behalf of the plaintiffs

8  by the attorneys of record representing the

9  plaintiffs?

10     A.   That's my understanding.

11     Q.   Okay.  I want to talk -- I want to direct

12 your attention to several statements that are set

13 forth in the memorandum, and I want to ask if you

14 agree with them.

15          And I want to direct your attention to

16 page 2.  You'll see at the very beginning, under the

17 argument heading A, it says, before his retirement in

18 2005, Doctor Joseph Simoni served for 34 years as a

19 professor of sociology of West Virginia University.

20 Do you see that?

21     A.   Yes.

22     Q.   And then it goes on to say, not

23 surprisingly, throughout his tenure at WVU, as a

24 sociology professor, Doctor Simoni undertook a number

1   of social and cultural studies; one of Doctor

2   Simoni's first research projects focused on the

3   social and cultural history of Spanish-Americans

4   residing in West Virginia, including Spelter; during

5   this period in the early '70s, Doctor Simoni became

6   familiar with the Spelter area and developed close

7   ties with some of the Spelter's residents.  Do you

8   see that?

9       A.   I do.

10      Q.   And you'll agree that's an accurate

11  characterization of Doctor Simoni's relationship with

12  the Spelter residents?

13      A.   Yes.

14      Q.   Okay.  And in fact, Doctor Simoni had

15  previously related to you that he had these types of

16  ties with residents in Spelter?

17      A.   Yes.  Plus, there were people who knew him

18  there that I can remember Joe talking to that

19  indicated to me that he had known them for a number

20  of years.

21      Q.   Do you recall any of the particular names?

22      A.   I think one may have been Benny -- I'm not

23  thinking of his last name.  Ben --

24      Q.   Vasquez?

1    A.    No.  It started with a Q.

2    Q.    In any event, you were aware that he knew

3  some people for a long period of time?

4    A.    Well, certainly, a few.  I mean, I don't

5  know the number, but there were a few.  Yes.

6    Q.    And you would agree with me that Doctor

7  Simoni's familiarity with and ties to residents to

8  the Spelter community was beneficial to the

9  development and prosecution of the Spelter

10  litigation?

11    A.    It was helpful.

12    Q.    Did you get the sense that the residents in

13  the Spelter community trusted him and knew him?

14    A.    Yes.

15    Q.    Okay.  And that the residents in the

16  Spelter community would communicate with him if they

17  had questions about the litigation?

18    A.    Some did.

19    Q.    And that there were occasions on which

20  Doctor Simoni was asked to communicate with the

21  residents of the Spelter community by the attorneys

22  representing the plaintiffs?

23    A.    Oh, I don't know about that.

24    Q.    Now, if you'll look at the next paragraph,

1  it says, around the year 2000, Doctor Simoni was

2  introduced by mutual friends to Gary Rich, one of the

3  plaintiffs' attorneys involved in the asbestos

4  litigation at WVU; over the years, Doctor Simoni

5  worked with Doctor Rich on at least two environmental

6  litigation matters, the WVU asbestos litigation, and

7  the Westinghouse/Fairmont litigation.

8          That's an accurate statement; isn't it?

9       A.   Correct.

10      Q.   It goes on to say, in connection with his

11  work on the Westinghouse case, Doctor Simoni met John

12  Hando with the West Virginia Department of

13  Environmental Protection; during the meeting, Hando

14  mentioned, quote, 50 acres of contamination in

15  Spelter, unquote; Mr. Hando's passing reference to

16  Spelter struck a chord with Doctor Simoni who had a

17  long-standing familiarity with the area and its

18  people.

19          Is it accurate to state that the first

20  indication that there might be an issue with the

21  Spelter area came to Doctor Simoni from Mr. Hando?

22      A.   Well, I'm not certain about that.  I don't

23  know when Joe met Hando.  I don't know if it was in

24  connection with the Westinghouse case.  I don't know

1   what -- I believe I maybe met Hando once.

2        Q.   Is there any reason for me to believe that

3   the description set forth in this paragraph is

4   inaccurate?

5                  MR. CASH:   Object to form.

6        A.   I shouldn't think so.

7        Q.   Okay.  And do you have any information that

8   would in your mind tell you that the representation

9   made in this memorandum that I just read is in any

10  way inaccurate?

11       A.   No.

12       Q.   Now, it goes in the next paragraph, on

13  page 3, because of his experiences with the

14  Westinghouse case, as well as the asbestos litigation

15  at WVU, Doctor Simoni wondered whether the 50 acres

16  of contamination might present a hazard to the

17  community.

18            Did Doctor Simoni communicate to you that

19  he had questions or concerns about whether there was

20  areas of contamination in Spelter?

21       A.   Oh, yes.

22       Q.   Okay.  Did you first learn about the

23  possibility of there being contamination at Spelter

24  from Doctor Simoni?

1      A.    Yes.

2      Q.    And to your knowledge, it would've been

3   Doctor Simoni who would've also communicated to the

4   law firms that ultimately became involved in this

5   case, such as the Levin firm and The Cochran Firm,

6   about the possibility of contamination in Spelter?

7               MS. MASON:  Object to form.

8      A.    I'm sorry.  Can you say that again?

9      Q.    Sure.

10              It was Doctor Simoni who communicated to

11   the Levin firm and The Cochran Firm about the

12   possibility of there being contamination in Spelter

13   and the possibility of a case?

14              MS. MASON:  Object to form.

15      A.    I don't think so.  I don't think Joe ever

16   spoke to The Cochran Firm initially about this, so I

17   can remember having a conversation with Farrest and

18   that introduction was made by Steve Medina to Farrest

19   Taylor.

20      Q.    Who made the initial contact with the Levin

21   firm?

22      A.    I don't know.  It could well have been Joe,

23   or it could've been me.  It could've been that Joe

24   gave me the name from his research and that I

1    telephoned.  I don't know.

2          Q.   One of the services that Joe Simoni

3    performed in the Spelter litigation was to research

4    law firms that would have the capability and possible

5    interest in pursuing this litigation; is that true?

6          A.   Joe certainly did the research, as I did,

7    on it.  He did his research independently.  I never

8    directed him to do it, but he would come to me with

9    names and say, hey, I think this is a firm that would

10   be able to bring this sort of -- or look into this

11   sort of action.

12         Q.   Okay.  And he was the one who brought the

13   Levin name to your attention?

14         A.   I don't know that.  I may have found that

15   name on my own, but I'm not certain of it.

16         Q.   When the -- was there a meeting set with

17   the Levin firm?

18         A.   Yeah.  Initially, Levin came, I think at my

19   -- you know, I telephoned Levin, and Steve Medina and

20   Jan Schlichtmann came to visit.  And at that point in

21   time, Cochran, I can tell you, was not involved in

22   this at all.

23         Q.   When those two -- I'm sorry.  Were you

24   finished?

1        A.    I'm finished, yeah.  Go ahead.

2        Q.    When those two individuals from the Levin

3   firm came to West Virginia, who met with them?

4        A.    Well, I can remember picking them up at the

5   airport and then going to Spelter and meeting with

6   Joe and a group of the so-called core -- the core

7   group, core clients.

8        Q.    Okay.  And can you identify for me who the

9   core clients were?

10        A.    Well, of course, Willis and -- Willis

11   Perrine and his wife, Lenora.  I'm having difficulty

12   remembering all the names at this point, but there

13   were probably ten people that I considered core.

14        Q.    And prior to the meeting involving the two

15   individuals from the Levin firm, there would have

16   been prior meetings with these residents of Spelter

17   about the possibility of a cause of action or suit

18   involving the contamination in that area; is that a

19   fair statement?

20        A.    There would've been.  Although, I was not

21   present at a number of those meetings.  I wasn't

22   involved in this action, but I suspect that Joe had

23   met with these people probably at least six months or

24   more before I knew anything about --

1    Q.    Okay.

2    A.    -- Spelter.

3    Q.    So to make sure that I understand, Doctor

4  Simoni would have met with residents of the Spelter

5  community about the possibility of there being an

6  action for contamination of that area before Doctor

7  Simoni came and discussed this with you?

8    A.    That's my recollection.  Yeah.

9    Q.    At the time of the meeting with the two

10  attorneys from the Levin firm, had you already had

11  retainer agreements with these individuals?

12    A.    At the time that Jan and Steve came, yes, a

13  few.

14    Q.    Did you have retainer -- were there some of

15  the core group of plaintiffs that you had not yet had

16  retainer agreements with?

17    A.    Well, I think all the core group was -- had

18  been retained.  There were -- of course, ultimately,

19  there were thousands, hundreds certainly, in terms of

20  numbers, far more than what I had originally signed,

21  and these people were -- the clients were -- my

22  retainer was cancelled, superseded with the Cochran

23  and Levin -- well, I think we got together and

24  drafted a new retainer.  It was pretty much -- well,

1    I can't say that.  I can't remember exactly, but I

2    think all three firms had input into the retainer

3    agreement.  And Sherri Goodman reviewed that for us.

4         Q.   Now, the first meeting when individuals

5    from the Levin firm came to Spelter, you were there

6    and so wasn't Doctor Simoni?

7         A.   Correct.

8         Q.   And there was the core group of plaintiffs,

9    correct?

10        A.   Yes.

11        Q.   How long did that meeting last?

12        A.   I don't know at this point.

13        Q.   In connection with the initial contact with

14   the Levin firm, was information in terms of documents

15   and other information supplied to the Levin firm?

16        A.   I don't know if any documents -- you're

17   saying, at that particular meeting --

18        Q.   No.

19        A.   -- or prior to that meeting?

20        Q.   Prior to that meeting.

21        A.   Prior to that meeting, I had dispatched a

22   binder of documents to the firms, to various firms

23   trying to generate interest, at least get people to

24   come and have a look.

1      Q.    And is it fair to say that the binders were

2    compiled by Doctor Simoni?

3      A.    Joe gave me documents that he had -- I

4    don't know where he'd obtained them, possibly from

5    Hando, probably from others as well.

6            And I went out and bought binders.  My

7    staff and I, as I remember, drafted a -- or I drafted

8    a letter, and we Fed-Exed them out to probably half a

9    dozen firms.

10     Q.    I'm looking at your discovery responses,

11   interrogatory answers in this case and specifically

12   the response to Interrogatory No. 10, and there's a

13   statement here, with respect to the Spelter

14   litigation, Doctor Simoni participated in one or more

15   early meetings with potential clients from the

16   Spelter area and he generally encouraged individuals

17   to consider the possibility of litigation against

18   DuPont.

19           That's accurate, correct?

20     A.    I'm sorry.  Say it again.

21     Q.    Yeah.

22           It's accurate that with respect to the

23   Spelter litigation Doctor Simoni participated in one

24   or more early meetings with potential clients from

1   the Spelter area and he generally encouraged

2   individuals to consider the possibility of litigation

3   against DuPont?

4       A.   I would say that's fair.

5       Q.   Okay.

6             MS. MASON:  Excuse me.

7   BY MR. WAKEFIELD:

8       Q.   And it says, he --

9             MS. MASON:  Mr. Wakefield, I'm sorry.

10   What number were you referring to?

11             MR. WAKEFIELD:  It's Interrogatory

12   No. 10 --

13             MS. MASON:  Thanks.

14             MR. WAKEFIELD:  -- in the response.

15   BY MR. WAKEFIELD:

16       Q.   There's also a statement, he also inserted

17   himself into the process of identifying an

18   experienced outside law firm with the ability and

19   resources to take a leadership role in the

20   litigation, participating in certain meetings with

21   potential co-counsel, assembling binders of various

22   documents and information regarding the case, and on

23   his own initiative visiting the offices of certain

24   lawyers, including Levin, Papantonio, Thomas,

1  Mitchell, Rafferty & Proctor; is that correct?

2       A.   Joe -- yes.  Joe went to Florida.  I don't

3  know why, but it wasn't specifically to meet with

4  Levin, but he was there for some other reason.

5       Q.   And to your knowledge, he did actually stop

6  at the Levin offices?

7       A.   Oh, yeah.  That's what he told me.  I

8  assume.

9       Q.   And would this have been before the Levin

10  attorneys came to West Virginia on the first

11  occasion?

12      A.   I think this was actually after they had

13  been there.

14      Q.   And we -- you've mentioned the binders of

15  documents that were assembled.  Those were

16  distributed to potential law firms?

17      A.   I Fed-Exed them to the various firms that

18  he and I thought might be able to come in and get

19  this job done.

20      Q.   Okay.  Other than the Levin firm, what

21  other firms did you send those documents?

22      A.   I think there was Cohen & Milstein --

23  Milstead.  I think there was a firm in Baltimore, the

24  fellow that owns the Orioles.  I can't think of his

1  name.  Peter Angelos.  There were a few other ones

2  too.  I can't tell you, but it should be in the

3  production.  All the letters should be there that I

4  signed sending these out.

5      Q.  Okay.  Prior to the letters going out with

6  these binders, had Doctor Simoni made contact with

7  those law firms?

8      A.  I don't know that Joe called them.  He may

9  have called some.  I don't know for sure.  It

10 wouldn't surprise me if he had.  I mean, he's eager.

11     Q.  Did you contact any of the firms before the

12 binders went out?

13     A.  Oh, yeah.

14     Q.  Which firms did you contact?

15     A.  I can't tell you today, but again, there

16 would be my phone records of those calls.  My

17 handwritten notes would be there or should be there.

18     Q.  Okay, okay.  I want to direct your

19 attention back to Deposition Exhibit No. 7, please

20 and specifically page 3 again.  There's a statement

21 in there, sometime after talking with Mr. Hando,

22 Doctor Simoni contacted one of the families, and then

23 has in parentheses, i.e. Anita Menendez, in the

24 community with whom he still had ties to discuss the

1  contamination; upon Ms. Menendez's recommendation,

2  Doctor Simoni discussed the matter with two other

3  Spelter residents, Ron Brown and Willis Perrine;

4  between December 2000 and April 2001, Doctor Simoni

5  attended four or five meetings at the home of Willis

6  and Lenora Perrine's home, and in April 2001, Doctor

7  Simoni attended a public meeting conducted at the old

8  firehouse in Spelter.

9             I assume that's all accurate.

10             MS. MASON:  Object to form.

11     A.   See, I don't know.  I wasn't involved at

12  that point.

13     Q.   Okay.  This would've been prior to Doctor

14  Simoni bringing the Spelter --

15     A.   Well, I was --

16     Q.   -- contamination issue to your attention?

17     A.   Or he may have been talking to me and I

18  wasn't interested.

19     Q.   Okay.

20     A.   But I was at the old firehouse.  I first

21  went there in April, was the first time, and I think

22  Sandy Holpit had telephoned and left a message for

23  me.

24             Joe had spoken to me about this, and I

1   believe also at the same time Larry Harless was

2   encouraging me to, as he put it, stand up, be a man,

3   and help these people because no one else will.

4        Q.   And so this would've been in April of 2001

5   that you attended this meeting at the firehouse?

6        A.   Yeah.  And I may have gone to a meeting

7   around -- I think around my birthday, which is

8   April 14th, so it was in that time period was when I

9   first met the Perrines.

10            But I believe Joe had been looking at --

11  well, I know he had been looking at this prior to

12  that, but I was reluctant to get involved.

13       Q.   And as we sit here today, do you have any

14  information that would indicate that what is

15  represented in this memorandum is inaccurate?

16            MR. CASH:  The entire memorandum,

17  everything?

18            MR. WAKEFIELD:  Yes.

19       A.   Well, I shouldn't think that something was

20  filed by Levin and Cochran that would be inaccurate.

21  I mean, not -- I don't think they'd do that

22  knowingly, so I mean, what I've seen thus far is

23  accurate --

24       Q.   Okay.

1        A.    -- to the best of my knowledge.

2        Q.    That was going to be my next question.

3   Specifically what I've just covered with you on

4   page 3, do you have any information that would

5   indicate that any of this is inaccurate?

6        A.    No.

7        Q.    Is it also your understanding, as reflected

8   on page 4 of the memorandum, that before the April

9   2001 meeting Doctor Simoni had been given a soil

10  sample from a garden and Doctor Simoni was asked to

11  have the university examine it?

12       A.    I seem to recall something about a soil

13  sample, but I -- at this point, I can't tell you much

14  more than that.

15       Q.    I want to direct your attention to the

16  bottom of page 4, or actually, the last paragraph

17  starting on page 4 of Exhibit 7 and carrying over to

18  page 5.

19            There's -- it says, after his discussions

20  with Hando and the Spelter residents, Doctor Simoni

21  felt that, quote, it was worth getting an answer to

22  the question of whether there was any harm to the

23  people in the community, unquote and that due to his

24  experience as a Peace Corps volunteer and his

1  experience in the WVU asbestos and the Westinghouse
2  litigations he might be able to help find someone who
3  could get the answer; accordingly, he began searching
4  on the internet for plaintiff's law firms that
5  specialized in environmental litigation and that
6  would have the resources for and interest in
7  investigating the matter; Doctor Simoni contacted at
8  least three firms, Masry & Vititoe, Levin Papantonio,
9  and a law firm in Norfolk, Virginia.
10          Do you see that?
11     A.   I'm sorry.  This is at the bottom of
12  page 4?
13     Q.   Yeah.  Starts at the bottom of page 4 and
14  then carries over to page --
15     A.   The footnote?
16     Q.   No, not -- no, no.  The first paragraph --
17     A.   Oh, yes.  Fee split
18     Q.   -- in the body.
19     A.   Yes.  I do see that, yes.
20     Q.   And it carries over to page 5.  Do you see
21  that?
22     A.   Correct.
23     Q.   And again, do you have any information that
24  would indicate that anything set forth in that

1  paragraph is inaccurate?

2      A.   No.  I don't know that anything is

3  inaccurate, no.

4      Q.   Now, in the next paragraph, it references

5  January 2002, Doctor Simoni attended a meeting in

6  Spelter with two attorneys, Steven A. Medina and Jan

7  Schlichtmann.

8      A.   Yes.

9      Q.   Is that the meeting that you talked about

10  --

11      A.   Yes.

12      Q.   -- a few moments ago?

13      A.   It is.

14      Q.   And then it goes on to say, later in 2002,

15  after the meeting with Levin Papantonio, Doctor

16  Simoni began a consulting relationship with the Masry

17  law firm working at the law firm's direction to

18  facilitate Masry's investigation of the Spelter

19  matter.  Do you see that?

20      A.   I do.

21      Q.   Did anyone from Masry tell you that they

22  felt they had a consulting relationship with Doctor

23  Simoni?

24      A.   Yeah.  I think it was discussed with me.

1        Q.   And did representatives of the Levin

2    Papantonio firm say to you that they had a consulting

3    relationship with Doctor Simoni?

4                    MS. MASON:  Object to form.

5    BY MR. WAKEFIELD:

6        Q.   You may answer.

7        A.   Can you repeat the question again?

8        Q.   Sure.

9             Did anyone from the Levin firm tell you

10   that that firm had a consulting relationship with

11   Doctor Simoni?

12                   MS. MASON:  Object to form.

13       A.   I believe Steve Medina did.

14       Q.   Did anyone else in the Levin firm say that?

15       A.   Not that I can recall.

16       Q.   Did anyone from the Cochran law firm ever

17   say to you that The Cochran Firm had a consulting

18   relationship with Doctor Simoni?

19       A.   I don't believe so.

20       Q.   Now, I'm going to direct your attention to

21   page 5 of Exhibit 7, the paragraph that begins, in

22   late summer 2003, after Masry was no longer reviewing

23   the Spelter matter, Levin Papantonio began

24   investigating the Spelter matter in earnest and

1     towards that end retained Doctor Simoni to facilitate

2     that investigation.

3              Do you see that?

4         A.   Yes.

5         Q.   Did representatives of the Levin firm

6     advise you that they had retained Doctor Simoni to

7     facilitate the investigation of the Spelter

8     litigation?

9                   MR. CASH:  Object.

10                  MR. WAKEFIELD:  What's the objection?

11                  MR. CASH:  To the form.

12                  MR. WAKEFIELD:  What's wrong with the

13    form?

14                  MR. CASH:  I don't like it.

15    BY MR. WAKEFIELD:

16        Q.   You can answer.  Would you like the

17    question read back?

18        A.   Yes.

19                  COURT REPORTER:  Did representatives

20    of the Levin firm advise you that they had retained

21    Doctor Simoni to facilitate the investigation of the

22    Spelter litigation?

23                  MS. MASON:  Object to form.

24        A.   I don't know if that -- the term facilitate

1  was used, but I can remember discussing and I think

2  there are notes of mine which indicate that Steve

3  Medina and I discussed Joe's role. I can't be any

4  more specific than that at this point in time.

5      Q.   Okay. You'll see, if you go back to page 5

6  of Exhibit No. 5, there is a citation after the

7  sentence that says, see Medina record statement,

8  Simoni deposition, and then it cites the pages of the

9  deposition transcript.

10     A.   Yes.

11     Q.   Do you have any information available to

12 you today that would indicate that the sentence that

13 I just read is inaccurate?

14     A.   Is inaccurate?  No.

15     Q.   Now, if we look at the bottom of page 5 --

16 and again, I'm talking about the body of the

17 memorandum, as opposed to the footnotes.

18     A.   Yes.

19     Q.   -- and carry over to page 6, there's some

20 discussion about Doctor Simoni being involved with

21 Doctor Flowers and Doctor Brown.

22     A.   Yes.

23     Q.   Who is Doctor Flowers?

24     A.   Doctor Flowers was a professor at Tulane

 1  University in New Orleans.

 2      Q.   And was he retained as an expert in the

 3  case?

 4      A.   Yes.

 5      Q.   Who retained him?

 6      A.   I believe Steve Medina did.

 7      Q.   And who is Doctor Brown?

 8      A.   Doctor Brown I remember meeting, but I

 9  don't know.  He was from some other school, not

10  Tulane.

11      Q.   Do you know what specialty Doctor Flowers

12  had?

13      A.   He's a geologist.

14      Q.   And what about Doctor Brown?

15      A.   I don't know.

16      Q.   Okay.  To your knowledge, did Doctor Simoni

17  assist both Doctor Flowers and Doctor Brown in

18  gaining access to properties for soil samples?

19      A.   It's my understanding that Joe did.

20      Q.   Okay.  And did he provide that assistance

21  in terms of access to properties on more than one

22  occasion, that is there was more than one occasion on

23  which soil samples were taken?

24      A.   There was.  I don't know -- I know my

1   office did that as well.  I don't know how many times

2   Joe did it.  I'm sure he did it at least once,

3   probably more.

4       Q.   Did you or anyone from your office ever

5   accompany Doctor Flowers or Doctor Brown in the

6   taking of soil samples?

7       A.   I did.

8       Q.   On how many occasions did you do that?

9       A.   At least once.  I think it was a ten-hour

10  day, but it would be in my time records.  It may have

11  been two or three other times, but I can remember

12  doing it in -- it was rather chilly out, and it was

13  me and the two professors.

14      Q.   Was Joe with you?

15      A.   No.  But I think at one time there was a

16  grad student who was there that worked with Joe.

17      Q.   Do you recall that individual's name?

18      A.   No.  I might know it -- if somebody said

19  it, I might remember this young man.

20      Q.   In connection with gaining access to the

21  properties for the purpose of taking soil samples,

22  was it necessary for there to be record room research

23  done?

24      A.   I don't know.  I don't remember.

1          Q.   Do you know whether Doctor Simoni engaged
2     in record room research with respect to the Spelter
3     litigation?
4          A.   I think I can remember Steve or Carol
5     telling me that he had gone to the courthouse looking
6     at a repository of documents that DuPont had at a
7     place there.
8          Q.   He being Doctor Simoni?
9          A.   Yes.
10         Q.   And were copies of those documents obtained
11    in connection with the litigation?
12         A.   I'm assuming so, but I don't know at this
13    point.
14         Q.   Do you know what the documents were?
15         A.   I think it was a way of DuPont was trying
16    to show that people were put on notice as to certain
17    chemicals that might've been -- or toxins that
18    might've been present, but again, I don't know.  I
19    wasn't involved in that.
20         Q.   Is it also accurate to say that Doctor
21    Simoni's knowledge and relationship with various
22    Spelter residents helped facilitate the taking of
23    soil samples?
24         A.   I would say so.  Yes.

1        Q.    There is a statement on page 6 of

2   Deposition Exhibit No. 7.  It's in the first sentence

3   of the paragraph that begins with, Doctor Simoni's

4   deposition testimony demonstrates that he had

5   interacted with Spelter and some of its residents and

6   that later, after actively seeking law firms who

7   might be interested in examining the contamination in

8   more detail, he began working on behalf of and at the

9   direction of law firms in anticipation of litigation.

10            Do you know what law firms Doctor Simoni

11  began working on behalf of and at the direction of?

12                  MS. MASON:  Object to form.

13  BY MR. WAKEFIELD:

14        Q.    You may answer.

15        A.    Well, I'm assuming that it would be the law

16  firms involved in this litigation.

17        Q.    To your knowledge, did Doctor Simoni work

18  on behalf of and at the direction of the Levin firm?

19        A.    I think he communicated quite a bit with

20  Steve and Carol.

21        Q.    Well, in addition to communicating, do you

22  believe that he worked -- strike that.

23            Do you have any knowledge that members of

24  the Levin firm provided direction to Doctor Simoni in

1  terms of activity to be conducted in the Spelter

2  litigation?

3      A.   I --

4            MR. CASH:  Objection.

5      A.   I think that they did tell him, this needs

6  to be done, and I think he did it.

7      Q.   To your knowledge, did anyone on behalf of

8  The Cochran Firm provide direction to Doctor Simoni

9  as to activities to perform in connection with the

10  Spelter litigation?

11      A.   I don't believe Cochran had much

12  interaction with Joe, but I don't know that for a

13  fact.

14      Q.   Did you ever direct Joe Simoni to perform

15  certain activities in connection with the Spelter

16  litigation?

17      A.   Not that I can recall.

18      Q.   Did you ever direct Joe Simoni to perform

19  certain activities in connection with the

20  Fairmont/Westinghouse litigation?

21      A.   Not that I can recall.

22      Q.   Did you ever direct Joe Simoni to perform

23  certain activities in connection with the WVU

24  asbestos litigation?

1      A.    Early on, there may have been questions

2   about documents, about getting something.  I did not

3   direct him.

4      Q.    Would it be fair to say that in regard to

5   the Spelter litigation that Joe Simoni worked on

6   behalf of Gary Rich, L.C.?

7      A.    Worked on behalf?  Are you saying with

8   respect to my directing him to do something or just

9   his actions or on my behalf?

10     Q.    His actions being on your behalf.

11     A.    I think he did things that I didn't know

12  about that probably benefited me and the clients and

13  the other firms, yeah.  But --

14     Q.    Okay.  And in fact, you've previously

15  acknowledged in this case that the activities of Joe

16  Simoni benefited Gary Rich, L.C., correct?

17     A.    Yes.

18     Q.    And that the activities of Joe Simoni

19  benefited the Levin firm, correct?

20     A.    Yes.

21     Q.    And that the activities of Joe Simoni

22  benefited The Cochran Firm?

23     A.    Cochran may not have known it, but yes.

24     Q.    Okay.

1          MR. WAKEFIELD:  We need to take a

2   break to change --

3          VIDEOGRAPHER:  We're going off the

4   record.  The time is 3:10 p.m.

5          This ends Disc No. 2 in the deposition of

6   Gary Rich.

7                        -----

8                   (Brief break)

9                        -----

10          VIDEOGRAPHER:  We are now going back

11   on the record.  The time is 3:20 p.m.

12          This begins Disc No. 3 in the deposition of

13   Gary Rich.

14   BY MR. WAKEFIELD:

15      Q.   Mr. Rich, I want to direct your attention

16   again to Deposition Exhibit No. 7, and specifically,

17   I want you to take a look at pages 10, 11, 12, and

18   the top part of 13.  If you'll take a moment just to

19   look at those.

20          Have you had --

21      A.   All right.

22      Q.   Have you had an opportunity to review those

23   pages?

24      A.   Yes.

1          Q.   You'll agree with me that those pages

2   consist primarily of a number of paragraphs that bear

3   letters a through h?

4          A.   Yes.

5          Q.   And before Paragraph a, there is a sentence

6   that says, in the instant action, plaintiffs have

7   presented the following evidence reflecting the

8   existence of a consulting or agent relationship

9   between Doctor Simoni and the Masry law firm and

10  later between Doctor Simoni and plaintiffs' --

11                  MR. WAKEFIELD:   And that's plural

12  possessive.

13  BY MR. WAKEFIELD:

14         Q.   -- counsel.

15              Do you see that?

16         A.   I do.

17         Q.   Okay.   Do you have any information

18  available to you today that would indicate that any

19  of the representations contained in Subparagraphs a

20  through h is inaccurate?

21         A.   I have nothing that would -- that I can

22  recall that would lead me to believe this is

23  inaccurate.

24         Q.   And in connection with the entire exhibit,

1  that is Deposition Exhibit No. 7, as we sit here

2  today, is there any information that you have

3  available to you that would indicate that any of the

4  representations made as to the activities of Doctor

5  Simoni with respect to the Spelter litigation is in

6  any way inaccurate?

7                    MR. MARINO:  Well, again, I'm going to

8  object to the form.  I don't -- I don't know if he's

9  read the whole document.

10                    THE WITNESS:  I have -- well, I'm

11  scanning it.

12                    MR. MARINO:  Did you want him to read

13  the whole document, Jeff and answer that?

14                    MR. WAKEFIELD:  If in order for you to

15  be comfortable with answering the question you need

16  to read the document, then I would ask that you do

17  that.

18                    MR. MARINO:  All right.  Why don't we

19  -- maybe we can go off the record --

20                    MR. WAKEFIELD:  That's fine.

21                    MR. MARINO:  -- so he can do that?

22  Okay.  Yeah.  I'm not trying to be a pain, but it's

23  --

24                    MR. WAKEFIELD:  No.  That's fine.

1              MR. MARINO:  -- a long document.

2              MR. WAKEFIELD:  I mean, in fairness to

3    the witness, if he wants --

4              MR. MARINO:  Yeah.

5              MR. WAKEFIELD:  -- to review it,

6    that's fine.

7              MS. MASON:  Before we go off the

8    record, can I get the question again?

9              MR. WAKEFIELD:  Will you read the

10   question back, please?

11             COURT REPORTER:  And in connection

12   with the entire exhibit, that is Deposition Exhibit

13   No. 7, as we sit here today, is there any information

14   that you have available to you that would indicate

15   that any of the representations made as to the

16   activities of Doctor Simoni with respect to the

17   Spelter litigation is in any way inaccurate?

18             VIDEOGRAPHER:  We're going off the

19   record.  The time is 3:24 p.m.

20                       -----

21                  (Brief break)

22                       -----

23             VIDEOGRAPHER:  We're back on the

24   record.  The time is 3:28 p.m.

1  BY MR. WAKEFIELD:

2      Q.   Mr. Rich, have you had an opportunity to

3  read Deposition Exhibit No. 7?

4      A.   I have.

5      Q.   In light of your reading the exhibit, can

6  you answer the question that was posed?

7      A.   I need the question read to me again.

8              MR. WAKEFIELD:  If the court reporter

9  would please do so.

10             COURT REPORTER:  And in connection

11  with the entire exhibit, that is Deposition Exhibit

12  No. 7, as we sit here today, is there any information

13  that you have available to you that would indicate

14  that any of the representations made as to the

15  activities of Doctor Simoni with respect to the

16  Spelter litigation is in any way inaccurate?

17             MS. MASON:  Object to form.

18     A.   I saw nothing inaccurate.

19     Q.   Thank you.

20             I'm going to hand you a series, and we'll

21  mark each one of these.

22             MR. WAKEFIELD:  This will be --

23             COURT REPORTER:  8.

24             MR. WAKEFIELD:  -- 8.  Thanks.

1                              -----

2                    (Exhibit No. 8 marked for purposes of

3    identification.)

4                              -----

5    BY MR. WAKEFIELD:

6         Q.    Mr. Rich, you have been handed what has

7    been marked as Deposition Exhibit No. 8, and I would

8    like for you to identify that document or that copy,

9    if you could.

10        A.    Identify it?

11        Q.    Yes.

12        A.    It's a message from Susan to me saying that

13   Joe had telephoned.

14        Q.    Okay.  It's a typical phone message slip

15   there where somebody has taken a call --

16        A.    Yes.

17        Q.    -- and they've left a message for you?

18        A.    Yes.

19        Q.    And I notice is has a Bates number of

20   Rich92, which would indicate that it was produced by

21   your office?

22        A.    Yes.

23        Q.    Okay.  And it bears the date of January 21,

24   2004?

1    A.   Yes.   That's correct.

2    Q.   And this is a message from Joe Simoni, and
3    it has, apparently, a summary of the message from
4    him; doesn't it?

5    A.   It does.

6    Q.   And that Doctor Simoni had called, for your
7    information, geologist, George Flowers, asked Joe for
8    heavy metal soil standards; Joe got info from Hando
9    and e-mailed to Flowers.

10        Is that right?

11   A.   That's correct.

12   Q.   Okay.   And are you aware of other instances
13   where Joe Simoni went out and retrieved information
14   at the request or for the benefit of Doctor Flowers?

15   A.   I can't think of anything here today.

16   Q.   Okay.   When it references George Flowers,
17   that's the Doctor Flowers?

18   A.   From Tulane.   Yes.

19        MR. WAKEFIELD:   Would you mark that,
20   please?

21              -----

22        (Exhibit No. 9 marked for purposes of
23   identification.)

24              -----

1          MR. WAKEFIELD:  There you go.

2          MR. MARINO:  Thanks.

3    BY MR. WAKEFIELD:

4      Q.   Mr. Rich, you have been handed a document

5    which has been marked as Deposition Exhibit No. --

6          COURT REPORTER:  9.

7    BY MR. WAKEFIELD:

8      Q.   -- 9.  And can you tell me whose

9    handwriting that is?

10     A.   Susan Fare.

11     Q.   Okay.  That's somebody in your office?

12     A.   It is.

13     Q.   This has a Bates number of Rich104, which

14   would indicate it was produced by your office?

15     A.   Correct.

16     Q.   And it's apparently, Thursday, 3/25/04, and

17   again, it's in essence a phone message of a call from

18   Joe Simoni?

19     A.   That's what it appears to be.  Yes.

20     Q.   Okay.  It says, Joe Simoni called, has been

21   talking with George Flowers, info for sampling,

22   George and others planning to be here July 20 to 30;

23   Medina in trials now, as soon as available, George

24   expects okay from Medina and additional info about

1    where with more time than last; Joe will keep us

2    informed; GWR to call anytime if he needs Joe.

3            Do you see that?

4        A.   I do.

5        Q.   I get the impression from this document

6    that it was common for Joe Simoni to keep you updated

7    with the activities in the Spelter litigation,

8    whether they be activities conducted by experts or

9    things that were being done by the attorneys.

10              MS. MASON:  Object to --

11   BY MR. WAKEFIELD:

12       Q.   Is that a fair statement?

13              MS. MASON:  Object to form.

14              MR. CASH:  Join.

15       A.   Certainly, he did.  I can't say that he

16   always did.  I don't know how frequent it was, but

17   obviously, from these notes, he did.

18       Q.   Okay.  Would it be fair to say that Joe

19   Simoni had more interaction with the geologists than

20   you did?

21       A.   Probably.

22       Q.   Okay.  There's a reference in the exhibit

23   that George and others planning to be here July 20 to

24   30.  Is it your recollection that there was a ten-day

1  period when the geologists were in the Spelter area

2  doing work and in particular, collecting soil

3  samples?

4      A.   I think the geologists were there several

5  times.  I seem to recall coming back from

6  Philadelphia once and finding that they were there

7  and I knew nothing about this.

8      Q.   The reason I'm showing you the exhibit in

9  part is to see whether it refreshes your recollection

10  of whether the geologists were there between July 20

11  and 30.

12      A.   Oh, I have no idea.

13      Q.   Okay.  Is it fair to say that the

14  geologists did come for periods of time where they

15  would stay for several days, including as much as

16  maybe ten days?

17      A.   I can't recall now.  I know they were there

18  two or three, four times.  How long they stayed, I

19  don't know.

20      Q.   Okay.  Now, you testified earlier, as I

21  understand it, there was at least one occasion where

22  you accompanied --

23      A.   Yes.

24      Q.   -- Doctor Flowers for some --

1        A.      Yes.

2        Q.      -- soil sampling.  Is that right?

3        A.      Yes.

4        Q.      Did you do that on more than one occasion?

5        A.      More than one day?  I think I did during a

6    particular, you know, time that they were there.

7        Q.      Okay.

8        A.      I don't know that I went -- and it was

9    cold.  I can remember it being chilly, and this would

10   indicate they were there in July.  I don't remember

11   being with them when it was hot.  And I may have been

12   -- you know, I'm sure one time I was out of town and

13   I knew nothing about them coming and they were just

14   there.

15       Q.      Okay.  What I'm gathering from your

16   testimony, there was at least one visit where the

17   geologists were here and you accompanied them, and it

18   may have been on more than one day during that --

19       A.      Yes.

20       Q.      -- particular visit?

21       A.      Correct.  And that would be in my

22   timesheets, if that's the case.  I think that is, but

23   I can't tell you with a hundred percent certainty,

24   but it would be in my timesheets.

1      Q.   Okay.  Do you have a recollection whether

2    on the occasion or occasions where you accompanied

3    the geologists to do the soil sampling did Joe Simoni

4    also go?

5      A.   I testified earlier that he was not there

6    with me.

7      Q.   Okay.

8      A.   I think a grad student may have been on one

9    of the days.

10      Q.   But you were aware that Doctor Simoni had

11    accompanied the geologists on other occasions when

12    they were doing soil sampling?

13      A.   Yeah.  One time I found after the fact that

14    they had been there and -- or were there and Joe had

15    been with them, as I recall.

16                    MR. WAKEFIELD:  10?

17                    COURT REPORTER:  Yes.

18                        -----

19                    (Exhibit No. 10 marked for purposes of

20    identification.)

21                        -----

22                    MR. MARINO:  Thanks.

23    BY MR. WAKEFIELD:

24      Q.   Mr. Rich, the -- you have been handed a

1  document that has been marked as Deposition Exhibit

2  No. 10.  I want you to take a look at that for a

3  moment, please.

4     A.   Yes.

5     Q.   Again, is this a handwritten note generated

6  by someone in your office?

7     A.   It is.

8     Q.   And the person's name again?

9     A.   Susan Fair.

10    Q.   Was Susan Fair your secretary?

11    A.   She was.

12    Q.   Did she also kind of serve as the

13 receptionist as well?

14    A.   Well, it was a small office.  It was me and

15 Susan and my wife, when she was there and later on,

16 Bobbie Larew.

17    Q.   And I notice this has Bates No. Rich131,

18 which would indicate it was produced by your office

19 --

20    A.   Correct.

21    Q.   -- is that right?

22    A.   Yes.

23    Q.   And this is a note of -- dated March 15,

24 2004.  Is this another phone message from Joe Simoni?

1        A.    Appears to be.

2        Q.    Okay.  There's a -- there's a statement

3   there, George Flowers asked Joe to get some info from

4   John Hando.

5              Was it common for the geologists to go

6   directly to Joe Simoni and ask for information?

7        A.    Apparently so.  I mean, I don't know.  I

8   don't remember this, but what I do remember is Joe

9   working with him or being told that he was with them,

10  but I don't recall these messages --

11       Q.    And --

12       A.    -- sitting here today.

13       Q.    Do you have any recollection of Joe Simoni

14  contacting Mr. Hando at the Department of

15  Environmental Protection and obtaining information

16  from him in connection with the Spelter case?

17       A.    I mean, I -- contacting him?  I mean, I

18  didn't witness him calling him, but it's my belief

19  that -- or my understanding that he did obtain

20  documents from him.

21       Q.    Okay.  I mean --

22       A.    Yes.

23       Q.    -- do you have any reason to doubt that

24  Doctor Simoni had contact with Mr. Hando?

1       A.    Oh, none.

2       Q.    And at the bottom of this exhibit, No. 10,

3    it has another statement, Joe will keep GWR posted.

4       A.    Yes.

5       Q.    Would it be fair to characterize this as a

6    message from Joe Simoni keeping you posted as to

7    what's going on at that particular time?

8       A.    I think so.  Yes.

9                      -----

10                   (Exhibit No. 11 marked for purposes of

11   identification.)

12                      -----

13                   MR. WAKEFIELD:  Thanks.

14   BY MR. WAKEFIELD:

15      Q.    Mr. Rich, you have been handed what has

16   been marked as Deposition Exhibit No. 11.  And is

17   this another handwritten note that comes from your

18   office?

19      A.    It is.

20      Q.    Bearing Bates No. Rich132, indicating that

21   it's been produced by your office?

22      A.    Correct.

23      Q.    And it has the date of March 11, 2004.

24   Would it be fair to say this is another phone message

1  from Joe Simoni?

2        A.   It appears to be.  Yes.

3        Q.   Okay.  There's a statement in the last

4  sentence on the note that says, I told him about

5  potential town meeting with Steve, Farrest, and

6  Johnny.

7             Do you see that?

8        A.   I do.

9        Q.   Who's Johnny?

10        A.   I'm assuming it's Johnny Cochran.

11        Q.   Did that town meeting occur?

12        A.   Johnny Cochran did not visit West Virginia,

13  or if he did, it was not for this case.

14        Q.   Do you recall a town meeting that

15  Mr. Medina and Mr. Taylor attended?

16        A.   Yes.

17        Q.   Okay.  Do you recall when that was?

18        A.   Well, there were more than one.

19        Q.   Was Joe Simoni in attendance at that town

20  meeting?

21        A.   He may have been initially at, say, the

22  first meeting, but subsequent meetings, no.  I don't

23  believe so.

24        Q.   Was there a reason why Doctor Simoni was

1   not present at subsequent meetings?

2        A.   Because of attorney/client privilege.

3        Q.   Was there a concern that if he was present

4   there would be a breach of the privilege?

5        A.   I think some of the attorneys involved were

6   of that opinion.

7        Q.   Did other attorneys express the opinion

8   that they thought his attendance would not breach the

9   attorney/client privilege?

10       A.   For some reason, I seem to think that, but

11  I can't tell you who that might've been.

12                 MR. WAKEFIELD:  This is 12, right?

13                 COURT REPORTER:  Yes.

14                      -----

15                 (Exhibit No. 12 marked for purposes of

16  identification.)

17                      -----

18  BY MR. WAKEFIELD:

19       Q.   Mr. Rich, the court reporter has marked as

20  Deposition Exhibit No. 12 a document.  Can you

21  identify this document?

22       A.   Looks like notes of a meeting that I

23  documented.

24       Q.   Okay.  Is this your handwriting?

1        A.    It is.

2        Q.    And I notice it has Bates No. Rich175,

3   which would indicate that this document was produced

4   by your office.  Is that right?

5        A.    Correct.

6        Q.    And it -- apparently, it has, Monday,

7   24 May '04?

8        A.    Yes.

9        Q.    Okay.  Now, 1435 to 1500, I -- that's

10  military time.  And is that the period of time

11  covering a meeting that you had?

12       A.    Well, I'm assuming so.

13       Q.    Okay.

14       A.    I mean, I'm the fellow who wrote that, so I

15  would think that's accurate.

16       Q.    And at the top, are the individuals

17  identified who were in the meeting?

18       A.    Yes.

19       Q.    And that would be Steve Medina --

20       A.    Yes.

21       Q.    -- George Flowers -- who's the geologist,

22  right?

23       A.    Yes.

24       Q.    -- yourself --

1      A.    Yeah.

2      Q.    -- and Joe Simoni?

3      A.    Correct.

4      Q.    Okay.  Now, there's a -- you have in your

5  handwriting, sampling -- what's the next word?

6      A.    Plan.

7      Q.    Okay.  And then there -- looks like an

8  arrow over to Joe.

9      A.    Yes.

10      Q.    Okay.  Does that mean that Joe Simoni was

11  to develop the sampling plan?

12      A.    I'm assuming so.

13      Q.    This, again, would be for Spelter; wouldn't

14  it?

15      A.    Yes.

16      Q.    George Flowers was never retained as a

17  geologist in connection with the Fairmont litigation;

18  was he?

19      A.    He was not.

20      Q.    Okay.  Then it has, GWR, hyphen, CD and

21  then an arrow to Joe.  Do you see that?

22      A.    Yes.

23      Q.    What does that mean?

24      A.    I don't know.

1          Q.    Can you read the next sentence?

2          A.    Jared, grad assistant, can be involved.

3     That's the young man that I couldn't think of his

4     name.  It's Jared.

5          Q.    Does this exhibit refresh your recollection

6     as to who the graduate assistant was?

7          A.    It does.

8          Q.    And that would've been the graduate

9     assistant who would've been in attendance at a soil

10    sampling at which you were also present?

11         A.    One of the days, anyway.  Yes.

12         Q.    What is the next line underneath there?

13    Looks like something rights.

14         A.    Yeah, it does.  It has boat, so I'm

15    guessing it has something to do with water rights on

16    the river.

17         Q.    Can you read the rest of the -- of the note

18    for me?  Because I have a little bit of difficultly

19    interpreting it.

20         A.    You do?  So do I.

21               But 20 to 31 July; 21 commence field work;

22    30 last day in field; Levin Papantonio go ahead for

23    Jared to start work; Medina, slash, Simoni equal

24    consultant.

1      Q.   Was there some discussion at this meeting
2   of May 24, 2004 that Joe Simoni was a consultant to
3   the Levin firm?
4      A.   I don't know at this point.
5      Q.   The time frame that you just read into the
6   record, the 20 to 31 and 21 commence field work,
7   30 last day in field, that's consistent with the
8   earlier note that we saw where they -- George Flowers
9   was planning to be in the field in July for about a
10  ten-day period?
11     A.   Yes.  That's the note of March 25.  Yeah.
12  That's Exhibit 9.
13                      -----
14                (Exhibit No. 13 marked for purposes of
15  identification.)
16                      -----
17  BY MR. WAKEFIELD:
18     Q.   Mr. Rich, you have been handed what has
19  been marked as Deposition Exhibit No. 13.  Is it fair
20  to say this is another handwritten note generated by
21  your office?
22     A.   It is.
23     Q.   With a Bates number of Rich177, indicating
24  it was produced by your office?

1      A.   Yes.

2      Q.   It says -- it has the date of May 19, 2004,

3  Spelter, 1:10 p.m., Professor Cady returned my call;

4  unsure of what I mean by, quote, syllabus concerning

5  Spelter, unquote; Joe Simoni will handle; okay; nice

6  chat.

7         Do you -- do you know what syllabus

8  concerning Spelter meant?

9      A.   Well, I suspect someone called from one of

10  the co-counsel's office and asked about obtaining Tom

11  Cady's latest syllabus for his torts class, and Susan

12  telephoned Cady to ask him for a copy, which Tom

13  would -- you know, he's a very helpful guy and

14  would've given to us, which he, I think, did.  But he

15  must've said, well, I'm not sure what you mean by

16  this, but I'll talk to Joe Simoni about it.

17      Q.   Okay.  I was going to ask you, the Joe

18  Simoni will handle, did that indicate that Joe was

19  going to obtain the syllabus?

20      A.   Well, I don't know, but I suspect that Cady

21  probably said, I'll see Joe and talk to him about

22  this.  I'm guessing.

23      Q.   Did Joe Simoni do legal research in

24  connection with the Spelter case?

1      A.   I'm not sure what -- when you say legal

2   research, what constitutes legal research?

3      Q.   Well, where you actually had to research

4   either case law, statutes, regulations that might be

5   applicable to the case.

6      A.   I don't remember him doing any of that sort

7   of work.  I think he did obtain documents from the

8   DEP.  He probably obtained documents from clients.  I

9   mean, if that constitutes legal research, then yes.

10   He may have done so.  I don't know.

11      Q.   Okay.  Do you have any independent

12   recollection of Joe Simoni preparing any legal

13   memoranda concerning legal issues?

14      A.   I remember he gave me a document -- maybe a

15   couple different documents, things -- I don't know if

16   he actually analyzed them, but here's something that

17   might be of help on such and such issue.

18      Q.   Did Joe Simoni ever do any legal research

19   in connection with the Fairmont/Westinghouse case?

20      A.   Possibly.  I mean, he may have done and you

21   know, at the time, I might've known, but sitting here

22   today, I can't tell you with any certainty that he

23   did.

24      Q.   Did Joe Simoni participate or help prepare

1   the complaint or complaints filed in the

2   Fairmont/Westinghouse case?

3       A.    I believe he looked at the complaint that

4   was prepared by, I think, Nancy Eichler of Masry &

5   Vititoe.  I think Joe look at that complaint.

6       Q.    Do you -- do you know whether Doctor Simoni

7   ever proposed any edits to the complaint?

8       A.    I think he marked it up.  I think a lot of

9   it -- of what he marked were typos, because the work,

10  the -- some of the documents that I received were

11  riddled with typos.  It seemed to be quite common,

12  and I didn't want to put my name on something like

13  that.

14          But I can't say that Joe didn't contribute

15  in some other way, may have looked at Cady's outline

16  and cited something.  I don't remember at this point,

17  but I can remember the two of us, you know, finding

18  it somewhat amusing that we got this document with

19  all sorts of typos.

20      Q.    Did Joe Simoni participate in the drafting

21  of the complaint or complaints filed in the Spelter

22  litigation?

23      A.    I don't think so.  I think Farrest and

24  Steve Medina did, and I think they were still

1    touching that document up at my office.

2             And there was -- Tracy Hendrix, I believe,

3    was the paralegal that was sitting there in my office

4    who worked for -- I think she worked for Levin, and I

5    don't think Joe had any involvement in that

6    complaint.  Because I remember it was a very hot day,

7    and we drove down to Clarksburg and filed the

8    document, you know, just before 4:00 p.m.

9        Q.  To your knowledge, did Joe Simoni review

10   the complaint before it was filed?

11       A.  I don't think he had any involvement, but

12   he may have, but I don't -- I don't remember him

13   being involved in that.

14             MR. WAKEFIELD:  This is --

15             COURT REPORTER:  14.

16             MR. WAKEFIELD:  -- 14.

17                 -----

18             (Exhibit No. 14 marked for purposes of

19   identification.)

20                 -----

21             MR. MARINO:  Thanks.

22   BY MR. WAKEFIELD:

23       Q.  Mr. Rich, you have been handed what has

24   been marked as Deposition Exhibit No. 14.  Again, is

1    that a handwritten note generated by your office?

2        A.   It is.

3        Q.   It has Bates No. Rich179, indicating it was

4    produced by your office; is that right?

5        A.   Yes.

6        Q.   It has the date of Wednesday, 5/19/04, and

7    it says, per GWR, schedule conference call with

8    Medina, Flowers, GWR, and Joe Simoni; is that right?

9        A.   Correct.

10       Q.   Do you know what that conference call was

11   about?

12       A.   No.

13       Q.   It would be fair to say -- well, strike

14   that.

15          Do you know whether the conference call

16   occurred?

17       A.   I do not.

18       Q.   Would it be fair to say that there were

19   conference calls held in connection with the Spelter

20   litigation in which Joe Simoni participated with you

21   and with attorneys from Levin firm?

22       A.   I don't remember any such calls, but there

23   may have been.  Again, if there was, it would be in

24   my timesheets.

1      Q.   Okay.  Do you recall any telephone

2   conference calls in which Joe Simoni participated

3   where there were members of The Cochran Firm

4   involved?

5      A.   No.

6              MR. WAKEFIELD:  This is 15?

7              COURT REPORTER:  Yes.

8                    -----

9              (Exhibit No. 15 marked for purposes of

10  identification.)

11                   -----

12             MR. MARINO:  Thanks.

13  BY MR. WAKEFIELD:

14     Q.   Mr. Rich, you have been handed what has

15  been marked as Deposition Exhibit No. 15.  These

16  would appear to be handwritten notes of yours?

17     A.   Correct.

18     Q.   Bearing a Bates No. Rich229, which would

19  indicate it was produced by your office?

20     A.   Yes.

21     Q.   Now, am I correct that the date at the top

22  is Friday, 17 December '04?

23     A.   Yes.

24     Q.   Okay.  And what, 10:49?

1      A.   Yes.

2      Q.   Which would be the -- is this an in-person

3  meeting or notes with regard to a phone call?

4      A.   Well, it says, Spelter telecon, and there's

5  the toll free number and the code to enter that

6  particular telephone session.

7      Q.   So this is a Spelter telephone conference?

8      A.   Yes.

9      Q.   And the participants would be Steve -- who

10  I assume is Steve Medina?

11      A.   Yes.

12      Q.   Is that Darnell or --

13      A.   Darnell Shaffer.

14      Q.   And is that with the Levin firm?

15      A.   Yes.

16      Q.   Carol is who?

17      A.   Carol Moore, Levin.

18      Q.   All right.  Joe Simoni participated?

19      A.   It appears such that he -- yes.

20      Q.   And GWR being you; is that right?

21      A.   That's me, yes.

22      Q.   Okay.  Now, I see there's an arrow drawn

23  from Steve's name to a sentence.  Could you read that

24  for me, please?

1        A.    Joe is in a confidential consultant's role.

2        Q.    Was that a description that was being

3    placed upon Joe Simoni by Mr. Medina?

4        A.    I don't remember this conversation.

5        Q.    The reason I ask is simply because of the

6    arrow from Mr. Medina's name to the sentence.

7        A.    Well, yeah.  I'm assuming that he made the

8    statement, that that's why I put the arrow down

9    there, but I have no recollection at this point of

10    this call which is, you know, going on nine years

11    ago.

12        Q.    Okay.  Can you read the next entry?

13        A.    Yeah.  It's Joe gathering DEP documents at

14    DEP's office yesterday, is what it's saying.

15        Q.    Do you know what documents he gathered?

16        A.    I have no idea at this point.

17        Q.    But you understood that one of the roles

18    that Joe Simoni did play in the Spelter litigation

19    was to gather documents from DEP?

20                 MS. MASON:  Object to the form.

21        A.    I can't say that I knew that was his role.

22    It appears that he did that.  I can remember him, you

23    know, coming in with documents.

24        Q.    Let me rephrase the question so that there

1    isn't any ambiguity.

2              You will agree with me that Joe Simoni

3    gathered documents from DEP in connection with the

4    Spelter litigation?

5         A.   Yes.

6         Q.   What is the next entry?

7         A.   Steve suggests that whole file be copied,

8    only three-inch thick file.

9         Q.   Uh-huh.

10             And underneath that, what is the next

11   entry?

12        A.   Joe will go to Harrison County Health

13   Department.

14        Q.   Do you know why Joe Simoni was to go to the

15   Harrison County Health Department?

16        A.   He may have been looking at the rate of

17   cancer.  Maybe there were documents there which

18   showed the -- you know, the -- what the rate was

19   relative to the national average or it may have been

20   that someone was going to look at -- I think there

21   were people looking at the CDC website and comparing

22   these numbers to what the national average was and

23   looking at counties all across America.

24        Q.   Are you aware of whether Doctor Simoni did

1   medical type research in connection with the Spelter

2   case?

3        A.   Well, it appears he went to the Harrison

4   County Health Department or was scheduled to go

5   there.  I don't know if he did.

6        Q.   Uh-huh.

7             What's the next entry?

8        A.   It says, Doctor Flowers, Simoni is

9   available to be with Flowers and Allison from the 2nd

10  to the 8th of January and then the dates, Monday,

11  Tuesday, Wednesday, Thursday, Friday.

12       Q.   Okay.  And is that -- is that another visit

13  by Doctor Flowers obtaining soil samples?

14       A.   I think so.  And that may have been when I

15  was involved, because of the weather.  I know it was

16  cold, so that would probably be it.

17       Q.   And what's the last entry on the document?

18       A.   I don't know what that is.

19             MR. CASH:  Does that suggest that

20  Simoni hung up at 11:14?

21             THE WITNESS:  It's something off, but

22  I don't think it's Simoni, but it could be.  I don't

23  know.

24             MR. WAKEFIELD:  Okay.

1                              -----

2                    (Exhibit No. 16 marked for purposes of

3       identification.)

4                              -----

5       BY MR. WAKEFIELD:

6            Q.   Mr. Rich, you have been handed a document

7       that has been marked as Deposition Exhibit No. 16.

8       And again, this looks like your handwritten notes.

9       Is that right?

10           A.   It is.

11           Q.   Bearing Bates No. Rich242, which would

12      indicate it was produced by your office; is that

13      right?

14           A.   Yes, yes.

15           Q.   And the date at the top is what?

16           A.   Friday, the 3rd of -- I'm not sure if

17      that's June or January.

18           Q.   Of 2005?

19           A.   Correct.

20           Q.   And again, it -- based upon your earlier

21      testimony, is it fair for me to assume that the

22      beginning entry is Spelter telecon?

23           A.   Spelter telecon continued.

24           Q.   Continued.

1       A.    So it must be page 2 of the telecon notes.

2       Q.    And then there's an entry here that says,

3  Simoni working with George Flowers next week,

4  correct?

5       A.    Yes.

6       Q.    What's the next entry?

7       A.    Some talk about testing during years ago by

8  Simoni; Simoni says he only did a few, but can't find

9  results.

10      Q.    What's that about?

11      A.    I don't know.

12      Q.    Can you read the next entry for me, please?

13      A.    Met with David, took statements; David

14  Drummond, brother of Danny, Carol and Nathan;

15  interviewed re: Honda R.G. cleaner causing --

16  cleaning -- cleaner product causing -- and that's

17  Steve -- it's Steven King.

18            Met with Clifton, brother of Tonya, worked

19  with Danny before he met with Tonya -- before he met

20  Tonya.  Danny rode on pile as a five-year-old.  Carol

21  and Nathan did an inventory of cleaners in Danny's

22  garage, still intact.

23      Q.    Do you know who those individuals are, that

24  is the Carol and Nathan?

1          A.    Carol could possibly be Carol Moore.

2     Nathan, there was a -- that may have been a summer

3     intern or a paralegal for Levin, but I'm not certain

4     of that.  Carol, it might not be Carol Moore.  I

5     don't know in what context this is written.

6          Q.    Yeah.  I -- the impression I get is that

7     perhaps Carol, Nathan, and there's a reference to a

8     David Drummonds --

9          A.    Yes.

10         Q.    -- would have been Spelter residents.

11         A.    That's right.

12         Q.    Am I correct?

13         A.    Yes.  But Carol could be Carol Moore, or it

14    could be a resident of Spelter.  I don't know.

15                    MR. WAKEFIELD:  17?

16                    COURT REPORTER:  Yes.

17                         -----

18                    (Exhibit No. 17 marked for purposes of

19    identification.)

20                         -----

21                    MR. MARINO:  Thanks.

22    BY MR. WAKEFIELD:

23         Q.    Mr. Rich, you have been handed a document

24    that has been marked as Deposition Exhibit No. 17.

1    These are also handwritten notes from your office?

2         A.    Yes.

3         Q.    Bearing Bates No. Rich432, which indicates

4    it was produced by your office?

5         A.    Yes.

6         Q.    Friday, 12 May 2006, is that the date?

7         A.    Correct.

8         Q.    Are these notes of a meeting or phone call

9    with Steve Medina?

10        A.    These would be a call.  These notes would

11   be from a call that Steve made to me.

12        Q.    Okay.  Can you -- can you read the notes

13   for me, please?  Because I can't make them out.

14        A.    Steve Medina thanked me for supporting his

15   view on not having outside transcriber for class cert

16   transcript, would be offensive to court and court

17   reporter, came up during today's telecon.

18              Simoni, 15 to 20 minutes yesterday,

19   non-testimonial testifying relationship once Levin

20   became involved, before Levin no assertion as to

21   confidentiality; let him know that Joe does not

22   listen to me, he has little respect as he sees me as

23   a rookie attorney.

24              Steve responded that if it were not for me

1   there would be no case and that he valued me and my

2   contribution.

3        Q.   Would this have been a call just strictly

4   between you and Mr. Medina?

5        A.   Yes.

6        Q.   Did you hold the view in May of 2006 that

7   Joe Simoni did not show you very much respect?

8        A.   Apparently so.  Yes.

9        Q.   Did you ever discuss that with Doctor

10  Simoni, about the level of respect he showed you?

11       A.   I don't know if I used the word respect

12  with him, but I differed with some of the things that

13  he did, his judgment.  I just didn't like some of the

14  things he did.

15       Q.   What things did you not like that he did?

16       A.   One was the way he talked to Barbara Core,

17  who was the circuit clerk of Marion County.

18       Q.   That would've been in connection with the

19  Fairmont/Westinghouse case?

20       A.   Correct.  Yes.

21            I mean, there were other things I just

22  disagreed with him, but that's -- you know, I

23  disagreed with others as well.

24       Q.   I assume that throughout the Spelter

1  litigation there would've been occasions on which you
2  disagreed with the views expressed by the Levin firm
3  on issues?
4      A.   Yes.
5      Q.   And would there have been occasions on
6  which you would've disagreed with views or positions
7  taken by The Cochran Firm?
8      A.   Probably.  Yes.
9      Q.   Now, going back to your involvement in the
10  WVU asbestos litigation, I believe you had testified
11  earlier that some of the things that Doctor Simoni
12  did in the WVU litigation included organizing
13  meetings with potential plaintiffs?
14      A.   Correct.
15      Q.   And that those were held at the union
16  office?
17      A.   Yes.
18      Q.   That he also researched law firms to get
19  involved in the case?
20      A.   Yes.
21      Q.   Eventually, there was an attorney by the
22  name of Bob Sweeney who became involved?
23      A.   Correct.
24      Q.   Was it Mr. -- or Doctor Simoni who came up

1   with Mr. Sweeney's name?

2        A.   I don't know at this point.

3        Q.   Okay.

4        A.   It could've been me.  It could've been Joe.

5   I know he came to me with a list of attorneys,

6   printouts from websites.  I was looking at some

7   myself.  I think Larry Harless had suggested Ness

8   Motley.  You know, so I can't be certain who came up

9   with Bob's name.

10       Q.   Was there a visit to Mr. Sweeney's office

11  in Cleveland?

12       A.   There was.  I don't know if Sweeney came to

13  Morgantown first or if I went to see him.  I don't

14  remember the chronology of those events, but there

15  were visits.  Yes.

16       Q.   Okay.  And the visits to Mr. Sweeney's

17  office in Cleveland, was Joe Simoni a participant?

18       A.   Yes.  Not all of them.  I can remember

19  being there at least once or twice on my own.

20       Q.   Okay.  In those instances where Mr. Sweeney

21  came to Morgantown, was Joe Simoni present at any

22  meetings with Mr. Sweeney?

23       A.   I can't say that he was at every meeting,

24  but he was at meetings, yes, with Bob.

1        Q.   The impression I get is that the -- what
2   was done in the WVU litigation was organizing --
3   having organizational meetings with potential
4   plaintiffs to explain the potential for litigation.
5   Is that a fair statement?
6        A.   These were members of his union, and I
7   don't know if there were non-union members there, but
8   yes, people that he thought had been exposed.
9        Q.   Okay.  So would it be fair to say that the
10  organizational model, for lack of a better
11  description, was to do some research into the
12  possible hazard, organize a series of meetings with
13  potential plaintiffs, then go out and do some
14  research to find a law firm or law firms that would
15  have the knowledge and expertise and resources to
16  prosecute the case?
17       A.   I think so.  Yes.
18       Q.   Okay.  Was that same type of organizational
19  model followed with regard to Fairmont?
20       A.   Yes.
21       Q.   Okay.  And would it also be fair to say
22  that type of organizational model was followed with
23  regard to Spelter?
24                 MS. MASON:  Object to form.

1          MR. CASH:  Object to form.

2     A.   I would say so.  Yes.

3     Q.   And in -- and in all three pieces of

4  litigation, Joe Simoni certainly was substantially

5  involved in organizing meetings of potential

6  plaintiffs?

7     A.   Initially, yes.

8     Q.   Okay.  And Joe Simoni was substantially

9  involved in researching law firm in all three pieces

10  of litigation?

11     A.   I don't know if substantially is correct,

12  but he was involved.

13          MR. WAKEFIELD:  Let's take about a

14  five-minute break.

15          VIDEOGRAPHER:  We're going off the

16  record.  The time -- we're going off the record.  The

17  time is 4:14 p.m.

18                    -----

19               (Brief break)

20                    -----

21          (Exhibit Nos. 18 and 19 marked for

22  purposes of identification.)

23                    -----

24          VIDEOGRAPHER:  We're back on the

1 record.  The time is 4:24 p.m.

2 BY MR. WAKEFIELD:

3     Q.   Mr. Rich, you have actually been handed two

4 exhibits, Nos. 18 and 19.  No. 18 is a letter that is

5 addressed to you and Joe Simoni; is that right?

6     A.   Correct.

7     Q.   Bearing the date of November 21, 2000?

8     A.   That's right.

9     Q.   Has Rich Bates No. 2221, indicating that it

10 was produced by your office?

11     A.   Yes.

12     Q.   It is from the law firm of Glasser &

13 Glasser, located in Norfolk, Virginia?

14     A.   Correct.

15     Q.   Am I fair in my characterization of

16 Deposition Exhibit 18 that it is a letter confirming

17 a meeting that you and Joe Simoni had with this law

18 firm concerning a possible involvement in the

19 Fairmont litigation?

20     A.   That's what it appears to be.  Yes.

21     Q.   Okay.  And was this a meeting that occurred

22 in West Virginia?

23     A.   It -- well, it -- the meeting -- meeting

24 both of you last week in West Virginia.  I would say

1    that's correct.  Yes.

2         Q.   And it's addressed to both you and Joe

3    Simoni, which would indicate to me that both you and

4    Joe Simoni were participants in the meeting.

5         A.   Meeting both of you last week.  Yes.

6         Q.   Okay.

7         A.   I would say that's --

8         Q.   And --

9         A.   -- correct.

10        Q.   And then on top of that, would it have been

11   Doctor Simoni would made the initial contact with

12   Glasser & Glasser?

13        A.   I don't know.

14        Q.   I want to direct your attention to

15   Deposition Exhibit No. 19.  That is also a letter

16   addressed to you and Joe Simoni.  And am I correct

17   that the address listed on this letter would have

18   been the office that you occupied in December of

19   2000?

20        A.   Yes.

21        Q.   And that would've also been true with

22   Deposition Exhibit No. 18?

23        A.   Yes.

24        Q.   And again, this confirmed a meeting that

1    apparently -- or at least a conversation that

2    occurred about possible representation?

3         A.   Yes.

4         Q.   Okay.  Did you and Joe Simoni actually go

5    to Charleston, South Carolina to meet with the Ness

6    Motley folks?

7         A.   No.

8         Q.   Did anyone from Ness Motley come to West

9    Virginia to meet with you and Doctor Simoni?

10        A.   I don't believe so.

11        Q.   Now, is this letter concerning the Fairmont

12   litigation or WVU?

13        A.   I don't know.

14        Q.   The reason I ask that question, I believe

15   you testified earlier that Larry Harless had

16   suggested the Ness Motley firm --

17        A.   About --

18        Q.   -- about the WVU project?

19        A.   He did.

20        Q.   Okay.  Do you have any recollection of

21   having communications with the Ness Motley firm about

22   getting involved in the Fairmont litigation?

23        A.   I don't recall.

24        Q.   Mr. Rich, I am going to read to you from a

1    response to Interrogatory No. 3 of your --

2        A.    Yes.

3        Q.    -- interrogatory responses.

4                MR. CASH:  To which party?

5                MR. WAKEFIELD:  They are the

6    responses, Gary W. Rich and Law Office of Gary W.

7    Rich's Objections and Responses to Joseph Simoni's

8    First Set of Interrogatories.

9    BY MR. WAKEFIELD:

10        Q.    And I'm particularly interested in

11   Interrogatory No. 3.  The question that was asked

12   was, please itemize all hours expended in prosecution

13   of the Spelter litigation by, quote, staff, unquote

14   or quote, other staff, unquote, as identified on your

15   petition to the Harrison County Circuit Court for an

16   award of attorney fees and litigation expenses.

17              Beginning paragraph of the response says,

18   plaintiffs object to this request on the basis that

19   it seeks information relating to a particular

20   designation and grouping which was not created by

21   plaintiffs but by Levin, Papantonio, Thomas,

22   Mitchell, Rafferty & Proctor, P.A.

23              And it goes on to say, subject to and

24   without waiving the foregoing objections, plaintiffs

1    state that it is their understanding and belief that

2    the 908.2 hours consolidated by Levin Papantonio and

3    identified with, quote, other staff, unquote,

4    consists of a subset -- and it has parentheses,

5    identified by Levin, Papantonio, Thomas, Mitchell,

6    Rafferty & Proctor, P.A. -- of the 1,027 total hours

7    during the period from May 2001 through October 2007

8    which Mr. Rich reported to Levin Papantonio, Thomas,

9    Mitchell, Rafferty & Proctor, P.A. on or about

10   November 1, 2007 and which consisted of hours worked

11   and recorded by Susan S. Fair, Bobbie Larew, and

12   Theresa R. Rich.

13          Now, my understanding is that Susan Fair

14   was a secretary, slash, receptionist for you?

15       A.   Paralegal.  Yes.

16       Q.   Okay.  And Bobbie Larew, what role did that

17   person occupy?

18       A.   The same.

19       Q.   Did Bobbie Larew replace Susan Fair?

20       A.   No.

21       Q.   Okay.  And then Teresa Rich was your wife;

22   is that right?

23       A.   Correct.

24       Q.   I take it that you had these individuals

1  record their time in connection with tasks they

2  performed in the Spelter litigation?

3      A.  Yes.

4      Q.  Okay.  What types of tasks did Susan Fair

5  perform?

6      A.  Well, you've handed me a number of notes

7  that she had written.  Scheduling meetings,

8  scheduling depos, you know, whatever needed to be

9  done.  If she got a call from one of the other firms,

10  do this, she did it.

11      Q.  Okay.  And what tasks did Bobbie Larew

12  perform?

13      A.  The same.

14      Q.  All right.  What about Theresa Rich?

15      A.  She did a lot of the office management,

16  paying bills.  She would -- you know, we -- there

17  were lots of photocopies made.  We would take them --

18  she would take them to a copy shop, have them made --

19  or make them herself there.  Again, pretty much

20  whatever needed to be done.

21      Q.  Would it be fair to say that the tasks

22  performed by Susan Fair, Bobbie Larew, and Theresa

23  Rich would be administrative tasks?

24      A.  Yes.  Bobbie was a trained paralegal.  She

1    -- well, I can't say she did any legal research on

2    these cases, but she did do legal research, but

3    probably more in the immigration realm.

4         Q.   But in any event, you had them keep their

5    hours and you submitted those hours to the Levin

6    Papantonio firm, correct?

7         A.   Yes.

8         Q.   And then those hours were apparently

9    submitted in connection with the fee petition?

10        A.   That's right.

11        Q.   Okay.  And the fee petition, of course, was

12   seeking an award of fees based upon the results of

13   the Spelter litigation?

14        A.   Based on the results?

15        Q.   Well, let me -- let me rephrase the

16   question.  That may not have been artfully phrased.

17             The fee petition was submitted following a

18   successful result in the Spelter litigation?

19        A.   It was initially submitted after we had the

20   jury verdict.

21        Q.   And was there another fee petition

22   submitted after the settlement?

23        A.   I believe so.

24        Q.   Okay.  And these hours of the tasks

1  performed by individuals in your office were

2  submitted after the jury verdict initially and then

3  again submitted in connection with the fee petition

4  after the settlement?

5          MS. MASON:  Object to form.

6      A.   I don't think they were resubmitted.  I

7  think that Carol and I had liaised back and forth,

8  and I simply told her that I had done maybe 150 hours

9  of work since that time.

10          I don't know that I listed anything for the

11  staff, because I didn't really know.  We sort of --

12  after the trial, we continued to do work, but a lot

13  of it was appellate work, so the involvement was not

14  that great.

15          And furthermore, I was in Saudi Arabia at

16  the time, so Susan had left and Bobbie had left and

17  so there really -- I didn't feel comfortable

18  reporting anything, I don't believe, for the staff,

19  so it was just me.

20      Q.   You're talking about for the period between

21  the jury verdict and the settlement?

22      A.   Correct.

23      Q.   So these would've been hours that would've

24  been submitted in connection with work done up

1    through the trial?

2         A.    Yeah.  And I think the way Carol and I

3    looked at it was, well, what do you think you've

4    done?  And I said, probably about 150 hours, probably

5    more than that, but I felt comfortable saying that.

6         Q.    And then, as I understand it, these hours

7    were included in the fee petition filed after the

8    jury verdict?

9         A.    I believe my --

10                    MS. MASON:  Object to form.

11        A.    -- 150 hours, if that was the number --

12   maybe it was 100, maybe it was 200.  I'm not certain

13   sitting here today, but whatever that number was,

14   there was an e-mail or -- I think an e-mail probably

15   to Carol saying, that's what I think should be added

16   to my total.

17        Q.    I understand.

18        A.    Yeah.

19        Q.    What I'm just trying to ascertain is

20   whether the hours themselves, of the 908.2, did those

21   get included in a fee petition?

22        A.    Well, those -- that 908 hours is

23   inaccurate.  It is actually more than that, and the

24   way Carol listed that -- and there was a chart that I

1    sent to Farrest.  I didn't send it.  Someone in my

2    office sent -- well, I may have sent it.  I'm not

3    sure.

4            There was a chart I think Susan prepared

5    listing month by month the hours, and she derived

6    those numbers from the timesheets, so for every

7    month, there was so much for me, Susan, Bobbie.  I

8    mean, it -- depending on, of course, if they worked

9    on this case.  Those hours were submitted.

10           Carol chose to reduce those hours for me

11   and I believe the staff, and she also listed the

12   names of contract attorneys that had worked for us.

13   Because there were times when there were depositions

14   going on -- well, a number of depositions going on at

15   the same time, and I couldn't be in two depositions

16   at once, so we hired attorneys to sit in for us, so

17   just on a contract basis, and I think she had listed

18   a couple of those people as -- you know, their hours,

19   but I don't know how she came up with that.

20           But I spoke to Sherri Goodman about this.

21   And she said, well, as long as the hours are not in

22   excess of what was worked, then it's not a big deal,

23   if it's less than.  And furthermore, my compensation

24   was really not based on those hours anyway.

1    Q.    Why did you keep track of your time?

2    A.    Why did I?  I think someone told me to.

3    Q.    Who?

4    A.    I don't remember.

5    Q.    Was it from one of the other law firms --

6    A.    Well --

7    Q.    -- such as the Levin firm or The Cochran

8  Firm?

9    A.    I had already been keeping it because,

10  quite frankly, I didn't know how these things worked.

11  I didn't know if one got paid on an hourly basis, if

12  it was a lump sum.  I didn't know, so I kept records,

13  but typically, I did not in immigration cases.  My

14  work was all done on lump sum -- on a lump sum basis.

15    Q.    Did you keep track of your time in the

16  Fairmont litigation?

17    A.    Yes.

18    Q.    Did you keep track of your time in the WVU

19  asbestos litigation?

20    A.    I can't remember now.

21    Q.    You had some understanding that time should

22  be kept for later submission at the conclusion of the

23  case to the extent that would have an impact on the

24  awarding of fees?

1        A.    Well, as I said, I kept the time initially

2    because I didn't know how the -- how one would be

3    compensated.  I didn't know if this was needed for

4    the court.  And then once the other firms got

5    involved, I think I actually submitted the time in --

6    you know, monthly to them.

7        Q.    So you --

8        A.    At least with Masry & Vititoe I think I was

9    submitting the time, and then I think Baron & Budd

10   may have said, we don't want to see this, but I'm not

11   certain of that.

12       Q.    But did you have any understanding that you

13   acquired during either the Fairmont litigation or the

14   Spelter litigation that time recorded or kept would

15   later be submitted in connection with a fee petition?

16       A.    I can't remember someone specifically

17   telling me that, but I probably knew that could

18   happen.

19       Q.    Why did you instruct the members of your

20   staff, Susan Fair, Bobbie Larew, and Theresa Rich, to

21   keep track of their time?

22       A.    For that very reason.

23       Q.    With the idea that it may need to be

24   submitted at the conclusion of the case?

1        A.   Yeah.  I believe so.  I mean, and also,

2   just a record of what we were doing.

3        Q.   Did you pay any bonus to Susan Fair as a

4   result of the settlement of the Fairmont litigation?

5        A.   No.

6        Q.   Did you pay any bonus to Susan Fair as a

7   result of the settlement of the Spelter case?

8        A.   No.

9        Q.   Did you pay any bonus to Bobbie Larew as a

10  result of the settlement of the Fairmont litigation?

11       A.   No.  We had simplified employee pension

12  accounts set up.  That was for all -- for everyone in

13  the -- in the office, me and the three women, but it

14  really wasn't contingent on anything to do with this

15  case --

16       Q.   Was there any additional --

17       A.   -- or cases.

18       Q.   -- consideration paid to Susan Fair as a

19  result of the recovery in the Fairmont litigation?

20       A.   No.

21       Q.   Any additional consideration paid to Susan

22  Fair as a result of the settlement of the Spelter

23  case?

24       A.   No.

1      Q.   Any additional consideration paid to Bobbie

2  Larew as a result of the Fairmont litigation?

3      A.   No.

4      Q.   Any additional consideration paid to Bobbie

5  Larew as a result of the Spelter case?

6      A.   No.

7      Q.   Any additional consideration paid to

8  Theresa Rich as a result of the settlement of the

9  Fairmont case?

10     A.   No.

11     Q.   Any additional consideration paid to

12  Theresa Rich as a result of the settlement of the

13  Spelter litigation?

14     A.   No.

15     Q.   I'm a little confused by your testimony a

16  moment ago about this -- shared retirement account;

17  was it?

18     A.   It's a simplified employee pension.  I

19  simply set that up for the office, and it was based

20  on a percentage of their income.

21     Q.   Okay.

22     A.   That would be -- it wasn't a lot.  It was

23  maybe three percent of their income would be taken

24  off the top.  It's like a 401(k) plan but a very

1  simple version of that.

2      Q.   Did you pay Susan Fair and Bobbie Larew on

3  an hourly basis or salary basis?

4      A.   I think it was hourly.

5      Q.   Did you ever consider hiring Joe Simoni?

6      A.   I think we probably talked about that, or I

7  may have considered it, didn't talk to him about it.

8  I can't remember.  But not -- you know, I don't know

9  when it was, and I can't say that it was necessarily

10 about these cases.  I mean, it was just in general.

11     Q.   In general, to perhaps hire him to work

12 with you on the three pieces of litigation, WVU,

13 Fairmont, and Spelter, as well as any other legal

14 work you may have?

15     A.   Not necessarily legal.  I mean, I was doing

16 other things.

17     Q.   Such as?

18     A.   Well, real estate.  We'd talked about this

19 mobile sign advertising business.  I don't know.

20 There was something else too, I think, but these --

21 again, this was just talk, general --

22 generalizations.

23     Q.   I get the impression you owned your office

24 building in Morgantown at some point.

1    A.    Yes.

2    Q.    It's located on High Street?

3    A.    That's right.

4    Q.    Do you still own it?

5    A.    Yes.

6    Q.    There are lawyers who are tenants of yours?

7    A.    One.

8    Q.    Who is that?

9    A.    Phil Magro.

10    Q.    Did you ever have any discussions with Joe

11   Simoni about paying him to be a real estate developer

12   or consultant?

13    A.    Talked to him about real estate.  I can't

14   remember the exact context at this point in time.

15    Q.    I do recall some testimony you gave this

16   morning about giving him the name of a real estate

17   developer or broker --

18    A.    Consultant.

19    Q.    -- or consultant in Florida.  Is that

20   right?

21    A.    Correct.

22    Q.    And that was in connection with your

23   understanding that Doctor Simoni was going to be

24   moving to Florida?

1          A.    Yes.

2          Q.    Okay.  Did you have any other discussion

3    with Joe Simoni about compensating him to serve in

4    the capacity of a real estate consultant or developer

5    or broker?

6          A.    I don't remember specific terms.

7          Q.    Do you recall generally?

8          A.    There was talk about real estate.

9          Q.    Okay.

10         A.    That's all I can remember at this point.

11         Q.    Okay.  What generally do you recall about

12   discussing with Doctor Simoni about real estate?

13         A.    I told him it might be a good investment

14   for him.  I don't remember where he was going.  I

15   think it was to be near his parents who were quite

16   elderly.  I don't remember the location.  I was just

17   talking in general terms.  I wasn't telling him to

18   buy something or that I was buying something, because

19   I don't know the area.

20         Q.    Okay.

21         A.    I wouldn't know if it was a good investment

22   or not, but --

23         Q.    Did you ever propose to Joe Simoni about

24   jointly investing in some real estate?

1      A.   I think I probably did.

2      Q.   In Florida?

3      A.   Probably.  Yes.

4      Q.   Is there a reason why that didn't come to

5  fruition?

6      A.   I don't think we ever talked about it

7  again.

8      Q.   It was just a general discussion?

9      A.   Just talking.  Yeah.

10                COURT REPORTER:  20?

11                MR. WAKEFIELD:  It's 20.  You're

12  right.  I'm sorry.

13                      -----

14                (Exhibit No. 20 marked for purposes of

15  identification.)

16                      -----

17  BY MR. WAKEFIELD:

18      Q.   Mr. Rich, you have been handed what has

19  been marked as Deposition Exhibit No. 20, which, as

20  you can see, is a time summary from 1999 to 2007.

21  And I believe in response to one of Mr. Cash's

22  questions this morning you had indicated that you had

23  reviewed the time summary.

24      A.   Yes.

1      Q.   And you understand this is a time summary
2    prepared by Doctor Simoni?
3      A.   That's my understanding.
4      Q.   And it's your understanding this is a time
5    summary reflecting what Doctor Simoni maintains is
6    the work that he performed in the WVU case, the
7    Fairmont/Westinghouse case, and the Spelter case,
8    correct?
9      A.   I don't remember the WVU being on here.
10     Q.   Is WVU listed?
11     A.   It is.  But this isn't the one that I've
12   seen before, I don't believe.
13               MR. CASH:  Can we interrupt you for a
14   second?  Could I take us off the record for one
15   second?
16               MR. WAKEFIELD:  Okay.
17               MR. CASH:  This is not the time
18   summary that you --
19               VIDEOGRAPHER:  Did you want to go off
20   the record?
21               MR. CASH:  We can stay on the video.
22   It's fine if you want to stay on.  All right.  They
23   want to stay on.
24               We served a request for admissions to your

1    client asking to authenticate the document.  The

2    version that's been floating around on our side is

3    from August 31st.  The version shown here is

4    August 23rd, so I just wanted to make clear.  I think

5    we should refer to the one that's been provided to

6    the parties in discovery.

7                   I just wondered if you could clarify.  This

8    August 23rd one, I don't think I've seen it.  I don't

9    think it's been produced in the --

10                   MR. WAKEFIELD:  Well, it has the Bates

11   number.

12                   MR. CASH:  I see the Bates number.  Is

13   there a difference between these two?

14                   MR. WAKEFIELD:  Well, I mean, you

15   apparently have one in front.  Does the one in front

16   of you eliminate WVU, I suspect?

17                   MR. MCCARTHY:  It appears to.

18                   MR. WAKEFIELD:  I think that's the

19   difference then.

20                   MR. MCCARTHY:  And I think it also

21   separates the two.  Then there's a little overlap

22   where it --

23                   MR. MARINO:  Well, it's -- I mean, the

24   document you've marked seems to be an older version,

1  right?

2                   MR. WAKEFIELD:  Well, that would

3  appear to be the case.

4                   MR. MARINO:  Yeah.  And so the one

5  that you gave us earlier and that I gave to everybody

6  is the newer version, all right?  So that's the one

7  --

8                   MR. WAKEFIELD:  Let's go off -- let's

9  go off the record --

10                  MR. MARINO:  Yeah.

11                  MR. WAKEFIELD:  -- so we can clarify

12  this.

13                  MR. MARINO:  Yeah.

14                  VIDEOGRAPHER:  We're going off the

15  record.  The time is 4:47 p.m.

16                          -----

17                      (Brief break)

18                          ----

19                  VIDEOGRAPHER:  This ends the

20  deposition of Gary W. Rich for today on April 30th,

21  2013.  The time is 5:03 p.m.

22                          -----

23                  (Concluded for the day)

24                          -----

1                              -----

2                           PROCEEDINGS

3                              -----

4                    (Exhibit No. 21 marked for purposes of

5      identification.)

6                              -----

7                    VIDEOGRAPHER:  We are here today for

8      the continued deposition of Gary W. Rich on May 1st,

9      2013 in the case of Rich v. Simoni, third-party

10     defendants.

11             Will the court reporter please remind the

12     witness that he is still under oath?

13                    COURT REPORTER:  You're still under

14     oath from yesterday, sir.

15                    THE WITNESS:  Yes.

16     BY MR. WAKEFIELD:

17          Q.   Good morning, Mr. Rich.

18          A.   Good morning.

19          Q.   I want to resume my examination of you that

20     we adjourned yesterday afternoon.  I had asked you

21     some questions yesterday about your timekeeping for

22     you and your staff in connection with the Spelter

23     case.

24             Did you also keep count or track of the

1    hours that you expended in the Fairmont/Westinghouse

2    litigation?

3         A.   I did.

4         Q.   Can you -- can you tell me approximately

5    how many hours you recorded in connection with that

6    litigation?

7         A.   I cannot.

8         Q.   Can you give me an estimate as to whether

9    the amount of hours that you expended in the

10   Fairmont/Westinghouse litigation was more or less

11   than in the Spelter litigation?

12        A.   I suspect it would be more, because there

13   were probably 200 depositions in that particular case

14   and I attended most of those.

15        Q.   And when you say, that particular case,

16   you're talking about the Fairmont litigation?

17        A.   Correct.

18        Q.   Did you also have your staff record hours

19   in connection with the Fairmont litigation?

20        A.   I did, yes.

21        Q.   Do you have any estimate as to the number

22   of hours recorded by your staff in the Fairmont

23   litigation?

24        A.   I do not.

1          Q.   Can you give me an estimate as to whether

2    the amount of hours recorded by your staff in the

3    Fairmont litigation would have been more or less than

4    in the Spelter litigation?

5          A.   I don't know.

6          Q.   In what year did you receive the fee

7    distribution in the Spelter litigation?

8          A.   I believe it was 2008.

9          Q.   For Spelter?

10         A.   Oh, Spelter.  No.  2011, I believe.

11         Q.   Did you pay a bonus to your employees in

12   the year 2011?

13         A.   I did not.

14         Q.   Did you pay a bonus of any sort to your

15   employees in the year 2010?

16         A.   I did not.

17         Q.   In what year did you the receive fee

18   distribution from the Fairmont/Westinghouse

19   litigation?

20         A.   I believe that was 2008.

21         Q.   Did you pay a bonus of any sort to your

22   employees in the year 2008?

23         A.   I did not.

24         Q.   In connection with the

1    Fairmont/Westinghouse litigation, what percentage of
2    the fee did you receive?
3        A.   I don't recall.
4        Q.   There was a written fee sharing agreement?
5        A.   Yes.
6        Q.   Was there also a memorandum of
7    understanding in connection with the Fairmont
8    litigation?
9        A.   Yes.  I believe so.
10       Q.   Your fee sharing agreement in the
11   Fairmont/Westinghouse litigation was with what firm
12   or firms?
13       A.   That would've been with Masry & Vititoe,
14   Baron & Budd, and my firm.
15       Q.   Any other law firms share in the fee
16   distribution from the Fairmont/Westinghouse
17   litigation?
18       A.   I don't believe so.  No.
19       Q.   In the Fairmont/Westinghouse litigation,
20   were you paid a monthly stipend?
21       A.   I was paid a -- initially, a monthly
22   stipend, and then it became an annual stipend.
23       Q.   What was the monthly stipend?
24       A.   I believe it was $3,000.

1          Q.   When was the stipend first paid?

2          A.   I don't know.

3          Q.   For how long did you receive a monthly

4     stipend?

5          A.   Not very long, maybe -- I'm not certain --

6     ten, 12 months, something like that.

7          Q.   Did the monthly stipend ever increase?

8          A.   It ceased.

9          Q.   So rather than increasing, it ceased and

10    you were being paid on an annual basis?

11         A.   Yes.

12         Q.   What was the annual amount you were being

13    paid in the Fairmont litigation?

14         A.   I believe it was $90,000.

15         Q.   What firm or firms paid that amount to you?

16         A.   Baron & Budd.

17         Q.   Did you ever receive any stipend or

18    payments from the Masry firm?

19         A.   Well, initially, the monthly stipend.

20         Q.   So the monthly stipend would've been

21    received from the Masry firm; is that right?

22         A.   Correct.

23         Q.   And then the annual amount you were

24    receiving was paid by Baron & Budd?

1      A.   Yes.

2      Q.   How long did you receive an annual payment

3  from Baron & Budd in connection with the Fairmont

4  litigation?

5      A.   I don't know, but I'm thinking probably

6  four years, five years.  I'm not certain.

7      Q.   Why did you receive a monthly stipend?

8      A.   Because that's the deal I negotiated.

9      Q.   Why did you want a monthly stipend?

10      A.   Well, because this litigation was taking me

11  away from other activities, and it was something to

12  help pay the bills.

13      Q.   Would it be fair to say that you negotiated

14  a monthly stipend and later an annual payment because

15  you were devoting a substantial amount of your time

16  to the Fairmont/Westinghouse litigation?

17      A.   I think that's fair.  Yes.

18      Q.   And because you were devoting a substantial

19  amount of your time to the Fairmont/Westinghouse

20  litigation, you were not available to do other legal

21  work that would generate income for you?

22      A.   Yes.

23      Q.   And you did not expect to receive any fee

24  compensation with respect to the

1    Fairmont/Westinghouse litigation until the case was

2    either settled or successfully tried?

3        A.    Correct.

4        Q.    Did you receive any stipend in connection

5    with the Spelter litigation?

6        A.    I did not.

7        Q.    Did you request a stipend in the Spelter

8    litigation?

9        A.    I don't recall.

10       Q.    To your knowledge, did any individual

11   receive a stipend in the Spelter litigation?

12       A.    Not that I'm aware of.

13       Q.    The stipend that you received in the

14   Fairmont/Westinghouse litigation, was that offset

15   from the ultimate fee recovery?

16       A.    No.

17       Q.    Did you ask Doctor Simoni to provide

18   assistance to you in negotiating your fee split with

19   either the Masry firm or Baron & Budd?

20       A.    Not with the Masry firm, but upon the

21   arrival of Baron & Budd, there was an issue as to

22   their involvement, my involvement, and Joe helped me

23   obtain the services of his nephew, John Simoni.

24       Q.    And did John Simoni represent you in your

1    negotiations with Baron & Budd?

2         A.    He did.

3         Q.    You testified yesterday, as I recall, that

4    Baron & Budd became involved in the Fairmont

5    litigation and indicated that they were going to

6    receive 75 percent of any fee.  Is that correct?

7         A.    That's what they told me.  Yes.

8         Q.    And that the arrangement that you had with

9    the Masry firm was for you to receive 30 percent so

10   that if you added 30 and 75 you ended up with

11   105 percent?

12        A.    That's correct.

13        Q.    And that led to you having to enter into

14   negotiations with Baron & Budd on how the fee split

15   between you and Baron & Budd was to be handled?

16        A.    Correct.

17        Q.    And John Simoni represented you in those

18   negotiations?

19        A.    He did.

20        Q.    Did Mr. Marino ever represent you in those

21   negotiations?

22        A.    He did.

23        Q.    Did Mr. Marino substitute for John Simoni

24   at some point?

1      A.   I'm not sure what you mean by substitute.

2      Q.   Well, I get the impression you originally

3  had John Simoni representing you in the negotiations.

4      A.   Correct.

5      Q.   Later Mr. Marino became involved?

6      A.   He did.

7      Q.   Did he step in the shoes of Mr. Simoni --

8      A.   Yes.

9      Q.   -- and replace him?

10     A.   Yeah.  John Simoni at that point was no

11  longer representing me.

12     Q.   Okay.  Was there a reason why John Simoni

13  was no longer representing you?

14     A.   Well, he was in New York.  I was paying him

15  by the hour.  And Marino had prior experience with

16  the Masry firm, which I was aware of this, and I

17  thought he would be a better fit for me.

18     Q.   Did Doctor Simoni attend meetings between

19  you and Mr. Marino in connection with the dispute

20  with the Baron & Budd firm?

21     A.   I think possibly one meeting he was at.

22     Q.   And where did -- where was that meeting

23  held?

24     A.   I'm not certain.

1        Q.   Did Doctor Simoni attend any meetings with
2    Baron & Budd representatives with you in connection
3    with this dispute?
4        A.   He was at, I think, different meetings with
5    clients, and this issue would come up as a -- as a
6    side issue.  Obviously, the clients weren't a party
7    to it, but I think he may have interacted with
8    Baron & Budd at that time.
9        Q.   I take it the dispute between you and
10   Baron & Budd concerning fee splitting was resolved.
11       A.   Eventually, yes.
12       Q.   Okay.  What was the resolution?
13       A.   The resolution was that the percentage
14   dropped from 30 percent, I think, to 25 percent.  I'm
15   not certain of that.  And as a result, the stipend
16   went to $90,000 a year.
17       Q.   Were those two items contemporaneous?  In
18   other words, your percentage of the fee to ultimately
19   be recovered was reduced to 25 percent, and in
20   exchange for that, you received an increased stipend?
21       A.   I think that's how Baron & Budd saw it.
22   Yes.
23       Q.   Is that how you saw it?
24       A.   I suppose so.  Yeah.  I mean, I don't know

1   how else to look at it at this point.

2        Q.   I take it that the resolution of the

3   dispute with Baron & Budd would have resulted in a

4   new fee sharing agreement?

5        A.   It resulted in a -- I think a rather

6   lengthy MOU.

7        Q.   And by MOU, you mean memorandum of

8   understanding?

9        A.   Correct.

10       Q.   Did Doctor Simoni assist in the drafting of

11  the memorandum of understanding?

12       A.   He did not.

13       Q.   Did you ask Doctor Simoni to review the

14  memorandum of understanding?

15       A.   I don't believe so.

16       Q.   Did Doctor Simoni provide any comments to

17  you about the memorandum of understanding?

18       A.   Not that I can recall.

19       Q.   Did you ask for Doctor Simoni's assistance

20  in negotiating the memorandum of understanding that

21  existed on the Spelter litigation?

22       A.   No.

23       Q.   Did Doctor Simoni attend with you any

24  meetings either with the Levin firm or The Cochran

1   Firm where the fee split was discussed or negotiated?

2       A.   No.  That was done by telephone, and it was

3   just, I think, me and Farrest and Steve Medina.

4       Q.   Did you ever have a dispute with either the

5   Levin firm or The Cochran Firm over the terms of the

6   fee sharing agreement?

7       A.   I wouldn't say dispute.  There were -- I

8   don't know if the word is disagreement, but there

9   were firms brought in with very little input from me.

10      Q.   Was your consent sought for bringing in

11  other firms?

12      A.   As I recall, it was after the fact.

13      Q.   What firms were added to the Spelter

14  litigation?

15      A.   It was a Clarksburg firm, West & Jones.

16      Q.   Who brought the West & Jones firm into the

17  Spelter litigation?

18      A.   I think Steve Medina is the one who

19  approached them.

20      Q.   Okay.  Did West & Jones sign a memorandum

21  of understanding to your knowledge?

22      A.   I'm not certain.  I suspect they did.

23      Q.   Do you know whether they had a separate

24  written agreement with the Levin Papantonio firm?

1        A.    No.  I don't think it was separate.

2        Q.    Do you know what percentage of the fee

3    sharing was going to be given to West & Jones?

4        A.    I do not.  I mean, I -- I'm certain I knew

5    at the time, but today, sitting here, I can't tell

6    you.

7        Q.    Okay.  But as I understand it, West & Jones

8    was brought into the Spelter litigation and you were

9    told about it after the fact?

10        A.    Well, remembering back, I can remember

11    suggesting names.  The other firms were wanting a

12    local Clarksburg firm for logistic reasons, I think,

13    and I can remember giving them names.

14             They did talk to me.  I think Steve spoke

15    to me about names, and I gave him a few names.

16    West & Jones was not one of them.  And then I was

17    told it was West & Jones.  I didn't know them.

18        Q.    Did you raise any objection to West & Jones

19    being --

20        A.    Yeah.  I was -- I was --

21        Q.    You've got to let me finish my question.

22             Did you raise any objection to West & Jones

23    being brought into the Spelter litigation?

24        A.    I did.

1          Q.    What was the basis of the objection?

2          A.    Well, I just thought it was -- if anything,

3    it was not polite to just dictate to me that this

4    firm was coming in, and it wasn't as though they were

5    being associated and paid from, say, Levin's portion

6    of the fee, but rather I was told that this would be

7    done from all three firms on an equal basis.

8          Q.    So I take it the addition of West & Jones

9    to the Spelter litigation resulted in there being in

10   a reduction in the percentage of the fee that you

11   would receive if there was a successful recovery?

12         A.    Correct.

13         Q.    When you raised the objection about West &

14   Jones being added to the Spelter litigation, did

15   anyone honor the objection, did it have any effect on

16   West & Jones becoming involved?

17         A.    It had no effect.

18         Q.    Well --

19         A.    They became involved.

20         Q.    Was it a fait accompli?

21               MS. MASON:  Object to form.

22         A.    I -- you know, I can't remember it's been

23   so long ago, but I know I objected.  As it turned

24   out, I think West & Jones did a fabulous job and in

1    retrospect it was fine.

2        Q.   Was it your belief that the memorandum of

3    understanding required your consent before another

4    law firm could be added?

5        A.   Well, if one reads the memorandum -- and I

6    haven't in a number of years, but I believe it talks

7    about the executive committee.  And probably it's a

8    majority vote, and there were three members, so I'm

9    assuming that Cochran and Levin voted and that was

10   the majority.

11       Q.   Were you told that?

12       A.   I was not told that.

13       Q.   Okay.

14       A.   I was just told, they're coming in.

15       Q.   So your assumption would be that the Levin

16   firm and The Cochran Firm must have agreed to bring

17   West & Jones into the litigation?

18       A.   That I think is a reasonable assumption.

19       Q.   Were any other law firms added to the

20   Spelter litigation as counsel for the plaintiffs?

21       A.   Yes.

22       Q.   What other firms?

23       A.   Kennedy & Madonna was the next firm that

24   was brought in.

1      Q.    Who brought in Kennedy & Madonna?

2      A.    I think Levin Papantonio was the driving

3 force behind that.

4      Q.    Were you asked for your consent to bring

5 Kennedy & Madonna into the Spelter litigation?

6      A.    Steve Medina spoke to me about it.  I had

7 reservations saying, what could he possibly add?  And

8 I don't know how many discussions we had.

9            We talked about the NRA.  I can remember

10 that, the National Rifle Association and that that's

11 a rather popular thing in this area.  The Kennedys

12 are anti-gun.

13            And I was just saying, I'm not sure what

14 Mr. Kennedy can bring to the case.

15      Q.    What reason or reasons were given to you

16 for the addition of Kennedy & Madonna as counsel for

17 the plaintiffs?

18      A.    Well, I can remember Steve telling me that

19 he was very close friends with Mike Papantonio, Bobby

20 Kennedy, Jr. and that they had done cases together in

21 the past and he was coming in.

22      Q.    Did you also raise an objection to the

23 addition of Kennedy & Madonna?

24      A.    I just said, I don't see what they add; I

1 don't see what they bring; in fact, he could even be

2 a negative.

3     Q.   I take it your comments did not sway anyone

4 and Kennedy & Madonna did become counsel for the

5 plaintiffs?

6     A.   You're correct.  I found out about it from

7 a pro hac that was filed by West & Jones.

8     Q.   Did the addition of the Kennedy & Madonna

9 firm also result in a reduction in the percentage of

10 the fee that you would receive if there was a

11 successful recovery?

12     A.   It did.

13     Q.   How much of a reduction?

14     A.   I do not recall.

15     Q.   Any other law firms added to the Spelter

16 litigation as counsel for the plaintiff?

17     A.   Yes.

18     Q.   What other firms?

19     A.   Ed Hill's law firm.

20     Q.   And that would be Hill, Peterson, Carper,

21 Bee & Deitzler?

22     A.   I don't know the name, the full name, but

23 yes, that's it.

24     Q.   Who added Mr. Hill's firm to the Spelter

1  litigation?

2      A.   I don't know if it was jointly done by

3  Levin and Cochran or not.  I can remember the

4  discussions I had was with Farrest concerning that

5  addition.

6      Q.   And when you say Farrest, you mean Farrest

7  Taylor?

8      A.   Yes.

9      Q.   And Mr. Taylor is with The Cochran Firm?

10     A.   He is.

11     Q.   Did Mr. Taylor give you any reason or

12 reasons as to why Mr. Hill's firm was being added to

13 the Spelter litigation?

14     A.   Well, there was appellate work that needed

15 to be done, and I think Farrest told me that it was a

16 done deal, that he had been selected, that -- I don't

17 know that Farrest had met him, but I think Mike

18 Papantonio and probably Steve Givens had met with

19 Mr. Hill in Las Vegas or someplace at a -- at a

20 seminar and it was decided that he would get

21 involved.

22     Q.   Was this after the jury verdict?

23     A.   Yes.  I believe so.

24     Q.   You said Steve Givens.  Did you mean Keith

1    Givens?

2         A.    Yes.  I'm sorry.  Keith Givens, yes.

3         Q.    Keith Givens was with The Cochran Firm?

4         A.    Yes.

5         Q.    Did the addition of Mr. Hill's firm as

6    counsel for the plaintiffs in the Spelter litigation

7    result in a reduction in the fee percentage you would

8    receive in the event of a successful outcome?

9         A.    It did.

10        Q.    Did you object to the addition of Mr. Hill?

11        A.    Well, I said, I -- again, this is the third

12   time -- I -- actually, Steve -- no.  I don't think

13   Steve Medina and I -- I think my conversations were

14   with Farrest at that time.

15             But yeah, here we go again; we're, you

16   know, bringing in a third firm.  I suppose -- and I

17   think I thought at the time I could just say, well,

18   you guys pay for it.

19             But again, you want to get along, you want

20   to do what's right for your clients, and if this is

21   going to help us, if this guy can do what he needs to

22   do or needs -- you know, what needs to be done, then

23   I'm going to be a team player and go along with it.

24        Q.    Am I correct in my understanding that with

1    the addition of each law firm as counsel for the

2    plaintiffs in the Spelter litigation there would've

3    been a pro rata sharing or reduction in the

4    percentage to be received by the existing firms under

5    the fee sharing agreement?

6              MS. MASON:  Object to form.

7         A.   That's a good question.  You used the word

8    pro rata.  That was one of the issues I had, that

9    that's not how all these things were put to me.  I --

10        Q.   How were they put to you?

11        A.   I was told, it'll just be equal, the three

12   firms, not based on a pro rata sharing, but rather,

13   it's just going to be the same amount given up by

14   each firm.

15        Q.   Was there a reason given to you as to why

16   the fee would be shared in that manner?

17        A.   I don't recall one being given.  I was just

18   told.

19        Q.   Who told you that?

20        A.   I think it was Steve in the first two

21   cases.  It may have been Farrest in the last one.

22   When I say Steve, I mean Steve Medina, not Steve

23   Givens.  And I -- and I think on the last one it was

24   Farrest.  I don't think Farrest was -- I mean, he

1  wasn't nasty about it.  He just said, hey, Gary, this
2  has -- this has been decided.  And in fact, I think
3  he was rather apologetic about it.
4      Q.  So but it would've been Steve Medina with
5  respect to West & Jones and Kennedy & Madonna who
6  would've told you that each of the existing counsel
7  would contribute equally to the percentage that would
8  be assigned to the new attorneys?
9      A.  You know, at this point, I can't be certain
10 of that.  I know I had conversations with Steve, but
11 we're going back, some of these things, eight, nine
12 years ago.  I can't tell you with 100 percent
13 certainty that's how it was, but yeah, I think -- I
14 think it was Steve who told me these things.  And as
15 I said, the last time -- the last go round it was
16 Farrest.
17     Q.  Did Mike Papantonio ever discuss with you
18 compensating Joe Simoni for his contributions to the
19 Spelter litigation?
20     A.  I don't ever remember talking to Mike
21 Papantonio about Joe in any manner.
22     Q.  When you become involved in the
23 Fairmont/Westinghouse litigation, were you a member
24 of the -- what would've then been the Association of

1 Trial Lawyers of America or ATLA?

2     A.   No.

3     Q.   Did you later join?

4     A.   I don't believe so, or if I did, it was

5 some complimentary membership.  It may have been

6 Steve Medina may have said something.  I vaguely

7 remember something like that, but no, I was not a

8 member, I didn't join.  If I did, it was -- Steve may

9 have signed me up.  I don't know.

10     Q.   Did you -- were you a member of the West

11 Virginia Trial Lawyers Association when you first

12 became involved in the Fairmont litigation?

13     A.   No.

14     Q.   Did you later join the West Virginia Trial

15 Lawyers Association?

16     A.   No.

17     Q.   Was there ever a suggestion made by either

18 the Masry firm or Baron & Budd that you should join

19 the trial lawyers associations, whether it'd be the

20 American Trial Lawyers Association or the West

21 Virginia Trial Lawyers Association?

22     A.   I don't remember anything like that, but it

23 could've happened.  I do not have any recollection of

24 that.

1          Q.   In connection with the stipends that you

2     were paid in the Fairmont/Westinghouse litigation,

3     were there any conditions places on those stipends in

4     terms of things that you had to do in exchange for

5     receiving the stipends?

6          A.   Well, I had to be available for all

7     depositions and all filings, and I was the local guy.

8     I was the only one, so --

9          Q.   Were you required to join any

10    organizations?

11         A.   To carry out those duties?

12         Q.   Yes.

13         A.   I don't remember anyone telling me.  I

14    can't think what it would be that I would have to be

15    a member of to -- other than the bar.  I don't

16    understand the question, actually.

17         Q.   Well, obviously, when you became involved

18    in the Fairmont/Westinghouse litigation, you were

19    already a member of the West Virginia State Bar,

20    correct?

21         A.   Correct.

22         Q.   Were you a member of the Monongalia County

23    Bar Association?

24         A.   I believe so.

1        Q.   Did you join any county bar associations
2   after you got involved in the Fairmont/Westinghouse
3   litigation?
4        A.   After?  I don't believe so.
5        Q.   Was it ever suggested to you by anyone with
6   the Masry firm or Baron & Budd that you needed to
7   become more involved in legal organizations or
8   associations?
9        A.   I have no recollection of anything like
10  that being said to me.
11       Q.   And with regard to the Spelter litigation,
12  did any of the firms involved in that litigation on
13  behalf of the plaintiffs, the Levin Papantonio firm,
14  The Cochran Firm, in particular, ever suggest to you
15  that you needed to become more involved in legal
16  organizations or associations?
17       A.   No.
18       Q.   Was there ever a discussion with you about
19  your profile in the legal community?
20       A.   Not that I can recall.  I mean, I don't
21  know.  I don't think so.
22       Q.   While you were involved in the
23  Fairmont/Westinghouse litigation, did you receive any
24  complaints that the plaintiffs were bothered by a

1  lack of responsiveness on your part?

2      A.   Not that I'm aware of.  No.

3      Q.   Did any of the law firms that were

4  representing the plaintiffs in the

5  Fairmont/Westinghouse litigation ever complain to you

6  about a lack of involvement or effort on your part in

7  connection with the Fairmont litigation?

8      A.   No.

9      Q.   Did any of the law firms in the Fairmont

10  litigation ever tell you that you needed to become

11  more involved or interactive with the plaintiffs in

12  that case?

13      A.   Not that I can recall.  No.

14      Q.   With regard to the Spelter litigation, were

15  there ever any complaints raised by any of the other

16  attorneys representing the plaintiffs about the work

17  you were performing or the amount of effort that you

18  were providing in that litigation?

19      A.   I don't recall anyone ever saying anything

20  like that to me.

21      Q.   Okay.  Was there ever a complaint about

22  lack of responsiveness by you to any of the

23  plaintiffs in the Spelter litigation?

24      A.   No.

1                    MR. MARINO:  Does everyone have a copy

2      of the document now, the one we're talking about?

3      You have one, right?

4                    MS. MASON:  I think Bill doesn't have

5      his.

6                    MR. MARINO:  I'm sorry?

7                    MR. CASH:  I'm waiting for my copy.

8                    MR. MARINO:  You're still waiting for

9      your -- okay.  Just a simple question.

10                    MS. MASON:  Maybe you can look over --

11     do you want to just look over -- if you want to go

12     ahead and start?

13                    MR. WAKEFIELD:  That's fine.  I mean,

14     I'm just waiting to make sure everyone had a copy

15     before we preceded, so --

16                    MS. MASON:  Okay.

17                    MR. CASH:  Thanks very much.  That's

18     twice.  This is the second time.

19     BY MR. WAKEFIELD:

20          Q.   Mr. Rich, I believe you have in front of

21     you what has been marked as Deposition Exhibit --

22                    COURT REPORTER:  21.

23     BY MR. WAKEFIELD:

24          Q.   -- 21.

1          A.    I do, yes.

2          Q.    And that is a detailed time summary that

3    has been produced on behalf of Doctor Simoni in this

4    case.  Is that your understanding?

5          A.    That's my understanding.

6          Q.    And the copy that is in front of you, as I

7    understand it, is a copy that you have reviewed and

8    which contains markings from you; is that right?

9          A.    Yes.  I marked this up some months ago.

10          Q.    And the markings take the form of some

11    highlighting as well as some actual Xs and circles

12    and some interlineations; is that right?

13          A.    Correct.

14          Q.    And I want to kind of go through and

15    discuss with you the markings that you have made on

16    the document.  It is my understanding from your

17    testimony yesterday that in your review of the time

18    summary you disagree with certain parts of the

19    summary.  Is that right?

20          A.    Yeah.  There were things here that I

21    thought that -- you know, Joe has me being with him

22    on a certain date.  Well, I wasn't there.  I wasn't

23    in this state.

24                I know there's at least in one place where

1   there was a meeting -- he lists a series of meetings,

2   but he left out one that -- I'm just saying that

3   there, I think, are some where he was here -- he was

4   with me that he doesn't have listed.  There are a

5   number of ones that he has me being with him when I

6   certainly wasn't there, wasn't in the State of West

7   Virginia at the time.

8        Q.   In looking at the copy of the detailed time

9   summary that has your markings on it --

10       A.   Yes.

11       Q.   -- I noticed that there are many entries

12  where you have no marking or comment.  Is that true?

13       A.   That is true.

14       Q.   Is it fair for me to assume that as to

15  those entries that have no marking on them that you

16  do not challenge or question that entry?

17            MR. MARINO:  Well, I'm going to object

18  to the form of the question, because counsel may

19  challenge things and the witness --

20       A.   Well --

21            MR. MARINO:  -- may not have an

22  opinion on it, so --

23       A.   -- what -- challenge?

24            MR. WAKEFIELD:  Yeah.  I'm asking him

1    as Gary Rich.

2                    MR. MARINO:  Right.  Okay.

3                    THE WITNESS:  Yeah.  That's fine.

4         A.    And there are many of these entries which I

5    have no knowledge of.  I can't say that Joe did this

6    or he didn't do it.  I have no knowledge, all right?

7    That's -- the ones that are blank I would say are in

8    that category.

9         Q.    All right.  So would it be fair for me to

10   assume that as to those entries for which there isn't

11   a marking from you that means that you have no

12   information to question in your mind whether the

13   entry is accurate or inaccurate?

14        A.    That's correct.

15                   MS. MASON:  Object to form.

16   BY MR. WAKEFIELD:

17        Q.    Now, there are entries, of course, where

18   you do have markings, correct?

19        A.    Yes.

20        Q.    And let's start with the first page of the

21   document.  I notice that there is a -- an entry with

22   a date of 4/2000.  The matter is described as

23   Fairmont?

24        A.    Yes.

1      Q.   There's a description, and then there are a
2   number of hours listed in the right-hand column,
3   correct?
4      A.   Correct.
5      Q.   You have circled the number of hours; is
6   that right?
7      A.   Yes.
8      Q.   Why did you circle the number of hours?
9      A.   And I have Xs.
10          As I said, I marked this up a number of
11   months ago, but I believe that I had looked at my
12   time records and that I wasn't involved at that point
13   in time, I believe.
14      Q.   Okay.  All right.  So the first entry,
15   which is in April of 2000, on the Fairmont
16   litigation, you have circled the number of hours and
17   there is an X, correct?
18      A.   Correct.
19      Q.   Does the X signify that you were not
20   involved in the Fairmont matter at that time?
21      A.   You know, sitting here today, I'm not
22   100 percent certain that's what I meant by that, but
23   I suspect it was, that I don't believe I was involved
24   in the Fairmont matter at that time --

1        Q.    And --

2        A.    -- April, May of 2000.

3        Q.    All right.  So when we go to the next

4   entry, which is May of 2000, also concerning

5   Fairmont, you have circled the number of hours and an

6   X.

7            And based on what I'm hearing from you this

8   morning, you believe that would indicate that you

9   were not involved in the Fairmont litigation in the

10  April and May time period?

11       A.    I believe that to be correct.  Now, one

12  could look at my timesheets and maybe that's -- maybe

13  I'm remembering it incorrectly, but I believe that's

14  the case.

15       Q.    Okay.  Do you have a recollection of Joe

16  Simoni performing work in connection with the

17  Fairmont litigation before you became involved in the

18  matter?

19       A.    Well, I don't know for a fact that he did,

20  but I -- when he came to me -- and he came to me a

21  number of times wanting me to get involved -- I'm

22  assuming that he had done quite a bit of work,

23  research, talking to people, and that's why he was

24  so, you know, eager or passionate to get things

1  going, so yes, but how much work, I have no idea.

2        Q.   So when you circle the number of hours in

3  both of the entries on the first page, you're

4  circling them not because you are directly

5  challenging the number of hours, because what I'm

6  hearing you say is you don't know how many hours he

7  would've put?

8        A.   That's right.

9        Q.   Let's look at the second page, and if we

10  look at the entries of June 2000 and July of 2000,

11  they are both the Fairmont matter.  And again, like

12  the earlier ones you have circled the number of hours

13  and you have the Xs next to those entries, correct?

14        A.   Yes.  Same thing --

15        Q.   Yeah.

16        A.   -- as the first two.

17        Q.   And so that would be a situation where,

18  again, you do not believe you were involved yet in

19  the Fairmont litigation or Fairmont matter in June

20  and July of 2000 --

21        A.   Right.

22        Q.   -- is that correct?

23        A.   Right.  That's correct sitting here today.

24  I'll -- my timesheets may reflect something else, and

1    if they do, then I am challenging that I was involved

2    with him to that degree of 45 hours.  I may have

3    worked an hour.  I may have thought about this.

4            I can remember Larry Harless encouraging me

5    to get involved, get involved and help these people

6    because no one else will.  Now, you know, I don't

7    know if I recorded that time with Larry and I don't

8    remember when that was, but I'd have to look at the

9    timesheets.

10           But sitting here today, I think I'm --

11   these marks mean that I was not involved.

12       Q.   And again, like the earlier entries on

13   page 1, your circling of the 45 does not indicate

14   that you know that he either did or did not spend

15   that amount of time?

16       A.   That's correct.  I have no way of knowing

17   that.

18       Q.   Now, look at the entry on August of 2000 in

19   the Fairmont matter.  There's a description.  You

20   have not circled the number of hours, but you have

21   some handwriting off to the right.  What is that?

22       A.   That's few hours, so what I -- what I mean

23   by that is it looks as though, at that point, I was

24   at least talking to Joe and thinking about this and I

1    must've put down a few hours and my timesheets would
2    reflect that.
3         Q.   So what I understand you're saying is that
4    at least in August of 2000 you recognized in
5    reviewing the time summary that you had spent at
6    least a few hours involved in the matter?
7         A.   Yes.
8         Q.   Now, you'll note that in the descriptions
9    for April, May, June, July of 2000 there is a
10   description of meetings with G. Rich.
11        A.   Uh-huh.
12        Q.   I -- you've got to say yes or no.
13        A.   Yes.
14        Q.   Are you -- is it your testimony that in
15   that time frame of April, May, June, and July you had
16   no meetings with Joe Simoni about Fairmont?
17        A.   That's not my testimony.
18        Q.   Okay.
19        A.   I think I said earlier I don't know, I
20   would have to look at my time records, and I -- even
21   then I can't conclusively say that I never spoke to
22   Joe about Fairmont, because he had been asking me for
23   at least six months after Sue Fullen brought this up
24   to get involved because no one else would.

1          I think Joe may have spoken to other law

2    firms about this particular situation and no one was

3    interested.  I seem to recall that, and I think

4    that's why Larry Harless was telling me that there is

5    no one else that is going to get involved in this;

6    these sorts of cases are fraught with danger and that

7    someone has got to get involved.  And that person was

8    me and him, but you know, unfortunately, he didn't

9    get involved.

10         Q.   As you sit here today and we take a look at

11   the descriptions for April, May, June, and July and

12   also August of 2000, do you have any information

13   available to you that would indicate that the

14   descriptions provided by Doctor Simoni are inaccurate

15   in terms of what he did?

16         A.   Which --

17              MR. MARINO:  Object to the form of the

18   question.

19         You may answer it.

20         A.   Which ones were those again?

21         Q.   April, May, June, July, and August of 2000.

22         A.   No.  I have no reason to doubt what he's

23   saying other than there weren't meetings with me.

24         Q.   Let's take a look at the entry of 9/13/2000

1  for Fairmont.  It's a rather short description,

2  arranged and participated in meeting at my personal

3  residence regarding a civil action against the

4  owners/operators of the Philips/Westinghouse plant;

5  present were Rich and six to eight potential

6  plaintiffs.

7          And I see there's underscoring under

8  personal residence.

9      A.    Uh-huh.

10     Q.    Is that your underscoring?

11     A.    It is.

12     Q.    Why did you underscore that?

13     A.    Because if Joe is talking about his

14  personal residence I've never been to his personal

15  residence.

16     Q.    Okay.  Do you recall being at a meeting

17  with six to eight potential plaintiffs and Joe?

18     A.    I do.

19     Q.    Where was that meeting held?

20     A.    And that's why I have, no, Sue Fullen's, so

21  I'm saying the meeting was at Sue Fullen's house, not

22  Joe's.

23     Q.    Okay.  So your markings indicate that it

24  was inaccurate for Doctor Simoni to say that the

1    meeting was at his personal residence, instead the

2    meeting was at Sue Fullen's?

3         A.   The venue is inaccurate, but there was a

4    meeting.

5         Q.   Are the other aspects of the description

6    accurate?

7         A.   I think so.  Yes.

8         Q.   Okay.  Including the hours?

9         A.   I'd have to look at my timesheets, but I

10   would say that's pretty much right.

11        Q.   Then I see fall of 2000 is an entry,

12   Fairmont, and the description is, over a period of

13   little more than a month, organized, attended, and

14   led, with Rich present, five meetings for potential

15   plaintiffs at the homes of Sue Fullen and Paula

16   Williams, and then it has 9/20, 9/27, 10/4, 10/18,

17   and 10/25.  And I see you have circled the 10/25.

18   There is an X, and then I think your handwriting

19   says, no such meeting?

20        A.   It does, yes.

21        Q.   Okay.  All right.  Can you explain your

22   marking?

23        A.   Well, there was no such meeting on

24   October 25th, according to my records, but there was

1  a meeting on the 10th of -- or October 11th, there

2  was, so I'm disputing the one meeting, but there was

3  a meeting that he left out and I believe he was

4  probably at all those.  Now, when he says that he

5  organized, I'm not sure that's accurate.  I think Sue

6  Fullen organized for the most part --

7       Q.   Okay.

8       A.   -- as opposed to Joe, but I do believe Joe

9  was at all those meetings.

10      Q.   Okay.  And in fact, what I'm hearing from

11  you is that you agree that there were six meetings,

12  but one of the dates he's listed, the meeting didn't

13  occur, instead it was on a different date?

14      A.   Correct.  Yes.

15      Q.   And the number of hours, does that appear

16  accurate to you for the six meetings -- or five

17  meetings, I mean?

18      A.   I would say those hours are -- it actually

19  might be more, but again, my timesheets I think would

20  reflect the correct amount.  It might've been

21  25 hours.  I think these meetings, if you count one's

22  time getting there and back, I think it's probably

23  about five hours per session.

24      Q.   So if we had five meetings, then is the

1 25 accurate or are you telling me that it might

2 actually be more hours?

3      A.   Well, he -- oh, he does have 25.  Okay.

4 Yeah.  I'd say that's accurate.  I was thinking it

5 was 20.

6      Q.   The next entry is fall of 2000, Fairmont,

7 and then it says, with Wanda Bower at her home,

8 investigated boxes of documents related to her legal

9 case, Bower v. Westinghouse and investigated, slash,

10 researched the Westinghouse cullet pile on Hoult Road

11 just below the plant.

12           And I see you apparently have a comment

13 about that entry.  Is that right?

14      A.   I do.  I just say, no go GWR.  That's me.

15 I wasn't there.  Now, I don't know if Joe was there

16 or not.

17      Q.   Okay.  Did Joe ever talk to you about

18 having gone to Wanda Bower's home to investigate

19 documents in connection with her case which was Bower

20 v. Westinghouse?

21      A.   I don't remember him saying he'd been to

22 her house, but Joe was friendly with Wanda Bower.

23      Q.   Okay.  And in connection with the Fairmont

24 litigation, was there some investigation about the

1    Bower v. Westinghouse case which, as I recall, is the

2    case in West Virginia that led to the adoption of

3    medical monitoring.  Correct?

4         A.    You're absolutely right.  Famous case.

5         Q.    Now, at page 3, I don't see any comments or

6    markings by you on that page.  Correct?

7         A.    Correct.

8         Q.    Okay.  And it would be fair for me to

9    assume that at least as to these entries you don't

10   have any information one way or the other as to

11   whether these are accurate or inaccurate?

12        A.    Well, if my name is listed and I -- and I

13   don't have it crossed off, I believe that means it's

14   correct, I was there.

15        Q.    Well, let me rephrase the question.  Is it

16   fair for me to assume on page 3, because there are no

17   markings, there is nothing about these entries that,

18   at least based upon the time period when you reviewed

19   the summary and today, that you have any reason to

20   question the entries?

21        A.    Correct.

22        Q.    Now, if we go to page 4, I see an entry on

23   -- there are several entries on this page, but there

24   is one for 1/26/2001, Fairmont.

1      A.    Yes.

2      Q.    It says, faxed for Rich Masry proposed

3 retainer agreement to Goodman, and it looks as if the

4 word faxed or faxed for has been circled. Is that

5 your circling?

6      A.    It is.

7      Q.    Is that your question mark?

8      A.    Yes.

9      Q.    What does the circling and the question

10 mark signify?

11      A.    I don't believe he faxed any such agreement

12 to Sherri Goodman.

13      Q.    Did -- do you believe he sent it in some

14 other manner?

15      A.    No, I don't.

16      Q.    Okay. Are you saying that the proposed

17 retainer agreement was provided to Sherri Goodman by

18 someone other than Joe Simoni?

19      A.    Well, I think I provided it to her, but

20 again, I can't -- I cannot tell you 100 percent that

21 Joe did not fax it, but I don't have any recollection

22 of saying, hey, Joe, go fax this. I mean, I would've

23 faxed it myself.

24      Q.    In other words, there was a question in

1  your mind, and that's why --

2      A.   There was.

3      Q.   -- you circled it?

4      A.   There was.

5      Q.   And it looks as if in the last entry on

6  page 4, which is March 2, 2001, Fairmont, reviewed

7  with Rich final version of Masry/Girardi/Rich

8  memorandum of understanding.

9          And I see a line and it looks like Miami,

10  Florida.  Do you see that?

11      A.   I do.

12      Q.   Is that your handwriting?

13      A.   It is.

14      Q.   What does that signify?

15      A.   Well, I don't remember Joe reviewing any

16  such agreement, but I can state for certain that I

17  was in Miami, Florida on that day.

18      Q.   On business, vacation, or --

19      A.   I was with -- it was business.

20      Q.   Okay.  You had testified earlier you

21  weren't sure that Joe Simoni had reviewed the

22  memorandum of understanding; is that right?

23      A.   That's right.

24      Q.   Are you certain about that, or is it

1  possible that he did review it?

2      A.   It's possible.  I don't remember him

3  reviewing it.  I'm certain he never reviewed the

4  final document with Baron & Budd.  I'm certain of

5  that.

6      Q.   In March of 2001, was Baron & Budd involved

7  in the Fairmont matter at that time?

8      A.   In what month?

9      Q.   March of 2001.

10      A.   Baron & Budd?

11      Q.   Uh-huh.

12      A.   I don't know.

13      Q.   Yes.  I just made the same mistake that I

14  tell witnesses about all the time.  I said uh-huh.

15  Yes.

16      A.   I don't know.  I mean, that was 12 years

17  ago.  They may have been.  I -- my time records would

18  reflect that.

19      Q.   Okay.  Looking to page 5 of the exhibit, I

20  see there are no markings or comments by you as to

21  any of these entries, correct?

22      A.   Correct.

23      Q.   On page -- well, now, it jumps to page 8,

24  so we're missing some pages.

1            MR. WAKEFIELD:  Is that your --

2            MR. TAYLOR:  That's what we were --

3    let's go off the record.

4            VIDEOGRAPHER:  We're going off the

5    record.  The time is 10:52 a.m.

6                    -----

7                (Brief break)

8                    -----

9            VIDEOGRAPHER:  We're back on the

10   record.  The time is 10:58 a.m.

11   BY MR. WAKEFIELD:

12       Q.   Before we broke, Mr. Rich, I had covered

13   with you page 5 of Deposition Exhibit No. 21 and we

14   established that there are no markings on that page,

15   correct?

16       A.   Page 5 --

17       Q.   That's correct.

18       A.   -- that's correct.

19       Q.   On page 6, are there any markings on that

20   page by you?

21       A.   There is one.

22       Q.   Okay.  What is the entry date?

23       A.   The date is the next to the last entry on

24   page 6.  It says, winter 2001, Fairmont, and Joe has

1    arranged for, coordinated, and assisted with

2    neurological testing of Philips/Westinghouse

3    employees over three to four-day period at the

4    Holiday Inn in Fairmont, and he has 25 hours listed.

5         Q.   What marking did you make?

6         A.   I circled the arranged for and coordinated

7    and assisted.

8         Q.   Why did you circle it?

9         A.   Well, I'm not saying he didn't do it,

10   because I think he did.

11              And because I can remember Masry & Vititoe

12   telephoning me late the night before this and telling

13   me to be at the Holiday Inn the next morning or

14   suggesting that I be there.  And I said, well, I have

15   another engagement tomorrow morning.

16              And they said, well, that's okay; Joe will

17   be there.  And I said, really?  I said, when was this

18   arranged?  And they said, oh, we've been working on

19   this for a number of weeks.  I knew nothing about it.

20   I did not attend, but I'm assuming Joe did attend.

21         Q.   So am I fair in assuming that the reason

22   you circled the entry was because it was a

23   circumstance where the arrangements had been made and

24   you didn't learn about it until the last minute?

1      A.   That's it.

2      Q.   You're not calling into question whether

3   the testing was done or whether Joe Simoni was

4   involved; is that correct?

5      A.   Not at all.

6      Q.   Well, is that correct?

7      A.   That is correct.

8      Q.   All right.  Okay.  Now, if -- and is that

9   --

10      A.   That's page 6.  That's the only marking.

11      Q.   Okay.

12      A.   Page 7, I have -- well, three or four

13   markings.  The third entry down on page 7, which is

14   listed as 02, slash, 02 --

15      Q.   Uh-huh.

16      A.   -- Fairmont, Joe has 25 hours and he's

17   saying, local level work, development of case, work

18   closely with legal team, i.e. Masry & Vititoe and

19   Rich, put together invaluable fund of information

20   about the lighting plant employees and their work,

21   illness, and deaths, visits re: dying people,

22   meetings with Rich, drafting, editing, reviewing

23   letters and documents.

24      Q.   Did you make a marking?

1        A.    I did.   I have, if 02/02/02, meaning if it
2    was February 2nd, 2002, I did nothing, but I don't
3    know if he means that's for the -- I guess, the full
4    month of February at 25 hours, but I don't have
5    anything in my listings, my timesheets that I was
6    looking at to substantiate that.
7        Q.    Okay.   When you say you don't have anything
8    in your timesheets, are you saying you don't have
9    anything in your timesheets for February 2 of 2002 or
10   simply February of 2002?
11       A.    Well, it looks like February 2, just
12   February 2.
13       Q.    Did you in fact do work on the Fairmont
14   matter in the month of February in 2002?
15       A.    I'm sure I did.   Yeah.   My timesheets would
16   reflect that.
17       Q.    Okay.   If in fact the date entry is meant
18   to be February of 2002, would you agree with the
19   accuracy of the description?
20       A.    I'm sorry.   Say that again, please.
21       Q.    If the date entry is February of 2002, as
22   opposed to February 2nd, would you agree with the
23   accuracy of the description?
24       A.    I don't know that I could dispute it.   I

1   couldn't say that it is accurate.

2          Q.   Do you have any information that indicates

3   that it's inaccurate?

4          A.   No.

5          Q.   Okay.  And do you have any information that

6   would indicate that the number of hours put with that

7   entry is in any way inaccurate?

8          A.   No.

9          Q.   Are there any other markings that you have

10  on page 7 of the exhibit?

11         A.   There is.  February 28th, 2002, Fairmont,

12  description is, with Bonnie Oliver, visited home of

13  M.L. Spriggs and he has five hours.

14              I looked at my notes, and I remember

15  meeting Mr. Sprigg -- I think it's Sprigg.  He's a

16  very interesting fellow, and Joe definitely was not

17  at this meeting.  It was me and Sue Fullen.  There

18  was one other lady.  I can't think of her name, but

19  my timesheets would reflect that.

20         Q.   What is the marking that you actually have

21  made with regard to that entry?

22         A.   I circled the hours, 5.0, and I put, GWR

23  only, and that was me.

24         Q.   Am I correct then that it's your testimony

1    that it was Gary Rich who visited the home of

2    M.L. Sprigg on February 28th and that Joe Simoni was

3    not present?

4         A.   Well, he wasn't present when I was there

5    unless he went at a different time than me.  I mean,

6    I don't know, but he was not -- I have never been

7    with Joe -- well, he's not saying he was with me.

8    He's saying he's with Bonnie Oliver, so -- but I'm --

9    I think that's the day I was there as well.  Joe was

10   not.

11        Q.   Okay.  So as I understand it, you certainly

12   visited Mr. Sprigg, and when you visited him, Joe

13   Simoni was not with you.  Is that correct?

14        A.   That's correct.

15        Q.   But you do not know whether Joe Simoni may

16   have visited Mr. Sprigg on a different occasion when

17   you weren't present?

18        A.   I do not know whether he's met with him or

19   not.

20        Q.   Okay.  When you visited with Mr. Sprigg, do

21   you recall how long you were there?

22        A.   A number of hours, because he was wanting

23   to -- he was talking to me about -- he had a blender,

24   and he was making all sorts of drinks.  And he was

1    using plants and things from his yard, and he was

2    telling me exactly what I needed to -- I don't know

3    -- be more -- I'm not sure what the word was he used.

4            MR. MARINO:  Better looking, healthy.

5        A.    -- better looking, healthy, but I chose to

6    -- I didn't drink his potions that day, and I don't

7    think anyone else did other than himself.

8        Q.    When you visited with Mr. Sprigg, was

9    Bonnie Oliver with you?

10       A.    I think Bonnie was there.  I know Sue was,

11   and there was another lady, and her name would be in

12   the timesheets for that day, but it was a rather

13   entertaining meeting, talking to me and it was good

14   fun.

15       Q.    Okay.  Mr. Sprigg was one of the plaintiffs

16   in the Fairmont case; wasn't he?

17       A.    I believe so.  He had some documents that I

18   think Masry & Vititoe was interested in.

19       Q.    And I -- in connection with this time

20   summary that Doctor Simoni has put together you'll

21   notice that there are several entries that concern

22   visitations to individuals in their home, correct?

23       A.    Yes.

24       Q.    And I assume you'll agree with me that

```
 1    Doctor Simoni did visit with several of the --
 2                    MR. MCCARTHY:  Objection to form.
 3    BY MR. WAKEFIELD:
 4         Q.   -- plaintiffs in their home?
 5                    MR. WAKEFIELD:  Pardon me?
 6                    MR. MCCARTHY:  Objection to form.
 7         A.   He visited with plaintiffs in their homes,
 8    yes, I would say that he did.
 9         Q.   And you visited with plaintiffs in their
10    homes too?
11         A.   Some of them.  Yes.
12         Q.   Okay.  In addition to Mr. Sprigg, I'm
13    assuming there were other plaintiffs with whom you
14    met.
15         A.   Oh --
16         Q.   Correct?
17         A.   -- yes.
18         Q.   And the purpose behind that would be, of
19    course, to find out what information they may have
20    about having worked at the plant, documents, that
21    type of thing, correct?
22         A.   Was that and also some of these people were
23    very sick, they were elderly, it was to comfort them,
24    let them know how things were going.
```

1        Q.   To let them know that you cared about them?

2        A.   That's right.

3        Q.   In connect with that, there would be

4 occasions where some of the plaintiffs would in fact

5 pass while the matter was pending, correct?

6        A.   Oh, many of them did.

7        Q.   And were you aware that Doctor Simoni would

8 go to the visitations of these individuals?

9        A.   You mean to the funeral homes?

10       Q.   Yes.

11       A.   I do know that, yes.

12       Q.   As part and parcel of letting these

13 individuals know that the individuals working on

14 their behalf cared about what had happened?

15               MR. MCCARTHY:  Objection.

16 BY MR. WAKEFIELD:

17       Q.   You can answer.

18       A.   I don't know what Joe was thinking, but I

19 mean, I can't say that he went to let them know that

20 we cared, but he did go.

21       Q.   Did you ever go to any of the funeral

22 homes?

23       A.   I can remember maybe on two occasions.

24       Q.   And why did you go?

1          A.    Because it was the proper thing to do.

2          Q.    All right.  Are there any other entries on

3     page 7 of the exhibit where you have made markings?

4          A.    There is.  April 11th, 2002, went with key

5     plaintiffs to Charleston for lunch with Erin

6     Brockovich.

7          Q.    Did you make -- what marking did you make

8     on that?

9          A.    I made a marking that it was March 27th.

10         Q.    Did you go with -- to that meeting?

11         A.    I did.

12         Q.    Was Joe Simoni with you?

13         A.    He was at the meeting.  I don't believe he

14    went with me to the meeting, but he was there.

15         Q.    And there were other plaintiffs or key

16    plaintiffs who attended that meeting?

17         A.    Yes.  And we met with Erin Brockovich.  We

18    had lunch with her.  It was a nice meeting.  Erin was

19    very kind to these -- to the ladies.  She gave them

20    autographed copies of her book that had recently been

21    released, videos of -- DVDs, I believe, of the movie

22    Erin Brockovich.  We had a nice day.

23         Q.    So the marking that you made on the exhibit

24    with regard to the meeting with Erin Brockovich was

1   in connection with the date being incorrect?

2        A.    He has the wrong date, but there was a

3   meeting.  It was just a couple weeks before what he

4   has listed.

5        Q.    And the number of hours was accurate?

6        A.    He has nine hours.  I would say if he drove

7   to Charleston from Morgantown and back and -- yeah,

8   at least nine hours, I would think.

9        Q.    Any other entries on page 7 that you've

10  marked?

11       A.    There's a -- there was a day, April 27th,

12  2002, I have -- well, he has April 27th, 2002,

13  Fairmont, attended meeting -- attended dinner meeting

14  with Sue and George Fullen, and he has 5.5 hours.

15       Q.    What marking did you make?

16       A.    I have not GWR.  Now, he's not saying I was

17  there, but I'm saying I was not there because I know

18  that day is my daughter April's birthday, so I know I

19  was not at that particular dinner.

20       Q.    Okay.  So the marking that you've made is

21  to the April 27, 2002 entry is simply to note that

22  you weren't present at the meeting?

23       A.    That's correct.

24       Q.    You're not calling into question whether

1    the dinner meeting occurred; are you?

2        A.   I have no knowledge of that dinner meeting.

3        Q.   All right.  Turning to page 8 of the

4    exhibit, I see that in the second entry on that page,

5    June 21, 2002, the matter is Fairmont, met with Rich,

6    discussed Eichler, federal court filings, July

7    hearing.

8             And you have a question mark to the left;

9    is that right?

10       A.   Yes.

11       Q.   Why did you put the question mark there?

12       A.   Well, as I said, I did this a few months

13   back.  I suspect that I have no entry for that day or

14   that no entry relative to Joe, meeting with him.

15       Q.   Okay.  Do you recall any meeting with

16   Doctor Simoni where you discussed Eichler, federal

17   court filings, and July hearings?

18       A.   Not offhand.  No.

19       Q.   If we go to the entry of July 22nd, 2002,

20   under Fairmont, it says, edited and reviewed with

21   Rich Rich's 7/22/02 letter to Masry expressing

22   disappointment with Rich's decision on Spelter.

23            And you appear to have put a question mark

24   off to the right of that entry?

1      A.    Yeah.

2                  MR. MARINO:  I think you misread that.

3      Disappointment and Rich's decision.  You said

4      disappointment with Rich's decision.

5                  MR. WAKEFIELD:  Oh, I apologize.

6      BY MR. WAKEFIELD:

7      Q.    Let me read it over again so that the

8      record is clear.

9                  MR. WAKEFIELD:  Thank you.

10     BY MR. WAKEFIELD:

11     Q.    Edited and reviewed with Rich Rich's

12     7/22/02 letter to Masry expressing disappointment and

13     Rich's decision on Spelter.

14           And my understanding is you have put a

15     question mark to the right of that entry.

16     A.    Yes.

17     Q.    Okay.  What's the purpose behind the

18     question mark?

19     A.    Well, I'm not certain, but I suspect I have

20     no entry for that, but I don't know.  One would have

21     to look at my timesheets to be certain.

22     Q.    Do you have any recollection of reviewing

23     with Doctor Simoni your July 22, 2002 letter to

24     Masry?

1      A.   I can't remember if -- about a letter that

2   was written 11 years ago, but I think it's fair to

3   say that Joe and I discussed the situation with Masry

4   and -- yeah, this was Masry's possible involvement in

5   Spelter and --

6      Q.   Do you know what the disappointment is

7   that's referenced there?

8      A.   Today, I don't know.

9      Q.   Do you have any recollection of writing a

10   letter to Masry in or around July of 2002 expressing

11   some disappointment about something?

12      A.   I don't, but I suspect it was about just

13   saying that we wouldn't be working together.

14      Q.   And there's a reference here to Rich's

15   decision on Spelter.  Do you know what that is?

16      A.   Maybe I made the decision that they would

17   not be involved in Spelter.

18      Q.   Okay.  And was that a decision that you had

19   made in terms of what firm or firms to involve in

20   Spelter?

21      A.   Well, they were having difficulty in

22   handling the Fairmont case.  I mean, it was

23   overloading them, so when you asked earlier about

24   disappointment, I think some of the clients were

1    concerned about things not getting done in a timely

2    manner and that's why they associated themselves with

3    Baron & Budd who immediately put, you know, an army

4    on the job and got things going.

5        Q.    Do you have any recollection of the

6    particular matters that weren't getting done and

7    about which disappointment was expressed?

8        A.    I'd say in general things were not moving

9    along the way they should've been.

10        Q.    And ultimately, when you made a decision

11    about the attorneys or firms to get involved in the

12    Spelter litigation, you made a decision that the

13    Masry firm was not a firm to use; is that a fair

14    statement?

15        A.    That was my decision.  Yes.

16        Q.    The next entry says, July 23, 2002 and

17    July 24, 2002, telephone conversations with Masry

18    concerning his agreement with Rich.  You also have a

19    question mark to the right of that entry.

20        A.    Uh-huh.

21        Q.    You have to say yes or no.

22        A.    Yes, yes, yes.

23        Q.    Why did you put a question mark there?

24        A.    I think I found it interesting that Joe had

1    telephoned -- or that Masry had telephoned Joe

2    concerning my agreement.

3         Q.   Were you aware that there had been

4    conversations between Doctor Simoni and Masry about

5    the agreement that Masry had with you?

6         A.   I think Joe told me something like that.

7         Q.   So the question mark here isn't concerning

8    any question as to whether the conversations

9    occurred; it was simply your observation that it was

10   interesting that Masry and Doctor Simoni would've

11   been talking about your agreement with Masry; is that

12   a fair statement?

13        A.   Yes, yes.

14        Q.   The next entry is July 28, 2002 for

15   Fairmont.  It says, phone conversation with Rich

16   about Fairmont, slash, Masry.  Again, there is a

17   question mark to the right of the entry.  Why did you

18   put that question mark?

19        A.   I suspect I checked my timesheets and there

20   were no -- there was no entry for that.

21        Q.   You did in fact have conversations, though,

22   with Doctor Simoni about the Fairmont litigation and

23   Masry; is that a fair statement?

24        A.   It is.

1      Q.   And I assume you had more than one

2  conversation with Doctor Simoni about the Fairmont

3  litigation and Masry?

4      A.   Your assumption is correct.

5      Q.   So if there's a question in your mind, it's

6  about whether the conversation occurred on the date

7  indicated?

8      A.   Yes.

9      Q.   Not whether there as a conversation; is

10  that a fair statement?

11     A.   It is a fair statement.

12     Q.   The next entry I see is August 3, 2002,

13  again in connection with Fairmont.  It says, phone

14  conference with Rich about Westinghouse, slash,

15  Fairmont; Rich asked me to meet him the following

16  evening, 8/4, at the Pittsburgh Airport Hyatt Hotel

17  to meet with Eichler and Scott Summy, and it has in

18  parentheses B&B, end parentheses, to talk about Rich,

19  slash, Masry, slash, B&B agreement, talk with

20  John, Jr.

21          And I see you have a circle around what

22  looks like to be Rich asked with some question marks.

23  Is that a fair statement?

24     A.   It is.

1      Q.   Why did you circle Rich asked and put the
2  question marks there?
3      A.   I have no recollection of asking Joe to
4  meet me at the Pittsburgh Airport Hyatt.
5      Q.   Did Joe ever meet with you at the
6  Pittsburgh Airport Hyatt?
7      A.   I think he may have, but not -- I think it
8  was Steve Medina and myself.
9      Q.   And not Eichler?
10     A.   Not that I recall.
11     Q.   Did you ever have a meeting with Eichler
12  and Scott Summy at the Pittsburgh Airport Hyatt
13  hotel?
14     A.   Yes, I did.
15     Q.   Was Joe Simoni in attendance at that
16  meeting?
17     A.   I don't recall him being there.
18     Q.   Do you recall when the meeting was?
19     A.   Yes.
20     Q.   When was it?
21     A.   Because it's the next entry.  It was
22  July 20th, 2002.
23     Q.   So --
24     A.   Well, okay.  It's the next entry he has.

1    My next note deals with that, I should say.

2         Q.    All right.  Let's talk about the next

3    entry, because I think it provides context to the

4    previous entry.

5         A.    It does.

6         Q.    The next entry is August 4, 2002, Fairmont.

7    The entry is drove with Jeanne from Charlton, New

8    York to Pittsburgh; met with Rich, Eichler, and

9    Summy, three hours; after meeting, Rich and Eichler

10   drove around in Pittsburgh area having heated

11   discussion; Rich called me after to relate the

12   details regarding Masry and fee splitting agreement.

13            And in this entry, you have underscored

14   Rich and Eichler drove around in Pittsburgh area; is

15   that right?

16        A.    Correct.

17        Q.    Why did you underscore that?

18        A.    Because I didn't drive around with Nancy on

19   August 4th of 2002.  My records indicate that it was

20   July 20th, 2002.  And that's when I first met Baron &

21   Budd.  Joe was not present at any such meeting.

22        Q.    Okay.  So as I understand your testimony,

23   it was on July 20, 2002 that you had a meeting with

24   Ms. Eichler and Mr. Summy.  Is that right?

1          A.    Well, it's more than just Scott Summy --

2          Q.    Summy, excuse me.

3          A.    -- and Nancy Eichler.  There were other

4    people there as well.  Ellen Presby was there.  I

5    believe Steve Jensen was there.  There may have been

6    one other person.  My -- I think my notes would

7    indicate who was there, but that's when I first

8    learned of this -- you know, the math didn't add up

9    to me, the 75 percent and the 30 percent.  That's

10   when that was first -- that's when I first learned of

11   this 105 percent deal.

12        Q.   Was this meeting where you first met the

13   Baron & Budd people along -- and also met with

14   Ms. Eichler, did that occur at the Pittsburgh airport

15   Hyatt?

16               MR. MCCARTHY:  Objection.

17   BY MR. WAKEFIELD:

18        Q.   Okay.

19        A.   Yes.

20        Q.   And --

21               MR. MCCARTHY:  Objection.  Did you

22   indicate he did meet them or --

23               MR. WAKEFIELD:  Yes.

24               MR. MCCARTHY:  Okay.

1       A.    I did meet them, yes.

2       Q.    And it's your recollection that Joe Simoni

3   was not present at that meeting?

4       A.    That's correct.  I'm certain he was not

5   present at that meeting.

6       Q.    Okay.  And your notes indicate that the

7   meeting that you had with Ms. Eichler and with folks

8   from Baron & Budd was on July 20, 2002, correct?

9       A.    That is correct.

10      Q.    All right.  Did you ever contact Joe Simoni

11  when Mr. Simoni was in upstate New York and ask him

12  to come to Pittsburgh to attend a meeting with you

13  and Ms. Eichler and Baron & Budd concerning the fee

14  arrangement?

15      A.    I have no recollection of talking with him

16  about that.

17      Q.    Did you ever have a heated discussion with

18  Ms. Eichler while driving around in the Pittsburgh

19  area?

20      A.    I don't know if I would use heated.  If it

21  was heated, I probably would still be driving around

22  up there, because I'm not very good with directions

23  and I was the one driving, so -- but we did talk

24  quite a bit and -- you know, because I was puzzled by

1    this 105 percent thing.

2            And I said, if I get 30 percent and they

3    get 20 -- 75 percent, what do you get; what does

4    Masry & Vititoe get?  And she says, well, we don't

5    know.  And I said, I think we need to determine that.

6        Q.   If you go to the previous entry of

7    August 3, 2002, there is a note there that says,

8    talked with John, Jr.

9        A.   Yes.

10        Q.   My understanding is you did have John

11    Simoni represent you at one point.

12        A.    I testified to that earlier, and that is

13    correct.

14        Q.   Okay.  And that was in connection with this

15    issue or dispute that arose once Baron & Budd became

16    involved in the Fairmont litigation?

17        A.    That's right.

18        Q.   Did you ask Joe Simoni to find counsel for

19    you?

20        A.    Well, I told him what was going on.

21        Q.   Did he volunteer to contact his nephew?

22        A.    Oh, yeah.  He said, oh, my nephew -- we

23    talked about this out-of-state -- dealing with

24    out-of-state firms and that their perception of West

1   Virginians in general and certainly West Virginia

2   attorneys.  And Joe said, well, you need someone who

3   was from out of state that will garner more respect

4   than a local firm would; you know, obviously, this

5   needs to be resolved.

6          And he says, my nephew works in Manhattan.

7   And I said, well, that -- you know, Manhattan is

8   probably more, you know, well thought of by someone

9   in Los Angeles than Morgantown, West Virginia.  So I

10  talked to his nephew.  And I think John Simoni, you

11  know, he did a good job for me.

12       Q.   Before you met with Ms. Eichler and

13  individuals from Baron & Budd at the Pittsburgh

14  Airport Hyatt Hotel, were you aware of what the

15  subject matter was going to be of the meeting?

16       A.   You know, I didn't, but I thought it was

17  odd that there had been numerous calls to me wanting

18  to meet with me and even willing to send a plane to

19  pick me up to fly me to Los Angeles, and I simply

20  didn't have the time to do that.  And I couldn't

21  understand why I would be needed in Los Angeles, and

22  --

23       Q.   Before --

24       A.   -- it just seemed very strange, and I

1    didn't know what to expect.

2         Q.   Before you had the meeting at the

3    Pittsburgh Airport Hyatt Hotel with Ms. Eichler and

4    individuals from Baron & Budd, did you think that,

5    quote, something was up, unquote?

6         A.   I did, yeah.

7         Q.   Did you have any idea of what it was?

8         A.   No.

9         Q.   Did you think it had anything to do with

10   the fee arrangement?

11        A.   No.

12        Q.   Okay.  Let's turn to the next page, page 9

13   of Deposition Exhibit No. 21.  There is an entry of

14   9/14/2002.  Again, the matter is Fairmont.  Reviewed

15   with Rich B&B 9/13 proposed fee agreement.

16             You have a question mark to the right of

17   that entry.  Why did you put the question mark there?

18        A.   I didn't have anything in my records on

19   that.

20        Q.   Anything about Joe Simoni reviewing with

21   you the B&B proposed fee agreement or that the date

22   was incorrect?

23        A.   Oh, nothing about his reviewing it.

24        Q.   Okay.  Do you have any recollection of

1   whether Joe Simoni reviewed the proposed fee

2   agreement with Baron & Budd?

3       A.   He may have.  Because I can remember him

4   being present when I would telephone his nephew.

5       Q.   Did he review it with you in your physical

6   presence?

7       A.   Well, I probably had it -- had it in my --

8   you know, I was referring to it as I spoke to John.

9       Q.   Did Joe Simoni participate in your

10  conversations with John Simoni about the fee

11  agreement?

12      A.   Well, if he happened to be in my office

13  when I telephoned John, yeah, he might've said

14  something to him.  I don't know.

15      Q.   Would it be fair to say that with regard to

16  the 9/14/2002 entry about reviewing the proposed

17  Baron & Budd fee agreement the question you have

18  isn't whether it was reviewed but the date on which

19  it is listed?

20      A.   Well, I mean, I don't know about the hours,

21  and he has, you know, quite a bit of time allocated

22  to that.  I doubt that he spent that sort of time on

23  it.

24      Q.   The next entry is 9/25/2002.

1          A.    Yes.

2          Q.    Fairmont, again.  Reviewed with Rich John

3    Simoni's draft of letter to Nancy Eichler.  Again,

4    you have a question mark to the right of that entry.

5    Why is the question mark there?

6          A.    Probably because I had no entry in my time

7    records.

8          Q.    And by entry in your time records, you're

9    indicating there was no entry on September 25, 2002?

10         A.    I believe so.  Again, one would have to

11   check my time records.  I'm remembering this from a

12   number of months ago.

13         Q.    Okay.  Is it accurate, nonetheless, that

14   Doctor Simoni did review with you a draft of John

15   Simoni's letter to Nancy Eichler?

16         A.    Oh, I have no idea at this point in time.

17         Q.    The next entry is November 12, 2002,

18   Fairmont again.  Research and deliver to Rich

19   material on splitting of attorney fees between

20   attorneys.

21               And I notice that the entry -- or marking

22   that you have appears to be some initials, LKG.

23         A.    Correct.

24         Q.    What does LKG signify?

1          A.    L.K. Graphics.

2          Q.    L.K. Graphics?

3          A.    Uh-huh.

4          Q.    What is L.K. Graphics?

5          A.    It's a company in Belle Vernon,

6     Pennsylvania.

7                    MR. CASH:  Where?

8                    THE WITNESS:  Belle Vernon,

9     Pennsylvania.

10                   MR. CASH:  Okay.

11    BY MR. WAKEFIELD:

12         Q.    Why did you put LKG next to this entry?

13                   MR. MCCARTHY:  I'm sorry.  Which entry

14    are you on?

15                   MR. WAKEFIELD:  I'm on November 12,

16    2012 -- 2002.  Excuse me.

17                   MR. MCCARTHY:  Okay.

18    BY MR. WAKEFIELD:

19         Q.    Why did you put LKG to the right of this

20    entry?

21         A.    Because I was in their offices all day that

22    day.

23         Q.    So -- all right.  So are you indicating

24    that the entry is inaccurate because you weren't in

1    Morgantown or that you just simply happened to be

2    somewhere else?

3         A.    Well, he did not deliver to me on that day

4    any documents.  I mean, I wasn't in town.

5         Q.    Okay.

6         A.    I wasn't here.

7         Q.    Okay.  Did Doctor Simoni ever deliver to

8    you material on splitting of attorney fees between

9    attorneys?

10        A.    I think I did see something on that.

11        Q.    Okay.  And did he deliver it to your

12   office?

13        A.    Oh, I have no idea.

14        Q.    But you're not questioning whether he in

15   fact researched and delivered to you material on

16   splitting attorney fees between attorneys; are you?

17        A.    No.  I'm questioning the date.  He did not

18   deliver anything to me on that date because I was not

19   in Morgantown that -- on that particular day.

20        Q.    Could he have delivered it to your office

21   even though you weren't there?

22        A.    Well, he could have, yeah.

23        Q.    There's an entry of January 17, 2003, also

24   in the Fairmont matter.  Reviewed with Rich Marino's

1  proposed retainer agreement.

2          You have a question mark to the right of

3  that entry.  Why is there a question mark?

4      A.   I don't remember him being involved in

5  anything dealing with Marino.

6      Q.   Okay.  Your recollection, as you sit here

7  today, is that Joe Simoni was not involved in

8  reviewing any proposed retainer agreement with

9  Mr. Marino?

10      A.   I don't think.  I mean, it's possible, but

11  I don't -- I don't remember it, and I don't have

12  anything for that particular day.

13      Q.   Okay.  Page 10 of Deposition Exhibit No. 11

14  --

15              MR. WAKEFIELD:  Would you like to take

16  a break, Mr. Rich?

17              THE WITNESS:  No.  I'm fine.

18  BY MR. WAKEFIELD:

19      Q.   Page 10 of Deposition Exhibit No. 21, there

20  is an entry on June 10, 2003.  The matter is

21  Fairmont.  It says, reviewed with Rich Summy's -- and

22  then it has in parentheses B&B -- 6/10/03 letter to

23  Marino.

24              And you have off to the right, LKG and then

1 some other initials, right?

2      A.    Uh-huh.

3      Q.    What are those other initials?

4      A.    Well, those aren't initials.  That's

5 Tuesday.

6      Q.    Okay.  LKG, Tuesday?

7      A.    Yes.

8      Q.    I take it -- am I fair in assuming that

9 you've made this entry because you would've again

10 been at L.K. Graphics in Belle Vernon on that

11 Tuesday?

12      A.    That is correct.

13      Q.    Okay.  And so -- but the entry itself,

14 reviewing with Rich Summy's 6/10/03 letter to Marino,

15 did you ever review with Doctor Simoni Summy's letter

16 to Mr. Marino bearing the date of June 10, 2003?

17      A.    I have no idea at this point in time.

18      Q.    Is the question that you're raising with

19 regard to the June 10, 2003 entry is that a --

20 whatever is described could not have occurred on that

21 date because you weren't in your office?

22      A.    That's right.

23      Q.    It is possible that Doctor Simoni did

24 review Summy's letter?

1        A.    It is possible, but I don't know.

2        Q.    The next entry, it actually has two dates

3   to it, 6/22/2003 and 6/23/2003.  Again, the matter

4   described is Fairmont.  Drafted and helped Rich

5   finalize letter to Marino.

6              To the right of it, you have two question

7   marks.  Do you see that?

8        A.    Yes.

9        Q.    Why did you put two question marks to the

10  right of that entry?

11       A.    Because I think it's dealing with two

12  particular dates, the 22nd and the 23rd of June, and

13  I have nothing on that.

14       Q.    Okay.  You have no time entry?

15       A.    I believe that to be the case.  Again, one

16  would have to go back and look at my time records.

17       Q.    Okay.  Did Joe Simoni help you draft and

18  finalize a letter to Mr. Marino?

19       A.    I don't remember him being involved in

20  anything with Marino.  I'm not saying that he wasn't.

21  I think Susan Fair and I drafted most letters.

22       Q.    Did you ever ask Doctor Simoni to review --

23       A.    I may have talked to him, or his nephew may

24  have said to me -- in fact, I think John said to --

1    he may have given me some advice on how to structure

2    a, you know, retainer with Dan Marino.

3        Q.   You -- during this time period of 2002,

4    2003 during the Fairmont litigation, you were, of

5    course, keeping track of your time; weren't you?

6        A.   Yes.

7        Q.   And you were keeping track of your time

8    with regard to activities you were performing on the

9    Fairmont litigation; is that a fair statement?

10        A.   Correct.

11        Q.   Would I be fair in assuming that you may

12   not have recorded time for drafting letters

13   concerning the retention of counsel because you had a

14   fee issue?

15        A.   Yeah.  I was careful -- and so was my staff

16   -- not to mingle these two issues together, right?  I

17   didn't think that was fair, so we had a separate

18   accounting of our time for this issue with Baron &

19   Budd.

20             And I can remember when Dan came and picked

21   up the documents from my storage unit that there was

22   a box that contained records for that dispute with

23   Baron & Budd.

24        Q.   Okay.

1        A.   So I was not billing time for that issue.

2    That was a -- you know, a -- I don't know.  I

3    shouldn't say personal issue, but it had nothing to

4    do with my performing my duties for my clients in

5    Fairmont.

6        Q.   So one would not expect in your time

7    records for the duties that you performed on the

8    Fairmont litigation to have any entries about your

9    activities in the fee dispute with Baron & Budd?

10       A.   Should not.  I can't tell you for certainty

11   that's the case.  Something may have slipped in

12   there, but our intent was to keep those as separate

13   issues.

14       Q.   Now, did you still have possession of the

15   separate time records on the Baron & Budd fee dispute

16   --

17       A.   Yes.  And --

18       Q.   -- when this litigation started?

19       A.   Yes.  And they were given to my counsel?

20       Q.   And did you review those time records as

21   well when you were reviewing this summary?

22       A.   Yes.

23       Q.   Okay.  And so even in the personal time

24   records you had no entry for 6/22/03 or 6/23/03

1    concerning any drafting or finalizing of a letter to

2    Mr. Marino; is that a fair statement?

3         A.    Sitting here today, I believe that's what

4    this question mark means, but I cannot tell you

5    without referring to those records with 100 percent

6    certainty.

7         Q.    The next entry on page 10 is June 27, 2003,

8    Fairmont matter.  Prepared for, participated in, and

9    reviewed with Rich telephone conference, and then it

10   has in parentheses B&B, Masry & Vititoe, Rich, Susan

11   Fair, end parentheses.

12        A.    Yes.

13        Q.    You have a checkmark to the right of that

14   entry.  Why did you put a checkmark?

15        A.    Because that happened and I agreed with

16   that entry.

17        Q.    The next entry is June 30, 2003, also in

18   Fairmont.  Edited and reviewed with Rich Rich's 6/30

19   of response to Presby -- and then it has in

20   parentheses B&B, end parentheses -- and 6/27/03

21   telephone conference.

22              To the right of that entry you have a

23   question mark.  Why is there a question mark?

24        A.    Because I didn't have anything, or if I

1    did, it did not include Joe.

2        Q.   When you say you didn't have anything, you

3    didn't have anything in your time records --

4        A.   Well --

5        Q.   -- for that date?

6        A.   I suspect that's the case.  I can't tell

7    you with certainty.

8        Q.   Did Joe Simoni ever edit and review with

9    you your June 30, 2003 letter of response to Presby

10   of Baron & Budd?

11       A.   June 30 --

12       Q.   Yes.

13       A.   -- I have no idea.

14       Q.   Okay.  Did you write a June 30, 2003 letter

15   to --

16       A.   I don't know.  One -- again, one would have

17   to look at my time records.

18       Q.   Okay.  Do you have a recollection of Joe

19   Simoni reviewing letters that you wrote to B&B, being

20   Baron & Budd?

21       A.   I'm trying to think.  I think Susan Fair

22   and I showed him a letter once, at least once.  I

23   think we had lunch with him and showed him something

24   we'd written.

1      Q.   The next entry is 7/2/2003, Fairmont again.

2  Reviewed for Rich drafts of Marino letter to Baron &

3  Budd and Susan Fair's suggestions related to that

4  letter.

5         And off to the right of that, you have LKG

6  again.

7      A.   Yeah.  I was at L.K. Graphics.

8      Q.   Okay.  You will agree with me the

9  description doesn't indicate that he met with you on

10  that day; is that right?

11     A.   The description --

12     Q.   In the entry.  Doesn't say that he met with

13  you on that date.

14     A.   Correct.

15     Q.   This reviewing for Rich drafts of Marino

16  letter to Baron & Budd and Susan Fair's suggestions,

17  would this be consistent with what you just testified

18  to a moment ago about perhaps having Joe Simoni look

19  at at least one letter to Baron & Budd with Susan

20  Fair?

21     A.   I think it happened in -- at lunch one day.

22     Q.   The next entry I see is on page 11 --

23     A.   Yes.

24     Q.   -- of Deposition Exhibit No. 21 where on

1  10/23/03 with regard to Fairmont it says, arranged,

2  coordinated, and participated in

3  information-gathering meeting at IUE hall with

4  Melissa Dutcher -- has in parentheses, Masry, end

5  parentheses -- Alicia Butler, Ellen Presby, and Steve

6  Jensen -- parentheses B&B, end parentheses --

7  Philips, slash, Westinghouse employees from all the

8  different departments and Rich.

9          And then you have interlineated on this

10  entry, hearing, dash, no meeting.

11      A.    That's right.

12      Q.    What does that mean?

13      A.    It means there was a hearing that day.

14  There was no such meeting at the union hall in

15  Fairmont.

16      Q.    Was there a meeting at the union hall in

17  Fairmont involving the people set forth in the

18  description?

19      A.    I believe so.

20      Q.    Okay.  So --

21      A.    But it didn't take place on that day.

22      Q.    Okay.  So your comment about that entry is

23  that the date is incorrect, correct?

24      A.    Correct.  And I don't know if Joe would've

1    been at such a meeting.

2         Q.   Okay.  But you do agree there was a meeting

3    at the IUE hall?

4         A.   Oh, definitely.

5         Q.   And that the individuals described in the

6    description were present?

7         A.   I don't know about Joe.  Well, he says --

8    well, I don't know if he's meaning that he was

9    present or not.  It says, arranged, coordinated, and

10   participated in information-gathering meeting.  Well,

11   I -- do you read that as -- I don't remember him

12   being at one of these meetings.  It's possible.

13        Q.   Okay.

14        A.   But the meeting did not occur on that day.

15        Q.   Okay.  Are the number of hours for the

16   meeting accurate?

17        A.   Probably.

18        Q.   Let's go to page 12 of Deposition Exhibit

19   No. 21.  You have -- with an entry dated 7/27/05,

20   Fairmont.  The entry is Gary Rich called 9:00 p.m.

21   and amongst other things said B&B was making a

22   calculated attempt to illustrate that he was not

23   carrying out his duties of the local lawyer and that

24   B&B was just elitist slime and that he was not going

1  to give in to elitist slime.

2         Now, to the right of that, you have two

3  question marks, and then there is some handwriting.

4  Can you read the handwriting for me, please?

5     A.   Yeah.  It says, dispute settled by this

6  time.

7     Q.   Why are the two question marks put there?

8     A.   Well, that's probably just -- one question

9  mark would've sufficed, but the issue with Baron &

10  Budd was settled by that time.

11    Q.   When was the issue with Baron & Budd

12  settled?

13    A.   I don't know, but it was settled by that

14  time --

15    Q.   Did you --

16    A.   -- so --

17    Q.   I'm sorry.  I didn't mean to cut you off.

18  Were you finished?

19    A.   Yes.

20    Q.   Did you ever have a call with Joe Simoni

21  where you talked about B&B making a calculated effort

22  or attempt to illustrate that you were not carrying

23  out your duties?

24    A.   Possibly.  But I don't -- I wouldn't use

1    the word elitist slime.  That --

2        Q.    That was going to be my next question to

3    you.  Did you ever use the term elitist slime to

4    describe Baron & Budd?

5        A.    No.  I don't believe so.

6        Q.    Okay.

7        A.    I don't use the word -- I can't remember

8    when I last used the word slime.

9        Q.    But you do recall having discussions with

10   Joe Simoni about Baron & Budd making a calculated

11   effort to illustrate that you weren't carrying out

12   your responsibilities as the local attorney?

13       A.    I actually don't.  I mean, obviously, there

14   was some friction between us, but the work got done.

15   I don't think that they ever -- there was any sort of

16   -- I think they were interested in seeing this case

17   went well.

18           And I was displeased with the pleadings

19   that they would send to me, that, as I said --

20   yesterday I testified that they were riddled with

21   typos, and I just -- I just couldn't believe it.

22           And so whether or not I thought at that

23   point in time or Joe thought that this was calculated

24   on their part that I would file something that was so

1    poorly prepared, so unprofessionally done that it
2    would make me look bad because I was the guy signing
3    my name on the line.
4          Q.   One of the roles that you played as local
5    counsel in the Fairmont/Westinghouse case was to sign
6    the pleadings; is that right?
7          A.   That's right.
8          Q.   You mentioned a moment ago that there was
9    some friction with Baron & Budd?
10         A.   Well, obviously, there was.
11         Q.   Okay.  The friction included the dispute
12   about the fee sharing, correct?
13         A.   Well, of course.
14         Q.   What other friction was there?
15         A.   Well, just, you know, over the pleadings
16   that they were sending me.  I didn't -- I had
17   problems signing documents when they were just so --
18   as I said before, it was just unprofessional and I
19   would not sign them.  We would redo the documents.
20         Q.   Other than documents that contained
21   typographical errors and the fee dispute with Baron &
22   Budd, were there any other sources of friction?
23         A.   I don't believe -- well, I'm not sure I
24   understand what you mean by that.  What -- sources of

 1    friction --

 2         Q.   Yeah.

 3         A.   -- meaning what?

 4         Q.   Well, you'd indicated earlier that there

 5    had been some friction between you and Baron & Budd.

 6         A.   Well, the fee split, these documents that

 7    we were getting.

 8         Q.   Any other items of friction?

 9         A.   Well, for example, scheduling these -- the

10    entry sometime back that we talked about concerning

11    the testing at the -- at the hotel, at the motel in

12    Fairmont, doing that and not telling me anything

13    about it until maybe ten o'clock the night before.  I

14    mean, that's just -- I don't -- I just find that odd

15    that someone would do that, so there were other, I

16    believe, situations like that.

17         Q.   Any others that you can identify?

18         A.   At this point, no.  But again, in my notes,

19    I'm sure there are things that are documented.

20         Q.   Did anyone from Baron & Budd ever call into

21    question whether you were performing your duties as

22    local counsel properly?

23         A.   They may have said something like this

24    during the fee split.  They said to me, well, who

1  would your clients go with if we decide we want to

2  take them and you're out?  I said, well, I would

3  assume they would go with you; you have the

4  resources; you have the expertise to bring the case.

5           And they said, well, then we'll just take

6  all your clients.  And I said, go ahead and take

7  them; do it; don't tell me -- don't threaten me; just

8  do it.  Yeah, there were -- there were conversations

9  like that.

10       Q.   Were there ever any conversations where

11  someone from Baron & Budd said, Mr. Rich, you're not

12  doing the things that we think you should be doing as

13  the local counsel for these -- for these cases?

14       A.   They were upset with me when I would insist

15  on redoing some of their pleadings.  Yes.

16       Q.   Okay.  Any other areas where they were

17  upset with you?

18       A.   Not that I can recall at this point.  But

19  they did not like me retyping things that they had

20  sent.

21       Q.   Even if you were correcting typographical

22  errors?

23       A.   That's right.  They would say, that's not

24  your job; just sign the documents.  And I would say,

1    no.

2         Q.   Let's take a look at page 13 of Deposition

3    Exhibit No. 21.  The only marking I see on this page

4    is the entry of 4/22/08.  Again, it's Fairmont.  It

5    says, called Sue Fullen; she said, one, lawyers

6    settled all but seven estates before Stone; two,

7    Edward Masry was at her house December 2000; three,

8    she remembers my working with Wanda Bower, DEP,

9    Nancy, and Melissa; four, she would consider asking

10   Baron & Budd lawyers for their time and expense

11   report; five, she already had Gary's time and expense

12   report that B&B sent to her.

13             And it looks like there's a star or

14   asterisk or something that you've written.

15        A.   Yeah.

16        Q.   Why did you put that?

17        A.   I just found it interesting that Baron &

18   Budd had sent to her my time records.

19        Q.   Did you find that objectionable?

20        A.   I just found it odd.  I don't have a

21   problem with her having them.

22        Q.   Okay.  Your mark in no way calls into

23   question the accuracy of the description; is that a

24   fair statement?

1        A.    No.  It's just I don't know if Sue Fullen
2  has my time records or not.
3        Q.    Well, I understand.  But what I'm just
4  trying to ascertain is, when you've made a mark next
5  to this entry --
6        A.    Yes.
7        Q.    -- it isn't because you say this didn't
8  occur or this isn't inaccurate; is that a fair
9  statement?
10        A.    Correct.
11        Q.    The next page is page 15 -- or excuse me --
12  page 14.  There's an entry, 7/7/2008, Fairmont,
13  received notes this week from Susan Fullen, maybe
14  made by Bob Stemple, critical of the way lawyers
15  handled settlement, one note says, single quote, no
16  original lawyer left, end quote; thinking of Rich,
17  that's an interesting comment.
18              And there is, again, what looks like a star
19  or an asterisk.
20        A.    Yes.
21        Q.    And why was that put there?
22        A.    Because I found it interesting that Bob
23  Stemple was upset about how things had gone, because
24  he had been one of the plaintiffs who had received

1    quite a large settlement.

2          Q.    Okay.

3          A.    And I know he was still upset and I thought

4    inciting some of the other clients.  There were

5    people who were disappointed.  Of course, just the

6    sheer number of people, I don't believe we could ever

7    please them all, but we did the best job we could.

8          Q.    How many plaintiffs were there eventually

9    in Fairmont?

10         A.    I think there were around 1600 plaintiffs.

11   And I don't know if there were people inciting them,

12   but I just found it interesting.  And he's saying no

13   original lawyer left.  Of course, at this point in

14   time, I was in Saudi Arabia, so maybe that's what

15   he's referring to.

16         Q.    So again, your mark is mainly expressing

17   some interest --

18         A.    No.  I'm not --

19         Q.    -- in the comment being made, correct?

20         A.    Yeah.  I'm not disputing the accuracy of

21   what's down here.  I have no idea.  I'm in -- I'm in

22   Saudi Arabia.

23         Q.    Let's take a look at page 15 of Exhibit

24   No. 21.  There's an entry on 4/2/2002.  The matter is

1  described as general, slash, Fairmont, slash,

2  Spelter.  It says, met Rich one afternoon outside his

3  office; we walked in an alley off of High Street; he

4  said he was changing our agreement from 50/50 to

5  80/20; I told him that a unilateral change was

6  unfair; during the next 24 hours, Jeanne wrote a

7  draft response for me, but I never used it, still

8  have the text; agreement history, 11/99, slash,

9  50/50, 4/02, hyphen, 80/20, fall '02, hyphen, 50/50

10  restored, 12/03, hyphen, returned to 80/20, 6/3/05,

11  80/20 confirmed.

12          And I see you have a -- again, it looks

13  like a star or an asterisk, and then you have written

14  what looks like to be, wow.

15      A.    Uh-huh.  That's correct.

16      Q.    Okay.  Why did you write, wow?

17      A.    I was just surprised with that entry.

18      Q.    And why were you surprised?

19      A.    I don't remember all that.

20      Q.    Is the entry accurate in terms of you

21  having different discussions with Doctor Simoni about

22  different percentages?

23      A.    I don't know if that particular day is

24  accurate.  There were discussions, as I've testified

1  to earlier.  I don't remember any of these numbers.

2  No.

3      Q.   The next entry is 7/17/02.  Again, it's

4  general, slash, Fairmont, slash, Spelter.  Meeting

5  with Rich, all cases discussed.

6          And I see what looks like originally was a

7  question mark and you made a checkmark.  Is that

8  right?

9      A.   Yes.

10     Q.   Does that mean you agree with that entry?

11     A.   Yes.

12     Q.   The next entry is 8/7/02, general,

13 Fairmont, Spelter.  Met Rich and Nancy Eichler for

14 lunch, went to Spelter for meeting with core group,

15 then to funeral home in Fairmont for Beverly

16 Humphrey, worked on Reedsville, slash, Arthurdale

17 letter for lead testing.

18          Do you see that?

19     A.   I do.

20     Q.   You have a question mark to the right of

21 it?

22     A.   Yes.

23     Q.   Why did you put a question mark?

24     A.   Because I don't remember or I did not have

1    any records indicating that I'd met with Joe and

2    Nancy Eichler for lunch on that particular day.

3         Q.   What about the entry that says, went to

4    Spelter for meeting with core group.  Do you recall

5    ever going to Spelter for a meeting with the core

6    group at or about this time?

7         A.   I doubt that it was in my records or I

8    would've checked it.  Now, that doesn't mean that he

9    didn't go.  I don't know.  I don't believe I went

10   that day, but again, to be certain, we would need to

11   check my records.

12        Q.   Okay.  You'll agree with me there were

13   instances where Doctor Simoni would on his own or at

14   least without you being present go and meet with

15   members of the plaintiffs' group for Spelter?

16        A.   Yes.  I'm sure there were a number of

17   those.

18        Q.   Funeral home in Fairmont for Beverly

19   Humphrey, was she one of the Philips/Westinghouse

20   plaintiffs?

21        A.   I believe so.

22        Q.   The next entry, 8/21/02, again, it's,

23   general, Fairmont, slash, Spelter.  The description

24   is, 5:30 p.m. meeting with Rich, all cases.

1          Again, you have a question mark to the

2    right of that entry; don't you?

3          A.    Yes.

4          Q.    Why did you put the question mark there?

5          A.    I suspect that I had no entry for that.

6          Q.    Would it be fair to say that there were

7    periodic occasions where you and Joe Simoni would

8    just simply sit down and discuss the pending cases?

9          A.    Yeah.  He would want a status, what's going

10   on.  Yes.

11         Q.    And would there be times where Doctor

12   Simoni would bring you up to speed as to activities

13   in which he was engaged on the cases?

14         A.    Sometimes.

15         Q.    And those would be meetings where you would

16   talk about Spelter, as well as Fairmont/Westinghouse?

17         A.    They could've been.  Yes.

18         Q.    Okay.  So the question mark signifies that

19   at least for that date you don't have an entry or you

20   don't believe you do?

21         A.    That's what I believe sitting here today.

22   Again, one would have to refer back to my records.

23         Q.    Okay.  You're not disputing that there were

24   meetings with you where cases were discussed.  Is

1  that a fair statement?

2      A.   It is.

3      Q.   Next entry, 12/11/02, general, Fairmont,

4  Spelter.  Met with Gary Rich, talked about WVU,

5  Fairmont -- has in parentheses B&B filing, end

6  parentheses -- and his negotiations with Marino over

7  retainer, Marino proposed -- parentheses 11, hyphen,

8  27, end parentheses -- 20, 30, 40 contingency, Gary

9  planning to counter with 10, 12, 15.

10          Do you see that?

11     A.   I do.

12     Q.   You have a checkmark next to that; is that

13 right?

14     A.   Yes.

15     Q.   Why did you put a checkmark there?

16     A.   Because I met with him that day.  Now, what

17 I discussed, I don't know.  It would be in my notes.

18 I don't remember discussing Dan Marino with him.

19     Q.   You don't have any recollection of

20 discussing with Doctor Simoni any of the negotiations

21 you had with Mr. Marino as to how he was to be

22 compensated?

23     A.   Well, I can remember, as I said -- or

24 testified earlier, that he might've been in my office

1   when I talked to his nephew and the nephew was

2   telling me what he thought would be a fair deal.  And

3   that's John Simoni.

4        Q.   Okay.  The description on the 12/11/2002

5   entry, in terms of what had been proposed for a

6   contingency and what you were planning to counter,

7   was that accurate?

8        A.   I don't remember at this point in time.

9        Q.   Is that the arrangement that you made with

10  Mr. Marino, in other words, that it was a

11  contingency?

12       A.   Yes.

13       Q.   The next entry is 1/27/03.  Again, it's

14  general, Fairmont, Spelter.  3:00 p.m. meeting with

15  Rich, all cases.

16            I see off to the right of that you have a

17  checkmark, but then you seem to also have put 1.0.

18       A.   Uh-huh.

19       Q.   Is that right?

20       A.   Yes.

21       Q.   Why did you --

22       A.   Because I must've had only one hour

23  allocated to that.  He has four.

24       Q.   But the checkmark would indicate that, in

1    fact, a meeting occurred?

2          A.    Correct.

3          Q.    The next date is 2/27/03, again, general,

4    Fairmont, Spelter.  Meeting with Rich, all cases.

5                Again, you have a checkmark, and then

6    you've also put 1.0.

7          A.    As before, same thing.

8          Q.    In other words, you have confirmed that a

9    meeting occurred on that date, but you had one hour

10   down, as opposed to four?

11         A.    Correct.

12         Q.    The next entry is 8/18/2003, general,

13   Fairmont, Spelter.  Met with Tom Cady, reviewed

14   discovery rule, slash, damages cases.

15                And you have a question mark to the right

16   of that entry.  Why did you put a question mark?

17         A.    I don't know.  Because he's not stating

18   that I was there.  Maybe I found it interesting that

19   he was meeting with Tom Cady --

20         Q.    Were there --

21         A.    -- about those issues.

22         Q.    Were there occasions where Professor Cady

23   was consulted about legal issues that would arise

24   from these cases?

1          A.    Yes.

2          Q.    And that was because he was a torts

3    professor at West Virginia University?

4          A.    Yes.

5          Q.    Okay.  And you were aware that Doctor

6    Simoni met with Professor Cady on more than one

7    occasion?

8          A.    Yeah.  He was at some of the meetings with

9    me.  I met with Cady on more than one occasion.

10         Q.    Okay.  So it wouldn't surprise you that

11   there would be a meeting between Doctor Simoni and

12   Tom Cady where they would review the discovery rule

13   and damage cases in West Virginia?

14         A.    Wouldn't surprise me.  I'm sure they talked

15   about other things.  They were friendly.

16         Q.    So you're not calling into question the

17   accuracy of the entry; are you?

18         A.    No.

19         Q.    Is that correct?

20         A.    Correct.

21               MR. WAKEFIELD:  I hate to do this, but

22   I need to take a short break for just a second.

23               VIDEOGRAPHER:  We're going off the

24   record.  The time is 11:58 a.m.

1                          -----

2                     (Brief break)

3                          -----

4               VIDEOGRAPHER:  This ends Disc 1 in the

5    continued deposition of Gary Rich.

6                          -----

7                     (Brief break)

8                          -----

9               VIDEOGRAPHER:  We're going back on the

10   record.  The time is 12:09 p.m.

11          This begins Disc No. 2 in the continued

12   deposition of Gary Rich.

13   BY MR. WAKEFIELD:

14       Q.   Mr. Rich, I'm going to direct your

15   attention to page 16 of Deposition Exhibit 21 at the

16   entry that is bearing the date of 12/10/2003.  It

17   again is described as general, Fairmont, Spelter.  It

18   says, with Rich, took Medina, et al. to Pittsburgh

19   Airport, stopped in Canonsburg on way for brief

20   meeting; on the way back, Rich and I stopped in

21   Waynesburg, P.A. coffee house where Rich informed me

22   in an extremely degrading manner than he found it

23   necessary to return to an 80/20 split agreement,

24   cited one reason from each of the four cases, WVU,

1    Fairmont, slash, Westinghouse, Spelter, and

2    Reedsville, slash, Arthurdale.

3              I notice you again have an asterisk or some

4    marking as well as a checkmark.  Can you --

5         A.   I do.

6         Q.   Can you explain to me why the checkmark is

7    there?

8         A.   Because I think the hours are accurate, and

9    there was such an event, going to the airport and

10   also stopping at a coffee shop.  I think it's

11   Groovy's.

12        Q.   The copy that I have -- and it would show

13   up more on your original -- indicates that you

14   apparently highlighted starting with, I stopped in --

15        A.   Actually --

16        Q.   -- Waynesburg --

17        A.   -- I've highlighted it all.

18              MR. MARINO:  Do you want to see it,

19   Jeff?

20              MR. WAKEFIELD:  Yeah.

21        A.   The whole entry --

22        Q.   Okay.

23        A.   -- is highlighted.

24        Q.   And you have this marking or asterisk.  Why

1  is it there?

2      A.   Well, I don't remember all that, and I

3  don't remember the 80/20 split, although I may have

4  said something like that.

5      Q.   So as I understand it, you do recall having

6  a meeting in a -- or stopping at the coffee house in

7  Waynesburg?

8      A.   Yeah.  To get something to drink.

9      Q.   And do you recall that there was a

10  discussion about the split of fees?

11      A.   Yeah.  If he were to get licensed and come

12  into the case, that's what he would get.  I don't

13  remember the number, but I was getting rather

14  frustrated that nothing was happening.

15      Q.   When you say frustrated that nothing was

16  happening, what do you mean?

17      A.   Well, his efforts to get re -- or to get

18  licensed.

19      Q.   When you say you were getting frustrated,

20  did you have an understanding that he was attempting

21  to get licensed?

22      A.   At some point, yes.

23      Q.   Were you frustrated that he had not yet

24  obtained a license?

1      A.    Yes.

2      Q.    Did he give you an explanation as to why he

3  didn't yet have a license?

4      A.    I don't know.  At this point, I don't know.

5      Q.    Did he ever discuss with you the taking of

6  the bar?

7      A.    He did.

8      Q.    Did he discuss with you the results of his

9  bar --

10     A.    He --

11     Q.    -- examination?

12     A.    He did.

13     Q.    What did he say?

14     A.    Said he failed.

15     Q.    Did you give him reasons for each of the

16  four matters listed in the description as to why you

17  thought there might be a need to change any split?

18     A.    I don't remember that.

19     Q.    Did you have any disagreement or complaint

20  about Joe Simoni's work in the WVU case?

21     A.    I don't know at this point.

22     Q.    Did you have any complaint or disagreement

23  about the work that Joe Simoni was doing in the

24  Fairmont/Westinghouse case?

1      A.   I can't cite anything at this point in

2 time.

3      Q.   Okay.  Did you have any disagreement or

4 complaint about the work that Joe Simoni did in the

5 Spelter case?

6      A.   Again, I don't know at this point.

7      Q.   Did you have any complaint or disagreement

8 with any work that Joe Simoni did on the

9 Reedsville/Arthurdale matter?

10      A.   I can't say anything at this point.  I

11 don't believe so.

12      Q.   There was some investigation done about

13 Reedsville and Arthurdale, correct?

14      A.   Correct.

15      Q.   But no lawsuit was ever filed?

16      A.   That is right.

17      Q.   Next entry, 2/13/2004, general, Fairmont,

18 Spelter.  Meeting with Rich regarding case

19 developments.

20           I see you have a checkmark, which I am

21 interpreting to mean that you have confirmed that

22 that meeting occurred that day.

23      A.   Correct.

24      Q.   And the hourly -- or the hour designation

1    would be correct?

2        A.    Yes.

3        Q.    On 4/7/2004, entry, again, general,

4    Fairmont, Spelter.  3:00 p.m. meeting with Rich

5    regarding case developments in WVU, Fairmont,

6    Spelter.

7            Again, you have a checkmark which would

8    indicate that you've confirmed that that's accurate?

9        A.    Correct.

10       Q.    9/19/2004, meeting -- or entry, I should

11   say, matter is general, Fairmont, Spelter.  It says,

12   met Gary Rich at Knapp Hall --

13           MR. WAKEFIELD:  That's K-n-a-p-p.

14   BY MR. WAKEFIELD:

15       Q.    -- WVU, 12:30 p.m., hyphen, three months

16   since last meet, discussed, one, WVU case, Sweeney

17   arrival for Pugh and Satterfield depositions the

18   following Wednesday; two, Philips, hyphen,

19   Westinghouse case, the preparation for Sue and Bonnie

20   Oliver for depos, Dan Marino, negotiations, hyphen,

21   still hanging; number three, Spelter case, the

22   sampling in July that Jeanne helped out in Lumberport

23   because my assistant, Jared, was not available, that

24   overall we had good property access, that the

1    agreement with L&P was a straight 25 percent with no

2    monthly.

3            Now, I see you have at least three question

4    marks written in connection with this description.

5    Is that right?

6        A.    That is correct.

7        Q.    And you have, underscore, Dan Marino,

8    negotiations still hanging; is that right?

9        A.    Correct.

10       Q.    Why did you underscore, Dan Marino,

11   negotiations still hanging?

12       A.    Because that's not true.

13       Q.    Not true in terms of having a discussion

14   with Joe Simoni about the negotiations?

15               MS. MASON:  Object to form.

16       A.    It's not true or accurate because

17   everything with regards to Marino or Baron & Budd had

18   been resolved before that.

19       Q.    So this isn't accurate in the sense that

20   there were no continuing or ongoing negotiations with

21   Dan Marino at this point?

22       A.    Or Baron & Budd.  No.  It was long over.

23       Q.    You also seem to have underscored, straight

24   25 percent with no monthly.  Do you see that?

1      A.    Yeah.  I didn't --

2      Q.    Why is that underscored?

3      A.    Because I've never discussed that with Joe.

4      Q.    The monthly, I'm assuming is a monthly

5  stipend.  Do you know?

6      A.    I have no way of knowing.

7      Q.    Were you receiving a monthly stipend in

8  2004?

9      A.    From Levin and Papantonio?

10     Q.    Yes.

11     A.    I've never received any sort of stipend

12  from any firm in the Spelter litigation.

13     Q.    Okay.  Was it -- would it be fair to say

14  that the agreement that you had with Levin and

15  Papantonio was for a straight percentage of a fee

16  split and that no monthly stipend was going to be

17  paid?

18     A.    I think I've testified to that a number of

19  times.  There was no stipend from any of the firms

20  involved in the Spelter litigation.

21     Q.    And that would be the Levin firm and The

22  Cochran Firm, correct?

23     A.    Yes.  And any of the other --

24            MS. MASON:  Object to form.

1        A.    -- firms that were involved.  I mean, there

2    was -- that was never talked about, I don't think.

3        Q.    Now, did you -- is it accurate that there

4    was a meeting in Knapp Hall with --

5        A.    On Sunday, I couldn't find that in my

6    records and I don't think I'd be meeting with him on

7    Sunday.

8        Q.    Did you have meetings with Joe Simoni in

9    Knapp Hall?

10        A.    I've been there a few times.

11        Q.    And was that where his office was located?

12        A.    It was.

13        Q.    And were there occasions where his office

14    or a conference room in Knapp Hall was used for

15    meetings in connection with both the Fairmont

16    litigation and the Spelter litigation?

17        A.    Not that I can recall.

18        Q.    Uh-huh.

19              You have, in the left-hand corner, written,

20    Sunday, indicating that that was the day of the week

21    of this date?

22        A.    I believe September 19th, 2004 was Sunday.

23    I find it strange that I would be meeting with him on

24    a Sunday in Knapp Hall.  I have no entry for that.

1      Q.   Did you meet with Doctor Simoni on the
2  weekends to discuss the cases?
3      A.   I don't believe on a Sunday.  No.
4      Q.   Did you meet on Saturdays?
5      A.   It's possible, but not necessarily to
6  discuss cases.  It might've been a sporting event or
7  talking about sports.
8      Q.   The impression I get from reviewing this
9  description -- and I realize you didn't author it --
10  is that Mr. Sweeney, who was involved in the WVU
11  litigation, was going to be arriving for depositions
12  of two individuals.  Did those depositions occur, to
13  your knowledge?
14      A.   I'm sorry.  I don't -- in what --
15      Q.   In the WVU case, were there depositions for
16  -- of Pugh and Satterfield?
17      A.   Oh, you mean -- where are you seeing this?
18      Q.   It starts in the second line in the
19  description of 9/19/04, Sweeney arrival --
20      A.   Oh.
21      Q.   -- for Pugh and Satterfield depositions the
22  following Wednesday.
23      A.   I don't recall, but there were a number of
24  depositions in the West Virginia case which I

1    attended.

2         Q.   Were there also depos scheduled for Sue

3    Fullen and Bonnie Oliver in connection with the

4    Fairmont case?

5         A.   Yes, indeed.  I don't know the -- I'm not

6    sure if this time frame is accurate, but definitely

7    there -- they were deposed.  Yes.

8         Q.   Okay.  Let's take a look at the entry of

9    12/8/2004, and the matter is, general, Fairmont,

10   Spelter.  Met with Gary Rich, in addition to Rich's

11   irritation with people's talk about how he was paying

12   me in the Stanridge case -- parentheses, where,

13   again, I received nothing, end parentheses -- in

14   which there was settlement with one defendant for a

15   few thousand, according to Rich, we discussed all

16   three cases, what was happening in each, and what

17   needed to be done on our end; for Westinghouse, we

18   talked about his invite to Fred Barron's Christmas

19   bash, how his B&B, slash, Masry problem remained; on

20   Spelter, we talked about my needing to do more

21   property access work and also more work through WVDEP

22   gathering documents.

23              Now, you have a question mark to the right

24   of that entry.  Why is the question mark there?

1       A.    Because I believe I had nothing for that

2    day.

3       Q.    No time entry for December 8, 2004?

4       A.    That's what I think.

5       Q.    Okay.  Did you ever express any irritation

6    to Joe Simoni about people talking about how Doctor

7    Simoni was being paid?

8       A.    Sam Nadler had mentioned to me, who was

9    another professor, about Simoni getting paid, and he

10   seemed to be upset that Simoni was getting something.

11   And I said, well, he wasn't getting anything.

12      Q.    Was he another professor in the sociology

13   department?

14      A.    No.  He was in the math department.  He was

15   really the driving force behind the WVU case, was Sam

16   Nadler.

17      Q.    How was he the driving force?

18      A.    Well, he was the guy who brought it to

19   attention, and he brought it to Joe saying, something

20   has to be done.

21      Q.    The WVU case was about asbestos being

22   located in the Coliseum?

23      A.    Well, that was -- it was in the Coliseum,

24   but that came out later.  The -- initially, it was in

1  Nadler's building, which may have been Armstrong

2  Hall.  I'm not sure.  But it was in where Sam Nadler

3  was working.  He was very upset about asbestos.

4  Eventually, it caused the coliseum to be shut down

5  and the basketball team had to play all their games

6  away.

7       Q.    There's a reference here to how the Baron &

8  Budd, slash, Masry problem remained.  Was there a

9  problem with Baron & Budd and Masry in December of

10 2004 still?

11      A.    Well, I -- you know, I -- overall, the

12 things -- we were getting along better.  They still

13 sent pleadings that were just not up to standard, so

14 that was still going on.  You know, there was still

15 things being said that I didn't like, but overall, it

16 was going on.

17      Q.    What was being said that you didn't like?

18      A.    Just the general tone, how they conduct

19 themselves.

20      Q.    What about their general tone was an issue?

21 Can you describe what you mean by the general tone?

22      A.    Their attitude, I think, toward -- you

23 know, some of their people not wanting to come to

24 West Virginia.  You know, oh, where can we stay?  And

1  then being pleasantly surprised after staying at the

2  Waterfront or the Radisson it was at that time.

3  Things of that nature, just hearing people complain

4  about this or that.

5      Q.   Were there any complaints about you and the

6  work you were doing?

7      A.   Not that I'm aware of.

8      Q.   Let's look at the 2/21/05 entry on page 17

9  of Deposition Exhibit 21.  It's, general, Fairmont,

10 Spelter is the matter.  Met Bob Sweeney and Gary Rich

11 early evening at Radisson hotel in Morgantown; after

12 the meeting, met with Rich in the parking garage.

13          And you have a checkmark, which I am

14 interpreting as confirming that this occurred.  Is

15 that right?

16     A.   Correct.

17     Q.   Next entry is 2/23/05, again, general,

18 Fairmont, Spelter.  11:00 a.m., met at Gary Rich's

19 office for a call to Bob Sweeney and Steve Foley to

20 talk about witness list WVU; after the call, Rich and

21 I discussed my trip to the Fairmont DEP office for

22 the Spelter case and that I thought I might be

23 digging up some good stuff for that case.

24          Now, you have a question mark.  Why is the

1    question mark there?

2        A.    I didn't -- I'm assuming it's because I had

3    no entry for that.

4        Q.    Okay.  Do you recall having a meeting at

5    your office where a call was placed to Bob Sweeney

6    and Steve Foley to talk about the witness list?

7        A.    I don't, but I'm not saying there wasn't

8    such a call made.

9        Q.    Did Doctor Simoni participate in the

10   preparation of witness lists in the WVU case?

11       A.    He probably did since he was -- he and

12   Nadler both probably did.

13       Q.    Did Doctor Simoni participate in the

14   preparation of witness lists in the Fairmont

15   litigation?

16       A.    I don't know.

17       Q.    Did Doctor Simoni participate in the

18   preparation of witness lists for the Spelter

19   litigation?

20       A.    I don't know.

21       Q.    Do you recall having a discussion with

22   Doctor Simoni about Doctor Simoni's trip to the

23   Fairmont DEP office?

24       A.    I don't know.  I mean, he went to -- you

1  know, as we, I think, established yesterday, I think

2  he met with John Hando in the DEP realm.

3      Q.   And --

4      A.   So I don't know if it was about that or if

5  it was on this date or in this general time frame,

6  but yes, he did have meetings with Mr. Hando.

7      Q.   Who was with the Fairmont DEP office?

8      A.   Correct.

9      Q.   Did Doctor Simoni ever represent to you

10  that he thought he was digging up some good material

11  or stuff for the Spelter case?

12      A.   He may have.  I don't know.  Probably.

13      Q.   You can take a look at the next entry,

14  6/3/05, again, general, Fairmont, Spelter.  It is a

15  very lengthy description that I'm not going to read.

16          There appears to be an asterisk or a star

17  that you have put to the right.  Is that correct?

18      A.   That's right.

19      Q.   Okay.  Why is that marked there?

20      A.   Because it's -- it is -- I don't remember a

21  lot of that.

22      Q.   Yeah.

23      A.   But there was such a meeting.

24      Q.   At the Star City Park along the river?

1      A.    There was such a meeting.  Yes.

2      Q.    And is the date that Doctor Simoni has down

3  for the meeting accurate?

4      A.    I believe it is.

5      Q.    I'd like for you to read the description to

6  yourself, and in that description, I want you to

7  identify for me anything that you disagree occurred.

8      A.    Well, I don't remember anything about

9  Baron & Budd being said.  I don't remember anything

10  being said about what would happen to him.

11          And I -- until I read this, I never knew he

12  had a heart condition, because he was a runner.  I

13  didn't know that he had any physical problems, other

14  than his back sometimes bothered him.

15          Talking about percentages, I think we did,

16  if -- again, if he became licensed.  And now we're in

17  2005, and the time is slipping away.

18      Q.    Is it accurate in this description that you

19  wrote things and did not speak out loud?

20      A.    We did.  Both of us were concerned about

21  our phones being tapped.

22      Q.    Why did you have a concern about your phone

23  being tapped?

24      A.    Well, I was concerned because of my problem

1  with Baron & Budd, although that issue was resolved.

2      Q.   Can you explain that further for me?  I

3  mean, why were you concerned about your phone being

4  tapped because of the issue with Baron & Budd?

5      A.   Well, threats had been -- or a threat had

6  been made against my youngest daughter by an attorney

7  from Masry & Vititoe, and we were talking -- we were

8  --

9           Most of the conversation, as I remember,

10  talked about where my oldest daughter would go to

11  school, where she would go to university.  And Joe

12  was very interested in her going to Notre Dame where

13  he had gone to school, and she was looking at various

14  school, Marquette, Tulane.  She ultimately went to

15  Tulane.

16           We were talking about that, and I think at

17  this point she'd made the decision that she would go

18  to Tulane University.  And I didn't want anyone to

19  know where she was going to school.

20      Q.   And that was because there had been a

21  threat made about your youngest daughter?

22      A.   Correct.

23      Q.   Who made the threat?

24      A.   A lawyer from Masry & Vititoe.  It was a --

1    my perception that it was a threat.  Certainly, my

2    wife thought it was.

3         Q.    Who was the lawyer?

4         A.    Nancy Eichler.

5         Q.    What was the nature of the threat?

6         A.    She said to me that I should spend more

7    time with my family and little April, I should hug

8    her, because, you know, you never know, you might

9    come home one day and she's not there.

10        Q.    Did she say anything else that you

11   perceived to be a threat?

12        A.    No.  But that was more than enough for me

13   and my wife.

14        Q.    And your impression of that or your

15   perception of that was that that was a threat being

16   made?

17        A.    Yes.  And this was during this dispute.

18        Q.    The dispute you were having with Baron &

19   Budd --

20        A.    Yes.

21        Q.    -- about the fee splitting; is that right?

22        A.    Yes.

23        Q.    And as a result of that, you had some

24   concern that your phone might be tapped by Baron &

1  Budd?

2      A.    Yes.  Or Masry & Vititoe.

3      Q.    Did anyone -- Nancy Eichler, as I

4  understand it, was with Masry?

5      A.    Correct.

6      Q.    Did anyone at Baron & Budd ever threaten

7  you?

8      A.    No.  Other than to take my clients, that

9  they would take them away and there'd be nothing I

10 could do about it, and they said that repeatedly.

11 And I would just respond, go ahead and do it.

12     Q.    Did Doctor Simoni ever express to you

13 concern that he thought his phone was tapped?

14     A.    He was wary of them as well.

15     Q.    Them being who?

16     A.    Them being those two firms.

17     Q.    Baron & Budd and Masry & Vititoe?

18     A.    Yes.

19     Q.    Am I correct then that because of this

20 concern about whether your phone was being tapped is

21 why things were written out at the meeting?

22     A.    Yes.  And this included cell phones as

23 well.  In fact, Joe always removed the battery from

24 his phone before he would talk about anything he felt

1    was sensitive.

2              We were talking about my daughter going

3    away to school.  Eichler had asked -- or people at

4    Baron & Budd were very interested in where she was

5    going to school.  I find that odd.

6         Q.   Now, he has numbered different topics or

7    things that were written down.  Do you see that?

8         A.   Yes.

9         Q.   Are those accurate to your recollection?

10        A.   Well, some of them.  Yes.  I mean, I talked

11   about his role.  I appreciated what he's done.  There

12   wouldn't have been a case without him and -- at WVU.

13   There wouldn't have been a case in Westinghouse or

14   Spelter, but there wouldn't have been cases without

15   other people as well, and I think I told him that.

16   For example, in Spelter, there wouldn't have been a

17   case without Steve Medina, so --

18        Q.   Of the numbered items, number one would be

19   accurate; is that correct?

20        A.   Yes.

21        Q.   No. 2 would be correct?

22        A.   I probably said that.

23        Q.   No. 3 accurate?

24        A.   I may have said that, if he became

1  licensed, that we would get on and he could get

2  involved and take over the workload.  Yes.

3       Q.   Is No. 4 accurate?

4       A.   I didn't say I'd buy property for him.  We

5  talked about his going to -- he was moving to Florida

6  or maybe he'd moved to Florida.  I don't know.  He

7  was going to buy property or his parents were selling

8  property.  I gave him the name of Dan Levitan.

9            I was talking to him about taxes.  You

10  know, we were -- he was saying, how could they -- I

11  guess, because of their age, some exemption,

12  something to that effect.  But there was no -- there

13  was nothing underhanded going on.

14       Q.   There is a statement under No. 4 that,

15  delivery of my part might be to me as an employee.

16  Did you talk to him about being an employee?

17       A.   Yeah.  We talked about his possibly being

18  an employee of the firm, in the event that it

19  wouldn't be accepted by the other firms that he

20  become --

21            Well, in the MOU, I think there's a

22  provision that they have to agree to the association

23  of another counsel, but if I wanted to hire him, I

24  guess there's nothing wrong with that.

1     Q.   Was there any discussion about payment in

2  the form of loans that would be forgiven?

3     A.   Not that I can remember, unless there was

4  some tax advantage or perceived tax advantage to

5  something like that.  I don't know how that would

6  work.

7         I don't know if he suggested that and I

8  simply said, well, it's something to consider.  I

9  don't know.  But again, that would not be done if it

10  wasn't proper.  I mean, I listen to all sorts of

11  things.  That doesn't mean that I'm going to do them.

12     Q.   There's a comment here, meaning about you,

13  he then again wrote that he was concerned about my

14  badgering him after the WVU case settled and about my

15  lack of patience.

16         Is that accurate?

17     A.   Well, he was asking me about WVU.  And I

18  said, well, what is there to talk about; you're a

19  client in that case; how would you ever be

20  compensated?  He said, well, he didn't start out as a

21  client, so if he became licensed, could he get paid?

22  I said, I don't think so.

23     Q.   Was WVU done by this point?

24     A.   Possibly or it was nearly done.

1      Q.   Did he say to you, patience and badgering
2   were not going to be a problem?

3      A.   I don't know.

4      Q.   Is the amount of time that is described for
5   the meeting accurate?

6      A.   I don't know about that.  Probably.
7   Because I know we were walking along down there.

8      Q.   Let's look at page 18 of the exhibit.
9   6/7/05, general, Fairmont, Spelter manner.  Met Gary
10  Rich his request, his office, 2:45 p.m.; we went out
11  on street, walked near Hotel Morgan; he talked about
12  two matters; one, he asked me to go through my
13  calendars to look for dates and work done on cases
14  that he might've missed, also said it didn't make
15  much sense for me to file time for WVU case since
16  there was no money; two, Dan Levitan, Fort
17  Lauderdale, property investment expert, that with
18  Dan's help I could be his agent in Florida; meeting
19  ended about 3:15 p.m.

20           You have a question mark next to that.  Why
21  is the question mark?

22     A.   I don't think I had an entry for meeting
23  him that day.

24     Q.   In looking at your time slips, were there

1  occasions where you would have entries and Joe Simoni

2  would have been involved in the meeting and you

3  wouldn't note that Simoni was present?

4      A.   Could be.

5      Q.   Did Doctor Simoni ever ask you -- excuse

6  me.  Did you ever ask Doctor Simoni to go through

7  your -- his calendars to look for dates?

8      A.   I believe I did.  Because, at that point,

9  I'm thinking, what happens if this guy doesn't get

10  licensed; then what?  And I believe possibly at that

11  point or before Sherri Goodman was saying that

12  quantum meruit might apply.  But he never got

13  anything together.

14      Q.   The next entry is 3/8/2006, general,

15  Fairmont, Spelter.

16         I won't read the entry, but I see you have

17  a checkmark which would indicate to me that you have

18  confirmed the entry, but then I also see what looks

19  like might be a question mark.

20      A.   Yes.

21      Q.   Okay.  Why is there the question mark?

22      A.   Because he's stating that Rich said that he

23  probably logged more hours than anyone.  I never said

24  that.

1          Q.   Would that be accurate that you logged more
2     hours than anyone?

3          A.   Definitely not.  And that L&P, Medina was
4     volatile with everyone but means well and that Mike
5     Pap was good.  I don't ever remember saying anything
6     about Medina to him or about Mike Papantonio.

7               But definitely I have never said that I
8     logged more hours than anyone.  I mean, there were
9     people in this case that aren't -- that logged, I
10    think, in the Spelter case, seven, 8,000 hours or
11    more.  I think -- I think there were 30,000 hours
12    logged by one of the firms in Spelter.

13         Q.   In the description, there is a statement
14    that says that with B&B nothing has worked out.  Did
15    you ever make that type of statement to Doctor
16    Simoni?

17         A.   I'm not remembering anything about that.

18         Q.   I want you to take a look at page 19 of
19    Deposition Exhibit 21.  There is an entry on 5/18/06.
20    The matter is general, Fairmont, Spelter.

21              You have a checkmark to the right of that
22    entry or -- does that mean that the entry is
23    accurate?

24         A.   It means that we met that day.

1    Q.   Are the number of hours recorded accurate?

2    A.   Probably.

3    Q.   Did you have any conversation with Doctor

4  Simoni at or around May 18th, 2006 that people didn't

5  respect you?

6    A.   This may have been going back to the

7  Baron & Budd thing.  We may have been talking about

8  how ridiculous that whole thing was.

9    Q.   Did you have an impression, based upon the

10 tone that was used by Baron & Budd, that they didn't

11 have respect for you?

12   A.   I don't think they respect people in West

13 Virginia in general.

14   Q.   Did you have that impression from any of

15 the firms that worked in the Spelter case?

16   A.   No.

17   Q.   Did you make any comment to Doctor Simoni

18 about his lack of respect for you?

19   A.   I may have said something about his -- some

20 of the things that he did, I thought he exercised

21 poor judgment.

22   Q.   In what areas?

23   A.   Well, one big example would be the way he

24 confronted Barbara Core, the Circuit Clerk of Marion

1  County.

2       Q.   Any other areas?

3       A.   I can't think of anything now, but there

4  were other issues.

5       Q.   There's also an entry here about the way I,

6  meaning Simoni, let Bill Byrne talk to you.  What was

7  that about?  Did you have a conversation with Bill

8  Byrne?

9       A.   Yeah.  I talked to Bill Byrne about this

10  fee split issue with Baron & Budd, and Bill Byrne,

11  you know, was just hostile, I thought, about it.

12       Q.   Hostile to your position?

13       A.   Well, just saying, what -- you know,

14  basically, I got the opinion -- the impression from

15  Burn that this is what you get when you go to these

16  out-of-staters.  Why are you going to them?  There's

17  good lawyers in West Virginia?  Why are you bothering

18  these -- bothering with these people?

19            I just thought it was odd the way he

20  conducted himself, but I also think Simoni had talked

21  to him about these cases before he spoke to me, so

22  that's why I was going to out-of-staters, because

23  they were the ones that had the resources and the

24  expertise to bring these sorts of cases.

1          Q.    Would you have talked to Bill Byrne before

2     John Simoni became involved in representing you?

3          A.    Probably.  Yeah.

4          Q.    Okay.

5          A.    Or -- yeah.  Probably.  Or maybe at the

6     same time.

7          Q.    And the reason I ask is, the entry date is

8     May of 2006.  Yet, I understood that the dispute with

9     Baron & Budd was prior to that.  Wasn't it?

10         A.    Correct.  Now, this is just talking about

11    -- I'm assuming if this -- if I did mention this,

12    this was referring back to something that happened a

13    number of years before.

14              And that Byrne is supposedly his friend, I

15    didn't know Bill Byrne, but I think he was the mayor

16    of Morgantown at that time or at one point in time.

17    I didn't know him, but he encouraged me to see Byrne,

18    that here's a guy -- and then I go and see him, and

19    it was just like, you know, what are you doing?

20         Q.    There's a entry in this description that

21    indicates that you stated that you had told Medina

22    that you don't know why Simoni does things, that you

23    have no control over Simoni, and that's just the way

24    Simoni is, like showing up in Clarksburg at court or

1    trial.

2            Do you see that?

3        A.   Yes.

4        Q.   Did you make that statement to Joe Simoni?

5        A.   Probably.  That I had no control over him,

6    I think that there was thinking -- and I don't know

7    why -- that he shouldn't come to the hearings or he

8    certainly shouldn't come to any of the meetings, and

9    I told him this.

10       Q.   Did there come a point where there was the

11   possibility you were going to have to be a witness in

12   the Spelter litigation?

13       A.   There was some discussions about me being

14   deposed.

15       Q.   And was that in connection with you

16   possessing certain factual information about when the

17   residents may have known --

18       A.   I believe so.  Yes.

19       Q.   -- about possible contamination?

20       A.   Yes.

21       Q.   Did you -- were you ever deposed?

22       A.   I was not.

23       Q.   The next entry I see some marking, I think,

24   is the 12/2000 in connection with Spelter.  Met with

1  G. Rich regarding plan, slash, strategy for Spelter

2  case.

3           And you have a question mark to the right

4  of that; is that correct?

5       A.   Correct.

6       Q.   Why is the question mark there?

7       A.   Probably because I had no entry.

8       Q.   Next entry is 2/28/2001, Spelter.  Organize

9  and attended with G. Rich informational meeting for

10  Spelter area residents at the Perrine's home.

11           And then off to the right, it seems like

12  you've written, in Miami with, and I can't read the

13  rest of it.

14       A.   With Jay Morgan.

15       Q.   Is that indicating that you would not have

16  been present on February 28th, 2001?

17       A.   I was in Miami.

18       Q.   Did you attend with Joe Simoni

19  informational meetings for Spelter area residents at

20  the Perrine's home?

21       A.   I have, but not at this point in time.  I

22  did not get involved until April, I believe it was

23  2001, so I was definitely -- this is the period of

24  time that Joe was accumulating documents and

1  information and he was trying to find someone to help
2  him with this case.
3      Q.   Okay.  So activity that would've been
4  conducted by Joe Simoni in the February 2001 time
5  period would've been on his own and would not have
6  involved you; is that a --
7                MR. MARINO:  Object to the --
8  BY MR. WAKEFIELD:
9      Q.   -- fair statement?
10                MR. MARINO:  Object to the form of the
11  question.
12            You can answer if you understand.
13      A.   That's not correct, in that later on in
14  2001, but prior to April 2001, I had no involvement
15  in Spelter.  He may have mentioned it to me in
16  passing.
17            I think someone called my office from
18  Spelter saying they had heard that I was a great
19  environmental lawyer and needed my help.  You know, I
20  told them -- I probably gave them someone else's
21  name.
22      Q.   There's an entry of March 11, 2001, again,
23  under Spelter.  Organize and attended with G. Rich
24  informational meeting for Spelter area residents at

1    the Perrine's home.

2              Again, I see a question mark and what's

3    written, no go.

4         A.    Uh-huh.

5         Q.    And I assume your testimony would be the

6    same, you were not involved at that point?

7         A.    That's absolutely right.

8         Q.    I see an entry on page 20 of Exhibit 21,

9    4/30/2001, Spelter.  Plan and attended public

10   informational meeting in Spelter at old VFD hall.

11             And then you have something written off to

12   the right.  Can you read that for us, please?

13        A.    No, meeting with Eichler.

14        Q.    What does that mean?

15        A.    Well, no.  Maybe that's -- oh, no.  It's no

16   meeting for me anyway because I was with Nancy

17   Eichler.  That's what it means.

18        Q.    So your marking simply indicates that you

19   would not have been present at that meeting, correct?

20        A.    No.  I was with Nancy Eichler.

21        Q.    You're not calling to question whether the

22   meeting actually was held; are you?

23        A.    Right.  He may have well have had a

24   meeting.  I don't know.

1          Q.   There's also the next entry, 5/10/2001 to
2     8/1/2001, planned, organized, and attended meetings
3     at the Perrine residence in Spelter, opened all
4     meetings and always introduced Rich, potential
5     clients signed, total of 98 retainer agreements, and
6     it has 5/10, 5/26, 6/9, 6/20, 7/7, 8/1.
7               And I see some marking in that description.
8     Is that yours?
9          A.   Yes.
10         Q.   What does that marking signify?
11         A.   Well, I was ticking off the dates, and
12    those dates are corrects.
13         Q.   So this is --
14         A.   It's --
15         Q.   This is an accurate description?
16         A.   I don't know about the number of retainer
17    agreements, but the dates that he has listed,
18    meetings did take place on those days.
19         Q.   And is it accurate to say that Doctor
20    Simoni would introduce you at those meetings?
21         A.   Probably.  Or Lenora Perrine.
22         Q.   And in terms of retainer agreements in the
23    Spelter case, did Doctor Simoni assist in obtaining
24    those retainer agreements?

1          A.    People just signed them at these meetings.

2          Q.    Okay.  I take it you'd have an -- you'd

3    have one of these meetings, it would be informational

4    meeting, people would attend, and perhaps some of

5    them would sign a retainer agreement --

6          A.    Some would.

7          Q.    -- at the meeting?

8          A.    And Susan Fair might have been there.  It

9    just depended.

10         Q.    Okay.  I see the entry 9/20/2001, Spelter,

11   trip to Glasser & Glasser law firm in Norfolk,

12   Virginia to visit with Beth Vaughn and interest the

13   firm in the case.  And then I see what looks like,

14   not with GWR.

15         A.    Correct.

16         Q.    Now, you did not go with Doctor Simoni to

17   Glasser & Glasser?

18         A.    I have never been to Glasser & Glasser.

19         Q.    Do you agree that Doctor Simoni did go to

20   Glasser & Glasser?

21         A.    I don't remember anything -- him talking

22   about any such visit.  May have happened, but I don't

23   remember any talk about it.

24         Q.    Next entry, on page 22, 4/2002, Spelter.

1  Prepared for Rich draft for communications with

2  out-of-state law firms, providing introductory

3  information and inviting them to take a look at

4  Spelter.

5         You had a question mark to the right of

6  that.  Why is the question mark there?

7     A.   I don't remember any draft of his -- or

8  sending information to out-of-state firms.  He did

9  assemble the information that I put in a binder, and

10 as I remember, I drafted or Susan Fair drafted the

11 letter and I signed it and we Fed-Exed them out to a

12 number of law firms.

13    Q.   Was Joe Simoni consulted about the content

14 of the letter?

15    A.   I don't know.  He may have -- he may have

16 come in with a document or something and Susan

17 might've said, hey, we wrote this letter; this is

18 going out, and we Fed-Exed them out.

19    Q.   Do you -- do you have any recollection of

20 asking Joe Simoni to review the cover letters for

21 lack of a better description that would accompany

22 these notebooks?

23    A.   I don't.  At this point, I have no

24 recollection of that.  I just remember the binder,

1    and I think my wife collected them and took them to

2    Fed-Ex and sent them out.

3         Q.   The next entry is 3/1/2002 for Spelter,

4    drafted for Rich model letter about the Spelter

5    health survey which he then used in attempting to

6    interest out-of-state firms.

7              You have a question mark next to it.  Why

8    is the question mark there?

9         A.   Model -- I don't remember anything about

10   that, a health survey.  I -- unless -- maybe Nancy

11   Eichler had him do a survey or something on Spelter

12   when they were looking at that case, but I never

13   participated in any health survey, and I don't

14   believe I ever sent anything out on that.

15        Q.   Okay.  You don't believe you sent any type

16   of letter to out-of-state firms about a Spelter

17   health survey?

18        A.   I don't remember anything like that.  I'm

19   not saying it's not possible, but I have no

20   recollection of it.

21        Q.   Page 21 of Exhibit 21, the date is 3/28/02

22   for the entry, and the matter is Spelter.  Prepared

23   and delivered FOIA request to John Hando, WVDEP and

24   to Harrison County Emergency Services.

1          Off to the right I see your initials, GWR.

2     A.   Yes.

3     Q.   And now, is that all one entry, GWR, first

4 meeting?

5     A.   Yes.  That's relative to the next meeting

6 --

7     Q.   Very good.

8     A.   -- which I think I was confused about the

9 very first time I went there.  I knew it was around

10 my birthday, which is April 14th, and quite frankly,

11 I never knew -- and I think in my time records I just

12 put April because I didn't know the day, so I suspect

13 Joe is correct that it was April 13th.

14     Q.   And it's -- the entry is organized and

15 attended with G. Rich informational meeting for

16 Spelter area residents at the Perrine's home.

17          And your entry indicates that this would

18 have been the first time that you met with residents

19 concerning the Spelter matter?

20     A.   Yes.

21     Q.   There is a entry, 9/30/2002, Spelter.  Trip

22 with Rich to Martinsburg for meeting with John Hando,

23 WVDEP, and out-of-state of lawyer -- out-of-state

24 lawyer, Beth Vaughn, Glasser & Glasser.

1          There's a checkmark.  I'm assuming you're
2    confirming that entry?

3          A.    Yes.

4          Q.    There are no markings on page 22 of the
5    exhibit, correct?

6          A.    Correct.

7          Q.    We go to page 23.  On -- there's an entry
8    of 8/23/2003, Spelter.  Trip to Spelter to update key
9    people on renewed lawyer interest.

10          You have a question mark.  Why do you have
11    the question mark there?

12          A.    Well, I didn't attend any such trip.  He
13    may have.  See, I just put a question mark.

14          Q.    You're not indicating with a question mark
15    as to whether Joe Simoni actually went to Spelter to
16    update key people; is that correct?

17          A.    Correct.

18          Q.    Next entry, 8/25/2003, Spelter.  Telephone
19    conference with Rich, Medina, Toolan, included fee
20    split discussion and quote, taking care of Joe,
21    unquote, reference post-conference recap with Rich.

22          Now, you have underscored the language in
23    quotations marks, taking care of Joe.  Why did you
24    underscore that?

1      A.   I don't remember any discussion with Steve
2  Medina, Kathleen Toolan concerning taking care of
3  Joe.  I don't know what that means.  What does it
4  mean?  I don't know.
5      Q.   Who is Kathleen Toolan?
6      A.   She was an attorney that worked for Levin
7  Papantonio.
8      Q.   And so as I understand it, you don't have
9  any recollection of having any discussions with
10  Mr. Medina or Ms. Toolan about taking care of Joe
11  Simoni.  Is that a fair statement?
12      A.   Correct.
13      Q.   Is that also why you have a question mark
14  in the description?
15      A.   Yes.
16      Q.   There's also a checkmark, which I would
17  interpret as you confirming that there was, in fact,
18  a telephone conference on that date?
19      A.   Yes.
20      Q.   And were the participants in that telephone
21  conference those described in the description?
22      A.   Yes.
23      Q.   What is to the right of the checkmark?
24      A.   I think I had a question mark, and when I

1    looked at it again, I saw that, yes, there had been a

2    teleconference on that particular day.

3         Q.   Next entry by which you have a mark is

4    11/3/2003, Spelter.  Map work, Clarksburg, Spelter

5    meeting regarding update core group on latest

6    developments.

7              You have a checkmark, which I interpret as

8    you confirming that this in fact occurred?

9         A.   Well, that there was a meeting on that day.

10   I don't remember anything about a map.  Well, it

11   looks like he did map work that particular day.

12        Q.   Did you have an understanding that some of

13   the -- strike that.

14             Did you have an understanding that Joe

15   Simoni did in fact perform map work in connection

16   with the Spelter case?

17        A.   I think he and Medina did.  Yes.

18        Q.   Looking at page 24 of Exhibit 21, we have a

19   -- an entry on 11/20/2003, Spelter.  Has approximate

20   -- or approx, reviewed with Rich 11/14 Medina letter

21   to Richard Lewis.

22             And it appears as if you have underscored

23   Richard Lewis; is that right?

24        A.   Yes.

1      Q.   Why did you underscore that?

2      A.   I didn't know who Richard Lewis was, but

3   now that we're talking about it, I think Richard

4   Lewis may have been an attorney with Glasser &

5   Glasser, but I don't know that for sure.

6      Q.   Do you have any recollection of Steve

7   Medina's sending a letter to Richard Lewis?

8      A.   No.  I mean, obviously, there were hundreds

9   of letters sent.  I -- hundreds of calls made.  I

10  can't sit here and tell you that I remember a letter

11  to Richard Lewis.  When I saw the name, I thought,

12  who is Richard Lewis; it's a name I don't recognize.

13          Just now, I think that Richard Lewis was an

14  attorney that worked for Glasser & Glasser and he

15  was, you know, well versed in something.  Maybe it

16  was lead contamination.  I don't know.

17     Q.   You have question marks also in connection

18  with this entry; don't you?

19     A.   Yes.  Probably because I had no entry on

20  that.

21     Q.   Okay.  You didn't have a time entry for

22  11/20/03?

23     A.   Probably not.  But again, to be certain,

24  one would need to check my records.

1          Q.   Next entry where you have some marking is

2     12/5/03, Spelter.  Call from Medina regarding trip to

3     West Virginia to me, approx 8:15 p.m.; prepare and

4     place spec print order for property records and

5     follow-up with Rich.

6               And then you have off to the right the

7     initials LKG, which would again indicate you were in

8     Belle Vernon, Pennsylvania?

9          A.   That's correct.  And I know nothing about

10     spec print.  I have no idea what that means.

11          Q.   Okay.  You did have an understanding that

12     Doctor Simoni did in fact review property records in

13     Harrison County?

14          A.   Yes.

15          Q.   I see no markings on page 25 of Exhibit 21.

16     Is that correct?

17          A.   Correct.

18          Q.   If we look at page 26 of Exhibit 21, there

19     is an entry, 6/3/04.  The matter is Spelter.  The

20     description is, talked about in-state defendants with

21     three core group people in Spelter.

22               And then you have LKG.  Again, I'm

23     interpreting meaning that you were in Belle Vernon,

24     Pennsylvania?

1    A.    Correct.

2    Q.    Okay.  You're not indicating -- strike

3  that.

4          You're not stating by use of this marking

5  that Doctor Simoni didn't talk to in-state -- about

6  in-state defendants with three core group people; are

7  you?

8    A.    Of course not.

9    Q.    Okay.  On 6/9/04 entry, the matter being

10  Spelter, met with Steve Medina regarding various

11  aspects of ongoing casework, including in-state

12  defendant matter, dinner, then 11:00 p.m. meeting,

13  one hour.

14          And you have some writing to the right.

15  What is that?

16    A.    Philly.

17    Q.    And that means you were in Philadelphia on

18  that date?

19    A.    That's what it means, yes.

20    Q.    Okay.  You're not stating that Doctor

21  Simoni didn't meet with Steve Medina that date; are

22  you?

23    A.    No.  I don't know what they were doing.  I

24  can remember coming back from Philadelphia -- I think

1  I was there four or five -- and learning that testing

2  had been going on.  I wasn't aware that testing had

3  been scheduled or if I -- that's what I think at this

4  point.  I had learned something had been going on and

5  I didn't know about it, but --

6      Q.  Apparently, some arrangements had been made

7  between Doctor Simoni and the Levin firm to get some

8  testing done, and you weren't really in the loop;

9  would that be a fair statement?

10             MS. MASON:  Object to form.

11     A.  Sitting here today, that's my recollection.

12     Q.  Okay.  You have two other entries, 6/10 --

13  strike that.  They're not your entries.

14             There are two other entries, 6/10/2004 and

15  6/11/2004 is one of those entries, again about

16  Spelter.  Work with Medina, L&P on information about

17  business corporations, Meadowbrook Corporation,

18  Grasselli Chemical Company, TL Diamond,

19  M.M.C. Corporation, Selerno, Inc., et cetera.

20             And then, again, I get the impression

21  you're also stating that on that date or those dates

22  you were still in Philadelphia?

23     A.  Absolutely.  Yes.

24     Q.  And then the next entry of 6/14/04,

1    Spelter.  Harrison County clerk, corporate records.

2    You're merely noting that when that activity was

3    occurring you were in Philadelphia?

4         A.    That's right.

5         Q.    Page 27 of Exhibit No. 21, if we look at

6    the last entry on the page, 8/30/04, Spelter.  I see,

7    WVSCA, which I'm interpreting to West Virginia

8    Supreme Court of Appeals, amendment of complaint

9    case, research and fax to Medina, slash, L&P.

10             You have LKG written to the right; don't

11   you?

12        A.    I do.

13        Q.    Which would indicate merely that you were

14   in Belle Vernon when this activity occurred?

15        A.    That is correct.

16        Q.    Oh, excuse me.  There is also an entry on

17   page 27 bearing the date of 7/24/04 about Spelter.

18   Third attempt to contact Rich regarding matter

19   update; Flowers arrived, met with him regarding plans

20   for sampling work.

21             You have underscored third attempt to

22   contact Rich regarding matter.  Why did you

23   underscore that?

24        A.    I was just surprised to see that.

1      Q.   Why were you surprised?

2      A.   Because I'm surprised that third attempt to

3 contact me and he had not been successful.  I find

4 that strange.

5      Q.   If we take a look at page 28 of Exhibit 21,

6 again, there's an entry, 10/25/04 involving Spelter.

7 Description, prepared and sent 53-page fax to Toolan

8 and Medina, L&P.

9       Again, you have merely noted the initials

10 LKG to indicate that you were in Belle Vernon when

11 that activity occurred?

12     A.   Correct.

13     Q.   There's an entry of 12/17/04, Spelter

14 conference call with Rich and Medina, Moore and

15 Darnell, L&P, includes preparation and recap with

16 Rich.

17       You have a checkmark, which I assume means

18 you are confirming that this occurred?

19     A.   Yes.

20     Q.   I see no markings on page 29 of Exhibit 21.

21 Is that correct?

22     A.   Correct.

23     Q.   If we go to page 30 of Exhibit 21, if we

24 take a look at the last entry on the page, it's

1  6/9/05, Spelter.  The description is, secured

2  property access for Aley property, Spelter; assisted

3  with 15 core drillings, parentheses, 120 samples, end

4  parentheses; met with Medina and Ben Ross at

5  Perrine's; met with Bud and Barbara Sheaffer --

6  Shaffer, perhaps -- met George Flowers at Hampton.

7          And you have circled met with Medina,

8  correct?

9      A.   Yes.

10     Q.   Why did you circle that?

11     A.   I don't know at this point.

12     Q.   You have two question marks to the right as

13  well.  Why are those question marks there?

14     A.   It may be that I was surprised that Medina

15  was in town that day.  Maybe I didn't have notes on

16  that.  I don't know.  I really don't know what that

17  means.

18     Q.   Okay.  And if we look at page 31 of

19  Exhibit 21, there is an entry, 6/27/05, Spelter.  Met

20  Gary Rich downtown Morgantown, walked near Hotel

21  Morgan, talked mostly in front of Warner Theatre,

22  talked about whether he was involved with L&P on

23  Drummond case, said he assumed general agreement

24  would cover, that I should give him the info I had

1   and he would write Medina, and it has in parentheses,

2   I could draft letter, end parentheses, that this

3   would make record.

4           And off to the right, you have some

5   writing, and I'd like for you to read that into the

6   record, please.

7       A.   I have a question mark.  Then I have, WH in

8   depositions, and what I'm saying there is that I was

9   in a deposition or maybe depositions that day

10  concerning the Westinghouse case.

11      Q.   Okay.

12      A.   So I don't think I was walking downtown

13  talking about those things on that -- on that date.

14      Q.   Okay.  Did -- was there an occasion where

15  Doctor Simoni met you in downtown Morgantown and you

16  walked near the Hotel Morgan and talked mostly in

17  front of the Warner Theatre?

18      A.   I don't know.

19      Q.   Okay.

20                  MR. WAKEFIELD:  Let's go off the

21  record.

22                  VIDEOGRAPHER:  We're going off the

23  record.  The time is 1:05 p.m.

24

1                          -----

2                    (Lunch break)

3                          -----

4              VIDEOGRAPHER:  We're back on the

5     record.  The time is 1:49 p.m.

6              MR. WAKEFIELD:  I have no further

7     questions of the witness.

8              MS. MASON:  Thank you.

9                          -----

10                     EXAMINATION

11    BY MS. MASON:

12        Q.   Mr. Rich, my name is Angela Mason.  You

13    know me, right?

14        A.   I do indeed.

15        Q.   I'm going to try to not repeat too much

16    that's already gone on and also but try to clarify

17    some things that I was confused about from

18    yesterday's testimony.

19             One thing you talked about yesterday was

20    that when you were at a mediation in Charleston, West

21    Virginia you may have had -- you had a discussion

22    with Keith Givens about compensating Doctor Simoni;

23    is that correct?

24        A.   That came up in a conversation, yeah,

1    speaking with him, a conversation.  I'm not sure it

2    started out about that, but yes.

3         Q.   And that's what I wanted to find out about

4    is get some of the context of what was going on and

5    what you were talking about and that sort of thing,

6    but let's back up.

7              Do you recall what day this was?

8         A.   It was the night before the mediation.

9         Q.   And do you recall what day the mediation

10   was?

11        A.   I'd have to look at my time records for

12   that.

13        Q.   And I made this huge exhibit, so we're

14   going to use it.

15             MS. MASON:  Can you share?

16             MR. MARINO:  Oh, I've got -- I've got

17   them up here.

18             MS. MASON:  Okay.

19             MR. MARINO:  So I'll try to follow

20   along.

21                      -----

22             (Exhibit No. 22 marked for purposes of

23   identification.)

24                      -----

1    BY MS. MASON:

2         Q.   Mr. Rich, can you identify for us what this

3    Exhibit 22 is?

4         A.   It's my timesheets or time records from the

5    -- I think they're all from the Spelter litigation.

6         Q.   Okay.  And does that appear to be a

7    complete set of your time records throughout your

8    involvement in the Spelter case?

9         A.   No.

10        Q.   It's not a complete set of your records?

11        A.   Well, it's a complete -- yes, it is a

12   complete set of the records.  Although, it's not -- I

13   don't think it covers everything I did, because I

14   didn't have time records after a certain point.

15        Q.   I just --

16                  MR. WAKEFIELD:  Excuse me, excuse me.

17   Do you have an extra copy for us?

18                  MS. MASON:  I thought Bill took it --

19                  MR. CASH:  I'm sorry.  I thought it

20   was for me.

21                  MS. MASON:  I'm sorry.  No.

22                  MR. CASH:  I'd be glad to give it to

23   you.

24        A.   No.  I don't see the trial, that time,

1   listed here.

2        Q.    Okay.

3        A.    But anyway, yes, it's a substantial amount.

4        Q.    And does -- let me ask it this way.  Are

5   these all the records you have written out that

6   you've produced in this litigation related to the

7   Spelter action?

8        A.    Most likely.  Yes.

9        Q.    Okay.  And if you would, turn to -- well,

10  let me just say for the record Exhibit 22 is a

11  collection of documents starting with Bates stamped

12  R-I-C-H001340 through R-I-C-H001693.

13            And then if you would, turn to June 28th of

14  2006 -- or excuse me -- '07.

15                 MR. WAKEFIELD:  Is there a Bates

16  number on that?

17                 MS. MASON:  I'm looking.

18                 THE WITNESS:  June 27.

19                 MS. MASON:  June 28th --

20                 THE WITNESS:  June 28th.

21                 MS. MASON:  And what Bates stamp

22  number is that?

23                 THE WITNESS:  I have 1672.

24

1  BY MS. MASON:

2      Q.   So based on this record of -- and then

3  specifically page 1672, does that refresh your

4  recollection as to when the mediation was conducted

5  in the Spelter case?

6      A.   Oh, no, no.  I'm sorry.  This is -- the

7  number I gave you was Bobbie Larew's time, so my time

8  record would be --

9      Q.   1671?

10     A.   Yes.  1670 and 71, but 71 -- 1671 depicts

11  the mediation as being on June 28th.

12     Q.   And you prepared these records in the

13  ordinary course of your business; is that right?

14     A.   Generally so.  Yes.

15     Q.   As a -- at least as a lawyer for -- working

16  on the Spelter case, you prepared these records?

17     A.   Yes.

18     Q.   And you have no reason to believe that that

19  date is incorrect, do you, the mediation date of

20  June 28th, 2007?

21     A.   I have no reason to --

22     Q.   Okay.

23     A.   -- believe that it's not correct.

24     Q.   And can you tell from these records when

1  you traveled to Charleston?

2      A.   Yes.

3      Q.   When was that?

4      A.   On the previous page, 1670, I traveled from

5  Morgantown to Charleston on June 27th.

6      Q.   Okay.  And do you recall what time you

7  arrived in Charleston that day, roughly?

8      A.   The dinner had already started.  I think it

9  was probably 7:00 or so or later.  I'm not sure, but

10 I know I arrived and that's when I first met Keith

11 Givens, I believe and people welcomed me and I sat

12 down and we ate.

13     Q.   Okay.  And did you have any discussions at

14 dinner with anyone about Mr. Simoni?

15     A.   I don't think so.  I think I may have

16 mentioned to Farrest that I wanted to speak to him

17 after the dinner.  I don't think I broached the

18 subject at dinner, but I may have.  I don't know.

19     Q.   Okay.  Who was at the dinner?

20     A.   Lots of people.

21     Q.   Tell me who you remember.

22     A.   I remember Keith, I remember Farrest, Tom

23 -- I think it's Tom Proctor -- anyway, Mr. Proctor

24 from Levin Papantonio, oh and Moose Morris from Levin

1  Papantonio, I believe, was there.  There were a

2  number of people.  I don't remember them all at this

3  point.

4       Q.   So after dinner, what did you do?

5       A.   I went to someone's room, whether it was my

6  room, Farrest's room, or Keith's room, and we talked.

7       Q.   And who was in the room?

8       A.   The three of us, me, Keith, and Farrest.

9       Q.   Okay.  And give me a little bit of context

10 or if you could, just summarize for me the substance

11 of the conversation you had that night.

12      A.   Well, I told them about an earlier

13 conversation with Joe Simoni that he seemed agitated

14 and he had mentioned the West Virginia case and about

15 just payment in general, I believe.  And his upcoming

16 deposition had been -- I don't know if it'd been

17 scheduled or we knew that he was going to be deposed

18 soon, and we talked about that.

19           And Keith said he wasn't opposed to

20 compensating him for the work he had done in the

21 Spelter case.  And I don't know if it was me or

22 Farrest, one of us or maybe both of us said, well,

23 how can this be done; this fellow is a witness,

24 material witness; and how would this look?

1          And Keith said, as I recall, that, well,
2   this would be done after this case is over, and he
3   would be paid like any vendor.
4          Q.   And did you come to any agreement that
5   night about how -- I know -- you said that Keith had
6   made the suggestion that you could pay -- that the
7   Spelter team could pay Doctor Simoni like they would
8   any other vendor after the case was finished.
9          A.   That's right.
10         Q.   Did you agree with him that that's what you
11  all were going to do?
12         A.   I don't think we reached an agreement.
13  Keith just made that statement.  And I think I said
14  or Farrest said, well, hmm, how could this be done?
15  And he said, well, like any vendor.
16         And then we talked about his degrees.  And
17  I said, well, the guy is highly educated; he has four
18  or five different degrees.  And Given said -- Keith,
19  at that point, said, well, yeah, that would justify a
20  higher hourly rate.  And I think someone threw out a
21  number like 100, $120,000, but I'm not certain of
22  that.
23         And they said to me, both of them said, oh,
24  don't worry about this; you handled this correctly,

1    the way you answered his question.  And they said,

2    let's get some sleep.

3        Q.    What was his question?

4        A.    Talked about getting compensated.  And I

5    said, well, listen, we're not going to do anything

6    that's unlawful.  You know, if it's proper, that's

7    one thing, but if it's unlawful, we're not going to

8    do anything.

9        Q.    And we're using the pronoun he, but we're

10   talking about Simoni, correct?

11       A.    We're talking about Joe Simoni.  Yes.

12       Q.    And he was talking about compensation in

13   general or specifically about the Spelter case?

14       A.    I think in general -- as I recall, I think

15   it was in general.  But Keith was talking about

16   Spelter, and I can't say that there was -- you know,

17   was there any agreement amongst the three of us that

18   he definitely would be paid?  I don't think that we

19   ever talked like that.  All we said was, okay.

20            And Keith said to me, you handled it right.

21   Or Farrest said, you handled it right; don't worry

22   about it; let's get some sleep.  That's it.

23       Q.    And did you ever convey this conversation

24   to anybody else?

1      A.   Possibly Dan or Sherri Goodman.

2      Q.   But you never told Mr. Simoni that?

3      A.   Oh, no.  I -- in fact, I had not spoken to

4  Joe since that day, which was, what, the 27th or --

5  yeah, the 27th of June 2007, I had not seen -- I

6  don't believe I had seen him.  I certainly had not

7  spoken to him until yesterday.  I'd had no contact

8  with Joe Simoni.

9      Q.   From June 27th, 2007 to April 29th, 2013?

10     A.   April 30th.

11     Q.   What'd I say?

12     A.   29th.

13     Q.   Sorry.

14     A.   April 30th, it was yesterday, Joe, as he

15  walked up, he was very pleasant, came over to me and

16  chit-chatted about -- again, we were talking about

17  schools, colleges.

18     Q.   Had he attempted to contact you in -- from

19  that last conversation on June 27th to yesterday?

20     A.   Had he attempted to contact me?

21     Q.   Yes.

22     A.   He sent a letter.  I think Mr. Wakefield

23  sent a few letters addressed to in the Spelter case

24  all the firm, that's including, you know, Madonna --

1  Kennedy & Madonna, Ed Hill, you know, all the firms

2  involved in that litigation and I believe all the

3  firms involved in the Westinghouse matter, so if

4  that's a contact, then, yes, there was a contact, but

5  it emanated from Mr. Wakefield.

6      Q.   You're not aware of Joe Simoni himself

7  calling your office and leaving a message for you to

8  call him back or anything like that between that last

9  conversation you had with him on June 27th and

10  yesterday?

11     A.   Not that I'm aware of.  Now, I'm not saying

12  that didn't happen, but I have no recollection of Joe

13  trying to contact me, nor do I have any recollection

14  of speaking to Joe until yesterday.

15     Q.   And you referenced a phone call that

16  occurred on June 27th, and you looked at your

17  timesheet Bates stamped 1670 to confirm that that was

18  the date that you last spoke with Professor Simoni?

19     A.   That's correct.  Yes.

20     Q.   I'm going to hand you what we're marking as

21  Exhibit 23 and ask you if you can identify that for

22  us.

23

24

1                    -----

2                    (Exhibit No. 23 marked for purposes of

3    identification.)

4                    -----

5        A.   Yes.

6        Q.   What is that?

7        A.   That's a note that Bobbie Larew, who worked

8    for me, drafted after the call with Joe.  Joe

9    initially spoke to Bobbie, and he asked to speak with

10   me.  And then he --

11                   She put his call through to me, and I took

12   the call, and she was in the outer office.  She

13   walked in, I believe and stood there and waited for

14   the call to finish, and she heard what I said.

15       Q.   Did she -- did you ask her to come in and

16   listen to your end of the conversation?

17       A.   I don't think I did.  I don't think I did,

18   but she could hear me speaking from -- my office is

19   just two -- well, two rooms that I used, and she

20   could hear what was going on.

21       Q.   Did you ask her to generate this document?

22       A.   Oh, yes.

23       Q.   And I don't know if you had time to review

24   it just now.  But does it appear to fairly and

1    accurately depict your memory of the conversation

2    with Doctor Simoni?

3         A.    I don't remember all of this.  In fact, I

4    thought the call was very short, but here she's got

5    the duration of about 13 minutes.  I thought this

6    call was no more than five minutes maximum, my

7    recollection, but my perception was that very little

8    was said.  I mean, my recollection was that very

9    little was said.

10        Q.    And you've already referenced it a little

11   bit.  But could you tell us what you do remember both

12   you and Professor Simoni said during that call?

13        A.    I just remember Joe seemed very agitated,

14   the tone of his voice.  Normally, he's very upbeat,

15   very buoyant.  He seemed very upset, didn't sound

16   like himself.  He talked about, you know, his work

17   and -- and I said, you know, that I couldn't have

18   done this without him or something and there would be

19   no cases without him.

20             And I said, well, you know, what are you

21   asking me to do?  I said, you're going to be deposed

22   shortly; you're a witness; what are you asking me to

23   do, break the law?  And he says, is this how you're

24   going to speak to me?  And I said, yeah, I just did.

1    And he just hung up.  That's what I remember.

2         Q.   So did you inform him during that

3    conversation that he was going to have to give a

4    second deposition?

5         A.   I don't -- I just said, it looks like

6    you're going to be deposed.  I think this was before

7    the first deposition.  I don't know.  I don't

8    remember the chronology of events as to whether or

9    not he'd been deposed and then there was a second

10   deposition that had been scheduled, but whatever it

11   was, there was a deposition coming up and to talk

12   about payment to a witness, I knew that was not

13   proper.

14        Q.   Well, you know that Mr. Simoni gave two

15   depositions in the Spelter case, correct?

16        A.   I remember that.  Yes.

17        Q.   And let's just back up a little bit in time

18   and see if we can figure out whether this would've

19   been his first or second deposition.  Do you remember

20   when the trial was?

21        A.   The trial, I believe, was in October,

22   November --

23        Q.   Of --

24        A.   -- I think.

1       Q.   -- 2007, correct?

2       A.   Correct.

3       Q.   And this conversation was in June --

4       A.   June.

5       Q.   -- 2007, so given those dates, don't -- do

6 you think it's more likely that this was in regard to

7 a second deposition?

8       A.   Probably.

9       Q.   And because, in fact, there was a motion

10 that we looked at yesterday that DuPont filed seeking

11 a second deposition from him, correct?

12       A.   I don't recall.

13       Q.   Okay.  So you -- do you recall whether he

14 already had knowledge that he was going to give a

15 second deposition, whether you gave him that

16 information during the call, or whether there was any

17 discussion about the deposition?

18       A.   I'm sure I said, listen, you're a witness;

19 how can you be paid?  Now, reading Bobbie's note, it

20 says, Joe -- GWR understands that JS could be deposed

21 again.  So yes, this must've been the second

22 deposition.

23       Q.   Okay.  And you said you asked him did he

24 want you to break the law?  And you said you weren't

1  going to break the law, correct?

2       A.   I just said, are you asking me to do

3  something that's unlawful?  He said to me -- as I

4  remember, he said to me, is that how you're going to

5  talk to me, meaning him?  And I said, I just did.

6  And he hung up.

7            That's what I recall, but sitting here

8  today, it seems like this call was very short.  Now,

9  looking in her notes, she's got at least 13 minutes.

10      Q.   What were you referring to when you said,

11 are you asking me to do something unlawful?

12      A.   Well, I think paying a witness, a fact

13 witness would be unlawful.  And we later talked about

14 that, and we all thought that that looked very bad.

15      Q.   Let me ask you, while we're talking about

16 payments, did he -- did Doctor Simoni ever get any

17 money on the WVU case as a plaintiff?

18      A.   I don't know.  He may have gotten something

19 as a -- the WVU case, the underlying case was medical

20 monitoring.  There was no payments, okay?  There were

21 some third-party cases, and they were very small

22 payments that went to certain clients.

23            And I believe that he and his wife,

24 Jeannie, were within that group, but when I say

1  payments, I'm talking three, four, $500, as I

2  remember, but I don't know for certain sitting here

3  today.

4       Q.   During that call on the 27th with Professor

5  Simoni, did he discuss with you any specific amount

6  he wanted from you?

7       A.   No.

8       Q.   Did he discuss any specific percentage he

9  wanted from you?

10      A.   No.

11      Q.   And you noted on -- back to Exhibit 22, on

12  page 1670, you noted here, telecon with Professor Joe

13  Simoni and then in parentheses, very agitated; is

14  that correct?  1670.

15      A.   Correct.

16      Q.   Is that your usual practice, to

17  characterize a conversation in your time records when

18  the other party is agitated or excited?

19      A.   Well, I don't typically talk to people that

20  are very agitated, but I think throughout my notes

21  you'll see, pleasant conversation, nice chat.  I do

22  things like that.  So typing this up, Susan Fair

23  probably did this.  I didn't type this.

24      Q.   And Exhibit 23, you said that Bobbie Larew

1  generated this; is that correct?

2      A.   Correct.

3      Q.   And did she do that at your request?

4      A.   I believe so.

5      Q.   Why did you ask her to do that?

6      A.   Well, I thought it was important.

7      Q.   Why?

8      A.   Well, it seemed pretty -- you know, to me,

9  knowing that he was going to be deposed again, I was

10  pretty upset about this, and I think Farrest and

11  Keith can tell you that.  In fact, they told me,

12  relax, you handled it well; let's get some rest.

13      Q.   You say you were pretty upset about this.

14  What are you referring to when you say this?

15      A.   The fact that he called and was agitated,

16  wanting money, and I knew that he was a key witness

17  with respect to the statute of limitations in this

18  particular case.  And knowing that my co-counsel has

19  spent millions of dollars on -- in bringing this

20  litigation, yeah, that shook me up.

21      Q.   So were you -- did you perceive that

22  Professor Simoni was somehow threatening the Spelter

23  case with that call?

24             MR. WAKEFIELD:  Object to the form.

1      A.    I don't think he would knowingly do

2   anything that's going to hurt someone.  Now, I think

3   he exercises poor judgment at times.  I didn't know

4   what he was going to do, but I don't think Joe

5   thought, wow, I can -- you know, I can extort money

6   here from these people.  I don't think he would do

7   that.

8           And I don't think that he would want to

9   hurt the residents of Spelter by doing something that

10  would impact -- negatively impact the litigation that

11  we were, you know, engaged in.

12      Q.    Well, if you felt that way about him, why

13  would you be concerned then about the call?

14      A.    Well, because I said he sometimes exercised

15  poor judgment.  I don't think it would be his

16  intention, but was he being incited by someone, was

17  he being manipulated by someone?  I don't know.

18  Nonetheless, it was a concern, and I brought it to

19  Keith and Farrest's attention.

20          I -- you know, I viewed myself as a person

21  involved in this litigation, and as local counsel, I

22  had a duty to do the best job I could.  I know people

23  were taking large amounts of risk, and yeah, it

24  concerned me.  We all had something at stake and

1    also, most importantly, the clients.

2                          -----

3                (Exhibit No. 24 marked for purposes of

4    identification.)

5                          -----

6    BY MS. MASON:

7         Q.   I'm going to hand you Exhibit 24, and it

8    Bates stamped Simoni1366.  Have you ever seen this

9    document, Mr. Rich?

10               MR. MARINO:  Hang on just a second.

11               MS. MASON:  Okay.  I'm sorry.

12               MR. MARINO:  May I see -- examine the

13   document?

14               THE WITNESS:  Yes.

15               MS. MASON:  And Farrest is bringing

16   you an extra copy.

17               MR. MARINO:  Well, and -- thanks.

18   BY MS. MASON:

19        Q.   Have you ever seen this, Mr. Rich?

20        A.   Recently, yes.

21        Q.   Okay.  Is this one of the documents you

22   reviewed in preparation for your deposition?

23        A.   I don't know if it was in preparation, but

24   I saw the document.

1      Q.   It's been within the last couple of weeks?

2      A.   I think.  Or the last month or so.  I don't

3 know.  I've, you know, been traveling.  I've seen

4 different things at different times.  I don't know

5 exactly when I saw it, but it does look familiar.

6      Q.   So what do you understand this to be?

7      A.   It would appear to be Joe's perception, his

8 notes on what took place in that call.

9      Q.   That same call on June 27th, 2007?

10     A.   Correct.

11     Q.   And what I wanted to do is look at the

12 middle section first where he's labeled this, his

13 summary.

14     A.   Right.

15     Q.   And I'll let you -- I'll let you try to

16 read it and see if you can make out the handwriting.

17     A.   Okay.

18     Q.   If you would, just read into the record the

19 section purports to be a summary of your conversation

20 -- a summary of what you said in the call.

21     A.   What Joe thinks I said?

22     Q.   Yes.

23     A.   What agreement?  He agreed to help Larry

24 Harless and bring case to something, which he has

1    done.  He is man of his word.  Been told by Levin &
2    Papantonio to not talk to me about any cases, and he
3    told me last September that we should not talk about
4    the law, that a lot of people are affected, that he
5    did not want to do anything that would jeopardize
6    their welfare, that he didn't know who might have
7    influenced me to call, but it wasn't a good idea,
8    that he did not want to do anything that was against
9    the law.

10        Q.   Does that sound fairly accurate about what
11   you said during the conversation?

12        A.   I do not remember saying anything about
13   Levin & Papantonio during that conversation.  I may
14   have.  I may have said something to him previously,
15   but I don't remember saying it at that time, but I
16   could have.

17        Q.   Do you know -- do you recall whether you'd
18   had any conversation with Levin Papantonio about
19   limiting your contact with Simoni?

20        A.   Yes.

21        Q.   Tell us about those conversations.

22        A.   I think a number of times Steve had said
23   that I should limit my interaction with him.

24        Q.   Steve Medina said you should limit your

1    interaction with --

2         A.   With Joe Simoni.

3         Q.   And did he give you a reason for that?

4         A.   I think it was probably due to -- well, I

5    think it varied from time to time, whether it was

6    protected, if this was something -- if he was a

7    consultant, I guess it -- you know, it varied from

8    whatever his status was with the firms at that point

9    in time.

10        Q.   Had you ever told Professor Simoni that you

11   were not able to speak with him about the case prior

12   to the June 27th call?

13        A.   I may well have.  I do not remember saying

14   it during that call, but I probably had said that

15   prior to that call.

16        Q.   Had you ever received an ethical opinion

17   from Sherri Goodman suggesting you limit your

18   contact?

19        A.   No.  I don't believe so.

20        Q.   Let's look at the top of the document

21   starting with No. 1.  He writes, I kept my word, no

22   pushing or badgering; two, told him 18 months has

23   passed since WVU settlement and have heard nothing

24   from him, told him I thought we had good faith,

1    man-to-man agreement and that he was a man of his

2    word, search his mind and soul and look in mirror.

3              Is that an accurate rendition of what

4    Mr. Simoni said to you in that call?

5         A.   I don't remember that.

6         Q.   Any of it?

7         A.   Sitting here today, I don't know.  I don't

8    -- I can't say with any certainty.

9         Q.   Do you recall whether he specifically

10   mentioned WVU during the call?

11        A.   He may have, but I think our focus was

12   mainly on his being deposed.

13        Q.   And you're not sure whether he already knew

14   that or whether you disclosed that to him?

15        A.   I have no idea.

16                  MR. MARINO:  I'll tell you what, if

17   you could hand Gary two copies and then he can give

18   me one and you can -- thank you.

19                       -----

20                  (Exhibit No. 25 marked for purposes of

21   identification.)

22                       -----

23   BY MS. MASON:

24        Q.   Yesterday we looked at a brief that I think

1  was entitled, Plaintiffs' Response to DuPont's Motion

2  to Compel discussing Professor Simoni and his

3  relationship to the Spelter case.  Do you recall that

4  --

5       A.   I think --

6       Q.   -- exhibit?

7       A.   I think that is Mr. Wakefield's exhibit --

8       Q.   Yes.

9       A.   -- I think.

10      Q.   Yes.

11      A.   I do recall that, yes.

12      Q.   What I've handed you now and I've marked it

13  Exhibit 22 is the order granting DuPont's motion to

14  compel.  Are you familiar with this document?

15      A.   I'm sure I've seen it before, but I can't

16  say I'm familiar with it.

17      Q.   I'd like you to turn to page 9 of the

18  exhibit, of the order.

19      A.   Yes.

20      Q.   And you see the findings of fact and

21  conclusions of law, correct?

22      A.   On page 10?

23      Q.   Page 9.

24      A.   Oh, page -- it's not here.

1          MR. MARINO:  Here, here's page 9.

2          MS. MASON:  Okay.

3   BY MS. MASON:

4      Q.   Page 9 --

5      A.   Right here.

6      Q.   Yay.

7           Tell -- for the jurors, tell us what an

8   order is.  What's a court order?

9      A.   It's a ruling by the court.

10     Q.   Okay.  And in this instance -- I know I

11  directed you to page 9, but let's look first at -- on

12  page 12, there's a signature by Teresa L. Lyons,

13  Discovery Commissioner.

14     A.   Yes.

15     Q.   Now, are you familiar with her?

16     A.   Yes.

17     Q.   What was her role in the Spelter

18  litigation?

19     A.   She was the discovery commissioner.

20     Q.   And what is a -- I'm sorry.  I didn't mean

21  to cut you off.

22     A.   Well, she's a person that looks at the

23  discovery being produced in the -- in the case and

24  determines what's admissible and what isn't.

1          Q.   And so she would've heard the motion to

2     compel on the Simoni matter, correct?

3          A.   Yes.

4          Q.   And once she drafts her recommended order,

5     what's your understanding of what happens?  Well,

6     turn to page 13.

7          A.   Well, it's -- the court sign -- the judge

8     signs it, and it's filed.  It becomes part of the

9     record.  It's --

10         Q.   And so the judge entered this order on

11    July 6th, 2007, correct?

12         A.   Yes.  And --

13                   MR. MARINO:  I'm sorry.  Which order

14    are you talking about, the judge's order or her

15    order?

16                   MS. MASON:  It's all the same order.

17                   MR. MARINO:  No.  There are two orders

18    in the same document.

19                   MS. MASON:  All right.  That's fine.

20                   MR. MARINO:  All right.  There's her

21    order, which is earlier, right?

22    BY MS. MASON:

23         Q.   Judge Bedell entered this order when?

24         A.   July -- let's see.  Judge Bedell signed it

1  July 6th.

2  Q. And in his order, he adopted or accepted

3  the findings of fact and conclusions of law entered

4  -- or submitted by the discovery commissioner?

5  A. Ms. Lyons, the discovery commissioner, yes.

6  Q. And when did the discovery commissioner

7  make her recommendation to Judge Bedell?

8  A. June 19th.

9  Q. And then -- I'm sorry -- back up to 9 now.

10  Sorry about that. The discovery commissioner and

11  Judge Bedell found that Doctor Simoni was an activist

12  who was instrumental in raising community awareness

13  of contamination in Spelter, correct?

14  A. Yes.

15  Q. Okay. And she then went on to reject the

16  claim that Professor Simoni served as a consultant, a

17  non-testifying consultant for the plaintiffs,

18  correct?

19  A. Yes.

20  Q. And what was the impact of that ruling?

21  A. It affected -- it would affect what Joe

22  would be able to say in his deposition. In other

23  words, certain things might not be privileged because

24  he was no longer acting as a consultant to these two

1   firms.

2       Q.   And she went on to note that the only

3   duties outlined with any specificity related to

4   Doctor Simoni was his assistance with experts and

5   that that was a suitable topic for discovery,

6   correct?

7       A.   Yes.

8               MR. WAKEFIELD:   Object to the form.

9   The order speaks for itself.   The question is

10  incomplete.

11  BY MS. MASON:

12      Q.   Do you know whether this order was ever

13  shared with Professor Simoni?

14      A.   I shouldn't think so.   It wasn't shared by

15  me.

16      Q.   It certainly wasn't shared with him by you

17  prior to June 27th, right?

18      A.   I don't think so.

19      Q.   And up until -- are you aware of any --

20  well, during the phone conversation with Professor

21  Simoni, did he mention any of the other counsel from

22  any of the other law -- plaintiffs' law firms in the

23  Spelter case, did he mention any of those law firms

24  in his call with you?

1      A.    Not that I recall.  He has written here in

2  his summary that I told him Levin Papantonio

3  suggested or requested that I not speak with him.  I

4  do not remember saying that in this call.  I'm not

5  saying with certainty that's the case, but I don't

6  have any recollection of it.

7           I do probably can -- I can say that

8  probably I've told him before that, I'm not going to

9  be talking to you about these things and that Levin

10 had suggested that.

11     Q.   Has he -- did Simoni ever suggest to you

12 that he had had a conversation with anybody from The

13 Cochran Firm or Levin Papantonio suggesting that he

14 would be compensated for anything he was working on?

15     A.    No.  In fact, I learned that his wife had

16 been compensated for something for her work long

17 after that happened.  I knew nothing about any

18 payments to anyone.

19     Q.    And during that night before the mediation,

20 June 27th, when you were relaying your conversation

21 with Professor Simoni to Keith Givens and to Farrest

22 Taylor, did you ever tell them about your fee split

23 arrangement you had contemplated with Simoni?

24     A.    I did not.  I did not feel it was material.

1    I did not impart that information to them.

2         Q.   And when you say you didn't feel it was

3    material, why wasn't it material?

4         A.   Because that would've been an agreement

5    between Joe and myself for him to get licensed, to

6    come in and start doing some of the work, and even

7    let me leave.

8         Q.   Well, do you think it would've been

9    material for your co-counsel to know that you were

10   contemplating leaving the country and leaving the

11   local duties to Professor Simoni?

12        A.   In retrospect, yes.

13        Q.   I noticed on Exhibit 22, on the very first

14   page --

15        A.   Exhibit --

16        Q.   22.  The big --

17        A.   Oh, the timesheets.

18        Q.   -- timesheets.

19             On the very first page, the very first

20   entry, it says, telecon with Attorney Larry Harless

21   re: information pertaining to potential case.

22        A.   Yes.

23        Q.   Did Larry Harless bring the Spelter case to

24   you, or did Simoni bring the Spelter case to you?

1      A.   Joe is the person who brought the case to
2   -- apparently to Larry and to me.  Larry called and
3   told me that I needed to get involved in this case
4   sometime during April, beginning of April.  I first
5   met with Willis and Lenora sometime in April.
6           I think we saw a document earlier that
7   indicated it was the 13th of April, so I went on the
8   13th of April because Larry Harless asked me to.
9   Larry Harless didn't know anything about the case
10  other than what Joe had told him.  And Larry said,
11  you need to get involved and do something here; no
12  one else with do it.
13      Q.   And this was in 2001, correct?
14      A.   Yes.
15      Q.   And I know you talked some yesterday about
16  how you came to meet Professor Simoni through Larry
17  Harless.  I wasn't clear on your -- what you talked
18  about in terms of your understanding of what Simoni
19  had done for Harless in the past.  Was it your
20  understanding that he had performed legal work for
21  Larry Harless?
22      A.   I think he did research.  I think he did a
23  number of things for Harless, but I don't know what
24  they were.  I mean, I think they had a relationship

1  that went back years and years.

2      Q.   What made you draw the conclusion that

3  Simoni had done legal work for Harless?

4      A.   Well, I think Larry told me.  If I remember

5  correctly, Larry had been working with him on -- even

6  before Joe went to law school, they had worked on

7  things together for, I'm guessing, 20 years or more.

8  I don't know.  I wasn't in the country at the time,

9  but that was the impression I got in speaking with

10  Larry.

11          Larry says, this is a good guy; you need to

12  meet him.  But as I said yesterday, we -- Larry and I

13  went to lunch.  Then we went -- I think it was the

14  Econo Motor Lodge in Westover, and Simoni came there,

15  and we talked to him.  I don't know that anything was

16  said necessarily about cases.  It was just talking

17  probably about sports.

18      Q.   Do you have any understanding of whether

19  Professor Simoni ever received any compensation from

20  Larry Harless?

21      A.   I don't know.  I -- for some reason, I

22  think he may have, but I don't know that for a fact.

23  And I don't know why I think that.

24      Q.   You don't recall any conversations you had

1   with Professor Simoni where he discussed that with

2   you?

3        A.   Oh, I never talked to Simoni about his

4   payments from someone else.  I don't remember it.  If

5   I did, I certainly don't recall it.

6        Q.   And to nail down the time a little bit, you

7   had the WVU case and when you first got the WVU case,

8   you thought that Professor Simoni was an actual

9   licensed lawyer, correct?

10        A.   Initially, yes.

11        Q.   And then you couldn't tell us when you

12   learned that Professor Simoni wasn't licensed?

13        A.   It must've been fairly soon thereafter

14   because I never signed any written agreement with

15   him.  I didn't have any sort of -- any sort of

16   understanding with him.

17        Q.   And you eventually associated with

18   Mr. Sweeney on the --

19        A.   Robert Sweeney from Cleveland, Ohio.

20        Q.   -- on the WVU case?

21        A.   Correct.

22        Q.   When you associated with Mr. Sweeney, did

23   you know then that Professor Simoni was not licensed?

24        A.   I believe so.  Yes.

1    Q.   And do you recall roughly when you
2 associated with Sweeney?

3    A.   I don't, but again, that would be in the
4 records.  I'm -- I think -- well, I don't know.  I
5 don't know when that is, but it'd be easy to find
6 out.

7    Q.   Did you have an MOU or a memorandum of
8 understanding in the WVU case?

9    A.   Yes.  And I may have testified yesterday
10 that I was the sole attorney involved in that case
11 with Sweeney.  That's not true.  Actually, I just
12 remembered Pat Jacobs, a lawyer in Charleston, West
13 Virginia, was involved, Nelson Bickley & Pat Jacobs.

14    Q.   And did all the attorneys in the case
15 receive a fee?

16    A.   Yes.

17    Q.   And did -- do you know if these records --
18 do you have these records?  Are they retained?

19    A.   I don't think I have records.  That case
20 ended a number of years back.  I think maybe the only
21 thing I have would be the -- possibly the retainer
22 agreements or just the final order.  I don't know.

23    Q.   Did you have any discussions with Professor
24 Simoni about submitting his hours to Mr. Sweeney for

1  compensation?

2      A.   I don't believe so.

3      Q.   Did you have any conversations with

4  Mr. Sweeney about compensating Mr. -- or Professor

5  Simoni?

6      A.   I think I may have.  After this call, I

7  think I spoke to Sweeney, the call in this case.

8      Q.   Okay.

9      A.   I spoke to Bob.

10     Q.   The call on June 27th, 2007?

11     A.   I believe so.  Yeah.

12     Q.   When did you call him?

13     A.   Shortly thereafter.

14     Q.   Why did you call him?

15     A.   Because I was concerned about the Spelter

16  case.

17     Q.   Well, what relevance would the Spelter case

18  have to Mr. Sweeney?

19     A.   Well, I'm just thinking about payments, and

20  I can't remember what Bob said at this point.

21     Q.   Did you -- were you asking him if he had

22  ever gotten paid on the -- whether Simoni had ever

23  gotten paid --

24     A.   Yeah.

1          Q.    -- on the WVU case?

2          A.    I asked him if he had been -- if he had

3    paid him anything, what he thought about the

4    situation -- because I was calling Dan Marino, Sherri

5    Goodman.  We talked about this, you know, what --

6    this is a dilemma; what does one do in this

7    situation?

8          Q.    Did Mr. Sweeney say that he had heard from

9    --

10         A.    No.

11         Q.    -- Joe Simoni?

12         A.    No.  Sweeney said he'd had no contact with

13    him, and he said that he didn't want this to ruin my

14    relationship with Joe, this sort of talk, that Joe

15    was a good guy, he was one of the finest men he's

16    ever met.

17         Q.    Did he offer to intervene?

18         A.    I don't think so, but he made these

19    statements to me.

20         Q.    And you said that you were consulting

21    Sherri Goodman.  After you got this call on

22    June 27th, did you consult her about Joe Simoni?

23         A.    I think so.  Yeah.

24         Q.    When did you do that?

1        A.    I don't know.

2                MR. MARINO:  That's probably all we

3    should say about that.  That's probably privileged

4    information.

5    BY MS. MASON:

6        Q.    Did you share any opinion you received from

7    -- what's her name -- Sherri Goodson --

8        A.    Goodman.

9        Q.    Goodman, sorry.

10            Did you share any opinion you received from

11   Sherri Goodman with your co-counsel in the Spelter

12   case?

13       A.    I don't recall.

14       Q.    Did you submit that as an expense in the

15   case?

16       A.    I don't believe so.  Most of my dealings

17   with Sherri I did not submit as an expense, because

18   many of these things is just double-checking to make

19   certain that I'm doing the correct thing and in some

20   cases, didn't know what to do and I'm asking her, and

21   I don't think that was fair to pass that on to my

22   clients when I probably should've known.

23       Q.    And to back up a little bit on what we

24   talked about yesterday, you first consulted Sherri

1 Goodman about whether you could compensate Professor

2 Simoni during the WVU case; is that right?

3    A.    Yes.

4    Q.    And it was -- and you were trying to find

5 out if you could compensate him even though he wasn't

6 a licensed attorney?

7    A.    No.  The main issue was, could he be

8 compensated should be become licensed.  That was the

9 big thing, because I fully expected him to become

10 licensed, but would he be able to participate after

11 having been involved in putting these cases together?

12 How would that be viewed from an ethical standpoint?

13 She did not know.  She suggested going to the bar and

14 asking them for an opinion.

15    Q.    Did you ever consult her as to whether you

16 could compensate Professor Simoni even though he was

17 a plaintiff in the case?

18    A.    I don't know, but I knew that you couldn't

19 do that because there was a case going on, I think at

20 that time, in California, where some fellow had paid

21 someone for -- who was a client, had paid him -- I

22 don't remember the details, but that was pretty

23 evident.

24           And Bob Sweeney said, yeah, that's -- that

1  wouldn't be proper, but Simoni was acting as a union
2  official and kept going on about that he did cases
3  all the time, represents unions, they bring people
4  in.
5      Q.  And if I understood you right, yesterday,
6  you said that you had consulted Ms. Goodman three
7  times about whether Simoni could be compensated.
8      A.  Three times?
9      Q.  Is that right?
10     A.  I don't think I said three times.
11     Q.  Okay.  How many times?  Do you recall?
12     A.  Oh, I have no idea.
13     Q.  More than once?
14     A.  Oh, yeah.  Over the years, how can we do
15  this, or can we do this?
16     Q.  And did the answer ever change?
17     A.  Ultimately, she said, I think quantum
18  meruit.  And I think that's when I told Simoni, well,
19  get your hours together.  Once it became apparent
20  these cases were winding down and this guy is not
21  licensed --
22     Q.  And did you tell him that?
23     A.  I told him to get his hours together.
24  That's what it looked like to me.

1      Q.   That you weren't going to be able to pay

2  him a percentage?

3      A.   Well, I think he knew that.

4      Q.   So you don't need to consult Ms. Goodman to

5  tell you that you can't share a fee with a

6  non-lawyer, right?

7      A.   Yeah.  Yes.  That's correct.

8      Q.   Okay.  And you say that Mr. Simoni knew

9  that?

10      A.   Well, I think I did.

11           MR. MARINO:  Object to form.

12      A.   I think he probably knew that from having

13  attended law school, but --

14      Q.   And had you told him that?

15      A.   I don't know if I ever came right out and

16  told him that or not, but I -- it's presumed by me

17  that he knew that.  Now, you know, things change.

18           I'm checking with her all the time -- well,

19  not all the time, but I'm checking with her over the

20  course of these cases, you know, what's going on and

21  here's what happening.  I'm talking to her quite a

22  bit about my work in these cases as well and what do

23  I do, what does this mean, should I do this, should I

24  do that?

1          And it wasn't about Simoni.  It's just

2    about the day-to-day operation here, what should I

3    do?  For example, pro hac vices, I didn't know

4    anything about filing a pro hac, how to prepare one,

5    what to do.  She helped me do that.  So are these

6    routine -- what a lot of lawyers might call routine,

7    I had no experience in doing.

8          Q.   Well, and let's go back to her suggestion

9    that quantum meruit might be the way to proceed.  Did

10   you convey that to Professor Simoni?

11         A.   I don't know if I used the term quantum

12   meruit.  I said, hey, it looks like an hourly basis

13   is the way to go here; get your hours together.

14         Q.   And when was this?

15         A.   I have no idea at this point.

16         Q.   Do you know -- you said the cases were

17   winding down.

18         A.   Well, I believe so.  Yes.  I mean, this

19   spans a -- you know, a 13-year period, going on

20   14 years now.  I don't know the exact dates.

21         Q.   Pinpoint for me, if you could, when the

22   three cases were starting to wind down.  And by three

23   cases, I mean WVU --

24         A.   I think WVU --

1        Q.    -- Fairmont/Westinghouse, and Spelter.

2        A.    I think WVU was finishing up in 2005.  I

3    think Spelter -- or Westinghouse, you know, we --

4    there was a -- our case was dismissed on summary

5    judgment, and it was -- we appealed that to the West

6    Virginia Supreme Court.  I don't remember when this

7    happened, maybe 2006.  And then by 2000 -- late 2007,

8    there had been an appeal but no ruling.  We -- there

9    was a deal negotiated.

10        Q.    So do you recall where in the process you

11    were when you had the quantum meruit conversation

12    with Sherri Goodman?

13        A.    I don't.  But probably sometime like 2006,

14    2007.  Of course, you know, we're going to trial in

15    Spelter in 2007.  I'm assuming sometime 2006, 2007,

16    but I don't -- I can't say that with certainty.

17        Q.    And so when you talked to Professor Simoni,

18    was this -- do you recall if this was in person or

19    over the phone about telling him that he needed to --

20        A.    I don't know.

21        Q.    -- do his hours?

22        A.    I have no idea.

23        Q.    Did he ask you -- or did -- was there any

24    discussion about whether paying him hourly would

1    foreclose any percentage of a fee?

2        A.    I don't remember anything like that.

3        Q.    Did you have any discussion about what his

4    hourly rate would be?

5        A.    No.

6        Q.    And I think yesterday you had said that you

7    weren't opposed -- and I may be putting words in your

8    mouth, so correct me -- I'm sure you will -- you

9    weren't opposed to paying him a reasonable amount for

10   the work that he had done.

11       A.    I've never been opposed to paying him for

12   the work that he's done if it's lawful and it's

13   reasonable.  I certainly would be the last person

14   that would object to paying him.

15       Q.    And my question is, what is a reasonable

16   amount?

17       A.    That's a good question, because I don't

18   know what all he has done.  I have no way of knowing.

19   In fact, some of these documents I've seen here, I

20   had no idea that he was doing this amount of work.

21       Q.    Are you aware of any work that he did do

22   that required his sociology doctorate?

23                MR. MARINO:  Object to the form of the

24   question.

1                    MR. WAKEFIELD:  Object to the form.

2    Competency.

3         A.    Yeah.  I don't -- you know, I'm not -- I

4    have no idea on that.  I just think Joe is a kind,

5    caring person, and he is -- you know, I just think he

6    wants to help people.

7         Q.    Are you aware of any tasks that he

8    undertook during the Spelter case that required a

9    specialized legal knowledge?

10                   MR. WAKEFIELD:  Object to the form.

11    Vague.

12        A.    I'm not sure what all Joe did, and I mean,

13    he obviously had to go to the record room.  He knew

14    how to look up and see who owns this property or that

15    property.  I would say most people who have no legal

16    training wouldn't know how to do that, so that -- I

17    think he knew how to do legal research.

18                   I mean, obviously, the guy had a law

19    degree, so yeah, I think -- and I think that's

20    something that Keith Givens talked about.  And we

21    were saying, the guy has, you know -- he has a

22    master's degree, he has a Ph.D. in sociology, he has

23    a law degree.  He also, if I remember correctly, had

24    almost an MBA from Columbia University.  And his

1    other degree is -- three degrees from Notre Dame, one
2    from West Virginia, and almost a degree from
3    Columbia, an MBA.
4            So the guy is highly educated and he's a
5    nice guy, although I didn't always agree with him and
6    I think sometimes he did things that really surprised
7    me, but --
8        Q.   How did he use all those degrees to do any
9    of the tasks that you do know about that he did in
10   Spelter?
11       A.   That's hard to say.  The guy -- I just
12   think it's the cumulative effect of these things, and
13   I think also his age.  You know, he had a lot of
14   experience.  He knew how to communicate with people,
15   and he came across as a very kind and caring person,
16   so I think he was able to -- he had the ear of the
17   clients.  I think that's what Steve Medina said, the
18   guy has the ear of the clients.
19       Q.   But you would agree with me that somebody
20   could have the ear of the clients and not have four
21   or five college degrees, right?
22       A.   I would agree.
23               MS. MASON:  Okay.  Let's take a break.
24   She needs to change the CD -- DVD.

1          VIDEOGRAPHER:  We're going off the
2   record.  The time is 2:47 p.m.
3          This ends Disc No. 2 in the deposition of
4   Gary Rich.
5                        -----
6                    (Brief break)
7                        -----
8          VIDEOGRAPHER:  We're back on the
9   record.  The time is 2:54 p.m.
10          This begins Disc No. 3 in the continued
11   deposition of Gary Rich.
12   BY MS. MASON:
13       Q.   We were talking about, before the break,
14   what would constitute a reasonable hourly rate for
15   the work that Professor Simoni did.  Do you know
16   whether he used his legal expertise to do any
17   research on the statute of limitations issue in
18   Spelter?
19       A.   I don't know about that.  No.
20       Q.   Did you ever see any research he did on the
21   statute of limitations issue in Spelter?
22       A.   Not that I recall.
23       Q.   And so obviously, you'd never shared any of
24   his research with your co-counsel?  You never -- you

1    never --

2         A.   I don't know of any research, but I'm not

3    saying there wasn't any.  But I don't recall any

4    research on the statute of limitations issue in

5    Spelter that Joe did.  Maybe he did.  I don't know.

6         Q.   Did you ever direct him to do any?

7         A.   Definitely not.

8         Q.   And then to go back to that issue about the

9    quantum meruit -- and I apologize if I asked you this

10   already -- but did you -- did Simoni respond to you

11   in any way about what would happen with your

12   percentage deal?

13        A.   I don't remember him saying it.

14        Q.   And did you ever inform any of your

15   co-counsel on the Spelter case that you had

16   instructed him to prepare his hours for compensation?

17        A.   No.

18        Q.   If you had -- if he had prepared those

19   hours, would you have -- what -- would you have

20   submitted those to be reimbursed?

21        A.   I don't know what I would've done.  I

22   would've probably talked to Sherri Goodman before I

23   did anything.

24        Q.   I think -- are you familiar with Professor

1    Simoni's amended answer and counterclaim against you?

2         A.    Well, I've looked at it.

3         Q.    Yeah.

4         A.    Of course.

5         Q.    Okay.  And in Paragraph 39 of that, he says

6    that as part of his investigation and with the

7    knowledge and consent of Mr. Rich, Doctor Simoni

8    performed legal research regarding mass litigation,

9    court filing fees, the statute of limitations, and

10   other legal issues and kept the defendants and others

11   informed of his findings.

12        A.    Keep the defendants informed?

13        Q.    I think he's referring to the third-party

14   defendants, maybe.

15                   MR. MARINO:   Just go with your

16   question.

17   BY MS. MASON:

18        Q.    Oh, counter defendants.

19              What I want to ask you about is, is it true

20   that he performed legal research regarding mass

21   litigation?

22        A.    You know, I think I do recall now that he

23   did a lot of research for Masry & Vititoe on the

24   issue of moving the case from circuit court to this

1    mass litigation panel that West Virginia has.

2        Q.   And that was not an issue in Spelter,

3    correct?

4        A.   That was not an issue in Spelter.

5        Q.   Do you know if he did any court filing --

6    any investigation and legal research regarding court

7    filing fees?

8        A.   He may have.  I know I did, because I

9    didn't know what they were, and I called the circuit

10   clerk in Jackson County, West Virginia on that issue.

11       Q.   Did you ever consent to have him perform

12   legal research regarding court filing fees?

13       A.   I didn't consent.  He just did these

14   things.

15       Q.   What about the legal research regarding

16   mass litigation, did you consent to that?

17       A.   I'm not sure what you mean by consent.  I

18   mean, I didn't say, hey, Joe, fabulous you did this.

19   I mean --

20       Q.   Well, I'm just using the language that

21   Professor Simoni uses.

22       A.   I would say consent is mischaracterizing my

23   actions.  I didn't object to him doing these things.

24   He did what he wanted to do.  I did not direct him.

1       Q.   And did you use that information that he
2   gathered for court filing fees?
3       A.   Whatever the fees were, we paid.  And this
4   may have been at the time that he had -- in the
5   Westinghouse case, there was a big issue because the
6   Masry & Vititoe, being from California, they were
7   calling the case a direct action, as opposed to a
8   class action, so they were wanting to list every
9   single plaintiff.
10           And the circuit clerk took the position,
11  well, that's fine; you'll pay the filing fee for
12  every single plaintiff.  Which amounted to, you know,
13  a lot of money, so that was a big issue, and I think
14  he and Nancy Eichler did do work on that.
15           I remember calling people, like Sherri
16  Goodman, what's your opinion?  Calling the circuit
17  clerk in Jackson County, asking him what he thought
18  about this, how would he handle this?  You know, did
19  we use the information Joe -- you know, I mean, as
20  far as the -- what the fee would be?  The fee is what
21  it is.  I mean, it's not that hard to determine.
22      Q.   Did he consolidate this information in
23  written form?
24      A.   I don't remember.

1      Q.   What about the statute of limitations?  He
2   listed that.  Did he ever do any statute of
3   limitations research on any of your cases?
4      A.   Not that I recall.
5      Q.   Do you recall any other legal issues he
6   researched with your knowledge and consent?
7      A.   You know, as far as my knowledge goes, I
8   know he was always doing something or he would come
9   in, I've done this, or I've done that.  I did not
10  direct him to do anything.
11     Q.   Would you feel comfortable relying on the
12  conclusions Professor Simoni reached in his legal
13  research?
14     A.   That's a good question.  I would probably
15  have double-checked what he did, but then again, I
16  would do that with most people.
17     Q.   Would you feel comfortable relying on his
18  legal research on the issue of statute of
19  limitations?
20     A.   Not solely.  Because it was a very complex
21  issue in the -- certainly, in the Spelter case.
22     Q.   Did you double check any of the research
23  that Simoni did do for you?
24     A.   He did for me?

1              MR. MARINO:  Object to the form -- to
2    the form of the question.
3         A.   He didn't do research for me.
4         Q.   Did you double check any of the legal
5    research he shared with you?
6         A.   Definitely.  And I double checked things
7    that The Cochran Firm did.  You may find that
8    surprising, but I did and typically, with Dan Marino
9    or Sherri Goodman.  And I did not bill anyone for
10   that.  I paid for it.
11        Q.   And that leads me to the next thing I
12   wanted to ask you about, and that's the memorandum of
13   understanding.  And I think Mr. Cash made it an
14   exhibit yesterday.  I don't recall the number.  Do
15   you have it there in front of you?
16        A.   Probably.
17        Q.   I don't have extra copies of it.
18              COURT REPORTER:  Exhibit 5.
19              THE WITNESS:  Yes.
20              MS. MASON:  Thank you.
21   BY MS. MASON:
22        Q.   So on page 3 of the memorandum of
23   understanding it reflects there was a fee allocation
24   or fee split between Levin Papantonio, The Cochran

1    Firm, and your firm, correct?

2         A.    That's correct.

3         Q.    And Levin Papantonio and Cochran were to

4    receive 37.5 percent, and you were to receive

5    25 percent?

6         A.    That is correct.

7         Q.    And after -- you signed this agreement on

8    May 4th, 2004, I think.  Well, no, you signed it on

9    April 23rd, 2004.

10        A.    Correct.

11        Q.    After you entered into this agreement, did

12   you submit any of your costs that you had incurred in

13   the Spelter case for reimbursement to your

14   co-counsel?

15        A.    I don't remember.

16        Q.    What was your understanding of how costs

17   were to be handled?

18        A.    That Cochran and Levin would be splitting

19   those costs.

20        Q.    All costs in the case?

21        A.    Well, I think common costs.

22        Q.    Yeah.  Let's look at page 2, paragraph 3-A.

23        A.    Yes.

24        Q.    Each party, except for Rich, shall

1   contribute to the common costs pursuant to

2   Section 3.B below and bear its proportionate share of

3   common Spelter litigation expenses.  What did you

4   consider to be common Spelter litigation expenses?

5        A.   Well, certainly not -- it would be

6   everything except for the running of the -- of my

7   firm, overhead -- well, any of the firms, so in other

8   words, it wouldn't be the salaries of the women

9   working for me and it wouldn't be my telephone

10   expense.

11           Generally, I didn't keep track of such

12   expenses.  You know, it would be what we needed to do

13   -- like expert witnesses, deposition costs, all this

14   sort of thing would be common costs.

15        Q.   And as of April of 2004, you had not

16   incurred any costs of that nature?

17        A.   I probably had.  I probably had incurred

18   costs relative to photocopies, maybe travel expenses.

19        Q.   Okay.  And travel to where?

20        A.   Oh, not out of state, but locally.

21   Possibly to Pittsburgh.

22        Q.   If you look under -- continue on at

23   Paragraph 3.A, all other Spelter litigation related

24   expenses, firm overhead costs, and individual

1    attorney travel expenses are non-common costs.  So

2    does that suggest to you that in fact under the

3    agreement attorney travel expenses weren't

4    compensable?

5         A.   That's what it appears to be.  Yes.

6         Q.   Would you consider any work that Professor

7    Simoni performed related to the Spelter case to fall

8    within a common Spelter litigation expense or some

9    other expense?

10              MR. MARINO:  Objection.  Incomplete

11   hypothetical.  Object to the form of the question.

12        A.   I don't know how to classify what Joe did.

13   I don't know -- for example, I don't know what all he

14   did.  I don't know what his hourly rate would be, and

15   I don't know how to classify it.  It's -- you know, I

16   think that's why we're here today.

17        Q.   And I'm asking your opinion.

18        A.   And I don't know.  I don't have one.  I

19   don't know what to think about it.  It's a -- it's a

20   dilemma.

21                       -----

22              (Exhibit No. 26 marked for purposes of

23   identification.)

24                       -----

1          MR. MARINO:  What's that going to be?

2          THE WITNESS:  This one is 27.

3          MS. MASON:  I only have a total of two

4  copies so --

5          MR. MARINO:  The one you were just

6  handed?

7          THE WITNESS:  Wait a minute.

8          COURT REPORTER:  I think it should be

9  26.

10          THE WITNESS:  26, this should be 26, I

11  think.

12          COURT REPORTER:  Yeah.

13          MS. MASON:  Uh-huh.  Sorry about that.

14          THE WITNESS:  I thought --

15          MR. MARINO:  So that's going to be --

16          THE WITNESS:  This one is 26.

17  BY MS. MASON:

18      Q.    Are you familiar with Exhibit 26?

19      A.    I am.

20      Q.    What is it, please?

21      A.    It's an amended memorandum of

22  understanding.

23      Q.    Between the counsel in the Spelter case --

24      A.    Yeah.

1      Q.   -- correct?

2      A.   That's correct.

3      Q.   And other than the exhibit we just looked

4   at, Exhibit 5 and this Exhibit 26, are you aware of

5   any other memoranda of understanding in the Spelter

6   case?

7      A.   I don't believe so.

8      Q.   And did you sign this amended MOU?

9      A.   I did.

10      Q.   When was that?

11      A.   You know, it's -- I don't see a date, but I

12   did sign it.

13      Q.   If you look at page 6 of 7.

14      A.   Yes.  Oh, there is a date there.  Yes.

15      Q.   All right.  So you signed it May 2nd, 2008?

16      A.   Correct.

17      Q.   That was after the trial had been conducted

18   in Spelter, correct?

19      A.   Yes.

20      Q.   And what is your understanding, just

21   overall, of what this amended MOU was meant to

22   accomplish?

23      A.   I think it -- what I remember was it was

24   to, I think, bring Ed Hill into the case, or it --

1    it's -- let's see.  This is the second -- no.

2         Q.   Let's just look at page 4 of that.

3         A.   All right.

4         Q.   You may be able to refresh your

5    recollection.

6         A.   Yes.

7         Q.   It does refresh your recollection, page 4?

8         A.   Yes.

9         Q.   Okay.  What did it do?  What did the MOU

10   accomplish?

11        A.   Well, it set forth the various -- the fees

12   -- the fee structure, how it would be allocated

13   amongst the attorneys involved in this case.

14        Q.   And so it was the agreement that included

15   Levin Papantonio, The Cochran Firm, your firm,

16   Kennedy & Madonna, and West & Jones?

17        A.   Yes.

18        Q.   Now, you said West & Jones had done a

19   fabulous job?

20        A.   I think I said that.  Yes.

21        Q.   You didn't comment on whether you thought

22   Bobby Kennedy had done a fabulous job.

23        A.   That's correct.

24        Q.   Do you think that it was -- do you think

1    that he helped the case?

2         A.   He probably helped, but I think there were

3    others that made a far bigger contribution than he

4    did.

5         Q.   He -- you went to the trial every day;

6    didn't you?

7         A.   I did indeed.

8              MR. MARINO:  Can I examine the

9    exhibit?  I -- does it have Exhibit A on it?

10             MS. MASON:  Yeah.  It's Exhibit A.

11             MR. MARINO:  Okay.

12             THE WITNESS:  It does.

13             MR. MARINO:  All right.  I don't know

14   why you directed the witness just to page 4 when he

15   said that the purpose of this was to bring Ed Hill

16   in, so I think that was misleading, so --

17             MS. MASON:  Okay.  We'll talk about

18   Exhibit A.

19             MR. MARINO:  Okay.

20             MS. MASON:  Or you can always follow

21   up.

22             MR. MARINO:  Well, I don't want to

23   take time with it.  I think if you just ask -- you

24   know, if you just direct him to the appropriate

1  portions in the firsthand sense, we won't have

2  confusion.

3  BY MS. MASON:

4      Q.   So --

5              MR. MARINO:   So yeah.

6  BY MS. MASON:

7      Q.   -- you were there for the punitive damages

8  phase of the trial?

9      A.   Yes, indeed.

10     Q.   Did you see Bobby Kennedy's performance

11 during that last phase of the trial?

12     A.   Of course.

13     Q.   And you were there for his closing

14 argument?

15     A.   I was there.

16     Q.   And do you recall what the punitive damage

17 award was in that case?

18     A.   I don't.  But it was very substantial.

19     Q.   It was $196,000,000; wasn't it?

20     A.   It was.

21     Q.   And do you think that Bobby Kennedy can

22 take some credit for that?

23     A.   I think he can, but I think there were also

24 other attorneys there that could probably have made

1    that closing or even a better closing.

2        Q.   Have you been in any other cases where

3    you've got $196,000,000 in punitive damages?

4        A.   I haven't.

5        Q.   Me either.

6             So the new fee division on page 4 reflected

7    33.5 percent to Levin Papantonio, 33.5 percent to The

8    Cochran Firm, 22.5 percent to you, and then 2. -- or

9    excuse me -- 5.25 percent to Kennedy & Madonna and

10   5.25 percent from West & Jones.

11            Now, I've already said math is not my

12   strong suit.  But was that -- did that -- earlier you

13   were saying that it wasn't a pro rata reduction.

14       A.   I didn't say that.  What I said was, that

15   was told to me, this is how it's going to be.  I

16   didn't agree to that.

17       Q.   Okay.  So what did -- what -- how did it

18   come about then that this -- that this distribution

19   on page 4 was determined?

20       A.   Well, it came about because I simply

21   referred -- whoever was telling me, this is how it's

22   going to be, I didn't want to argue with them because

23   I thought there were more important things to do for

24   me, and I simply referred them to Dan Marino and he

1  spoke to them about this, not me.

2     Q.   And so Levin Papantonio and The Cochran

3  Firm each took a four percent reduction in their --

4  in their fee and you took a 2.5 percent reduction in

5  your feet based on this page 4, correct?

6              MR. MARINO:  I think that's incorrect.

7     A.   I don't know.  I don't know.

8              MR. MARINO:  So you're misreading that

9  document.

10    A.   It was done ultimately on a pro rata

11 ultimately.  I don't know the mechanics of that or

12 the numbers, but yes, that's how it was ultimately

13 done.

14    Q.   And then -- well, look at Exhibit A which

15 is attached and referenced in the amended memorandum

16 of understanding.

17    A.   Yes.

18    Q.   And what was your understanding about what

19 amendment -- Exhibit A was intended to accomplish?

20    A.   This one is the one that brought Ed Hill

21 into the case and his law firm.

22    Q.   And that for the appellate work, correct?

23    A.   That was my understanding.

24    Q.   And so what is the difference between what

1    we saw on page 4 and the distribution that we see on
2    page 2 of Exhibit A?
3         A.    What is the difference?
4         Q.    Yeah.  How did things change once you
5    brought -- once your co-counsel brought Ed Hill in?
6         A.    You're talking in percentage terms?
7         Q.    Yes.
8         A.    Relative to my percentage or just
9    everyone's?  Again, this was done on a --
10        Q.    Let's start with your percentage.
11                  MR. MARINO:  Doesn't the document
12   speak for itself?  I mean, is this good use of time.
13        A.    Well, actually, I can't really -- I mean,
14   I'd have to sit here and --
15                  MR. MARINO:  I'm sorry.  Just a
16   second, Gary.
17             You've asked us to go past ten hours, and I
18   said we wouldn't stop you at ten hours, but you know,
19   I don't think this is useful.  You know, the document
20   speaks for itself; doesn't it?
21                  MS. MASON:  I understood him to say
22   that it was not a pro rata distribution.
23                  MR. MARINO:  Right.
24                  MS. MASON:  And now we've

1    accomplished, we've learned that in fact it wound up

2    being pro rata.

3                    MR. MARINO:  I disagree.  I mean --

4                    MS. MASON:  Well --

5                    MR. MARINO:  -- the document speaks

6    for itself, so why do we have to argue about it?

7                    MS. MASON:  Because we want his

8    testimony about what his understanding was.

9                    MR. MARINO:  Well, what difference

10   does it make what his understanding is when the

11   document is plain and speaks for itself?  He doesn't

12   dispute what the document says.

13                   MS. MASON:  You know, just -- can I

14   just get through this one page?

15                   MR. MARINO:  Well, first of all, we've

16   done a lot of things.  We've talked about Bobby

17   Kennedy, which I don't know what he's got to do with

18   this, with this issue, with this case, but --

19                   MS. MASON:  It was follow-up from the

20   -- his testimony --

21                   MR. MARINO:  No.  I understand, but

22   you spent a lot of time wondering -- asking him if

23   Bobby Kennedy benefited the case.  I mean, what's

24   that got to do with us, and what does this have to do

1  with anything?  The document speaks for itself.  Go
2  ahead, but you know, don't ask us to go beyond ten
3  hours if this is what you're going to do.
4       A.   But Angela, I don't think I testified
5  earlier that the ultimate agreement was not done on a
6  pro rata basis.  I said, that's what was told to me.
7  This is what was proposed to me.  I didn't say that's
8  how it ended up.
9            But yeah, that's how it ended up.  It was
10  done on a pro rata basis, but each time these things
11  came up, it was, this is how it's going to be.  I
12  mean, I was just told, this guy is coming in and this
13  is what you're going to do.
14            And because I didn't want to strain the
15  relationship with these firms, I would simply say,
16  speak to Dan Marino about this, but I'm not trying to
17  suggest that this isn't the number that I got by any
18  means.
19            This is what it was.  Now, I didn't
20  necessarily have to agree, I don't think, to sharing
21  costs for bringing these people in, but I did for the
22  sake of harmony.
23       Q.   And you got a good result, right?
24       A.   I think there was a good result, and I

1   think the people in Spelter should be pleased with

2   what we did for them.

3        Q.   And when you gave up, I think it was a

4   three percent -- no, it wasn't three percent.  When

5   you cut back on your fee a little over one percent to

6   bring in Ed Hill, did you get anything in return for

7   that?

8        A.   I don't know what Ed Hill did.

9        Q.   Well, I'm saying, just giving up your

10  percentage, do you -- the deal was you didn't have to

11  do anything else on the case, right?

12       A.   That was -- that was part of the deal, yes,

13  that I was -- I had no further obligations.

14  Although, I would be available to consult.  I

15  ultimately agreed with Farrest that I would come back

16  for the trial.  He said, I want you there.  And I

17  said, okay.  I didn't have to be there, I don't think

18  --

19       Q.   You made --

20       A.   -- but I wanted to be there.

21       Q.   Yeah.

22            You made yourself available, correct?

23       A.   I did.

24       Q.   Okay.  But that was -- but you didn't have

1    that obligation to do that under the memorandum of

2    understanding anymore; is that right?

3         A.   But that's -- it's expressly stated there.

4         Q.   And that was something you wanted to

5    negotiate?

6         A.   Well, I wasn't in the -- I wasn't going to

7    be in the country, so it would be difficult, but I

8    would certainly do my utmost to be available to do

9    what was needed for my co-counsel and my clients in

10   Spelter.

11        Q.   Yesterday we looked at Exhibit 12.  Can you

12   pull that for me?

13             MR. WAKEFIELD:  Can you identify that

14   for the record --

15             MS. MASON:  Yes.

16             MR. WAKEFIELD:  -- so I can locate it?

17             MS. MASON:  It's Rich000175.

18        A.   12?

19        Q.   Yes.

20        A.   Got it.

21        Q.   And the date on that is May 24th, 2004,

22   correct?

23        A.   Correct.

24        Q.   And that reflected a -- well, you tell me.

1   That was a telephone conversation on that day?

2       A.   I don't think it was a phone conversation.

3   I think it was a -- well, it may have been a phone

4   conversation.  I don't know.  Typically, I would have

5   a number written, a telephone number, but I don't see

6   a number, but it may well have been because I don't

7   know that George Flowers would've been there in May

8   and talking about doing work in July.

9       Q.   But it indicates you had a conversation

10  with Steve Medina, Joe Simoni, George Flowers, and

11  you, correct?

12      A.   Oh, it does, yes.

13      Q.   All right.  And the substance of that call

14  related to upcoming sample of the area?

15      A.   Yes.

16      Q.   And assignments for Joe Simoni and his

17  graduate assistant?

18      A.   That's what it looks like.

19                      -----

20              (Exhibit No. 27 marked for purposes of

21  identification.)

22                      -----

23  BY MS. MASON:

24      Q.   I've handed you what we've marked as

1    Exhibit 27, and it is Rich000174.  Do you recognize

2    this document?

3         A.   Yes.

4         Q.   What is it?

5         A.   It appears to be a series of calls with

6    Steve Medina.

7         Q.   How do you know it's a series of calls?

8         A.   Because in the margin I have 9:30 I've left

9    a message with Tracy, I think.  At 1346, I've left a

10   message.  At 1619, I left a message.  And it appears

11   at 1625 to 1631 I spoke to Steve.

12        Q.   Okay.  And you have a telephone number for

13   him at the top, right?

14        A.   Yes.

15        Q.   And what does it say that you spoke with

16   Steve about?

17        A.   Community meeting date, 15 June '04,

18   mailing to existing clients, mailing to attendees,

19   advertising.

20        Q.   And then there's a line drawn.

21        A.   Yes.

22        Q.   And what does that say underneath the line?

23        A.   I suspect that's what Steve said to me.  He

24   must've brought up these topics.

1      Q.   Which topics?

2      A.   Telecon at 1430 today, what to give Simoni,

3  confidentiality.

4      Q.   And what does it say in the margin there?

5      A.   It looks like, went well.

6      Q.   Do you recall this conversation with Steve

7  Medina?

8      A.   I don't.

9      Q.   Do you -- so you don't know what -- well,

10  let me ask you whether you can answer this or not.

11  It says, what to give Simoni.  Were you having a

12  discussion with Medina about whether to pay Simoni?

13      A.   I don't think so.  I would say it has

14  something to do with giving him documents, what's the

15  impact of confidentiality.  In fact, for whatever he

16  was going, what can he be given?

17      Q.   Okay.

18      A.   That's how I read it.

19      Q.   What can he be given as a task?

20      A.   Possibly.  Or are there documents to give

21  him to do something?  What would that do?  You know,

22  if he were to review this, what would happen?  Would

23  this be, you know, a problem?

24      Q.   And then if you look at Exhibit 12, which

1   is Rich175 --

2        A.   12, okay.

3        Q.   -- it shows a time of 1435.

4        A.   Yes.

5        Q.   That's 2:35 in regular people time.

6             Do you -- is it fair to conclude that this

7    conversation this telephone conversation -- that this

8    was a telephone conversation between you and Simoni

9    and Flowers and Medina following up on with your call

10   with Steve Medina at -- where you talked about what

11   you could give Simoni?

12        A.   I would say that's -- probably.  Yeah.

13   That was something that we didn't discuss in the

14   meeting with Flowers or Simoni.

15        Q.   And so do you -- do you think that you

16   stayed on the phone with Mr. Medina and then he

17   brought George Flowers and Joe Simoni into the call?

18        A.   No.  I'm reading it just the opposite, that

19   this call was first.

20        Q.   This --

21        A.   This one meaning Exhibit 12, the call from

22   1435, which would be 2:35 to 3:00 in the afternoon.

23        Q.   Okay.

24        A.   Subsequently, at 1625 -- you're saying it's

1  regular people time, which would be 4:25.  I spoke

2  then with Medina, and we probably talked about what

3  can Simoni be given, you know, as far as his looking

4  at tax maps or doing sampling or whatever, because

5  there, I guess, was concern about being a consultant

6  or not being a consultant.  What do you want me to

7  give this guy, if anything?  I'm guessing.  I don't

8  think it has anything to do with financial

9  compensation.

10                         -----

11                    (Exhibit No. 28 marked for purposes of

12  identification.)

13                         -----

14  BY MS. MASON:

15      Q.   Are you familiar with this document that

16  I've marked Exhibit 28?

17      A.   I am not.  But it looks like Susan Fair's

18  notes that she had on probably the weekly Spelter

19  conference call.

20      Q.   And if you weren't able to attend a

21  conference call, did you have one of your staff sit

22  in usually?

23      A.   Usually.

24      Q.   And did you usually have the staff takes

1   notes of the -- what occurred at the conference?

2         A.   I would think they would do that just as a

3   matter of course, to update me as to what had

4   transpired.

5         Q.   And was it your practice to review those

6   notes if you had missed a conference call?

7         A.   Well, of course.

8         Q.   Look at page 231, if you would, please.

9         A.   Yes.

10        Q.   At the bottom of the page, it says, Steve,

11  Katie to talk to Joe, S.F. to talk to GWR, assist

12  Flowers.  Do you know what that's referring to?

13        A.   Well, I don't remember who Katie is, but

14  Susan -- S.F. is to talk to me about helping Doctor

15  Flowers.

16        Q.   You personally helping Doctor Flowers or

17  Mr. Simoni helping Doctor Flowers?

18        A.   I'm thinking it's for me to help him,

19  because that, I think, is the time period that I did

20  help him.  This is December, and I think -- you know,

21  as I stated yesterday, it was cold outside.  My

22  timesheets would reflect my involvement.

23        Q.   The next page, 232.

24        A.   Yes.

1      Q.   At the top of the page, it says, Steve
2  wants us to, quote, hold Joe's hand, close quotes,
3  about air samples; have received some info from Joe,
4  everyone; Joe Simoni on conference calls on
5  December 17th.
6           Had you heard Medina ever say that the
7  counsel needed to hold Joe's hand?
8      A.   I can't remember.  I mean, this is nine
9  years ago.  I don't know.
10     Q.   How would you interpret that now?
11     A.   I don't -- I have no idea what this means,
12  hold his hand, if it means help him or -- I don't --
13  I really don't know.  I don't know what it means.
14     Q.   Did you ever hear Medina express any
15  concerns about Professor Simoni's ability to work
16  with Doctor Flowers?
17     A.   His ability?  You mean his being able or
18  qualified to do so or just from a confidentiality
19  standpoint?
20     Q.   Not from a confidentiality standpoint, but
21  from a will he do a decent job standpoint.
22     A.   Oh, I don't understand -- I don't think
23  that anyone doubted that he couldn't go along and
24  collect soil samples or go and talk to people about

1    getting permission to sample their front yard.

2        Q.   So you don't think when he said, we need to

3    hold Joe's hand that he was concerned about his

4    ability to perform the job?

5                   MR. WAKEFIELD:  Object to the form.

6        A.   As I said before, I don't know what that

7    means, holding his hand.  I don't know.

8                          -----

9                   (Exhibit No. 29 marked for purposes of

10   identification.)

11                         -----

12   BY MS. MASON:

13       Q.   Exhibit 29 is an e-mail trail, and it's

14   marked LP000880.  Have you ever seen this e-mail --

15   e-mail trail?

16       A.   I don't think so.

17       Q.   At the bottom of the first message is a

18   message from Colleen Balzer.  Did you know her?

19       A.   That name doesn't ring a bell.

20       Q.   And she says, Joe Simoni left a message

21   last night regarding George Flowers' new contact

22   number; he hasn't spoken with Doctor Flowers since

23   the hurricane, and he wanted to give him a call; Mr.

24   -- and then she leaves Mr. Simoni's new cell number.

1          And in response, Carol Moore responds and
2    says, please do not give Simoni Doctor Flowers' new
3    number; if you are uncomfortable, direct Simoni's
4    call to me and I will handle; you may simply tell him
5    you do not know for sure what Doctor Flowers' current
6    phone numbers might be since he has/have moved around
7    since the hurricane; I will gladly handle if this
8    becomes an issue.
9          Were you aware that Levin Papantonio did
10   not want to give Professor Simoni Doctor Flowers'
11   contact number?
12       A.   I was not aware of that, and I'm surprised
13   to see that.
14       Q.   Okay.  You never had any conversations with
15   Steve Medina where you talked about the need to limit
16   Professor Simoni's contact with Doctor Flowers?
17       A.   I think -- with Doctor Flowers, no.  I
18   think Doctor Flowers and Joe were friendly.
19       Q.   So Medina never expressed any concern to
20   you about what Simoni might say to Doctor Flowers
21   that would be discoverable?
22       A.   Steve and I had a conversation, and I can't
23   tell you when.  We were concerned about what might be
24   discoverable, what his role was as far as is he a

1  consultant, isn't he, what is this guy?  I mean, it

2  -- I don't think anyone really knew, but specifically

3  to say, you know, he shouldn't speak with George

4  Flowers, I don't recall anything like that.

5                          -----

6                  (Exhibit No. 30 marked for purposes of

7  identification.)

8                          -----

9  BY MS. MASON:

10      Q.   All right.  I've handed you what we've

11  marked as Exhibit 30.  It's LP861 and 862, and it's

12  another e-mail trail.

13      A.   Yes.

14      Q.   Do you know whether you've ever seen this

15  before?

16      A.   I have not.

17      Q.   Take a moment to review it since you

18  haven't seen it before.

19      A.   Okay.

20      Q.   It starts with an e-mail from Robert Price

21  telling Mr. Medina that Mr. Simoni has called again

22  to talk to you and wants -- didn't want to leave a

23  message, just wanted to talk to Medina.  Is that

24  fair?

1      A.   When you say you, you're not referring to
2  me.
3      Q.   No, no.  This is -- I'm sorry.
4      A.   This -- you're reading the e-mail --
5      Q.   Yeah.
6      A.   -- and it's -- Mr. Simoni is wanting to
7  speak with Mr. Medina.  That's how I read it.
8      Q.   And Medina says he doesn't have time to
9  talk with him right now, see if I can call him later.
10  And Carol Moore responds that she'll handle it,
11  correct?
12      A.   Correct.
13      Q.   And at the top of the -- the last entry on
14  the e-mail says, I handled Joe Simoni; we can wait a
15  week or so to talk with him; he does want to read his
16  deposition; be sure and send it to him when it
17  arrives.  And then she includes his address.
18           Did you ever receive the impression that
19  Joe Simoni was a bit of a problem in terms of
20  frequent calls to the Levin Papantonio firm?
21              MR. WAKEFIELD:  Object to the form.
22      A.   I never knew that.  I mean, I don't know
23  anything about how many times Joe was calling there.
24  I know Steve Medina thought highly of Joe Simoni, at

1    least that's what he'd said to me.  I don't know

2    about this.  I've never seen this before.

3        Q.    And Carol Moore had never talked with you

4    about having to put Simoni off when he called?

5        A.    Not about calling.  I think Carol had

6    reservations, again, confidentiality, about what

7    might be discoverable.  I think Carol was concerned

8    that, you know, this was -- could be potentially

9    damaging to the case.

10            And again, it gets back to this business

11   of, you know, what is Joe; is he a witness; is he a -

12   - is he a consultant; is he a community activist.  I

13   mean, you know, just all these things, it's really

14   difficult and there's no clear-cut answer on these

15   things.

16       Q.    So you never got the impression that the

17   Levin Papantonio firm was providing tasks for

18   Professor Simoni to keep him occupied?

19            MR. MARINO:  Objection.

20       A.    To keep him occupied?

21            MR. MARINO:  Objection to the form of

22   the question.  You've misstated the testimony.  I

23   don't know why you're making those faces, but you

24   know, I --

1          THE WITNESS:  Oh, this one is for you.

2     A.   To keep him occupied?

3          MR. WAKEFIELD:  Do you have one for

4    us?

5          MS. MASON:  Oh, no.  Sorry.

6          MR. MARINO:  What are we doing?  What

7    number is that one, Gary?

8          MS. MASON:  It's No. 188, Rich188.

9          THE WITNESS:  Yeah.

10          MR. MARINO:  No.  What exhibit number?

11          THE WITNESS:  And this would be

12    Exhibit 31.

13          MR. WAKEFIELD:  That's not helpful.

14          MR. MARINO:  I can read the number on

15    here.

16          MR. WAKEFIELD:  I'll stand over --

17          MR. MARINO:  What exhibit number is

18    that?

19          THE WITNESS:  3-1, 31.

20          MS. MASON:  Exhibit 31.

21                    -----

22          (Exhibit No. 31 marked for purposes of

23    identification.)

24                    -----

1  BY MS. MASON:

2      Q.   And is this a note that you made?

3      A.   The top part of this would appear to be

4  Susan Fair's handwriting.

5      Q.   And then the bottom part of it is your

6  handwriting?

7      A.   Yes.

8      Q.   Okay.  And that's the part I wanted to ask

9  you about is, can you translate for it what you've

10  written here?

11      A.   Translate.  Simoni, cavalier, false.

12  Complaint from WVU, e-mail Farrest complaint, Steve's

13  visit.

14      Q.   What did that mean, Simoni, cavalier,

15  false?

16      A.   I think Medina is saying these things to me

17  because -- so I called him back -- I called Steve

18  back, and he's asking me, he's making these comments,

19  I guess, that Simoni is cavalier, but I don't think

20  that's a word that I use.  And he may be wanting the

21  complaint that was filed in the WVU case for some

22  reason.  And e-mail Farrest the complaint and about

23  his visit, you know, he's saying it to me.

24      Q.   Do you recall what he was saying Simoni was

1   cavalier about?

2       A.   I don't remember anyone using that word,

3   cavalier, but I've written it down there.  It's not a

4   word that I would use, but I do not remember Steve

5   using that word.

6       Q.   The date on that document, Exhibit 31, is

7   June 7th, 2004.  Now, that's about the time that you

8   all filed the complaint in the Spelter action; is

9   that right?

10      A.   I don't remember.

11      Q.   Okay.

12      A.   When you say you all, you're meaning me,

13  Farrest, and -- yeah, it is.  It was in -- it was

14  very hot, I remember, and just as though that was set

15  on heat earlier, I drove Steve and Farrest to the

16  courthouse and I had my vehicle's heat on.

17      Q.   Well, does that prompt any -- or refresh

18  any recollection about what -- since that -- what was

19  going on was you were filing the complaint around

20  that time, about what Simoni was being cavalier about

21  or that -- or that Medina was suggesting Simoni was

22  being cavalier about?

23              MR. MARINO:  Well, object to the form

24  of the question.

1       A.   Well --

2                    MR. MARINO:  You can answer if you

3   can.

4       A.   -- I'm not certain Medina is saying this.

5   Maybe he's saying someone else said this, but I do

6   think that he wanted the complaint that was filed and

7   -- because, probably, he and Farrest were working on

8   the complaint in the Spelter case, I suspect at that

9   point in time.  But I don't have any recollection of

10  anyone using the word cavalier.  I don't think it's a

11  word I would use, and I don't remember Steve Medina

12  using that word relative to Joe.

13                          -----

14                   (Exhibit No. 32 marked for purposes of

15  identification.)

16                          -----

17  BY MS. MASON:

18      Q.   All right.  And we've handed you what we've

19  marked as Exhibit 32, which is Rich544.

20                   MR. MARINO:  I'm sorry.  Do we have a

21  copy of it?

22                   MS. MASON:  I'm sorry.  I ran out of

23  ink last night.  I only have two copies.

24                   MR. MARINO:  Okay.  Well, let me just

1   see what it is.

2                 MR. WAKEFIELD: I've already marked

3   it.

4                 MR. MARINO: Oh, okay. Well, here.

5   BY MS. MASON:

6       Q.   Now, is this your handwriting, Mr. Rich?

7       A.   It is.

8       Q.   Could you read that for us, please?

9       A.   Monday, the 11th of December 2006, Steve

10  Medina. It's a phone call that I had with Steve from

11  7:04 p.m. to 7:48 p.m., and the first entry is hybrid

12  approach, unpaid consultant as of summer of 2003,

13  Masry unpaid consultant as of February 2002, so

14  that's what transpired in that call.

15        The second call was from -- that would be

16  9:12 to 9:18 p.m. on the same day, suggested that

17  Simoni was my unpaid consultant from the beginning,

18  told him if he had been my consultant he would've

19  been fired a long time ago, kooky client but not

20  consultant.

21       Q.   Now, that's what you told Medina?

22      A.   That's what I told Medina.

23      Q.   And were you being serious?

24      A.   Well, I'm -- as I said earlier, I had -- I

1  differed with Joe on a number of things and didn't
2  like always the way he conducted himself, but I was
3  being asked what is this guy's role, is he a
4  consultant?  And he was telling me, Medina was, that
5  he was Masry's consultant, although I think I can
6  remember saying something about him being an intern,
7  that Masry had suggested that he was their -- I don't
8  know -- 59-year-old intern, which I didn't think made
9  a lot of sense.
10      Q.   And you described him as kooky?
11      A.   That's right.
12      Q.   What do you mean by kooky?
13      A.   Well, I just think that some of the things
14  that he did was kooky.
15      Q.   Is that a good thing or a bad thing?
16      A.   I don't think it was malicious.  I just
17  think it was poor judgment.
18                      -----
19              (Exhibit No. 33 marked for purposes of
20  identification.)
21                      -----
22              MR. MARINO:  What's the number on
23  that, 33?
24              THE WITNESS:  Yes.

1    BY MS. MASON:

2        Q.    I've handed you what we've marked as

3    Exhibit 33, which is Rich501.  Do you recognize that?

4        A.    Well, I recognize that it's my handwriting

5    and it's a note that I've made concerning different

6    calls, it looks like.

7        Q.    And do you think it was January 19th, 2007?

8        A.    Yes.

9        Q.    And you've referenced Simoni about one -- a

10   third of the way down the page, right?

11       A.    Yes.

12       Q.    Read that for us, please.

13                MR. WAKEFIELD:  Excuse me.  For

14   purposes of the record, is this Rich501?

15                MS. MASON:  Rich000501.

16       A.    Simoni, unstable, incorrect testimony, what

17   might come up, Masry & Vititoe.  What is best for

18   case?  What is best for GWR?  How do we implement

19   similar?

20       Q.    Do you recall this -- having a conversation

21   where you called Simoni unstable?

22       A.    I don't know if I was calling him that or

23   if somebody else called him that.

24       Q.    Well, let's get a little bit of context.

1    It's a telephone call, right?

2         A.   It is.

3         Q.   And who's on it?

4         A.   Taylor, Marino, and me, so that's Farrest

5    Taylor and Dan Marino.

6         Q.   And you don't recall that specific call?

7         A.   I don't.

8         Q.   And you don't know who called Simoni

9    unstable?

10        A.   I don't.

11        Q.   Do you know if anybody called him unstable

12   during that phone call?

13        A.   I don't remember the call.

14        Q.   Would you have written unstable if no one

15   said that?

16        A.   No.

17        Q.   Was it your opinion that he was unstable?

18        A.   At this point?

19        Q.   Yes.

20        A.   Possibly.

21                        -----

22                   (Exhibit No. 34 marked for purposes of

23   identification.)

24                        -----

1    BY MS. MASON:

2         Q.    And I'm handing you Exhibit 34, which is

3    Rich000503.

4                    MS. MASON:  I have enough copies of

5    this one.

6                    MR. WAKEFIELD:  Can you give me a date

7    on that?

8                    MS. MASON:  A date?

9                    MR. WAKEFIELD:  Date.

10                   MS. MASON:  I think it is --

11                   THE WITNESS:  I can't read this.

12                   MS. MASON:  -- June or January.

13                   THE WITNESS:  I think it's January.

14                   MR. MARINO:  Let me see your copy,

15   Gary.

16             This exhibit is a little hard to read.

17                   THE WITNESS:  Yeah.  This one was --

18                   MR. MARINO:  The copies are better.

19                   THE WITNESS:  -- yellow.  It's -- I

20   don't think that's the one we should mark.

21                   MS. MASON:  They're all --

22                   THE WITNESS:  Well, Dan has one that

23   isn't --

24                   MR. MARINO:  The black and white

1  copies are better.

2                MS. MASON:  All right.

3                THE WITNESS:  Fair better.

4  BY MS. MASON:

5     Q.   This is another -- Exhibit 34 is another

6  memorialization by you of a telephone conversation

7  with Farrest Taylor, correct?

8     A.   Correct.

9     Q.   And we think it was January 17th, 2007?

10     A.   I think it's January, as opposed to June,

11  but I'm not certain.

12     Q.   Are there any references to Simoni on this

13  document?

14     A.   Strategy for Simoni depo, unpaid advocate,

15  incorrect testimony, mental problems.

16     Q.   Is there anything else on here related to

17  Simoni?

18     A.   Issues, prep Simoni.  I don't know.

19     Q.   And I'm sorry.  What did you say that was,

20  something advocate?

21     A.   Unpaid advocate is what, I think, probably,

22  Farrest is saying to me.

23     Q.   So you think Farrest was suggesting to you

24  that Simoni was an unpaid advocate?

1    A.   I think so.  I don't think I would be
2  saying advocate.
3    Q.   What about incorrect testimony, do you
4  think it would -- was that something you said or
5  Farrest said?
6    A.   Well --
7    Q.   If anybody.
8    A.   Well, someone said it, but would this be --
9  was this before his first deposition or after his
10  first deposition, I don't know.
11    Q.   I'll stipulate it was after his -- it was a
12  month after his first deposition.
13    A.   Okay.  Then I'm thinking Farrest said to me
14  that he -- there was incorrect testimony in his first
15  deposition.
16    Q.   Did you ever read that transcript?
17    A.   I don't believe so.
18    Q.   What about mental problems, was that
19  something you thought Simoni had?
20    A.   I don't think I would've said that in this
21  call.  I think he does things at times that are --
22  you know, I just don't understand his rationale.
23  Again, I don't know if someone is manipulating him,
24  but I'm not here to -- you know, I don't feel

1  competent in saying someone is mentally ill.  I don't
2  know.
3      Q.   Okay.
4              MS. MASON:  I think that's about it.
5  If we could just take a quick break, I'll stop.
6              MR. MARINO:  Chris, are you going to
7  have some?
8              MR. MCCARTHY:  Yeah.
9              MR. MARINO:  Okay.
10             MR. MCCARTHY:  It'll be short.
11             VIDEOGRAPHER:  We're going off the
12 record.  The time is 3:52 p.m.
13                     -----
14                  (Brief break)
15                     -----
16             VIDEOGRAPHER:  We're back on the
17 record.  The time is 3:56 p.m.
18 BY MS. MASON:
19     Q.   I have just a couple of more questions,
20 Mr. Rich.  I'll try to make it quick.
21         We've already talked about that you had
22 reviewed Professor Simoni's complaint against you.
23 In one of the paragraphs, he states that, Mr. Rich,
24 you, depended on Doctor Simoni to answer questions

1  because Mr. Rich, in most cases, had neither the

2  knowledge nor the understanding to do so.

3              MR. MARINO:  What paragraph are you

4  quoting from?

5              MS. MASON:  Paragraph 26.

6              MR. WAKEFIELD:  Object to the form to

7  the extent it's not the complete paragraph.

8      A.   I don't recall that --

9              MR. MARINO:  Wait a second, Gary.  She

10  hasn't asked a question yet now.

11  BY MS. MASON:

12      Q.   Do you agree with that?

13      A.   In what context?

14      Q.   Let me read you the whole paragraph.

15      A.   That would be better.

16      Q.   All right.  While actively soliciting the

17  involvement and the association of other law firms,

18  Doctor Simoni participated in numerous meetings, both

19  in person and via telephone.  Upon information and

20  belief, no such meeting took place without Doctor

21  Simoni's personal involvement.  Mr. Rich -- Mr. Rich

22  depended on Doctor Simoni to answer questions because

23  Mr. Rich, in most cases, had neither the knowledge

24  nor the understanding to do so.

1            And my question is, do you agree with that?

2       A.   I do not.

3       Q.   If -- pull Exhibit 22 for me.  That's the

4  big one.

5       A.   Oh, the timesheets?

6       Q.   Yes.

7            Turn to 1401.

8                 MR. MARINO:  Can you just tell us what

9  the date is that you're looking for?

10                MS. MASON:  Is it February 27th, 2003.

11                MR. WAKEFIELD:  What's the Bates

12  number again?

13                MS. MASON:  1401.

14      A.   Yes.  I see it.

15      Q.   At the top, it lists an activity of one

16  hour, meeting with Professor Joe Simoni, re: Preston

17  Gates.

18      A.   Yes.

19      Q.   Who is Preston Gates?

20      A.   Preston Gates is the firm that Dan Marino

21  was with.

22      Q.   And do you recall what you were meeting

23  with Professor Simoni about regarding Preston Gates?

24      A.   I don't.

1      Q.   If you look down under Susan Fair's time,

2   it says, activity, preparation and mailing of

3   information in binder to Attorney Daniel Marino.

4      A.   Okay.  That tells me what it was about.

5      Q.   What was it about?

6      A.   That was sending the binder that Joe had

7   collected the information from Hondo, and I sent it

8   to Preston Gates because I was in hopes that that law

9   firm might have an interest in the Spelter case.

10     Q.   And how -- and you sent it specifically to

11  Dan Marino, or did you send it to anybody else at

12  Preston Gates?

13     A.   I would've sent it to Dan Marino and Mike

14  Larson --

15     Q.   And --

16     A.   -- at Preston Gates.

17     Q.   -- did they ever follow-up on that?

18     A.   Yes.

19     Q.   Tell me what they did.

20     A.   They came and had a look at the site.  They

21  also, I think, met with some of the core group.

22     Q.   And was Joe Simoni at any of those

23  meetings?

24     A.   I don't think there were meetings.  There

1    was one.

2          Q.    The visit.

3          A.    Yes.  Yes.  I believe he was.

4          Q.    So if you'll turn to Rich1402 and that's

5    March 11th, 2003 --

6          A.    Yes.

7          Q.    -- it lists a site visit with Attorneys

8    Daniel Marino and Mike Garson of Preston Gates,

9    meeting with Professor Tom Cady re: WVU case law,

10   Attorney Garson drove.

11               That doesn't indicate to me that Professor

12   Simoni was there.  But you recollect that he was

13   there?

14         A.    I think he was there, or he, at least,

15   spoke to -- I can remember being on -- I think, on

16   High Street and Simoni talked to them.  Maybe he did

17   not go.  It's possible he did not attend this

18   meeting.  Maybe he was busy.  I don't know.  I think

19   on High Street, and I remember getting into Mike

20   Garson's car.

21         Q.    Turn to Rich1409, and that is May 2003

22   billing.

23         A.    Yes.

24         Q.    Under May 12th, 2003, it lists 11.5 hours,

1  meeting with Martinsburg, West Virginia with

2  Attorneys Marino and Mike Garson, John Hando of W --

3  WVDEP and Professor Joe Simoni.

4       A.   Yes.

5       Q.   So that's at least two meetings that you

6  had with Dan Marino and Mike Garson related to the

7  Spelter case, correct?

8       A.   Correct.

9       Q.   And you were trying to see if they would be

10 interested in taking on the case as the plaintiffs'

11 lawyers?

12      A.   Correct.

13      Q.   And you -- do you feel fairly certain that

14 Professor Joe Simoni was at this May 12th meeting?

15      A.   Well, he's listed, and I wouldn't have put

16 him down if he wasn't, so I suspect he did not attend

17 the first meeting and did attend this meeting.

18      Q.   And what was the purpose of this meeting?

19      A.   To inform Garson and Marino about the

20 situation in Spelter, and I think Mr. Hando was able

21 to give him a lot of information.

22      Q.   Did Simoni participate in any talking?

23      A.   I don't remember at this point.  That's ten

24 years ago.

1          Q.   You don't remember what his role was at the

2     meeting?

3          A.   I'm sure he's -- he had something to say,

4     but what he said, I have no recollection.

5          Q.   Do you recall whether he was answering all

6     the questions because you weren't qualified to do so?

7          A.   I don't recall that.

8          Q.   Okay.

9                    MS. MASON:  That's all I have.

10                        -----

11                    EXAMINATION

12    BY MR. MCCARTHY:

13         Q.   Hello, Mr. Rich.  My name is Chris

14    McCarthy, and I represent Baron & Budd.

15         A.   Good afternoon.

16         Q.   How are you?

17              You had mentioned earlier -- I believe,

18    actually, it was yesterday -- that Baron & Budd

19    became involved in the case later on in its

20    progression; is that correct?

21         A.   In the Fairmont litigation?

22         Q.   That's correct.

23         A.   That's correct.

24         Q.   I may have referenced the Westinghouse.  I

1   apologize. So --

2       A.   Well, I don't think you said anything. You

3   didn't reference anything.

4       Q.   The -- why was Baron & Budd getting

5   involved in a later date -- at such a late date after

6   the case started?

7       A.   Because Tom Girardi, who was involved -- I

8   remember Ed Masry saying that he wasn't doing

9   anything and that they needed help. This was -- this

10   case was overwhelming and that they needed to get

11   someone else involved, and they brought in Baron &

12   Budd.

13       Q.   Did you have any say in that decision?

14       A.   They told me that -- well, after the fact.

15   Because Scott Summy had been telephoning clients.

16   And I had calls coming in, who is this guy, Scott

17   Summy? The clients didn't know. And I called Nancy

18   Eichler and said, what's going on here; who is this

19   guy?

20            And Tom Cady and I had lunch one day. And

21   he says, some fellow by the name of Scott keeps

22   calling me and talking about Freddy. He says, who

23   are these people? And I said, well, I don't know

24   anything about it.

1           Eventually, Eichler -- Nancy Eichler said,

2    well, this is Baron & Budd; they're the largest

3    plaintiffs firm in America, and we're trying to get

4    them interested in this case to come in and help us.

5    So that's when I learned about it, and the next thing

6    I knew, I had pro hac vices sent to me for my

7    signature.

8           And I talked with Nancy and Melissa

9    Dutcher.  And I'd done some research on Baron & Budd,

10   and I saw they were a large firm.  And I thought,

11   well, this looks like a good thing.  And I talked to,

12   I think it was, Ed Masry.  And he said, yeah, this is

13   a good firm, and they'll be able to do what needs to

14   be done here; go ahead and -- this doesn't impact our

15   agreement; just go ahead and sign the pro hacs and

16   get these people moving on this.  And I said, fine.

17   And that's what I did.

18      Q.    When you say it didn't impact your

19   agreement, are you referring to the original MOU you

20   had with Masry?

21      A.    Correct.

22      Q.    And why did it have no impact on it in your

23   mind?  Did you --

24      A.    It wasn't in my mind.  It was in his mind.

1      Q.   Did you agree with his --

2      A.   Well, he said there would be no impact, so

3   I just assumed that he was splitting his fee with --

4   or giving them Girardi's fee.  I think the way the

5   MOU was written it was just X percent to Girardi and

6   Keese and Masry & Vititoe possibly.  I don't know.

7   But it did not impact my percentage or my duties.  I

8   would still be local counsel, and so I didn't think

9   anything about it.  I just filed the pro hac vices

10  and that was that.

11     Q.   When did that occur?  When did all this

12  occur when you first heard that some firm was

13  contacting your clients?

14     A.   I can't tell you now, but it was after the

15  case had been filed.  And my clients were suspicious.

16  They thought it was one of the defendants calling

17  them.

18     Q.   Are you -- are you saying that you thought

19  the Texas firm was calling your clients to -- for any

20  negative purpose, or was it just -- why would they be

21  contacting them?

22     A.   Well, I didn't know.

23     Q.   Why did you --

24     A.   I didn't know who they were.  Tom Cady said

1  to me, who are these people?  I said, I have no idea;
2  what are you talking about?
3      Q.  How did Tom Cady learn that they were
4  calling?
5      A.  Well, they were calling Tom Cady.
6      Q.  And what were they asking him?
7      A.  They were asking for his thoughts on, well,
8  I guess, West Virginia law.  I think he even sent
9  them his syllabus.  And how did they know about him?
10     Q.  That's --
11     A.  Because Nancy Eichler had told -- had told
12 them about him.
13     Q.  And this had occurred without you knowing
14 that there was any sort of contact between Eichler
15 and --
16     A.  Correct.
17     Q.  -- the Dallas firm?
18     A.  That's right.
19     Q.  Okay.  What was the condition of the case
20 when this occurred?
21     A.  Things weren't getting done, and clients
22 were getting upset.  And Masry & Vititoe recognized
23 this, and that's why they took action, to get Baron &
24 Budd involved.  And Baron & Budd immediately sent a

1    large number of people.  I mean, they dedicated

2    people.  They sent them to West Virginia, and they

3    got on with it.

4         Q.   I think the word -- that's the -- those are

5    the words you used yesterday.  Would you say that

6    Baron & Budd becoming involved in the case actually

7    benefited you?

8         A.   Benefited me?

9         Q.   And your clients.

10        A.   Well, I think ultimately it did.  Although,

11   initially, as I have testified earlier, it was a

12   rather stressful time, people coming in and telling

13   you that, you know, here's the deal, I'm taking your

14   clients from you, making all sorts of wild

15   statements.

16        Q.   And who said that they were taking your

17   clients from you?

18        A.   Well, okay.  That's not quite correct.

19   What they said to me was, what would happen,

20   Mr. Rich, if we decided we wanted to take your

21   clients?  I said, what do you mean?  Well, if we go

22   to them and say, hey, do you want to work with Gary

23   Rich, or do you want to work with us; what do you

24   think they would say?

1          And I said, well, I would think that they
2    would probably go with you since you have the
3    resources and the expertise to bring such a case;
4    yeah, I think they would go with you.  And this
5    happened quite a bit.  And I'd say, well, why don't
6    you just do that then if you think you can do that;
7    get on with it.
8          Q.    And who was telling you that?
9          A.    Scott Summy said that.  Ellen Presby said
10   that.
11         Q.    When was the first time you met Scott
12   Summy?
13         A.    I think it was at the meeting at the Hyatt
14   in Pittsburgh.
15         Q.    At that meeting, was there any discussion
16   regarding your role in the case?
17         A.    No.  They just said they were -- they were
18   pleased to be involved, they looked forward to
19   working with me, and at the end of the conversation,
20   they stood up and -- well, first of all, they
21   introduced themselves, they told me who -- you know,
22   each one said, I've done this, I've done that.  I
23   remember they kept making a big to-do about one flew
24   in from maybe Wyoming, another one came from

1    somewhere in the Caribbean, another one came from

2    Texas.  They're talking about all these things, how

3    they had all gathered and their private jet was

4    sitting outside on the runway.

5              And they asked about me.  And Nancy said,

6    oh, we don't have time for Gary to say anything, just

7    -- this is it.  And they said to me that they were

8    going to meet the next president.  And I said,

9    president of what?  And they said, of the United

10   States.  And I said, who's that?  And they said, John

11   Edwards.  And then they said, oh, by the way, Mr.

12   Rich, we're taking 75 percent of this case.

13        Q.   Did -- were you presented with a settlement

14   agreement or a new MOU or any change?

15        A.   At that point?

16        Q.   At that point.

17        A.   No.  Definitely not.

18        Q.   Were you ever?

19        A.   I think Ellen sent me an MOU.

20        Q.   And how did the terms change with regard to

21   the original MOU to the settlement agreement that

22   they provided to you at that point?

23        A.    It was rather convoluted, but if you read

24   it carefully, I ended up getting something like

1   one-tenth of a percent.  It just went on and on and
2   on.  Like Tom Girardi was paid $900,000 for his exit.
3   I don't know.  It was -- it was humorous the way it
4   was written.  And of course, I said, no.
5          Q.   Once Baron & Budd was involved in the case,
6   did Doctor Simoni have any direct contact with them?
7          A.   Oh, they talked to him initially.  And they
8   even had gone to him and said, listen, you know, this
9   guy, Gary Rich, has -- you know, we're not going to
10  be able to work with him, and we'd like you to work
11  with us.  That's what Joe told me.
12         Q.   And who told that -- who allegedly made
13  that comment to --
14         A.   I don't know if it was Scott Summy or Ellen
15  Presby or Steve Jensen.  Maybe all of them at one
16  point or another had -- they had telephoned him and
17  asked him, hey, we'd like you to be involved with us.
18         Q.   To your knowledge, did Doctor Simoni play
19  any part in any motions that was prepared -- that
20  were prepared by Baron & Budd?
21         A.   I don't believe he did anything like that
22  for Baron & Budd.
23         Q.   Didn't prepare any discovery or anything of
24  that nature?

1          A.    Not that I recall.

2          Q.    Did he participate at all in the trial

3    preparation?

4          A.    No.

5          Q.    Settlement talks, did he participate in

6    those?

7          A.    No.

8          Q.    Did you participate in any preparation of

9    any motions --

10         A.    Preparation --

11         Q.    -- in the Westinghouse case?  Did you help

12    prepare or did you prepare and then provide it to --

13         A.    No.

14         Q.    -- Baron & Budd?

15         A.    They were prepared and I reviewed and then

16    signed them.  I testified earlier I was unhappy

17    mainly from a, you know, standpoint of typos, clients

18    their names being listed incorrectly, clients

19    appearing -- or names appearing who were not involved

20    in the case who were not clients.  I mean, it was

21    just unbelievable.

22         Q.    Did you prepare -- or participate in any

23    trial preparation?

24         A.    Well, there was no trial, but yeah, I was

1   involved in --

2        Q.    What about settlement talks, did you

3   participate in that?

4        A.    No.  They -- that was all conduct by Baron

5   & Budd, solely by Baron & Budd, as I understand it.

6        Q.    Overall, were you happy with the result of

7   the case or --

8        A.    Well, I disagreed with Judge Stone's

9   ruling, but --

10       Q.    Maybe it'd be better to ask, were you happy

11  with the representation that Baron & Budd provided?

12       A.    I think Baron & Budd -- I think we were

13  fortunate to have gotten what we did given the

14  position we were in, and I -- I'm not a fan of Baron

15  & Budd, but I think that can be attributed them that

16  they were able to negotiate the deal they did given

17  the position we were in.

18       Q.    I'm going to hand you a document that we're

19  going to mark as Plaintiff's Exhibit 35.

20                       -----

21                 (Exhibit No. 35 marked for purposes of

22  identification.)

23                       -----

24       A.    Yes.

1      Q.   Do you recognize that document?

2      A.   I do.

3      Q.   And could you read it for us?

4      A.   The entire document?

5      Q.   The first two paragraphs would be fine,

6   actually.

7            MR. MARINO:  I'm sorry.  Do you want

8   him to read it into the record, or do you want him to

9   just look at it?

10           MR. MCCARTHY:  He can read it --

11  BY MR. MCCARTHY:

12     Q.   Actually, just read it and I'll ask you

13  questions.  You don't need to read it into the

14  record.

15       What's the date on that document, sir?

16     A.   6 December 2001.

17     Q.   Okay.  Does this appear to be your

18  handwriting?

19     A.   It is.

20     Q.   And could you tell me who it was -- what

21  this document represents?

22     A.   Well, at 10:03, I telephoned Barbara Core

23  and spoke with Rhonda and left a message.  At 12:20,

24  Barbara Core telephoned me back.

1     Q.   And what was the -- or the content of the
2  message that you took down?

3     A.   The content was that Barbara Core was
4  extremely upset with Joe Simoni and that he had
5  telephoned her, and I guess -- she thought, anyway,
6  that he was threatening her from a standpoint of
7  reelection, that there was a sizeable number of
8  people in Marion County involved in this case who
9  were plaintiffs who -- family and friends of
10  plaintiffs and that her ridiculous position on filing
11  fees would impact her reelection, something to that
12  effect.

13          And I told her that Joe did not work for me
14  and that I tried to be professional at all times and
15  that I am of the opinion that the attorneys at Masry
16  & Vititoe are of the same mind, is what I told her.
17  This is before Baron & Budd's involvement.

18     Q.   And could you read the first line of the
19  second paragraph?  Because I don't -- I think I'm
20  misreading it.

21     A.   The second line of the second paragraph?

22     Q.   I'm sorry.  The first line of the second
23  paragraph.

24     A.   Explained that Simoni does not work for me

1  and that emotions are running high.

2      Q.   So that last word is me and not us?

3      A.   Does not work for me.

4      Q.   Okay.

5      A.   Yes.

6      Q.   I read that as us.  I'm sorry.

7      A.   Well, that's -- it's not -- it's definitely

8  not us.  It's me.

9      Q.   Okay.  So did you contact Judge Fox also?

10     A.   I did not, definitely did not.

11     Q.   Did you talk to Joe regarding this

12  incident?

13     A.   Oh, yes.

14     Q.   And what'd you tell Mr. Simoni?

15     A.   Well, I told him it was unacceptable and

16  that this was something that just couldn't have this

17  happen, and I think Baron and -- not Baron & Budd but

18  I think Masry & Vititoe spoke more to him about this

19  than I did.

20     Q.   And do you know what the content of any of

21  those conversations were?

22     A.   No.

23     Q.   I hand you another document.

24              MR. TAYLOR:  36.

1                          -----

2                    (Exhibit No. 36 marked for purposes of

3    identification.)

4                          -----

5    BY MR. MCCARTHY:

6         Q.    Could you tell me what -- if you recognize

7    this document?

8         A.    That's my handwritten notes.

9         Q.    And what do they indicate?

10        A.    The entire document, you want me to sort of

11   summarize what it is and --

12        Q.    Just tell me the -- tell me the content of

13   the -- of the document.

14        A.    All right.  It's a call from Melissa

15   Dutcher to me.  And this gets back to what we were

16   talking about earlier today in that testing was

17   scheduled at the Holiday Inn in Fairmont, and this

18   was at the request of Baron & Budd.

19              I -- Baron & Budd was doing their due

20   diligence, so they had a Doctor Gant come from Dallas

21   to test certain clients.  And this call came in at

22   almost nine o'clock on Monday night telling me that

23   this had been scheduled.  And I said, well, I don't

24   know anything about this.  And they said, well, this

1  is taking place tomorrow, and it'll be taking place

2  over the next few days.  And I said, well, gee, you

3  know, I have my day planned tomorrow; I'm going to be

4  at L.K. Graphics in Belle Vernon, PA.

5          Which I typically went there on Tuesday,

6  not every Tuesday, but generally, I would go there on

7  Tuesdays.  And the next day, I went to L.K. Graphics.

8  And they said, well, not a problem, Joe will be

9  there.  Joe apparently went there the next day.

10     Q.   In one of the letters, it talked about Joe

11  --

12     A.   Well, it doesn't say that.  It just -- it -

13  I was just giving you some background there.

14          And I said -- well, okay.  That's what this

15  call was about.  Then, reading on, she's telling me

16  about Scott Summy, he's a great guy, he's very

17  interested, he's excited, however his partner is

18  older and wants to do some due diligence testing.

19  That's what this is about.  And then she's telling me

20  Baron & Budd has 500 staff members, including

21  attorneys and Doctor Gant would be coming.

22          And then talking about I.Q. of 158.  This

23  is something unrelated.  The Pirate game, this is

24  unrelated.

1      Q.   And with regard to Doctor -- to Scott

2  Summy, does this document indicate that Baron & Budd

3  is not actually in the case at this point?

4      A.   That's right.

5      Q.   Was this the first time you've ever heard

6  about -- of Mr. Summy?

7      A.   Of Scott Summy?

8      Q.   Yes.

9      A.   Well, Cady had said to me, who is this guy;

10  who's this?  Cady, I believe, was telling me this in

11  April or so, but Eichler had mentioned, I believe,

12  Baron & Budd was looking at the case, but I still

13  didn't tie this together until this time.  Yes.

14      Q.   On the second page, could you tell me --

15  actually, could you read that for me?  I can't read

16  the second part of it.

17      A.   Yes.

18      Q.   Okay.

19      A.   Discussed Simoni's status, not paid, no

20  promises, never discussed any sort of reward, is he

21  an agent?  She's saying -- I'm saying to her, how can

22  you have this guy there tomorrow; what's going on

23  here; is he working for you; what have you said to

24  Joe Simoni?

1          She's saying, we haven't said anything to

2     him; we're not promising him anything.  And then I

3     said, is he your agent; he must be something; what is

4     he?

5          Q.   So you were asking what his position was?

6     You were concerned about his position?

7          A.   Yeah.  Because I didn't know how this would

8     look.  What is he doing there?  You know, they're

9     directing him.  Who is Baron & Budd?  What's going

10    on?

11         And then I said, what about solicitation;

12    what -- you know, because I think there were other

13    people coming to this too.  And she said, well, he's

14    a full-time sociologist.

15         Q.   Had Doctor Simoni ever participated in any

16    other event during this -- during the Westinghouse

17    case?

18         A.   Well, he'd been at other meetings.  Yes.

19         Q.   Had you ever been concerned about his

20    participation at that -- any of those meetings?

21         A.   Yes.  But they were the one telling me that

22    it was a problem before, and then I'm surprised that

23    all of a sudden they're scheduling meetings and he's

24    scheduling -- I understand from looking at his

1   documents now that he was helping coordinate this.

2          I knew nothing about it.  I was taken

3   aback, you know, at -- to get this call that goes

4   almost to ten o'clock at night and I've got to be in

5   Pennsylvania the next morning to learn of us, I was

6   just astounded.

7          So she's saying, oh, he's our intern.  And

8   I said, really?  And she said, well, I'll ask Nancy

9   about it.  And she called back at a certain point --

10  or maybe I didn't -- maybe I called her back.  It was

11  going on -- you know, after 10:00 or so.  And Nancy

12  says there's no problem with Joe being there.  That's

13  what's about.

14     Q.   There's no indication in that document,

15  though, that you were concerned about him actually

16  being at the -- at the screening?

17              MR. MARINO:  I'm sorry.  I didn't -- I

18  didn't hear the question.

19  BY MR. MCCARTHY:

20     Q.   Were you concerned about Doctor Simoni's

21  presence, though?

22     A.   Yes, I was.  Because it was inconsistent

23  with the positions they were taking or with what they

24  were saying to me about him.

1      Q.   You had stated earlier in the deposition

2  that you kept two -- or two expense and two hour

3  logs, is that correct, or reports, billing reports?

4      A.   Relative to these two cases?

5      Q.   Relative to the Westinghouse case.  Is that

6  correct?

7      A.   Yeah.  There was one that had to do with

8  the case and one which had to do with my issue with

9  Baron & Budd, and I did not think it was fair to list

10  that time that I'm spending, you know, going back and

11  forth with people, you know, telling me they were

12  going to take my clients, they were going to do this

13  or going to do that.  I didn't see how that pertained

14  to my clients.

15      Q.   I'm going to hand you an exhibit.

16                MR. MCCARTHY:  37?

17                COURT REPORTER:  37.

18                THE WITNESS:  37.

19                MR. MCCARTHY:  I'd like to mark this

20  collectively.

21                     -----

22                (Exhibit No. 37 marked for purposes of

23  identification.)

24                     -----

1  BY MR. MCCARTHY:

2      Q.   Do you recognize that document -- those

3  documents?

4      A.   Looks like my timesheets in the

5  Westinghouse case, most of them.

6      Q.   And were those kept in the regular course

7  of business during the Westinghouse case?

8      A.   Yes.

9      Q.   And describe how you kept those records?

10     A.   I usually made notes on a calendar that I

11  had.  My staff kept notes.  We would go back at some

12  point and type those up just in a Word document.

13     Q.   Did those records typically identify

14  anybody appearing in a particular activity?  I think

15  it was --

16     A.   Well, I think so.  I mean, there was a

17  basis for whatever was done.  It was usually

18  handwritten notes for all telephone calls.

19     Q.   Would it identify any person on a telephone

20  call typically?

21     A.   Well, I would think so.  I mean, it may not

22  identify the person in my office who was -- do you --

23  do you mean here?

24     Q.   Within each activity, it lists --

1      A.   Yes.  Of course.

2      Q.   Your billing record has a section for

3  activity, and within that activity, it would

4  typically list all persons appearing on the call --

5  appearing on a call --

6      A.   Well --

7      Q.   -- or appearing at a meeting?

8      A.   -- maybe not on this summary, but certainly

9  in the backup to this.  I mean, these were just the

10  -- a summary of all the activities.  Now, there would

11  be back-up notes, right?  If Susan call -- Susan Fair

12  called Farrest Taylor, there would be a note

13  someplace listing what she and Farrest spoke about or

14  at least the time that she spoke to Farrest, but that

15  may not be depicted here.  I would --

16      Q.   Who would --

17      A.   -- think it would just say --

18      Q.   Who would be the party that would take the

19  written notes and put them into the, I assume,

20  computer notes or --

21      A.   Well, Susan Fair, usually or Bobbie would

22  consolidate these things, would go through and look

23  at them.

24      Q.   And --

1      A.   But as I said, there was handwritten notes

2   to substantiate anything that would appear here.

3      Q.   What was the distinction between the --

4   would you call these your standard billing records,

5   or how would you identify those?

6      A.   Standard --

7      Q.   I believe earlier in the deposition --

8   actually, yesterday, I think you identified those as

9   your standard billing record.

10     A.   I don't remember using the word standard,

11  but these were my records.

12     Q.   Okay.

13     A.   I don't know what to call them.

14     Q.   You also had -- you had also maintained

15  what you called records for this fee dispute with --

16     A.   Oh, yes, yes.

17     Q.   What would --

18     A.   That information shouldn't be in here.

19  Now, I can't conclusively tell you that that didn't

20  creep in here occasionally, but --

21     Q.   And what type of information would not

22  appear in your -- I'm calling it your standard

23  record.  If that's the wrong word --

24     A.   No.  That's a good word, I suppose.

1      Q.   What type of information would not appear
2   on that but would appear in your breach of contract
3   billing statements?
4      A.   That's what I called it, actually.
5      Q.   And what sort of -- what sorts of documents
6   would not appear on --
7      A.   Well --
8      Q.   -- standard but would appear on breach of
9   contract?
10     A.   What would appear in this breach of
11  contract would be things like Scott Summy saying,
12  we're taking your clients or me talking to Dan Marino
13  about this or that or me and Susan Fair sitting down
14  and drafting a letter to Scott Summy or Ellen Presby.
15  I wouldn't be billing my clients -- although, it
16  actually wouldn't have really mattered, but I kept
17  these two things distinct.
18     Q.   Did you think it would be unfair for your
19  clients to be billed --
20     A.   Well --
21     Q.   -- for those sorts of entries?
22     A.   -- of course.  Of course, I did.
23     Q.   On the timesheets that were provided to us
24  earlier -- I can't remember the exhibit number --

1  Joseph Simoni's time records --

2      A.   Yes.

3              MR. WAKEFIELD:  You mean the time

4  summary?

5              MR. MCCARTHY:  Yes.  I'm sorry.

6  BY MR. MCCARTHY:

7      Q.   I believe it's 27, but I'm not sure of

8  that.

9      A.   It is --

10             THE WITNESS:  It is 20.

11             COURT REPORTER:  21 is the --

12             MR. MARINO:  21 is the --

13             THE WITNESS:  Oh, 21 is the -- this.

14             MR. MARINO:  You mean the one that we

15  were working with that had Gary's notes?

16             THE WITNESS:  Yeah.  It's 21.

17             MR. MARINO:  21.

18  BY MR. MCCARTHY:

19     Q.   Go ahead and flip to page 9 of that

20  document.

21     A.   Yeah.  Page 9, yes.

22     Q.   In the entry for fall of 2002, can you tell

23  me what that is?

24     A.   Trip with Rich to his office -- to office

1    of his lawyer, Dan Marino, in Washington, D.C.

2         Q.   Do you recall that trip?

3         A.   I do.

4         Q.   Was that a trip for the benefit of the

5    Westinghouse class or --

6         A.   No.  I think that was a trip to talk to Dan

7    about my situation and -- with Baron & Budd, and I

8    think Joe was going along to just give his views on

9    his.  And also, I think he related to Dan how Baron &

10   Budd had been --

11        Q.   So he's -- he was actually a participant in

12   the meeting with Mr. Marino?

13        A.   Well, I think he probably -- he had some

14   input.  I think he related to Dan that this person

15   has called me wanting me to -- wanting me to work

16   with them because they want to oust Gary Rich.

17        Q.   And the next entry on the -- would be for

18   9/9/2002, says, reviewed with Rich BB -- B&B 9/6

19   proposed fee agreement and suggested response from

20   John Simoni, Jr.

21             Do you recognize that entry?

22        A.   Recognize it?  I'm reading it.  Yes.

23        Q.   Do you know what the purpose of -- or do

24   you know who John Simoni is?  It's John Simoni, Jr.

1    I'm sorry.

2         A.   I definitely know who he is.  He's Joe

3    Simoni's nephew, and he was my attorney initially in

4    this issue with Baron & Budd.

5         Q.   And would you agree that this entry would

6    not usually -- would not appear on your standard

7    billing records?

8         A.   Well, these aren't my billing records.

9         Q.   No.  I understand.  But --

10        A.   This is Joe's summary.

11        Q.   -- that would not appear on your standard

12   billing --

13        A.   It shouldn't be in mine.  I can't say that

14   it was not conclusively, but --

15        Q.   But there's clearly no benefit to Baron &

16   Budd for this activity; is that correct?

17        A.   There is no benefit --

18        Q.   Is there any reason that Baron & Budd would

19   be responsible for payment of any charge associated

20   with this particular activity?  Is that correct?

21   Maybe --

22        A.   Well, I wouldn't want my clients to be

23   paying for it, but yeah, I think Joe Simoni gave me

24   moral support at this time --

1      Q.   So it's for --

2      A.   -- when I --

3      Q.   It's for personal support versus anything

4 for the class itself?

5      A.   Well, I think one could argue that by

6 making me feel better that that might've been helping

7 the class, but it's something that should never have

8 happened.  It should not have happened, what I'm

9 saying is this fee problem.

10      Q.   I understand.

11                MR. MCCARTHY:  I have no further

12 questions.

13                MR. MARINO:  Okay.  That concludes the

14 deposition.

15                VIDEOGRAPHER:  This ends the

16 deposition of Gary Rich.  We are now going off the

17 record.  The time is 4:35 p.m.  This also ends Disc

18 No. 3.

19                COURT REPORTER:  Is he going to read

20 and sign?

21                MR. MARINO:  Yes.

22

23

24

1                          -----
2                (Signature was not waived.)
3        (The deposition was concluded at 4:35 p.m.)
4                          -----
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

```
THE STATE OF          :
WEST VIRGINIA         :
                      :    SS:    C E R T I F I C A T E
COUNTY OF HARRISON    :
```

I, AMY HARRIS, CCR, Certified Court Reporter and Notary Public within and for the State of West Virginia, duly commissioned and qualified, do hereby certify that the within-named witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth in the cause aforesaid; and then testimony then given by the witness was by me reduced to text and recorded by Stenomask; afterwards reduced to transcription under my direction and control; that the foregoing is a true and correct transcription of the testimony given by said witness.

I do further certify that this testimony was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal of office at Clarksburg, West Virginia, on the _____day of _____, 2013.

_____
AMY C. HARRIS,
Notary Public within and for the
State of West Virginia

My Commission expires July 9, 2017.

WV Depos
888-WV-DEPOS

ERRATA SHEET

I, the undersigned, GARY W. RICH, do hereby certify that I have read the foregoing continued deposition and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

PAGE/LINE        CORRECTION AND REASON FOR CORRECTION

_____
_____
_____
_____
_____
_____
_____
_____

See attached sheet(s) for additional information:
_____YES  _____ NO


_____
(Signature)

Subscribed and sworn to before me this _____ day of _____, 2013.

_____
Notary Public

My commission expires:

_____


WV Depos
888-WV-DEPOS

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

## $

**$100 (1)**
121:1
**$120,000 (1)**
445:21
**$150,000 (1)**
195:15
**$196,000,000 (2)**
498:19;499:3
**$3,000 (1)**
295:24
**$500 (1)**
454:1
**$75,000 (1)**
121:7
**$90,000 (2)**
296:14;301:16
**$900,000 (1)**
543:2

## A

**aback (1)**
553:3
**ability (4)**
214:18;512:15,17;
513:4
**able (24)**
25:10;33:16;90:3;
110:15,22;112:19;
115:11;131:10;
142:14;209:10;
215:18;220:2;460:11;
465:22;476:10;478:1;
483:16;496:4;510:20;
512:17;534:20;
537:13;543:10;
545:16
**abroad (1)**
26:23
**Absolutely (4)**
162:21;331:4;
421:7;433:23
**accepted (3)**
14:19;410:19;465:2
**access (7)**
145:7;225:18,21;
226:20;394:24;
399:21;436:2
**accompanied (4)**
240:22;241:17;
242:2,11
**accompany (2)**
226:5;424:21
**accompli (1)**
305:20
**accomplish (3)**
495:22;496:10;
500:19
**accomplished (1)**
502:1

**accordance (1)**
147:3
**according (2)**
328:24;399:15
**accordingly (1)**
220:3
**account (31)**
52:13,17,23,24;
53:3,4,7,15,16,17;
55:16,20,23;56:4,9,
12,14,17,20,23;57:20,
22;58:19,21;59:5;
73:9,11,13,14,16;
284:16
**accountant (4)**
24:17;31:20;32:2;
74:6
**accounting (3)**
24:18;176:6;366:18
**accounts (14)**
50:16;56:24;57:13,
14,15,20,22;58:2,5,
17,20,22;72:13;
283:12
**accredited (1)**
24:13
**accumulating (1)**
419:24
**accuracy (5)**
338:19,23;378:23;
380:20;388:17
**accurate (50)**
64:12;67:1;163:9;
164:16;170:15,19;
204:10;206:8,19;
213:19,22;217:9;
218:23;227:20;
248:15;320:13;328:6;
329:5,16;330:1,4;
331:11;339:1;345:5;
360:13;372:16;
381:20,24;386:7;
390:8;394:8;395:16,
19;397:3;399:6;
405:3,18;409:9,19,23;
410:3;411:16;412:5;
414:1,23;415:1;
422:15,19;459:10;
461:3
**accurately (1)**
450:1
**acknowledged (1)**
230:15
**acquired (4)**
51:2,11;73:15;
282:13
**acres (2)**
206:14;207:15
**across (2)**
260:23;483:15
**act (1)**
137:20
**acting (4)**

**108:15;184:24;**
**465:24;477:1**
**action (20)**
16:23;35:1;39:11;
43:12,15;53:13;
80:14;83:21;126:1;
209:11;210:17,22;
211:6;232:6;327:3;
441:7;488:7,8;520:8;
539:23
**actions (4)**
180:24;230:9,10;
487:23
**active (3)**
30:13;31:12;139:14
**actively (3)**
33:15;228:6;530:16
**activist (4)**
105:12;110:22;
465:11;517:12
**activities (20)**
18:13;85:19;
110:16;229:9,15,19,
23;230:15,18,21;
233:4;234:16;235:15;
239:7,8;297:11;
366:8;367:9;384:12;
556:10
**activity (13)**
229:1;420:3;434:2,
14;435:11;531:15;
532:2;555:14,24;
556:3,3;561:16,20
**acts (1)**
33:23
**actual (2)**
318:11;471:8
**actually (44)**
14:12,17,19;47:21;
96:12;119:23;122:10;
163:13;173:11;
176:15;179:17;196:7;
215:5,12;219:16;
253:3,16;271:3;
273:4;279:23;282:5;
310:12;314:16;
329:18;330:2;339:20;
365:2;374:13;390:15;
421:22;427:15;
472:11;501:13;
535:18;540:6;546:6,
12;551:3,15;553:15;
557:8;558:4,16;
560:11
**add (4)**
167:2;307:7,24;
354:8
**added (9)**
279:15;299:10;
303:13;305:14;306:4,
19;308:15,24;309:12
**adding (1)**
94:22

**addition (11)**
228:21;305:8;
307:16,23;308:8;
309:5;310:5,10;
311:1;342:12;399:10
**additional (10)**
95:5;172:23;
173:15;238:24;
283:16,21;284:1,4,7,
11
**address (4)**
50:12;56:16;
272:17;516:17
**addressed (4)**
271:5;272:2,16;
447:23
**addresses (3)**
50:14;51:16;55:14
**addressing (1)**
160:7
**adds (1)**
167:13
**Adelphia (4)**
51:2,11;52:8;73:15
**adjourned (1)**
292:20
**administrative (1)**
276:23
**admissible (1)**
463:24
**admissions (1)**
289:24
**admit (5)**
146:20,22;147:16,
24;157:7
**adopted (1)**
465:2
**adoption (1)**
331:2
**advantage (3)**
132:21;411:4,4
**advertise (1)**
93:13
**advertising (4)**
93:9,12;285:19;
507:19
**advice (3)**
111:4,17;366:1
**advise (5)**
184:16;187:11,21;
223:6,20
**advised (1)**
188:5
**advisor (1)**
110:14
**advocate (5)**
527:14,20,21,24;
528:2
**affect (1)**
465:21
**affected (2)**
459:4;465:21
**affirm (1)**

**10:2**
**afford (1)**
139:19
**afternoon (8)**
72:12;182:4,8;
184:9;292:20;381:2;
509:22;535:15
**again (111)**
68:9;78:5;88:4;
94:16;112:24;128:6,
9;134:22;136:2;
140:11;142:19;148:3;
154:6,23;156:18;
162:13;179:18;208:8;
213:20;216:15,20;
220:23;222:7;224:16;
227:18;231:16;233:7;
234:8;235:7;238:17;
243:5,8;249:13;
255:24;263:23;262:8,
20;272:24;276:19;
278:3;285:21;288:7;
310:11,15,19;323:11,
18;324:12;326:20;
329:19;332:20;
338:20;347:7;350:16;
351:13;358:14;360:2,
3,10,18;364:9;365:3,
15;369:16;370:1,6;
376:18;378:4;379:18;
380:16;381:12;382:3;
383:10,22;384:1,22;
386:13;387:3,5;
389:17;390:3;393:6;
394:3,7;399:13;
402:17;404:14;
405:16;411:9,13;
420:22;421:2;429:1;
430:23;431:7,22;
433:15,20;435:6,9;
447:16;452:21;455:9;
472:3;489:15;501:9;
515:21;517:6,10;
528:23;531:12
**against (18)**
34:12,14;35:10,16;
146:5;168:8;175:13;
176:19;177:17;
180:23;181:12;
213:17;214:3;327:3;
406:6;459:8;486:1;
529:22
**age (2)**
410:11;483:13
**agent (4)**
232:8;412:18;
551:21;552:3
**agitated (6)**
444:13;450:13;
454:13,18,20;455:15
**ago (29)**
13:23;38:20;59:12;
75:16;76:12,21;

89:20,21;126:5,6;
162:5;164:19;197:9;
221:12;259:11;263:7;
284:16;305:23;
312:12;318:9;321:11;
334:17;348:2;360:12;
370:18;375:8;512:9;
522:19;534:24

**agree (33)**
56:17;77:18,20;
110:3;174:24;182:10,
15;194:20;203:14;
204:10;205:6;232:1;
260:2;329:11;338:18,
22;341:24;370:8;
372:2;382:10;383:12;
410:22;423:19;
445:10;483:5,19,22;
499:16;503:20;
530:12;531:1;538:1;
561:5

**agreeable (3)**
130:12,15,22

**agreed (6)**
37:20;160:10;
306:16;368:15;
458:23;504:15

**agreement (84)**
96:13;97:15;98:10,
11,15;100:23;102:12;
104:11,12,19,21;
105:3,14;109:22;
125:7;131:5,8,14,14,
19,22;132:5,7,8;
133:2;160:8,9;166:5,
13,19;173:2,4,7,14;
175:22;177:4;212:3;
295:4,10;302:4;
303:6,24;311:5;
332:3,11,17;333:16;
349:18;350:2,5,11;
351:19;353:12;
358:15,21;359:2,11,
17;363:1,8;381:4,8;
389:23;395:1;396:14;
423:5;436:23;445:4,
12;446:17;458:23;
461:1;468:4;471:14;
491:7,11;493:3;
496:14;503:5;537:15,
19;542:14,21;560:19

**agreements (13)**
45:3;99:2;103:23;
104:1,2;125:20;
211:11,16;422:5,17,
22,24;472:22

**ahead (14)**
22:6;115:3;147:15,
23;174:12;210:1;
250:22;317:12;377:6;
408:11;503:2;537:14,
15;559:19

**air (1)**

512:3

**airport (10)**
210:5;351:16;
352:4,6,12;354:14;
357:14;358:3;389:19;
390:9

**al (1)**
389:18

**Alabama (1)**
118:18

**Aley (1)**
436:2

**Alicia (1)**
371:5

**al-Khobar (1)**
62:6

**allegedly (1)**
543:12

**alleges (1)**
148:18

**Allen (1)**
118:3

**alley (1)**
381:3

**Allison (1)**
261:9

**allocated (3)**
359:21;386:23;
496:12

**allocation (1)**
490:23

**almost (5)**
191:24;482:24;
483:2;549:22;553:4

**along (14)**
62:2;74:19;75:2;
157:21;310:19,23;
349:9;354:13;401:12;
404:24;412:7;439:20;
512:23;560:8

**alter (1)**
160:11

**although (14)**
28:7;48:5;62:4;
97:18;110:21;210:20;
391:3;406:1;440:12;
483:5;504:14;523:5;
540:10;558:15

**always (8)**
77:17;239:16;
408:23;422:4;483:5;
489:8;497:20;523:2

**ambiguity (1)**
260:1

**amenable (1)**
132:7

**amended (8)**
170:17,18;176:14;
486:1;494:21;495:8,
21;500:15

**amendment (2)**
434:8;500:19

**America (3)**

260:23;313:1;537:3

**American (2)**
13:24;313:20

**amongst (3)**
372:21;446:17;
496:13

**amount (23)**
121:1;167:12;
169:12;176:1;178:17;
195:22;293:9;294:2;
296:12,15,23;297:15,
19;311:13;316:17;
324:15;329:20;412:4;
441:3;454:5;481:9,
16,20

**amounted (1)**
488:12

**amounts (1)**
456:23

**amusing (1)**
254:18

**Amy (1)**
8:20

**analyzed (1)**
253:16

**Angela (7)**
9:7;71:3;72:22;
196:13;197:8;438:12;
503:4

**Angeles (4)**
16:12;357:9,19,21

**Angelos (1)**
216:1

**Angie (2)**
61:9;72:18

**Anita (1)**
216:23

**annual (7)**
74:6;295:22;
296:10,12,23;297:2,
14

**answered (1)**
446:1

**anticipation (3)**
108:3;110:19;228:9

**anti-gun (1)**
307:12

**anymore (2)**
58:20;505:2

**apart (1)**
167:7

**apologetic (1)**
312:3

**apologize (4)**
70:19;347:5;485:9;
536:1

**apparatus (1)**
23:23

**apparent (1)**
477:19

**apparently (13)**
237:3;238:16;
244:7;248:6;266:8;

273:1;277:8;290:15;
330:12;390:14;433:6;
469:2;550:9

**appeal (1)**
480:8

**appealed (1)**
480:5

**Appeals (1)**
434:8

**appear (20)**
152:23;173:1;
257:16;291:3;329:15;
346:23;440:6;449:24;
458:7;519:3;546:17;
557:2,22;558:1,2,6,8,
10;561:6,11

**appearances (1)**
9:2

**appeared (1)**
203:4

**appearing (6)**
544:19,19;555:14;
556:4,5,7

**appears (17)**
158:12;159:18;
160:6;238:19;244:1;
246:2;258:19;259:22;
261:3;271:20;290:17;
360:22;404:16;
429:22;493:5;507:5,
10

**appellate (3)**
278:13;309:14;
500:22

**applicable (1)**
253:5

**applied (1)**
13:23

**apply (2)**
22:8;413:12

**applying (1)**
115:15

**appointments (2)**
16:6;62:12

**apportion (2)**
176:18;178:7

**appreciate (1)**
46:13

**appreciated (1)**
409:11

**approach (1)**
522:12

**approached (2)**
149:17;303:19

**appropriate (1)**
497:24

**approval (5)**
171:20;172:15,23;
173:14;174:7

**approx (2)**
429:20;431:3

**approximate (1)**
429:19

**approximately (3)**
8:24;144:13;293:4

**April (48)**
8:15;15:10;16:21;
146:21;147:8;152:19;
153:6;159:8,9,10;
161:17;162:20;
163:13;217:4,6,21;
218:4,8;219:8;
291:20;321:15;322:2,
10;325:9,15;326:11,
21;344:4;345:11,12,
21;407:7;419:22;
420:14;426:10,12,13;
447:9,10,14;469:4,4,
5,7,8;491:9;492:15;
551:11

**April's (1)**
345:18

**Arabia (29)**
13:16,19;14:13;
19:10;27:6,11,19,24;
30:5,11;61:23;68:1,3,
7,11,16;69:7,17,19;
70:9,12;71:4;72:3,17;
95:17;143:14;278:15;
380:14,22

**Arabian (4)**
13:13,13,24;14:4

**Aramco (18)**
13:24;14:2,7,14,14;
20:18;21:6,19;52:13;
53:5,7,15,22;57:20;
58:6,21;59:2,3

**area (23)**
32:1;44:6;49:7;
96:22;104:23;204:6;
206:17,21;210:18;
211:6;213:16;214:1;
240:1;287:19;307:11;
353:10,14;355:19;
419:10,19;420:24;
426:16;506:14

**areas (5)**
77:16;207:20;
377:16;415:22;416:2

**argue (8)**
40:20;41:14;
120:14,17;178:2;
499:22;502:6;562:5

**arguing (3)**
159:4;178:4,5

**argument (6)**
177:21;178:14,16,
20;203:17;498:14

**argumentative (1)**
162:14

**arise (1)**
387:23

**arising (2)**
38:4;201:17

**Armstrong (1)**
401:1

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**army (1)**
349:3
**arose (1)**
356:15
**around (21)**
15:14;42:14;82:18;
110:9;124:9;206:1;
218:7,7;290:2;
348:10;351:21;
353:10,14,18;355:18,
21;380:10;415:4;
426:9;514:6;520:19
**arranged (7)**
48:16;327:2;336:1,
6,18;371:1;372:9
**arrangement (10)**
143:2;160:14,19;
167:11;175:7;299:8;
355:14;358:10;386:9;
467:23
**arrangements (2)**
336:23;433:6
**arrival (3)**
298:21;394:17;
398:19
**arrive (1)**
61:13
**arrived (5)**
15:9;61:12;434:19;
443:7,10
**arrives (1)**
516:17
**arriving (1)**
398:11
**arrow (5)**
249:8,21;258:22;
259:6,8
**arsenic (1)**
47:24
**artfully (1)**
277:16
**Arthurdale (5)**
44:4,8;382:16;
390:2;393:13
**asbestos (28)**
43:21;46:15;47:5,
11,22;49:2;77:24;
78:3,20,23;79:2,12;
80:8,10;83:19;
104:16;107:15;109:8;
133:10;206:3,6;
207:14;220:1;229:24;
267:10;281:19;
400:21;401:3
**ascertain (2)**
279:19;379:4
**aspects (2)**
328:5;432:11
**assemble (1)**
424:9
**assembled (1)**
215:15
**assembling (1)**

214:21
**assert (4)**
40:6,24;41:19;
181:12
**asserting (1)**
179:15
**assertion (2)**
40:5;265:20
**assets (1)**
32:22
**assigned (1)**
312:8
**assignment (2)**
23:6,7
**assignments (1)**
506:16
**assist (6)**
39:9;172:16;
225:17;302:10;
422:23;511:11
**assistance (5)**
139:18;225:20;
298:18;302:19;466:4
**assistant (5)**
250:2,6,9;394:23;
506:17
**assisted (3)**
336:1,7;436:2
**associate (3)**
172:16;173:20;
174:8
**associated (8)**
88:13;171:16;
305:5;349:2;471:17,
22;472:2;561:19
**association (11)**
27:15,18;307:10;
312:24;313:11,15,20,
21;314:23;410:22;
530:17
**associations (4)**
313:19;315:1,8,16
**assume (18)**
17:14;36:13;107:7;
215:8;217:9;258:10;
262:21;266:24;
319:14;320:10;331:9,
16;341:24;351:1;
377:3;421:5;435:17;
556:19
**assumed (3)**
99:24;436:3;538:3
**Assumes (1)**
180:17
**assuming (22)**
91:13;146:11;
155:3;164:16;227:12;
228:15;246:10;
248:12;249:12;259:7;
306:9;322:22;336:20,
21;342:13;364:8;
366:11;396:4;403:2;
417:11;427:1;480:15

**assumption (3)**
306:15,18;351:4
**asterisk (6)**
378:14;379:19;
381:13;390:3,24;
404:16
**astounded (1)**
553:6
**ate (1)**
443:12
**ATLA (1)**
313:1
**attached (1)**
500:15
**attempt (8)**
63:19;64:11;65:2;
372:22;373:22;
434:18,21;435:2
**attempted (7)**
63:14,17;64:8;65:1;
126:16;447:18,20
**attempting (4)**
63:24;64:7;391:20;
425:5
**attend (14)**
129:5;300:18;
301:1;302:23;336:20,
20;355:12;419:18;
423:4;427:12;510:20;
533:17;534:16,17
**attendance (4)**
246:19;247:8;
250:9;352:15
**attended (19)**
128:17,18;217:5,7;
218:5;221:5;246:15;
293:14;328:13;
344:16;345:13,13;
399:1;419:9;420:23;
421:9;422:2;426:15;
478:13
**attendees (1)**
507:18
**attention (17)**
77:8;171:12;
182:20;183:4;202:8;
203:12,15;209:13;
216:19;217:16;
219:15;222:20;
231:15;272:14;
389:15;400:19;
456:19
**attitude (1)**
401:22
**attorney (67)**
12:1;19:4;31:8;
36:5,11;42:11;45:9;
47:7;48:22;52:1;
60:11;74:20;88:13;
95:15;96:3,12;100:1,
3,8;101:4,18;102:7;
103:6;105:5;108:16;
111:14;119:8;126:24;

128:15;129:14,20;
130:8;133:22;134:12;
137:5;142:4;147:2;
168:10;172:8,9,10;
174:3,11,18;185:12;
188:20;190:5;191:17;
265:23;267:21;
274:16;360:19;362:8,
16;374:12;406:6;
428:6;430:4,14;
468:20;472:10;476:6;
493:1,3;532:3;
533:10;561:3
**attorney/client (3)**
128:16;247:2,9
**attorneys (47)**
30:9;54:22;59:17;
60:5;61:10;62:7;67:5;
71:12;73:23;81:14;
84:7;183:9,18;184:1,
3,10;187:20;192:5,9;
202:12;203:8;205:21;
206:3;211:10;215:10;
221:6;239:9;247:5,7;
256:21;268:5;280:12,
16;312:8;316:16;
349:11;357:2;360:20;
362:9,16;472:14;
496:13;498:24;533:7;
534:2;547:15;550:21
**attributed (1)**
545:15
**August (11)**
290:3,4,8;324:18;
325:4;326:12,21;
351:12;353:6,19;
356:7
**authenticate (1)**
290:1
**author (1)**
398:9
**authorities (1)**
117:22
**autographed (1)**
344:20
**available (17)**
15:16,20;131:12;
224:11;232:18;233:3;
234:14;235:13;
238:23;261:9;297:20;
314:6;326:13;394:23;
504:14,22;505:8
**average (2)**
260:19,22
**award (5)**
174:14,18;274:16;
277:12;498:17
**awarding (1)**
281:24
**awards (1)**
175:1
**aware (33)**
23:18;33:9;43:3,6;

57:18;58:16,21;99:8;
125:10;137:2;178:23;
184:10;205:2;237:12;
242:10;260:24;
298:12;300:16;316:2;
343:7;350:3;357:14;
388:5;402:7;433:2;
448:6,11;466:19;
481:21;482:7;495:4;
514:9,12
**awareness (1)**
465:12
**away (6)**
133:22;297:11;
401:6;405:17;408:9;
409:3

**B**

**B&B (17)**
351:18,19;358:15,
21;363:22;368:10,20;
369:19;371:6;372:21,
24;373:21;378:12;
385:5;399:19;414:14;
560:18
**B&O (5)**
31:2,2,4;32:1,6
**back (79)**
12:19;14:1,20;15:5,
18;16:2,3,5,5;17:15;
21:4;27:5,6;30:7;
42:1,18,22;66:20;
68:12,24;70:23,24;
76:16;95:4;110:24;
117:9,14;118:10;
159:19;180:7;216:19;
223:17;224:5;231:10;
234:10,23;240:5;
267:9;270:24;278:7;
304:10;312:11;
329:22;335:9;345:7;
346:13;365:16;
376:10;384:22;389:9,
20;405:14;415:6;
417:12;432:24;438:4;
439:6;448:8;451:17;
454:11;465:9;470:1;
472:20;475:23;479:8;
484:8;485:8;504:5,
15;517:10;519:17,18;
529:16;546:24;
549:15;553:9,10;
554:10;555:11
**background (6)**
19:7;20:16;24:21;
25:24;139:16;550:13
**Backing (1)**
191:7
**backup (1)**
556:9
**back-up (1)**
556:11

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

bad (3)
375:2;453:14;
523:15
badgering (3)
411:14;412:1;
460:22
Baltimore (1)
215:23
Balzer (1)
513:18
bar (33)
100:11;101:13,20;
102:5;110:12;113:14;
122:13;123:18,20,23;
124:4,10,11,14,21;
125:1,5,11,19,23;
126:3,13,16,18;
173:19;175:8;314:15,
19,23;315:1;392:6,9;
476:13
Barbara (6)
266:16;415:24;
436:5;546:22,24;
547:3
Baron (124)
8:6;9:11;129:3;
146:6;166:2,17,21;
168:9;175:15;184:14;
185:2,9,13,16;186:3,
12,15;189:4,10,12,17,
19;190:1;282:9;
295:14;296:16,24;
297:3;298:19,21;
299:1,4,14,15;300:20;
301:2,8,10,21;302:3;
313:18;315:6;334:4,
6,10;349:3;353:20;
354:13;355:8,13;
356:15;357:13;358:4;
359:2,17;366:18,23;
367:9,15;369:10,20;
370:2,16,19;373:9,11;
374:4,10;375:9,21;
376:5,20;377:11;
378:10,17;395:17,22;
401:7,9;405:9;406:1,
4;407:18,24;408:6,
17;409:4;415:7,10;
416:10;417:9;535:14,
18;536:4,11;537:2,9;
539:23,24;540:6;
543:5,20,22;544:14;
545:4,5,11,12,14;
547:17;548:17,17;
549:18,19;550:20;
551:2,12;552:9;
554:9;560:7,9;561:4,
15,18
Barron's (1)
399:18
baseball (1)
85:23
based (18)

12:1;118:24;119:4;
175:21;176:23,24;
198:5;262:20;277:12,
14;280:24;284:19;
311:12;322:7;331:18;
345:9;442:2;500:5
bash (1)
399:19
basically (4)
19:14;30:1;148:4;
416:14
basis (27)
12:3;35:14;39:2;
40:4,19;41:5,17;
111:2;175:17;176:22;
180:22;186:9;195:3,
4;274:18;280:17;
281:11,14;285:3,3;
296:10;305:1,7;
479:12;503:6,10;
555:17
basketball (2)
85:24;401:5
Bates (19)
236:19;238:13;
243:17;245:20;248:2;
251:23;256:3;257:18;
262:11;265:3;271:9;
290:10,12;441:11,15,
21;448:17;457:8;
531:11
battery (1)
408:23
BB (1)
560:18
bear (2)
232:2;492:2
Bearing (8)
245:20;257:18;
262:11;265:3;271:7;
364:16;389:16;
434:17
bears (2)
201:9;236:23
became (33)
51:3;91:3;94:19;
96:2,2,3;97:5;101:9;
110:15;115:9;138:8;
141:14;147:1;160:23;
174:10;204:5;208:4;
265:20;267:22;
295:22;299:4;300:5;
305:19;313:12;
314:17;322:17;
356:15;405:16;
409:24;411:21;417:2;
477:19;535:19
become (11)
88:13;125:10;
141:14;308:4;312:22;
315:7,15;316:10;
410:20;476:8,9
becomes (3)

154:11;464:8;514:8
becoming (4)
95:15;110:20;
305:16;540:6
Bedell (4)
464:23,24;465:7,11
Bee (1)
308:21
beeline (1)
123:15
began (6)
165:19;220:3;
221:16;222:23;228:8,
11
beginning (8)
42:14,18;98:6;
203:16;262:22;
274:17;469:4;522:17
begins (6)
117:11;222:21;
228:3;231:12;389:11;
484:10
behalf (22)
9:16,18;37:13;
175:4;182:22;184:24;
185:1;186:15;191:1;
192:21;203:7;228:8,
11,18;229:7;230:6,7,
9,10;315:13;318:3;
343:14
behind (4)
307:3;342:18;
347:17;400:15
belabor (1)
37:8
belief (11)
61:15;106:22;
142:9;143:5,9;
187:12;192:22;
244:18;275:1;306:2;
530:20
bell (1)
513:19
Belle (8)
361:5,8;364:10;
431:8,23;434:14;
435:10;550:4
below (2)
330:11;492:2
Ben (2)
204:23;436:4
beneficial (1)
205:8
benefit (4)
237:14;560:4;
561:15,17
benefited (7)
230:12,16,19,22;
502:23;540:7,8
Benny (1)
204:22
Best (9)
8:13;67:2,6;87:16;

219:1;380:7;456:22;
524:17,18
bestow (1)
46:5
Beth (2)
423:12;426:24
better (13)
269:10;300:17;
341:4,5;401:12;
424:21;499:1;526:18;
527:1,3;530:15;
545:10;562:6
Beverly (2)
382:15;383:18
beyond (2)
85:9;503:2
Bickley (1)
472:13
big (8)
280:22;415:23;
468:16;476:9;488:5,
13;531:4;541:23
bigger (1)
497:3
Bill (14)
9:5;10:14;169:8;
180:15;181:8;317:4;
416:6,7,9,10;417:1,
15;440:18;490:9
billboard (1)
93:10
billed (1)
558:19
billing (11)
367:1;533:22;
554:3;556:2;557:4,9;
558:3,15;561:7,8,12
bills (3)
37:15;276:16;
297:12
binder (5)
212:22;424:9,24;
532:3,6
binders (6)
213:1,6;214:21;
215:14;216:6,12
birthday (4)
52:22;218:7;
345:18;426:10
bit (18)
27:1;80:4;188:11;
196:7;228:19;250:18;
322:22;355:24;
359:21;444:9;450:11;
451:17;471:6;475:23;
478:22;516:19;
524:24;541:5
black (1)
526:24
blank (1)
320:7
blender (1)
340:23

blue (1)
125:9
boat (1)
250:14
Bob (19)
43:21;45:4;47:16;
80:6;81:24;83:21,24;
108:1;128:21;267:22;
268:24;379:14,22;
402:10,19;403:5;
473:9,20;476:24
Bobbie (19)
243:16;275:11,16,
19;276:11,22,24;
278:16;280:7;282:20;
283:9;284:1,4;285:2;
442:7;449:7,9;
454:24;556:21
Bobbie's (1)
452:19
Bobby (6)
307:19;496:22;
498:10,21;502:16,23
Bob's (1)
268:9
body (2)
220:18;224:16
bombardment (1)
21:23
Bonasso (2)
9:16,18
Bonn (2)
28:6,12
Bonnie (6)
339:12;340:8;
341:9,10;394:19;
399:3
bonus (6)
283:3,6,9;294:11,
14,21
book (1)
344:20
born (1)
13:4
both (30)
34:21;36:2,10;
42:13;62:8;84:4,15;
95:21;113:11;138:2;
152:6;153:15;163:20;
164:20;184:1;192:9;
225:17;271:24;272:2,
3,5;323:3,11;397:15;
403:12;405:20;
444:22;445:23;
450:11;530:18
bothered (2)
315:24;405:14
bothering (2)
416:17,18
bottom (12)
152:9;153:20;
158:21,22;219:16;
220:11,13;224:15;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

245:2;511:10;513:17;
519:5
**bought (3)**
75:11;88:8;213:6
**Bower (6)**
330:7,9,19,22;
331:1;378:8
**Bower's (1)**
330:18
**Box (3)**
8:22;153:21;366:22
**boxes (4)**
42:12;43:6;67:16;
330:8
**boxload (1)**
69:8
**breach (5)**
247:4,8;558:2,8,10
**break (28)**
19:23;66:8,18;
116:24;117:7;128:16;
179:24;180:5;231:2,
8;234:21;270:14,19;
291:17;335:7;363:16;
388:22;389:2,7;
438:2;450:23;452:24;
453:1;483:23;484:6,
13;529:5,14
**Bridge (1)**
44:10
**Bridgeport (1)**
8:14
**Brief (15)**
66:18;129:11;
180:5;201:16;231:8;
234:21;270:19;
291:17;335:7;389:2,
7,19;461:24;484:6;
529:14
**bring (25)**
12:22;13:1;34:13;
78:10;79:9;123:8;
129:2;169:15;173:15;
209:10;306:16;307:4,
14;308:1;377:4;
384:12;416:24;
458:24;468:23,24;
477:3;495:24;497:15;
504:6;541:3
**bringing (9)**
34:20;48:2;83:21;
217:14;303:10;
310:16;455:19;
457:15;503:21
**broached (2)**
48:4;443:17
**Brockovich (4)**
344:6,17,22,24
**broke (1)**
335:12
**broken (4)**
64:9,10;65:3,13
**broker (2)**

286:17;287:5
**brother (2)**
263:14,18
**brought (22)**
129:4;166:14,21;
172:22;209:12;303:9,
16;304:8,23;306:24;
307:1;325:23;400:18,
19;456:18;469:1;
500:20;501:5,5;
507:24;509:17;
536:11
**Brown (7)**
217:3;224:21;
225:7,8,14,17;226:5
**bubble (1)**
61:10
**Buchanan (2)**
198:16,24
**Bud (1)**
436:5
**Budd (122)**
8:7;9:12;129:3;
146:6;166:2,17,21;
168:10;175:15;
184:14;185:2,9,13,16;
186:3,12,15;189:4,10,
12,17,19;190:1;
282:9;295:14;296:16,
24;297:3;298:19,21;
299:1,4,14,15;300:20;
301:2,8,10,21;302:3;
313:18;315:6;334:4,
6,10;349:3;353:21;
354:13;355:8,13;
356:15;357:13;358:4;
359:2,17;366:19,23;
367:9,15;369:10,20;
370:3,16,19;373:10,
11;374:4,10;375:9,
22;376:5,20;377:11;
378:10,18;395:17,22;
401:8,9;405:9;406:1,
4;407:19;408:1,6,17;
409:4;415:7,10;
416:10;417:9;535:14,
18;536:4,12;537:2,9;
539:24,24;540:6;
543:5,20,22;544:14;
545:5,5,11,12,15;
548:17;549:18,19;
550:20;551:2,12;
552:9;554:9;560:7,
10;561:4,16,18
**Budd's (1)**
547:17
**budget (2)**
22:21,21
**building (5)**
18:1,1;33:3;285:24;
401:1
**buildings (2)**
18:24;80:12

**built (1)**
29:21
**bulk (3)**
45:5;72:17,19
**buoyant (1)**
450:15
**Burn (1)**
416:15
**business (31)**
31:1,6,9;51:22;
52:15;53:7;75:22;
86:24;88:3,4,8,9,11,
12,14,16,21;93:14,15,
22;94:11,12;155:20,
21;285:19;333:18,19;
433:17;442:13;
517:10;555:7
**business-related (1)**
18:13
**busted (1)**
65:10
**busy (2)**
86:2;533:18
**Butler (1)**
371:5
**buy (11)**
76:5,22;90:5,7,19;
91:16,19;92:16;
287:18;410:4,7
**buying (11)**
76:1,8;89:2;90:1,
11,14,21;91:8,9;
92:12;287:18
**Byrne (8)**
416:6,8,9,10;417:1,
14,15,17

---

# C

**cable (3)**
64:10;65:3,13
**Cady (16)**
252:3,12,20;
387:13,19,22;388:6,9,
12;533:9;536:20;
538:24;539:3,5;
551:9,10
**Cady's (2)**
252:11;254:15
**calculated (4)**
372:22;373:21;
374:10,23
**Caleb (1)**
9:15
**calendar (1)**
555:10
**calendars (2)**
412:13;413:7
**California (4)**
16:12;166:15;
476:20;488:6
**call (93)**
15:17;81:19,20;

82:7,16,18;102:17;
127:4;155:21;164:7;
236:15;238:17;239:2;
252:3;256:7,10,15;
258:3;259:10;265:8,
10,11;266:3;276:9;
373:20;376:20;
402:19,20;403:5,8;
431:2;435:14;448:8,
15;449:8,11,12,14;
450:4,6,12;452:16;
453:8;454:4;455:23;
456:13;458:8,9,20;
459:7;460:12,14,15;
461:4,10;466:24;
467:4;473:6,7,10,12,
14;474:21;479:6;
506:13;509:9,17,19,
21;510:19,21;511:6;
513:23;514:4;516:9;
522:10,14,15;525:1,6,
12,13;528:21;549:14,
21;550:15;553:3;
555:20;556:4,5,11;
557:4,13
**called (34)**
33:20;44:3;73:5;
81:24;82:8;89:22;
118:3;216:8,9;237:6;
238:20;252:9;353:11;
372:20;378:5;420:17;
455:15;469:2;487:9;
515:21;517:4;519:17,
17;524:21,23;525:8,
11;536:17;553:9,10;
556:12;557:15;558:4;
560:15
**calling (22)**
44:7;81:13;82:5;
244:18;337:2;345:24;
388:16;421:21;448:7;
474:4;488:7,15,16;
516:23;517:5;524:22;
536:22;538:16,19;
539:4,5;557:22
**calls (20)**
68:18;70:9;81:13,
15,18;82:6;216:16;
256:19,22;257:2;
357:17;378:22;430:9;
507:5,7;512:4;
516:20;524:6;536:16;
555:18
**came (53)**
17:9;27:5;42:22;
47:4,8;76:19;77:6,7;
78:3,4;81:11;105:1;
110:24;143:20;144:6,
12;147:7;149:21;
160:23;161:2;167:16;
173:22;206:21;
209:18,20;210:3;
211:7,12;212:5;

215:10;265:17;
267:24;268:5,8,12,21;
280:19;322:20,20;
366:20;400:24;
438:24;447:15;
469:16;470:14;
478:15;483:15;
499:20;503:11;
532:20;541:24;542:1;
549:21
**can (219)**
9:3,23;13:9;14:10;
16:8,10,15,17;18:9;
19:23;21:17;24:20,
22;25:13;36:14;
38:13,16;39:6,12,17;
40:4;43:12;50:15;
51:17;53:4,10,10,21;
56:21;59:10;64:19;
65:10;66:7;67:6,9;
73:14;74:16;82:14;
83:6;85:22;87:4;
88:21;91:22;97:20;
102:17;107:21;
111:22,22;117:17;
118:9;121:24;122:15;
126:17,19;127:18,21,
23;132:12;134:24;
135:15,17;138:6,7;
139:9;140:23;141:21,
22;142:20,21;144:10;
145:6,10,15;151:23;
152:21;153:15,24;
157:7;158:1;159:19;
161:13,21;163:11;
165:19;168:13,15;
169:2,3;171:13,19,19;
176:9,13;180:19;
181:16;187:20;
194:15;196:9;197:5;
202:2;204:18;208:8,
17;209:21;210:4,8;
222:7,15;223:16;
224:1;226:11;227:4;
229:17,21;232:21;
233:19,21;234:8;
235:5;238:8;241:9;
247:20;250:1,2,17;
254:17;259:12,22;
263:12;265:12,12;
268:18;287:10;
288:20;289:13,21;
291:11;293:4,4,8;
294:1;302:18;304:10,
13;307:9,14,18;
309:3;310:21;315:20;
316:13;317:10;324:4;
328:21;333:16;
336:11;343:17,23;
359:3;366:20;373:4;
376:17;377:18;
385:23;390:4,6;
397:17;401:21,24;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

404:13;406:2;411:3;
420:12;421:12;
432:24;439:15;440:2;
442:24;444:23;
448:21;451:18;
452:19;455:11;456:5,
5;458:16;461:17,18;
467:7,7;477:14,15;
497:8,20;498:21,23;
502:13;505:11,13,16;
508:10,16,19;510:3;
516:9,14;518:14;
519:9;521:2,3;523:5;
526:6;531:8;533:15;
541:6;545:15;546:10;
551:21;559:22
**Canada (3)**
93:16,17,18
**cancelled (1)**
211:22
**cancer (1)**
260:17
**Canonsburg (1)**
389:19
**capability (1)**
209:4
**capable (2)**
106:10;131:13
**capacity (6)**
35:11;36:1;122:16,
16;174:3;287:4
**Capital (2)**
18:18,20
**car (1)**
533:20
**care (4)**
427:20,23;428:2,10
**cared (3)**
343:1,14,20
**career (1)**
139:13
**careful (1)**
366:15
**carefully (1)**
542:24
**Caribbean (1)**
542:1
**caring (2)**
482:5;483:15
**Carol (26)**
197:20;198:2;
227:4;228:20;258:16,
17;263:14,20,24;
264:1,1,4,4,7,13,13;
278:7;279:2,15,24;
280:10;514:1;516:10;
517:3,5,7
**Carolina (1)**
273:5
**Carper (1)**
308:20
**carrier (1)**
33:17

**carries (2)**
220:14,20
**carry (2)**
224:19;314:11
**carrying (4)**
219:17;372:23;
373:22;374:11
**Cary (2)**
184:14;186:7
**Case (317)**
8:11;10:23;29:10;
34:3;36:20;42:10,14;
43:16,21,23,24;44:3,
5,16;45:4,6;46:7,15,
16;47:5,10,11,13,14;
49:4,14,14;52:3,10,
18,20;53:11,18,23;
57:16,24;71:10;78:7,
10;79:13,17,18,20;
80:3,4,9;81:4,10;
83:17;84:7,16;85:6;
88:15,22;96:11,15,18;
102:18;104:15,16,20;
105:2;106:2,3,13,16,
20;107:8,15,23;
108:4;114:1,17;
115:15;116:3,10,14;
117:23;118:1,2,3,6;
121:10;122:2,10;
126:7;133:24;138:7;
143:14,21;146:2,18;
147:1,2;149:18;
152:7;154:19;160:24;
161:2;166:10,16;
167:8,22,23;169:13,
15;171:4;173:21;
174:17,19;175:12,18;
178:24;180:24;
181:13;183:22;185:3,
15;190:4,8,13;193:19,
22;194:1,2,19,22;
199:9;201:10,13;
206:11,24;207:14;
208:5,13;213:11;
214:22;225:3;230:15;
241:22;244:16;
246:13;252:24;253:4,
5,19;254:2;261:2;
266:1,19;267:19;
269:16;280:9;281:23;
282:24;283:7,15,23;
284:5,9;289:6,7,7;
291:3;292:9,23;
293:13,15;298:1;
307:14;316:12;318:4;
322:14;330:9,19;
331:1,2,4;337:17;
341:16;348:22;
365:15;367:11;369:6;
374:16;375:5;377:4;
391:12;392:20,24;
393:5,18;394:5,16,19,
21;398:15,24;399:4,

12;400:15,21;402:22,
23;403:10;404:11;
409:12,13,17;411:14,
19;412:15;414:9,10;
415:15;419:2;420:2;
422:23;423:13;
425:12;429:16;434:9;
436:23;437:10;440:8;
442:5,16;444:14,21;
445:2,8;446:13;
447:23;451:15;
453:17,19,19;455:18,
23;458:24;460:11;
462:3;463:23;466:23;
467:5;468:21,23,24;
469:1,3,9;471:7,7,20;
472:8,10,14,19;473:7,
16,17;474:1;475:12,
15;476:2,17,19;
480:4;482:8;485:15;
486:24;488:5,7;
489:21;491:13,20;
493:7;494:23;495:6,
24;496:13;497:1;
498:17;500:21;
502:18,23;504:11;
517:9;519:21;521:8;
524:18;532:9;533:9;
534:7,10;535:19;
536:6,10;537:4;
538:15;539:19;540:6;
541:3,16;542:12;
543:5;544:11,20;
545:7;547:8;551:3,
12;552:17;554:5,8;
555:5,7
**cases (104)**
30:9;33:19;42:13;
43:7,8,8,15;45:12,12;
46:14;48:2;49:4,11,
15,17,18,21;53:20;
62:21;79:9,11;84:14,
23;91:3,8;95:4,6,10,
10,12,16,23;96:5,23;
98:14;102:20,24;
103:24;109:10;
113:13,17,18,19,22,
22;114:6,15,24;
115:1;118:18,18,18;
119:1;122:11;125:12;
135:3,19;139:12;
183:12;184:1;277:2;
281:13;283:17;
285:10;307:20;
311:21;326:6;377:13;
382:5;383:24;384:8,
13,24;386:15;387:4,
14,24;388:13;389:24;
398:2,6;399:16;
409:14;412:13;
416:21,24;450:19;
453:21;459:2;470:16;
475:20;476:11;477:2,

20;478:20,22;479:16,
22,23;489:3;499:2;
530:1,23;554:4
**casework (1)**
432:11
**Cash (121)**
9:5,5;10:13,15;
11:5;12:3,8,12,18,21;
39:3;40:4,8,11,15,19,
23;41:3,16,23;42:3,5;
63:12;66:10,13,22;
69:3;92:8;102:3,19,
22;104:9;105:17;
107:17;112:12;
116:24;117:13,19;
118:20,23;119:2,5,8,
11,13,16,19,24;120:7,
12,14,18;127:13,17,
21;128:3,7,8;134:19;
135:23;136:3;137:13;
142:2;144:5;145:4,8,
12,17,20,23;146:1;
147:19,21,22;149:4,5;
150:9,21,22;151:1,6,
9,12,16;155:5;156:6,
14,21;157:1,3;
162:15;164:1;165:14,
16;169:19,23;170:5;
179:23;180:9;181:19;
207:5;218:16;223:9,
11,14;229:4;239:14;
261:19;270:1;274:4;
289:13,17,21;290:12;
317:7,17;361:7,10;
440:19,22;490:13
**Cash's (1)**
288:21
**category (1)**
320:8
**cause (1)**
210:17
**caused (1)**
401:4
**causes (1)**
139:17
**causing (2)**
263:15,16
**cavalier (8)**
519:11,14,19;
520:1,3,20,22;521:10
**CD (2)**
249:20;483:24
**CDC (1)**
260:21
**CD-ROM (1)**
59:19
**CD-ROMs (2)**
59:16;67:17
**CDs (4)**
59:21,22,23;60:9
**cease (1)**
181:11
**ceased (4)**

20:2;33:17;296:8,9
**cell (2)**
408:22;513:24
**cert (1)**
265:15
**certain (56)**
34:13;37:14;76:19;
84:2;111:9;144:18;
152:23;153:5;171:11;
176:7;185:1;194:18;
202:2;206:22;209:15;
214:20,23;227:16;
229:15,19,23;264:3;
268:8;279:12;282:11;
296:5;297:6;300:24;
301:15;303:22;304:4;
312:9;318:18,22;
321:22;333:16,24;
334:3,4;347:19,21;
355:4;383:10;418:16;
430:23;440:14;
445:21;453:22;454:2;
465:23;475:19;521:4;
527:11;534:13;
549:21;553:9
**certainly (23)**
59:11,13;137:1;
159:2;188:5;205:4;
209:6;211:19;239:15;
270:4;319:6;340:11;
357:1;407:1;418:8;
447:6;466:16;471:5;
481:13;489:21;492:5;
505:8;556:8
**certainty (9)**
241:23;253:22;
312:13;367:10;368:6;
369:7;461:8;467:5;
480:16
**cetera (1)**
433:19
**challenge (3)**
319:16,19,23
**challenging (2)**
323:5;324:1
**champion (2)**
75:4,7
**chance (4)**
10:22;66:24;
157:10;170:9
**change (11)**
160:9;163:1;231:2;
381:5;392:17;477:16;
478:17;483:24;501:4;
542:14,20
**changed (1)**
77:13
**changes (1)**
55:4
**changing (2)**
161:17;381:4
**characterization (2)**
204:11;271:15

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**characterize (3)**
105:9;245:5;454:17
**characterized (1)**
110:1
**charge (2)**
59:18;561:19
**Charleston (11)**
45:9;86:20;193:13;
273:5;344:5;345:7;
438:20;443:1,5,7;
472:12
**Charlton (1)**
353:7
**chart (2)**
279:24;280:4
**chat (2)**
252:6;454:21
**check (5)**
360:11;383:11;
430:24;489:22;490:4
**checked (3)**
350:19;383:8;490:6
**checking (2)**
478:18,19
**checkmark (20)**
368:13,14;382:7;
385:12,15;386:17,24;
387:5;390:4,6;
393:20;394:7;402:13;
413:17;414:21;427:1;
428:16,23;429:7;
435:17
**checks (3)**
20:16;169:9,11
**Chemical (1)**
433:18
**chemicals (1)**
227:17
**Cherry (1)**
8:7
**chief (1)**
197:21
**children (3)**
16:7,8;164:7
**chilly (1)**
226:12;241:9
**chit-chatted (1)**
447:16
**choice (3)**
150:7,8;168:5
**chord (1)**
206:16
**chose (3)**
132:8;280:10;341:5
**Chris (3)**
9:11;529:6;535:13
**Christmas (5)**
87:7,9,11,13;
399:18
**chronology (3)**
27:17;268:14;451:8
**Chung (1)**
55:24

**circle (6)**
321:8;323:2;336:8;
351:21;352:1;436:10
**circled (12)**
321:5,16;322:5;
323:12;324:20;
328:17;332:4;333:3;
336:6,22;339:22;
436:7
**circles (1)**
318:11
**circling (4)**
323:4;324:13;
332:5,9
**Circuit (11)**
118:1,2;201:10,21;
266:17;274:15;
415:24;486:24;487:9;
488:10,16
**circumstance (1)**
336:23
**circumstances (2)**
74:16;100:7
**citation (1)**
224:6
**citations (1)**
118:16
**cite (1)**
393:1
**cited (2)**
254:16;389:24
**cites (1)**
224:8
**cities (1)**
15:20
**citizen (1)**
13:20
**City (10)**
30:24;31:3,8,10,15,
22;75:18;89:19;
148:19;404:24
**civil (2)**
18:23;327:3
**claim (1)**
465:16
**claims (7)**
34:13,20;35:10,15,
15;37:4;38:4
**clarify (3)**
290:7;291:11;
438:16
**Clarksburg (7)**
8:22;202:15;255:7;
303:15;304:12;
417:24;429:4
**class (8)**
80:14;130:6;
252:11;265:15;488:8;
560:5;562:4,7
**classes (1)**
113:5
**classify (2)**
493:12,15

**clause (2)**
179:12,15
**cleaner (2)**
263:15,16
**cleaners (1)**
263:21
**cleaning (1)**
263:16
**clear (16)**
82:15;84:20;108:9;
110:8;132:14;133:20;
137:8;138:10;139:20,
22;141:1;142:6;
200:2;290:4;347:8;
469:17
**clearance (3)**
25:1,3,7
**clear-cut (1)**
517:14
**clearer (1)**
31:17
**clearly (2)**
42:13;561:15
**clerk (6)**
266:17;415:24;
434:1;487:10;488:10,
17
**Cleveland (5)**
43:22;80:7;268:11,
17;471:19
**client (18)**
34:12;47:14;55:15,
22;56:1,4;81:20;
88:20,21;115:9;
127:5;165:3;177:17;
290:1;411:19,21;
476:21;522:19
**clients (66)**
37:14,14;46:23;
62:23;80:13,17,19,21,
23;81:7,9,19;82:9,16,
19;87:21;106:18;
108:13;109:5,8;
128:11;210:7,9;
211:21;213:15,24;
230:12;253:8;301:5,
6;310:20;348:24;
367:4;377:1,6;380:4;
408:8;422:5;453:22;
457:1;475:22;483:17,
18,20;505:9;507:18;
536:15,17;538:13,15,
19;539:21;540:9,14,
17,21;544:17,18,20;
549:21;554:12,14;
558:12,15,19;561:22
**Clifton (1)**
263:18
**close (7)**
29:21,23;55:13;
72:11;204:6;307:19;
512:2
**closed (1)**

29:24
**closely (1)**
337:18
**closing (3)**
498:13;499:1,1
**Cochran (62)**
8:7;9:8,10;35:6;
58:9;143:8,17;146:6;
147:13;148:15;
149:14;156:7;165:6,
12;168:9;171:9;
172:10;175:14;
180:24;181:7;192:4,
5,21;196:1,5,21;
197:11;202:20;208:5,
11,16;209:21;211:22;
218:20;222:16,17;
229:8,11;230:22,23;
246:10,12;257:3;
267:7;281:7;302:24;
303:5;306:9,16;
309:3,9;310:3;
315:14;396:22;
467:13;490:7,24;
491:3,18;496:15;
499:8;500:2
**cocktail (3)**
122:6,19,20
**co-counsel (11)**
102:17,23;214:21;
455:18;468:9;475:11;
484:24;485:15;
491:14;501:5;505:9
**co-counsel's (1)**
252:10
**code (1)**
258:5
**coffee (3)**
389:21;390:10;
391:6
**Cohen (1)**
215:22
**cold (3)**
241:9;261:16;
511:21
**Coliseum (3)**
400:22,23;401:4
**collect (1)**
512:24
**collected (3)**
42:23;425:1;532:7
**collecting (1)**
240:2
**collection (1)**
441:11
**collectively (1)**
554:20
**Colleen (1)**
513:18
**college (2)**
26:4;483:21
**colleges (1)**
447:17

**Colonial (1)**
8:21
**Columbia (2)**
482:24;483:3
**column (1)**
321:2
**com (1)**
51:4
**Comcast (8)**
51:3;52:8;53:3,4;
58:19,23;73:13,15
**comcastcom (1)**
51:4
**comfort (1)**
342:23
**comfortable (5)**
233:15;278:17;
279:5;489:11,17
**coming (16)**
22:2;129:6,7;240:5;
241:13;259:23;305:4;
306:14;307:21;
432:24;451:11;
503:12;536:16;
540:12;550:21;
552:13
**commence (2)**
250:21;251:6
**comment (10)**
122:17;319:12;
330:12;371:22;
379:17;380:19;
411:12;415:17;
496:21;543:13
**comments (6)**
195:10;302:16;
308:3;331:5;334:20;
519:18
**commercial (1)**
18:1
**Commissioner (6)**
463:13,19;465:4,5,
6,10
**committee (8)**
171:4,22,24;
172:13,24;174:8;
175:9;306:7
**common (9)**
239:6;244:5;
254:11;491:21;492:1,
3,4,14;493:8
**communicate (16)**
52:18;80:17;81:6;
111:5;128:10;185:13;
188:22;189:11;
190:15;191:23;
192:12,22;205:16,20;
207:18;483:14
**communicated (6)**
80:19;188:12,14;
208:3,10;228:19
**communicating (1)**
228:21

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**communication (1)**
127:4;159:3,6
**communications (6)**
46:4;190:20;
198:10,19;273:21;
424:1
**communities (2)**
139:14,15
**community (13)**
139:14;205:8,13,
16,21;207:17;211:5;
216:24;219:23;
315:19;465:12;
507:17;517:12
**companies (2)**
14:11;93:12
**company (19)**
13:11,12,14,15,24;
14:2,4,8,17;18:9;
19:17;21:3,7,10,24;
93:10,17;361:5;
433:18
**compared (1)**
197:11
**comparing (1)**
260:21
**compassionate (1)**
81:1
**compel (6)**
41:11,24;201:17;
462:2,14;464:2
**compensable (1)**
493:4
**compensate (5)**
194:21;195:4;
476:1,5,16
**compensated (32)**
91:4,13,14;111:18;
183:12,21;184:12,18;
185:14;186:8,16;
187:3,8,13,23;190:16;
191:5,9,12;192:13,23;
194:8;196:3,17;
282:3;385:22;411:20;
446:4;467:14,16;
476:8;477:7
**compensating (8)**
186:5,9;190:7;
287:3;312:18;438:22;
444:20;473:4
**compensation (17)**
109:20;144:16;
146:24;148:2,5;
149:8;182:11,16;
185:19;186:21;
280:23;297:24;
446:12;470:19;473:1;
485:16;510:9
**Competency (1)**
482:2
**competent (1)**
529:1
**compiled (1)**

213:2
**complain (4)**
180:14;181:6;
316:5;402:3
**complaint (34)**
34:12,16;35:12;
146:5;168:8;175:13;
180:23;182:21;183:5;
200:3,10,13;254:1,3,
5,7,21;255:6,10;
316:21;392:19,22;
393:4,7;434:8;
519:12,12,21,22;
520:8,19;521:6,8;
529:22
**complaints (5)**
254:1,21;315:24;
316:15;402:5
**complete (6)**
163:11;440:7,10,
11,12;530:7
**completed (1)**
136:20
**completely (1)**
127:3
**complex (1)**
489:20
**complies (1)**
170:8
**complimentary (1)**
313:5
**comprised (1)**
172:1
**compute (1)**
175:20
**computed (3)**
168:13;176:8,11
**computer (1)**
556:20
**concern (14)**
30:17,19;83:4;
126:22;128:17;247:3;
341:21;405:22;
407:24;408:13,20;
456:18;510:5;514:19
**concerned (20)**
49:1;81:24;82:3;
128:15;186:10;349:1;
405:20,24;406:3;
411:13;456:13,24;
473:15;513:3;514:23;
517:7;552:6,19;
553:15,20
**concerning (24)**
22:2;135:2;184:2;
190:10,23;252:4,8;
253:13;271:18;
273:11;301:10;309:4;
322:4;349:18;350:2,
7;355:13;366:13;
368:1;376:10;426:19;
428:2;437:10;524:5
**concerns (2)**

207:19;512:15
**conclude (1)**
509:6
**Concluded (2)**
291:23;563:3
**concludes (1)**
562:13
**conclusion (3)**
281:22;282:24;
470:2
**conclusions (3)**
462:21;465:3;
489:12
**conclusively (7)**
46:10;59:11;
185:19;199:15;
325:21;557:19;
561:14
**condition (2)**
405:12;539:19
**conditions (1)**
314:3
**Conduct (3)**
147:4;401:18;545:4
**conducted (9)**
147:3;217:7;229:1;
239:8;416:20;420:4;
442:4;495:17;523:2
**conference (19)**
256:7,10,15,19;
257:2;258:7;351:14;
368:9,21;397:14;
427:19;428:18,21;
435:14;510:19,21;
511:1,6;512:4
**confidence (2)**
137:3,6
**confidential (2)**
126:23;259:1
**confidentiality (6)**
265:21;508:3,15;
512:18,20;517:6
**confirm (1)**
448:17
**confirmed (6)**
272:24;381:11;
387:8;393:21;394:8;
413:18
**confirming (6)**
271:16;402:14;
427:2;428:17;429:8;
435:18
**conflicts (2)**
19:21;20:16
**confronted (1)**
415:24
**confused (5)**
49:24;70:1;284:15;
426:8;438:17
**confusion (3)**
24:3;28:1;498:2
**connect (2)**
65:3;343:3

**connection (58)**
45:11,18;57:16;
81:4;165:22;192:10;
196:22;206:10,24;
212:13;226:20;
227:11;229:9,15,19,
23;232:24;234:11;
235:10;244:16;
249:17;252:24;
253:19;256:19;260:3;
261:1;266:18;276:1;
277:9;278:3,24;
282:15;286:22;
292:22;293:5,19;
294:24;295:7;297:3;
298:4;300:19;301:2;
314:1;316:7;322:16;
330:19,23;341:19;
345:1;351:13;356:14;
395:4;397:15;399:3;
418:15,24;429:15;
430:17
**consent (10)**
303:10;306:3;
307:4;486:7;487:11,
13,16,17,22;489:6
**conservative (1)**
32:2
**consider (14)**
24:23;30:16,18;
53:15;88:10;119:6;
164:21;213:17;214:2;
285:5;378:9;411:8;
492:4;493:6
**consideration (7)**
186:19;283:18,21;
284:1,4,7,11
**considered (4)**
31:23;94:17;
210:13;285:7
**consist (1)**
232:2
**consisted (1)**
275:10
**consistent (2)**
251:7;370:17
**consists (1)**
275:4
**consolidate (2)**
488:22;556:22
**consolidated (1)**
275:2
**constitute (1)**
484:14
**constitutes (2)**
253:2,9
**constraints (1)**
137:2
**construction (1)**
18:24
**consulate (1)**
22:1
**consult (9)**

11:17;114:6,7,9,
14;474:22;476:15;
478:4;504:14
**consultant (22)**
89:10;250:24;
251:2;286:12,18,19;
287:4;460:7;465:16,
17,24;510:5,6;515:1;
517:12;522:12,13,17,
18,20;523:4,5
**consultant's (1)**
259:1
**consulted (4)**
387:23;424:13;
475:24;477:6
**consulting (7)**
221:16,22;222:2,
10,17;232:8;474:20
**consuming (1)**
181:2
**contact (28)**
80:2;208:20;
212:13;216:6,11,14;
244:24;272:11;
355:10;356:21;
434:18,22;435:3;
447:7,18,20;448:4,4,
13;459:19;460:18;
474:12;513:21;
514:11,16;539:14;
543:6;548:9
**contacted (2)**
216:22;220:7
**contacting (4)**
244:14,17;538:13,
21
**contacts (1)**
62:24
**contain (1)**
62:16
**contained (5)**
62:11,20;232:19;
366:22;375:20
**contains (1)**
318:8
**contamination (15)**
46:18;206:14;
207:16,20,23;208:6,
12;210:18;211:6;
217:1,16;228:7;
418:19;430:16;
465:13
**contemplate (3)**
94:18;96:20;179:8
**contemplated (10)**
94:13;95:5,14,19;
96:15;97:2;101:6,14;
174:17;467:23
**contemplating (2)**
93:21;468:10
**contemporaneous (2)**
72:10;301:17
**content (5)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

424:13;547:1,3;
548:20;549:12
**contention (3)**
175:12,15;181:3
**context (10)**
122:2,10;145:15;
264:5;286:14;353:3;
439:4;444:9;524:24;
530:13
**contingency (3)**
385:8;386:6,11
**contingent (1)**
283:14
**continue (4)**
22:14;107:8,14;
492:22
**continued (11)**
29:1;106:15;
113:13;133:9;262:23,
24;278:12;292:8;
389:5,11;484:10
**continuing (4)**
135:5;144:15,16;
395:20
**continuously (1)**
14:8
**contours (2)**
97:3;137:4
**contract (13)**
19:20;35:5;168:15;
171:6,8,12;172:20;
174:4;280:12,17;
558:2,9,11
**contracting (1)**
21:6
**contractor (2)**
23:13,20
**contractors (2)**
20:14,14
**contracts (9)**
18:11,12;19:12,13,
13;20:4,12,19;21:5
**contractual (2)**
34:24;36:8
**contribute (3)**
254:14;312:7;492:1
**contributed (1)**
188:7
**contribution (3)**
182:14;266:2;497:3
**contributions (28)**
182:11,17;183:12,
21;185:15;186:16;
187:3,8,13,23;188:23;
190:8,16;191:10;
192:1,14,18,24;194:9,
12;195:12;196:3,18;
197:23;198:12,20;
199:3;312:18
**contributor (5)**
188:10,13;189:6,
13,20
**control (2)**

**conversation (52)**
116:1,17;124:22;
134:1,4;147:11;
148:10;149:6;155:6;
208:17;259:4;273:1;
350:15;351:2,6,9;
406:9;415:3;416:7;
438:24;439:1;444:11,
13;446:23;447:19;
448:9;449:16;450:1;
451:3;452:3;454:17,
21;458:19;459:11,13,
18;466:20;467:12,20;
480:11;506:1,2,4,9;
508:6;509:7,7,8;
514:22;524:20;527:6;
541:19
**conversations (28)**
61:8;71:2;72:18;
91:24;92:3;96:4;
97:19;127:9;149:20;
184:4,6;187:7;
190:11;191:3;310:13;
312:10;349:17;350:4,
8,21;359:10;377:8,
10;459:21;470:24;
473:3;514:14;548:21
**convey (3)**
112:18;446:23;
479:10
**conveyed (1)**
111:10
**convoluted (1)**
542:23
**coordinate (1)**
553:1
**coordinated (4)**
336:1,6;371:2;
372:9
**copied (2)**
59:16;260:7
**copies (10)**
150:21;227:10;
344:20;461:17;
490:17;494:4;521:23;
526:4,18;527:1
**copy (23)**
63:14,24;73:4;
150:20;151:15;
156:23;170:15,18,19;
236:8;252:12;276:18;
317:1,7,14;318:6,7;
319:8;390:12;440:17;
457:16;521:21;
526:14
**core (21)**
210:6,6,7,9,13;
211:15,17;212:8;
266:16;382:14;383:4,
5;415:24;429:5;
431:21;432:6;436:3;
532:21;546:22,24;

**corner (2)**
201:6;397:19
**corporate (3)**
19:16;53:6;434:1
**corporation (14)**
8:7;30:12,14;32:9,
12,15,22;34:8,19;
36:12,19;37:3;
433:17,19
**corporations (1)**
433:17
**Corps (1)**
219:24
**correcting (1)**
377:21
**correctly (3)**
445:24;470:5;
482:23
**corrects (1)**
422:12
**costs (14)**
174:18;491:12,16,
19,20,21;492:1,13,14,
16,18,24;493:1;
503:21
**Counsel (33)**
9:2,12,14;11:17;
13:1;41:14;128:19;
171:16;172:16;
173:20;174:9;201:12;
232:14;306:20;
307:16;308:4,16;
310:6;311:1;312:6;
319:18;356:18;
366:13;367:19;375:5;
376:22;377:13;
410:23;456:21;
466:21;494:23;512:7;
538:8
**count (2)**
292:24;329:21
**counter (3)**
385:9;386:6;486:18
**counterclaim (1)**
486:1
**counties (1)**
260:23
**countries (1)**
22:23
**country (7)**
68:21;69:1,5;86:18;
468:10;470:8;505:7
**County (18)**
17:24;43:24;
201:10,21;260:12,15;
261:4;266:17;274:15;
314:22;315:1;416:1;
425:24;431:13;434:1;
487:10;488:17;547:8
**couple (9)**
43:10;50:14;59:6;
190:12;253:15;

**547:3**
**course (47)**
37:7;52:12;65:8;
80:7,14;98:3;111:20;
114:8;116:8;124:12;
131:23;136:21,24;
137:18;162:23;163:7;
167:13;169:6,14,16;
172:8;174:10;176:5;
179:1;210:10;211:18;
277:11;280:8;320:17;
342:19;366:5;375:13;
380:5,13;432:8;
442:13;478:20;
480:14;486:4;498:12;
511:3,7;543:4;555:6;
556:1;558:22,22
**Court (53)**
8:10,20;9:3,22;
10:1,6;169:21;
174:18;175:1;182:23;
194:1;201:10,21;
223:19;234:11;235:8,
10,23;238:6;242:17;
247:13,19;255:15;
257:7;264:16;265:16,
16;274:15;282:4;
288:10;292:11,13;
317:22;346:6,17;
417:24;434:8;463:8,
9;464:7;480:6;486:9,
24;487:5,6,12;488:2;
490:18;494:8,12;
554:17;559:11;
562:19
**courtesy (1)**
151:15
**courthouse (2)**
227:5;520:16
**cover (4)**
34:2;99:3;424:20;
436:24
**covered (2)**
219:3;335:12
**covering (1)**
248:11
**covers (2)**
33:22;440:13
**co-workers (1)**
47:17
**created (1)**
274:20
**credit (1)**
498:22
**creep (1)**
557:20
**critical (1)**
379:14
**cropping (1)**
78:1
**cross (1)**
38:13

**crossed (1)**
331:13
**crystal (1)**
141:1
**cullet (1)**
330:10
**cultural (2)**
204:1,3
**cumulative (1)**
483:12
**curious (5)**
44:22;53:13;91:21;
122:5;150:9
**current (1)**
514:5
**Currently (5)**
13:7;17:5;33:10;
58:22;167:21
**cut (6)**
108:9;163:13;
165:10;373:17;
463:21;504:5
**cutting (3)**
154:5,8;163:5

## D

**Dallas (2)**
539:17;549:20
**damage (2)**
388:13;498:16
**damages (5)**
179:9,11;387:14;
498:7;499:3
**damaging (1)**
517:9
**Dame (1)**
406:12;483:1
**Dan (35)**
9:20;42:22;67:11,
13;72:24;74:5;89:15,
18;90:20;145:13;
366:2,20;385:18;
394:20;395:7,10,21;
410:8;412:16;447:1;
474:4;490:8;499:24;
503:16;525:5;526:22;
531:20;532:11,13;
534:6;558:12;560:1,
6,9,14
**danger (2)**
23:5;326:6
**Daniel (2)**
532:3;533:8
**Danny (3)**
263:14,19,20
**Danny's (1)**
263:21
**Dan's (1)**
412:18
**Darnell (3)**
258:12,13;435:15
**dash (1)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

371:10
**data (3)**
63:15,19;65:10
**date (66)**
15:17;100:6;113:6,
8;148:23;159:5,7,8;
168:24;236:23;
245:23;252:2;256:6;
257:21;262:15;265:6;
271:7;318:22;320:22;
329:13;335:22,23;
338:17,21;345:1,2;
351:6;358:21;359:18;
362:17,18;364:16,21;
369:5;370:13;371:23;
384:19;387:3,9;
389:16;397:21;404:5;
405:2;417:7;425:21;
428:18;432:18,21;
433:21;434:17;
437:13;442:19,19;
448:18;495:11,14;
505:21;507:17;520:6;
526:6,8,9;531:9;
536:5,5;546:15
**dated (2)**
243:23;372:19
**dates (14)**
96:8;162:1;261:10;
329:12;365:2,12;
412:13;413:7;422:11,
12,17;433:21;452:5;
479:20
**daughter (16)**
16:11,12,14,18,19,
21;55:20;56:8,22;
57:3;130:5;345:18;
406:6,10,21;409:2
**daughters (1)**
15:2
**David (3)**
263:13,13;264:8
**Day (58)**
87:11,12,12;98:1;
124:19;133:12;
226:10;241:5,18;
250:22;251:7;255:6;
291:23;333:17;340:9;
341:6,12;344:22;
345:11,18;346:13;
361:21,22;362:3,19;
363:12;370:10,21;
371:13,21;372:14;
381:23;383:2,10;
385:16;393:22;
397:20;400:2;407:9;
412:23;414:24;
426:12;429:2,9,11;
436:15;437:9;439:7,
9;443:7;447:4;497:5;
506:1;522:16;536:20;
550:3,7,9
**days (8)**

13:18;16:2;240:15,
16;242:9;250:11;
422:18;550:2
**day-to-day (1)**
479:2
**DC (2)**
86:21;560:1
**deal (17)**
131:17;132:23;
137:19;154:14,16;
156:1;280:22;297:8;
309:16;354:11;386:2;
480:9;485:12;504:10,
12;540:13;545:16
**dealing (6)**
43:7;116:13;196:6;
356:23;363:5;365:11
**dealings (1)**
475:16
**deals (1)**
353:1
**dealt (6)**
25:1;80:12;82:6,6;
196:7,22
**deaths (2)**
47:17;337:21
**deceased (1)**
98:23
**December (12)**
14:18,19;217:4;
257:22;272:18;378:7;
400:3;401:9;511:20;
512:5;522:9;546:16
**decent (1)**
512:21
**decide (1)**
377:1
**decided (6)**
32:2;33:19;37:6;
309:20;312:2;540:20
**decision (13)**
194:1;346:22;
347:3,4,13;348:15,16,
18;349:10,12,15;
406:17;536:13
**declaratory (1)**
182:21
**dedicated (1)**
540:1
**deemed (2)**
44:1;195:7
**deeply (1)**
160:1
**defend (2)**
169:13;177:11
**defendant (5)**
183:11,15,24;
399:14;432:12
**Defendants (12)**
8:6;53:24;176:19;
180:11;292:10;
431:20;432:6;486:10,
12,14,18;538:16

**define (1)**
24:1
**Definitely (23)**
52:2,4,8;53:21;
57:2;58:20;69:10;
89:1;121:9;175:5;
339:16;372:4;399:6;
414:3,7;419:23;
446:18;485:7;490:6;
542:17;548:7,10;
561:2
**definition (1)**
174:13
**degrading (1)**
389:22
**degree (9)**
24:19;130:1;
195:16;324:2;482:19,
22,23;483:1,2
**degrees (7)**
195:18,18;445:16,
18;483:1,8,21
**Deitzler (1)**
308:21
**deliver (5)**
360:18;362:3,7,11,
18
**delivered (3)**
362:15,20;425:23
**delivery (1)**
410:15
**demand (1)**
168:10
**demonstrates (1)**
228:4
**dentist (1)**
16:5
**DEP (9)**
253:8;259:13,19;
260:3;378:8;402:21;
403:23;404:2,7
**department (23)**
19:17;21:20;22:1,8;
24:6,23;27:6;28:5,9;
51:16,24;52:4;53:16,
19;57:21;58:6;
206:12;244:14;
260:13,15;261:4;
400:13,14
**departments (1)**
371:8
**depended (4)**
97:5;423:9;529:24;
530:22
**depending (1)**
280:8
**depends (3)**
23:4;25:5;64:17
**depict (1)**
450:1
**depicted (1)**
556:15
**depicts (1)**

442:10
**depo (1)**
527:14
**deponent (1)**
11:9
**Depos (4)**
8:21;276:8;394:20;
399:2
**deposed (12)**
194:19;199:9;
399:7;418:14,21;
444:17;450:21;451:6,
9;452:20;455:9;
461:12
**deposition (101)**
8:5,13;10:6,23,24;
11:10,11,15,21;12:10;
16:23;38:15,23;39:5;
63:5,7;64:3;92:2;
117:4,11;141:23;
145:19;151:22;
157:17,20;192:6;
194:16,17;199:11,14;
200:5,22;201:18;
216:19;224:8,9;
228:2,4;231:5,12,16;
233:1;234:12;235:3,
11;236:7;238:5;
243:1;245:16;247:20;
251:19;255:24;
257:15;262:7;264:24;
271:16;272:15,22;
288:19;291:20;292:8;
317:21;335:13;
358:13;363:13,19;
370:24;372:18;378:2;
389:5,12,15;402:9;
414:19;437:9;444:16;
451:4,7,10,11,19;
452:7,11,15,17,22;
457:22;465:22;484:3,
11;492:13;516:16;
528:9,10,12,15;554:1;
557:7;562:14,16;
563:3
**depositions (17)**
10:19;41:14;
120:15;280:13,14,15;
293:13;314:7;394:17;
398:11,12,15,21,24;
437:8,9;451:15
**depressed (1)**
79:16
**DEP's (1)**
259:14
**derived (1)**
280:5
**describe (4)**
160:4;374:4;
401:21;555:9
**described (11)**
68:12;73:22;
320:22;364:20;365:4;

372:5;381:1;389:17;
412:4;428:21;523:10
**describes (2)**
152:3;174:21
**description (37)**
207:3;259:2;
269:11;321:1;324:19;
325:10;327:1;328:5,
12;338:19,23;339:12;
370:9,11;371:18;
372:6;378:23;383:23;
386:4;392:16;395:4;
398:9,19;404:15;
405:5,6,18;414:13;
417:20;422:7,15;
424:21;428:14,21;
431:20;435:7;436:1
**descriptions (3)**
325:8;326:11,14
**design (1)**
18:16
**designation (2)**
274:20;393:24
**designing (1)**
18:22
**Desk (1)**
33:5
**Desks (1)**
33:6
**detail (1)**
228:8
**detailed (3)**
62:22;318:2;319:8
**details (3)**
97:20;353:12;
476:22
**determine (4)**
168:13;177:7;
356:5;488:21
**determined (6)**
46:21;128:23;
175:24;177:3,19;
499:19
**determines (1)**
463:24
**develop (2)**
77:23;249:11
**developed (2)**
49:9;204:6
**developer (3)**
286:11,17;287:4
**Development (3)**
28:22;205:9;337:17
**developments (3)**
393:19;394:5;429:6
**device (3)**
63:15;65:4,5
**devoting (2)**
297:15,18
**Dhahran (8)**
13:19;14:20,21;
17:7,8;21:22;22:1;
62:5

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**DHL (4)**
61:21;62:5;65:14;
74:4
**Diamond (1)**
433:18
**dictate (1)**
305:3
**differed (2)**
266:12;523:1
**difference (8)**
36:7,16,18;290:13,
19;500:24;501:3;
502:9
**different (33)**
22:7,18,22,22;
32:18;43:11;45:23;
47:9;50:14;70:9;
72:21;88:6;89:5;93:3,
11;96:6;97:12;
103:18;134:9;153:17;
253:15;301:4;329:13;
340:5,16;371:8;
381:21,22;409:6;
445:18;458:4,4;524:5
**difficult (3)**
199:5;505:7;517:14
**difficultly (1)**
250:18
**difficulty (2)**
210:11;348:21
**digging (1)**
402:23;404:10
**dilemma (2)**
474:6;493:20
**diligence (3)**
103:13;549:20;
550:18
**diligently (1)**
37:13
**dinner (13)**
86:4,5;345:13,19;
346:1,2;432:12;
443:8,14,17,18,19;
444:4
**diplomat (2)**
23:3;24:13
**diplomats (1)**
21:21
**direct (23)**
182:20;183:4;
202:6,8;203:11,15;
216:18;219:15;
222:20;229:14,18,22;
230:3;231:15;272:14;
389:14;485:6;487:24;
488:7;489:10;497:24;
514:3;543:6
**directed (3)**
209:8;463:11;
497:14
**directing (2)**
230:8;552:9
**direction (6)**

221:17;228:9,11,
18,24;229:8
**directions (1)**
355:22
**directly (6)**
21:20;80:19;124:1;
196:6;244:6;323:4
**disagree (4)**
110:3;318:18;
405:7;502:3
**disagreed (5)**
266:22,23;267:2,6;
545:8
**disagreement (6)**
179:4;303:8;
392:19,22;393:3,7
**disappeared (1)**
133:7
**disappointed (2)**
160:2;380:5
**disappointment (8)**
346:22;347:3,4,12;
348:6,11,24;349:7
**disbursing (1)**
22:19
**Disc (9)**
117:4,11;231:5,12;
389:4,11;484:3,10;
562:17
**discern (3)**
34:10;19;36:6
**disclose (2)**
25:10;144:7
**disclosed (1)**
461:14
**disclosures (5)**
53:11;54:3,11,14,
19
**discoverable (3)**
514:21,24;517:7
**discovery (13)**
213:10;290:6;
387:14;388:12;
463:13,19,23;465:4,5,
6,10;466:5;543:23
**discuss (23)**
25:18;92:9,12;
94:21;97:7;99:9,13;
102:23;144:16;148:5;
149:8;216:24;266:9;
312:17;318:15;384:8;
392:5,8;398:2,6;
454:5,8;509:13
**discussed (37)**
55:14;57:13;85:10;
89:2;90:14;92:24;
93:15;99:21;103:5;
109:18,19;123:22;
125:21;146:22;148:1;
149:22;153:11;156:3;
160:8;211:7;217:2;
221:24;224:3;303:1;
346:6,16;348:3;

382:5;384:24;385:17;
394:16;396:3;399:15;
402:21;471:1;551:19,
20
**discussing (5)**
224:1;287:12;
385:18,20;462:2
**discussion (33)**
142:12;150:15;
161:16,19,21,23,24;
162:4,6,7,16;163:1,
12;188:16;224:20;
251:1;287:2;288:8;
315:18;353:11;
355:17;391:10;
395:13;403:21;411:1;
427:20;428:1;438:21;
452:17;480:24;481:3;
508:12;541:15
**discussions (21)**
173:17;183:10,19;
184:1,11,17;187:2;
190:1,6;198:5;
219:19;286:10;307:8;
309:4;374:9;381:21,
24;418:13;428:9;
443:13;472:23
**dismissed (1)**
480:4
**dispatched (1)**
212:21
**displeased (1)**
374:18
**dispute (21)**
166:12;167:19;
300:19;301:3,9;
302:3;303:4,7;
338:24;356:15;
366:22;367:9,15;
373:5;375:11,21;
407:17,18;417:8;
502:12;557:15
**disputing (3)**
329:2;380:20;
384:23
**distance (1)**
196:11
**distinct (1)**
558:17
**distinction (2)**
34:17;557:3
**distributed (2)**
200:21;215:16
**distribution (6)**
294:7,18;295:16;
499:18;501:1,22
**District (5)**
8:10,11;118:5;
182:23,24
**division (1)**
499:6
**Doctor (277)**
9:16,18;43:12,18;

44:17,18;45:13;46:2,
4,22;48:1,12;53:16;
57:23;59:9;76:7;77:9,
22;78:2,10,22;79:19;
80:2,9,18,22;81:9;
84:22;85:9,13;93:16;
94:19;98:24;99:5;
112:18;120:20;
124:22;130:23;133:8,
14,21;134:1,8,17;
146:20,23;147:1,24;
148:6,17,18;149:23,
24;152:19;153:21;
154:7,18;177:24;
180:13,15,16;182:6,7,
10;184:21;185:14,21,
23;186:4,15;187:2,6,
12,22;188:6,13;189:6,
13,19;190:6,7,15;
191:4,9,23;192:13,17,
23;194:8,21;195:11;
196:2,17;197:11,15,
18,23;198:11,20;
199:2,8;203:18,24;
204:1,5,11,14;205:6,
20;206:1,4,5,11,16,
21;207:15,18,24;
208:3,10;211:3,6;
212:6;213:2,14,23;
216:6,22;217:2,4,6,
13;219:9,10,20;
220:7;221:5,15,22;
222:3,11,18;223:1,6,
21;224:20,21,21,23,
24;225:7,8,11,14,16,
17,17;226:5,5;227:1,
8,20;228:3,10,17,24;
229:8;232:9,10;
233:4;234:16;235:15;
237:6,14,17;240:24;
242:10;244:24;
246:24;254:6;260:24;
261:8,13;266:9;
267:11,24;272:11;
273:9;286:23;287:12;
289:2,5;298:17;
300:18;301:1;302:10,
13,16,19,23;318:3;
326:14;327:24;
341:20;342:1;343:7;
346:16;347:23;350:4,
10,22;351:2;360:14;
362:7;364:15,23;
365:22;381:21;
383:13;384:11;
385:20;388:5,11;
398:1;400:6;403:9,
13,17,22,22;404:9;
405:2;408:12;413:5,
6;414:15;415:3,17;
422:19,23;423:16,19;
431:12;432:5,20;
433:7;437:15;438:22;

445:7;450:2;453:16;
465:11;466:4;486:7;
511:14,16,17;512:16;
513:22;514:2,5,10,16,
17,18,20;529:24;
530:18,20,22;543:6,
18;549:20;550:21;
551:1;552:15;553:20
**doctorate (1)**
481:22
**document (75)**
11:10;42:7;54:5;
98:11;116:23;145:7,
24;146:8;147:15;
151:5,7,13;159:20;
163:5;164:15;201:20,
23;233:9,13,16;
234:1;236:8;238:4;
239:5;243:1;247:20,
21;248:3;253:14;
254:18;255:1,8;
261:17;262:6;264:23;
290:1,24;317:2;
318:16;320:21;334:4;
424:16;449:21;457:9,
13,24;460:20;462:14;
464:18;469:6;500:9;
501:11,19;502:5,11,
12;503:1;507:2;
510:15;520:6;527:13;
545:18;546:1,4,15,21;
548:23;549:7,10,13;
551:2;553:14;555:2,
12;559:20
**documented (2)**
247:23;376:19
**documenting (1)**
115:16
**documents (95)**
11:20;12:23;13:1;
16:22;38:14,22;39:4,
9,15,16;40:12;42:9,
17,23;43:2;44:24;
45:13,17,22;46:5,7;
48:6;50:7;56:11,15;
58:14,18;61:7,13;
67:9,23;68:2,9,16,18,
20;69:8,12,15;70:13,
16,24;72:19,24;73:3,
6,8;106:19;157:19;
168:2;176:17;212:14,
16,22;213:3;214:22;
215:15,21;227:6,10,
14;230:2;244:20;
253:7,8,15;254:10;
259:13,15,19,23;
260:3,17;330:8,19;
337:23;341:17;
342:20;362:4;366:21;
375:17,19,20;376:6;
377:24;399:22;
419:24;441:11;
457:21;481:19;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

508:14,20;553:1;
555:3;558:5
**dollars (1)**
455:19
**done (77)**
31:24;45:7;64:21;
77:18;84:5;96:24;
132:3;164:8;178:12,
24;188:10;194:13,22;
198:23;215:19;
226:23;229:6;239:9;
253:10,20;269:2;
276:9,20;278:8,24;
279:4;281:14;303:2;
305:7;307:20;309:2,
15,16;310:22;322:22;
337:3;349:1,6;
374:14;375:1;393:12;
399:17;400:20;
409:11;411:9,23,24;
412:13;433:8;444:20,
23;445:2,14;450:18;
459:1;469:19;470:3;
481:10,12,18;485:21;
489:9,9;496:18,22;
500:10,13;501:9;
502:16;503:5,10;
537:9,14;539:21;
541:22,22;555:17
**double (3)**
489:22;490:4,6
**double-checked (1)**
489:15
**double-checking (1)**
475:18
**doubt (12)**
103:19;120:24;
141:6,7,10,11,13;
142:3;244:23;326:22;
359:22;383:7
**doubted (1)**
512:23
**down (30)**
19:23;30:6;77:12;
90:17,23;100:18;
113:24;122:22;255:7;
259:8;325:1;337:13;
380:21;384:8;387:10;
401:4;405:2;409:7;
412:7;443:12;471:6;
477:20;479:17,22;
520:3;524:10;532:1;
534:16;547:2;558:13
**download (8)**
63:15,17,19,24;
64:7,10;65:1,10
**downtown (3)**
436:20;437:12,15
**dozen (1)**
213:9
**draft (23)**
54:10,12,18,20,22;
98:15;99:2;104:6,11,

19;105:18,21,24;
132:8;173:7,8;360:3,
14;365:17;381:7;
424:1,7;437:2
**drafted (20)**
96:12;98:12,18;
104:3,12;105:14;
109:21;131:5,19;
173:9,10;211:24;
213:7,7;365:4,21;
424:10,10;425:4;
449:8
**drafting (10)**
18:12;19:12;21:5;
133:2;254:20;302:10;
337:22;366:12;368:1;
558:14
**drafts (3)**
370:2,15;464:4
**draw (2)**
171:12;470:2
**drawn (2)**
258:22;507:20
**Drige (1)**
44:11
**D-r-i-g-e (1)**
44:11
**drillings (1)**
436:3
**drink (2)**
341:6;391:8
**drinking (1)**
79:15
**drinks (1)**
340:24
**drive (2)**
73:5;353:18
**driving (6)**
307:2;355:18,21,
23;400:15,17
**dropped (1)**
301:14
**drove (7)**
255:7;345:6;353:7,
10,14;520:15;533:10
**Drummond (2)**
263:14;436:23
**Drummonds (1)**
264:8
**due (8)**
23:1;9;37:6;103:13;
219:23;460:4;549:19;
550:18
**duly (1)**
10:9
**duplicate (1)**
71:12
**DuPont (7)**
118:6;193:6;
213:18;214:3;227:6,
15;452:10
**DuPont's (3)**
201:17;462:1,13

**duration (1)**
450:5
**during (35)**
21:21,23;77:1;
162:4;204:4;206:13;
241:5,18;263:7;
265:17;275:7;282:13;
366:3,4;376:24;
381:6;407:17;450:12;
451:2;452:16;454:4;
459:11,13;460:14;
461:10;466:20;
467:19;469:4;476:2;
482:8;498:11;525:12;
552:16,16;555:7
**Dutcher (5)**
188:19,20;371:4;
537:9;549:15
**duties (11)**
18:10;20:15;
314:11;367:4,7;
372:23;373:23;
376:21;466:3;468:11;
538:7
**duty (1)**
456:22
**DVD (1)**
483:24
**DVDs (1)**
344:21
**dying (1)**
337:21

---

**E**

**eager (2)**
216:10;322:24
**ear (4)**
80:13;483:16,18,20
**earlier (48)**
17:16;40:8;67:12;
74:22;89:4;92:21;
110:4;117:20;130:11;
132:1;134:14;135:9,
16,18;136:18;139:23;
152:2;178:20;240:20;
242:5;251:8;262:20;
267:11;273:15;291:5;
323:12;324:12;
325:19;333:20;
348:23;356:12;376:4;
382:1;385:24;444:12;
464:21;469:6;499:12;
503:5;520:15;522:24;
535:17;540:11;
544:16;549:16;554:1;
557:7;558:24
**early (9)**
19:15;21:4;79:6;
100:22;204:5;213:15,
24;230:1;402:11
**earned (1)**
167:12

**earnest (1)**
222:24
**earth (1)**
77:12
**EarthLink (1)**
52:7
**easy (2)**
54:1;472:5
**EC (6)**
171:20,21;172:7,
16;173:14;174:4
**Econo (2)**
76:17;470:14
**Ed (12)**
190:22,24;308:19;
448:1;495:24;497:15;
500:20;501:5;504:6,
8;536:8;537:12
**edit (1)**
369:8
**edited (3)**
346:20;347:11;
368:18
**editing (1)**
337:22
**edits (1)**
254:7
**educated (2)**
445:17;483:4
**educational (1)**
24:21
**Edward (1)**
378:7
**Edwards (1)**
542:11
**effect (9)**
32:21;91:5;189:5;
192:20;305:15,17;
410:12;483:12;
547:12
**effort (4)**
316:6,17;373:21;
374:11
**efforts (2)**
181:7;391:17
**Eichler (38)**
187:18,21;188:17;
254:4;346:6,16;
351:17;352:9,11;
353:8,9,14,24;354:3,
14;355:7,13,18;
357:12;358:3;360:3,
15;382:13;383:2;
407:4;408:3;409:3;
421:13,17,20;425:11;
488:14;536:18;537:1,
1;539:11,14;551:11
**eight (4)**
59:13;312:11;
327:5,17
**e-i-l (1)**
118:1
**either (14)**

79:1;157:8;184:21,
21;191:24;253:4;
282:13;298:2,19;
302:24;303:4;313:17;
324:14;499:5
**elderly (3)**
81:1;287:16;342:23
**elected (2)**
23:10;47:24
**eliminate (1)**
290:16
**elitist (4)**
372:24;373:1;
374:1,3
**Elizabeth (1)**
16:18
**Ellen (6)**
354:4;371:5;541:9;
542:19;543:14;
558:14
**else (45)**
36:15;41:1;48:3;
57:4;64:14,16;73:22;
77:7;78:13;85:12;
87:20;121:2,16;
137:22;161:12,18;
163:2;177:24;187:19;
191:22;196:1,21;
197:7,17;198:8;
218:3;222:14;285:20;
302:1;323:24;324:6;
325:24;326:5;341:7;
362:2;407:10;446:24;
469:12;471:4;504:11;
521:5;524:23;527:16;
532:11;536:11
**else's (1)**
420:20
**e-mail (23)**
50:9,12,16;51:15;
52:22;55:14;57:15;
58:17;68:5;72:13;
73:8,11;279:14,14;
513:13,14,15;515:12,
20;516:4,14;519:12,
22
**e-mailed (2)**
53:14;237:9
**e-mails (14)**
50:8,10;57:6;59:6,
7,9,14,15;67:17;71:6,
9;72:20;74:3;120:10
**emanated (1)**
448:5
**Embassy (2)**
28:6;193:16
**Emergency (1)**
425:24
**emotions (1)**
548:1
**employed (4)**
21:14;23:13,16,19
**employee (8)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

14:6,7;83:12;
283:11;284:18;
410:15,16,18
**employees (9)**
20:16;105:12;
107:4;294:11,15,22;
336:3;337:20;371:7
**employment (3)**
109:11,11,13
**encouraged (4)**
22:8;213:16;214:1;
417:17
**encouraging (2)**
218:2;324:4
**end (23)**
22:24;23:11;62:7;
115:1;136:7;174:16,
17,23;223:1;351:18;
368:11,20;371:4,6;
379:16;385:5,8;
399:13,17;436:3;
437:2;449:16;541:19
**ended (6)**
299:10;412:19;
472:20;503:8,9;
542:24
**ends (7)**
117:4;231:5;
291:19;389:4;484:3;
562:15,17
**energies (1)**
181:2
**engage (1)**
85:20
**engaged (5)**
88:4,16;227:1;
384:13;456:11
**engagement (1)**
336:15
**engagements (1)**
15:19
**engaging (2)**
77:11;88:1
**engineering (3)**
18:15,21;19:2
**enough (2)**
407:12;526:4
**enter (6)**
34:23;83:15;104:1,
2;258:5;299:13
**entered (5)**
37:20;464:10,23;
465:3;491:11
**entering (1)**
102:16
**entertaining (1)**
341:13
**entire (7)**
195:7;218:16;
232:24;234:12;
235:11;546:4;549:10
**entities (1)**
36:11

**entitled (8)**
37:9;41:16;113:14;
182:10,13,16;201:15;
462:1
**entity (4)**
30:18,21;36:4;
46:19
**entries (24)**
319:11,15;320:4,
10,17;323:3,10,13;
324:12;331:9,17,20,
23;334:21;341:21;
344:2;345:9;367:8;
413:1;433:12,13,14,
15;558:21
**entry (170)**
259:12;260:6,11;
261:7,17;262:22;
263:2,6,12;319:16;
320:13,21;321:14;
322:4;324:18;326:24;
328:11;330:6,13;
331:22;333:5;335:22,
23;336:22;337:13;
338:17,21;339:7,21;
345:21;346:4,13,14,
19,24;347:15,20;
349:16,19;350:14,17,
20;351:12;352:21,24;
353:3,4,6,7,13;356:6;
358:13,17;359:16,24;
360:4,6,8,9,17,21;
361:12,13,20,24;
362:23;363:3,20;
364:9,13,19;365:2,10,
14;367:24;368:7,14,
16,17,22;370:1,12,22;
371:10,22;372:19,20;
376:10;378:4;379:5,
12;380:24;381:17,20;
382:3,10,12;383:3,22;
384:2,5,19;385:3;
386:5,13;387:12,16;
388:17;389:16;
390:21;393:17;394:3,
10;397:24;399:8,24;
400:3;402:8,17;
403:3;404:13;412:22;
413:14,16,18;414:19,
22,22;416:5;417:7,
20;418:23;419:7,8;
420:22;421:8;422:1;
423:10,24;425:3,22;
426:3,14,17,21;427:2,
7,18;429:3,19;430:18,
19,21;431:1,19;
432:9;433:24;434:6,
16;435:6,13,24;
436:19;468:20;
516:13;522:11;
559:22;560:17,21;
561:5
**envelope (1)**

61:7
**environmental (10)**
49:10,14,18,19;
95:5;206:5,13;220:5;
244:15;420:19
**equal (3)**
250:23;305:7;
311:11
**equally (1)**
312:7
**equivocating (1)**
91:21
**Erin (5)**
344:5,17,18,22,24
**errors (2)**
375:21;377:22
**essence (1)**
238:17
**essentially (4)**
30:22;34:7;138:24;
175:15
**established (2)**
335:14;404:1
**estate (11)**
28:18;89:10,13;
285:18;286:11,13,16;
287:4,8,12,24
**estates (1)**
378:6
**esteem (1)**
188:21
**estimate (4)**
87:16;293:8,21;
294:1
**et (2)**
389:18;433:19
**ethical (11)**
111:17;114:1;
135:4;137:18;139:2;
142:10;143:1;147:5;
148:4;460:16;476:12
**ethically (1)**
112:20
**ethics (14)**
110:14;111:10,15;
112:13;113:5;134:16;
136:14,15,19,21;
137:4,18;139:24;
140:4
**European (1)**
23:7
**even (25)**
31:21,21;32:1;
52:18;57:23;77:6;
79:2;90:2;110:14;
122:12;132:6;140:3;
308:1;325:20;357:18;
362:21;367:23;
377:21;468:6;470:5;
476:5;16;499:1;
539:8;543:8
**evening (1)**
351:16;402:11

**event (8)**
165:23;205:2;
277:4;310:8;390:9;
398:6;410:18;552:16
**events (4)**
39:10;62:12;
268:14;451:8
**eventually (8)**
14:3;91:1;267:21;
301:11;380:8;401:4;
471:17;537:1
**everybody (3)**
25:24;140:2;291:5
**everyone (9)**
106:21;140:8,14,
15;283:12;317:1,14;
414:4;512:4
**everyone's (1)**
501:9
**evidence (6)**
104:8;169:2,3;
175:8;180:18;232:7
**evident (1)**
476:23
**evolved (1)**
79:4
**exact (3)**
96:8;286:14;479:20
**exactly (4)**
15:15;212:1;341:2;
458:5
**EXAMINATION (6)**
10:12;182:2;
292:19;392:11;
438:10;535:11
**examine (3)**
219:11;457:12;
497:8
**examined (2)**
10:10;16:6
**examining (1)**
228:7
**example (11)**
48:9;52:21;83:9;
86:3;128:13,21;
376:9;409:16;415:23;
479:3;493:13
**exceed (1)**
121:7
**exceeded (1)**
166:24
**except (2)**
491:24;492:6
**excess (1)**
280:22
**exchange (2)**
301:20;314:4
**exchanged (1)**
59:8
**excited (2)**
454:18;550:17
**excuse (15)**
26:17;27:23;70:15;

185:7;214:6;354:2;
361:16;379:11;413:5;
434:16;440:16,16;
441:14;499:9;524:13
**executive (7)**
171:4,22,23;
172:24;174:8;175:9;
306:7
**exemption (1)**
410:11
**exercised (2)**
415:20;456:14
**exercises (1)**
456:3
**Exhibit (165)**
11:2,7;63:7,9;
64:14;65:18;66:24;
67:1,7;68:13;73:19,
22;150:17;151:2,9;
156:11,15,16,17;
160:1;169:19;170:2,
10;200:6,17,22;
201:2;216:19;219:17;
222:21;224:6;228:2;
231:16;232:24;233:1;
234:12,12;235:3,5,11,
11;236:2,7;237:22;
238:5;239:22;240:8;
242:19;243:1;245:2,
10,16;247:15,20;
250:5;251:12,14,19;
255:18,24;257:9,15;
262:2,7;264:18,24;
270:21;271:16;
272:15,22;288:14,19;
292:4;317:21;334:19;
335:13;339:10;344:3,
23;346:4;358:13;
363:13;370:24;
372:18;378:3;380:23;
389:15;402:9;412:8;
414:19;421:8;425:21;
427:5;429:18;431:15,
18;434:5;435:5,20,
23;436:19;439:13,22;
440:3;441:10;448:21;
449:2;454:11,24;
457:3,7;461:20;
462:6,7,13,18;468:13,
15;490:14,18;493:22;
494:18;495:3,4,4;
497:9,9,10,18;500:14,
19;501:2;505:11;
506:20;507:1;508:24;
509:21;510:11,16;
513:9,13;515:6,11;
518:10,12,17,20,22;
520:6;521:14,19;
523:19;524:3;525:22;
526:2,16;527:5;
531:3;545:19,21;
549:2;554:15,22;
558:24

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**exhibits (1)**
271:4
**existed (1)**
302:21
**existence (1)**
232:8
**existing (3)**
311:4;312:6;507:18
**exists (1)**
98:20
**exit (1)**
543:2
**expect (4)**
176:24;297:23;
358:1;367:6
**expectation (2)**
142:17;144:1
**expected (2)**
102:8;476:9
**expects (1)**
238:24
**expended (3)**
274:12;293:1,9
**expense (9)**
174:14;378:10,11;
475:14,17;492:10;
493:8,9;554:2
**expenses (12)**
168:10;171:5;
174:24;175:3;274:16;
492:3,4,12,18,24;
493:1,3
**experience (5)**
219:24;220:1;
300:15;479:7;483:14
**experienced (2)**
119:20;214:18
**experiences (1)**
207:13
**expert (5)**
134:15;136:15;
225:2;412:17;492:13
**expertise (10)**
19:2;49:6,9;83:22;
96:22;269:15;377:4;
416:24;484:16;541:3
**experts (2)**
239:8;466:4
**explain (5)**
36:14;269:4;
328:21;390:6;406:2
**Explained (1)**
547:24
**explanation (1)**
392:2
**exposed (3)**
49:1;83:19;269:8
**express (4)**
247:7;400:5;
408:12;512:14
**expressed (3)**
267:2;349:7;514:19
**expressing (4)**

346:21;347:12;
348:10;380:16
**expressly (1)**
505:3
**extent (4)**
131:4;134:3;
281:23;530:7
**extort (1)**
456:5
**extra (3)**
440:17;457:16;
490:17
**extremely (1)**
389:22;547:4
**Exxon (1)**
14:5
**eyes (1)**
16:6

## F

**F2d (1)**
118:1
**F3d (1)**
118:4
**fabulous (4)**
305:24;487:18;
496:19,22
**faces (1)**
517:23
**facilitate (6)**
221:18;223:1,7,21,
24;227:22
**fact (47)**
25:15;93:11;131:3;
142:12;173:4;179:19;
184:8;188:6;195:14;
203:3;204:14;229:13;
230:14;242:13;
303:12;304:9;308:1;
312:2;322:19;329:10;
338:13,17;343:4;
350:21;362:15;
365:24;387:1;408:23;
428:17;429:8,15;
431:12;447:3;450:3;
452:9;453:12;455:11,
15;462:20;465:3;
467:15;470:22;
481:19;493:2;502:1;
508:15;536:14
**facts (4)**
176:17;178:9,10;
180:17
**factual (1)**
418:16
**fail (1)**
103:13
**failed (2)**
126:18;392:14
**fair (79)**
177:18;178:1;
184:12;197:12;

210:19;213:1;214:4;
230:4;239:12,18;
240:13;243:9,10;
245:5,24;251:19;
256:13,18;262:21;
269:5,9,21;271:15;
275:11,13,19;276:4,
21,22;282:20;283:3,6,
18,22;285:2;297:13,
17;319:14;320:9;
331:8,16;336:21;
348:2;349:13;350:12,
23;351:10,11,23;
359:15;364:8;365:21;
366:9,11,17;368:2,11;
369:21;370:20;
378:24;379:8;384:6;
385:1;386:2;396:13;
420:9;423:8;424:10;
428:11;433:9;454:22;
475:21;509:6;515:24;
527:3;554:9;556:11,
21;558:13
**fairly (5)**
100:22;449:24;
459:10;471:13;
534:13
**Fairmont (143)**
42:13;43:16;44:23;
47:14,16;88:15;
95:11;114:9;136:11;
153:14;182:18;183:9,
19;184:11,18;185:5,
10;186:5,17;187:3,9,
14,23;188:7,23;189:7,
14,20;249:17;269:19;
271:19;273:11,22;
281:16;282:13;283:4,
10,19;284:2;
285:13;293:16,19,22;
294:3;295:7;296:13;
297:3;299:4;313:12;
316:7,9;320:23;
321:15,20,24;322:5,9,
17;323:11,19,19;
324:19;325:16,22;
327:1;328:12;330:6,
23;331:24;333:6;
334:7;335:24;336:4;
337:16;338:13;
339:11;341:16;
345:13;346:5,20;
348:22;350:15,16,22;
351:2,13,15;353:6;
356:16;358:14;360:2,
18;362:24;363:21;
365:4;366:4,9;367:5,
8;368:8,18;370:1;
371:1,15,17;372:20;
376:12;378:4;379:12;
380:9;381:1;382:4,
13,15;383:18,23;
385:3,5;386:14;

387:4,13;389:17;
390:1;393:17;394:4,
5,11;397:15;399:4,9;
402:9,18,21;403:14,
23;404:7,14;412:9;
413:15;414:20;
535:21;549:17
**Fairmont/Westinghouse (26)**
229:20;253:19;
254:2;266:19;289:7;
293:1,10;294:18;
295:1,11,16,19;
297:16,19;298:1,14;
312:23;314:2,18;
315:2,23;316:5;
375:5;384:16;392:24;
480:1
**fairness (1)**
234:2
**Fair's (5)**
370:3,16;510:17;
519:4;532:1
**fait (1)**
305:20
**faith (1)**
460:24
**fall (5)**
328:11;330:6;
381:9;493:7;559:22
**false (3)**
138:15;519:11,15
**familiar (10)**
31:4;47:1;204:6;
458:5;462:14,16;
463:15;485:24;
494:18;510:15
**familiarity (2)**
205:7;206:17
**familiarize (1)**
170:7
**families (1)**
216:22
**family (4)**
14:24;16:16;407:7;
547:9
**Famous (1)**
331:4
**fan (1)**
545:14
**far (17)**
30:19;35:2;37:16;
63:2,23;64:6;83:20,
20;91:2;195:18;
211:20;218:22;
488:20;489:7;497:3;
510:3;514:24
**Fare (1)**
238:10
**farm (1)**
17:24
**Farrest (54)**
9:9;49:22;58:13;
61:9;71:3;72:18,21;

190:21;192:19;193:8;
196:9,10;197:8;
202:19;208:17,18;
246:5;254:23;280:1;
303:3;309:4,6,6,15,
17;310:14;311:21,24,
24;312:16;443:16,22;
444:8,22;445:14;
446:21;455:10;
457:15;467:21;
504:15;519:12,22;
520:13,15;521:7;
525:4;527:7,22,23;
528:5,13;556:12,13,
14
**Farrest's (2)**
444:6;456:19
**faster (2)**
127:18,22
**fault (1)**
103:15
**fax (5)**
33:6;332:21,22;
434:9;435:7
**faxed (5)**
332:2,4,4,11,23
**February (16)**
338:2,4,9,10,11,12,
14,18,21,22;339:11;
340:2;419:16;420:4;
522:13;531:10
**federal (3)**
23:11;346:6,16
**Fed-Ex (1)**
425:2
**Fed-Exed (4)**
213:8;215:17;
424:11,18
**fee (95)**
91:4;96:15;97:3;
99:3;115:11;131:5;
137:5,9,19;138:16;
141:2,3;142:5,10;
143:2,6;144:1;
149:23;162:6,16;
166:5,24;167:15;
171:5;174:13;175:23;
220:17;277:9,11,17,
21;278:3;279:7,21;
282:15;294:6,17;
295:2,4,10,15;297:23;
298:15,18;299:6,14;
301:10,18;302:4;
303:1,6;304:2;305:6,
10;308:10;310:7;
311:5,16;353:12;
355:13;358:10,15,21;
359:1,10,17;366:14;
367:9,15;375:12,21;
376:6,24;396:15;
407:21;416:10;
427:19;467:22;
472:15;478:5;481:1;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

488:11,20,20;490:23,
24;496:12;499:6;
500:4;504:5;538:3,4;
557:15;560:19;562:9
**feel (11)**
24:4;27:16;102:4;
278:17;467:24;468:2;
489:11,17;528:24;
534:13;562:6
**feeling (3)**
82:1;138:23;167:9
**fees (49)**
32:6;91:8;95:23,24;
96:5,13,20;97:2;
99:10,22;101:6,15;
103:24;105:15;
114:15;115:15;
125:15;130:14,23;
131:6;133:24;134:5;
136:16;139:5;140:3;
142:17;143:9;146:24;
161:3;166:20;167:5;
168:10,12;173:19;
174:18;274:16;
277:12;281:24;
360:19;362:8,16;
391:10;486:9;487:7,
12;488:2,3;496:11;
547:11
**feet (1)**
500:5
**fellow (10)**
48:8;77:12;111:1;
138:11;215:24;
248:14;339:16;
444:23;476:20;
536:21
**felt (13)**
167:5,10;187:22;
188:6;189:5,12,19;
191:23;219:21;
221:22;279:5;408:24;
456:12
**few (24)**
88:7;9;118:17;
122:11;132:4;150:4;
165:18;193:14;197:9;
205:4,5;211:13;
216:1;221:12;263:8;
304:15;324:22;325:1,
6;346:12;397:10;
399:15;447:23;550:2
**field (6)**
111:15;250:21,22;
251:6,7,9
**figure (6)**
26:1;53:1;72:11;
136:15;178:11;
451:18
**file (9)**
63:5;67:19;71:11,
14;173:10;260:7,8;
374:24;412:15

**filed (26)**
8:10;35:13;45:7;
118:2;146:2,4,14;
177:17;182:21;
201:21;203:7;218:20;
254:1,21;255:7,10;
279:7;308:7;393:15;
452:10;464:8;519:21;
520:8;521:6;538:9,15
**files (9)**
44:21,22;45:5,10;
59:19;69:16;72:6,7,
13
**filing (11)**
175:13;385:5;
479:4;486:9;487:5,7,
12;488:2,11;520:19;
547:10
**filings (3)**
314:7;346:6,17
**final (3)**
333:7;334:4;472:22
**finalize (2)**
365:5,18
**finalizing (1)**
368:1
**financial (7)**
22:11,16,20;24:9,
14;160:9;510:8
**find (25)**
37:9;42:9;50:9;
58:18;79:9;83:17;
84:13;96:23;124:13;
220:2;263:8;269:14;
342:19;356:18;
376:14;378:19;397:5,
23;409:5;420:1;
435:3;439:3;472:5;
476:4;490:7
**finding (2)**
240:6;254:17
**findings (3)**
462:20;465:3;
486:11
**fine (14)**
66:11;177:20;
233:20,24;234:6;
289:22;306:1;317:13;
320:3;363:17;464:19;
488:11;537:16;546:5
**finest (1)**
474:15
**finish (7)**
30:9;112:5;125:17;
127:16;141:23;
304:21;449:14
**finished (7)**
27:17;30:8;112:8;
209:24;210:1;373:18;
445:8
**finishing (1)**
480:2
**Finley (1)**

63:6
**fired (1)**
522:19
**firehouse (3)**
217:8,20;218:5
**firm (203)**
27:4,14;29:6,9;
32:24;33:8,10,14;
34:13;35:6,6,7,8,10,
11,16,22;36:1,9;58:3,
4,10;94:21,22;
142:16;143:5,8,13,18,
21;144:7;146:6,6;
147:8,10,13;148:12,
15;149:11,14,17,21;
165:4,6,9;168:9,9;
171:8,9;172:3,7,10,
11;175:14,14;176:1;
177:22;178:16;
180:24;185:9;187:1,
7,11;188:9,17;190:14,
19;191:7,8,17,22;
192:4,6,21;196:1,5,
21;197:10,11,14,18;
198:8;199:14;202:20,
22;208:5,5,11,11,16,
21;209:9,17;210:3,
15;211:10;212:5,14,
15;214:18;215:20,23;
220:9;221:17;222:2,
9,10,14,16,17;223:5,
20;228:18,24;229:8;
230:19,22;232:9;
251:3;256:21;257:3;
258:14;267:2,7;
269:14;270:9;271:12,
18;273:16,21;277:6;
281:7,8;295:11,14;
296:15,18,21;298:19,
20;299:9;300:16,20;
302:24;303:1,5,5,15,
16,24;304:12;305:4;
306:4,16,16,23;308:9,
19,24;309:9,12;310:3,
5,16;311:1,14;
313:18;315:6,13,14;
348:19;349:13,13;
357:4;396:12,21,22;
410:18;423:11,13;
433:7;447:24;467:13;
490:7;491:1,1;492:7,
24;496:15,15;499:8;
500:3,21;516:20;
517:17;531:20;532:9;
537:3,10,13;538:12,
19;539:17
**Firm-Dothan (2)**
9:8,10
**firms (84)**
37:12;80:1;84:13,
18,23;85:5;96:23;
166:6;170:14;172:2;
175:14;176:7;181:10,

12;184:7;185:3;
190:13,23;191:2;
208:4;209:4;212:2,
22,22;213:9;215:16,
17,21;216:7,11,14;
220:4,8;228:6,9,10,
16;230:13;267:18;
269:14;276:9;281:5;
282:4;295:12,15;
296:15;303:9,11,13;
304:11;305:7;306:19,
22;308:15,18;311:4,
12;315:12;316:3,9;
326:2;348:19;349:11;
356:24;396:19;397:1;
408:16;410:19;
414:12;415:15;424:2,
8,12;425:6,16;448:1,
3;460:8;466:1,22,23;
492:7;503:15;530:17
**firms' (1)**
181:7
**firm's (1)**
221:17
**first (79)**
10:9;14:15;27:8;
29:3;47:5,20;48:4;
50:11,18;51:18;
72:15;74:14;77:10;
79:2;96:9,14;98:10,
11;129:13;145:7;
149:17;152:15;
156:24;183:7;204:2;
206:19;207:22;212:4;
215:10;217:20,21;
218:9;220:16;228:2;
246:22;268:13;274:8;
296:1;311:20;313:11;
320:20;321:14;323:3,
16;353:20;354:7,10,
10,12;426:3,9,18;
443:10;451:7,19;
458:12;463:11;
468:13,19,19;469:4;
471:7;475:24;502:15;
509:19;513:17;
522:11;528:9,10,12,
14;534:17;538:12;
541:11,20;546:5;
547:18,22;551:5
**firsthand (1)**
498:1
**fit (1)**
300:17
**five (26)**
19:13,18,24,24;
20:5,9;59:13;67:19;
69:16;72:6,14;89:20,
21;195:18;217:5;
297:6;328:14;329:16,
23,24;339:13;378:11;
433:1;445:18;450:6;
483:21

12;184:7;185:3;
190:13,23;191:2;
208:4;209:4;212:2,
22,22;213:9;215:16,
17,21;216:7,11,14;
220:4,8;228:6,9,10,
16;230:13;267:18;
269:14;276:9;281:5;
282:4;295:12,15;
296:15;303:9,11,13;
304:11;305:7;306:19,
22;308:15,18;311:4,
12;315:12;316:3,9;
326:2;348:19;349:11;
356:24;396:19;397:1;
408:16;410:19;
414:12;415:15;424:2,
8,12;425:6,16;448:1,
3;460:8;466:1,22,23;
492:7;503:15;530:17

**five-minute (2)**
66:8;270:14
**five-year-old (1)**
263:20
**fix (3)**
125:1,6,7
**fixtures (1)**
33:5
**Flaherty (2)**
9:15,18
**flew (2)**
68:11;541:23
**flight (1)**
15:13
**flip (2)**
174:12;559:19
**floating (1)**
290:2
**Floor (1)**
8:18
**Florida (26)**
42:16;89:9,11,19;
90:6,8,11,12,14;
91:12;92:1,9,11,13,
17;118:17,18;215:2;
286:19,24;288:2;
333:10,17;410:5,6;
412:18
**Flowers (40)**
224:21,23,24;
225:11,17;226:5;
237:7,9,14,16,17;
238:21;240:24;244:3;
248:21;249:16;251:8;
256:8;261:8,9,13;
263:3;434:19;436:6;
506:7,10;509:9,14,17;
511:12,15,16,17;
512:16;513:22;
514:16,17,18,20;
515:4
**Flowers' (4)**
513:21;514:2,5,10
**fly (1)**
357:19
**flying (1)**
70:23
**FMO (1)**
22:20
**focus (2)**
79:5;461:11
**focused (1)**
204:2
**Foertsch (1)**
8:16
**FOIA (1)**
425:23
**folder (2)**
71:8,8
**folders (2)**
67:19;72:14
**Foley (2)**
402:19;403:6

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**folks (2)**
273:6;355:7
**follow (3)**
85:3;439:19;497:20
**followed (2)**
269:19,22
**following (7)**
124:20;232:7;
277:17;351:15;
394:18;398:22;509:9
**follows (1)**
10:10
**follow-up (3)**
431:5;502:19;
532:17
**footnote (1)**
220:15
**footnotes (1)**
224:17
**force (3)**
307:3;400:15,17
**foreclose (1)**
481:1
**foregoing (1)**
274:24
**forgive (1)**
24:3
**forgiven (1)**
411:2
**form (74)**
103:8,16;104:5;
108:6;112:21;114:20;
134:2,21;137:11,12,
21;138:17;139:7;
140:6,13,21;144:3,8;
154:9;155:2;156:5;
157:22;158:8;160:5;
163:23;164:4,5;
181:14;207:5;208:7,
14;217:10;222:4,12;
223:11,13,23;228:12;
233:8;235:17;239:13;
259:20;269:24;270:1;
278:5;279:10;305:21;
311:6;318:10;319:18;
320:15;326:17;342:2,
6;395:15;396:24;
411:2;420:10;433:10;
455:24;466:8;478:11;
481:23;482:1,10;
488:23;490:1,2;
493:11;513:5;516:21;
517:21;520:23;530:6
**formal (2)**
111:12;112:15
**formally (1)**
32:15
**formed (1)**
198:10
**former (2)**
18:3;28:7
**formerly (1)**
191:17

**formula (1)**
177:15
**Fort (1)**
412:16
**forth (11)**
15:5;17:15;175:22;
177:1;203:13;207:3;
220:24;278:7;371:17;
496:11;554:11
**fortunate (1)**
545:13
**forward (7)**
103:24;104:20;
106:13;110:10;131:3;
173:23;541:18
**forwarded (1)**
73:6
**found (31)**
80:10;83:19;84:4,
24;85:1;100:19;
102:5;106:19;110:7,
8;116:6;121:15;
123:1,10,21;124:9,10,
16;126:21;134:12;
209:14;242:13;308:6;
349:24;378:17,20;
379:22;380:12;
387:18;389:22;
465:11
**Foundation (5)**
152:20;153:23;
154:21;155:4;164:3
**founder (1)**
78:15
**four (17)**
23:8;59:7;195:18;
217:5;240:18;297:6;
337:12;378:9;386:23;
387:10;389:24;
392:16;433:1;445:17;
454:1;483:20;500:3
**four-day (1)**
336:3
**fourth (1)**
163:18
**Fox (1)**
548:9
**frame (5)**
126:8;251:5;
325:15;399:6;404:5
**frankly (2)**
281:10;426:10
**fraught (1)**
326:6
**Fred (1)**
399:18
**Freddy (1)**
536:22
**free (4)**
106:23;107:8;
109:17;258:5
**frequent (2)**
239:16;516:20

**frequently (1)**
197:14
**friction (8)**
374:14;375:9,11,
14,22;376:1,5,8
**Friday (1)**
257:22;261:11;
262:16;265:6
**friend (6)**
28:18;59:6;74:22;
76:14;132:18;417:14
**friendly (6)**
48:8;85:17;110:5;
330:22;388:15;
514:18
**friends (9)**
16:7;26:15;49:5;
85:16,18,19;206:2;
307:19;547:9
**front (8)**
290:15,15;317:20;
318:6;436:21;437:17;
490:15;513:1
**fruition (1)**
288:5
**frustrated (4)**
391:14,15,19,23
**FSupp2d (1)**
118:6
**full (7)**
39:19;137:3,6;
139:15;163:10;
308:22;338:3
**Fullen (15)**
47:14,15;48:4,9;
50:2,4;325:23;
328:15;329:6;339:17;
345:14;378:5;379:1,
13;399:3
**Fullens (1)**
48:13
**Fullen's (3)**
327:20,21;328:2
**full-time (2)**
27:9;552:14
**fully (2)**
178:23;476:9
**fun (1)**
341:14
**function (4)**
80:22,24;108:19;
171:1
**fund (1)**
337:19
**funding (1)**
83:21
**funeral (4)**
343:9,21;382:15;
383:18
**furniture (1)**
33:4
**further (6)**
15:22;146:22;

406:2;438:6;504:13;
562:11
**furthermore (2)**
278:15;280:23
**future (5)**
88:7;92:22,24;
94:11,12

## G

**gained (1)**
199:1
**gaining (2)**
225:18;226:20
**gamble (2)**
139:1,1
**game (2)**
85:24;550:23
**games (1)**
401:5
**Gant (2)**
549:20;550:21
**garage (2)**
263:22;402:12
**garden (1)**
219:10
**garner (1)**
357:3
**Garson (5)**
533:8,10;534:2,6,
19
**Garson's (1)**
533:20
**Gary (55)**
8:5;9:14,21,21;
10:8;30:13;34:17,18;
48:22;101:21;112:7;
117:5,12;142:1;
152:16;158:13,14;
162:12;182:22;
202:17;206:2;230:6,
16;231:6,13;274:6,6;
291:20;292:8;312:1;
320:1;340:1;372:20;
385:4,8;389:5,12;
394:12;399:10;
402:10,18;412:9;
436:20;461:17;484:4,
11;501:16;518:7;
526:15;530:9;540:22;
542:6;543:9;560:16;
562:16
**garyrich414@gmailcom (1)**
56:10
**Gary's (2)**
378:11;559:15
**garywrich@adelphiacom (1)**
50:24
**garywrich@comcastcom (1)**
51:5
**garywrich@earthlinknet (1)**
50:19
**garywrichcom (1)**

51:4
**Gates (8)**
531:17,19,20,23;
532:8,12,16;533:8
**Gateway (1)**
8:21
**gather (1)**
259:19
**gathered (6)**
189:24;195:9;
259:15;260:3;488:2;
542:3
**gathering (3)**
241:15;259:13;
399:22
**gave (27)**
39:10;45:17;59:16;
67:17;81:2;84:24;
85:3;89:9;112:13;
114:17;132:4;152:11;
208:24;213:3;253:14;
286:15;291:5,5;
304:15;344:19;410:8;
420:20;442:7;451:14;
452:15;504:3;561:23
**gee (1)**
550:2
**general (46)**
81:5;89:12;99:19;
114:22,23;115:2;
116:5;122:3;135:14;
198:4;285:10,11,21;
287:17;288:8;349:8;
357:1;381:1;382:4,
12;383:23;385:3;
386:14;387:3,12;
389:17;393:17;394:3,
11;399:9;401:18,20,
21;402:9,17;404:5,
14;412:9;413:14;
414:20;415:13;
436:23;444:15;
446:13,14,15
**generalizations (1)**
285:22
**Generally (12)**
17:16;24:14,16;
25:13;43:13;213:16;
214:1;287:7,11;
442:14;492:11;550:6
**generate (3)**
212:23;297:21;
449:21
**generated (11)**
31:15,21,22;70:16,
22;71:15,16;243:5;
251:20;256:1;455:1
**generating (2)**
30:20;70:24
**geologist (4)**
225:13;237:7;
248:21;249:17
**geologists (9)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

239:19;240:1,4,10,
   14;241:17;242:3,11;
   244:5
**George (21)**
   47:14;48:9,11;
   237:7,16;238:21,22,
   23;239:23;244:3;
   248:21;249:16;251:8;
   263:3;345:14;436:6;
   506:7,10;509:17;
   513:21;515:3
**Germany (2)**
   28:6;129:17
**gets (2)**
   517:10;549:15
**Gillian (2)**
   16:18;57:3
**G-i-l-l-i-a-n (1)**
   16:19
**Girardi (4)**
   166:15;536:7;
   538:5;543:2
**Girardi's (1)**
   538:4
**given (20)**
   60:5;169:12;178:3,
   22;219:9;252:14;
   304:3;307:15;311:13,
   15,17;366:1;367:19;
   445:18;452:5;508:16,
   19;510:3;545:13,16
**Givens (18)**
   8:8;193:3,4;194:7,
   20;195:10;196:14,23;
   309:18,24;310:1,2,3;
   311:23;438:22;
   443:11;467:21;
   482:20
**Givens' (1)**
   195:10
**gives (1)**
   21:2
**giving (7)**
   25:3;286:16;
   304:13;504:9;508:14;
   538:4;550:13
**glad (1)**
   440:22
**gladly (1)**
   514:7
**Glasser (18)**
   271:12,13;272:12,
   12;423:11,11,17,17,
   18,18,20,20;426:24,
   24;430:4,5,14,14
**Gmail (5)**
   55:16,20,22;56:9;
   59:5
**goal (1)**
   96:21
**goes (6)**
   21:2;132:20;133:1;
   148:3;195:19;203:22;

206:10;207:12;
   221:14;274:23;489:7;
   553:3
**good (37)**
   10:14,17,18;23:6;
   61:4;76:24;92:14;
   134:16;182:4;287:13,
   21;292:17,18;311:7;
   341:13;355:22;
   357:11;394:24;
   402:23;404:10;414:5;
   416:17;426:7;459:7;
   460:24;470:11;
   474:15;481:17;
   489:14;501:12;
   503:23,24;523:15;
   535:15;537:11,13;
   557:24
**Goodman (24)**
   110:13;113:24;
   135:2;138:6;212:3;
   280:20;332:3,12,17;
   413:11;447:1;460:17;
   474:5,21;475:8,9,11;
   476:1;477:6;478:4;
   480:12;485:22;
   488:16;490:9
**goodness (1)**
   193:12
**Goodson (1)**
   475:7
**Goodwin (2)**
   111:14;134:15
**Goodwin's (1)**
   138:15
**government (5)**
   14:4;21:15;23:14,
   17,20
**grad (1)**
   226:16;242:8;250:2
**graduate (5)**
   26:6,10;250:6,8;
   506:17
**graduating (1)**
   26:19
**granting (1)**
   462:13
**Graphics (7)**
   361:1,2,4;364:10;
   370:7;550:4,7
**Grasselli (1)**
   433:18
**great (3)**
   278:14;420:18;
   550:16
**grey (1)**
   32:1
**grich@yahoocom (1)**
   56:12
**grievances (3)**
   105:13;107:4;
   108:11
**grocery (1)**

122:7
**Groovy's (1)**
   390:11
**group (14)**
   210:6,7;211:15,17;
   212:8;382:14;383:4,
   6,15;429:5;431:21;
   432:6;453:24;532:21
**grouping (1)**
   274:20
**guess (31)**
   19:22;24:4;31:18;
   34:5,10;35:9;44:20;
   50:8,15;63:22;64:7,
   11,11,18;65:23;74:5;
   91:21;97:18;110:18;
   129:10;156:16;
   163:10;177:10;338:3;
   410:11,24;460:7;
   510:5;519:19;539:8;
   547:5
**guessing (4)**
   250:15;252:22;
   470:7;510:7
**guide (1)**
   90:4
**Gulf (2)**
   14:15;21:21
**guy (44)**
   75:3;76:23;77:12;
   85:17;86:2;87:24;
   90:3;105:11;107:5;
   108:14;110:5,6;
   132:22;133:7;139:11;
   194:12,16;195:15;
   252:13;310:21;314:7;
   375:2;400:18;413:9;
   417:18;445:17;
   470:11;474:15;
   477:20;482:18,21;
   483:4,5,11,18;503:12;
   510:7;515:1;536:16,
   19;543:9;550:16;
   551:9,22
**guys (2)**
   160:14;310:18
**guy's (1)**
   523:3
**GWR (15)**
   239:2;245:3;
   249:20;256:7,8;
   258:20;330:14;
   339:22;345:16;
   423:14;426:1,3;
   452:20;511:11;
   524:18

**H**

**hac (5)**
   308:7;479:3,4;
   537:6;538:9
**hacs (1)**

537:15
**half (2)**
   23:6;213:8
**hall (13)**
   48:14,17;371:3,14,
   16;372:3;394:12;
   397:4,9,14,24;401:2;
   421:10
**Hammond (1)**
   13:5
**Hampton (1)**
   436:6
**hand (14)**
   9:23;11:6;235:20;
   448:20;457:7;461:17;
   512:2,7,12;513:3,7;
   545:18;548:23;
   554:15
**hand-carrying (1)**
   70:24
**handed (19)**
   63:4;236:6;238:4;
   242:24;245:15;
   251:18;255:23;
   257:14;262:6;264:23;
   271:3;276:6;288:18;
   462:12;494:6;506:24;
   515:10;521:18;524:2
**handing (1)**
   526:2
**handle (7)**
   171:5;252:5,18;
   488:18;514:4,7;
   516:10
**handled (8)**
   299:15;379:15;
   445:24;446:20,21;
   455:12;491:17;
   516:14
**handling (3)**
   43:9;122:10;348:22
**Hando (18)**
   206:12,13,21,23;
   207:1;213:5;216:21;
   219:20;237:8;244:4,
   14,24;404:2,6;
   425:23;426:22;534:2,
   20
**Hando's (1)**
   206:15
**hands (1)**
   133:22
**handwriting (15)**
   157:6;238:9;
   247:24;249:5;324:21;
   328:18;333:12;373:3,
   4;458:16;519:4,6;
   522:6;524:4;546:18
**handwritten (15)**
   156:19;157:4,12;
   158:6;216:17;243:5;
   245:17;251:20;256:1;
   257:16;262:8;265:1;

549:8;555:18;557:1
**hang (2)**
   127:6;457:10
**hanging (3)**
   394:21;395:8,11
**happen (13)**
   30:4;81:22;83:5;
   91:22;100:5;123:24;
   282:18;405:10;
   448:12;485:11;
   508:22;540:19;
   548:17
**happened (28)**
   51:8;61:6,17,19;
   62:2;65:15;70:8;83:3,
   7;87:17;91:22;116:1;
   125:2;127:7;155:10;
   313:23;343:14;
   359:12;362:1;368:15;
   370:21;417:12;
   423:22;467:17;480:7;
   541:5;562:8,8
**happening (4)**
   391:14,16;399:16;
   478:21
**happens (2)**
   413:9;464:5
**happy (3)**
   52:22;545:6,10
**hard (3)**
   483:11;488:21;
   526:16
**hardship (1)**
   23:4
**Harless (48)**
   47:8;49:3;74:18,20;
   76:8;77:21;78:5;
   79:14;95:3,21;96:3,
   12,17;98:12,18,22;
   103:2;104:12,22;
   105:1,22;107:3;
   108:10,24;109:14,16,
   19;122:12;130:16;
   131:4,5;143:13;
   218:1;268:7;273:15;
   324:4;326:4;458:24;
   468:20,23;469:8,9,17,
   19,21,23;470:3,20
**harm (1)**
   219:22
**harmful (1)**
   46:20
**harmony (1)**
   503:22
**Harris (1)**
   8:20
**Harrison (9)**
   201:10,21;260:12,
   15;261:3;274:15;
   425:24;431:13;434:1
**has/have (1)**
   514:6
**hate (2)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

37:8;388:21

**hazard (2)**
207:16;269:12

**heading (1)**
203:17

**Health (7)**
260:12,15;261:4;
425:5,10,13,17

**healthy (2)**
341:4,5

**hear (6)**
62:18;92:3;449:18,
20;512:14;553:18

**heard (9)**
89:18;420:18;
449:14;460:23;464:1;
474:8;512:6;538:12;
551:5

**hearing (9)**
24:12;150:13;
322:7;323:6;329:10;
346:7;371:10,13;
402:3

**hearings (2)**
346:17;418:7

**heart (1)**
405:12

**heat (2)**
520:15,16

**heated (4)**
353:10;355:17,20,
21

**heavily (1)**
79:15

**heavy (1)**
237:8

**held (10)**
8:13;188:21;
192:22;193:9,24;
256:19;267:15;
300:23;327:19;
421:22

**Hello (1)**
535:13

**help (37)**
39:24;40:1;62:12;
84:6,11,13;91:20;
131:18;132:15,16,17,
19;139:13;153:13;
156:18;157:20;
171:19;178:11;218:3;
220:2;253:17,24;
297:12;310:21;324:5;
365:17;412:18;420:1,
19;458:23;482:6;
511:18,20;512:12;
536:9;537:4;544:11

**helped (16)**
47:8;84:12;106:19,
21,21;131:20;132:4;
173:7,8;227:22;
298:22;365:4;394:22;
479:5;497:1,2

**helpful (7)**
48:6;77:20;105:11;
108:14;205:11;
252:13;518:13

**helping (8)**
84:23;132:8;
173:21;511:14,16,17;
553:1;562:6

**Hendrix (1)**
255:2

**herein (1)**
10:9

**here's (6)**
132:18;253:16;
417:18;463:1;478:21;
540:13

**herself (1)**
276:19

**hey (17)**
75:10;76:13;102:6,
11;123:16;125:5;
133:21;164:24;
180:14;209:9;312:1;
332:22;424:17;
479:12;487:18;
540:22;543:17

**High (7)**
18:2;188:21;286:2;
381:3;533:16,19;
548:1

**higher (1)**
445:20

**highlighted (3)**
390:14,17,23

**highlighting (1)**
318:11

**highly (3)**
445:17;483:4;
516:24

**Hill (14)**
190:22;191:1,4,6;
308:20;309:19;
310:10;448:1;495:24;
497:15;500:20;501:5;
504:6,8

**Hill's (4)**
308:19,24;309:12;
310:5

**himself (7)**
147:3;214:17;
341:7;416:20;448:6;
450:16;523:2

**hire (3)**
167:16;285:11;
410:23

**hired (3)**
14:1,18;280:16

**hiring (1)**
285:5

**history (2)**
204:3;381:8

**hmm (1)**
445:14

**hold (7)**
92:22,23;266:6;
512:2,7,12;513:3

**holding (1)**
513:7

**Holiday (3)**
336:4,13;549:17

**holidays (1)**
87:5

**Holpit (1)**
217:22

**home (19)**
17:19;29:22;53:4;
58:12;217:5,6;330:7,
18;339:12;340:1;
341:22;342:4;382:15;
383:18;407:9;419:10,
20;421:1;426:16

**homes (5)**
328:15;342:7,10;
343:9,22

**Honda (1)**
263:15

**Hondo (1)**
532:7

**honor (1)**
305:15

**hope (1)**
117:16

**hopes (2)**
113:13;532:8

**hostile (2)**
416:11,12

**hot (3)**
241:11;255:6;
520:14

**hotel (13)**
76:16;77:5;193:10,
11;351:16;352:13;
357:14;358:3;376:11;
402:11;412:11;
436:20;437:16

**hotels (1)**
193:14

**Hoult (1)**
330:10

**hour (8)**
300:15;324:3;
386:22;387:9;393:24;
432:13;531:16;554:2

**hourly (15)**
111:1;142:11;
167:23;195:20,22;
281:11;285:3,4;
393:24;445:20;
479:12;480:24;481:4;
484:14;493:14

**hours (85)**
111:3;115:4,14,22;
116:20;274:12;275:2,
6,10;277:5,5,8,24;
278:8,23;279:4,6,11,
20,22;280:5,9,10,18,

21,24;293:1,5,9,18,
22;294:2;321:2,5,8,
16;322:5;323:2,5,6,
12;324:2,20,22;325:1,
6;328:8;329:15,18,21,
23;330:2;336:4;
337:16;338:4;339:6,
13,22;340:22;345:5,6,
8,14;353:9;359:20;
372:15;381:6;390:8;
413:23;414:2,8,10,11;
415:1;472:24;477:19,
23;479:13;480:21;
485:16,19;501:17,18;
503:3;533:24

**house (6)**
164:7;327:21;
330:22;378:7;389:21;
391:6

**hug (1)**
407:7

**huge (1)**
439:13

**humorous (1)**
543:3

**Humphrey (2)**
382:16;383:19

**hundred (1)**
241:23

**hundreds (3)**
211:19;430:8,9

**hung (3)**
261:20;451:1;453:6

**hurricane (2)**
513:23;514:7

**hurt (2)**
456:2,9

**husband (1)**
48:10

**Hyatt (8)**
351:16;352:4,6,12;
354:15;357:14;358:3;
541:13

**hybrid (1)**
522:11

**hyphen (2)**
249:20;381:9,9,10;
385:7;394:15,18,20

**hypothetical (1)**
493:11

## I

**idea (27)**
25:13;87:15;93:18,
22;95:2;109:7;116:2;
240:12;259:16;
282:23;323:1;358:7;
360:16;362:13;
364:17;369:13;
380:21;431:10;459:7;
461:15;477:12;
479:15;480:22;

21,24;293:1,5,9,18,
22;294:2;321:2,5,8,
16;322:5;323:2,5,6,
12;324:2,20,22;325:1,
6;328:8;329:15,18,21,
23;330:2;336:4;
337:16;338:4;339:6,
13,22;340:22;345:5,6,
8,14;353:9;359:20;
372:15;381:6;390:8;
413:23;414:2,8,10,11;
415:1;472:24;477:19,
23;479:13;480:21;
485:16,19;501:17,18;
503:3;533:24

**481:20;482:4;512:11;
539:1**

**ideas (1)**
93:20

**identification (36)**
11:3;63:10;150:18;
156:12;170:3;200:18;
201:3;236:3;237:23;
242:20;245:11;
247:16;251:15;
255:19;257:10;262:3;
264:19;270:22;
288:15;292:5;439:23;
449:3;457:4;461:21;
493:23;506:21;
510:12;513:10;515:7;
518:23;521:15;
523:20;525:23;
545:22;549:3;554:23

**identified (5)**
248:17;274:14;
275:3,5;557:8

**identify (14)**
156:18;210:8;
236:8,10;247:21;
376:17;405:7;440:2;
448:21;505:13;
555:13,19,22;557:5

**identifying (2)**
157:1;214:17

**ie (2)**
216:23;337:18

**ill (1)**
529:1

**illegal (1)**
137:20

**illness (1)**
337:21

**illustrate (3)**
372:22;373:22;
374:11

**immediately (4)**
39:15;124:16;
349:3;539:24

**immigration (6)**
43:8,8;47:7;56:2;
277:3;281:13

**imminent (1)**
194:18

**immunity (1)**
119:10

**impact (11)**
281:23;456:10,10;
465:20;508:15;
537:14,18,22;538:2,7;
547:11

**impart (1)**
468:1

**implement (1)**
524:18

**implications (1)**
135:5

**important (3)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

150:10;455:6;
499:23
**importantly (1)**
457:1
**imposed (1)**
31:14
**impression (22)**
103:11;189:22,24;
195:9;198:4,7,11;
199:2;239:5;264:6;
269:1;285:23;300:2;
398:8;407:14;415:9,
14;416:14;433:20;
470:9;516:18;517:16
**impressions (2)**
77:9,13
**inaccuracies (2)**
65:18,20
**inaccurate (26)**
65:21;207:4,10;
218:15,20;219:5;
221:1,3;224:13,14;
232:20,23;233:6;
234:17;235:16,18;
279:23;320:13;
326:14;327:24;328:3;
331:11;339:3,7;
361:24;379:8
**inactive (1)**
30:22
**Inc (1)**
433:19
**incident (1)**
548:12
**incited (1)**
456:16
**inciting (2)**
380:4,11
**include (3)**
130:16;167:15;
369:1
**included (7)**
267:12;279:7,21;
375:11;408:22;
427:19;496:14
**includes (2)**
435:15;516:17
**including (8)**
108:10;204:4;
214:24;240:15;328:8;
432:11;447:24;
550:20
**income (6)**
30:20;31:21,22;
284:20,23;297:21
**incompetent (1)**
132:22
**incomplete (2)**
466:10;493:10
**inconsistent (2)**
65:22;553:22
**incorrect (9)**
345:1;358:22;

371:23;442:19;500:6;
524:16;527:15;528:3,
14
**incorrectly (2)**
322:13;544:18
**increase (1)**
296:7
**increased (2)**
181:1;301:20
**increasing (3)**
180:15;181:11;
296:9
**incurred (4)**
168:11;491:12;
492:16,17
**incurring (1)**
180:12
**indeed (5)**
32:7;399:5;438:14;
497:7;498:9
**indemnification (1)**
179:12
**independent (1)**
253:11
**independently (2)**
84:5;209:7
**Indiana (1)**
13:5
**indicate (40)**
186:20;192:16;
196:2;218:14;219:5;
220:24;224:2,12;
232:18;233:3;234:14;
235:13;236:20;
238:14;241:10;
243:18;248:3;252:18;
257:19;262:12;272:3;
322:8;324:13;326:13;
327:23;339:6;353:19;
354:7,22;355:6;
370:9;386:24;394:8;
413:17;431:7;434:13;
435:10;533:11;549:9;
551:2
**indicated (9)**
186:15;188:5;
194:7;204:19;288:22;
299:5;351:7;376:4;
469:7
**indicates (7)**
265:3;339:2;
390:13;417:21;
421:18;426:17;506:9
**indicating (11)**
245:20;251:23;
256:3;271:9;360:9;
361:23;383:1;397:20;
419:15;427:14;432:2
**indication (2)**
206:20;553:14
**indirectly (2)**
23:16,19
**indispensable (5)**

191:13,13,14,24,24
**individual (14)**
34:18;35:10,15;
36:1,11,23;37:2,5;
38:9;185:20,24;
186:20;298:10;
492:24
**individually (3)**
36:9,20;37:23
**individuals (21)**
54:2;108:10;190:1;
210:2,15;211:11;
212:4;213:16;214:2;
248:16;263:23;
275:24;278:1;341:22;
343:8,13,13;357:13;
358:4;372:5;398:12
**individual's (1)**
226:17
**inexpensive (1)**
76:18
**influenced (1)**
459:7
**info (6)**
237:8;238:21,24;
244:3;436:24;512:3
**inform (3)**
451:2;485:14;
534:19
**information (53)**
53:12;62:8;82:9,11,
13;126:23;127:1,2;
176:12;207:7;212:14,
15;214:22;218:14;
219:4;220:23;224:11;
232:17;233:2;234:13;
235:12;237:7,13;
244:6,15;274:19;
320:12;326:12;
331:10;337:19;339:2,
5;342:19;418:16;
420:1;424:3,8,9;
433:16;452:16;468:1,
21;475:4;488:1,19,
22;530:19;532:3,7;
534:21;557:18,21;
558:1
**informational (6)**
419:9,19;420:24;
421:10;423:3;426:15
**information-gathering (2)**
371:3;372:10
**informed (4)**
239:2;389:21;
486:11,12
**initial (8)**
53:11;54:2,10,13,
18;208:20;212:13;
272:11
**initially (24)**
19:12;78:8;84:1;
96:10;114:3;130:19;
131:16;138:19;

170:21;208:16;
209:18;246:21;270:7;
277:19;278:2;282:1;
295:21;296:19;
400:24;449:9;471:10;
540:11;543:7;561:3
**initials (7)**
360:22;364:1,3,4;
426:1;431:7;435:9
**initiative (1)**
214:23
**ink (1)**
521:23
**Inn (3)**
336:4,13;549:17
**in-person (1)**
258:2
**input (3)**
212:2;303:9;560:14
**inquiries (1)**
62:5
**inserted (2)**
61:11;214:16
**inside (1)**
140:17
**insight (1)**
21:2
**insist (1)**
377:14
**instance (2)**
83:6;463:10
**instances (3)**
237:12;268:20;
383:13
**instant (1)**
232:6
**in-state (4)**
431:20;432:5,6,11
**instead (2)**
328:1;329:13
**instruct (3)**
11:24;39:1;282:19
**instructed (3)**
40:17;129:9;485:16
**instructing (1)**
40:15
**instruction (2)**
12:15;117:21
**instructions (1)**
118:23
**instrumental (1)**
465:12
**insurance (3)**
33:11,12,13
**intact (2)**
59:22;263:22
**intended (2)**
75:21;500:19
**intent (1)**
367:12
**intention (2)**
34:21;456:16
**interacted (5)**

197:15,18;198:18;
228:5;301:7
**interaction (6)**
177:23;197:10;
229:12;239:19;
459:23;460:1
**interactions (1)**
199:6
**interactive (1)**
316:11
**interest (11)**
19:21;20:17;
166:17;209:5;212:23;
220:6;380:17;423:12;
425:6;427:9;532:9
**interested (18)**
47:22;76:1;78:6;
79:11;94:8;98:14;
130:20;217:18;228:7;
274:10;326:3;341:18;
374:16;406:12;409:4;
534:10;537:4;550:17
**interesting (8)**
339:16;349:24;
350:10;378:17;
379:17,22;380:12;
387:18
**interfaced (1)**
106:18
**interlineated (1)**
371:9
**interlineations (1)**
318:12
**intern (4)**
264:3;523:6,8;
553:7
**international (1)**
20:14
**internet (1)**
220:4
**interpret (3)**
428:17;429:7;
512:10
**interpretation (1)**
34:6
**interpreting (5)**
250:19;393:21;
402:14;431:23;434:7
**interrogatories (2)**
55:12;274:8
**interrogatory (6)**
213:11,12;214:11;
274:1,3,11
**interrupt (5)**
68:8;128:1,6;202:7;
289:13
**interrupting (1)**
141:24
**interruptions (1)**
127:22
**intervene (1)**
474:17
**interviewed (1)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

263:15
**into (50)**
21:2;24:20,21;29:3;
34:7,23;37:20;65:4;
79:12,14;83:15;
93:22;94:18;102:16;
104:1,2,23;106:12;
122:8;144:15;160:23;
161:2;186:18;209:10;
212:2;214:17;251:5;
269:11;299:13;
303:16;304:8,23;
306:17;307:5;337:2;
345:24;376:20;
378:22;388:16;
391:12;437:5;458:18;
491:11;495:24;
500:21;509:17;
533:19;546:8,13;
556:19
**introduce (2)**
48:15;422:20
**introduced (9)**
44:18;45:12;87:20,
22;88:2;182:4;206:2;
422:4;541:21
**introduction (3)**
48:12;75:21;208:18
**introductory (1)**
424:2
**invaluable (1)**
337:19
**inventory (1)**
263:21
**invest (1)**
91:12
**investigate (1)**
330:18
**investigated (2)**
330:8,9
**investigating (5)**
19:19;20:4;101:16;
220:7;222:24
**investigation (8)**
221:18;223:2,7,21;
330:24;393:12;486:6;
487:6
**investigator (1)**
197:21
**investing (1)**
287:24
**investment (4)**
92:15;287:13,21;
412:17
**investors (1)**
32:11
**invite (1)**
399:18
**inviting (1)**
424:3
**involve (1)**
348:19
**involved (123)**

13:7;18:11,12,15;
19:17;21:3,5,7;43:12,
15;47:12,24;49:13;
67:13;76:7;78:8;80:6;
81:15;84:15,17,22;
95:3;96:3;104:22;
113:17,18;170:14;
183:9,18;184:10;
185:9;190:13;206:3;
208:4;209:21;210:22;
217:11;218:12;
224:20;227:19;
228:16;247:5;250:2;
255:13;257:4;261:15;
265:20;267:19,22;
270:5,9,12;273:22;
282:5;299:4;300:5;
305:16,19;309:21;
312:22;313:12;
314:17;315:2,7,12,15,
22;316:11;321:12,20,
23;322:9,17,21;
323:18;324:1,5,5,11;
325:6,24;326:5,7,9;
334:6;337:4;348:17;
349:11;356:16;363:4,
7;365:19;396:20;
397:1;398:10;410:2;
413:2;417:2;419:22;
420:6;421:6;436:22;
448:2,3;456:21;
469:3,11;472:10,13;
476:11;496:13;
535:19;536:5,7,11;
539:24;540:6;541:18;
543:5,17;544:19;
545:1;547:8
**involvement (21)**
33:18;47:6;48:19;
73:18;128:19;135:7;
255:5,11;267:9;
271:18;278:13;
298:22,22;316:6;
348:4;420:14;440:8;
511:22;530:17,21;
547:17
**involving (5)**
167:19;210:14,18;
371:17;435:6
**iPhone (1)**
63:1
**IQ (1)**
550:22
**irritation (2)**
399:11;400:5
**issue (46)**
25:17;43:6,11;57:7;
77:24;102:24;121:4;
129:1,3;166:2,4;
167:8;206:20;217:16;
253:17;298:21;301:5,
6;356:15;366:14,18;
367:1,3;373:9,11;

401:20;406:1,4;
416:10;476:7;484:17,
21;485:4,8;486:24;
487:2,4,10;488:5,13;
489:18;21;502:18;
514:8;554:8;561:4
**issues (17)**
19:18;25:2;47:9;
85:2;135:2;160:8;
253:13;267:3;311:8;
366:16;367:13;
387:21,23;416:4;
486:10;489:5;527:18
**Italy (1)**
16:14
**itemize (1)**
274:12
**items (5)**
67:10;73:19;
301:17;376:8;409:18
**IUE (2)**
371:3;372:3

## J

**Jackson (2)**
487:10;488:17
**Jacobs (2)**
472:12,13
**Jan (3)**
209:20;211:12;
221:6
**January (11)**
144:13;221:5;
236:23;261:10;
262:17;362:23;524:7;
526:12,13;527:9,10
**Jared (4)**
250:2,4,23;394:23
**Jay (1)**
419:14
**Jeanne (3)**
353:7;381:6;394:22
**Jeannie (1)**
453:24
**Jeff (5)**
9:17;157:2;182:5;
233:13;390:19
**Jensen (3)**
354:5;371:6;543:15
**jeopardize (1)**
459:5
**Jerald (1)**
202:14
**jet (1)**
542:3
**job (20)**
13:22;19:5,14;
22:24;24:8,24;27:8,9;
96:24;215:19;305:24;
349:4;357:11;377:24;
380:7;456:22;496:19,
22;512:21;513:4

**Joe (336)**
9:16;42:15;45:22;
48:5,6;50:5;52:22;
74:11;75:2,3,11;76:6,
14,19;77:1,3,4,6,19;
78:4,14,14,19;80:11,
16;81:1,15,16,19,19;
82:7;84:1;85:17;
88:23;95:2;98:13;
103:9;105:5,11;
107:1;108:5,7;
113:17;114:22;122:8,
13;125:5;130:16;
135:5;139:11;142:4;
152:4,7;153:18;
155:6;158:13,16;
161:11;163:17;
173:18;174:8;175:4,
6,7,16,24;177:3;
178:12;181:1;182:13,
15;183:16,19;184:11,
17,19;185:13,17,22;
188:10,21;191:12;
194:19;195:16;198:2,
18,22;199:6;204:18;
206:23;208:15,22,23;
209:2,6;210:6,22;
213:3;215:2,2;216:8;
217:24;218:10;
225:19;226:2,14,16;
229:12,14,18,22;
230:5,15,18,21;
236:13;237:2,7,8,13;
238:18,20;239:1,2,6,
18;242:3,14;243:24;
244:3,6,8,13;245:3,6;
246:1,19;249:2,8,10,
21;251:2;252:5,16,17,
18,21,23;253:12,18,
24;254:5,14,20;255:5,
9;256:8,20;257:2;
258:18;259:1,3,13,18;
260:2,12,14;265:21;
266:7;268:4,17,21;
270:4,8;271:5,17;
272:2,4,16;273:4;
285:5;286:10;287:3,
23;298:22;312:18,21;
318:21;320:5;322:15;
324:24;325:16,22;
326:1;327:13,17;
329:8,8;330:15,17,22;
332:18,21,22;333:15,
21;335:24;336:16,20;
337:3,16;339:16;
340:2,7,9,12,15;
343:18;344:12;
346:14;348:3;349:24;
350:1,6;352:3,5,15;
353:21;355:2,10;
356:18;357:2;358:20;
359:1,9;363:7;
365:17;369:1,8,18;

370:18;371:24;372:7;
373:20;374:10,23;
383:1;384:7;392:20,
23;393:4,8;395:14;
396:3;397:8;400:6,
19;406:11;408:23;
413:1;418:4;419:18,
24;420:4;424:13,20;
426:13;427:15,20,23;
428:3,10;429:14;
444:13;446:11;447:4,
8,14;448:6,12,14;
449:8,8;450:13;
452:20;454:12;456:4;
458:21;460:2;465:21;
468:5;469:1,10;
470:6;474:11,14,14,
22;482:4,12;485:5;
487:18;488:19;
493:12;506:10,16;
509:17;511:11;512:3,
4;513:20;514:18;
516:14,19,23,24;
517:11;521:12;523:1;
531:16;532:6,22;
534:3,14;543:11;
547:4,13;548:11;
550:8,9,10;551:24;
553:12;560:8;561:2,
23
**Joe's (10)**
114:23;163:4;
188:23;224:3;327:22;
458:7;512:2,7;513:3;
561:10
**John (29)**
206:11;244:4;
298:23,24;299:17,23;
300:3,10,12;351:20;
356:8,10;357:10;
359:8,10,13;360:2,14;
365:24;386:3;404:2;
417:2;425:23;426:22;
534:2;542:10;560:20,
24,24
**Johnny (4)**
246:6,9,10,12
**join (8)**
22:8;239:14;313:3,
8,14,18;314:9;315:1
**joined (5)**
14:14;19:9,16;
21:19;28:4
**joint (4)**
163:20;164:21,22;
165:1
**jointly (4)**
179:9,11;287:24;
309:2
**Jones (21)**
202:14,14;303:15,
16,20;304:3,7,16,17,
18,22;305:8,14,16,24;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

306:17;308:7;312:5;
496:16,18;499:10
**Joseph (4)**
202:19;203:18;
274:7;559:1
**Jr (5)**
307:20;351:20;
356:8;560:20,24
**JS (1)**
452:20
**judge (8)**
464:7,10,23,24;
465:7,11;545:8;548:9
**judge's (1)**
464:14
**judgment (7)**
182:21;266:13;
415:21;456:3,15;
480:5;523:17
**July (29)**
238:22;239:23;
240:10;241:10;
250:21;251:9;323:10,
20;325:9,15;326:11,
21;346:6,17,19;
347:23;348:10;
349:16,17;350:14;
352:22;353:20,23;
355:8;394:22;464:11,
24;465:1;506:8
**jumbled (1)**
63:3
**jump (1)**
118:4
**jumps (1)**
334:23
**June (48)**
14:20;30:5;67:12,
13;148:24;194:4;
262:17;323:10,19;
325:9,15;326:11,21;
346:5;363:20;364:16,
19;365:12;368:7,17;
369:9,11,14;441:13,
18,19,20;442:11,20;
443:5;447:5,9,19;
448:9,16;452:3,4;
458:9;460:12;465:8;
466:17;467:20;
473:10;474:22;
507:17;520:7;526:12;
527:10
**Jung (1)**
55:24
**jurors (1)**
463:7
**jury (5)**
277:20;278:2,21;
279:8;309:22
**justifiable (1)**
195:21
**justify (1)**
445:19

### K

**Kathleen (2)**
428:2,5
**Katie (2)**
511:11,13
**keep (20)**
69:2;112:1;134:17;
141:24;143:13;239:1,
6;245:3;277:4;281:1,
15,18;282:21;292:24;
367:12;486:12;
492:11;517:18,20;
518:2
**keeping (5)**
200:2;245:6;281:9;
366:5,7
**keeps (1)**
536:21
**Keese (1)**
538:6
**Keith (23)**
193:3;194:11,12;
195:13;196:14;
309:24;310:2,3;
438:22;443:10,22;
444:8,19;445:1,5,13,
18;446:15,20;455:11;
456:19;467:21;
482:20
**Keith's (1)**
444:6
**Kennedy (20)**
9:13,13;202:24;
306:23;307:1,5,14,16,
20,23;308:4,8;312:5;
448:1;496:16,22;
498:21;499:9;502:17,
23
**Kennedys (1)**
307:11
**Kennedy's (1)**
498:10
**kept (15)**
78:1;134:8;281:12,
22;282:1,14;460:21;
477:2;486:10;541:23;
554:2;555:6,9,11;
558:16
**Kevin (1)**
202:24
**key (7)**
187:16;198:2;
344:4,15;427:8,16;
455:16
**kind (7)**
107:5;120:20;
243:12;318:14;
344:19;482:4;483:15
**King (1)**
263:17
**Kingdom (1)**

13:15
**Knapp (5)**
394:12;397:4,9,14,
24
**K-n-a-p-p (1)**
394:13
**knew (54)**
30:7;48:9;80:11,12,
16;93:3;101:17;
105:4;107:13;113:2;
124:5,20;128:14;
130:1;137:4,9;138:2,
5,10,20;140:19;
142:23;143:23;
196:13;204:17;205:2,
13;210:24;240:7;
241:13;259:21;
282:17;304:4;336:19;
405:11;426:9,11;
444:17;451:12;
455:16;461:13;
467:17;476:18;478:3,
8,12,17;482:13,17;
483:14;515:2;516:22;
537:6;553:2
**Knight (2)**
9:15,15
**knowing (9)**
60:13;62:4;110:19;
324:16;396:6;455:9,
18;481:18;539:13
**knowingly (2)**
218:22;456:1
**knowledge (30)**
67:2;126:15;
183:20;185:12;190:6,
14;208:2;215:5;
219:1;225:16;227:21;
228:17,23;229:7;
255:9;269:15;298:10;
303:21;320:5,6;
346:2;398:13;452:14;
482:9;486:7;489:6,7;
530:2,23;543:18
**knowledgeable (1)**
111:15
**known (6)**
48:11;204:19;
230:23;253:21;
418:17;475:22
**knows (5)**
88:1;115:11;140:2,
8,14
**kooky (4)**
522:19;523:10,12,
14

### L

**L&P (7)**
395:1;414:3;
433:16;434:9;435:8,
15;436:22

**labeled (4)**
42:14;67:20;75:6;
458:12
**lack (7)**
269:10;316:1,6,22;
411:15;415:18;
424:21
**ladies (1)**
344:19
**lady (2)**
339:18;341:11
**Lane (2)**
8:8;202:19
**language (2)**
427:22;487:20
**languished (1)**
131:11
**Larew (13)**
243:16;275:11,16,
19;276:11,22;282:20;
283:9;284:2,5;285:2;
449:7;454:24
**Larew's (1)**
442:7
**large (4)**
380:1;456:23;
537:10;540:1
**largest (1)**
537:2
**Larry (57)**
47:7;49:3;74:18,20;
75:24;76:5,5,6,8,11,
22;77:4,21;78:6,6,11,
12;95:3,21;96:17;
104:12,14,17;106:1,2,
8;109:1,4,11;122:23;
130:15;131:9,12,15;
132:14;218:1;268:7;
273:15;324:4,7;
326:4;458:23;468:20,
23;469:2,2,8,9,10,16,
21;470:4,5,10,11,12,
20
**Larry's (2)**
76:16;109:5
**Larson (1)**
532:14
**Las (1)**
309:19
**last (43)**
28:24;31:18;38:18;
59:12;73:14;81:24;
89:18;160:10;163:19;
180:10;204:23;
212:11;219:16;239:1;
246:3;250:22;251:7;
261:17;271:24;272:5;
311:21,23;312:15,15;
333:5;335:23;336:24;
374:8;394:16;434:6;
435:24;447:19;448:8,
18;458:1,2;459:3;
481:13;498:11;

513:21;516:13;
521:23;548:2
**late (9)**
14:6;29:5;38:7;
74:15;164:7;222:22;
336:12;480:7;536:5
**later (26)**
68:12;113:6,15;
124:17,18;141:13;
147:15;148:17;
153:15;221:14;228:6;
232:10;243:15;
281:22;282:15;
297:14;300:5;313:3,
14;400:24;420:13;
443:9;453:13;516:9;
535:19;536:5
**latest (3)**
252:11;429:5
**Lauderdale (1)**
412:17
**Law (109)**
9:21;18:3,4;19:10;
26:8,12,14,24;27:13,
14;30:12;32:8,24;
33:16;34:13,18;47:7;
49:7,10;58:4;80:1;
84:13;93:16;103:17;
109:13;113:3;121:16;
124:24;130:1,1,2;
133:15;136:20,20;
137:4;140:13;142:15;
143:4,12,20;144:7;
147:8,10;148:12;
149:11,17,21;165:4,9;
168:9;175:13;177:22;
182:22;195:16;208:4;
209:4;214:18;215:16;
216:7;220:4,9;
221:17,17;222:16;
228:6,9,10,15;232:9;
253:4;267:18;269:14,
14;270:9;271:12,17;
274:6;281:5;295:15;
306:4,19;308:15,19;
311:1;316:3,9;326:1;
423:11;424:2,12;
450:23;452:24;453:1;
459:4,9;462:21;
465:3;466:22,22,23;
470:6;478:13;482:18,
23;500:21;530:17;
532:8;533:9;539:8
**lawful (2)**
147:4;481:12
**lawsuit (3)**
80:14;177:16;
393:15
**lawyer (23)**
29:4;32:19;43:21;
44:19;63:4;110:20,
20;137:19;140:2;
166:15;372:23;

379:16;380:13;
406:24;407:3;420:19;
426:23,24;427:9;
442:15;471:9;472:12;
560:1

**lawyers (22)**
30:10;152:7;
172:23;173:15;197:1,
2,4;203:3;214:24;
286:6;313:1,11,15,19,
20,21;378:5,10;
379:14;416:17;479:6;
534:11

**LC (7)**
30:13;36:4,12;38:2,
8;230:6,16

**lead (5)**
85:5;193:23;
232:22;382:17;
430:16

**leadership (1)**
214:19

**leading (1)**
117:23

**leads (1)**
490:11

**learn (5)**
185:20;207:22;
336:24;539:3;553:5

**learned (9)**
19:14;100:2;354:8,
10;433:4;467:15;
471:12;502:1;537:5

**learning (4)**
100:7;163:20;
164:20;433:1

**least (34)**
15:17;21:9;25:24;
124:6;206:5;210:23;
212:23;220:8;226:2,
9;240:21;241:16;
268:19;273:1;282:8;
318:24;324:24;325:4,
6,23;331:9,18;345:8;
369:22;370:19;
383:14;384:19;395:3;
442:15;453:9;517:1;
533:14;534:5;556:14

**leave (7)**
15:13,23;23:5;95:4;
143:15;468:7;515:22

**leaves (2)**
17:16;513:24

**leaving (6)**
21:19;40:22;
166:16;448:7;468:10,
10

**led (10)**
47:13;103:5,9;
180:24;189:11,18;
193:21;299:13;
328:14;331:2

**left (29)**

14:15;22:15;26:23;
27:11,18,20;28:4;
30:5;31:22;43:1;
44:21;104:23;105:1;
166:15,16;217:22;
236:17;278:16,16;
319:2;329:3;346:8;
379:16;380:13;507:8,
9,10;513:20;546:23

**left-hand (1)**
397:19

**Legal (56)**
8:17;27:8,9;28:20;
30:18,21;32:17;36:4,
12,21;37:3;38:5;45:9;
52:15,19;109:2,3;
138:24;140:3;174:2;
179:19;182:14;
252:23;253:1,2,9,12,
13,18;277:1,2;285:13,
15;297:20;315:7,15,
19;330:8;337:18;
387:23;469:20;470:3;
482:9,15,17;484:16;
486:8,10,20;487:6,12,
15;489:5,12,18;490:4

**lengthy (2)**
302:6;404:15

**Lenora (4)**
210:11;217:6;
422:21;469:5

**less (4)**
98:8;280:23;
293:10;294:3

**letter (48)**
158:12,15;159:3,4;
160:1,4;163:16;
190:22,24;213:8;
271:4,16;272:15,17;
273:11;346:21;
347:12,23;348:1,10;
360:3,15;363:22;
364:14,15,24;365:5,
18;368:1;369:9,14,
22;370:2,4,16,19;
382:17;424:11,14,17;
425:4,16;429:20;
430:7,10;437:2;
447:22;558:14

**letters (11)**
216:3,5;232:3;
337:23;365:21;
366:12;369:19;
424:20;430:9;447:23;
550:10

**letting (1)**
343:12

**level (3)**
86:1;266:10;337:17

**Levin (123)**
8:8;9:6,12;10:15;
34:13,14;35:6;58:3;
142:15;143:4,12,20;

144:6,12;146:5;
147:8,10;148:12;
149:11,17,21;156:1;
165:3,9;168:8;171:8;
172:9;175:14;176:1;
177:21;180:23;181:6,
20;190:14,19;191:7,8,
17,22;196:6;197:10,
14,18;198:8;199:14;
202:22;208:5,11,20;
209:13,17,18,19;
210:2,15;211:10,23;
212:5,14,15;214:24;
215:4,6,9,20;218:20;
220:8;221:15;222:1,
9,14,23;223:5,20;
228:18,24;230:19;
250:22;251:3;255:4;
256:21;258:14,17;
264:3;265:19,20;
267:2;274:21;275:2,
5,8;277:5;281:7;
302:24;303:5,24;
306:9,15;307:2;
309:3;315:13;396:9,
14,21;428:6;433:7;
443:24,24;459:1,13,
18;467:2,9,13;
490:24;491:3,18;
496:15;499:7;500:2;
514:9;516:20;517:17

**Levin's (1)**
305:5

**Levitan (4)**
89:15;90:21;410:8;
412:16

**Lewis (8)**
429:21,23;430:2,4,
7,11,12,13

**liabilities (5)**
33:8;180:12,16;
181:1,12

**liability (7)**
49:14,16,21;
176:19,22;177:12;
178:7

**liable (3)**
177:3;179:9,11

**liaise (1)**
21:24

**liaised (2)**
197:7;278:7

**license (20)**
26:18;30:24;31:2,
11,13;103:14,21;
107:13;110:9;116:7;
121:16;122:9;123:22;
124:17,24;133:15,18;
139:1;391:24;392:3

**licensed (48)**
88:13;91:3;94:19;
95:15;96:3;97:6;
100:1,3,8;101:3,9,18;

102:7,11;103:6;
105:5;107:11;108:7;
110:15,17,23;129:14,
19;130:8;141:14;
142:9,24;147:2;
154:11;160:23;161:1;
173:22;174:11;
391:11,18;21;405:16;
410:1;411:21;413:10;
468:5;471:9,12,23;
534:6,8,10;477:21

**ligations (2)**
44:23;45:11

**light (1)**
235:5

**lighting (1)**
337:20

**likely (3)**
72:5;441:8;452:6

**limit (6)**
87:1;185:4;459:23,
24;460:17;514:15

**limitations (8)**
455:17;484:17,21;
485:4;486:9;489:1,3,
19

**limited (2)**
49:22;199:7

**Limiting (2)**
97:1;459:19

**limits (3)**
31:10,15,22

**line (11)**
70:3;152:15;
250:12;333:9;375:3;
398:18;507:20,22;
547:18,21,22

**list (7)**
38:13;268:5;
402:20;403:6;488:8;
554:9;556:4

**listed (24)**
32:20;54:4;62:16;
202:12;272:17;
278:10;279:24;
280:11,17;289:10;
319:4;321:2;329:12;
331:12;336:4;337:14;
345:4;359:19;392:16;
422:17;441:1;489:2;
534:15;544:18

**listen (7)**
127:6;265:22;
411:10;446:5;449:16;
452:18;543:8

**listing (2)**
280:5;556:13

**listings (1)**
338:5

**lists (8)**
319:1;403:10,14,
18;531:15;533:7,24;
555:24

**litigate (1)**
84:23

**litigating (2)**
84:7;107:14

**litigation (229)**
32:3;37:13;60:10;
62:13;68:3,10,10,23;
78:23;79:6,10;82:17,
20,23;84:17;88:11;
93:13;96:19;97:2;
98:4;101:7,8,16;
103:1;115:4;130:13;
133:10;136:6,12;
149:22;166:8;167:4,
7;168:11;170:14;
179:16;182:12,18;
183:9,10,19;184:11,
18;185:5,10;186:6,
17;187:4,9,14,24;
188:7,24;189:7,14,21;
190:5,17;191:10,19;
192:2,10,14,18,24;
194:10;195:12;196:4,
18,23;197:24;198:12,
21;199:4;205:10,17;
206:4,6,6,7;207:14;
209:3,5;213:14,17,23;
214:2,20;220:5;
223:8,22;227:3,11;
228:9,16;229:2,10,16,
20,24;230:5;233:5;
234:17;235:16;239:7;
249:17;254:22;
256:20;259:18;260:4;
267:1,10,12;269:2,4;
270:4,10;271:19;
273:12,22;274:13,16;
276:2;277:13,18;
281:16,19;282:13,14;
283:4,10,19;284:2,13;
285:12;293:2,6,10,11,
16,19,23;294:3,4,7,
19;295:1,8,11,17,19;
296:13;297:4,10,16,
20;298:1,5,8,11,14;
299:5;302:21;303:14,
17;304:8,23;305:9,
14;306:17,20;307:5;
308:16;309:1,13;
310:6;311:2;312:19,
23;313:12;314:2,18;
315:3,11,12,23;316:5,
7,10,14,18,23;321:16;
322:9,17;323:19;
330:24;349:12;
350:22;351:3;356:16;
366:4,9;367:8,18;
396:12,20;397:16,16;
398:11;403:15,19;
418:12;440:5;441:6;
448:2;455:20;456:10,
21;463:18;486:8,21;
487:1,16;492:3,4,23;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

493:8;535:21
**litigations (12)**
43:11,19;45:1,14;
57:7;88:19;98:7;
99:10,14;134:9;
153:17;220:2
**litigator (3)**
47:22;80:8,10
**little (20)**
27:1;29:2;136:19;
250:18;265:22;
284:15;290:21;303:9;
328:13;407:7;444:9;
450:7,9,10;451:17;
471:6;475:23;504:5;
524:24;526:16
**live (5)**
16:9;89:16;90:3;
177:2,4
**lives (9)**
15:4;16:10,11,13,
14,20,21;17:8;89:19
**living (6)**
13:18;14:21;15:2;
28:7;29:17;71:24
**LK (7)**
361:1,2,4;364:10;
370:7;550:4,7
**LKG (11)**
360:22,24;361:12,
19;363:24;364:6;
370:5;431:7,22;
434:10;435:10
**loans (1)**
411:2
**local (15)**
9:12,13;20:14;
304:12;314:7;337:17;
357:4;372:23;374:12;
375:4;376:22;377:13;
456:21;468:11;538:8
**locally (1)**
492:20
**locate (2)**
84:6;505:16
**located (11)**
8:17;18:4;31:9;
61:1;68:20;73:8;
83:24;271:13;286:2;
397:11;400:22
**location (1)**
287:16
**Lodge (2)**
76:17;470:14
**Lodgeville (1)**
8:14
**log (1)**
53:4
**logged (5)**
413:23;414:1,8,9,
12
**logically (1)**
124:10

**logistic (1)**
304:12
**logs (1)**
554:3
**long (18)**
15:11;22:14;28:24;
45:4;76:21;205:3;
212:11;234:1;240:18;
280:21;296:3,5;
297:2;305:23;340:21;
395:22;467:16;
522:19
**longer (12)**
29:2;31:3;33:15;
119:17;126:6;129:5;
130:21;132:2;222:22;
300:11,13;465:24
**long-standing (1)**
206:17
**look (80)**
47:10,18,21;57:9;
65:4;79:12;145:1;
147:15,23;156:17;
157:9,10;159:2;
163:18;170:7,10;
171:15;174:13,23;
205:24;209:10;
212:24;224:15;
231:17,19;243:2;
254:5;260:20;302:1;
317:10,11;322:12;
323:9,10;324:8,18;
325:20;326:10,24;
328:9;347:21;365:16;
369:17;370:18;375:2;
378:2;380:23;399:8;
402:8;404:13;412:8,
13;413:7;414:18;
424:3;431:18;434:5;
435:5,24;436:18;
439:11;444:24;458:5,
11;460:20;461:2;
463:11;482:14;
491:22;492:22;
495:13;496:2;500:14;
508:24;511:8;532:1,
20;546:9;552:8;
556:22
**looked (27)**
38:7;43:23;89:12;
90:11;93:11;96:10,
14;98:16;104:17;
159:13;170:11;
179:21;254:3,15;
279:3;321:11;339:14;
429:1;448:16;452:10;
453:14;461:24;
477:24;486:2;495:3;
505:11;541:18
**looking (34)**
20:16;64:6;139:5;
146:9,10,11,12;162:1;
178:10;183:23;195:5;

213:10;218:10,11;
227:5;260:16,21,23;
268:6;319:8;334:19;
338:6;341:4,5;
406:13;412:24;
425:12;429:18;
441:17;453:9;510:3;
531:9;551:12;552:24
**looks (30)**
67:5;73:24;153:13;
247:22;249:7;250:13;
262:8;324:23;332:3;
333:5,9;338:11;
351:22;378:13;
379:18;381:12,14;
382:6;413:18;423:13;
429:11;451:5;463:22;
479:12;506:18;508:5;
510:17;524:6;537:11;
555:4
**loop (1)**
433:8
**loose (2)**
27:14,18
**Los (4)**
16:12;357:9,19,21
**loss (1)**
197:6
**lost (5)**
61:2,3,4;65:14;
173:10
**lot (20)**
21:5;79:23;107:22;
109:4;112:4;177:11;
254:8;276:15;278:12;
284:22;404:21;459:4;
479:6;483:13;486:23;
488:13;502:16,22;
523:9;534:21
**lots (3)**
81:13;276:17;
443:20
**loud (1)**
405:19
**LP000880 (1)**
513:14
**LP861 (1)**
515:11
**Lumberport (1)**
394:22
**lump (3)**
281:12,14,14
**lunch (27)**
75:10,11,14;76:1,5,
8,13,15,23;77:1,2,5;
85:22;86:5;87:10,10;
117:7,16;344:5,18;
369:23;370:21;
382:14;383:2;438:2;
470:13;536:20
**luncheon (1)**
87:7
**Lyons (2)**

463:12;465:5

---

## M

**machine (1)**
33:7
**Madonna (14)**
202:24,24;306:23;
307:1,5,16,23;308:4,
8;312:5;447:24;
448:1;496:16;499:9
**Magro (1)**
286:9
**mailed (2)**
61:9;74:2
**mailing (3)**
507:18,18;532:2
**main (1)**
476:7
**mainly (6)**
19:12;68:7,18;
380:16;461:12;
544:17
**maintain (2)**
17:17;33:10
**maintained (2)**
56:18;557:14
**maintains (1)**
289:5
**major (2)**
13:11;21:3
**majority (2)**
306:8,10
**makes (1)**
137:1
**making (12)**
30:19;131:13;
178:19;340:24;
372:21;373:21;
374:10;517:23;
519:18;540:14;
541:23;562:6
**malfeasance (2)**
19:19;20:4
**malicious (1)**
523:16
**Mallard (1)**
107:22
**Malpractice (2)**
33:24;179:18
**malpracticed (1)**
34:5
**man (8)**
44:11,19;135:15;
218:2;226:19;250:3;
459:1;461:1
**management (11)**
13:8,10;18:8;19:11,
20;21:4;22:11,16,20;
24:9;276:15
**Manhattan (2)**
357:6,7
**manipulated (1)**

456:17
**manipulating (1)**
528:23
**manner (7)**
189:11;311:16;
312:21;332:14;349:2;
389:22;412:9
**man-to-man (1)**
461:1
**manual (1)**
21:6
**Many (22)**
13:23;80:11,24;
97:23;113:21;119:20;
121:13;127:8;128:18;
153:1;226:1,8;293:5;
307:8;319:11;320:4;
323:6;343:6;380:8;
475:18;477:11;
516:23
**Map (4)**
429:4,10,11,15
**maps (1)**
510:4
**March (10)**
42:20;243:23;
245:23;251:11;333:6;
334:6,9;344:9;
420:22;533:5
**margin (2)**
507:8;508:4
**Marino (259)**
9:20,20;11:24;12:4,
6,11,14,20;38:24;
39:6,12,17;40:3,6,9,
13,17,20;41:1,3,6,10,
13,21;42:2,4;64:4;
69:2,4;92:5;101:21,
24;102:2;104:5,7;
105:16,19;107:16,19;
108:6;111:22;112:1,
5,11,21,24;117:17,20;
119:1,3,6,10,12,15,18,
22;120:2,4,9,11,13,
16;127:12,15,19,24;
128:5;132:10;134:18,
21,24;135:22;136:1;
137:12,15;139:7;
140:6,9,21;141:17,20;
142:18;144:3,8;
145:10,14,18;146:10;
149:2;150:7,11,20,24;
151:3,8,11,15,23;
152:20;153:23;
154:21;155:4;157:22;
158:1,8;162:9,12,18;
164:3;165:19;167:16,
22;169:13,20;180:17;
181:14;183:2;199:19,
23;200:7,9,15;233:7,
12,18,21;234:1,4;
238:2;242:22;255:21;

257:12;264:21;
290:23;291:4,10,13;
299:20,23;300:5,15,
19;317:1,6,8;319:17,
21;320:2;326:17;
341:4;347:2;363:5,9,
23;364:14,16;365:5,
18,20;366:2;368:2;
370:2,15;385:6,7,18,
21;386:10;390:18;
394:20;395:7,10,17,
21;420:7,10;439:16,
19;457:10,12,17;
461:16;463:1;464:13,
17,20;474:4;475:2;
478:11;481:23;
486:15;490:1,8;
493:10;494:1,5,15;
497:8,11,13,19,22;
498:5;499:24;500:6,
8;501:11,15,23;502:3,
5,9,15,21;503:16;
517:19,21;518:6,10,
14,17;520:23;521:2,
20,24;522:4;523:22;
525:4,5;526:14,18,24;
529:6,9;530:3,9;
531:8,20;532:3,11,13;
533:8;534:2,6,19;
546:7;553:17;558:12;
559:12,14,17;560:1,
12;562:13,21

**Marino's (3)**
61:24;168:12;
362:24

**Marion (3)**
266:17;415:24;
547:8

**Marion/Philips (1)**
43:17

**mark (65)**
63:6;199:23;200:1,
3;235:21;237:19;
332:7,10;346:8,11,23;
347:15,18;349:19,23;
350:7,17,18;358:16,
17;360:4,5;363:2,3;
368:4,23,23;373:9;
378:22;379:4;380:16;
382:7,20,23;384:1,4,
18;387:15,16;399:23,
24;402:24;403:1;
412:20,21;413:19,21;
419:3,6;421:2;424:5,
6;425:7,8;427:10,11,
13,14;428:13,24;
429:3;437:7;526:20;
545:19;554:19

**marked (65)**
11:2,7;63:9;150:17;
156:11;170:2;200:17,
22;201:2;236:2,7;
237:22;238:5;242:19;

243:1;245:10,16;
247:15,19;251:14,19;
254:8,9;255:18,24;
257:9,15;262:2,7;
264:18,24;270:21;
288:14,19;290:24;
292:4;317:21;318:9;
321:10;345:10;
404:19;439:22;449:2;
457:3;461:20;462:12;
493:22;506:20,24;
510:11,16;513:9,14;
515:6,11;518:22;
521:14,19;522:2;
523:19;524:2;525:22;
545:21;549:2;554:22

**marking (26)**
199:17;200:12;
319:12,15;320:11;
328:22;336:5;337:10,
24;339:20;344:7,9,
23;345:15,20;360:21;
378:3;390:4,24;
418:23;421:18;422:7,
10;431:1;432:4;
448:20

**markings (17)**
318:8,10,15;319:9;
320:18;327:23;331:6,
17;334:20;335:14,19;
337:13;339:9;344:3;
427:4;431:15;435:20

**marks (12)**
324:11;351:22;
352:2;365:7,9;373:3,
7;395:4;427:23;
430:17;436:12,13

**Marquette (1)**
406:14

**married (1)**
17:12

**Martinsburg (2)**
426:22;534:1

**MASON (111)**
9:7,7;17:24;118:8,
13,15;120:10;150:21;
151:14;196:16,24;
208:7,14;214:6,9,13;
217:10;222:4,12;
223:23;228:12;234:7;
235:17;239:10,13;
259:20;269:24;278:5;
279:10;305:21;311:6;
317:4,10,16;320:15;
395:15;396:24;
433:10;438:8,11,12;
439:15,18;440:1,18,
21;441:17,19,21;
442:1;457:6,11,15,18;
461:23;463:2,3;
464:16,19,22;466:11;
475:5;483:23;484:12;
486:17;490:20,21;

494:3,13,17;497:10,
17,20;498:3,6;501:21,
24;502:4,7,13,19;
505:15,17;506:23;
510:14;513:12;515:9;
518:5,8,20;519:1;
521:17,22;522:5;
524:1,15;526:1,4,8,
10,12,21;527:2,4;
529:4,18;530:5,11;
531:10,13;535:9

**Masry (68)**
166:2,14;167:15;
186:23;187:7,11;
188:17;220:8;221:16,
21;222:22;232:9;
254:4;282:8;295:13;
296:18,21;298:19,20;
299:9;300:16;313:18;
315:6;332:2;336:11;
337:18;341:18;
346:21;347:12,24;
348:3,10;349:13,17;
350:1,4,5,10,11,16,
23;351:3,19;353:12;
356:4;368:10;133:6;
378:7;399:19;401:8,
9;406:7,24;408:2,4,
17;486:23;488:6;
522:13;523:7;524:17;
536:8;537:12,20;
538:6;539:22;547:15;
548:18

**Masry/Girardi/Rich (1)**
333:7

**Masry's (3)**
221:18;348:4;523:5

**mass (4)**
486:8,20;487:1,16

**master's (1)**
482:22

**material (11)**
143:11;195:6;
360:19;362:8,15;
404:10;444:24;
467:24;468:3,3,9

**materials (1)**
62:10

**math (4)**
177:13;354:8;
400:14;499:11

**matter (46)**
8:5;10:3;11:12;
139:12;148:1;167:18,
19;217:2;220:7;
221:19;222:23,24;
320:22;321:20,24;
322:18;323:11,19;
324:19;325:6;334:7;
338:14;343:5;346:5;
357:15;358:14;
362:24;363:20;365:3;
368:8;380:24;393:9;

394:11;399:9;402:10;
414:20;425:22;
426:19;431:19;432:9,
12;434:18,22;448:3;
464:2;511:3

**mattered (1)**
558:16

**matters (4)**
206:6;349:6;
392:16;412:12

**maximum (1)**
450:6

**May (171)**
15:14;22:20,21;
23:7;25:21;27:16;
29:13;32:20;33:2;
62:15;66:6;71:6;
72:20,22;77:3,6;
78:13;79:2;84:1,3,4;
85:23;87:6;89:21;
91:17;98:1;104:17,
18;108:22;116:4,13;
119:18;120:21;121:3;
122:12,13,22,23,23;
124:7;125:4,24;
129:8;131:20;133:6;
138:18;160:15,16;
167:1;172:16;190:24;
195:17;197:18;198:9,
14;204:22;209:14;
216:8;217:17;218:6;
222:6;226:10;228:14;
230:1,23;241:11,18;
242:8;246:21;248:7;
251:2;252:2;253:10,
20;254:15;255:12;
256:23;260:16,19;
261:14;264:2;265:6;
266:6;275:7;277:16;
280:2;282:10,23;
285:7,14;292:8;
301:7;311:21;313:5,
6,8;319:18,21;322:2,
4,10;323:24;324:2,3;
325:9,15;326:1,11,19,
21;334:17;340:15;
342:19;352:7;354:5;
359:3;365:23,23;
366:1,11;367:11;
376:23;391:3;401:1;
404:12;409:24;415:4,
6,7,19;417:8;418:17;
420:15;421:23;
423:22;424:15,15;
427:13;430:4;436:14;
438:21;443:15,18;
453:18;457:12;
459:13,14;460:13;
461:11;470:22;472:9;
473:6;481:7;487:8;
488:4;490:7;491:8;
495:15;496:4;505:21;
506:3,6,7;514:4;

519:20;533:21,24;
534:14;535:24;
555:21;556:15

**maybe (61)**
19:22;29:2,2;33:4,
6;59:12;68:5;71:8;
75:16;87:6,12;90:2;
91:4;110:20;113:14;
139:1,2;169:11;
196:10;207:1;233:19;
240:16;253:14;
260:17;278:8;279:12,
12;284:23;296:5;
317:10;322:12,12;
343:23;348:16;
376:13;379:13;
380:14;387:18;410:6;
417:5;421:15;425:10;
430:15;436:15;437:9;
444:22;472:20;480:7;
485:5;486:14;492:18;
521:5;533:16,18;
541:24;543:15;
545:10;553:10,10;
556:8;561:21

**mayor (1)**
417:15

**MBA (2)**
482:24;483:3

**McCarthy (27)**
9:11,11;290:17,20;
342:2,6;343:15;
354:16,21,24;361:13,
17;529:8,10;535:12,
14;546:10,11;549:5;
553:19;554:16,19;
555:1;559:5,6,18;
562:11

**McDougal (2)**
184:14;186:7

**Meadowbrook (1)**
433:17

**mean (153)**
20:1;23:6,24;30:8;
31:16;33:21;34:9;
35:2;38:24;43:5;63:2;
67:2;76:12,17,21;
77:3,17;80:14;81:23;
82:5,11;83:20;84:5;
85:15,21,22;86:16;
87:23;88:1;90:24;
93:19;96:17;98:1;
104:23;105:11;110:5;
113:2,2,9,21;120:13;
122:18;138:3;150:12;
154:7;162:19;167:13;
176:13;180:20;184:4,
19;202:6;205:4;
216:10;218:21,22;
234:2;244:7,17,17,21;
248:14;249:10,23;
252:4,15;253:9,20;
266:21;280:8;283:1;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

285:10,15;290:14,23;
300:1;301:24;302:7;
304:4;309:6,24;
311:22,24;315:20;
317:13;324:11,22;
329:17;332:22;
334:16;340:5;343:9,
19;348:22;359:20;
362:4;363:10;371:12;
373:17;374:13;
375:24;376:14;
382:10;383:8;391:16;
393:21;397:1;398:17;
401:21;403:24;406:3;
409:10;411:10,11;
414:8,22;421:14;
428:4;430:8;450:8;
463:20;469:24;
478:23;479:18,23;
482:12,18;487:17,18,
19;488:19,21;501:12,
13;502:3,23;503:12;
512:8,17;515:1;
516:22;517:13;
519:14;523:12;540:1,
21;544:20;555:16,21,
23;556:9;559:3,14
**meaning (12)**
18:24;148:11;
164:9;338:1;372:8;
376:3;411:12;416:6;
431:23;453:5;509:21;
520:12
**means (19)**
320:11;331:13;
338:3;368:4;371:13;
414:4,24;421:17;
428:3;431:10;432:17,
19;435:17;436:17;
503:18;512:11,12,13;
513:7
**meant (4)**
252:8;321:22;
338:17;495:21
**mechanics (1)**
500:11
**mediation (11)**
193:5,19,21,24;
438:20;439:8,9;
442:4,11,19;467:19
**medical (4)**
16:6;261:1;331:3;
453:19
**Medina (81)**
191:12,16;197:17;
198:9;201:24;202:22;
208:18;209:19;221:6;
222:13;224:3,7;
225:6;238:23,24;
246:15;248:19;
250:23;254:24;256:8;
258:10;259:3;265:9,
14;266:4;303:3,18;

307:6;310:13;311:22;
312:4;313:6;352:8;
389:18;409:17;414:3,
6;417:21;427:19;
428:2,10;429:17,20;
431:2;432:10,21;
433:16;434:9;435:8,
14;436:4,7,14;437:1;
459:24;483:17;
506:10;507:6;508:7,
12;509:9,10,16;
510:2;512:6,14;
514:15,19;515:21,23;
516:7,8,24;519:16;
520:21;521:4,11;
522:10,21,22;523:4
**Medina's (2)**
259:6;430:7
**meet (26)**
48:22;74:14,18;
75:2,7;76:14,23;
129:15;215:3;273:5,
9;351:15,17;352:4,5;
354:22;355:1;357:18;
383:14;394:16;398:1,
4;432:21;469:16;
470:12;542:8
**meeting (176)**
74:17;78:2;148:18,
20;152:16,18;153:2,4,
6,9,10,12;155:15;
159:21;160:3,4;
162:20;193:8,9;
206:13;209:16;210:5,
14;211:9;212:4,11,17,
19,20,21;217:7;218:5,
6;219:9;221:5,9,15;
225:8;246:5,11,14,20,
22;247:22;248:11,17;
251:1;258:3;265:8;
268:23;271:17,21,23,
23;272:4,5,24;300:21,
22;319:1;327:2,16,19,
21;328:1,2,4,19,23;
329:1,2,3,12;339:15,
17;341:13;344:10,13,
14,16,18,24;345:3,13,
13,22;346:1,2,14,15;
352:11,16,18;353:9,
21,23;354:12;355:3,5,
7,12;357:15;358:2;
371:3,10,14,16;372:1,
2,10,14,16;382:4,14;
383:4,5,24;386:14;
387:1,4,9,19;388:11;
389:20;391:6;393:18,
22;394:4,10;397:4,6,
23;402:12;403:4;
404:23;405:1,3;
408:21;412:5,18,22;
413:2;419:9;420:24;
421:10,13,16,19,22,
24;423:4,7;426:4,5,

15,22;429:5,9;
432:12;507:17;
509:14;530:20;
531:16,22;533:9,18;
534:1,14,17,17,18;
535:2;541:13,15;
556:7;560:12
**meetings (59)**
62:15;79:24;
128:18;129:5;144:15;
153:1;210:16,21;
213:15,24;214:20;
217:5;246:22;247:1;
267:13;268:22,24;
269:3,12;270:5;
276:7;300:18;301:1,
4;302:24;319:1;
325:10,16;326:23;
328:14;329:9,11,16,
17,21,24;337:22;
372:12;384:15,24;
388:8;397:8,15;
404:6;418:8;419:19;
422:2,4,18,20;423:1,
3;530:18;532:23,24;
534:5;552:18,20,23
**Melissa (6)**
188:19,20;371:4;
378:9;537:8;549:14
**member (9)**
21:11;38:8;125:5;
312:23;313:8,10;
314:15,19,22
**members (11)**
16:16;172:1;184:6;
228:23;257:3;269:6,
7;282:19;306:8;
383:15;550:20
**membership (1)**
313:5
**memo (2)**
63:20;64:5
**memoranda (2)**
253:13;495:5
**memorandum (39)**
35:3,4;37:18,20,24;
38:11;63:5;166:5;
169:18;170:13,15,19;
171:2;179:7;201:16;
203:7;13;207:9;
218:15,16;219:8;
224:17;295:6;302:7,
11,14,17,20;303:20;
306:2,5;333:8,22;
472:7;490:12,22;
494:21;500:15;505:1
**memorialization (1)**
527:6
**memorialize (1)**
171:3
**memory (2)**
39:19;450:1
**men (3)**

75:5,8;474:15
**Menendez (1)**
216:23
**Menendez's (1)**
217:1
**mental (3)**
104:24;527:15;
528:18
**Mentally (5)**
106:9;131:10,13;
132:22;529:1
**mention (3)**
417:11;466:21,23
**mentioned (17)**
47:20;74:1;89:14,
24;119:20,23;150:1;
206:14;215:14;375:8;
400:8;420:15;443:16;
444:14;461:10;
535:17;551:11
**mercury (1)**
47:23
**merely (3)**
434:2,13;435:9
**merger (1)**
51:12
**meruit (7)**
142:11;413:12;
477:18;479:9,12;
480:11;485:9
**message (20)**
217:22;236:12,14,
17;237:2,3;238:17;
243:24;245:6,24;
448:7;507:9,10,10;
513:17,18,20;515:23;
546:23;547:2
**messages (1)**
244:10
**met (74)**
21:21;22:7;48:14,
19;67:11;75:11;77:1,
5,10;78:5;86:11;
113:18;129:13,15,19;
130:7;146:20;196:10,
14;206:11,23;207:1;
210:3,23;211:4;
218:9;263:13,18,19,
19;309:17,18;340:18;
342:14;344:17;346:5;
353:8,20;354:12,13;
357:12;370:9,12;
381:2;382:13;383:1;
385:4,16;387:13;
388:6,9;394:12;
399:10;402:10,12,18;
404:2;412:9;414:24;
418:24;426:18;
432:10;434:19;436:4,
5,6,7,19;437:15;
443:10;469:5;474:16;
532:21;541:11
**metal (1)**

237:8
**meticulous (1)**
62:11
**Miami (4)**
333:9,17;419:12,17
**mid-'90s (3)**
129:13,15,16
**middle (2)**
61:11;458:12
**might (55)**
23:5;25:16;46:19;
50:10;53:12,17;
62:12;64:14,16;71:7;
81:23;88:7;90:16,22;
91:1,2,11;92:14,22,
23;93:24;112:19;
129:24;160:18;
206:20;207:16;
215:18;220:2;226:18,
19;228:7;253:4,17;
264:4;287:13;329:19;
330:1;392:17;402:22;
407:8,24;410:15;
413:12,19;423:8;
459:6;465:23;479:6,
9;514:6,20,23;517:7;
524:17;532:9
**might've (13)**
58:13;71:9;227:17,
18;247:11;253:21;
329:20;359:13;
385:24;398:6;412:14;
424:17;562:6
**Mike (11)**
307:19;309:17;
312:17,20;414:4,6;
532:13;533:8,19;
534:2,6
**military (2)**
21:12;248:10
**millions (1)**
455:19
**Milstead (1)**
215:23
**Milstein (1)**
215:22
**mind (12)**
137:8;145:10;
175:21;207:8;320:12;
333:1;351:5;461:2;
537:23,24,24;547:16
**mine (7)**
28:19;76:14;87:8;
96:18;132:18;224:2;
561:13
**mingle (1)**
366:16
**Minneapolis (2)**
16:13,20
**Minnesota (1)**
16:21
**minute (10)**
24:21;64:13;140:9,

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

10;141:20;145:3,6;
156:20;336:24;494:7
**minutes (4)**
265:18;450:5,6;
453:9
**mirror (1)**
461:2
**mischaracterizing (1)**
487:22
**miscommunicated (1)**
69:13
**misleading (1)**
497:16
**misled (1)**
102:4
**mismanagement (1)**
19:20
**misread (1)**
347:2
**misreading (2)**
500:8;547:20
**missed (2)**
412:14;511:6
**missiles (1)**
22:2
**missing (3)**
25:21;27:16;334:24
**misspoke (1)**
140:16
**misstated (7)**
105:19;112:22;
132:11;134:22;140:7;
162:13;517:22
**Misstates (3)**
107:19;114:21;
140:13
**misstating (5)**
69:2;104:7;136:1;
140:11;142:19
**mistake (1)**
334:13
**mistaken (1)**
77:4
**misunderstanding (1)**
103:21
**Mitchell (5)**
8:9;215:1;274:22;
275:5,9
**ML (2)**
339:13;340:2
**MMC (1)**
433:19
**MO (1)**
179:21
**Mobil (1)**
14:5
**mobile (2)**
93:10;285:19
**model (5)**
269:10,19,22;
425:4,9
**moment (7)**
192:5;231:18;

243:3;284:16;370:18;
375:8;515:17
**moments (2)**
197:9;221:12
**Monday (4)**
248:6;261:10;
522:9;549:22
**money (4)**
76:3;91:2,7;107:2;
169:12;412:16;
453:17;455:16;456:5;
488:13
**monitoring (2)**
331:3;453:20
**Monongalia (1)**
314:22
**month (15)**
59:16;124:19,20;
159:12,12,17;280:5,5,
7;328:13;334:8;
338:4,14;458:2;
528:12
**monthly (17)**
282:6;295:20,21,
23;296:3,7,19,20;
297:7,9,14;395:2,24;
396:4,4,7,16
**months (11)**
47:19,20;210:23;
296:6;318:9;321:11;
325:23;346:12;
360:12;394:15;
460:22
**Moore (12)**
197:20,22;198:6,9;
258:17;264:1,4,13;
435:14;514:1;516:10;
517:3
**Moose (1)**
443:24
**moral (2)**
81:3;561:24
**more (69)**
18:9;33:18;59:6;
62:17,21,22;75:24;
94:1;113:4,8;119:20;
122:10;124:7;136:21,
24;177:22,23;188:14;
210:24;211:20;
213:14,24;219:14;
224:4;225:21,22;
226:3;228:8;239:1,
19;241:4,5,18;
246:18;277:3;279:5,
23;293:10,12;294:3;
315:7,15;316:11;
328:13;329:19;330:2;
341:3;351:1;354:1;
357:3,8;388:6,9;
390:13;399:20,21;
407:6,12;413:23;
414:1,8,11;450:6;
452:6;470:7;477:13;

499:23;529:19;
548:18
**Morgan (4)**
412:11;419:14;
436:21;437:16
**Morgantown (24)**
17:6,21;18:2;26:22;
28:19;29:19,22;31:1;
42:22;43:1;75:19;
87:24;268:13,21;
285:24;345:7;357:9;
362:1,19;402:11;
417:16;436:20;
437:15;443:5
**morning (11)**
10:14,17,18;
286:16;288:22;
292:17,18;322:8;
336:13,15;553:5
**Morris (1)**
443:24
**most (17)**
72:5;178:17,18;
186:10;197:10;
293:14;329:6;365:21;
406:9;441:8;457:1;
475:16;482:15;
489:16;530:1,23;
555:5
**mostly (2)**
436:21;437:16
**motel (3)**
76:19;77:5;376:11
**mother (4)**
15:4;16:7,8,10
**mother's (1)**
16:17
**motion (6)**
41:11;201:17;
452:9;462:1,13;464:1
**motions (2)**
543:19;544:9
**motivated (1)**
139:17
**Motley (5)**
268:8;273:6,8,16,
21
**Motor (1)**
470:14
**MOU (21)**
38:4,7;172:18,20;
176:14;177:1,15;
179:12,21;302:6,7;
410:21;472:7;495:8,
21;496:9;537:19;
538:5;542:14,19,21
**mouth (1)**
481:8
**move (6)**
17:7;23:9;28:15;
41:24;69:7;157:21
**moved (5)**
29:19,22;42:16;

410:6;514:6
**movie (1)**
344:21
**moving (11)**
89:9;91:12;92:1,9,
10;94:6;286:24;
349:8;410:5;486:24;
537:16
**much (29)**
19:10,18;27:2;45:4,
7;62:22;65:2,15;73:1;
77:8;86:1;130:21;
168:14,24;169:4;
186:20;211:24;
219:13;229:11;
240:15;266:7;276:19;
280:7;308:13;317:17;
323:1;328:10;412:15;
438:15
**multiple (1)**
97:18
**must (5)**
11:9;132:16;263:1;
306:16;552:3
**must've (7)**
68:4;252:15;325:1;
386:22;452:21;
471:13;507:24
**mutual (2)**
37:14;103:22;206:2
**myself (8)**
85:1;113:6;182:5;
268:7;332:23;352:8;
456:20;468:5

## N

**Nadler (3)**
78:20,20;400:8,16;
401:2;403:12
**Nadler's (1)**
401:1
**nail (1)**
471:6
**name (42)**
8:16;10:14;16:17;
35:11;55:24;56:9;
89:10;90:1;152:10;
159:4;197:5;202:17;
204:23;208:24;
209:13,15;216:1;
226:17;243:8;250:4;
254:12;258:23;259:6;
267:22;268:1,9;
286:16;308:22,22;
331:12;339:18;
341:11;375:3;410:8;
420:21;430:11,12;
438:12;475:7;513:19;
535:13;536:21
**named (4)**
16:24;53:12;71:14;
193:14

**names (16)**
16:15;63:2;84:24;
85:1,3,5;204:21;
209:9;210:12;280:12;
304:11,13,15,15;
544:18,19
**Nancy (23)**
153:14;187:18;
254:4;353:18;354:3;
360:3,15;378:9;
382:13;383:2;407:4;
408:3;421:16,20;
425:10;488:14;
536:17;537:1,8;
539:11;542:5;553:8,
11
**nasty (1)**
312:1
**Natalie (2)**
16:20;56:23
**Nathan (5)**
263:14,21,24;
264:2,7
**National (8)**
13:13;23:22;24:5,
24;25:19;260:19,22;
307:10
**nature (8)**
46:14;109:10;
185:18;190:10;402:3;
407:5;492:16;543:24
**near (4)**
287:15;412:11;
436:20;437:16
**nearly (2)**
191:14;411:24
**necessarily (8)**
72:10;75:9;81:21;
285:9,15;398:5;
470:16;503:20
**necessary (2)**
226:22;389:23
**need (21)**
132:17,19;136:14;
137:18;140:4;231:1;
233:15;235:7;282:23;
356:5;357:2;383:10;
388:22;392:17;
430:24;469:11;
470:11;478:4;513:2;
514:15;546:13
**needed (21)**
15:17;175:1;
176:12;276:8,20;
282:3;309:14;315:6,
15;316:10;341:2;
357:21;399:17;
420:19;469:3;480:19;
492:12;505:9;512:7;
536:9,10
**needing (1)**
399:20
**needs (8)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

229:5;239:2;
310:21,22,22;357:5;
483:24;537:13
**negative (3)**
195:2;308:2;538:20
**negatively (1)**
456:10
**negotiate (4)**
131:16;132:23;
505:5;545:16
**negotiated (7)**
132:6;160:18;
173:4;297:8,13;
303:1;480:9
**negotiating (10)**
18:11;19:13;
131:14;132:7,13,17;
160:20,24;298:18;
302:20
**negotiations (13)**
132:14;299:1,14,
18,21;300:3;385:6,
20;394:20;395:8,11,
14,20
**neither (2)**
530:1,23
**Nelson (1)**
472:13
**nephew (10)**
298:23;356:21,22;
357:6,10;359:4;
365:23;386:1,1;561:3
**Ness (5)**
268:7;273:5,8,16,
21
**net (1)**
50:24
**neurological (1)**
336:2
**new (16)**
30:7;119:13,18;
167:11;211:24;225:1;
300:14;302:4;312:8;
353:7;355:11;499:6;
513:21,24;514:2;
542:14
**newer (1)**
291:6
**next (75)**
78:2;205:24;
207:12;219:2;221:4;
249:5;250:1,12;
259:12;260:6,10;
261:7;263:3,6,12;
306:23;322:3;323:13;
330:6;335:23;336:13;
349:16;350:14;
351:12;352:21,24;
353:1,2,6;358:12;
359:24;360:17;
361:12;365:2;368:7,
17;370:1,22;374:2;
379:4,11;381:6;

382:3,12;383:22;
385:3,12;386:13;
387:3,12;393:17;
402:17;404:13;
412:20;413:14;
418:23;419:8;422:1;
423:24;425:3,7;
426:5;427:18;429:3;
431:1;433:24;490:11;
511:23;537:5;542:8;
550:2,7,9;553:5;
560:17
**nice (8)**
75:3;77:12;110:5;
252:5;344:18,22;
454:21;483:5
**nicer (1)**
193:13
**night (14)**
81:24;164:7;193:5,
18;336:12;376:13;
439:8;444:11;445:5;
467:19;513:21;
521:23;549:22;553:4
**nine (7)**
59:13;259:10;
312:11;345:6,8;
512:8;549:22
**noise (2)**
94:2,3
**non-Aramco (1)**
53:7
**non-attorney (1)**
137:5
**non-common (1)**
493:1
**None (2)**
49:8;245:1
**nonetheless (2)**
360:13;456:18
**non-lawyer (11)**
126:22;136:16;
137:10,20;138:16;
140:1,3;141:2,19;
142:4;478:6
**non-testifying (1)**
465:17
**non-testimonial (1)**
265:19
**non-union (1)**
269:7
**nor (3)**
448:13;530:2,24
**Norfolk (3)**
220:9;271:13;
423:11
**Normally (1)**
450:14
**Northern (2)**
8:11;182:23
**Nos (2)**
270:21;271:4
**note (22)**

163:4;243:5,23;
245:17;246:4;250:17;
251:8,11,20;256:1;
325:8;345:21;353:1;
356:7;379:15;413:3;
449:7;452:19;466:2;
519:2;524:5;556:12
**notebooks (1)**
424:22
**noted (3)**
435:9;454:11,12
**notes (46)**
61:8;62:12;70:9;
72:18;151:18,20;
152:1,4,11;153:4,13;
216:17;224:2;239:17;
247:22;257:16;258:3;
262:8;263:1;265:1,8,
10,12;276:6;339:14;
354:6;355:6;376:18;
379:13;385:17;
436:15;453:9;454:20;
458:8;510:18;511:1,
6;549:8;555:10,11,
18;556:11,19,20;
557:1;559:15
**notice (14)**
10:23,24;11:16;
16:24;91:20;182:7;
227:16;236:19;
243:17;248:2;320:21;
341:21;360:21;390:3
**noticed (3)**
194:17;319:11;
468:13
**noting (1)**
434:2
**Notre (2)**
406:12;483:1
**novel (1)**
93:18
**November (7)**
75:16;129:16;
271:7;275:10;360:17;
361:15;451:22
**NRA (1)**
307:9
**number (91)**
14:2;29:1;47:17,19;
48:24;62:10;87:23;
152:10;158:21,22;
168:3;169:12;195:17;
199:18,19;203:24;
204:19;205:5;210:21;
214:10;232:2;236:19;
238:13;251:23;258:5;
276:6;279:11,13;
280:14;290:11,12;
293:21;306:6;319:5;
321:2,5,8,10,16;
322:5,21;323:2,5,12;
324:20;329:15;
336:19;339:6;340:22;

345:5;360:12;372:15;
380:6;383:16;391:13;
394:21;396:18;
398:23;409:18;415:1;
417:13;422:16;
424:12;441:16,22;
442:7;444:2;445:21;
459:22;469:23;
472:20;490:14;
503:17;506:5,5,6;
507:12;513:22,24;
514:3,11;518:7,10,14,
17;523:1,22;531:12;
540:1;547:7;558:24
**numbered (2)**
409:6,18
**numbers (8)**
63:3;195:13;
211:20;260:22;280:6;
382:1;500:12;514:6
**numerous (5)**
113:18;114:13;
135:2;357:17;530:18

## O

**Oaky (1)**
176:17
**oath (3)**
65:23;292:12,14
**Object (76)**
103:8,16;104:5;
108:6;112:21;114:20;
134:2,18,21;137:11,
12,21;138:17;139:7;
140:6,12,21;142:18;
144:3,8;154:9,20;
155:2;156:5;157:22;
158:8;160:5;162:14;
163:23;164:4,5;
181:14;207:5;208:7,
14;217:10;222:4,12;
223:9,23;228:12;
233:8;235:17;239:10,
13;259:20;269:24;
270:1;274:18;278:5;
279:10;305:21;
310:10;311:6;319:17;
320:15;326:17;
395:15;396:24;420:7,
10;433:10;455:24;
466:8;478:11;481:14,
23;482:1,10;487:23;
490:1;493:11;513:5;
516:21;520:23;530:6
**objected (1)**
305:23
**objection (32)**
12:4;41:8;105:16;
107:16,19;119:4;
132:10;135:22;
152:20;153:23;
154:21;155:4;161:8;

162:9;164:3;180:17;
223:10;229:4;304:18,
22;305:1,13,15;
307:22;342:2,6;
343:15;354:16,21;
493:10;517:19,21
**objectionable (1)**
378:19
**Objections (2)**
274:7,24
**obligation (3)**
37:11,12;505:1
**obligations (4)**
37:15,18;172:17;
504:13
**observation (1)**
350:9
**obtain (4)**
244:19;252:19;
253:7;298:23
**obtained (6)**
45:22;74:6;213:4;
227:10;253:8;391:24
**obtaining (4)**
244:15;252:10;
261:13;422:23
**obviously (13)**
62:22;64:22;67:3;
239:17;301:6;314:17;
357:4;374:13;375:10;
430:8;482:13,18;
484:23
**occasion (11)**
188:14;215:11;
225:22,22;240:21;
241:4;242:2;340:16;
388:7,9;437:14
**occasionally (2)**
47:8;557:20
**occasions (14)**
120:24;183:8;
205:19;226:8;242:2,
11;267:1,5;343:4,23;
384:7;387:22;397:13;
413:1
**occupation (1)**
31:6
**occupied (4)**
272:18;517:18,20;
518:2
**occupy (1)**
275:17
**occur (8)**
246:11;329:13;
354:14;372:14;379:8;
398:12;538:11,12
**occurred (22)**
68:23;129:22;
256:16;271:21;273:2;
346:1;350:9;351:6;
364:20;387:1,9;
393:22;402:14;405:7;
429:8;434:14;435:11,

**Gary W. Rich and Law Office of Gary W. Rich, L.C. v.**
Joseph Simoni, et al.

**Gary W. Rich**
**April 30, 2013**

18;448:16;511:1;
539:13,20
**occurring (1)**
434:3
**o'clock (3)**
376:13;549:22;
553:4
**October (5)**
14:16;275:7;
328:24;329:1;451:21
**odd (5)**
357:17;376:14;
378:20;409:5;416:19
**off (49)**
38:13;64:4;65:10;
66:6,15,23;95:17;
117:2;143:14;150:15;
180:2;193:14;231:3;
233:19;234:7,18;
261:21;270:15,16;
284:24;289:14,19;
291:8,9,14;324:21;
331:13;335:3,4;
346:24;363:24;370:5;
373:17;381:3;386:16;
388:23;419:11;
421:11;422:11;426:1;
431:6;437:4,20,22;
463:21;484:1;517:4;
529:11;562:16
**offensive (1)**
265:16
**offer (8)**
14:18;90:5,7;91:15,
18,19;92:16;474:17
**Offhand (5)**
165:21;168:1;
192:3;198:13;346:18
**Office (78)**
8:21;9:21;18:3,4;
30:13;31:23,24;32:9;
33:4;34:18;36:21;
43:2;44:21;45:10;
58:12;61:24;80:1;
81:14,23;82:6;
146:21;182:22;226:1,
4;236:21;238:11,14;
243:6,14,18;245:18,
21;248:4;251:21,24;
252:10;255:1,3;
256:1,4;257:19;
259:14;262:12;265:1,
4;267:16;268:10,17;
271:10;272:18;274:6;
276:15;278:1;280:2;
283:13;284:19;
285:23;359:12;
362:12,20;364:21;
381:3;385:24;397:11,
13;402:19,21;403:5,
23;404:7;412:10;
420:17;448:7;449:12,
18;555:22;559:24,24

**officer (8)**
22:11,17,19,20,21;
24:10;35:7;38:2
**offices (4)**
8:21;214:23;215:6;
361:21
**official (1)**
477:2
**officially (1)**
29:24
**offset (1)**
298:14
**Ohio (1)**
471:19
**oil (9)**
13:11,12,14,15,24;
14:5,8;18:9;21:3
**old (6)**
49:5;57:21;74:22;
217:7,20;421:10
**older (2)**
290:24;550:18
**oldest (2)**
16:18;406:10
**Oliver (5)**
339:12;340:8;
341:9;394:20;399:3
**once (24)**
15:7;85:24;90:12;
110:23;124:6;133:6;
196:11;207:1;226:2,
9;240:6;265:19;
268:19;280:16;282:4;
356:15;369:22,22;
464:4;477:13,19;
501:4,5;543:5
**one (200)**
15:24;20:15;23:3;
36:23,23;39:22;
43:14;50:18,19,23;
51:18,19;52:5,7;
65:10;73:6;74:2,3;
79:15;81:14;83:6;
93:8;99:7,13;111:23;
115:20;119:14;
133:12;135:19;
141:21;150:20;
152:10;157:8;159:13;
163:18;165:14;166:9;
167:6;170:21;172:3,
6;173:9,10;178:19;
180:10;185:17;
188:14;193:13;
198:14;199:18;204:1,
22;206:2;209:2,12;
213:14,23;216:22;
218:3;225:21,22;
226:15;235:21;
240:21;241:4,5,12,16,
18;242:8,13;246:18;
250:11;252:9;259:17;
266:16;276:9;281:5,
11;282:2;286:7;

288:21;289:11,14;
290:5,8,15,15;291:4,
6;300:21;303:18;
304:16;306:5;311:8,
17,21,23;314:8;317:2,
3;318:24;319:2;
322:11;324:6;325:24;
326:2,5;329:2,12;
331:10,24;335:21;
339:18;341:15;
347:20;351:1;354:6;
355:23;356:11;
360:10;365:15;367:6;
369:16,16;370:19,21;
372:12;373:8;375:4;
378:5;379:15,24;
381:2;383:19;384:22;
386:22;387:9;388:6,
9;389:24;394:16;
399:14;407:9;409:18;
412:12;414:12;
415:23;417:16;423:3;
426:3;430:24;432:13;
433:15;438:19;
444:22;446:7;457:21;
461:18;469:12;474:6,
15;479:4;483:1;
493:18;494:2,5,16;
500:20,20;502:14;
504:5;509:21;510:21;
518:1,3,7;524:9;
525:14;526:5,17,20,
22;529:23;531:4,15;
533:1;536:20;538:16;
541:22,23,24;542:1;
543:15;550:10;
552:21;554:7,8;
559:14;562:5
**one-page (1)**
151:6
**ones (11)**
83:7;99:18;150:1;
167:7;177:20;216:1;
319:5;320:7;323:12;
326:20;416:23
**one's (1)**
329:21
**one-tenth (1)**
543:1
**one-way (1)**
127:4
**ongoing (2)**
395:20;432:11
**online (1)**
84:3
**only (22)**
11:7;63:13;66:8;
73:13,16;90:12;99:7;
141:21;172:6,7,8;
260:8;263:8;314:8;
337:10;339:23;378:3;
386:22;466:2;472:20;
494:3;521:23

**onto (1)**
59:19
**open (2)**
34:5;65:4
**opened (3)**
29:15;61:15;422:3
**operate (1)**
31:1
**operating (1)**
19:4
**operation (1)**
479:2
**operations (2)**
30:2;33:17
**opinion (34)**
111:10,11,12,21;
112:13,15,16,17,17,
18,19;114:1,18;
134:16;135:10,18;
136:4,11;137:18;
138:16;139:24;140:4;
247:6,7;319:22;
416:14;460:16;475:6,
10;476:14;488:16;
493:17;525:17;
547:15
**opinions (3)**
135:14;136:14;
179:19
**opportunity (2)**
231:22;235:2
**opposed (11)**
48:3;224:17;329:8;
338:22;387:10;
444:19;481:7,9,11;
487:7;527:10
**opposite (1)**
509:18
**Opposition (1)**
201:16
**oral (1)**
116:17
**order (21)**
59:23;125:20;
136:15;233:14;431:4;
462:13,18;463:8,8;
464:4,10,13,14,15,16,
21,23;465:2;466:9,
12;472:22
**orders (1)**
464:17
**ordinary (1)**
442:13
**organization (1)**
14:13
**organizational (4)**
269:3,10,18,22
**organizations (3)**
314:10;315:7,16
**organize (3)**
269:12;419:8;
420:23
**organized (6)**

79:24;328:13;
329:5,6;422:2;426:14
**organizer (1)**
105:10
**organizing (3)**
267:12;269:2;270:5
**original (6)**
60:11;379:16;
380:13;390:13;
537:19;542:21
**originally (4)**
154:19;211:20;
300:2;382:6
**Orioles (1)**
215:24
**Orleans (1)**
225:1
**others (12)**
51:14;52:9;142:12;
146:21;150:4;213:5;
238:22;239:23;
266:23;376:17;
486:10;497:3
**Otherwise (2)**
40:22;147:4
**ought (2)**
194:21,23
**oust (1)**
560:16
**out (90)**
26:1,14;37:9,18;
38:4;50:9;53:1;55:13;
68:20;69:1,5;71:10,
18,20;72:1,7,11,11,
23,23;83:17;86:3,18,
19,20;93:19;96:23;
100:19;102:5;104:20;
110:8;116:6;121:15;
123:2,10,21;124:9,11,
13,16;125:9;126:21;
134:12;136:15;
178:11;195:13;213:6,
8;216:4,5,12;226:12;
237:13;241:12;
265:13;269:13;
305:24;308:6;314:11;
319:2;329:3;342:19;
357:3;372:23;373:23;
374:11;377:2;394:22;
400:24;405:19;
408:21;411:20;
412:10;414:14;
424:11,18,18;425:2,
14;439:2,3;441:5;
445:20;451:18;
458:16;472:6;476:5;
478:15;492:20;
521:22
**outcome (1)**
310:8
**outer (1)**
449:12
**outline (1)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

254:15
**outlined (1)**
466:3
**Outlook (1)**
59:15
**out-of-state (8)**
356:23,24;424:2,8;
425:6,16;426:23,23
**out-of-staters (2)**
416:16,22
**outset (5)**
95:20;96:21;101:7;
102:11;114:5
**outside (8)**
93:15;128:19;
140:16;214:18;
265:15;381:2;511:21;
542:4
**over (43)**
17:9;45:4;63:1;
68:3,11;72:16;98:3;
112:1,3;113:9;
129:18;149:16;150:5,
8;153:3;170:11;
173:18;206:4;219:17;
220:14,20;224:19;
249:8;303:5;317:10,
11;328:12;336:3;
347:7;375:15;385:6;
395:22;410:2;417:23;
418:5;445:2;447:15;
477:14;478:19;
480:19;504:5;518:16;
550:2
**overall (7)**
77:14,18;394:24;
401:11,15;495:21;
545:6
**overhead (2)**
492:7,24
**overlap (1)**
290:21
**overloading (1)**
348:23
**overseas (5)**
26:15,21;30:7;95:4;
96:22
**overwhelming (1)**
536:10
**owe (1)**
121:3
**own (9)**
27:3;36:13;42:7;
209:15;214:23;
268:19;286:4;383:13;
420:5
**owned (4)**
13:15;14:4;88:23;
285:23
**owners/operators (1)**
327:4
**owns (3)**
32:24;215:24;

482:14

## P

**PA (7)**
8:10,18;274:22;
275:6,9;389:21;550:4
**package (4)**
61:11,16;67:4;74:2
**page (123)**
11:9;152:10;
156:19,22;157:4,5,6,
12;171:13;174:12;
202:9;203:16;207:13;
216:20;219:4,8,16,17,
18;220:12,13,14,20;
222:21;224:5,15,19;
228:1;263:1;320:20;
323:3,9;324:13;
331:5,6,16,22,23;
333:6;334:19,23,23;
335:13,14,16,19,20,
24;337:10,12,13;
339:10;344:3;345:9;
346:3,4;358:12,12;
363:13,19;368:7;
370:22;372:18;378:2,
3;379:11,11,12;
380:23;389:15;402:8;
412:8;414:18;421:8;
423:24;425:21;427:4,
7;429:18;431:15,18;
434:5,6,17;435:5,20,
23,24;436:18;442:3;
443:4;454:12;462:17,
22,23,24;463:1,4,11,
12;464:6;468:14,19;
490:22;491:22;
495:13;496:2,7;
497:14;499:6,19;
500:5;501:1,2;
502:14;511:8,10,23;
512:1;524:10;551:14;
559:19,21
**pages (5)**
224:8;231:17,23;
232:1;334:24
**paid (58)**
31:2,7,18,24;108:4,
8,13;110:11,16,23;
111:1;112:20;113:15;
114:15,19;115:17,20;
133:21;135:15;138:7,
7;139:21;140:1;
148:5;168:24;169:4;
281:11;283:18,21;
284:1,4,7,11;295:20,
21;296:1,10,13,15,24;
305:5;314:2;396:17;
400:7,9;411:21;
445:3;446:18;452:19;
473:22,23;474:3;
476:20,21;488:3;

490:10;543:2;551:19
**pain (1)**
233:22
**Palm (2)**
61:10;62:20
**PalmPilot (10)**
60:23;61:1,16;
62:11,13,17;63:16;
65:6,10,15
**panel (1)**
487:1
**Pap (1)**
414:5
**Papantonio (70)**
8:9;9:6,12;10:15;
34:13,14;35:6;58:3;
142:15;143:4,12,20;
144:6,12;146:5;
147:8,10;148:12;
149:11,17,21;156:2;
165:4,9;168:9;171:9;
172:10;175:14;176:1;
177:22;180:23;181:6,
20;214:24;220:8;
221:15;222:2,23;
250:22;274:21;275:2,
5,8;277:6;303:24;
307:2,19;309:18;
312:17,21;315:13;
396:9,15;414:6;
428:7;443:24;444:1;
459:2,13,18;467:2,13;
490:24;491:3;496:15;
499:7;500:2;514:9;
516:20;517:17
**paper (2)**
72:13;118:12
**Paragraph (33)**
145:1,23;147:19,
23;149:4;163:18;
171:15;174:13,21;
183:5,7,16;205:24;
207:3,12;219:16;
220:16;221:1,4;
222:21;228:3;232:5;
274:17;486:5;491:22;
492:23;530:3,5,7,14;
547:19,21,23
**paragraphs (4)**
159:5;232:2;
529:23;546:5
**paralegal (5)**
197:21;255:3;
264:3;275:15;276:24
**paralegals (1)**
198:15
**parcel (1)**
343:12
**Pardon (2)**
50:3;342:5
**parentheses (24)**
216:23;275:4;
351:18,18;363:22;

368:10,11,20,20;
371:4,5,6,6;385:5,6,7,
8;391:12,13;436:3,4;
437:1,2;454:13
**parents (2)**
287:15;410:7
**Park (2)**
8:22;404:24
**parking (1)**
402:12
**part (17)**
146:24;231:18;
240:9;316:1,6;329:6;
343:12;374:24;
410:15;464:8;486:6;
504:12;519:3,5,8;
543:19;551:16
**participant (3)**
143:1;268:17;
560:11
**participants (3)**
258:9;272:4;428:20
**participate (13)**
253:24;254:20;
359:9;403:9,13,17;
476:10;534:22;544:2,
5,8,22;545:3
**participated (12)**
213:14,23;256:20;
257:2;258:18;327:2;
368:8;371:2;372:10;
425:13;530:18;
552:15
**participating (1)**
214:20
**participation (1)**
552:20
**particular (32)**
43:11;49:6;84:7;
136:6;165:22;166:9;
183:5;188:9;204:21;
212:17;240:2;241:6,
20;245:7;258:6;
274:19;293:13,15;
315:14;326:2;345:19;
349:6;362:19;363:12;
365:12;381:23;383:2;
429:2,11;455:18;
555:14;561:20
**particularly (1)**
274:10
**parties (13)**
20:11,13,19;34:22;
36:7,23;37:19;
122:19;167:19;
174:24;176:6;179:8;
290:6
**partner (5)**
88:21,22;155:20,
21;550:17
**partners (2)**
32:8,10
**partnership (1)**

99:21
**parts (2)**
145:16;318:18
**party (15)**
20:18;29:9;34:19,
24;37:23;122:7,20;
172:16,17,22;274:4;
301:6;454:18;491:24;
556:18
**pass (10)**
102:5;113:14;
125:19,22;126:3,16;
175:11;181:21;343:5;
475:21
**passed (7)**
100:11;110:12;
122:13;124:11;
125:11;175:7;460:23
**passing (4)**
122:18;173:18;
206:15;420:16
**passionate (1)**
322:24
**past (4)**
33:23;307:21;
469:19;501:17
**Pat (2)**
472:12,13
**patience (2)**
411:15;412:1
**Paula (1)**
328:15
**pay (31)**
32:2,6;107:15;
108:19;109:14;
114:12;133:24;139:2;
168:12;169:8;175:7,
16,16;176:2,4;
177:22;178:18;283:3,
6,9;285:2;294:11,14,
21;297:12;310:18;
445:6,7;478:1;
488:11;508:12
**paying (16)**
37:15;77:8;107:23;
108:1;167:22;195:6;
276:16;286:11;
300:14;399:11;
453:12;480:24;481:9,
11,14;561:23
**payment (7)**
190:23;297:2,14;
411:1;444:15;451:12;
561:19
**payments (12)**
120:20;169:5,7;
184:2;296:18;453:16,
20,22;454:1;467:18;
471:4;473:19
**pays (1)**
37:16
**PC (3)**
8:8;9:8,10

**Peace (1)**
219:24
**Peil (2)**
117:23,24
**pending (2)**
343:5;384:8
**Pennsylvania (8)**
28:16;148:2,6;
361:6,9;431:8,24;
553:5
**pension (2)**
283:11;284:18
**people (94)**
16:9;20:19;22:7;
27:12;48:13;49:1;
52:18,20;53:12,14;
71:3;74:3,4;80:15,24;
81:13;82:5;83:18;
87:23;88:2;107:3;
132:16;139:13,18;
140:16;166:7;177:11;
187:15,17;204:17;
205:3;206:18;210:13,
23;211:21;212:23;
218:3;219:23;227:16;
260:21;269:8;280:18;
322:23;324:5;337:21;
342:22;354:4,13;
371:17;380:5,6,11;
400:6;401:23;402:3;
409:3,15;414:9;
415:4,12;416:18;
423:1,4;427:9,16;
431:21;432:6;443:11,
20;444:2;454:19;
456:6,22;459:4;
477:3;482:6,15;
483:14;488:15;
489:16;503:21;504:1;
509:5;510:1;512:24;
536:23;537:16;539:1;
540:1,2,12;547:8;
552:13;554:11
**people's (1)**
399:11
**per (2)**
256:7;329:23
**perceive (1)**
455:21
**perceived (2)**
407:11;411:4
**percent (52)**
98:12,12,13;
105:15;154:5,8,14,18;
163:6;165:10;166:19,
22;167:1,2,14;176:2,
4;241:23;284:23;
299:6,9,11;301:14,14,
19;312:12;321:22;
332:20;354:9,9,11;
356:1,2,3;368:5;
395:1,24;491:4,5;
499:7,7,8,9,10;500:3,

4;504:4,4,5;538:5;
542:12;543:1
**percentage (22)**
161:20;166:22;
284:20;295:1;301:13,
18;304:2;305:10;
308:9;310:7;311:4;
312:7;396:15;454:8;
478:2;481:1;485:12;
501:6,8,10;504:10;
538:7
**percentages (9)**
97:11,14;175:22;
176:7,24;177:4,19;
381:22;405:15
**perception (5)**
356:24;407:1,15;
450:7;458:7
**perform (9)**
229:9,14,18,22;
276:5,12;429:15;
487:11;513:4
**performance (2)**
172:17;498:10
**performed (11)**
73:23;209:3;276:2,
22;278:1;289:6;
367:7;469:20;486:8,
20;493:7
**performing (5)**
316:17;322:16;
366:8;367:4;376:21
**perhaps (7)**
142:10,11;264:7;
285:11;370:18;423:4;
436:6
**period (17)**
204:5;205:3;218:8;
240:1;248:10;251:10;
275:7;278:20;322:10;
328:12;331:18;336:3;
366:3;419:23;420:5;
479:19;511:19
**periodic (1)**
384:7
**periods (1)**
240:14
**permission (2)**
174:3;513:1
**Perrine (7)**
194:1,2;201:9;
210:11;217:3;422:3,
21
**Perrines (1)**
218:9
**Perrine's (6)**
217:6;419:10,20;
421:1;426:16;436:5
**Perry (1)**
202:14
**person (34)**
16:24;32:19;44:14,
15;76:24;77:20;81:2,

12;111:23;126:23;
129:23;141:21;172:3,
7;184:16;186:14;
189:12,19;191:1;
198:3;275:17;326:7;
354:6;456:20;463:22;
469:1;480:18;481:13;
482:5;483:15;530:19;
555:19,22;560:14
**personal (25)**
35:10;46:22,24;
53:5;57:15;59:8;
73:18;75:21;85:13,
15;86:1,8,23;87:1,3;
122:16;327:2,8,14,14;
328:1;367:3,23;
530:21;562:3
**personally (7)**
34:23;35:2;38:3;
48:3;67:8,10;511:16
**persons (1)**
556:4
**person's (1)**
243:8
**pertained (1)**
554:13
**pertaining (3)**
43:5;62:21;468:21
**pertains (1)**
179:17
**Peter (1)**
216:1
**Peterson (1)**
308:20
**petition (9)**
274:15;277:9,11,
17,21;278:3;279:7,
21;282:15
**pharmaceutical (2)**
49:16,20
**phase (2)**
498:8,11
**PhD (3)**
195:15,16;482:22
**Phil (1)**
286:9
**Philadelphia (5)**
240:6;432:17,24;
433:22;434:3
**Philips (2)**
371:7;394:18
**Philips/Westinghouse (4)**
182:17;327:4;
336:2;383:19
**Philly (1)**
432:16
**phone (28)**
15:21;68:18;
111:13;127:6;216:16;
236:14;238:17;
243:24;245:24;258:3;
265:8;350:15;351:13;
405:22;406:3;407:24;

408:13,20,24;448:15;
466:20;480:19;506:2,
3;509:16;514:6;
522:10;525:12
**phones (2)**
405:21;408:22
**photocopies (2)**
276:17;492:18
**phrased (2)**
135:6;277:16
**phrases (1)**
132:5
**physical (2)**
359:5;405:13
**physically (8)**
106:9;131:10,13;
154:6,24;155:8,19;
159:17
**P-i- (1)**
117:24
**pick (1)**
357:19
**picked (1)**
366:20
**picking (1)**
210:4
**picture (1)**
143:24
**piece (1)**
118:12
**pieces (3)**
270:3,9;285:12
**P-i-l (1)**
117:24
**pile (2)**
263:20;330:10
**pin (2)**
100:18;113:24
**Pinpoint (1)**
479:21
**pipelines (1)**
18:23
**Pirate (1)**
550:23
**Pittsburgh (18)**
8:18;28:16;29:17;
351:16;352:4,6,12;
353:8,10,14;354:14;
355:12,18;357:13;
358:3;389:18;492:21;
541:14
**place (12)**
44:3;87:8;90:2;
227:7;318:24;371:21;
422:18;431:4;458:8;
530:20;550:1,1
**placed (2)**
259:3;403:5
**places (1)**
314:3
**plain (1)**
502:11
**plaintiff (10)**

115:10,12;138:9;
146:18;183:8;308:16;
453:17;476:17;488:9,
12
**plaintiffs (52)**
80:12;145:2;
146:17,22;147:16,24;
202:12;203:4,7,9;
205:22;211:15;212:8;
232:6;267:13;269:4,
13;270:6;274:18,21,
24;306:20;307:17;
308:5;310:6;311:2;
315:13,24;316:4,11,
16,23;327:6,17;
328:15;341:15;342:4,
7,9,13;343:4;344:5,
15,16;379:24;380:8,
10;383:20;465:17;
537:3;547:9,10
**Plaintiffs' (7)**
201:16;206:3;
232:10;383:15;462:1;
466:22;534:10
**plaintiff's (2)**
220:4;545:19
**plan (8)**
15:11;107:23;
143:13;249:6,11;
284:24;419:1;421:9
**plane (1)**
357:18
**planned (2)**
108:1;422:2;550:3
**planning (9)**
66:10;116:19;
124:4,10;238:22;
239:23;251:9;385:9;
386:6
**plans (2)**
15:22;434:19
**plant (5)**
47:15;327:4;
330:11;337:20;
342:20
**plants (1)**
341:1
**play (3)**
259:18;401:5;
543:18
**played (1)**
375:4
**player (2)**
187:16;310:23
**pleaded (3)**
37:19;153:2;154:19
**Pleading (1)**
145:8
**pleadings (8)**
34:11;100:2;
144:20;374:18;375:6,
15;377:15;401:13
**pleasant (2)**

447:15;454:21
**pleasantly (1)**
402:1
**please (25)**
11:23;41:19;64:13;
65:17;170:6;216:19;
234:10;235:9;237:20;
243:3;258:24;263:12;
265:13;274:12;
292:11;338:20;373:4;
380:7;421:12;437:6;
494:20;511:8;514:2;
522:8;524:12
**pleased (2)**
504:1;541:18
**pled (1)**
150:2
**plug (1)**
64:9
**plural (1)**
232:11
**Plus (2)**
8:14;204:17
**pm (38)**
117:3;10;152:17;
154:4;159:21;180:3,
8;231:4,11;234:19,
24;252:3;255:8;
270:17;271:1;291:15,
21;372:20;383:24;
386:14;389:10;394:4,
15;412:10,19;431:3;
432:12;437:23;438:5;
484:2,9;522:11,11,16;
529:12,17;562:17;
563:3
**point (114)**
27:3,5;28:4;33:2;
34:8;37:8;42:12,15;
45:24;46:11,12;
53:20;67:15,16;
71:24;75:15;76:20;
77:7;79:3;83:7;84:3;
93:1;94:16;99:24;
100:1;101:13;105:7;
106:24;108:9;110:24;
111:2;124:5,6,20;
126:4;131:9;133:23;
138:19,22;161:4,5;
163:15;164:11,17;
176:20;178:8;185:17;
186:2;194:18;195:2;
199:5;209:20;210:12;
212:12;217:12;
219:13;224:4;227:13;
251:4;254:16;259:9,
16;268:2;285:24;
286:14;287:10;
299:24;300:10;302:1;
312:9;321:12;324:23;
356:11;360:16;
364:17;374:23;
376:18;377:18;

380:13;386:8;391:22;
392:4,21;393:1,6,10;
395:21;406:17;
411:23;413:8,11;
417:16;418:10;
419:21;421:6;424:23;
433:4;436:11;440:14;
444:3;445:19;460:8;
473:20;479:15;521:9;
525:18;534:23;
542:15,16,22;543:16;
551:3;553:9;555:12
**policies (1)**
21:7
**policy (1)**
34:2
**polite (2)**
77:12;305:3
**polluting (1)**
46:19
**pollution (3)**
94:2,3,4
**poor (4)**
415:21;456:3,15;
523:17
**poorly (1)**
375:1
**popular (1)**
307:11
**port (2)**
64:9;65:2
**portion (1)**
305:5
**portions (1)**
498:1
**posed (1)**
235:6
**position (13)**
19:8;22:10;24:18,
24;97:17;110:12;
416:12;488:10;
545:14,17;547:10;
552:5,6
**positions (2)**
267:6;553:23
**possessing (1)**
418:16
**possession (1)**
367:14
**possessive (1)**
232:12
**possibility (13)**
139:21;142:24;
183:11,20;207:23;
208:6,12,13;210:17;
211:5;213:17;214:2;
418:11
**possible (18)**
58:11;90:2;143:24;
209:4;269:12;271:18;
273:2;334:1,2;348:4;
363:10;364:23;365:1;
372:12;398:5;418:19;

425:19;533:17
**Possibly (29)**
25:12;38:6;50:24;
59:12;85:24;86:5,13;
90:3;115:14,20;
140:17;143:5;161:4,
11;213:4;253:20;
264:1;300:21;307:7;
373:24;410:17;
411:24;413:10;447:1;
472:21;492:21;
508:20;525:20;538:6
**post-conference (1)**
427:21
**posted (4)**
28:5,12;245:3,6
**posting (3)**
23:4,5,9
**potential (22)**
45:12;46:23;47:10;
78:23;146:23;148:1;
149:23;213:15,24;
214:21;215:16;246:5;
267:13;269:3,4,13;
270:5;327:5,17;
328:14;422:4;468:21
**potentially (3)**
80:15;173:19;517:8
**potions (1)**
341:6
**practice (8)**
26:13;29:3,23;
41:14;94:18;134:17;
454:16;511:5
**practicing (4)**
26:24;33:16;47:7;
94:24
**practitioner (1)**
32:16
**preceded (1)**
317:15
**prefer (2)**
145:14;158:10
**prep (1)**
527:18
**preparation (18)**
38:23;39:4;115:14;
151:22;157:17,20;
394:19;403:10,14,18;
435:15;457:22,23;
532:2;544:3,8,10,23
**prepare (10)**
11:11;202:2;
253:24;431:3;479:4;
485:16;543:23;
544:12,12,22
**prepared (17)**
132:19;157:7;
201:23;254:4;280:4;
289:2;368:8;375:1;
424:1;425:22;435:7;
442:12,16;485:18;
543:19,20;544:15

**preparing (1)**
253:12
**Presby (7)**
354:4;368:19;
369:9;371:5;541:9;
543:15;558:14
**presence (2)**
359:6;553:21
**present (28)**
42:24;50:8;116:19;
192:6;199:11;207:16;
210:21;227:18;247:1,
3;250:10;268:21;
327:5;328:14;340:3,
4,17;345:22;353:21;
355:3,5;359:4;372:6,
9;383:14;413:3;
419:16;421:19
**presented (2)**
232:7;542:13
**president (3)**
32:17;542:8,9
**Preston (9)**
43:24;531:16,19,
20,23;532:8,12,16;
533:8
**presume (1)**
60:10
**presumed (1)**
478:16
**pretty (13)**
19:10;65:15;111:9;
113:3;138:9;142:6;
211:24;276:19;
328:10;455:8,10,13;
476:22
**previous (6)**
159:13,20;163:5;
353:4;356:6;443:4
**previously (3)**
204:15;230:14;
459:14
**Price (1)**
515:20
**Primarily (6)**
18:15;43:7;61:8;
72:18;197:8;232:2
**primary (1)**
79:5
**print (4)**
72:1;73:2;431:4,10
**printed (7)**
71:10,18,20;72:3,7,
23,23
**printouts (1)**
268:6
**prior (19)**
11:14;39:16;48:19;
64:3;71:23;210:14,
16;212:19,20,21;
216:5;217:13;218:11;
300:15;417:9;420:14;
460:11,15;466:17

**private (1)**
542:3
**privilege (14)**
12:13;40:5,7,23;
41:17,19;118:24;
119:7,11,12;128:16;
247:2,4,9
**privileged (4)**
12:5,13;465:23;
475:3
**pro (16)**
175:19;308:7;
311:3,8,12;479:3,4;
499:13;500:10;
501:22;502:2;503:6,
10;537:6,15;538:9
**Probably (112)**
38:20;42:20;43:8;
45:3,22;47:19;52:8;
55:5;59:11;71:11,20;
72:22;76:3,17;81:5;
89:20,21;94:14;98:8;
101:1,5;109:11;
111:6;113:1,4;
121:10,14;122:18;
126:4,5;128:12;
129:16;136:19;153:8;
186:1;188:15;193:12;
198:13;201:24;
210:13,23;213:5,8;
226:3;230:12;239:21;
252:21;253:8;261:16;
267:8;277:3;279:4,4,
14;282:17;285:6;
288:1,3;293:13;
297:5;306:7;309:18;
329:4,22;355:21;
357:8;359:7;360:6;
372:17;373:8;403:11,
12;404:12;409:22;
412:6;413:23;415:2;
417:3,5;418:5;419:7;
420:20;422:21;
430:19,23;443:9;
452:8;454:23;460:4,
14;467:7,8;470:17;
475:2,3,22;478:12;
480:13;485:22;
489:14;490:16;
492:17,17;497:2;
498:24;509:12;510:2,
18;521:7;527:21;
541:2;560:13
**problem (20)**
44:1;104:24;
166:18;167:3;168:20;
173:24;195:7,8;
378:21;399:19;401:8,
9;405:24;412:2;
508:23;516:19;550:8;
552:22;553:12;562:9
**problems (4)**
375:17;405:13;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

527:15;528:18
**procedures (1)**
  21:6
**proceed (2)**
  131:10;479:9
**PROCEEDINGS (2)**
  8:2;292:2
**process (3)**
  59:18;214:17;
  480:10
**Proctor (7)**
  8:9;215:1;274:22;
  275:6,9;443:23,23
**produce (6)**
  11:10;58:14;168:2,
  15;169:2,3
**produced (29)**
  16:23;42:7,10;
  56:11;57:17;58:16,
  18;59:22;60:9;62:19;
  68:10,12;158:16,18;
  236:20;238:14;
  243:18;245:21;248:3;
  251:24;256:4;257:19;
  262:12;265:4;271:10;
  290:9;318:3;441:6;
  463:23
**product (8)**
  12:2;49:14,16;
  119:4,9;128:11;
  181:2;263:16
**production (5)**
  42:7;56:16;59:24;
  151:13;216:3
**products (1)**
  49:21
**profession (1)**
  13:6
**professional (10)**
  8:7;30:12;85:8,11;
  89:13;110:2,4;
  122:16;147:4;547:14
**professor (54)**
  78:19;129:23,24;
  130:1;177:23;203:19,
  24;224:24;252:3;
  387:22;388:3,6;
  400:9,12;448:18;
  450:12;454:4,12;
  455:22;460:10;462:2;
  465:16;466:13,20;
  467:21;468:11;
  469:16;470:19;471:1,
  8,12,23;472:23;
  473:4;476:1,16;
  479:10;480:17;
  484:15;485:24;
  487:21;489:12;493:6;
  512:15;514:10,16;
  517:18;529:22;
  531:16,23;533:9,11;
  534:3,14
**professors (1)**

226:13
**profile (1)**
  315:19
**Program (2)**
  18:18,21
**progression (1)**
  535:20
**project (7)**
  13:7,9;18:8;19:11,
  20;21:4;273:18
**projects (1)**
  204:2
**promises (4)**
  551:20
**promising (1)**
  552:2
**prompt (1)**
  520:17
**pronoun (1)**
  446:9
**proper (11)**
  168:19,23;177:5,7,
  19;182:13;344:1;
  411:10;446:6;451:13;
  477:1
**properly (1)**
  376:22
**properties (4)**
  17:22;225:18,21;
  226:21
**property (29)**
  17:17,19;18:5;
  88:23;89:2,11;90:1,5,
  7,11,13,14;91:8,16,
  19;92:12,16;394:24;
  399:21;410:4,7,8;
  412:17;431:4,12;
  436:2,2;482:14,15
**proportionate (1)**
  492:2
**propose (1)**
  287:23
**proposed (15)**
  103:23;125:21;
  254:7;332:2,16;
  358:15,21;359:1,16;
  363:1,8;385:7;386:5;
  503:7;560:19
**prosecute (2)**
  171:4;269:16
**prosecution (3)**
  49:10;205:9;274:12
**protected (1)**
  460:6
**Protection (2)**
  206:13;244:15
**provide (9)**
  117:22;118:21;
  139:18;176:15;
  225:20;229:8;298:17;
  302:16;544:12
**provided (10)**
  45:14;151:14;

228:24;290:5;326:14;
332:17,19;542:22;
545:11;558:23
**provider (1)**
  53:5
**provides (1)**
  353:3
**providing (3)**
  316:18;424:2;
  517:17
**provision (2)**
  175:10;410:22
**provisions (1)**
  171:11
**public (2)**
  217:7;421:9
**Pugh (3)**
  394:17;398:16,21
**pull (2)**
  505:12;531:3
**punitive (3)**
  498:7,16;499:3
**purchased (2)**
  120:21;121:13
**purports (1)**
  458:19
**purpose (8)**
  93:13;226:21;
  342:18;347:17;
  497:15;534:18;
  538:20;560:23
**purposes (41)**
  11:2;36:20;51:23;
  52:1;63:9;150:17;
  156:11;170:2;200:2,
  17;201:2;236:2;
  237:22;242:19;
  245:10;247:15;
  251:14;255:18;257:9;
  262:2;264:18;270:22;
  288:14;292:4;439:22;
  449:2;457:3;461:20;
  493:22;506:20;
  510:11;513:9;515:6;
  518:22;521:14;
  523:19;524:14;
  525:22;545:21;549:2;
  554:22
**pursuant (1)**
  492:1
**pursue (1)**
  37:13
**pursuing (1)**
  209:5
**pushing (1)**
  460:22
**put (51)**
  59:14;61:7;117:17;
  120:10;124:8;132:5;
  145:15;154:5,23;
  191:14;218:2;227:16;
  254:12;259:8;311:9,
  10;323:7;325:1;

337:19;339:6,22;
341:20;346:11,23;
347:14;349:3,23;
350:18;352:1;358:17;
361:12,19;365:9;
368:14;373:7;378:16;
379:21;382:23;384:4;
385:15;386:17;387:6,
16;404:17;424:9;
426:12;427:13;
449:11;517:4;534:15;
556:19
**putting (3)**
  54:24;476:11;481:7
**puzzled (1)**
  355:24

### Q

**qualified (4)**
  21:9;197:2;512:18;
  535:6
**qualifies (3)**
  19:7;9;21:1
**qualify (1)**
  173:20
**quantum (7)**
  142:11;413:12;
  477:17;479:9,11;
  480:11;485:9
**quasi-legal (1)**
  108:12
**quick (2)**
  529:5,20
**quite (18)**
  63:1;80:4;179:21;
  188:8,11;196:7;
  228:19;254:11;
  281:10;287:15;
  322:22;355:24;
  359:21;380:1;426:10;
  478:21;540:18;541:5
**quotations (1)**
  427:23
**quote (11)**
  206:14;219:21;
  252:4;274:13,14;
  275:3;358:5;379:15,
  16;427:20;512:2
**quotes (1)**
  512:2
**quoting (1)**
  530:4

### R

**Radisson (2)**
  402:2,11
**Rafferty (5)**
  8:9;215:1;274:22;
  275:6,9
**raise (4)**
  9:23;304:18,22;

307:22
**raised (2)**
  305:13;316:15
**raising (1)**
  364:18;465:12
**ran (1)**
  521:22
**rata (7)**
  175:19;311:3,8,12;
  499:13;500:10;
  501:22;502:2;503:6,
  10
**rate (10)**
  142:12;167:24;
  195:21,22;260:16,18;
  445:20;481:4;484:14;
  493:14
**rather (15)**
  145:15;150:8;
  195:1;226:12;296:9;
  302:5;305:6;307:11;
  311:12;312:3;327:1;
  341:12;391:13;
  540:12;542:23
**rationale (1)**
  528:22
**re (7)**
  118:3;263:15;
  337:21;391:17;
  468:21;531:16;533:9
**reached (6)**
  97:15;445:12;
  489:12
**reaction (1)**
  102:13
**read (58)**
  118:20;119:1;
  145:12;146:13;154:2;
  157:11;171:18;179:9;
  207:9;223:17;224:13;
  233:9,12,16;234:9;
  235:3,7;250:1,17;
  251:5;258:23;259:12;
  263:12;265:12;
  273:24;347:7;372:11;
  373:4;404:15;405:5,
  11;413:16;419:12;
  421:12;437:5;458:16,
  18;508:18;516:7,15;
  518:14;522:8;524:12;
  526:11,16;528:16;
  530:14;542:23;546:3,
  8,10,12,13;547:18;
  548:6;551:15,15;
  562:19
**reader (2)**
  82:2,22
**reading (8)**
  145:16;173:1;
  235:5;452:19;509:18;
  516:4;550:15;560:22
**reads (1)**
  306:5

**ready (4)**
11:21;12:10;38:14;
119:24
**real (11)**
28:18;89:10,13;
285:18;286:11,13,16;
287:4,8,12,24
**realize (1)**
398:9
**realized (1)**
101:12
**really (22)**
11:8;57:8;63:13;
70:1;94:7;158:22;
179:20;278:11,17;
280:24;283:14;
336:17;400:15;433:8;
436:16;483:6;501:13;
512:13;515:2;517:13;
553:8;558:16
**realm (2)**
277:3;404:2
**reason (27)**
71:7;103:19;207:2;
215:4;240:8;244:23;
246:24;247:10;259:5;
273:14;282:22;288:4;
300:12;307:15;
309:11;311:15;
326:22;331:19;
336:21;389:24;417:7;
442:18;21;460:3;
470:21;519:22;
561:18
**reasonable (7)**
182:11,16;306:18;
481:9,13,15;484:14
**reasons (6)**
16:3;52:19;304:12;
307:15;309:12;
392:15
**reassigned (1)**
23:1
**Rebecca (1)**
8:16
**recall (102)**
39:14;54:7,9;75:20;
87:9;98:9;102:15;
121:5;125:11;129:1;
148:19;154:15;
155:19,22;164:6;
186:7;188:16;196:5,
19;204:21;219:12;
222:15;226:17;
229:17,21;232:22;
240:5,17;242:15;
244:10;246:14,17;
257:1;273:23;286:15;
287:7,11;295:3;
298:9;299:3;302:18;
303:12;308:14;
311:17;315:20;
316:13,19;326:3;

327:16;331:1;340:21;
346:15;352:10,17,18;
374:9;377:18;383:4;
391:5,9;397:17;
398:23;403:4,21;
439:7,9;443:6;445:1;
446:14;452:12,13;
453:7;459:17;461:9;
462:3,11;467:1;
470:24;471:5;472:1;
475:13;477:11;
480:10,18;484:22;
485:3;486:22;489:4,
5;490:14;498:16;
508:6;515:4;519:24;
524:20;525:6;530:8;
531:22;535:5,7;
544:1;560:2
**recalled (1)**
39:15
**recap (2)**
427:21;435:15
**receive (6)**
137:5,9;146:23;
294:6,17;295:2;
296:3,17;297:2,7,23;
298:4,11;299:6,9;
305:11;308:10;310:8;
315:23;472:15;491:4,
4;516:18
**received (20)**
14:18;46:2;107:2;
166:19;190:22,24;
254:10;296:21;
298:13;301:20;311:4;
379:13,24;396:11;
399:13;460:16;
470:19;475:6,10;
512:3
**receiving (3)**
296:24;314:5;396:7
**recent (2)**
113:8;137:17
**recently (8)**
38:10;55:21;
136:21,24;164:8,9;
344:20;457:20
**receptionist (2)**
243:13;275:14
**recognize (9)**
430:12;507:1;
524:3,4;546:1;549:6;
555:2;560:21,22
**recognized (2)**
325:4;539:22
**recollect (1)**
533:12
**recollecting (1)**
39:10
**recollection (44)**
11:12;163:15;
164:16;211:8;239:24;
240:9;242:1;244:13;

250:5;253:12;259:9;
273:20;313:23;315:9;
322:15;332:21;
347:22;348:9;349:5;
352:3;355:2,15;
358:24;363:6;369:18;
385:19;409:9;424:19,
24;425:20;428:9;
430:6;433:11;442:4;
448:12,13;450:7,8;
467:6;496:5,7;
520:18;521:9;535:4
**recommendation (2)**
217:1;465:7
**recommended (1)**
464:4
**record (70)**
8:24;9:3;64:4;66:7,
16,21,23;73:11;
82:15;95:16;117:3,
10,18;150:15;151:10;
180:3,8;200:2;
201:12;203:4,8;
224:7;226:22;227:2;
231:4,11;233:19;
234:8,19,24;251:6;
270:16,16;271:1;
276:1;283:2;289:14,
20;291:9,15;293:18;
335:3,5,10;347:8;
388:24;389:10;437:3,
6,21,23;438:5;
441:10;442:2,8;
458:18;464:9;482:13;
484:2,9;505:14;
524:14;529:12,17;
546:8,14;556:2;
557:9,23;562:17
**recorded (8)**
275:11;282:14;
293:5,22;294:2;
324:7;366:12;415:1
**records (56)**
216:16;226:10;
281:12;321:12;
325:20;328:24;
334:17;353:19;
358:18;360:7,8,11;
365:16;366:22;367:7,
15,20,24;368:5;369:3,
17;378:18;379:2;
383:1,7,11;384:22;
397:6;426:11;430:24;
431:4,12;434:1;
439:11;440:4,7,10,12,
14;441:5;442:12,16,
24;454:17;472:4,17,
18,19;555:9,13;557:4,
11,15;559:1;561:7,8
**recovered (2)**
147:1;301:19
**recovery (4)**
283:19;298:15;

305:11;308:11
**redo (1)**
375:19
**redoing (1)**
377:15
**reduce (2)**
167:11;280:10
**reduced (1)**
301:19
**reduction (8)**
305:10;308:9,13;
310:7;311:3;499:13;
500:3,4
**Reedsville (9)**
43:23;44:5,7;45:6,
21;153:16;382:16;
390:2;393:13
**Reedsville/Arthurdale (2)**
46:17;393:9
**reelection (2)**
547:7,11
**refer (3)**
89:24;290:5;384:22
**reference (7)**
206:15;239:22;
264:7;348:14;401:7;
427:21;536:3
**referenced (7)**
183:15;348:7;
448:15;450:10;
500:15;524:9;535:24
**references (3)**
221:4;237:16;
527:12
**referencing (1)**
147:18
**referred (4)**
30:9;89:23;499:21,
24
**referring (18)**
54:1;63:15;95:11;
115:4;128:20;149:2;
176:13;214:10;359:8;
368:5;380:15;417:12;
453:10;455:14;
486:13;511:12;516:1;
537:19
**Refineries (1)**
18:23
**reflect (8)**
169:11;323:24;
325:2;329:20;334:18;
338:16;339:19;
511:22
**reflected (3)**
219:7;499:6;505:24
**reflecting (2)**
232:7;289:5
**reflects (1)**
490:23
**refresh (6)**
11:11;250:5;442:3;
496:4,7;520:17

**refreshes (1)**
240:9
**regard (22)**
45:2,6,20,21;48:23;
53:22;80:23;185:2;
230:4;258:3;269:19,
23;315:11;316:14;
339:21;344:24;
359:15;364:19;366:8;
371:1;452:6;542:20;
551:1
**regarding (22)**
11:12;214:22;
327:3;353:12;393:18;
394:5;419:1;429:5;
431:2;432:10;434:18,
19,22;486:8,20;487:6,
12,15;513:21;531:23;
541:16;548:11
**regards (1)**
395:17
**regular (4)**
80:2;509:5;510:1;
555:6
**regularly (1)**
1:6
**regulations (1)**
253:4
**reimbursed (1)**
485:20
**reimbursement (1)**
491:13
**reiterate (1)**
38:21
**reject (1)**
465:15
**rejoined (1)**
14:17
**relate (3)**
44:22,24;353:11
**related (13)**
45:15;204:15;
330:8;370:3;441:6;
466:3;492:23;493:7;
506:14;527:16;534:6;
560:9,14
**relating (5)**
45:14;57:6;68:2,9;
274:19
**relationship (37)**
34:24;36:8,17;46:5,
23,24;74:11;75:23;
77:22;79:5;83:15;
85:8,14;88:3;92:23;
102:17;105:7,8;
106:12;108:24;110:1,
2;134:6;165:18;
204:11;221:16,22;
222:3,10,18;227:21;
232:8;265:19;462:3;
469:24;474:14;
503:15
**relative (11)**

17:3;31:20;175:23;
260:19;346:14;426:5;
492:18;501:8;521:12;
554:4,5
**relatively (1)**
76:18
**relatives (1)**
86:11
**relax (1)**
455:12
**relaying (1)**
467:20
**released (1)**
344:21
**relevance (2)**
53:13;473:17
**relevant (8)**
25:17;46:6;52:3;
53:17;67:16;71:10;
168:7,11
**relied (1)**
81:8
**reluctant (2)**
130:19;218:12
**rely (5)**
81:6;84:6,8,10;
176:18
**relying (2)**
489:11,17
**remained (3)**
142:7;399:19;401:8
**remaining (1)**
130:20
**remember (193)**
38:9;39:24;40:1;
50:11;54:17;55:9;
73:14;75:15,17,18;
76:11;77:3;83:6;
85:22;89:7;92:4;
97:12,14,19,22,23;
98:13;115:6,21,22;
116:9;121:21,24;
123:16;126:17,19;
133:13;140:4;148:22;
149:6;153:9;154:13;
155:23;159:21;
161:22,23,24;162:1,7,
8;163:3,8,12;164:13;
165:21;166:20;186:1;
188:1,11;189:22;
196:9;198:1;204:18;
208:17;210:4;212:1;
213:7;224:1;225:8;
226:11,19,24;227:4;
241:9,10;244:8,8;
253:6,14;254:16,17;
255:6,12;256:22;
259:4,22;268:14,18;
281:4,20;282:16;
285:8;286:14;287:6,
10,14,16;289:9;
304:10,13;305:22;
307:9,18;309:3;

312:20;313:7,22;
314:13;324:4,8;
330:21;333:15;334:2;
336:11;339:14;
343:23;348:1;359:3;
363:4,11;365:19;
366:20;372:11;374:7;
381:19;382:1,24;
385:18,23;386:8;
391:2,3,13;392:18;
404:20;405:8,9;
406:9;411:3;414:5;
423:21,23;424:7,10,
24;425:9,18;428:1;
429:10;430:10;
432:24;443:21,22,22;
444:2;450:3,11,13;
451:1,8,16,19;453:4;
454:2;459:12,15;
460:13;461:5;467:4;
470:4;471:4;473:20;
476:22;480:6;481:2;
482:23;485:13;
488:15,24;491:15;
495:23;511:13;512:8;
520:2,4,10,14;521:11;
523:6;525:13;533:15,
19;534:23;535:1;
536:8;541:23;557:10;
558:24
**remembered (1)**
472:12
**remembering (5)**
210:12;304:10;
322:13;360:11;
414:17
**remembers (1)**
378:8
**remind (1)**
292:11
**removed (5)**
59:23;60:1,3;61:18;
408:23
**render (1)**
179:19
**rendition (1)**
461:3
**renewed (1)**
427:9
**rep (3)**
48:24;49:24;50:4
**repeat (4)**
142:21;189:15;
222:7;438:15
**repeatedly (2)**
47:16;408:10
**rephrase (3)**
259:24;277:15;
331:15
**replace (2)**
275:19;300:9
**report (2)**
378:11,12

**reported (1)**
275:8
**reporter (29)**
8:20;9:3,22;10:1,6;
169:21;223:19;
234:11;235:8,10,23;
238:6;242:17;247:13,
19;255:15;257:7;
264:16;265:17;
288:10;292:11,13;
317:22;490:18;494:8,
12;554:17;559:11;
562:19
**reporting (1)**
278:18
**reports (3)**
74:6;554:3,3
**repository (1)**
227:6
**represent (9)**
10:15;83:18;
167:18;182:6;298:24;
299:20;356:11;404:9;
535:14
**representation (3)**
207:8;273:2;545:11
**representations (3)**
232:19;233:4;
234:15;235:14
**representative (4)**
108:16;128:24;
138:8;184:20
**representatives (4)**
222:1;223:5,19;
301:2
**represented (3)**
199:14;218:15;
299:17
**representing (12)**
9:5;165:20;202:12;
203:4,8;205:22;
300:3,11,13;316:4,16;
417:2
**represents (2)**
477:3;546:21
**request (12)**
38:21;106:14;
111:23;170:8;237:14;
274:18;289:24;298:7;
412:10;425:23;455:3;
549:18
**requested (2)**
46:3;467:3
**required (7)**
31:7;54:6;55:11;
306:3;314:9;481:22;
482:8
**requires (1)**
18:19
**research (44)**
84:3;85:1;109:3;
204:2;208:24;209:3,
6,7;226:22;227:2;

252:23;253:2,2,3,9,
18;261:1;269:11,14;
277:1,2;322:23;
360:18;434:9;469:22;
482:17;484:17,20,24;
485:2,4;486:8,20,23;
487:6,12,15;489:3,13,
18,22;490:3,5;537:9
**researched (5)**
80:1;267:18;
330:10;362:15;489:6
**researching (2)**
103:14;270:9
**reservations (2)**
307:7;517:6
**reserve (1)**
12:19
**residence (6)**
327:3,8,14,15;
328:1;422:3
**resident (1)**
264:14
**residents (21)**
204:7,12,16;205:7,
12,15,21;210:16;
211:4;217:3;219:20;
227:22;228:5;264:10;
418:17;419:10,19;
420:24;426:16,18;
456:9
**residing (1)**
204:4
**resign (1)**
23:10
**resigned (1)**
28:9
**resolution (3)**
301:12,13;302:2
**resolved (4)**
301:10;357:5;
395:18;406:1
**resources (6)**
214:19;220:6;
269:15;377:4;416:23;
541:3
**respect (21)**
37:15;45:8;213:13,
22;227:2;230:8;
233:5;234:16;235:15;
265:22;266:7,10,11;
297:24;312:5;357:3;
415:5,11,12,18;
455:17
**respond (2)**
408:11;485:10
**responded (2)**
194:15;265:24
**responds (2)**
514:1;516:10
**response (11)**
213:12;214:14;
274:1,17;288:21;
368:19;369:9;381:7;

462:1;514:1;560:19
**responses (4)**
213:10;274:3,6,7
**responsibilities (1)**
374:12
**responsible (2)**
103:20;561:19
**responsive (1)**
107:6
**responsiveness (2)**
316:1,22
**rest (4)**
42:23;250:17;
419:13;455:12
**restored (1)**
381:10
**resubmitted (1)**
278:6
**result (17)**
277:18;283:4,7,10,
19,22;284:2,5,8,12;
301:15;308:9;310:7;
407:23;503:23,24;
545:6
**resulted (3)**
302:3,5;305:9
**results (4)**
263:9;277:12,14;
392:8
**resume (1)**
292:19
**retained (8)**
211:18;223:1,6,20;
225:2,5;249:16;
472:18
**retainer (19)**
45:3;211:11,14,16,
22,24;212:2;332:3,
17;363:1,8;366:2;
385:7;422:5,16,22,24;
423:5;472:21
**retention (1)**
366:13
**retirement (2)**
203:17;284:16
**retrieved (1)**
237:13
**retrospect (3)**
65:20;306:1;468:12
**return (3)**
15:22;389:23;504:6
**returned (2)**
252:3;381:10
**retyping (1)**
377:19
**revenue (1)**
31:14
**review (31)**
10:23;11:18,20;
38:22;39:4;42:6;
64:14;65:17,24;
66:24;201:20;231:22;
234:5;255:9;302:13;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

318:17;334:1;359:5;
360:14;364:15,24;
365:22;367:20;369:8;
388:12;424:20;
431:12;449:23;
508:22;511:5;515:17
**reviewed (38)**
11:10;12:4,9;38:11,
14,17,18;39:9,20;
40:12;55:1;64:4;
157:19;163:4;212:3;
288:23;318:7;331:18;
333:6,21;334:3;
346:20;347:11;
358:14;359:1,18;
360:2;362:24;363:21;
368:9,18;370:2;
387:13;429:20;
457:22;529:22;
544:15;560:18
**reviewing (18)**
16:22;39:14,16;
222:22;325:5;333:15;
334:3;337:22;347:22;
358:20,23;359:16;
363:8;364:14;367:21;
369:19;370:15;398:8
**reward (1)**
551:20
**RG (1)**
263:15
**Rhodes (1)**
118:6
**Rhonda (1)**
546:23
**Rich (197)**
8:5,6;9:14,21,21,22,
24;10:5,8,14;11:8;
13:4;16:19,20,22,24;
30:13;34:17,18;
37:17;42:6;43:10;
48:22;56:23;57:1;
63:14;64:3;66:23;
91:20;115:13;117:5,
12,14;120:8,19;
145:21;146:21,22;
147:16,24;148:3;
151:17;158:13,14;
164:2;165:17;170:6,
9;180:10;182:4,20,
22;183:8;200:22;
202:7,17;206:2,5;
230:6,16;231:6,13,15;
235:2;236:6;238:4;
242:24;245:15;
247:19;251:18;
255:23;257:14;262:6;
264:23;271:3,9;
273:24;274:6;275:8,
12,21;276:14,23;
282:20;284:8,12;
288:18;291:20;292:8,
9,17;317:20;320:1;

325:10;327:5;328:14;
332:2;333:7;335:12;
337:19,22;340:1;
346:5,21;347:11;
349:18;350:15;
352:1;353:8,9,11,14;
358:15;360:2,18;
362:24;363:16,21;
364:14;365:4;368:9,
10,18;370:2,15;
371:8;372:20;377:11;
379:16;381:2;382:5,
13;383:24;385:4;
386:15;387:4;389:5,
12,14,18,20,21;
393:18;394:4,12;
399:10,15;402:10,12,
20;412:10;413:22;
419:1,9;420:23;
422:4;424:1;425:4;
426:15,22;427:19,21;
429:20;431:5;434:18,
22;435:14,16;436:20;
438:12;440:2;457:9,
19;484:4,11;486:7;
491:24;522:6;529:20,
23;530:1,21,21,23;
535:13;540:20,23;
542:12;543:9;559:24;
560:16,18;562:16
**Rich000174 (1)**
507:1
**Rich000175 (1)**
505:17
**Rich000501 (1)**
524:15
**Rich000503 (1)**
526:3
**R-I-C-H001340 (1)**
441:12
**R-I-C-H001693 (1)**
441:12
**Rich104 (1)**
238:13
**Rich131 (1)**
243:17
**Rich132 (1)**
245:20
**Rich1402 (1)**
533:4
**Rich1409 (1)**
533:21
**Rich175 (2)**
248:2;509:1
**Rich177 (1)**
251:23
**Rich179 (1)**
256:3
**Rich188 (1)**
518:8
**Rich229 (1)**
257:18

**Rich242 (1)**
262:11
**Rich432 (1)**
265:3
**Rich501 (2)**
524:3,14
**Rich544 (1)**
521:19
**Rich723 (1)**
201:6
**Rich92 (1)**
236:20
**Richard (8)**
429:21,23;430:2,3,
7,11,12,13
**Rich's (11)**
274:7;346:21,22;
347:3,4,11,13;348:14;
368:18;399:10;
402:18
**riddled (2)**
254:11;374:20
**ride (1)**
75:10
**Ridge (5)**
44:13,14;45:8,15,
20
**ridiculous (2)**
415:8;547:10
**Rifle (1)**
307:10
**right (220)**
9:23;12:18,19;
20:20;26:18;36:3;
38:12;50:6;52:6,14;
57:12;60:18;64:13;
65:16;66:12;74:10;
77:19;100:4;102:2,
21;109:24;112:10;
118:13;119:13,24;
121:12;128:5;130:7,
12;133:4,18,19;
139:23;143:23;
145:21;146:6,16;
151:11;152:3,11;
153:20;156:9;158:24;
159:2,17;165:17;
167:9,21;169:17;
170:6;171:9;172:6,
20;173:11,15;174:14,
19;177:7,9;179:22;
180:1;181:20;185:5;
192:7;197:6;200:10;
201:13;203:1;231:21;
233:18;237:10;241:2;
243:21;247:12;248:4,
22;256:4,8;258:18,
20;262:9,13;264:11;
271:5,8;275:22;
276:14;277:10;286:3,
20;288:12;289:22;
291:1,6;296:21;
310:20;317:3;318:8,

12,19;320:2,6,9;
321:6,14;322:3;
323:8,21,23;324:21;
328:10,21;330:13;
331:4;333:22,23;
337:8;343:2;344:2;
346:3,9,24;347:15;
349:19;350:17;353:2,
15,24;355:10;356:17;
358:16;360:4;361:19,
23;363:2,24;364:1,
22;365:6,10;366:16;
368:13,22;370:5,10;
371:11;373:2;375:6,
7;377:23;382:8,20;
384:2;385:13;386:16,
19;387:15;393:16;
395:5,8;399:23;
402:15;404:17,18;
407:21;414:21;419:3,
11;421:7,12,23;
424:5;426:1;428:23;
429:23;431:6;432:14;
434:4,10;436:12;
437:4;438:13;442:13;
445:9;446:20,21;
458:14;463:5;464:19,
20,21;466:17;476:2;
477:5,9;478:6,15;
483:21;495:15;496:3;
497:13;501:23;
503:23;504:11;505:2;
506:13;507:13;
515:10;516:9;520:9;
521:18;523:11;
524:10;525:1;527:2;
530:16;539:18;
549:14;551:4;556:11
**right-hand (2)**
201:6;321:2
**rights (2)**
250:13,15
**ring (1)**
513:19
**Ripley (1)**
16:10
**rise (1)**
39:10
**risk (3)**
154:6,23;456:23
**river (2)**
250:16;404:24
**Road (2)**
8:14;330:10
**Robert (5)**
45:8;80:7;83:19;
471:19;515:20
**rode (1)**
263:20
**role (17)**
32:14;48:1;49:20;
79:9;96:24;114:23;
214:19;224:3;259:1,

21;275:16;409:11;
463:17;514:24;523:3;
535:1;541:16
**roles (2)**
259:17;375:4
**Rome (2)**
16:14,21
**Ron (1)**
217:3
**rookie (1)**
265:23
**room (15)**
26:1;75:12;76:16;
140:17,17;193:10;
226:22;227:2;397:14;
444:5,6,6,6,7;482:13
**rooms (1)**
449:19
**Ross (1)**
436:4
**rotates (1)**
23:3
**roughly (2)**
443:7;472:1
**round (1)**
312:15
**Route (1)**
8:22
**routine (2)**
479:6,6
**ruin (1)**
474:13
**rule (2)**
387:14;388:12
**rules (2)**
10:20;147:3
**ruling (4)**
463:9;465:20;
480:8;545:9
**run (1)**
122:7
**runner (1)**
405:12
**running (5)**
143:15;180:14;
181:8;492:6;548:1
**runway (1)**
542:4
**Ryan (1)**
9:13

## S

**saddened (1)**
160:1
**safe (1)**
17:14
**sake (1)**
503:22
**salaries (1)**
492:8
**salary (1)**
285:3

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**Sam (5)**
78:20;107:22;
400:8,15;401:2
**same (35)**
12:14;36:20;39:2;
44:6;60:12;62:7,8;
84:5;88:17;114:11,
17;118:19;130:6;
149:18;153:7;159:12,
12,17;160:4;218:1;
269:18;275:18;
276:13;280:15;
311:13;323:14;
334:13;387:7;417:6;
421:6;458:9;464:16,
18;522:16;547:16
**sample (4)**
219:10,13;506:14;
513:1
**samples (10)**
225:18,23;226:6,
21;227:23;240:3;
261:13;436:3;512:3,
24
**sampling (10)**
238:21;241:2;
242:3,12;249:5,11;
250:10;394:22;
434:20;510:4
**Sanctions (1)**
201:17
**Sandy (1)**
217:22
**sat (1)**
443:11
**satisfy (1)**
177:16
**Satterfield (3)**
394:17;398:16,21
**Saturdays (1)**
398:4
**Saudi (34)**
13:13,13,16,19;
14:3,8,12;19:10;27:5,
11,19,24;30:5,10;
61:23;68:1,3,7,11,16,
17;69:7,17,19;70:9,
12;71:3;72:2,17;
95:17;143:14;278:15;
380:14,22
**save (1)**
59:19
**saw (19)**
50:7;93:9,17;132:3;
159:20;179:3;196:11;
202:1;235:18;251:8;
301:21,23;429:1;
430:11;457:24;458:5;
469:6;501:1;537:10
**saying (89)**
36:22;39:24;54:9,
17;58:5;64:6,16;
71:17;80:16;81:16,

18;82:15;101:22;
103:9;118:9;125:11;
140:5;162:6;168:22;
178:20;181:7;194:15;
196:10,19;212:17;
230:7;236:12;259:14;
279:5,15;307:7,13;
316:19;319:2;325:3;
326:23;327:21;
330:21;332:16,22;
336:9;337:17;338:8;
340:7,8;345:16,17;
348:13;365:20;
380:12;400:19;403:7;
410:10;413:11;414:5;
416:13;420:18;
425:19;437:8;448:11;
459:12,15;460:13;
467:4,5;482:21;
485:3,13;499:13;
504:9;509:24;519:16,
23,24;521:4,5;523:6;
527:22;528:2;529:1;
536:8;538:18;551:21,
21;552:1;553:7,24;
558:11;562:9
**Sayre (1)**
45:8
**S-a-y-r-e (1)**
45:9
**scanning (1)**
233:11
**schedule (1)**
256:7
**scheduled (9)**
15:13,24;261:4;
399:2;433:3;444:17;
451:10;549:17,23
**Scheduling (5)**
276:7,8;376:9;
552:23,24
**Schlichtmann (2)**
209:20;221:7
**school (17)**
19:11;26:8,15;
27:13;103:17;113:3;
130:3;136:20;225:9;
406:11,13,14,19;
409:3,5;470:6;478:13
**schools (1)**
447:17
**Scott (15)**
185:16;351:17;
352:12;354:1;536:15,
16,21;541:9,11;
543:14;550:16;551:1,
7;558:11,14
**screening (1)**
553:16
**scud (2)**
21:22;22:2
**search (2)**
58:17;461:2

**searching (2)**
67:8;220:3
**second (37)**
16:19;50:19,23;
56:8;66:7;78:22,24;
79:1;151:3;157:5;
162:12;165:14;
289:14,15;317:18;
323:9;346:4;388:22;
398:18;451:4,9,19;
452:7,11,15,21;
457:10;496:1;501:16;
522:15;530:9;547:19,
21,21,22;551:14,16
**seconds (1)**
162:5
**secret (4)**
25:1,2,7,11
**secretary (2)**
243:10;275:14
**section (4)**
458:12,19;492:2;
556:2
**secured (1)**
436:1
**security (9)**
19:16,18;21:8,22,
23;23:23;24:5,24;
25:19
**seeing (2)**
374:16;398:17
**seeking (3)**
228:6;277:12;
452:10
**seeks (1)**
274:19
**seem (11)**
87:8;120:16;121:5;
164:6;186:7;219:12;
240:5;247:10;326:3;
386:17;395:23
**seemed (11)**
77:11;78:6;126:19;
186:10;254:11;
357:24;400:10;
444:13;450:13,15;
455:8
**seems (3)**
290:24;419:11;
453:8
**sees (1)**
265:22
**select (1)**
84:23
**selected (2)**
145:16;309:16
**selecting (2)**
84:17,19
**Selerno (1)**
433:19
**self-serving (1)**
110:18
**selling (1)**

410:7
**seminar (1)**
309:20
**senate (1)**
150:13
**send (11)**
52:21;65:13;67:22;
68:15,17;215:21;
280:1;357:18;374:19;
516:16;532:11
**sending (7)**
61:21;65:9;216:4;
375:16;424:8;430:7;
532:6
**Sensabaugh (2)**
9:16,18
**sense (6)**
71:1;205:12;
395:19;412:15;498:1;
523:9
**sensitive (1)**
409:1
**sent (39)**
53:23;55:3;58:12,
13;67:19;68:23;72:2,
17,21,21,22,24;73:3;
74:1,1,3;280:1,2,2;
332:13;377:20;
378:12,18;401:13;
425:2,14,15;430:9;
435:7;447:22,23;
532:7,10,13;537:6;
539:8,24;540:2;
542:19
**sentence (12)**
155:1;163:19;
171:18;183:7;224:7,
12;228:2;232:5;
246:4;250:1;258:23;
259:6
**separate (5)**
303:23;304:1;
366:17;367:12,15
**separates (1)**
290:21
**September (3)**
360:9;397:22;459:3
**series (5)**
235:20;269:12;
319:1;507:5,7
**serious (1)**
522:23
**seriously (1)**
94:16
**serve (2)**
243:12;287:3
**served (5)**
53:11;108:19;
203:18;289:24;
465:16
**server (1)**
71:9
**service (2)**

14:13;23:11
**Services (5)**
8:17;167:22;209:2;
298:23;425:24
**session (3)**
193:6;258:6;329:23
**set (24)**
37:18;55:21,22;
56:4,8;60:9,10,11;
107:4;175:22;177:1;
203:12;207:3;209:16;
220:24;274:8;283:12;
284:19;371:17;440:7,
10,12;496:11;520:14
**settled (9)**
32:3;194:19;298:2;
373:5,10,12,13;378:6;
411:14
**settlement (20)**
193:22,23;194:2;
277:22;278:4,21;
283:4,7,10,22;284:8,
12;379:15;380:1;
399:14;460:23;
542:13,21;544:5;
545:2
**seven (3)**
89:20;378:6;414:10
**several (6)**
203:12;240:4,15;
331:23;341:21;342:1
**SF (2)**
511:11,14
**Shaffer (2)**
258:13;436:6
**shake (1)**
133:22
**shall (1)**
491:24
**share (20)**
95:23,24;96:13;
103:23;154:5,8;
156:1,3;159:14;
163:6;175:19,19,20;
177:22;295:15;
439:15;475:6,10;
478:5;492:2
**shared (8)**
127:2;284:16;
311:16;466:13,14,16;
484:23;490:5
**shares (1)**
14:3
**sharing (17)**
96:5,15,20;97:2,3;
126:22;127:1;295:4,
10;302:4;303:6;
304:3;311:3,5,12;
375:12;503:20
**sharper (3)**
136:19,23;137:1
**Sheaffer (1)**
436:5

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**sheer (1)**
380:6
**Sherri (23)**
110:13;111:13,14;
134:15;135:1;138:6;
212:3;280:20;332:12,
17;413:11;447:1;
460:17;474:4,21;
475:7,11,17,24;
480:12;485:22;
488:15;490:9
**shielding (1)**
25:3
**shipment (1)**
61:23
**shocked (1)**
56:19
**shoes (2)**
34:8;300:7
**shook (1)**
455:20
**shop (2)**
276:18;390:10
**short (5)**
327:1;388:22;
450:4;453:8;529:10
**shortcut (1)**
53:10
**shortly (2)**
450:22;473:13
**show (8)**
143:15;144:19;
145:14;156:15;157:5;
227:16;266:7;390:12
**showed (7)**
56:15;63:22;67:13;
260:18;266:10;
369:22,23
**showing (4)**
56:11;145:11;
240:8;417:24
**shown (1)**
290:3
**shows (2)**
152:10;509:3
**shut (1)**
401:4
**sick (1)**
342:23
**sickly (1)**
81:1
**side (3)**
46:6;290:2;301:6
**sides (1)**
62:8
**sign (19)**
54:5;94:6;100:23;
104:21;131:8;132:9;
133:3;170:23;285:19;
303:20;375:5,19;
377:24;423:5;464:7;
495:8,12;537:15;
562:20

**signature (3)**
463:12;537:7;563:2
**signed (26)**
35:7;38:1,8,9;54:7;
55:9,11;67:4;98:17;
125:7;166:13;170:21;
173:2,11;211:20;
216:4;313:9;422:5;
423:1;424:11;464:24;
471:14;491:7,8;
495:15;544:16
**signifies (1)**
384:18
**signify (5)**
321:19;332:10;
333:14;360:24;
422:10
**signing (4)**
35:3;102:12;375:2,
17
**signs (1)**
464:8
**similar (1)**
524:19
**Simoni (577)**
8:6;9:16,19;43:12,
18;44:17,18;45:13;
46:2,4,22;48:12;50:2,
4;52:22;57:23;59:9;
74:12;75:2;76:7;77:9,
23;78:3,10,22;79:6,
19;80:3,9,18,22;
81:10;82:10,16,18;
84:6,13,22;85:9,13;
88:24;89:23;90:15;
91:16;92:24;93:16;
94:19;95:15;96:1,5,
16;97:3;98:24;99:5;
100:1,13;101:3;
102:4,24;103:5,21;
105:3,15;106:16,18,
19,19,22;107:7;108:3,
11;109:14,16,20;
110:1;111:5;112:19;
113:12;114:15;115:3,
13;120:20;121:16;
122:9;123:2,8;
124:23;126:12,21;
128:10;129:13,19;
130:23;131:4,6;
133:8,14,21;134:1,8,
17;135:5;136:18;
138:23;139:20;142:4,
16,23;143:5,9,14,24;
144:17;146:20,23;
147:1;148:1,6,17,18;
149:8,23,24;151:13;
152:4,19;153:18,21;
154:7,18;155:7;
156:2;158:13,20;
163:17;173:18;174:8;
175:4,6,7,24;177:3,
24,24;178:17,23;

180:13,15,16;181:1,8,
11;182:6,7,10,15;
183:16,19,20;184:12,
17,19,24;185:13,14,
14,21,23;186:4,15;
187:2,6,12,22;188:6,
13;189:6,13,19;190:7,
7,15;191:4,9,12,23;
192:13,17,23;194:8,
21;195:11;196:2,17;
197:11,15,19,23;
198:20;199:2,8;
201:18;203:18,24;
204:5,14;205:20;
206:1,4,11,16,21;
207:15,18,24;208:3,
10;209:2;211:4,7;
212:6;213:2,14,23;
216:6,22;217:2,4,7,
14;219:9,10,20;
220:7;221:5,16,23;
222:3,11,18;223:1,6,
21;224:8,20;225:16;
227:1,8;228:10,17,24;
229:8,14,18,22;230:5,
16,18,21;232:9,10;
233:5;234:16;235:15;
237:2,6,13;238:18,20;
239:6,19;242:3,10;
243:24;244:6,13,24;
245:6;246:1,19,24;
249:2,10;250:23;
251:2;252:5,16,18,23;
253:12,18,24;254:6,
20;255:9;256:8,20;
257:2;258:18;259:3,
18;260:2,14,24;261:8,
20,22;263:3,8,8;
265:18;266:7,10;
267:11,24;268:17,21;
270:4,8;271:5,17;
272:3,4,11,16;273:4,
9;285:5;286:11,23;
287:3,12,23;289:2,5;
292:9;298:17,23,24;
299:17,23;300:3,7,10,
12,18;301:1;302:10,
13,16,23;312:18;
318:3;322:16;325:16;
326:14;327:24;
332:18;333:21;337:3;
340:2,13,15;341:20;
342:1;343:7;344:12;
346:16;347:23;350:4,
10,22;351:2;352:15;
355:2,10,11;356:11,
18;357:10;358:20;
359:1,9,10;360:14;
362:7;363:7;364:15,
23;365:17,22;369:8,
19;370:18;373:20;
374:10;381:21;
383:13;384:7,12;

385:20;386:3;388:6,
11;392:23;393:4,8;
395:14;397:8;398:1;
400:6,7,9,10;403:9,
13,17,22;404:9;
405:2;408:12;413:1,
3,5,6;414:16;415:4,
17;416:6,20;417:2,22,
23,24;418:4;419:18;
420:4;422:20,23;
423:16,19;424:13,20;
427:15;428:11;
429:15;431:12;432:5,
21;433:7;437:15;
438:22;443:14;
444:13;445:7;446:10,
11;447:2,8;448:6,18;
450:2,12;451:14;
453:16;454:5,13;
455:22;459:19;460:2,
10;461:4;462:2;
464:2;465:11,16;
466:4,13,21;467:11,
21,23;468:11,24;
469:16,18;470:3,14,
19;471:1,3,8,12,23;
472:24;473:5,22;
474:11,22;476:2,16;
477:1,7,18;478:8;
479:1,10;480:17;
484:15;485:10;486:7;
487:21;489:12,23;
493:7;506:10,16;
508:2,11,12;509:8,11,
14,17;510:3;511:17;
512:4;513:20;514:2,
10,20;515:21;516:6,
14,19,24;517:4,18;
519:11,14,19,24;
520:20,21;522:17;
524:9,16,21;525:8;
527:12,14,17,18,24;
528:19;529:24;
530:18,22;531:16,23;
532:22;533:12,16;
534:3,14,22;543:6,18;
547:4,24;548:14;
551:24;552:15;
560:20,24,24;561:23
**Simoni1338 (2)**
156:22;157:4
**Simoni1366 (1)**
457:8
**Simoni412 (1)**
151:12
**Simoni's (26)**
48:1;142:9;152:7;
198:11;204:2,11;
205:7;227:21;228:3;
274:7;302:19;360:3,
15;392:20;403:22;
486:1;512:15;513:24;
514:3,16;529:22;

530:21;551:19;
553:20;559:1;561:3
**simple (4)**
70:6,10;285:1;
317:9
**simpler (1)**
82:14
**simplified (2)**
283:11;284:18
**simply (21)**
13:23;31:14;73:5;
76:13;89:24;94:2;
259:5;278:8;284:19;
338:10;345:21;350:9;
357:19;362:1;384:8;
411:8;421:18;499:20,
24;503:15;514:4
**single (3)**
379:15;488:9,12
**sit (14)**
55:5;184:9;189:1;
218:13;233:1;234:13;
235:12;280:16;
326:10;363:6;384:8;
430:10;501:14;
510:21
**site (3)**
118:4;532:20;533:7
**sitting (18)**
33:7;182:7;244:12;
253:21;255:3;279:13;
304:5;321:21;323:23;
324:10;368:3;384:21;
433:11;453:7;454:2;
461:7;542:4;558:13
**situation (8)**
46:20;323:17;
326:2;348:3;474:4,7;
534:20;560:7
**situations (1)**
376:16
**six (8)**
47:19;89:20;
210:23;325:23;327:5,
17;329:11,16
**sizeable (1)**
547:7
**skip (1)**
10:20
**slash (24)**
63:14;250:23;
275:14;330:9;337:14;
350:16;351:14,19,19;
371:7;381:1,1,8;
382:4,4,16;383:23;
387:14;390:1,2;
399:19;401:8;419:1;
434:9
**sleep (2)**
446:2,22
**slime (5)**
372:24;373:1;
374:1,3,8

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

slip (1)
236:14

slipped (1)
367:11

slipping (1)
405:17

slips (1)
412:24

small (2)
243:14;453:21

Smith (1)
8:8

Smithfield (1)
8:18

so-called (1)
210:6

social (4)
75:21;79:1;204:1,3

sociologist (1)
552:14

sociology (6)
129:23;203:19,24;
400:12;481:22;
482:22

soil (15)
219:9,12;225:18,
23;226:6,21;227:23;
237:8;240:2;241:2;
242:3,12;250:9;
261:13;512:24

soil/water (1)
46:18

sold (2)
14:3;166:17

sole (1)
472:10

solely (2)
489:20;545:5

solemnly (1)
10:1

solicitation (1)
552:11

soliciting (1)
530:16

solo (1)
32:16

somebody (14)
24:4;48:3;61:15,18;
74:5;122:8;133:12;
137:22;177:21;
226:18;236:15;
238:11;483:19;
524:23

someday (1)
143:13

somehow (1)
455:22

someone (45)
63:22;77:7;78:13,
18;83:18;90:1,2;
100:9;121:16;122:4;
124:23;125:4;132:15,
16;158:18;178:2;

184:24;186:11;220:2;
243:6;252:9;260:20;
280:1;281:2;282:16;
326:7;332:18;357:2,
8;376:15;377:11;
420:1,17,20;445:20;
456:2,16,17;471:4;
476:21;521:5;528:8,
23;529:1;536:11

someone's (1)
444:5

someplace (3)
76:18;309:19;
556:13

sometime (6)
216:21;376:10;
469:4,5;480:13,15

Sometimes (5)
17:16;384:14;
405:14;456:14;483:6

somewhat (2)
110:5;254:18

Somewhere (4)
51:10;133:13;
362:2;542:1

soon (3)
238:23;444:18;
471:13

sorry (46)
36:14;37:1;101:23;
102:1;113:10;118:8;
131:2;142:21;147:19;
158:13;189:15;208:8;
209:23;213:20;214:9;
220:11;288:12;310:2;
317:6;338:20;361:13;
373:17;398:14;
440:19,21;442:6;
447:13;457:11;
463:20;464:13;465:9,
10;475:9;494:13;
501:15;516:3;518:5;
521:20,22;527:19;
546:7;547:22;548:6;
553:17;559:5;561:1

sort (32)
19:21;33:12;47:6;
62:8;63:3;73:17;
77:11;79:3;93:12;
100:23;108:12;
131:10;138:11;
139:11;209:10,11;
253:6;278:11;294:14,
21;359:22;374:15;
396:11;439:5;471:15,
15;474:14;492:14;
539:14;549:10;
551:20;558:5

sorts (8)
254:19;326:6;
340:24;411:10;
416:24;540:14;558:5,
21

sought (1)
303:10

soul (1)
461:2

sound (3)
94:11;450:15;
459:10

sounds (1)
102:19

sources (3)
45:23;375:22,24

South (1)
273:5

Southern (1)
118:5

Soviet (1)
28:8

Spanish-Americans (1)
204:3

spans (1)
479:19

speak (11)
111:23;405:19;
443:16;449:9;450:24;
460:11;467:3;501:12;
503:16;515:3;516:7

speaking (5)
191:1;439:1;
448:14;449:18;470:9

speaks (6)
35:13;466:9;
501:20;502:5,11;
503:1

spec (2)
431:4,10

specialist (1)
8:17

specialized (2)
220:5;482:9

specialty (2)
109:13;225:11

specific (15)
18:9;67:18;77:16;
89:8;115:1;116:14;
128:12;148:23;
190:12;198:1;224:4;
287:6;454:5,8;525:6

Specifically (22)
18:14,20;89:7;
99:17,17,18;114:24;
184:10;189:2,23;
191:7;213:11;215:3;
216:20;219:3;231:16;
282:16;442:3;446:13;
461:9;515:2;532:10

specificity (3)
115:22;124:9;466:3

specifics (4)
97:7;153:11;162:8;
163:3

speed (1)
384:12

Spelter (300)

32:3;42:13;43:13,
16;44:23;84:16;
88:10;95:11,12;
96:19,20;97:1;98:3;
101:7,8,15;114:7;
136:6,7;143:21;
149:22;153:14,16;
170:14;174:19;
180:12;182:12;
183:10;185:3;190:4,
5,13,17;191:10,19;
192:1,10,14,18,24;
193:19,22;194:9;
195:12;196:4,18,22;
197:24;198:12,21;
199:3;204:4,6,12,16;
205:8,9,13,16,21;
206:15,16,21;207:20,
23;208:6,12;209:3;
210:5,16,21:2,4;
212:5;213:13,16,23;
214:1;217:3,8,14;
219:20;221:6,18;
222:23,24;223:7,22;
227:2,22;228:5;
229:1,10,15;230:5;
233:5;234:17;235:16;
239:7;240:1;244:16;
249:13;252:3,5,8,24;
254:21;256:19;258:4,
7;259:18;260:4;
261:1;262:22,23;
264:10,14;266:24;
269:23;274:13;276:2;
277:13,18;282:14;
283:7,22;284:5,13;
285:13;289:7;292:22;
293:11;294:4,7,9,10;
298:5,7,11;302:21;
303:13,17;304:8,23;
305:9,14;306:20;
307:5;308:15,24;
309:13;310:6;311:2;
312:19;315:11;
316:14,23;346:22;
347:13;348:5,15,17,
20;349:12;381:2;
382:4,13,14;383:4,5,
15,23;384:16;385:4;
386:14;387:4,13;
389:17;390:1;393:5,
18;394:4,6,11,21;
396:12,20;397:16;
399:10,20;402:10,18,
22;403:18;404:11,14;
409:14,16;412:9;
413:15;414:10,12,20;
415:15;418:12,24;
419:1,8,10,19;420:15,
18,23,24;421:9,10;
422:3,23;423:10,24;
424:4;425:3,4,11,16,
22;426:16,19,21;

427:8,8,15,18;429:4,
4,16,19;431:2,19,21;
432:10;433:16;434:1,
6,17;435:6,13;436:1,
2,19;440:5,8;441:7;
442:5,16;444:21;
445:7;446:13,16;
447:23;451:15;
455:22;456:9;462:3;
466:23;468:23,24;
473:15,17;475:11;
480:1,3,15;482:8;
483:10;484:18,21;
485:5,15;487:2,4;
489:21;491:13;492:3,
4,23;493:7,8;494:23;
495:5,18;504:1;
505:10;510:18;520:8;
521:8;532:9;534:7,20

Spelter's (1)
204:7

spend (2)
324:14;407:6

spending (1)
554:10

spent (7)
19:13,19;178:16;
325:5;359:22;455:19;
502:22

split (31)
105:14;131:6;
134:5;136:16;137:19;
143:2;144:1;149:23;
161:2;162:6,16;
165:4,10;166:5;
171:5;175:23;220:17;
298:18;299:14;303:1;
376:6,24;389:23;
391:3,10;392:17;
396:16;416:10;
427:20;467:22;
490:24

splitting (21)
99:3,9,21;101:6,15;
125:15;130:13,23;
139:5;142:17;143:6,
9;173:19;301:10;
353:12;360:19;362:8,
16;407:21;491:18;
538:3

spoke (21)
185:21;208:16;
280:20;304:14;307:6;
325:21;359:8;416:21;
448:18;449:9;473:7,
9;500:1;507:11,15;
510:1;533:15;546:23;
548:18;556:13,14

spoken (11)
84:2;135:7;186:4;
190:9;191:6;196:11;
217:24;326:1;447:3,

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

7;513:22
**Sporck (2)**
117:23,24
**S-p-o-r-c-k (1)**
117:24
**sporting (1)**
398:6
**sports (2)**
85:23;398:7;470:17
**Sprigg (9)**
339:15,15;340:2,
12,16,20;341:8,15;
342:12
**Spriggs (1)**
339:13
**squeezed (3)**
167:5,9,10
**staff (18)**
82:6;213:7;274:13,
14;275:3;278:11,18;
280:11;282:20;
292:22;293:18,22;
294:2;366:15;510:21,
24;550:20;555:11
**stake (1)**
456:24
**stamp (1)**
441:21
**stamped (3)**
441:11;448:17;
457:8
**Stan (8)**
44:10,11,13,14;
45:8,15,19,20
**S-t-a-n (1)**
44:11
**Stanbridge (1)**
44:9
**stand (3)**
55:7;218:2;518:16
**Standard (10)**
14:5;401:13;557:4,
6,9,10,22;558:8;
561:6,11
**standards (1)**
237:8
**standpoint (8)**
32:17;38:6;476:12;
512:19,20,21;544:17;
547:6
**Stanridge (1)**
399:12
**Star (6)**
148:19;378:13;
379:18;381:13;
404:16,24
**start (11)**
26:12;29:6;112:8;
129:18;156:24;
250:23;317:12;
320:20;411:20;468:6;
501:10
**started (12)**

14:10;22:12;27:3;
29:5;101:16,16;
149:21;205:1;367:18;
439:2;443:8;536:6
**starting (7)**
93:15;94:21;
219:17;390:14;
441:11;460:21;
479:22
**starts (4)**
163:18;220:13;
398:18;515:20
**state (26)**
9:2;21:20;22:1,9;
24:7,23;27:7;28:5,10;
40:4;51:16,24;52:4;
53:16,19;57:21;58:6;
79:17;206:19;275:1;
314:19;318:23;319:6;
333:16;357:3;492:20
**stated (8)**
54:2;119:3;130:11;
152:2;417:21;505:3;
511:21;554:1
**statement (34)**
184:13;197:9;
206:8;210:19;213:13;
214:16;216:20;224:7;
228:1;239:12;244:2;
245:3;246:3;259:8;
269:5;349:14;350:12,
23;351:10,11,23;
366:9;368:2;378:24;
379:9;385:1;410:14;
414:13,15;418:4;
420:9;428:11;433:9;
445:13
**statements (7)**
179:5;199:1;
203:12;263:13;
474:19;540:15;558:3
**States (25)**
8:10;13:20;15:1,6,
12,17,23;16:4;17:18,
23;18:6;21:12,15;
22:19;23:17,23;27:9;
67:24;70:23;71:24;
93:23;182:23;183:8;
529:23;542:10
**stating (7)**
148:3;189:23;
387:17;413:22;432:4,
20;433:21
**status (3)**
384:9;460:8;551:19
**statute (8)**
455:17;484:17,21;
485:4;486:9;489:1,2,
18
**statutes (1)**
253:4
**stay (6)**
15:11;240:15;

289:21,22,23;401:24
**stayed (2)**
240:18;509:16
**staying (2)**
76:17;402:1
**Stemple (2)**
379:14,23
**step (2)**
132:16;300:7
**stepped (1)**
34:7
**Steve (72)**
191:12,14;201:24;
208:18;209:19;
211:12;222:13;224:2;
225:6;227:4;228:20;
246:5;248:19;254:24;
258:9,10;260:7;
263:17;265:9,11,14,
24;303:3,18;304:14;
307:6,18;309:18,24;
310:12,13;311:20,22,
22,22;312:4,10,14;
313:6,8;352:8;354:5;
371:5;402:19;403:6;
409:17;428:1;430:6;
432:10,21;459:22,24;
483:17;506:10;507:6,
11,16,23;508:6;
509:10;511:10;512:1;
514:15,22;516:24;
519:17;520:4,15;
521:11;522:9,10;
543:15
**Steven (3)**
202:22;221:6;
263:17
**Steve's (2)**
258:23;519:12
**still (40)**
13:20;17:12;22:16;
29:17;30:13,16;33:4,
7;53:3;55:19;61:2;
69:12;71:24;77:14;
98:15,20;121:3,21;
127:19;216:24;
254:24;263:22;286:4;
292:12,13;317:8;
355:21;367:14;380:3;
381:7;394:21;395:8,
11;401:10,12,14,14;
433:22;538:8;551:12
**stipend (24)**
295:20,22,22,23;
296:1,4,7,17,19,20;
297:7,9,14;298:4,7,
11,13;301:15,20;
396:5,7,11,16,19
**stipends (3)**
314:1,3,5
**stipulate (1)**
528:11
**stole (1)**

61:16
**Stone (1)**
378:6
**Stone's (1)**
545:8
**stood (2)**
449:13;541:20
**stop (6)**
128:2,6;181:10;
215:5;501:18;529:5
**stopped (5)**
14:11,12;389:19,
20;390:14
**stopping (2)**
390:10;391:6
**storage (3)**
42:11;67:14;366:21
**store (1)**
122:7
**story (1)**
129:11
**straight (6)**
19:10;26:14;
129:11;395:1,23;
396:15
**strain (1)**
503:14
**strange (3)**
357:24;397:23;
435:4
**strategy (2)**
419:1;527:14
**Street (11)**
8:18;18:2;122:23;
154:4;159:21;160:3;
286:2;381:3;412:11;
533:16,19
**stressful (1)**
540:12
**strictly (1)**
266:3
**strike (5)**
228:22;256:13;
429:13;432:2;433:13
**strong (1)**
499:12
**struck (1)**
206:16
**structure (2)**
366:1;496:12
**student (2)**
226:16;242:8
**studies (1)**
204:1
**studying (2)**
101:13,19
**stuff (2)**
402:23;404:11
**style (1)**
201:9
**subject (5)**
41:9;48:5;274:23;
357:15;443:18

**submission (1)**
281:22
**submit (7)**
174:24;175:3,8;
177:14;475:14,17;
491:12
**submitted (15)**
179:3;277:5,9,17,
19,22;278:2,3,24;
280:9;282:5,15,24;
465:4;485:20
**submitting (2)**
282:9;472:24
**Subparagraphs (1)**
232:19
**subsequent (2)**
246:22;247:1
**Subsequently (3)**
42:22;166:14;
509:24
**subset (1)**
275:4
**substance (3)**
166:12;444:10;
506:13
**substantial (12)**
189:6,9,13,20;
192:1,17;195:11;
199:3;297:15,18;
441:3;498:18
**substantially (3)**
270:4,8,11
**substantiate (2)**
338:6;557:2
**substitute (2)**
299:23;300:1
**successful (5)**
277:18;305:11;
308:11;310:8;435:3
**successfully (1)**
298:2
**sudden (1)**
552:23
**Sue (16)**
47:15,16;48:4;
325:23;327:20,21;
328:2,15;329:5;
339:17;341:10;
345:14;378:5;379:1;
394:19;399:2
**sued (4)**
35:21,24,24;176:21
**Sue's (1)**
48:10
**sufficed (1)**
373:9
**suggest (5)**
261:19;315:14;
467:11;493:2;503:17
**suggested (12)**
90:20;104:18;
268:7;273:16;315:5;
411:7;467:3,10;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

476:13;522:16;523:7;
560:19
**suggesting (7)**
103:10;304:11;
336:14;460:17;
467:13;520:21;
527:23
**suggestion (4)**
160:9;313:17;
445:6;479:8
**suggestions (2)**
370:3,16
**suggests (1)**
260:7
**suing (1)**
36:9
**Suit (3)**
42:2;210:17;499:12
**suitable (1)**
466:5
**Suite (1)**
8:22
**Suites (1)**
193:16
**sum (3)**
281:12,14,14
**summarize (3)**
129:12;444:10;
549:11
**summary (25)**
179:2,5;237:3;
288:20,23;289:1,5,18;
318:2,18,19;319:9;
325:5;331:19;341:20;
367:21;458:13,19,20;
467:2;480:4;556:8,
10;559:4;561:10
**summer (3)**
222;222;264:2;
522:12
**Summy (18)**
185:16;351:17;
352:12;353:9,24;
354:1,2;536:15,17;
541:9,12;543:14;
550:16;551:2,6,7;
558:11,14
**Summy's (4)**
363:21;364:14,15,
24
**Sunday (9)**
15:9;72:12,16;
397:5,7,20,22,24;
398:3
**Sundays (1)**
72:15
**superseded (1)**
211:22
**supplied (1)**
212:15
**support (3)**
81:3;561:24;562:3
**supporting (2)**

168:3;265:14
**suppose (4)**
102:6;301:24;
310:16;557:24
**supposed (1)**
75:22
**supposedly (1)**
417:14
**Supreme (3)**
194:1;434:8;480:6
**sure (80)**
10:19;11:18;15:15;
20:1;23:24;25:16;
31:16;33:14;35:17;
36:22;38:7;42:19;
54:4;58:7;67:5;72:23;
82:11;83:8;85:15;
86:14;87:22;88:2;
101:2;111:6;112:7,
23;113:1;114:18;
117:19;138:22;
139:10;140:16;
142:22;144:21;145:8;
151:21;152:2;157:16;
165:15;176:8;180:20;
183:24;184:2;189:16;
208:9;211:3;216:9;
222:8;226:2;241:12;
252:15;253:1;262:16;
280:3;300:1;307:13;
317:14;329:5;333:21;
338:15;341:3;375:23;
376:19;383:16;
388:14;399:6;401:2;
430:5;439:1;443:9;
452:18;461:13;
462:15;481:8;482:12;
487:17;514:5;516:16;
535:3;559:7
**surprise (3)**
216:10;388:10,14
**surprised (14)**
46:9;60:21;133:17;
188:3;381:17,18;
402:1;434:24;435:1,
2;436:14;483:6;
514:12;552:22
**surprising (1)**
490:8
**surprisingly (1)**
203:23
**surrounding (1)**
167:19
**survey (5)**
425:5,10,11,13,17
**Susan (39)**
236:12;238:10;
243:9,10,15;252:11;
275:11,13,19;276:4,
22;278:16;280:4,7;
282:20;283:3,6,18,21;
285:2;365:21;368:10;
369:21;370:3,16,19;

379:13;423:8;424:10,
16;454:22;510:17;
511:14;519:4;532:1;
556:11,11,21;558:13
**suspect (26)**
38:20;52:7;83:11;
138:20;152:22;
154:10;179:18;189:1;
198:18;210:22;252:9,
20;290:16;293:12;
303:22;321:23;
346:13;347:19;
348:12;350:19;369:6;
384:5;426:12;507:23;
521:8;534:16
**suspicious (1)**
538:15
**sway (1)**
308:3
**swear (3)**
9:4,23;10:1
**Sweeney (35)**
43:21;45:4;47:16,
21;80:6,7;83:19,20,
21,24;105:1;108:1;
128:21;267:22;
268:12,20,22;394:16;
398:10,19;402:10,19;
403:5;471:18,19,22;
472:2,11,24;473:4,7,
18;474:8,12;476:24
**Sweeney's (4)**
128:24;268:1,10,16
**swore (1)**
150:3
**sworn (1)**
10:9
**Sybil (1)**
16:17
**S-y-b-i-l (1)**
16:18
**syllabus (5)**
252:4,7,11,19;
539:9
**system (1)**
93:12

**T**

**table (1)**
105:24
**tail (3)**
33:16,20,21
**talk (57)**
31:19;74:11;81:9,
20;82:16,17;88:3;
94:10;112:3;113:9;
135:1,4;141:22;
190:4;192:4;197:22;
198:22;203:11;
252:16,21;263:7;
285:7,21;287:8;
304:14;330:17;

351:18,19;353:2;
355:23;384:16;
399:11;402:20;403:6;
408:24;410:16;
411:18;416:6;423:23;
432:5;451:11;453:5;
454:19;459:2,3;
474:14;497:17;
511:11,11,14;512:24;
515:22,23;516:9,15;
548:11;560:6
**talked (91)**
48:21;49:11;57:19;
62:5;78:3;88:6;89:4,
5,8,10;90:16,22;91:1,
6,7,17;92:21;93:3,8,
10;94:9;97:24;99:16;
102:16;110:13;
113:24;114:5,24;
123:19;127:5;185:17,
19;221:9;266:16;
285:6,18;286:13;
288:6;307:9;356:8,
23;357:10;365:23;
373:21;376:10;385:4;
386:1;388:14;397:2;
399:18,20;406:10;
409:10;410:5,17;
412:11;416:9,20;
417:1;431:20;436:21,
22;437:16;438:19;
444:6,18;445:16;
446:4,19;450:16;
453:13;469:15,17;
470:15;471:3;474:5;
475:24;480:17;
482:20;485:22;
502:16;509:10;510:2;
514:15;517:3;529:21;
533:16;537:8,11;
543:7;550:10
**talking (83)**
19:24;58:6;69:16;
72:6;78:23;82:22;
85:23;103:2,17,18;
111:13,19;112:1;
114:1,3;115:1;122:3;
125:13;130:2;131:4;
136:8;138:2,5,6;
156:24;162:20;164:2;
166:8;186:8;195:15;
196:9;204:18;216:21;
217:17;224:16;
238:21;278:20;
287:17;288:9;293:16;
312:20;317:2;322:23;
324:24;327:13;
340:23;341:13;
350:11;355:15;398:7;
400:6;405:15;406:7,
16;409:2;410:9;
415:7;417:10;423:21;
430:3;437:13;439:5;

446:10,11,12,15;
447:16;453:15;454:1;
464:14;467:9;470:16;
478:21;484:13;501:6;
506:8;534:22;536:22;
539:2;542:2;549:16;
550:22;558:12
**talks (3)**
306:6;544:5;545:2
**tapped (6)**
405:21,23;406:4;
407:24;408:13,20
**task (1)**
508:19
**tasks (9)**
276:1,4,11,21,23;
277:24;482:7;483:9;
517:17
**tax (10)**
31:6,7,14,18,24;
32:1,6;411:4,4;510:4
**taxes (2)**
31:2;410:9
**Taylor (23)**
8:8;9:9,9;41:4,8,11;
72:19;192:12,16;
196:23;202:19;
208:19;246:15;309:7,
9,11;335:2;467:22;
525:4,5;527:7;
548:24;556:12
**team (5)**
195:7;310:23;
337:18;401:5;445:7
**technical (1)**
19:1
**telecon (8)**
258:4;262:22,23;
263:1;265:17;454:12;
468:20;508:2
**teleconference (1)**
429:2
**telephone (22)**
257:1;258:6,7;
303:2;349:17;359:4;
368:9,21;427:18;
428:18,20;492:9;
506:1,5;507:12;
509:7,8;525:1;527:6;
530:19;555:18,19
**telephoned (12)**
209:1,19;217:22;
236:13;252:12;350:1,
1;359:13;543:16;
546:22,24;547:5
**telephoning (2)**
336:12;536:15
**telling (36)**
60:18,19;68:13;
92:10;102:13;116:22;
125:21;126:17;127:3;
130:18,22;139:20;
160:21;227:5;282:17;

**Gary W. Rich and Law Office of Gary W. Rich, L.C. v.**
Joseph Simoni, et al.

**Gary W. Rich**
April 30, 2013

287:17;307:18;
314:13;326:4;330:1;
336:12;341:2;376:12;
386:2;480:19;499:21;
515:21;523:4;540:12;
541:8;549:22;550:15,
19;551:10;552:21;
554:11
**tells (2)**
133:13;532:4
**ten (14)**
98:2,8;126:5,6;
164:19;210:13;
240:16;296:6;376:13;
501:17,18;503:2;
534:23;553:4
**tenants (1)**
286:6
**ten-day (2)**
239:24;251:10
**ten-hour (1)**
226:9
**Tenth (1)**
8:18
**tenure (1)**
203:23
**Teresa (2)**
275:21;463:12
**term (3)**
223:24;374:3;
479:11
**terminate (1)**
134:6
**terms (21)**
43:2;67:8;186:8;
211:19;212:14;
225:21;229:1;287:6,
17;303:5;314:4;
326:15;348:19;
381:20;386:5;395:13;
422:22;469:18;501:6;
516:19;542:20
**test (2)**
59:6;549:21
**testified (17)**
10:10;240:20;
242:5;267:10;273:15;
299:3;333:20;356:12;
370:17;374:20;
381:24;385:24;
396:18;472:9;503:4;
540:11;544:16
**testifying (1)**
265:19
**testimony (35)**
10:2;25:4;95:14;
105:20;107:20;110:8;
112:24;113:7,12;
114:21;132:11;
134:22;136:2;140:11;
142:19;162:13;228:4;
241:16;262:21;
284:15;286:15;

318:17;325:14,17;
339:24;353:22;421:5;
438:18;502:8,20;
517:22;524:16;
527:15;528:3,14
**testing (10)**
263:7;336:2;337:3;
376:11;382:17;433:1,
2,8;549:16;550:18
**Texaco (1)**
14:5
**Texas (2)**
538:19;542:2
**thanked (1)**
265:14
**Thanks (12)**
112:11;183:2;
214:13;235:24;238:2;
242:22;245:13;
255:21;257:12;
264:21;317:17;
457:17
**Theatre (2)**
436:21;437:17
**theme (1)**
87:13
**thereabouts (1)**
126:11
**thereafter (2)**
471:13;473:13
**there'd (1)**
408:9
**therefore (1)**
115:10
**Theresa (8)**
16:24;59:20;
275:12;276:14,22;
282:20;284:8,12
**thick (1)**
260:8
**thinking (16)**
25:15;67:11;97:16;
113:16;137:7;204:23;
297:5;324:24;330:4;
343:18;379:16;413:9;
418:6;473:19;511:18;
528:13
**third (7)**
310:11,16;337:13;
434:18,21;435:2;
524:10
**Third-Party (14)**
8:6;34:12,16;146:5;
175:13,17;176:19;
177:16;180:11,20,23;
292:9;453:21;486:13
**Thomas (5)**
8:9;214:24;274:21;
275:5,8
**though (15)**
24:15;30:2;32:1;
73:1;132:6;168:21;
305:4;324:23;350:21;

362:21;476:5,16;
520:14;553:15,21
**thought (73)**
76:23;85:4;93:18,
24;94:1,6;95:22;
96:11;107:10;108:7;
110:22;120:14;
133:18;137:16;141:5;
176:20;178:3,21,22;
180:11;187:15,18;
188:9;191:9;192:13;
194:8;196:2,17;
198:2;199:2;215:18;
247:8;269:8;300:17;
305:2;310:17;318:21;
324:3;357:8,16;
374:22,23;380:3;
386:2;392:17;402:22;
404:10;407:2;408:13;
415:20;416:11,19;
430:11;440:18,19;
450:4,5;453:14;
455:6;456:5;460:24;
471:8;474:3;488:17;
494:14;496:21;
499:23;516:24;
528:19;537:10;
538:16,18;547:5
**thoughts (1)**
539:7
**thousand (1)**
399:15
**thousands (2)**
80:15;211:19
**threat (7)**
406:5,21,23;407:1,
5,11,15
**threaten (2)**
377:7;408:6
**threatened (3)**
155:7,12;159:16
**threatening (5)**
155:20,22,23;
455:22;547:6
**threats (1)**
406:5
**three (46)**
22:15;23:7,8;27:12;
59:7;96:13;113:22;
120:24;135:19;
149:16;150:2;172:2;
175:13;212:2;220:8;
226:11;240:18;270:3,
9;283:13;284:23;
285:12;305:7;306:8;
311:11;336:3;337:12;
353:9;378:7;394:15,
21;395:3;399:16;
431:21;432:6;444:8;
446:17;454:1;477:6,
8,10;479:22,22;
483:1;504:4,4
**three-inch (1)**

260:8
**three-person (1)**
172:13
**threw (2)**
195:13;445:20
**throughout (5)**
28:7;203:23;
266:24;440:7;454:20
**throwing (1)**
93:19
**Thursday (2)**
238:16;261:11
**thus (1)**
218:22
**ticking (1)**
422:11
**tie (1)**
551:13
**ties (4)**
204:7,16;205:7;
216:24
**Tillman (1)**
63:6
**timekeeping (1)**
292:21
**timely (1)**
349:1
**times (28)**
88:7;9;96:6;97:13,
23;98:2;119:20;
126:12;155:13;226:1,
11;240:5,18;280:13;
322:21;384:11;
396:19;397:10;456:3;
458:4;459:22;477:7,
8,10,11;516:23;
528:21;547:14
**timesheet (1)**
448:17
**timesheets (28)**
62:16,19,22;
241:22,24;256:24;
280:6;322:12;323:24;
324:9;325:1;328:9;
329:19;338:5,8,9,15;
339:19;341:12;
347:21;350:19;440:4;
468:17,18;511:22;
531:5;555:4;558:23
**titles (1)**
22:18
**TL (1)**
433:18
**today (45)**
10:16;11:21;12:10;
25:4,18;30:14;38:15;
55:5,7;127:5;178:4,5,
21;179:20;183:23;
216:15;218:13;
224:12;232:18;233:2;
234:13;235:12;
237:15;244:12;
253:22;279:13;

291:20;292:7;304:5;
321:21;323:23;
324:10;326:10;
331:19;348:8;363:7;
368:3;384:21;433:11;
453:8;454:3;461:7;
493:16;508:2;549:16
**today's (1)**
265:17
**to-do (1)**
541:23
**together (29)**
43:20;48:7;54:24;
67:23;87:5;88:5;
90:23;94:21;99:21;
111:3;113:20;115:4,
14,23;116:22;160:10;
211:23;307:20;
337:19;341:20;
348:13;366:16;
413:13;470:7;476:11;
477:19,23;479:13;
551:13
**told (99)**
18:8;24:9;47:16;
62:9,10;69:4;73:20;
74:22;78:12;92:14,
21;99:24;100:9;
101:3;106:18;107:2;
108:11;111:6;115:3,
13;116:21;121:15;
123:1;124:23;125:4;
131:17;132:1;134:14;
135:9;138:15,18,19;
139:23,24;140:1;
143:17;161:1;164:6;
184:6;185:22;191:8;
215:7;244:9;246:4;
278:8;281:2;287:13;
299:7;304:9,17;
305:6;306:11,12,14;
309:15;311:11,18,19;
312:6,14;350:6;
356:20;381:5;409:15;
417:21;418:9;420:20;
444:12;447:2;455:11;
459:1,3;460:10,22,24;
467:2,8;469:3,10;
470:4;477:18,23;
478:14,16;499:15;
503:6,12;522:18,21,
22;536:14;539:11,11;
541:21;543:11,12;
547:13,16;548:15
**toll (1)**
258:5
**Tom (16)**
82:7;166:14;
252:10,12;387:13,19;
388:12;443:22,23;
533:9;536:7,20;
538:24;539:3,5;543:2
**tomorrow (4)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

336:15;550:1,3;
551:22
**tone (5)**
401:18,20,21;
415:10;450:14
**Tonya (3)**
263:18,19,20
**took (24)**
42:11,12,17;47:21;
68:2,9;69:20;70:9;
74:18;83:17;96:22;
124:6;263:13;389:18;
425:1;440:18;449:11;
458:8;488:10;500:3,
4;530:20;539:23;
547:2
**Toolan (5)**
427:19;428:2,5,10;
435:7
**top (19)**
25:1,2,7,10;152:14,
16;159:5;231:18;
248:16;257:21;
262:15;272:10;
284:24;460:20;
507:13;512:1;516:13;
519:3;531:15
**top-flight (2)**
80:8,10
**topic (2)**
114:11;466:5
**topics (4)**
114:13;409:6;
507:24;508:1
**Toronto (3)**
86:7;87:2;93:9
**torts (2)**
252:11;388:2
**total (8)**
98:2;121:1;166:24;
167:13;275:6;279:16;
422:5;494:3
**touching (1)**
255:1
**toward (1)**
401:22
**towards (1)**
223:1
**town (10)**
74:20;86:19,20;
241:12;246:5,11,14,
19;362:4;436:15
**toxins (2)**
47:23;227:17
**toying (1)**
93:20
**track (8)**
281:1,15,18;
282:21;292:24;366:5,
7;492:11
**Tracy (2)**
255:2;507:9
**trail (3)**

513:13,15;515:12
**trained (1)**
276:24
**training (2)**
19:1;482:16
**transcriber (1)**
265:15
**transcript (3)**
224:9;265:16;
528:16
**transcription (5)**
157:6,7;158:5,10;
159:7
**transfer (1)**
63:2
**transferred (1)**
63:1
**translate (2)**
519:9,11
**transpired (4)**
160:2;162:2;511:4;
522:14
**travel (4)**
492:18,19;493:1,3
**traveled (3)**
22:22;443:1,4
**traveling (1)**
458:3
**travels (1)**
17:15
**treasurer (1)**
32:20
**treated (2)**
194:13;195:23
**trial (23)**
194:3,4;278:12;
279:1;313:1,11,14,19,
20,21;418:1;440:24;
451:20,21;480:14;
495:17;497:5;498:8,
11;504:16;544:2,23,
24
**trials (1)**
238:23
**tried (3)**
127:24;298:2;
547:14
**trip (17)**
15:24;17:10;86:8,
19;87:2,3;402:21;
403:22;423:11;
426:21;427:8,12;
431:2;559:24;560:2,
4,6
**trips (5)**
86:6,15,16,23;87:1
**trouble (1)**
133:1
**troubled (3)**
34:11;81:12;177:11
**true (37)**
27:4;36:21;39:22;
64:5,5,15;66:3;88:18;

106:13;108:22;
124:11;133:3,10,15;
134:20;135:10;
136:22;137:14;
138:15;139:3,4;
141:2;143:2,3,21;
158:14;159:6;175:16;
209:5;272:21;319:12,
13;395:12,13,16;
472:11;486:19
**trusted (2)**
48:11;205:13
**truth (3)**
10:3,3,4
**truthfully (1)**
64:19
**try (11)**
50:18;65:20;
101:21,24;129:11;
176:18;438:15,16;
439:19;458:15;
529:20
**trying (30)**
23:19;25:23;26:1;
34:10,19;36:6;53:1,2;
64:20,23;68:19;69:9;
70:5;72:11;109:23;
125:18;132:23;197:3;
212:23;227:15;
233:22;279:19;
369:21;379:4;420:1;
448:13;476:4;503:16;
534:9;537:3
**Tuesday (7)**
8:15;261:11;364:5,
6,11;550:5,6
**Tuesdays (1)**
550:7
**Tulane (6)**
224:24;225:10;
237:18;406:14,15,18
**turn (12)**
65:5;82:18;169:17;
171:13;358:12;441:9,
13;462:17;464:6;
531:7;533:4,21
**turned (1)**
305:23
**Turning (1)**
346:3
**twice (4)**
40:17;69:4;268:19;
317:18
**two (60)**
27:12;36:23;59:4;
88:11;95:12;120:24;
124:17;143:15;192:5;
206:5;209:23;210:2,
14;211:9;217:2;
221:6;226:11,13;
240:18;254:17;271:3;
280:15;290:13,21;
301:17;311:20;

323:16;343:23;365:2,
6,9,11;366:16;373:2,
7;378:6;394:18;
398:12;408:16;
412:12,16;433:12,14;
436:12;449:19,19;
451:14;460:22;
461:17;464:17;
465:24;494:3;521:23;
534:5;546:5;554:2,2,
2,4;558:17
**two-page (2)**
151:4;156:17
**type (13)**
13:9;18:23;56:1;
261:1;269:18,22;
342:21;414:15;
425:15;454:23;
555:12;557:21;558:1
**types (3)**
85:19;204:15;276:4
**typewritten (1)**
157:5
**typical (1)**
236:14
**typically (8)**
281:13;454:19;
490:8;506:4;550:5;
555:13,20;556:4
**typing (1)**
454:22
**typographical (2)**
375:21;377:21
**typos (5)**
254:9,11,19;
374:21;544:17

# U

**ultimate (2)**
298:15;503:5
**Ultimately (16)**
47:11;79:14,17;
103:24;138:8;208:4;
211:18;301:18;
349:10;406:14;
477:17;500:10,11,12;
504:15;540:10
**unacceptable (1)**
548:15
**unaware (1)**
163:19
**unbelievable (1)**
544:21
**unclear (2)**
46:18;110:14
**uncomfortable (1)**
514:3
**undated (1)**
63:5
**under (19)**
21:22;35:4;65:23;
153:14;172:17;

173:13;203:16;
292:12,13;311:4;
327:7;346:20;410:14;
420:23;492:22;493:2;
505:1;532:1;533:24
**Undergraduate (1)**
26:7
**underhanded (3)**
103:10,12;410:13
**underlying (1)**
453:19
**underneath (3)**
250:12;260:10;
507:22
**underscore (7)**
327:12;353:17;
395:7,10;427:24;
430:1;434:23
**underscored (6)**
353:13;395:23;
396:2;427:22;429:22;
434:21
**underscoring (2)**
327:7,10
**understands (1)**
452:20
**understood (7)**
36:13;130:17;
137:3;259:17;417:8;
477:5;501:21
**undertook (2)**
203:24;482:8
**unethical (1)**
133:24
**unfair (2)**
381:6;558:18
**unfortunately (1)**
326:8
**unhappy (1)**
544:16
**unilateral (1)**
381:5
**Union (20)**
28:8;48:14,16,24;
49:24;50:4;78:15,16;
79:24,24;105:10;
107:4;108:16;128:24;
138:8;267:15;269:6;
371:14,16;477:1
**unions (1)**
477:3
**unit (3)**
42:11;67:14;366:21
**United (22)**
8:10;13:20;14:24;
15:6,12,16,23;16:4;
17:18,23;18:5;21:11,
15;22:19;23:17,23;
27:9;67:24;71:24;
93:22;182:23;542:9
**University (19)**
26:5;43:21;48:10;
49:2;78:17,21;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

104:15;107:15;
108:17;129:24;133:9;
135:20;203:19;
219:11;225:1;388:3;
406:11,18;482:24
**unlawful (6)**
138:12;446:6,7;
453:3,11,13
**unless (8)**
107:10;110:12;
184:14;194:19;196:5;
340:5;411:3;425:10
**unlicensed (1)**
142:7
**unpaid (6)**
522:12,13,17;
527:14,21,24
**unprofessional (1)**
375:18
**unprofessionally (1)**
375:1
**unquote (8)**
206:15;219:23;
252:5;274:13,14;
275:3;358:5;427:21
**unrelated (2)**
550:23,24
**unstable (6)**
524:16,21;525:9,
11,14,17
**unsure (1)**
252:4
**up (84)**
23:8;30:8;55:21,22;
56:4,8;63:3;78:1;
85:3;107:4;122:6,9;
123:8;127:4,6;129:3,
4;132:16;133:12;
164:7;167:2,14;
169:19;180:14;181:8;
191:7;210:4;218:2;
254:8;255:1;261:20;
265:17;267:24;268:8;
278:24;280:19;
283:12;284:19;
299:10;301:5;311:13;
313:9;318:9;321:10;
325:23;354:8;355:22;
357:19;358:5;366:21;
384:12;390:13;
401:13;402:23;
404:10;417:24;
438:24;439:6,17;
447:15;451:1,11,17;
453:6;454:22;455:20;
465:9;466:19;475:23;
480:2;482:14;497:21;
502:1;503:8,9,11;
504:3,9;507:24;
509:9;524:17;541:20;
542:24;555:12
**upbeat (1)**
450:14

**upcoming (2)**
444:15;506:14
**update (5)**
427:8,16;429:5;
434:19;511:3
**updated (1)**
239:6
**upon (9)**
198:5;217:1;259:3;
262:20;277:12;
298:20;331:18;415:9;
530:19
**upset (14)**
126:19;155:13,14;
377:14,17;379:23;
380:3;400:10;401:3;
450:15;455:10,13;
539:22;547:4
**upstate (1)**
355:11
**USDO (1)**
22:19
**use (26)**
50:9;53:6;56:6;
58:22;59:3,15;92:17;
157:8;158:4,5;174:1;
177:13;349:13;
355:20;373:24;374:3,
7;432:4;439:14;
483:8;488:1,19;
501:12;519:20;520:4;
521:11
**used (29)**
50:16;51:22;52:14,
17,23;53:6;56:7,13;
57:13,22;58:2;73:16;
165:2;189:8;194:11;
195:4;224:1;266:11;
311:7;341:3;374:8;
381:7;397:14;415:10;
425:5;449:19;479:11;
484:16;540:5
**useful (1)**
501:19
**uses (1)**
487:21
**using (11)**
50:17;73:14;93:22;
341:1;446:9;487:20;
520:2,5;521:10,12;
557:10
**usual (1)**
454:16
**Usually (9)**
15:7;81:11;510:22,
23,24;555:10,17;
556:21;561:6
**utmost (1)**
505:8

**V**

**vacation (2)**

16:1;333:18
**Vague (1)**
482:11
**vaguely (1)**
313:6
**valuable (2)**
188:10,13
**valued (1)**
266:1
**varied (3)**
97:12;460:5,7
**Various (13)**
20:13;37:12;
139:15;170:14;183:8;
202:11;212:22;
214:21;215:17;
227:21;406:13;
432:10;496:11
**Vasquez (1)**
204:24
**Vaughn (2)**
423:12;426:24
**Vegas (1)**
309:19
**vehicle (1)**
94:3
**vehicle's (1)**
520:16
**vendor (6)**
142:14;194:13;
195:24;445:3,8,15
**venture (8)**
88:8,9,11,12,16;
163:20;164:21;165:1
**venturer (1)**
164:22
**ventures (3)**
88:5;94:11,12
**venue (1)**
328:3
**verbal (1)**
101:21
**verdict (5)**
277:20;278:2,21;
279:8;309:22
**Veritas (1)**
8:17
**Vernon (8)**
361:5,8;364:10;
431:8,23;434:14;
435:10;550:4
**versed (2)**
113:4;430:15
**version (7)**
158:6;285:1;290:2,
3,24;291:6;333:7
**versus (2)**
117:24;562:3
**VFD (1)**
421:10
**via (1)**
530:19
**viable (1)**

85:4
**vices (3)**
479:3;537:6;538:9
**video (5)**
8:4,16;66:20;180:7;
289:21
**VIDEOGRAPHER (29)**
8:4;66:15,20;117:2,
9;180:2,7;231:3,10;
234:18,23;270:15,24;
289:19;291:14,19;
292:7;335:4,9;
388:23;389:4,9;
437:22;438:4;484:1,
8;529:11,16;562:15
**videos (1)**
344:21
**view (7)**
26:15;192:17;
195:11;197:23;
198:11;265:15;266:6
**viewed (2)**
456:20;476:12
**views (4)**
188:23;267:2,6;
560:8
**violated (2)**
174:4;175:10
**Virginia (72)**
8:11,15,23;16:11;
18:1;26:5;29:15;
43:20;45:2;46:15;
75:5,8;78:1,16;79:18,
20;81:10;86:21;
96:11,15;104:15;
105:12;107:14;118:6;
126:7;133:9;135:10,
12,19;148:19;182:24;
198:16,17,18;203:19;
204:4;206:12;210:3;
215:10;220:9;246:12;
271:13,22,24;273:9;
313:11,14,21;314:19;
319:7;331:2;357:1,9;
388:3,13;398:24;
401:24;415:13;
416:17;423:12;431:3;
434:7;438:21;444:14;
472:13;480:6;483:2;
487:1,10;534:1;
539:8;540:2
**Virginians (1)**
357:1
**virtue (1)**
181:1
**visit (17)**
78:22,24;79:1,2;
209:20;241:16,20;
246:12;261:12;
268:10;342:1;423:12,
22;519:13,23;533:2,7
**visitations (2)**
341:22;343:8

**visited (9)**
339:12;340:1,12,
12,16,20;341:8;342:7,
9
**visiting (1)**
214:23
**visits (3)**
268:15,16;337:21
**visual (1)**
94:4
**vitamins (4)**
88:8;120:21;121:5,
13
**Vititoe (24)**
166:3,14;186:24;
187:1;220:8;254:5;
282:8;295:13;336:11;
337:18;341:18;356:4;
368:10;406:7,24;
408:2,17;486:23;
488:6;524:17;538:6;
539:22;547:16;
548:18
**Vititoe's (1)**
167:15
**Vitoe (1)**
186:23
**vocal (1)**
78:20
**voice (1)**
450:14
**volatile (1)**
414:4
**volunteer (7)**
106:23;107:18;
108:21;110:11;139:4;
219:24;356:21
**volunteered (1)**
125:24
**vote (1)**
306:8
**voted (1)**
306:9

**W**

**wait (14)**
92:5,5;140:9,9;
141:20;142:1;145:3,
6;150:24;156:20,20;
494:7;516:14;530:9
**waited (1)**
449:13
**waiting (3)**
317:7,8,14
**waive (1)**
41:20
**waived (1)**
563:2
**waiving (1)**
274:24
**wake (1)**
164:7

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**Wakefield (156)**
9:17,17;66:6,12,14;
102:18,21;103:8,16;
111:24;112:3;114:20;
134:2;137:11,21;
138:17;140:12;145:3,
6,22;147:17,20;154:9,
20;155:2;156:5,20,
23;160:5;161:8;
163:23;164:4;181:22;
182:3,5;185:7,8;
199:22;200:1,5,11,14,
20;201:5;214:7,9,11,
14,15;218:18;222:5;
223:10,12,15;228:13;
231:1,14;232:11,13;
233:14,20,24;234:2,5,
9;235:1,8,22,24;
236:5;237:19;238:1,
3,7;239:11;242:16,
23;245:13,14;247:12,
18;251:17;255:14,16,
22;257:6,13;261:24;
262:5;264:15,22;
270:13;271:2;274:5,
9;288:11,17;289:16;
290:10,14,18;291:2,8,
11;292:16;317:13,19,
23;319:24;320:16;
335:1,11;342:3,5;
343:16;347:5,6,9,10;
354:17,23;361:11,15,
18;363:15,18;388:21;
389:13;390:20;
394:13,14;420:8;
437:20;438:6;440:16;
441:15;447:22;448:5;
455:24;466:8;482:1,
10;505:13,16;513:5;
516:21;518:3,13,16;
522:2;524:13;526:6,
9;530:6;531:11;559:3

**Wakefield's (1)**
462:7

**walk (1)**
133:22

**walked (6)**
381:3;412:11;
436:20;437:16;
447:15;449:13

**walking (3)**
122:22;412:7;
437:12

**Walnut (1)**
160:3

**Wanda (4)**
330:7,18,22;378:8

**Wands (2)**
67:4;74:4

**wants (8)**
77:19;138:11;
139:18;234:3;482:6;
512:2;515:22;550:18

**War (2)**
14:15;21:21

**warden (1)**
21:23

**Warner (2)**
436:21;437:17

**wary (1)**
408:14

**Washington (2)**
86:21;560:1

**water (1)**
250:15

**Waterfront (1)**
402:2

**way (54)**
48:7;60:13;62:3,4;
64:2;97:16;115:18,
20;118:19;122:8;
133:14;135:6;145:17,
18;160:11;179:10;
191:14;194:21,24;
195:1;207:10;227:15;
233:6;234:17;235:16;
254:15;266:16;279:2,
24;324:16;331:10;
339:7;349:9;378:22;
379:14;389:19,20;
396:6;415:23;416:5,
19;417:23;441:4;
446:1;456:12;479:9,
13;481:18;485:11;
523:2;524:10;538:4;
542:11;543:3

**Waynesburg (4)**
148:2;389:21;
390:16;391:7

**weather (1)**
261:15

**website (1)**
260:21

**websites (1)**
268:6

**Wednesday (4)**
256:6;261:11;
394:18;398:22

**week (6)**
263:3;271:24;
272:5;379:13;397:20;
516:15

**weekends (1)**
398:2

**weekly (1)**
510:18

**weeks (3)**
336:19;345:3;458:1

**welcome (1)**
117:14

**welcomed (1)**
443:11

**welfare (1)**
459:6

**well-known (1)**
87:24

**weren't (24)**
62:23;69:18;
113:21;128:15;301:6;
326:23;333:21;
340:17;345:22;349:6;
361:24;362:21;
364:21;366:5;374:11;
433:8;452:24;478:1;
481:7,9;493:3;
510:20;535:6;539:21

**West (87)**
8:11,14,22;16:11;
17:24;26:5;29:15;
43:20;45:2;46:15;
75:5,8;77:24;78:16;
79:18,19;81:10;
86:20;95:12;96:11,
15;104:15;105:12;
107:14;118:5;126:7;
133:9;135:10,11,19;
148:19;182:24;
203:19;204:4;206:12;
210:3;215:10;246:12;
271:22,24;273:8;
303:15,16,20;304:3,7,
16,17,18,22;305:8,13,
16,24;306:17;308:7;
312:5;313:10,14,20;
314:19;319:6;331:2;
356:24;357:1,9;
388:3,13;398:24;
401:24;415:12;
416:17;431:3;434:7;
438:20;444:14;
472:12;480:5;483:2;
487:1,10;496:16,18;
499:10;534:1;539:8;
540:2

**Western (1)**
8:14

**Westinghouse (30)**
47:13;84:15;95:13;
98:5;166:10;206:11,
24;207:14;220:1;
330:9,10,20;331:1;
351:14;371:7;390:1;
394:19;399:17;
409:13;437:10;448:3;
480:3;488:5;535:24;
544:11;552:16;554:5;
555:5,7;560:5

**Westinghouse/Fairmont (1)**
206:7

**Westinghouse/North (1)**
43:17

**Westover (1)**
470:14

**WH (1)**
437:7

**what'd (3)**
86:10;447:11;
548:14

**what's (43)**

13:6;32:14;33:21;
36:7,16;43:14;56:9;
87:16;93:6;164:2;
167:24;171:21;
177:18,18;223:10,12;
245:7;249:5;261:7,
17;263:6,10;310:20;
347:17;380:21;384:9;
421:2;463:8,24;
464:5;475:7;478:20;
488:16;494:1;502:23;
508:14;523:22;
531:11;536:18;
546:15;551:22;552:9;
553:13

**Whenever (1)**
169:8

**white (1)**
526:24

**whole (9)**
10:3;59:22;98:3;
233:9,13;260:7;
390:21;415:8;530:14

**Who's (9)**
146:10;246:9;
248:21;525:3;542:10;
551:10

**whose (2)**
47:15;238:8

**wife (15)**
17:4;32:18;47:15;
59:20;61:10;73:3,24;
210:11;243:15;
275:21;407:2,13;
425:1;453:23;467:15

**wild (1)**
540:14

**Williams (1)**
328:16

**willing (4)**
154:11;168:2,4;
357:18

**Willis (5)**
210:10,10;217:3,5;
469:5

**wind (1)**
479:22

**winding (3)**
30:6;477:20;479:17

**winning (1)**
174:19

**winter (1)**
335:24

**wish (1)**
160:11

**withdraw (1)**
40:2

**withdrawing (1)**
95:16

**withdrew (2)**
106:2,7

**withheld (1)**
25:7

**within (7)**
31:9,15;453:24;
458:1;493:8;555:24;
556:3

**without (14)**
107:15;108:13,19;
172:23;274:24;368:5;
383:14;409:12,14,17;
450:18,19;530:20;
539:13

**witness (83)**
9:4;10:9;12:1,7;
37:1;40:10,22;41:2,
22;92:7;101:23;
102:1;112:2,10;
117:21;120:3;145:11;
165:15;169:22;170:8;
179:20;180:1;194:16;
195:6,6;199:17,20;
200:4,8,12;233:10;
234:3;244:18;261:21;
292:12,15;319:19;
320:3;361:8;363:17;
402:20;403:6,10,14,
18;418:11;438:7;
441:18,20,23;444:23,
24;450:22;451:12;
452:18;453:12,13;
455:16;457:14;
490:19;494:2,7,10,14,
16;497:12,14;517:11;
518:1,9,11,19;523:24;
526:11,13,17,19,22;
527:3;554:18;559:10,
13,16

**witnesses (3)**
161:14;334:14;
492:13

**women (4)**
75:5,8;283:13;
492:8

**wondered (2)**
207:15;290:7

**wondering (1)**
502:22

**word (31)**
64:17;144:23;
165:2;189:8;194:11;
195:4;249:5;266:11;
303:8;311:7;332:4;
341:3;374:1,7,8;
459:1;460:21;461:2;
519:20;520:2,4,5;
521:10,11,12;540:4;
548:2;555:12;557:10,
23,24

**worded (1)**
64:18

**wording (1)**
131:21

**words**
301:18;332:24;
386:10;387:8;465:23;

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

481:7;492:8;540:5
**work (134)**
10:19;1:1;18:16;
20:24;21:5,8;23:22;
24:14;27:1,6,12;28:7,
18,20;30:6,7,10;
31:24;44:3;45:10;
47:6;49:3;53:15;
57:14,19;58:5;59:3;
63:2;72:15;83:20;
90:3;94:1;99:20;
104:1;105:2;106:13,
15,19;107:8,22;
108:11,12,12;109:1,2,
6,14;113:13;115:16;
119:4,8;128:10,11;
133:9,21;135:5;
138:24;139:3;147:2;
149:18;174:2,2;
176:1;181:2;186:5;
188:11;192:9;194:14;
206:11;228:17;240:2;
250:21,23;251:6;
253:7;254:9;278:9,
12,13,24;281:14;
285:11,14;289:6;
297:21;309:14;
316:16;322:16,22;
323:1;337:17,17,20;
338:13;374:14;
392:20,23;393:4,8;
399:21,21;402:6;
411:6;412:13;429:4,
11,15;433:16;434:20;
444:20;450:16;
467:16;468:6;469:20;
470:3;478:22;481:10,
12,20,21;484:15;
488:14;493:6;500:22;
506:8;512:15;540:22,
23;543:10,10;547:13,
24;548:3;560:15
**worked (44)**
13:24;14:1,14;
19:11;24:5,6;27:10;
43:18,20;44:16;
47:15;48:9;99:12;
104:20;105:13;107:1,
3;113:19;139:12;
153:18;191:19;
198:14;206:5;226:16;
228:22;230:5,7;
255:4,4;263:18;
275:10;280:8,12,22;
281:10;324:3;342:20;
382:16;414:14;
415:15;428:6;430:14;
449:7;470:6
**working (35)**
14:11;27:17;75:5,8;
106:23;109:20;
125:12;129:24;
130:13,15;134:8,17;

175:6;180:13;181:11;
185:17;190:5;221:17;
228:8,11;244:9;
263:3;336:18;343:13;
348:13;378:8;401:3;
442:15;467:14;470:5;
492:9;521:7;541:19;
551:23;559:15
**workload (1)**
410:2
**works (3)**
74:5;152:13;357:6
**worry (2)**
445:24;446:21
**worth (1)**
219:21
**wound (1)**
502:1
**wow (3)**
381:14,16;456:5
**wrap (1)**
61:10
**wrapped (1)**
61:10
**write (4)**
169:9;369:14;
381:16;437:1
**writes (4)**
160:7;164:18,20;
460:21
**writing (4)**
116:15;348:9;
432:14;437:5
**written (32)**
57:9;71:22;153:22;
155:11;159:3;264:5;
276:7;295:4;303:24;
348:2;369:24;378:14;
381:13;395:4;397:19;
408:21;409:7;419:12;
421:3,11;434:10;
441:5;467:1;471:14;
488:23;506:5;519:10;
520:3;525:14;538:5;
543:4;556:19
**wrong (5)**
27:21;223:12;
345:2;410:24;557:23
**wrongdoing (1)**
19:19
**wrote (6)**
248:14;369:19;
381:6;405:19;411:13;
424:17
**WV (1)**
8:21
**WVDEP (4)**
399:21;425:23;
426:23;534:3
**WVSCA (1)**
434:7
**WVU (55)**
88:20;114:3;115:9;

138:7;153:17;203:23;
206:4,6;207:15;
220:1;229:23;267:10,
12;269:2;273:12,18;
281:18;285:12;289:6,
9,10;290:16;385:4;
389:24;392:20;394:5,
15,16;398:10,15;
400:15,21;402:20;
403:10;409:12;
411:14,17,23;412:15;
453:17,19;460:23;
461:10;471:7,7,20;
472:8;474:1;476:2;
479:23,24;480:2;
519:12,21;533:9
**Wyoming (1)**
541:24

## X

**Xs (3)**
318:11;321:9;
323:13

## Y

**Yahoo (3)**
56:20,22;57:11
**yard (2)**
341:1;513:1
**Yay (1)**
463:6
**year (30)**
15:7,8;23:5;26:22,
24;27:10,11;33:15;
38:20;42:19;51:3;
67:12;86:12;100:21,
24;115:7;174:17,
18;126:18;143:22;
160:10;165:21;206:1;
294:6,12,15,17,22;
301:16
**years (52)**
13:23;14:2;19:14,
18,24,24;20:5,9;
21:17;22:15;23:8,8;
29:1;59:12,13;67:18;
68:6;75:16;76:12;
79:6;89:20,21;
105:13;107:1,3;
125:12,14;126:5,6;
134:9;149:16;164:19;
203:18;204:20;206:4;
259:10;263:7;297:6,
6;306:6;312:12;
334:16;348:2;417:13;
470:1,1,7;472:20;
477:14;479:20;512:9;
534:24
**yellow (3)**
67:19;69:16;526:19
**yesterday (30)**

160:2;259:14;
265:18;292:14,20,21;
299:3;318:17;374:20;
404:1;438:19;447:7,
14,19;448:10,14;
452:10;461:24;
469:15;470:12;472:9;
475:24;477:5;481:6;
490:14;505:11;
511:21;535:18;540:5;
557:8
**yesterday's (1)**
438:18
**York (3)**
300:14;353:8;
355:11
**young (5)**
44:10;19;198:15;
226:19;250:3
**youngest (3)**
16:21;406:6,21

## Z

**zip (1)**
73:4

## 0

**02 (5)**
159:9,10;337:14,
14;381:9
**02/02/02 (1)**
338:1
**04 (3)**
248:7;257:22;
507:17
**07 (1)**
441:14

## 1

**1 (7)**
11:2,7;117:4;
275:10;324:13;389:4;
460:21
**1,027 (1)**
275:6
**1.0 (2)**
386:17;387:6
**1/2 (1)**
176:2
**1/26/2001 (1)**
331:24
**1/27/03 (1)**
386:13
**1:05 (2)**
117:10;437:23
**1:10 (1)**
252:3
**1:12-CV-12-IMK (1)**
8:12
**1:49 (1)**

438:5
**10 (17)**
67:20;68:6;213:12;
214:12;231:17;
242:16,19;243:2;
245:2;363:13,19,20;
364:16,19;368:7;
385:9;462:22
**10/18 (1)**
328:16
**10/23/03 (1)**
371:1
**10/25 (2)**
328:17,17
**10/25/04 (1)**
435:6
**10/4 (1)**
328:16
**10:00 (1)**
553:11
**10:03 (1)**
546:22
**10:08 (1)**
9:1
**10:49 (1)**
257:24
**10:52 (1)**
335:5
**10:58 (1)**
335:10
**100 (8)**
8:14;195:14;
279:12;312:12;
321:22;332:20;368:5;
445:21
**105 (5)**
167:2,14;299:11;
354:11;356:1
**106 (1)**
118:4
**10th (1)**
329:1
**11 (13)**
67:20;68:6;183:5,
16;231:17;245:10,16,
23;348:2;363:13;
370:22;385:7;420:22
**11.5 (1)**
533:24
**11/14 (1)**
429:20
**11/20/03 (1)**
430:22
**11/20/2003 (1)**
429:19
**11/3/2003 (1)**
429:4
**11/99 (1)**
381:8
**11:00 (2)**
402:18;432:12
**11:10 (1)**
66:16

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

**11:14 (1)**
  261:20
**11:17 (1)**
  66:21
**11:58 (1)**
  388:24
**119 (1)**
  8:22
**11th (4)**
  329:1;344:4;522:9;
  533:5
**12 (19)**
  59:12;67:12;
  231:17;247:12,15,20;
  265:6;296:6;334:16;
  360:17;361:15;
  372:18;385:9;463:12;
  505:11,18;508:24;
  509:2,21
**12/03 (1)**
  381:10
**12/10/2003 (1)**
  389:16
**12/11/02 (1)**
  385:3
**12/11/2002 (1)**
  386:4
**12/17/04 (1)**
  435:13
**12/2000 (1)**
  418:24
**12/5/03 (1)**
  431:2
**12/8/2004 (1)**
  399:9
**12:08 (1)**
  117:3
**12:09 (1)**
  389:10
**12:20 (1)**
  546:23
**12:30 (1)**
  394:15
**120 (1)**
  436:3
**120,000 (1)**
  195:14
**12th (2)**
  533:24;534:14
**13 (10)**
  59:12;75:16;76:12;
  231:18;251:14,19;
  378:2;450:5;453:9;
  464:6
**1346 (1)**
  507:9
**13th (3)**
  426:13;469:7,8
**13-year (1)**
  479:19
**14 (8)**
  75:16;76:12;
  255:15,16,18,24;

  379:12;479:20
**1401 (2)**
  531:7,13
**1430 (1)**
  508:2
**1435 (3)**
  248:9;509:3,22
**14th (2)**
  218:8;426:10
**15 (11)**
  162:5;243:23;
  257:6,9,15;265:18;
  379:11;380:23;385:9;
  436:3;507:17
**150 (3)**
  278:8;279:4,11
**1500 (1)**
  248:9
**15222 (1)**
  8:19
**158 (1)**
  550:22
**16 (3)**
  262:2,7;389:15
**1600 (1)**
  380:10
**1619 (1)**
  507:10
**1625 (2)**
  507:11;509:24
**1631 (1)**
  507:11
**1670 (5)**
  442:10;443:4;
  448:17;454:12,14
**1671 (2)**
  442:9,10
**1672 (2)**
  441:23;442:3
**17 (6)**
  257:22;264:15,18,
  24;362:23;402:8
**17th (2)**
  512:5;527:9
**18 (7)**
  270:21;271:4,4,16;
  272:22;412:8;460:22
**188 (1)**
  518:8
**18th (1)**
  415:4
**19 (5)**
  252:2;270:21;
  271:4;272:15;414:18
**1976 (1)**
  26:7
**1980 (2)**
  26:11;27:11
**1981 (5)**
  14:1,8,13;27:18,22
**1982 (1)**
  14:14
**1985 (1)**

  20:10
**1991 (7)**
  14:16;20:10;21:19;
  22:12;27:19;28:2;
  51:21
**1994 (3)**
  22:15,24;28:10
**1995 (3)**
  29:5,12,13
**1996 (3)**
  29:13;50:13,21
**1999 (6)**
  74:15;75:16;
  129:16,19;130:8;
  288:20
**19th (3)**
  397:22;465:8;524:7
**1st (1)**
  292:8

## 2

**2 (27)**
  8:22;11:9;63:7,9;
  64:14;65:18;66:24;
  67:1,7;68:13;73:19,
  22;87:18;117:11;
  203:16;231:5;263:1;
  333:6;338:9,11,12;
  389:11;409:21;484:3;
  491:22;499:8;501:2
**2.5 (1)**
  500:4
**2/13/2004 (1)**
  393:17
**2/21/05 (1)**
  402:8
**2/23/05 (1)**
  402:17
**2/27/03 (1)**
  387:3
**2/28/2001 (1)**
  419:8
**2:03 (1)**
  180:3
**2:11 (1)**
  180:8
**2:35 (2)**
  509:5,22
**2:45 (1)**
  412:10
**2:47 (1)**
  484:2
**2:54 (1)**
  484:9
**20 (24)**
  154:5,8,14,18;
  163:6;165:10;238:22;
  239:23;240:10;
  250:21;251:6;265:18;
  288:10,11,14,19;
  330:5;353:23;355:8;
  356:3;385:8;421:8;

  470:7;559:10
**200 (2)**
  279:12;293:13
**2000 (23)**
  29:2;101:1,4;110:9;
  206:1;217:4;271:7;
  272:19;321:15;322:2,
  4;323:10,10,20;
  324:18;325:4,9;
  326:12,21;328:11;
  330:6;378:7;480:7
**2001 (22)**
  86:13;101:1,4;
  110:9;126:8;217:4,6;
  218:4;219:9;275:7;
  333:6;334:6,9;
  335:24;419:16,23;
  420:4,14,14,22;
  469:13;546:16
**2002 (46)**
  101:15;143:21;
  144:13,16;146:21;
  147:8;152:19;153:7;
  161:17;162:22;
  163:13;164:11;221:5,
  14;338:2,9,10,14,18,
  21;339:11;344:4;
  345:12,12,21;346:5,
  19;347:23;348:10;
  349:16,17;350:14;
  351:12;352:22;353:6,
  19,20,23;355:8;
  356:7;360:9,17;
  361:16;366:3;522:13;
  559:22
**2003 (19)**
  87:18;144:16;
  148:2,6;222:22;
  362:23;363:20;
  364:16,19;366:4;
  368:7,17;369:9,14;
  522:12;531:10;533:5,
  21,24
**2004 (14)**
  236:24;243:24;
  245:23;251:2;252:2;
  396:8;397:22;400:3;
  401:10;491:8,9;
  492:15;505:21;520:7
**2005 (5)**
  148:24;203:18;
  262:18;405:17;480:2
**2006 (10)**
  42:15;265:6;266:6;
  415:4;417:8;441:14;
  480:7,13,15;522:9
**2007 (29)**
  14:18,19;42:15;
  67:20;68:5;71:8,9,11,
  14,15,23;194:6;275:7,
  10;288:20;442:20;
  447:5,9;452:1,5;
  458:9;464:11;473:10;

  480:7,14,15,15;524:7;
  527:9
**2008 (10)**
  14:20,22;30:5;68:6;
  70:14;71:8;294:8,20,
  22;495:15
**2010 (2)**
  32:4;294:15
**2011 (2)**
  294:10,12
**2012 (4)**
  42:20,21;67:13;
  361:16
**2013 (5)**
  8:15;42:20;291:21;
  292:9;447:9
**20-percent (3)**
  156:1,3;159:14
**20th (3)**
  15:14;352:22;
  353:20
**21 (34)**
  236:23;250:21;
  251:6;271:7;292:4;
  317:22,24;335:13;
  346:5;358:13;363:19;
  370:24;372:19;378:3;
  380:24;389:15;402:9;
  414:19;421:8;425:21,
  21;429:18;431:15,18;
  434:5;435:5,20,23;
  436:19;559:11,12,13,
  16,17
**22 (11)**
  427:23;423:24;
  427:4;439:22;440:3;
  441:10;454:11;
  462:13;468:13,16;
  531:3
**22.5 (1)**
  499:8
**2221 (1)**
  271:9
**22nd (3)**
  15:10;346:19;
  365:12
**23 (5)**
  349:16;427:7;
  448:21;449:2;454:24
**231 (1)**
  511:8
**232 (1)**
  511:23
**23rd (4)**
  290:4,8;365:12;
  491:9
**24 (9)**
  202:9,10;248:7;
  251:2;349:17;381:6;
  429:18;457:3,7
**24th (1)**
  505:21
**25 (20)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

98:12,13;105:15,
15;176:4;251:11;
301:14,19;329:21;
330:1,3;336:4;
337:16;338:4;360:9;
395:1,24;431:15;
461:20;491:5
**25th (1)**
328:24
**26 (9)**
431:18;493:22;
494:9,10,10,16,18;
495:4;530:5
**26301 (1)**
8:23
**27 (10)**
345:21;368:7;
385:8;434:5,17;
441:18;494:2;506:20;
507:1;559:7
**27th (18)**
344:9;345:11,12;
443:5;447:4,5,9,19;
448:9,16;454:4;
458:9;460:12;466:17;
467:20;473:10;
474:22;531:10
**28 (4)**
350:14;435:5;
510:11,16
**28th (8)**
339:11;340:2;
419:16;441:13,19,20;
442:11,20
**29 (3)**
435:20;513:9,13
**29th (2)**
447:9,12
**2nd (5)**
152:19;261:9;
338:2,22;495:15

**3**

**3 (18)**
150:17;151:2,9;
171:13;207:13;
216:20;219:4;231:12;
274:1,11;331:5,16;
351:12;356:7;409:23;
484:10;490:22;
562:18
**3/1/2002 (1)**
425:3
**3/25/04 (1)**
238:16
**3/28/02 (1)**
425:21
**3/8/2006 (1)**
413:14
**3:00 (4)**
152:17;386:14;
394:4;509:22

**3:10 (1)**
231:4
**3:15 (1)**
412:19
**3:20 (1)**
231:11
**3:24 (1)**
234:19
**3:28 (1)**
234:24
**3:52 (1)**
529:12
**3:56 (1)**
529:17
**30 (20)**
105:13;167:1;
238:22;239:24;
240:11;250:22;251:7;
299:9,10;301:14;
354:9;356:2;368:17;
369:9,11,14;385:8;
435:23;515:6,11
**30,000 (1)**
414:11
**30th (4)**
8:15;291:20;
447:10,14
**31 (8)**
250:21;251:6;
436:18;518:12,19,20,
22;520:6
**3-1 (1)**
518:19
**312 (1)**
118:1
**31st (1)**
290:3
**32 (2)**
521:14,19
**33 (3)**
523:19,23;524:3
**33.5 (2)**
499:7,7
**34 (4)**
203:18;525:22;
526:2;527:5
**35 (2)**
545:19,21
**36 (4)**
145:9,24;548:24;
549:2
**37 (5)**
176:2;554:16,17,
18,22
**37.5 (1)**
491:4
**39 (1)**
486:5
**3A (1)**
492:23
**3-A (1)**
491:22
**3B (1)**

492:2
**3rd (2)**
118:1;262:16

**4**

**4 (23)**
8:18;87:18;156:11,
16;160:1;174:12;
219:8,16,17;220:12,
13;331:22;333:6;
353:6;410:3,14;
496:2,7;497:14;
499:6,19;500:5;501:1
**4/02 (1)**
381:9
**4/2/02 (1)**
152:17
**4/2/2002 (1)**
380:24
**4/2000 (1)**
320:22
**4/2002 (1)**
423:24
**4/22/08 (1)**
378:4
**4/30/2001 (1)**
421:9
**4/7/2004 (1)**
394:3
**4:00 (1)**
255:8
**4:14 (1)**
270:17
**4:24 (1)**
271:1
**4:25 (1)**
510:1
**4:30 (2)**
154:4;159:21
**4:35 (2)**
562:17;563:3
**4:47 (1)**
291:15
**40 (1)**
385:8
**401k (1)**
284:24
**406 (1)**
8:22
**41 (2)**
145:1,23
**43 (3)**
147:19,20,23
**45 (2)**
324:2,13
**4th (2)**
353:19;491:8

**5**

**5 (17)**
169:19,20,21,22;

492:2 — (already placed above under 3B)
170:2,10;219:18;
220:20;222:21;224:5,
6,15;334:19;335:13,
16;490:18;495:4
**5.0 (1)**
339:22
**5.25 (2)**
499:9,10
**5.5 (1)**
345:14
**5/10 (1)**
422:6
**5/10/2001 (1)**
422:1
**5/18/06 (1)**
414:19
**5/19/04 (1)**
256:6
**5/26 (1)**
422:6
**5:03 (1)**
291:21
**5:30 (1)**
383:24
**50 (4)**
98:12;105:15;
206:14;207:15
**50/50 (11)**
160:10,14,19;
161:2,17;163:2,13;
165:4;381:4,9,9
**500 (1)**
550:20
**52 (1)**
149:4
**53-page (1)**
435:7
**558 (1)**
118:6
**582 (1)**
118:4
**59-year-old (1)**
523:8

**6**

**6 (11)**
199:20;200:4,6,17;
224:19;228:1;335:19,
24;337:10;495:13;
546:16
**6/10 (1)**
433:12
**6/10/03 (2)**
363:22;364:14
**6/10/2004 (1)**
433:14
**6/11/2004 (1)**
433:15
**6/14/04 (1)**
433:24
**6/20 (1)**
422:6

**6/22/03 (1)**
367:24
**6/22/2003 (1)**
365:3
**6/23/03 (1)**
367:24
**6/23/2003 (1)**
365:3
**6/27/03 (1)**
368:20
**6/27/05 (1)**
436:19
**6/3/04 (1)**
431:19
**6/3/05 (2)**
381:10;404:14
**6/30 (1)**
368:18
**6/7/05 (1)**
412:9
**6/9 (1)**
422:6
**6/9/04 (1)**
432:9
**6/9/05 (1)**
436:1
**608 (1)**
118:4
**660 (1)**
118:7
**6th (2)**
464:11;465:1

**7**

**7 (17)**
200:23;201:2;
216:19;219:17;
222:21;228:2;231:16;
233:1;234:13;235:3,
12;337:12,13;339:10;
344:3;345:9;495:13
**7/17/02 (1)**
382:3
**7/2/2003 (1)**
370:1
**7/22/02 (2)**
346:21;347:12
**7/24/04 (1)**
434:17
**7/27/05 (1)**
372:19
**7/7 (1)**
422:6
**7/7/2008 (1)**
379:12
**7:00 (1)**
443:9
**7:04 (1)**
522:11
**7:48 (1)**
522:11
**70s (1)**

Gary W. Rich and Law Office of Gary W. Rich, L.C. v.
Joseph Simoni, et al.

Gary W. Rich
April 30, 2013

204:5

**71 (2)**
442:10,10

**75 (7)**
166:22;167:1;
299:6,10;354:9;
356:3;542:12

**759 (1)**
118:1

**7th (1)**
520:7

---

**8**

---

**8 (8)**
67:20;235:23,24;
236:2,7;334:23;
346:3;400:3

**8,000 (1)**
414:10

**8/1 (1)**
422:6

**8/1/2001 (1)**
422:2

**8/18/2003 (1)**
387:12

**8/21/02 (1)**
383:22

**8/23/2003 (1)**
427:8

**8/25/2003 (1)**
427:18

**8/30/04 (1)**
434:6

**8/4 (1)**
351:16

**8/7/02 (1)**
382:12

**8:15 (1)**
431:3

**80/20 (7)**
163:14;381:5,9,10,
11;389:23;391:3

**80s (3)**
14:6;19:15;21:4

**81 (1)**
27:11

**82 (1)**
14:1

**86 (1)**
20:10

**862 (1)**
515:11

**8th (1)**
261:10

---

**9**

---

**9 (15)**
67:20;68:6;237:22;
238:6,8;251:12;
358:12;462:17,23;
463:1,4,11;465:9;

559:19,21

**9/13 (1)**
358:15

**9/13/2000 (1)**
326:24

**9/14/2002 (2)**
358:14;359:16

**9/19/04 (1)**
398:19

**9/19/2004 (1)**
394:10

**9/20 (1)**
328:16

**9/20/2001 (1)**
423:10

**9/25/2002 (1)**
359:24

**9/27 (1)**
328:16

**9/30/2002 (1)**
426:21

**9/6 (1)**
560:18

**9/9/2002 (1)**
560:18

**9:00 (1)**
372:20

**9:12 (1)**
522:16

**9:18 (1)**
522:16

**9:30 (1)**
507:8

**908 (1)**
279:22

**908.2 (2)**
275:2;279:20

**96 (1)**
51:20

**98 (1)**
422:5

# APPENDIX C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

GARY W. RICH and LAW OFFICE OF          )
GARY W. RICH, L.C.,                     )
                                        )
    Plaintiffs/Counter-              )
Defendants,                             )
                                        )
v.                                       )
                                        )
JOSEPH SIMONI,                           )
                                        )
    Defendant/Counter-Plaintiff.  )
_____ ) CASE NO.
                                        ) 1:12-CV-12-IMK
GARY W. RICH and LAW OFFICE OF          )
GARY W. RICH, L.C.,                     ) JUDGE KEELEY
                                        )
    Third-Party Plaintiffs,          ) MAGISTRATE JUDGE
                                        ) KAULL
v.                                       )
                                        )
BARON AND BUDD, a professional          )
corporation; COCHRAN, CHERRY,           )
GIVENS, SMITH, LANE & TAYLOR,           )
P.C.; and LEVIN, PAPANTONIO,            )
THOMAS, MITCHELL, RAFFERTY &            )
PROCTOR, P.A.,                          )
                                        )
    Third-Party Defendants.          )
                                        )


    The video deposition of JOSEPH SIMONI, Ph.D.,
Volume I, taken upon oral examination, pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure, before Teresa A. VanMeter, CRR, RMR and
Notary Public in and for the State of West
Virginia, Tuesday, June 11, 2013, at 10:00 a.m., at
Flaherty, Sensabaugh & Bonasso, 200 Capitol Street,
Charleston, West Virginia.

JOHNNY JACKSON & ASSOCIATES, INC.
606 Virginia Street, East
Charleston, WV 25301

```
 1                    APPEARANCES:

 2

 3   On behalf of the Plaintiffs/Counter-Defendants:

 4       ROBINSON & McELWEE, PLLC
         E. Ryan Kennedy, Esquire
 5       erk@ramlaw.com
         140 W. Main Street, Suite 300
 6       Clarksburg, WV  26301
         (304) 326-5318
 7

         MARINO LAW, PLLC
 8       Daniel Marino, Esquire
         dmarino@marinolawpllc.com
 9       910 17th Street, NW, Suite 800
         Washington, DC  20006
10       (202) 223-8888
11   On behalf of the Defendant/Counter-Plaintiff:
12       FLAHERTY, SENSABAUGH & BONASSO, PLLC
         Jeffrey M. Wakefield, Esquire
13       jwakefield@fsblaw.com
         Caleb P. Knight, Esquire
14       200 Capitol Street
         P.O. Box 3843
15       Charleston, WV  25338-3843
         (304) 345-0200
16

     On behalf of the Third-Party Defendants:
17

         BOOTH & MCCARTHY
18       Christopher J. McCarthy, Esquire
         cjmccarthy@booth-mccarthy.com
19       901 West Main Street, Suite 201
         Bridgeport, WV  26330
20       (304) 842-0460
21

22

23

24
```

```
 1              APPEARANCES:  (CONT'D.)

 2

 3   On behalf of the Third-Party Defendant Baron &
     Budd:

 4

         BARON & BUDD, P.C.
 5       Cary McDougal, Esquire
         cmcdougal@baronbudd.com
 6       The Centrum
         3102 Oak Lawn Avenue, Suite 1100
 7       Dallas, TX  75219-4281
 8   On behalf of the Third-Party Defendant Cochran,
     Cherry, Givens, Smith, Lane & Taylor, P.C.:

 9

         THE COCHRAN FIRM
10       Angela J. Mason, Esquire
         amason@cochranfirm.com
11       111 East Main Street
         Dothan, AL  36302
12       (334) 793-1555
13   On behalf of the Third-Party Defendant Levin,
     Papantonio, Thomas, Mitchell, Rafferty & Proctor,
14   P.A.:
15       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
         RAFFERTY & PROCTOR, P.A.
16       William F. Cash, III, Esquire
         bcash@levinlaw.com
17       316 South Baylen Street
         Pensacola, FL  32502
18       (850) 435-7059
19   ALSO PRESENT:
20       Anthony Taylor, Videographer
21
22
23
24
```

1                           I N D E X

2                  DEPONENT:  JOSEPH SIMONI, Ph.D.

3

4     EXAMINATION BY:                              PAGE:

5         Ms. Mason     . . . . . . . . . . . .      7

          Mr. McDougal  . . . . . . . . . . . .    213

6

                           EXHIBIT INDEX

7

      DEPOSITION                                   PAGE:

8

      1    Handwritten Notes                        64

9

      2    Fax Cover Sheet and Governor of          72

10         West Virginia Visits U.S. Silica

11    3    Handwritten Notes                        78

12    4    Handwritten Notes                        83

13    5    Handwritten Notes                        95

14    6    Handwritten Notes                       104

15    7    August 6, 2002 E-mail                   113

16    8    Handwritten Notes                       118

17    9    Handwritten Notes                       125

18    10   Handwritten Notes                       128

19    11   Handwritten Notes                       140

20    12   Handwritten Notes                       147

21    13   Handwritten Notes                       168

22    14   Handwritten Notes                       174

23    15   July 24, 2005 and July 25, 2005         179

           Typewritten Notes

24

1                    EXHIBIT INDEX (CONT'D.)

2     DEPOSITION                                    PAGE:

3     16   Handwritten Notes                        181

4     17   Handwritten Notes                        184

5     18   Handwritten Notes                        188

6     19   Handwritten Notes                        198

7     20   November 7, 2007 E-mail                  206

8     21   Memorandum of Understanding              244

9     22   Fax Cover Sheet with September 6, 2002 248
           Letter

10

      23   Settlement Agreement and Mutual          250
11         Release

12    24   Fax Cover Sheet and July 22, 2002        261
           Letter

13

      25   Information Needed For a Good Decision 269
14         Questions For Our Lawyers

15

16

17

18

19

20

21

22

23

24

1          THE VIDEOGRAPHER:  We are now on the

2    record in the matter of Gary W. Rich and the Law

3    Office of Gary W. Rich, L.C. versus Joseph Simoni.

4          My name is Anthony Taylor.  I'm a video

5    specialist for Johnny Jackson & Associates located

6    in Charleston, West Virginia.  I am not related to

7    any of the parties to this action or to counsel of

8    record, nor do I have a financial interest in this

9    action.

10         Today's date is the 11th day of June

11   2013.  The time is 10:18 a.m.  This deposition is

12   taking place at 200 Capitol Street, Charleston,

13   West Virginia.  The witness today is Joseph

14   Simoni.

15         Would counsel please identify themselves

16   for the record.

17         MS. MASON:  Angela Mason for The Cochran

18   Firm.

19         MR. CASH:  Bill Cash representing Levin

20   Papantonio.

21         MR. McDOUGAL:  Cary McDougal for Baron &

22   Budd.

23         MR. KENNEDY:  Ryan Kennedy on behalf of

24   the plaintiffs.

1          MR. MCCARTHY:  Chris McCarthy on behalf of

2     the third-party defendants.

3          MR. KNIGHT:  Caleb Knight on behalf of

4     Dr. Simoni.

5          MR. WAKEFIELD:  Jeff Wakefield on behalf

6     of Dr. Simoni.

7          THE VIDEOGRAPHER:  Would the court

8     reporter please swear in the witness.

9          JOSEPH SIMONI, Ph.D., DEPONENT, SWORN

10                     EXAMINATION

11     BY MS. MASON:

12          Q.   Will you state your name for the record,

13     please?

14          A.   Joseph Simoni.

15          Q.   And do you prefer to go -- be addressed as

16     Dr. Simoni or Professor Simoni?

17          A.   However you choose will be okay.

18          Q.   Whichever you prefer.  I want to go with

19     what you're most comfortable with.  You don't have

20     any preference?

21          A.   No special preference.

22          Q.   Okay.  We've met before; is that right?

23          A.   Yes.

24          Q.   My name is Angie Mason, and I represent

1    The Cochran Firm in this litigation.  And we saw

2    each other at Gary Rich's deposition about a month

3    ago; is that right?

4         A.   That's correct.

5         Q.   Were you there for both days of his

6    deposition?

7         A.   I was there only for the first day.

8         Q.   Okay.  And, of course, you've given your

9    deposition how many times before --

10        A.   How many times have I been deposed for

11   legal matters?

12        Q.   Yes.

13        A.   I don't remember.  A few times.

14        Q.   But you were deposed twice in the Spelter

15   matter; is that right?

16        A.   Two different days, yes.

17        Q.   Okay.  Other than those depositions that

18   you gave in the Spelter case, have you ever given

19   any other depositions?

20        A.   None come to mind, but I just have to

21   think over the years there might have been -- none

22   come to mind though.

23        Q.   As we go through today, if you need a

24   break at any time, let me know and we'll take a

1   break.  Okay?

2        A.   Thank you.

3        Q.   And if you don't understand my question,

4   or it's a bad question, which it may very well be,

5   tell me and I'll try to rephrase it.  Okay?

6        A.   Thank you.

7        Q.   And I will try really hard not to

8   interrupt you, but if I do, stop me and let me know

9   that I'm interrupting you.  Okay?

10       A.   Okay.

11       Q.   I wanted to talk a little bit about your

12  educational background.  You received a BA in

13  political science at Notre Dame?

14       A.   I did.

15       Q.   When was that?

16       A.   1963.

17       Q.   After 19 -- after you graduated with your

18  BA in political science, what did you do?

19       A.   I spent a year at Columbia University in

20  New York studying international business.

21       Q.   What led you to go to Columbia to study

22  international business?

23       A.   To the best of my recollection, I had

24  gotten married in my senior year of college.  And

1    looking back on it as a -- you know, I believe what

2    happened is I had this idea that I needed to be --

3    you know, I was going to be married now and have

4    family in the future, and I needed to be

5    responsible.  So I needed to provide for a family.

6    And I was interested in international things, and I

7    thought I would apply to Columbia for international

8    business.

9         Q.   Was this a graduate program you applied

10   to?

11        A.   Graduate MBA program.

12        Q.   Did you get your MBA?

13        A.   I did not.

14        Q.   Why didn't you complete your MBA?

15        A.   After one year, my wife was graduating

16   from her nursing program, and we decided through a

17   series of circumstances to apply for Peace Corps

18   service.  And we did that, we were accepted into

19   the Peace Corps and spent two years in the Peace

20   Corps between 1964 and 1966.

21        Q.   And when you finished with the Peace Corps

22   in 1966, you went back to school; is that right?

23        A.   Yes.

24        Q.   You went back to Notre Dame?

1    A.    Went back to Notre Dame.

2    Q.    To do what?

3    A.    To study for a Ph.D. in sociology.

4    Q.    And what led to your interest in

5    sociology?

6    A.    My Peace Corps service work.  I became

7    interested in working with communities and the idea

8    of community change and development.  And so that's

9    where my interest was taken to, and I decided that

10   sociology was an area in which I could pursue that

11   interest.

12   Q.    And did you enter the program with the

13   expectation of eventually becoming a professor

14   yourself?

15   A.    The Ph.D. program?

16   Q.    Yes.

17   A.    I wasn't exactly sure when I entered the

18   program where it was going to lead.

19   Q.    You got your master's degree in sociology

20   at Notre Dame; is that right?

21   A.    Yes, I did.

22   Q.    What year was that?

23   A.    I believe the master's was actually

24   granted in 1970.

1    Q.   And that was part of the process of

2  getting your Ph.D.?

3    A.   That was on the road to the Ph.D.

4    Q.   When did you obtain your Ph.D.?

5    A.   Best of my recollection, 1973.

6    Q.   And in 1973, had you already accepted a

7  position at West Virginia University?

8    A.   I began working at West Virginia

9  University in 1971, in August of 1971.

10   Q.   So during those two years, 1971 to 1973,

11  you were living in Morgantown?

12   A.   Yes.

13   Q.   And were you completing your dissertation

14  while teaching?

15   A.   Yes.

16   Q.   Did you have any particular area of

17  specialty within sociology?

18   A.   Well, in the Ph.D. program that I was in,

19  we had five areas that we were examined on that you

20  might call specialty areas, and I don't remember --

21  well, I know one of them was research methods, and

22  I know one of them was community.  I don't remember

23  the other three, what they happened to be.

24   Q.   And when you went -- when you started at

1    WVU, were you hired as an assistant professor?

2        A.    I was.

3        Q.    Eventually you became an associate

4    professor?

5        A.    I did.

6        Q.    When was that, do you recall?

7        A.    I don't recall the year.

8        Q.    Do you remember --

9        A.    I would imagine it was -- I don't recall

10    the year, but I would imagine it was about six or

11    seven years after I began there.  That would be the

12    usual time.

13        Q.    And you're retired from WVU now; is that

14    right?

15        A.    I am.

16        Q.    What year did you retire?

17        A.    1975.  Excuse me.  Excuse me.  2005.

18    Sorry.

19        Q.    I almost didn't catch that.

20              And you retired as an associate professor;

21    is that right?

22        A.    As an associate professor.

23        Q.    And you were granted emeritus status?

24        A.    I was.

1    Q.   What does that mean?

2    A.   What does an emeritus status mean?  It

3    means recognized for the contributions -- I believe

4    it's recognition for the contributions I made to

5    the university while I was working there.  And so

6    general recognition of that, and it grants you the

7    opportunity if you want to come back into your

8    department and work and, you know, have an office

9    and work in the office area and so forth.

10   Q.   So it allows you special privileges to

11   remain working and active within the WVU campus if

12   you want to?

13   A.   That's my understanding of it.

14   Q.   Have you taken advantage of that?

15   A.   No, I haven't.

16   Q.   Why not?

17   A.   In 1975 --

18        MR. WAKEFIELD:  You mean 2005.

19   A.   I'm sorry.  In 2005.  I'll try to get 1975

20   out of my mind.

21        In 2005, my wife had retired in 2004, and

22   I was retiring in August of 2005.  And we thought

23   about what we would do upon retirement.  And what

24   we decided because my father was living in Florida,

1   and he was 95 years old at the time, we decided

2   that the right thing for us to do was to be in

3   Florida within a half hour of him.  And so we

4   decided to go to Florida.

5       Q.   So you moved from Morgantown in 2005 to

6   Florida?

7       A.   (Nods head up and down.)

8       Q.   Where in Florida?

9       A.   We moved to -- we spent a little time in

10  Cooper City with my father, but we eventually in

11  October of 2005 purchased a home in Davie, Florida.

12      Q.   And is that where you still live today?

13      A.   Still live in the same home.

14      Q.   So from 1971 to 2005 you resided in

15  Morgantown, correct?

16      A.   From 1971 until 2005, yes.  That's

17  correct.

18      Q.   Okay.  Now, you also obtained your J.D. --

19  your juris doctorate; is that right?

20      A.   I did.

21      Q.   What is that?

22      A.   It's the degree that's awarded when you

23  finish law school.

24      Q.   When did you get that?

1    A.    1995.

2    Q.    And where did you go to law school at?

3    A.    West Virginia University.

4    Q.    What prompted you to go to law school?

5    A.    My oldest daughter, my older of the two,

6    she was finishing her undergraduate degree in

7    Morgantown at West Virginia University.  And what

8    she -- I asked her, I said you know, what are you

9    interested in doing, and she decided that maybe

10   with a little prompting from me that she might,

11   might want to study law.  And I said, well, let's

12   go take the LSATs together and we'll see what

13   happens.  You don't have to make a decision about

14   law school yet.  Let's just go take the LSATs.

15         So we went over one Saturday morning and

16   took the LSATs and fortunately we both did okay.

17   And I said, well, do you want to apply, and she

18   said, well -- and I said, again, no commitment.

19   You can decide if you really want to go after you

20   apply and if you get admitted.  And she said,

21   okay.  So I said, okay.  We'll apply and see what

22   happens.

23         And I had an interest also from --

24   probably stemming from the grievance work that I

1   did at the university for a long time, about --

2   actually about 20 years.  And so we both applied,

3   and fortunately we both were admitted, and we ended

4   up sitting in first-year law classes together.

5       Q.   And while you were going to law school,

6   were you still working as a sociology professor?

7       A.   I was.

8       Q.   How long did it take you to complete your

9   degree?

10      A.   Five years.

11      Q.   And did you intend to do anything with

12  your law degree once you had it?

13      A.   I wasn't sure -- when I began law school,

14  I wasn't sure what I might end up doing, so I

15  didn't have any clear intentions at the beginning.

16      Q.   At any point during the time -- from the

17  time you started law school until the time you

18  graduated, did you have an intention to practice as

19  a lawyer?

20      A.   Yes.

21      Q.   What -- tell me a little bit about that

22  intention.  What did that entail?

23      A.   Well, I hoped that -- I hoped when I

24  finished law school that if I practiced law that I

1    would be able to practice good law.

2        Q.    Were you considering practicing law and

3    remaining a professor, or were you going to retire

4    and then practice law?

5        A.    I hadn't thought about that decision.

6        Q.    Did you have any idea of what type of law

7    you might be interested in practicing?

8        A.    When are you asking about?

9        Q.    When you were -- during law school.

10       A.    No.  I don't think I had a clear idea of

11   what kind of law I would practice.

12       Q.    When you were in law school, did you work

13   with any law firms in the Morgantown area?

14       A.    I did.

15       Q.    What law firms did you work with?

16       A.    I worked with Al Karlin and his firm.  And

17   I worked with Larry Harless, former Larry Harless;

18   is no longer with us.

19       Q.    And do you remember roughly when it was

20   that you worked with Al Karlin?

21       A.    I do not.  I just know it was during my

22   time at law school.

23       Q.    So from 1990 to '95?

24       A.    During that period of time.

1   Q.   Okay.

2   A.   Might not have been the full period, but

3   during that period of time.

4   Q.   And what did you do for him?

5   A.   The major thing I did with Al is, that I

6   recall, is I helped prepare witnesses for testimony

7   at trials.

8   Q.   What kind of law does Mr. Karlin practice?

9   A.   When you say what kind of law?

10   Q.   Then.  I'm sorry.  Let me rephrase.  At

11   the time you were working with Mr. Karlin, what

12   type of law practice did he have?

13   A.   Well, I think he generally was considered

14   to be a plaintiffs lawyer, to represent plaintiffs.

15   Q.   And did you have regular hours that you

16   worked for Mr. Karlin?

17   A.   No.  They usually were at night and times

18   when I could fit it in.

19   Q.   How did you come to know Mr. Karlin?

20   A.   Oh, Al Karlin and I were long-time friends

21   in Morgantown.  I don't know exactly how we came to

22   know each other, but the circle of friends that I

23   had in Morgantown and associated with, many of

24   those people were friends of his.

1    Q.   So what were the circumstances that arose

2    that allowed you the opportunity to work in

3    Mr. Karlin 's office?

4    A.   I don't remember if I asked him if he

5    needed help or if he asked me if I would help.  I

6    do not recall.

7    Q.   Did you get paid for your time there?

8    A.   I believe I did.

9    Q.   Do you remember what your -- were you paid

10   hourly?

11   A.   I don't remember anything about the

12   compensation.

13   Q.   Other than helping to prepare witnesses

14   for testimony at trial or for testifying at trial,

15   did you have any other responsibilities that you

16   can recall?

17   A.   At this moment, I cannot recall any.

18   Q.   And you indicated that you also worked

19   with Larry Harless?

20   A.   With Larry Harless.

21   Q.   Between 1990 and 1995?

22   A.   Actually, I think I -- I think I might

23   have done some work with Larry Harless previous to

24   that time, also.

1    Q.   Prior to 1990?

2    A.   Prior to 1990.

3    Q.   Okay.  Let me go back to Mr. Karlin for

4    just a minute.  Does Mr. Karlin --

5    A.   Can I just --

6    Q.   Absolutely.

7    A.   -- clarify?

8         When I say "worked with," that may be an

9    overstatement in the sense of I had a -- sort of a

10   working relationship with Larry Harless, meaning

11   that different problem situations, some of which

12   turned into cases, came to my attention, and I

13   thought they were kinds of cases that Larry Harless

14   could do a good job on, and so maybe I, as the best

15   of my recollection, I got him involved in some of

16   them.  It was that kind of a relationship.  I

17   wouldn't say I actually worked for him.

18   Q.   Okay.  And I'll come back to Mr. Harless

19   in just a minute, but I wanted to go back to

20   Mr. Karlin for just briefly.

21   A.   Sure.

22   Q.   Does he still practice in Morgantown?

23   A.   I believe he does, yeah.

24   Q.   And I know you said you couldn't recall

1    the details of how you were paid when you worked

2    with Mr. Karlin; is that right?

3        A.    Uh-huh.  I -- today, to the best of my

4    recollection, I don't actually ever recall

5    receiving -- I mean, I may have, I just don't

6    recall it, I may have been doing that work as sort

7    of like an internship as part of my legal

8    education.  I can't tell you that I did or didn't,

9    because I do not remember that I actually received

10   any compensation for that.

11       Q.    Do you recall whether you kept track of

12   the hours that you worked for Mr. Karlin?

13       A.    Not to my knowledge.

14       Q.    Okay.  We'll go back to Mr. Harless.  Now,

15   Mr. Harless is no -- has passed away?

16       A.    Yes.

17       Q.    He was a lawyer in Morgantown?

18       A.    Well, he did work in the Morgantown area

19   from time to time.  He -- people who know Larry

20   knew he was a roamer.  He did work in different

21   parts of the state.

22       Q.    What did he -- what was the name of his

23   law firm?

24       A.    He was a sole practitioner, so I don't

1    know how he actually titled his practice.

2        Q.    And what kind of cases did he take

3    generally?

4        A.    I would say he was a -- again, known to be

5    a plaintiffs lawyer.

6        Q.    And do you recall how you met Mr. Harless?

7        A.    I think, to the best of my recollection, I

8    think I actually met Larry long before I had any

9    kind of a working relationship with him.  I think

10   one time when my family went to Mexico for a year,

11   his family rented our house.  I'm trying to

12   remember the best I can.  Whether I actually knew

13   him before that, I'm not sure.  But I knew I had a

14   connection with the Harlesses, the Harless family

15   at that time because they rented our property.

16       Q.    What was the first legal problem that you

17   recall bringing to Larry Harless' attention?

18       A.    I have no idea.

19       Q.    Well, you said you took some issues to him

20   that later became lawsuits; is that right?

21       A.    Some of them, to the best of my memory,

22   turned into cases for him.

23       Q.    Cases.  Okay.  Can you tell me -- list for

24   me those cases?

1    A.   I do not remember.

2    Q.   You don't remember any of the cases?

3    A.   I couldn't give you any accurate

4    information about that.

5    Q.   And this was prior to 1990?

6    A.   There were some prior to 1990, before I

7    started law school.

8    Q.   And then this same relationship where you

9    would bring cases to him -- or issues to him that

10   might later become cases continued for how long?

11   A.   It was sort of ongoing.

12   Q.   Until his death?

13   A.   Well, not until his death.  I think -- I

14   don't remember the year Larry died.  But I think

15   once I became involved in the cases that are the

16   subject of our interaction here, I think that sort

17   of ended it, because I was so involved in these

18   cases, I wasn't doing -- I wasn't looking for other

19   people -- you know, people brought me problems, I'm

20   not sure what I said to them about them at that

21   time I was so busy.

22   Q.   And do you recall ever performing legal

23   work at the direction of Larry Harless on any of

24   the matters that you brought to him that later

1  became cases?

2      A.  I do not.  We had a -- first of all, we

3  had a friendship, and we had sort of a working

4  relationship in the way I described it to you

5  before.  I wasn't working for him.  We could talk

6  about things that he knew about and I knew about,

7  or if there were things in common, if there were

8  things he was working on, I happened to know the

9  people involved, we would talk about things like

10  that, but that was the extent of...

11      Q.  You didn't work for him in an intern or

12  law clerk capacity like you did for Mr. Karlin?

13      A.  I would say not.

14      Q.  Did you ever receive any payments from

15  Mr. Harless ever?

16      A.  No.

17      Q.  And I got a little bit sidetracked from

18  the law school.  We were talking about law school

19  and your time there.

20      A.  Yes.

21      Q.  Do you recall what your class rank was

22  when you graduated?

23      A.  No, I do not.

24      Q.  What about your GPA?

1      A.   I do not remember.

2      Q.   After you graduated from law school, did

3   you ever have the intention to -- did you ever form

4   the intent to practice law?

5      A.   After I left law school?

6      Q.   Yes.

7      A.   Yeah.  I had an intent to practice.

8      Q.   Tell me about that intent.

9      A.   Well, I mean, I wanted to eventually get

10  licensed and be able to practice.

11     Q.   And at that point were you thinking of

12  practicing any specific type of law?

13     A.   At what point?

14     Q.   After you graduated from law school and

15  you determined that you wanted to get licensed and

16  practice.

17     A.   I hadn't made any definite decision about

18  any specific area.

19          (Mr. Marino joined the deposition.)

20  BY MS. MASON:

21     Q.   And then I believe Mr. Harless died in

22  2004.  Does that sound right?

23     A.   That sounds approximately right.  Yeah.

24     Q.   And you think your working relationship as

1    you've described it actually petered out sometime

2    before 2004?

3         A.   Definitely I would say I had minimal

4    contact with Larry.  And I'm saying minimal just to

5    leave open the possibility of some that I don't

6    remember, but certainly minimal contact with him

7    after 2000, beginning of 2000.

8         Q.   And did you ever decide --

9         A.   I think -- excuse me.

10        Q.   Sorry.

11        A.   I think there -- yeah.  It was minimal,

12   but to be fair, I'm just thinking there was --

13   there might have been a case that he had been

14   working on that I knew about, and I think I did

15   have possibly, you know, some contact with him.  I

16   don't know how long that went on.  I just don't

17   remember.

18        Q.   And he never paid you any referral fees

19   for referring cases to him?

20        A.   No.  No.  I -- my relationship with Larry,

21   again, for me was a learning experience.  I

22   respected his legal mind a great deal from, you

23   know, what little law I knew maybe coming out of

24   law school, but I sort of looked at him as a

1   brilliant legal mind, and I was learning from him

2   by talking with him and watching the way he went

3   about his work to the best I could.  And I just --

4   you know, I think I learned, and that was, for me,

5   that was what I got out of it.

6        Q.   So did you at any point ever determine

7   that you were interested in practicing a specific

8   type of law?

9        A.   I never made that decision.

10       Q.   Did you ever take the bar exam?

11       A.   I took the bar exam.

12       Q.   You took it twice; is that right?

13       A.   No.  I believe I took it four times.

14       Q.   Is it a two-day exam in West Virginia?

15       A.   I believe it was.  Yeah.  Got to know the

16   inside of the Civic Center pretty well, as you all

17   know, those of you who have taken it.

18       Q.   Over what time period did those four times

19   cover?

20       A.   Well, I believe -- and I just learned this

21   yesterday, actually, because I didn't know for sure

22   and I thought I probably should know, so I

23   contacted the bar office.  They told me it was

24   twice in '96, I believe once in '97, and once in

1    '92 -- 2002.  I'm sorry.  Once in 2002.  So that

2    would be four.  That's according to their

3    information of yesterday.

4        Q.  And obviously you didn't pass it the first

5    three times, and you didn't pass it the fourth

6    time, right?

7        A.  Never passed it.

8        Q.  And other than West Virginia, you haven't

9    sat for any bar exams in any other states?

10       A.  No.

11       Q.  And you have never held a law license in

12   any state to practice law?

13       A.  No.

14       Q.  We've talked about your degrees from Notre

15   Dame and your law degree from WVU, your one-year

16   study at Columbia on international business.  Other

17   than that, do you have any other certificates,

18   certifications or licensures or degrees that you

19   think would have some bearing on the proceedings

20   today?

21       A.  No.

22       Q.  How did you meet Gary Rich?

23       A.  I think, if I remember correctly, the

24   first time and only time that I ever had contact

1    with him was one time that Al Karlin was doing some

2    case in I think it was Morgantown.  Yeah, I'm

3    pretty sure it was Morgantown.  He was doing --

4    working on some case, and he was in a courtroom,

5    and I happened to be sitting in.

6              And I believe that Gary Rich was there at

7    that same proceeding, and Larry Harless introduced

8    me to him as a -- an old friend of his.  That, I

9    believe, was the only time, that I recall at this

10   moment, having met -- having had contact with him

11   in any way before we got involved working on these

12   cases that we're discussing today.

13       Q.   Okay.  You said Al Karlin was doing

14   something in a courtroom and you were observing?

15       A.   No.  Did I say Al Karlin?  I'm sorry.

16   Larry Harless.

17       Q.   Okay.

18       A.   I meant Larry Harless.  If I said Al

19   Karlin, I meant Larry Harless.

20       Q.   The record will say what it is, but we

21   know you meant Larry Harless now, right?

22       A.   (Nods head up and down.)

23       Q.   And was the -- so that would have been

24   when you were in law school or after?

1      A.   Well, I think that might have been

2   sometime between -- well, I don't know.  I can't

3   really say.  My best guess would have been that it

4   was in the '90s, but I don't know.  I don't know

5   when.

6      Q.   And do you recall whether Larry Harless

7   introduced you as a lawyer to Gary Rich?

8      A.   I do not recall.

9      Q.   If he had introduced you as a lawyer,

10   would you have corrected him?

11        MR. WAKEFIELD:  Object to the form.  You

12   can answer.

13      A.   If he had introduced me as a lawyer, well,

14   I would have made it clear that I wasn't practicing

15   law, yeah, that I didn't have a license to

16   practice.  We were friends, Larry Harless and I.  I

17   think he probably just introduced me as Joe.  And

18   Gary Rich was a friend, you know, was a friend of

19   his, also.  This is Gary Rich, and this is Joe

20   Simoni.  I think that's the way it was.

21      Q.   Do you recall the next time you met Gary

22   Rich?

23      A.   The next time, I believe I met Gary Rich

24   was at an Econo Lodge, I think in Fairmont, West

1    Virginia.

2        Q.   And what were the circumstances of that

3    meeting?

4        A.   Well, my understanding of all of that was

5    that I had spoken with Larry Harless about the

6    asbestos problem at the university and encouraged

7    him to look -- to take a serious look at it,

8    because I had so many people coming to me and

9    telling me about these crazy asbestos-related

10   situations that they were working on, environments

11   that they were working in.

12          And it didn't sound very good to me, and I

13   thought somebody should take a serious look at it.

14   And I thought Larry might be the guy to do it.  And

15   so I went and talked with Larry, and I think he

16   either -- he either said to me, do you mind if I

17   get a fellow -- I don't know if he said a fellow I

18   introduced you to awhile back or an old friend of

19   mine or whatever he said, get Gary Rich to meet

20   with us and talk about it, also.  I said, no, I

21   don't have any problem.

22          And so the long and short of it is we

23   ended up at the -- to the best of my recollection,

24   at the Fairmont Econo Lodge and had a talk about

1    it.  And that was the next time that I remember

2    contact with Gary Rich.

3        Q.   Was Larry Harless staying at the Econo

4    Lodge in Fairmont?

5        A.   I don't know.  I don't remember.

6             MR. WAKEFIELD:  You need to let her finish

7    the question first --

8             THE DEPONENT:  I'm sorry.

9             MR. WAKEFIELD:  -- before you start to

10   answer.

11            THE DEPONENT:  Sorry.

12   BY MS. MASON:

13       Q.   Did he indicate whether Gary Rich would --

14   had any sort of special qualifications that would

15   make him appropriate to work on an asbestos case

16   for WVU?

17       A.   I don't remember that.

18       Q.   Today do you have any knowledge as to

19   whether Gary Rich had any special qualifications

20   that would have supported the idea that he would

21   make a good plaintiffs attorney on the WVU asbestos

22   cases?

23            MR. WAKEFIELD:  Object to the form; vague.

24       A.   Yeah, I'm --

1     Q.   I may object to myself.

2     A.   I'm not sure I'm following the question.

3     Q.   Since meeting Gary Rich -- well, do we

4     have a specific time?  Can you narrow down for us

5     when it is you think you met with Gary Rich at the

6     Econo Lodge?

7     A.   Well, it had to be previous to November of

8     1999, probably not too long before that.  I don't

9     recall exactly when it was, but it had to be before

10    that.

11    Q.   So you've known Gary Rich since at least

12    1999?

13    A.   That's correct.

14    Q.   And you've worked with him professionally

15    since 1999?

16    A.   That's correct.

17    Q.   Having worked with him over those years,

18    do you -- are you aware of any qualifications

19    Mr. Rich has that would qualify him to work on an

20    asbestos case representing the -- WVU?

21         MR. WAKEFIELD:  Object to the form again.

22    You can answer.

23    A.   Could you ask me that question once more,

24    please?

1    Q.    Probably not.  I can try -- let me start

2    over.

3           Since 1999 and knowing Mr. Rich, are you

4    aware of any qualifications he had at the time that

5    would have qualified him to serve as counsel,

6    plaintiffs counsel, in the WVU asbestos case?

7           MR. WAKEFIELD:  Same objection.  You can

8    answer.

9    A.    I just know today that he had worked as a

10   lawyer for a period of time.

11   Q.    When you met him, was he practicing

12   primarily immigration law?

13   A.    That was my understanding.

14   Q.    And ultimately Mr. Rich agreed to become

15   involved in the WVU asbestos case; is that right?

16   A.    Yes.  Ultimately, he did.

17   Q.    When was that?

18   A.    Well, I would have to say that that

19   agreement took place in November of 1999.

20   Q.    And was that a written agreement?

21   A.    No.

22   Q.    Can you outline for us what that agreement

23   entailed?

24   A.    My understanding at that time was that we

1 were agreeing to work on the case together, on the

2 WVU asbestos case, and that we would share the

3 benefits half/half, 50/50.

4     Q.   Okay.  So let's back up just a second.

5 You said we were going to work on the WVU asbestos

6 case together.  "We" being you and Gary Rich?

7     A.   That's correct.

8     Q.   Not Larry Harless?

9     A.   No.

10     Q.   And --

11     A.   That's correct.  I'm sorry.

12     Q.   And at your meeting at the Econo Lodge,

13 did you represent that you were a lawyer at that

14 time?

15     A.   No.

16     Q.   Did Larry Harless represent that you were

17 a lawyer at that time?

18     A.   No.  Both people knew I was not a lawyer

19 at that time.

20     Q.   How do you know that Gary Rich knew you

21 weren't a lawyer at that time?

22     A.   How do I know?

23     Q.   Yes.

24     A.   I can't give you a concrete answer to

1    that.  It was at least my clear assumption that he

2    knew.

3         Q.   And you said -- and you think this

4    agreement occurred sometime in November 1999?

5         A.   I know it.  I know it occurred in November

6    1999.

7         Q.   All right.  Why does that date stick out

8    to you?

9         A.   Because it sort of was the kickoff to an

10   understanding, long-term understanding that I had

11   with him to work on these cases.

12        Q.   And you said that you would share the

13   benefits from those cases 50/50?

14        A.   That was the understanding at the time.

15        Q.   And when you say the benefits from those

16   cases, what do you mean by the "benefits"?

17        A.   At that time -- at that time I don't think

18   we discussed what the benefits would be or how they

19   would be or...  This was just the beginning.  We

20   hadn't done anything and -- but we did have this

21   understanding or agreement that was made between

22   the two of us.

23        Q.   Did benefits -- as far as you understood,

24   did benefits include attorneys' fees?

1    A.   I didn't think of attorneys' fees at the

2    time.  If you're asking was I thinking about

3    attorneys' fees, I would have to say no.  I just

4    was thinking about starting to work with this guy,

5    Gary Rich.  I was very interested in seeing work

6    done on the university case.  He said he would be

7    willing to work with me.  We sat down in his

8    kitchen in November of 1999 at his home, and that's

9    what he said.

10   Q.   Okay.  So to you benefits didn't mean

11   anything about money?

12   A.   Oh, I thought it had something to do with

13   money.

14   Q.   Okay.

15   A.   But I didn't know anything about the

16   details.  I wasn't thinking anything about details

17   at that time.

18   Q.   Okay.  And I'm a little confused.  We were

19   talking about this initial meeting that you had

20   with Gary Rich at the Econo Lodge, and you thought

21   that was in November 1999, right?

22   A.   Previous to.  It might have been -- I

23   don't remember exactly when the meeting was at his

24   house.  It might have been later November, and

1    possibly we met at the Econo Lodge early November,

2    but I know it was previous to the meeting at his

3    house.  I'm thinking previous to November, but it

4    might have been early November.  I cannot tell you

5    at this point.

6         Q.   Okay.  But so there was an initial meeting

7    with you and Larry Harless and Gary Rich where you

8    talked initially about the WVU case?

9         A.   Right.  Can I go back a minute?

10        Q.   Absolutely.

11        A.   Now that I'm thinking more clearly about

12   it, I think it was -- it had to be previous to

13   November because -- could I explain why?

14        Q.   Sure.  Absolutely.

15        A.   Because between the meeting at the Econo

16   Lodge and the meeting with Gary Rich at his home in

17   November of 1999, there was communication between

18   Harless and Rich -- between the three of us, and

19   me, concerning the possibility of trying to get

20   lawyers from out of state to come in and work on

21   the university asbestos case.  And I know that

22   occurred over a small -- a short period of time.  I

23   don't know if it was two weeks or a month or -- but

24   I believe, therefore, that that meeting at the

1    Econo Lodge occurred before November of 1999.

2        Q.   And so then in between the meeting at the

3    Econo Lodge and the meeting at Gary's house, you

4    had communications with Gary and Larry Harless

5    about bringing in an out-of-state law firm to work

6    on the WVU asbestos case?

7        A.   That's correct.

8        Q.   Why would you be interested in bringing an

9    out-of-state law firm in to work on the case?

10        A.   Gary Rich and I felt that we needed an

11   out-of-state firm because of the politics in West

12   Virginia, and we believed we needed a big

13   out-of-state firm with the resources to be able to

14   do a significant job on the asbestos case.

15        Q.   So between those two meeting times that

16   you've described, did any of the three of you

17   contact any out-of-state firms to talk to them

18   about the WVU case?

19        A.   I believe there was contact.

20        Q.   Okay.  Who made the contact and with whom?

21        A.   To the best of my recollection, I believe

22   I made the contacts.  And I don't remember all of

23   the firms that I might have contacted, how many

24   there were, but I certainly remember contacting the

1    firm that eventually decided to come into West

2    Virginia to help with that case.

3        Q.    And what firm was that?

4        A.    The Robert E. Sweeney firm from Cleveland.

5        Q.    And so you made the initial contact with

6    Robert Sweeney's firm?

7        A.    Yeah.  One of the reasons why I believe

8    that that happened that way is because I found in

9    my investigation of that firm that it was a firm

10   that was related to work with unions, and at the

11   university a lot of the plaintiffs who were having

12   -- eventual plaintiffs, potential plaintiffs who

13   were having problems with asbestos, were members of

14   the university union that I also was a part of at

15   that time.

16            And anyway, because in my investigations I

17   saw that there was that union-related work from the

18   Sweeney firm, in the history of the firm, I decided

19   maybe this is a good firm to talk to, and so I

20   believe that's what prompted me to make that

21   contact.

22       Q.    So before the meeting in the kitchen with

23   Gary in November 1999, you had already talked to

24   Robert Sweeney's firm?

1    A.    I don't know if the contact with his firm

2   actually came after that meeting or before that

3   meeting, but -- all right.  I'll let you ask the

4   questions.

5    Q.    Okay.  Let's talk about the meeting at

6   Gary's house.  That's the meeting -- before meeting

7   at Gary's house, had you already talked about this

8   50/50 sharing of benefits?

9    A.    (Shakes head back and forth.)  Had no

10   communication before that.

11    Q.    Okay.  At the Econo Lodge, did you discuss

12   at all the terms under which you and Gary might

13   work together on the WVU case?

14    A.    No, or the terms -- no.  Answer to that is

15   no.

16    Q.    And in between the Econo Lodge meeting and

17   the meeting at Gary's house, did you discuss the

18   terms under which you might work with Gary, Gary

19   Rich, on the WVU case?

20    A.    No.

21    Q.    You said you had communications amongst

22   the three of you, Larry Harless, Gary Rich and you

23   about possible out-of-state lawyers.  How did you

24   -- how was that communication made?

1    A.    My recollection of it is that we had

2    communications.  You know, remember Larry and Gary

3    Rich and I were friends.  And, I mean, Larry with

4    Gary, and I with Larry at that point.

5         And we talked about proceeding with the --

6    you know, trying to do a -- put together the

7    workings for a WVU asbestos case, and it became

8    clear in those communications that Larry was not

9    interested in being involved if there was going to

10   be an out-of-state firm coming in.  And so he made

11   that decision.  He -- in essence, what he said was,

12   if you two fellows want to go ahead and do it, do

13   this, that's okay with me, but I do not want to be

14   involved if you're thinking about an out-of-state

15   firm.  Gary Rich and I were of the mind that it was

16   important to have an out-of-state firm come in.

17        And so you know, we sort of looked at each

18   other at some point, I don't remember whether it

19   was in his house or -- I think it was maybe a

20   little bit previous to that, but we said, well,

21   Larry doesn't want to be involved, you know.

22   Should we try to go ahead ourselves?  And we

23   decided, yeah, maybe we should.

24    Q.    So it sounds like there were some

1    in-person meetings with the three of you between

2    the time you were at the Econo Lodge and the time

3    you met with Gary in his kitchen?

4         A.   I don't believe so.  I think there might

5    have been individual phone contacts or -- you know,

6    I don't recall any meeting of the three of us at

7    any place.  I don't recall that.

8         Q.   And then when you -- before the meeting at

9    Gary's house, did you -- were you aware of any sort

10   of draft agreement Larry Harless had created of a

11   partnership -- or let me rephrase that.

12            At any point did you become aware of a

13   draft agreement of a venture between you and Gary

14   Rich and Larry Harless regarding pursuit of the WVU

15   case?

16        A.   No.

17        Q.   Are you aware of any draft agreement Larry

18   Harless created which would have assigned 50

19   percent of the profits to Harless, 25 percent to

20   Rich and 25 percent to you?

21        A.   No.

22        Q.   You never saw an agreement like that?

23        A.   No.

24        Q.   Did Harless ever talk to you about an

1    agreement like that?

2       A.   No.

3       Q.   So you met, just the two of you, Gary Rich

4    and you, at Gary Rich's house?

5       A.   In November of '99.

6       Q.   Okay.  And it was at that meeting that you

7    discussed a 50/50 split of the benefits of the WVU

8    asbestos case?

9       A.   That's correct.

10      Q.   Okay.  And did that encompass -- did you

11   believe that to encompass anything other than the

12   WVU case?

13      A.   That was the only thing we were involved

14   with.  I mean, we really weren't involved at that

15   point.  I mean, we just had taken an initial look.

16   I mean, I had a lot of information about things

17   going on at the university, but that was just our

18   initial communication.

19           After -- you know, after the Econo Lodge

20   and some individual communications, I think, that

21   occurred, that was the next time that we sat down

22   and, you know, were talking seriously about whether

23   we should proceed ahead and how that would be.

24      Q.   Did you discuss the division of labor?

1    A.    No.  We just -- well, when you say, did we

2    discuss the division of labor, we understood we

3    both were going to be involved.

4    Q.    Involved how?  What would be -- what did

5    you foresee as your involvement in the WVU case?

6    A.    Well, my involvement was sort of just laid

7    out there.  I mean, I was at the university.  I had

8    a multitude of contacts with employees at the

9    university.  I had represented employees for years,

10   I think I mentioned 20 years, or maybe I didn't

11   before, grievance work.  But I was very involved

12   with many different areas of employees from

13   different work areas, and they were bringing this

14   information about their asbestos -- contact with

15   asbestos, being exposed to asbestos, they thought

16   in various parts of the university.

17            I was naturally interested in following

18   up on some of that information and -- but it was

19   sort of a natural thing for me, because I was in

20   the university setting every day and, you know,

21   having contact with all these kinds of people.  So

22   we didn't talk about what are you going to do and

23   what am I going to do, if that's what you mean.

24   Q.    That's what I meant.

1    A.   We didn't discuss it in that detail at

2    that meeting.

3    Q.   Did you ever discuss your division of

4    labor on the WVU case with Gary Rich?

5    A.   I'm not sure I understand your question.

6    Q.   Well, you just said we never talked about

7    you're going to do this, and I'm going to do that.

8    Did you ever have that kind of conversation with

9    Gary Rich about the WVU case?

10    A.   I don't believe so.

11    Q.   Did Gary Rich ever give you any

12    assignments related to the WVU case?

13    A.   I'm not sure I understand what you mean by

14    give assignments.  Are you asking was he aware of

15    things that I was doing and he was consenting to

16    them and he was agreeable to that?

17    Q.   No.  I'm asking did he specifically say --

18    tell you to do something related to the case.

19    A.   To tell me to directly -- we might have

20    had a discussion from time to time when we

21    discussed, well, you know, this needs to be done

22    and, you know, can you get it done or can I -- you

23    know, that kind of thing.

24    Q.   When did Bob -- I'm sorry.  I didn't mean

1    to interrupt.

2             MR. WAKEFIELD:  Were you finished?

3             THE DEPONENT:  Yeah, I'm finished.  I'm

4    sorry.

5    BY MS. MASON:

6        Q.   When did Bob Sweeney get involved in the

7    case?

8        A.   He got involved in the case -- well, he

9    was in -- I can't give you an exact date, but he

10   was certainly in in early 2000.

11       Q.   And do you recall what the financial

12   agreement was between Sweeney and Rich?

13       A.   I believe that the agreement was something

14   like 65 -- it was an initial -- it eventually broke

15   down to less than 30 for Rich, because I remember

16   we discussed it.  And, of course, I -- back then I

17   was privy to the agreement.  I saw the agreement.

18   I think he ended up with less than 30.  I think it

19   was 28, because there needed to be some room for

20   some other lawyers from -- who were involved in

21   West Virginia.

22            And also, Professor Cady from the law

23   school was involved in that agreement, I think, for

24   a very minimal amount, but he was involved in that

1  agreement.

2      Q.  Well, did the -- was there an initial

3  written agreement about a fee split between Gary

4  Rich, Bob Sweeney, Professor Cady and any other

5  lawyers?

6      A.  Could you repeat that, please?  I just

7  want to make sure I'm understanding the question.

8      Q.  Yeah.  Was there -- did you ever see an

9  initial written agreement or -- that proposed a fee

10  split between Rich and Bob Sweeney?

11      A.  Not just between the two of them, but with

12  these other parties involved, also?

13      Q.  Either way.

14      A.  Yes.  Definitely I saw it, yes.

15      Q.  At the beginning of the litigation?

16      A.  Uh-huh, yes.

17      Q.  And did that -- as far as you know, did

18  that written agreement change at any point

19  throughout the litigation?

20      A.  I'm not sure.  I do not believe so but I'm

21  not sure.

22      Q.  Well, they added Pat Jacobs to the --

23      A.  Well that was -- when I said other

24  lawyers, it was Bigly and Jacobs who were -- to the

1    best of my recollection, they were in for, like,

2    seven percent of that initial agreement.

3        Q.   Okay.  And we're saying "initial

4    agreement."  Do you know if there was a later

5    agreement?

6        A.   I don't believe there was.

7        Q.   Okay.  And did you help negotiate --

8        A.   I don't remember if there was.  I'm

9    sorry.  I just wanted to clarify.

10       Q.   That's fine.  And I appreciate that.  Did

11   you help negotiate this agreement on Gary's behalf?

12       A.   He and I talked about it.  You know, what

13   we thought was fair for him.

14       Q.   But did you talk with Bob Sweeney about

15   the negotiations or the fee splits?

16       A.   No.

17       Q.   And did that agreement that we've been

18   talking about, did it contemplate any division of

19   work amongst the lawyers?

20            MR. WAKEFIELD:  Did it contemplate or did

21   it contain division?

22            MS. MASON:  I don't even remember the

23   question.  I got distracted by the note that we

24   need to change the tape.

1    BY MS. MASON:

2        Q.   Did the agreement specify any division of

3    labor amongst the lawyers referenced in the

4    agreement?

5        A.   No.

6             MS. MASON:  We need to change the tape, so

7    let's go off the record and take a break.

8             THE VIDEOGRAPHER:  We are now off the

9    record.  The time is 11:17 a.m.

10                   (Short break taken.)

11            THE VIDEOGRAPHER:  We are now back on the

12   video record.  This is tape number two of the video

13   deposition of Joseph Simoni.  Today is June 11th,

14   2013.  The time is 11:29 a.m.

15   BY MS. MASON:

16       Q.   Did Gary Rich ever ask you if you were a

17   lawyer?

18            MR. WAKEFIELD:  Object to the form.  And

19   let me explain the basis for my objection.  I think

20   he's a lawyer.  He's not a licensed lawyer.

21            MS. MASON:  Well, that was going to be my

22   next question.

23            MR. WAKEFIELD:  But he's a lawyer.  So I

24   -- the impression I have from your earlier

1    questions is that you're using the term "lawyer" to

2    mean a licensed lawyer.

3            MS. MASON:  And I was earlier.

4    BY MS. MASON:

5        Q.   Did Gary Rich ever ask you if you were a

6    lawyer?

7        A.   I don't ever remember that question.

8        Q.   Did you ever ask you if you were a

9    licensed lawyer?

10       A.   Don't ever remember that question.

11       Q.   Did you ever tell him that you were not a

12   licensed lawyer?

13       A.   I didn't tell him in those words, but

14   through communications that we had, he knew I was

15   not a licensed lawyer.

16       Q.   What communications would you have had

17   that would have indicated to him you were not a

18   licensed lawyer?

19       A.   Well, we had communications about the bar

20   exam, and so...

21       Q.   Did you tell him -- did these

22   communications include telling him that you had

23   taken the bar three times before?

24       A.   I don't remember that.

1    Q.   Did they relate solely to your taking the

2    bar in 2002?

3    A.   I do not remember what the communications

4    were.

5    Q.   He was aware that you -- "he" being Gary

6    Rich, was aware that you took the bar exam in 2002?

7    A.   Yes.

8    Q.   Had he requested you take the bar exam?

9    A.   No.

10   Q.   And to go back to the agreement we were

11   discussing before the break with Bob Sweeney that

12   you were privy to, did you anticipate that you were

13   to receive 50 percent of whatever Rich received

14   from the WVU case?

15   A.   Could you repeat that question, please?

16   Q.   I can try.  Based on the agreement we were

17   talking about before the break, setting out the fee

18   split amongst Bob Sweeney and Gary Rich and others

19   in the WVU litigation, did you expect that you

20   would receive 50 percent of whatever Rich received?

21   A.   That was the understanding that I had as a

22   result of communications with him.

23   Q.   Did you have any concerns at that point as

24   to whether it was ethical for you to receive a

1    percentage of attorneys' fees from Gary Rich?

2        A.   Could you repeat that question, please?

3        Q.   Did you have any ethical concerns -- well,

4    let me scratch that.

5             At any time -- let's just come back to

6    that.

7        A.   Could I --

8             MR. WAKEFIELD:  No.  You need to answer

9    questions.  If you have something you want to

10   discuss with me later, you can.

11            THE DEPONENT:  Okay.

12   BY MS. MASON:

13       Q.   Did you ever discuss with Bob Sweeney fee

14   splits between yourself and Bob Sweeney?

15       A.   Did I have any communication with Bob

16   Sweeney about receiving any compensation from him?

17   Is that --

18       Q.   That's not exactly what I asked, but what

19   I said is, did you have any conversations with him

20   about fee splits between you and Bob Sweeney?

21       A.   No.

22       Q.   Okay.  Did you have any conversations

23   about compensation -- compensating you with Bob

24   Sweeney?

1    A.    No.

2    Q.    You've never discussed --

3    A.    You're -- are you -- I'm not sure I

4    understand the time frame of your question.

5    Q.    Exactly.  I understand that, and at that

6    point I was saying ever, and so let me back up.

7          First of all, did you ever have any

8    conversations or communications with Bob Sweeney

9    about fee splits related to any litigation?

10   A.    No.

11   Q.    Did you ever have any compensation -- any

12   conversations or communications with Bob Sweeney

13   about compensating you on any litigation?

14   A.    Yes.

15   Q.    What litigation?

16   A.    The WVU asbestos litigation.

17   Q.    Any others?

18   A.    No.

19   Q.    Okay.  Was Gary Rich present for those

20   communications with Bob Sweeney about compensating

21   you?

22   A.    No.

23   Q.    What was the rough -- roughly the time

24   frame of those communications with Bob Sweeney

1    about compensating you?

2        A.    Well, the time period roughly, to the best

3    of my memory, was around the time that the

4    university asbestos case was settling.

5        Q.    And when was that?

6        A.    I believe it settled in January of 2006.

7    So I believe the communication was in a six month

8    -- I can't give you an exact date, but say a

9    six-month period around that date, around January

10   of 2006.

11       Q.    And did you approach Bob Sweeney about

12   compensating you?

13       A.    I did not.

14       Q.    Bob Sweeney approached you about

15   compensating you?

16            Let me ask you this:  How did it come

17   about that you discussed compensating you with Bob

18   Sweeney?

19       A.    Yeah, I want to go back to your previous

20   question, if I might, or maybe take them both

21   together.  I'm not sure.

22            There were communications that I had with

23   Bob Sweeney about the idea that it appeared like I

24   might not get anything from all of the work I did

1    on the WVU asbestos case.

2         Q.   When was that?

3         A.   Well, it was in that six-month period.

4         Q.   And when you say it appeared that you

5    might not be compensated for the work you had done

6    on the WVU case, what were the -- what were you

7    basing that on?

8         A.   Well, I was basing it on the idea that I

9    started out in November of '99 with Gary Rich

10   having an understanding that as a result of the

11   work that I would do, I would receive 50 percent.

12   Then over the years between 1999 and the end of

13   2005, beginning of 2006, that period, there were

14   other communications.

15        Q.   With Gary --

16        A.   All -- with Gary Rich, all suggesting that

17   I would be receiving compensation.

18             But the problem was, from my end, is the

19   percentages kept changing through the years, and it

20   got to a point where I got to thinking I don't know

21   that I'm going to get anything.  I had no

22   guarantees.  I had no guarantees, and that brought

23   about -- I can't give you a specific trigger or

24   whatever, but that led to the conversations with

1    Bob Sweeney about the possibility that I might not

2    get anything.

3         Q.   And did you initiate that conversation?

4         A.   I don't remember.

5         Q.   And it was in person?

6         A.   I believe it was.

7         Q.   Was anybody else there?

8         A.   No.

9         Q.   At any time --

10        A.   It might have been over the telephone.  I

11   don't know.  I don't recall for sure.

12        Q.   At any time did Gary Rich tell you that

13   you should keep your hours -- keep up with your

14   hours that you worked on the WVU case?

15        A.   Never.

16        Q.   At any point did Bob Sweeney tell you that

17   you should keep up with the hours that you were

18   working on the WVU case?

19        A.   No.

20        Q.   Other than the WVU case, did you bring any

21   other cases to Bob Sweeney for his consideration?

22        A.   I don't think it would be fair to say that

23   I brought any other cases.  I think there was a

24   communication that he was involved with at the

1    beginning, at the very, very initial beginning of

2    the case against Phillips Westinghouse in

3    Fairmont.  He happened just to be at a place where

4    that was -- where there was a very, very initial

5    mention of a -- of problems down there in Fairmont.

6              MR. WAKEFIELD:  I want to take a break for

7    just a moment, consult with my client.

8              MS. MASON:  Okay.

9              THE VIDEOGRAPHER:  We are now off the

10   record.  Time is 11:39 a.m.

11              (Short break taken.)

12              THE VIDEOGRAPHER:  We are now back on the

13   record.  The time is 11:47 a.m.

14   BY MS. MASON:

15       Q.   Other than the WVU case, the Spelter case

16   and the Fairmont case, are there any other cases

17   that you worked on with Gary Rich?

18       A.   Yes.

19       Q.   What were they?

20       A.   When you say "cases," can you explain to

21   me what you mean?

22       Q.   Were there any matters that you brought to

23   Larry -- excuse me -- to Gary Rich for his

24   consideration to provide legal advice or to pursue

1    or prosecute?  They didn't necessarily have to turn

2    into an actual lawsuit.

3         A.   Okay.  There were two that come to mind.

4    One was a case involving a fiberglass plant in the

5    Reedsville/Arthurdale area of West Virginia.

6         Q.   And how did that case come to your

7    attention?

8         A.   From people living out in the

9    Reedsville/Arthurdale area.

10        Q.   People that you already knew?

11        A.   People I already knew.

12        Q.   And did they contact you and describe a

13   problem?

14        A.   Over a period of time, there was -- there

15   were communications with them about things that

16   they were noting in their area.

17        Q.   Who initiated those communications?

18        A.   I don't recall because these were people,

19   some of whom I knew from the university, that

20   worked at the university and lived in that area.

21   Others were people who lived in that area who I

22   might have met through people who worked at the

23   university.  I don't recall the way that came

24   about.

1    Q.   And what was the outcome of that case?

2    A.   It was a case that never actually moved to

3    a litigation stage.  It was just early research,

4    and we tried to develop it.

5    Q.   Did you involve any other lawyers other

6    than Gary Rich in the Reedsville and Arthurdale

7    project?

8    A.   There were a number of out-of-state

9    lawyers who came in and looked at it.

10   Q.   Who were they?

11   A.   Levin Papantonio took a look at it.  Peter

12   Angelos firm, Baltimore, they took a look at it.

13   Glasser and Glasser.  I'm trying to remember.  At

14   least those.  I'm trying to remember if there was

15   another.  Right now, that's what comes to mind.

16   Q.   Masry?

17   A.   Masry, I believe they took a brief look at

18   it also.

19   Q.   Tom Girardi?

20   A.   Not Tom Girardi.

21   Q.   Okay.  And was your role in this

22   Reedsville/Arthurdale project the same as it was in

23   the initial stages of the Spelter litigation and

24   the Fairmont litigation?

1    A.    Similar.

2    Q.    Similar how?

3    A.    In terms of organization relating to the

4    people at the local level, research.  Similar in

5    those respects.

6    Q.    And you were primarily responsible for

7    pitching these -- this case to these other out-of-

8    state law firms; is that right?

9    A.    That's true.

10    Q.    Other than the Reedsville/Arthurdale, I

11    think you said there were two, what was the second

12    one?

13    A.    There was an individual malpractice case

14    involving an individual by the name of William

15    Stanridge.

16    Q.    Medical --

17    A.    Lived in -- oh, I'm sorry.

18    Q.    No, I'm sorry.  I interrupted you.

19          Medical malpractice?

20    A.    Medical malpractice.

21    Q.    Okay.  And how did this come to your

22    attention?

23    A.    From people in -- down in Harrison County.

24    Q.    People that Mr. Stanridge knew?

1     A.    People that I met in Harrison County

2     brought to my attention, as I best recollect today,

3     the problem of William Stanridge.

4          Q.    Did you contact Mr. Stanridge directly?

5          A.    I did at one point.

6          Q.    For your initial contact?

7          A.    My initial contact was I think with a

8     relative of his.

9          Q.    How did you meet Mr. Stanridge for the

10    first time?

11         A.    I think the relative took me to --

12         Q.    Okay.

13         A.    -- to his home.

14         Q.    And you considered or brought this case to

15    Gary Rich's attention?

16         A.    I did.

17         Q.    And then what was the outcome of that

18    case?

19         A.    I do not know actually.

20         Q.    Did Mr. Rich sign -- or did Mr. Stanridge

21    sign a retainer agreement with Mr. Rich?

22         A.    I believe he did but I'm not sure.

23         Q.    And then did Mr. Rich associate another

24    law firm to assist on this Stanridge case?

1      A.   Yes.

2      Q.   Who?

3      A.   A sole practitioner here in Charleston.

4  Robert Sayre.

5      Q.   And is there any particular reason that

6  you're aware of that Mr. Rich selected Robert

7  Sayre?

8      A.   I believe they were longtime friends.

9      Q.   Did Mr. Sayre typically handle medical

10 malpractice cases?

11     A.   I do not know.

12     Q.   So other than Stanridge, Reedsville, WVU,

13 Fairmont and Spelter, can you recall any other

14 potential cases that you brought to Gary Rich's

15 attention?

16     A.   Not at this moment.

17          MR. WAKEFIELD:  Are these together?

18          MS. MASON:  Yes.

19          MR. WAKEFIELD:  Thank you.

20          (Deposition Exhibit No. 1 marked.)

21 BY MS. MASON:

22     Q.   I'm going to hand you what has been marked

23 as Exhibit No. 1.  And this is Bates stamped 1347

24 and 1348, Simoni 1347 and Simoni 1348.

1       Professor, you provided a number of

2    documents in this litigation, in this litigation

3    that we're here about today, didn't you?

4       A.   Yes.

5       Q.   And do these two pages include some of the

6    documents that you provided to us?

7       A.   I believe they are.

8       Q.   You -- in your production, I would say

9    there are several hundreds of pages related to the

10   Spelter case.  Where did you locate those documents

11   that you produced related to the Spelter case?

12      A.   I located them from all the materials that

13   I had collected over the years.  I guess that's the

14   best way to say it.

15      Q.   Where were they physically located?

16      A.   At my home.

17      Q.   In?

18      A.   In Davie, Florida.

19      Q.   And you moved to Davie, Florida in October

20   2005; is that right?

21      A.   Five.  October 2005.  No.  To Davie -- to

22   Florida in August of 2005.

23      Q.   Okay.  And then when did you move to

24   Davie?

1      A.    In October.

2      Q.    And when did you start looking for the

3    documents that you've produced in this litigation?

4      A.    Somewhere between 2010 maybe and 2012.

5      Q.    Had you ever made any effort to locate any

6    of these documents prior to 2010?

7      A.    No.

8      Q.    And this is your handwriting on Exhibit 1?

9      A.    Yes, it is.

10     Q.    Okay.  And the -- it's dated 12/8/04; is

11   that right?

12     A.    Yes, it is.

13     Q.    Now, did you make this note on 12/8/04?

14     A.    I believe so.

15     Q.    So you made this note contemporaneously

16   with your meeting with Gary Rich?

17     A.    It appears that way.

18     Q.    To the best of your recollection?

19     A.    To the best of my recollection.

20     Q.    Okay.  About midway down the page, it

21   says, talking about fee splitting, and then I

22   believe it says Byrne, B-y-r-n-e.  September '03?

23     A.    Yes.

24     Q.    Who is this Byrne?

1     A.   I believe it's a reference to Bill Byrne,

2  a lawyer in Morgantown.

3     Q.   And what case was he related to?

4     A.   He wasn't involved in any of the cases.

5     Q.   Do you know the context for your note here

6  that says, talking about fee splitting?

7     A.   I think there was some -- no, I don't

8  recall what it was.  I couldn't tell you today what

9  it was.

10     Q.   You don't recall any case that you had

11  either brought to Gary Rich's attention or to

12  Mr. Byrne's attention that would have resulted in a

13  fee split?

14     A.   No.

15     Q.   And then Mr. Karlin, that's the attorney

16  that you told us about earlier that you actually

17  did some intern or legal clerking for?

18     A.   Yes.

19     Q.   And he's listed under talking about fee

20  splitting as well?

21     A.   Yes.

22     Q.   Do you recall what the context was for you

23  to list Karlin under that topic?

24     A.   I do not.

1     Q.    Below that you have Stanridge and that's

2     the case you referred to previously, a medical

3     malpractice case?

4     A.    Yes.

5     Q.    You brought that to Mr. Rich's attention?

6     Yes?

7     A.    Yes.

8     Q.    And he associated Mr. Sayre?

9     A.    That's correct.

10    Q.    And it says here, settled one defendant,

11    or triangle, one defendant, a few thousand.

12    A.    Uh-huh.  Yes.

13    Q.    Does that refresh your recollection about

14    the outcome of the Stanridge case?

15    A.    No.

16    Q.    What -- do you recall any information --

17    does this refresh your recollection about any of

18    the circumstances about the Stanridge case?

19    A.    This note here?

20    Q.    Yes.

21    A.    No.

22    Q.    And then you have at the last line -- why

23    don't you read that into the record, the last

24    line.

1      A.   The last line says, Karlin, dash, fall of

2    '03, dash, asking about payment to Joe.

3      Q.   Do you recall what the circumstances were

4    that caused you to -- that led you to write this

5    down?

6      A.   I do not.

7      Q.   Do you know why Mr. Karlin would have been

8    asking about a payment to you?

9      A.   I do not.

10     Q.   And this -- these were notes that you took

11   after a meeting with Gary Rich?

12     A.   I assume from my notes that they were --

13   had to do with this communication with him of

14   12/8/04.

15     Q.   And was it your habit to take these --

16   make these notes during your meeting with Gary Rich

17   or after your meeting with Gary Rich?

18     A.   I think I might have done both.

19     Q.   Okay.  And up above on page 1347 where it

20   says Nadler, blasting me, evil, self-centered, what

21   I had been doing, what is Simoni being P-A, and

22   then it's cut off.  Who is Nadler, do you know?

23     A.   Nadler was a mathematics professor at West

24   Virginia University during the time I was there.

1    Q.   And was he -- from these notes, can you

2    tell whether he was blasting you, Simoni, or Gary

3    Rich?

4    A.   From these notes, I -- you say looking at

5    these notes can I tell?

6    Q.   Yes.

7    A.   No.

8    Q.   Do you recall that Mr. Nadler called you

9    evil and self-centered?

10   A.   I don't believe that ever happened.

11   Q.   Okay.  Do you recall Gary Rich telling you

12   that Mr. Nadler had called you evil and self-

13   centered?

14   A.   Could you repeat that, please?

15   Q.   Do you recall Mr. Rich telling you that

16   Mr. Nadler had called you evil and self-centered?

17   A.   I don't believe that ever happened.

18   Q.   You don't believe that Gary Rich ever told

19   you that Nadler said that?

20   A.   About me?

21   Q.   Yes.

22   A.   I believe that never happened.  That that

23   -- I don't have any recollection of Rich saying

24   that to me, if that's your question.

1    Q.   That was my question.

2         And then do you recall whether Mr. Nadler

3    had ever raised any concerns about what you were

4    being paid for in the WVU case?

5         MR. WAKEFIELD:  Object to the form.

6    A.   Could you repeat that, please?

7    Q.   Do you recall whether Mr. Nadler ever

8    raised any concerns about what you were being paid

9    for in the WVU case?

10   A.   I don't recall that.

11   Q.   Underneath that it says, Gary should

12   withdraw.  Do you recall what the circumstances

13   were around that comment?

14   A.   I do not.

15   Q.   Now, you worked with the Masry firm on the

16   Fairmont case, right?

17   A.   I did.

18   Q.   And when you say "Fairmont," that's

19   synonymous with the Westinghouse case?

20   A.   Yes.

21   Q.   Okay.  And are you familiar with an

22   attorney named Nancy Eichler?

23   A.   Yes.

24   Q.   Who is she?

1    A.   She was the lead attorney from the Masry

2    firm.

3    Q.   Did you ever pitch any cases to Nancy

4    Eichler?

5         MR. WAKEFIELD:  Object to the form.

6    Q.   Do you understand what I mean by

7    "pitched"?

8    A.   Not sure.

9    Q.   Well, we know in the Spelter case and in

10   the Reedsville case, you put together a certain

11   amount of information and presented it to various

12   law firms and talked to them about the case and the

13   potential for the case, correct?

14   A.   That's true.

15   Q.   Other than the cases we've already talked

16   to about -- talked to -- talked about today, do you

17   recall any other cases that you might have proposed

18   to Nancy Eichler?

19   A.   Directly to Nancy Eichler?

20   Q.   Yes.

21   A.   No.

22        (Deposition Exhibit No. 2 marked.)

23   BY MS. MASON:

24   Q.   I'm going to hand you what I've marked as

1   Exhibit 2, and it is labeled Simoni 0922.  Do you

2   recognize this document?

3        A.   I do.

4        Q.   What is it?

5             MR. MARINO:  Do we have any other copies

6   of this?

7             MS. MASON:  I only brought a total of

8   five.

9             MR. MARINO:  Okay.  Well, we're going to

10  need to see it.  We're going need to make more

11  copies.

12            MR. McDOUGAL:  I'll let him look.

13  BY MS. MASON:

14       Q.   What is it, Professor Simoni?  And take

15  your time if you need to look at it.

16       A.   It looks like a fax from me to Nancy

17  Eichler and Melissa Dutcher.

18       Q.   And what were you faxing?

19       A.   It appears to be an article about some

20  environment problem down in the Berkeley Springs

21  area of West Virginia.

22       Q.   And was this related in any way to the

23  Fairmont litigation?

24       A.   I don't believe so.

1    Q.   Or any of the other litigation that you

2    were working on?

3    A.   I do not believe so.

4    Q.   And then your message on the -- well, the

5    fax page has the West Virginia University name and

6    address on it, correct?

7    A.   Yes.

8    Q.   And that would indicate that you were

9    using West Virginia University's resources to fax

10   this information to Ms. Eichler?

11   A.   That's true.

12   Q.   And I'm sorry.  Who is Melissa Dutcher?

13   A.   She was the lead field investigator,

14   researcher for the Masry firm.

15   Q.   And then your message says:  This may be a

16   good one.  Let me know your thoughts.  Call or

17   e-mail.  Thanks, Joe.

18        Do you know what you were referring to

19   when you said "this may be a good one?"

20   A.   Only what it appears to be.  It appears to

21   be this case, I was referring to the case, possible

22   case in Berkeley Springs.

23   Q.   That it could be a good litigation case?

24   A.   Yes.

1    Q.    And do you know what happened with that?

2    A.    With the Berkeley Springs?

3    Q.    Yes.

4    A.    I have no idea.

5    Q.    Do you recall ever discussing it any more

6    with Nancy Eichler?

7    A.    I do not.

8    Q.    Or any other attorneys?

9    A.    I do not.

10    Q.    The -- going back specifically to the

11    Spelter case, who -- what law firms did you propose

12    the Spelter case to?

13    A.    The Spelter case, well, obviously Levin

14    and Papantonio.  Masry & Vititoe, Glasser and

15    Glasser.  And I'm thinking there were another one

16    or two, but I'm blocking on the names right now.

17    Q.    Rich Serpe?

18    A.    Well, Richard Serpe was with Glasser and

19    Glasser.  He was their lead specialist.

20    Q.    Dan Marino?

21    A.    Yes.  That's true.

22    Q.    Beth Vaughn at Glasser and Glasser?

23    A.    Yeah.  Beth Vaughn at Glasser and Glasser.

24    Q.    Christian Hartley at Richardson, Patrick,

1    Westbrook & Brickman?

2         A.    What I recall about that is we might have

3    sent them a binder of materials about it to look

4    at.  But in terms of their coming into West

5    Virginia to actually look at it, I don't believe

6    that ever happened.

7         Q.    And you -- did you -- were you responsible

8    for putting this binder together to send out to law

9    firms?

10        A.    I was.

11        Q.    And did you collect all the information

12   that was contained in the binder?

13        A.    I did.

14        Q.    Did Gary Rich have any input about what

15   went into that binder?

16        A.    Not to my recollection.

17        Q.    What was the practice of drafting cover

18   letters to go with the binder?

19        A.    What was the question?

20        Q.    And what I mean by that is, were you

21   responsible for drafting the cover letters to

22   accompany the binders that went to these law

23   firms?

24        A.    I believe that I might have been asked to

1    draft a letter.

2        Q.   And then --

3        A.   Or -- yeah.

4        Q.   And would you sign the letter, or would

5    you prepare it for Gary Rich's signature?

6        A.   No, I never was the signatory on the

7    letters.

8             MR. McDOUGAL:  Sorry.  Never was?

9             THE DEPONENT:  I never was the signature.

10            MR. McDOUGAL:  Thank you.

11   BY MS. MASON:

12       Q.   All right.  So other than that last law

13   firm we listed, all the other -- other than this

14   Richardson, Patrick, Westbrook & Brickman, all the

15   other law firms that you identified as proposing

16   Spelter as potential litigation for those law

17   firms, they all came and made actual visits to the

18   Spelter area?

19       A.   Well, I'd have to go through them one by

20   one maybe.

21       Q.   Let's go through them.  Levin Papantonio?

22       A.   Yes.

23       Q.   Masry?

24       A.   Yes.

1     Q.  Glasser and Glasser?

2     A.  Yes.

3     Q.  Dan Marino?

4     A.  Yes.

5     Q.  Did I leave someone out?  That's all I can

6  think of.

7         And each time these law firms or lawyers

8  came to visit, they -- did you accompany these

9  lawyers?

10    A.  Yes.

11    Q.  Were you responsible for putting together

12  an itinerary for the visiting lawyers?

13    A.  I believe I did every time.

14    Q.  Let's talk specifically about Dan Marino.

15  Did you accompany him to the Spelter site?

16    A.  I -- to the best of my recollection, I

17  did.  Yeah.

18    Q.  Who else was with you?

19    A.  I believe there was another attorney from

20  his firm, Garson.  Is that -- I'm not -- another

21  attorney from his firm.  And I think Gary Rich

22  might have been with us.  I don't recall.

23         (Deposition Exhibit No. 3 marked.)

24  BY MS. MASON:

1     Q.   I'm going to hand you what I've marked as

2     Exhibit 3, and it is Bates stamped Simoni 0416.  Is

3     this a document that you drafted?

4     A.   Looks like my handwriting.

5     Q.   There looks to be a yellow sticky on the

6     bottom right-hand corner in a different

7     handwriting.  Do you know who wrote that?

8     A.   That's not my handwriting.  I do not know.

9     Q.   Do you know who Keith Brotherton is?

10     A.   Keith Brotherton was -- he was in West

11     Virginia.  I don't remember what his exact position

12     was at the time.

13     Q.   Was he a potential client?

14     A.   Not a potential client.  I think he was a

15     -- I think he was a circuit clerk or -- something

16     on that order.

17     Q.   Well, if you look at the top of this page,

18     there is -- it looks to be quite a bit of

19     information about filing fees.

20     A.   That's what it appears like, yes.

21     Q.   Do you know what the context was for you

22     keeping this information regarding filing fees?

23     A.   Could you repeat that, please?

24     Q.   Well, were you looking into or researching

1    the issue of filing fees?

2         A.    There's no date on here, is there?  At one

3    time I was.

4         Q.    For what case?

5         A.    Well, I remember it related to the

6    Fairmont case.

7         Q.    And then at the bottom right-hand of this

8    corner, there is, or sorry, left-hand, it says

9    Marino visit, Wednesday the 12th.

10        A.    Yes.

11        Q.    And then there is a schedule listed

12   there.  Do you recall that particular visit by

13   Marino?

14        A.    I recall the visit, yes.

15        Q.    Did he ever make more than one visit to

16   the Spelter site of which you're aware?

17        A.    To the best of my recollection, it was one

18   time to the Spelter site.

19        Q.    Okay.  And tell -- did you pick him up at

20   9:30 that day?

21        A.    I don't believe I picked him up.  I think

22   he arrived in Morgantown.

23        Q.    All right.  And tell me what the rest of

24   the day was like with -- what you did.

1    A.   I don't recall.

2    Q.   Do you recall that you went with him to

3  Spelter?

4    A.   I think I did.

5    Q.   Do you recall having lunch in Fairmont?

6    A.   I do not recall that.

7    Q.   It says 2:00 to 5:00 flex time, slash,

8  Cady.  Do you know what that means?

9    A.   I do not know at this point.

10    Q.   Well Cady, there was a Professor Cady at

11  the law school?

12    A.   There was.

13    Q.   Was it unusual for you to take visiting

14  professors over to -- or visiting lawyers over to

15  meet with professor Cady?

16    A.   Was it?

17    Q.   Unusual?

18    A.   Not unusual.

19    Q.   In fact, that was pretty much part of the

20  routine when a visiting attorney came in to look at

21  a potential case, right?

22    A.   That was normally done.  I don't think it

23  happened every time, but it was normally done.

24    Q.   And other than recalling that you

1    accompanied Mr. Marino and another person from his

2    firm to Spelter, do you recall discussing the

3    merits of the case with Mr. Marino?

4        A.   I don't recall that.

5        Q.   Do you recall ever meeting with Mr. Marino

6    and a John Hando (ph)?

7        A.   Yes.

8        Q.   What do you recall about that?

9        A.   It was a meeting in Martinsburg, I

10   believe.

11       Q.   Was that the same day that you took him to

12   the Spelter site?

13       A.   It couldn't have been the same day.

14       Q.   Do you recall what was discussed with

15   Mr. Hando?

16       A.   No, I do not.

17       Q.   And do you remember if Mr. Rich was with

18   you and Mr. Marino and Mr. Hando?

19       A.   I believe that he was there.

20       Q.   And do you recall what the purpose was of

21   your visit with Mr. Hando?

22       A.   The visit with Mr. Hando?

23       Q.   Yes.

24            MR. WAKEFIELD:  You're talking about the

1    same visit with Mr. Marino?

2         Q.   Yes.  I'm sorry.  I'm sorry.  That same

3    visit with -- let me start over.

4              The day that you met with Mr. Hando,

5    Mr. Marino and Mr. Rich, what was the purpose of

6    that visit?

7         A.   It was an opportunity for Mr. Marino and I

8    believe his associate to hear from someone who was

9    working within the West Virginia Department of

10   Environmental Protection about his knowledge of the

11   Spelter situation.

12        Q.   And did Mr. Marino's law firm ultimately

13   become involved in the Spelter case?

14        A.   No.

15        Q.   Did they provide you with any reason why

16   they did not?

17        A.   I am not aware of that.

18             (Deposition Exhibit No. 4 marked.)

19   BY MS. MASON:

20        Q.   We were talking before the last break, I

21   think, about Mr. Sweeney and the possibility of you

22   receiving compensation in the WVU case.  Did you

23   receive any compensation as a claimant in that

24   case?

1    A.   I don't recollect receiving anything as a

2    plaintiff in that case.

3    Q.   You qualified for medical monitoring; is

4    that right?

5    A.   Excuse me?

6    Q.   Did you qualify for medical monitoring

7    program?

8    A.   I believe in the end I did -- I was part

9    of that group that qualified.

10   Q.   Okay.  So that was your benefit from the

11   WVU asbestos lawsuit as a plaintiff is that you

12   got --

13   A.   Potential benefit.

14   Q.   Okay.  And did you take advantage of that?

15   A.   I've never received the medical

16   monitoring.

17   Q.   Okay.  On page -- this page I've handed

18   you, which I've marked as Exhibit 4, is Bates

19   stamped Simoni 1349.  Do you recognize this page?

20   A.   I do.

21   Q.   This is your handwriting, correct?

22   A.   It is.

23   Q.   When's the last time you saw this

24   document?

1    A.    I do not recall.

2    Q.    Has it been within the last week?

3    A.    No.

4    Q.    Okay.  And it's dated February 21st and

5    February 23rd, 2005?

6    A.    It is.

7    Q.    And what were the circumstances that led

8    you to make these notes?

9    A.    Well, the notes indicate that there was a

10   meeting at the Radisson Hotel in Morgantown with

11   Mr. Sweeney.

12   Q.    Okay.  And above that it says, continuing

13   contacts with Gary and talked to Mike about

14   something.  Can you read that?

15   A.    Can I read -- can I read what?

16   Q.    The last word of that says, continue -- do

17   you see where I'm saying -- at the top of the page,

18   continuing contacts with Gary and talked to Mike,

19   or talked with Mike about what?  I can't read the

20   last.

21   A.    Well, I see a T-H-E.  That's all I -- I

22   mean, I don't...

23   Q.    Okay.  So you don't know what that's

24   referring to?

1     A.   I can't say for sure.

2     Q.   What did you mean by continuing contacts

3  with Gary?

4     A.   I don't remember.

5     Q.   How -- do you recall how soon after your

6  meeting with Gary you drafted these notes?

7     A.   I do not.

8     Q.   Had it become your practice in 2005 to

9  begin taking notes regarding your meetings with

10  Gary Rich?

11     A.   Could you repeat the question, please?

12     Q.   Had it become your practice as of 2005 --

13  or was it your practice as of 2005 to make notes

14  about your meetings with Gary Rich after the fact?

15     A.   Was it my -- I'm trying to understand the

16  question.  I believe I said before I took notes,

17  sometimes at the time of the meeting or soon after

18  the meeting.  It depended on the opportunity to

19  take notes sometimes.  I don't recall, you know.

20     Q.   Did you take notes after every meeting?

21     A.   I don't think so.

22     Q.   Through -- I mean, throughout the course

23  of your relationship with Gary Rich, did you take

24  notes after every meeting?

1    A.    No.

2    Q.    Did there come a time when you thought

3    that you needed to take -- make notes more than you

4    had been in the past?

5    A.    No.

6    Q.    You didn't feel a need to start

7    documenting your meetings with Gary Rich?

8    A.    You said did there come a time?  No.

9    Q.    Okay.  And there was nothing that caused

10    you to believe that you needed to start documenting

11    your meetings with Gary Rich?

12    A.    No.

13    Q.    So there was a meeting with Gary Rich and

14    Bob Sweeney and you on February 21st, 2005; is that

15    right?

16    A.    That's what this appears to indicate.

17    Q.    Well, do you recall that meeting?

18    A.    I recall being at the Radisson.

19    Q.    Do you recall talking to Gary Rich in the

20    parking lot after that meeting?

21    A.    I do.

22    Q.    Do you recall Gary Rich talking about,

23    quote, liberal elitists, closed quote?

24    A.    Do I recall today?

1      Q.   Yes.

2      A.   Without looking at these notes?

3      Q.   Do you recall today either independently

4    or through refreshing your recollection from these

5    notes of Gary Rich berating Sweeney and calling him

6    a liberal elitist?

7      A.   Let me read this.

8      Q.   Sure.

9      A.   Because I haven't actually read it.

10     Q.   I'm sorry.  Take your time.

11     A.   No, that's all right.

12          Okay.  Can I go back to your question,

13   please?

14     Q.   Yes, sir.  Now, you've now reviewed Simoni

15   1349 that we've marked Exhibit 4, correct?

16     A.   Yes.

17     Q.   This was a document written by you?

18     A.   Yes.

19     Q.   Do you recall a meeting with Gary Rich in

20   the parking lot or parking garage of the Radisson

21   where Gary Rich berated Sweeney and called him a

22   liberal elitist?

23     A.   I only recall -- I don't recall the

24   specifics of the meeting.  I can only say that if I

1    made these notes, they were about the meeting.

2        Q.    And you would have expected them to be

3    accurate?

4        A.    I believe so.

5        Q.    Was it uncommon for Gary Rich to use the

6    phrase "liberal elitist"?

7        A.    I heard it more than once.

8        Q.    And then there's -- if you would, just

9    read into the record that third bullet point

10   beginning asked about.  If you could read that

11   aloud for us.

12       A.    I'm sorry?

13       Q.    Could you read that aloud for us, the

14   paragraph beginning asked about?

15       A.    Asked about -- okay.  It says, asked about

16   his sharing time sheets.  He said, for what.  I

17   said, we had worked out his time together

18   concerning -- I can't read that last word on that

19   line.  I'm not sure.  Concern something, concern --

20   I don't know.  Organizing case initially.  Meets

21   with employees.  Keep on?

22       Q.    Yes, please.

23       A.    He said, you just don't get it about my

24   getting paid.  I said, remember you mentioned about

1    Sweeney paying me for hours, suggesting that I

2    would need to submit hours.  He then went off.

3        Q.    Okay.  So do you recall, though, having

4    this conversation with Gary Rich when you asked him

5    to share his time sheets?

6        A.    I recall having communications with him

7    after the -- after we left Sweeney, but I don't

8    remember the details.

9        Q.    Do you recall ever asking him to share his

10   time sheets regarding his WVU time?

11       A.    Do I remember ever asking him, is that

12   your question?

13       Q.    That's my question.

14       A.    No, I do not remember asking him.

15       Q.    Do you have any reason to think you did

16   not ask him after having reviewed this document,

17   Exhibit 4?

18            MR. MARINO:  Object to the form of the

19   question.

20       A.    Let me read this again.  It says, asked

21   him about -- asked about his sharing time sheets.

22   That's what it says.

23       Q.    Did he ever share his time sheets with

24   you?

1    A.    No.

2    Q.    Did you ultimately submit time sheets to

3    Sweeney?

4    A.    Did I?

5    Q.    Yes.

6    A.    Yes.

7    Q.    How did you compile those time sheets?

8    A.    I did not, of course, keep contemporary

9    time records back then.  Contemporaneous -- excuse

10   me -- contemporaneous time records back then.  So I

11   put together the best I could, and Bob Sweeney

12   shared his time records with me to help me remember

13   times that I had been involved with him.

14   Q.    And so now having reviewed this Exhibit 4,

15   do you recall Mr. Rich ever telling you to keep up

16   with your hours, in WVU or any other case?

17   A.    Do I recall Mr. Rich ever asking me to

18   keep up with my hours?

19   Q.    Yes.

20   A.    That never happened.

21   Q.    It says here, I said, remember you

22   mentioned about Sweeney paying me for hours

23   suggesting that I would need to submit hours.  Do

24   you think that's different than keeping up with

1    your hours?

2        A.    I believe it is.

3        Q.    How's it different?

4        A.    It's not saying -- it's not any suggestion

5    of keeping hours, and I just never interpreted it

6    that way.

7        Q.    What did you -- how did you interpret

8    submitting your hours?

9        A.    Let me read here again.  And your question

10   again, please?

11       Q.    It says here, suggesting that I would need

12   to submit hours.  How did -- what did you interpret

13   that to mean you would need to do?

14       A.    There seems to be a suggestion of

15   submitting hours to Sweeney, that he said something

16   about submitting hours to Sweeney.

17       Q.    But awhile ago I asked you, and you said

18   you did not -- you didn't consider submitting hours

19   to be the same thing as keeping up with your time.

20   And so I'm just trying to figure out how is that

21   different in your mind?

22           MR. WAKEFIELD:  I'm going to object to the

23   form, because your question earlier was about all

24   cases.  It wasn't just this.

1          MS. MASON:  Okay.

2      A.   I don't remember what you asked about

3   that.

4   BY MS. MASON:

5      Q.   All right.  Let's just start over then.

6      A.   Okay.

7      Q.   Gary Rich -- did Gary Rich ever tell you

8   that you needed to keep up with your time in any

9   case?

10     A.   No.

11     Q.   Did Gary Rich ever tell you that you would

12  need to submit your hours in WVU?

13     A.   No.

14     Q.   Okay.  Did Gary Rich ever tell you about

15  any conversations that he had with Sherri --

16          MR. CASH:  Goodman.

17     Q.   -- Goodman about ways that you could be

18  compensated?

19     A.   No.

20     Q.   Did he ever share with you any

21  conversations that he had with Sherri Goodman about

22  you?

23     A.   No.

24     Q.   Did he ever tell you that you would need

1    to rely on quantum meruit in order to be

2    compensated?

3         A.   No.

4         Q.   Did you know Sherri Goodman before you met

5    Gary Rich?

6         A.   I believe so, through the contact with the

7    bar.

8         Q.   And did you ever consult her with regard

9    to issues of compensation for your work with

10   various cases, legal cases?

11        A.   No.

12        Q.   Did you ever consult her for any other

13   reason?

14        A.   No.

15        Q.   Did you sometimes consult her on behalf of

16   Gary Rich?

17        A.   No.

18             MS. MASON:  I'm about to go through a

19   series of documents.  If you want to take a break,

20   I can make an extra copy since I only brought five

21   copies.

22             MR. MARINO:  I think we'll...

23             MS. MASON:  Okay.

24             MR. MARINO:  Cary's been giving me his

1    copies.

2            MS. MASON:  All right.

3            MR. MARINO:  We can share.

4            (Deposition Exhibit No. 5 marked.)

5    BY MS. MASON:

6        Q.    Professor Simoni, this is another document

7    drafted by you, correct?

8        A.    Yes.

9        Q.    And it is numbered Simoni 0412.  Yes?

10       A.    Yes.

11       Q.    And it is dated April 2nd, 2002, 3:00 p.m;

12   is that right?

13       A.    That's what it says.

14       Q.    And it appears that -- and it was

15   recording your notes about a meeting with Gary; is

16   that right?

17       A.    Yes.

18       Q.    And at that meeting, apparently you

19   discussed Spelter and Fairmont.

20       A.    It appears that way.

21       Q.    Was Nancy at that meeting, Nancy Eichler?

22       A.    I don't believe so.

23       Q.    Okay.  And so at that meeting, you and

24   Gary discussed a deal where the Masry firm would

1    take the Spelter and Fairmont cases and pay Gary

2    Rich 25 percent plus a $3,000 stipend each month;

3    is that -- was that -- is that correct?

4        A.    That appears to be what's here.  Yeah.

5        Q.    Do you recall that?

6        A.    I don't specifically recall that, but

7    that's my note.

8        Q.    And then it states under -- a little

9    further down that there was a meeting on April 8th

10   with a focus group?

11       A.    I'm not sure if the April 8th refers to

12   the focus group or if it refers to our 50th wedding

13   anniversary.

14       Q.    Okay.

15       A.    I don't know.

16       Q.    Well, do you recall doing a focus group

17   for the Spelter case?

18       A.    I met many times with people regarding the

19   Spelter case for many different reasons.  I'm not

20   sure what my meaning was of a focus group, using

21   the word "focus" here.  I don't know -- I don't

22   recall.

23       Q.    You weren't putting together a mock jury

24   and presenting the issues for their deliberation,

1    were you?

2         A.   It wasn't that.

3              MS. MASON:  Okay.  All right.  We need to

4    change the tape, so let's take a break, and then

5    we'll continue with this document.

6              THE VIDEOGRAPHER:  We are now off the

7    record.  The time is 12:35 p.m.

8                   (Lunch break taken.)

9              THE VIDEOGRAPHER:  We are now back on the

10   video record.  This is tape number three of the

11   video deposition of Joseph Simoni.  Today is June

12   11, 2013, and the time is 1:23 p.m.

13   BY MS. MASON:

14        Q.   We were looking at Exhibit 5 before the

15   break.  And if you would, look to the bottom of the

16   page on Exhibit 5, and there's -- the end of the

17   page, there's like a box drawn around a bit of

18   text.  Is that your handwriting in that box?

19        A.   It is.

20        Q.   Okay.  And can you read that into the

21   record, please?

22        A.   It says 4:30 p.m. on street.  Said he was

23   cutting my share to 20 percent.  Said if I put him

24   at risk again, he would come at me physically.

1    Q.   Okay.  The "he" you're referring to there,

2    is that Gary Rich?

3    A.   Yes.

4    Q.   And the meeting that you referred to at

5    the top of this document, was that a meeting inside

6    Gary's office?

7    A.   That was a meeting, a very few minutes of

8    it possibly was in Gary's office.  Most of it was

9    outside on the street.

10   Q.   Is there any particular reason you left

11   the building and went out on the street to meet?

12   A.   Yes.

13   Q.   What was it?

14   A.   Gary was concerned about his office area

15   being under some kind of surveillance.

16   Q.   By whom?

17   A.   I don't remember what specific parties he

18   mentioned at the time or if he mentioned specific

19   parties.

20   Q.   Did you share his concerns that his office

21   was bugged?

22   A.   I heard him talk about that possibility.

23   Q.   But did you share those concerns?

24   A.   Oh, did I share those concerns?

1    Q.   Yes.

2    A.   No.

3    Q.   And do you remember this specific

4    conversation on the street at 4:30 p.m.?

5    A.   Do I remember the specific conversations?

6    Q.   Yes.

7    A.   Pretty much.

8    Q.   And so what -- was there anything that led

9    to this conversation about cutting your share?

10    A.   I'm not sure I'm understanding your

11    question.

12    Q.   I guess I'm wondering, were you talking

13    about fee splitting in general with other law firms

14    and that led him to talk to you, or did he just

15    bring this up out of the blue?

16    A.   He just brought it up out of the blue.

17    Q.   Okay.  And what did you understand that to

18    mean, cutting my share to 20 percent?

19    A.   Well, my understanding since November of

20    1999 was that we had a 50/50 agreement, and what he

21    was saying to me, that he was reducing my share

22    from 50 percent to 20 percent.

23    Q.   And that agreement was -- covered more

24    than just WVU; is that right?

1      A.    This is in April of 2002.

2      Q.    Yes.

3      A.    Yes.

4      Q.    So that would have applied to the Fairmont

5    case?

6      A.    Yes.

7      Q.    And you were looking at Spelter at the

8    time, correct?

9      A.    Yes.

10      Q.    So it would have applied to the Spelter

11    case?

12      A.    Yes.

13      Q.    Do you know if it was supposed to apply to

14    the Stanridge case?

15      A.    I believe so.

16      Q.    Did he give you an explanation for why he

17    was cutting your share?

18      A.    Yes.

19      Q.    What was it?

20      A.    He was upset regarding a mention that I

21    made that I told him about in one of my classes at

22    the university, about the students being able to --

23    students were exposed to asbestos also at the

24    university.  And I was teaching a social problems

1    class at the time.  And in the discussion with

2    students, I just simply raised the issue with them

3    about students, possibly being able to look at an

4    action involving students.  The WVU asbestos case

5    did not involve students.

6         Q.   And did he object to that?  Object to your

7    referencing this?

8         A.   He objected to my talking to students

9    about it.

10        Q.   Did he give you a reason for that?

11        A.   He just was upset by it.

12        Q.   And so did you interpret the cutting the

13   share to 20 percent to be a punitive measure?

14        A.   A what kind of --

15        Q.   A punitive measure?  That he was punishing

16   you for talking about the case in class, and so he

17   was cutting your share to 20 percent?

18        A.   Yes.

19        Q.   And then you said, said if I put him at

20   risk again, he would come at me physically.  What

21   did you think he meant by, if I put him at risk

22   again, or what was your understanding of what you

23   had done to put him at risk?

24        A.   Well, my understanding of what he was

1    talking about was what I related to you about the

2    class, about my mentioning to students.  And he was

3    also concerned about meetings that we had in

4    Fairmont when I would introduce -- when I would

5    open up public meetings with potential plaintiffs,

6    and I would use the proceed noun "we" rather than

7    the pronoun "I," because the "we," he took it as

8    implicating him, and so he was upset about those

9    two things.

10        Q.   But what was the risk?

11        A.   I didn't understand the risk --

12        Q.   Okay.

13        A.   -- at the time.  All I knew is he was

14   upset.

15        Q.   Did you -- you said at the time.  Did you

16   later understand what he perceived as a risk?

17        A.   I never understood his sense of the risk.

18   With respect to those things, I didn't understand

19   it.

20        Q.   And he actually said he would come at you

21   physically?

22        A.   That's -- I would not have written that

23   down if that had not been said.

24        Q.   And did that put you in fear for your

1    physical safety?

2        A.    I took it as his being very upset.  I

3    didn't quite understand it all, but I made a note

4    of what he said.

5        Q.    Was this response that you -- of Gary

6    Rich's characteristic of his conduct with you?

7        A.    Characteristic of his conduct with me?

8            MR. WAKEFIELD:  Object to the form.

9    Object to the form; overly broad.  You can answer.

10       Q.    Let me re-ask it.  Well, let me -- before

11   we go there, what was your response to Gary when he

12   raised these issues with you on the street?

13       A.    Well, I told him I thought it was unfair.

14   I told him that, you know, what he was suggesting

15   to me that he was doing was not fair, and that was

16   the sum total of sort of my response to him.

17       Q.    And this threat that he made to you that

18   he would come at you physically, was that

19   uncharacteristic of your previous dealings with

20   him?

21       A.    Yes.

22       Q.    Did he later at any point reiterate the

23   threat to come after you physically?

24       A.    I don't --

1    Q.   Ever, not just at this particular time.

2    A.   I don't remember another time.

3    Q.   Okay.  And did you perceive that he was

4    concerned about exposure or accusations of ethical

5    violations by your conduct?

6    A.   It wasn't clear to me what his upset

7    status, state was due to.

8    Q.   And you were pretty upset when he told you

9    this, right?

10   A.   Yes.

11   Q.   Other than telling him it wasn't fair, did

12   you respond in any other way?

13   A.   To him directly?

14   Q.   Yes.  That day.

15   A.   No.

16   Q.   How did you leave things that day?

17   A.   Well, as I said, he was telling me what he

18   was going to do, and I was telling him that I

19   thought it was unfair what he was talking about

20   doing.

21        (Deposition Exhibit No. 6 marked.)

22   BY MS. MASON:

23   Q.   I've handed you Exhibit 6, which is Simoni

24   1338.  And I'm going to give you time to go over

1  this document, but do you recognize it first?

2      A.   I have a general recognition of it, but

3  it's difficult -- my copy's very difficult to read,

4  but I'll make an attempt to read it.

5      Q.   This is -- and is this your handwriting?

6      A.   This is my wife's handwriting, I believe.

7      Q.   Okay.  And the April '02 up at the top of

8  the document, did you write that?

9      A.   I wrote that.

10     Q.   Okay.  And then the rest of the

11 handwriting is all your wife's?

12     A.   Yes.

13     Q.   And your wife's name is Jeanne?

14     A.   Jeanne

15     Q.   Jeanne.  And what were the circumstances

16 that led her to draft this letter?

17     A.   Well, I arrived back home that evening and

18 shared with her the communication that I had with

19 Gary.  She was very upset by it, and she felt like

20 a letter -- something -- he needed to receive

21 something in writing, and so she drafted this.

22     Q.   Did you tell -- did you dictate the letter

23 or --

24     A.   No.

1    Q.   So this was all generated by your wife?

2    A.   After we talked about what had happened.

3    Q.   Did you read the letter after she finished

4  writing it?

5    A.   I did.

6    Q.   Did you agree with it?

7    A.   I thought it was not appropriate to be

8  sending this.

9    Q.   Why not?

10    A.   Because I felt Gary was upset.  I didn't

11  quite understand.  You know, maybe there was

12  something else going on that I wasn't privy to, but

13  he obviously was upset.  But I thought that this

14  particular letter was not appropriate, so I

15  suggested that we not send it.

16    Q.   Was there anything in the letter that you

17  disagreed with?

18    A.   Well, can I --

19    Q.   Absolutely.

20    A.   I don't remember the...

21    Q.   Actually, if you can try to read it out

22  loud for us as you go along, just so that we have

23  some sort of transcript.  I know it's -- it's hard

24  for all of us to read, not just your copy.

1      A.    Okay.  It says:  Gary, I am deeply

2  saddened and disappointed in what transpired

3  yesterday in our meeting on Walnut Street.

4           Addressing the issues discussed.

5           Number one, I am not in agreement with

6  your suggestion that we change the financial

7  agreement.  We -- the next word I can't read -- we

8  made, I think, financial agreement, we made

9  together last year.  If that word is made.  I'm not

10  sure if it is.  We made together last year.  We

11  agreed it would be 50/50.  And I do not -- I can't

12  read this next word.

13      Q.    Wish.  Is it, I do not wish?

14      A.    I don't know.

15      Q.    Okay.

16      A.    I'm not sure what that word is.  I don't

17  know what those -- that following phrase is.

18      Q.    Okay.

19      A.    But there is an obvious error in there, in

20  the language, because it says -- if that language

21  on that line says, agreement we made together last

22  year, it would -- that would be incorrect, because

23  it was in 1999 when that agreement was made.

24      Q.    Okay.

1    A.   I'm not sure what you want me to do at

2    this point, because I can't --

3    Q.   Well, let me ask you a question there.  So

4    other than the fact that she has gotten the date

5    wrong, it's still accurate that you had agreed to a

6    50/50 split, right?

7    A.   50/50 in November of 1999.

8    Q.   Okay.  And you did not wish to alter it in

9    any way; is that right?

10   A.   That's correct.

11   Q.   And she says here, I think, we entered

12   into it equally when I brought the case to you.

13   Now, do you agree that you brought the case to him?

14        MR. WAKEFIELD:  You've skipped a couple

15   lines.

16        THE DEPONENT:  Yeah.

17        MS. MASON:  I did?

18        MR. WAKEFIELD:  Yeah.

19   BY MS. MASON:

20   Q.   Let's see.  It's agreed -- let's see.  I'll

21   just start from the beginning.  I am not in

22   agreement with your suggestion that we change the

23   financial agreement we made together last year.  We

24   agreed it would be 50/50, and I do not, I think

1    it's wish, to alter it in any way.  We entered into

2    it equally when I brought the case to you.

3           Do you agree that you brought a case to

4    him?

5        A.    Well, again, it's a bit incorrect because

6    by this time of April of 2002, there were two cases

7    well on their way by April of 2002.

8        Q.    And a third in the pipeline?

9        A.    And a third in the pipeline.

10       Q.    Okay.  But you did bring all three of

11   those cases to him?

12       A.    Yes.

13       Q.    Okay.  And then let's read on.  Number

14   two, you have mentioned changes -- let's see.  You

15   have mentioned changes in the way we are managing

16   the case.  I am not -- no.  I am willing to do that

17   and do agree that we need to discuss this before

18   taking any action.  I do not intend to rehash this

19   issue every week.

20          So my question to you is did he propose a

21   change in the way that you two were managing the

22   case?

23       A.    It appears from my notes -- well, it

24   appears from -- I don't remember that.

1    Q.   Okay.

2    A.   I don't remember that.

3    Q.   You don't remember discussing that the day

4    before in your meeting with him on Walnut Street?

5    A.   The day before?

6    Q.   Wasn't this letter written the night --

7    oh, I'm sorry.  This letter was written the night

8    that you got home from your meeting with Gary.  So

9    you don't remember talking about changing the

10   management of the cases during your meeting with

11   Gary that same day?

12   A.   I don't remember that.

13   Q.   Okay.  I was unaware until you told me

14   that you only wished to talk at certain times --

15   let's see --

16        MR. WAKEFIELD:  Certain hours.

17   Q.   -- certain hours about the case.  As I

18   have stated and adhered to, I will not call you at

19   home.  We are both learning in this joint venture.

20        Did you discuss that day that he didn't

21   like when you were calling him?

22   A.   I believe we did.

23   Q.   What did he say about that?

24   A.   Well, he was -- he just -- I think it's

1    suggested in these words that he was asking me to

2    not call him at home.  That kind of communication

3    was involved in our meeting, and he was -- I mean,

4    my take is that he was generally upset and he was

5    -- this is one of the things he was throwing out to

6    me.

7        Q.    So did he want you to restrict your calls

8    to business hours?

9        A.    I don't remember him actually saying that.

10       Q.    Okay.  And then when you referred to or

11   your wife referred to this joint venture, do you

12   agree that you were involved in a joint venture

13   with Gary Rich?

14       A.    Yes.

15       Q.    And that joint venture covered multiple

16   cases?

17       A.    Yes.

18       Q.    All right.  And then it goes on, we are

19   adult men and can work out our differences and

20   discussion.  We do not need to play games of crime

21   and punishment.  It is and remains an equal

22   agreement.

23            Is that -- are those your words, or are

24   those Jeanne's words?

1     A.    Those were Jeanne's words.

2     Q.    Okay.  I apologize for showing my emotions

3  yesterday.  I deeply disappointed -- that's a word

4  -- I think it's probably, I am deeply disappointed

5  with the proposal, re, changing our agreement, and

6  I, of course, reject it.

7          Had you -- she says you had shown your

8  emotions yesterday.  Had you done that?

9     A.    I think I might have talked to her about

10  doing that, that I was -- that his communication

11  was upsetting to me, and that I was emotionally --

12     Q.    How did you show your emotions?

13     A.    Oh, I just -- probably by my general

14  manner.  I don't know.  I don't know exactly --

15     Q.    Did you raise your voice?

16     A.    I'm not an expert in how one shows

17  emotions, but...  Did I -- no, I didn't raise my

18  voice, I know that.  I --

19     Q.    Go ahead.  I'm about to ask a question

20  unless you want to go.

21     A.    I was just going to say that you asked

22  about my emotions.  I had been working very hard on

23  these cases and trying to do the best I could, and

24  the guy meets me on the street and is telling me

1    about changing the agreement.  It was -- you know,

2    it was a bit upsetting.

3        Q.    It felt like a slap in the face, didn't

4    it?

5        A.    But I didn't raise my voice, I know that.

6        Q.    Did it feel like a slap in the face?

7        A.    You might term it that.  You know, some

8    people might term it that.

9            (Deposition Exhibit No. 7 marked.)

10   BY MS. MASON:

11       Q.    Okay.  I'm going to hand you what I've

12   marked as Exhibit 7.  Well, before we go to Exhibit

13   7, on Exhibit 6, I realize this is a -- that's a

14   letter that your wife drafted.  Other than the

15   timing of the agreement, the 50/50 agreement, do

16   you see anything in that letter that you considered

17   incorrect?

18       A.    Well, there's some other things that we've

19   already talked about but...

20       Q.    That were incorrect or that were just her

21   language?

22           MR. WAKEFIELD:  I think incorrect, he

23   mentioned the cases.  There was more than one case.

24           MS. MASON:  Oh, yes.  You're right.

1    Okay.

2         A.    I'd have to read through it all again.

3    BY MS. MASON:

4         Q.    No, don't then.  Let's don't worry about

5    that.

6               All right.  Let's look at Exhibit 7.  And

7    it is a three-page exhibit marked Simoni 0757

8    through 0759.  You've seen this before, haven't

9    you?

10        A.    This is Exhibit 7?

11        Q.    Yes.  It's three pages.

12        A.    Three pages.  Okay.

13        Q.    Do you have three pages there?

14        A.    Yes, I believe I do.

15        Q.    Okay.  Take a minute to look at it, and

16   then I'm going to ask you a couple questions about

17   it.

18        A.    Okay.  Okay.

19        Q.    Do you recall having seen this document

20   before?

21        A.    Yes.

22        Q.    It is from John Simoni; is that right?

23        A.    It is.

24        Q.    John Simoni is your nephew?

1      A.    Yes.

2      Q.    And he's a lawyer in New York?

3      A.    He is.

4      Q.    How did this document come to be in your

5  possession?

6      A.    I'm not absolutely sure how that happened.

7      Q.    Okay.  Did Gary Rich routinely share with

8  you information he received from John Simoni?

9      A.    Yes.

10     Q.    And what was the relationship between John

11  Simoni and Gary Rich?

12     A.    John Simoni was representing Gary Rich.

13     Q.    Regarding what?

14     A.    Regarding the fee dispute between Gary

15  Rich and Masry & Vititoe and Baron & Budd.

16     Q.    On the Fairmont case?

17     A.    On the Fairmont case.

18     Q.    And you -- did you recommend that Gary

19  consult with your nephew?

20     A.    I must have.

21     Q.    Did they know each other before that?

22     A.    No.

23     Q.    Okay.  Do you recall what the

24  circumstances were of this letter?  John Simoni has

1    sent a draft of a letter to Gary Rich that he

2    intends to send to Masry & Vititoe.  Do you recall

3    what the circumstances were that were giving rise

4    to this letter?

5        A.   I do not.

6        Q.   Okay.  In the letter itself, it looks like

7    John Simoni is proposing various alternatives on

8    the fee dispute, ways that they can resolve the fee

9    dispute with -- between Gary Rich and his

10   co-counsel.  Is that fair?

11       A.   Yes.  That's what it looks like.

12       Q.   Okay.  And that, in fact, was the thing

13   that John Simoni was representing Gary Rich for.

14   Yes?

15       A.   Yes.

16       Q.   One of the proposals he made is at -- near

17   the bottom of the first page, the second-to-the-

18   last paragraph, on the monthly attorney fee

19   payment, Mr. Rich will accept 13,000 per month plus

20   expenses paid on the first of every month towards

21   Mr. Rich's time and the time of his staff and

22   outside consultants.

23            As of August 6th, 2002, do you know who

24   was serving as an outside consultant to Mr. Rich?

1    A.   Maybe Sherri Goodman.

2    Q.   Did you consider yourself an outside

3  consultant?

4    A.   For Gary Rich?

5    Q.   Yes.

6    A.   No.  I considered myself a working partner

7  with Gary Rich.

8    Q.   Okay.  At the top of this letter, it --

9  there's a little note to Gary that says, Gary, this

10  is the revised letter.  For FICA, tax withholding

11  reasons, I must say staff and consultants.  Call

12  with your comments, and then I will send it out.

13        Did you ever have any discussions with

14  either Gary Rich or John Simoni about what reasons

15  -- what the tax withholding reasons were for

16  including staff and consultants in the proposal?

17    A.   I'm very sorry to say that I missed where

18  you were pointing to in the letter.

19    Q.   And there's no way I can repeat that.  At

20  the very first part of the letter, the first

21  paragraph.

22    A.   Okay.

23    Q.   On page 1.

24    A.   Uh-huh.

1      Q.   There's a note to Gary.  It says, this is

2   the revised letter.  For FICA, tax withholding

3   reasons, I must say staff and consultants.  Call

4   with your comments, and then I will send it out.

5          First of all, do you know whether this

6   letter ever actually got sent out?

7      A.   I can't say sitting here today that I know

8   definitely, no.

9      Q.   Do you think it was sent out?

10     A.   I think it was sent out.

11     Q.   Okay.  And then my second question is, did

12  you ever have any discussions with either John

13  Simoni or Gary Rich about what the tax implications

14  were for including staff and consultants?

15     A.   No.

16     Q.   And did you have any understanding that

17  you were to be included as a consultant?

18     A.   Never had that understanding.

19     Q.   Okay.

20          (Deposition Exhibit No. 8 marked.)

21  BY MS. MASON:

22     Q.   I've handed you what I've marked as

23  Exhibit 8, and it is Simoni 0737.  Is this your

24  handwriting?

1      A.   It looks like my handwriting, yes.

2      Q.   Do you see a date anywhere on this

3   document?

4      A.   I do not.

5      Q.   Let me draw your attention to the bottom

6   right-hand corner.  Is -- it looks to be a copy of

7   a yellow sticky in the corner.  Is that your

8   handwriting?

9      A.   That is not my handwriting.

10      Q.   Okay.  Do you know whose handwriting that

11   is?

12      A.   I do not.

13      Q.   It says, in-person -- it had telephone,

14   and then that was stricken through.  And then it

15   says, in-person conference with John Simoni, re,

16   handling of fee arrangement, I think, with Rich.

17   Occurred in New York, summer, unsure of year.

18          Is that consistent with your -- well,

19   first of all, do you recollect writing this

20   document, recall that --

21      A.   Let me look at --

22      Q.   Sure.

23      A.   -- the points.

24          MR. WAKEFIELD:  Other than the sticky

1    note.

2        Q.   Yes.

3        A.   Okay.  I'm sorry.  Your question again,

4    please?

5        Q.   Well, having reviewed the document, does

6    that give you some indication of when this document

7    was generated?

8        A.   Yes.

9        Q.   When was it generated?

10       A.   2002, I believe.

11       Q.   And what were the circumstances of this

12   document?  What gave raise to this document?

13       A.   What gave rise to it?

14       Q.   Let me -- were you memorializing a meeting

15   that had occurred with John Simoni?

16       A.   Some communicate -- I believe these are

17   some notes on some communications that I had with

18   John Simoni.

19       Q.   Was Gary Rich involved in those

20   communications?

21       A.   No.

22       Q.   Okay.  And then this note down in the

23   corner suggests that it was an in-person

24   conference.  Is that consistent with your

1    recollection?

2        A.    Yes.

3        Q.    How many in-person conferences did you

4    have with John Simoni without Gary Rich regarding

5    potential compensation?

6        A.    I don't remember any others.

7        Q.    Okay.  Were -- did you just happen to be

8    in New York, or did you visit specifically to meet

9    with John Simoni about this issue?

10        A.    Just happened to be in New York at his --

11    my brother, his father's place.

12        Q.    And so if you would, tell me what this

13    document represents.

14            MR. WAKEFIELD:  Object to the form; overly

15    broad and vague.

16        A.    Well, I think I already said it appears to

17    be notes that I made from some communications with

18    John Simoni.

19        Q.    And it represents -- you had discussed

20    ways that you could be compensated for your work

21    with Gary Rich, with John Simoni; is that right?

22        A.    Let me just read this through again --

23        Q.    Okay.

24        A.    -- just to make sure.  I believe this

1    represents some ideas of John Simoni.

2        Q.    Okay.  And the first idea he lists is he

3    -- it says he takes his split, 30 percent or 20

4    percent, or buy-down amount, et cetera.  Who is

5    "he"?

6        A.    I -- my recollection is that refers to

7    Rich.

8        Q.    Okay.  And at this particular time, the

9    summer of 2002, John Simoni is negotiating with the

10   Fairmont co-counsel about a fee split or a buy down

11   for Gary Rich, correct?

12       A.    Could you repeat that, please?

13       Q.    Probably not.  About this time, August --

14   or in summer of 2002, John Simoni was negotiating a

15   changing fee agreement between Gary Rich and

16   Baron & Budd and Masry & Vititoe, correct?

17       A.    Well, this previous exhibit suggests that.

18       Q.    All right.  And one of the things they

19   were talking about was a fee split of either 30

20   percent or 20 percent, or even some sort of

21   buy-down amount?

22       A.    Are you talking about in this previous

23   exhibit?

24       Q.    In the previous exhibit or generally

1    speaking.

2        A.    Well, I don't know what they were actually

3    talking about.

4        Q.    Okay.  Well, you were privy to the

5    negotiations going on.

6        A.    I don't remember what they were actually

7    talking about.

8        Q.    Okay.  All right.  In any event, let's go

9    to number two.  He pays tax.  Again, does that

10   refer to Rich?

11       A.    I believe so.

12       Q.    Okay.  Number three, he splits tax, or

13   excuse me, he splits after-tax dollar 50/50 as -- I

14   think as payoff for consulting, investigation,

15   organizing, client rapport, et cetera, not for

16   practice of law.  Did I read that right?

17       A.    I think you read it correctly.

18       Q.    Okay.  I mean, you wrote it, so I just --

19   and you underlined not for practice of law.

20       A.    It appears that I did underline that.

21       Q.    Any particular reason you underlined that?

22       A.    Don't remember.

23       Q.    You considered that important enough to

24   underline?

1      A.   I don't recall.

2      Q.   Okay.  And so what John Simoni has

3    suggested then is that Gary gets his -- Gary Rich

4    would receive the -- his part of the fee split in

5    the Fairmont case.  He would pay taxes on it.  Then

6    the two of you would split the money after Gary had

7    paid the taxes 50/50, but you would be getting it

8    for your consulting, investigating, organizing,

9    client rapport, not for the practice of law; is

10   that right?

11     A.   That's what this appears to suggest.

12     Q.   And then it goes on to say, the paid

13   consultant, investigator, organizer, pays taxes on

14   the amount received.  Right?  That's the suggestion

15   at least?

16     A.   I think that simply -- my understanding, I

17   think, of that was he was maybe suggesting that if

18   you receive something, you have to pay taxes on

19   it.

20     Q.   Okay.  And did John Simoni express to you

21   any concern that you would not be able to split a

22   fee for the practice of law and that you should be

23   compensated instead as a consultant or

24   investigator?

1      A.   I don't remember that.  And if he had,

2   maybe I would have put it here in the notes.  I

3   don't remember.

4      Q.   Did you ever present this to Gary Rich,

5   this idea?

6      A.   I don't believe so.  I don't recall that

7   at all.

8      Q.   And you don't recall John Simoni raising

9   issues about whether you could be ethically

10  compensated with proceeds from a fee?

11     A.   Sitting here today, I don't -- do not

12  recall that.

13     Q.   Okay.

14          (Deposition Exhibit No. 9 marked.)

15  BY MS. MASON:

16     Q.   I've handed you what I've marked as

17  Exhibit 9, and it's Simoni 0598.

18          Professor, have you had an opportunity to

19  review this document?

20     A.   I'm just finishing up here.

21     Q.   Okay.  I'm sorry.

22     A.   Okay.

23     Q.   And this is a document generated by you,

24  correct?

1      A.   It's my writing.

2      Q.   Okay.  And is there a date anywhere on

3  this document?

4      A.   I don't see one.

5      Q.   Having read over the contents of Exhibit

6  9, are you able to pinpoint the approximate time

7  this was generated?

8      A.   I'm thinking here as I'm looking at the

9  contents.

10      Q.   Well, let me point you to about a third of

11  the way down on the page.  It says, ask John if B

12  and B does not respond in writing, what do we do.

13  Do you know what that refers to?

14      A.   I do not.

15      Q.   Do you think it refers to the fee dispute

16  going on between Gary Rich and Baron & Budd that

17  John Simoni was assisting Gary with?

18          MR. WAKEFIELD:  Object to the form.  Calls

19  him to speculate.  You may answer.

20      A.   Possibly, but I don't know.

21      Q.   Okay.  Down below that, it says idea, for

22  arrangement -- excuse me.  Is that arrangement or

23  agreement?

24      A.   It says arrangement.

1    Q.   For arrangement between John, Gary and

2    me.  And then it says number one and number two.

3    And then Gary and me is circled there.  And then

4    immediately below that, it says payment to John

5    apart from firm.

6    A.   That's what it says.

7    Q.   Okay.  Do you recall what this -- what the

8    -- this was intended to represent --

9    A.   No.

10   Q.   -- what this --

11   A.   You mean the payment apart from firm?

12   Q.   Well, what was the arrangement for --

13   between John, Gary and me?

14   A.   I don't remember what any of that meant.

15   Q.   Okay.  Do you think it -- well, did you

16   have any discussions about Gary Rich paying John

17   Simoni a legal fee separate from one to John

18   Simoni's firm which he could then funnel to you?

19   A.   I do not remember that.  I don't think --

20   to funnel to me?

21   Q.   Yes.

22   A.   Was that your question?

23   Q.   Yes.

24   A.   I don't think that was ever discussed.

1    Q.   Do you recall why Gary Rich would want to

2    pay John apart from his firm?

3         MR. WAKEFIELD:  Object to the form.

4    A.   When I look at this, I don't understand

5    what it was about.

6    Q.   Okay.  It doesn't jog your memory at all?

7    A.   It doesn't jog my memory.

8    Q.   And just to be clear, this is your

9    handwriting?

10   A.   It is my handwriting.

11   Q.   And it was your practice to make notes

12   after meetings?

13   A.   I don't know if this was after a meeting.

14   I think this -- I don't know.  It could have been

15   just notes that I made about things that I was

16   working on or things that I had in mind.  I don't

17   know.

18   Q.   Okay.  Okay.

19        (Deposition Exhibit No. 10 marked.)

20   BY MS. MASON:

21   Q.   I'm going to hand you Exhibit 10.  I'm

22   sorry.  Okay.  This is Exhibit 10, Simoni 1345.

23   And this is another document generated by you,

24   correct?

1      A.   Yes.

2      Q.   And you generated it on December 11th,

3    2002?

4      A.   It appears that way, yes.

5      Q.   After meeting with Gary Rich?

6      A.   Probably.

7      Q.   You say "probably."  What's giving you --

8      A.   I don't know if it was during the meeting

9    or after the meeting.

10     Q.   Okay.  And the -- what this topic -- or

11   this document covers is a proposed agreement for

12   your 50/50 split, correct?

13          MR. MARINO:  Object to the form of the

14   question.  Misstating the document.

15     Q.   Tell me what this document -- just

16   summarize for me what that document says.

17     A.   Well, there's some reference to an

18   agreement 50/50 split on it, yes.

19     Q.   Did you present this proposal that we see

20   here on Exhibit 10 to Gary Rich?

21          MR. MARINO:  Object to the form of the

22   question.  Again, you're misstating the document.

23     A.   Would you repeat your question, please?

24     Q.   Did you make a proposal consistent with

1    what we see here on Exhibit 10 to Gary Rich

2    regarding a 50/50 split?

3         MR. WAKEFIELD:  I'll object to the form as

4    well.  The document speaks for itself.  I don't

5    think he's characterized it at all.

6    A.   Yeah, I'm not sure -- I'm not

7    understanding your question.

8    Q.   You proposed a 50/50 split on December 11,

9    2002 with Gary Rich?

10   A.   Oh, I don't know that I did that.

11   Q.   All right.  Well, tell me what you do know

12   that you did on December 11th, 2002 with regard to

13   discussing a fee split with Gary Rich.

14        MR. MARINO:  Object to the form of the

15   question.  Assuming facts not in evidence.

16   A.   What I remember about the 50/50 split

17   related to the time, which is late in 2002, is that

18   Gary Rich addressed to me -- I don't remember the

19   specific time.  All I know, it was after a visit

20   to -- actually to Mr. Marino's office in DC, that

21   he was agreeing to return to the initial 50/50.

22   That's what I remember about the 50/50 split late

23   in 2002.

24   Q.   Okay.  Let's back up for a second.  So we

1    know in April he said -- Gary Rich said to you, I'm

2    cutting it to 20 percent, right?

3        A.    That's correct.

4        Q.    Then at what point between then and

5    December -- from April to December, when did he

6    tell you that he was willing to go back to a 50/50

7    deal?

8        A.    It was sometime not long after a trip that

9    we made to Mr. Marino's office in Washington, DC.

10        Q.    And who is "we"?

11        A.    Gary Rich and I.

12        Q.    What was the purpose for you and Gary Rich

13    to go to Dan Marino's office?

14        A.    Mr. Marino was representing him at that

15    time.

16        Q.    In his dispute with Baron & Budd?

17        A.    Yes, and the Masry firm.

18        Q.    And did you go -- and so did you discuss

19    the 50/50 split in the presence of Dan Marino?

20        A.    No.

21        Q.    Do you have any idea what prompted

22    Mr. Rich to go back to the 50/50 deal?

23        A.    Oh, I don't know specifically what

24    prompted.

1      Q.   What?

2      A.   We were on our way to Washington, DC on

3    that trip.  And we were traveling down the road,

4    and I mentioned to him that I needed to return a

5    call to Baron & Budd because they had called me, I

6    didn't know what it was about, and I probably

7    should return that call.  And what we decided is we

8    would stop at one of the Sheetz service stations

9    there, I think it was in Maryland, western

10   Maryland, and get something to drink, and I would

11   make the call at that time.

12        We were -- please excuse the length of my

13   answer, but I can't adequately answer your question

14   any other way.

15        We were standing outside of the Sheetz

16   service station.  There was a telephone box, one of

17   those green, good size telephone boxes.  And so we

18   sat our drinks on top of that, I remember, and we

19   -- I made this telephone call to Baron & Budd.  And

20   I spoke with Ellen Presby and with Steve Jensen.

21        And I was saying to them, I'm returning

22   your call.  And they said the reason why we wanted

23   to speak with you is we wanted to ask you what you

24   would do if Gary Rich was not any longer involved

1    in the case.

2            I responded to them, with Gary Rich right

3    by my side, I said, there's maybe something you

4    need to know about me.  What you need to know is

5    that I'm involved in this case for two reasons --

6    I'm involved in this case because I'm -- I think

7    what I said is I'm involved in this case because

8    the people in the Fairmont area need some help and,

9    you know, we're trying to seek fairness for those

10   people.

11           I said, the other thing you maybe need to

12   know about me and maybe you don't know at this

13   point is that if I make a commitment to someone, I

14   keep it.  My suggestion in that communication was

15   to tell them I had made a commitment to work with

16   Gary Rich on this case, and my intent was to keep

17   that commitment.

18           I understood what they were talking to me

19   about, and so my firm belief is -- and he suggested

20   that at a little later date, is he said to me

21   because you have done what you have done, I'm

22   agreeing to go back to 50/50.

23       Q.   Okay.

24       A.   So that's what that's about.  Now, I can't

1    tell you what -- you know, you might have other

2    questions about this.

3        Q.   I do.  But so that trip that you described

4    to Washington, DC, how close in time was it to this

5    December 11th, 2002, do you recall, roughly?

6        A.   All I remember is the trip to Washington,

7    DC was in, I think, late fall.  That's what I -- my

8    best recollection.

9        Q.   And did you discuss any other issues in

10   front of Dan Marino or did -- during your meeting

11   with Dan Marino and Gary Rich, did you discuss any

12   issues other than the dispute with Baron & Budd

13   related to your compensation?

14            MR. MARINO:  Object to the form of the

15   question; assuming facts not in evidence.

16            MR. WAKEFIELD:  I object to the question

17   as being -- well, I'll withdraw the objection.

18            MS. MASON:  Unwieldy and inartful?

19            MR. WAKEFIELD:  Well, I didn't want to

20   phrase it that way, but I had a tough time

21   following it, frankly.

22            MS. MASON:  I had a tough time getting it

23   out.

24            MR. CASH:  I liked it.

1          MS. MASON:  Thank you.

2     BY MS. MASON:

3          Q.   Professor Simoni, let me try again.  You

4     met with Gary Rich and Dan Marino in Washington, DC

5     at Dan Marino's office; is that right?

6          A.   I met with Gary and Dan Marino in Dan

7     Marino's office.  That's correct.

8          Q.   Okay.  Was there anybody else there

9     besides the three of you?

10         A.   I think in that meeting not.  I think no.

11    Just the three of us.

12         Q.   What were the topics covered in that

13    meeting?

14         A.   The dispute that -- his representation of

15    Gary Rich in the fee dispute.

16         Q.   Okay.  And what we see on Exhibit 10,

17    where it says forms of compensation and there's

18    four items listed there, did any of that come up

19    during your meeting in Dan Marino's office with

20    Gary Rich?

21         A.   No.  There was nothing about compensation

22    regarding me --

23         Q.   Okay.

24         A.   -- in that meeting.

1    Q.   All right.  And then what we see on

2    Exhibit 10 is, it says forms of compensation,

3    number one, bonus driven by success.  Erin's

4    bonus.  Can you make out what that says?

5    A.   I can't read that third word.

6    Q.   Similar?  All right.  Well, we'll just go

7    with Erin's bonus, and then no success, no bonus.

8    And then another line, if Masry leaves Gary with

9    nothing, nothing due Joe.

10         So who came up with that idea?

11   A.   What idea?

12   Q.   To -- well, the way I read this is you --

13   possibility was your 50/50 split could come in the

14   form of a bonus driven by success, like Erin

15   Brockovich's bonus was based on?

16        MR. MARINO:  Object to the form of the

17   question.

18   Q.   Is that a fair characterization?

19   A.   It's not a fair characterization.  I don't

20   remember what produced these notes.

21   Q.   Okay.  What do you understand this bonus

22   proposal to be, looking at them now?

23        MR. MARINO:  Object to the form of the

24   question again.  Assuming facts not in evidence.

1          MR. WAKEFIELD:  Yeah.

2     BY MS. MASON:

3          Q.   Would you agree with me that this is --

4          MR. WAKEFIELD:  Let me just object to the

5     form of the question, because you keep

6     characterizing it as a proposal, and I don't know

7     that it's a proposal at all.  The notes say what

8     they say.

9          MS. MASON:  Okay.

10          MR. WAKEFIELD:  And he can certainly

11     describe what they say to the extent that he can.

12     BY MS. MASON:

13          Q.   Let's look at what the four items are, and

14     then we'll come back to see if we can characterize

15     it in some way that is agreeable to you.  So the

16     first item references a bonus.  The second item

17     says IC-1099.  Do you know what that stands for?

18          A.   I believe it refers to a 1099 kind of tax

19     form.

20          Q.   What about the IC?

21          A.   I think that 1099 is a form that's used

22     for independent contracts.

23          Q.   Okay.

24          A.   So maybe that's what the IC is for.

1      Q.    And then it says split on monthly payments

2   since Masry agreement is hourly based, and Gary is

3   lawyer and Joe is not, arrow, 75/25 split.  Did I

4   read that right?

5      A.    You read it --

6      Q.    Okay.

7      A.    You read what's here, I believe.

8      Q.    Let's go through three and four, and then

9   we'll come back to all four of these.

10          Three, can you read that?

11      A.    Looks like it says, pay John, Junior,

12   personally apart from law firm, local advisor apart

13   from firm, fee to him.  I believe.

14      Q.    Okay.

15      A.    There's a fee to him on the side.

16      Q.    All right.  And then four, is that web

17   page?

18      A.    Web page, I believe it says.  Yes.

19      Q.    Web page on lawyer, dash, agent, bar web

20   page.

21          So having reviewed these four items listed

22   under the heading form of compensation, is it fair

23   to say that these were forms of compensation --

24   these were options for you to be compensated within

1    your 50/50 split with Gary Rich?

2         MR. MARINO:  Object to the form of the

3    question.

4         MR. WAKEFIELD:  Object to form.

5    A.   I would say no.  I don't know if -- these

6    notes are my notes, but I have no recall of what...

7    Q.   You don't remember ever having any

8    discussions about your being paid as an independent

9    contractor with a 75/25 split between you and Gary?

10   A.   I do not.

11   Q.   Do you -- and you don't remember ever

12   having any discussions about paying John Simoni

13   apart from his law firm?

14   A.   I do not.

15   Q.   And did you have any -- do you ever recall

16   having any discussions about a lawyer agent?

17        MR. WAKEFIELD:  I don't think that's

18   agent, is it?

19        MS. MASON:  Sorry?

20        MR. WAKEFIELD:  Is that agreement or is it

21   agent?

22        MS. MASON:  Oh, I thought it was agent.

23   Is it agreement?

24        MR. WAKEFIELD:  I don't know.

1          THE DEPONENT:  I don't know what it is

2     either.

3     BY MS. MASON:

4          Q.   Hey, it's your writing, man.

5          So you don't know either way whether it's

6     agreement or agent?

7          A.   It's not clear.

8          Q.   Okay.

9          A.   If there was -- if there are other letters

10    that got cut off, I don't know.

11         Q.   Okay.

12         (Deposition Exhibit No. 11 marked.)

13    BY MS. MASON:

14         Q.   Okay.  Exhibit 11, and it's Bates stamped

15    Simoni 0146.  I'm sorry.

16         A.   Thank you.

17         MS. MASON:  Why don't we take a break to

18    change the tape, and you can finish looking at

19    that, Mr. Simoni, Professor Simoni.

20         THE VIDEOGRAPHER:  We are now off the

21    record.  The time is 2:23 p.m.

22              (Short break taken.)

23         THE VIDEOGRAPHER:  We are now back on the

24    video record.  This is tape number four of the

1   video deposition of Joseph Simoni.  Today is June

2   11th, 2013, and the time is 2:34 p.m.

3   BY MS. MASON:

4       Q.   Professor Simoni, we were looking at

5   Exhibit 11, which is Bates stamped Simoni 0146.  Is

6   this a document you generated?

7       A.   Yes.

8       Q.   Now, you had a chance to look it over

9   during the break.  Do you recollect or do you

10  recall writing this document?

11      A.   No.

12      Q.   Do you recall the events contained in this

13  document?

14      A.   No.

15      Q.   If you can, I need a little help with your

16  handwriting on the first half of the page.  It

17  looks like it's a date of January 23rd, 2003, call

18  from John, Junior at 10:38 a.m.  Is that what it

19  says?

20      A.   That's what it says.

21      Q.   And John, Junior would refer to John

22  Simoni?

23      A.   Yes.

24      Q.   Okay.  And it says, message, Gary-you know

1    what, I'm going to need you to read that if you

2    can.

3         A.   Well, it appears to say, Gary e-mail

4    draft, and then the next one I can't -- I don't

5    know.  Agreement with Gates.  And then it says,

6    provides for allocation, maybe.  And beneath that,

7    what is that, there's a 15 WO off to the side, and

8    then the words pie, concerning, maybe, me.

9         Q.   And did you say -- and I'll need you to

10   interpret the rest of it in a minute, but it says

11   agreement with Gates.

12        A.   Does it say agreement with Gates?

13        Q.   Yeah.  Is that what you had said awhile

14   ago?

15        A.   Those are the words that I think are

16   there, yeah.

17        Q.   Okay.  Who is Gates?

18        A.   Gates, I -- to the best of my recollection

19   is the firm Mr. Marino's with, was with.  I'm not

20   sure if he's with them now.

21        Q.   Okay.  And do you know what the phrase

22   provides for allocations refers to?

23        A.   I do not.

24        Q.   What about pie concerning me?

1      A.    I don't know what that refers to.

2      Q.    Okay.  And this was -- was this a message

3   that John, Junior had left on your phone?

4      A.    I do not know.

5      Q.    It says message at the top, right?

6      A.    It does.

7      Q.    Then below that, it says, does not advise

8   me to underwrite any of the costs.  Had you at any

9   time considered underwriting any of the costs

10   associated with the litigation you and Gary Rich

11   were working on?

12      A.    No.

13      Q.    Do you know --

14      A.    Well, did I have any -- did I have any

15   expenses?  Is that what you're saying?

16      Q.    No.  I'm not saying that.

17      A.    Oh, okay.

18      Q.    I'm saying did you ever talk with Gary --

19      A.    About underwriting costs?

20      Q.    Yes.

21      A.    No.

22      Q.    Okay.

23            MR. WAKEFIELD:  You need to let her finish

24   the question first before you answer.

1    A.    I'm sorry.  I'm sorry.

2    Q.    Then there's this sort of circle-y thing

3    off to the left on the top half of the page.  Can

4    you read that for us?

5    A.    It looks like 1, dash, 18, dash, 03.  The

6    next word, I do not know what that is.  And then it

7    looks like Hall, talked with Gary, and then it

8    looks like maybe he accused me of dealing

9    deceptively.  And then under that, suggested that I

10   wouldn't be doing any other kind of work because I

11   never did.  I believe those are the words.

12   Q.    Do you recall what this is referring to?

13   A.    No.  I've been looking at it and wondering

14   myself.

15   Q.    Was -- do you know if this was referring

16   to -- when it says, he accused me of dealing

17   deceptively, whether Gary was accusing you of

18   dealing deceptively?

19   A.    I've been looking at it, and I can't -- I

20   just don't know what all that refers to.

21   Q.    And then down below at the bottom of the

22   page, it says number one, met with Scott February

23   26th.  Scott suggests quantum meruit.  Do you know

24   who Scott is?

1    A.    I am not the only -- no.  I do not know

2    who Scott is here.

3    Q.    Well, let's back up for a second and give

4    some context to this note.  It's underneath 1/24/03

5    at 4:20 p.m., call to John, Junior.  So do you take

6    that to mean you were calling John, Junior back?

7    A.    That's what it appears to be.

8    Q.    Okay.  And then under number one, it says

9    met with Scott February 26th.  Do you think that

10   refers to Scott Summing?

11          MR. McDOUGAL:  Summing.

12   Q.    Summing?

13   A.    I don't know.

14   Q.    All right.  Do you remember having any

15   discussions with John, Junior about quantum meruit?

16   A.    I do not remember.

17   Q.    Ever?

18   A.    I do not remember --

19   Q.    Okay.

20   A.    -- that happening.

21   Q.    And number two, Gary not interested in

22   terms of November demand letter.  Possibility of

23   counterclaims.  And is that -- as far as you know

24   -- or does that refer to his conflict or fee

1   dispute with Baron & Budd and Masry & Vititoe?

2       A.   I'm not sure.  It could have been with

3   reference to that, although I'm -- well, I don't --

4   the time, January of '03, it's possible, but I

5   don't remember when John stopped his -- you know,

6   discontinued his representation of...

7       Q.   Well, because at the top it says Gary

8   e-mail draft, something, agreement with Gates.

9   And, in fact --

10      A.   So maybe it was still going on.

11      Q.   Yeah.  Gary Rich hired Dan Marino to

12  represent him in lieu of John Simoni related to his

13  fee dispute?

14      A.   I don't remember the time frame.

15      Q.   But that's what happened, right?

16      A.   I -- say that again.

17      Q.   He --

18      A.   What was your question?

19      Q.   Gary hired Dan Marino -- Gary Rich hired

20  Dan Marino to represent him in a fee dispute

21  against Baron & Budd and Masry & Vititoe, and

22  stopped using John Simoni at some point?

23      A.   I believe that's correct?

24      Q.   Okay.

1          (Deposition Exhibit No. 12 marked.)

2     BY MS. MASON:

3          Q.   I'll hand you Exhibit 12.  Take a look at

4     that and let me know when you've had a chance to

5     review it, Professor.

6          A.   Okay.

7          Q.   Okay.  This Exhibit 12 appears to be four

8     stickies posted on one page memorializing a meeting

9     that you had with Gary Rich on June 3rd, 2005 at

10    Star City River Park; is that right?

11         A.   That's correct.

12         Q.   Did I say the name of the park right?

13         A.   Star City Park or River Park.  I'm not

14    sure.

15         Q.   Okay.

16         A.   Riverfront Park.  I'm not sure exactly

17    what the name is.

18         Q.   Okay.  And do you recall this meeting?

19         A.   I do.

20         Q.   At this meeting it -- you generated these

21    sticky notes, correct?

22         A.   I did very soon after the meeting, because

23    I wanted to try to get everything down as quickly

24    as I could.

1    Q.   Why was it important to you to memorialize

2    what had occurred at that meeting as quickly as you

3    could?

4    A.   Why was it important?

5    Q.   Yes.

6    A.   Because there were more communications

7    having to do with our agreement.

8    Q.   And this time he's back to a 20 percent

9    agreement, right?

10   A.   Well, he's -- my notes indicate that he's

11   confirming that he will stick to the agreement that

12   was made in Waynesburg, Pennsylvania, if you look

13   at number one.

14   Q.   Okay.  Oh, I see.  You wrote, I assumed he

15   would keep his word from that day in Waynesburg.

16   So you had a meeting in Waynesburg?

17   A.   In December.

18   Q.   Of?

19   A.   Of 2003.

20   Q.   Okay.  So this is over a year later?

21   A.   Yes.

22   Q.   What happened in Waynesburg?

23   A.   Can you be a little more specific?

24   Q.   Sure.  Where did you meet in Waynesburg?

1    A.    We met in a little coffee shop across from

2    Waynesburg college.

3    Q.    Did one of you request to meet there?

4    A.    We agreed to meet there.  We were on our

5    way back from Pittsburgh, from the Pittsburgh

6    airport, traveling together.  And one of us

7    suggested stopping to get some coffee in the coffee

8    shop there.

9    Q.    Oh, so it wasn't a meeting.  You happened

10   to be riding together, and then you guys stopped at

11   this coffee shop in Waynesburg?

12   A.    Yes.  I believe that's a good way to put

13   it.

14   Q.    Okay.  And that was in December of 2003?

15   A.    In December of 2003.

16   Q.    And what had you been doing together in

17   Pittsburgh?

18   A.    We had been transporting folks from the

19   Levin Papantonio firm to Pittsburgh, to the

20   airport.

21   Q.    And so while you were at the coffee shop

22   in Waynesburg, what -- you talked about the terms

23   of your compensation?

24   A.    Yes.

1    Q.   And what did you -- what was the -- tell

2    me what you talked about in terms of compensation.

3    A.   Well, he raised the issue, and he said he

4    was changing the agreement again from the 50/50

5    that we had gotten to, back to in late fall of

6    2002, that he was changing it back to the 80/20.

7    And he talked about that and why he was doing that.

8    Q.   Why did he do that?

9    MR. WAKEFIELD:  Object to the form.

10   Q.   What reasons did he give for doing that?

11   A.   He said that in the West Virginia

12   University case that I had talked with students,

13   which I mentioned earlier in the deposition.

14   He said in the Fairmont case that I had

15   used the "we" pronoun rather than the "I" pronoun

16   when I was speaking before the crowd, public crowd

17   at meetings.

18   He said that in the Arthurdale,

19   Reedsville/Arthurdale case that he had given me

20   some retainer forms that I had not returned to him

21   or they were not filled out and did not get them

22   back to him.

23   And then finally, there was a reason in

24   the Spelter case which I'm blocking on at this

1    moment.  There were four -- there was a reason

2    related to each case, and there were four reasons I

3    remember clearly.  But he said because of those

4    things, he decided that he was going to go back to

5    80/20.

6         Q.   And what did you say in response to that?

7         A.   You really want to know?

8         Q.   Yes, I really want to know.

9         A.   Okay.  I was speechless, actually.  I had

10   never -- it's fair to say I had never been talked

11   to in my lifetime that I could remember as I was

12   talked to that day in that coffee shop in

13   Waynesburg.

14        What I actually -- my response actually

15   was to ask him to excuse me for a minute, and I

16   went out on the street.  And I'm ashamed to say it,

17   but I was crying.  And I came back in, and we

18   eventually got back in the car and I said -- I came

19   back in and I said, excuse me, but I just needed

20   some time away.

21        Q.   Did you address it at all when you came

22   back in?

23        A.   I was visibly upset, and I was trying to

24   emotionally get back to a stability, and that's

1    where I was at that point.

2         Q.   And that was -- remind me again.  That was

3    in December of 2003?

4         A.   December of '03.

5         Q.   Okay.

6         A.   I believe it was December 10th.

7         Q.   When was the next time you remember

8    talking to him about this percentage agreement?

9         A.   In June of '05.

10        Q.   That was the next time you brought it up?

11   Or --

12        A.   In June of '05.

13        Q.   I said you brought it up.  I don't know

14   that that's to be the case.  Who brought up this

15   discussion at the park about compensation?

16        A.   Well, the notes -- what happened, who

17   brought --

18        Q.   If you remember.

19        A.   Who brought it up?  You can think about

20   number one as the beginning of the meeting.  We

21   were walking along a blacktop path.  It's called

22   the Rail-Trail path along the river there.  And

23   there was this communication that I indicate in

24   number one.

1          And he indicated he wanted to find a place

2     where he could write, and I suggested, well, I

3     said, there is a little picnic shelter down near

4     the river.  I don't think anybody's there at this

5     time, and maybe we could go down there and write, I

6     mean, and talk.  So we did do that.  So that's

7     number one.

8          Q.   Well, let me ask you something on number

9     one.  It says, he asked my agenda.  What did you

10    understand him to mean when he asked your agenda?

11    Agenda for what?

12         A.   I think maybe he wanted to know what I

13    wanted to talk about.

14         Q.   Okay.  So you called the meeting?

15         A.   I called -- I think up on top, it says

16    called Gary to meet.

17         Q.   Okay.

18         A.   And so then I went on to explain to him

19    what I wrote out there.

20         Q.   So at this point you're just trying to

21    ensure that he's still going to go with the 20

22    percent?

23         A.   Yeah.

24         Q.   Is that --

1    A.   That -- that's pretty much what I said --

2  what I have in my notes there.

3    Q.   Yeah.

4    A.   You know, at the time I was 63, and I did

5  have a heart condition.  I didn't know what was

6  going to happen to me physically, and I was

7  concerned about my wife if something did happen to

8  me.

9    Q.   You had just retired from the university?

10    A.   Well, I had retired in -- I was retiring

11  in August.

12    Q.   Okay.  And so -- and then at the bottom of

13  this first sticky note, it says, Jeanne says

14  taping.  What is that about?

15    A.   Well, when we went down to the shelter, he

16  wouldn't speak.  He would just write out things.

17  And so he wrote out a number of different things.

18  And when I was making up these notes, when I got

19  back home and I was making these notes up, Jeanne

20  says -- Jeanne said that she believed he was

21  taping, and I -- you know, that's what she said.

22  So I just put that in the note there.

23         So then number two is the next one.

24    Q.   Tell me -- can you go through -- I think I

1    can read most of them, but I think is it number --

2    well, it says number one.  I appreciate your role.

3    Two, something to the effect that he could not have

4    done it alone.  Three, that he would honor 20

5    percent agreement.  And then I can't read that next

6    one.  Is that another three or a four?

7        A.    Number three -- well, that's misnumbered,

8    it looks like.  It says that delivery, meaning

9    compensation, I understood it as, might be through

10   me as an employee working down in Florida, involved

11   with buying property for him, or the second option

12   was this making loans to me where he would forgive

13   the debt.

14       Q.    Okay.  Let's back up, and if you would,

15   just read it word for word here, because I think

16   you were adding some explanation there.  Let's get

17   what it actually says.

18       A.    Sorry if I was.

19       Q.    No, that's fine, but just to make sure.

20   It says that delivery might be one, is that a one?

21       A.    Might be one, me as employee.

22       Q.    Then buying property?

23       A.    That's related to me as an employee.

24       Q.    Okay.  Buying property for?

1     A.   For him.

2     Q.   For him in Florida?

3     A.   Florida.

4     Q.   Or loans to me where he would forgive

5  debt?

6     A.   Yeah.  Those were two things that he

7  talked about.

8     Q.   Okay.  And -- or wrote about?

9     A.   I'm sorry.  Wrote about.

10     Q.   Had he ever talked about it before that

11  day that he wrote about it?

12     A.   No.

13     Q.   What did you understand him to mean by

14  saying that buying property for him in Florida?

15     A.   I don't remember the time frame at the

16  time.  I don't remember the specific time frame,

17  but he had an acquaintance in Florida by the name

18  of Dan Levitan, and -- who he had respect for as a

19  good real estate property developer kind of guy.

20          And I think it -- I think I actually

21  learned the name of the guy not at this meeting,

22  because he -- I don't believe he was writing that

23  out, you know, the name and so forth.  But I

24  learned about him soon after, if not -- soon after,

1    I would say, that's my best guess at this point,

2    where he told me who this -- the name of the guy

3    and who he was and so forth.

4            But that's what the -- that was reference

5    to -- that note was with reference to that.  And

6    then, I guess, the loans to me where he would

7    forgive debt is a way that he could channel money

8    through forgiveness of debt, I guess.

9       Q.   Yeah.  And do you know if that's legal?

10      A.   I actually do not know.

11      Q.   Let's see.  Then we go on to page 3, or

12   sticky note three.  Let's see if I can read this.

13   You tell me if I'm reading it right.

14           I did say aloud, Gary, I do not have

15   experience with large sums of money like this.  I

16   will need you to work out specifics.  He wrote,

17   concerned about, one, badgering him after

18   university case settles, about two, my patience.  I

19   said, patience and badgering was not going to be a

20   problem.  He expressed relief, pointed to what he

21   wrote.  I will honor this, 20 percent.

22           Did I read that right?

23      A.   I believe you did.

24      Q.   Okay.  Had -- what did you understand him

1    to mean when he said he was concerned about you

2    badgering him after the university case settles?

3        A.   Well, I think he -- I had no expectation

4    for compensation until all of these cases settled.

5    I mean, I -- you know, my sense of it was that I

6    was going to receive compensation based on the

7    contributions I made to these cases, and hopefully

8    the value of my contributions would be taken into

9    account and I would receive -- you know, receive

10   some fair compensation.

11       He was concerned that once the university

12   case settled, I would start badgering him for -- I

13   mean, that was the understanding I had from his

14   note that he wrote out, that I would start

15   badgering him for money right away.

16       Q.   So your understanding was that you would

17   not be paid any compensation on the WVU case, the

18   Fairmont case or the Spelter case until all three

19   cases had resolved?

20       A.   Had resolved, and if they didn't resolve

21   in favor of the plaintiffs, I would receive

22   nothing.  That was my expectation.

23       Q.   Did they all three have to resolve in

24   favor of the plaintiff for you to be compensated?

1       A.    No, not all three of them, but any one

2    that I had worked on.

3       Q.    Well, so --

4       A.    So, for example, two might have resolved

5    in favor of the plaintiffs and one not.  But, you

6    know, the understanding, agreement that I had with

7    him was, with the changing percentages, whether it

8    was 50/50, 80/20, you know, whatever time frame you

9    want to look at, that that would be at the end when

10   the cases settled and the benefits were received.

11      Q.    But so you're saying that your WVU --

12   assuming the WVU case ended favorably, resolved

13   favorably, you would still not be entitled to

14   compensation from that until after the Fairmont

15   case and Spelter case resolved?

16           MR. WAKEFIELD:  Object to the form.  You

17   can answer.

18      A.    I believed our agreement was there were

19   three cases that we were working together.  We

20   didn't know if all three of them would resolve

21   favorably, you know, for the plaintiffs.  But

22   whatever cases got resolved, what got settled,

23   there wasn't any expectation of compensation until

24   the settlements.  And the -- I lost my train of

1    thought there.  I'm sorry.  And if they didn't

2    settle, as I think I said a minute ago, if they

3    didn't settle favorably, then even though, you

4    know, we both, you know, put in time on the cases,

5    you know, you lose.  I mean, that was the

6    understanding.

7        Q.   I'm just not sure I understand.  The WVU

8    case ended favorably, right?  When was the WVU case

9    resolved?

10       A.   I believe it was January of '06.

11       Q.   Okay.  So January 2006 the WVU case is

12   resolved.  When in your mind do you think -- when

13   do you think that you would have been entitled to

14   compensation from the WVU case?

15       A.   I think we had a general sense of --

16   although we never actually had concrete

17   communications about it, I think there was a

18   general sense that we maybe would wait until

19   everything was settled out.  But we never had any

20   communications about that.

21            MR. WAKEFIELD:  She's asking about the WVU

22   case.

23            THE DEPONENT:  Uh-huh.

24            MR. WAKEFIELD:  When you say "everything,"

1    what do you mean?

2          THE DEPONENT:  Well, there were three

3    cases going on.

4    BY MS. MASON:

5          Q.   Yes.

6          A.   Three cases going on.  And your question

7    again?  I'm sorry.

8          Q.   I'm not sure.

9          A.   Maybe -- I'm sorry for confusing you.

10         Q.   I'm not sure that I'm understanding you.

11   So are you saying that you didn't think that Gary

12   should pay you anything until after all three

13   cases, WVU, Spelter and Fairmont, had all resolved,

14   positively or negatively?

15         A.   No.  I maybe confused the situation there.

16         Q.   Because that sounds like a really bad

17   deal.

18         A.   I believe that our understanding was that

19   when one case settled out, then there would be an

20   expectation of sharing of benefits.

21         Q.   Okay.

22         A.   Is that --

23         Q.   Yeah.  That makes sense to me.  And

24   then --

1        MR. MARINO:  Listen, I'm going to object

2    to the sidebar comments about what's a good deal

3    and what's a bad deal.

4        MS. MASON:  All right.  That's fine.

5        MR. MARINO:  Let's just keep those to

6    yourself.

7        MS. MASON:  Can I strike it or whatever?

8    That's fine.

9        MR. MARINO:  No, just don't do it anymore.

10    That's all.

11        MS. MASON:  Okay.  Sometimes I just have

12    to be honest.

13        MR. MARINO:  Sometimes, you know, you just

14    have to control yourself and not influence the

15    witness with comments like that.

16        MR. CASH:  All right.  That's uncalled

17    for.

18        MR. WAKEFIELD:  No.  I mean, his point's

19    well taken.  You're supposed to just question the

20    witness and not --

21        MR. MARINO:  I overlooked it the first

22    one.

23        MR. WAKEFIELD:  -- comment on questions.

24        MR. CASH:  I just don't think Mr. Marino

1    should --

2            MR. WAKEFIELD:  Wait a minute.

3            MR. CASH:  -- tell her to control

4    herself.

5            MR. WAKEFIELD:  Don't -- hey, can I

6    finish, please?

7            MR. CASH:  That's my objection.  As

8    lawyers, we don't have to tell each other to

9    control ourselves.  I don't think that's an

10   appropriate comment.

11           MR. WAKEFIELD:  Well, no, I think that

12   it's legitimate to object to comments about

13   testimony as opposed to simply questioning the

14   witness.  So I think his comment's well taken.  I

15   didn't make an objection about it, but I would join

16   in the request.

17           THE DEPONENT:  I apologize for any

18   confusion I caused.

19           MS. MASON:  Me, too.  And that was

20   probably an inappropriate comment on my part again,

21   so strike that.

22   BY MS. MASON:

23       Q.  So going back to Exhibit 12 and sticky

24   note number three on Exhibit 12, it says, he wrote

1    concerned about badgering him after university case

2    settles, and about two, my patience.  I said,

3    patience and badgering was not going to be a

4    problem.

5            So this is in 2005.  The WVU case has not

6    settled?

7        A.    That's correct.

8        Q.    And so you -- did you understand him to be

9    -- well, it says you -- you wrote, he was concerned

10   about you badgering him after the case settled.

11       A.    (Nods head up and down.)

12       Q.    What did you think he was concerned about

13   you badgering him about?

14       A.    There were times when Gary expressed

15   things and I didn't fully understand.  I knew

16   badgering and patience was not a problem, but he

17   apparently felt that it was, and I just tried to

18   let him know that it was not going to be a problem.

19       Q.    So it wasn't necessarily badgering about

20   any compensation you might be due?

21       A.    Well, I think that was his direction with

22   this comment.

23       Q.    Okay.  And then let's look at number

24   four.  You say, talked more about one.  Is it

1    Gillian?  Gillian?

2         A.    Gillian was his daughter.

3         Q.    Number one, Gillian and Tulane.

4         A.    This is his daughter.

5         Q.    Two, why they never came to wedding?

6         A.    Uh-huh.

7         Q.    Then it says, my asking for Medina

8    agreement set it off.  Did I read that right?

9         A.    That's what it says, my asking for Medina

10   agreement set it off.

11        Q.    Okay.  Never knew why, thought, Theresa, I

12   wanted to do them in.  Left on positive note.

13   Parted 5:30 approximately.

14             What was the Medina agreement you

15   reference here?

16        A.    To the best of my recollection, I believe

17   that refers to the agreement that was made between

18   Levin and Papantonio and Rich.  The fee split

19   agreement.

20        Q.    On Spelter?

21        A.    Excuse me?

22        Q.    On Spelter.

23        A.    On Spelter.

24        Q.    And it says that you -- that my asking for

1    Medina agreement set it off.  What are you

2    referring to, set it off?

3        A.   Well, he indicated that -- I have that

4    under why they never came to my wedding in the

5    summer of '04.  And he, I believe, suggested that

6    my asking about the -- or for a copy of the Medina

7    agreement, to see a copy of it -- maybe I did ask

8    but I don't remember -- apparently was a trigger

9    for him, for his not coming to our wedding, I

10   guess.

11       Q.   Did he ever express any objection to you

12   asking for the Medina agreement?

13       A.   Not at the time.

14       Q.   Did you ever receive a copy of it?

15       A.   I don't believe I ever saw a copy of that

16   agreement.

17       Q.   And then the next thing says, never knew

18   why, thought Theresa, I wanted to do them in.  What

19   does that refer to?

20       A.   He made a suggestion that there was some

21   thought on their part that I was wanting to do them

22   in.  I don't -- I just noted this because it was

23   from the meeting.

24       Q.   Well, Theresa is Gary Rich's wife?

1    A.    Yes.

2    Q.    And so when you say, I wanted to do them

3    in, that's referring to they thought -- or Gary

4    expressed to you that he and Theresa thought that

5    you wanted to do them in?

6    A.    Excuse me?

7    Q.    I'll try again.  Now, you're actually

8    talking at this point.  You're not writing

9    anything, or Gary's not writing anything when

10   you're talking about why they never came to your

11   wedding?

12   A.    He's not writing.  I'm just...

13   Q.    Okay.  And he says to you something along

14   the lines of he thought that you wanted to do him

15   and Theresa in, or he and Theresa thought --

16   explain to me.

17   A.    Something to --

18   Q.    Okay.

19   A.    Yeah, something to that effect.

20   Q.    Okay.  And what did you say in response to

21   that?

22   A.    I don't remember.

23   Q.    Did you -- what happened to that document

24   that Gary Rich was writing on that's referenced on

1    part two of this Exhibit 12?

2         A.   You mean the notes that he would pass to

3    me?

4         Q.   Yes.

5         A.   He would write on sticky notes also

6    different things.  He would hand them to me to

7    read, and then he would take them back.

8         Q.   And then did you see what he did with them

9    once he took them back?

10        A.   No.

11        Q.   Did you ever ask him for an agreement, a

12   compensation agreement in writing?

13        A.   No.

14        Q.   Why not?

15        A.   Because I felt we had an agreement.

16        Q.   And so as of --

17        A.   I understood later that it was not

18   enforceable, but I never did for that reason.  I

19   felt we had an agreement.

20        Q.   So as of June 2005, you think you've got

21   an agreement of 20 percent with him?

22        A.   Yes.

23        Q.   Okay.

24             (Deposition Exhibit No. 13 marked.)

```
 1    BY MS. MASON:

 2        Q.   All right.  Here is Exhibit 13.  Exhibit

 3    13 is Simoni 1352.  And it is a -- looks like

 4    another sticky note generated by you, correct?

 5        A.   Yes.

 6        Q.   Okay.  And it is memorializing a meeting

 7    that you had with Gary at his request on June 7th?

 8        A.   That's correct.

 9        Q.   Read for me, if you can, what that sticky

10    note...

11        A.   What it says?

12        Q.   Yeah, to the best -- to the extent you're

13    able.

14        A.   Okay.  It says, met with Gary at his

15    request.  I'm sorry.  It says, met with Gary, dash,

16    his request.  Then below that, we went out on

17    street, walked to Hotel Morgan.  He talked about

18    two matters.  Number one, asked me to go through my

19    calendars to look for dates and work that he might

20    have missed.  Said it didn't make much sense for me

21    to file time for university case.  And then I have

22    -- there's an arrow and it says, no money.

23            MR. WAKEFIELD:  It says a dollar sign,

24    doesn't it?
```

1       A.   I'm sorry.  It says no and then a dollar

2    sign.  I'm sorry.

3           And then number two, it says, Dan Levitan,

4    Fort Lauderdale, a property investment expert.  And

5    then I have noted, I could be Gary's agent in

6    Florida, and then it says, with Dan's help.  Dan

7    Levitan, I assume.

8       Q.   Okay.  So is this a -- he called this

9    meeting, right?

10      A.   I'm sorry?

11      Q.   Well, these two issues that are discussed

12   here, Dan Levitan and also your filing hours on the

13   university case, had you brought those issues up to

14   him before?

15          MR. WAKEFIELD:  Object to the form.

16   Doesn't cover everything that's in the note.

17      A.   Well, the Dan Levitan matter, I was just

18   talking about a few minutes ago when we were

19   talking about the meeting on -- down by the Star

20   City River -- in the Star City Riverfront Park.

21   That's the real estate developer, Dan Levitan.  I

22   think I said before that he -- I didn't know his

23   name then.  That's why it wasn't in my notes, I

24   believe.  But a few days later we had this meeting

1    and he gave me the name.

2        Q.   And I'm sorry.  I had the wrong date on

3    the Star City Park meeting, so that was my

4    confusion.

5        A.   Okay.

6        Q.   So you met with Gary, this is basically

7    four days after the Star City meeting?

8        A.   That's correct.

9        Q.   Okay.  And this is an actually talking

10   meeting where he doesn't write things down?

11       A.   That's correct.

12       Q.   Again, you're outside his office because

13   he's concerned that he may be under surveillance?

14       A.   He preferred to have meetings outside his

15   office.

16       Q.   But when he asked you to go through your

17   calendars to look for dates and work that he might

18   have missed, what did you say?

19       A.   I told him that I would look to see.  That

20   was my response.

21       Q.   Did you ask him whether you should be

22   keeping up with your hours on the university case?

23       A.   I did not.

24       Q.   He just volunteered the information that

1    you -- that it didn't make much sense for you to

2    file time for the university case?

3        A.    That's what I recall him saying.  That's

4    why I wrote it down.

5        Q.    Did you question him about that at all?

6        A.    No.  See, I wasn't -- I never had the idea

7    that it was important for me to keep hours, because

8    we have these general agreements, and that's why I

9    never had contemporaneous records, because we have

10   these agreements.  You know, we might not get paid

11   anything, but if things went well, at the end of

12   the cases, we had expectations of recuperating

13   something.

14       Q.    And then how was that --

15       A.    Or recouping something, I should say.

16       Q.    What you described, how is that -- that's

17   really like a contingency fee agreement, right?

18       A.    Say that again, please.

19       Q.    Well, a contingency fee agreement is when

20   you're going to get money if he gets money.  If he

21   doesn't get money, you don't get any money.  So the

22   basis of your 50/50 or later 80/20 deal was based

23   on the contingency of whether there was any success

24   in the case, correct?

1      A.   Well, my compensation definitely would be

2   -- my understanding would be based on whether there

3   was success, meaning I wouldn't get anything if

4   there wasn't success.  I wasn't exactly sure how

5   this was all going to -- I mean, if you just trace

6   these communications through the years, I wasn't

7   sure exactly how my compensation was going to come,

8   but I had the understanding that I was making

9   substantial contributions, and I had the hope and

10   expectation that the value of my contributions

11   would be taken into account, but only after these

12   cases were settled.  There was no expectation of

13   anything before.

14      Q.   And so you didn't have an expectation of

15   being reasonably compensated if there were bad

16   results in the case?

17      A.   No.  Get zero.

18      Q.   Okay.  And then tell me a little bit more

19   about this issue with Dan Levitan saying I could be

20   Gary's agent in Florida with Dan's help.  What was

21   your understanding of that deal?

22           MR. WAKEFIELD:  Object to the form.

23      A.   My understanding -- could you repeat your

24   question?

1    Q.   Well, what was your understanding about

2   what could happen if you became Gary's agent in

3   Florida with Dan Levitan's help?

4    A.   My general understanding, to the best of

5   my recollection at this point, was that he foresaw

6   that possibly I could be working with Dan Levitan,

7   but Dan Levitan would be the conduit for him to

8   channel money, and that I would get paid possibly

9   as a, I don't know, as an employee or an agent of

10   Dan Levitan and his real estate development work.

11   And the money would -- buying property for Gary

12   Rich in Florida, and that I would get something

13   from that business transaction.  You know, money

14   could be channeled to me through that business

15   transaction.

16    Q.   Were you supposed to become a licensed

17   real estate agent with Dan Levitan?

18    A.   We never talked about the details.

19        (Deposition Exhibit No. 14 marked.)

20   BY MS. MASON:

21    Q.   I'm going to hand you Exhibit 14.  And it

22   is Bates stamped Simoni 1353.

23    A.   Okay.

24    Q.   You generated this document correct,

1    Exhibit 14?

2        A.   Yes.

3        Q.   And it's two sticky notes memorializing

4    two different meetings with Gary Rich, correct?

5        A.   Yes.

6        Q.   The top one is for June 27th, 2005, which

7    is the same month that we've been talking about the

8    last two exhibits.  It says you discussed about

9    whether he was involved with L and P.  I'm going to

10   assume that's Levin Papantonio on bikers' case.  Do

11   you recall what the bikers' case was?

12            MR. WAKEFIELD:  Let me object to the form

13   as being incomplete in terms of what's contained in

14   the note.  You can answer.

15       A.   The bikers' case never was a case.  It was

16   -- to the best of my recollection, it was never a

17   case.  There was some talk about possibly there

18   being something with respect to bikers who had

19   ridden on the cullet pile at Spelter.  And I didn't

20   know exactly what was developing about that.  So I

21   asked him if -- wondering if there was anything

22   developing.

23       Q.   And how did Gary respond to that?

24       A.   Well, what he -- he suggested that there

1   was something possibly developing, but no details

2   as I recall.  And he said he assumed that the

3   general agreement that we had would cover or -- I'm

4   sorry.  Can I --

5       Q.   Yes.

6       A.   I'm not sure that that was it.  He might

7   have been saying -- I really don't know for sure.

8   He might have been saying that maybe the general

9   agreement that he had with Levin and Papantonio

10  would cover it.  But he wanted me to give him

11  information that I had about the biking -- the

12  biker situation.  And he would write Medina, as it

13  says there, and then I could draft the letter.

14      Q.   And that was my main question, was what

15  did the general agreement refer to.  And you're not

16  sure if it referred to your agreement with him or

17  his agreement --

18      A.   I'm not sure.

19      Q.   -- his agreement with Levin and

20  Papantonio?

21          MR. WAKEFIELD:  You need to let her

22  finish.  You need to let her finish --

23          THE DEPONENT:  I'm sorry.

24          MR. WAKEFIELD:  Hey, hey, hey.  Let her

1    finish the question, and then you can answer it.

2    All right?

3            THE DEPONENT:  Okay.  I'm sorry.

4    BY MS. MASON:

5        Q.   And then at the bottom, it says, this

6    would make record.  Did you indicate to you why it

7    would be necessary to make record?

8        A.   I'm sorry.  Where are you looking?

9        Q.   On that first sticky note at the very,

10   very bottom, it says, this would make record.

11       A.   This would make record.  Oh.

12       Q.   Did he indicate why it was necessary to

13   make a record about the bikers' case?

14       A.   I don't remember --

15       Q.   Okay.

16       A.   -- about that.

17       Q.   And then the next sticky note is 6/29/05.

18   So we're still in June of 2005.  And it says he

19   wanted advice on how to respond to Sweeney about

20   $39,000, question mark.  Then it says, d-i-f-f,

21   slash, 28 versus 22 90.  What does that refer to?

22           MR. WAKEFIELD:  First of all, let the

23   record reflect I'm not sure that's a slash.  That

24   may be the Y from Sweeney.

1          MS. MASON:  That's why I need to let him

2     read these things.

3          THE DEPONENT:  Okay.  Question, please,

4     again?

5     BY MS. MASON:

6     Q.   That's -- that sentence that refers to

7     Sweeney and the $39,000, what did that refer to?

8     A.   It referred to the agreement that he had

9     with Sweeney, with the Sweeney firm for fee split

10    in the WVU asbestos case.

11    Q.   And Sweeney was offering him $39,000 as

12    his fee, as Gary's fee?

13    A.   No.  I think there was a re-negotiation of

14    the agreement towards the end of the case, and the

15    re-negotiation would mean, to the best of my

16    recollection, a reduction of his percentage from 28

17    to 22.

18    Q.   Oh, and that's a percentage sign?

19    A.   I think that's a percentage sign, yes.

20    Q.   Okay.  And would that -- and so did you

21    advise him on the best way to approach Sweeney on

22    this deal?

23    A.   As my notes say, I suggested that maybe

24    flexibility was the way to go and to give Sweeney a

1    chance, you know, negotiate with him and see, maybe

2    you could end up in the middle somewhere between 28

3    and 22.

4         (Deposition Exhibit No. 15 marked.)

5    BY MS. MASON:

6        Q.   I'm handing you Exhibit 15, which is

7    Simoni 1354.  And you should feel free to read the

8    whole thing, but I'm only going to ask you about

9    the one paragraph that's numbered two under --

10       A.   The second paragraph?

11       Q.   The one that's got the number two in front

12   of it.

13       A.   Oh, okay.  Let me read the whole thing

14   first, please.

15       Q.   Okay.

16       A.   Okay.

17       Q.   So Exhibit 15 includes your notes from two

18   meetings with Gary Rich, one of July 24th -- or not

19   meetings.  A telephone call on July 24th, and a

20   telephone call on July 25th, 2005; is that right?

21       A.   Well, there was an initial call and then

22   he came over, with respect to July 24th.  He came

23   over to our living -- residential area.

24       Q.   And this was after regular business hours?

1    A.   Yeah.  I think it says about 8:00 p.m.

2   Oh, no.  After 8:00 p.m., actually, because I

3   called him back about 8:00 p.m.  He wanted to drive

4   over, so it was in the evening sometime.

5    Q.   Okay.  And paragraph -- well, the third

6   paragraph on the page starts with a number two, and

7   it says, he also said that Sweeney had never

8   responded to him regarding the fee split, and due

9   to that, he decided he was not going to negotiate

10   with him and saw no reason to negotiate with a,

11   quote, liberal elitist, close quote, who had

12   inherited his low firm from his father.  Which I'm

13   assuming the "low" is a typo and it should be firm?

14    A.   I think it was law firm.

15    Q.   Okay.  You have liberal elitist in

16   quotes.  Did Gary Rich actually use that term that

17   night?

18    A.   Yes.

19    Q.   And did he indicate to you what he

20   intended to do in lieu of negotiating with Sweeney

21   about the fee split?

22    A.   I don't remember that he said what he was

23   going to do.

24    Q.   So this is the second, this agreement that

1    Gary Rich has had with his co-counsel regarding fee

2    splits.  Is that fair?  He's had this agreement

3    with Baron & Budd and Masry Vititoe, correct?

4         A.   I'm not sure what you're...

5         Q.   Okay.  Let me just -- that's fine.  We

6    don't need to go there.

7         A.   Okay.

8         Q.   Do you know what the outcome was of the

9    fee split issue with Sweeney?  Did they actually

10   agree?

11        A.   I am not sure what that resolution was.

12        Q.   Did you ever ask Mr. Rich what that

13   resolution was?

14        A.   I don't remember asking.  I may have.  I

15   don't remember.

16             (Deposition Exhibit No. 16 marked.)

17   BY MS. MASON:

18        Q.   I'm going to hand you what I've marked as

19   Exhibit 16, which is Simoni 1357.  Okay.  This is a

20   document you generated memorializing your call to

21   Gary Rich on August 22nd, 2005?

22        A.   Yes.

23        Q.   And in that call, you discussed the real

24   estate agent in Florida.  Is that referring to Dan

1    Levitan?

2        A.   Yes.

3        Q.   What did you discuss about it?

4        A.   I do not remember.

5        Q.   It says here and is underlined that I

6    would get back to him on it.  Back to Gary Rich on

7    it?

8        A.   I believe that's a fair assumption.

9        Q.   Did you ever talk to Dan Levitan?

10       A.   No, I've never had any communication with

11   him.

12       Q.   And then under that it says, he said he

13   didn't have time to think about that now.  "He"

14   being Gary Rich?

15       A.   Yes.

16       Q.   And "that" being the real estate agent in

17   Florida?

18       A.   Yes.

19            MS. MASON:  Okay.  Okay.  We're going to

20   need to take a break.

21            THE VIDEOGRAPHER:  We are now off the

22   record.  The time is 3:33 p.m.

23                 (Short break taken.)

24            THE VIDEOGRAPHER:  We are now back on the

1    record.  This is videotape number five of the video

2    deposition of Joseph Simoni.  Today is June 11,

3    2013, and the time is 3:49 p.m.

4    BY MS. MASON:

5         Q.   We were looking at Exhibit 16 before we

6    went on the break.  In about the middle of the

7    page, it says -- there it says, Theresa says it's

8    me, and that's in quotation marks.  Is that

9    something that Gary Rich said to you?

10        A.   Yes.

11        Q.   And when -- so he was saying, Theresa says

12   it's Gary?

13        A.   (Nods head up and down.)

14        Q.   Okay.  And what did you understand that to

15   mean?

16        A.   My understanding of it was that she was

17   saying to him the reason why they wanted to change

18   the agreement was something to do with him.

19        Q.   And did he agree with that?

20        A.   I think the next sentence that I wrote out

21   suggests that he didn't agree with that.

22        Q.   And he says -- and you're right.  He says

23   he thinks --

24        A.   Thinks, yes.

1     Q.    -- it's just more of this elitist thing.

2     And again, that's in quotation marks, just more of

3     this elitist thing.  What did you take to mean,

4     just more of this elitist thing?

5     A.    I took it to be another use of that

6     language.  Not quite having a full comprehension or

7     understanding of what he meant.

8     Q.    And then there's a note, two lines down

9     that says that he was trying to deal with Sweeney,

10    too.  Was that in reference to the fee split on the

11    WVU case?

12    A.    Down below where it says that he was

13    trying to deal with Sweeney, too?

14    Q.    Yes.

15    A.    I believe that was still going on.

16          (Deposition Exhibit No. 17 marked.)

17    BY MS. MASON:

18    Q.    This is Exhibit 17.  Have you completed

19    your review of Exhibit 17?

20    A.    I did.

21    Q.    And it's Bates stamped Simoni 1361, and it

22    appears to be three different notations about phone

23    calls that you had with Gary Rich.  Is that fair?

24    A.    Yes.

1    Q.   One on September 28th, 2005, one on

2    October 8th, 2005, and one on October 10th, 2005.

3    A.   Appears to be correct.

4    Q.   If you would, could you read the entry for

5    10/8/05.

6    A.   10/8/05 says trip to see Ann.  Left

7    message on Gary's cell saying we were wondering

8    about Gillian's plans.

9    Q.   And who is Ann?

10   A.   Ann is my sister in California.

11   Q.   Okay.  And had Mr. Rich accused you at any

12   point of interfering with Gillian's plans to attend

13   college?

14   A.   He suggested at one point that maybe I

15   wasn't being as helpful as he thought I should have

16   been.

17   Q.   Was Gillian planning to go to -- to apply

18   to Notre Dame?

19   A.   In the early talk about that, I think she

20   may have applied.  I don't recall exactly.  But

21   yes, there was talk about her applying to Notre

22   Dame.

23   Q.   And did he accuse you of just failing to

24   do something to assist her?

1    A.   I don't remember exactly.  I told him that

2    I'd be willing to write a letter of recommendation

3    for her if she wanted -- she wanted that.

4    Q.   And did you do that?

5    A.   No, I never did it.  And there was

6    something that he interpreted, and I don't even

7    remember what it was as being something negative on

8    my part, but I don't remember.  I certainly didn't

9    do anything in my sense of it, of negative.  So I

10   don't exactly know what he was upset about.  I

11   never did understand that.

12   Q.   And eventually Gillian went to Tulane,

13   right?

14   A.   Yes, she ended up at Tulane.

15   Q.   Then would you read the note for October

16   10th, 2005?

17   A.   Well, I was visiting my sister, Ann, in

18   California.  Okay?  Let me -- this is on the trip

19   back to Sedona, Arizona, from California.

20       So it says, on trip back to Sedona, Gary

21   called 12:00 to 1:00 p.m., excuse me, and said L

22   and P, Levin and Papantonio, told him last Thursday

23   or Friday that they were having Jones in Clarksburg

24   -- or Jones, Clarksburg lawyer file pro hac vice

1   papers for Kennedy.  That Marino said he should not

2   overreact, that Farrest Taylor said he was, that he

3   was sorry for what was going on and that he asked

4   what Gary wanted.  Gary told him he wanted them to

5   just, quote, honor the agreement.

6         After the call, Jeanne and I laughed

7   about, quote, honoring the agreement, unquote,

8   saying that Gary only got such good agreements

9   because of the organization and the groundwork laid

10  for all three cases by me.

11       Q.   Did you ever at any point ask Gary to

12  honor his agreement with you with the 50/50 split?

13       A.   Could you repeat that, please?

14       Q.   At any point did you ever ask Gary to,

15  quote, honor the agreement with you concerning the

16  50/50 split?

17       A.   Well, in June of '05, as you recall, he

18  said he would honor the 20 percent agreement that

19  he had made in December of '03.

20       Q.   And what made you and Jeanne laugh about

21  him saying he wanted them to just honor the

22  agreement?

23       A.   I think the document sort of speaks for

24  itself, what it says below that.  We were just

1    talking about what he said in the communication

2    with me and, you know, that what he had told either

3    -- I don't remember whether it was Levin Papantonio

4    or maybe people from your firm about just honoring

5    the agreement.  And we were just reflecting on the

6    agreements and how the agreements came about.

7         Q.   So you weren't laughing because he had

8    from time to time tried to back out of his own

9    agreement with you?

10        A.   No, no, no.  This was about the

11   agreements --

12        Q.   Okay.

13        A.   -- that he had with the out-of-state law

14   firms.

15            (Deposition Exhibit No. 18 marked.)

16   BY MS. MASON:

17        Q.   I'm handing you what we've marked as

18   Exhibit 18, and that is Bates stamped Simoni 1366.

19        A.   Okay.

20        Q.   Okay.  Exhibit 18 is a document generated

21   by you; is that right?

22        A.   Yes.

23        Q.   And it memorializes a call you made to

24   Gary Rich on June 27th, 2007?

1    A.   Yes.

2    Q.   Do you recall this call?

3    A.   I do.

4    Q.   What prompted you to make this call?

5    A.   Well, the university case settled in

6    January of 2006, and I think we may have had a

7    phone call after that.  I don't remember.  I think

8    one of your exhibits suggested that.

9         But anyway, I said -- I sort of said in my

10   notes what -- that I -- what I told him in the

11   call.  That's what prompted my call to him.  Told

12   him 18 months had passed since WVU's settlement and

13   hadn't heard anything from him.

14   Q.   Were you aware that a mediation was

15   occurring on June 28th in Charleston on the Spelter

16   case?

17   A.   At that point?

18   Q.   When you made this call.

19   A.   At that point I was not.

20   Q.   When did you find out that there had been

21   a mediation on June 28th in the Spelter case?

22   A.   I think I only became aware of that in

23   going through some of the discovery documents.

24   Q.   So if I understand this -- well, what was

1    the point of your call to him on this day?

2        A.    Well, like, we had an agreement, and the

3    understanding was that after the case was settled,

4    there was going to be some kind of compensation for

5    me.

6        Q.    So you were calling specifically about

7    your compensation related to the WVU case?

8        A.    Yes.

9        Q.    Okay.  And it says, told him I thought we

10   had good faith man-to-man agreement and that he was

11   man of his word.  Search his mind and soul and look

12   in mirror.

13            Is that pretty much verbatim what you told

14   him that day?

15       A.    Pretty much characterizes what I said,

16   yeah.

17       Q.    Okay.  And how did he respond to you?

18       A.    Well, I tried to note the response in my

19   notes.  He said, what agreement?  He agreed to help

20   Larry Harless bring the case to fruition, which he

21   has done, and he is a man of his word therefore.

22   And then he went on to talk about Levin and

23   Papantonio, advising them not to talk to me about

24   law.

1          I don't know if I've answered your

2    question.

3        Q.   No, you have, and I have more specific

4    questions for you.  Let me go back up to -- you

5    said it had been 18 months since the WVU case had

6    settled.

7        A.   That's correct.

8        Q.   At the time of this call.

9        A.   Well, January to June, I guess that might

10   have been 17 months.  Sixteen, 17 months, something

11   like that.  Maybe not 18.

12       Q.   And when were you expecting to be paid on

13   the WVU case?

14       A.   Well, the understanding, the understanding

15   was that I was doing the work.  After the case got

16   settled, okay, then I would be compensated.

17       Q.   If you were doing work on the WVU case

18   after the case settled?

19       A.   After the case settled.  Not before the

20   case settled.

21       Q.   Wait.  I'm confused.  Let me try again.

22   When -- let me ask it again.

23          When did you think that your -- you should

24   be paid for your participation in the WVU case?

1    A.   In the WVU case, I'm -- I have this

2    agreement with him, no expectation of anything if

3    there's no favorable settlement for the

4    plaintiffs.  But if there is a favorable settlement

5    for the plaintiffs, then at the time of the

6    settlement that would kick in our agreement at the

7    time of the settlement, and therefore I should be

8    getting some communication about compensation.

9    Q.   So would you -- would you have expected

10   your compensation to be payable from Gary Rich from

11   the date that he received his compensation in the

12   WVU case?

13   A.   Yeah.  That was the understanding we had.

14   Q.   And so at that phone call on June 27th, he

15   denied that you had -- or did you understand that

16   he was denying that you had an agreement to share

17   in the favorable outcome of the WVU case?

18   A.   When you look at my notes, it appears that

19   that's what he was suggesting.

20   Q.   And there's an arrow and a number one down

21   there, and it says, asked if he thought that was

22   the extent of our agreement.  So you asked him, do

23   you think that's the extent of our agreement?

24   A.   After he went through all of his comments,

1    I asked him if he thought the extent of our

2    agreement was what he said.

3        Q.   And --

4        A.   And actually, there's a line that goes

5    from that number one back up to that comment about

6    bringing the case to fruition, and I think it

7    didn't make it in the copy.  But what I was asking

8    him was that the -- was that what he thought was

9    the extent of the agreement.

10        Q.   And what did he say in response to your

11    question?

12        A.   Yes.  And I just ended the conversation.

13    I just said, you know how to reach me.

14        Q.   And were you agitated during this call?

15        A.   Was I agitated?

16        Q.   Yes.

17        A.   I was concerned about his communication

18    with me.

19        Q.   Well, were you agitated at the beginning

20    of the call?

21        A.   I just said to him, it's been 18 months

22    since the settlement of the WVU case and I haven't

23    heard a word for you.

24        Q.   Would it be fair to characterize you as

1    agitated as the call proceeded?

2        A.    I don't remember any agitation.  I mean,

3    that just -- I just asked him, you know, in a sense

4    what's happening here.

5        Q.    And then go to the second point under his

6    summary.  It says, been told by Levin and

7    Papantonio to not talk to me about any cases, and

8    he told me last September that we should not talk

9    about law.

10            What did you understand him to mean when

11   he said he was told not to talk to you about any

12   cases?  Was he -- what cases was he referring to,

13   if you know?

14       A.    Well, the Levin and Papantonio -- if he's

15   talking about Levin and Papantonio, I assume it was

16   Spelter.

17       Q.    You didn't interpret that to also mean the

18   Fairmont case or any other cases you were working

19   on with Gary Rich?

20       A.    Clearly Levin and Papantonio and in

21   Spelter, but you know, I didn't know for sure.

22       Q.    And do you recall him telling you in

23   September of 2006 that you two should not talk

24   about law?

1    A.   I don't remember that.  I didn't remember

2  that at the time.

3    Q.   Do you remember that now?

4    A.   No.  I mean, I didn't at the time, and I

5  don't remember it now.

6    Q.   And then the third point was he said that

7  a lot of people are affected, that he did not want

8  to do anything that would -- is that jeopardize or

9  terrorize their welfare?

10   A.   I'm sorry.  I was tuning out for a second

11  there.

12   Q.   That's fine.  Look under his summary, the

13  third dash there.

14   A.   Okay.

15   Q.   That a lot of people are affected, that he

16  did not want to do anything that would -- is that

17  jeopardize or --

18   A.   That he didn't want to do anything that

19  was against the law, that's the bottom one, and

20  then that he didn't know -- let's see.  That a lot

21  of people are affected, that he did not want to do

22  anything that would, I believe, yes, it's

23  jeopardize their welfare.

24   Q.   Okay.  And did you have any understanding

1    of who he was referring to when he said a lot of

2    people are affected?

3        A.    I wasn't clear.

4        Q.    Okay.  Did he make any suggestions to you

5    about who -- or that you were being -- well, strike

6    that.

7            When he said that he didn't want to do

8    anything that was against the law, how did you

9    respond to that?

10       A.    I just took it where that was his word,

11   that's what he was saying.

12       Q.    Were you asking him to do something

13   against the law?

14       A.    I didn't believe so.

15       Q.    Did you tell him that?

16       A.    I didn't tell him that in that

17   conversation.

18       Q.    Did you tell him that after this

19   conversation on June 27th, 2007?

20       A.    That I was -- that I --

21       Q.    That you weren't asking him to do anything

22   illegal?

23       A.    I didn't have any communication with him.

24   I don't recall further communication.  I, mean

1    there might have been some that I don't recall

2    but...

3        Q.   Was this the last time you ever spoke with

4    Gary Rich until you saw him April 30th at his own

5    deposition?

6        A.   I can't say for sure.

7        Q.   Did he become agitated in the call?

8        A.   No.  I don't think it was an agitated

9    tone.  He just made the points he wanted to make, I

10   guess, and I don't remember him being -- you know,

11   seeming very upset or agitated.

12       Q.   So at that point what did you believe that

13   the status of your agreement with him was?

14       A.   I believed it was the 80/20 that we had

15   communicated about in June of '05 in Star City.

16       Q.   Still in place on WVU, Spelter and

17   Fairmont?

18       A.   Always the percentages that we talked

19   about.  The understanding that I believed we had,

20   and I'm pretty sure it was that way, without a

21   doubt in my mind anyway, that it applied to all of

22   the cases.

23       Q.   Did you talk with anybody about the fact

24   that you made this call to Gary Rich on June 27th,

1   2007?

2       A.   Well, eventually I --

3            MR. WAKEFIELD:  Object to the question to

4   the extent it would involve counsel, any

5   communications of that nature.

6       Q.   Let me ask it this way:  Did you ever talk

7   to Bob Sweeney about this phone call on June 27th,

8   2007?

9       A.   I believe at some time I did.  I don't

10  remember exactly when that was though.

11      Q.   Do you recall if you initiated the

12  conversation or if Mr. Sweeney did?

13      A.   I do not remember.  Bob and I are friends,

14  and we call each other sometimes, not about legal

15  things, just to ask how each is doing and that kind

16  of thing.  So I don't recall.

17      Q.   Okay.

18           (Deposition Exhibit No. 19 marked.)

19  BY MS. MASON:

20      Q.   I'll hand you Exhibit 19.  It's two pages.

21      A.   Okay.

22      Q.   And I've handed you Exhibit 19, which is

23  Bates stamped number Simoni 2547 and 2548.  These

24  two pages are notes that you took -- well, notes

1    you took after a conversation with Keith Givens on

2    March 31st, 2008?

3         A.    It appears that way, yes.

4         Q.    Was that conversation in person or over

5    the phone?

6         A.    Well, it had to be over the phone.

7         Q.    Why did it have to be over the phone?

8         A.    I would not have had any occasion to be in

9    his company at that date.

10        Q.    How many times had you met Keith Givens

11   before you generated Exhibit 19?

12        A.    I have two general recollections of being

13   in Keith Givens' company.  Three actually.  Three.

14   One, one, the day of a court hearing in Clarksburg,

15   West Virginia, when he and Steve Medina came for a

16   court hearing, I believe.  Or if it wasn't a

17   hearing, a court procedure of some kind.  And Gary

18   Rich and I were with Steve Medina and Farrest

19   Taylor for a brief time.

20             And then I remember, I believe June of '05

21   when the dust sampling in the homes at Spelter was

22   being conducted, the dust sampling and some core

23   sampling that George Flowers was doing, the

24   geologist.  And to the best of my recollection,

1    Farrest Taylor was in Spelter during that period of

2    time.  I don't know if on all the days, but on -- I

3    remember him being there.  I don't remember if it

4    was one day, two days.  I don't remember.

5              And then the third time --

6        Q.    Okay.  Let me back you up for a second.

7    I'm asking about Keith Givens.

8        A.    Oh, I'm sorry.

9        Q.    No problem.  Let's go back to Keith

10   Givens, and we may want to get on Farrest Taylor

11   later.

12       A.    I apologize.

13       Q.    No problem.  I confuse them myself often.

14       A.    Okay.

15       Q.    So you said you met someone at a hearing,

16   but you think that was Farrest?

17       A.    That was Farrest.

18       Q.    Okay.  So when was the first time you met

19   Keith Givens?

20       A.    I think the first time I actually was in

21   the company of Keith Givens was when he came to the

22   second day of my deposition in Spelter, and that

23   was here in Charleston.

24       Q.    Okay.  And we've already talked about this

1    a little bit.  You gave a deposition in December of

2    2006 in Florida in the Spelter matter; is that

3    right?

4         A.   December of 2006 was the first day, and

5    then the second day was in the summer of 2007.

6         Q.   Okay.  And so that was the first time that

7    you met Keith Givens was in the summer of 2007?

8         A.   I believe that's correct.

9         Q.   And have you ever had an opportunity to

10   meet with him since you met him at your deposition

11   in Charleston?

12        A.   No.

13        Q.   So you talked with him on March 31st,

14   2008.  Did you call him?

15        A.   I'm thinking I did.

16        Q.   And what was the purpose of your call?

17        A.   I don't remember that.  I just -- I'm

18   looking at the notes that I made from the call, but

19   I don't remember if I had a reason, you know, if I

20   did have a specific reason why I was calling.  I

21   don't know.

22        Q.   And in the top -- well, it says Keith

23   Givens at the top of the document, and then right

24   below that it says Medina, dollar sign, K, and then

1    there's a box written -- or a box drawn around it.

2        A.    Uh-huh.

3        Q.    What did that signify to you?

4        A.    Don't know.

5        Q.    You learned during this phone call that

6    Mr. Medina was no longer with the Levin and

7    Papantonio firm?

8        A.    Yes.

9        Q.    Did you talk with Keith Givens at any time

10   during this conversation about your expectations

11   for compensation?

12       A.    I don't see it here in my notes, so...  I

13   don't remember talking about that.

14       Q.    And then down at the bottom, told him I

15   was only talking with him about this.  Check back

16   around november 2008.  Was there some reason that

17   you were only talking to Keith Givens about this?

18       A.    When you gave me this exhibit, I looked at

19   that note.  I don't know what it refers to.

20       Q.    And then when you met with Keith Givens in

21   Charleston, did you have any discussions with him

22   in Charleston about your expectations for

23   compensation in the Spelter matter?

24       A.    When I met with him in Charleston at the

1    time of the second day of my deposition?

2        Q.    Yes.

3        A.    I did.

4        Q.    What did you tell him?

5        A.    I don't remember exactly what I told him,

6    but I told him that -- he told me that he was not

7    representing me, and I shared with him that I was

8    really feeling uncomfortable, that I was feeling

9    like I was being left out, you know, the term left

10   out to dry.

11            I was feeling a little bit uncomfortable

12   along that line, because I'm in this situation,

13   which I shared with him, where I have this

14   agreement, okay, and I'm concerned about whether

15   I'm actually going to be -- whether the agreement's

16   going to be held up in two-thousand -- in summer of

17   2007.

18            MR. WAKEFIELD:  You're talking about Keith

19   Givens or Steve Medina?

20            THE DEPONENT:  No.  I'm talking about

21   Keith Givens.

22   BY MS. MASON:

23       Q.    And then -- and when you're referring to

24   agreement, you're talking about your agreement with

1    Gary Rich?

2        A.    Yes.  I had never discussed that, to the

3    best of my memory, with anyone from your firm.  I

4    don't think that was ever raised in discussion with

5    me.  And I was just feeling -- you know, I was

6    being told, okay, I'm here, but I'm really not

7    representing you.  You're on your own, so to

8    speak.  And I was feeling kind of, kind of out

9    there.  And I just said, you know, this is not a --

10   you know, who's watching out for me?  I've got this

11   agreement, and I just don't have a good feeling.

12   So I shared that with him that day.

13       Q.    And --

14       A.    Now -- go ahead.  I'll let you go.

15       Q.    What did he say in response to that, if

16   anything?

17       A.    Okay.  He said to me that we'll talk about

18   that more before I leave.  And then the following

19   day, just before he got into, I think, a taxi, he

20   said to me, don't worry about what we talked

21   about.  He said, I understand and I will take care

22   of it.

23       Q.    And you took that to mean -- did he

24   specifically reference the agreement that you

1    talked about when he said that?

2       A.   He did not specifically say that in his --

3    he did not specifically reference the agreement in

4    his comments, but that was the clear understanding

5    I had.

6       Q.   Okay.  But you hadn't been talking about

7    that just before he got in the cab?  Had you been

8    talking about the agreement right before he got in

9    the cab to leave?

10      A.   No.  He just said about what we talked

11   about yesterday, he said, don't worry about that.

12   I understand and I will take care of it.

13      Q.   And did he give you any explanation about

14   why he could not serve as your lawyer in that

15   second deposition or that second day of your

16   deposition?

17      A.   He may have but I don't recall.  I just --

18   I was sort of focusing on the fact that he was

19   telling me I'm not being represented.

20      Q.   Other than that conversation you had with

21   Keith Givens, did you ever have any conversation

22   with any anybody else at The Cochran Firm telling

23   them about your agreement with Gary Rich?

24      A.   To the best of my recollection, no.

1          (Cell phone ringing.)

2     A.   Sorry.  Sorry.

3     Q.   Do you need to take a break?

4     A.   No.  Sorry.

5          (Deposition Exhibit No. 20 marked.)

6  BY MS. MASON:

7     Q.   I've handed you what I've marked as

8  Exhibit 20.

9     A.   Oops, sorry.

10    Q.   Well, let me just back up for a second to

11 Exhibit 19 that were the notations about your call

12 to Keith Givens.  Do you recall if during that

13 conversation on March 31st, 2008 whether you talked

14 about your agreement with Gary?

15    A.   Could you repeat that, please?

16    Q.   Yeah.  Back on this Exhibit 19, you spoke

17 with Keith Givens by telephone on March 31st,

18 2008.  Now, that was after the trial of the Spelter

19 matter, correct?  Do you remember if that was after

20 the case had been tried?

21    A.   I don't remember the actual dates of the

22 trial.  I think the trial was in the fall of '07,

23 to the best of my recollection.

24    Q.   So you talked with Keith that following

1    March after the trial.  Did you talk to him then

2    about your agreement with Gary for compensation?

3        A.    On what date?

4        Q.    This date, March 31st, 2008, in Exhibit

5    19, if you recall.

6        A.    I do not recall.

7        Q.    All right.  Then let's look at Exhibit

8    20.  That's the one I've just handed you.  What

9    happened?  We lost it.

10        A.    I have it here.  Okay.  Let me see here.

11    Okay.

12        Q.    Now, when the trial was -- the Spelter

13    trial was going on, were you keeping up with how it

14    was proceeding?

15        A.    I think I had asked Keith maybe when we

16    were in Charleston together to let me know when the

17    trial had concluded.  And I vaguely remember a

18    call, I happened to be in Saratoga Springs -- no,

19    not Saratoga -- Saratoga Lake in New York, upstate

20    New York.  And I remember receiving a call, I

21    believe, from Keith.  I think that was the day.

22    And he was calling me to -- now, I think he called

23    me.  It's possible that I might have called him,

24    but I think he called me just to let me know

1    that -- what had happened with the trial at that

2    point.

3        Q.   And as far as you recall, was that close

4    to the date when the trial was concluded?

5        A.   Yes.

6        Q.   Okay.

7        A.   I think it had -- at least the major part

8    had concluded suggesting favorable results.

9        Q.   Okay.  And then what I've handed you as

10   Exhibit 20, it's Simoni 2747, and it is an e-mail

11   from Christian Campbell.  Do you know who she was,

12   is?

13       A.   I saw this not too long ago, and took it

14   that she was someone in the Cochran office.

15       Q.   Do you know if you had ever spoken to her

16   ever?

17       A.   I may have spoken with her, something

18   about deposition, because I did communicate with

19   The Cochran Firm about, you know, being in

20   Charleston and for the deposition and that kind of

21   thing.

22       Q.   Did you receive this e-mail from Christian

23   Campbell?

24       A.   Did I receive this e-mail?

1    Q.  Yes.

2    A.  I assume that I did.  Let me see.  Let me

3 see the -- it's got my e-mail address on it.

4    Q.  Okay.  Which one is your e-mail address?

5    A.  The wisaguy61@yahoo.com.

6    Q.  And do you know who Michael Brookshire is?

7    A.  Yes, I do.

8    Q.  Who is he?

9    A.  He's an expert having to do with medical

10 monitoring and...  He was involved in the WVU case.

11    Q.  Was he involved in the Spelter case?

12    A.  I believe so, yeah.

13    Q.  What about K. Brown, do you know who that

14 is?

15    A.  My guess is K. Brown was possibly -- and

16 this is an educated guess.

17        MR. WAKEFIELD:  Well, I don't want you to

18 guess.

19        THE DEPONENT:  Okay.

20        MR. WAKEFIELD:  If you know, tell her you

21 know.

22        THE DEPONENT:  I do not know for sure.

23 BY MS. MASON:

24    Q.  Did you do any work for Dr. Kirk Brown in

1    the Spelter case?

2        A.    I believe Kirk Brown was the guy involved

3    with the -- the expert involved with the dust

4    sampling.

5        Q.    And do you know who

6    toby@envirotoxicology.com is?

7        A.    No.

8        Q.    Do you know who George C. Flowers is?

9        A.    Yes.

10       Q.    Who is he?

11       A.    He's a geologist in the Spelter case.

12       Q.    Okay.  And john@greenfieldadvisors.com, do

13   you know who that is?

14       A.    No.

15       Q.    Toxicking@aol.com?

16       A.    No.

17       Q.    Easi@att.net?

18       A.    No.

19       Q.    Wisaguy61@yahoo.com.  That's you?

20       A.    That's me.

21       Q.    Jstewart@eheinc.com?

22       A.    No.

23       Q.    C. Werntz?

24       A.    I believe C. Werntz is a physician at the

1    university -- West Virginia University Medical

2    Center.

3        Q.   Do you know whether he was involved in the

4    Spelter matter?

5        A.   I believe he was.

6        Q.   And then GSC652?

7        A.   I do not know whose e-mail that is.

8        Q.   All right.  And the e-mail says, please

9    make sure you have submitted all final invoices to

10   our office concerning the above-referenced case.

11   Thank you.

12            What did you do in response to this

13   e-mail?

14       A.   Well, I know I didn't send any invoices.

15       Q.   Did you contact anybody and ask them if

16   you should send any invoices?

17       A.   No.

18       Q.   Is there any reason you didn't send any

19   invoices?

20       A.   I didn't understand why I would have -- be

21   having to submit invoices, except if it was

22   something -- related to something I had done in

23   Spelter.  Like, you know, I was reimbursed for maps

24   that I had purchased and things like that.

1       But since my compensation, as I

2  understood, would come from the agreement that I

3  had with Rich, you know, not until the cases were

4  settled and based on my contributions and the value

5  of my contributions, never had the thought or

6  expectation of having to keep hours of work or

7  anything like that.  And so the idea of invoices

8  for work didn't make any sense to me.  I think

9  that's why I didn't respond.

10      Q.   And I think I asked you.  It's getting

11  late in the day.

12      A.   That's okay.

13      Q.   So did you say you did not contact anybody

14  in response to this e-mail?

15      A.   I don't believe so.  I don't recall doing

16  that.

17      Q.   Now, you had submitted an invoice on

18  behalf of your wife at some point, correct?

19      A.   Yes.

20      Q.   Why did you submit an invoice for her?

21      A.   She was assisting in the property access

22  work for the geologist and getting access to

23  properties, and she helped for a short period of

24  time.  I don't -- I don't know, maybe it was a week

1    or 10-day period that she was helping with that.

2        Q.   So who did you submit the invoice to?

3        A.   I think -- I'm quite sure it was Levin

4    Papantonio.

5        Q.   And was your wife paid for her time?

6        A.   Yes.

7             MS. MASON:  Okay.  That's all I have for

8    right now.  Do you want to go off the record and

9    switch seats?

10            MR. WAKEFIELD:  Sure.

11            THE VIDEOGRAPHER:  We are now off the

12   record.  The time is 4:32 p.m.

13                  (Short break taken.)

14            THE VIDEOGRAPHER:  We are now back on the

15   record.  The time is 4:34 p.m.

16                       EXAMINATION

17   BY MR. McDOUGAL:

18       Q.   Dr. Simoni, are you ready to continue your

19   deposition, sir?

20       A.   I am.

21       Q.   I think I introduced myself to you before

22   the deposition began.  That's -- I'm Cary McDougal

23   with the law firm of Baron & Budd.  You understand

24   that, right?

1      A.   It's good to see you again.

2      Q.   You and I met.  In fact, I think you

3  refreshed my memory.  I think we first met at

4  Mr. Fullen's funeral, correct?

5      A.   That's correct.

6      Q.   And I think that's the only time we've

7  met; is that right?

8      A.   I believe so.

9      Q.   I have a number of questions for you.

10  Ms. Mason has significantly shortened what I'm

11  going to ask you, so that's the good news.

12          If during the course of my questions if

13  you don't understand what I'm asking you, just let

14  me know and I will glad to rephrase it.  Fair

15  enough?

16      A.   Fair.

17      Q.   All right.  It's my understanding from

18  your testimony that your formal educational

19  training really relates to the field of sociology

20  and the law.  Is that fair?

21      A.   Sociology and the law, and with the one

22  year at -- in business school.

23      Q.   Exactly.  In terms of your training in --

24  as a sociologist, as a professor in sociology and

1  in your attending law school, you don't have any

2  specific training in environmental litigation, do

3  you, sir?

4      A.   No.

5      Q.   You don't have any training in litigation

6  related to chemical exposure, do you?

7      A.   No.

8      Q.   Or beryllium or mercury exposure?

9      A.   Let me just say --

10     Q.   Sure.

11     A.   -- that in my undergraduate education,

12  before I received -- before I achieved my BA in

13  political -- with political science from Notre

14  Dame, I was a pre-med science major, and in that

15  course of study, I took and received credits for 21

16  hours of chemistry, it just so happens.  So I have

17  some acquaintance with chemicals and chemistry.  So

18  I was -- I don't know.  I'll just leave it at that.

19     Q.   Fair enough.  With the exception of your

20  21 hours in undergrad of chemistry, you don't have

21  any other training in litigation related to

22  chemical mercury or beryllium exposure, do you?

23     A.   Mercury or beryllium, no.

24     Q.   We talked about training.  You've also not

1    had any experience in litigating environmental law

2    cases, have you, sir?

3        A.    Before -- in litigating experience?

4        Q.    Yes, sir.

5        A.    Personal?

6        Q.    Yes, sir.

7        A.    No.

8        Q.    You've not had any experience in

9    litigating chemical exposure cases either, have

10    you, sir?

11        A.    No.

12        Q.    Or mass tort cases?

13        A.    No.

14        Q.    When you went to law school, and I believe

15    you got your JD in 1995; is that correct?

16            MR. WAKEFIELD:  Let's go off the record.

17            MR. McDOUGAL:  Sure.

18            MR. WAKEFIELD:  Is there something you

19    need to check, Joe?

20            THE DEPONENT:  I'm just trying to get this

21    off so it doesn't bother --

22            MR. WAKEFIELD:  I'm sorry.

23            THE DEPONENT:  I'm sorry.

24            MR. WAKEFIELD:  No, that's no problem.

1          THE DEPONENT:  All right.  I finally got

2     it.  Okay.  Thank you.

3          MR. McDOUGAL:  You ready to go back on?

4          THE DEPONENT:  Yes.

5          MR. WAKEFIELD:  Yes.

6          THE VIDEOGRAPHER:  We never did go off.

7          MR. McDOUGAL:  Okay.  We're still on.

8     BY MR. McDOUGAL:

9          Q.   You graduated from law school or obtained

10    your JD degree in 1995, correct?

11         A.   Yes.

12         Q.   All right.  During the -- I believe you

13    indicated there were four attempts to pass the

14    bar.

15         A.   Yes.

16         Q.   Beginning in 1996, 1997 and 2002, correct?

17         A.   Yes.

18         Q.   During any of the attempts at passing the

19    bar during those occasions, those four occasions --

20    strike that.

21              The West Virginia bar, I've never taken

22    it.  So the West Virginia bar, is it a two- or

23    three-day test?

24         A.   Two-day.

1    Q.   Does it have any portion of the test that

2    applies to ethics.

3    A.   Not the actual bar exam.

4    Q.   Do you take a separate examination, what I

5    believe has been referred to as the MPRE?

6    A.   Yes.

7    Q.   Did you take that?

8    A.   I did.

9    Q.   Did you take that on how many occasions?

10   A.   I believe I took it every time I took the

11   bar, but I don't recall for sure.

12   Q.   Fair enough.  And did you receive a

13   separate score for the MPRE separate from the West

14   Virginia two-day bar that you've described?

15   A.   Yes.

16   Q.   Did you -- and what were your results of

17   the MPRE test you took?

18   A.   To the best of my recollection, I think I

19   passed each time I took the MPRE.

20   Q.   You believe you took it four times, and

21   you believe you passed each time?

22   A.   At least two.  I don't know about four,

23   but at least a couple.  I don't remember what the

24   requirements were, you know, whether each time you

1    took the exam, bar exam, that you have to take the

2    MPRE again.  I don't remember that.

3        Q.   Did you take some ethics courses while at

4    West Virginia law school?

5        A.   Yes.

6        Q.   And one or more than one?

7        A.   One.

8        Q.   Was it just an ethics course, a course on

9    ethics?

10       A.   To the best of my recollection, yes.

11       Q.   Who taught it?

12       A.   Professor Bowman, I believe.

13       Q.   Is he still a faculty member there?

14       A.   I do not know.

15       Q.   Did you pass that course?

16       A.   Yes.

17       Q.   And the ethics course that was taught by

18   Professor Bowman, in terms of Professor Bowman

19   himself, would you consider him an expert in the

20   area of ethics?

21       A.   Yes.

22       Q.   You would consider him authoritative in

23   that area?

24       A.   Yes.

1    Q.   As part of your studies in ethics and your

2  preparation for the MPRE, did you come to

3  understand that the sharing of legal fees was

4  impermissible with non-lawyers?

5    A.   To the best of my recollection, I believe

6  that was part of the content, study.

7    Q.   And you -- I'm sorry.

8    A.   I believe that was part of the content of

9  study for that.

10    Q.   You knew that in 1995, did you not?

11    A.   Yes.

12    Q.   You certainly knew that in 2000?

13    A.   Yes.

14    Q.   All right.  As part of your studies in law

15  school, you also took, I assume, classes on

16  procedure?

17    A.   On?

18        MR. WAKEFIELD:  What type of procedure?

19  Civil?

20        MR. McDOUGAL:  Civil procedures.  I'm

21  sorry.  Sorry.

22    A.   On civil procedures?

23    Q.   Yes, sir.

24    A.   Yes.

1    Q.   In your civil procedure classes, you

2    understood and were taught what it meant to have a

3    privilege that attaches in a particular case.  You

4    understand that concept?

5    A.   Yes.

6    Q.   You understand that there's an attorney

7    client privilege that is preserved between the

8    attorney and the client that he or she represents,

9    correct?

10   A.   I do.

11   Q.   You understand that if a third person is

12   injected in that relationship who is not a lawyer,

13   then that privilege that exists between the

14   attorney and the client can be waived?

15        MR. WAKEFIELD:  Object to the form.  Not

16   accurate.

17   Q.   Do you understand that, sir?

18   A.   Could you maybe rephrase the question?

19   Q.   Absolutely.  You understand, or do you

20   understand that when a lawyer is talking with or

21   communicating with his or her client, that if there

22   is someone else there, that that privilege between

23   the lawyer and the client might be waived?  Do you

24   understand that, sir?

1          MR. WAKEFIELD:  Object to the form.  You

2    can answer.

3          A.   I believe that's the case.

4          Q.   And you knew that in 2000, did you not,

5    sir?

6          A.   Did I know it in 2000?

7          Q.   Yes, sir.

8          A.   About privilege, you're asking?

9          Q.   Yes.  Absolutely.

10         A.   Yes.

11         Q.   With Ms. Mason you talked about, frankly,

12   a number of different lawsuits or pieces of

13   litigation that you have had some knowledge of or

14   involvement in.  And what I want to ask you is

15   other than the Spelter and the Fairmont litigation,

16   have we covered all of the lawsuits that you have

17   had any involvement in with other lawyers from 1995

18   to the present?  I just want to make sure we've

19   covered them all.

20         A.   I believe we have.

21         Q.   Thank you.

22              I want to visit with you just a little bit

23   about Mr. Harless.

24         A.   Yes.

1      Q.   I believe it's Larry Harless.

2      A.   That's correct.

3      Q.   I think you indicated you had what you

4 described as a working relationship with him; is

5 that correct?

6      A.   We were friends and I worked with him, not

7 for him, but with him on different things.

8      Q.   You never obtained payment in connection

9 with the cases with Mr. Harless, but you basically

10 were an intern and learning was sufficient for you?

11     A.   That's correct.

12     Q.   How many hours did you spend on cases for

13 which you did not get any kind of payment but the

14 learning was enough with him?

15     A.   I have no idea.

16     Q.   You didn't keep your time back then?

17     A.   Never.

18          MR. WAKEFIELD:  You need to let him finish

19 his question first --

20          THE DEPONENT:  Yes.  I'm sorry.

21          MR. WAKEFIELD:  -- before you answer.

22 BY MR. McDOUGAL:

23     Q.   Mr. Rich in his deposition described in

24 relation to Mr. Harless a written document that I

1    believe Mr. Harless drafted.  Were you there for

2    that portion of Mr. Rich's deposition?

3        A.    I was.  I'm sorry.  Yes, I was.

4        Q.    Do you have any recollection of that

5    document?

6        A.    I have no recollection of that document.

7        Q.    And before you heard Mr. Rich testify to

8    that fact, you didn't know that there was any

9    agreement or that any such document existed?

10       A.    That was the first I heard of it.

11       Q.    Mr. Rich also indicated in his deposition

12   that as to that document or that agreement, that to

13   use his words, quote, things languished, end

14   quote.  Do you have any knowledge about what he

15   might be referring to with regard to things

16   languishing as to an agreement with you,

17   Mr. Harless and Mr. Rich?

18           MR. WAKEFIELD:  Object to the form.

19       A.    He used the language?  You're saying that

20   he used the language?

21       Q.    He just said as to the agreement between

22   the three of you, things languished.

23       A.    And your question for me is what.

24       Q.    Do you know what he's talking about?

1    MR. WAKEFIELD:  Object to the form.

2  A. I think I do.

3  Q. What would that be, sir?

4  A. I think he's referring to the period of

5 time after we -- the three of us had first talked

6 about, at the Econo Lodge in Fairmont, that there

7 was a period of time in which -- until there was a

8 decision to move ahead.  And I spoke to that, I

9 believe, in the earlier part of the deposition

10 where Larry Harless was not wanting to move ahead

11 with an out-of-state attorney involved.  And so

12 that's -- that, I think, was the major reason for

13 what Rich described as languishing.

14  Q. I want to walk through a little bit the

15 discussions that you had with Mr. Rich concerning

16 payment for your time.  All right?

17  A. Sure.

18  Q. It looks to me that there was an initial

19 agreement in November of 1999 that you've already

20 testified to, correct?

21  A. Yes.

22  Q. That initial agreement was as to a 50/50

23 split as to Mr. Rich's portions of whatever

24 proceeds he might get.

1      A.    Correct.

2      Q.    And you were expecting from Mr. Rich

3    whatever -- from whatever he got that you would get

4    50 percent of that, correct?

5      A.    Yes.

6      Q.    And that was your agreement with Mr. Rich

7    in November of 1999?

8      A.    That's correct.

9      Q.    And it was that -- no one else was party

10   to that agreement, were they?

11     A.    No.

12     Q.    You expected Mr. Rich to honor that

13   agreement, correct?

14     A.    I did.

15     Q.    Was it in any way conditioned upon your

16   procuring a law license?

17     A.    Never.

18     Q.    Did you hear him testify to that in his

19   deposition?

20     A.    I did.

21     Q.    And I assume you disagree with that?

22     A.    I do.

23     Q.    Were any of the discussions that you had

24   with Mr. Rich concerning payment to you ever

1  conditioned on any licensing by you in terms of

2  getting a law license?

3      A.   No.

4      Q.   This November 1999 agreement between you

5  and Mr. Rich, that agreement was never communicated

6  to Baron & Budd, was it, sir?

7          MR. WAKEFIELD:  Object to the form.

8          MR. MARINO:  Objection, foundation.

9      Q.   You never told Baron & Budd about it, did

10  you?

11      A.   I never told Baron & Budd about it.

12      Q.   You're not aware of anyone else ever

13  telling Baron & Budd about it, are you?

14      A.   I'm not aware of anybody.

15      Q.   After the original November 1999

16  agreement, the 50/50 agreement, the next discussion

17  that you had with Mr. Rich concerning any change to

18  that agreement would have been April of 2002,

19  correct?

20      A.   That is correct.

21      Q.   And that's where I believe you testified

22  that Mr. Rich indicated he was going to reduce your

23  fee in the agreement that you had with him?

24      A.   My portion of the agreement.

1    Q.   Yes, sir.

2    A.   The percentage.

3    Q.   Yes, sir.

4    A.   He was going to reduce the percentage.

5    Q.   And I believe you indicated he was going

6 to reduce that to 20 percent; is that right?

7    A.   Yes.

8    Q.   Do you have the exhibits in front of you,

9 Dr. Simoni?

10    A.   I do.

11    Q.   Just pull up, if you would, Exhibit No.

12 5.

13    A.   Okay.

14    Q.   That's what -- that's the April 2002

15 modification we're talking about, isn't it?

16    A.   Yes.

17    Q.   And as to that April 2002 modification and

18 your note on Exhibit No. 5, you did not ever

19 communicate that or the substance of it or the fact

20 that it even occurred to Baron & Budd, did you,

21 sir?

22    A.   No.

23    Q.   You don't know that Mr. Rich or anybody

24 else ever did, do you?

1      A.    I am not aware of any communication about

2    that.

3           MR. McDOUGAL:  We've got to take a break

4    for the tape.

5           THE VIDEOGRAPHER:  We are now off the

6    record.  The time is 4:49 p.m.

7                (Short break taken.)

8           THE VIDEOGRAPHER.  We are now back on the

9    video record.  This is tape number six of the video

10   deposition of Joseph Simoni.  Today is June 11,

11   2013, and the time is 4:56 p.m.

12   BY MR. McDOUGAL:

13     Q.    Dr. Simoni, we were talking before the

14   break about the April 2002 modification by Mr. Rich

15   to your agreement with him.

16     A.    Yes.

17     Q.    I believe you indicated earlier that the

18   reduction that he made to 20 percent, you believe

19   was a punitive measure for you either doing or

20   failing to do some things that displeased him.

21     A.    That was my sense of it, yes.

22     Q.    And I think you indicated that it

23   surprised you because you perceived you and he to

24   be in a joint venture.  Do you recall that, sir?

1    A.   Yes.  And had been working together since

2    November of '99.

3    Q.   And the joint venture that you and he had

4    agreed to and were working on, that was a joint

5    venture between two people, that is Mr. Rich and

6    you, correct?

7    A.   Yes.

8    Q.   The next discussion and/or modification

9    that I've got at least to this original agreement

10   that you had with him would have been in late

11   December of 2002.  Do you recall that, sir?

12   A.   Yes.

13   Q.   Look at Exhibit No. 10, if you would.

14   A.   Okay.

15   Q.   Do you see that, sir?

16   A.   I do.

17   Q.   In December 2002, I believe you testified

18   that Mr. Rich agreed to modify the agreement again

19   and raise your percentage to -- back to the 50

20   percent that it -- where it began, correct?

21   A.   Well, I believe what I said, if I may --

22   Q.   Sure.

23   A.   -- was that it was sometime after the

24   visit to Washington, DC that he and I made to

1    Mr. Marino's office.  The exact date I think I said

2    I wasn't sure of, but it was late -- the trip to

3    Washington was middle fall to late fall of -- to

4    the best of my recollection.  And then it was

5    sometime after that trip that he made it clear to

6    me that he was going to go back to the 50/50.

7        Q.   And that would have been -- when you say

8    late or fall, that would have been 2002, correct?

9        A.   2002.

10       Q.   Okay.  And, in fact, you memorialized that

11   event in Exhibit No. 10, didn't you?

12       A.   Yeah, it appears that I did.

13       Q.   And the decision that Mr. Rich

14   communicated to you that he would return your

15   portion to the 50 percent originally agreed to,

16   that was his unilateral decision, was it not?

17       A.   Yes.

18       Q.   You mentioned a phone call that you

19   received from Baron & Budd.  Do you recall that,

20   sir?

21       A.   Yes.

22       Q.   And I believe that would have been around

23   the same time, in this fall, late fall or December

24   2002 time frame.  Do you recall that?

1      A.    Yes.  It was just before the trip to

2  Washington, DC.

3      Q.    And you indicated that Ms. Presby and

4  Mr. Jensen called you?

5      A.    Yes.  Well, I don't know who actually -- I

6  don't remember who actually called me, but it was a

7  call with a message from -- I don't know if it was

8  from both of them or one of them to please call,

9  you know, please call them back.  I don't remember

10  if it was from -- if the call came from both of

11  them or one of them.

12      Q.    Fair enough.  And you returned a phone

13  call where both of them were on the other line?

14      A.    Yes.

15      Q.    You indicated in that phone call that one

16  or both of them asked a question that had to do

17  with what if Mr. Rich were not in the case,

18  something though that effect.  Do you recall that?

19      A.    Something to that -- yes, I do, clearly.

20      Q.    And you communicated that to Mr. Rich who

21  was standing right by you?

22      A.    Well, I didn't communicate to me (sic).

23  He was listening to the conversation.

24      Q.    Okay.  Was anyone else part of that

1    conversation --

2        A.    No.

3        Q.    -- that you're aware of?  Anyone else on

4    the Baron & Budd end?

5        A.    I don't believe so.

6        Q.    Did they indicate, either of them,

7    indicate to you anything about what they meant by

8    Mr. Rich not being in the case?

9        A.    I do not recall.

10       Q.    Did they suggest that you sever your

11   relationship with Mr. Rich or anything of that

12   nature?

13       A.    I don't remember their exact words, but it

14   was clear to me that they were asking me if I was

15   willing to go on in the case with him out of it.

16       Q.    You were -- I'm sorry.  Go ahead.

17             You recall in general terms that being

18   communicated to you; you don't recall specifically

19   how they did it?

20       A.    I don't -- right.

21       Q.    And your response was I -- to the effect

22   of once I make a commitment to someone, I honor

23   that?

24       A.    That was part of my response, yes.

1    Q.   What was the rest of your response?

2    A.   The other part I underscored for them was

3    that I was involved with the case because I was

4    wanting to help do good things for the people in

5    Fairmont.

6    Q.   It was immediately after that that

7    Mr. Rich increased your amount back to 50 percent?

8    A.   Very soon after that.  I don't remember

9    the exact time line, but soon after that trip over

10   to Washington.

11   Q.   Was your perception that that return to

12   the 50 percent was a reward for your loyalty?

13   A.   I have no doubt in my mind that it was.

14   Q.   That return to 50 percent was -- you never

15   communicated that to Baron & Budd, did you, sir?

16   A.   No.

17   Q.   You never even addressed this issue with

18   Baron & Budd, did you?

19   A.   Never did.

20   Q.   You don't know that Mr. Rich or anybody

21   else ever communicated that fact to Baron & Budd?

22   A.   I have no knowledge of that.

23   Q.   The next discussion on fees with Mr. Rich

24   that I have is a visit to Waynesburg.

1    A.   It was on the way back from a trip to the

2    Pittsburgh airport, stopping in Waynesburg,

3    Pennsylvania.

4    Q.   December 2003?

5    A.   That's correct.

6    Q.   And that was the coffee shop that you

7    described?

8    A.   Yes.

9    Q.   And the difficult visit which resulted in

10   you becoming a little emotional?

11   A.   Yes.

12   Q.   It was during that visit that there had

13   been another modification by Mr. Rich back down to

14   20 percent?

15   A.   Yes.

16   Q.   That coffee shop visit and the

17   communication between you and Mr. Rich and this

18   change of percentages again, that was never

19   communicated by you to Baron & Budd, was it?

20   A.   Not by me.

21   Q.   Wasn't communicated, to your knowledge,

22   anyone else to Baron & Budd, was it?

23   A.   I have no idea of that.

24   Q.   Mr. Rich never told you that he ever

1    brought any of these fee issues up -- or strike

2    that.

3            Mr. Rich never communicated to you that he

4    ever addressed with Baron & Budd his agreement with

5    you?

6        A.   That's correct.

7        Q.   The last discussion I've got between you

8    and Mr. Rich concerning compensation is in June of

9    2005, and that would have been in the -- I believe

10   the Star City, West Virginia meeting.

11       A.   Yes.

12       Q.   Am I right on that?  Have I got all the

13   meetings about --

14       A.   June of 2005, Star City.

15       Q.   And in that particular discussion -- well,

16   turn to Exhibit No. 12, if you would.

17       A.   Okay.

18       Q.   Exhibit No. 12 memorializes the Star City

19   June 2005 meeting with Mr. Rich, doesn't it?

20       A.   June 3, 2005, yes.

21       Q.   And the communications between you and

22   Mr. Rich on that particular -- concerning that

23   particular visit concerning the issues contained in

24   Exhibit No. 12, that was never communicated by you

1    to Baron & Budd, was it?

2        A.    No.

3        Q.    You're not aware of Mr. Rich or anyone

4    else telling Baron & Budd about it?

5        A.    No.

6        Q.    Have we covered -- and I've got five of

7    them.  Have we covered each of the discussions or

8    communications you had with Mr. Rich concerning you

9    getting paid?

10       A.    I believe we have.

11       Q.    Are there any others?

12       A.    Only the phone communication that I

13   already talked about in the deposition in 2007, I

14   believe.

15       Q.    Anything else?

16       A.    No.

17       Q.    You've mentioned a number of cases other

18   than Spelter and Fairmont where you worked with

19   other lawyers and Mr. Rich.  Mr. Sweeney is an

20   example, correct?

21       A.    Yes.

22       Q.    And I believe you indicated that at least

23   Mr. Harless didn't -- never paid you any moneys in

24   connection with your services to him or the cases

1    that he was affiliated with?

2         A.   That's correct.

3         Q.   During the course of these various cases

4    and these various lawyers that you worked with and

5    dealt with, did you ever receive any 1099s from any

6    of those lawyers for payments to you?

7         A.   Yes.

8         Q.   What were they?  When and where?

9         A.   I received a 1099 from Mr. Sweeney.  And

10   the other part of your question was?

11        Q.   I think it was just when and where.

12        A.   When and where?

13        Q.   Probably from whom and when.

14        A.   Okay.  I just refreshed my memory, if I

15   may say, use that terminology --

16        Q.   Sure.

17        A.   -- just yesterday that there was a 1099.

18   That's -- I believe it was issued for the 2006 tax

19   year.

20        Q.   Any others?

21        A.   No.

22        Q.   Do you keep your records of your income

23   tax filings back how far?

24        A.   I try to keep them every year.  I don't

1    know how far back we go.

2         Q.    Does it go back to 2000, do you think, or

3    do you know?

4         A.    I'm not sure if they go back to 2000.

5         Q.    For the Reedsville case, you never

6    obtained any compensation?

7         A.    No.  Well, that case never got off the

8    ground.

9         Q.    Did you bill anyone for your time spent on

10   that case?

11        A.    No, because we -- well, because of the

12   same general understanding that Rich and I had when

13   we worked on cases.

14        Q.    Would that be true of the Stanridge case

15   as well?

16        A.    I assumed the same general understanding

17   in that, but maybe he didn't.  You know, maybe we

18   never talked about that specifically.  I don't have

19   a recollection of any specific communication with

20   him about that, you know, about sharing.

21        Q.    Yes, sir.  Turn to Exhibit No. 4.  I just

22   had a quick follow-up question on that, please,

23   sir.

24        A.    Exhibit No. 4?

1    Q.   Yes, sir.

2    A.   I should put these in order.  Okay.

3    Q.   Got it?

4    A.   I do.

5    Q.   At the bottom of that Exhibit No. 4, there

6    is a number two.  Do you see that?

7    A.   Yes.

8    Q.   And that's where there's some mention of

9    you doing something to prevent his daughter, I

10   believe that's Mr. Rich from -- Mr. Rich's daughter

11   being accepted at ND or Notre Dame.  Do you see

12   that?

13   A.   I do.

14   Q.   Beneath that, what does it say?  It says,

15   I asked, and then what?

16   A.   Says, I asked, and then there's a dash,

17   and it says talked about agreement, not yet reached

18   with Baron & Budd.

19   Q.   Do you recall what that means?

20   A.   Oh, it's not -- reached with Baron, it

21   says, and then -- I'm looking for a date here.

22   This is 2/21/05.  Talked about agreement not yet

23   reached with Baron & Budd.  I'm not sure at this

24   point what that actually referred to specifically.

1    Q.    There's another comment about these

2    liberal elitists.  Do you see that, sir?

3    A.    I do.

4    Q.    And who is that referring to in this

5    occasion?

6    A.    I believe it was referring, since there's

7    an arrow after the Baron, I believe it was

8    referring to Baron & Budd, but I'm not absolutely

9    sure.

10    Q.    And then you indicate that Mr. Marino

11    thinks that he's over the top, but stays with -- I

12    believe that's him, but I'm not positive.  Do you

13    see that, sir?

14    A.    I do.

15    MR. WAKEFIELD:  I think it says within,

16    doesn't it?

17    Q.    Within?

18    A.    Well, it's not -- there's something off

19    the copy.

20    Q.    Yeah.

21    A.    I don't know what that last...

22    Q.    Do you recall what you meant by that?

23    A.    Well, I believe he was relating to me that

24    his sense of what Marino was thinking about him.

1    That's all I recollect.

2        Q.    Back on the conversation with

3    Ms. Jensen -- Mr. Jensen and Ms. Presby, was there

4    ever any follow-up to that discussion, that

5    telephone call that you had with those two people?

6        A.    No.

7        Q.    Not from them or by you?

8        A.    No.  I mean, we had communications after

9    that, but not anything related to that that I

10   recall.

11       Q.    You may have been asked this by

12   Ms. Mason.  I apologize if I'm going over it

13   again.  Why did you start creating time records in

14   this case, in these cases?

15       A.    I didn't.  Not until just relatively

16   recently when we -- you know, until we got into

17   this case, this particular case that we're all

18   involved with right now.  I was not -- I did not

19   keep contemporaneous time records, because I've

20   never had the notion that there was a need for me

21   to do that.

22       Q.    All of the time summaries that you have

23   provided to us are recreated time summaries piecing

24   together?

1    A.    To the best of my ability, from all of my

2    recollections and every piece of paper I could come

3    across.  That's just -- I did the best I could.

4    Q.    Do you recall before Baron & Budd's being

5    brought into this case that there was a memorandum

6    of understanding between Mr. Rich, Tom Girardi and

7    the Masry firm?

8    A.    I do.

9    Q.    You saw that document, didn't you?

10    A.    Yes, I did.

11    Q.    There was a formal memorandum of

12    understanding that paid certain fees in connection

13    with the Fairmont, West Virginia case, correct?

14    A.    Yes.

15    Q.    Did you assist Mr. Rich in dealing with

16    the issues related to what became known as that

17    memorandum of understanding?

18    A.    I'm not sure I'm understanding your

19    question.  I don't want to speak to what you're not

20    asking.  If you would just clarify for me, please.

21    Q.    Sure.  The memorandum of understanding

22    that was executed by Girardi, Masry and Mr. Rich,

23    you knew its contents, didn't you?

24    A.    I did.

1    Q.   You knew that that memorandum of

2    understanding called for Mr. Rich to be paid a

3    certain percentage?

4    A.   I did.

5    Q.   And all the percentages that were

6    reflected in that memorandum of understanding

7    related to only those three entities, Rich, Masry

8    and Girardi, correct?

9    A.   That's correct.

10    Q.   It also -- that memorandum also called for

11    the fronting of expenses or costs in connection

12    with the Fairmont case.  Do you recall that?

13    A.   By the way, can I go back to the last

14    question?

15    Q.   Sure.  Absolutely.

16    A.   I don't recall in that agreement, I just

17    don't remember -- I remember the general

18    percentages, but I don't remember if there was any

19    allowance in the agreement for, like, Professor

20    Cady, you know.  I just don't recall in that

21    specific agreement.  I just wanted to clarify that.

22         (Deposition Exhibit No. 21 marked.)

23    BY MR. McDOUGAL:

24    Q.   Let me just -- just so that we're clear,

1    I'm trying to get through things a little quicker

2    than maybe I should, and maybe this will help.  Let

3    me hand you defendants, or excuse me, Deposition

4    Exhibit -- is it 21?

5        A.   21, yes.

6        Q.   You see that to be the memorandum of

7    understanding that I was just referring to,

8    correct?

9        A.   Yes.

10       Q.   And under Roman numeral II there's a cost

11   and expense paragraph, isn't there?

12       A.   Yes.  Might I say?

13       Q.   Sure.

14       A.   Actually, there was an earlier agreement.

15       Q.   Okay.

16       A.   Before March, where Rich's percentage was

17   35 percent.  But it was a mistake, and it was

18   corrected in this agreement, I believe.

19       Q.   In Exhibit 21 is the corrected version?

20       A.   It's the corrected version of the

21   agreement.

22       Q.   And I believe that exhibit also contains a

23   paragraph on costs and expenses.  Do you see that,

24   sir, number two?

1    A.   Yes.  Uh-huh.

2    Q.   That contemplates the costs that are

3  advanced for different people that are involved in

4  the case, such as experts or consultants, that

5  those would be submitted and repaid.  Do you see

6  that, sir?

7    A.   I see that.  Yes.

8         MR. WAKEFIELD:  Object to the form,

9  incomplete.

10   Q.   Do you know whether as part of that

11  memorandum of understanding or the follow-up to it

12  that Mr. Rich ever submitted any bill, cost or

13  documentation saying, hey, Joe Simoni's working on

14  this case, and I would expect that he be repaid?

15   A.   To the best of my knowledge, no.

16   Q.   Now, you worked with Mr. Rich in

17  connection with the -- what's been described as the

18  fee dispute between Baron & Budd, Masry and

19  Mr. Rich, did you not?

20   A.   I did.

21   Q.   All right.  In fact, you've documented in

22  some of the recreated time specific time that was

23  devoted to that issue.  Do you recall that?

24   A.   Yes.

1    Q.   You assisted Mr. Rich in revising

2  proposals, things of that nature, correct?

3    A.   Yes.

4    Q.   And I believe you also visited with

5  Mr. Masry and called Mr. Masry on behalf of

6  Mr. Rich --

7    A.   I did.

8    Q.   -- in connection with that fee dispute?

9    A.   Yes.

10    Q.   What do you recall from that conversation?

11    A.   Well, Mr. Rich asked me to call Mr. Masry

12  to remind him that there was an agreement and that

13  his portion of this agreement was 30 percent.  And

14  as I recall, there were two phone communications.

15  I think I reached Masry and he was not able to

16  speak the first night, and we called -- we talked

17  the second night.  But finally there was this

18  communication about that.

19         And do you have another question about

20  that?

21    Q.   No.  I was going to let you finish.

22    A.   Okay.  Well, what I remember is -- you

23  want me to recollect, give you a recollection of --

24    Q.   Sure.

1      A.   What I remember is that Mr. Masry told me

2    that he felt it was necessary to bring Baron & Budd

3    in.  And so he got on the phone and called Fred

4    Baron and asked for Baron & Budd to come in,

5    because as Mr. Masry related to me, he felt that

6    the Masry firm didn't have the resources to deal

7    with what needed to be done in the case.  That's

8    the best of my recollection.

9      Q.   What was Mr. Rich's reaction to that?

10     A.   Well, he appreciated the information.

11   That didn't resolve his problem.

12     Q.   What was his problem?

13     A.   His problem was he was sensing that the

14   percent that he agreed to was -- part of that was

15   being taken away from him as a result of the

16   agreement that Masry needed to make with Baron &

17   Budd.

18     Q.   And it was as part of that problem that

19   you were enlisted by Mr. Rich to help him?

20     A.   I think that's fair to say.

21        (Deposition Exhibit No. 22 marked.)

22   BY MR. McDOUGAL:

23     Q.   And as -- look at Exhibit No. 22, if you

24   would.

1      A.    Yes.  I am looking at it.

2      Q.    Did you see this letter dated September

3  6th, 2002 on or around that date?

4      A.    Yes.

5      Q.    Whose notations are those that are on

6  that?

7      A.    Those are not mine.

8      Q.    Do you know whose they are?

9      A.    I do not.

10      Q.    Okay.  They don't look familiar to you?

11      A.    Doesn't look like my writing.  I'm not

12  sure.

13      Q.    Do you see on the facsimile page that

14  Mr. Rich is faxing that to you?  Am I right on

15  that?

16      A.    Yes.

17      Q.    So Exhibit No. 22, this letter dealing

18  with the fee relationship with Masry, Baron & Budd

19  and Mr. Rich, that's something that Mr. Rich sent

20  to you to help with?

21      A.    That's correct.

22      Q.    All right.  Did you work with Mr. Rich to

23  resolve that issue up until the time that it was

24  finally settled in 2004 between the parties?

1      A.   To the best of my recollection, I remember

2   working with him in terms of communicating with him

3   about it, and he might ask what I thought at

4   different points and that kind of thing.  Certainly

5   through 2002 and -- but you mentioned 2004.  I'm

6   not sure that it went that long.

7            I know clearly there was a lot in 2002,

8   and then there was -- I have a recollection of

9   2003, also, but I'm not sure if I was involved at

10  the end in 2004.  I don't recall that.

11     Q.   Do you recall seeing the ultimate

12  settlement agreement that Mr. Rich entered into

13  with Masry and Baron & Budd?

14     A.   I don't remember, sir.

15          (Deposition Exhibit No. 23 marked.)

16  BY MR. McDOUGAL:

17     Q.   Let me show you what I have marked as

18  Exhibit No. 23, sir.

19     A.   Sure.

20     Q.   Have you seen that before?

21     A.   I may have seen it during the discovery

22  phase of this particular case, but I don't know if

23  I saw it earlier.

24     Q.   You know that the ultimate settlement

1    agreement between Mr. Rich and Masry and Baron &

2    Budd resulted in a fee allocation to those firms.

3    You know that, do you not?

4        A.   Yes.

5        Q.   You know that also that that settlement

6    agreement resulted in each of those firms having a

7    requirement that they disclose to the others any

8    costs or expenses that they might have?

9        A.   I noted that relatively recently when I

10   was reading over the discovery documents.

11       Q.   You've seen that since then, haven't you?

12       A.   I've seen that since, yes.

13       Q.   And you know that pursuant to that

14   agreement, there was an opportunity for any of

15   those firms who had obligations to other folks to

16   disclose that fact to the other firms and get

17   reimbursed for them if it was in accordance with

18   the agreement?

19       A.   I assume that would be the case.

20       Q.   Do you know whether Mr. Rich submitted

21   expenses in accordance with that agreement to Baron

22   & Budd?

23       A.   I do not know that.

24       Q.   Did you participate or assist him in

1    Mr. Rich's statements and invoices to Baron & Budd?

2        A.   Could you repeat that, please?

3        Q.   Yes, sir.  That was a bad question.

4             Did you ever participate or assist

5    Mr. Rich in sending invoices to Baron & Budd for

6    payment of costs and/or expenses?

7        A.   I do not believe so.

8        Q.   Have you in the discovery process of this

9    case seen the various expenses and costs that have

10   been sent to Baron & Budd for payment by Mr. Rich?

11       A.   I think in the discovery search that I

12   went through and study, I think I've seen documents

13   having to do with expense statements of his, that

14   he did send.

15       Q.   Do you know who Leigh Ann Cardosa is?

16       A.   Leigh Ann Cardosa?

17       Q.   Yes, sir.

18       A.   At this moment I would have to say no.

19       Q.   What about Deanna Pairington?

20   Pennington.  Excuse me.

21       A.   Leigh Ann?

22       Q.   Deanne.

23       A.   Deanne?

24       Q.   Yes, sir.

1     A.   If I don't have her confused, I think she

2  might have been working in Mr. Rich's office.

3     Q.   Were you aware that Mr. Rich --

4     A.   And I want to say --

5     Q.   Yes, sir.

6     A.   -- began working in maybe late 2004, early

7  2005, in that period.

8     Q.   Were you aware that beginning in late 2004

9  through the pendency of the Fairmont litigation

10 that Mr. Rich sent to Baron & Budd invoices for

11 repayment of different costs and expenses,

12 including bills from the two women that I just

13 mentioned?

14    A.   No, I was not aware of that.

15    Q.   Were you aware that from 2004, late 2004

16 throughout the pendency of the litigation and its

17 settlement that Mr. Rich never once indicated that

18 there was a liability to you for any kind of

19 payment of anything?

20    A.   Could you please repeat that?

21    Q.   Yes, sir.  Were you aware from the end of

22 2004 throughout the pendency of the Fairmont

23 litigation that Mr. Rich, even though he's sending

24 invoices, sometimes monthly, that he never, ever

1  sent an invoice or any kind of documentation that

2  said, hey, Joe Simoni's owed anything?

3      A.   I was not aware of any such communication.

4      Q.   That doesn't surprise you, though, does

5  it?

6      A.   No, it does not.

7      Q.   On the time summary, you have -- you

8  provided us a number of modified time summaries,

9  the last of which was June 6th, 2013.  Do you

10  recall that, sir?

11      A.   Yes.

12      Q.   There's a note at the beginning of that

13  time summary that indicates that it's been

14  reconstructed, as you have testified to, and that

15  it's subject to change?

16      A.   Yes.

17      Q.   And that it does not include expenses that

18  you may have incurred.  Do you recall that?

19      A.   Yes.

20      Q.   All right.  My question to you is do you

21  anticipate the detailed time summary changing at

22  all?

23      A.   In any significant way, I would say not.

24  On the other hand, I just -- I would say not in any

1    significant way.

2        Q.   Do you know of any outstanding

3    documentation or communication that is available to

4    you that either you've not seen or heard from that

5    might impact or change the June 6th, 2013 time

6    summary?

7        A.   At this point, no.

8        Q.   There was a time summary that I believe is

9    June 2013 and then another one shortly thereafter,

10   June 6th, 2013.  Do you know what I'm talking

11   about?

12       A.   Could you repeat that, please?

13       Q.   Yes, sir.  There was a time summary that

14   is dated just generally June 2013, and then a

15   subsequent time summary dated June 6th, 2013.

16       A.   I'm aware of that.  Yeah.

17       Q.   Okay.  My question to you is between the

18   June and the -- just the June 2013 time summary and

19   the June 6th, 2013 time summary, what did you --

20   what information did you gain and from where that

21   would have allowed you to make changes that

22   resulted in the June 6th time summary?

23       A.   I can't sit here and tell you -- I can't

24   answer that question for you, but I know that I

1    found things that I communicated to this office

2    here, the law firm here of hours that needed to be

3    added.

4        Q.   Where did you find them?

5        A.   I can't specifically answer that question

6    for you now.  But I -- you know, I sent the fax to

7    the law firm.

8        MR. WAKEFIELD:  Just tell him what you

9    found as opposed to what your counsel --

10       A.   I can't tell you what I found, because I

11   don't remember specifically what it was.

12       Q.   And I guess what I'm trying to determine,

13   Dr. Simoni, is is there some source of information

14   or documentation out there that you suddenly became

15   aware of and the need to supplement this time

16   summary between those dates?

17       A.   Oh, okay.  Okay.  I think maybe I can

18   help.  I think the additions came from my study

19   from some discovery documents, and I believe they

20   were -- well, I don't want to say, because I don't

21   want to misinform you.  But they were discovery

22   documents that I had not seen, I had not seen up

23   until two weeks ago.  And when I went through

24   those, I found the additional hours.  I think they

1    were about 15 hours.  I don't remember exactly.

2        Q.   Other than the discovery documents in this

3    case that allowed you to change some things, make

4    some additions and deletions, was there any other

5    source of information that allowed you to change

6    what we've been given as June 6th time summary?

7        A.   Not the June -- June 6th is my

8    understanding of the final one.

9        Q.   Yes, sir.  That's right.

10       A.   Not that I'm aware of.

11       Q.   Other than your lawyers, have you talked

12   with anybody else to obtain information that would

13   allow you to make modifications to the June time

14   summary?

15       A.   No.

16       Q.   Have you ever talked with Ms. Eichler or

17   Ms. Dutcher?  I'm sorry.

18       A.   Concerning --

19            MR. WAKEFIELD:  That's pretty broad.

20       Q.   Concerning the time that you spent in

21   recreating the time summaries that you prepared for

22   us?

23       A.   Never have talked with them about the time

24   summary.

1    Q.   Have you talked with them recently?

2    A.   Well, let me go back.  I don't want to

3    answer incorrectly.  I was out in California maybe

4    a year or two ago, and I had a brief lunch meeting

5    with Ms. -- with Melissa Dutcher and talked with

6    her about the idea possibly of getting a look at

7    her time records to help me refresh, you know, on

8    my time.  And their law firm has been going through

9    a lot of change and that never happened, but there

10   was that -- you asked me if I had ever talked to

11   anybody --

12   Q.   Thank you.

13   A.   -- and I just wanted you to know that I

14   did have communication.

15   Q.   In terms of the meeting roughly a year ago

16   with Ms. Dutcher in California, did the substance

17   of this lawsuit come up?

18   A.   Yes.

19   Q.   And tell me what was said either by you or

20   by her in that.

21   A.   I just told her that I was trying to get

22   what I thought was fair compensation, that -- and

23   that's what it was about.

24   Q.   And when you explained to Ms. Dutcher the

1    loss, that you were talking about getting fair

2    compensation from Mr. Marino, were you not?

3        A.   From -- you mean Mr. Marino?

4        Q.   I'm sorry.  I apologize.  Sorry about

5    that.

6             MR. MARINO:  Not going to get fair

7    compensation from me.

8        Q.   Fair compensation for Mr. Rich.  Excuse

9    me.

10       A.   Fair compensation from Mr. Rich.  Yes.

11       Q.   Did Ms. Dutcher indicate to you any

12   opinions that she had with regard to the merits of

13   your allegations or -- well, your allegations?

14       A.   She suggested that she believed that I had

15   merit, that there was merit to my allegations.

16       Q.   In terms of your claims for reasonable

17   compensation from Mr. Rich?

18       A.   Yes.

19       Q.   Did you let her know at that time or -- I

20   don't know that it even had occurred -- that there

21   had been an allegation by Mr. Rich against the

22   various law firms that were involved in the

23   Fairmont litigation?

24       A.   I'm not -- I'm a little bit confused about

1    the time line.  I don't remember whether that had

2    happened yet.  I'm not sure.

3        Q.   Have you asked Ms. Dutcher or Ms. Eichler

4    or anyone associated currently or formerly with the

5    Masry firm to assist you in this case at all, other

6    than what you've mentioned?

7        A.   Yes.

8        Q.   And what did you ask?  Or what was asked?

9    What request was made?

10       A.   I had communication with Ms. Eichler and

11   asked if she could please contact my lawyers and

12   talk with them.

13       Q.   When was that, sir?

14       A.   Sometime in the last six months.  I don't

15   remember when.

16       Q.   And was that a phone call you made to her?

17       A.   I think that's correct, in the last six

18   months.  Certainly in the last year, but I think

19   the last six months.

20       Q.   And was that a phone call that you made to

21   Ms. Eichler?

22       A.   Yes.

23       Q.   And tell me everything that you recall

24   from that discussion.

1      A.    That was it.

2      Q.    Okay.  What did she -- how did she

3   respond?

4      A.    She didn't respond to me directly.

5            MR. WAKEFIELD:  He's talking about the

6   call you had with her.  She responded --

7      A.    Yeah.  I left a message.  I left a message

8   for her, and to the best of my recollection, she

9   did not get directly back to me.  But I believe I

10  left a number in my message of the law firm here,

11  and I believe she may have called the law firm.  I

12  think that's the way -- how it happened.

13     Q.    And don't tell me anything that you've

14  learned from your lawyer.  I'm not trying to get to

15  that.  I just want to know if you independently,

16  independent from your lawyers, know of any

17  communications with Ms. Eichler concerning what

18  she's going to do in this case or any opinions she

19  has.

20     A.    No.

21           (Deposition Exhibit No. 24 marked.)

22  BY MR. McDOUGAL:

23     Q.    Let me hand you what I have marked as

24  Exhibit No. 24, sir.  This appears to be a letter

1    that you have faxed to Mr. Masry.  Do you see that,

2    sir?

3         A.    Yes, I do.

4         Q.    Back in July of 2002?

5         A.    Yes.

6         Q.    That's consistent with your testimony

7    earlier that you were working with and assisting

8    Mr. Rich in dealing with this fee dispute with

9    Mr. Masry?

10        A.    Yes.

11        Q.    And this is consistent with your testimony

12   that you had had a telephone call at some point

13   with Mr. Masry, correct?

14        A.    That's correct.

15        Q.    In terms of your discussions with anyone

16   affiliated with Baron & Budd, have you had any

17   discussions with any lawyers there concerning --

18   let me strike that.  I lost my train of thought.

19            You've talked about a telephone call that

20   you had with Ms. Presby and Mr. Jensen.  Do you

21   recall that, sir?

22        A.    Yes.

23        Q.    Have there been any other communications

24   that you recall specifically as you're sitting here

1    with anyone at Baron & Budd concerning anything?

2          MR. WAKEFIELD:  Object to the form.

3    Overly broad.

4          A.    I was involved -- yes.  I do recall one.

5          Q.    Tell me.

6          A.    There was a telephone conference that I

7    was involved with Mr. Rich and with Ellen Presby, I

8    remember, and I think there were a couple of other

9    people involved in the telephone conference.  But I

10   can't give you the date, the time line, but I do

11   remember there was a telephone conference.  That's

12   the other one that sticks out in my mind, as you

13   asked me that question.

14         Q.    What was the purpose of it?

15         A.    Discussing the progression of the case, of

16   the Phillips Westinghouse case and what may be

17   needed to be done in the near future after that

18   call.

19         Q.    Were you in Mr. Rich's office for that

20   phone call?

21         A.    I was in Mr. Rich's office, yes.

22         Q.    Are you aware of any other telephone calls

23   or discussions with Baron & Budd employees other

24   than what you've mentioned to me?

1    A.    I do not recall any more at this point.

2    Q.    Do you recall Mr. Rich referring to Baron

3    & Budd as elitist slime?

4    A.    I do.

5    Q.    Elitist slime?

6    A.    I do.

7    Q.    In what context was that comment made?

8    A.    I don't remember the specific context.

9    Q.    Were you there for Mr. Rich testifying

10   that he would never use those terms?

11   A.    I was.

12   Q.    You would disagree with him on that?

13   A.    I believe I was.  I think that was the

14   first day, but I'm not -- maybe -- I either --

15   either I was there the -- when it -- when that part

16   of his deposition occurred or I read it, because I

17   read the second day part of the deposition.  So I'm

18   not -- I'm not sure.  I can't tell you for sure.

19   Q.    If he disagreed with having said that, you

20   would disagree with him, wouldn't you?

21   A.    Yes.

22   Q.    In fact, those terms are consistent with

23   the terms that Mr. Rich used at various times in

24   connection with Baron & Budd, isn't it?

1    A.   Yes.  Various times, not meaning every

2    day.

3    Q.   Did you -- strike that.

4         Dr. Simoni, you were aware once Baron &

5    Budd became involved in this case that they devoted

6    a significant amount of time and resources to it?

7    A.   Yes.

8    Q.   Do you have any disagreement with the work

9    that was performed by Baron & Budd or the resources

10   that were devoted to the Fairmont litigation?

11   A.   No.

12   Q.   You were aware that there were many, many

13   motions and responses filed by Baron & Budd in

14   connection with the litigation?

15   A.   Yes, sir.

16   Q.   You did not assist or work on those

17   motions and responses that Baron & Budd created,

18   did you?

19   A.   No.

20   Q.   You're aware that Baron & Budd filed

21   numerous pleadings in connection with that

22   litigation as well, are you not?

23   A.   Can I go back --

24   Q.   Sure.

1    A.    -- one question?  Just to clarify.

2    Q.    Uh-huh.

3    A.    My only involvement would have been in

4    maybe reviewing drafts of motions or pleadings,

5    things that were going to be filed with the court.

6    I did play that role with Mr. Rich in helping

7    review things that he was going to be filing.

8    Q.    And that was a role that Mr. Rich gave to

9    you and asked you to perform, correct?

10    A.    Well, yes.

11    Q.    What would happen, and I've noticed it

12    with regard to maybe two pleadings that Baron, Budd

13    sent a pleading to Mr. Rich for filing, and then he

14    would then send it to you, "he" being Mr. Rich,

15    would send that pleading to you to look at, and

16    there might be typos or statements that needed to

17    be corrected.  Is that what you're talking about?

18    A.    Yes.

19    Q.    Other than that, what you just mentioned

20    at least, you did not work on the preparation of

21    these motions or pleadings or responses that were

22    filed on behalf of the Fairmont folks, were you?

23    A.    In terms of drafting --

24    Q.    Yes, sir.

1    A.   -- the content?

2    Q.   Absolutely.

3    A.   No.

4    Q.   You know that there were hundreds of

5  depositions taken in the Fairmont case, do you not?

6    A.   Yes.

7    Q.   You didn't take any of those, did you,

8  sir?

9    A.   No.

10    Q.   You're aware that there was significant

11  amount of time devoted to trial preparation prior

12  to Judge Stone's ruling?

13    A.   Yes.

14    Q.   You knew that.

15    You were not involved with Baron & Budd in

16  the trial preparation, were you, sir?

17    A.   No.

18    Q.   You know that once Judge Stone entered a

19  summary judgment in the Fairmont litigation that

20  there was a long appeal that involved significant

21  appellate issues and briefing?

22    A.   I am aware of that.

23    Q.   And you did not participate in that

24  either, did you, sir?

1    A.   That's correct.

2    Q.   Ultimately, you know that the Fairmont

3 case, that Baron & Budd obtained a settlement with

4 the defendants in that case, correct?

5    A.   I am aware of that.

6    Q.   How did you become aware of that?

7    A.   I believe maybe initially through the lead

8 plaintiffs, a Sue -- at the time Sue Fullen.

9    Q.   That would have been in late 2007; is that

10 correct?

11    A.   Yes.  That's probably correct.

12    Q.   Is it your memory that once you -- that in

13 2007, late in 2007 that Ms. Fullen was the person

14 who told you that the Fairmont case had been --

15 there was a potential settlement, at least?

16    A.   To the best of my recollection.

17    Q.   Did Mr. Rich ever come forward and say,

18 hey, this Fairmont case is resolved?

19    A.   No.

20    Q.   Do you know why?

21    A.   I do not.

22    Q.   Did it trouble you that Ms. Fullen was the

23 one who contacted you saying the Fairmont case may

24 be resolving, and Mr. Rich has yet to say anything

1   to you about it?

2       A.   Mildly.  I was mildly troubled.  Not

3   entirely, you know, thrown out of kilter over it.

4       Q.   It was a question you had, though, isn't

5   it?

6       A.   I had a question about that, yes.

7           (Deposition Exhibit No. 25 marked.)

8   BY MR. McDOUGAL:

9       Q.   Let me hand you Exhibit No. 25.  Have you

10  seen that, sir?

11      A.   Yes.  I think I have.

12      Q.   Do you know who prepared that?

13      A.   To the best of my recollection, this

14  resulted -- these five points on here resulted of

15  some communications that I had with Sue Fullen at

16  the time and with a few other people from that

17  case.

18      Q.   It's fair to state, Dr. Simoni, isn't it,

19  that you and Ms. Fullen and a few others, maybe

20  Ms. Oliver, some other lead plaintiffs,

21  communicated directly concerning the potential

22  settlement and what it meant?

23      A.   That's fair to say.

24      Q.   In fact, Ms. Fullen would call you and she

1    would ask your opinions on it, wouldn't she?

2         A.    Yes.

3         Q.    You would give those opinions, wouldn't

4    you?

5         A.    I did.

6         Q.    When Ms. Fullen received her settlement,

7    the specifics of the settlement, she communicated

8    those specific details to you, didn't she?

9         A.    She did.

10        Q.    Did you assist in preparing certain

11   questions for Baron & Budd in connection with this

12   settlement, assist Ms. Fullen?

13        A.    Well, like these kinds of questions

14   here --

15        Q.    Right.

16        A.    -- yes.

17        Q.    And, in fact, the kinds of questions that

18   you helped Ms. Fullen with are contained in Exhibit

19   No. 25, aren't they?

20        A.    I don't know if it is all of them, but

21   it's certainly some of them.

22        Q.    The claimants that were settling -- that

23   were a part of the Fairmont litigation and

24   potentially settling it had a meeting at the -- I

1    believe at the west -- it's the Fairmont armory.

2    Do you recall that, sir?

3        A.    I think there was a meeting at the armory.

4        Q.    Did you assist any of those folks in

5    connection with preparing for that meeting?

6        A.    I remember a little bit of preparation

7    related to that, communications related to that.

8        Q.    At some point, either before, during or

9    after that meeting among the plaintiffs and their

10   lawyers, you were notified by Ms. Fullen or someone

11   who was receiving a settlement that there was

12   paperwork that they were going to have to sign.  Do

13   you recall that, sir?

14       A.    I do.

15       Q.    In fact, you looked at some of that

16   paperwork, didn't you?

17       A.    I did.

18       Q.    And there was a document entitled A

19   Description of a Potential Settlement Agreement

20   that set forth all the details of the settlement,

21   didn't it?

22       A.    I believe that's correct.

23       Q.    And some of the details of that

24   description set out that you read reflected the

1    amounts that were being paid, how they were being

2    paid, the law fees that were being deducted from it

3    and the expenses that were incurred.  Do you recall

4    seeing that, sir?

5        A.   Yes.

6        Q.   You understood that if that settlement was

7    approved that there would be fees paid to the

8    lawyers as identified by that agreement, and that

9    would be Mr. Rich, Masry and Baron & Budd, correct?

10       A.   That was my understanding.

11       Q.   You weren't on that list, were you?

12       A.   I was not.

13       Q.   You understood that there were expenses

14   specifically itemized that would be paid to the

15   lawyers for expenses that they incurred or costs

16   they incurred related to either individuals that

17   were working on the case or services that were

18   performed for the case.  You knew that, did you

19   not?

20       A.   Yes.

21       Q.   You weren't on that list either, were you?

22       A.   I was not.

23       Q.   Did you ever at that point, once you found

24   this out from Ms. Fullen, go to Mr. Rich and say,

1  hey, I'm owed money by you for this case, and

2  there's no mention of it?  Did you ever say

3  anything to that effect?

4      A.   Did I ever have any communications with --

5      Q.   With Mr. Rich about that.

6      A.   I did not.

7      Q.   Did you ever see the expenses that

8  Mr. Rich had in the Fairmont litigation that were

9  reimbursed from Baron & Budd that Ms. Fullen

10 requested copies of?

11     A.   Yes.  I believe I did see that.

12     Q.   Ms. Fullen sent that to you, didn't she?

13     A.   Yes, she did.

14     Q.   There was a long list of expenses and

15 costs that Mr. Rich had, correct?

16     A.   Yes.

17     Q.   If fact, I sent those to her.

18     A.   Did you?

19     Q.   Do you recall that?  And you weren't

20 anywhere listed on -- as --

21     A.   Not to my recollection.

22     Q.   One of those expenses.

23          You mentioned a meeting with Ms. Dutcher.

24          MR. McDOUGAL:  Bless you.

1          THE VIDEOGRAPHER:  Thank you.

2     BY MR. McDOUGAL:

3          Q.   You mentioned a attempted phone

4     conversation with Ms. Eichler.  Other than those

5     two that you've already told me about, are there

6     any other individuals associated with the firms of

7     Masry & Vititoe or Baron & Budd that you've had any

8     communication with concerning this lawsuit?

9          A.   I'm sorry to ask you to repeat that.

10         Q.   That's all right.

11         A.   I just want to be sure I'm answering

12    correctly.

13         Q.   That's all right.  I just want to make

14    sure I know --

15         A.   Yes.

16         Q.   -- if you've had a discussion with

17    someone, I want to know who it was and what they

18    said.

19         A.   Okay.

20         Q.   And my question is, is other than the

21    discussion that you mentioned with Ms. Dutcher in

22    her meeting and the telephone contact that you

23    tried to have with Ms. Eichler, are you aware of

24    any other communications with individuals either at

1    Masry & Vititoe or Baron & Budd concerning this

2    lawsuit?

3        A.    There were none.

4        Q.    Dr. Simoni, you did not file a claim or a

5    lawsuit against Baron & Budd, did you, sir?

6        A.    No.

7        Q.    You didn't file a claim or a lawsuit

8    against the Levin firm, did you, sir?

9        A.    No.

10        Q.    Didn't file one against The Cochran Firm,

11    did you?

12        A.    No.

13        Q.    And the reason you didn't is because you

14    were looking to Mr. Rich to honor the agreement

15    that you believe you had with him, correct?

16        A.    That's correct.

17        Q.    You weren't looking to those other folks

18    because they weren't part of that agreement?

19        A.    That's correct.

20        Q.    And you know of no evidence at all that

21    indicates that Baron & Budd was ever made aware of

22    the agreement that you and Mr. Rich had?

23        A.    That's correct.

24            MR. McDOUGAL:  Can we take a short break

1    and I think I'm...

2            THE VIDEOGRAPHER:  We are now off the

3    record.  The time is 5:54 p.m.

4                  (Short break taken.)

5            THE VIDEOGRAPHER:  We are now back on the

6    video record.  This is tape number seven of the

7    video deposition of Joseph Simoni.  Today is June

8    11th, 2013, and the time is 5:57 p.m.

9            MR. McDOUGAL:  Dr. Simoni, you've been

10   very courteous and I appreciate your time today.  I

11   have no further questions of you at this point.

12           THE DEPONENT:  Thank you.

13           MR. McDOUGAL:  Thank you, sir.  I

14   appreciate it.

15           THE DEPONENT:  Appreciate your courtesy,

16   also.

17           MR. McDOUGAL:  Thank you, sir.

18           MR. WAKEFIELD:  At this time I'm going to

19   propose that we adjourn for the day to resume at

20   9:00 a.m. tomorrow morning.

21           MR. CASH:  9:00 is good.

22           THE VIDEOGRAPHER:  The deposition of

23   Dr. Joseph Simoni is adjourned until 9:00 a.m.

24   tomorrow morning.  The time is 5:57 p.m.

1      (Videotaped Deposition of JOSEPH SIMONI, Ph.D.

2              adjourned at 5:57 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    STATE OF WEST VIRGINIA, To-wit:

2

       I, Teresa A. VanMeter, RMR, CRR, a Notary
3    Public and Court Reporter within and for the State
     aforesaid, duly commissioned and qualified, do
4    hereby certify that the videotaped deposition of
     JOSEPH SIMONI, Ph.D. was duly taken by me and
5    before me at the time and place in specified the
     caption hereof.

6

7        I do further certify that said proceedings
     were correctly taken by me in stenotype notes, that
8    the same were accurately transcribed out in full
     and true record of the testimony given by said
9    witness.

10

         I further certify that I am neither attorney
11   or counsel for, nor related to or employed by, any
     of the parties to the action in which these
12   proceedings were had, and further I am not a
     relative or employee of any attorney or counsel
13   employed by the parties hereto or financially
     interested in the action.

14

15       My commission expires February 1, 2022.

16

         Given under my hand and seal this _____ day
17
     of _____, 20_____.

18

19

20   _____

21   Teresa A. VanMeter, RMR, CRR, Notary Public

22

23

24

**A**

**ability** 243:1
**able** 18:1 26:10 40:13 100:22
    101:3 124:21 126:6 169:13
    247:15
**aboverereferenced** 211:10
**absolutely** 21:6 39:10,14
    106:19 115:6 221:19 222:9
    241:8 244:15 267:2
**accept** 116:19
**accepted** 10:18 12:6 240:11
**access** 212:21,22
**accompanied** 82:1
**accompany** 76:22 78:8,15
**account** 158:9 173:11
**accurate** 24:3 89:3 108:5
    221:16
**accurately** 278:8
**accusations** 104:4
**accuse** 185:23
**accused** 144:8,16 185:11
**accusing** 144:17
**achieved** 215:12
**acquaintance** 156:17 215:17
**action** 6:7,9 101:4 109:18
    278:11,13
**active** 14:11
**actual** 60:2 77:17 206:21
    218:3
**added** 49:22 256:3
**adding** 155:16
**additional** 256:24
**additions** 256:18 257:4
**address** 74:6 151:21 209:3,4
**addressed** 7:15 130:18
    234:17 236:4
**addressing** 107:4
**adequately** 132:13
**adhered** 110:18
**adjourn** 276:19
**adjourned** 276:23 277:2
**admitted** 16:20 17:3
**adult** 111:19
**advanced** 246:3
**advantage** 14:14 84:14
**advice** 59:24 177:19
**advise** 143:7 178:21
**advising** 190:23
**advisor** 138:12
**affiliated** 238:1 262:16

**aforesaid** 278:3
**aftertax** 123:13
**agenda** 153:9,10,11
**agent** 138:19 139:16,18,21,22
    140:6 170:5 173:20 174:2,9
    174:17 181:24 182:16
**agitated** 193:14,15,19 194:1
    197:7,8,11
**agitation** 194:2
**ago** 8:3 92:17 142:14 160:2
    170:18 208:13 256:23 258:4
    258:15
**agree** 106:6 108:13 109:3,17
    111:12 137:3 181:10 183:19
    183:21
**agreeable** 47:16 137:15
**agreed** 35:14 107:11 108:5
    108:20,24 149:4 190:19
    230:4,18 231:15 248:14
**agreeing** 36:1 130:21 133:22
**agreement** 5:10 35:19,20,22
    37:4,21 44:10,13,17,22 45:1
    48:12,13,17,17,23 49:1,3,9
    49:18 50:2,4,5,11,17 51:2,4
    53:10,16 63:21 99:20,23
    107:5,7,8,21,23 108:22,23
    111:22 112:5 113:1,15,15
    122:15 126:23 129:11,18
    138:2 139:20,23 140:6
    142:5,11,12 146:8 148:7,9
    148:11 150:4 152:8 155:5
    159:6,18 165:8,10,14,17,19
    166:1,7,12,16 168:11,12,15
    168:19,21 172:17,19 176:3
    176:9,15,16,17,19 178:8,14
    180:24 181:2 183:18 187:5
    187:7,12,15,18,22 188:5,9
    190:2,10,19 192:2,6,16,22
    192:23 193:2,9 197:13
    203:14,24,24 204:11,24
    205:3,8,23 206:14 207:2
    212:2 224:9,12,16,21
    225:19,22 226:6,10,13
    227:4,5,16,16,18,23,24
    229:15 230:9,18 236:4
    240:17,22 244:16,19,21
    245:14,18,21 247:12,13
    248:16 250:12 251:1,6,14
    251:18,21 271:19 272:8
    275:14,18,22

**agreements** 172:8,10 187:8
    188:6,6,11 203:15
**ahead** 43:12,22 45:23 112:19
    204:14 225:8,10 233:16
**airport** 149:6,20 235:2
**al** 3:11 18:16,20 19:5,20 30:1
    30:13,15,18
**allegation** 259:21
**allegations** 259:13,13,15
**allocation** 142:6 251:2
**allocations** 142:22
**allow** 257:13
**allowance** 244:19
**allowed** 20:2 255:21 257:3,5
**allows** 14:10
**aloud** 89:11,13 157:14
**alter** 108:8 109:1
**alternatives** 116:7
**amason** 3:10
**amount** 48:24 72:11 122:4,21
    124:14 234:7 265:6 267:11
**amounts** 272:1
**angela** 3:10 6:17
**angelos** 61:12
**angie** 7:24
**ann** 185:6,9,10 186:17
    252:15,16,21
**anniversary** 96:13
**answer** 31:12 33:10 34:22
    35:8 36:24 42:14 54:8
    103:9 126:19 132:13,13
    143:24 159:17 175:14 177:1
    222:2 223:21 255:24 256:5
    258:3
**answered** 191:1
**answering** 274:11
**anthony** 3:20 6:4
**anticipate** 53:12 254:21
**anybody** 58:7 135:8 197:23
    205:22 211:15 212:13
    227:14 228:23 234:20
    257:12 258:11
**anybodys** 153:4
**anymore** 162:9
**anyway** 41:16 189:9 197:21
**aol** 210:15
**apart** 127:5,11 128:2 138:12
    138:12 139:13
**apologize** 112:2 163:17
    200:12 242:12 259:4

**apparently** 95:18 164:17 166:8
**appeal** 267:20
**appearances** 2:1 3:1
**appeared** 56:23 57:4
**appears** 66:17 73:19 74:20 74:20 79:20 87:16 95:14,20 96:4 109:23,24 121:16 123:20 124:11 129:4 142:3 145:7 147:7 184:22 185:3 192:18 199:3 231:12 261:24
**appellate** 267:21
**applied** 10:9 17:2 100:4,10 185:20 197:21
**applies** 218:2
**apply** 10:7,17 16:17,20,21 100:13 185:17
**applying** 185:21
**appreciate** 50:10 155:2 276:10,14,15
**appreciated** 248:10
**approach** 56:11 178:21
**approached** 56:14
**appropriate** 33:15 106:7,14 163:10
**approved** 272:7
**approximate** 126:6
**approximately** 26:23 165:13
**april** 95:11 96:9,11 100:1 105:7 109:6,7 131:1,5 197:4 227:18 228:14,17 229:14
**area** 11:10 12:16 14:9 18:13 22:18 26:18 60:5,9,16,20,21 73:21 77:18 98:14 133:8 179:23 219:20,23
**areas** 12:19,20 46:12,13
**arent** 270:19
**arizona** 186:19
**armory** 271:1,3
**arose** 20:1
**arrangement** 119:16 126:22 126:22,24 127:1,12
**arrived** 80:22 105:17
**arrow** 138:3 169:22 192:20 241:7
**arthurdale** 60:5,9 61:6,22 62:10 150:18,19
**article** 73:19
**asbestos** 32:6 33:15,21 34:20 35:6,15 36:2,5 39:21 40:6

40:14 41:13 43:7 45:8 46:14,15,15 55:16 56:4 57:1 84:11 100:23 101:4 178:10
**asbestosrelated** 32:9
**ashamed** 151:16
**asked** 16:8 20:4,5 54:18 76:24 89:10,14,15,15 90:4 90:20,21 92:17 93:2 112:21 153:9,10 169:18 171:16 175:21 187:3 192:21,22 193:1 194:3 207:15 212:10 232:16 240:15,16 242:11 247:11 248:4 258:10 260:3 260:8,11 263:13 266:9
**asking** 18:8 38:2 47:14,17 69:2,8 90:9,11,14 91:17 111:1 160:21 165:7,9,24 166:6,12 181:14 193:7 196:12,21 200:7 214:13 222:8 233:14 243:20
**assigned** 44:18
**assignments** 47:12,14
**assist** 63:24 185:24 243:15 251:24 252:4 260:5 265:16 270:10,12 271:4
**assistant** 13:1
**assisted** 247:1
**assisting** 126:17 212:21 262:7
**associate** 13:3,20,22 63:23 83:8
**associated** 19:23 68:8 143:10 260:4 274:6
**associates** 1:22 6:5
**assume** 69:12 170:7 175:10 194:15 209:2 220:15 226:21 251:19
**assumed** 148:14 176:2 239:16
**assuming** 130:15 134:15 136:24 159:12 180:13
**assumption** 37:1 182:8
**att** 210:17
**attaches** 221:3
**attempt** 105:4
**attempted** 274:3
**attempts** 217:13,18
**attend** 185:12
**attending** 215:1
**attention** 21:12 23:17 60:7

62:22 63:2,15 64:15 67:11 67:12 68:5 119:5
**attorney** 33:21 67:15 71:22 72:1 78:19,21 81:20 116:18 221:6,8,14 225:11 278:10 278:12
**attorneys** 37:24 38:1,3 54:1 75:8
**august** 4:15 12:9 14:22 65:22 116:23 122:13 154:11 181:21
**authoritative** 219:22
**available** 255:3
**avenue** 3:6
**awarded** 15:22
**aware** 34:18 35:4 44:9,12,17 47:14 53:5,6 64:6 80:16 83:17 189:14,22 227:12,14 229:1 233:3 237:3 253:3,8 253:14,15,21 254:3 255:16 256:15 257:10 263:22 265:4 265:12,20 267:10,22 268:5 268:6 274:23 275:21
**awhile** 32:18 92:17 142:13

**B**
**ba** 9:12,18 215:12
**back** 10:1,22,24 11:1 14:7 21:3,18,19 22:14 32:18 36:4 39:9 42:9 48:16 51:11 53:10 54:5 55:6 56:19 59:12 75:10 88:12 91:9,10 97:9 105:17 130:24 131:6 131:22 133:22 137:14 138:9 140:23 145:3,6 148:8 149:5 150:5,6,22 151:4,17,18,19 151:22,24 154:19 155:14 163:23 168:7,9 180:3 182:6 182:6,24 186:19,20 188:8 191:4 193:5 200:6,9 202:15 206:10,16 213:14 217:3 223:16 229:8 230:19 231:6 232:9 234:7 235:1,13 238:23 239:1,2,4 242:2 244:13 258:2 261:9 262:4 265:23 276:5
**background** 9:12
**bad** 9:4 161:16 162:3 173:15 252:3
**badgering** 157:17,19 158:2 158:12,15 164:1,3,10,13,16

164:19
**baltimore** 61:12
**bar** 28:10,11,23 29:9 52:19
  52:23 53:2,6,8 94:7 138:19
  217:14,19,21,22 218:3,11
  218:14 219:1
**baron** 1:12 3:3,4 6:21 115:15
  122:16 126:16 131:16 132:5
  132:19 134:12 146:1,21
  181:3 213:23 227:6,9,11,13
  228:20 231:19 233:4 234:15
  234:18,21 235:19,22 236:4
  237:1,4 240:18,20,23 241:7
  241:8 243:4 246:18 248:2,4
  248:4,16 249:18 250:13
  251:1,21 252:1,5,10 253:10
  262:16 263:1,23 264:2,24
  265:4,9,13,17,20 266:12
  267:15 268:3 270:11 272:9
  273:9 274:7 275:1,5,21
**baronbudd** 3:5
**based** 53:16 136:15 138:2
  158:6 172:22 173:2 212:4
**basically** 171:6 223:9
**basing** 57:7,8
**basis** 51:19 172:22
**bates** 64:23 79:2 84:18
  140:14 141:5 174:22 184:21
  188:18 198:23
**baylen** 3:17
**bcash** 3:16
**bearing** 29:19
**becoming** 11:13 235:10
**began** 12:8 13:11 17:13
  213:22 230:20 253:6
**beginning** 17:15 27:7 37:19
  49:15 57:13 59:1,1 89:10,14
  108:21 152:20 193:19
  217:16 253:8 254:12
**behalf** 2:3,11,16 3:3,8,13
  6:23 7:1,3,5 50:11 94:15
  212:18 247:5 266:22
**belief** 133:19
**believe** 10:1 11:23 14:3 20:8
  21:23 26:21 28:13,15,20,24
  30:6,9 31:23 39:24 40:19,21
  41:7,20 44:4 45:11 47:10
  48:13 49:20 50:6 56:6,7
  58:6 61:17 63:22 64:8 65:7
  66:14,22 67:1 70:10,17,18

70:22 73:24 74:3 76:5,24
  78:13,19 80:21 82:10,19
  83:8 84:8 86:16 87:10 89:4
  92:2 94:6 95:22 100:15
  105:6 110:22 114:14 120:10
  120:16 121:24 123:11 125:6
  137:18 138:7,13,18 144:11
  146:23 149:12 152:6 156:22
  157:23 160:10 161:18
  165:16 166:5,15 170:24
  182:8 184:15 195:22 196:14
  197:12 198:9 199:16,20
  201:8 207:21 209:12 210:2
  210:24 211:5 212:15 214:8
  216:14 217:12 218:5,10,20
  218:21 219:12 220:5,8
  222:3,20 223:1 224:1 225:9
  227:21 228:5 229:17,18
  230:17,21 231:22 233:5
  236:9 237:10,14,22 238:18
  240:10 241:6,7,12,23
  245:18,22 247:4 252:7
  255:8 256:19 261:9,11
  264:13 268:7 271:1,22
  273:11 275:15
**believed** 40:12 154:20 159:18
  197:14,19 259:14
**beneath** 142:6 240:14
**benefit** 84:10,13
**benefits** 36:3 37:13,15,16,18
  37:23,24 38:10 42:8 45:7
  159:10 161:20
**berated** 88:21
**berating** 88:5
**berkeley** 73:20 74:22 75:2
**beryllium** 215:8,22,23
**best** 9:23 12:5 21:14 22:3
  23:7,12,21 28:3 31:3 32:23
  40:21 50:1 56:2 63:2 65:14
  66:18,19 78:16 80:17 91:11
  112:23 134:8 142:18 157:1
  165:16 169:12 174:4 175:16
  178:15,21 199:24 204:3
  205:24 206:23 218:18
  219:10 220:5 231:4 243:1,3
  246:15 248:8 250:1 261:8
  268:16 269:13
**beth** 75:22,23
**big** 40:12
**bigly** 49:24

**biker** 176:12
**bikers** 175:10,11,15,18
  177:13
**biking** 176:11
**bill** 6:19 67:1 239:9 246:12
**bills** 253:12
**binder** 76:3,8,12,15,18
**binders** 76:22
**bit** 9:11 17:21 25:17 43:20
  79:18 97:17 109:5 113:2
  173:18 201:1 203:11 222:22
  225:14 259:24 271:6
**blacktop** 152:21
**blasting** 69:20 70:2
**bless** 273:24
**blocking** 75:16 150:24
**blue** 99:15,16
**bob** 47:24 48:6 49:4,10 50:14
  53:11,18 54:13,14,15,20,23
  55:8,12,20,24 56:11,14,17
  56:23 58:1,16,21 87:14
  91:11 198:7,13
**bonasso** 1:20 2:12
**bonus** 136:3,4,7,7,14,15,21
  137:16
**booth** 2:17
**boothmccarthy** 2:18
**bother** 216:21
**bottom** 79:6 80:7 97:15
  116:17 119:5 144:21 154:12
  177:5,10 195:19 202:14
  240:5
**bowman** 219:12,18,18
**box** 2:14 97:17,18 132:16
  202:1,1
**boxes** 132:17
**break** 8:24 9:1 51:7,10 53:11
  53:17 59:6,11 83:20 94:19
  97:4,8,15 140:17,22 141:9
  182:20,23 183:6 206:3
  213:13 229:3,7,14 275:24
  276:4
**brickman** 76:1 77:14
**bridgeport** 2:19
**brief** 61:17 199:19 258:4
**briefing** 267:21
**briefly** 21:20
**brilliant** 28:1
**bring** 24:9 58:20 99:15
  109:10 190:20 248:2

**bringing** 23:17 40:5,8 46:13 193:6
**broad** 103:9 121:15 257:19 263:3
**brockovichs** 136:15
**broke** 48:14
**brookshire** 209:6
**brother** 121:11
**brotherton** 79:9,10
**brought** 24:19,24 57:22 58:23 59:22 63:2,14 64:14 67:11 68:5 73:7 94:20 99:16 108:12,13 109:2,3 152:10,13,14,17,19 170:13 236:1 243:5
**brown** 209:13,15,24 210:2
**budd** 1:12 3:3,4 6:22 115:15 122:16 126:16 131:16 132:5 132:19 134:12 146:1,21 181:3 213:23 227:6,9,11,13 228:20 231:19 233:4 234:15 234:18,21 235:19,22 236:4 237:1,4 240:18,23 241:8 246:18 248:2,4,17 249:18 250:13 251:2,22 252:1,5,10 253:10 262:16 263:1,23 264:3,24 265:5,9,13,17,20 266:12 267:15 268:3 270:11 272:9 273:9 274:7 275:1,5 275:21
**budds** 243:4
**bugged** 98:21
**building** 98:11
**bullet** 89:9
**business** 9:20,22 10:8 29:16 111:8 174:13,14 179:24 214:22
**busy** 24:21
**buy** 122:10
**buydown** 122:4,21
**buying** 155:11,22,24 156:14 174:11
**byrne** 66:22,22,24 67:1
**byrnes** 67:12

**C**

**cab** 205:7,9
**cady** 48:22 49:4 81:8,10,10 81:15 244:20
**caleb** 2:13 7:3
**calendars** 169:19 171:17

**california** 185:10 186:18,19 258:3,16
**call** 12:20 74:16 110:18 111:2 117:11 118:3 132:5,7,11,19 132:22 141:17 145:5 179:19 179:20,21 181:20,23 187:6 188:23 189:2,4,7,11,11,18 190:1 191:8 192:14 193:14 193:20 194:1 197:7,24 198:7,14 201:14,16,18 202:5 206:11 207:18,20 231:18 232:7,8,9,10,13,15 242:5 247:11 260:16,20 261:6 262:12,19 263:18,20 269:24
**called** 70:8,12,16 88:21 132:5 152:21 153:14,15,16 170:8 180:3 186:21 207:22,23,24 232:4,6 244:2,10 247:5,16 248:3 261:11
**calling** 88:5 110:21 145:6 190:6 201:20 207:22
**calls** 111:7 126:18 184:23 263:22
**campbell** 208:11,23
**campus** 14:11
**cant** 22:8 31:2 36:24 48:9 56:8 57:23 85:19 86:1 89:18 107:7,11 108:2 118:7 132:13 133:24 136:5 142:4 144:19 155:5 197:6 255:23 255:23 256:5,10 263:10 264:18
**capacity** 25:12
**capitol** 1:20 2:14 6:12
**caption** 278:5
**car** 151:18
**cardosa** 252:15,16
**care** 204:21 205:12
**cary** 3:5 6:21 213:22
**carys** 94:24
**case** 1:8 8:18 27:13 30:2,4 33:15 34:20 35:6,15 36:1,2 36:6 38:6 39:8,21 40:6,9,14 40:18 41:2 42:13,19 43:7 44:15 45:8,12 46:5 47:4,9 47:12,18 48:7,8 53:14 56:4 57:1,6 58:14,18,20 59:2,15 59:15,16 60:4,6 61:1,2 62:7 62:13 63:14,18,24 65:10,11

67:3,10 68:2,3,14,18 71:4,9 71:16,19 72:9,10,12,13 74:21,21,22,23 75:11,12,13 80:4,6 81:21 82:3 83:13,22 83:24 84:2 89:20 91:16 93:9 96:17,19 100:5,11,14 101:4,16 108:12,13 109:2,3 109:16,22 110:17 113:23 115:16,17 124:5 133:1,5,6,7 133:16 150:12,14,19,24 151:2 152:14 157:18 158:2 158:12,17,18,18 159:12,15 159:15 160:8,8,11,14,22 161:19 164:1,5,10 169:21 170:13 171:22 172:2,24 173:16 175:10,11,15,15,17 177:13 178:10,14 184:11 189:5,16,21 190:3,7,20 191:5,13,15,17,18,19,20,24 192:1,12,17 193:6,22 194:18 206:20 209:10,11 210:1,11 211:10 221:3 222:3 232:17 233:8,15 234:3 239:5,7,10,14 242:14 242:17,17 243:5,13 244:12 246:4,14 248:7 250:22 251:19 252:9 257:3 260:5 261:18 263:15,16 265:5 267:5 268:3,4,14,18,23 269:17 272:17,18 273:1
**cases** 21:12,13 23:2,22,23,24 24:2,9,10,15,18 25:1 27:19 30:12 33:22 37:11,13,16 58:21,23 59:16,20 64:10,14 67:4 72:3,15,17 92:24 94:10 94:10 96:1 109:6,11 110:10 111:16 112:23 113:23 158:4 158:7,19 159:10,19,22 160:4 161:3,6,13 172:12 173:12 187:10 194:7,12,12 194:18 197:22 212:3 216:2 216:9,12 223:9,12 237:17 237:24 238:3 239:13 242:14
**cash** 3:16 6:19,19 93:16 134:24 162:16,24 163:3,7 276:21
**catch** 13:19
**caused** 69:4 87:9 163:18
**cell** 185:7 206:1
**center** 28:16 211:2

**centered** 70:13
**centrum** 3:6
**certain** 72:10 110:14,16,17
    243:12 244:3 270:10
**certainly** 27:6 40:24 48:10
    137:10 186:8 220:12 250:4
    260:18 270:21
**certificates** 29:17
**certifications** 29:18
**certify** 278:4,7,10
**cetera** 122:4 123:15
**chance** 141:8 147:4 179:1
**change** 11:8 49:18 50:24 51:6
    97:4 107:6 108:22 109:21
    140:18 183:17 227:17
    235:18 254:15 255:5 257:3
    257:5 258:9
**changes** 109:14,15 255:21
**changing** 57:19 110:9 112:5
    113:1 122:15 150:4,6 159:7
    254:21
**channel** 157:7 174:8
**channeled** 174:14
**characteristic** 103:6,7
**characterization** 136:18,19
**characterize** 137:14 193:24
**characterized** 130:5
**characterizes** 190:15
**characterizing** 137:6
**charleston** 1:21,23 2:15 6:6
    6:12 64:3 189:15 200:23
    201:11 202:21,22,24 207:16
    208:20
**check** 202:15 216:19
**chemical** 215:6,22 216:9
**chemicals** 215:17
**chemistry** 215:16,17,20
**cherry** 1:13 3:8
**choose** 7:17
**chris** 7:1
**christian** 75:24 208:11,22
**christopher** 2:18
**circle** 19:22
**circled** 127:3
**circley** 144:2
**circuit** 79:15
**circumstances** 10:17 20:1
    32:2 68:18 69:3 71:12 85:7
    105:15 115:24 116:3 120:11
**city** 15:10 147:10,13 170:20

170:20 171:3,7 197:15
    236:10,14,18
**civic** 28:16
**civil** 1:18 220:19,20,22 221:1
**cjmccarthy** 2:18
**claim** 275:4,7
**claimant** 83:23
**claimants** 270:22
**claims** 259:16
**clarify** 21:7 50:9 243:20
    244:21 266:1
**clarksburg** 2:6 186:23,24
    199:14
**class** 25:21 101:1,16 102:2
**classes** 17:4 100:21 220:15
    221:1
**clear** 17:15 18:10 31:14 37:1
    43:8 104:6 128:8 140:7
    196:3 205:4 231:5 233:14
    244:24
**clearly** 39:11 151:3 194:20
    232:19 250:7
**clerk** 25:12 79:15
**clerking** 67:17
**cleveland** 41:4
**client** 59:7 79:13,14 123:15
    124:9 221:7,8,14,21,23
**close** 134:4 180:11 208:3
**closed** 87:23
**cmcdougal** 3:5
**cochran** 1:13 3:8,9 6:17 8:1
    205:22 208:14,19 275:10
**cochranfirm** 3:10
**cocounsel** 116:10 122:10
    181:1
**coffee** 149:1,7,7,11,21 151:12
    235:6,16
**collect** 76:11
**collected** 65:13
**college** 9:24 149:2 185:13
**columbia** 9:19,21 10:7 29:16
**com** 2:5,8,13,18 3:5,10,16
    209:5 210:6,12,15,19,21
**come** 8:20,22 14:7 19:19
    21:18 39:20 41:1 43:16
    54:5 56:16 60:3,6 62:21
    87:2,8 97:24 101:20 102:20
    103:18,23 115:4 135:18
    136:13 137:14 138:9 173:7
    212:2 220:2 243:2 248:4

258:17 268:17
**comes** 61:15
**comfortable** 7:19
**coming** 27:23 32:8 43:10
    76:4 166:9
**comment** 71:13 162:23
    163:10,20 164:22 193:5
    241:1 264:7
**comments** 117:12 118:4
    162:2,15 163:12,14 192:24
    205:4
**commission** 278:15
**commissioned** 278:3
**commitment** 16:18 133:13,15
    133:17 233:22
**common** 25:7
**communicate** 120:16 208:18
    228:19 232:22
**communicated** 197:15 227:5
    231:14 232:20 233:18
    234:15,21 235:19,21 236:3
    236:24 256:1 269:21 270:7
**communicating** 221:21 250:2
**communication** 39:17 42:10
    42:24 45:18 54:15 56:7
    58:24 69:13 105:18 111:2
    112:10 133:14 152:23
    182:10 188:1 192:8 193:17
    196:23,24 229:1 235:17
    237:12 239:19 247:18 254:3
    255:3 258:14 260:10 274:8
**communications** 40:4 42:21
    43:2,8 45:20 52:14,16,19,22
    53:3,22 55:8,12,20,24 56:22
    57:14 60:15,17 90:6 120:17
    120:20 121:17 148:6 160:17
    160:20 173:6 198:5 236:21
    237:8 242:8 247:14 261:17
    262:23 269:15 271:7 273:4
    274:24
**communities** 11:7
**community** 11:8 12:22
**company** 199:9,13 200:21
**compensated** 57:5 93:18 94:2
    121:20 124:23 125:10
    138:24 158:24 173:15
    191:16
**compensating** 54:23 55:13,20
    56:1,12,15,17
**compensation** 20:12 22:10

54:16,23 55:11 57:17 83:22 83:23 94:9 121:5 134:13 135:17,21 136:2 138:22,23 149:23 150:2 152:15 155:9 158:4,6,10,17 159:14,23 160:14 164:20 168:12 173:1 173:7 190:4,7 192:8,10,11 202:11,23 207:2 212:1 236:8 239:6 258:22 259:2,7 259:8,10,17

**compile** 91:7
**complete** 10:14 17:8
**completed** 184:18
**completing** 12:13
**comprehension** 184:6
**concept** 221:4
**concern** 89:19,19 124:21
**concerned** 98:14 102:3 104:4 154:7 157:17 158:1,11 164:1,9,12 171:13 193:17 203:14
**concerning** 39:19 89:18 142:8,24 187:15 211:10 225:15 226:24 227:17 236:8 236:22,23 237:8 257:18,20 261:17 262:17 263:1 269:21 274:8 275:1
**concerns** 53:23 54:3 71:3,8 98:20,23,24
**concluded** 207:17 208:4,8
**concrete** 36:24 160:16
**condition** 154:5
**conditioned** 226:15 227:1
**conduct** 103:6,7 104:5
**conducted** 199:22
**conduit** 174:7
**conference** 119:15 120:24 263:6,9,11
**conferences** 121:3
**confirming** 148:11
**conflict** 145:24
**confuse** 200:13
**confused** 38:18 161:15 191:21 253:1 259:24
**confusing** 161:9
**confusion** 163:18 171:4
**connection** 23:14 223:8 237:24 243:12 244:11 246:17 247:8 264:24 265:14 265:21 270:11 271:5

**consenting** 47:15
**consider** 92:18 117:2 219:19 219:22
**consideration** 58:21 59:24
**considered** 19:13 63:14 113:16 117:6 123:23 143:9
**considering** 18:2
**consistent** 119:18 120:24 129:24 262:6,11 264:22
**consult** 59:7 94:8,12,15 115:19
**consultant** 116:24 117:3 118:17 124:13,23
**consultants** 116:22 117:11,16 118:3,14 246:4
**consulting** 123:14 124:8
**contact** 27:4,6,15 29:24 30:10 33:2 40:17,19,20 41:5,21 42:1 46:14,21 60:12 63:4,6 63:7 94:6 211:15 212:13 260:11 274:22
**contacted** 28:23 40:23 268:23
**contacting** 40:24
**contacts** 40:22 44:5 46:8 85:13,18 86:2
**contain** 50:21
**contained** 76:12 141:12 175:13 236:23 270:18
**contains** 245:22
**contd** 3:1 5:1
**contemplate** 50:18,20
**contemplates** 246:2
**contemporaneous** 91:9,10 172:9 242:19
**contemporaneously** 66:15
**contemporary** 91:8
**content** 220:6,8 267:1
**contents** 126:5,9 243:23
**context** 67:5,22 79:21 145:4 264:7,8
**contingency** 172:17,19,23
**continue** 85:16 97:5 213:18
**continued** 24:10
**continuing** 85:12,18 86:2
**contractor** 139:9
**contracts** 137:22
**contributions** 14:3,4 158:7,8 173:9,10 212:4,5
**control** 162:14 163:3,9
**conversation** 47:8 58:3 90:4

99:4,9 193:12 196:17,19 198:12 199:1,4 202:10 205:20,21 206:13 232:23 233:1 242:2 247:10 274:4
**conversations** 54:19,22 55:8 55:12 57:24 93:15,21 99:5
**cooper** 15:10
**copies** 73:5,11 94:21 95:1 273:10
**copy** 94:20 106:24 119:6 166:6,7,14,15 193:7 241:19
**copys** 105:3
**core** 199:22
**corner** 79:6 80:8 119:6,7 120:23
**corporation** 1:13
**corps** 10:17,19,20,21 11:6
**correct** 8:4 15:15,17 34:13,16 36:7,11 40:7 45:9 68:9 72:13 74:6 84:21 88:15 95:7 96:3 100:8 108:10 122:11,16 125:24 128:24 129:12 131:3 135:7 146:23 147:11,21 164:7 169:4,8 171:8,11 172:24 174:24 175:4 181:3 185:3 191:7 201:8 206:19 212:18 214:4 214:5 216:15 217:10,16 221:9 223:2,5,11 225:20 226:1,4,8,13 227:19,20 230:6,20 231:8 235:5 236:6 237:20 238:2 243:13 244:8 244:9 245:8 247:2 249:21 260:17 262:13,14 266:9 268:1,4,10,11 271:22 272:9 273:15 275:15,16,19,23
**corrected** 31:10 245:18,19,20 266:17
**correctly** 29:23 123:17 274:12 278:7
**cost** 245:10 246:12
**costs** 143:8,9,19 244:11 245:23 246:2 251:8 252:6,9 253:11 272:15 273:15
**couldnt** 21:24 24:3 67:8 82:13
**counsel** 6:7,15 35:5,6 198:4 256:9 278:11,12
**counter** 1:4
**counterclaims** 145:23

**counterdefendants** 2:3
**counterplaintiff** 1:7 2:11
**county** 62:23 63:1
**couple** 108:14 114:16 218:23 263:8
**course** 8:8 48:16 86:22 91:8 112:6 214:12 215:15 219:8 219:8,15,17 238:3
**courses** 219:3
**court** 1:1 7:7 199:14,16,17 266:5 278:3
**courteous** 276:10
**courtesy** 276:15
**courtroom** 30:4,14
**cover** 4:9 5:9,12 28:19 76:17 76:21 170:16 176:3,10
**covered** 99:23 111:15 135:12 222:16,19 237:6,7
**covers** 129:11
**crazy** 32:9
**created** 44:10,18 265:17
**creating** 242:13
**credits** 215:15
**crime** 111:20
**crowd** 150:16,16
**crr** 1:19 278:2,21
**crying** 151:17
**cullet** 175:19
**currently** 260:4
**cut** 69:22 140:10
**cutting** 97:23 99:9,18 100:17 101:12,17 131:2

**D**

**dallas** 3:7
**dame** 9:13 10:24 11:1,20 29:15 185:18,22 215:14 240:11
**dan** 75:20 78:3,14 131:13,19 134:10,11 135:4,5,6,6,19 146:11,19,20 156:18 170:3 170:6,12,17,21 173:19 174:3,6,7,10,17 181:24 182:9
**daniel** 2:8
**dans** 170:6 173:20
**dash** 69:1,2 138:19 144:5,5 169:15 195:13 240:16
**date** 6:10 37:7 48:9 56:8,9 80:2 108:4 119:2 126:2 133:20 141:17 171:2 192:11

199:9 207:3,4 208:4 231:1 240:21 249:3 263:10
**dated** 66:10 85:4 95:11 249:2 255:14,15
**dates** 169:19 171:17 206:21 256:16
**daughter** 16:5 165:2,4 240:9 240:10
**davie** 15:11 65:18,19,21,24
**day** 6:10 8:7 46:20 80:20,24 82:11,13 83:4 104:14,16 110:3,5,11,20 148:15 151:12 156:11 190:1,14 199:14 200:4,22 201:4,5 203:1 204:12,19 205:15 207:21 212:11 264:14,17 265:2 276:19 278:16
**days** 8:5,16 170:24 171:7 200:2,4
**dc** 2:9 130:20 131:9 132:2 134:4,7 135:4 230:24 232:2
**deal** 27:22 95:24 131:7,22 161:17 162:2,3 172:22 173:21 178:22 184:9,13 248:6
**dealing** 144:8,16,18 243:15 249:17 262:8
**dealings** 103:19
**dealt** 238:5
**deanna** 252:19
**deanne** 252:22,23
**death** 24:12,13
**debt** 155:13 156:5 157:7,8
**december** 129:2 130:8,12 131:5,5 134:5 148:17 149:14,15 152:3,4,6 187:19 201:1,4 230:11,17 231:23 235:4
**deceptively** 144:9,17,18
**decide** 16:19 27:8
**decided** 10:16 11:9 14:24 15:1,4 16:9 41:1,18 43:23 132:7 151:4 180:9
**decision** 5:13 16:13 18:5 26:17 28:9 43:11 225:8 231:13,16
**deducted** 272:2
**deeply** 107:1 112:3,4
**defendant** 1:7 2:11 3:3,8,13 68:10,11

**defendants** 1:4,16 2:16 7:2 245:3 268:4
**definite** 26:17
**definitely** 27:3 49:14 118:8 173:1
**degree** 11:19 15:22 16:6 17:9 17:12 29:15 217:10
**degrees** 29:14,18
**deletions** 257:4
**deliberation** 96:24
**delivery** 155:8,20
**demand** 145:22
**denied** 192:15
**denying** 192:16
**department** 14:8 83:9
**depended** 86:18
**deponent** 4:2 7:9 33:8,11 48:3 54:11 77:9 108:16 140:1 160:23 161:2 163:17 176:23 177:3 178:3 203:20 209:19,22 216:20,23 217:1 217:4 223:20 276:12,15
**deposed** 8:10,14
**deposition** 1:17 4:7 5:2 6:11 8:2,6,9 26:19 51:13 64:20 72:22 78:23 83:18 95:4 97:11 104:21 113:9 118:20 125:14 128:19 140:12 141:1 147:1 150:13 168:24 174:19 179:4 181:16 183:2 184:16 188:15 197:5 198:18 200:22 201:1,10 203:1 205:15,16 206:5 208:18,20 213:19,22 223:23 224:2,11 225:9 226:19 229:10 237:13 244:22 245:3 248:21 250:15 261:21 264:16,17 269:7 276:7,22 277:1 278:4
**depositions** 8:17,19 267:5
**describe** 60:12 137:11
**described** 25:4 27:1 40:16 134:3 172:16 218:14 223:4 223:23 225:13 235:7 246:17
**description** 271:19,24
**detail** 47:1
**detailed** 254:21
**details** 22:1 38:16,16 90:8 174:18 176:1 270:8 271:20 271:23
**determine** 28:6 256:12

**determined** 26:15
**develop** 61:4
**developer** 156:19 170:21
**developing** 175:20,22 176:1
**development** 11:8 174:10
**devoted** 246:23 265:5,10
    267:11
**dictate** 105:22
**didnt** 10:14 13:19 17:15 22:8
    25:11 28:21 29:4,5 31:15
    32:12 38:1,10,15 46:10,22
    47:1,24 52:13 60:1 65:3
    87:6 92:18 102:11,18 103:3
    106:10 110:20 112:17 113:3
    113:5 132:6 134:19 154:5
    158:20 159:20 160:1,3
    161:11 163:15 164:15
    169:20 170:22 172:1 173:14
    175:19 182:13 183:21 186:8
    193:7 194:17,21 195:1,4,18
    195:20 196:7,14,16,23
    211:14,18,20 212:8,9
    223:16 224:8 231:11 232:22
    237:23 239:17 242:15 243:9
    243:23 248:6,11 261:4
    267:7 270:8 271:16,21
    273:12 275:7,10,13
**died** 24:14 26:21
**diff** 177:20
**differences** 111:19
**different** 8:16 21:11 22:20
    46:12,13 79:6 91:24 92:3,21
    96:19 154:17 168:6 175:4
    184:22 222:12 223:7 246:3
    250:4 253:11
**difficult** 105:3,3 235:9
**direction** 24:23 164:21
**directly** 47:19 63:4 72:19
    104:13 261:4,9 269:21
**disagree** 226:21 264:12,20
**disagreed** 106:17 264:19
**disagreement** 265:8
**disappointed** 107:2 112:3,4
**disclose** 251:7,16
**discontinued** 146:6
**discovery** 189:23 250:21
    251:10 252:8,11 256:19,21
    257:2
**discuss** 42:11,17 45:24 46:2
    47:1,3 54:10,13 109:17

    110:20 131:18 134:9,11
    182:3
**discussed** 37:18 45:7 47:21
    48:16 55:2 56:17 82:14
    95:19,24 107:4 121:19
    127:24 170:11 175:8 181:23
    204:2
**discussing** 30:12 53:11 75:5
    82:2 110:3 130:13 263:15
**discussion** 47:20 101:1
    111:20 152:15 204:4 227:16
    230:8 234:23 236:7,15
    242:4 260:24 274:16,21
**discussions** 117:13 118:12
    127:16 139:8,12,16 145:15
    202:21 225:15 226:23 237:7
    262:15,17 263:23
**displeased** 229:20
**dispute** 115:14 116:8,9
    126:15 131:16 134:12
    135:14,15 146:1,13,20
    246:18 247:8 262:8
**dissertation** 12:13
**distracted** 50:23
**district** 1:1,1
**division** 45:24 46:2 47:3
    50:18,21 51:2
**dmarino** 2:8
**doctorate** 15:19
**document** 73:2 79:3 84:24
    88:17 90:16 95:6 97:5 98:5
    105:1,8 114:19 115:4 119:3
    119:20 120:5,6,12,12
    121:13 125:19,23 126:3
    128:23 129:11,14,15,16,22
    130:4 141:6,10,13 167:23
    174:24 181:20 187:23
    188:20 201:23 223:24 224:5
    224:6,9,12 243:9 271:18
**documentation** 246:13 254:1
    255:3 256:14
**documented** 246:21
**documenting** 87:7,10
**documents** 65:2,6,10 66:3,6
    94:19 189:23 251:10 252:12
    256:19,22 257:2
**doesnt** 43:21 128:6,7 169:24
    170:16 171:10 172:21
    216:21 236:19 241:16
    249:11 254:4

**doing** 16:9 17:14 22:6 24:18
    30:1,3,13 47:15 69:21 96:16
    103:15 104:20 112:10
    144:10 149:16 150:7,10
    191:15,17 198:15 199:23
    212:15 229:19 240:9
**dollar** 123:13 169:23 170:1
    201:24
**dont** 7:19 8:13 9:3 12:20,22
    13:7,9 16:13 18:10 19:21
    20:4,11 22:4,5,24 24:2,14
    27:5,16,16 31:2,4,4 32:17
    32:21 33:5,5,17 34:8 37:17
    38:23 39:23 40:22 42:1
    43:18 44:4,6,7 47:10 50:6,8
    50:22 52:7,10,24 57:20 58:4
    58:11,11,22 60:18,23 67:7
    67:10 68:23 70:10,17,18,23
    71:10 73:24 76:5 78:22
    79:11 80:21 81:1,22 82:4
    84:1 85:22,23 86:4,19,21
    88:23 89:20,23 90:7 93:2
    95:22 96:6,15,21,21 98:17
    103:24 104:2 106:20 107:14
    107:16 109:24 110:2,3,9,12
    111:9 112:14,14 114:4,4
    121:6 123:2,6,22 124:1
    125:1,3,6,6,8,11 126:4,20
    127:14,19,24 128:4,13,14
    128:16 129:8 130:4,10,18
    131:23 133:12 136:19 137:6
    139:5,7,11,17,24 140:1,5,10
    140:17 142:4 143:1 144:20
    145:13 146:3,5,14 152:13
    153:4 156:15,16,22 162:9
    162:24 163:5,8,9 166:8,15
    166:22 167:22 172:21 174:9
    176:7 177:14 180:22 181:6
    181:14,15 185:20 186:1,6,8
    186:10 188:3 189:7 191:1
    194:2 195:1,5 196:24 197:1
    197:8,10 198:9,16 200:2,3,4
    201:17,19,21 202:4,12,13
    202:19 203:5 204:4,11,20
    205:11,17 206:21 209:17
    212:15,15,24,24 214:13
    215:1,5,18,20 218:11,22,23
    219:2 228:23 232:5,6,7,9
    233:5,13,18,20 234:8,20
    238:24 239:18 241:21

243:19 244:16,17,18,20
249:10 250:10,14,22 253:1
256:11,20,20 257:1 258:2
259:20 260:1,14 261:13
264:8 270:20
**dothan** 3:11
**doubt** 197:21 234:13
**dr** 7:4,6,16 209:24 213:18
228:9 229:13 256:13 265:4
269:18 275:4 276:9,23
**draft** 44:10,13,17 77:1
105:16 116:1 142:4 146:8
176:13
**drafted** 79:3 86:6 95:7
105:21 113:14 224:1
**drafting** 76:17,21 266:23
**drafts** 266:4
**draw** 119:5
**drawn** 97:17 202:1
**drink** 132:10
**drinks** 132:18
**drive** 180:3
**driven** 136:3,14
**dry** 203:10
**due** 104:7 136:9 164:20 180:8
**duly** 278:3,4
**dust** 199:21,22 210:3
**dutcher** 73:17 74:12 257:17
258:5,16,24 259:11 260:3
273:23 274:21

---

**E**

**earlier** 51:24 52:3 67:16
92:23 150:13 225:9 229:17
245:14 250:23 262:7
**early** 39:1,4 48:10 61:3
185:19 253:6
**easi** 210:17
**east** 1:23 3:11
**econo** 31:24 32:24 33:3 34:6
36:12 38:20 39:1,15 40:1,3
42:11,16 44:2 45:19 225:6
**educated** 209:16
**education** 22:8 215:11
**educational** 9:12 214:18
**effect** 155:3 167:19 232:18
233:21 273:3
**effort** 66:5
**eheinc** 210:21
**eichler** 71:22 72:4,18,19
73:17 74:10 75:6 95:21

257:16 260:3,10,21 261:17
274:4,23
**either** 32:16,16 49:13 67:11
88:3 117:14 118:12 122:19
140:2,5 188:2 216:9 229:19
233:6 255:4 258:19 264:14
264:15 267:24 271:8 272:16
272:21 274:24
**elitist** 88:6,22 89:6 180:11,15
184:1,3,4 264:3,5
**elitists** 87:23 241:2
**ellen** 132:20 263:7
**email** 4:15 5:7 74:17 142:3
146:8 208:10,22,24 209:3,4
211:7,8,13 212:14
**emeritus** 13:23 14:2
**emotional** 235:10
**emotionally** 112:11 151:24
**emotions** 112:2,8,12,17,22
**employed** 278:11,13
**employee** 155:10,21,23 174:9
278:12
**employees** 46:8,9,12 89:21
263:23
**encompass** 45:10,11
**encouraged** 32:6
**ended** 17:3 24:17 32:23 48:18
159:12 160:8 186:14 193:12
**enforceable** 168:18
**enlisted** 248:19
**ensure** 153:21
**entail** 17:22
**entailed** 35:23
**enter** 11:12
**entered** 11:17 108:11 109:1
250:12 267:18
**entirely** 269:3
**entities** 244:7
**entitled** 159:13 160:13
271:18
**entry** 185:4
**environment** 73:20
**environmental** 83:10 215:2
216:1
**environments** 32:10
**envirotoxicology** 210:6
**equal** 111:21
**equally** 108:12 109:2
**erin** 136:14
**erins** 136:3,7

**erk** 2:5
**error** 107:19
**esquire** 2:4,8,12,13,18 3:5,10
3:16
**essence** 43:11
**estate** 156:19 170:21 174:10
174:17 181:24 182:16
**et** 122:4 123:15
**ethical** 53:24 54:3 104:4
**ethically** 125:9
**ethics** 218:2 219:3,8,9,17,20
220:1
**evening** 105:17 180:4
**event** 123:8 231:11
**events** 141:12
**eventual** 41:12
**eventually** 11:13 13:3 15:10
26:9 41:1 48:14 151:18
186:12 198:2
**evidence** 130:15 134:15
136:24 275:20
**evil** 69:20 70:9,12,16
**exact** 48:9 56:8 79:11 231:1
233:13 234:9
**exactly** 11:17 19:21 34:9
38:23 54:18 55:5 112:14
147:16 173:4,7 175:20
185:20 186:1,10 198:10
203:5 214:23 257:1
**exam** 28:10,11,14 52:20 53:6
53:8 218:3 219:1,1
**examination** 1:18 4:4 7:10
213:16 218:4
**examined** 12:19
**example** 159:4 237:20
**exams** 29:9
**exception** 215:19
**excuse** 13:17,17 27:9 59:23
84:5 91:9 123:13 126:22
132:12 151:15,19 165:21
167:6 186:21 245:3 252:20
259:8
**executed** 243:22
**exhibit** 4:6 5:1 64:20,23 66:8
72:22 73:1 78:23 79:2
83:18 84:18 88:15 90:17
91:14 95:4 97:14,16 104:21
104:23 113:9,12,12,13
114:6,7,10 118:20,23
122:17,23,24 125:14,17

126:5 128:19,21,22 129:20
130:1 135:16 136:2 140:12
140:14 141:5 147:1,3,7
163:23,24 168:1,24 169:2,2
174:19,21 175:1 179:4,6,17
181:16,19 183:5 184:16,18
184:19 188:15,18,20 198:18
198:20,22 199:11 202:18
206:5,8,11,16 207:4,7
208:10 228:11,18 230:13
231:11 236:16,18,24 239:21
239:24 240:5 244:22 245:4
245:19,22 248:21,23 249:17
250:15,18 261:21,24 269:7
269:9 270:18
**exhibits** 175:8 189:8 228:8
**existed** 224:9
**exists** 221:13
**expect** 53:19 246:14
**expectation** 11:13 158:3,22
159:23 161:20 173:10,12,14
192:2 212:6
**expectations** 172:12 202:10
202:22
**expected** 89:2 192:9 226:12
**expecting** 191:12 226:2
**expense** 245:11 252:13
**expenses** 116:20 143:15
244:11 245:23 251:8,21
252:6,9 253:11 254:17
272:3,13,15 273:7,14,22
**experience** 27:21 157:15
216:1,3,8
**expert** 112:16 170:4 209:9
210:3 219:19
**experts** 246:4
**expires** 278:15
**explain** 39:13 51:19 59:20
153:18 167:16
**explained** 258:24
**explanation** 100:16 155:16
205:13
**exposed** 46:15 100:23
**exposure** 104:4 215:6,8,22
216:9
**express** 124:20 166:11
**expressed** 157:20 164:14
167:4
**extent** 25:10 137:11 169:12
192:22,23 193:1,9 198:4

**extra** 94:20

## F

**face** 113:3,6
**facsimile** 249:13
**fact** 81:19 86:14 108:4
116:12 146:9 197:23 205:18
214:2 224:8 228:19 231:10
234:21 246:21 251:16
264:22 269:24 270:17
271:15 273:17
**facts** 130:15 134:15 136:24
**faculty** 219:13
**failing** 185:23 229:20
**fair** 27:12 50:13 58:22 103:15
104:11 116:10 136:18,19
138:22 151:10 158:10 181:2
182:8 184:23 193:24 214:14
214:16,20 215:19 218:12
232:12 248:20 258:22 259:1
259:6,8,10 269:18,23
**fairmont** 31:24 32:24 33:4
59:3,5,16 61:24 64:13 71:16
71:18 73:23 80:6 81:5
95:19 96:1 100:4 102:4
115:16,17 122:10 124:5
133:8 150:14 158:18 159:14
161:13 194:18 197:17
222:15 225:6 234:5 237:18
243:13 244:12 253:9,22
259:23 265:10 266:22 267:5
267:19 268:2,14,18,23
270:23 271:1 273:8
**fairness** 133:9
**faith** 190:10
**fall** 69:1 134:7 150:5 206:22
231:3,3,8,23,23
**familiar** 71:21 249:10
**family** 10:4,5 23:10,11,14
**far** 37:23 49:17 145:23 208:3
238:23 239:1
**farrest** 187:2 199:18 200:1
200:10,16,17
**father** 14:24 15:10 180:12
**fathers** 121:11
**favor** 158:21,24 159:5
**favorable** 192:3,4,17 208:8
**favorably** 159:12,13,21 160:3
160:8
**fax** 4:9 5:9,12 73:16 74:5,9
256:6

**faxed** 262:1
**faxing** 73:18 249:14
**fear** 102:24
**february** 85:4,5 87:14 144:22
145:9 278:15
**federal** 1:18
**fee** 49:3,9 50:15 53:17 54:13
54:20 55:9 66:21 67:6,13,19
99:13 115:14 116:8,8,18
119:16 122:10,15,19 124:4
124:22 125:10 126:15
127:17 130:13 135:15
138:13,15 145:24 146:13,20
165:18 172:17,19 178:9,12
178:12 180:8,21 181:1,9
184:10 227:23 236:1 246:18
247:8 249:18 251:2 262:8
**feel** 87:6 113:6 179:7
**feeling** 203:8,8,11 204:5,8,11
**fees** 27:18 37:24 38:1,3 54:1
79:19,22 80:1 220:3 234:23
243:12 272:2,7
**fellow** 32:17,17
**fellows** 43:12
**felt** 40:10 105:19 106:10
113:3 164:17 168:15,19
248:2,5
**fiberglass** 60:4
**fica** 117:10 118:2
**field** 74:13 214:19
**figure** 92:20
**file** 169:21 172:2 186:24
275:4,7,10
**filed** 265:13,20 266:5,22
**filing** 79:19,22 80:1 170:12
266:7,13
**filings** 238:23
**filled** 150:21
**final** 211:9 257:8
**finally** 150:23 217:1 247:17
249:24
**financial** 6:8 48:11 107:6,8
108:23
**financially** 278:13
**find** 153:1 189:20 256:4
**fine** 50:10 155:19 162:4,8
181:5 195:12
**finish** 15:23 33:6 140:18
143:23 163:6 176:22,22
177:1 223:18 247:21

**finished** 10:21 17:24 48:2,3
106:3
**finishing** 16:6 125:20
**firm** 3:9 6:18 8:1 18:16 22:23
40:5,9,11,13 41:1,3,4,6,9,9
41:18,18,19,24 42:1 43:10
43:15,16 61:12 63:24 71:15
72:2 74:14 77:13 78:20,21
82:2 83:12 95:24 127:5,11
127:18 128:2 131:17 133:19
138:12,13 139:13 142:19
149:19 178:9 180:12,13,14
188:4 202:7 204:3 205:22
208:19 213:23 243:7 248:6
256:2,7 258:8 260:5 261:10
261:11 275:8,10
**firms** 18:13,15 40:17,23 62:8
72:12 75:11 76:9,23 77:15
77:17 78:7 99:13 188:14
251:2,6,15,16 259:22 274:6
**first** 8:7 23:16 25:2 29:4,24
33:7 55:7 63:10 105:1
116:17,20 117:20,20 118:5
119:19 122:2 137:16 141:16
143:24 154:13 162:21 177:9
177:22 179:14 200:18,20
201:4,6 214:3 223:19
224:10 225:5 247:16 264:14
**firstyear** 17:4
**fit** 19:18
**five** 12:19 17:10 65:21 73:8
94:20 183:1 237:6 269:14
**fl** 3:17
**flaherty** 1:20 2:12
**flex** 81:7
**flexibility** 178:24
**florida** 14:24 15:3,4,6,8,11
65:18,19,22 155:10 156:2,3
156:14,17 170:6 173:20
174:3,12 181:24 182:17
201:2
**flowers** 199:23 210:8
**focus** 96:10,12,16,20,21
**focusing** 205:18
**folks** 149:18 251:15 266:22
271:4 275:17
**following** 34:2 46:17 107:17
134:21 204:18 206:24
**followup** 239:22 242:4
246:11

**foresaw** 174:5
**foresee** 46:5
**forgive** 155:12 156:4 157:7
**forgiveness** 157:8
**form** 26:3 31:11 33:23 34:21
51:18 71:5 72:5 90:18
92:23 103:8,9 121:14
126:18 128:3 129:13,21
130:3,14 134:14 136:14,16
136:23 137:5,19,21 138:22
139:2,4 150:9 159:16
170:15 173:22 175:12
221:15 222:1 224:18 225:1
227:7 246:8 263:2
**formal** 214:18 243:11
**former** 18:17
**formerly** 260:4
**forms** 135:17 136:2 138:23
150:20
**fort** 170:4
**forth** 14:9 42:9 156:23 157:3
271:20
**fortunately** 16:16 17:3
**forward** 268:17
**found** 41:8 256:1,9,10,24
272:23
**foundation** 227:8
**four** 28:13,18 29:2 135:18
137:13 138:8,9,16,21
140:24 147:7 151:1,2 155:6
164:24 171:7 217:13,19
218:20,22
**fourth** 29:5
**frame** 55:4,24 146:14 156:15
156:16 159:8 231:24
**frankly** 134:21 222:11
**fred** 248:3
**free** 179:7
**friday** 186:23
**friend** 30:8 31:18,18 32:18
**friends** 19:20,22,24 31:16
43:3 64:8 198:13 223:6
**friendship** 25:3
**front** 134:10 179:11 228:8
**fronting** 244:11
**fruition** 190:20 193:6
**fsblaw** 2:13
**full** 19:2 184:6 278:8
**fullen** 268:8,13,22 269:15,19
269:24 270:6,12,18 271:10

272:24 273:9,12
**fullens** 214:4
**fully** 164:15
**funeral** 214:4
**funnel** 127:18,20
**further** 96:9 196:24 276:11
278:7,10,12
**future** 10:4 263:17

## G

**gain** 255:20
**games** 111:20
**garage** 88:20
**garson** 78:20
**gary** 1:2,3,9,9 6:2,3 8:2 29:22
30:6 31:7,18,19,21,23 32:19
33:2,13,19 34:3,5,11 36:6
36:20 38:5,20 39:7,16 40:4
40:10 41:23 42:12,18,18,22
43:2,4,15 44:3,13 45:3,4
47:4,9,11 49:3 51:16 52:5
53:5,18 54:1 55:19 57:9,15
57:16 58:12 59:17,23 61:6
63:15 64:14 66:16 67:11
69:11,16,17 70:2,11,18
71:11 76:14 77:5 78:21
85:13,18 86:3,6,10,14,23
87:7,11,13,19,22 88:5,19,21
89:5 90:4 93:7,7,11,14 94:5
94:16 95:15,24 96:1 98:2,14
103:5,11 105:19 106:10
107:1 110:8,11 111:13
115:7,11,12,14,18 116:1,9
116:13 117:4,7,9,9,14 118:1
118:13 120:19 121:4,21
122:11,15 124:3,3,6 125:4
126:16,17 127:1,3,13,16
128:1 129:5,20 130:1,9,13
130:18 131:1,11,12 132:24
133:2,16 134:11 135:4,6,15
135:20 136:8 138:2 139:1,9
142:3 143:10,18 144:7,17
145:21 146:7,11,19,19
147:9 153:16 157:14 161:11
164:14 166:24 167:3,24
169:7,14,15 171:6 174:11
175:4,23 179:18 180:16
181:1,21 182:6,14 183:9,12
184:23 186:20 187:4,4,8,11
187:14 188:24 192:10
194:19 197:4,24 199:17

204:1 205:23 206:14 207:2
**garys** 40:3 42:6,7,17 44:9
 50:11 98:6,8 167:9 170:5
 173:20 174:2 178:12 185:7
**garyyou** 141:24
**gates** 142:5,11,12,17,18
 146:8
**general** 14:6 99:13 105:2
 112:13 160:15,18 172:8
 174:4 176:3,8,15 199:12
 233:17 239:12,16 244:17
**generally** 19:13 23:3 111:4
 122:24 255:14
**generated** 106:1 120:7,9
 125:23 126:7 128:23 129:2
 141:6 147:20 169:4 174:24
 181:20 188:20 199:11
**geologist** 199:24 210:11
 212:22
**george** 199:23 210:8
**getting** 12:2 89:24 124:7
 134:22 192:8 212:10,22
 227:2 237:9 258:6 259:1
**gillian** 165:1,1,2,3 185:17
 186:12
**gillians** 185:8,12
**girardi** 61:19,20 243:6,22
 244:8
**give** 24:3 36:24 47:11,14 48:9
 56:8 57:23 100:16 101:10
 104:24 120:6 145:3 150:10
 176:10 178:24 205:13
 247:23 263:10 270:3
**given** 8:8,18 150:19 257:6
 278:8,16
**givens** 1:13 3:8 199:1,10,13
 200:7,10,19,21 201:7,23
 202:9,17,20 203:19,21
 205:21 206:12,17
**giving** 94:24 116:3 129:7
**glad** 214:14
**glasser** 61:13,13 75:14,15,18
 75:19,22,22,23,23 78:1,1
**go** 7:15,18 8:23 9:21 15:4
 16:2,4,12,14,19 21:3,19
 22:14 39:9 43:12,22 51:7
 53:10 56:19 76:18 77:19,21
 88:12 94:18 103:11 104:24
 106:22 112:19,20 113:12
 123:8 131:6,13,18,22

133:22 136:6 138:8 151:4
 153:5,21 154:24 157:11
 169:18 171:16 178:24 181:6
 185:17 191:4 194:5 200:9
 204:14,14 213:8 216:16
 217:3,6 231:6 233:15,16
 239:1,2,4 244:13 258:2
 265:23 272:24
**goes** 111:18 124:12 193:4
**going** 10:3 11:18 17:5 18:3
 36:5 43:9 45:17 46:3,22,23
 47:7,7 51:21 57:21 64:22
 72:24 73:9,10 75:10 79:1
 92:22 104:18,24 106:12
 112:21 113:11 114:16 123:5
 126:16 128:21 142:1 146:10
 151:4 153:21 154:6 157:19
 158:6 161:3,6 162:1 163:23
 164:3,18 172:20 173:5,7
 174:21 175:9 179:8 180:9
 180:23 181:18 182:19
 184:15 187:3 189:23 190:4
 203:15,16 207:13 214:11
 227:22 228:4,5 231:6
 242:12 247:21 258:8 259:6
 261:18 266:5,7 271:12
 276:18
**good** 5:13 18:1 21:14 32:12
 33:21 41:19 74:16,19,23
 132:17 149:12 156:19 162:2
 187:8 190:10 204:11 214:1
 214:11 234:4 276:21
**goodman** 93:16,17,21 94:4
 117:1
**gotten** 9:24 108:4 150:5
**governor** 4:9
**gpa** 25:24
**graduate** 10:9,11
**graduated** 9:17 17:18 25:22
 26:2,14 217:9
**graduating** 10:15
**granted** 11:24 13:23
**grants** 14:6
**great** 27:22
**green** 132:17
**greenfieldadvisors** 210:12
**grievance** 16:24 46:11
**ground** 239:8
**groundwork** 187:9
**group** 84:9 96:10,12,16,20

**gsc652** 211:6
**guarantees** 57:22,22
**guess** 31:3 65:13 99:12 157:1
 157:6,8 166:10 191:9
 197:10 209:15,16,18 256:12
**guy** 32:14 38:4 112:24 156:19
 156:21 157:2 210:2
**guys** 149:10

## H

**habit** 69:15
**hac** 186:24
**hadnt** 18:5 26:17 37:20
 189:13 205:6
**half** 15:3 36:3,3 141:16 144:3
**hall** 144:7
**hand** 64:22 72:24 79:1
 113:11 128:21 147:3 168:6
 174:21 181:18 198:20 245:3
 254:24 261:23 269:9 278:16
**handed** 84:17 104:23 118:22
 125:16 198:22 206:7 207:8
 208:9
**handing** 179:6 188:17
**handle** 64:9
**handling** 119:16
**hando** 82:6,15,18,21,22 83:4
**handwriting** 66:8 79:4,7,8
 84:21 97:18 105:5,6,11
 118:24 119:1,8,9,10 128:9
 128:10 141:16
**handwritten** 4:8,11,12,13,14
 4:16,17,18,19,20,21,22 5:3
 5:4,5,6
**happen** 121:7 154:6,7 174:2
 266:11
**happened** 10:2 12:23 25:8
 30:5 41:8 59:3 70:10,17,22
 75:1 76:6 81:23 91:20
 106:2 115:6 121:10 146:15
 148:22 149:9 152:16 167:23
 207:9,18 208:1 258:9 260:2
 261:12
**happening** 145:20 194:4
**happens** 16:13,22 215:16
**hard** 9:7 106:23 112:22
**harless** 18:17,17 20:19,20,23
 21:10,13,18 22:14,15 23:6
 23:14,17 24:23 25:15 26:21
 30:7,16,18,19,21 31:6,16
 32:5 33:3 36:8,16 39:7,18

40:4 42:22 44:10,14,18,19
44:24 190:20 222:23 223:1
223:9,24 224:1,17 225:10
237:23
**harlesses** 23:14
**harrison** 62:23 63:1
**hartley** 75:24
**havent** 14:15 29:8 88:9 114:8
193:22 251:11
**head** 15:7 30:22 42:9 164:11
183:13
**heading** 138:22
**hear** 83:8 226:18
**heard** 89:7 98:22 189:13
193:23 224:7,10 255:4
**hearing** 199:14,16,17 200:15
**heart** 154:5
**held** 29:11 203:16
**help** 20:5,5 41:2 50:7,11
91:12 133:8 141:15 170:6
173:20 174:3 190:19 234:4
245:2 248:19 249:20 256:18
258:7
**helped** 19:6 212:23 270:18
**helpful** 185:15
**helping** 20:13 213:1 266:6
**hereof** 278:5
**hereto** 278:13
**hes** 51:20,20,23 67:19 115:2
130:5 142:20 148:8,10,10
153:21 167:12 171:13 181:2
194:14 209:9 210:11 224:24
225:4 241:11 253:23 261:5
**hey** 140:4 163:5 176:24,24,24
246:13 254:2 268:18 273:1
**hired** 13:1 146:11,19,19
**history** 41:18
**home** 15:11,13 38:8 39:16
63:13 65:16 105:17 110:8
110:19 111:2 154:19
**homes** 199:21
**honest** 162:12
**honor** 155:4 157:21 187:5,12
187:15,18,21 226:12 233:22
275:14
**honoring** 187:7 188:4
**hope** 173:9
**hoped** 17:23,23
**hopefully** 158:7
**hotel** 85:10 169:17

**hour** 15:3
**hourly** 20:10 138:2
**hours** 19:15 22:12 58:13,14
58:17 90:1,2 91:16,18,22,23
92:1,5,8,12,15,16,18 93:12
110:16,17 111:8 170:12
171:22 172:7 179:24 212:6
215:16,20 223:12 256:2,24
257:1
**house** 23:11 38:24 39:3 40:3
42:6,7,17 43:19 44:9 45:4
**hows** 92:3
**hundreds** 65:9 267:4

# I

**ic** 137:20,24
**ic1099** 137:17
**id** 77:19 114:2 186:2
**idea** 10:2 11:7 18:6,10 23:18
33:20 56:23 57:8 75:4
122:2 125:5 126:21 131:21
136:10,11 172:6 212:7
223:15 235:23 258:6
**ideas** 122:1
**identified** 77:15 272:8
**identify** 6:15
**ii** 245:10
**iii** 3:16
**ill** 9:5 14:19 21:18 42:3 73:12
105:4 108:20 130:3 134:17
142:9 147:3 167:7 198:20
204:14 215:18
**illegal** 196:22
**im** 6:4 9:9 14:19 19:10 23:11
23:13 24:19 27:4,12 29:1
30:2,15 33:8,24 34:2,2
36:11 38:18 39:3,11 47:5,7
47:13,17,24 48:3,3 49:7,20
49:20 50:8 55:3 56:21
57:21 61:13,14 62:17,18
63:22 64:22 72:24 74:12
75:15,16 78:20 79:1 83:2,2
85:17 86:15 88:10 89:12,19
92:20,22 94:18 96:11,19
99:10,10,12 104:24 107:9
107:16 108:1 110:7 112:16
112:19 113:11 114:16 115:6
117:17 120:3 125:20,21
126:8,8 128:21,21 130:6,6
131:1 132:21 133:5,6,6,7,21
140:15 142:1,19 143:16,18

144:1,1 146:2,3 147:13,16
150:24 151:16 156:9 157:13
160:1,7 161:7,8,9,10,10
162:1 167:12 169:15 170:1
170:2,10 171:2 174:21
175:9 176:3,6,18,23 177:3,8
177:23 179:6,8 180:12
181:4,18 188:17 191:21
192:1 195:10 197:20 200:7
200:8 201:15,17 203:12,14
203:15,20 204:6,6 205:19
213:3,22 214:10,13 216:20
216:22,23 220:7,20 223:20
224:3 227:14 233:16 239:4
240:21,23 241:8,12 242:12
243:18,18 245:1 249:11
250:5,9 255:10,16 256:12
257:10,17 259:4,24,24
260:2 261:14 264:14,17,18
273:1 274:9,11 276:1,18
**imagine** 13:9,10
**immediately** 127:4 234:6
**immigration** 35:12
**impact** 255:5
**impermissible** 220:4
**implicating** 102:8
**implications** 118:13
**important** 43:16 123:23
148:1,4 172:7
**impression** 51:24
**inappropriate** 163:20
**inartful** 134:18
**include** 37:24 52:22 65:5
254:17
**included** 118:17
**includes** 179:17
**including** 117:16 118:14
253:12
**income** 238:22
**incomplete** 175:13 246:9
**incorrect** 107:22 109:5
113:17,20,22
**incorrectly** 258:3
**increased** 234:7
**incurred** 254:18 272:3,15,16
**independent** 137:22 139:8
261:16
**independently** 88:3 261:15
**index** 4:6 5:1
**indicate** 33:13 74:8 85:9

87:16 148:10 152:23 177:6
177:12 180:19 233:6,7
241:10 259:11
**indicated** 20:18 52:17 153:1
166:3 217:13 223:3 224:11
227:22 228:5 229:17,22
232:3,15 237:22 253:17
**indicates** 254:13 275:21
**indication** 120:6
**individual** 44:5 45:20 62:13
62:14
**individuals** 272:16 274:6,24
**influence** 162:14
**information** 5:13 24:4 29:3
45:16 46:14,18 68:16 72:11
74:10 76:11 79:19,22 115:8
171:24 176:11 248:10
255:20 256:13 257:5,12
**inherited** 180:12
**initial** 38:19 39:6 41:5 45:15
45:18 48:14 49:2,9 50:2,3
59:1,4 61:23 63:6,7 130:21
179:21 225:18,22
**initially** 39:8 89:20 268:7
**initiate** 58:3
**initiated** 60:17 198:11
**injected** 221:12
**inperson** 44:1 119:13,15
120:23 121:3
**input** 76:14
**inside** 28:16 98:5
**intend** 17:11 109:18
**intended** 127:8 180:20
**intends** 116:2
**intent** 26:4,7,8 133:16
**intention** 17:18,22 26:3
**intentions** 17:15
**interaction** 24:16
**interest** 6:8 11:4,9,11 16:23
**interested** 10:6 11:7 16:9
18:7 28:7 38:5 40:8 43:9
46:17 145:21 278:13
**interfering** 185:12
**intern** 25:11 67:17 223:10
**international** 9:20,22 10:6,7
29:16
**internship** 22:7
**interpret** 92:7,12 101:12
142:10 194:17
**interpreted** 92:5 186:6

**interrupt** 9:8 48:1
**interrupted** 62:18
**interrupting** 9:9
**introduce** 102:4
**introduced** 30:7 31:7,9,13,17
32:18 213:21
**investigating** 124:8
**investigation** 41:9 123:14
**investigations** 41:16
**investigator** 74:13 124:13,24
**investment** 170:4
**invoice** 212:17,20 213:2
254:1
**invoices** 211:9,14,16,19,21
212:7 252:1,5 253:10,24
**involve** 61:5 101:5 198:4
**involved** 21:15 24:15,17 25:9
30:11 35:15 43:9,14,21
45:13,14 46:3,4,11 48:6,8
48:20,23,24 49:12 58:24
67:4 83:13 91:13 111:3,12
120:19 132:24 133:5,6,7
155:10 175:9 209:10,11
210:2,3 211:3 225:11 234:3
242:18 246:3 250:9 259:22
263:4,7,9 265:5 267:15,20
**involvement** 46:5,6 222:14
222:17 266:3
**involving** 60:4 62:14 101:4
**isnt** 228:15 245:11 264:24
269:4,18
**issue** 80:1 101:2 109:19 121:9
150:3 173:19 181:9 234:17
246:23 249:23
**issued** 238:18
**issues** 23:19 24:9 94:9 96:24
103:12 107:4 125:9 134:9
134:12 170:11,13 236:1,23
243:16 267:21
**item** 137:16,16
**itemized** 272:14
**items** 135:18 137:13 138:21
**itinerary** 78:12
**ive** 72:24 79:1 84:15,17,18
104:23 113:11 118:22,22
125:16,16 144:13,19 181:18
182:10 191:1 198:22 204:10
206:7,7 207:8 208:9 217:21
230:9 236:7 237:6 242:19
251:12 252:12 266:11

**J**

**jackson** 1:22 6:5
**jacobs** 49:22,24
**january** 56:6,9 141:17 146:4
160:10,11 189:6 191:9
**jd** 216:15 217:10
**jeanne** 105:13,14,15 154:13
154:19,20 187:6,20
**jeannes** 111:24 112:1
**jeff** 7:5
**jeffrey** 2:12
**jensen** 132:20 232:4 242:3,3
262:20
**jeopardize** 195:8,17,23
**job** 21:14 40:14
**joe** 31:17,19 69:2 74:17 136:9
138:3 216:19 246:13 254:2
**jog** 128:6,7
**john** 82:6 114:22,24 115:8,10
115:12,24 116:7,13 117:14
118:12 119:15 120:15,18
121:4,9,18,21 122:1,9,14
124:2,20 125:8 126:11,17
127:1,4,13,16,17 128:2
138:11 139:12 141:18,21,21
143:3 145:5,6,15 146:5,12
146:22 210:12
**johnny** 1:22 6:5
**join** 163:15
**joined** 26:19
**joint** 110:19 111:11,12,15
229:24 230:3,4
**jones** 186:23,24
**joseph** 1:6,17 4:2 6:3,13 7:9
7:14 51:13 97:11 141:1
183:2 229:10 276:7,23
277:1 278:4
**jstewart** 210:21
**judge** 1:9,10 267:12,18
**judgment** 267:19
**july** 4:23,23 5:12 179:18,19
179:20,22 262:4
**june** 1:20 6:10 51:13 97:11
141:1 147:9 152:9,12
168:20 169:7 175:6 177:18
183:2 187:17 188:24 189:15
189:21 191:9 192:14 196:19
197:15,24 198:7 199:20
229:10 236:8,14,19,20
254:9 255:5,9,10,14,15,18

255:18,19,22 257:6,7,7,13
276:7
**junior** 138:11 141:18,21
143:3 145:5,6,15
**juris** 15:19
**jury** 96:23
**jwakefield** 2:13

## K

**karlin** 18:16,20 19:8,11,16,19
19:20 20:3 21:3,4,20 22:2
22:12 25:12 30:1,13,15,19
67:15,23 69:1,7
**kaull** 1:11
**keeley** 1:9
**keep** 58:13,13,17 89:21 91:8
91:15,18 93:8 133:14,16
137:5 148:15 162:5 172:7
212:6 223:16 238:22,24
242:19
**keeping** 79:22 91:24 92:5,19
171:22 207:13
**keith** 79:9,10 199:1,10,13
200:7,9,19,21 201:7,22
202:9,17,20 203:18,21
205:21 206:12,17,24 207:15
207:21
**kennedy** 2:4 6:23,23 187:1
**kept** 22:11 57:19
**kick** 192:6
**kickoff** 37:9
**kilter** 269:3
**kind** 18:11 19:8,9 21:16 23:2
23:9 47:8,23 98:15 101:14
111:2 137:18 144:10 156:19
190:4 198:15 199:17 204:8
204:8 208:20 223:13 250:4
253:18 254:1
**kinds** 21:13 46:21 270:13,17
**kirk** 209:24 210:2
**kitchen** 38:8 41:22 44:3
**knew** 22:20 23:12,13 25:6,6
27:14,23 36:18,20 37:2
52:14 60:10,11,19 62:24
102:13 164:15 165:11
166:17 220:10,12 222:4
243:23 244:1 267:14 272:18
**knight** 2:13 7:3,3
**know** 8:24 9:8 10:1,3 12:21
12:22 14:8 16:8 18:21
19:19,21,22 21:24 22:19

23:1 24:19 25:8 27:15,16,23
28:4,15,17,21,22 30:21 31:2
31:4,4,18 32:17 33:5 35:9
36:20,22 37:5,5 38:15 39:2
39:21,23 42:1 43:2,6,17,21
44:5 45:19,22 46:20 47:21
47:22,23 49:17 50:4,12
57:20 58:11 63:19 64:11
67:5 69:7,22 72:9 74:16,18
75:1 79:7,8,9,21 81:8,9
85:23 86:19 89:20 94:4
96:15,21 100:13 103:14
106:11,23 107:14,17 112:14
112:14,18 113:1,5,7 115:21
116:23 118:5,7 119:10
123:2 126:13,20 128:13,14
128:17 129:8 130:10,11,19
131:1,23 132:6 133:4,4,9,12
133:12 134:1 137:6,17
139:5,24 140:1,5,10 141:24
142:5,21 143:1,4,13 144:6
144:15,20,23 145:1,13,23
146:5 147:4 151:7,8 152:13
153:12 154:4,5,21 156:23
157:9,10 158:5,9 159:6,8,20
159:21 160:4,4,5 162:13
164:18 170:22 172:10 174:9
174:13 175:20 176:7 179:1
181:8 186:10 188:2 191:1
193:13 194:3,13,21,21
195:20 197:10 200:2 201:19
201:21 202:4,19 203:9
204:5,9,10 207:16,24
208:11,15,19 209:6,13,20
209:21,22 210:5,8,13 211:3
211:7,14,23 212:3,24
214:14 215:18 218:22,24
219:14 222:6 224:8,24
228:23 232:5,7,9 234:20
239:1,3,17,20 241:21
242:16 244:20 246:10 249:8
250:7,22,24 251:3,5,13,20
251:23 252:15 255:2,10,24
256:6 258:7,13 259:19,20
261:15,16 267:4,18 268:2
268:20 269:3,12 270:20
274:14,17 275:20
**knowing** 35:3
**knowledge** 22:13 33:18 83:10
222:13 224:14 234:22

235:21 246:15
**known** 23:4 34:11 243:16

## L

**labeled** 73:1
**labor** 45:24 46:2 47:4 51:3
**laid** 46:6 187:9
**lake** 207:19
**lane** 1:13 3:8
**language** 107:20,20 113:21
184:6 224:19,20
**languished** 224:13,22
**languishing** 224:16 225:13
**large** 157:15
**larry** 18:17,17 20:19,20,23
21:10,13 22:19 23:8,17
24:14,23 27:4,20 30:7,16,18
30:19,21 31:6,16 32:5,14,15
33:3 36:8,16 39:7 40:4
42:22 43:2,3,4,8,21 44:10
44:14,17 59:23 190:20
223:1 225:10
**late** 130:17,22 134:7 150:5
212:11 230:10 231:2,3,8,23
253:6,8,15 268:9,13
**lauderdale** 170:4
**laugh** 187:20
**laughed** 187:6
**laughing** 188:7
**law** 1:2,9 2:7 6:2 15:23 16:2,4
16:11,14 17:4,5,12,13,17,24
17:24 18:1,2,4,6,9,11,12,13
18:15,22 19:8,9,12 22:23
24:7 25:12,18,18 26:2,4,5
26:12,14 27:23,24 28:8
29:11,12,15 30:24 31:15
35:12 40:5,9 48:22 62:8
63:24 72:12 75:11 76:8,22
77:12,15,16 78:7 81:11
83:12 99:13 123:16,19
124:9,22 138:12 139:13
180:14 188:13 190:24 194:9
194:24 195:19 196:8,13
213:23 214:20,21 215:1
216:1,14 217:9 219:4
220:14 226:16 227:2 256:2
256:7 258:8 259:22 261:10
261:11 272:2
**lawn** 3:6
**lawsuit** 60:2 84:11 258:17
274:8 275:2,5,7

**lawsuits** 23:20 222:12,16
**lawyer** 17:19 19:14 22:17
   23:5 31:7,9,13 35:10 36:13
   36:17,18,21 51:17,20,20,23
   52:1,2,6,9,12,15,18 67:2
   115:2 138:3,19 139:16
   186:24 205:14 221:12,20,23
   261:14
**lawyers** 5:14 39:20 42:23
   48:20 49:5,24 50:19 51:3
   61:5,9 78:7,9,12 81:14
   163:8 222:17 237:19 238:4
   238:6 257:11 260:11 261:16
   262:17 271:10 272:8,15
**lead** 11:18 72:1 74:13 75:19
   268:7 269:20
**learned** 28:4,20 156:21,24
   202:5 261:14
**learning** 27:21 28:1 110:19
   223:10,14
**leave** 27:5 78:5 104:16
   204:18 205:9 215:18
**leaves** 136:8
**led** 9:21 11:4 57:24 69:4 85:7
   99:8,14 105:16
**left** 26:5 90:7 98:10 143:3
   144:3 165:12 185:6 203:9,9
   261:7,7,10
**lefthand** 80:8
**legal** 8:11 22:7 23:16 24:22
   27:22 28:1 59:24 67:17
   94:10 127:17 157:9 198:14
   220:3
**legitimate** 163:12
**leigh** 252:15,16,21
**length** 132:12
**letter** 5:9,12 77:1,4 105:16,20
   105:22 106:3,14,16 110:6,7
   113:14,16 115:24 116:1,4,6
   117:8,10,18,20 118:2,6
   145:22 176:13 186:2 249:2
   249:17 261:24
**letters** 76:18,21 77:7 140:9
**level** 62:4
**levin** 1:14 3:13,15 6:19 61:11
   75:13 77:21 149:19 165:18
   175:10 176:9,19 186:22
   188:3 190:22 194:6,14,15
   194:20 202:6 213:3 275:8
**levinlaw** 3:16

**levitan** 156:18 170:3,7,12,17
   170:21 173:19 174:6,7,10
   174:17 182:1,9
**levitans** 174:3
**liability** 253:18
**liberal** 87:23 88:6,22 89:6
   180:11,15 241:2
**license** 29:11 31:15 226:16
   227:2
**licensed** 26:10,15 51:20 52:2
   52:9,12,15,18 174:16
**licensing** 227:1
**licensures** 29:18
**lieu** 146:12 180:20
**lifetime** 151:11
**liked** 134:24
**line** 68:22,24 69:1 89:19
   107:21 136:8 193:4 203:12
   232:13 234:9 260:1 263:10
**lines** 108:15 167:14 184:8
**list** 23:23 67:23 272:11,21
   273:14
**listed** 67:19 77:13 80:11
   135:18 138:21 273:20
**listen** 162:1
**listening** 232:23
**lists** 122:2
**litigating** 216:1,3,9
**litigation** 8:1 49:15,19 53:19
   55:9,13,15,16 61:3,23,24
   65:2,2 66:3 73:23 74:1,23
   77:16 143:10 215:2,5,21
   222:13,15 253:9,16,23
   259:23 265:10,14,22 267:19
   270:23 273:8
**little** 9:11 15:9 16:10 17:21
   25:17 27:23 38:18 43:20
   96:8 117:9 133:20 141:15
   148:23 149:1 153:3 173:18
   201:1 203:11 222:22 225:14
   235:10 245:1 259:24 271:6
**live** 15:12,13
**lived** 60:20,21 62:17
**living** 12:11 14:24 60:8
   179:23
**loans** 155:12 156:4 157:6
**local** 62:4 138:12
**locate** 65:10 66:5
**located** 6:5 65:12,15
**lodge** 31:24 32:24 33:4 34:6

   36:12 38:20 39:1,16 40:1,3
   42:11,16 44:2 45:19 225:6
**long** 17:1,8 23:8 24:10 27:16
   32:22 34:8 131:8 208:13
   250:6 267:20 273:14
**longer** 18:18 132:24 202:6
**longterm** 37:10
**longtime** 19:20 64:8
**look** 32:7,7,13 45:15 61:11,12
   61:17 73:12,15 76:3,5 79:17
   81:20 97:15 101:3 114:6,15
   119:21 128:4 137:13 141:8
   147:3 148:12 159:9 164:23
   169:19 171:17,19 190:11
   192:18 195:12 207:7 230:13
   248:23 249:10,11 258:6
   266:15
**looked** 27:24 43:17 61:9
   202:18 271:15
**looking** 10:1 24:18 66:2 70:4
   79:24 88:2 97:14 100:7
   126:8 136:22 140:18 141:4
   144:13,19 177:8 183:5
   201:18 240:21 249:1 275:14
   275:17
**looks** 73:16 79:4,5,18 116:6
   116:11 119:1,6 138:11
   141:17 144:5,7,8 155:8
   169:3 225:18
**lose** 160:5
**loss** 259:1
**lost** 159:24 207:9 262:18
**lot** 41:11 45:16 87:20 88:20
   195:7,15,20 196:1 250:7
   258:9
**loud** 106:22
**low** 180:12,13
**loyalty** 234:12
**lsats** 16:12,14,16
**lunch** 81:5 97:8 258:4

---

## M

**magistrate** 1:10
**main** 2:5,19 3:11 176:14
**major** 19:5 208:7 215:14
   225:12
**making** 154:18,19 155:12
   173:8
**malpractice** 62:13,19,20
   64:10 68:3
**man** 140:4 190:11,21

management 110:10
managing 109:15,21
manner 112:14
mantoman 190:10
maps 211:23
march 199:2 201:13 206:13
206:17 207:1,4 245:16
marino 2:7,8 26:19 73:5,9
75:20 78:3,14 80:9,13 82:1
82:3,5,18 83:1,5,7 90:18
94:22,24 95:3 129:13,21
130:14 131:14,19 134:10,11
134:14 135:4,6 136:16,23
139:2 146:11,19,20 162:1,5
162:9,13,21,24 187:1 227:8
241:10,24 259:2,3,6
marinolawpllc 2:8
marinos 83:12 130:20 131:9
131:13 135:5,7,19 142:19
231:1
mark 177:20
marked 64:20,22 72:22,24
78:23 79:1 83:18 84:18
88:15 95:4 104:21 113:9,12
114:7 118:20,22 125:14,16
128:19 140:12 147:1 168:24
174:19 179:4 181:16,18
184:16 188:15,17 198:18
206:5,7 244:22 248:21
250:15,17 261:21,23 269:7
marks 183:8 184:2
married 9:24 10:3
martinsburg 82:9
maryland 132:9,10
mason 3:10 4:5 6:17,17 7:11
7:24 26:20 33:12 48:5
50:22 51:1,6,15,21 52:3,4
54:12 59:8,14 64:18,21
72:23 73:7,13 77:11 78:24
83:19 93:1,4 94:18,23 95:2
95:5 97:3,13 104:22 108:17
108:19 113:10,24 114:3
118:21 125:15 128:20
134:18,22 135:1,2 137:2,9
137:12 139:19,22 140:3,13
140:17 141:3 147:2 161:4
162:4,7,11 163:19,22 169:1
174:20 177:4 178:1,5 179:5
181:17 182:19 183:4 184:17
188:16 198:19 203:22 206:6

209:23 213:7 214:10 222:11
242:12
masry 61:16,17 71:15 72:1
74:14 75:14 77:23 95:24
115:15 116:2 122:16 131:17
136:8 138:2 146:1,21 181:3
243:7,22 244:7 246:18
247:5,5,11,15 248:1,5,6,16
249:18 250:13 251:1 260:5
262:1,9,13 272:9 274:7
275:1
mass 216:12
masters 11:19,23
materials 65:12 76:3
mathematics 69:23
matter 6:2 8:15 170:17 201:2
202:23 206:19 211:4
matters 8:11 24:24 59:22
169:18
mba 10:11,12,14
mccarthy 2:17,18 7:1,1
mcdougal 3:5 4:5 6:21,21
73:12 77:8,10 145:11
213:17,22 216:17 217:3,7,8
220:20 223:22 229:3,12
244:23 248:22 250:16
261:22 269:8 273:24 274:2
275:24 276:9,13,17
mcelwee 2:4
mean 14:1,2,18 22:5 26:9
37:16 38:10 43:3 45:14,15
45:16 46:7,23 47:13,24 52:2
59:21 72:6 76:20 85:22
86:2,22 92:13 99:18 111:3
123:18 127:11 145:6 153:6
153:10 156:13 158:1,5,13
160:5 161:1 162:18 168:2
173:5 178:15 183:15 184:3
194:2,10,17 195:4 196:24
204:23 242:8 259:3
meaning 21:10 96:20 155:8
173:3 265:1
means 14:3 81:8 240:19
meant 30:18,19,21 46:24
101:21 127:14 184:7 221:2
233:7 241:22 269:22
measure 101:13,15 229:19
mediation 189:14,21
medical 62:16,19,20 64:9
68:2 84:3,6,15 209:9 211:1

medina 165:7,9,14 166:1,6
166:12 176:12 199:15,18
201:24 202:6 203:19
meet 29:22 32:19 63:9 81:15
98:11 121:8 148:24 149:3,4
153:16 201:10
meeting 32:3 34:3 36:12
38:19,23 39:2,6,15,16,24
40:2,3,15 41:22 42:2,3,5,6,6
42:16,17 44:6,8 45:6 47:2
66:16 69:11,16,17 82:5,9
85:10 86:6,17,18,20,24
87:13,17,20 88:19,24 89:1
95:15,18,21,23 96:9 98:4,5
98:7 107:3 110:4,8,10 111:3
120:14 128:13 129:5,8,9
134:10 135:10,13,19,24
147:8,18,20,22 148:2,16
149:9 152:20 153:14 156:21
166:23 169:6 170:9,19,24
171:3,7,10 236:10,19 258:4
258:15 270:24 271:3,5,9
273:23 274:22
meetings 44:1 86:9,14 87:7
87:11 102:3,5 128:12
150:17 171:14 175:4 179:18
179:19 236:13
meets 89:20 112:24
melissa 73:17 74:12 258:5
member 219:13
members 41:13
memorandum 5:8 243:5,11
243:17,21 244:1,6,10 245:6
246:11
memorialize 148:1
memorialized 231:10
memorializes 188:23 236:18
memorializing 120:14 147:8
169:6 175:3 181:20
memory 23:21 56:3 128:6,7
204:3 214:3 238:14 268:12
men 111:19
mention 59:5 100:20 240:8
273:2
mentioned 46:10 89:24 91:22
98:18,18 109:14,15 113:23
132:4 150:13 231:18 237:17
250:5 253:13 260:6 263:24
266:19 273:23 274:3,21
mentioning 102:2

**mercury** 215:8,22,23
**merit** 259:15,15
**merits** 82:3 259:12
**meruit** 94:1 144:23 145:15
**message** 74:4,15 141:24
  143:2,5 185:7 232:7 261:7,7
  261:10
**met** 7:22 23:6,8 30:10 31:21
  31:23 34:5 35:11 39:1 44:3
  45:3 60:22 63:1 83:4 94:4
  96:18 135:4,6 144:22 145:9
  149:1 169:14,15 171:6
  199:10 200:15,18 201:7,10
  202:20,24 214:2,3,7
**methods** 12:21
**mexico** 23:10
**michael** 209:6
**middle** 179:2 183:6 231:3
**midway** 66:20
**mike** 85:13,18,19
**mildly** 269:2,2
**mind** 8:20,22 14:20 27:22
  28:1 32:16 43:15 60:3
  61:15 92:21 128:16 160:12
  190:11 197:21 234:13
  263:12
**mine** 32:19 249:7
**minimal** 27:3,4,6,11 48:24
**minute** 21:4,19 39:9 114:15
  142:10 151:15 160:2 163:2
**minutes** 98:7 170:18
**mirror** 190:12
**misinform** 256:21
**misnumbered** 155:7
**missed** 117:17 169:20 171:18
**misstating** 129:14,22
**mistake** 245:17
**mitchell** 1:14 3:13,15
**mock** 96:23
**modification** 228:15,17
  229:14 230:8 235:13
**modifications** 257:13
**modified** 254:8
**modify** 230:18
**moment** 20:17 30:10 59:7
  64:16 151:1 252:18
**money** 38:11,13 124:6 157:7
  157:15 158:15 169:22
  172:20,20,21,21 174:8,11
  174:13 273:1

**moneys** 237:23
**monitoring** 84:3,6,16 209:10
**month** 8:2 39:23 56:7 96:2
  116:19,20 175:7
**monthly** 116:18 138:1 253:24
**months** 189:12 191:5,10,10
  193:21 260:14,18,19
**morgan** 169:17
**morgantown** 12:11 15:5,15
  16:7 18:13 19:21,23 21:22
  22:17,18 30:2,3 67:2 80:22
  85:10
**morning** 16:15 276:20,24
**motions** 265:13,17 266:4,21
**move** 65:23 225:8,10
**moved** 15:5,9 61:2 65:19
**mpre** 218:5,13,17,19 219:2
  220:2
**multiple** 111:15
**multitude** 46:8
**mutual** 5:10

## N

**nadler** 69:20,22,23 70:8,12
  70:16,19 71:2,7
**name** 6:4 7:12,24 22:22 62:14
  74:5 105:13 147:12,17
  156:17,21,23 157:2 170:23
  171:1
**named** 71:22
**names** 75:16
**nancy** 71:22 72:3,18,19 73:16
  75:6 95:21,21
**narrow** 34:4
**natural** 46:19
**naturally** 46:17
**nature** 198:5 233:12 247:2
**nd** 240:11
**near** 116:16 153:3 263:17
**necessarily** 60:1 164:19
**necessary** 177:7,12 248:2
**need** 8:23 33:6 50:24 51:6
  54:8 73:10,10,15 87:6 90:2
  91:23 92:11,13 93:12,24
  97:3 109:17 111:20 133:4,4
  133:8,11 141:15 142:1,9
  143:23 157:16 176:21,22
  178:1 181:6 182:20 206:3
  216:19 223:18 242:20
  256:15
**needed** 5:13 10:2,4,5 20:5

40:10,12 48:19 87:3,10 93:8
  105:20 132:4 151:19 248:7
  248:16 256:2 263:17 266:16
**needs** 47:21
**negative** 186:7,9
**negatively** 161:14
**negotiate** 50:7,11 179:1
  180:9,10
**negotiating** 122:9,14 180:20
**negotiations** 50:15 123:5
**neither** 278:10
**nephew** 114:24 115:19
**net** 210:17
**never** 27:18 28:9 29:7,11
  44:22 47:6 55:2 58:15 61:2
  70:22 77:6,8,9 84:15 91:20
  92:5 102:17 118:18 144:11
  151:10,10 160:16,19 165:5
  165:11 166:4,17 167:10
  168:18 172:6,9 174:18
  175:15,16 180:7 182:10
  186:5,11 204:2 212:5 217:6
  217:21 223:8,17 226:17
  227:5,9,11 234:14,17,19
  235:18,24 236:3,24 237:23
  239:5,7,18 242:20 253:17
  253:24 257:23 258:9 264:10
**new** 9:20 115:2 119:17 121:8
  121:10 207:19,20
**news** 214:11
**night** 19:17 110:6,7 180:17
  247:16,17
**nods** 15:7 30:22 164:11
  183:13
**nonlawyers** 220:4
**normally** 81:22,23
**northern** 1:1
**notary** 1:19 278:2,21
**notations** 184:22 206:11
  249:5
**note** 50:23 66:13,15 67:5
  68:19 96:7 103:3 117:9
  118:1 120:1,22 145:4
  154:13,22 157:5,12 158:14
  163:24 165:12 169:4,10
  170:16 175:14 177:9,17
  184:8 186:15 190:18 202:19
  228:18 254:12
**noted** 166:22 170:5 251:9
**notes** 4:8,11,12,13,14,16,17

4:18,19,20,21,22,23 5:3,4,5
5:6 69:10,12,16 70:1,4,5
85:8,9 86:6,9,13,16,19,20
86:24 87:3 88:2,5 89:1
95:15 109:23 120:17 121:17
125:2 128:11,15 136:20
137:7 139:6,6 147:21
148:10 152:16 154:2,18,19
168:2,5 170:23 175:3
178:23 179:17 189:10
190:19 192:18 198:24,24
201:18 202:12 278:7
**notice** 1:18
**noticed** 266:11
**notified** 271:10
**noting** 60:16
**notion** 242:20
**notre** 9:13 10:24 11:1,20
29:14 185:18,21 215:13
240:11
**noun** 102:6
**november** 5:7 34:7 35:19
37:4,5 38:8,21,24 39:1,3,4
39:13,17 40:1 41:23 45:5
57:9 99:19 108:7 145:22
202:16 225:19 226:7 227:4
227:15 230:2
**number** 51:12 61:8 65:1
97:10 107:5 109:13 123:9
123:12 127:2,2 136:3
140:24 144:22 145:8,21
148:13 152:20,24 153:7,8
154:17,23 155:1,2,7 163:24
164:23 165:3 169:18 170:3
179:11 180:6 183:1 192:20
193:5 198:23 214:9 222:12
229:9 237:17 240:6 245:24
254:8 261:10 276:6
**numbered** 95:9 179:9
**numeral** 245:10
**numerous** 265:21
**nursing** 10:16
**nw** 2:9

**O**

**oak** 3:6
**object** 31:11 33:23 34:1,21
51:18 71:5 72:5 90:18
92:22 101:6,6 103:8,9
121:14 126:18 128:3 129:13
129:21 130:3,14 134:14,16

136:16,23 137:4 139:2,4
150:9 159:16 162:1 163:12
170:15 173:22 175:12 198:3
221:15 222:1 224:18 225:1
227:7 246:8 263:2
**objected** 101:8
**objection** 35:7 51:19 134:17
163:7,15 166:11 227:8
**obligations** 251:15
**observing** 30:14
**obtain** 12:4 257:12
**obtained** 15:18 217:9 223:8
239:6 268:3
**obvious** 107:19
**obviously** 29:4 75:13 106:13
**occasion** 199:8 241:5
**occasions** 217:19,19 218:9
**occurred** 37:4,5 39:22 40:1
45:21 119:17 120:15 148:2
228:20 259:20 264:16
**occurring** 189:15
**october** 15:11 65:19,21 66:1
185:2,2 186:15
**offering** 178:11
**office** 1:2,9 6:3 14:8,9 20:3
28:23 98:6,8,14,20 130:20
131:9,13 135:5,7,19 171:12
171:15 208:14 211:10 231:1
253:2 256:1 263:19,21
**oh** 19:20 38:12 62:17 98:24
110:7 112:13 113:24 130:10
131:23 139:22 143:17
148:14 149:9 177:11 178:18
179:13 180:2 200:8 240:20
256:17
**okay** 7:17,22 8:8,17 9:1,5,9
9:10 15:18 16:16,21,21 19:1
21:3,18 22:14 23:23 30:13
30:17 36:4 38:10,14,18 39:6
40:20 42:5,11 43:13 45:6,10
50:3,7 54:11,22 55:19 59:8
60:3 61:21 62:21 63:12
65:23 66:10,20 69:19 70:11
71:21 73:9 80:19 84:10,14
84:17 85:4,12,23 87:9 88:12
89:15 90:3 93:1,6,14 94:23
95:23 96:14 97:3,20 98:1
99:17 102:12 104:3 105:7
105:10 107:1,15,18,24
108:8 109:10,13 110:1,13

111:10 112:2 113:11 114:1
114:12,15,18,18 115:7,23
116:6,12 117:8,22 118:11
118:19 119:10 120:3,22
121:7,23 122:2,8 123:4,8,12
123:18 124:2,20 125:13,21
125:22 126:2,21 127:7,15
128:6,18,18,22 129:10
130:24 133:23 135:8,16,23
136:21 137:9,23 138:6,14
140:8,11,14 141:24 142:17
142:21 143:2,17,22 145:8
145:19 146:24 147:6,7,15
147:18 148:14,20 149:14
151:9 152:5 153:14,17
154:12 155:14,24 156:8
157:24 160:11 161:21
162:11 164:23 165:11
167:13,18,20 168:23 169:6
169:14 170:8 171:5,9
173:18 174:23 177:3,15
178:3,20 179:13,15,16
180:5,15 181:5,7,19 182:19
182:19 183:14 185:11
186:18 188:12,19,20 190:9
190:17 191:16 195:14,24
196:4 198:17,21 200:6,14
200:18,24 201:6 203:14
204:6,17 205:6 207:10,11
208:6,9 209:4,19 210:12
212:12 213:7 217:2,7
228:13 230:14 231:10
232:24 236:17 238:14 240:2
245:15 247:22 249:10
255:17 256:17,17 261:2
274:19
**old** 15:1 30:8 32:18
**older** 16:5
**oldest** 16:5
**oliver** 269:20
**once** 17:12 24:15 28:24,24
29:1 34:23 89:7 158:11
168:9 233:22 253:17 265:4
267:18 268:12 272:23
**oneyear** 29:15
**ongoing** 24:11
**oops** 206:9
**open** 27:5 102:5
**opinions** 259:12 261:18
270:1,3

**opportunity** 14:7 20:2 83:7 86:18 125:18 201:9 251:14
**opposed** 163:13 256:9
**option** 155:11
**options** 138:24
**oral** 1:18
**order** 79:16 94:1 240:2
**organization** 62:3 187:9
**organizer** 124:13
**organizing** 89:20 123:15 124:8
**original** 227:15 230:9
**originally** 231:15
**outcome** 61:1 63:17 68:14 181:8 192:17
**outline** 35:22
**outof** 62:7
**outofstate** 40:5,9,11,13,17 42:23 43:10,14,16 61:8 188:13 225:11
**outside** 98:9 116:22,24 117:2 132:15 171:12,14
**outstanding** 255:2
**overlooked** 162:21
**overly** 103:9 121:14 263:3
**overreact** 187:2
**overstatement** 21:9
**owed** 254:2 273:1

**P**

**pa** 69:21
**page** 4:4,7 5:2 66:20 69:19 74:5 79:17 84:17,17,19 85:17 97:16,17 116:17 117:23 126:11 138:17,18,19 138:20 141:16 144:3,22 147:8 157:11 180:6 183:7 249:13
**pages** 65:5,9 114:11,12,13 198:20,24
**paid** 20:7,9 22:1 27:18 71:4,8 89:24 116:20 124:7,12 139:8 158:17 172:10 174:8 191:12,24 213:5 237:9,23 243:12 244:2 272:1,2,7,14
**pairington** 252:19
**papantonio** 1:14 3:13,15 6:20 61:11 75:14 77:21 149:19 165:18 175:10 176:9,20 186:22 188:3 190:23 194:7 194:14,15,20 202:7 213:4

**paper** 243:2
**papers** 187:1
**paperwork** 271:12,16
**paragraph** 89:14 116:18 117:21 179:9,10 180:5,6 245:11,23
**park** 147:10,12,13,13,16 152:15 170:20 171:3
**parking** 87:20 88:20,20
**part** 12:1 22:7 41:14 81:19 84:8 117:20 124:4 163:20 166:21 168:1 186:8 208:7 220:1,6,8,14 225:9 232:24 233:24 234:2 238:10 246:10 248:14,18 264:15,17 270:23 275:18
**parted** 165:13
**participate** 251:24 252:4 267:23
**participation** 191:24
**particular** 12:16 64:5 80:12 98:10 104:1 106:14 122:8 123:21 221:3 236:15,22,23 242:17 250:22
**parties** 6:7 49:12 98:17,19 249:24 278:11,13
**partner** 117:6
**partnership** 44:11
**parts** 22:21 46:16
**party** 226:9
**pass** 29:4,5 168:2 217:13 219:15
**passed** 22:15 29:7 189:12 218:19,21
**passing** 217:18
**pat** 49:22
**path** 152:21,22
**patience** 157:18,19 164:2,3 164:16
**patrick** 75:24 77:14
**pay** 96:1 124:5,18 128:2 138:11 161:12
**payable** 192:10
**paying** 90:1 91:22 127:16 139:12
**payment** 69:2,8 116:19 127:4 127:11 223:8,13 225:16 226:24 252:6,10 253:19
**payments** 25:14 138:1 238:6
**payoff** 123:14

**pays** 123:9 124:13
**peace** 10:17,19,21 11:6
**pendency** 253:9,16,22
**pennington** 252:20
**pennsylvania** 148:12 235:3
**pensacola** 3:17
**people** 19:24 22:19 24:19,19 25:9 32:8 36:18 46:21 60:8 60:10,11,18,21,22 62:4,23 62:24 63:1 96:18 113:8 133:8,10 188:4 195:7,15,21 196:2 230:5 234:4 242:5 246:3 263:9 269:16
**perceive** 104:3
**perceived** 102:16 229:23
**percent** 44:19,19,20 50:2 53:13,20 57:11 96:2 97:23 99:18,22,22 101:13,17 122:3,4,20,20 131:2 148:8 153:22 155:5 157:21 168:21 187:18 226:4 228:6 229:18 230:20 231:15 234:7,12,14 235:14 245:17 247:13 248:14
**percentage** 54:1 152:8 178:16,18,19 228:2,4 230:19 244:3 245:16
**percentages** 57:19 159:7 197:18 235:18 244:5,18
**perception** 234:11
**perform** 266:9
**performed** 265:9 272:18
**performing** 24:22
**period** 18:24 19:2,3 28:18 35:10 39:22 56:2,9 57:3,13 60:14 200:1 212:23 213:1 225:4,7 253:7
**person** 58:5 82:1 199:4 221:11 268:13
**personal** 216:5
**personally** 138:12
**peter** 61:11
**petered** 27:1
**ph** 1:17 4:2 7:9 11:3,15 12:2 12:3,4,18 82:6 277:1 278:4
**phase** 250:22
**phillips** 59:2 263:16
**phone** 44:5 143:3 184:22 189:7 192:14 198:7 199:5,6 199:7 202:5 206:1 231:18

232:12,15 237:12 247:14
248:3 260:16,20 263:20
274:3
**phrase** 89:6 107:17 134:20
142:21
**physical** 103:1
**physically** 65:15 97:24
101:20 102:21 103:18,23
154:6
**physician** 210:24
**pick** 80:19
**picked** 80:21
**picnic** 153:3
**pie** 142:8,24
**piece** 243:2
**pieces** 222:12
**piecing** 242:23
**pile** 175:19
**pinpoint** 126:6
**pipeline** 109:8,9
**pitch** 72:3
**pitched** 72:7
**pitching** 62:7
**pittsburgh** 149:5,5,17,19
235:2
**place** 6:12 35:19 44:7 59:3
121:11 153:1 197:16 278:5
**plaintiff** 84:2,11 158:24
**plaintiffs** 1:4,10 2:3 6:24
19:14,14 23:5 33:21 35:6
41:11,12,12 102:5 158:21
159:5,21 192:4,5 268:8
269:20 271:9
**planning** 185:17
**plans** 185:8,12
**plant** 60:4
**play** 111:20 266:6
**pleading** 266:13,15
**pleadings** 265:21 266:4,12,21
**please** 6:15 7:8,13 34:24 49:6
53:15 54:2 70:14 71:6
79:23 86:11 88:13 89:22
92:10 97:21 120:4 122:12
129:23 132:12 163:6 172:18
178:3 179:14 187:13 206:15
211:8 232:8,9 239:22
243:20 252:2 253:20 255:12
260:11
**pllc** 2:4,7,12
**plus** 96:2 116:19

**point** 17:16 26:11,13 28:6
39:5 43:4,18 44:12 45:15
49:18 53:23 55:6 57:20
58:16 63:5 81:9 89:9
103:22 108:2 126:10 131:4
133:13 146:22 152:1 153:20
157:1 167:8 174:5 185:12
185:14 187:11,14 189:17,19
190:1 194:5 195:6 197:12
208:2 212:18 240:24 255:7
262:12 264:1 271:8 272:23
276:11
**pointed** 157:20
**pointing** 117:18
**points** 119:23 162:18 197:9
250:4 269:14
**political** 9:13,18 215:13,13
**politics** 40:11
**portion** 218:1 224:2 227:24
231:15 247:13
**portions** 225:23
**position** 12:7 79:11
**positive** 165:12 241:12
**positively** 161:14
**possession** 115:5
**possibility** 27:5 39:19 58:1
83:21 98:22 136:13 145:22
**possible** 42:23 74:21 146:4
207:23
**possibly** 27:15 39:1 98:8
101:3 126:20 174:6,8
175:17 176:1 209:15 258:6
**posted** 147:8
**potential** 41:12 64:14 72:13
77:16 79:13,14 81:21 84:13
102:5 121:5 268:15 269:21
271:19
**potentially** 270:24
**practice** 17:18 18:1,4,11 19:8
19:12 21:22 23:1 26:4,7,10
26:16 29:12 31:16 76:17
86:8,12,13 123:16,19 124:9
124:22 128:11
**practiced** 17:24
**practicing** 18:2,7 26:12 28:7
31:14 35:11
**practitioner** 22:24 64:3
**prefer** 7:15,18
**preference** 7:20,21
**preferred** 171:14

**premed** 215:14
**preparation** 220:2 266:20
267:11,16 271:6
**prepare** 19:6 20:13 77:5
**prepared** 257:21 269:12
**preparing** 270:10 271:5
**presby** 132:20 232:3 242:3
262:20 263:7
**presence** 131:19
**present** 3:19 55:19 125:4
129:19 222:18
**presented** 72:11
**presenting** 96:24
**preserved** 221:7
**pretty** 28:16 30:3 81:19 99:7
104:8 154:1 190:13,15
197:20 257:19
**prevent** 240:9
**previous** 20:23 34:7 38:22
39:2,3,12 43:20 56:19
103:19 122:17,22,24
**previously** 68:2
**primarily** 35:12 62:6
**prior** 21:1,2 24:5,6 66:6
267:11
**privilege** 221:3,7,13,22 222:8
**privileges** 14:10
**privy** 48:17 53:12 106:12
123:4
**pro** 186:24
**probably** 16:24 28:22 31:17
34:8 35:1 112:4,13 122:13
129:6,7 132:6 163:20
238:13 268:11
**problem** 21:11 23:16 32:6,21
57:18 60:13 63:3 73:20
157:20 164:4,16,18 200:9
200:13 216:24 248:11,12,13
248:18
**problems** 24:19 41:13 59:5
100:24
**procedure** 1:19 199:17
220:16,18 221:1
**procedures** 220:20,22
**proceed** 45:23 102:6
**proceeded** 194:1
**proceeding** 30:7 43:5 207:14
**proceedings** 29:19 278:7,12
**proceeds** 125:10 225:24
**process** 12:1 252:8

**proctor** 1:15 3:13,15
**procuring** 226:16
**produced** 65:11 66:3 136:20
**production** 65:8
**professional** 1:12
**professionally** 34:14
**professor** 7:16 11:13 13:1,4
13:20,22 17:6 18:3 48:22
49:4 65:1 69:23 73:14
81:10,15 95:6 125:18 135:3
140:19 141:4 147:5 214:24
219:12,18,18 244:19
**professors** 81:14
**profits** 44:19
**program** 10:9,11,16 11:12,15
11:18 12:18 84:7
**progression** 263:15
**project** 61:7,22
**prompted** 16:4 41:20 131:21
131:24 189:4,11
**prompting** 16:10
**pronoun** 102:7 150:15,15
**properties** 212:23
**property** 23:15 155:11,22,24
156:14,19 170:4 174:11
212:21
**proposal** 112:5 117:16
129:19,24 136:22 137:6,7
**proposals** 116:16 247:2
**propose** 75:11 109:20 276:19
**proposed** 49:9 72:17 129:11
130:8
**proposing** 77:15 116:7
**prosecute** 60:1
**protection** 83:10
**provide** 10:5 59:24 83:15
**provided** 65:1,6 242:23 254:8
**provides** 142:6,22
**public** 1:19 102:5 150:16
278:3,21
**pull** 228:11
**punishing** 101:15
**punishment** 111:21
**punitive** 101:13,15 229:19
**purchased** 15:11 211:24
**purpose** 82:20 83:5 131:12
201:16 263:14
**pursuant** 1:18,18 251:13
**pursue** 11:10 59:24
**pursuit** 44:14

**put** 43:6 72:10 91:11 97:23
101:19,21,23 102:24 125:2
149:12 154:22 160:4 240:2
**putting** 76:8 78:11 96:23

**Q**

**qualifications** 33:14,19 34:18
35:4
**qualified** 35:5 84:3,9 278:3
**qualify** 34:19 84:6
**quantum** 94:1 144:23 145:15
**question** 9:3,4 33:7 34:2,23
47:5 49:7 50:23 51:22 52:7
52:10 53:15 54:2 55:4
56:20 70:24 71:1 76:19
86:11,16 88:12 90:12,13,19
92:9,23 99:11 108:3 109:20
112:19 118:11 120:3 127:22
129:14,22,23 130:7,15
132:13 134:15,16 136:17,24
137:5 139:3 143:24 146:18
161:6 162:19 172:5 173:24
176:14 177:1,20 178:3
191:2 193:11 198:3 221:18
223:19 224:23 232:16
238:10 239:22 243:19
244:14 247:19 252:3 254:20
255:17,24 256:5 263:13
266:1 269:4,6 274:20
**questioning** 163:13
**questions** 5:14 42:4 52:1 54:9
114:16 134:2 162:23 191:4
214:9,12 270:11,13,17
276:11
**quick** 239:22
**quicker** 245:1
**quickly** 147:23 148:2
**quite** 79:18 103:3 106:11
184:6 213:3
**quotation** 183:8 184:2
**quote** 87:23,23 180:11,11
187:5,7,15 224:13,14
**quotes** 180:16

**R**

**radisson** 85:10 87:18 88:20
**rafferty** 1:14 3:13,15
**railtrail** 152:22
**raise** 112:15,17 113:5 120:12
230:19
**raised** 71:3,8 101:2 103:12

150:3 204:4
**raising** 115:8
**ramlaw** 2:5
**rank** 25:21
**rapport** 123:15 124:9
**reach** 193:13
**reached** 240:17,20,23 247:15
**reaction** 248:9
**read** 68:23 85:14,15,15,19
88:7,9 89:9,10,13,18 90:20
92:9 97:20 105:3,4 106:3,21
106:24 107:7,12 109:13
114:2 121:22 123:16,17
126:5 136:5,12 138:4,5,7,10
142:1 144:4 155:1,5,15
157:12,22 165:8 168:7
169:9 178:2 179:7,13 185:4
186:15 264:16,17 271:24
**reading** 157:13 251:10
**ready** 213:18 217:3
**real** 156:19 170:21 174:10,17
181:23 182:16
**realize** 113:13
**really** 9:7 16:19 31:3 45:14
151:7,8 161:16 172:17
176:7 203:8 204:6 214:19
**reask** 103:10
**reason** 64:5 83:15 90:15
94:13 98:10 101:10 123:21
132:22 150:23 151:1 168:18
180:10 183:17 201:19,20
202:16 211:18 225:12
275:13
**reasonable** 259:16
**reasonably** 173:15
**reasons** 41:7 96:19 117:11,14
117:15 118:3 133:5 150:10
151:2
**recall** 13:6,7,9 19:6 20:6,16
20:17 21:24 22:4,6,11 23:6
23:17 24:22 25:21 30:9
31:6,8,21 34:9 44:6,7 48:11
58:11 60:18,23 64:13 67:8
67:10,22 68:16 69:3 70:8,11
70:15 71:2,7,10,12 72:17
75:5 76:2 78:22 80:12,14
81:1,2,5,6 82:2,4,5,8,14,20
85:1 86:5,19 87:17,18,19,22
87:24 88:3,19,23,23 90:3,6
90:9 91:15,17 96:5,6,16,22

114:19 115:23 116:2 119:20
124:1 125:6,8,12 127:7
128:1 134:5 139:6,15
141:10,12 144:12 147:18
172:3 175:11 176:2 185:20
187:17 189:2 194:22 196:24
197:1 198:11,16 205:17
206:12 207:5,6 208:3
212:15 218:11 229:24
230:11 231:19,24 232:18
233:9,17,18 240:19 241:22
242:10 243:4 244:12,16,20
246:23 247:10,14 250:10,11
254:10,18 260:23 262:21,24
263:4 264:1,2 271:2,13
272:3 273:19
**recalling** 81:24
**receive** 25:14 53:13,20,24
57:11 83:23 105:20 124:4
124:18 158:6,9,9,21 166:14
208:22,24 218:12 238:5
**received** 9:12 22:9 53:13,20
84:15 115:8 124:14 159:10
192:11 215:12,15 231:19
238:9 270:6
**receiving** 22:5 54:16 57:17
83:22 84:1 207:20 271:11
**recognition** 14:4,6 105:2
**recognize** 73:2 84:19 105:1
**recognized** 14:3
**recollect** 63:2 84:1 119:19
141:9 242:1 247:23
**recollection** 9:23 12:5 21:15
22:4 23:7 32:23 40:21 43:1
50:1 66:18,19 68:13,17
70:23 76:16 78:16 80:17
88:4 121:1 122:6 134:8
142:18 165:16 174:5 175:16
178:16 199:24 205:24
206:23 218:18 219:10 220:5
224:4,6 231:4 239:19
247:23 248:8 250:1,8 261:8
268:16 269:13 273:21
**recollections** 199:12 243:2
**recommend** 115:18
**recommendation** 186:2
**reconstructed** 254:14
**record** 6:2,8,16 7:12 30:20
51:7,9,12 59:10,13 68:23
89:9 97:7,10,21 140:21,24

177:6,7,10,11,13,23 182:22
183:1 213:8,12,15 216:16
229:6,9 276:3,6 278:8
**recording** 95:15
**records** 91:9,10,12 172:9
238:22 242:13,19 258:7
**recouping** 172:15
**recreated** 242:23 246:22
**recreating** 257:21
**recuperating** 172:12
**reduce** 227:22 228:4,6
**reducing** 99:21
**reduction** 178:16 229:18
**reedsville** 60:5,9 61:6,22
62:10 64:12 72:10 150:19
239:5
**refer** 123:10 141:21 145:24
166:19 176:15 177:21 178:7
**reference** 67:1 129:17 146:3
157:4,5 165:15 184:10
204:24 205:3
**referenced** 51:3 167:24
**references** 137:16
**referencing** 101:7
**referral** 27:18
**referred** 68:2 98:4 111:10,11
176:16 178:8 218:5 240:24
**referring** 27:19 74:18,21
85:24 98:1 144:12,15 166:2
167:3 181:24 194:12 196:1
203:23 224:15 225:4 241:4
241:6,8 245:7 264:2
**refers** 96:11,12 122:6 126:13
126:15 137:18 142:22 143:1
144:20 145:10 165:17 178:6
202:19
**reflect** 177:23
**reflected** 244:6 271:24
**reflecting** 188:5
**refresh** 68:13,17 258:7
**refreshed** 214:3 238:14
**refreshing** 88:4
**regard** 94:8 130:12 224:15
259:12 266:12
**regarding** 44:14 79:22 86:9
90:10 96:18 100:20 115:13
115:14 121:4 130:2 135:22
180:8 181:1
**regular** 19:15 179:24
**rehash** 109:18

**reimbursed** 211:23 251:17
273:9
**reiterate** 103:22
**reject** 112:6
**relate** 53:1
**related** 6:6 41:10 47:12,18
55:9 65:9,11 67:3 73:22
80:5 102:1 130:17 134:13
146:12 151:2 155:23 190:7
211:22 215:6,21 242:9
243:16 244:7 248:5 271:7,7
272:16 278:11
**relates** 214:19
**relating** 62:3 241:23
**relation** 223:24
**relationship** 21:10,16 23:9
24:8 25:4 26:24 27:20
86:23 115:10 221:12 223:4
233:11 249:18
**relative** 63:8,11 278:12
**relatively** 242:15 251:9
**release** 5:11
**relief** 157:20
**rely** 94:1
**remain** 14:11
**remaining** 18:3
**remains** 111:21
**remember** 8:13 12:20,22
13:8 18:19 20:4,9,11 22:9
23:12 24:1,2,14 26:1 27:6
27:17 29:23 33:1,5,17 38:23
40:22,24 43:2,18 48:15 50:8
50:22 52:7,10,24 53:3 58:4
61:13,14 79:11 80:5 82:17
86:4 89:24 90:8,11,14 91:12
91:21 93:2 98:17 99:3,5
104:2 106:20 109:24 110:2
110:3,9,12 111:9 121:6
123:6,22 125:1,3 127:14,19
130:16,18,22 132:18 134:6
136:20 139:7,11 145:14,16
145:18 146:5,14 151:3,11
152:7,18 156:15,16 166:8
167:22 177:14 180:22
181:14,15 182:4 186:1,7,8
188:3 189:7 194:2 195:1,1,3
195:5 197:10 198:10,13
199:20 200:3,3,4 201:17,19
202:13 203:5 206:19,21
207:17,20 218:23 219:2

232:6,9 233:13 234:8
244:17,17,18 247:22 248:1
250:1,14 256:11 257:1
260:1,15 263:8,11 264:8
271:6
**remind** 152:2 247:12
**renegotiation** 178:13,15
**rented** 23:11,15
**repaid** 246:5,14
**repayment** 253:11
**repeat** 49:6 53:15 54:2 70:14
71:6 79:23 86:11 117:19
122:12 129:23 173:23
187:13 206:15 252:2 253:20
255:12 274:9
**rephrase** 9:5 19:10 44:11
214:14 221:18
**reporter** 7:8 278:3
**represent** 7:24 19:14 36:13
36:16 127:8 146:12,20
**representation** 135:14 146:6
**represented** 46:9 205:19
**representing** 6:19 34:20
115:12 116:13 131:14 203:7
204:7
**represents** 121:13,19 122:1
221:8
**request** 149:3 163:16 169:7
169:15,16 260:9
**requested** 53:8 273:10
**requirement** 251:7
**requirements** 218:24
**research** 12:21 61:3 62:4
**researcher** 74:14
**researching** 79:24
**resided** 15:14
**residential** 179:23
**resolution** 181:11,13
**resolve** 116:8 158:20,23
159:20 248:11 249:23
**resolved** 158:19,20 159:4,12
159:15,22 160:9,12 161:13
268:18
**resolving** 268:24
**resources** 40:13 74:9 248:6
265:6,9
**respect** 102:18 156:18 175:18
179:22
**respected** 27:22
**respects** 62:5

**respond** 104:12 126:12
175:23 177:19 190:17 196:9
212:9 261:3,4
**responded** 133:2 180:8 261:6
**response** 103:5,11,16 151:6
151:14 167:20 171:20
190:18 193:10 204:15
211:12 212:14 233:21,24
234:1
**responses** 265:13,17 266:21
**responsibilities** 20:15
**responsible** 10:5 62:6 76:7,21
78:11
**rest** 80:23 105:10 142:10
234:1
**restrict** 111:7
**result** 53:22 57:10 248:15
**resulted** 67:12 235:9 251:2,6
255:22 269:14,14
**results** 173:16 208:8 218:16
**resume** 276:19
**retainer** 63:21 150:20
**retire** 13:16 18:3
**retired** 13:13,20 14:21 154:9
154:10
**retirement** 14:23
**retiring** 14:22 154:10
**return** 130:21 132:4,7 231:14
234:11,14
**returned** 150:20 232:12
**returning** 132:21
**review** 125:19 147:5 184:19
266:7
**reviewed** 88:14 90:16 91:14
120:5 138:21
**reviewing** 266:4
**revised** 117:10 118:2
**revising** 247:1
**reward** 234:12
**rich** 1:2,3,9,9 6:2,3 29:22
30:6 31:7,18,19,22,23 32:19
33:2,13,19 34:3,5,11,19
35:3,14 36:6,20 38:5,20
39:7,16,18 40:10 42:19,22
43:3,15 44:14,20 45:3 47:4
47:9,11 48:12,15 49:4,10
51:16 52:5 53:6,13,18,20
54:1 55:19 57:9,16 58:12
59:17,23 61:6 63:20,21,23
64:6 66:16 69:11,16,17 70:3

70:11,15,18,23 75:17 76:14
78:21 82:17 83:5 86:10,14
86:23 87:7,11,13,19,22 88:5
88:19,21 89:5 90:4 91:15,17
93:7,7,11,14 94:5,16 96:2
98:2 111:13 115:7,11,12,15
116:1,9,13,19,24 117:4,7,14
118:13 119:16 120:19 121:4
121:21 122:7,11,15 123:10
124:3 125:4 126:16 127:16
128:1 129:5,20 130:1,9,13
130:18 131:1,11,12,22
132:24 133:2,16 134:11
135:4,15,20 139:1 143:10
146:11,19 147:9 165:18
167:24 174:12 175:4 179:18
180:16 181:1,12,21 182:6
182:14 183:9 184:23 185:11
188:24 192:10 194:19 197:4
197:24 199:18 204:1 205:23
212:3 223:23 224:7,11,17
225:13,15 226:2,6,12,24
227:5,17,22 228:23 229:14
230:5,18 231:13 232:17,20
233:8,11 234:7,20,23
235:13,17,24 236:3,8,19,22
237:3,8,19 239:12 240:10
243:6,15,22 244:2,7 246:12
246:16,19 247:1,6,11
248:19 249:14,19,19,22
250:12 251:1,10 252:5,10
253:3,10,17,23 259:8,10,17
259:21 262:8 263:7 264:2,9
264:23 266:6,8,13,14
268:17,24 272:9,24 273:5,8
273:15 275:14,22
**richard** 75:18
**richardson** 75:24 77:14
**richs** 8:2 45:4 63:15 64:14
67:11 68:5 77:5 103:6
116:21 166:24 224:2 225:23
240:10 245:16 248:9 252:1
253:2 263:19,21
**ridden** 175:19
**riding** 149:10
**right** 7:2 8:3,15 10:22 11:20
13:14,21 15:2,19 22:2 23:20
26:22,23 28:12 29:6 30:21
35:15 37:7 38:21 39:9 42:3
61:15 62:8 65:20 66:11

71:16 75:16 77:12 80:23 81:21 84:4 87:15 88:11 93:5 95:2,12,16 97:3 99:24 104:9 108:6,9 111:18 113:24 114:6,22 121:21 122:18 123:8,16 124:10,14 130:11 131:2 133:2 135:5 136:1,6 138:4,16 143:5 145:14 146:15 147:10,12 148:9 157:13,22 158:15 160:8 162:4,16 165:8 169:2 170:9 172:17 177:2 179:20 183:22 186:13 188:21 201:3 201:23 205:8 207:7 211:8 213:8,24 214:7,17 217:1,12 220:14 225:16 228:6 232:21 233:20 236:12 242:18 246:21 249:14,22 254:20 257:9 270:15 274:10,13

**righthand** 79:6 80:7 119:6
**ringing** 206:1
**rise** 116:3 120:13
**risk** 97:24 101:20,21,23 102:10,11,16,17
**river** 147:10,13 152:22 153:4 170:20
**riverfront** 147:16 170:20
**rmr** 1:19 278:2,21
**road** 12:3 132:3
**roamer** 22:20
**robert** 41:4,6,24 64:4,6
**robinson** 2:4
**role** 61:21 155:2 266:6,8
**roman** 245:10
**room** 48:19
**rough** 55:23
**roughly** 18:19 55:23 56:2 134:5 258:15
**routine** 81:20
**routinely** 115:7
**rules** 1:18
**ruling** 267:12
**ryan** 2:4 6:23

**S**

**saddened** 107:2
**safety** 103:1
**sampling** 199:21,22,23 210:4
**saratoga** 207:18,19,19
**sat** 29:9 38:7 45:21 132:18
**saturday** 16:15

**saw** 8:1 41:17 44:22 48:17 49:14 84:23 166:15 180:10 197:4 208:13 243:9 250:23
**saying** 27:4 50:3 55:6 70:23 85:17 92:4 99:21 111:9 132:21 143:15,16,18 156:14 159:11 161:11 172:3 173:19 176:7,8 183:11,17 185:7 187:8,21 196:11 224:19 246:13 268:23
**sayre** 64:4,7,9 68:8
**says** 66:21,22 67:6 68:10 69:1 69:20 71:11 74:15 80:8 81:7 85:12,16 89:15 90:20 90:22 91:21 92:11 95:13 97:22 107:1,20,21 108:11 112:7 117:9 118:1 119:13 119:15 122:3 126:11,21,24 127:2,4,6 129:16 135:17 136:2,4 137:17 138:1,11,18 141:19,20,24 142:5,10 143:5,7 144:16,22 145:8 146:7 153:9,15 154:13,13 154:20 155:2,8,17,20 163:24 164:9 165:7,9,24 166:17 167:13 169:11,14,15 169:22,23 170:1,3,6 175:8 176:13 177:5,10,18,20 180:1,7 182:5,12 183:7,7,7 183:11,22,22 184:9,12 185:6 186:20 187:24 190:9 192:21 194:6 201:22,24 211:8 240:14,16,17,21 241:15
**schedule** 80:11
**school** 10:22 15:23 16:2,4,14 17:5,13,17,24 18:9,12,22 24:7 25:18,18 26:2,5,14 27:24 30:24 48:23 81:11 214:22 215:1 216:14 217:9 219:4 220:15
**science** 9:13,18 215:13,14
**score** 218:13
**scott** 144:22,23,24 145:2,9,10
**scratch** 54:4
**seal** 278:16
**search** 190:11 252:11
**seats** 213:9
**second** 36:4 62:11 118:11 130:24 137:16 145:3 155:11

179:10 180:24 194:5 195:10 200:6,22 201:5 203:1 205:15,15 206:10 247:17 264:17
**secondtothe** 116:17
**sedona** 186:19,20
**see** 16:12,21 49:8 73:10 85:17 85:21 108:20,20 109:14 110:15 113:16 119:2 126:4 129:19 130:1 135:16 136:1 137:14 148:14 157:11,12 166:7 168:8 171:19 172:6 179:1 185:6 195:20 202:12 207:10 209:2,3 214:1 230:15 240:6,11 241:2,13 245:6,23 246:5,7 249:2,13 262:1 273:7,11
**seeing** 38:5 250:11 272:4
**seek** 133:9
**seen** 114:8,19 250:20,21 251:11,12 252:9,12 255:4 256:22,22 269:10
**selected** 64:6
**self** 70:12
**selfcentered** 69:20 70:9,16
**send** 76:8 106:15 116:2 117:12 118:4 211:14,16,18 252:14 266:14,15
**sending** 106:8 252:5 253:23
**senior** 9:24
**sensabaugh** 1:20 2:12
**sense** 21:9 102:17 158:5 160:15,18 161:23 169:20 172:1 186:9 194:3 212:8 229:21 241:24
**sensing** 248:13
**sent** 76:3 116:1 118:6,9,10 249:19 252:10 253:10 254:1 256:6 266:13 273:12,17
**sentence** 178:6 183:20
**separate** 127:17 218:4,13,13
**september** 5:9 66:22 185:1 194:8,23 249:2
**series** 10:17 94:19
**serious** 32:7,13
**seriously** 45:22
**serpe** 75:17,18
**serve** 35:5 205:14
**service** 10:18 11:6 132:8,16
**services** 237:24 272:17

serving 116:24
set 165:8,10 166:1,2 271:20
271:24
setting 46:20 53:17
settle 160:2,3
settled 56:6 68:10 158:4,12
159:10,22 160:19 161:19
164:6,10 173:12 189:5
190:3 191:6,16,18,19,20
212:4 249:24
settlement 5:10 189:12 192:3
192:4,6,7 193:22 250:12,24
251:5 253:17 268:3,15
269:22 270:6,7,12 271:11
271:19,20 272:6
settlements 159:24
settles 157:18 158:2 164:2
settling 56:4 270:22,24
seven 13:11 50:2 276:6
sever 233:10
shakes 42:9
share 36:2 37:12 90:5,9,23
93:20 95:3 97:23 98:20,23
98:24 99:9,18,21 100:17
101:13,17 115:7 192:16
shared 91:12 105:18 203:7
203:13 204:12
sharing 42:8 89:16 90:21
161:20 220:3 239:20
sheet 4:9 5:9,12
sheets 89:16 90:5,10,21,23
91:2,7
sheetz 132:8,15
shelter 153:3 154:15
sherri 93:15,21 94:4 117:1
shes 160:21 261:18
shop 149:1,8,11,21 151:12
235:6,16
short 32:22 39:22 51:10
59:11 140:22 182:23 212:23
213:13 229:7 275:24 276:4
shortened 214:10
shortly 255:9
show 112:12 250:17
showing 112:2
shown 112:7
shows 112:16
sic 232:22
side 133:3 138:15 142:7
sidebar 162:2

sidetracked 25:17
sign 63:20,21 77:4 169:23
170:2 178:18,19 201:24
271:12
signatory 77:6
signature 77:5,9
significant 40:14 254:23
255:1 265:6 267:10,20
significantly 214:10
signify 202:3
silica 4:10
similar 62:1,2,4 136:6
simoni 1:6,17 4:2 6:3,14 7:4
7:6,9,14,16,16 31:20 51:13
64:24,24 69:21 70:2 73:1,14
79:2 84:19 88:14 95:6,9
97:11 104:23 114:7,22,24
115:8,11,12,24 116:7,13
117:14 118:13,23 119:15
120:15,18 121:4,9,18,21
122:1,9,14 124:2,20 125:8
125:17 126:17 127:17
128:22 135:3 139:12 140:15
140:19,19 141:1,4,5,22
146:12,22 169:3 174:22
179:7 181:19 183:2 184:21
188:18 198:23 208:10
213:18 228:9 229:10,13
256:13 265:4 269:18 275:4
276:7,9,23 277:1 278:4
simonis 127:18 246:13 254:2
simply 101:2 124:16 163:13
sir 88:14 213:19 215:3 216:2
216:4,6,10 220:23 221:17
221:24 222:5,7 225:3 227:6
228:1,3,21 229:24 230:11
230:15 231:20 234:15
239:21,23 240:1 241:2,13
245:24 246:6 250:14,18
252:3,17,24 253:5,21
254:10 255:13 257:9 260:13
261:24 262:2,21 265:15
266:24 267:8,16,24 269:10
271:2,13 272:4 275:5,8
276:13,17
sister 185:10 186:17
sit 255:23
site 78:15 80:16,18 82:12
sitting 17:4 30:5 118:7
125:11 262:24

situation 83:11 161:15
176:12 203:12
situations 21:11 32:10
six 13:10 56:7 229:9 260:14
260:17,19
sixmonth 56:9 57:3
sixteen 191:10
size 132:17
skipped 108:14
slap 113:3,6
slash 81:7 177:21,23
slime 264:3,5
small 39:22
smith 1:13 3:8
social 100:24
sociologist 214:24
sociology 11:3,5,10,19 12:17
17:6 214:19,21,24
sole 22:24 64:3
solely 53:1
somebody 32:13
soon 86:5,17 147:22 156:24
156:24 234:8,9
sorry 13:18 14:19 19:10
27:10 29:1 30:15 33:8,11
36:11 47:24 48:4 50:9
62:17,18 74:12 77:8 80:8
83:2,2 88:10 89:12 110:7
117:17 120:3 125:21 128:22
139:19 140:15 144:1,1
155:18 156:9 160:1 161:7,9
169:15 170:1,2,10 171:2
176:4,23 177:3,8 187:3
195:10 200:8 206:2,2,4,9
216:22,23 220:7,21,21
223:20 224:3 233:16 257:17
259:4,4 274:9
sort 21:9 22:6 24:11,16 25:3
27:24 33:14 37:9 43:17
44:9 46:6,19 103:16 106:23
122:20 144:2 187:23 189:9
205:18
soul 190:11
sound 26:22 32:12
sounds 26:23 43:24 161:16
source 256:13 257:5
south 3:17
speak 132:23 154:16 204:8
243:19 247:16
speaking 123:1 150:16

**speaks** 130:4 187:23
**special** 7:21 14:10 33:14,19
**specialist** 6:5 75:19
**specialty** 12:17,20
**specific** 26:12,18 28:7 34:4
  57:23 98:17,18 99:3,5
  130:19 148:23 156:16 191:3
  201:20 215:2 239:19 244:21
  246:22 264:8 270:8
**specifically** 47:17 75:10
  78:14 96:6 121:8 131:23
  190:6 204:24 205:2,3
  233:18 239:18 240:24 256:5
  256:11 262:24 272:14
**specifics** 88:24 157:16 270:7
**specified** 278:5
**specify** 51:2
**speculate** 126:19
**speechless** 151:9
**spelter** 8:14,18 59:15 61:23
  64:13 65:10,11 72:9 75:11
  75:12,13 77:16,18 78:15
  80:16,18 81:3 82:2,12 83:11
  83:13 95:19 96:1,17,19
  100:7,10 150:24 158:18
  159:15 161:13 165:20,22,23
  175:19 189:15,21 194:16,21
  197:16 199:21 200:1,22
  201:2 202:23 206:18 207:12
  209:11 210:1,11 211:4,23
  222:15 237:18
**spend** 223:12
**spent** 9:19 10:19 15:9 239:9
  257:20
**split** 45:7 49:3,10 53:18
  67:13 108:6 122:3,10,19
  124:4,6,21 129:12,18 130:2
  130:8,13,16,22 131:19
  136:13 138:1,3 139:1,9
  165:18 178:9 180:8,21
  181:9 184:10 187:12,16
  225:23
**splits** 50:15 54:14,20 55:9
  123:12,13 181:2
**splitting** 66:21 67:6,20 99:13
**spoke** 132:20 197:3 206:16
  225:8
**spoken** 32:5 208:15,17
**springs** 73:20 74:22 75:2
  207:18

**stability** 151:24
**staff** 116:21 117:11,16 118:3
  118:14
**stage** 61:3
**stages** 61:23
**stamped** 64:23 79:2 84:19
  140:14 141:5 174:22 184:21
  188:18 198:23
**standing** 132:15 232:21
**stands** 137:17
**stanridge** 62:15,24 63:3,4,9
  63:20,24 64:12 68:1,14,18
  100:14 239:14
**star** 147:10,13 170:19,20
  171:3,7 197:15 236:10,14
  236:18
**start** 33:9 35:1 66:2 83:3 87:6
  87:10 93:5 108:21 158:12
  158:14 242:13
**started** 12:24 17:17 24:7 57:9
**starting** 38:4
**starts** 180:6
**state** 1:19 7:12 22:21 29:12
  39:20 62:8 104:7 269:18
  278:1,3
**stated** 110:18
**statements** 252:1,13 266:16
**states** 1:1 29:9 96:8
**station** 132:16
**stations** 132:8
**status** 13:23 14:2 104:7
  197:13
**staying** 33:3
**stays** 241:11
**stemming** 16:24
**stenotype** 278:7
**steve** 132:20 199:15,18
  203:19
**stick** 37:7 148:11
**stickies** 147:8
**sticks** 263:12
**sticky** 79:5 119:7,24 147:21
  154:13 157:12 163:23 168:5
  169:4,9 175:3 177:9,17
**stipend** 96:2
**stone** 267:18
**stones** 267:12
**stop** 9:8 132:8
**stopped** 146:5,22 149:10
**stopping** 149:7 235:2

**street** 1:20,23 2:5,9,14,19
  3:11,17 6:12 97:22 98:9,11
  99:4 103:12 107:3 110:4
  112:24 151:16 169:17
**stricken** 119:14
**strike** 162:7 163:21 196:5
  217:20 236:1 262:18 265:3
**students** 100:22,23 101:2,3,4
  101:5,8 102:2 150:12
**studies** 220:1,14
**study** 9:21 11:3 16:11 29:16
  215:15 220:6,9 252:12
  256:18
**studying** 9:20
**subject** 24:16 254:15
**submit** 90:2 91:2,23 92:12
  93:12 211:21 212:20 213:2
**submitted** 211:9 212:17
  246:5,12 251:20
**submitting** 92:8,15,16,18
**subsequent** 255:15
**substance** 228:19 258:16
**substantial** 173:9
**success** 136:3,7,14 172:23
  173:3,4
**suddenly** 256:14
**sue** 268:8,8 269:15
**sufficient** 223:10
**suggest** 124:11 233:10
**suggested** 106:15 111:1
  124:3 133:19 144:9 149:7
  153:2 166:5 175:24 178:23
  185:14 189:8 259:14
**suggesting** 57:16 90:1 91:23
  92:11 103:14 124:17 192:19
  208:8
**suggestion** 92:4,14 107:6
  108:22 124:14 133:14
  166:20
**suggestions** 196:4
**suggests** 120:23 122:17
  144:23 183:21
**suite** 2:5,9,19 3:6
**sum** 103:16
**summaries** 242:22,23 254:8
  257:21
**summarize** 129:16
**summary** 194:6 195:12 254:7
  254:13,21 255:6,8,13,15,18
  255:19,22 256:16 257:6,14

257:24 267:19
**summer** 119:17 122:9,14
166:5 201:5,7 203:16
**summing** 145:10,11,12
**sums** 157:15
**supplement** 256:15
**supported** 33:20
**supposed** 100:13 162:19
174:16
**sure** 11:17 17:13,14 21:21
23:13 24:20 28:21 30:3
34:2 39:14 47:5,13 49:7,20
49:21 55:3 56:21 58:11
63:22 72:8 86:1 88:8 89:19
96:11,20 99:10 107:10,16
108:1 115:6 119:22 121:24
130:6 142:20 146:2 147:14
147:16 148:24 155:19 160:7
161:8,10 173:4,7 176:6,7,16
176:18 177:23 181:4,11
194:21 197:6,20 209:22
211:9 213:3,10 215:10
216:17 218:11 222:18
225:17 230:22 231:2 238:16
239:4 240:23 241:9 243:18
243:21 244:15 245:13
247:24 249:12 250:6,9,19
260:2 264:18,18 265:24
274:11,14
**surprise** 254:4
**surprised** 229:23
**surveillance** 98:15 171:13
**swear** 7:8
**sweeney** 41:4,18 48:6,12 49:4
49:10 50:14 53:11,18 54:13
54:14,16,20,24 55:8,12,20
55:24 56:11,14,18,23 58:1
58:16,21 83:21 85:11 87:14
88:5,21 90:1,7 91:3,11,22
92:15,16 177:19,24 178:7,9
178:9,11,21,24 180:7,20
181:9 184:9,13 198:7,12
237:19 238:9
**sweeneys** 41:6,24
**switch** 213:9
**sworn** 7:9
**synonymous** 71:19

**T**

**take** 8:24 16:12,14 17:8 23:2
28:10 32:7,13 51:7 53:8

56:20 59:6 69:15 73:14
81:13 84:14 86:19,20,23
87:3 88:10 94:19 96:1 97:4
111:4 114:15 140:17 145:5
147:3 168:7 182:20 184:3
204:21 205:12 206:3 218:4
218:7,9 219:1,3 229:3 267:7
275:24
**taken** 1:18 11:9 14:14 28:17
45:15 51:10 52:23 59:11
97:8 140:22 158:8 162:19
163:14 173:11 182:23
213:13 217:21 229:7 248:15
267:5 276:4 278:4,7
**takes** 122:3
**talk** 9:11 25:5,9 32:20,24
40:17 41:19 42:5 44:24
46:22 50:14 78:14 98:22
99:14 110:14 143:18 153:6
153:13 175:17 182:9 185:19
185:21 190:22,23 194:7,8
194:11,23 197:23 198:6
202:9 204:17 207:1 260:12
**talked** 29:14 32:15 39:8
41:23 42:7 43:5 47:6 50:12
72:12,15,16,16 85:13,18,19
106:2 112:9 113:19 144:7
149:22 150:2,7,12 151:10
151:12 156:7,10 164:24
169:17 174:18 197:18
200:24 201:13 204:20 205:1
205:10 206:13,24 215:24
222:11 225:5 237:13 239:18
240:17,22 247:16 257:11,16
257:23 258:1,5,10 262:19
**talking** 25:18 28:2 38:19
45:22 50:18 53:17 66:21
67:6,19 82:24 83:20 87:19
87:22 99:12 101:8,16 102:1
104:19 110:9 122:19,22
123:3,7 133:18 152:8 167:8
167:10 170:18,19 171:9
175:7 188:1 194:15 202:13
202:15,17 203:18,20,24
205:6,8 221:20 224:24
228:15 229:13 255:10 259:1
261:5 266:17
**tape** 50:24 51:6,12 97:4,10
140:18,24 229:4,9 276:6
**taping** 154:14,21

**taught** 219:11,17 221:2
**tax** 117:10,15 118:2,13 123:9
123:12 137:18 238:18,23
**taxes** 124:5,7,13,18
**taxi** 204:19
**taylor** 1:13 3:8,20 6:4 187:2
199:19 200:1,10
**teaching** 12:14 100:24
**telephone** 58:10 119:13
132:16,17,19 179:19,20
206:17 242:5 262:12,19
263:6,9,11,22 274:22
**tell** 9:5 17:21 22:8 23:23 26:8
39:4 47:18,19 52:11,13,21
58:12,16 67:8 70:2,5 80:19
80:23 93:7,11,14,24 105:22
121:12 129:15 130:11 131:6
133:15 134:1 150:1 154:24
157:13 163:3,8 173:18
196:15,16,18 203:4 209:20
255:23 256:8,10 258:19
260:23 261:13 263:5 264:18
**telling** 32:9 52:22 70:11,15
91:15 104:11,17,18 112:24
194:22 205:19,22 227:13
237:4
**teresa** 1:19 278:2,21
**term** 52:1 113:7,8 180:16
203:9
**terminology** 238:15
**terms** 42:12,14,18 62:3 76:4
145:22 149:22 150:2 175:13
214:23 219:18 227:1 233:17
250:2 258:15 259:16 262:15
264:10,22,23 266:23
**terrorize** 195:9
**test** 217:23 218:1,17
**testified** 225:20 227:21
230:17 254:14
**testify** 224:7 226:18
**testifying** 20:14 264:9
**testimony** 19:6 20:14 163:13
214:18 262:6,11 278:8
**text** 97:18
**thank** 9:2,6 64:19 77:10
135:1 140:16 211:11 217:2
222:21 258:12 274:1 276:12
276:13,17
**thanks** 74:17
**thats** 8:4 11:8 14:13 15:16,22

29:2 31:20 34:13,16 36:7,11
38:8 40:7 41:20 42:6 43:13
45:9 46:23,24 50:10 54:18
61:15 62:9 65:13 67:15
68:1,9 70:24 71:18 72:14
74:11 75:21 78:5 79:8,20
85:21,23 87:16 88:11 90:13
90:22 91:24 95:13 96:7
102:22 108:10 112:3 113:13
116:11 124:11,14 127:6
130:22 131:3 133:24,24
134:7 135:7 137:21,24
139:17 141:20 145:7 146:15
146:23 147:11 149:12
151:24 152:14 153:6 154:1
154:21 155:7,19,23 157:1,4
157:9 162:4,8,10,16 163:7,9
164:7 165:9 167:3,24 169:8
170:16,21,23 171:8,11
172:3,3,8,16 175:10 177:23
178:1,6,18,19 179:9,11
181:5 182:8 183:8 184:2
189:11 191:7 192:19,23
195:12,19 196:11 201:8
207:8 210:19,20 212:9,12
213:7,22 214:5,6,11 216:24
222:3 223:2,11 225:12
226:8 227:21 228:14,14
235:5 236:6 238:2,18 240:8
240:10 241:12 242:1 243:3
244:9 248:7,20 249:19,21
257:9,19 258:23 260:17
261:12 262:6,14 263:11
268:1,11 269:23 271:22
274:10,13 275:16,19,23
**theres** 80:2 89:8 97:16,17
113:18 117:9,19 118:1
129:17 133:3 135:17 138:15
142:7 144:2 169:22 184:8
192:3,20 193:4 202:1 221:6
240:8,16 241:1,6,18 245:10
254:12 273:2
**theresa** 165:11 166:18,24
167:4,15,15 183:7,11
**thing** 15:2 19:5 45:13 46:19
47:23 92:19 116:12 133:11
144:2 166:17 179:8,13
184:1,3,4 198:16 208:21
250:4
**things** 10:6 25:6,7,8,9 45:16

47:15 60:15 102:9,18
104:16 111:5 113:18 122:18
128:15,16 151:4 154:16,17
156:6 164:15 168:6 171:10
172:11 178:2 198:15 211:24
223:7 224:13,15,22 229:20
234:4 245:1 247:2 256:1
257:3 266:5,7
**think** 8:21 18:10 19:13 20:22
20:22 23:7,8,9 24:13,14,16
26:24 27:9,11,14 28:4 29:19
29:23 30:2 31:1,17,20,24
32:15 34:5 37:3,17 38:1
39:12 43:19 44:4 45:20
46:10 48:18,18,23 51:19
58:22,23 62:11 63:7,11 67:7
69:18 78:6,21 79:14,15
80:21 81:4,22 83:21 86:21
90:15 91:24 94:22 101:21
107:8 108:11,24 110:24
112:4,9 113:22 118:9,10
119:16 121:16 123:14,17
124:16,17 126:15 127:15,19
127:24 128:14 130:5 132:9
133:6 134:7 135:10,10
137:21 139:17 142:15 145:9
152:19 153:4,12,15 154:24
155:1,15 156:20,20 158:3
160:2,12,13,15,17 161:11
162:24 163:9,11,14 164:12
164:21 168:20 170:22
178:13,19 180:1,14 182:13
183:20 185:19 187:23 189:6
189:7,22 191:23 192:23
193:6 197:8 200:16,20
204:4,19 206:22 207:15,21
207:22,24 208:7 212:8,10
213:3,21 214:2,3,6 218:18
223:3 225:2,4,12 229:22
231:1 238:11 239:2 241:15
247:15 248:20 252:11,12
253:1 256:17,18,24 260:17
260:18 261:12 263:8 264:13
269:11 271:3 276:1
**thinking** 26:11 27:12 38:2,4
38:16 39:3,11 43:14 57:20
75:15 126:8 201:15 241:24
**thinks** 183:23,24 241:11
**third** 89:9 109:8,9 126:10
136:5 180:5 195:6,13 200:5

221:11
**thirdparty** 1:10,16 2:16 3:3,8
3:13 7:2
**thomas** 1:14 3:13,15
**thought** 10:7 14:22 18:5
21:13 28:22 32:13,14 38:12
38:20 46:15 50:13 87:2
103:13 104:19 106:7,13
139:22 160:1 165:11 166:18
166:21 167:3,4,14,15
185:15 190:9 192:21 193:1
193:8 212:5 250:3 258:22
262:18
**thoughts** 74:16
**thousand** 68:11
**threat** 103:17,23
**three** 12:23 29:5 39:18 40:16
42:22 44:1,6 52:23 97:10
109:10 114:11,12,13 123:12
135:9,11 138:8,10 155:4,6,7
157:12 158:18,23 159:1,19
159:20 161:2,6,12 163:24
184:22 187:10 199:13,13
224:22 225:5 244:7
**threeday** 217:23
**threepage** 114:7
**throwing** 111:5
**thrown** 269:3
**thursday** 186:22
**time** 6:11 8:24 13:12 15:1,9
17:1,16,17,17 18:22,24 19:3
19:11 20:7,24 22:19,19
23:10,15 24:21 25:19 28:18
29:6,24,24 30:1,9 31:21,23
33:1 34:4 35:4,10,24 36:14
36:17,19,21 37:14,17,17
38:2,17 39:22 41:15 44:2,2
45:21 47:20,20 51:9,14 54:5
55:4,23 56:2,3 58:9,12
59:10,13 60:14 63:10 69:24
73:15 78:7,13 79:12 80:3,18
81:7,23 84:23 86:17 87:2,8
88:10 89:16,17 90:5,10,10
90:21,23 91:2,7,9,10,12
92:19 93:8 97:7,12 98:18
100:8 101:1 102:13,15
104:1,2,24 109:6 116:21,21
122:8,13 126:6 130:17,19
131:15 132:11 134:4,20,22
140:21 141:2 143:9 146:4

146:14 148:8 151:20 152:7
152:10 153:5 154:4 156:15
156:16,16 159:8 160:4
166:13 169:21 172:2 182:13
182:22 183:3 188:8,8 191:8
192:5,7 195:2,4 197:3 198:9
199:19 200:2,5,18,20 201:6
202:9 203:1 212:24 213:5
213:12,15 214:6 218:10,19
218:21,24 223:16 225:5,7
225:16 229:6,11 231:23,24
234:9 239:9 242:13,19,22
242:23 246:22,22 249:23
254:7,8,13,21 255:5,8,13,15
255:18,19,22 256:15 257:6
257:13,20,21,23 258:7,8
259:19 260:1 263:10 265:6
267:11 268:8 269:16 276:3
276:8,10,18,24 278:5
**times** 8:9,10,13 19:17 28:13
28:18 29:5 40:15 52:23
91:13 96:18 110:14 164:14
199:10 218:20 264:23 265:1
**timing** 113:15
**titled** 23:1
**toby** 210:6
**today** 6:13 8:23 15:12 22:3
29:20 30:12 33:18 35:9
51:13 63:2 65:3 67:8 72:16
87:24 88:3 97:11 118:7
125:11 141:1 183:2 229:10
276:7,10
**todays** 6:10
**told** 28:23 67:16 70:18
100:21 103:13,14 104:8
110:13 157:2 171:19 186:1
186:22 187:4 188:2 189:10
189:11 190:9,13 194:6,8,11
202:14 203:5,6,6 204:6
227:9,11 235:24 248:1
258:21 268:14 274:5
**tom** 61:19,20 243:6
**tomorrow** 276:20,24
**tone** 197:9
**top** 79:17 85:17 98:5 105:7
117:8 132:18 143:5 144:3
146:7 153:15 175:6 201:22
201:23 241:11
**topic** 67:23 129:10
**topics** 135:12

**tort** 216:12
**total** 73:7 103:16
**tough** 134:20,22
**towit** 278:1
**toxicking** 210:15
**trace** 173:5
**track** 22:11
**train** 159:24 262:18
**training** 214:19,23 215:2,5
215:21,24
**transaction** 174:13,15
**transcribed** 278:8
**transcript** 106:23
**transpired** 107:2
**transporting** 149:18
**traveling** 132:3 149:6
**trial** 20:14,14 206:18,22,22
207:1,12,13,17 208:1,4
267:11,16
**trials** 19:7
**triangle** 68:11
**tried** 61:4 164:17 188:8
190:18 206:20 274:23
**trigger** 57:23 166:8
**trip** 131:8 132:3 134:3,6
185:6 186:18,20 231:2,5
232:1 234:9 235:1
**trouble** 268:22
**troubled** 269:2
**true** 62:9 72:14 74:11 75:21
239:14 278:8
**try** 9:5,7 14:19 35:1 43:22
53:16 106:21 135:3 147:23
167:7 191:21 238:24
**trying** 23:11 39:19 43:6
61:13,14 86:15 92:20
112:23 133:9 151:23 153:20
184:9,13 216:20 245:1
256:12 258:21 261:14
**tuesday** 1:20
**tulane** 165:3 186:12,14
**tuning** 195:10
**turn** 60:1 236:16 239:21
**turned** 21:12 23:22
**twice** 8:14 28:12,24
**two** 8:16 10:19 12:10 16:5
37:22 39:23 40:15 43:12
45:3 49:11 51:12 60:3
62:11 65:5 75:16 102:9
109:6,14,21 123:9 124:6

127:2 133:5 145:21 154:23
155:3 156:6 157:18 159:4
164:2 165:5 168:1 169:18
170:3,11 175:3,4,8 179:9,11
179:17 180:6 184:8 194:23
198:20,24 199:12 200:4
217:22 218:22 230:5 240:6
242:5 245:24 247:14 253:12
256:23 258:4 266:12 274:5
**twoday** 28:14 217:24 218:14
**twothousand** 203:16
**tx** 3:7
**type** 18:6 19:12 26:12 28:8
220:18
**typewritten** 4:23
**typically** 64:9
**typo** 180:13
**typos** 266:16

**U**

**uhhuh** 22:3 49:16 68:12
117:24 160:23 165:6 202:2
246:1 266:2
**ultimate** 250:11,24
**ultimately** 35:14,16 83:12
91:2 268:2
**unaware** 110:13
**uncalled** 162:16
**uncharacteristic** 103:19
**uncomfortable** 203:8,11
**uncommon** 89:5
**undergrad** 215:20
**undergraduate** 16:6 215:11
**underline** 123:20,24
**underlined** 123:19,21 182:5
**underneath** 71:11 145:4
**underscored** 234:2
**understand** 9:3 47:5,13 55:4
55:5 72:6 86:15 99:17
102:11,16,18 103:3 106:11
128:4 136:21 153:10 156:13
157:24 160:7 164:8,15
183:14 186:11 189:24
192:15 194:10 204:21
205:12 211:20 213:23
214:13 220:3 221:4,6,11,17
221:19,20,24
**understanding** 5:8 14:13
32:4 35:13,24 37:10,10,14
37:21 49:7 53:21 57:10
99:10,19 101:22,24 118:16

118:18 124:16 130:7 158:13
158:16 159:6 160:6 161:10
161:18 173:2,8,21,23 174:1
174:4 183:16 184:7 190:3
191:14,14 192:13 195:24
197:19 205:4 214:17 239:12
239:16 243:6,12,17,18,21
244:2,6 245:7 246:11 257:8
272:10
**understood** 37:23 46:2
102:17 133:18 155:9 168:17
212:2 221:2 272:6,13
**underwrite** 143:8
**underwriting** 143:9,19
**unfair** 103:13 104:19
**unilateral** 231:16
**union** 41:14
**unionrelated** 41:17
**unions** 41:10
**united** 1:1
**university** 9:19 12:7,9 14:5
16:3,7 17:1 32:6 38:6 39:21
41:11,14 45:17 46:7,9,16,20
56:4 60:19,20,23 69:24 74:5
100:22,24 150:12 154:9
157:18 158:2,11 164:1
169:21 170:13 171:22 172:2
189:5 211:1,1
**universitys** 74:9
**unquote** 187:7
**unsure** 119:17
**unusual** 81:13,17,18
**unwieldy** 134:18
**upset** 100:20 101:11 102:8,14
103:2 104:6,8 105:19
106:10,13 111:4 151:23
186:10 197:11
**upsetting** 112:11 113:2
**upstate** 207:19
**use** 89:5 102:6 180:16 184:5
224:13 238:15 264:10
**usual** 13:12
**usually** 19:17

V

**vague** 33:23 121:15
**vaguely** 207:17
**value** 158:8 173:10 212:4
**vanmeter** 1:19 278:2,21
**various** 46:16 72:11 94:10
116:7 238:3,4 252:9 259:22

264:23 265:1
**vaughn** 75:22,23
**venture** 44:13 110:19 111:11
111:12,15 229:24 230:3,5
**verbatim** 190:13
**version** 245:19,20
**versus** 6:3 177:21
**vice** 186:24
**video** 1:17 6:4 51:12,12 97:10
97:11 140:24 141:1 183:1
229:9,9 276:6,7
**videographer** 3:20 6:1 7:7
51:8,11 59:9,12 97:6,9
140:20,23 182:21,24 213:11
213:14 217:6 229:5,8 274:1
276:2,5,22
**videotape** 183:1
**videotaped** 277:1 278:4
**violations** 104:5
**virginia** 1:1,20,21,23 4:10 6:6
6:13 12:7,8 16:3,7 28:14
29:8 32:1 40:12 41:2 48:21
60:5 69:24 73:21 74:5,9
76:5 79:11 83:9 150:11
199:15 211:1 217:21,22
218:14 219:4 236:10 243:13
278:1
**visibly** 151:23
**visit** 78:8 80:9,12,14,15 82:21
82:22 83:1,3,6 121:8 130:19
222:22 230:24 234:24 235:9
235:12,16 236:23
**visited** 247:4
**visiting** 78:12 81:13,14,20
186:17
**visits** 4:10 77:17
**vititoe** 75:14 115:15 116:2
122:16 146:1,21 181:3
274:7 275:1
**voice** 112:15,18 113:5
**volume** 1:18
**volunteered** 171:24

W

**wait** 160:18 163:2 191:21
**waived** 221:14,23
**wakefield** 2:12 7:5,5 14:18
31:11 33:6,9,23 34:21 35:7
48:2 50:20 51:18,23 54:8
59:6 64:17,19 71:5 72:5
82:24 92:22 103:8 108:14

108:18 110:16 113:22
119:24 121:14 126:18 128:3
130:3 134:16,19 137:1,4,10
139:4,17,20,24 143:23
150:9 159:16 160:21,24
162:18,23 163:2,5,11
169:23 170:15 173:22
175:12 176:21,24 177:22
198:3 203:18 209:17,20
213:10 216:16,18,22,24
217:5 220:18 221:15 222:1
223:18,21 224:18 225:1
227:7 241:15 246:8 256:8
257:19 261:5 263:2 276:18
**walk** 225:14
**walked** 169:17
**walking** 152:21
**walnut** 107:3 110:4
**want** 7:18 14:7,12 16:11,17
16:19 43:12,13,21 49:7 54:9
56:19 59:6 94:19 108:1
111:7 112:20 128:1 134:19
151:7,8 159:9 195:7,16,18
195:21 196:7 200:10 209:17
213:8 222:14,18,22 225:14
243:19 247:23 253:4 256:20
256:21 258:2 261:15 274:11
274:13,17
**wanted** 9:11 21:19 26:9,15
50:9 132:22,23 147:23
153:1,12,13 165:12 166:18
167:2,5,14 176:10 177:19
180:3 183:17 186:3,3 187:4
187:4,21 197:9 244:21
258:13
**wanting** 166:21 225:10 234:4
**washington** 2:9 131:9 132:2
134:4,6 135:4 230:24 231:3
232:2 234:10
**wasnt** 11:17 17:13,14 24:18
24:18 25:5 31:14 38:16
67:4 92:24 97:2 104:6,11
106:12 110:6 149:9 159:23
164:19 170:23 172:6 173:4
173:4,6 185:15 196:3
199:16 231:2 235:21
**watching** 28:2 204:10
**way** 25:4 28:2 30:11 31:20
41:8 49:13 60:23 65:14
66:17 73:22 92:6 95:20

104:12 108:9 109:1,7,15,21 117:19 126:11 129:4 132:2 132:14 134:20 136:12 137:15 140:5 149:5,12 157:7 178:21,24 197:20 198:6 199:3 226:15 235:1 244:13 254:23 255:1 261:12

**waynesburg** 148:12,15,16,22 148:24 149:2,11,22 151:13 234:24 235:2

**ways** 93:17 116:8 121:20

**web** 138:16,18,19,19

**wedding** 96:12 165:5 166:4,9 167:11

**wednesday** 80:9

**week** 85:2 109:19 212:24

**weeks** 39:23 256:23

**welfare** 195:9,23

**went** 10:22,24 11:1 12:24 16:15 23:10 27:16 28:2 32:15 76:15,22 81:2 90:2 98:11 151:16 153:18 154:15 169:16 172:11 183:6 186:12 190:22 192:24 216:14 250:6 252:12 256:23

**werntz** 210:23,24

**west** 1:1,19,21 2:19 4:10 6:6 6:13 12:7,8 16:3,7 28:14 29:8 31:24 40:11 41:1 48:21 60:5 69:23 73:21 74:5,9 76:4 79:10 83:9 150:11 199:15 211:1 217:21 217:22 218:13 219:4 236:10 243:13 271:1 278:1

**westbrook** 76:1 77:14

**western** 132:9

**westinghouse** 59:2 71:19 263:16

**weve** 7:22 29:14 50:17 72:15 88:15 113:18 175:7 188:17 200:24 214:6 222:18 229:3 257:6

**whats** 96:4 129:7 138:7 162:2 162:3 175:13 194:4 246:17

**whens** 84:23

**whichever** 7:18

**whos** 204:10

**wife** 10:15 14:21 106:1 111:11 113:14 154:7 166:24 212:18 213:5

**wifes** 105:6,11,13

**william** 3:16 62:14 63:3

**willing** 38:7 109:16 131:6 186:2 233:15

**wisaguy61** 209:5 210:19

**wish** 107:13,13 108:8 109:1

**wished** 110:14

**withdraw** 71:12 134:17

**withholding** 117:10,15 118:2

**witness** 6:13 7:8 162:15,20 163:14 278:9

**witnesses** 19:6 20:13

**wo** 142:7

**women** 253:12

**wondering** 99:12 144:13 175:21 185:7

**word** 85:16 89:18 96:21 107:7,9,12,16 112:3 136:5 144:6 148:15 155:15,15 190:11,21 193:23 196:10

**words** 52:13 111:1,23,24 112:1 142:8,15 144:11 224:13 233:13

**work** 11:6 14:8,9 16:24 18:12 18:15 20:2,23 22:6,18,20 24:23 25:11 28:3 33:15 34:19 36:1,5 37:11 38:4,5,7 39:20 40:5,9 41:10,17 42:13 42:18 46:11,13 50:19 56:24 57:5,11 94:9 111:19 121:20 133:15 144:10 157:16 169:19 171:17 174:10 191:15,17 209:24 212:6,8 212:22 249:22 265:8,16 266:20

**worked** 18:16,17,20 19:16 20:18 21:8,17 22:1,12 34:14 34:17 35:9 58:14 59:17 60:20,22 71:15 89:17 159:2 223:6 237:18 238:4 239:13 246:16

**working** 11:7 12:8 14:5,11 17:6 19:11 21:10 23:9 25:3 25:5,8 26:24 27:14 30:4,11 32:10,11 58:18 74:2 83:9 112:22 117:6 128:16 143:11 155:10 159:19 174:6 194:18 223:4 230:1,4 246:13 250:2 253:2,6 262:7 272:17

**workings** 43:7

**worry** 114:4 204:20 205:11

**wouldnt** 21:17 144:10 154:16 173:3 264:20 270:1,3

**write** 69:4 105:8 153:2,5 154:16 168:5 171:10 176:12 186:2

**writing** 105:21 106:4 119:19 126:1,12 140:4 141:10 156:22 167:8,9,12,24 168:12 249:11

**written** 35:20 49:3,9,18 88:17 102:22 110:6,7 202:1 223:24

**wrong** 108:5 171:2

**wrote** 79:7 105:9 123:18 148:14 153:19 154:17 156:8 156:9,11 157:16,21 158:14 163:24 164:9 172:4 183:20

**wv** 1:23 2:6,15,19

**wvu** 13:1,13 14:11 29:15 33:16,21 34:20 35:6,15 36:2 36:5 39:8 40:6,18 42:13,19 43:7 44:14 45:7,12 46:5 47:4,9,12 53:14,19 55:16 57:1,6 58:14,18,20 59:15 64:12 71:4,9 83:22 84:11 90:10 91:16 93:12 99:24 101:4 158:17 159:11,12 160:7,8,11,14,21 161:13 164:5 178:10 184:11 190:7 191:5,13,17,24 192:1,12,17 193:22 197:16 209:10

**wvus** 189:12

**X**

**Y**

**yahoo** 209:5 210:19

**yeah** 21:23 26:7,23 27:11 28:15 30:2 31:15 33:24 41:7 43:23 48:3 49:8 56:19 75:23 77:3 78:17 96:4 108:16,18 130:6 137:1 142:13,16 146:11 153:23 154:3 156:6 157:9 161:23 167:19 169:12 180:1 190:16 192:13 206:16 209:12 231:12 241:20 255:16 261:7

**year** 9:19,24 10:15 11:22 13:7,10,16 23:10 24:14 107:9,10,22 108:23 119:17

148:20 214:22 238:19,24 258:4,15 260:18

**years** 8:21 10:19 12:10 13:11 15:1 17:2,10 34:17 46:9,10 57:12,19 65:13 173:6

**yellow** 79:5 119:7

**yesterday** 28:21 29:3 107:3 112:3,8 205:11 238:17

**york** 9:20 115:2 119:17 121:8 121:10 207:19,20

**youre** 7:19 13:13 38:2 43:14 47:7 52:1 55:3 64:6 80:16 82:24 98:1 113:24 129:22 143:15 153:20 159:11 162:19 167:7,8,10 169:12 171:12 172:20 176:15 181:4 183:22 203:18,23,24 204:7 222:8 224:19 227:12 233:3 237:3 243:19 262:24 265:20 266:17 267:10

**youve** 8:8 27:1 34:11,14 40:16 55:2 66:3 88:14 108:14 114:8 147:4 168:20 215:24 216:8 218:14 225:19 237:17 246:21 251:11 255:4 260:6 261:13 262:19 263:24 274:5,7,16 276:9

---

**Z**

**zero** 173:17

---

**0**

**00** 1:20 81:7,7 95:11 180:1,2 180:3 186:21,21 276:20,21 276:23

**000** 96:2 116:19 177:20 178:7 178:11

**0146** 140:15 141:5

**02** 105:7

**03** 66:22 69:2 144:5 145:4 146:4 152:4 187:19

**04** 66:10,13 69:14 166:5

**0412** 95:9

**0416** 79:2

**05** 152:9,12 177:17 185:5,6 187:17 197:15 199:20 240:22

**0598** 125:17

**06** 160:10

**07** 206:22

**0737** 118:23

**0757** 114:7

**0759** 114:8

**0922** 73:1

---

**1**

**1** 1:8 4:8 64:20,23 66:8 97:12 117:23 144:5 145:4 186:21 278:15

**10** 1:20 4:18 6:11 128:19,21 128:22 129:20 130:1 135:16 136:2 141:18 185:5,6 230:13 231:11

**104** 4:14

**1099** 137:18,21 238:9,17

**1099s** 238:5

**10day** 213:1

**10th** 152:6 185:2 186:16

**11** 1:20 4:19 51:9,14 59:10,13 97:12 130:8 140:12,14 141:5 183:2 229:10

**1100** 3:6

**111** 3:11

**113** 4:15

**118** 4:16

**11th** 6:10 51:13 129:2 130:12 134:5 141:2 276:8

**12** 4:20 66:10,13 69:14 97:7 147:1,3,7 163:23,24 168:1 186:21 236:16,18,24

**125** 4:17

**128** 4:18

**12cv12imk** 1:8

**12th** 80:9

**13** 4:21 116:19 168:24 169:2 169:3

**1338** 104:24

**1345** 128:22

**1347** 64:23,24 69:19

**1348** 64:24,24

**1349** 84:19 88:15

**1352** 169:3

**1353** 174:22

**1354** 179:7

**1357** 181:19

**1361** 184:21

**1366** 188:18

**14** 4:22 174:19,21 175:1

**140** 2:5 4:19

**147** 4:20

**15** 4:23 142:7 179:4,6,17 257:1

**16** 5:3 181:16,19 183:5

**168** 4:21

**17** 5:4 51:9 184:16,18,19 191:10,10

**174** 4:22

**179** 4:23

**17th** 2:9

**18** 5:5 6:11 144:5 188:15,18 188:20 189:12 191:5,11 193:21

**181** 5:3

**184** 5:4

**188** 5:5

**19** 5:6 9:17 198:18,20,22 199:11 206:11,16 207:5

**1963** 9:16

**1964** 10:20

**1966** 10:20,22

**1970** 11:24

**1971** 12:9,9,10 15:14,16

**1973** 12:5,6,10

**1975** 13:17 14:17,19

**198** 5:6

**1990** 18:23 20:21 21:1,2 24:5 24:6

**1995** 16:1 20:21 216:15 217:10 220:10 222:17

**1996** 217:16

**1997** 217:16

**1999** 34:8,12,15 35:3,19 37:4 37:6 38:8,21 39:17 40:1 41:23 57:12 99:20 107:23 108:7 225:19 226:7 227:4 227:15

---

**2**

**2** 4:9 72:22 73:1 81:7 140:21 141:2 240:22

**20** 5:7 17:2 46:10 97:23 99:18 99:22 101:13,17 122:3,20 131:2 145:5 148:8 150:6 151:5 153:21 155:4 157:21 159:8 168:21 172:22 187:18 197:14 206:5,8 207:8 208:10 228:6 229:18 235:14 278:17

**200** 1:20 2:14 6:12

**2000** 27:7,7 48:10 220:12 222:4,6 239:2,4

**20006** 2:9

**2002** 4:15 5:9,12 29:1,1 53:2

53:6 95:11 100:1 109:6,7
116:23 120:10 122:9,14
129:3 130:9,12,17,23 134:5
150:6 217:16 227:18 228:14
228:17 229:14 230:11,17
231:8,9,24 249:3 250:5,7
262:4
**2003** 141:17 148:19 149:14
149:15 152:3 235:4 250:9
**2004** 14:21 26:22 27:2 249:24
250:5,10 253:6,8,15,15,22
**2005** 4:23,23 13:17 14:18,19
14:21,22 15:5,11,14,16
57:13 65:20,21,22 85:5 86:8
86:12,13 87:14 147:9 164:5
168:20 175:6 177:18 179:20
181:21 185:1,2,2 186:16
236:9,14,19,20 253:7
**2006** 56:6,10 57:13 160:11
189:6 194:23 201:2,4
238:18
**2007** 5:7 188:24 196:19 198:1
198:8 201:5,7 203:17
237:13 268:9,13,13
**2008** 199:2 201:14 202:16
206:13,18 207:4
**201** 2:19
**2010** 66:4,6
**2012** 66:4
**2013** 1:20 6:11 51:14 97:12
141:2 183:3 229:11 254:9
255:5,9,10,14,15,18,19
276:8
**202** 2:10
**2022** 278:15
**206** 5:7
**21** 5:8 215:15,20 240:22
244:22 245:4,5,19
**213** 4:5
**21st** 85:4 87:14
**22** 5:9,12 177:21 178:17
179:3 248:21,23 249:17
**2238888** 2:10
**22nd** 181:21
**23** 5:10 97:12 140:21 250:15
250:18
**23rd** 85:5 141:17
**24** 4:23 5:12 145:4 261:21,24
**244** 5:8
**248** 5:9

**24th** 179:18,19,22
**25** 4:23 5:13 44:19,20 96:2
138:3 139:9 269:7,9 270:19
**250** 5:10
**25301** 1:23
**253383843** 2:15
**2547** 198:23
**2548** 198:23
**25th** 179:20
**261** 5:12
**26301** 2:6
**26330** 2:19
**269** 5:13
**26th** 144:23 145:9
**2747** 208:10
**27th** 175:6 188:24 192:14
196:19 197:24 198:7
**28** 48:19 177:21 178:16 179:2
**28th** 185:1 189:15,21
**29** 51:14 177:17
**2nd** 95:11

### 3

**3** 4:11 78:23 79:2 95:11 96:2
157:11 182:22 183:3 236:20
**30** 48:15,18 80:20 97:22 99:4
122:3,19 165:13 247:13
**300** 2:5
**304** 2:6,15,20
**30th** 197:4
**3102** 3:6
**316** 3:17
**31st** 199:2 201:13 206:13,17
207:4
**32** 213:12
**32502** 3:17
**3265318** 2:6
**33** 182:22
**334** 3:12
**34** 141:2 213:15
**3450200** 2:15
**35** 97:7 245:17
**36302** 3:11
**38** 141:18
**3843** 2:14
**39** 59:10 177:20 178:7,11
**3rd** 147:9

### 4

**4** 4:12 83:18 84:18 88:15
90:17 91:14 97:22 99:4

145:5 213:12,15 229:6,11
239:21,24 240:5
**4357059** 3:18
**47** 59:13
**49** 183:3 229:6

### 5

**5** 4:13 81:7 95:4 97:14,16
165:13 228:12,18 276:3,8
276:24 277:2
**50** 36:3,3 37:13,13 42:8,8
44:18 45:7,7 53:13,20 57:11
99:20,20,22 107:11,11
108:6,6,7,7,24,24 113:15,15
123:13,13 124:7,7 129:12
129:12,18,18 130:2,2,8,8,16
130:16,21,21,22,22 131:6,6
131:19,19,22,22 133:22,22
136:13,13 139:1,1 150:4,4
159:8,8 172:22,22 187:12
187:12,16,16 225:22,22
226:4 227:16,16 230:19
231:6,6,15 234:7,12,14
**50th** 96:12
**54** 276:3
**56** 229:11
**57** 276:8,24 277:2

### 6

**6** 4:14,15 5:9 104:21,23
113:13 177:17
**606** 1:23
**63** 154:4
**64** 4:8
**65** 48:14
**6th** 116:23 249:3 254:9 255:5
255:10,15,19,22 257:6,7

### 7

**7** 4:5,15 5:7 113:9,12,13
114:6,10
**72** 4:9
**75** 138:3 139:9
**752194281** 3:7
**78** 4:11
**7931555** 3:12
**7th** 169:7

### 8

**8** 4:16 66:10,13 69:14 118:20
118:23 180:1,2,3 185:5,6

**80** 150:6 151:5 159:8 172:22
 197:14
**800** 2:9
**83** 4:12
**8420460** 2:20
**850** 3:18
**8th** 96:9,11 185:2

---

### 9

**9** 4:17 80:20 125:14,17 126:6
 276:20,21,23
**90** 177:21
**901** 2:19
**90s** 31:4
**910** 2:9
**92** 29:1
**95** 4:13 15:1 18:23
**96** 28:24
**97** 28:24
**99** 45:5 57:9 230:2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF WEST VIRGINIA

GARY W. RICH and LAW OFFICE OF    )
GARY W. RICH, L.C.,               )
                                  )
    Plaintiffs/Counter-           )
Defendants,                       )
                                  )
v.                                 )
                                  )
JOSEPH SIMONI,                     )
                                  )
    Defendant/Counter-Plaintiff.  )
_____   ) CASE NO.
                                  ) 1:12-CV-12-IMK
GARY W. RICH and LAW OFFICE OF    )
GARY W. RICH, L.C.,               ) JUDGE KEELEY
                                  )
    Third-Party Plaintiffs,       ) MAGISTRATE
                                  ) JUDGE KAULL
v.                                )
                                  )
BARON AND BUDD, a professional    )
corporation; COCHRAN, CHERRY,     )
GIVENS, SMITH, LANE & TAYLOR,     )
P.C.; and LEVIN, PAPANTONIO,      )
THOMAS, MITCHELL, RAFFERTY &      )
PROCTOR, P.A.,                    )
                                  )
    Third-Party Defendants.       )
                                  )

    The continued video deposition of JOSEPH
SIMONI, Ph.D., Volume II, taken upon oral
examination, pursuant to notice and pursuant to the
Federal Rules of Civil Procedure, before Teresa A.
VanMeter, CRR, RMR and Notary Public in and for the
State of West Virginia, Wednesday, June 12, 2013,
at 9:00 a.m., at Flaherty, Sensabaugh & Bonasso,
200 Capitol Street, Charleston, West Virginia.

JOHNNY JACKSON & ASSOCIATES, INC.
606 Virginia Street, East
Charleston, WV 25301
(304) 346-8340

```
 1                    APPEARANCES:

 2

 3   On behalf of the Plaintiffs/Counter-Defendants:

 4       ROBINSON & McELWEE, PLLC
         E. Ryan Kennedy, Esquire
 5       erk@ramlaw.com
         140 W. Main Street, Suite 300
 6       Clarksburg, WV  26301
         (304) 326-5318
 7

         MARINO LAW, PLLC
 8       Daniel Marino, Esquire
         dmarino@marinolawpllc.com
 9       910 17th Street, NW, Suite 800
         Washington, DC  20006
10       (202) 223-8888

11   On behalf of the Defendant/Counter-Plaintiff:

12       FLAHERTY, SENSABAUGH & BONASSO, PLLC
         Jeffrey M. Wakefield, Esquire
13       jwakefield@fsblaw.com
         Caleb P. Knight, Esquire
14       200 Capitol Street
         P.O. Box 3843
15       Charleston, WV  25338-3843
         (304) 345-0200
16

     On behalf of the Third-Party Defendants:
17

         BOOTH & MCCARTHY
18       Christopher J. McCarthy, Esquire
         cjmccarthy@booth-mccarthy.com
19       901 West Main Street, Suite 201
         Bridgeport, WV  26330
20       (304) 842-0460

21

22

23

24
```

```
 1              APPEARANCES:  (CONT'D.)

 2

 3   On behalf of the Third-Party Defendant Cochran,
     Cherry, Givens, Smith, Lane & Taylor, P.C.:

 4

         THE COCHRAN FIRM
 5       Angela J. Mason, Esquire
         amason@cochranfirm.com
 6       111 East Main Street
         Dothan, AL  36302
 7       (334) 793-1555

 8   On behalf of the Third-Party Defendant Levin,
     Papantonio, Thomas, Mitchell, Rafferty & Proctor,

 9   P.A.:

10       LEVIN, PAPANTONIO, THOMAS, MITCHELL,
         RAFFERTY & PROCTOR, P.A.
11       William F. Cash, III, Esquire
         bcash@levinlaw.com
12       316 South Baylen Street
         Pensacola, FL  32502
13       (850) 435-7059

14   ALSO PRESENT:

15       Kevin Scarbrough, Videographer

16

17

18

19

20

21

22

23

24
```

1                    I N D E X

2          DEPONENT:  JOSEPH SIMONI, Ph.D.

3

4   EXAMINATION BY:                          PAGE:

5        Mr. Marino  . . . . . . . . . . . .  283
         Mr. Cash    . . . . . . . . . . . .  351
6        Ms. Mason   . . . . . . . . . . . .  471

7

                     EXHIBIT INDEX

8

    DEPOSITION                                PAGE:

9

10       26   November 11, 2002 Memo and Robert    287
              Rossi's Attorneys' Fees

11       27   March 26, 2010 Letter                294

12       28   Detailed Time Summary 1999 to 2009,  299
              Last Updated June 6, 2013

13

         29   Notes From Spelter Meeting, April 30, 319
14            2001

15       30   Estimated Hours For Gary Rich        325

16       31   West Virginia University Annual      336
              Faculty Productivity Report

17

         32   Evaluation of Performance For Calendar 343
18            Year 2001 For Joseph Simoni

19       33   E-mails                              451

20       34   Fax Cover Sheet and Case Citation    484

21       35   Fax Cover Sheet and Geological Survey 494
              Information

22

23

24

1          THE VIDEOGRAPHER:  We're now on the record

2     in the matter of Gary W. Rich and Law Office of

3     Gary W. Rich, LC and Joseph Simoni.

4          My name is Kevin Scarbrough.  I'm a video

5     specialist for Johnny Jackson & Associates located

6     in Charleston, West Virginia.  I'm not related to

7     any of the parties to this action or to counsel of

8     record, nor do I have a financial interest this

9     action.

10          Today's date is the 12th of June 2013.

11     The time is 9:03 a.m.  This deposition is taking

12     place at 200 Capital Street, Charleston, West

13     Virginia.

14          The witness today is Joseph Simoni.

15                         EXAMINATION

16     BY MR. MARINO:

17     Q.   Okay.  Dr. Simoni, good morning.

18     A.   Good morning.

19     Q.   Obviously we know each other.  We've met

20     in the past, and I'm going to call you Dr. Simoni

21     on the record here, if that's okay.

22     A.   Whatever you like is fine with me.

23     Q.   Okay.  I just have a few questions for

24     you.  I'm not going to have a lot.  We'll try to

1    get out of here before the storms come in today.

2              Let me just clarify a couple things.  I

3    think -- when exactly did you meet Gary Rich for

4    the first time?

5         A.   It was in the 1990s, but I don't remember

6    exactly.  I think I said yesterday it was in a

7    courtroom.

8         Q.   Right.  With Larry Harless?

9         A.   Larry Harless had a proceeding in the

10   courtroom.

11        Q.   Right.

12        A.   And Gary and I were there for that

13   proceeding.  We sat in on it just to learn, listen

14   and -- I, at least, for learning.

15        Q.   Right.

16        A.   And he introduced us to each other --

17        Q.   Okay.

18        A.   -- at that time.

19        Q.   So Larry Harless introduced you and Gary?

20        A.   Yes.

21        Q.   Okay.

22        A.   That's the way I remember it.

23        Q.   And was that in the circuit court here in

24   West Virginia somewhere?

1      A.   I think it was in the circuit court

2   Morgantown.  I'm quite sure it was.

3      Q.   All right.  And your recollection is prior

4   to that you hadn't met Gary Rich, correct?

5      A.   Yes.  That's my recollection.

6      Q.   And had you ever heard of him prior to

7   that?

8      A.   Larry might have mentioned -- I'm not

9   sure.  He might have mentioned his friend, you

10  know, Gary Rich to me.  But I don't have a clear

11  recollection of that.

12     Q.   Do you remember whether he told you that

13  he and Larry had been classmates at law school?

14     A.   I do not remember for sure that.

15     Q.   Okay.  And what did -- if you can recall,

16  what did Mr. Harless tell Gary about you?

17     A.   I do not know.

18     Q.   Well, I mean, when you met, how did he

19  introduce you?

20     A.   Oh, just this is Joe Simoni.  Now, whether

21  -- I don't know if Gary knew my name, whether they

22  had mentioned me before.  I don't know.

23     Q.   All right.  Did he tell Gary in your

24  presence that you were a professor at the

1    university?

2        A.    I don't remember that.

3        Q.    And if you can recall, how long before the

4    Econo Lodge meeting that you talked about was this

5    first meeting?

6        A.    It could have been a year.  It could have

7    been two years.  I do not recall.

8        Q.    And you mentioned yesterday that you took

9    the bar exam in West Virginia four times, correct?

10       A.    Yes.

11       Q.    All right.  And at the time that you met

12   Gary Rich, you'd already taken the bar exam at

13   least once or twice.  Is that fair to say?

14       A.    Yes.  Well, no.  At the time that I met

15   him?

16       Q.    Yes.

17       A.    I don't remember when I met him.  In the

18   courtroom, I don't remember when that was.

19       Q.    Okay.

20       A.    I don't remember actually whether that was

21   previous to 1996 or after 1996.

22       Q.    All right.  Is it possible that you met

23   him before you took the bar exam for the first

24   time?

1       A.    It's possible.

2       Q.    And is it possible that you met him before

3    you graduated from law school?

4       A.    In '95?  Possible.

5       Q.    Okay.  Did you ever tell Gary Rich that

6    you had a law degree?

7       A.    I never told him that.

8       Q.    So to your knowledge --

9       A.    Oh, wait a minute.  Maybe -- let me make

10   sure I'm understanding.  Did I ever tell him that I

11   finished law school, that I had a law degree?

12      Q.    Yes, sir.

13      A.    I think that somehow came up in -- I think

14   he -- as a result of communications between us, he

15   learned that.

16           MR. MARINO:  Let's see here.  26.

17           (Deposition Exhibit No. 26 marked.)

18   BY MR. MARINO:

19      Q.    All right.  Showing you, sir, what's been

20   marked as Exhibit 26.

21           MR. MARINO:  Jeff, for you.  Got two.  You

22   guys can share if you want.

23   BY MR. MARINO:

24      Q.    Exhibit 26 purports to be a memorandum

1  dated November 11, 2002 to Gary Rich from Joe

2  Simoni.  It bears Bate number Simoni 0575 through

3  587.  Have you seen this document before, sir?

4      A.   Yes.

5      Q.   And did you, in fact, draft this

6  memorandum?

7      A.   It certainly appears that I did.

8      Q.   Okay.  And you did -- did you do some

9  research on division of fees between -- well,

10 splitting of attorneys' fees?

11     A.   Yes.

12     Q.   And why were you doing that research?

13     A.   Because Gary was involved with the fee

14 split dispute with Masry & Vititoe and Baron &

15 Budd.

16     Q.   Okay.  And so -- and you, in fact,

17 consulted this treatise, Robert Rossi's treatise on

18 Attorneys' Fees, Third Edition?

19     A.   That was something I found when I was

20 researching.

21     Q.   Okay.  And if you look at the second page

22 of the exhibit, you see at the top there's a title

23 that says or a heading that says Division of Fees

24 With Non-Lawyers.  Do you see that?

1    A.    I see that.

2    Q.    Do you recall whether during your research

3    you read that portion of Mr. Rossi's treatise?

4    A.    I don't remember.  I don't remember that I

5    read that.  My -- I don't remember.

6    Q.    Okay.  But suffice it to say that you were

7    certainly aware in 2002 that a lawyer could

8    certainly not split fees with a non-lawyer,

9    correct?

10    A.    Was I aware -- let me just get your

11    question once more, please.

12    Q.    Yeah.  Let me try to rephrase it.  You

13    remember yesterday Mr. McDougal was asking you some

14    questions about ethics courses you took?

15    A.    (Nods head up and down.)

16    Q.    You remember that?

17    A.    (Nods head up and down.)

18    Q.    You indicated yesterday that you

19    understood from your ethics courses from your study

20    for the bar from the MPRE exams that you took that

21    that it was unethical for a lawyer to split fees

22    with a non-lawyer.  You knew that, right?

23    A.    I believe I learned that in the ethics

24    course.

1    Q.   All right.  And that would have been in

2    the nineties, correct?

3    A.   Yes.

4    Q.   All right.  Certainly as of 2002, you

5    understood that Gary Rich could not ethically split

6    fees with you unless you were a licensed attorney,

7    correct?

8    A.   I think I -- it's fair to say that I had

9    that knowledge or information somewhere in my --

10   somewhere in my mind --

11   Q.   Right.

12   A.   -- that I had picked up somewhere along

13   the way.

14   Q.   So yesterday when you were talking

15   throughout the day about agreements that you had

16   with Gary Rich, you talked about a 50/50 split, you

17   talked about a 20/80 split, you referred to it as

18   agreement.  You referred to it as understanding.

19   Do you recall that testimony generally yesterday?

20   A.   Yes.

21   Q.   You knew, you understood that unless you

22   were a licensed attorney, Mr. Rich wouldn't be able

23   to split anything with you, correct?

24        MR. WAKEFIELD:  Object to the form.  You

1    can answer.

2        A.    That was not my understanding.

3        Q.    Okay.  You believed that he could split

4    his fees with you even though you were not a

5    licensed attorney?

6        A.    No, but I believed that there was a

7    possibility, clear possibility of being compensated

8    at the end of the case or cases.  Each case, you

9    know, at the end of each case, if the -- that I

10   believed that I could still be compensated at the

11   end of each case, but that compensation would be

12   linked to the total recovery of the plaintiffs.

13   That's what I always believed.

14       Q.    So you believed you could get a portion of

15   whatever the plaintiffs got in those cases?  Is

16   that --

17       A.    If there would be compensation in some

18   form, that there could be.

19       Q.    Okay.  Well, where did you think the

20   compensation was going to come from?

21       A.    Well, as a result of the communications

22   through the years with Rich, I wasn't exactly clear

23   how it was going to come or how it could end up

24   coming, but I was with the understanding in all of

1    my communications with him that there was a

2    possibility of compensation.

3        Q.   Well, I thought you were testifying

4    yesterday that you thought the compensation was

5    going to come as a portion of the fees that Gary

6    Rich received.  Is that not correct?

7        A.   That the -- well, that the compensation

8    might come from that -- from that amount of money.

9        Q.   Okay.  And so when you were talking about

10   20 percent, 80 percent, 50 percent, 50 percent,

11   what were you talking about?  50 percent of what?

12       A.   Of the amount of money that he received.

13       Q.   And you understood the money he would be

14   receiving would be fees, correct?

15       A.   Yes.

16       Q.   So was your -- what you were trying to

17   tell us yesterday was that you expected to get a

18   percentage of his fees, correct?

19       A.   Yes.

20       Q.   And you knew that, did you not, that

21   ethically he could not share his fees with you if

22   you were -- unless you were a licensed attorney?

23   You understood that, did you not?

24       A.   I had the general understanding of a

1    lawyer not being able to split fees --

2        Q.    Right.  So --

3        A.    -- with a non-lawyer.

4        Q.    Is that why you didn't put the agreement

5    or the understanding in writing?

6        A.    No.

7        Q.    Why didn't you put the agreement or

8    understanding in writing?

9        A.    I do not know.

10        Q.    Did you ever ask Gary to put it in

11    writing?

12        A.    I never did ask him that.

13        Q.    Okay.  Yesterday in response to

14    Mr. McDougal's questions, you said that you've

15    never -- I believe you said you've never made a

16    claim or brought a suit against the Levin

17    Papantonio firm or Baron & Budd or The Cochran Firm

18    with respect to your request for compensation.  Do

19    you recall that?

20        A.    Yes.

21        Q.    What did you understand Mr. McDougal to

22    mean by "a claim" when he asked you that question?

23            MR. CASH:  Objection.

24        A.    Okay.  Could you go back over what you're

1    asking me, please?

2        Q.   Yeah.  I'm trying to understand.  You told

3    Mr. McDougal in part that you've never made a claim

4    against the Levin Papantonio firm or The Cochran

5    Firm or the Baron & Budd firm for compensation in

6    connection with the cases that you worked on.  Is

7    that what you said?

8        A.   I don't know that I actually said that.

9        Q.   Okay.  Well, in fact, you did make a claim

10   against all of those firms for compensation, did

11   you not?

12           MS. MASON:  Object to form.

13           MR. CASH:  Join.

14       A.   I'm thinking maybe we're needing to

15   clarify what you mean as a claim.

16       Q.   Demand.  A demand for compensation.

17       A.   I think early on, there was a -- I don't

18   remember clearly.  I remember some communications.

19   I don't remember the form of the communications

20   with respect to your question of demand.

21           (Deposition Exhibit No. 27 marked.)

22   BY MR. MARINO:

23       Q.   Let me show you what's been marked as

24   Exhibit 26.  I'm sorry.  Is that -- 27.  I'm

1    sorry.  Give you that one.

2            Exhibit 27 purports to be a letter dated

3    March 26th, 2010 from Mr. Wakefield to various

4    people, including Gary Rich, Ed Hill and lawyers

5    from The Cochran Firm, Levin Papantonio and

6    others.  Have you seen this document before?

7        A.   Yes, I have.

8        Q.   And you were aware that your attorney was

9    advising all of those firms that you performed

10   substantial services in the successful prosecution

11   of the DuPont matter, correct?

12       A.   Yes.

13       Q.   In the letter, Mr. Wakefield says, it is

14   the purpose of this letter to provide notice that

15   Dr. Simoni believes he has a claim for compensation

16   for professional services rendered, and is prepared

17   to pursue appropriate remedies to ensure that he

18   obtains adequate compensation, if necessary.  Do

19   you see that?

20       A.   I do.

21       Q.   So you understood that your lawyer was

22   making claim against all of those firms for

23   compensation, did you not?

24            MS. MASON:  Object to form.

1    A.   No that's not my understanding of this

2    text.

3    Q.   Did you know that your lawyer was telling

4    all of those firms that you had a claim for

5    compensation?

6    A.   My understanding is, to the best of my

7    recollection, that my lawyer was telling other

8    firms that I believed that I had a claim, which is

9    the language here in the letter.

10    Q.   Are you aware that your attorney claimed

11    to the Levin Papantonio firm that you had expended

12    1,000 hours in connection with the case and that

13    you were demanding $1.2 million?

14         MS. MASON:  Object to form.

15    A.   Could you repeat that, please?

16    Q.   Yeah.  Were you aware that your attorney

17    was telling the Levin Papantonio firm that you had

18    a claim for $1.2 million for 1,000 hours that you

19    expended in support of the Spelter case?

20         MS. MASON:  Object to form.

21         MR. WAKEFIELD:  Yeah.  I object to form,

22    without foundation.  Never communicated to the

23    Levin firm.

24    BY MR. MARINO:

1    Q.  Well, let me withdraw.

2        Do you know an individual named Virginia

3    Buchanan?

4    A.  I know of her.

5    Q.  And she's a partner at the Levin

6    Papantonio firm, correct?

7    A.  I believe that's correct.

8    Q.  I was provided at one o'clock this morning

9    with an e-mail from that firm, right, where

10   apparently she indicated that you made a claim

11   against the firm for $1.2 million and 1,000 hours

12   of time.  Were you aware that such a claim had been

13   made?

14   A.  Well, I'm not sure that -- I know there

15   was some communication, and I know that -- I know

16   that that amount of money was mentioned in the

17   communication, but I don't know that it was a

18   claim.  I believe there was some communication

19   about that, about that amount of money, but I can't

20   tell you more than that.

21   Q.  Well, were you not demanding back in 2010

22   $1.2 million in compensation?

23   A.  Well, you used the word "demand."  I know

24   there -- again, I know there were communications,

1    and I know there was communication about that

2    amount of money, but I don't want to characterize

3    or agree to that characterization, because I'm not

4    sure that that's what it was.

5         Q.   You did do work with the Levin Papantonio

6    firm in support of the Spelter case, did you not?

7         A.   Yes.

8         Q.   And some of that work you did at their

9    request, right?

10        A.   Yes.

11        Q.   Remember Steve Medina and Carol Moore

12   would periodically make requests to you to perform

13   certain tasks?

14        A.   Yes.

15        Q.   They asked you to accompany George Flowers

16   doing property inspections, et cetera?

17        A.   Yes.

18        Q.   They asked you to go to the Department of

19   Environmental Protection and get documents,

20   correct?

21        A.   Yes.

22        Q.   They certainly knew you were coordinating

23   with the plaintiffs in the case, correct?

24        A.   Yes.

1     Q.   The same is true with The Cochran Firm.

2    They were aware, were they not, that you were

3    coordinating with the plaintiffs in the case?

4         MS. MASON:  Object to form.

5     A.   I believe so.

6         (Deposition Exhibit No. 28 marked.)

7    BY MR. MARINO:

8     Q.   Let me ask you -- I'm showing you what's

9    been marked as Exhibit 28.

10     A.   Okay.

11     Q.   Sorry.  I think I only have one more copy

12    of this.  Actually, I have two.  You can use that.

13         Exhibit 28 purports to be a Detailed Time

14    Summary for 1999 through 2009, last updated June

15    6th, 2013.  This is something that you produced in

16    discovery, correct?

17     A.   Yes.

18     Q.   And this is a document that you prepared,

19    correct?

20     A.   Yes.

21     Q.   And this is -- purports to be a list of

22    dates and hours and descriptions of your activities

23    during that period in support of the Spelter case

24    and the Fairmont case, correct?

1    A.   Yes.

2    Q.   Let me ask you to look at page 29 of this

3    document.  I'll direct your attention specifically

4    to the date August 25, 2003.  Do you see that?

5    A.   Up on the top.  Okay.

6    Q.   Yes, sir.

7    A.   Yes, I see it.

8    Q.   And it references in the description,

9    telephone conference with Rich, Medina, Toolan;

10   included fee split discussion and taking care of

11   Joe reference.  Do you see that?

12   A.   I do.

13   Q.   Can you tell me what that's all about?

14   A.   Well, there was a telephone conference

15   with the parties indicated here in the description,

16   and there was a mention from I believe Steve Medina

17   related to the importance of taking care of Joe.

18   Q.   And you understood that to mean taking

19   care of Joe in what sense?

20   A.   I think it related, to the best of my

21   recollection, to compensation.

22   Q.   But do you understand that -- you

23   understood at the time that Steve Medina was a

24   partner at the Levin Papantonio firm?

1    A.    Yes.  I --

2    Q.    I'm sorry?

3    A.    Yes, he was.

4    Q.    And you understood him to be saying that

5    it was important to take care of Joe financially or

6    through compensation because of all the efforts

7    that you had put into the case, correct?

8    A.    That was my understanding.

9          MS. MASON:  Object to form.

10   Q.    Did you ever talk with Steve Medina about

11   that conversation after he had left the Levin

12   Papantonio firm?

13   A.    Never did.

14   Q.    At one point you asked him to provide you

15   with an affidavit in support of your case in this

16   litigation, correct?

17   A.    Yes.

18   Q.    And you wanted --

19   A.    Well, let me -- if I may.

20   Q.    Sure.

21   A.    I don't know that I ever -- I did have

22   communication with him, and the communication was

23   about support in the sense of simply telling what

24   he knew to the best of his recollection about my

1    contributions in the case.  I don't know that I

2    ever actually asked him for an affidavit.  It may

3    have happened, but I don't remember.

4        Q.   Okay.  Again, I was provided with an

5    e-mail at one o'clock this morning that -- I woke

6    up and saw it.  It seemed to indicate that you sent

7    an e-mail to Steve Medina asking him to provide an

8    affidavit, that you were asking Nancy Eichler to do

9    the same thing, and Mr. Medina refused to do that,

10   refused to provide an affidavit.  Does that refresh

11   your recollection?

12       A.   It refreshes my recollection a little bit,

13   and that e-mail that you're talking about may have

14   occurred.  I just do not remember it at this

15   moment.

16       Q.   And do you recall he's apparently -- it

17   appears from the e-mails he's gotten out of the

18   litigation business, didn't want to be involved in

19   the litigation.  Is that --

20            MS. MASON:  Object to form.

21            MR. WAKEFIELD:  Yeah, and let me just

22   object.  We haven't seen the e-mails, because

23   again, we were notified at 1:01.

24            MR. MARINO:  I understand.  I'd show you a

1    copy but I didn't have time to print it out.

2         MR. CASH:  I did have time to print it

3    out, and I'd be glad to give it to everybody.

4         MR. MARINO:  Yeah, that's fine.

5         MR. CASH:  It was one of the two documents

6    I was planning to ask Dr. Simoni about here.  I

7    just don't want there to be a statement that people

8    don't have access to the document, because it is

9    here if you want to see it.

10        MR. MARINO:  Okay.  I don't want to

11   belabor --

12        MR. WAKEFIELD:  I only want you to respond

13   to questions.  All right?

14        THE DEPONENT:  Yeah, I was just going to

15   ask if you had a question about that.  That's all.

16        MR. MARINO:  I don't want to belabor --

17        MR. WAKEFIELD:  If he has questions, he'll

18   tell you he has a question.

19        THE DEPONENT:  Okay.  All right.

20   BY MR. MARINO:

21        Q.   The -- with respect to The Cochran Firm,

22   do you believe that -- you understood that they

23   received fees from the Spelter litigation, correct?

24        A.   Yes.

1    Q.   And the Spelter litigation was apparently

2    successful, right?

3    A.   Yes.

4    Q.   Do you feel like you made a contribution

5    to that success?

6    A.   A major contribution.

7    Q.   Major?  And how did you make a

8    contribution to the success of that case?

9    A.   Well, first, I discovered the case.  Then

10   I was the major party with respect to organization

11   of it.  Thirdly, I was the major party with respect

12   to all of the investigation, the early

13   investigation in the first year of -- and into the

14   second -- in the first year, definitely I was the

15   major party with respect to investigation and

16   turning up materials that were important to the

17   case.

18        Later on, I also was important because I

19   was involved with turning up documents from

20   different sources, West Virginia DEP, different

21   agencies and so forth.

22        I also played a major role in the soil

23   sampling, which was the key element in the case,

24   that that -- my understanding is that that made the

1    case.  It was the scientific link that was needed

2    to make the case, and I played a major, major role

3    in that.

4         Q.   All right.  And -- I'm sorry.  Go ahead.

5         A.   Well, that -- I'll leave it at that.

6         Q.   And nobody -- this was not a secret that

7    you were doing all this, right?

8              MS. MASON:  Object to form.

9              MR. CASH:  Object to form.

10             THE DEPONENT:  May I answer that?

11   BY MR. MARINO:

12        Q.   You answer.

13             MR. WAKEFIELD:  You answer unless I tell

14   you not to answer.

15        A.   Oh, okay.  Okay.  I believe it was not a

16   secret.

17        Q.   Right.  In fact, you had e-mail

18   communications and you had telephone calls with

19   both The Cochran Firm and the Levin Papantonio firm

20   about what you were doing, correct?

21             MS. MASON:  Object to form.

22             MR. CASH:  Object.

23        A.   I had many communications with Levin and

24   Papantonio firm.  I had, as I've -- I believe I

1    testified yesterday, limited communication with

2    people at The Cochran Firm.

3        Q.   And those people would have been Farrest

4    Taylor?

5        A.   At The Cochran Firm?

6        Q.   Yes.

7        A.   Well, yes.  But, I mean, Farrest Taylor

8    was with The Cochran Firm, but I never had --

9    during my work in the case, I don't remember direct

10   communications with the Farrest Taylor.

11       Q.   Okay.  Who from The Cochran Firm did you

12   communicate with?

13       A.   Well, again, my communications with The

14   Cochran Firm were rather limited.  I testified

15   yesterday to some communication with -- some

16   contact with Keith Givens and that I had met

17   Farrest Taylor a couple of times, one in -- one

18   time at Clarksburg; interacted with him another

19   time in June of '05, I believe, in Spelter.  But

20   they were limited contacts with Farrest Taylor.  At

21   least I would term them limited.

22       Q.   Let me ask you to look at -- if you can

23   dig out Exhibit 19, please.

24       A.   19?

1      Q.   Yes, sir.  This is a two-page document,

2  handwritten notes.  It says Keith Givens at the

3  top.

4      A.   They took all my exhibits from me

5  yesterday.  I'm sorry.

6          MR. WAKEFIELD:  They're sitting there in

7  front of you.

8          THE DEPONENT:  Oh, you put them there.

9  Thank you.  I'm sorry.  I didn't realize you done

10 that.

11         COURT REPORTER:  That's okay.

12         THE DEPONENT:  And you have them in order,

13 right?

14         COURT REPORTER:  Yes.

15         THE DEPONENT:  I was fumbling around

16 yesterday every time I needed to look.

17         Okay.  I'm sorry.  We're looking at 19?

18 BY MR. MARINO:

19     Q.   Yes, sir.

20     A.   Okay.  I have it.

21     Q.   And this is -- we talked a little bit

22 about this yesterday.  These are your handwritten

23 notes, correct?

24     A.   Yes.

1    Q.   And they're -- am I correct that they're

2    notes of a call that you had with Keith Givens on

3    March 31st, 2008?

4    A.   At this point, I really can't say that.

5    All I know is they were made then.

6    Q.   You mean on that date, at that time?

7    A.   Yes.

8    Q.   10:00 a.m.

9    A.   That's my sense of it, anyway.

10   Q.   Okay.  You indicate, update, post-trial

11   motions denied.  I mean, is that information that

12   someone's giving you?  You don't know?

13   A.   I'm not sure.

14   Q.   Let me ask you to look at the note there

15   that's -- it's number three.  It says attorneys'

16   fees.  And then next to that there's a -- looks

17   like a K to the right.  You see that?

18   A.   Yes.  I see it.

19   Q.   All right.  And above that, it looks like

20   you've written O.K.ED, which I interpret as okayed,

21   and then it looks like 50K and dollar signs.  I

22   interpret that as somebody saying, okay $50,000.

23        MS. MASON:  Object to form.

24   Q.   Is that what it looks like to you?

1          MS. MASON:  Object to form.

2      A.   It looks like something like that.

3      Q.   Keith Givens told you that he'd okay

4  $50,000 to be paid to you; isn't that right?

5          MS. MASON:  Object to form.

6          MR. CASH:  Object to form.

7          MR. WAKEFIELD:  Object to form,

8  foundation.

9      A.   That definitely is a no.

10     Q.   Okay.  He never told you that he was okay

11  with paying you money?

12     A.   I never had any communication with Keith

13  Givens about compensation for me except -- except

14  at the time of the second day of my deposition here

15  in Charleston, when I talked to him about the

16  situation that I felt that I was in.

17     Q.   Okay.  And that was before March 31st,

18  2008, correct?

19     A.   That was in the summer of 2007.  Yes.

20     Q.   And at the end of that deposition or after

21  that deposition, as I understand it, he was getting

22  in his car and he said something to the effect of,

23  I'll take care of that matter we were talking

24  about, words to that effect, correct?

1      A.   He did say --

2           MS. MASON:  Object to form.

3      A.   He did say something like that, yes.

4      Q.   And the matter that you understood that

5  you'd been talking about was your compensation,

6  correct?

7      A.   Yes.

8      Q.   All right.  And you were present at Gary

9  Rich's testimony when -- or his deposition when he

10  testified that he had a meeting with Keith Givens

11  and Farrest Taylor in June of 2007, right, where

12  they discussed your compensation?  Do you recall

13  that testimony?

14           MS. MASON:  Object to form.

15      A.   I was there the first day of the

16  deposition, and I read the second day segment, but

17  I don't remember specifically what you're referring

18  to.  At this point, I don't.

19      Q.   Do you remember Gary Rich testifying

20  either by being present or reading the transcript

21  that Keith Givens indicated to him that he had no

22  problem with compensating you?

23           MS. MASON:  Object to form.

24      Q.   Do you remember that testimony?

1      A.    I don't remember that specific testimony.

2    I remember -- I have a recollection of there having

3    been some communication between them about

4    compensation.

5      Q.    You remember after -- do you remember

6    after your attorney wrote to The Cochran Firm and

7    the other firms that we talked about in the

8    previous exhibit, the firms indicating that they

9    had no problem with compensating you?

10          MS. MASON:  Object to --

11      Q.    Do you remember being told that they had

12    no problem with doing that?

13          MS. MASON:  Object to form.

14          MR. WAKEFIELD:  I'm going to object to any

15    communications between the witness and his counsel

16    and instruct you not to respond to that.

17    BY MR. MARINO:

18      Q.    Take a look at Exhibit 11, please, if you

19    have that in front of you.

20      A.    I should have if this young woman gave me

21    everything.

22      Q.    Should be in the same set.

23      A.    Exhibit 11.

24      Q.    Yes.

1    A.   I have it.

2    Q.   Okay.  I'd like to ask you to look at the

3    bottom of that exhibit again.  These appear to be

4    handwritten notes of yours from January 23 of '03.

5    Is that what that is?

6    A.   Of '03, yes.  Sorry.

7    Q.   Yeah, I just have to just go back to this

8    note on one -- it looks like 1/24/03 at the bottom

9    where it says, met with Scott.  I think you said

10   yesterday that you didn't -- I think you said you

11   didn't know who Scott was, who that refers to.

12   A.   I don't remember what I said yesterday,

13   but go ahead.

14   Q.   Do you know who Scott is, who that Scott

15   is?

16   A.   Well, I know Scotts.  Are you asking me if

17   I know who this Scott was?

18   Q.   Well, this note references -- it says,

19   call to John, Junior.  I guess that's John Simoni

20   in New York, right?

21   A.   Yes.

22   Q.   Okay.  And it says, met with Scott.  I

23   mean, can you tell me who met with Scott, who Scott

24   is?

1       A.    Well, it certainly wasn't my meeting with

2    Scott.

3       Q.    Okay.

4       A.    I don't know -- I think you're -- I mean,

5    I think it's correct to interpret this as somebody

6    meeting with Scott, but I don't know who that was.

7       Q.    All right.  I want you to put that aside,

8    if you would, and take a look at Exhibit 11 -- I'm

9    sorry, Exhibit 10 to --

10      A.    Exhibit 10.

11      Q.    Yes, sir.  You discussed this yesterday.

12      A.    I have it.

13      Q.    I just want to follow up on one of

14   Mr. McDougal's questions on that exhibit.

15           Mr. McDougal asked you about your

16   agreement with Gary Rich again, and he said that --

17   he asked you -- he said you memorialized that

18   agreement in Exhibit 10, and you responded, yes,

19   that you had done that.  Do you recall that

20   testimony yesterday?

21      A.    I do not recall that.  Did I say I

22   memorialized it?  I don't know.

23      Q.    The record says what it says, but I --

24           MR. WAKEFIELD:  Yeah.  I mean, the record

1    will say what it says.

2       A.    Yeah, I don't remember that.

3       Q.    I remember him asking you if you

4    memorialized it in Exhibit 10, and you said yes.

5    So that's why I'm following up, because you didn't

6    memorialize any agreement in Exhibit 10, did you?

7             MS. MASON:   Object to form.

8       A.    Okay.   I think I'm understanding that he

9    was saying that I made notes about that agreement

10   in this exhibit.

11      Q.    Well, let me just ask it a little

12   differently.   Exhibit 10, as I understood your

13   testimony in response to questions from Ms. Mason,

14   I thought you'd indicated that you didn't know

15   whether these were notes of a meeting or of a phone

16   call; you weren't sure what the notes were.

17            Can you tell me now what these are notes

18   of on Exhibit 10?

19      A.    No, I can't.

20      Q.    It says at the top, meeting with Gary.

21   And I mean, I think you indicated that -- yesterday

22   that sometimes you would make notes of meetings

23   during meetings.   Sometimes you would make notes of

24   meetings after meetings.   Do you recall that?

1      A.   Yes.

2      Q.   Did you ever make notes for an agenda

3   prior to a meeting?

4      A.   I believe probably I did.

5      Q.   Okay.  Let me ask you to look at -- I

6   think it's Exhibit 26 is the -- the detailed time

7   sheets.  Do you have that?  I've probably got the

8   wrong exhibit number, but...

9           MR. WAKEFIELD:  It's Exhibit 28.

10          MS. MASON:  28.

11     Q.   28.  There you go.  Go back to that,

12   please.

13     A.   Sure.

14     Q.   And go to the entry, if you would, for

15   December 12, 2002.

16     A.   With respect to what case is that?

17     Q.   Well, hang on a second.  Let me see if I

18   can find it for you.

19     A.   Well, if you give me a page number,

20   maybe.

21     Q.   Yeah.  That's what I'm going to try --

22          MR. CASH:  Try 13.

23     Q.   Yeah.  Page 13, about the middle of the

24   page.  Do you see that?

1     A.   Yes.  12/12/2002?

2     Q.   Right.  There's a reference there to a

3   meeting with Rich on December 12th, correct?

4     A.   Yes.

5     Q.   You don't -- do you have a meeting with

6   Rich on December 11 anywhere?

7     A.   On December 11?  Not here.

8     Q.   December 11, 2002.

9     A.   Yeah, I --

10     Q.   I'm trying to understand whether these,

11   the notes that you have here that are dated

12   December 11, 2002, relate to the meeting that you

13   had with Mr. Rich on December 12th, 2002.

14     A.   I don't know, and -- no, I don't know.

15     Q.   Is it possible that on the day before

16   December 11, you prepared an agenda for your

17   meeting with Mr. Rich on the next day?

18          MR. WAKEFIELD:  Object to the form.

19     A.   Possible.

20     Q.   All right.  Now, you attended a number of

21   client meetings and potential client meetings,

22   these sort of big affairs where people would gather

23   in a firehouse and places like that, right?

24     A.   Yes.

1    Q.    And you did that in connection with both

2    the Fairmont case and the Spelter case?

3    A.    Yes.

4    Q.    And what was the purpose of those

5    meetings?

6    A.    The purpose of the meetings generally was

7    to inform and update people.  That was the general

8    purpose.

9    Q.    Okay.  And was one of the purposes to

10   generate interest in the case and find plaintiffs

11   for the cases?

12   A.    Yes.

13   Q.    Okay.  And was there a set script for

14   these meetings in terms of who would speak and what

15   they would say?

16   A.    A set script?

17   Q.    Yes, sir.

18   A.    I would say not a set script.

19   Q.    Would you speak at the meetings?

20   A.    Yes.

21   Q.    And what would you talk about?

22   A.    I would talk about first if there were

23   people there who might -- I had no previous contact

24   with, I would introduce myself and give them a

1    little background for myself.  And then I would

2    explain about my involvement with -- my

3    environmental interest and involvements and talk

4    about that, those things, and then I would

5    introduce Gary Rich, and then he would proceed with

6    whatever he wanted to say.

7        Q.   How would you describe yourself to the

8    people at the meetings?  Would you say you were a

9    professor at the university, as an example?

10       A.   I would -- yeah, I would say I was a

11   professor at the university.  The reason why I

12   would mention that is because people in Harrison

13   County, for example, and Spelter, which is a

14   small -- as you know, a small community, could

15   relate to that very well.

16       Q.   Would you explain to the people attending

17   these meetings why you were involved?

18       A.   I may have said something about that.

19       Q.   Is it true that you would tell people that

20   one of the reasons you were involved was because

21   you wanted to help the residents of the

22   communities?

23       A.   I don't know that I said that

24   specifically.

1    Q.    You certainly didn't tell them that you

2    expected to get a financial benefit from your work

3    on the cases, did you?

4    A.    No.

5    Q.    In fact, you told them that you would not

6    financially benefit for your work on the cases.

7    A.    Never said anything about that.

8         (Deposition Exhibit No. 29 marked.)

9    BY MR. MARINO:

10    Q.    Okay.  Let me show you Exhibit 29.  This

11    purports to be the notes from the Spelter meeting,

12    April 30, 2001, and this is a document that was

13    produced to us by Levin Papantonio, which

14    apparently was produced by the defendants in the

15    Spelter case.  Have you seen this document before?

16    A.    I believe I've seen it.

17    Q.    And did you see it back during the Spelter

18    case, or have you seen it in connection with this

19    litigation?

20    A.    I don't remember when I first saw it.

21    Q.    Okay.  When you did see it, if you look at

22    the third bullet point, did you see the part where

23    this gentleman, R.L. Williams says, Joe Simoni, or

24    Simone -- he misspells your name -- does not

1   participate in financial settlements?  Do you see

2   that?

3          MS. MASON:  Which bullet point are you at,

4   Dan?

5          MR. MARINO:  Number three.  It's like the

6   third sentence.

7          MS. MASON:  Got it.  Sorry.

8          THE DEPONENT:  Let's see.  In bullet

9   number three.

10  BY MR. MARINO:

11     Q.   Yes, sir.  It's the third sentence in that

12  bullet.

13     A.   You're asking me to look at, they seek out

14  out-of-state law firms, that one?

15     Q.   Well, there's -- that's the second

16  sentence, I believe, and then it says Joe Simone

17  does not participate in financial settlements.  Do

18  you see that?

19     A.   I see that sentence, yes.

20     Q.   Isn't that something that you said at the

21  meeting on April 30, 2001?

22     A.   I don't remember ever saying that.

23     Q.   Okay.  Is it possible that you would tell

24  potential plaintiffs that you were not going to

1    participate in financial settlements?

2         A.    I know I never did that.

3         Q.    Other than your lawyers and possibly your

4    wife, did you tell anybody else about these

5    agreements that you said you had with Gary Rich?

6              MR. CASH:  I just -- I lost your

7    question.  I'm sorry.

8         Q.    Yeah.  I said, other than your lawyers or

9    your -- possibly your wife, did you tell anyone

10   else about these agreements that you said you had

11   with Gary Rich?

12        A.    I believe I talked with Robert Sweeney.

13        Q.    And you told him that you had general

14   agreements with Gary Rich to split his fees with

15   you?

16        A.    I don't remember the communications, but I

17   believe I talked to him about my expectation of

18   compensation, but I don't remember the details.

19   But I believe I had communications with Robert

20   Sweeney.

21        Q.    Other than Robert Sweeney, did you tell

22   anyone else about that expectation?

23        A.    I believe I talked with John Simoni when

24   he was involved.

1    Q.   In fact, you had some discussions with

2   John Simoni about ways that you could structure

3   that compensations -- the compensation, the ways it

4   could be done.  Is that fair?

5    A.   I think it's fair to say that John, my

6   nephew and I, talked about a lot of things, the

7   specifics of which I do not remember.

8    Q.   Well, you talked about that, right?  You

9   talked about the possibility of, you know, you

10  being a 1099 employee, those kinds of things that

11  we've talked about in Exhibit 10, correct?

12   A.   I don't remember specifically.  I mean,

13  if...

14   Q.   Okay.  Other than John Simoni and the

15  people you've already mentioned, did you tell

16  anyone else about your expectation of compensation

17  from Gary Rich?

18   A.   I can't say for sure that there were no

19  other parties that I ever mentioned it to, but I --

20  at this moment, I don't recall any others.

21   Q.   There were a number of times where

22  attorneys came from out of town, including me and

23  Mike Garson, right, to look at the Spelter site and

24  go on tours with you, correct?

1      A.   That's correct.

2      Q.   Went with you, correct?

3      A.   Right.

4      Q.   Did you tell any of those lawyers that you

5    expected that you were going to get compensation

6    from Gary Rich?

7      A.   No.  I don't believe -- I don't believe

8    so.

9      Q.   Didn't they ask you?

10     A.   I don't remember any communication.

11     Q.   Well, when those lawyers asked you who you

12   were, why you were involved, you told them it was

13   because you were concerned about the residents of

14   Fairmont and Spelter, right?

15     A.   I told them that was one of the reasons

16   why I was involved.  If they --

17     Q.   You certainly didn't tell them --

18     A.   If they asked me why I was involved, I'm

19   sure I told them that that was one of the reasons.

20     Q.   You certainly didn't tell them that you

21   were expecting to split fees with an attorney in

22   West Virginia, did you?

23     A.   I don't remember that communication, if

24   there was any or what it was.

1    Q.   You mentioned Mr. Sweeney, and as I

2    understand it, he actually -- he paid you $30,000

3    for your work on the West Virginia University case,

4    correct?

5    A.   Yes.

6    Q.   And if I understand correctly, you were a

7    plaintiff in that case, correct?

8    A.   I was a member of the class.

9    Q.   Did you sign a retainer agreement with

10   Gary Rich and Bob Sweeney as a plaintiff?

11   A.   I do not recall.

12   Q.   Did any of the other plaintiffs get paid

13   money in addition to whatever benefits came out of

14   the lawsuit?

15   A.   Not that I'm aware of.

16   Q.   Did any of the plaintiffs get money from

17   the lawsuit besides you?

18        MR. CASH:  Objection.

19        MS. MASON:  Objection.

20   A.   I do not know.

21   Q.   I'm sorry?

22   A.   I do not know.

23   Q.   Well, Gary Rich told you that there was no

24   money from the West Virginia case, correct?

1          MR. CASH:  Object.

2     Q.    Do you remember him saying that to you?

3     A.    I don't believe I ever said that or...

4          (Deposition Exhibit No. 30 marked.)

5  BY MR. MARINO:

6     Q.    Okay.  Let me show you what's been marked

7  as Exhibit 30.  These are -- it's a document we

8  received from Mr. Sweeney.  Can you tell me whose

9  handwriting this is?

10     A.    That's mine.

11     Q.    Okay.  And you prepared this for

12  Mr. Sweeney so he could pay you for your time

13  expended on the West Virginia case, correct?

14     A.    Yes.

15     Q.    And he paid you -- I guess he agreed to

16  pay you $150 per hour; is that correct?

17     A.    No.

18     Q.    You reported to him that you had a total

19  of 760.5 hours, correct?

20     A.    Yes.

21     Q.    And he -- for those 760 hours, he paid you

22  $30,000; is that correct?

23     A.    Yes.

24     Q.    Why did he agree to pay you for your work

1    on the West Virginia case?

2            MS. MASON:  Object to form.

3       A.   Because he wanted to be sure that I was

4    receiving something for the substantial work that I

5    did in the West Virginia case.

6       Q.   You didn't have an agreement with him, a

7    preexisting agreement to pay you?

8       A.   Definitely not.

9       Q.   So he just -- he basically did this

10   because he wanted to make sure you got something,

11   correct?

12           MS. MASON:  Object to form.

13      A.   That was my understanding.

14      Q.   And the hours that you reported in the

15   descriptions, were these based upon -- and this,

16   again, in Exhibit 30 -- were these based upon

17   contemporaneous time records that you kept?

18      A.   No.

19      Q.   How did you come up with the hours?

20      A.   A combination of notes and papers that I

21   had collected over time combined with his time

22   records.  Mr. Sweeney's time records.

23      Q.   Okay.  The last page of the document has

24   the total hours.  This is on Bate number 040, and

1    then there's a calculation, 760.5 at 150, slash,

2    hour, and then there's a calculation applied to

3    that, 60 percent of that, 68,445.  Is that your

4    writing?

5         A.    That's my writing.

6         Q.    Okay.  And what were you trying to do

7    there?

8         A.    With what?  With --

9         Q.    Well, was that what you were demanding in

10   terms of, you know, compensation for your time?

11        A.    I wasn't demanding anything.

12        Q.    Were you asking for compensation?

13        A.    I wasn't actually asking for compensation.

14        Q.    So why did you write the number 68,445?

15        A.    Because he asked me to compile my hours

16   and submit them to him, and that's what I did.

17        Q.    Okay.  Well, that's -- you did that when

18   you said 760.5, right?

19        A.    Yes.

20        Q.    So why are you doing that other

21   calculation?  What's that for?

22        A.    Are you referring to the calculation below

23   the 60 percent?

24        Q.    Referring to the one I just went through.

1  You multiplied 760.5 times 150.  You came up with

2  $114,075.  You multiplied that by .6.  Why did you

3  do all that?  What was that for?

4      A.   Oh, he said to -- he asked me to calculate

5  the hours or to give him the hours and put in an

6  hourly rate and come up with a total.

7      Q.   Total what?  Total of what he should pay

8  you or...

9      A.   A total of what the number of hours times

10  the hourly rate would be.

11      Q.   Okay.  Well, that's -- that was -- you

12  used a rate of $150, right?

13      A.   I used the rate of $150.

14      Q.   How did you come up with that rate?

15      A.   I do not remember actually.

16      Q.   But --

17      A.   I --

18      Q.   Go ahead.

19      A.   Well, I do not remember.

20      Q.   Okay.  In any event, that totals up to

21  114,000, right?  Then why did you apply a .6

22  multiplier to that?

23      A.   My understanding from communications with

24  Mr. Sweeney was that all of the parties involved

1    with the West Virginia case, the -- meaning the

2    firms, they had had an agreement, of course, a fee

3    split agreement.  And I don't know the details or

4    even remember what I was -- gotten communications

5    with him, but the sum total of it was that all of

6    the parties needed to take a 40 percent cut, and so

7    I was figuring in a 40 percent cut there.

8        Q.    All right.

9        A.    From the total.

10       Q.    So that makes -- that brings the number to

11   68,445, right?

12       A.    Yes.

13       Q.    So why did you get 30,000 instead of

14   68,000?

15       A.    Well, you have to understand, I believe,

16   that this was not a demand.  I was not asking.

17   This is something that he asked me to do.  And my

18   understanding -- my understanding is that he was --

19   we had no agreement for compensation previous to

20   that or anything like that.  He was trying to help

21   me out, and he ended up being able to do 30,000,

22   because in the context of his work, his firm and

23   his work situation, that's what he was able to do.

24   And he was -- you know, he was just communicating

1    to me that this is what I can do for you.

2         Q.   All right.  So you've calculated 68,445,

3    and then he came back to you and said, I can give

4    you 30?

5         A.   That's what I recollect.

6         Q.   All right.  It wasn't, I can give you 30,

7    and now give me the hours to justify the 30?  It

8    wasn't like that?

9         A.   It was -- I gave him --

10        Q.   Okay.

11        A.   I calculated hours, and that's what he

12   told me.  To the best of my recollection, I guess.

13        Q.   I just have really one more area I want to

14   cover with you and I think we'll be finished.  But

15   with respect to Mr. Medina, he defended you at your

16   first deposition in the Spelter case, correct?

17        A.   He did.

18        Q.   Did you understand why you were being

19   deposed in that case?

20        A.   Generally, I did.

21        Q.   Can you --

22        A.   I was --

23        Q.   Can you tell us in one sentence?

24        A.   Well, I was a key party.

1    Q.   Okay.

2    A.   A key player in the case.  And, I mean, if

3  you're asking me -- well, let me leave it at that.

4  I was a key party.

5    Q.   Did you -- you're familiar with the term

6  "statute of limitations"?

7    A.   I am.

8    Q.   Did you understand or believe that you

9  were a key witness on the issue of statute of

10  limitations in that case?

11    A.   I did.

12    Q.   And when did you first have that

13  understanding?  Let me withdraw that.

14         You understood that when you were being

15  deposed in the Spelter case, correct?

16    A.   I did.

17    Q.   And when Mr. Medina was preparing you for

18  your deposition, you understood that, correct?

19    A.   I did.

20    Q.   And you understand that Mr. Medina

21  struggled somewhat with how to describe you, what

22  your role was in the case.  Do you remember that?

23         MR. CASH:  Object.

24         MS. MASON:  Object to form.

1        MR. WAKEFIELD:  Yeah, I'll join.  Object

2   to the form of the question as well.

3   BY MR. MARINO:

4        Q.   You can answer.

5        A.   I don't remember him struggling.

6        Q.   Well, did she (sic) discuss with you how

7   you were going to be described, how you were going

8   to testify as to what your role was?

9             MS. MASON:  Object to form.

10            MR. CASH:  I'm going to object and point

11  out that that hinges on the work product privilege.

12       Q.   You can answer.

13       A.   I'm sorry.  Your question, please?

14       Q.   Yeah.  Do you remember discussing with

15  Mr. Medina prior to your deposition how you were

16  going to be described to the other side, what you

17  were going to say your role was in the case?

18       A.   Yes.

19       Q.   And do you remember him telling you

20  that -- or at least discussing with him that you

21  would be described as an unpaid consultant?

22       A.   A non-testifying consultant.  Unpaid

23  consultant, I believe.

24       Q.   Non-testifying and unpaid, right?

1      A.   I believe that was the characterization.

2      Q.   And you understood that you -- you

3  remember during your first deposition, the first

4  day of your deposition, Mr. Medina objected and

5  instructed you not to answer questions based on the

6  fact that you were a non-testifying consultant to

7  some extent, correct?

8      A.   Yes.

9      Q.   And you knew there was litigation over

10 that issue, right, in the circuit court in

11 Clarksburg, correct?

12          MS. MASON:   Object to form.

13     Q.   And you understood -- let me withdraw it.

14          You understood that the defendants in the

15 Spelter case filed a motion to compel your

16 testimony when you were instructed not to answer

17 questions because you were a unpaid, non-testifying

18 consultant.  Do you remember all that?

19     A.   Yes.

20     Q.   You understood that the Levin Papantonio

21 firm and The Cochran Firm were describing you to

22 Judge Bedell in that case as a unpaid,

23 non-testifying consultant, correct?

24          MS. MASON:   Object to form.  Let me

1    just --

2        A.    Are you asking me about post-deposition?

3        Q.    Yeah.    After your -- the first day of your

4    deposition, during the deposition Mr. Medina had

5    instructed you not to answer certain questions.

6    The defendants went to court in front of Judge

7    Bedell and moved to compel answers to those

8    questions.    You knew that, right?    Yes?

9        A.    Yes.

10        Q.    And you knew that Mr. Medina, The Cochran

11    Firm, the Levin Papantonio firm were describing --

12    in response to that motion were describing you as

13    an unpaid, non-testifying consultant, correct?

14            MS. MASON:    Object to form.

15        A.    Yes.

16        Q.    All right.    And you -- then you later

17    learned that Judge Bedell -- the discovery

18    commissioner and Judge Bedell both disagreed and

19    said, no, he's not an unpaid consultant; he's a

20    community activist.    You knew about all that,

21    right?

22            MS. MASON:    Object to form.

23            MR. CASH:    Objection.

24        A.    Yes.

1    Q.    And they ordered you to answer those

2    questions right?

3    A.    Yes.

4    Q.    When you found out that Mr. Medina, the

5    Levin Papantonio firm, The Cochran Firm were going

6    to describe you as an unpaid consultant, did you

7    object to that?

8            MS. MASON:  Object to form.

9    A.    No.  May I explain?

10           MR. WAKEFIELD:  I --

11   Q.    That's up -- that's fine.

12           MR. WAKEFIELD:  Explain your answer if you

13   feel necessary to do so.

14   Q.    Yeah.  Go ahead.

15   A.    My understanding was that was unpaid with

16   respect to Levin and Papantonio.  And so I didn't

17   think a whole lot of it.

18   Q.    So you thought when they told the judge

19   that you were an unpaid consultant that they only

20   meant they weren't paying you, correct?

21           MS. MASON:  Object to form.

22   Q.    Is that what you thought they meant?

23           MS. MASON:  Object to form.

24   A.    That they were -- I thought they were

1   characterizing me as a non-testifying, unpaid

2   consultant for them.  Yes.

3       Q.   All right.  And you never told anybody in

4   your deposition, in two days of deposition that you

5   were expecting payment for your work on the Spelter

6   case, did you?

7            MR. CASH:  Objection.

8       A.   Could you repeat that, please?

9       Q.   In two days of your deposition in the

10  Spelter case, you never told anyone that you were

11  expecting to be paid for your work on the Spelter

12  case, correct?

13           MR. CASH:  Object.

14      A.   Correct.

15      Q.   And you knew that the lawyers were

16  describing you to the judge as an unpaid

17  consultant, correct?

18      A.   Yes.

19           (Deposition Exhibit No. 31 marked.)

20  BY MR. MARINO:

21      Q.   Okay.  I'll show you what's been marked as

22  Exhibit 31.

23           MR. WAKEFIELD:  Do you have a copy for

24  me?

1          MR. MARINO:  Oh, I'm sorry.  I'm going to

2     need to take one of those back from Jeff.  I only

3     have four of those.  Sorry about that.

4          MR. WAKEFIELD:  Thank you.

5     BY MR. MARINO:

6          Q.   Dr. Simoni, this is a series of documents

7     in this exhibit that we obtained from West Virginia

8     University.  Purports to be an Annual Faculty

9     Productivity Report for 2002, and I'll represent to

10    you that the original document has several

11    attachments, as you know, I think.  But the only

12    attachments on this document are attachments seven

13    and nine.  Do you have --

14         A.   You want us to look at seven and nine?

15         Q.   Well, not at this point.  Just -- if you

16    could just tell me if I'm correct in my

17    understanding that annually, when you were a

18    professor at the university, you had to submit a

19    faculty productivity report.

20         A.   That's true.

21         Q.   And you would submit that for purposes of

22    you being evaluated for promotion, for tenure,

23    various things, correct?

24         A.   That's correct.

1    Q.   Now, and did you retire as an associate

2    professor?

3    A.   Yes.

4    Q.   And the purpose -- if I understand it

5    correctly, when you were a professor at the

6    university, you were evaluated based on primarily

7    three items, teaching, research and presumably

8    publication, and service, correct?

9    A.   Yes.

10   Q.   And is it fair to say that you -- well,

11   just you were subject to some criticism during at

12   least the last five, six years of your time there

13   about your research?

14   A.   That's correct.

15   Q.   Yeah.  I mean, they didn't feel like you

16   were publishing enough, correct?

17   A.   That's correct.

18   Q.   It's a common complaint in universities

19   with professors.  But -- and there was a point in

20   time where you said that basically you were

21   focusing -- trying to focus your time on service,

22   and you wanted to be evaluated primarily based upon

23   teaching and service, correct?

24   A.   I don't know what you mean by there was a

1    time.

2        Q.    I'll come back to that.  But in terms of

3    the 2002 report, this is some -- you would have

4    submitted this productivity report so they could

5    evaluate you in those three areas, correct?

6        A.    Yes.

7        Q.    All right.  If you'll look at page 15 of

8    your report.

9        A.    I see it.

10       Q.    You indicate for service context and

11   focus, you say, for 2002, my service activities

12   were divided between, and you talk about the school

13   and division, SASS, P & T Committee.  I guess

14   that's Privilege & Tenure Committee, correct?

15       A.    I'm sorry.  I didn't follow.

16       Q.    I'm sorry.  Are you on page 15?

17       A.    I'm on 15 now, yes.

18       Q.    Okay.  You're listing your service

19   activities for 2002, correct?

20       A.    Well, I'm looking to see what this

21   actually is.  I don't know if 15 is part of a

22   report from the Evaluation Committee.

23       Q.    Okay.  My understanding is that that --

24   that first part is actually your report, your

1    productivity report.

2        A.   Well, that's what -- I'm just looking.  I

3    don't remember for sure.

4             I can tell you under number one on page 15

5    that those -- that would be my statement where it

6    says, for 2002, my service activities were

7    divided.  I mean, that -- I'm not sure -- okay.

8    All right.  I'm following you.

9        Q.   Yeah.  I mean, this is --

10       A.   Yes, I believe you're correct.

11       Q.   There were different formats over the

12   years --

13       A.   Right.

14       Q.   -- but this is one year where you have to

15   submit a productivity report, and that's what

16   you're doing, correct?

17       A.   Yes.

18       Q.   And you're saying that part of your

19   service activities for the university, under number

20   two is, community working with residents in five WV

21   communities, seeking to prosecute major

22   environmental law claims, correct?

23       A.   Yes.

24       Q.   So you were essentially getting credit at

1   the university for doing that work, correct?

2      A.   For service.

3      Q.   For service work.

4      A.   Yes.

5      Q.   All right. And you -- you reference

6   attachment seven, which is -- if you go back, it's

7   the Westinghouse lawsuit, correct? There's an

8   article about the Westinghouse lawsuit.

9      A.   Let's see. Attachment seven. Okay. I'm

10   with you now.

11      Q.   All right. So in support of -- you're

12   showing the university, you're documenting your

13   service activities. You're attaching a copy of the

14   newspaper article about the Westinghouse lawsuit,

15   correct?

16      A.   That's correct.

17      Q.   Which we call it -- I've been calling it

18   the Fairmont litigation. Same thing, right?

19      A.   Yes.

20      Q.   And that's one of the things for which

21   you're seeking compensation, correct, now?

22      A.   Now?

23      Q.   Yes.

24      A.   Yes.

1     Q.  And then if you look at attachment nine,

2  which is your professional vitae, I don't -- I

3  never know how to say that word, but I guess it's

4  your --

5     A.  You're good.

6     Q.  -- it's your CV or your resume.

7     A.  Okay.

8     Q.  You indicate, if you look at the first

9  page of it, this is on Bate number 192 --

10     A.  192.  Let me go to that.

11     Q.  Yeah.  It's page 1 of your resume,

12  attachment nine, but it's --

13     A.  Okay.  I see it.

14     Q.  -- Bate number 192.  You talk about

15  consulting experience.  And this is a bad copy, but

16  it looks like it's saying 2000 to 2002,

17  out-of-state law firms, prosecuting major

18  environmental law claims on behalf of four

19  communities.  Do you see that?

20     A.  I do.

21     Q.  And then below that, you're talking -- you

22  talk about your consulting experience with U.S. AID

23  in Guatemala.  Do you see that?

24     A.  Yes.

1    Q.   So this is where you're telling the

2    university about the consulting experience that

3    you've had, correct?

4    A.   That's correct.

5    Q.   When you refer to the out-of-state law

6    firms, what firms are you referring to there?

7    A.   Well, this is 2002.

8    Q.   Yes, sir.

9    A.   What year?  In 2002, out-of-state law

10   firms, it would have been Masry & Vititoe and...

11   Q.   Baron & Budd?

12   A.   I'm trying to remember the time that Baron

13   & Budd came in.  Baron & Budd was in in 2002.  The

14   middle of -- yeah, the middle of 2002.  So yes,

15   Baron & Budd would have been one.

16   Q.   Okay.  Gary Rich is not an out-of-state

17   law firm, is he?

18   A.   No.

19       (Deposition Exhibit No. 32 marked.)

20   BY MR. MARINO:

21   Q.   I'll ask you to look at Exhibit 32. Sorry,

22   wrong copy.  All right.

23       All right.  This purports to be a

24   performance evaluation for calendar year 2001.

1    Also from the university, correct?

2        A.    Yes.

3        Q.    And this is -- let's see.  It's a

4    memorandum from the Faculty Evaluation Committee to

5    the Chair of Division of Sociology and Anthropology

6    dated February 13, 2002.  This is from your

7    personnel record, correct?

8        A.    That is correct.

9        Q.    Now, if you could look at page 132.  It's

10   Bate number 132.

11       A.    Yes.

12       Q.    Again, it describes at least their

13   evaluation of your service activities during 2001.

14   And it says, Dr. Simoni also indicates that a large

15   part of his public service efforts in 2001 were

16   focused on working with people in four West

17   Virginia communities who have suffered exposures to

18   numerous toxic substances.  He has used his time in

19   these communities to help organize them and empower

20   them to fight the polluters of their communities,

21   correct?

22       A.    That's what the document says, yes.

23       Q.    All right.  And that's true, that's what

24   you reported, correct?

1     A.   I'd have to go back and look again at the

2     report.  I don't know that I used these terms that

3     were used here.

4     Q.   Well, is it -- suffice it to say that you

5     were claiming as part of your service activities

6     for the university the work you were doing on these

7     environmental cases, correct?

8     A.   That's true.

9     Q.   And, I mean, would it be fair to say that

10    the university was paying you for doing that, in

11    part?  I mean, in other words you were -- that was

12    one of the reasons the university was paying you,

13    keeping you as a professor, because you were doing

14    this service work?

15    A.   Well, it's fair to say that as a

16    faculty -- excuse me.  I'm losing my voice.  Let me

17    get some water.  Sorry.

18         It's fair to say that as a faculty member,

19    I was expected to do teaching, research and

20    service, and that I was receiving a salary from the

21    university.

22    Q.   Okay.  If you'll look at the next

23    paragraph, it says, Dr. Simoni also indicates that

24    he wants to devote even more of his time to this

1    type of work, so he indicates he will soon be

2    proposing that teaching and service are his two

3    primary areas for performance evaluation.  Does

4    that refresh your recollection --

5        A.   Yes.

6        Q.   -- that you proposed that?

7        A.   Yes.

8        Q.   So you were basically proposing -- I mean,

9    you're essentially saying you weren't -- you didn't

10   want to do as much research, and you didn't want to

11   publish.  You wanted to do more of this kind of

12   service work on these environmental cases.  You

13   wanted to be evaluated for that and for teaching,

14   correct?

15       A.   Yes.

16       Q.   Were you proposing then that, you know,

17   you would do even more of this sort of consulting

18   work where you expect to be paid, and then the

19   university would evaluate you for that as opposed

20   to research and publication?

21           MR. CASH:  Objection.

22       A.   Could you repeat your question, please?

23       Q.   Yeah.  I guess I'm trying to understand.

24   I mean, if you're -- if the university is paying

1  you already, right, and you're proposing that as

2  part of your work for the university you want to

3  even increase even more the service work for which

4  you're expecting to be paid, aren't you asking --

5  you're asking the university to pay you, and you're

6  asking someone else to pay you for the same --

7  isn't that what that is?

8          MR. WAKEFIELD:  Object to the form.

9     A.   I don't agree with that characterization.

10    Q.   Did you take a sabbatical during the

11  period, let's say, 1995 until your retirement in

12  2005?

13    A.   I took one sabbatical in my 34 years at

14  West Virginia, or I think it was one.  I don't

15  remember.  I know I -- but anyway, what was the

16  time frame you were asking me about?

17    Q.   Well, if you took one sabbatical, can --

18  maybe you can tell me about that.  When was that

19  sabbatical?

20    A.   The sabbatical I remember, and I stand to

21  be corrected if there was another one, but I

22  remember one where I believe we went to Mexico for

23  a year.

24    Q.   Okay.

1    A.    Lived in Mexico for a year.  I believe

2   that was my sabbatical year, to the best of my

3   recollection.  I'm not exactly sure.

4    Q.    Did you take a sabbatical to do research

5   in Toronto regarding Italian populations in

6   Toronto, as in Canada?

7    A.    Toronto, as in Canada?

8    Q.    Yeah.  There might be other -- there may

9   be a Toronto, Louisiana for all I know.

10    A.    I don't remember a sabbatical to -- I

11   think I may have had thoughts about doing that.

12    Q.    Okay.  Did you visit Toronto for that

13   purpose?

14    A.    I have a cousin that lives in Toronto.

15    Q.    All right.  Just one more item and then

16   I'm done.  I promise.  I was trying to meet my

17   deadline but didn't quite make it, so...

18         Why did you take the bar exam in 2002?

19    A.    In 2002?

20    Q.    Yes, sir.

21    A.    Because I was still interested in getting

22   licensed, if possible, and being able to practice.

23    Q.    All right.  And is that why you took it

24   the previous times?  You took it so you could be a

1  practicing attorney?

2     A.   Yes.  I was -- I had that initial

3  interest, and that's why I followed up with taking

4  it.

5     Q.   Did you take the bar exam in July?  I

6  don't know how it works in West Virginia.  Do they

7  give it twice a year, the bar exam?

8     A.   I believe it's July and February.  Twice,

9  I think, twice a year.

10     Q.   Did you take the February bar or the July

11  bar?

12     A.   I think I may have taken it in both.  Are

13  you asking about 1996?

14     Q.   2002.

15     A.   Oh, in 2002 I took it once, and I do not

16  remember whether it was February or July.

17     Q.   And you -- and again, your recollection is

18  you took it in 2002 because you wanted to practice

19  law?

20     A.   Like most people, I think, taking the bar.

21     Q.   That's a yes?

22     A.   Yes.

23     Q.   Did you tell anybody that you were

24  thinking about practicing law in 2002?

1    A.   No.  I mean, I told people that I was

2   going to be taking the bar.  I assumed most people

3   know that if you're taking the bar exam that it's

4   to practice law.

5    Q.   Well, I mean, would it have been fair for

6   Gary Rich to assume you were taking it because you

7   wanted to get money from the Fairmont case, for

8   example?

9        MR. WAKEFIELD:  Object to the form.

10   A.   I can't -- I don't have any control over

11   why people would think I was taking the bar.  I

12   don't...

13   Q.   Okay.  Didn't he tell you that you needed

14   to be a licensed attorney for him to split any fees

15   with you?

16   A.   Never did.

17       MR. MARINO:  Okay.  All right.  That's all

18   I have, Dr. Simoni.  Thank you.

19       THE DEPONENT:  Thank you.

20       THE VIDEOGRAPHER:  We are now going off

21   the record.  The time is 10:17 a.m.

22            (Short break taken.)

23       THE VIDEOGRAPHER:  We are now back on the

24   record.  The time is 10:41 a.m.

1                    EXAMINATION

2    BY MR. CASH:

3        Q.   Dr. Simoni, it's okay to call you

4    Dr. Simoni?

5        A.   Sure.

6        Q.   Okay.  Seems to be what everybody else

7    used.  I want to cover a couple background

8    questions that I don't recall hearing the answers

9    to.  And if I did, if they were asked, I

10   apologize.  I'll apologize just generally if

11   anybody asked you something that I re-ask.  There

12   have been a lot of questions before me.  I'm last.

13              Where were you born?

14       A.   Where was I born?

15       Q.   Yeah.

16       A.   New Haven, Connecticut.

17       Q.   Okay.  Can you explain how you came to

18   wind up in West Virginia?

19       A.   I was in the middle of my doctoral studies

20   at Notre Dame, finishing up in 1970, and I was

21   hired by West Virginia at that time, to begin in

22   1971.

23       Q.   But did you have any specific ties to West

24   Virginia?

1      A.   Other than my grandfather had migrated

2  here, which I didn't know about at that time,

3  actually.

4      Q.   Okay.  How did you come to learn about the

5  position here?

6      A.   About?

7      Q.   The position here in West Virginia.

8      A.   Oh, I was at a conference in Washington,

9  DC, and the chair of the department from West

10  Virginia University was at that conference and got

11  my vitae out of a file that -- where I had left it,

12  excuse me, a file of people looking for jobs.  And

13  got a phone call from him and asked if I would be

14  interested in coming to West Virginia to look at a

15  job.

16      Q.   Did you have any specific interest in

17  coming to West Virginia, or was this essentially a

18  random selection?

19      A.   Well, actually, I didn't have any specific

20  interest in coming to West Virginia.  When he

21  called me, he said to me, we'd like you to come --

22  would you like to come to West Virginia for a job

23  interview?  And I said, I have to tell you

24  something.  I said, the only thing I know about

1  West Virginia is that there's coal there.  That's

2  the only thing I know.  So no, in terms of any --

3  pursuing any interest at the time.

4      Q.   Okay.  Do you have any ties to Canada?  I

5  know you did the sabbatical in Toronto.  Did you --

6  did I hear that you have a family connection in

7  Canada or any relationship to Canada?

8      A.   Well, I didn't actually do a sabbatical.

9  There was some thought about possibly planning for

10  a sabbatical to do in Toronto, because I was

11  interested in researching Italian -- Canadian-

12  Italians who are -- or Italian -- I'm not sure what

13  the correct term would be, but -- it would be

14  Italian-Canadians, I guess, in the way we use it --

15  who had migrated to Canada after World War II.

16  There was a major migration.  And one of my

17  interests is ethnic groups, and so that was an

18  interest that I was thinking about pursuing, go up

19  there to study that migration, about that

20  migration.

21      Q.   And I don't mean to get too personal, but

22  I'm just kind of curious.  Simoni is an Italian

23  name?

24      A.   It is.

1    Q.   And so was this a personal interest that

2    developed into a professional interest for you?

3    A.   Yeah, I would say.

4    Q.   Did you have any relatives of your own

5    that immigrated to Canada, for example?

6    A.   Yeah.  Like I was saying earlier in my

7    deposition, I have a cousin who lives up there.

8    Q.   Okay.  During your career at WVU, you were

9    active in the community.  Can you tell us what your

10   -- what would you characterize as your community

11   involvement?

12        MR. WAKEFIELD:  Object to the form.

13   Overly broad.

14   A.   I was involved in -- I was involved in the

15   university community.  I represented faculty at the

16   university, and represented them on a statewide

17   basis.  So I'm not sure where you want to go with

18   that.

19   Q.   Well, we can take the university part.

20   When you say you represented faculty, I understood

21   that you have represented faculty in grievances

22   with the university.

23   A.   I did.

24   Q.   And that was part of your involvement as a

1    union president?

2        A.    I believe at one time I was the union

3    president, yeah.  But I was representing employees

4    in grievances not as the president, but -- excuse

5    me, just as a grievant representative, grievance

6    representative.

7        Q.    Okay.  A delegate from the union to

8    represent a particular employee?

9        A.    Yes.

10       Q.    When you said you were representing

11   employees at the state level, what does that mean?

12       A.    Well, in West Virginia there's a --

13   there's a advisory council of faculty to the board

14   of -- I'm not sure what the statewide governing

15   board is called now.  At that time, it was called

16   the Board of Trustees, the statewide governing

17   board.  And as an advisory, there was an advisory

18   council of faculty made up of a representative from

19   each university.

20            And so the representative from WVU would

21   represent the faculty from WVU on that console.

22   And there would be a representative from each

23   higher ed institution.

24       Q.    Okay.  Would you consider that some kind

1    of civic involvement or community involvement?

2         A.   Well, it was professional involvement.

3         Q.   Okay.

4         A.   Definitely.

5         Q.   Is it true that you were involved in

6    litigations against the university over the

7    selection of the president at one time?

8         A.   I was.

9         Q.   Can you explain a little bit about that?

10   What were the circumstances that led to that

11   litigation?

12             MR. WAKEFIELD:  I'm going to object to

13   relevance.  We have a time limitation for the

14   deposition, and you're going down a path that I

15   don't arguably see as being relevant here.  So keep

16   that in mind in terms of the amount of time we're

17   going to allow this witness to be deposed.  If

18   we're going to spend a bunch of time on areas

19   independent of his claim in this case, I think

20   that's going to have an impact on how much time

21   we're going to make this witness available.

22             MR. CASH:  I'm just trying to get some

23   general background.

24             THE DEPONENT:  I'm sorry.  Can you go back

1    to your question?

2    BY MR. CASH:

3        Q.   I'd like to know briefly, if you can, just

4    tell us what were the circumstances that led to

5    litigation against the university over the

6    selection of its president.

7        A.   I had served as a member of the statewide

8    Board of Trustees, the governing body for all of

9    higher ed, and at the time that I served, David

10   Hardesty was one of the members of that board.  In

11   fact, he was, I believe, president of the Board of

12   Trustees for part of that period.  And I knew David

13   and generally liked David, so there was nothing

14   personal in my claim against the university and the

15   Board of Trustees.  But when he was appointed, it

16   was clear to me that the procedures that were

17   followed to make the appointment, I felt, were way

18   out of line, and so that was my reason for getting

19   involved in that.

20       Q.   Was it your goal to have someone else

21   installed as president or have him removed?

22       A.   As I said, I didn't have any personal

23   problems with David Hardesty.  If they had simply

24   gone back and followed the correct procedures, they

1    could have come up with him again and I wouldn't

2    have had any problem, if they had gone through the

3    correct procedures that were in the documents and

4    were set in stone, so to speak, that they should

5    have been following.

6         Q.   Okay.  Have you had any local civic

7    political involvement, run for office, you know,

8    had any political issues or things that you

9    advanced at the local level in the Morgantown area?

10        A.   Never ran for office.  Never did that.

11        Q.   Never took a big public stand on a

12   particular issue?

13        A.   Oh, I was involved with a case against the

14   developers of the power plant that was put in

15   Morgantown.  I don't remember the year it was put

16   in, but...  So I guess if you want to say took a

17   stand, I was involved with many people who were,

18   you know, questioning that.

19        Q.   And was that a civic interest of yours,

20   where you were trying to advance the good welfare

21   of the people in the area by doing that?

22        A.   No.  It was just more of an environmental

23   interest.

24        Q.   Okay.

1      A.   I mean, if I were to put a label on it.  I

2    was very concerned about the environmental

3    contamination from the power plant.

4      Q.   When you worked with the different

5    plaintiffs and the different groups in the towns

6    that were involved in the cases that have been at

7    issue in this deposition, Spelter and Fairmont and

8    so on, was that a similar type of activity where

9    you were trying to advance the environmental

10   interests of the community as a whole?

11     A.   I was concerned about these situations

12   related to these cases, very concerned about what

13   was happening to people, what had happened to

14   people and what was happening to people as a result

15   of the environments that they lived and worked in.

16     Q.   And we talked a lot about them.  I'm just

17   curious.  Are there any sort of community issues or

18   civic issues that you've advanced that haven't come

19   up in the deposition yet along these lines?

20          MR. WAKEFIELD:  Object to the form.

21   Overly broad.

22     A.   I can't think of one right now.

23     Q.   In one of your interrogatory responses,

24   you said you were involved in a lawsuit in Broward

1    County.  Do you recall that?

2        A.    Yes.

3        Q.    Can you tell us just briefly what's the

4    subject matter of that case?

5        A.    Do you have the title?

6        Q.    Simoni versus Donald E. Bramblett and

7    Kathy Farce (ph).

8        A.    These were people who were renting my

9    family's property where my father lived.  He passed

10   away in '06, and they were renting the property.

11   And simply put, they devastated the property.

12       Q.    Okay.

13       A.    And they stole, removed from the house all

14   kinds of things, so...

15       Q.    Okay.  It's --

16       A.    And didn't pay me anything for rent.

17   So...

18       Q.    Was that resolved?

19       A.    That's ongoing.

20       Q.    Okay.  And your deposition wasn't taken in

21   that case yet?

22       A.    No.

23       Q.    Do you anticipate it will be?

24       A.    I assume it's possible.

1      Q.   Okay.  Even though you have moved to

2   Florida, do you come back and make trips back to

3   this region to visit?

4      A.   Yes.

5      Q.   Can you tell us since you moved back in

6   2005 approximately how often you come back?

7      A.   I want to say -- I have family here.  We

8   have two families here, actually.  One in north

9   central West Virginia, and one here in Charleston

10  with grandkids in each, of course, and so we try to

11  get back, I would say on average at least a couple

12  of times a year.  We like May and October because

13  they're choice months in West Virginia, so we try

14  to do May and October if we possibly can.

15     Q.   Okay.  You testified quite at length about

16  having agreements with Gary Rich, and what I'd like

17  to know is did you ever have a similar agreement

18  with my client, Levin Papantonio?

19     A.   No.

20     Q.   You never sued Levin Papantonio, did you?

21     A.   No.

22     Q.   Can you tell us why not?

23          MR. WAKEFIELD:  I'm going to object and

24  instruct him not to respond to that.  That's based

1  upon his communications and advice of counsel.

2        MR. CASH:  Is there a privilege at issue

3  with that question?

4        MR. WAKEFIELD:  Yeah.  It's based upon the

5  advice of his counsel.  That's a privilege.

6  BY MR. CASH:

7     Q.  Did you believe that there was any reason

8  to sue Levin Papantonio?

9        MR. WAKEFIELD:  Do not respond to that

10 question if it involves anything that you've

11 learned or any advice that you obtained from your

12 counsel.

13    A.  And the question again is?

14    Q.  Did you believe there would be any reason

15 to sue Levin Papantonio, accepting this limitation?

16    A.  No.

17    Q.  Did Levin Papantonio do anything to

18 promise you compensation?

19    A.  No.

20    Q.  Do you know if your claims are properly

21 stated against Gary Rich personally or against his

22 firm?

23        MR. WAKEFIELD:  Objection, calls for a

24 legal conclusion.  He's asserted claims through

1    counsel who have filed pleadings on his behalf.

2       Q.   Is your claim against Gary Rich or against

3    Gary Rich's firm?

4            MR. WAKEFIELD:  His claims are against

5    both, as you can tell by the pleadings.

6       Q.   Can you set forth the facts that would

7    help me distinguish claims you have against Gary

8    Rich personally versus claims that you would have

9    against Gary Rich's firm?

10      A.   No.

11      Q.   Are you aware whether you have a claim

12   against one or against the other or both?

13      A.   I leave all of that to my lawyers.

14      Q.   When you made agreements with Gary Rich

15   for the splitting of fees, did you ever discuss

16   having those agreements being made with Rich

17   individually or against -- or with Rich's firm?

18      A.   Never -- there was never any discussion

19   like that or about that.

20      Q.   Is it fair to say that there's -- you're

21   not sure who the agreements were with then?

22      A.   Oh, I know who the agreement was with.

23      Q.   Can you tell us?

24      A.   Well, you know -- I've testified to

1    communications with Gary, about communications with

2    Gary Rich.

3        Q.   And I don't want to belabor this point in

4    detail, but it has been a point of confusion to me

5    at least that there are two Gary Rich parties in

6    this case, and nobody has done a great job of

7    distinguishing between them.  So I'm trying to find

8    out if you have facts --

9            MR. WAKEFIELD:  Well, I'm going to object

10   to your -- look, I'm going object to your

11   characterization that nobody's done a great job of

12   distinguishing.

13           The fact is claims have been brought

14   against Gary Rich and Gary Rich, LC.  He's

15   testified as to who his communications were with.

16           Gary Rich is an individual.  Gary Rich was

17   also a principal in a legal corporation.  So his

18   communications with him would be in both contexts.

19   So whether the claim is against the individual or

20   against the legal corporation is going to

21   ultimately be something that the Court will work

22   out.

23           MR. CASH:  Jeff, I'm just trying to move

24   it along.

1          MR. WAKEFIELD:  I want you to move on.

2          MR. CASH:  Okay.

3          MR. WAKEFIELD:  But you're characterizing.

4          MR. CASH:  Well, let me ask my questions

5    here.  I'm just trying to set up a background for

6    this question.

7    BY MR. CASH:

8        Q.   Are you aware that the Levin Papantonio

9    firm entered into a memorandum of understanding

10   with Gary Rich's law firm?

11       A.   Yes.

12       Q.   You know that the parties on that contract

13   are LP, The Cochran Firm and the Gary Rich company,

14   the law firm?

15       A.   I -- yes.

16       Q.   And Gary Rich was not a party to that

17   contract individually?

18       A.   I don't remember seeing that -- you know,

19   I don't remember all the distinctions there.

20       Q.   Okay.  But you're telling me --

21       A.   I saw the memorandum.

22       Q.   -- you may have a contract with Gary Rich

23   individually, and you may have a contract with Gary

24   Rich's firm, and you're not sure?

1    A.   No.  I -- could you restate that, please,

2    sir?

3    Q.   I'll withdraw it.

4    A.   Okay.

5    Q.   In seeking compensation from Rich, are you

6    asking for compensation for the time that you spent

7    in finding other firms to litigate cases, like my

8    firm?

9    A.   That was a major part of the work.

10    Q.   And that's work.  That you're seeking

11    compensation for?

12    A.   That was part of my contribution.

13    Q.   You maintained relationships with the

14    people of Spelter and other towns in the state.

15    True?

16    A.   Yes.

17    Q.   And have you said that that's a big part

18    of what you brought to the case, is your ability to

19    communicate with potential plaintiffs and people in

20    the towns?

21    A.   I believe it was.

22    Q.   Are you seeking compensation for that

23    work?

24    A.   That was part of the contributions that I

1    made to the case.

2        Q.   And you're seeking --

3        A.   Having the rapport that I developed with

4    the people in the communities.

5        Q.   And you're seeking to be compensated in

6    part because you developed that rapport?

7        A.   That's part of it.

8        Q.   You at times would communicate information

9    to these people about how the litigation was going,

10   didn't you?

11       A.   I'm sorry.  I lost the question.

12       Q.   You would have meetings with people in the

13   towns, plaintiffs, and you would communicate to

14   them about how the litigation was proceeding?  Did

15   you do that?

16       A.   Yes, there were periodic meetings.

17       Q.   And are you seeking to be compensated for

18   that time?

19       A.   That was part of the -- part of the

20   development.

21       Q.   Would it be fair to say that you're

22   seeking a finder's fee for locating the Spelter

23   case and bringing it to Levin Papantonio?

24            MR. WAKEFIELD:  Object to the form.

1    Object to the form.  He hasn't made any claim

2    against Levin Papantonio.

3              MR. CASH:  I understand that.

4              THE DEPONENT:  Could you repeat the

5    question, please?

6    BY MR. CASH:

7        Q.   Are you seeking to be compensated in part

8    as a finder's fee for locating the Spelter case?

9              MR. WAKEFIELD:  Object to the form.

10       A.   I'm seeking compensation for the major

11   contributions I made to the Spelter case.

12       Q.   Well, you told Mr. Marino earlier that

13   discovering the case was one of the four things

14   that was a key contribution of yours.

15       A.   That was one.

16       Q.   So are you seeking -- you're seeking to be

17   compensated for the mere finding of this situation

18   at Spelter?

19             MR. WAKEFIELD:  Object to the form.

20       A.   I wouldn't characterize it as "mere."

21       Q.   Otherwise, you'd agree with me?

22             MR. WAKEFIELD:  Object to the form of

23   that.

24       A.   Again, it's part of what I was involved

1    with to move that case along in its development.

2        Q.    Okay.  Dr. Simoni, you were at Rich's

3    deposition, and you read the entire deposition?

4        A.    I read -- no.  The answer to that is no.

5        Q.    Okay.  If I saw you there at day one, you

6    were there all day, right?

7        A.    I was there that day one.

8        Q.    Okay.  Do you recall that Gary Rich told

9    me that he thought, and I'll quote, from the

10   outset, that it was his intent to move to Saudi

11   Arabia, and that either you or Larry Harless would

12   take over litigations?

13       A.    I remember hearing that.

14       Q.    Was that true?

15             MR. WAKEFIELD:  Object to the form.

16             MR. MARINO:  Objection, foundation.

17       Q.    Did he ever tell you that that was his

18   intent?

19       A.    No.

20       Q.    Were you surprised when you heard it at

21   the deposition?

22       A.    Yes.

23       Q.    I want to go back to yesterday.  At the

24   start of the day, you said one of your agreements

1    with Gary Rich was to split 50 percent of -- 50/50

2    on the benefit.  Do you recall telling us that?

3        A.    Yes.

4        Q.    I believe you told my colleague that the

5    benefit didn't refer to fees but did refer to some

6    other kind of money.  Is that what you said

7    yesterday?

8        A.    What I agreed to was compensation.  What I

9    thought I was agreeing to was compensation that

10   would be fair, given the contributions that I made

11   in each of the cases, and that my compensation

12   would be based -- if there was no recovery, I would

13   get nothing, but if there was a recovery, the

14   compensation that I would receive would be a

15   function of the total recovery.

16              (Mr. Marino left the deposition.)

17   BY MR. CASH:

18       Q.    And I appreciate that, but I think

19   yesterday you made a distinction between the phrase

20   "the benefit" and attorney fees, suggesting that

21   there could be money other than attorney fees from

22   which you could be compensated.  And I'm curious if

23   you can identify what other source of money that

24   could be --

1    A.   I had no fix on any particular source.  I

2    was -- I just felt that I had an agreement to be

3    compensated.

4    Q.   Okay.  There was a little testimony on

5    Rich's concerns about surveillance and being taped.

6    A.   I remember that.

7    Q.   When we looked at the exhibit after the --

8    that you wrote, the four Post-it notes after the

9    Star City Park, and I think it was on number one at

10   the very bottom, you said, Jeanne said taping.  Did

11   you tell us that you thought Gary Rich might have

12   been taping that conversation?

13   A.   That's what my wife thought when she saw

14   my notes.

15   Q.   Okay.

16   A.   And I discussed with her the happening.

17   Q.   Did you ever personally have a concern

18   that your conversations would be taped, whether

19   they were with Rich or anyone else?

20   A.   Could you re -- maybe just try that

21   questions once more?

22   Q.   My question is have you ever personally

23   been concerned that anyone would be taping

24   conversations that you were having with anyone?

1    A.    No.

2    Q.    So although Gary Rich thought his

3    conversations might be taped or his office might be

4    bugged, that's not a concern you ever shared about

5    anyone?

6    A.    No.

7    Q.    Can you tell us if you've filed a tax

8    return every year since 2000?

9    A.    I'm sorry.  Did I file a tax return since

10   2000?

11   Q.    Every year since 2000.

12   A.    Every year since 2000?  Yes, I believe so.

13   Q.    Gary Rich gave you $1,500 in connection

14   with an immigration matter.  Did you receive a 1099

15   that -- reflecting that payment?

16   A.    I do not recall.

17   Q.    To the best of your knowledge, can you

18   tell us when that payment was made?

19   A.    Well, it was sometime after 2000.  So

20   between 2000 and two-thousand -- I would say --

21   between 2000 and 2004.

22   Q.    Okay.

23   A.    In that period of time.

24   Q.    Can you tell me what you did to earn the

1    $1,500?

2         A.    What did I do to earn $1,500?

3         Q.    Right.

4         A.    I believe two things.  One, I put Gary

5    Rich in contact with someone who could solve a

6    major immigration issue for him for one of his

7    clients.  And I believe that was the -- I believe

8    that was the major reason.

9         Q.    So he compensated you for helping him

10   locate another -- an attorney?

11        A.    Not another attorney.  Someone very well

12   versed in immigration --

13        Q.    Was this person --

14        A.    -- that he wasn't aware of.

15        Q.    Was this person an expert in immigration

16   law?

17        A.    He was -- I don't know about immigration

18   law, but he was an expert in immigration.

19        Q.    Can you tell me what expertise he brought

20   to this situation?

21        A.    Well, yes.  He was at one period of time

22   in the 1990s, I believe, the number two person in

23   the immigration service, in what was then -- I

24   think it was INS, Immigration and Naturalization

1    Service.

2         Q.   Who was it?

3         A.   It was my cousin.

4         Q.   Can you give us his name?

5         A.   Yeah.  Ben Farrell.

6         Q.   Okay.  Does he live in DC?

7         A.   He lives in the DC area.  I think he lives

8    in Maryland, actually.

9         Q.   Okay.  And how much time did you spend

10   making that referral for Gary?

11        A.   I wouldn't say an inordinate amount of

12   time.  I mean, I made a phone call and put him in

13   contact with Ben.  And then I remember being at

14   Gary's house one time when he, you know, called

15   Ben.  It wasn't a lot of time.  Not a whole lot of

16   time.

17        Q.   Less than an hour?

18        A.   No, more than that probably.

19        Q.   Can you tell us how much?

20        A.   Less than five hours but more than an hour

21   probably devoted to that.

22        Q.   Okay.  From Rich's deposition, do you

23   recall some questioning regarding Sherri Goodman

24   where Rich told us that he consulted Sherri Goodman

1    repeatedly on ethical matters on each of the three

2    litigations at issue here?

3         MR. WAKEFIELD:  Object to the form.

4    A.    Are you --

5    Q.    You recall his testimony about Sherri

6    Goodman?

7    A.    I recall some testimony about Sherri

8    Goodman, yes.

9    Q.    Let me read you a quote from Rich and ask

10   what you think about it.  He said, I'm talking to

11   Sherri Goodman to see how can he be paid.  Can he

12   be paid?  Now, on the WVU case, he was the union

13   representative, and he ultimately became a

14   plaintiff, so he could not be.  I think that's

15   pretty clear.  Now, whether he knew that, I don't

16   know.

17        Did you hear that answer?

18   A.    Yes.  I do.  I do recollect that general

19   testimony.

20   Q.    Did he ever tell you that Sherri Goodman

21   had told him that?

22   A.    No.

23   Q.    Were you surprised when you heard it at

24   the deposition?

1    A.    Definitely.

2    Q.    Why?

3    A.    I had never heard it from him before.

4    Q.    If Rich thought that was true, can you

5    think of any reason why he wouldn't pass that

6    information along?

7              MR. KENNEDY:  Object to form.

8              MR. WAKEFIELD:  Object to form.

9    A.    Sitting here today, I can't think of any

10   specific reason.

11   Q.    Did Rich ever tell you at all that he was

12   consulting Goodman on ethical matters?

13   A.    Yes.

14   Q.    Did you ever get anything in writing from

15   him reflecting her ethical opinions?

16   A.    I may -- I do not remember for sure.  I

17   may have received or been given a copy of something

18   she might have sent him about some issue, but I

19   can't -- I can't remember whether I saw them back

20   then at the time they happened, or I did see them

21   as part of the discovery documents.

22   Q.    In this case?

23   A.    Yeah.  I don't recall exactly.

24   Q.    Do you recall when it was written?

1    A.    No, I do not.

2    Q.    Do you think that Gary Rich didn't tell

3  you about Goodman's ethical opinion because he

4  wanted to keep you working on the cases --

5         MR. KENNEDY:  Object to the form.

6    Q.    -- even though he knew you couldn't get

7  paid?

8    A.    Do I think?  You don't want to know -- do

9  you want to know what I think?

10   Q.    Yes.

11        MR. WAKEFIELD:  Well, why don't you just

12  answer his question.

13   A.    Yeah.  Yeah.  What's the specific question

14  again?

15   Q.    My question here is Gary Rich told us he

16  had an ethical opinion from Goodman that there was

17  no way you could get paid on WVU because you were a

18  plaintiff, and he said, that's pretty clear.  My

19  question is, do you think he didn't tell you about

20  that ethical opinion because he wanted to keep you

21  working on the WVU case?

22   A.    It's certainly possible.

23        MR. KENNEDY:  Same objection.

24   Q.    Now, you were paid on the WVU case,

1    correct?

2         A.    Yes, I believe I've already...

3         Q.    That's the $30,000 you got from Bob

4    Sweeney?

5         A.    Yes.

6         Q.    Did Rich know about that payment?

7         A.    No.

8         Q.    Did Rich ever find out about that payment,

9    do you think, prior to this case, the case we're in

10   now?

11             MR. WAKEFIELD:  Object to the form.

12             MR. KENNEDY:  Object to form.

13        A.    I do not know.

14        Q.    You're not aware if Rich and Sweeney ever

15   discussed that, that payment that was made to you?

16        A.    I am not.

17        Q.    When you told Mr. Marino, who has left,

18   when you told Mr. Marino that Bob Sweeney made the

19   payment to you because, and I thought I wrote down

20   you said he wanted to be sure that you would get

21   paid, did you say that, that Sweeney wanted to be

22   sure that you would get something for your work?

23        A.    I believe I did say that.

24        Q.    Did you mean to suggest that there was

1    any -- that you thought Sweeney had any

2    apprehension that if Sweeney didn't make the

3    payment directly to you that Rich wouldn't make a

4    payment either?

5             MR. KENNEDY:  Object to the form.

6        A.    I would just stand on what I said, that he

7    just wanted to be sure that I received something.

8        Q.    Do you think it's possible that Sweeney

9    didn't trust Rich to pass the $30,000 on to you?

10            MR. KENNEDY:  Object to the form.

11            MR. WAKEFIELD:  Object to the form.

12       A.    Anything is possible.  I don't know.

13       Q.    That's not a concern that you have?  That

14   hasn't occurred to you?

15       A.    What?

16       Q.    There's no concern that you have that you

17   thought Sweeney was thinking if he didn't make the

18   payment directly to you, you wouldn't get paid from

19   Gary Rich?

20            MR. KENNEDY:  Same objection.

21       A.    I'm not -- I'm sorry.  I'm sorry to ask

22   you to go back.  I'm just not following you.

23       Q.    I'll move on.  That's okay.  Nevertheless,

24   your testimony is Rich never knew about that

1    payment?

2        A.    Yes, to the best of my knowledge.  I mean,

3    I have no information to say, to know that he did.

4        Q.    And that's all.  That's all I'm asking you

5    about.

6             You told Mr. Marino -- now, turning to the

7    Spelter litigation, earlier you gave Mr. Marino a

8    list of four things that you said were your

9    contributions to the case, and I'd like to just

10   review them with you here and ask more questions

11   about those four.  If there are other things beyond

12   this list of four, will you let me know at the end?

13       A.    Go ahead.

14       Q.    Okay.  All right.  What I wrote down,

15   number one, you discovered the case.

16       A.    Yes.

17       Q.    Number two, you told us that you were the

18   major party regarding organization of the case.

19       A.    Yes.

20       Q.    Can you explain what you mean by being the

21   major party regarding the organization of the case?

22       A.    Well, in the initial phase after I

23   learned -- and I believe you know about this, but

24   you want me to answer the question.  In the initial

1    phase, after I learned about the contamination

2    problem from the West Virginia DEP, I contacted

3    people I knew in Spelter and -- not people, a

4    person I knew in Spelter, and she led me to other

5    parties, one of which turned out to be the husband

6    of the lead plaintiff, a Lenora Perrine.  And I

7    talked to those two people that she led me to and

8    explored interests on their part to talk about the

9    contamination and the possibility of doing anything

10    about it if there was such a possibility.

11         And so I was involved in that initial

12    organization of people, bringing people together to

13    talk about it.  And then after that occurred, then

14    introducing them to Gary Rich.  Then following up

15    with periodic meetings that you are aware of, I'm

16    sure, through 2001.

17         And then there was all of the

18    investigation kind of work, talking with people in

19    the community about all of their experiences

20    related to Spelter, at Spelter, and all of that.

21    And talking with people outside of the -- see,

22    there were -- I'm sure you probably know this, but

23    there were nine communities involved in Spelter, in

24    the Spelter case.

1          So I was not talking to people just in

2     Spelter proper.  I was talking to people in these

3     other communities, too.  And there was a lot of

4     local community contact work, communication with

5     the people that needed to be done, I believed

6     anyway, that was important.  And so there was all

7     of that.

8          Then there was all of the related

9     investigation, such things as, you know, turning up

10    all of the documents.

11        Q.   If I can stop you for a second, that was

12    your third goal, and I just wanted to stick to your

13    second contribution, which was -- which you said

14    being the major party regarding the organization of

15    the case.  And we'll get to the investigation

16    part.

17        A.   Okay.

18        Q.   But the things that you said, those types

19    of activities you just described at length, that's

20    what you considered to be the organization of the

21    case.  Is that fair to say?

22        A.   Yeah.  That was the groundwork,

23    organization for it.

24        Q.   Okay.  So when you say organization of the

1    case, you didn't mention --

2         A.   Oh, I don't mean to interrupt you.  Go

3    ahead.

4         Q.   Okay.

5              MR. WAKEFIELD:  Well, did you want to

6    elaborate on your answer.

7         A.   Well, I just wanted to say there was also

8    the finding of the out-of-state law firms.  That

9    was, you know --

10        Q.   That was?

11        A.   That was crucial, and that was ongoing

12   through 2001, through 2002.  I mean, we didn't get

13   a commitment from Levin and Papantonio to come in

14   until I think it was late summer of '03.  So, I

15   mean, there was a long period of time talking and

16   recruiting the interest of different law firms.

17        Q.   And so all this -- you referred to -- and

18   I don't want to change your words -- you said, this

19   is the organization of the case.  That period

20   essentially runs from the time you discovered

21   Spelter until about 2003 when the case gets

22   underway?  Is that the time frame that we're

23   talking about?

24        A.   Yeah.  I mean, I don't think of it in

1    terms of those time frames that you're suggesting.

2    I mean, I just know that all of the involvements

3    that I had were major to the long-term development

4    of the case.

5        Q.   Well, when we're talking about when you

6    said the organization of the case, we're mainly

7    talking -- we're talking about the activities you

8    mentioned, but we're not talking about drafting

9    pleadings, hiring experts, interviewing witnesses,

10   taking depositions, attending hearings, trying the

11   case.  All those legal activities, that's not

12   included in what you said was your second

13   contribution to the litigation?

14       A.   Correct.

15       Q.   Okay.  The third thing you told us was you

16   said you were the major party on the early

17   investigation of the case, and you said at least

18   for the first year.  When you said at least for the

19   first year, what time period, what year are you

20   talking about?

21       A.   Well, now I just expanded that, actually,

22   into -- I mean, in terms of an investigation and

23   the research, that went on all the way through --

24   into '05, actually.

1      Q.   Were you the major person responsible for

2   all of the investigation that was necessary to

3   prosecute this litigation to its conclusion?

4      A.   Outside of --

5           MR. WAKEFIELD:  Object to the form.

6           THE DEPONENT:  I'm sorry?

7           MR. WAKEFIELD:  Go ahead.  You can answer.

8      A.   Apart from and outside of the legal work

9   that was done, which there was a great deal of it,

10  as you know, prep -- all the motions and all of the

11  legal work that had to be done, which I was

12  involved with, and simply in terms of reviewing

13  and, you know, maybe making a comment or a

14  suggestion for a change or that kind of thing, but

15  that wasn't anything I prepared or -- and I wasn't

16  the legal mind, of course, in all of that.

17          But all of the documents, the digging up

18  of all of the documents that were key, that went on

19  all the way through into late '04, and I believe

20  actually the record might show '05.  Now, I left in

21  August of '05, left West Virginia, but certainly it

22  continued for a long time.

23      Q.   I want to ask you again.  You said you

24  were the major party regarding investigation of the

1    case, at least as to the first year.  I want to

2    know if you're telling us you were the major

3    person, the lead person responsible for

4    investigation on the whole litigation.

5        A.    Pretrial?

6        Q.    Sure.

7        A.    Pre --

8            MR. WAKEFIELD:  Are you talking about just

9    the first year?

10            MR. CASH:  No, the whole litigation.

11            MR. WAKEFIELD:  Okay.

12        A.    What I'm saying is prior to the time --

13    prior to the time the suit was filed, which was

14    summer of '04, my best recollection, summer of '04,

15    I believe, up until that time, anything that needed

16    to be done in terms of an investigative work in

17    West Virginia, I was doing it.

18        Q.    And I hate to ask you a third time --

19        A.    That's okay.

20        Q.    -- Dr. Simoni, but I guess I want to pin

21    you down and find out.  Do you think that you were

22    the major person responsible for investigation

23    through the litigation of the case?

24            MR. WAKEFIELD:  Object to the form.

1      A.   Once again, through that time period I

2   just referred to, I believe I was.

3      Q.   Okay.  You know there were other

4   investigators that --

5      A.   No, now if -- can I just qualify that

6   once?

7      Q.   Sure.

8      A.   I'm not saying there were not -- there was

9   not investigative work being done by Carol Moore,

10  for example, at Levin and Papantonio.  And I worked

11  with Carol Moore quite closely.  So, of course, she

12  was involved.  And so if -- if you're suggesting

13  that I want to not give credit to Carol Moore for

14  her role, I'm not attempting to say that.  I'm

15  saying in terms of -- in parties in West Virginia,

16  parties in West Virginia who were working on the

17  investigation, okay, I was the major player.

18     Q.   If I'm hearing you right, you're saying of

19  the people located in West Virginia who did

20  investigative work, you were the major person

21  there.

22     A.   Of the local people.

23     Q.   Okay.

24     A.   On the local level, I was the major

1    person.

2        Q.    You're not saying that your contributions

3    outweighed Carol Moore's contributions?

4        A.    Of course not.

5        Q.    Or other investigators who worked on this

6    case?

7        A.    I'm not saying that at all.

8        Q.    Are you a certified legal investigator?

9        A.    I am not.

10       Q.    I don't know what it means either, but I

11   know Carol Moore has it.

12       A.    I felt Carol Moore did a good job, what

13   she did.  That was my experience anyway.

14       Q.    Some of the investigative work that we're

15   talking about that -- you mentioned locating

16   documents.  One of the things that you did to

17   locate those documents, as I understand it, is to

18   file Freedom of Information Act requests.

19       A.    (Nods head up and down.)

20       Q.    Was there anything unique about the

21   requests that you filed that couldn't have been

22   performed by another person?

23       A.    Well, I think you know the -- what the

24   procedure is for filing a request.  It's not an

1    abnormal kind of a procedure, some strange kind of

2    a procedure.  So could other people have done

3    that?  I believe so.

4        Q.   When investigative work needed to be done,

5    can you tell us who decided what needed to be

6    done?  Was it you?

7        A.   Well, the -- at different periods of time,

8    initially it was I because, for example, Levin and

9    Papantonio were not involved until -- on that level

10   until late summer of '03.  So up until that time, a

11   lot of those decisions were mine.

12       Q.   After Levin Papantonio got involved, did

13   the direction of investigative activity shift to

14   Levin Papantonio?  Did Levin Papantonio assume that

15   role of managing investigation?

16       A.   Well, after Levin and Papantonio became

17   the party or firm, along with The Cochran Firm -- I

18   don't remember the exact date that Cochran came in,

19   but it wasn't -- you know, it wasn't long after

20   that, until that -- until '03 I was making

21   decisions, but I was making decisions in

22   communication with Gary Rich.  Okay?  I mean, we

23   would meet periodically and talk about things that

24   I was doing and what I planned to do and, you know,

1    that kind of thing.

2         But certainly after '03 when Levin and

3    Papantonio assumed the priority position for the

4    governing of the case, for handling the case, then

5    I worked closely with and sometimes at the lead of

6    Carol Moore or Steve Medina, because there were --

7    you know, there were things that they were doing on

8    their end, identifying needs, identifying things or

9    needs that they were trying to get met at the local

10   level, and at the local level it was me.  So that

11   was -- that's the way that was.

12        Q.   Okay.  The fourth thing you told

13   Mr. Marino as your fourth key contribution to the

14   litigation, you said you played a major role in the

15   soil sampling.

16        A.   Yes.

17        Q.   You recall saying that?  Did you play any

18   role in the air modeling?

19        A.   No.  George Flowers, the lead geologist,

20   and David Allison, I assume, assisted him.  They

21   did the air modeling work, which was important,

22   very important.

23        Q.   Did you play any role in the perimeter

24   sampling?

1    A.    When you say perimeter sampling, what do

2    you mean by perimeter -- you're talking about the

3    control areas.

4    Q.    Yes.

5    A.    Yes.

6    Q.    What did you do?

7    A.    I had to get -- we needed the property

8    access for the control -- you know, in West

9    Virginia you just don't walk on somebody's property

10   and say -- you know, and see them or have them see

11   you out on their front lawn or on their front

12   property taking -- digging, you know, doing any

13   kind of digging.  So both in the control area and,

14   of course, in the nine communities around --

15   including Spelter, we needed property access.

16   Q.    And you used your connections in the

17   community and your considerable charm to get access

18   to the property?

19   A.    I got it.

20   Q.    Okay.  Epidemiology was a part of this

21   case.  Did you play any role in the epidemiology?

22   A.    Technically, no.

23   Q.    There were experts on the health effects

24   of heavy metals on human beings.  Did you

1    contribute any expertise in that area?

2       A.   I left that to the experts.

3       Q.   There was a property valuation expert, and

4    the burden on property values was a big part of

5    this case.  Is that true?

6       A.   That's true.

7       Q.   Did you contribute anything to the

8    valuation?

9       A.   Other than supplying experts through --

10   you know, if they identified anything they needed

11   at the local level, I was involved in helping them

12   get what they needed.  For example, for dust

13   sampling, again, they needed access, and so I was

14   very much involved in that.

15      Q.   Would you agree that all these disciplines

16   that I just listed were important for the

17   successful prosecution of this case?

18      A.   Definitely.

19      Q.   There's an interrogatory response that you

20   submitted that I'm curious about, and I hope you

21   could explain a little better.  This is Baron &

22   Budd's interrogatories to you, and it's number

23   three.  I'm not going to mark it as an exhibit.

24   And I'll show it to you, but I just want to read it

1    to you basically.

2          They asked you to identify what your

3    contributions to each litigation were, what your

4    duties were and who assigned you those tasks in

5    each litigation.

6          Your answer was -- on Spelter your answer

7    was, Dr. Simoni and Gary Rich began working on

8    Spelter -- edit some of this out -- he was assigned

9    functions and tasks by Gary Rich and Levin

10   Papantonio.

11         Would you like me to show this to you to

12   refresh your memory of your answer?

13     A.   Well, I don't know the question you're

14   going to ask me about it.

15     Q.   My question is --

16         MR. WAKEFIELD:  I would ask that you show

17   it to him.

18     Q.   That's fine.  I'm going to just underline

19   the part I'm referring to, just to move this

20   along.

21     A.   Okay.

22     Q.   And my question is what did Gary Rich

23   assign you, and what did Levin Papantonio assign

24   you?  Because in the answer you say that both firms

1    assigned you some work.  So I'm asking you to tell

2    me what did Rich tell you what to do, and what did

3    Levin Papantonio tell you to do?

4         A.    I can only refer back to what I testified

5    to a little bit earlier in response to your

6    questioning, that before Levin and Papantonio was

7    involved, there were many activities that I was

8    involved with that Gary Rich was aware of and was

9    agreeable to and consented, at least implicitly,

10   you know, that I pursue the activities.

11        And then after Levin and Papantonio became

12   involved, of course, there was a myriad of needs

13   that were identified by Levin and Papantonio in

14   terms of information, documents, help -- aid and

15   assistance for the geologists.  I mean, there was a

16   -- I'd have to sit down at a table and give it some

17   very serious thought to try to think of all of the

18   things.  Right now I can't think of them all, but

19   generally that was it.

20        So you know, as I said before, after the

21   summer of 2003, Carol Moore was key.  She was the

22   lead investigator.  And so, I mean, that's -- I

23   can't remember all of the individual things.  You

24   know, maybe looking at something later I might be

1    able to, but at this moment I can't.

2        Q.    Okay.  Did you do anything that you would

3    characterize as legal work on the case?

4        A.    Legal work.  I did some -- I did some

5    legal research.

6        Q.    Did you do --

7        A.    Certainly.

8        Q.    -- anything other than legal research?

9        A.    Well, I wasn't licensed to do legal work,

10   so I wasn't doing -- you know, I wasn't doing -- I

11   wasn't doing work that a licensed lawyer could only

12   do.

13       Q.    Well, for example, I have a paralegal who

14   can draft complaints, although she's not a lawyer.

15   Did you do --

16       A.    Okay.

17       Q.    -- anything that's legal in nature, even

18   if you weren't a licensed lawyer, other than legal

19   research?

20            MR. WAKEFIELD:  Object to the form.  Vague

21   definition of "legal," but go ahead and answer.

22       A.    Yeah, I cannot recall at this time without

23   some specific reference.

24       Q.    You said earlier that -- just about 10

1    minutes ago -- you said that from time to time you

2    would receive legal work from others, and you might

3    pass along a comment or a note on it.  Can you tell

4    me what you were referring to when you said that?

5         A.   What did I say?

6         Q.   If I'm not wrong, you said that from time

7    to time you would receive some kind of legal work

8    product, and you would make notes on it or you

9    would make a comment here and there.  Can you

10   remember what that was about?

11        A.   I'm not sure exactly what your reference

12   is to.

13        Q.   Did you do that?

14        A.   Well, I made comments on some legal

15   documents that were -- on drafts of legal

16   documents.  Certainly.  I did do that.

17        Q.   Did anybody ask you to do that?

18        A.   Yes.

19        Q.   Who?

20        A.   Gary Rich.

21        Q.   Okay.  And which documents?

22        A.   And I have a vague recollection, I can't

23   give you a specific time and date, but I have a

24   vague recollection that Steve Medina one time asked

1    me maybe to take a look at the initial complaint

2    that he was -- that was being prepared, you know.

3    I can't give you a date and time right now at this

4    moment, but I believe that happened.

5         Q.   If that's -- Dr. Simoni, if that's not in

6    your time summary, are you not claiming

7    compensation for it?

8         A.   Not claiming if it's not in the time

9    summary.

10        Q.   Is it true that you're only claiming

11   compensation for the work that is in the time

12   summary?

13        A.   With the qualification -- I mean, I have

14   to tell you that every day I see some things that I

15   didn't see before.  And I've tried to make an

16   exhaustive study of all the discovery documents,

17   but have I seen every one?  I can't tell you that

18   I've seen every, every discovery document.  But the

19   reason why I'm saying that is I don't want you to

20   think that there might -- might not be something

21   significant now.  I don't think -- I don't know of

22   anything, other than what's in there, but what --

23   but you know, I just don't want to be limited at

24   this point to that.

1    Q.   Are you telling me that you would claim

2    compensation for things that aren't in the time

3    summary -- let me back it up.  If I'm hearing you

4    right, you're saying you will only claim

5    compensation for things that are in the time

6    summary, but there may be other discovery documents

7    or things that will cause you to add to the time

8    summary later?

9    A.   What I'm saying is I don't believe there's

10   going to be any significant addition.

11   Q.   And you told that to Mr. McDougal

12   yesterday.  I understand that.

13   A.   Yeah.  That, I think -- I mean, and -- of

14   course, I would have to speak with my lawyers

15   because they give me guidance on this, but my

16   general thought is I don't believe there's anything

17   of any major significance coming down in the

18   pipeline.  I think I've  -- I've tried to see

19   everything.

20   Q.   So your claim for compensation is going to

21   be limited to what's in the time summary and

22   anything new that you may have to add later?

23   A.   It is based on the kinds -- the

24   contributions that are identified within the time

1   summary.

2        Q.   Okay.  Can you be as specific as you can

3   about which documents you were asked to review in

4   terms of legal contribution?

5        A.   No, I can't.

6             MR. WAKEFIELD:  For when?  Asked to review

7   when?

8        Q.   The entire case.  You mentioned the draft

9   complaint.  You mentioned some documents that Gary

10  Rich had asked you to comment on.

11            MR. WAKEFIELD:  Okay.  Okay.  I just want

12  to be clear.  You're talking about the underlying

13  case, Spelter or Fairmont, correct?

14       Q.   Yes.  I'm sorry.  I'm not -- I'm talking

15  about Spelter.  I'm not talking about this case,

16  12-CV-12.  I apologize.

17       A.   Okay.

18       Q.   You told me that you were asked to comment

19  -- you may have been asked to comment on the draft

20  complaint by Steve Medina.  You told me that Gary

21  Rich gave you documents to comment on.  There could

22  be others.  What I'm asking you to do here is list

23  each document that you were asked to comment on.

24       A.   I can't do that right now.

1   Q.   If it's not in the time summary, you're

2   not going to claim it.  True?

3   A.   I'd have to talk with my lawyer about

4   that.

5   Q.   Okay.

6   A.   Because he deals with what I claim.

7   Q.   Okay.  When you did legal research, what

8   topics did you research?  and I'll limit it to

9   Spelter.

10   A.   What topics did I research having to do

11   with Spelter?  Well, the history of the Spelter --

12   Q.   Is that legal research, though?  When I

13   say "legal research" --

14   A.   Okay.  Okay.  Legal research.

15   Q.   Yeah.

16   A.   Okay.  It's interesting you're asking me

17   that question, because I did have a note on that,

18   some papers in the last few days.  But I certainly

19   did some legal research on filing fees, on statute

20   of limitations, West Virginia cases having to do

21   with environmental issues.  There may have been

22   others.  They just don't come to mind right now.

23   Q.   Did you draft any opinion letters or memos

24   as a result of this research?

1      A.    I drafted -- as a result of that research,

2    I don't recall if there were -- if I drafted a

3    memo, a memo or two from time to time with respect,

4    you know, to Rich about some of the matters.  I

5    know I had communications with people about them.

6    Had -- I had communications with people about the

7    research that I did.  I don't remember the form

8    that it took.

9      Q.    Can you tell us for sure if there were any

10   written work product that you generated as a result

11   of legal research?

12     A.    I believe there was but I -- again, I

13   can't pinpoint it for you today sitting here.

14     Q.    Okay.  You don't -- you just don't

15   remember what it was about?

16     A.    Yeah.  I believe there was, but I just

17   don't recall the specific documents.

18     Q.    Okay.

19     A.    Or memos or whatever they were.

20     Q.    I'm going to shift topics.  You gave a

21   little testimony earlier about this idea of working

22   with Dan Levitan in Florida?

23     A.    Yes.

24     Q.    And I just didn't really understand what

1    you were saying, so I just want to clear it up.

2        A.    Yes.

3        Q.    Did -- the idea was kicked around that you

4    would serve as Rich's agent in acquiring property

5    in Florida?  Was that accurate?

6        A.    Working with -- my understanding was I

7    would be in some way working with Dan Levitan,

8    maybe as an agent for him, and maybe the money

9    might get channeled through him to me.  It was

10    never really clarified, just that this kind of

11    relationship with this real estate developer in

12    Florida was a way possibly for him to get

13    compensation to me.

14        Q.    And that was your idea or Rich's idea?

15        A.    I --

16        Q.    Or somebody else?

17        A.    I never thought of anything like that.  I

18    assumed I was going to be compensated from Rich.

19        Q.    Directly?

20        A.    Directly.

21        Q.    You never thought as the terms of any of

22    these agreements you negotiated with Rich that

23    there would have to be some indirect means of

24    getting compensated?

1    A.   Never did.

2    Q.  Do you have any qualifications in the real

3 estate field to be somebody's agent?

4    A.   No, I'm not certified in anything related

5 to real estate that I know of.

6    Q.  Was the idea behind this to pay you more

7 than fair value for the work that you would have

8 performed as a real estate agent in order to --

9    A.   I don't know what the idea --

10       MR. KENNEDY:  Object to form.

11       MR. WAKEFIELD:  Object to form.

12    A.   I do not know what the idea was.  I was

13 just told that this might be a way to channel

14 money.

15    Q.  Why would there be a need to channel money

16 to you through the subterfuge of being a real

17 estate agent rather than just writing you a check?

18       MR. KENNEDY:  Object to form.

19       MR. WAKEFIELD:  Object to form.

20    A.   I do not know.

21    Q.  You never asked?

22       MR. KENNEDY:  Same objection.

23    A.   I never asked.

24    Q.  Could it have been because Rich was

1    concerned about ethical problems for himself?

2         MR. KENNEDY:  Object to the form.

3         MR. WAKEFIELD:  Object to form.

4    A.   I -- again, I -- you know, speculation is

5    easy, but I do not know.

6    Q.   Don't need to speculate.

7         Let's talk about this idea of quantum

8    meruit.  We looked at a document earlier that Scott

9    mentioned it.  We don't know who Scott is.  Was

10   that the first time quantum meruit came up as a

11   possible way of having you compensated?

12   A.   Sitting here today --

13   Q.   When was the first time?

14   A.   -- I do not recall when the first time

15   was.

16   Q.   Nevertheless, the Scott memo definitely

17   reflects a time when quantum meruit was discussed.

18        MR. WAKEFIELD:  By whom?

19   A.   Yeah, I don't know who.  My notes don't

20   seem to indicate or verify who was discussing that

21   or who was --

22   Q.   Okay.

23   A.   I can't say.

24   Q.   Well, nevertheless, you made the notes.

1    True?

2        A.   I made the notes.

3        Q.   So when you wrote down quantum meruit,

4    surely at that time you knew what quantum meruit

5    was, or that at least you knew that that was a

6    possible way you could be compensated.  Isn't

7    that --

8        A.   Well, I think I knew of the idea of

9    quantum meruit sometime ago.  I don't know when I

10   first learned of it.

11       Q.   Okay.  Is it your understanding that the

12   measure of quantum meruit is essentially fair value

13   for services that are rendered?

14            MR. WAKEFIELD:  Object to the form.

15       A.   Is it my -- could you repeat, please?

16       Q.   What do you think the measure of quantum

17   meruit would be?

18            MR. WAKEFIELD:  Yeah, object to the form.

19   It calls for a legal conclusion.  There's a -- I

20   mean, quantum meruit is defined in the law.

21            THE DEPONENT:  Excuse me.  You want me to

22   answer?

23            MR. CASH:  I would.

24            MR. WAKEFIELD:  You can try to answer, but

1    it's a legal conclusion, and the legal standard is

2    already established.

3           THE DEPONENT:  Okay.  Generally,

4    generally, my understanding of it is it has to do

5    with the value of the contribution, how much the

6    contribution deserves.

7    BY MR. CASH:

8        Q.   And that should be a fair market value.

9    True?

10          MR. WAKEFIELD:  Again, object to the form.

11       A.   I don't know anything about the fair

12   market value business.

13       Q.   Do you know how the value for a quantum

14   meruit claim is established?

15       A.   I can't say I specifically know, no.

16       Q.   Well, let me ask you this:  Do you think a

17   person making a quantum meruit claim should be paid

18   more than the fair market value for their work?

19          MR. WAKEFIELD:  You know, object to the

20   form, because I mean, you're mixing apples and

21   oranges.  There's a standard for quantum meruit

22   under West Virginia law, and it consists of many

23   factors, and how they're applied to the facts of a

24   particular case may vary.

1      A.   Yeah, I'm not trying to evade your

2   question, but I don't think it's my place to be

3   answering that.

4      Q.   What was your understanding of the value

5   of the quantum meruit claim that you could

6   potentially assert in order to get paid from these

7   litigations?

8      A.   Could you repeat that once more, because

9   I'm having trouble following that question?

10     Q.   The idea of being compensated in quantum

11  meruit came up, right?  I guess I'm asking you

12  discussed -- when you had that idea in your mind,

13  how did you -- what did you understand would be the

14  value of the claim?

15          MR. WAKEFIELD:  Object to the form.

16     A.   My general idea of it is -- and of course,

17  I'm not an expert in quantum meruit -- my general

18  idea of it is that I would be -- let me just say I

19  would be compensated based on the significant

20  contributions that I made to the cases, and that

21  compensation would be based in turn on the total

22  recovery in the cases.  And that compensation for

23  me, because of those significant contributions,

24  that there would possibly somewhere along in the

1    process be -- that there would be a value placed on

2    the actual significance of the contributions

3    determined by somebody.  And that's how, in the

4    end, the quantum meruit compensation would occur.

5         Q.   Was it your understanding that in some

6    cases if litigations was unsuccessful, the value of

7    your quantum meruit claim would be zero?

8         A.   If the cases -- my understanding all the

9    way along in terms of my involvement in them, if

10   there was no recovery for the plaintiffs, that I

11   wouldn't get anything.

12        Q.   Would it be true to say then that your

13   understanding of making a quantum meruit claim

14   involved a contingency component?

15             MR. WAKEFIELD:  Object to the form.

16        A.   I'm not understanding what you mean by a

17   contingency component.

18        Q.   Your understanding of the value of your

19   quantum meruit claim is it varied depending on the

20   degree of success that the litigation achieved?

21        A.   Yes.

22             MR. WAKEFIELD:  Again, I'm going to object

23   to all these questions.

24             MR. CASH:  Okay.

1          MR. WAKEFIELD:  I mean, there are clear

2     definitions about this.  I don't think it's fair to

3     question this witness.

4          MR. CASH:  You can --

5          MR. WAKEFIELD:  Wait.

6          MR. CASH:  -- have an objection on this.

7          MR. WAKEFIELD:  You keep picking out maybe

8     a little factor that may or may not have an impact

9     in a quantum meruit analysis, you know.

10          MR. CASH:  I will give you a standing

11     objection on all these.

12          MR. WAKEFIELD:  But I don't think it's

13     fair to ask him this.

14          MR. CASH:  Okay.

15          MR. WAKEFIELD:  Because you're not really

16     utilizing the doctrine.  You're not quoting quantum

17     meruit law in West Virginia.

18          MR. CASH:  I don't need to.  I'm just --

19          MR. WAKEFIELD:  Well, I think you do if

20     you want to be fair with him.

21          MR. CASH:  Okay.  All right.

22          MR. WAKEFIELD:  Because you're trying to

23     get him to answer things, and you want him

24     committed to answers based on incomplete questions,

1    because they don't fully take into account the

2    doctrine.  So I object.

3    BY MR. CASH:

4        Q.   Okay.  Dr. Simoni, did you take contracts

5    law in law school?

6        A.   I did.

7        Q.   Did you study quantum meruit in that

8    course?

9        A.   I believe I did.

10       Q.   Did you understand it then?

11       A.   I think I did, yeah.

12       Q.   Was it -- is it your understanding that

13   quantum meruit can't be valued until you look at

14   the total value of the case, the total recovery of

15   the case at the end of the case?

16       A.   Let me just say about all this that I did

17   take contract law, and I'm sure quantum meruit was

18   a part it, and I think I understood the basics of

19   it, at least back then, but I also understand that

20   that was back then.  I graduated from law school in

21   '95.  I don't know what's occurred in West Virginia

22   between 1995 and now.  That's a long time.  And so

23   I would just be sort of guessing, you know, in

24   terms of responding to you by my understanding.

1    Q.    Okay.  This would be a good time to take a

2    short break.

3    A.    Okay.

4         THE VIDEOGRAPHER:  Now going off the

5    record.  The time is 11:48 a.m.

6         (Short break taken.)

7         THE VIDEOGRAPHER:  We are now back on the

8    record.  The time is twelve o'clock p.m.

9    BY MR. MARINO:

10    Q.    Okay.  Dr. Simoni, I'd like to turn to

11    Exhibit 28, which is the June 6th time summary.  Is

12    this -- this is an accurate copy of the time

13    summary you've put together in connection with this

14    case?

15    A.    The best of my knowledge, yes.

16    Q.    Dr. Simoni, there have been other versions

17    of this time summary, haven't there?

18    A.    Yes.

19    Q.    You authenticated an earlier one, an

20    August 31st, 2012 time summary previously in this

21    litigation?

22    A.    I believe that was the date.

23    Q.    And I just want to be clear.  It's your

24    intent to update this time summary and to list

1    every task for which you are seeking compensation?

2         A.    That was the intent of putting the time

3    summary together, to try to show the extent of the

4    contributions.

5         Q.    And this -- I'm asking you a different way

6    now.  You believe that every task that has a number

7    greater that zero hours next to it is a task for

8    which you should be compensated?

9         A.    To the best of my knowledge, yes.

10        Q.    If you compare the August time summary

11   from last year to the one we got last week, the

12   current one, there are some tasks which previously

13   had hours that have now been written down to zero.

14        A.    Yes.  That's correct.

15        Q.    Why did you do that?

16             MR. WAKEFIELD:  You can answer that

17   question to the extent that it doesn't involve any

18   advice or counsel that you received from your

19   attorney.

20             I mean, I can just state for the matter of

21   the record we wanted to make sure that whatever is

22   claimed is something in furtherance of the case,

23   and there's no question that one of the earlier

24   versions, perhaps more than one version of the time

1    summary, included things such as assisting Mr. Rich

2    in his fee dispute with Masry firm or with Baron &

3    Budd, and there is no claim being made for that,

4    because that really wasn't in furtherance of the

5    claim of the plaintiffs.

6         So as it says here under the note, this is

7    kind of a work in progress to make sure that

8    whatever is claimed is what Dr. Simoni believes he

9    should be compensated for work that was for the

10   benefit of the plaintiffs.

11   BY MR. CASH:

12       Q.   Do you agree with your lawyer?

13       A.   Yes, I do.

14       Q.   How did you decide which tasks to write

15   down to zero?

16       A.   Well, I believe my lawyer just said that

17   if there were communications or meeting times

18   having to do with helping Rich in his fee dispute,

19   those were numbers that were zeroed out or times

20   that were zeroed out.

21       Q.   Can I ask why they're still on the time

22   summary if you're not claiming compensation for

23   them?  Why didn't you just delete them?

24       A.   Because they illustrate that I was

1    involved in those activities.

2        Q.   Was it your intent to reflect every

3    activity relating to one of these three cases,

4    Spelter, Fairmont, WVU, on the time summary?

5        A.   In terms of -- could you please repeat?

6        Q.   You just said you left some of the zero

7    hour tasks on here because they helped illustrate

8    your involvement with the litigation.  So my

9    question is do you show every involvement you have

10   with any of the litigations as an entry on the time

11   sheet, even if it might have a zero on it?

12       A.   To the best of my knowledge, I do.

13            MR. WAKEFIELD:  Yeah, and let the record

14   reflect it's just for Fairmont and Spelter.

15            MR. MARINO:  Sure.

16            MR. WAKEFIELD:  Nothing on WVU.

17            MR. CASH:  Sure.  We understand that.

18   BY MR. CASH:

19       Q.   I want to ask you about another

20   interrogatory response that you made to The Cochran

21   Firm.  And again, to save time, I'm just going to

22   read it to you.  And again, I'll be glad to show it

23   to you.  Their interrogatory was, if you contend

24   that any of your --

1          MR. WAKEFIELD:  Can you identify it?

2          MR. CASH:  I'm sorry.  It's number 11.

3     Q.   If you contend that any of your alleged

4  contributions to the Spelter matter required or

5  used any specialized or particularized skill or

6  knowledge, please identify with particularity each

7  of your contributions, the date of that

8  contribution, and what specialized or

9  particularized skill or knowledge was required.

10          Your answer was, Dr. Simoni contends that

11  all of his contributions as identified on the time

12  summary relied on his specialized and

13  particularized skills and knowledge, including but

14  not limited to his doctorate degrees in both

15  sociology and law.  Was that your answer?

16     A.   Well, could I see that, please?

17     Q.   Of course.  Of course.  It's number 11 at

18  the bottom, and it goes on to the next page.

19     A.   Okay.  Okay.

20     Q.   Dr. Simoni, is that answer correct?

21     A.   I believe that my contributions reflected

22  both on the special skills that I brought as a

23  sociologist with a good understanding, some people

24  might say not so good because I didn't get through

1    the bar, but anyway, with an understanding of law

2    and experience that I obtained from working, for

3    example, on the WVU matter.  Certainly the

4    contributions in the time summary reflect that,

5    those specialized skills that either I developed

6    along the way or I had coming into the cases.

7         But there were some of the activities that

8    are reflected in the time summary which might

9    generally be looked at as paralegal type of work.

10   And so I think it's fair to look at my

11   contributions as a blend of some paralegal work,

12   and I would say in some cases some high-end

13   paralegal work, and activities that required and

14   called on the skills that I had from my studies and

15   degrees and so forth.

16        Q.   But the answer you gave in the

17   interrogatory is, Dr. Simoni contends that all of

18   his contributions, dot, dot, dot, relied on his

19   specialized skills, including the sociology degree

20   and the law degree.  Is that really true, that

21   every task you performed required a law degree and

22   a sociology degree?

23        A.   I think I just answered that.

24        Q.   Was it no?

1          MR. WAKEFIELD:  Object to the form.

2     A.   I think my answer would be what I just

3  said.  I just have to go back to what I just said.

4     Q.   I guess I don't understand and would like

5  you to answer whether you're saying that, yes,

6  every task required a Ph.D. in sociology --

7     A.   Okay.

8     Q.   -- and a juris doctor or it did not.

9     A.   Okay.  I -- maybe I can -- maybe I can --

10  you want me to proceed?

11          MR. WAKEFIELD:  Well, it says including

12  but not limited to in the answer.  Okay?

13  Particularized skills and knowledge including but

14  not limited to his doctorate degrees in both

15  sociology and law.  I think he's given some

16  explanation of what he meant by that, but go ahead

17  and answer.

18  BY MR. CASH:

19     Q.   Let's leave the interrogatory aside.

20     A.   Okay.

21     Q.   Did you need a sociology degree and a law

22  degree to do every task on the time summary?

23     A.   No.  And that's why I said I believe the

24  contributions reflected on the time summary reflect

1    a blend of contributions, some of which required, I

2    believe, specialized skills and some what I -- in

3    some cases I said paralegal, and some of that

4    paralegal stuff, I said I think high-end paralegal.

5        Q.   Okay.  When you refer to a blend of

6    contributions, are you going to be seeking a --

7    what is known as a blended rate for your time in

8    this case?

9        A.   That's not up to me, and I rely on legal

10   counsel for what I'm going to be seeking.

11       Q.   Okay.  Let's look at some of the entries,

12   and I'll tell you I'm concentrating mainly on the

13   Spelter entries here.  If you'll turn to page 24 in

14   the time summary, please.

15       A.   Twenty-four.  Okay.

16       Q.   Would you take a look at the italicized

17   tasks, October 2001, November 2001, December 2001.

18   You gave the same answer for each of those.  You

19   put, services provided, slash, time expended during

20   month.  Unable to verify as of this date.  Do you

21   see that?

22       A.   Yes, I do.

23       Q.   I can just tell you, you gave that answer

24   as to other months in the time summary.  My

1 question is, is there really no basis to

2 substantiate the work that was provided during

3 these months?

4     A.    Again, let me just go back.  You're

5 talking about 10/201 -- 2001, 11/2001, and 12/2001.

6     Q.    Yeah, and I'm using those as an example.

7 I guess I'm just asking generally in the areas in

8 the time summary where you said you're unable to

9 verify the tasks, you're telling us there's just no

10 way of telling us what work was performed during

11 that time?

12     A.    I'm not telling you that today.  I'm

13 telling you that as of this date, we've been unable

14 to verify.

15     Q.    Okay.  Some of these other entries you've

16 substantiated by looking at documents that my firm

17 produced.  You looked at your own notes.  You know,

18 you've looked at maybe call records that you have,

19 and you were able to reconstruct a lot of these

20 entries.

21     A.    Uh-huh.

22     Q.    But as to these ones that are blank, the

23 ones I've highlighted here, you're telling us you

24 just don't have documentary evidence to back up

1    what was done in these particular months.  Is that

2    true?

3        A.    In my possession at this time, to the best

4    of my knowledge, no.

5        Q.    Okay.  And you know that the discovery

6    phase of this litigation has been ongoing for

7    months, and you've had access to all the discovery

8    tools that are available in litigations?

9        A.    I have that general understanding.

10       Q.    Let me turn to another set of entries.

11   Let's go to 31 please, page 31.

12       A.    Thirty-one.

13       Q.    Yeah.  Now, in reading your summary, I

14   found another set of time entries that just from

15   looking at the entries, it's not possible for me to

16   tell exactly what was done.  And what I want to do

17   is highlight some of those entries for you and then

18   ask you some questions about them.  So, for

19   example, one of them is on February 13th, 2004.

20   You see that one?

21       A.    I do.

22       Q.    It says, meet with Rich 7:15 p.m., but

23   that's all it says.

24               There's another one.  If you look at March

1    10th, 2004, it says, phone reference with Medina

2    and Rich, various case issues.  You see that one?

3         A.   What's the date again, please?

4         Q.   March 10th.

5         A.   March 10th?

6         Q.   Yeah.

7         A.   Okay.

8         Q.   If you flip ahead one more page, near the

9    second-to-last one on page 32, it's June 18th,

10   2004.

11        A.   June?

12        Q.   June 18th, 2004.

13        A.   Okay.

14        Q.   And all it says there is Spelter plan of

15   work.

16        A.   Uh-huh.

17        Q.   Do you have any more detail about what

18   these three entries were other than what's in the

19   time summary?

20        A.   Well, this -- do I have it here today for

21   you?

22        Q.   Can you tell me today?

23        A.   I believe the Spelter plan of work had to

24   do with just that, putting together plans for how

1    to proceed in the next period of time.

2        Q.   Did you ever provide that plan of work to

3    anyone?

4        A.   Not to my knowledge.

5        Q.   Do you have it now?

6        A.   I don't know.  I don't know.  I just have

7    -- I have some reference somewhere which caused me

8    to put this entry in here.

9        Q.   Can you state with any certainty what that

10   plan was?

11       A.   No.  Today, no, I cannot.

12       Q.   And on the February 13th entry, for

13   example, it says, meet with Rich 7:15 p.m.  Do we

14   have any information about what that meeting was

15   about?

16       A.   No.  All -- I believe -- I don't have any

17   information on what that meeting was about right

18   today.

19       Q.   Okay.  Would you agree with me that at

20   least as to these entries here, a person reading

21   this time summary is not going to have enough

22   information to figure out what was done during

23   those particular events?

24       A.   I believe that's accurate.

1    Q.   Is there any better way that you can think

2    of to help us reconstruct what these tasks actually

3    were that you're now seeking compensation for?

4    A.   At this moment, I cannot suggest a better

5    way.

6    Q.   Okay.  If you look at page 31, I have

7    another section of time entries that to me look

8    like estimates, and I'd like to show them to you

9    and ask you about this category of entries.  You've

10   got an entry for -- I'm going to make it a little

11   easier for you here.  You've got an entry here for

12   June -- January 2004, February 2004, March 2004 and

13   April 2004.  Do you see those?

14   A.   I do.

15   Q.   And it's the same -- it's almost the same

16   answer for each one.  It looks like the January one

17   has a little more detail, but the other ones read,

18   30 hours a month, communications with area people

19   re information gathering, work for and

20   communication with lawyers, sharing the information

21   gathered from area people and documents obtained.

22   You see that?

23   A.   I do.

24   Q.   And for each of those, you're claiming

1    exactly 30.0 hours.

2         A.    Yes.

3         Q.    You've got other entries in the time

4    summary that are similar.  I believe if you look at

5    the next page, there's another one for May 2004.

6              Are these estimates of time?

7         A.    These are general -- this is a general

8    estimate of time.  And it's based on, as you say,

9    30 hours per month, and that's one hour a day.

10   During this case development in Spelter, I worked

11   Saturdays and Sundays many, many times.  I can't

12   say I worked every Saturday and Sunday, but I

13   worked many Saturdays and Sundays.  And I believe

14   that a fair estimate is at least one hour a day.

15        Q.    Okay.  You're not telling us you actually

16   worked exactly 30.0 hours each of these months?

17        A.    I believe it's a reasonable, fair

18   estimate.

19        Q.    Okay.  You have the same or substantially

20   similar language for each one of these entries.  Is

21   there any better way that you have to break this

22   down into smaller pieces so we can understand, for

23   example, who were the area people, who were the

24   lawyers, what information was shared, or is this

1    the most detail you've got?

2         A.    I understand your question, and as I said,

3    at this moment I do not have a suggestion of a

4    better way.

5         Q.    Okay.  If you would, please flip back with

6    me to page 25.  I have a question about the entry

7    that's labeled -- I'll wait for you.  I'm sorry.

8         A.    Twenty-five, you said?

9         Q.    Yeah.

10        A.    Okay.

11        Q.    This entry is in the middle, it's the one

12   that's labeled 02/2002.

13        A.    02/2002.

14        Q.    Right.

15        A.    Okay.

16        Q.    So here you say, worked with a Melissa

17   Dutcher at Masry & Vititoe in developing

18   questionnaire for health survey.  Surveyed 82

19   Spelter residents, tabulated results in preparation

20   for reporting.  And you're claiming 43 hours for

21   that task.

22        A.    Yeah.

23        Q.    First of all, did Masry & Vititoe ever

24   worked on the Spelter litigation?

1    A.   Well, they were involved in taking a look

2  at the case.

3    Q.   But they ultimately turned it down.

4    A.   They ultimately -- well, they ultimately

5  did not end up working on the case.

6    Q.   They turned it down.

7    A.   Again, they were -- they were not the firm

8  -- they made a decision, I guess, somebody made a

9  decision that they were not going to be involved.

10    Q.   Did the work that you performed as part of

11  this task benefit the class?  And by that I mean

12  the class of plaintiffs.  The work that you

13  performed here dealing with Masry & Vititoe --

14    A.   Oh, yes, definitely.

15    Q.   Okay.  How did that happen?

16    A.   Well, the health survey was a survey to

17  get a read of health problems that have been

18  experienced, suffered by people living in Spelter.

19    Q.   Did that work summary -- did that health

20  survey ultimately wind up being used in the

21  litigation?

22    A.   I do not know.

23    Q.   Did you provide it to anyone other than

24  Masry & Vititoe?

1      A.   Gary Rich had it.

2      Q.   Do you know if he used it in the case?

3      A.   I do not know.

4      Q.   It says, worked with Melissa Dutcher.

5  Does the 43 hours reflect all contributions that

6  you made, or is some of her work mixed in here,

7  too?

8      A.   No.  This is time that I spent.  Now, I

9  worked with them in developing the questionnaire.

10  You know, part of my expertise in sociology is

11  developing questionnaires.  So obviously that was

12  involved, but I worked with them in developing the

13  questionnaire.  I was the person who administered

14  the questionnaire to Spelter residents.  And again,

15  you knock on someone's door and you want to do this

16  kind of thing, you know, there has to be an

17  introduction and a rapport developed before you sit

18  down and do this questionnaire with the resident.

19      Q.   Is there any way that you can tell us how

20  this time breaks down across the 43 hours among

21  these sub tasks that you've got?

22      A.   I cannot at this point.  I can't today.

23  I've -- I remember reflecting on it and allotting

24  so much time to the preparation of the

1    questionnaire, so much time to the actual time I

2    spent in Spelter, you know, administering the

3    questionnaire, then putting the compilation of the

4    data together from the questionnaire, all of that.

5    I sort of allotted time to each segment of that.

6         Q.    So this is a composite estimate of all the

7    those sub tasks?

8         A.    Yes.

9         Q.    Okay.  Does some of this time include

10   convincing the residents that it's a good idea to

11   participate in a questionnaire?

12        A.    Well, as I said, it's part of the

13   administration of the questionnaire.

14        Q.    Okay.  Do you know if the questionnaire

15   posed a detriment to the class that was ultimately

16   certified?

17        A.    Not to my knowledge.

18        Q.    Do you know if this questionnaire had any

19   effect on the statute of limitations decisions in

20   Spelter?

21        A.    I do not.

22        Q.    Have you ever heard of block billing?

23        A.    Of what?

24        Q.    Block billing.

1      A.   Block billing?

2      Q.   Yes.

3      A.   I never heard the term.

4      Q.   It's a term where lawyers, rather than

5   writing down each individual task, will write down

6   a block of time.  Have you ever -- you've never

7   heard that?

8      A.   Never heard the term.

9      Q.   Can we look at another entry.  If you go

10   to page 35.  It's near the middle.  It's the one

11   that says 12/17 to 12/23.  I'm sorry.

12      A.   Did you say page 35?

13      Q.   Yeah.

14      A.   I'm sorry.  And we're looking at 12/17/04

15   to 12/23/04?

16      Q.   Right.

17      A.   Okay.

18      Q.   Property access work, map work and phone

19   calls to property owners, 23.5 hours?

20      A.   Yes.

21      Q.   Do you have any better way of breaking

22   this time down across those days?

23      A.   Not at this moment, but I do know that if

24   you look, it's the map work.  First you have to get

1  the maps and you have to -- you know, you have to

2  know where -- what area you're actually looking

3  in.  Then you have to get the property records and

4  match the property records with the maps.  Then you

5  have to contact the people.  And in this particular

6  period of time, we were trying to contact people by

7  phone.

8      Q.   And we don't have any better detail than

9  this 23-and-a-half hour block of time on what --

10  how that was distributed across those days?

11      A.   No.  I just know that's a very good

12  estimate of the time that was put in on that --

13      Q.   Do you know if --

14      A.   Across the --

15      Q.   I'm sorry to interrupt you.

16      A.   No, go ahead.

17      Q.   Do you know if anyone else was arranging

18  to get property access?

19      A.   Arranging to get property access?

20      Q.   Sure.

21      A.   In the Spelter case?

22      Q.   Yes.

23      A.   When you say "arranging," I'm not sure

24  what you mean.  I mean, I had -- I certainly had

1  communications with Levin and Papantonio, because

2  this was such a key component that we were working

3  on together.

4      Q.   Well, you've told me that it was a key

5  contribution of yours to talk to residents and

6  convince them to allow us to have access to their

7  property.

8      A.   Uh-huh.

9      Q.   Are you aware of that there were other

10 people doing the same thing?

11     A.   Well, my wife was -- I think I testified

12 yesterday that my wife helped out with some of the

13 property access work.

14     Q.   Are you aware that a lot of times when

15 sampling would occur, the people who were taking

16 the samples would just get property access right

17 then?

18     A.   Well, except for two days, in all of the

19 sampling that was done, and if you are aware of

20 that, there was a great deal of soil sampling done

21 except for two days in December of '03.  I believe

22 it was two days.  Definitely one day but possibly

23 two days.  I think it was the 20th and 21st of

24 December were two days that -- were the only two

1    days that I was not with the geologists when they

2    were collecting the soil samples.  And I believe

3    that was -- in those two days was when -- yeah,

4    those were the two days, to the best of my

5    knowledge.

6        Q.    If you would, flip to page 32 for me.

7        A.    Thirty-two?

8        Q.    Yeah.  In looking through your time

9    summary, I found another series of entries that

10   show instances where you received information from

11   someone else in the case, but I don't see where you

12   did anything with it or where you generated any

13   work product back.  And I want to talk about a

14   couple of those with you --

15       A.    Okay.

16       Q.    -- and have you can explain them.  If you

17   look at the second one, it's April 26th, 2004.  It

18   says, reviewed CD -- reviewed information on CD,

19   Dr. Flowers, 2.5 hours.

20       A.    Uh-huh.

21       Q.    Can you tell me what information that was?

22       A.    Right now, today, at this moment, I can't.

23       Q.    Okay.  So you're claiming two-and-a-half

24   hours of time --

1    A.    But I know I did that.

2    Q.    But you don't know what it is?

3    A.    I don't remember specifically what it was

4    related to.

5    Q.    Now, Dr. Flowers was the plaintiff's

6    expert, one of the plaintiffs?

7    A.    The lead geologist.

8    Q.    Okay.  And did he -- and he provided --

9    apparently provided you with some kind of

10   information?

11   A.    Yes.

12   Q.    Is there another entry on the time summary

13   that reflects that you did anything with that time,

14   with that information that you received?

15   A.    I don't know.  I'd have to look, but I

16   know that I had to review the information on that

17   CD in order to proceed with the property access

18   work that I was involved with.

19   Q.    Is there any entry on the time summary

20   that shows that you commented on that information

21   or that you processed it or had anything to do to

22   give that information back to Dr. Flowers in

23   another way or in a way that would reflect an added

24   contribution by you?

1        A.    I don't know.  I'd have to look at the --

2    all the entries.

3        Q.    If there isn't one, you're asking to

4    receive compensation essentially just for reviewing

5    information that other people put together?

6        A.    I'm asking for compensation for part of

7    the work that I had to do related to the property

8    access goal that we were trying to accomplish.  And

9    part of the work was reviewing the information that

10   Dr. Flowers was sending me and that I believe was

11   related to the entry on 5/24 where there was a

12   phone conference with Steve Medina and Flowers and

13   Rich regarding the sampling plan.  What we were --

14   you know, we had to have a sampling plan, how we

15   were going to proceed with all that.

16            What I'm saying is that the information

17   that I was receiving from Dr. Flowers or George

18   Flowers needed to be reviewed to incorporate the

19   information that I was receiving from him into the

20   work that I was doing on the property access.

21       Q.    Let me ask you this.  Did you need the

22   information on the CD in order to be in a position

23   to obtain access to property?

24       A.    I can't tell you today why I needed that

1    information.  What I can tell you today is I was

2    reviewing that CD because it was part of the

3    development of the property access work.

4        Q.   If the information on the CD went toward

5    the sampling plan, and we don't know that, did you

6    develop the sampling plan?

7        A.   I did not.  That was George Flowers' task.

8        Q.   Do you know if the people that did the

9    sampling work that you did --

10       A.   What -- go ahead.

11       Q.   You did sampling work in this case that

12   we'll talk about.

13       A.   I did not do sampling -- meaning taking

14   samples?

15       Q.   Did you do that?

16       A.   No.

17       Q.   Okay.

18       A.   I was -- you have to be certified, and you

19   have to be George Flowers' capacity and David

20   Allison to do that.

21       Q.   Okay.  There's no way of knowing what you

22   did with this information at this point, is there?

23       A.   Well, I think there's a way of knowing.  I

24   just -- I think I just explained what I did with

1    it.

2        Q.    Okay.  Let me turn to another entry.  If

3    you'd go ahead two pages to 34.

4        A.    To page 34?

5        Q.    Yeah.

6        A.    Okay.

7        Q.    It's an entry on August 23rd, 2004.

8        A.    August 23rd, 2004.  Okay.

9        Q.    It says, met with Willis Perrine, and I

10   understand he's the spouse of the lead plaintiff?

11       A.    Yes.

12       Q.    And it's about Paushel and Benjamin, et

13   cetera, and it's three-and-a-half hours.

14       A.    Uh-huh.

15       Q.    Does this generally reflect that you had a

16   meeting with the plaintiffs in the case, and you

17   discussed the case with them?

18       A.    In 2004, on August the 23rd, yes.

19       Q.    Okay.  Is there any way to tell if they

20   gave you any information back?

21       A.    Well, I -- you say from looking at the

22   time summary?

23       Q.    Yes.

24       A.    I don't know that there's a designation or

1    a specification in the time summary of what the

2    information was that got back, but I can tell what

3    this was about, if you would like to know that.

4         Q.   Sure.

5         A.   Okay.  This had to do with -- in the

6    period of time when we were trying to get more

7    information about the actual operations of the

8    Spelter (sic), and I believe during this period of

9    time I was talking with Willis Perrine about that,

10   but it also had to do with the identification of

11   in-state defendants.  So I was getting information

12   about that, also.

13        Q.   Is there anywhere in the time summary that

14   reflects that you got information from Willis

15   Perrine that you then conveyed back to the trial

16   team?

17        A.   I can't tell you right now that there is

18   in the time summary.

19        Q.   Okay.  I mean, this page runs ahead for,

20   you know, two more months.

21        A.   But I can --

22        Q.   I don't see any entry --

23        A.   But I can tell you any information on that

24   order that I received from communications with --

1    they would have been at this point -- I think the

2    case was about to be filed, in August 23rd, on

3    August 23rd.  I don't remember the actual date of

4    the filing.  But I can tell you that any of this

5    kind of information was shared back with either

6    Carol Moore or Steve Medina, you know, because they

7    were involved, also, in trying to -- they were

8    trying to get this kind of information that I was

9    receiving.

10        Q.   Were you aware that the complaint had

11   already been filed for two months by this point?

12        A.   Like I said, I didn't remember whether it

13   was...

14        Q.   Okay.

15        A.   I knew it was summer of '04.  I didn't

16   remember the exact date.

17        Q.   Nevertheless, there no entry on this page

18   that shows that you did convey any information back

19   from Willis Perrine, so how can you say that the

20   three-and-a-half hours that you are claiming time

21   for was a benefit to the class or to the firms in

22   the case?

23        A.   Only that I know it was.

24        Q.   Okay.  Do you have any e-mails or

1    documents or notes that you can think of that would

2    show what Willis Perrine may have told you about

3    the Spelter or about the in-state defendants that

4    we can look at to verify the three-and-a-half

5    hours?

6        A.    Any documents back from Willis Perrine?

7        Q.    Sure.  Do you have --

8        A.    No.

9        Q.    -- or any notes that you have regarding

10   this meeting that you could point to that would

11   help substantiate the three-and-a-half?

12       A.    I'm not sure.  I know that this entry got

13   into the time summary.  I didn't just dream up the

14   date and the entry.  So -- but can I pinpoint for

15   you today where that note is that gave me the

16   information for the entry?  I can't do that today.

17       Q.    Okay.  There's another set of tasks that I

18   don't think I need to show you, but I just want to

19   read to you.  And I hope you'll accept that these

20   are entries that are on the time summary, and we

21   can verify them if you want, but I want to give you

22   three tasks and then ask you a couple questions.

23            On June 24th, 2004 you claim an

24   hour-and-a-half for had copies of maps made at the

1    WVU copy center.

2          On October 21, 2004, you claim .75 hours

3    for obtained and faxed EPA document to Kathleen

4    Toolan at L and P.

5          On March 16th, 2005, you claim two hours

6    for sent copies and maps to Levin Papantonio.

7          If I'm not wrong, Dr. Simoni, these tasks

8    all just essentially reflect you shipping documents

9    or faxing documents to someone else.

10         A.   Well, if I remember what you just read

11   correctly, in at least one of them there was the

12   word "obtained and faxed."  I think that was in one

13   of them.  So part of it was faxing.  Part of it was

14   generating it, obtaining it.

15         Q.   On the March 16th entry, you claim two

16   hours for sending the copies and the maps to my

17   firm, and the day before you claim other hours for

18   collecting those documents.

19         A.   Uh-huh.

20         Q.   So at least as to that entry, you're

21   claiming two hours worth of work essentially for

22   just putting together a shipment of copies and maps

23   and putting that in the mail?

24         A.   Well, you are generalizing to what it

1  was.  Could I look again at the specific entries?

2      Q.  Sure.  If you want to look at page 37,

3  that's a good one to look at.

4      A.  Page 37?

5      Q.  Sure.

6      A.  Okay.  I'm on page 37.

7      Q.  So if you look at 3/15/2005, you have

8  13-and-a-half hours to go to the DEP and get those

9  copies.  And then on March 16th you have two hours

10  to send those copies and maps.

11         My question is, does it really require a

12  law degree or a sociology degree just to put copies

13  and maps in the mail?

14         MR. WAKEFIELD:  Object to the form.

15      A.  No.

16      Q.  Are you claiming the same rate for

17  gathering this information as you are for sending

18  it?

19      A.  I think I said earlier in my deposition

20  that the contributions reflected in the time

21  summary are kind of a blended series of activities.

22      Q.  Okay.

23      A.  Contributions, part of which are

24  paralegal, some upper end paralegal and others not.

1    Q.   This would be one of those that doesn't

2    require any specialized skill, sending things in

3    the mail?

4    A.   I think that's true, fair.

5    Q.   You've got other entries where you drive

6    to the Pittsburgh airport to pick people up, for

7    example.  That's not a task that required any

8    specialized skill, other than a driver's license.

9    Isn't that true?

10   A.   That's true.

11   Q.   And there are a lot of entries like that

12   on this time summary.

13        MR. WAKEFIELD:  Object to the form.

14   A.   There are definitely some.

15   Q.   Okay.  There are other entries on here

16   that are early on in the case where it appears

17   you're just learning about the case or conducting

18   an on-the-ground investigation.  You have -- in

19   going back to 2001, you have communications with

20   potential plaintiffs and research and

21   investigation.  If you want to look at that entry,

22   I can show it to you.

23        MR. WAKEFIELD:  Do you have a date?

24   Q.   It's a general date.  Go to page 23.

1    A.    Twenty-three?  Okay.

2    Q.    January 2001 and February 2001, you're

3    claiming 100 hours for communications with

4    plaintiffs, potential plaintiffs, and research and

5    investigation for those two months.  And there's no

6    further detail other than what's provided here.

7    This is an estimate?

8    A.    Uh-huh.

9    Q.    Okay.  With these potential plaintiffs,

10   you weren't providing legal services to them?

11         MR. WAKEFIELD:  Object to the form.

12   A.    Your question is?

13   Q.    Were you providing legal services to these

14   potential plaintiffs?

15   A.    No.

16   Q.    Did you have any expectation of payment

17   from these potential plaintiffs?

18   A.    From the plaintiffs?

19   Q.    Sure.

20   A.    No.

21   Q.    When did you first form an expectation of

22   payment for these 50 hours that you performed in

23   these two months?

24   A.    Well, my expectation of payment or

1   compensation, I guess you're asking, is related to

2   everything else I've said in my deposition, that I

3   had an expectation, clear expectation stemming from

4   the communications I had with Gary Rich going back

5   to November of 1999 and follow through to 2005, of

6   course.  But that clear expectation was for

7   compensation based on the significant contributions

8   that I was making to the case, and that expectation

9   for contribution, of course, was contingent upon

10  the idea that there would be a recovery and that my

11  compensation would be a function of the total

12  recovery that was gained by the plaintiffs.

13      Q.   If you look ahead to the next page and the

14  next set of entries generally.  I'm not going to

15  call out the specific ones, but I want to

16  discuss --

17      A.   On what page?

18      Q.   The next -- 24.

19      A.   Twenty-four.  Okay.

20      Q.   And thereabout.  We're not going to look

21  at the specific entries here.  I'm trying to save

22  some time.  But in general, you know that there are

23  entries on here that talk about discussing this

24  case with Masry & Vititoe, discussing this case

1    with Glasser and Glasser, discussing this case with

2    Jan Schlichtman.

3           You've got several entries where you claim

4    time for discussing the Spelter case with firms

5    that ultimately did not accept the case, did not

6    handle the case.  Do you agree with me on that?

7    A.    Yes.  That's true.

8    Q.    How did that work benefit the class if

9    those firms did not actually litigate the matter?

10   How did the plaintiffs benefit from that work?

11   A.    Well, I believe that ultimately or that

12   generally or maybe -- that generally what we needed

13   to do is we needed to go through this process to

14   eventually reach an agreement with a firm who was

15   interested in the case, and that this was part of

16   the investigation of firms.  And that

17   investigation, I believe, was ultimately

18   beneficial, because it ended up with an agreement

19   with a good law firm, that we felt was a good law

20   firm to handle the case.

21   Q.    But if you take Glasser and Glasser as an

22   example, ultimately you put a lot of time into

23   meeting with them, having a site visit, going to

24   their office, and they did no work on the

1    litigation, did they?

2        A.    No.

3        Q.    And they did nothing for the people of

4    Spelter.

5        A.    In terms of this litigation?

6        Q.    Right.

7        A.    That's true.

8        Q.    So --

9        A.    Let me.

10            MR. WAKEFIELD:  Just answer his question.

11        A.    Okay.  That's true.

12        Q.    Let's go ahead.  I want to shift now to

13    some of the legal investigation, legal research

14    that I found in the time sheet.  If you jump ahead

15    to page 30.

16        A.    Thirty.

17        Q.    If you look at December 15th, 2003.

18        A.    I'm sorry.  What was the date?

19        Q.    12/15/03.

20        A.    December 15th of '03.  Okay.

21        Q.    Do you see that one?  It says, researched,

22    located and faxed WVSOL court decision to Medina, L

23    and P, three hours.

24        A.    Yes.

1    Q.   I'm assuming this is a statute of

2    limitations case?

3    A.   It was a statute of limitations

4    research --

5    Q.   Okay.

6    A.   -- I was doing.

7    Q.   What court decision was this?

8    A.   I don't remember.

9    Q.   Did Steve Medina ask you to do it?

10   A.   I had communications with him about this,

11   this matter.

12   Q.   Did he ask you to perform these three

13   hours of research?

14   A.   I don't remember.

15   Q.   Do you have any documents that would help

16   us identify what the research was?

17   A.   I think he might have -- I think he might

18   have maybe the document or somebody might --

19   somebody at Levin Papantonio might have the

20   document.

21   Q.   Have you seen it in this litigation, in

22   this case?

23   A.   Did I what?

24   Q.   Have you seen it in the case we're in

1  today?

2      A.   I don't remember seeing it.

3      Q.   And you don't remember what it is?

4      A.   I do not.

5      Q.   How did you do this research?

6      A.   I was doing general research in the area

7  of statute of limitations and trying to look for, I

8  believe -- it's difficult for me to say exactly

9  today how I was doing it back in 2003, but from

10 this entry, it suggests to me that I was

11 researching the area of statute of limitations, and

12 I was looking for West Virginia cases, and I found

13 one that I thought would be pertinent and faxed it

14 to Medina.

15     Q.   Can we tell if we -- you did the research

16 in the library or online or some other way?

17     A.   Can I tell you?  I cannot tell you.

18     Q.   All right.  I want to move to another

19 area, so we'll put the time summary aside.

20          MR. WAKEFIELD:  Let me interrupt for a

21 moment.  Can you tell me how long we've gone?

22          MR. CASH:  I can tell you I have probably

23 20 minutes.

24          MR. WAKEFIELD:  Well, the reason -- part

1    of the reason for making the inquiry was whether we

2    ought to break or whether you'd like to continue.

3    My personal preference, subject to what the court

4    reporter, the videographer and the witness would

5    like to do, would be to continue.

6         MR. CASH:  Yeah, I wouldn't mind.

7         MR. WAKEFIELD:  And I'm heartened by the

8    fact that you have only 20 minutes more, so...

9         MR. CASH:  I wouldn't mind powering

10   through.  I know Ms. Mason would like to have a few

11   more questions, but I think we can power this out.

12   BY MR. CASH:

13       Q.  It's certainly up to you, Dr. Simoni.  If

14   you want a lunch break --

15       A.  I would prefer to continue.

16       Q.  I figured you'd say that.

17       MR. WAKEFIELD:  But going back to my basic

18   question, can you tell me how much time we've

19   expended?

20       COURT REPORTER:  If my calculation is

21   correct, eight hours and 58 minutes.

22       MR. WAKEFIELD:  Okay.  The reason I wanted

23   to know that, that's almost nine hours.  I'm

24   willing to let the witness go for up to another

1  hour.  That will be 10 hours, which is what

2  everyone wanted to have done, subject to the

3  objection that we raised that it should only be

4  that amount as contemplated under the rules of

5  civil procedure.  So our position is we will

6  continue the deposition for another hour and two

7  minutes.

8  BY MR. CASH:

9      Q.   Let me show you the -- on your

10  interrogatory responses again, if I could.  This is

11  The Cochran Firm's Interrogatory No. 19.

12      A.   Number 19.

13      Q.   Yeah.  It's the last one, and I've just

14  handed it to you.

15      A.   Uh-huh.

16      Q.   I won't make it an exhibit here.

17          The question was do you contend that any

18  individual ever told you you would be compensated

19  for your contributions to the Spelter matter, and

20  if so, identify that.

21          And you see your answer there?  Could you

22  read it out for me?

23      A.   It says, answer, Dr. Simoni was told that

24  he would be compensated by Gary W. Rich on those

1    occasions, referencing such conversations in the

2    already-produced time summary document.

3        Q.    Since you only identified Gary Rich here,

4    is it fair to say that nobody else ever made you a

5    promise that you would be compensated for your

6    contributions?

7        A.    That's true.

8        Q.    I'd like to look at some e-mails.  These

9    are the e-mails that you have.

10           MR. WAKEFIELD:  You handed me two

11   documents that had a series of e-mails on them.

12   Are those the ones you're going to question the

13   witness about?  Are those the ones you're going to

14   question the witness about?

15           MR. CASH:  Yeah.

16           MR. WAKEFIELD:  The ones you showed me

17   this morning?

18           MR. CASH:  That's right.  I will make this

19   Exhibit 33, and it is page LP 3062 and 3063.

20           (Deposition Exhibit No. 33 marked.)

21           MR. WAKEFIELD:  This is Exhibit 33, is

22   it?

23           MR. CASH:  Yes.

24           THE DEPONENT:  33.  And you have it

1    there?

2           MR. WAKEFIELD:  Have you seen this?

3           THE DEPONENT:  I don't know.

4           MR. CASH:  Let me ask the questions, if

5    that's okay.  I don't have so much time left.

6           MR. WAKEFIELD:  I understand, but I want

7    him a fair opportunity to read it since it's just

8    now being produced to him.

9           MR. CASH:  Fair enough.

10   BY MR. CASH:

11       Q.   Dr. Simoni, have you seen this before?

12       A.   I'm just now looking at it to see if I

13   have.

14       Q.   Okay.

15       A.   Yes, I have seen it.

16       Q.   Did you write this e-mail or parts of

17   these e-mails?

18       A.   Yes.

19       Q.   Okay.  This is an e-mail that you sent

20   back and forth with Steven Medina?

21       A.   Part of it is, yes.

22       Q.   Formerly at my firm?

23       A.   Yes.

24       Q.   Okay.  If you look at the second page,

1    just to orient you, it says, on January 13th, 2012,

2    Gary Rich filed a declaratory judgment action

3    against me.  And then you go on and say that

4    there's going to be a mediation in the case.  Do

5    you recall writing that?

6        A.   Can I take a minute and look at page 2?  I

7    didn't read page 2.

8        Q.   Sure.

9        A.   Okay.  Sorry.

10        Q.   Okay.  You discussed this e-mail with

11    Mr. Marino earlier this morning, didn't you, even

12    though he didn't show it to you?

13        A.   I don't remember the reference but...

14        Q.   You recall writing this e-mail in August

15    of 2012?

16        A.   Yes.

17        Q.   What was the purpose of writing to Steve

18    Medina?

19        A.   Are you talking about the e-mail at the

20    bottom of the page?

21        Q.   Yes.  The first one.

22        A.   Okay.  Well, I think it speaks for itself.

23        Q.   I'm asking you.

24        A.   But if you're asking me the purpose, the

1  purpose is, as it says, to -- at that point it was

2  to see if he would come forth with information

3  about the role that I played in the case.  I

4  thought that was important, because he was the

5  major lawyer from your firm at the time.  He was

6  the lead lawyer, I should say.

7      Q.   In terms of dealing with you, he was the

8  lead lawyer?

9      A.   Definitely in terms of dealing with me.

10     Q.   Is there a reason you didn't pick anybody

11 else at Levin Papantonio?

12     A.   In terms of my activities and my work, he

13 was the one I -- he and Carol Moore, I believe,

14 were the two people who knew most about what I

15 did.  And so that was the reason why I felt he was

16 important, but plus I considered him to be an

17 honest guy.

18     Q.   And in this e-mail you asked him to

19 provide you an affidavit that you could use in this

20 case.  True?

21     A.   Let's see.

22     Q.   I am asking you and Nancy Eichler --

23     A.   Yes.  Yes.

24     Q.   -- to each provide an affidavit.

1    A.   Yes.

2    Q.   And he wrote back and said, I am not

3    willing to provide an affidavit, and I do not want

4    any involvement in litigation.  Do you recall

5    getting that response?

6    A.   Yes.

7    Q.   What was your reaction when you got that

8    e-mail?

9    A.   I was disappointed but I understood,

10   because my understanding was that Steve in recent

11   years has been going through some major changes in

12   his life, and I understood his desire not to be

13   involved in anything having to do with the legal

14   process or procedure, litigation or anything.  So I

15   was disappointed but I understood.

16   Q.   Did you see him as a neutral party in this

17   dispute between you and Gary Rich?

18   A.   All I wanted Steve to do was tell the

19   truth.  I believed that he was the kind of person

20   who would just tell the truth.

21   Q.   And what you wanted him to say was to

22   substantiate your contributions for the case?

23   A.   I believe if he told the truth, that would

24   happen.

1      Q.    Looks like you wrote him back and said

2    that, if I have offended you with my request, I am

3    sorry, and there are some other personal comments

4    there.  I was curious if you ever got a response

5    back to that last e-mail.

6      A.    I think this is the last communication

7    that I've had with him.

8      Q.    You've not discussed anything with him

9    since this time?

10     A.    No.  Don't recall any further

11   communication after this.

12     Q.    Were you writing to Steve Medina to

13   substantiate the value of your contributions to the

14   litigation, or were you writing to him to have him

15   substantiate your claims that you had an agreement

16   with Gary Rich?

17     A.    Well, he never knew about the agreement

18   with Gary Rich.  I never had communication with

19   him, to the best of my recollection, ever about

20   that.  I just felt if he would just tell the truth

21   about his working relationship from Levin and

22   Papantonio level to the local level in West

23   Virginia with me, that my contributions would be

24   substantiated, because he knew a lot about that.

1     Q.  Did anyone at Levin Papantonio know about

2  your agreement with Rich?

3     A.  No.

4         MR. WAKEFIELD:  Object to the form.

5     Q.  Okay.  I think we're done with that,

6  Doctor.

7     A.  Let me say when I said --

8         MR. WAKEFIELD:  No, I don't want you to

9  say anything.

10    A.  I just want to say, to the best of my

11  knowledge, no.

12       MR. WAKEFIELD:  Okay.  I just want you to

13  respond to questions.

14       THE DEPONENT:  I was trying to do that.

15       MR. CASH:  Every lawyer freaks out when

16  that happens.  I'm with him on this one, believe

17  me.

18       MR. WAKEFIELD:  I am not freaking out.

19       MR. CASH:  I would.

20       MS. MASON:  Let the record reflect

21  Mr. Wakefield has turned purple to match his tie.

22  No.  Kidding, just kidding.

23  BY MR. CASH:

24     Q.  Mr. Marino showed you an exhibit earlier

1    today, it was Exhibit 27, which is a letter that

2    Mr. Wakefield wrote.  If you have it, please pull

3    it out.  If you don't, I have a spare copy.

4         A.   A letter?

5         Q.   Let me just give you -- this is the same

6    thing.  It's the letter from Mr. Wakefield to

7    several people.  It's dated March 26th, 2010.

8         A.   Okay.

9         Q.   Was March 26th, 2010 your first formal

10   written demand for compensation arising from the

11   Spelter matter?

12        A.   Can I just take a look --

13        Q.   Sure.

14        A.   -- and refresh my memory on this one?

15        Q.   Sure.  Sure.

16        A.   All right.  Thank you.  I'm sorry.

17        Q.   No problem.

18        A.   Go ahead.

19        Q.   Okay.  This is Mr. Marino's exhibit from

20   this morning.  The letter is dated March 26th,

21   2010.  Do you see that?

22        A.   Okay.

23        Q.   And Levin Papantonio is a recipient of

24   this letter.  We're listed.

1    A.   I see that.

2    Q.   It's the second or third, depending on how

3  you count.

4    A.   Uh-huh.

5    Q.   Was this your first demand to Levin

6  Papantonio in writing for compensation?  Let me

7  back it up, Doctor.

8    A.   Well, let me just say I --

9    Q.   I think I can save a little time.

10    A.   All right.  Go ahead.

11    Q.   Was this a demand to Levin Papantonio, or

12  was this simply a demand to Gary Rich and advising

13  Levin Papantonio of the pending demand?

14    A.   Okay.

15       MR. WAKEFIELD:  And first of all, I'm

16  going to object to the extent the document speaks

17  for itself.

18       Secondly, you can answer the question, but

19  I don't want you to answer in any manner which

20  would rely upon or reveal any counsel or advise you

21  received from your attorneys.

22    A.   And your question again, please?

23    Q.   Were you making a demand against Levin

24  Papantonio or not?

1    A.    Well, I believe the letter as I read it

2    just is saying that Flaherty, Sensabaugh & Bonasso

3    are representing me, and that I performed

4    substantial critical professional services, that I

5    have not been compensated, and it's -- it's a --

6    it's to provide notice, the intent of the letter is

7    to provide notice of a belief that I had -- at that

8    time that I had a claim.  I think that's what the

9    letter says.

10    Q.    Were you pressing that claim against Levin

11    Papantonio or not?

12    A.    All I can tell you is that Levin

13    Papantonio was one of the parties noticed to inform

14    that -- to inform about these things.

15    Q.    Did you hire -- you hired your current

16    counsel to help press this claim for compensation

17    that you have.  True?

18    A.    In my seeking compensation, fair

19    compensation, yes, I hired Flaherty, Sensabaugh &

20    Bonasso.

21    Q.    Were you expecting Levin Papantonio to pay

22    you after you sent this letter to Levin Papantonio?

23    A.    Was I expecting that there would be a

24    response saying they were going to pay -- that

1   Levin Papantonio was going to pay me?

2       Q.   Was that your intent?

3       A.   That was not my expectation concerning

4   this letter, because the letter doesn't -- it's --

5   suggests a noticing of a potential claim.

6       Q.   At the end of the letter it says,

7   Dr. Simoni is prepared to pursue -- it's on the

8   bottom of the first page, the one you're holding --

9   Dr. Simoni is prepared to pursue appropriate

10  remedies to ensure that he obtains adequate

11  compensation, if necessary.  What did you mean by

12  "pursue appropriate remedies?"

13       MR. WAKEFIELD:  Well, objection.  He

14  didn't author the letter.

15       A.   That's what I was just going to say.  I

16  did not author the letter, so I don't know what the

17  author intended with those words.

18       Q.   Was it your intent that if you couldn't

19  get compensation voluntarily that you would

20  initiate litigation against some or all of the

21  recipients of this letter?

22       MR. WAKEFIELD:  Again, you can answer the

23  question so long as it does not reveal any counsel

24  or advice or communication with your attorney.

1    A.   And the question again, please?

2    Q.   The question was were you intending to

3  pursue litigation against any of the recipients if

4  the letter didn't produce a voluntary payment to

5  you?

6    A.   I believe that I had the intent to do

7  whatever was necessary with the advice of counsel

8  to be fairly compensated.

9    Q.   Did that include filing suit?

10    A.   Whatever was necessary was in my mind.

11    Q.   I want to run through a list of Levin

12  Papantonio people with you and ask you about your

13  dealings with each of them, and if you don't have

14  any, just tell me that and I'll move on to the next

15  person.

16        I think you said earlier, I could be

17  wrong, have you ever met or spoken with Virginia

18  Buchanan?

19    A.   I believe not.

20    Q.   What about Ned McWilliams, have you ever

21  met or spoken with him?

22    A.   Yes.

23    Q.   Can you tell me when?

24    A.   I think Ned came to West Virginia one

1    time.  I think he was in West Virginia in the

2    development of the -- either in -- maybe it was

3    looking at the -- I don't remember exactly when.

4    Maybe looking at Spelter or maybe looking at

5    Reedsville/Arthurdale.  I sort of remember him

6    related to Reedsville/Arthurdale, in that potential

7    case in Reedsville/Arthurdale area.  But he came to

8    West Virginia, to the best of my recollection, one

9    time.

10        Q.   Do you recall anything that he discussed

11   with you during that visit?

12        A.   And I think I --

13        Q.   Other than --

14        A.   Excuse me.  I think I spoke with him once

15   in the Levin Papantonio offices, met him at least

16   maybe.

17        Q.   Did you have any substantive

18   communications with him?

19        A.   I don't remember that.

20        Q.   Anything that would be relevant to your

21   claims or defenses in this case?

22        A.   I don't think so.

23        Q.   Or mine?

24             MR. WAKEFIELD:  Object to the form.

1    Q.   Okay.  What about Mike Papantonio, have

2    you ever met or spoken with him?

3    A.   Yes.

4    Q.   When?

5    A.   Well, I met Mike Papantonio on one of my

6    visits to your firm's office.

7    Q.   Did --

8    A.   It was either -- my best guess at this

9    point, sitting here, it was either March of '02 or

10   November of '02.

11   Q.   Did you have any substantive

12   communications with him that would relate to this

13   case, the case we're in now?

14   A.   Yes.  I think so.

15   Q.   What were they?

16   A.   Related to this case or the underlying

17   case?

18   Q.   Rich versus Simoni.

19   A.   Oh, not related to this case.

20   Q.   Okay.  What about Mark Proctor?  Same

21   questions.  Have you ever met him?  Ever spoken

22   with him, and did you have any substantive

23   communications that would related to this case?

24   A.   I met Mark Proctor one time in a lunch

1    group session at your firm, I believe, where there

2    were a number of different people.  And related to

3    this particular case, Rich versus Simoni?

4        Q.    Yes.

5        A.    No, I've had no communication with him.

6        Q.    Okay.  What about the same questions as to

7    Bobby Blanchard?

8        A.    Bobby --

9        Q.    You ever met him?  Spoken with him?

10       A.    I don't remember Bobby Blanchard, and

11   therefore it would be a no to the second part.

12       Q.    What about Brian Barr?

13       A.    I've seen Brian Barr's name, I think, on

14   some documents, but I don't think -- I don't

15   remember ever meeting Brian Barr.

16       Q.    Or talking to him?

17       A.    Or talking to him.

18       Q.    What about Amanda Slevinski?

19       A.    I think Amanda was a paralegal, and I -- I

20   have a vague recollection of some -- not related to

21   this case.  I think I met her or had some

22   communication with her during the Spelter case

23   development.

24       Q.    Okay.  She got married to Brian Barr, by

1    the way.

2        A.    Okay.

3        Q.    What about Nathan Bess?

4        A.    Nathan Best (sic) was an investigator

5    working with Carol Moore.

6        Q.    Did you have communication with him as

7    respects to your duties in this case or the things

8    that you did in this case?  And by "this case," I

9    now mean the Spelter litigation.

10       A.    Yes.  Well, my contact with Nathan Best

11   was during the time of the dust sampling in June of

12   2005, and he came with Carol Moore.  I remember

13   meeting with them, and I was helping them with the

14   property access and so forth.  That was going on in

15   June of 2005.  But since that period of time, I

16   don't think I've had any communication with Nathan

17   Best.

18       Q.    And you didn't discuss anything relating

19   to Rich versus Simoni?

20       A.    No.

21       Q.    All right.  What about Robert Price, ever

22   talked to him?

23       A.    I don't recall that name, so certainly no

24   communication about this case.

1    Q.   Are there any other Levin Papantonio

2    employees that you can recall other than Carol

3    Moore and Steve Medina that you had communications

4    with?

5    A.   Back at the time of the Spelter case?

6    Q.   Yes.

7    A.   Well, I had certainly communications with

8    all of the paralegal people who worked in Steve

9    Medina's office.  That was a fairly regular thing,

10   phone calls and -- you know.

11   Q.   To shortcut it, Doctor, did you have any

12   conversations with them as regards the claims in

13   Rich versus Simoni?

14   A.   No.

15   Q.   Did you have -- you didn't have any

16   conversations with anybody at Levin Papantonio

17   regarding Rich versus Simoni?

18   A.   No.  Only Steve Medina, and that would --

19   he's not with the firm at the time.

20   Q.   Do you maintain any personal relationships

21   with anybody associated with the firm, any

22   friendships?

23   A.   No.  I hope there's still a chance for a

24   friendship with Steve Medina, but I don't know how

1    he views that at this point.  But that's something

2    for the future, but I have no other ties or

3    personal connections.

4        Q.   Okay.  Do you recall Darnel Shaffer?

5        A.   Oh, yes.  I do.

6        Q.   Okay.  Can you tell us about...

7        A.   Well, Darnel was one of -- she was the

8    paralegal at the time that Levin Papantonio

9    accepted the case.  And I had a lot of

10   communications with Darnel over a lot of different

11   matters that were going on with the case.

12       Q.   Okay.

13       A.   In fact, she came to West Virginia -- the

14   time we transported people up to the Pittsburgh

15   airport, she was with that group.  She came for

16   that meeting.

17       Q.   If I heard you correctly, the people you

18   have actually met in person are Ned McWilliams,

19   Mike Papantonio, Mark Proctor, Amanda Slevinski,

20   Nathan Bess, Carol Moore, Steve Medina, Darnel

21   Shaffer.  Did I leave anybody else?

22       A.   I think you've covered it.

23       Q.   It's true that you never got a paycheck

24   from Levin Papantonio?

1    A.   Yes.

2    Q.   And you never submitted hours to Levin

3  Papantonio?

4    A.   Yes.  I never did.

5    Q.   And you never submitted significant

6  business expenses to Levin Papantonio?

7    A.   That's true.

8    Q.   Now, we reimbursed you for incidental

9  charges for copying and things like that, but you

10  never submitted regular expenses, for example?

11    A.   That's true.

12    Q.   And nothing of more than a de minimus

13  value?

14    A.   That's true.

15    Q.   In your response to The Cochran Firm's

16  interrogatories, you said you should have been

17  compensated $4,369 for mileage.  How did you get to

18  that number?

19    A.   Oh, those were expenses for travel.

20    Q.   Did you ever submit those to --

21    A.   No.

22    Q.   -- anybody?

23    A.   No.

24    Q.   Can I ask why you --

1      A.   Why I never --

2      Q.   -- stated?

3      A.   -- submitted them?

4      Q.   Well, why do you state in the

5   interrogatory that you should have been reimbursed

6   when you never claimed those expenses?

7      A.   I don't remember the interrogatory

8   actually.

9      Q.   Are you claiming that now?

10     A.   I'm just saying that -- I'm just saying

11  that that was transportation time that I put in on

12  the case.

13         MR. CASH:  Okay.  I think those are all of

14  the questions that I had.

15         THE DEPONENT:  Okay.

16         MR. CASH:  I thank you very much for your

17  time.

18         THE DEPONENT:  Thank you.

19         MR. CASH:  And certainly for your

20  patience.

21         You want the mic?

22         MR. WAKEFIELD:  Yeah.  Let's take a break

23  for just one second.  I'm assuming you're not going

24  to have a whole lot.

1          MS. MASON:  No.  I've narrowed it --

2    winnowed it way down.

3          MR. WAKEFIELD:  Very good.

4          THE VIDEOGRAPHER:  We're going off the

5    record.  The time is 1:13 p.m.

6               (Short break taken.)

7          THE VIDEOGRAPHER:  We're now back on the

8    record.  The time is 1:19 p.m.

9                    RE-EXAMINATION

10   BY MS. MASON:

11   Q.   Professor Simoni, I have just a few

12   follow-up questions related to the testimony you've

13   given to the other lawyers.

14          Mr. Marino asked you a series of questions

15   earlier this morning about a motion to compel that

16   was filed in the Spelter case to compel you to give

17   a second day of deposition.  Do you recall that?

18   A.   I do.

19   Q.   When did you learn that DuPont had filed a

20   motion to compel a second day of testimony?

21   A.   I do not know.

22   Q.   Were you aware of it at the time that

23   DuPont filed it?

24   A.   I don't think so, but I'm not sure.

1    Q.   Isn't it true that you learned about the

2  motion to compel and the briefs that the parties

3  had submitted on the issue after the Court had

4  already ruled that you would have to provide a

5  second day of testimony?

6    A.   I'm not sure.  It's possible but I'm not

7  sure.

8    Q.   How else would you have learned about that

9  information?  Were you staying in contact with the

10  lawyers in 2007, and were they giving you updates

11  about the case?

12    A.   In contact with?

13    MR. WAKEFIELD:  Object to the form,

14  compound.

15    Q.   Let me just ask this.  As of January

16  2007 -- well, let me back up.  You gave your first

17  day of depositions in December 2006, correct?

18    A.   Correct.

19    Q.   After you gave that deposition, in 2007

20  were you made aware of the filings that were

21  occurring on a regular basis in the case?

22    A.   I don't believe so.

23    Q.   Do you recall when you first received

24  notice that you were going to have to provide a

1    second day of testimony?

2        A.    Could you repeat that, please?

3        Q.    Do you recall when you received notice

4    that you were going to have to provide a second day

5    of testimony?

6        A.    I do not.

7        Q.    Okay.  How much -- what was your salary at

8    the time of your retirement from WVU?

9            MR. WAKEFIELD:  Yeah, I'm going to

10    object.  What's the relevance of that?

11            MS. MASON:  He's -- well, first of all, I

12    don't think I have to make an argument for

13    relevance, but I'll go ahead and do that and say

14    that it's -- he's claiming that the work he did

15    related to his qualifications as a sociology

16    professor.  So I want to know what he was making as

17    a sociology professor.

18            MR. WAKEFIELD:  I'll let him answer.

19            MS. MASON:  And we can mark it

20    confidential.

21        A.    I do not recall that.

22    BY MS. MASON:

23        Q.    Would it be reflected in your tax records?

24        A.    In what records?

1      Q.   Your tax records for 2004 and 2005.

2      A.   I imagine it would be.

3      Q.   There was also some discussion about

4  visits with John, Junior, or John Simoni.  I talked

5  to you about that a little bit.  Then Mr. Marino

6  talked about it with you this morning a little

7  bit.  Is it your position that John, Junior, was

8  providing you with legal advice or serving as your

9  lawyer?

10     A.   He was not serving as my lawyer.  And I

11 think I said before, we were on vacation, for

12 example, in summer of 2002.  He's a family member.

13 We talked about lots of things and...

14     Q.   When you -- after you received the check

15 for $30,000 from Bob Sweeney, did you sign any

16 release related to receiving that check?

17     A.   No.

18     Q.   I think you also said when talking with

19 Mr. Marino that you were a key player in the case

20 with regard to the statute of limitations.  Can you

21 explain to me what you meant by that?

22     A.   Well --

23          MR. WAKEFIELD:  Let me object to the

24 form.  I think he just admitted to it when he was

1    asked that question.

2        Q.   Okay.  And so let me rephrase that,

3    because I think you're exactly right.  You agreed

4    with Mr. Marino that you were a key player in the

5    Spelter case as it related to the statute of

6    limitations, correct?

7        A.   Yes, and certainly viewed as such by the

8    defendants in that case.

9        Q.   And I wanted you to explain to me what

10   your understanding of how and why you were a key

11   player.

12       A.   Because I was involved with the early

13   communications with the people in the Spelter

14   community with respect to possibility of a case and

15   talking about environmental contamination and those

16   related things.

17       Q.   And how did that relate to the statute of

18   limitations?

19       A.   Well, as I recall, they were trying to

20   pinpoint -- the defense was trying to pinpoint when

21   plaintiffs knew when the statute would have been

22   triggered for the Spelter case.  And they were

23   looking at communications that I might have had

24   with people as a possible trigger.  And since I was

1   involved with all of the early communications,

2   that's why they were looking at me.

3       Q.   And do you know whether the issue of the

4   statute of limitations was ever decided by the

5   court in the Spelter case?

6           MR. WAKEFIELD:  Which one?

7       Q.   Any, any of the courts.

8       A.   What I recall was after the first main

9   trial, there was -- I think there was an appeal.

10  And the major thing, the major basis for the appeal

11  was the statute of limitations question.  And I

12  don't -- I can't sit here and tell you right now

13  that I actually remember how that was all resolved.

14      Q.   Was it your understanding that the

15  statute --

16      A.   I think it was resolved favorably in terms

17  of for the plaintiffs, but I can't say for sure

18  that I know, you know, remember that.

19      Q.   Okay.  Do you know whether after the case

20  got through the appellate procedure, did it return

21  back to state -- to the trial court to resume

22  trial?

23      A.   I don't remember what happened with the

24  procedures.

1    Q.   Do you -- are you aware of any of your

2    actions that -- from 2000 to 2005 that may have

3    been detrimental to the class in the Spelter case?

4        A.   I can't think of any offhand.

5        Q.   The documents that you obtained in the

6    Spelter case, were these all documents that were

7    available to the public?

8        A.   Generally available to the public, you're

9    saying?

10       Q.   I didn't say generally available to the

11   public.  Were the documents that you obtained in

12   the Spelter case, were they public documents?

13       A.   I can't say every one.  For the most part,

14   they were.

15       Q.   Okay.  And how did you generally obtain

16   those documents?

17       A.   Well, through FOIAs and researching files

18   and in the West Virginia DEP offices and other

19   agencies.

20       Q.   And when you would go, for instance, to

21   the WV DEP, would you -- what would you ask to

22   see?  Documents related to -- any files related to

23   the Spelter site, or did it vary?

24       A.   It varied, and I can just tell you I was

1    as comprehensive as I could possibly be to get

2    every possible -- possibly related document that

3    there was.

4        Q.   And so as you went through these files to

5    determine -- to identify what documents you wanted

6    a copy of, did you make any sort of evaluation as

7    to the importance of the document?

8        A.   I had --

9        Q.   To the legal action.

10       A.   I had a sense as I was looking through

11   files as to what might be potentially important and

12   what might not be.  I had that kind of a sense.

13   But I wasn't -- I was -- in my position, I was not

14   feeling that I was in the position to determine.

15   What I wanted to do is give people a chance to look

16   at everything, the lawyers, the lead investigators,

17   Carol Moore, for example, Steve Medina, to make

18   that determination.

19       Q.   So you were basically as inclusive as

20   possible in gathering the documents, and then you

21   would forward them to Levin Papantonio and let them

22   sort through them to determine the importance.  Is

23   that fair?

24       A.   I think that's fair.

1    Q.    Before Levin Papantonio's involvement, did

2    you have anyone performing that same sort of

3    service for you?  In other words, you gathered up

4    all the documents, and then you sent them to

5    somebody and said, here, these may be important.

6    Was there anybody performing that function before

7    Levin?

8        A.    Not that I'm aware of.

9        Q.    Did you ever present those documents to

10   Gary Rich, pre-Levin Papantonio involvement?

11       A.    I'm sure along the way I shared some

12   documents with him that I would turn up, but I

13   don't recall what they were.

14       Q.    And did he offer any assessment to you

15   about the relevant importance of those documents

16   when you did share them --

17       A.    No.

18       Q.    -- with him?

19       A.    Could you ask that question once more?  I

20   just want to be clear in my answer.

21       Q.    Did he, meaning Gary Rich, offer you any

22   assessment as to the importance of the documents

23   that you did present him with?

24       A.    I don't recall that.

1    Q.   Now, you said -- I think you indicated at

2    least three different legal issues that you

3    investigated or researched in the Spelter case, and

4    one of them, you said, was on filing fees.  What

5    specifically -- when you say "filing fees," what

6    are you referring to?

7    A.   Well, we had an issue in -- an issue that

8    the lawyers wanted to be clear on with respect to

9    the -- you know, the fees for filing in West

10   Virginia.  We had had a problem in the Fairmont

11   case with Phillips Westinghouse.  That was a little

12   different, because that was an individual action,

13   not a class action.  They just wanted the lawyers

14   wanted to be clear on what they would be looking at

15   for filing fees.  That was my understanding at the

16   time.

17   Q.   Well, in the Fairmont case there was an

18   issue of whether you would have to pay a filing

19   fee, that is a fee to the clerk, the clerk of the

20   court for filing a complaint for every specific

21   plaintiff listed, and there were, what, 800

22   plaintiffs?

23   A.   No, there were...

24   Q.   Even more?

1      A.   Even more than that.

2      Q.   And so you guys had to look into the issue

3   in Fairmont about whether you would have to pay for

4   each individual plaintiff, correct?

5      A.   Uh-huh.

6      Q.   And -- yes?

7      A.   Yes.  That's true.

8      Q.   And are you saying that that same issue

9   arose in Spelter?

10      A.   No.  I do not remember the specifics of

11   the statute of limitation concerns that arose.  I

12   just know that at one time I was researching and

13   communicating with Steve Medina about it.

14      Q.   Okay.  We're talking about filing fees.

15   You just said statute of limitations.

16      A.   Oh, I said -- I'm sorry.

17      Q.   Okay.

18      A.   Filing fees, the same.  I don't remember

19   the specifics.  All I remember is that I was

20   looking at that in West Virginia also for them.

21      Q.   And you don't remember what -- when you

22   say you researched it, you don't remember what that

23   research was?

24      A.   No, I do not.

1    Q.   Wasn't it as simple as calling the clerk

2    of court of Harrison County and saying, how much is

3    the filing fee if we file a class action?

4    A.   My -- to the best of my recollection, it

5    was not that simple.

6    Q.   Okay.  And did the information that you

7    provided to -- I may be saying -- reaching

8    conclusions that you didn't say.  So you say that

9    you provided this information on filing fees to

10   Steve Medina?

11   A.   To Levin -- it must have been Steve

12   Medina, because most everything I provided to Levin

13   Papantonio went through his office or Carol Moore.

14   Q.   And you also indicated that -- oh, well,

15   no.  I was going to ask you, was that information

16   that you provided to whoever it was at Levin

17   Papantonio, whether it was Carol Moore or Steve

18   Medina, was that the same information that you had

19   obtained in during the Fairmont litigation?

20   A.   I don't believe so.

21   Q.   It was completely new and different

22   information?

23   A.   That was -- to the best of my

24   recollection, it was new and different.

1    Q.   Okay.  And then on -- you said that you

2    had obtained some West Virginia cases on

3    environmental issues.  You were listing different

4    legal research that you did, and I think you had

5    said you obtained copies of West Virginia cases on

6    environmental issues; is that right?

7    A.   I don't remember saying that.

8    Q.   Okay.  Did you do that?

9    A.   I'm sure I was doing that.

10   Q.   How did you go about doing that?

11   A.   How?

12   Q.   Yes.

13   A.   I was either in the law school library or

14   I was online.  I don't remember exactly.

15   Q.   And what were you -- what were you looking

16   for, just a general search for environmental cases

17   in West Virginia?

18   A.   I think, to give an example, I was in --

19   at some point I was looking at the, excuse me, the

20   legal procedures that environmental cases in West

21   Virginia had taken, or I should say the route that

22   they had taken and the legal procedures involved.

23   That was part of it.

24   Q.   And is that information that would have

1    been -- well, was that information gathered through

2    either copies of legal opinions or legal treatises?

3        A.    Both.

4        Q.    Anything other than legal opinions or

5    legal treatises?

6        A.    Legal treatises and legal opinions, you

7    mean court opinions?

8        Q.    Yes.

9        A.    I don't recall.

10        Q.    Okay.  And then as far as your research on

11    the statute of limitations was concerned, did you

12    perform any research on the Fairmont case related

13    to statute of limitations?

14        A.    I do not recall at this moment.

15        Q.    I'm going to mark --

16        A.    I may very well have, but I --

17        Q.    Yeah, let me give you what I've marked as

18    Exhibit 34.

19            (Deposition Exhibit No. 34 marked.)

20            MR. WAKEFIELD:  Do you have any extra

21    copies?

22            MS. MASON:  I only have two.

23            MR. WAKEFIELD:  Is this all the --

24    everything in here is the exhibit.

1          MS. MASON:  Yeah.  Uh-huh.  And I'm only

2     going to ask questions about the cover page.  Oh,

3     he may have two copies of that.

4          THE DEPONENT:  I'm sorry.

5          MR. WAKEFIELD:  Well, he has just one copy

6     of the cover page, but he has more than one copy of

7     the case.

8          MS. MASON:  Okay.  I'm sorry.  Take it

9     back.  I saw a staple.

10    BY MS. MASON:

11       Q.   Professor, does this refresh your

12    recollection as to whether you performed any

13    statute of limitations research in the Fairmont

14    case?

15       A.   I'm not sure that this verifies that,

16    because I see notes in here about Harrison County

17    down at the bottom, and that would not have been

18    Fairmont, looking at the Harrison County local

19    rules.

20            This period of time, March of '02, this

21    was a period of time when Masry & Vititoe, Nancy

22    Eichler, were looking at Spelter.  So I can't say

23    for sure that this cover page reflects statute of

24    limitation research in Fairmont.

1    Q.   So it may have actually been to do with

2    Spelter?

3    A.   It may have.

4    Q.   Okay.  And who -- it says according to

5    Cady, this is it, ex -- or underline it.  Who was

6    Cady?

7    A.   Professor Tom Cady at West Virginia

8    University law school.

9    Q.   Okay.  And then you've attached a case or

10   you faxed them a case, excuse me, faxed Nancy

11   Eichler a case that you thought would address the

12   statute of limitations after consulting with

13   Professor Cady?

14   A.   I think that's true.

15   Q.   Or than this research -- well, did you

16   perform any additional research that you can recall

17   on the statute of limitations issue on the Spelter

18   case other than this -- procuring this particular

19   case for Nancy Eichler?

20   A.   I'm confident that I did, but I don't

21   recall the specifics.

22   Q.   And who -- did anyone direct you to do

23   that?

24   A.   On Spelter?

1      Q.   Yes.

2      A.   Well, as I said, my communications on all

3   of these different matters that were of concern in

4   the case were with Steve Medina and -- or Carol --

5   and/or Carol Moore.  And I don't know, I can't

6   remember a specific direction at this point.  I

7   can't remember whether there was one or whether

8   there wasn't.  I can't say.

9      Q.   If you had been directed, it would have

10  been either Steve Medina or Carol Moore that would

11  have directed you.  Is that fair?

12     A.   That's fair to say.

13     Q.   Okay.  I wanted to talk a little bit about

14  your role in the soil sampling, because I'm not

15  quite sure that I understand what you did.  Tell me

16  -- you procured site access, correct?  Property

17  access.

18     A.   Definitely did that, yes.

19     Q.   Okay.  And you talked a little bit about

20  that, and that you tried to do that in advance of

21  actually going out and sampling; is that right?

22     A.   Well, it had to be done before we went out

23  and sampled, because we didn't go out and sample

24  where we didn't have property access.

1    Q.   Well, wasn't there a situation where you

2    might -- while you were physically out with the

3    geologists sampling, you would knock on the door

4    and ask for permission to sample that property?

5    A.   That is true.  But generally, generally,

6    the property access was secured before sampling was

7    done.  Yet we would go into -- there were times, as

8    you're suggesting, when we would go into an area

9    where we had not achieved complete access, and we

10   had to contact people on the day that we were

11   sampling to ask if we could have access.

12   Q.   And you say "we."  Who was we?

13   A.   I always worked with George Flowers and

14   David Allison.

15   Q.   Are you aware of anybody else on the

16   litigation team that may have procured access for

17   permission to enter properties and sample

18   properties?

19   A.   On the --

20   Q.   Litigation team.

21   A.   On the litigation team?

22   Q.   Yes.

23   A.   I am not.

24   Q.   Okay.  And then when you were accompanying

1    the geologists, you've always accompanied

2    Dr. Flowers; is that right?

3        A.    And Dr. Allison.

4        Q.    And they were both always together, and

5    you were with them?

6        A.    Well, there were times when Dr. Flowers

7    was alone.  There were a number of times when they

8    were together.

9        Q.    Okay.  And you went with them.  What did

10   you do when you were with them?

11       A.    We would go along through the area we were

12   sampling, and I would identify properties where we

13   had access.  And then they would make a judgment as

14   to whether they wanted to sample on that property,

15   because they were not -- they were not -- I forget

16   what the distance was between samples that they

17   were doing, but there was a distance between

18   samples, and they would make judgements as to --

19   their professional judgements as to whether they

20   wanted to do every property that we had or skip

21   properties and so forth.

22       Q.    How did you know whether you had access to

23   the property?

24       A.    From contact with the property owners.

1    Q.   Well, you're out, let's say you're in

2    Hephzibah taking -- with Dr. Flowers and

3    Dr. Allison for sampling, and you get to a

4    particular property and Dr. Flowers said, we want a

5    sample here.  Do we have permission?  Did you

6    remember that?

7    A.   No, no, no.  I had notes on all -- all of

8    that.

9    Q.   Okay.  So you were consulting notes, and

10   you would look at your notes and tell them, yes, we

11   have access; no, we don't have access?

12   A.   Yes.

13   Q.   And then if there wasn't access, you would

14   go ask for permission --

15   A.   Yes.

16   Q.   -- to enter the property?

17   A.   (Nods head up and down.)

18   Q.   Other than that, was there anything else

19   that you were doing when you were with Dr. Flowers

20   and/or Dr. Allison during the sampling?

21   A.   Well, I would be helping them with the

22   collection of the samples.  They would actually

23   collect the samples.  But after they collected

24   that, I would see that -- I forget how -- I'm

1    trying to remember.  One of the questions was

2    making sure that the sample that was collected was

3    put in the proper place, and so that was also part

4    of what I was looking at.

5        Q.   When you say "proper place," you mean

6    where they were storing it?

7        A.   Storage places that they had -- they had

8    containers that they brought with them.

9        Q.   So you would -- you might physically carry

10   the sample from one of them to the box or wherever

11   they were storing it and place it in its proper

12   place?

13       A.   I don't know that I actually was handling

14   -- you know, handling the samples.  But I was

15   certainly involved with them in monitoring which

16   samples we had collected -- they had collected, and

17   did we have them in the proper container and things

18   like that.

19       Q.   Other than that, did you do anything else

20   when you were with them?

21       A.   During the actual days of sampling?

22       Q.   During the actual days of sampling.

23       A.   I don't recollect any, anything else.

24       Q.   Weren't you taking notes as you went

1    around recording where they were taking samples?

2        A.    Yes.  That's true.

3        Q.    Tell me a little bit about that process --

4        A.    Thank you for reminding me.

5        Q.    -- and what you did with those notes.

6        A.    Those notes were taken, and then they were

7    ultimately sent back to Levin Papantonio to --

8    well, I remember communicating with Darnel Shaffer

9    about those kinds of things.  I know she was

10   involved.  But back to the law firm, because they

11   needed to have the -- a record of the samples that

12   were taken.

13       Q.    So you took those notes at the direction

14   of the litigation team at Levin Papantonio?

15       A.    Yes.

16       Q.    And did they specify to --

17       A.    And George Flowers, because he knew it was

18   important.

19       Q.    Well, did George Flowers tell you what --

20   well, let me back up.  And I've seen these records,

21   and it's basically a series of columns on a legal

22   pad.  And the columns represent various types of

23   information about each property where you sampled.

24             Who told you what to put in those columns,

1    what information you were supposed to be gathering

2    for these reports?

3         A.    I believe it was Darnel.

4         Q.    Okay.  And then do you know whether this

5    information was ever shared with Dr. Flowers?

6         A.    I do not know.

7         Q.    You didn't share it with him, correct?

8         A.    I don't think I did.

9         Q.    And then to back up just a little bit, I

10   wanted to talk about the process of the

11   determination about what areas you were going to

12   sample.  Now, that was something that was decided

13   entirely by Dr. Flowers and the litigation team.

14        A.    And one of the things that I was involved

15   with related to that was getting information from

16   the West Virginia geological survey that

17   Dr. Flowers needed in terms of looking at the

18   geological formations, and that was part of the

19   information that he needed to make his

20   determination of where he wanted to sample,

21   especially in the control area.

22             I remember that was a -- or as someone

23   termed it, the perimeter area.  That was an

24   especially important consideration in that

1    information.  The geological survey was very

2    important, I believe, in making that determination.

3          (Deposition Exhibit No. 35 marked.)

4    BY MS. MASON:

5        Q.   I'm going to hand you what I've marked as

6    Exhibit 35.

7          MR. WAKEFIELD:  This is collectively the

8    exhibit?

9          MS. MASON:  Yes.

10   BY MS. MASON:

11       Q.   And it is marked Simoni 2609 through 2622.

12       A.   Okay.

13       Q.   Professor, is this the information,

14   contained in Exhibit 35, the information you just

15   referenced that you sent to George Flowers related

16   to the geological survey information?

17       A.   Well, I believe it's some of it.  I don't

18   know that it's all of it.

19       Q.   Okay.  And do you recall where you

20   obtained this information?

21       A.   As I was saying, the geological survey was

22   a major source of information of the kind that he

23   was interested in getting, and so I was consulting

24   with them and...

1      Q.    Who's "them"?

2      A.    People at the geological survey office.

3   And I think maybe some I got online, where they

4   gave me an online reference where I could get

5   some.  I don't remember all the details of how I

6   put the package together, this particular package.

7      Q.    This particular package at least came from

8   the internet, correct?

9      A.    That's what it looks like here.

10     Q.    Okay.  And you --

11     A.    But it's information on the internet

12  available through the geological survey, GIS, I

13  think.  That's what it looks like to me.

14     Q.    Did you have to have special permission to

15  obtain this information off the internet, or is it

16  available to anybody who can get on the internet?

17     A.    I don't think I needed any special -- you

18  said special information?

19     Q.    Special -- I'm not sure what I said.  But

20  is this available generally to the public, or did

21  you have special permission to get this

22  information?

23     A.    I don't think special permission was

24  necessary, but you had to know what you were

1    looking for, and how I knew what I was looking for

2    was through consult with the people at the

3    geological survey office.

4        Q.   And Dr. Flowers is -- has a Ph.D. in

5    geology; is that right?

6        A.   Well, he's a geologist and he's a doctor

7    in -- I think in -- I think his degree is in

8    geology.

9        Q.   What about Dr. Allison?

10       A.   I believe the same, but I'm not -- I can't

11   tell you for sure.  I just know that professionally

12   they work as geologists and have all of the

13   credentials to do so.

14       Q.   And we got sidetracked a little bit when

15   you started talking about George Flowers and the

16   geology survey.  I think I was -- had tried to

17   direct your attention to the process of deciding

18   what -- who was responsible for deciding what areas

19   you were going to sample.

20       A.   George Flowers was.

21       Q.   And did he identify the areas and then you

22   went and obtained -- and then you started your

23   process of trying to get permission to enter those

24   areas?

1       A.    Right.

2       Q.    So what did you do when those areas were

3   identified in order to start the process of getting

4   permission?

5       A.    Well, first I would get maps.  And then I

6   would --

7       Q.    From where?

8       A.    From the county assessor's office in

9   Harrison County.

10      Q.    And did you go to them and say, I need

11  maps for X area, and then they told you, all right,

12  here, these are the maps you need?

13      A.    Could you repeat that, please?

14      Q.    How did you convey to the people at the

15  county assessor's office which maps you needed?

16      A.    Excuse me.  I would identify for them the

17  general geographical area that Dr. Flowers had

18  decided on, and I would ask them for the maps that

19  they had to cover those areas.

20      Q.    And they would give those to you?

21      A.    I would get those from them.

22      Q.    Okay.  And then what was the next step in

23  the process?

24      A.    Then I had to go to the property records

1  for those map areas, and I would get those from an

2  outfit called SpecPrint.  They supply big books of

3  addresses, property addresses for areas that you

4  identify that you want.  And so I would get those,

5  and then that would -- those records, the SpecPrint

6  records would give me the identification of

7  property owner for all of the properties.

8      Q.  And the SpecPrint records, they were

9  computerized?

10     A.  Yes, I believe they were.

11     Q.  Okay.  And did you identify SpecPrint or

12  did --

13     A.  A computerized -- I mean, not in the sense

14  that you went on the computer to get them.  Maybe

15  computerized is the wrong term.  I'm not sure.

16     Q.  Maybe.

17     A.  I don't...  I'm not sure.

18     Q.  How was the information provided to you

19  from SpecPrint?

20     A.  By mail.

21     Q.  And it was a bunch of documents?

22     A.  It was books.

23     Q.  Okay.

24     A.  Books with all of the information about

1    the addresses.

2        Q.    And then would -- how -- you would start

3    -- what was the process that you would connect the

4    books to the maps?  How did you do that, or did you

5    do that?

6        A.    Well, yeah.  You had to -- before you made

7    your request from SpecPrint as to what you wanted

8    from them, you had to know the maps and the -- I'm

9    trying to remember, which is a little bit difficult

10   for me at this point.  But I think I had to

11   identify the map, the map numbers, and that that

12   was related to their ability to give me the

13   property records for that map area.

14       Q.    Then once you received the property

15   records, what did you do with them?

16       A.    Then I had the identification of each

17   owner of the properties.  Then --

18       Q.    And the next step?

19       A.    Then the next step would be either to go

20   house to house, which a lot of that was done, or by

21   phone.  A combination of it is what was used to get

22   access.

23       Q.    And did you do all of this yourself?

24       A.    I did all of that myself, except for a

1    short period of time where I had help from my wife,

2    and I can't remember --

3         Q.   Did your --

4         A.   -- if the graduate student from -- Jared

5    Frame, if I can remember his name, I think he was

6    involved a little bit in that but not a lot.

7         Q.   Now, was Jared a work-study student?

8         A.   He was a graduate student in the

9    Department of Sociology.

10        Q.   So did he receive a stipend from the

11   department for serving as your graduate student

12   assistant?

13        A.   No.

14        Q.   So he -- it was an unpaid position?

15        A.   He wasn't serving -- he was my graduate

16   assistant at an earlier time, at an earlier time,

17   but that was not related to this work at Spelter.

18        Q.   So you basically recruited him because you

19   knew him when he had started?

20        A.   I knew him from before, and he was at the

21   time looking for a master's thesis topic, and I

22   asked him if he was interested in learning a little

23   bit about what I was involved with, that it might

24   turn into a master's thesis for him.  And so that's

1    how he got involved.

2          And then, as I say, he helped one day, I

3    believe one day in December of 2003 when I was not

4    able to be there with the geologist, and then I

5    think there was a very short period of time when he

6    helped make some phone calls.

7          Q.   And we talked a little bit about this

8    before that Jeanne got paid -- Jeanne, your wife,

9    got paid for some work that she had done on the

10   project.  Was that related to her assisting you in

11   obtaining access?

12         A.   Property access.  Property access, yeah.

13         Q.   That's what that related to?

14         A.   Yes.

15         Q.   So other than you, Jared and Jeanne, are

16   you aware of anyone else who worked on the property

17   access issue?

18         A.   I am not.

19         Q.   Did you --

20         A.   I can't recall.  I don't recall anybody

21   else ever being involved with that.

22         Q.   Did you -- were you involved in property

23   access issues for the dust sampling?

24         A.   Oh, yes.  Definitely.

1      Q.   Was it the same procedure that you

2   followed for the soil sampling?

3      A.   No.

4      Q.   How did it differ?

5      A.   Well, Spelter's a very small community.

6   They wanted to do dust sampling in Spelter.  And if

7   you recall, I'd already been going house to house

8   with -- way before that with the health survey that

9   we were doing in 2002.

10          And so it was just a question of -- I

11   don't remember the details on -- I don't remember

12   the details on how Carol and Nathan Best identified

13   which homeowners they wanted to get access

14   permission from, but they identified for me what

15   they -- what people they were, what residents those

16   were that they wanted property access permission

17   from.  And then I would just go house to house and

18   -- and I think I also made a few phone calls

19   related to that, because sometimes you would go to

20   the house and they weren't there and had to follow

21   up with a phone call.  So there were also some

22   phone calls.

23      Q.   But that didn't require any more obtaining

24   maps and getting information?

1      A.    No.   No, the SpecPrint and -- no.   That

2    was not involved.

3            MS. MASON:   I think that's all I have, if

4    I can have just a few minutes to go over these

5    notes, take a break.

6            MR. WAKEFIELD:   Very good.

7            MS. MASON:   And then we should be done.

8            MR. WAKEFIELD:   Very good.

9            THE VIDEOGRAPHER:   We're off the record.

10   The time is 1:59 p.m.

11                (Short break taken.)

12           THE VIDEOGRAPHER:   We're now back on the

13   record.   The time is 2:04 p.m.

14   BY MS. MASON:

15      Q.    Earlier when you were listing what you

16   considered to be your major contributions to the

17   Spelter case, you indicated that you had a major

18   role in the soil sampling and that it was the key

19   element to the case.   Is that fair?   Is that an

20   accurate restatement?

21      A.    I believe.

22      Q.    Who gave you the understanding or where

23   did you get the understanding that the soil

24   sampling was the key element to the case?

1     A.   I don't know that anybody ever said that

2   to me, but it was clear from the development of the

3   case that once the soil samples, in the winter of

4   '03, that the results were looking very favorable

5   to the plaintiffs in terms of the fact that there

6   were a lot of contamination found; that it was

7   very, very clear in the working relationships that

8   I had with Steve Medina that he felt that that was

9   major.

10     Q.   Are you --

11     A.   And I understand that there needed to be a

12   scientific link and that was it.

13     Q.   Are you aware of the air modeling

14   samples -- or the air modeling process that

15   Dr. Stewart and Dr. Macintosh performed in the

16   case?

17     A.   I am not.

18     Q.   If you would, pull out Exhibit --

19     A.   I --

20     Q.   Go ahead.

21     A.   No, I'm not.

22     Q.   All right.  Exhibit 19.  Would you pull

23   out Exhibit 19?

24     A.   Exhibit 19?

1    Q.   Uh-huh.  Got it?

2    A.   Okay.

3    Q.   Mr. Marino asked you a question about the

4    -- well, for purposes of the record, Exhibit 19 are

5    the notes that you made from some communication

6    with Keith Givens on or about March 31st, 2008,

7    right?

8    A.   He was asking me questions about this

9    exhibit, yes.

10    Q.   Yes.  And that's what that exhibit is, is

11    notes that you made?

12    A.   They're notes that I made.  That's

13    correct.

14    Q.   Okay.  And under -- it says update, number

15    one post-trial, and there's an arrow, motions

16    denied.  Two, hearing, and then if you would, could

17    you read what follows after hearing?

18    A.   What follows after -- it says medical

19    monitoring, supplemental plaintiff, dollar sign,

20    dash, cut, and then beneath that, excuse me, okayed

21    $50,000.

22    Q.   Having read that entire entry there, does

23    that refresh your recollection about what that

24    $50,000 referred to?

1      A.    It refreshes it a little bit.  I mean, I

2  think I have a better idea.

3      Q.    Tell me what your idea is.

4      A.    I think that it has to do with money that

5  was actually okayed by the Court for payment to the

6  class representatives.

7      Q.    Okay.

8      A.    That's what I think.

9           MS. MASON:  That's all I have.

10          MR. WAKEFIELD:  He will read and sign the

11  deposition.

12          THE VIDEOGRAPHER:  This concludes the

13  deposition of Joseph Simoni.  The time is

14  2:09 p.m.

15    (Videotaped Deposition of JOSEPH SIMONI, Ph.D.

16            concluded at 2:09 p.m.)

17

18

19

20

21

22

23

24

1  STATE OF WEST VIRGINIA, To-wit:

2

    I, Teresa A. VanMeter, RMR, CRR, a Notary

3  Public and Court Reporter within and for the State
    aforesaid, duly commissioned and qualified, do

4  hereby certify that the videotaped deposition of
    JOSEPH SIMONI, Ph.D. was duly taken by me and

5  before me at the time and place in specified the
    caption hereof.

6

7      I do further certify that said proceedings
    were correctly taken by me in stenotype notes, that

8  the same were accurately transcribed out in full
    and true record of the testimony given by said

9  witness.

10

    I further certify that I am neither attorney

11 or counsel for, nor related to or employed by, any
    of the parties to the action in which these

12 proceedings were had, and further I am not a
    relative or employee of any attorney or counsel

13 employed by the parties hereto or financially
    interested in the action.

14

15     My commission expires February 1, 2022.

16

17     Given under my hand and seal this _____ day
    of _____, 20____.

18

19

20 _____

21 Teresa A. VanMeter, RMR, CRR, Notary Public

22

23

24

## A

**ability** 366:18 499:12
**able** 290:22 293:1 329:21,23
348:22 395:1 419:19 501:4
**abnormal** 389:1
**accept** 439:19 445:5
**accepted** 468:9
**accepting** 362:15
**access** 303:8 391:8,15,17
392:13 420:7 429:18 430:18
430:19 431:6,13,16 433:17
434:8,20,23 435:3 466:14
487:16,17,24 488:6,9,11,16
489:13,22 490:11,11,13
499:22 501:11,12,12,17,23
502:13,16
**accompanied** 489:1
**accompany** 298:15
**accompanying** 488:24
**accomplish** 434:8
**account** 410:1
**accurate** 402:5 411:12
422:24 503:20
**accurately** 507:8
**achieved** 408:20 488:9
**acquiring** 402:4
**act** 388:18
**action** 283:7,9 453:2 478:9
480:12,13 482:3 507:11,13
**actions** 477:2
**active** 354:9
**activist** 334:20
**activities** 299:22 339:11,19
340:6,19 341:13 344:13
345:5 382:19 384:7,11
394:7,10 414:1 416:7,13
441:21 454:12
**activity** 359:8 389:13 414:3
**actual** 408:2 428:1 437:7
438:3 491:21,22
**add** 398:7,22
**added** 433:23
**addition** 324:13 398:10
**additional** 486:16
**address** 486:11
**addresses** 498:3,3 499:1
**adequate** 295:18 461:10
**administered** 427:13
**administering** 428:2
**administration** 428:13

**admitted** 474:24
**advance** 358:20 359:9 487:20
**advanced** 358:9 359:18
**advice** 362:1,5,11 412:18
461:24 462:7 474:8
**advise** 459:20
**advising** 295:9 459:12
**advisory** 355:13,17,17
**affairs** 316:22
**affidavit** 301:15 302:2,8,10
454:19,24 455:3
**aforesaid** 507:3
**agencies** 304:21 477:19
**agenda** 315:2 316:16
**agent** 402:4,8 403:3,8,17
**ago** 396:1 405:9
**agree** 298:3 325:24 347:9
368:21 392:15 413:12
422:19 445:6
**agreeable** 394:9
**agreed** 325:15 370:8 475:3
**agreeing** 370:9
**agreement** 290:18 293:4,7
313:16,18 314:6,9 324:9
326:6,7 329:2,3,19 361:17
363:22 371:2 445:14,18
456:15,17 457:2
**agreements** 290:15 321:5,10
321:14 361:16 363:14,16,21
369:24 402:22
**ahead** 305:4 312:13 328:18
335:14 380:13 383:3 385:7
395:21 417:16 421:8 430:16
435:10 436:3 437:19 444:13
446:12,14 458:18 459:10
473:13 504:20
**aid** 342:22 394:14
**air** 390:18,21 504:13,14
**airport** 442:6 468:15
**al** 281:6
**alleged** 415:3
**allison** 390:20 435:20 488:14
489:3 490:3,20 496:9
**allotted** 428:5
**allotting** 427:23
**allow** 356:17 431:6
**alreadyproduced** 451:2
**amanda** 465:18,19 468:19
**amason** 281:5
**amount** 292:8,12 297:16,19

298:2 356:16 374:11 450:4
**analysis** 409:9
**angela** 281:5
**annual** 282:16 337:8
**annually** 337:17
**answer** 291:1 305:10,12,13
305:14 332:4,12 333:5,16
334:5 335:1,12 369:4
375:17 377:12 380:24 383:6
385:7 393:6,6,12,24 395:21
405:22,24 409:23 412:16
415:10,15,20 416:16 417:2
417:5,12,17 418:18,23
423:16 446:10 450:21,23
459:18,19 461:22 473:18
479:20
**answered** 416:23
**answering** 407:3
**answers** 334:7 351:8 409:24
**anthropology** 344:5
**anticipate** 360:23
**anybody** 321:4 336:3 349:23
351:11 396:17 454:10
467:16,21 468:21 469:22
479:6 488:15 495:16 501:20
504:1
**anyway** 308:9 347:15 382:6
388:13 416:1
**apart** 385:8
**apologize** 351:10,10 399:16
**apparently** 297:10 302:16
304:1 319:14 433:9
**appeal** 476:9,10
**appear** 312:3
**appearances** 280:1 281:1
**appears** 288:7 302:17 442:16
**appellate** 476:20
**apples** 406:20
**applied** 327:2 406:23
**apply** 328:21
**appointed** 357:15
**appointment** 357:17
**appreciate** 370:18
**apprehension** 379:2
**appropriate** 295:17 461:9,12
**approximately** 361:6
**april** 282:13 319:12 320:21
423:13 432:17
**arabia** 369:11
**area** 330:13 358:9,21 374:7

391:13 392:1 423:18,21 424:23 430:2 448:6,11,19 463:7 488:8 489:11 493:21 493:23 497:11,17 499:13
**areas** 339:5 346:3 356:18 391:3 419:7 493:11 496:18 496:21,24 497:2,19 498:1,3
**arent** 347:4 398:2
**arguably** 356:15
**argument** 473:12
**arising** 458:10
**arose** 481:9,11
**arranging** 430:17,19,23
**arrow** 505:15
**arthurdale** 463:5,6,7
**article** 341:8,14
**aside** 313:7 417:19 448:19
**asked** 293:22 298:15,18 301:14 302:2 313:15,17 323:11,18 327:15 328:4 329:17 351:9,11 352:13 393:2 396:24 399:3,6,10,18 399:19,23 403:21,23 454:18 471:14 475:1 500:22 505:3
**asking** 289:13 294:1 302:7,8 312:16 314:3 320:13 327:12 327:13 329:16 331:3 334:2 347:4,5,6,16 349:13 366:6 380:4 394:1 399:22 400:16 407:11 412:5 419:7 434:3,6 444:1 453:23,24 454:22 505:8
**assert** 407:6
**asserted** 362:24
**assessment** 479:14,22
**assessors** 497:8,15
**assign** 393:23,23
**assigned** 393:4,8 394:1
**assistance** 394:15
**assistant** 500:12,16
**assisted** 390:20
**assisting** 413:1 501:10
**associate** 338:1
**associated** 467:21
**associates** 279:22 283:5
**assume** 350:6 360:24 389:14 390:20
**assumed** 350:2 390:3 402:18
**assuming** 447:1 470:23
**attached** 486:9

**attaching** 341:13
**attachment** 341:6,9 342:1,12
**attachments** 337:11,12,12
**attempting** 387:14
**attended** 316:20
**attending** 318:16 384:10
**attention** 300:3 496:17
**attorney** 290:6,22 291:5 292:22 295:8 296:10,16 311:6 323:21 349:1 350:14 370:20,21 373:10,11 412:19 461:24 507:10,12
**attorneys** 282:10 288:10,18 308:15 322:22 459:21
**august** 300:4 385:21 411:20 412:10 436:7,8,18 438:2,3 453:14
**authenticated** 411:19
**author** 461:14,16,17
**available** 356:21 420:8 477:7 477:8,10 495:12,16,20
**average** 361:11
**aware** 289:7,10 295:8 296:10 296:16 297:12 299:2 324:15 363:11 365:8 373:14 378:14 381:15 394:8 431:9,14,19 438:10 471:22 472:20 477:1 479:8 488:15 501:16 504:13

## B

**back** 293:24 297:21 312:7 315:11 319:17 330:3 337:2 339:2 341:6 345:1 350:23 356:24 357:24 361:2,2,5,6 361:11 369:23 376:19 379:22 394:4 398:3 410:19 410:20 411:7 417:3 419:4 419:24 425:5 432:13 433:22 436:20 437:2,15 438:5,18 439:6 442:19 444:4 448:9 449:17 452:20 455:2 456:1 456:5 459:7 467:5 471:7 472:16 476:21 485:9 492:7 492:10,20 493:9 503:12
**background** 318:1 351:7 356:23 365:5
**bad** 342:15
**bar** 286:9,12,23 289:20 348:18 349:5,7,10,11,20 350:2,3,11 416:1
**baron** 279:12 288:14 293:17

294:5 343:11,12,13,15 392:21 413:2
**barr** 465:12,15,24
**barrs** 465:13
**based** 326:15,16 333:5 338:6 338:22 361:24 362:4 370:12 398:23 407:19,21 409:24 424:8 444:7
**basic** 449:17
**basically** 326:9 338:20 346:8 393:1 478:19 492:21 500:18
**basics** 410:18
**basis** 354:17 419:1 472:21 476:10
**bate** 288:2 326:24 342:9,14 344:10
**baylen** 281:12
**bcash** 281:11
**bears** 288:2
**bedell** 333:22 334:7,17,18
**began** 393:7
**behalf** 280:3,11,16 281:3,8 342:18 363:1
**beings** 391:24
**belabor** 303:11,16 364:3
**belief** 460:7
**believe** 289:23 293:15 297:7 297:18 299:5 300:16 303:22 305:15,24 306:19 315:4 319:16 320:16 321:12,17,19 321:23 323:7,7 325:3 329:15 331:8 332:23 333:1 340:10 347:22 348:1 349:8 355:2 357:11 362:7,14 366:21 370:4 372:12 373:4 373:7,7,22 378:2,23 380:23 385:19 386:15 387:2 389:3 397:4 398:9,16 401:12,16 410:9 411:22 412:6 413:16 415:21 417:23 418:2 421:23 422:16,24 424:4,13,17 431:21 432:2 434:10 437:8 445:11,17 448:8 454:13 455:23 457:16 460:1 462:6 462:19 465:1 472:22 482:20 493:3 494:2,17 496:10 498:10 501:3 503:21
**believed** 291:3,6,10,13,14 296:8 382:5 455:19
**believes** 295:15 413:8

**ben** 374:5,13,15
**beneath** 505:20
**beneficial** 445:18
**benefit** 319:2,6 370:2,5,20
   413:10 426:11 438:21 445:8
   445:10
**benefits** 324:13
**benjamin** 436:12
**bess** 466:3 468:20
**best** 296:6 300:20 301:24
   330:12 348:2 372:17 380:2
   386:14 411:15 412:9 414:12
   420:3 432:4 456:19 457:10
   463:8 464:8 466:4,10,17
   482:4,23 502:12
**better** 392:21 423:1,4 424:21
   425:4 429:21 430:8 506:2
**beyond** 380:11
**big** 316:22 358:11 366:17
   392:4 498:2
**billing** 428:22,24 429:1
**bit** 302:12 307:21 356:9
   394:5 474:5,7 487:13,19
   492:3 493:9 496:14 499:9
   500:6,23 501:7 506:1
**blanchard** 465:7,10
**blank** 419:22
**blend** 416:11 418:1,5
**blended** 418:7 441:21
**block** 428:22,24 429:1,6
   430:9
**board** 355:13,15,16,17 357:8
   357:10,11,15
**bob** 324:10 378:3,18 474:15
**bobby** 465:7,8,10
**body** 357:8
**bonasso** 279:20 280:12 460:2
   460:20
**books** 498:2,22,24 499:4
**booth** 280:17
**boothmccarthy** 280:18
**born** 351:13,14
**bottom** 312:3,8 371:10
   415:18 453:20 461:8 485:17
**box** 280:14 491:10
**bramblett** 360:6
**break** 350:22 411:2,6 424:21
   449:2,14 470:22 471:6
   503:5,11
**breaking** 429:21

**breaks** 427:20
**brian** 465:12,13,15,24
**bridgeport** 280:19
**briefly** 357:3 360:3
**briefs** 472:2
**bringing** 367:23 381:12
**brings** 329:10
**broad** 354:13 359:21
**brought** 293:16 364:13
   366:18 373:19 415:22 491:8
**broward** 359:24
**buchanan** 297:3 462:18
**budd** 279:12 288:15 293:17
   294:5 343:11,13,13,15
   413:3
**budds** 392:22
**bugged** 372:4
**bullet** 319:22 320:3,8,12
**bunch** 356:18 498:21
**burden** 392:4
**business** 302:18 406:12 469:6

## C

**cady** 486:5,6,7,13
**calculate** 328:4
**calculated** 330:2,11
**calculation** 327:1,2,21,22
   449:20
**caleb** 280:13
**calendar** 282:17 343:24
**call** 283:20 308:2 312:19
   314:16 341:17 351:3 352:13
   374:12 419:18 444:15
   502:21
**called** 352:21 355:15,15
   374:14 416:14 498:2
**calling** 341:17 482:1
**calls** 305:18 362:23 405:19
   429:19 467:10 501:6 502:18
   502:22
**canada** 348:6,7 353:4,7,7,15
   354:5
**canadian** 353:11
**cant** 297:19 308:4 314:19
   322:18 350:10 359:22 376:9
   376:19,19 394:18,23 395:1
   396:22 397:3,17 399:5,24
   401:13 404:23 406:15
   410:13 424:11 427:22
   432:22 434:24 437:17
   439:16 476:12,17 477:4,13

   485:22 487:5,7,8 496:10
   500:2 501:20
**capacity** 435:19
**capital** 283:12
**capitol** 279:21 280:14
**caption** 507:5
**car** 309:22
**care** 300:10,17,19 301:5
   309:23
**career** 354:8
**carol** 298:11 387:9,11,13
   388:3,11,12 390:6 394:21
   438:6 454:13 466:5,12
   467:2 468:20 478:17 482:13
   482:17 487:4,5,10 502:12
**carry** 491:9
**case** 279:8 282:20 291:8,8,9
   291:11 296:12,19 298:6,23
   299:3,23,24 301:7,15 302:1
   304:8,9,17,23 305:1,2 306:9
   315:16 317:2,2,10 319:15
   319:18 324:3,7,24 325:13
   326:1,5 329:1 330:16,19
   331:2,10,15,22 332:17
   333:15,22 336:6,10,12
   350:7 356:19 358:13 360:4
   360:21 364:6 366:18 367:1
   367:23 368:8,11,13 369:1
   375:12 376:22 377:21,24
   378:9,9 380:9,15,18,21
   381:24 382:15,21 383:1,19
   383:21 384:4,6,11,17 386:1
   386:23 388:6 390:4,4
   391:21 392:5,17 395:3
   399:8,13,15 406:24 410:14
   410:15,15 411:14 412:22
   418:8 421:2 424:10 426:2,5
   427:2 430:21 432:11 435:11
   436:16,17 438:2,22 442:16
   442:17 444:8,24,24 445:1,4
   445:5,6,15,20 447:2,22,24
   453:4 454:3,20 455:22
   463:7,21 464:13,13,16,17
   464:19,23 465:3,21,22
   466:7,8,8,24 467:5 468:9,11
   470:12 471:16 472:11,21
   474:19 475:5,8,14,22 476:5
   476:19 477:3,6,12 480:3,11
   480:17 484:12 485:7,14
   486:9,10,11,18,19 487:4

503:17,19,24 504:3,16
**cases** 291:8,15 294:6 317:11
 319:3,6 345:7 346:12 359:6
 359:12 366:7 370:11 377:4
 400:20 407:20,22 408:6,8
 414:3 416:6,12 418:3
 448:12 483:2,5,16,20
**cash** 281:11 282:5 293:23
 294:13 303:2,5 305:9,22
 309:6 315:22 321:6 324:18
 325:1 331:23 332:10 334:23
 336:7,13 346:21 351:2
 356:22 357:2 362:2,6
 364:23 365:2,4,7 368:3,6
 370:17 386:10 405:23 406:7
 408:24 409:4,6,10,14,18,21
 410:3 413:11 414:17,18
 415:2 417:18 448:22 449:6
 449:9,12 450:8 451:15,18
 451:23 452:4,9,10 457:15
 457:19,23 470:13,16,19
**category** 423:9
**cause** 398:7
**caused** 422:7
**cd** 432:18,18 433:17 434:22
 435:2,4
**center** 440:1
**central** 361:9
**certain** 298:13 334:5
**certainly** 288:7 289:7,8 290:4
 298:22 313:1 319:1 323:17
 323:20 377:22 385:21 390:2
 395:7 396:16 400:18 416:3
 430:24 449:13 466:23 467:7
 470:19 475:7 491:15
**certainty** 422:9
**certified** 388:8 403:4 428:16
 435:18
**certify** 507:4,7,10
**cetera** 298:16 436:13
**chair** 344:5 352:9
**chance** 467:23 478:15
**change** 383:18 385:14
**changes** 455:11
**channel** 403:13,15
**channeled** 402:9
**characterization** 298:3 333:1
 347:9 364:11
**characterize** 298:2 354:10
 368:20 395:3

**characterizing** 336:1 365:3
**charges** 469:9
**charleston** 279:21,23 280:15
 283:6,12 309:15 361:9
**charm** 391:17
**check** 403:17 474:14,16
**cherry** 279:13 281:3
**choice** 361:13
**christopher** 280:18
**circuit** 284:23 285:1 333:10
**circumstances** 356:10 357:4
**citation** 282:20
**city** 371:9
**civic** 356:1 358:6,19 359:18
**civil** 279:19 450:5
**cjmccarthy** 280:18
**claim** 293:16,22 294:3,9,15
 295:15,22 296:4,8,18
 297:10,12,18 356:19 357:14
 363:2,11 364:19 368:1
 398:1,4,20 400:2,6 406:14
 406:17 407:5,14 408:7,13
 408:19 413:3,5 439:23
 440:2,5,15,17 445:3 460:8
 460:10,16 461:5
**claimed** 296:10 412:22 413:8
 470:6
**claiming** 345:5 397:6,8,10
 413:22 423:24 425:20
 432:23 438:20 440:21
 441:16 443:3 470:9 473:14
**claims** 340:22 342:18 362:20
 362:24 363:4,7,8 364:13
 456:15 463:21 467:12
**clarified** 402:10
**clarify** 284:2 294:15
**clarksburg** 280:6 306:18
 333:11
**class** 324:8 426:11,12 428:15
 438:21 445:8 477:3 480:13
 482:3 506:6
**classmates** 285:13
**clear** 285:10 291:7,22 357:16
 375:15 377:18 399:12 402:1
 409:1 411:23 444:3,6
 479:20 480:8,14 504:2,7
**clearly** 294:18
**clerk** 480:19,19 482:1
**client** 316:21,21 361:18
**clients** 373:7

**closely** 387:11 390:5
**coal** 353:1
**cochran** 279:13 281:3,4
 293:17 294:4 295:5 299:1
 303:21 305:19 306:2,5,8,11
 306:14 311:6 333:21 334:10
 335:5 365:13 389:17,18
 414:20 450:11 469:15
**cochranfirm** 281:5
**colleague** 370:4
**collect** 490:23
**collected** 326:21 490:23
 491:2,16,16
**collecting** 432:2 440:18
**collection** 490:22
**collectively** 494:7
**columns** 492:21,22,24
**com** 280:5,8,13,18 281:5,11
**combination** 326:20 499:21
**combined** 326:21
**come** 284:1 291:20,23 292:5
 292:8 326:19 328:6,14
 339:2 352:4,21,22 358:1
 359:18 361:2,6 383:13
 400:22 454:2
**coming** 291:24 352:14,17,20
 398:17 416:6
**comment** 385:13 396:3,9
 399:10,18,19,21,23
**commented** 433:20
**comments** 396:14 456:3
**commission** 507:15
**commissioned** 507:3
**commissioner** 334:18
**commitment** 383:13
**committed** 409:24
**committee** 339:13,14,22
 344:4
**common** 338:18
**communicate** 306:12 366:19
 367:8,13
**communicated** 296:22
**communicating** 329:24
 481:13 492:8
**communication** 297:15,17,18
 298:1 301:22,22 306:1,15
 309:12 311:3 323:10,23
 382:4 389:22 423:20 456:6
 456:11,18 461:24 465:5,22
 466:6,16,24 505:5

**communications** 287:14 291:21 292:1 294:18,19 297:24 305:18,23 306:10,13 311:15 321:16,19 328:23 329:4 362:1 364:1,1,15,18 401:5,6 413:17 423:18 431:1 437:24 442:19 443:3 444:4 447:10 463:18 464:12 464:23 467:3,7 468:10 475:13,23 476:1 487:2

**communities** 318:22 340:21 342:19 344:17,19,20 367:4 381:23 382:3 391:14

**community** 318:14 334:20 340:20 354:9,10,15 356:1 359:10,17 381:19 382:4 391:17 475:14 502:5

**company** 365:13

**compare** 412:10

**compel** 333:15 334:7 471:15 471:16,20 472:2

**compensated** 291:7,10 367:5 367:17 368:7,17 370:22 371:3 373:9 402:18,24 404:11 405:6 407:10,19 412:8 413:9 450:18,24 451:5 460:5 462:8 469:17

**compensating** 310:22 311:9

**compensation** 291:11,17,20 292:2,4,7 293:18 294:5,10 294:16 295:15,18,23 296:5 297:22 300:21 301:6 309:13 310:5,12 311:4 321:18 322:3,16 323:5 327:10,12 327:13 329:19 341:21 362:18 366:5,6,11,22 368:10 370:8,9,11,14 397:7 397:11 398:2,5,20 402:13 407:21,22 408:4 412:1 413:22 423:3 434:4,6 444:1 444:7,11 458:10 459:6 460:16,18,19 461:11,19

**compensations** 322:3

**compilation** 428:3

**compile** 327:15

**complaint** 338:18 397:1 399:9,20 438:10 480:20

**complaints** 395:14

**complete** 488:9

**completely** 482:21

**component** 408:14,17 431:2

**composite** 428:6

**compound** 472:14

**comprehensive** 478:1

**computer** 498:14

**computerized** 498:9,13,15

**concentrating** 418:12

**concern** 371:17 372:4 379:13 379:16 487:3

**concerned** 323:13 359:2,11 359:12 371:23 404:1 484:11

**concerning** 461:3

**concerns** 371:5 481:11

**concluded** 506:16

**concludes** 506:12

**conclusion** 362:24 385:3 405:19 406:1

**conclusions** 482:8

**conducting** 442:17

**conference** 300:9,14 352:8,10 434:12

**confident** 486:20

**confidential** 473:20

**confusion** 364:4

**connect** 499:3

**connecticut** 351:16

**connection** 294:6 296:12 317:1 319:18 353:6 372:13 411:13

**connections** 391:16 468:3

**consented** 394:9

**consider** 355:24

**considerable** 391:17

**consideration** 493:24

**considered** 382:20 454:16 503:16

**consists** 406:22

**console** 355:21

**consult** 496:2

**consultant** 332:21,22,23 333:6,18,23 334:13,19 335:6,19 336:2,17

**consulted** 288:17 374:24

**consulting** 342:15,22 343:2 346:17 376:12 486:12 490:9 494:23

**contact** 306:16 317:23 373:5 374:13 382:4 430:5,6 466:10 472:9,12 488:10 489:24

**contacted** 381:2

**contacts** 306:20

**contained** 494:14

**container** 491:17

**containers** 491:8

**contamination** 359:3 381:1,9 475:15 504:6

**contd** 281:1

**contemplated** 450:4

**contemporaneous** 326:17

**contend** 414:23 415:3 450:17

**contends** 415:10 416:17

**context** 329:22 339:10

**contexts** 364:18

**contingency** 408:14,17

**contingent** 444:9

**continue** 449:2,5,15 450:6

**continued** 279:17 385:22

**contract** 365:12,17,22,23 410:17

**contracts** 410:4

**contribute** 392:1,7

**contribution** 304:4,6,8 366:12 368:14 382:13 384:13 390:13 399:4 406:5 406:6 415:8 431:5 433:24 444:9

**contributions** 302:1 366:24 368:11 370:10 380:9 388:2 388:3 393:3 398:24 407:20 407:23 408:2 412:4 415:4,7 415:11,21 416:4,11,18 417:24 418:1,6 427:5 441:20,23 444:7 450:19 451:6 455:22 456:13,23 503:16

**control** 350:10 391:3,8,13 493:21

**conversation** 301:11 371:12

**conversations** 371:18,24 372:3 451:1 467:12,16

**convey** 438:18 497:14

**conveyed** 437:15

**convince** 431:6

**convincing** 428:10

**coordinating** 298:22 299:3

**copies** 439:24 440:6,16,22 441:9,10,12 483:5 484:2,21 485:3

**copy** 299:11 303:1 336:23

341:13 342:15 343:22
376:17 411:12 440:1 458:3
478:6 485:5,6
**copying** 469:9
**corporation** 279:13 364:17
364:20
**correct** 285:4 286:9 289:9
290:2,7,23 292:6,14,18
295:11 297:6,7 298:20,23
299:16,19,24 301:7,16
303:23 305:20 307:23 308:1
309:18,24 310:6 313:5
316:3 322:11,24 323:1,2
324:4,7,24 325:13,16,19,22
326:11 330:16 331:15,18
333:7,11,23 334:13 335:20
336:12,14,17 337:16,23,24
338:8,14,16,17,23 339:5,14
339:19 340:10,16,22 341:1
341:7,15,16,21 343:3,4
344:1,7,8,21,24 345:7
346:14 353:13 357:24 358:3
378:1 384:14 399:13 412:14
415:20 449:21 472:17,18
475:6 481:4 487:16 493:7
495:8 505:13
**corrected** 347:21
**correctly** 324:6 338:5 440:11
468:17 507:7
**couldnt** 377:6 388:21 461:18
**council** 355:13,18
**counsel** 283:7 311:15 362:1,5
362:12 363:1 412:18 418:10
459:20 460:16 461:23 462:7
507:11,12
**count** 459:3
**counter** 279:4
**counterdefendants** 280:3
**counterplaintiff** 279:7
280:11
**county** 318:13 360:1 482:2
485:16,18 497:8,9,15
**couple** 284:2 306:17 351:7
361:11 432:14 439:22
**course** 289:24 329:2 361:10
385:16 387:11 388:4 391:14
394:12 398:14 407:16 410:8
415:17,17 444:6,9
**courses** 289:14,19
**court** 279:1 284:23 285:1

307:11,14 333:10 334:6
364:21 446:22 447:7 449:3
449:20 472:3 476:5,21
480:20 482:2 484:7 506:5
507:3
**courtroom** 284:7,10 286:18
**courts** 476:7
**cousin** 348:14 354:7 374:3
**cover** 282:20,21 330:14 351:7
485:2,6,23 497:19
**covered** 468:22
**credentials** 496:13
**credit** 340:24 387:13
**critical** 460:4
**criticism** 338:11
**crr** 279:19 507:2,21
**crucial** 383:11
**curious** 353:22 359:17
370:22 392:20 456:4
**current** 412:12 460:15
**cut** 329:6,7 505:20
**cv** 342:6

**D**

**dame** 351:20
**dan** 320:4 401:22 402:7
**daniel** 280:8
**darnel** 468:4,7,10,20 492:8
493:3
**dash** 505:20
**data** 428:4
**date** 283:10 300:4 308:6
389:18 396:23 397:3 411:22
415:7 418:20 419:13 421:3
438:3,16 439:14 442:23,24
446:18
**dated** 288:1 295:2 316:11
344:6 458:7,20
**dates** 299:22
**david** 357:9,12,13,23 390:20
435:19 488:14
**day** 290:15 309:14 310:15,16
316:15,17 333:4 334:3
369:5,6,7,24 397:14 424:9
424:14 431:22 440:17
471:17,20 472:5,17 473:1,4
488:10 501:2,3 507:16
**days** 336:4,9 400:18 429:22
430:10 431:18,21,22,23,24
432:1,3,4 491:21,22
**dc** 280:9 352:9 374:6,7

**de** 469:12
**deadline** 348:17
**deal** 385:9 431:20
**dealing** 426:13 454:7,9
**dealings** 462:13
**deals** 400:6
**december** 315:15 316:3,6,7,8
316:12,13,16 418:17 431:21
431:24 446:17,20 472:17
501:3
**decide** 413:14
**decided** 389:5 476:4 493:12
497:18
**deciding** 496:17,18
**decision** 426:8,9 446:22
447:7
**decisions** 389:11,21,21
428:19
**declaratory** 453:2
**defendant** 279:7 280:11
281:3,8
**defendants** 279:4,16 280:16
319:14 333:14 334:6 437:11
439:3 475:8
**defended** 330:15
**defense** 475:20
**defenses** 463:21
**defined** 405:20
**definitely** 304:14 309:9 326:8
356:4 376:1 392:18 404:16
426:14 431:22 442:14 454:9
487:18 501:24
**definition** 395:21
**definitions** 409:2
**degree** 287:6,11 408:20
416:19,20,21,22 417:21,22
441:12,12 496:7
**degrees** 415:14 416:15
417:14
**delegate** 355:7
**delete** 413:23
**demand** 294:16,16,20 297:23
329:16 458:10 459:5,11,12
459:13,23
**demanding** 296:13 297:21
327:9,11
**denied** 308:11 505:16
**dep** 304:20 381:2 441:8
477:18,21
**department** 298:18 352:9

500:9,11
**depending** 408:19 459:2
**deponent** 282:2 303:14,19
 305:10 307:8,12,15 320:8
 350:19 356:24 368:4 385:6
 405:21 406:3 451:24 452:3
 457:14 470:15,18 485:4
**deposed** 330:19 331:15
 356:17
**deposition** 279:17 282:8
 283:11 287:17 294:21 299:6
 309:14,20,21 310:9,16
 319:8 325:4 330:16 331:18
 332:15 333:3,4 334:4,4
 336:4,4,9,19 343:19 354:7
 356:14 359:7,19 360:20
 369:3,3,21 370:16 374:22
 375:24 441:19 444:2 450:6
 451:20 471:17 472:19
 484:19 494:3 506:11,13,15
 507:4
**depositions** 384:10 472:17
**describe** 318:7 331:21 335:6
**described** 332:7,16,21 382:19
**describes** 344:12
**describing** 333:21 334:11,12
 336:16
**description** 300:8,15
**descriptions** 299:22 326:15
**deserves** 406:6
**designation** 436:24
**desire** 455:12
**detail** 364:4 421:17 423:17
 425:1 430:8 443:6
**detailed** 282:12 299:13 315:6
**details** 321:18 329:3 495:5
 502:11,12
**determination** 478:18 493:11
 493:20 494:2
**determine** 478:5,14,22
**determined** 408:3
**detriment** 428:15
**detrimental** 477:3
**devastated** 360:11
**develop** 435:6
**developed** 354:2 367:3,6
 416:5 427:17
**developer** 402:11
**developers** 358:14
**developing** 425:17 427:9,11

427:12
**development** 367:20 369:1
 384:3 424:10 435:3 463:2
 465:23 504:2
**devote** 345:24
**devoted** 374:21
**didnt** 293:4,7 302:18 303:1
 307:9 312:10,11 314:5,14
 319:1 323:9,17,20 326:6
 335:16 338:15 339:15 346:9
 346:10 348:17 350:13 352:2
 352:19 353:8 357:22 360:16
 367:10 370:5 377:2,19
 379:2,9,17 383:1,12 397:15
 401:24 413:23 415:24
 438:12,15 439:13 453:7,11
 453:12 454:10 461:14 462:4
 466:18 467:15 477:10 482:8
 487:23,24 493:7 502:23
**differ** 502:4
**different** 304:20,20 340:11
 359:4,5 383:16 389:7 412:5
 465:2 468:10 480:2,12
 482:21,24 483:3 487:3
**differently** 314:12
**difficult** 448:8 499:9
**dig** 306:23
**digging** 385:17 391:12,13
**direct** 300:3 306:9 486:22
 496:17
**directed** 487:9,11
**direction** 389:13 487:6
 492:13
**directly** 379:3,18 402:19,20
**disagreed** 334:18
**disappointed** 455:9,15
**disciplines** 392:15
**discovered** 304:9 380:15
 383:20
**discovering** 368:13
**discovery** 299:16 334:17
 376:21 397:16,18 398:6
 420:5,7
**discuss** 332:6 363:15 444:16
 466:18
**discussed** 310:12 313:11
 371:16 378:15 404:17
 407:12 436:17 453:10 456:8
 463:10
**discussing** 332:14,20 404:20

444:23,24 445:1,4
**discussion** 300:10 363:18
 474:3
**discussions** 322:1
**dispute** 288:14 413:2,18
 455:17
**distance** 489:16,17
**distinction** 370:19
**distinctions** 365:19
**distinguish** 363:7
**distinguishing** 364:7,12
**distributed** 430:10
**district** 279:1,1
**divided** 339:12 340:7
**division** 288:9,23 339:13
 344:5
**dmarino** 280:8
**doctor** 417:8 457:6 459:7
 467:11 496:6
**doctoral** 351:19
**doctorate** 415:14 417:14
**doctrine** 409:16 410:2
**document** 283:2 295:6
 299:18 300:3 303:8 307:1
 319:12,15 325:7 326:23
 337:10,12 344:22 397:18
 399:23 404:8 440:3 447:18
 447:20 451:2 459:16 478:2
 478:7
**documentary** 419:24
**documenting** 341:12
**documents** 298:19 303:5
 304:19 337:6 358:3 376:21
 382:10 385:17,18 388:16,17
 394:14 396:15,16,21 397:16
 398:6 399:3,9,21 401:17
 419:16 423:21 439:1,6
 440:8,9,18 447:15 451:11
 465:14 477:5,6,11,12,16,22
 478:5,20 479:4,9,12,15,22
 498:21
**doesnt** 412:17 442:1 461:4
**doing** 288:12 298:16 305:7
 305:20 311:12 327:20
 340:16 341:1 345:6,10,13
 348:11 358:21 381:9 386:17
 389:24 390:7 391:12 395:10
 395:10,11 431:10 434:20
 447:6 448:6,9 483:9,10
 489:17 490:19 502:9

**dollar** 308:21 505:19
**donald** 360:6
**dont** 284:5 285:10,21,22
   286:2,17,18,20 289:4,4,5
   294:8,17,19 297:17 298:2
   301:21 302:1,3 303:7,8,10
   303:16 306:9 308:12 310:17
   310:18 311:1 312:12 313:4
   313:6,22 314:2 316:5,14,14
   318:23 319:20 320:22
   321:16,18 322:12,20 323:7
   323:7,10,23 325:3 329:3
   332:5 338:24 339:21 340:3
   342:2 345:2 347:9,14
   348:10 349:6 350:10,12
   351:8 353:21 356:15 358:15
   364:3 365:18,19 373:17
   375:15 376:23 377:8,11
   379:12 383:2,18,24 388:10
   389:18 391:9 393:13 397:19
   397:21,21,23 398:9,16
   400:22 401:2,7,14,14,17
   403:9 404:6,9,19,19 405:9
   406:11 407:2 409:2,12,18
   410:1,21 417:4 419:24
   422:6,6,16 430:8 432:11
   433:2,3,15 434:1 435:5
   436:24 437:22 438:3 439:18
   447:8,14 448:2,3 452:3,5
   453:13 456:10 457:8 458:3
   459:19 461:16 462:13 463:3
   463:19,22 465:10,14,14
   466:16,23 467:24 470:7
   471:24 472:22 473:12
   476:12,23 479:13,24 481:18
   481:21,22 482:20 483:7,14
   484:9 486:20 487:5 490:11
   491:13,23 493:8 494:17
   495:5,17,23 498:17 501:20
   502:11,11 504:1
**door** 427:15 488:3
**dot** 416:18,18,18
**dothan** 281:6
**dr** 283:17,20 295:15 303:6
   337:6 344:14 345:23 350:18
   351:3,4 369:2 386:20 393:7
   397:5 410:4 411:10,16
   413:8 415:10,20 416:17
   432:19 433:5,22 434:10,17
   440:7 449:13 450:23 452:11

461:7,9 489:2,3,6 490:2,3,4
   490:19,20 493:5,13,17
   496:4,9 497:17 504:15,15
**draft** 288:5 395:14 399:8,19
   400:23
**drafted** 401:1,2
**drafting** 384:8
**drafts** 396:15
**dream** 439:13
**drive** 442:5
**drivers** 442:8
**duly** 507:3,4
**dupont** 295:11 471:19,23
**dust** 392:12 466:11 501:23
   502:6
**dutcher** 425:17 427:4
**duties** 393:4 466:7

---

**E**

**earlier** 354:6 368:12 380:7
   394:5 395:24 401:21 404:8
   411:19 412:23 441:19
   453:11 457:24 462:16
   471:15 500:16,16 503:15
**early** 294:17 304:12 384:16
   442:16 475:12 476:1
**earn** 372:24 373:2
**easier** 423:11
**east** 279:22 281:6
**easy** 404:5
**econo** 286:4
**ed** 295:4 308:20 355:23 357:9
**edit** 393:8
**edition** 288:18
**effect** 309:22,24 428:19
**effects** 391:23
**efforts** 301:6 344:15
**eichler** 302:8 454:22 485:22
   486:11,19
**eight** 449:21
**either** 310:20 369:11 379:4
   388:10 416:5 438:5 463:2
   464:8,9 483:13 484:2
   487:10 499:19
**elaborate** 383:6
**element** 304:23 503:19,24
**email** 297:9 302:5,7,13
   305:17 452:16,19 453:10,14
   453:19 454:18 455:8 456:5
**emails** 282:19 302:17,22
   438:24 451:8,9,11 452:17

**employed** 507:11,13
**employee** 322:10 355:8
   507:12
**employees** 355:3,11 467:2
**empower** 344:19
**ended** 329:21 445:18
**ensure** 295:17 461:10
**enter** 488:17 490:16 496:23
**entered** 365:9
**entire** 369:3 399:8 505:22
**entirely** 493:13
**entries** 418:11,13 419:15,20
   420:10,14,15,17 421:18
   422:20 423:7,9 424:3,20
   432:9 434:2 439:20 441:1
   442:5,11,15 444:14,21,23
   445:3
**entry** 315:14 414:10 422:8,12
   423:10,11 425:6,11 429:9
   433:12,19 434:11 436:2,7
   437:22 438:17 439:12,14,16
   440:15,20 442:21 448:10
   505:22
**environmental** 298:19 318:3
   340:22 342:18 345:7 346:12
   358:22 359:2,9 400:21
   475:15 483:3,6,16,20
**environments** 359:15
**epa** 440:3
**epidemiology** 391:20,21
**erk** 280:5
**especially** 493:21,24
**esquire** 280:4,8,12,13,18
   281:5,11
**essentially** 340:24 346:9
   352:17 383:20 405:12 434:4
   440:8,21
**established** 406:2,14
**estate** 402:11 403:3,5,8,17
**estimate** 424:8,14,18 428:6
   430:12 443:7
**estimated** 282:15
**estimates** 423:8 424:6
**et** 298:16 436:12
**ethical** 375:1 376:12,15 377:3
   377:16,20 404:1
**ethically** 290:5 292:21
**ethics** 289:14,19,23
**ethnic** 353:17
**evade** 407:1

**evaluate** 339:5 346:19
**evaluated** 337:22 338:6,22
  346:13
**evaluation** 282:17 339:22
  343:24 344:4,13 346:3
  478:6
**event** 328:20
**events** 422:23
**eventually** 445:14
**everybody** 303:3 351:6
**evidence** 419:24
**ex** 486:5
**exact** 389:18 438:16
**exactly** 284:3,6 291:22 348:3
  376:23 396:11 420:16 424:1
  424:16 448:8 463:3 475:3
  483:14
**exam** 286:9,12,23 348:18
  349:5,7 350:3
**examination** 279:18 282:4
  283:15 351:1
**example** 318:9,13 350:8
  354:5 387:10 389:8 392:12
  395:13 416:3 419:6 420:19
  422:13 424:23 442:7 445:22
  469:10 474:12 478:17
  483:18
**exams** 289:20
**excuse** 345:16 352:12 355:4
  405:21 463:14 483:19
  486:10 497:16 505:20
**exhaustive** 397:16
**exhibit** 282:7 287:17,20,24
  288:22 294:21,24 295:2
  299:6,9,13 306:23 311:8,18
  311:23 312:3 313:8,9,10,14
  313:18 314:4,6,10,12,18
  315:6,8,9 319:8,10 322:11
  325:4,7 326:16 336:19,22
  337:7 343:19,21 371:7
  392:23 411:11 450:16
  451:19,20,21 457:24 458:1
  458:19 484:18,19,24 494:3
  494:6,8,14 504:18,22,23,24
  505:4,9,10
**exhibits** 307:4
**expanded** 384:21
**expect** 346:18
**expectation** 321:17,22 322:16
  443:16,21,24 444:3,3,6,8

461:3
**expected** 292:17 319:2 323:5
  345:19
**expecting** 323:21 336:5,11
  347:4 460:21,23
**expended** 296:11,19 325:13
  418:19 449:19
**expenses** 469:6,10,19 470:6
**experience** 342:15,22 343:2
  388:13 416:2
**experienced** 426:18
**experiences** 381:19
**expert** 373:15,18 392:3
  407:17 433:6
**expertise** 373:19 392:1
  427:10
**experts** 384:9 391:23 392:2,9
**expires** 507:15
**explain** 318:2,16 335:9,12
  351:17 356:9 380:20 392:21
  432:16 474:21 475:9
**explained** 435:24
**explanation** 417:16
**explored** 381:8
**exposures** 344:17
**extent** 333:7 412:3,17 459:16
**extra** 484:20

---

## F

**fact** 288:5,16 294:9 305:17
  319:5 322:1 333:6 357:11
  364:13 449:8 468:13 504:5
**factor** 409:8
**factors** 406:23
**facts** 363:6 364:8 406:23
**faculty** 282:16 337:8,19
  344:4 345:16,18 354:15,20
  354:21 355:13,18,21
**fair** 286:13 290:8 322:4,5
  338:10 345:9,15,18 350:5
  363:20 367:21 370:10
  382:21 403:7 405:12 406:8
  406:11,18 409:2,13,20
  416:10 424:14,17 442:4
  451:4 452:7,9 460:18
  478:23,24 487:11,12 503:19
**fairly** 462:8 467:9
**fairmont** 299:24 317:2
  323:14 341:18 350:7 359:7
  399:13 414:4,14 480:10,17
  481:3 482:19 484:12 485:13

485:18,24
**familiar** 331:5
**families** 361:8
**family** 353:6 361:7 474:12
**familys** 360:9
**far** 484:10
**farce** 360:7
**farrell** 374:5
**farrest** 306:3,7,10,17,20
  310:11
**father** 360:9
**favorable** 504:4
**favorably** 476:16
**fax** 282:20,21
**faxed** 440:3,12 446:22 448:13
  486:10,10
**faxing** 440:9,13
**february** 344:6 349:8,10,16
  420:19 422:12 423:12 443:2
  507:15
**federal** 279:19
**fee** 288:13 300:10 329:2
  367:22 368:8 413:2,18
  480:19,19 482:3
**feel** 304:4 335:13 338:15
**feeling** 478:14
**fees** 282:10 288:9,10,18,23
  289:8,21 290:6 291:4 292:5
  292:14,18,21 293:1 303:23
  308:16 321:14 323:21
  350:14 363:15 370:5,20,21
  400:19 480:4,5,9,15 481:14
  481:18 482:9
**felt** 309:16 357:17 371:2
  388:12 445:19 454:15
  456:20 504:8
**field** 403:3
**fight** 344:20
**figure** 422:22
**figured** 449:16
**figuring** 329:7
**file** 352:11,12 372:9 388:18
  482:3
**filed** 333:15 363:1 372:7
  386:13 388:21 438:2,11
  453:2 471:16,19,23
**files** 477:17,22 478:4,11
**filing** 388:24 400:19 438:4
  462:9 480:4,5,9,15,18,20
  481:14,18 482:3,9

**filings** 472:20
**financial** 283:8 319:2 320:1
  320:17 321:1
**financially** 301:5 319:6
  507:13
**find** 315:18 317:10 364:7
  378:8 386:21
**finders** 367:22 368:8
**finding** 366:7 368:17 383:8
**fine** 283:22 303:4 335:11
  393:18
**finished** 287:11 330:14
**finishing** 351:20
**firehouse** 316:23
**firm** 281:4 293:17,17 294:4,5
  294:5 295:5 296:11,17,23
  297:6,9,11 298:6 299:1
  300:24 301:12 303:21
  305:19,19,24 306:2,5,8,11
  306:14 311:6 329:22 333:21
  333:21 334:11,11 335:5,5
  343:17 362:22 363:3,9,17
  365:9,10,13,14,24 366:8
  389:17,17 413:2 414:21
  419:16 426:7 440:17 445:14
  445:19,20 452:22 454:5
  465:1 467:19,21 492:10
**firms** 294:10 295:9,22 296:4
  296:8 311:7,8 320:14 329:2
  342:17 343:6,6,10 366:7
  383:8,16 393:24 438:21
  445:4,9,16 450:11 464:6
  469:15
**first** 284:4 286:5,23 304:9,13
  304:14 310:15 317:22
  319:20 330:16 331:12 333:3
  333:3 334:3 339:24 342:8
  384:18,19 386:1,9 404:10
  404:13,14 405:10 425:23
  429:24 443:21 453:21 458:9
  459:5,15 461:8 472:16,23
  473:11 476:8 497:5
**five** 338:12 340:20 374:20
**fix** 371:1
**fl** 281:12
**flaherty** 279:20 280:12 460:2
  460:19
**flip** 421:8 425:5 432:6
**florida** 361:2 401:22 402:5
  402:12

**flowers** 298:15 390:19
  432:19 433:5,22 434:10,12
  434:17,18 435:7,19 488:13
  489:2,6 490:2,4,19 492:17
  492:19 493:5,13,17 494:15
  496:4,15,20 497:17
**focus** 338:21 339:11
**focused** 344:16
**focusing** 338:21
**foias** 477:17
**follow** 313:13 339:15 444:5
  502:20
**followed** 349:3 357:17,24
  502:2
**following** 314:5 340:8 358:5
  379:22 381:14 407:9
**follows** 505:17,18
**followup** 471:12
**forget** 489:15 490:24
**form** 290:24 291:18 294:12
  294:19 295:24 296:14,20,21
  299:4 301:9 302:20 305:8,9
  305:21 308:23 309:1,5,6,7
  310:2,14,23 311:13 314:7
  316:18 326:2,12 331:24
  332:2,9 333:12,24 334:14
  334:22 335:8,21,23 347:8
  350:9 354:12 359:20 367:24
  368:1,9,19,22 369:15 375:3
  376:7,8 377:5 378:11,12
  379:5,10,11 385:5 386:24
  395:20 401:7 403:10,11,18
  403:19 404:2,3 405:14,18
  406:10,20 407:15 408:15
  417:1 441:14 442:13 443:11
  443:21 457:4 463:24 472:13
  474:24
**formal** 458:9
**formations** 493:18
**formats** 340:11
**formerly** 452:22
**forth** 304:21 363:6 416:15
  452:20 454:2 466:14 489:21
**forward** 478:21
**found** 288:19 335:4 420:14
  432:9 446:14 448:12 504:6
**foundation** 296:22 309:8
  369:16
**four** 286:9 337:3 342:18
  344:16 368:13 371:8 380:8

380:11,12
**fourth** 390:12,13
**frame** 347:16 383:22 500:5
**frames** 384:1
**freaking** 457:18
**freaks** 457:15
**freedom** 388:18
**friend** 285:9
**friendship** 467:24
**friendships** 467:22
**front** 307:7 311:19 334:6
  391:11,11
**fsblaw** 280:13
**full** 507:8
**fully** 410:1
**fumbling** 307:15
**function** 370:15 444:11 479:6
**functions** 393:9
**further** 443:6 456:10 507:7
  507:10,12
**furtherance** 412:22 413:4
**future** 468:2

## G

**gained** 444:12
**garson** 322:23
**gary** 279:2,3,9,9 282:15
  283:2,3 284:3,12,19 285:4
  285:10,16,21,23 286:12
  287:5 288:1,13 290:5,16
  292:5 293:10 295:4 310:8
  310:19 313:16 314:20 318:5
  321:5,11,14 322:17 323:6
  324:10,23 343:16 350:6
  361:16 362:21 363:2,3,7,9
  363:14 364:1,2,5,14,14,16
  364:16 365:10,13,16,22,23
  369:8 370:1 371:11 372:2
  372:13 373:4 374:10 377:2
  377:15 379:19 381:14
  389:22 393:7,9,22 394:8
  396:20 399:9,20 427:1
  444:4 450:24 451:3 453:2
  455:17 456:16,18 459:12
  479:10,21
**garys** 374:14
**gather** 316:22
**gathered** 423:21 479:3 484:1
**gathering** 423:19 441:17
  478:20 493:1
**general** 292:24 317:7 321:13

356:23 375:18 398:16 407:16,17 420:9 424:7,7 442:24 444:22 448:6 483:16 497:17

**generalizing** 440:24

**generally** 290:19 317:6 330:20 351:10 357:13 394:19 406:3,4 416:9 419:7 436:15 444:14 445:12,12 477:8,10,15 488:5,5 495:20

**generate** 317:10

**generated** 401:10 432:12

**generating** 440:14

**gentleman** 319:23

**geographical** 497:17

**geological** 282:21 493:16,18 494:1,16,21 495:2,12 496:3

**geologist** 390:19 433:7 496:6 501:4

**geologists** 394:15 432:1 488:3 489:1 496:12

**geology** 496:5,8,16

**george** 298:15 390:19 434:17 435:7,19 488:13 492:17,19 494:15 496:15,20

**getting** 309:21 340:24 348:21 357:18 402:24 437:11 455:5 493:15 494:23 497:3 502:24

**gis** 495:12

**give** 295:1 303:3 315:19 317:24 328:5 330:3,6,7 349:7 374:4 387:13 394:16 396:23 397:3 398:15 409:10 433:22 439:21 458:5 471:16 478:15 483:18 484:17 497:20 498:6 499:12

**given** 370:10 376:17 417:15 471:13 507:8,16

**givens** 279:13 281:3 306:16 307:2 308:2 309:3,13 310:10,21 505:6

**giving** 308:12 472:10

**glad** 303:3 414:22

**glasser** 445:1,1,21,21

**go** 293:24 298:18 305:4 312:7 312:13 315:11,11,14 322:24 328:18 335:14 341:6 342:10 345:1 353:18 354:17 356:24 369:23 379:22 380:13 383:2 385:7 395:21 417:3,16

419:4 420:11 429:9 430:16 435:10 436:3 441:8 442:24 445:13 446:12 449:24 453:3 458:18 459:10 473:13 477:20 483:10 487:23 488:7 488:8 489:11 490:14 497:10 497:24 499:19 502:17,19 503:4 504:20

**goal** 357:20 382:12 434:8

**goes** 415:18

**going** 283:20,24 291:20,23 292:5 303:14 311:14 315:21 320:24 323:5 332:7,7,10,16 332:17 335:5 337:1 350:2 350:20 356:12,14,17,18,20 356:21 361:23 364:9,10,20 367:9 392:23 393:14,18 398:10,20 400:2 401:20 402:18 408:22 411:4 414:21 418:6,10 422:21 423:10 426:9 434:15 442:19 444:4 444:14,20 445:23 449:17 451:12,13 453:4 455:11 459:16 460:24 461:1,15 466:14 468:11 470:23 471:4 472:24 473:4,9 482:15 484:15 485:2 487:21 493:11 494:5 496:19 502:7

**good** 283:17,18 342:5 358:20 388:12 411:1 415:23,24 428:10 430:11 441:3 445:19 445:19 471:3 503:6,8

**goodman** 374:23,24 375:6,8 375:11,20 376:12 377:16

**goodmans** 377:3

**gotten** 302:17 329:4

**governing** 355:14,16 357:8 390:4

**graduate** 500:4,8,11,15

**graduated** 287:3 410:20

**grandfather** 352:1

**grandkids** 361:10

**great** 364:6,11 385:9 431:20

**greater** 412:7

**grievance** 355:5

**grievances** 354:21 355:4

**grievant** 355:5

**groundwork** 382:22

**group** 465:1 468:15

**groups** 353:17 359:5

**guatemala** 342:23

**guess** 312:19 325:15 330:12 339:13 342:3 346:23 353:14 358:16 386:20 407:11 417:4 419:7 426:8 444:1 464:8

**guessing** 410:23

**guidance** 398:15

**guy** 454:17

**guys** 287:22 481:2

## H

**hadnt** 285:4

**hand** 494:5 507:16

**handed** 450:14 451:10

**handle** 445:6,20

**handling** 390:4 491:13,14

**handwriting** 325:9

**handwritten** 307:2,22 312:4

**hang** 315:17

**happen** 426:15 455:24

**happened** 302:3 359:13 376:20 397:4 476:23

**happening** 359:13,14 371:16

**happens** 457:16

**hardesty** 357:10,23

**harless** 284:8,9,19 285:16 369:11

**harrison** 318:12 482:2 485:16,18 497:9

**hasnt** 368:1 379:14

**hate** 386:18

**haven** 351:16

**havent** 302:22 359:18 411:17

**head** 289:15,17 388:19 490:17

**heading** 288:23

**health** 391:23 425:18 426:16 426:17,19 502:8

**hear** 353:6 375:17

**heard** 285:6 369:20 375:23 376:3 428:22 429:3,7,8 468:17

**hearing** 351:8 369:13 387:18 398:3 505:16,17

**hearings** 384:10

**heartened** 449:7

**heavy** 391:24

**hed** 309:3

**hell** 303:17

**help** 318:21 329:20 344:19 363:7 394:14 423:2 439:11

447:15 460:16 500:1
**helped** 414:7 431:12 501:2,6
**helping** 373:9 392:11 413:18
466:13 490:21
**hephzibah** 490:2
**hereof** 507:5
**hereto** 507:13
**hes** 302:16,17 334:19,19
362:24 364:14 417:15
436:10 467:19 473:11,14
474:12 496:6,6
**highend** 416:12 418:4
**higher** 355:23 357:9
**highlight** 420:17
**highlighted** 419:23
**hill** 295:4
**hinges** 332:11
**hire** 460:15
**hired** 351:21 460:15,19
**hiring** 384:9
**history** 400:11
**holding** 461:8
**homeowners** 502:13
**honest** 454:17
**hope** 392:20 439:19 467:23
**hour** 325:16 327:2 374:17,20
414:7 424:9,14 430:9 450:1
450:6
**hourandahalf** 439:24
**hourly** 328:6,10
**hours** 282:15 296:12,18
297:11 299:22 325:19,21
326:14,19,24 327:15 328:5
328:5,9 330:7,11 374:20
412:7,13 423:18 424:1,9,16
425:20 427:5,20 429:19
432:19,24 436:13 438:20
439:5 440:2,5,16,17,21
441:8,9 443:3,22 446:23
447:13 449:21,23 450:1
469:2
**house** 360:13 374:14 499:20
499:20 502:7,7,17,17,20
**human** 391:24
**husband** 381:5

I

**id** 302:24 303:3 312:2 345:1
357:3 361:16 380:9 394:16
400:3 411:10 423:8 433:15
434:1 451:8 502:7

**idea** 401:21 402:3,14,14
403:6,9,12 404:7 405:8
407:10,12,16,18 428:10
444:10 506:2,3
**identification** 437:10 498:6
499:16
**identified** 392:10 394:13
398:24 415:11 451:3 497:3
502:12,14
**identify** 370:23 393:2 415:1,6
447:16 450:20 478:5 489:12
496:21 497:16 498:4,11
499:11
**identifying** 390:8,8
**ii** 279:18 353:15
**iii** 281:11
**ill** 300:3 305:5 309:23 332:1
336:21 337:9 339:2 343:21
351:10 366:3 369:9 379:23
392:24 400:8 414:22 418:12
425:7 462:14 473:13,18
**illustrate** 413:24 414:7
**im** 283:4,6,20,24 285:2,8
287:10 294:2,14,24,24
297:14 298:3 299:8 301:2
305:4 307:5,9,17 308:13
311:14 313:8 314:5,8
315:21 316:10 321:7 323:18
324:15,21 332:10,13 337:1
337:1,16 339:15,16,17,20
340:2,7,8 341:9 343:12
345:16 346:23 348:3,16
351:12 353:12,22 354:17
355:14 356:12,22,24 359:16
361:23 364:7,9,10,23 365:5
367:11 368:10 370:22 372:9
375:10 379:21,21,21,22
380:4 381:15,22 385:6
386:12 387:8,14,14,18
388:7 392:20,23 393:18,19
394:1 396:6,11 397:19
398:3,9 399:14,14,14,15,22
401:20 403:4 407:1,9,11,17
408:16,22 409:18 410:17
412:5 414:21 415:2 418:10
418:12 419:6,7,12,12
423:10 425:7 429:11,14
430:15,23 434:6,16 439:12
440:7 441:6 444:14,21
446:18 447:1 449:7,23

452:12 453:23 457:16
458:16 459:15 470:10,10,23
471:24 472:6,6 473:9 479:8
479:11 481:16 483:9 484:15
485:1,4,8,15 486:20 487:14
490:24 494:5 495:19 496:10
498:15,17 499:8 504:21
**imagine** 474:2
**immigrated** 354:5
**immigration** 372:14 373:6,12
373:15,17,18,23,24
**impact** 356:20 409:8
**implicitly** 394:9
**importance** 300:17 478:7,22
479:15,22
**important** 301:5 304:16,18
382:6 390:21,22 392:16
454:4,16 478:11 479:5
492:18 493:24 494:2
**incidental** 469:8
**include** 428:9 462:9
**included** 300:10 384:12
413:1
**including** 295:4 322:22
391:15 415:13 416:19
417:11,13
**inclusive** 478:19
**incomplete** 409:24
**incorporate** 434:18
**increase** 347:3
**independent** 356:19
**index** 282:7
**indicate** 302:6 308:10 339:10
342:8 404:20
**indicated** 289:18 297:10
300:15 310:21 314:14,21
480:1 482:14 503:17
**indicates** 344:14 345:23
346:1
**indicating** 311:8
**indirect** 402:23
**individual** 297:2 364:16,19
394:23 429:5 450:18 480:12
481:4
**individually** 363:17 365:17
365:23
**inform** 317:7 460:13,14
**information** 282:21 290:9
308:11 367:8 376:6 380:3
388:18 394:14 422:14,17,22

423:19,20 424:24 432:10,18
432:21 433:10,14,16,20,22
434:5,9,16,19,22 435:1,4,22
436:20 437:2,7,11,14,23
438:5,8,18 439:16 441:17
454:2 472:9 482:6,9,15,18
482:22 483:24 484:1 492:23
493:1,5,15,19 494:1,13,14
494:16,20,22 495:11,15,18
495:22 498:18,24 502:24
**initial** 349:2 380:22,24
381:11 397:1
**initially** 389:8
**initiate** 461:20
**inordinate** 374:11
**inquiry** 449:1
**ins** 373:24
**inspections** 298:16
**installed** 357:21
**instance** 477:20
**instances** 432:10
**instate** 437:11 439:3
**institution** 355:23
**instruct** 311:16 361:24
**instructed** 333:5,16 334:5
**intended** 461:17
**intending** 462:2
**intent** 369:10,18 411:24
412:2 414:2 460:6 461:2,18
462:6
**interacted** 306:18
**interest** 283:8 317:10 318:3
349:3 352:16,20 353:3,18
354:1,2 358:19,23 383:16
**interested** 348:21 352:14
353:11 445:15 494:23
500:22 507:13
**interesting** 400:16
**interests** 353:17 359:10 381:8
**internet** 495:8,11,15,16
**interpret** 308:20,22 313:5
**interrogatories** 392:22
469:16
**interrogatory** 359:23 392:19
414:20,23 416:17 417:19
450:10,11 470:5,7
**interrupt** 383:2 430:15
448:20
**interview** 352:23
**interviewing** 384:9

**introduce** 285:19 317:24
318:5
**introduced** 284:16,19
**introducing** 381:14
**introduction** 427:17
**investigated** 480:3
**investigation** 304:12,13,15
381:18 382:9,15 384:17,22
385:2,24 386:4,22 387:17
389:15 442:18,21 443:5
445:16,17 446:13
**investigative** 386:16 387:9,20
388:14 389:4,13
**investigator** 388:8 394:22
466:4
**investigators** 387:4 388:5
478:16
**involve** 412:17
**involved** 288:13 302:18
304:19 318:17,20 321:24
323:12,16,18 328:24 354:14
354:14 356:5 357:19 358:13
358:17 359:6,24 368:24
381:11,23 385:12 387:12
389:9,12 392:11,14 394:7,8
394:12 408:14 414:1 426:1
426:9 427:12 433:18 438:7
455:13 475:12 476:1 483:22
491:15 492:10 493:14 500:6
500:23 501:1,21,22 503:2
**involvement** 318:2 354:11,24
356:1,1,2 358:7 408:9 414:8
414:9 455:4 479:1,10
**involvements** 318:3 384:2
**involves** 362:10
**isnt** 309:4 320:20 347:7 405:6
434:3 442:9 472:1
**issue** 331:9 333:10 358:12
359:7 362:2 373:6 375:2
376:18 472:3 476:3 480:7,7
480:18 481:2,8 486:17
501:17
**issues** 358:8 359:17,18
400:21 421:2 480:2 483:3,6
501:23
**italian** 348:5 353:11,12,22
**italiancanadians** 353:14
**italians** 353:12
**italicized** 418:16
**item** 348:15

**items** 338:7
**ive** 305:24 315:7 319:16
341:17 363:24 378:2 397:15
397:18 398:18,18 419:23
427:23 444:2 450:13 456:7
465:5,13 466:16 471:1
484:17 492:20 494:5

**J**

**jackson** 279:22 283:5
**jan** 445:2
**january** 312:4 423:12,16
443:2 453:1 472:15
**jared** 500:4,7 501:15
**jeanne** 371:10 501:8,8,15
**jeff** 287:21 337:2 364:23
**jeffrey** 280:12
**job** 352:15,22 364:6,11
388:12
**jobs** 352:12
**joe** 285:20 288:1 300:11,17
300:19 301:5 319:23 320:16
**john** 312:19,19 321:23 322:2
322:5,14 474:4,4,7
**johnny** 279:22 283:5
**join** 294:13 332:1
**joseph** 279:6,17 282:2,18
283:3,14 506:13,15 507:4
**judge** 279:9,11 333:22 334:6
334:17,18 335:18 336:16
**judgements** 489:18,19
**judgment** 453:2 489:13
**july** 349:5,8,10,16
**jump** 446:14
**june** 279:20 282:12 283:10
299:14 306:19 310:11
411:11 421:9,11,12 423:12
439:23 466:11,15
**junior** 312:19 474:4,7
**juris** 417:8
**justify** 330:7
**jwakefield** 280:13

**K**

**kathleen** 440:3
**kathy** 360:7
**kaull** 279:11
**keeley** 279:9
**keep** 356:15 377:4,20 409:7
**keeping** 345:13
**keith** 306:16 307:2 308:2

309:3,12 310:10,21 505:6
**kennedy** 280:4 376:7 377:5
  377:23 378:12 379:5,10,20
  403:10,18,22 404:2
**kept** 326:17
**kevin** 281:15 283:4
**key** 304:23 330:24 331:2,4,9
  368:14 385:18 390:13
  394:21 431:2,4 474:19
  475:4,10 503:18,24
**kicked** 402:3
**kidding** 457:22,22
**kind** 346:11 353:22 355:24
  370:6 381:18 385:14 389:1
  389:1 390:1 391:13 396:7
  402:10 413:7 427:16 433:9
  438:5,8 441:21 455:19
  478:12 494:22
**kinds** 322:10 360:14 398:23
  492:9
**knew** 285:21 289:22 290:21
  292:20 298:22 301:24 333:9
  334:8,10,20 336:15 357:12
  375:15 377:6 379:24 381:3
  381:4 405:4,5,8 438:15
  454:14 456:17,24 475:21
  492:17 496:1 500:19,20
**knight** 280:13
**knock** 427:15 488:3
**know** 283:19 285:10,17,21,22
  291:9 293:9 294:8 296:3
  297:2,4,14,15,15,17,23,24
  298:1 301:21 302:1 308:5
  308:12 312:11,14,16,17
  313:4,6,22 314:14 316:14
  316:14 318:14,23 321:2
  322:9 324:20,22 327:10
  329:3,24 337:11 338:24
  339:21 342:3 345:2 346:16
  347:15 348:9 349:6 350:3
  352:2,24 353:2,5 357:3
  358:7,18 361:17 362:20
  363:22,24 365:12,18 373:17
  374:14 375:16 377:8,9
  378:6,13 379:12 380:3,12
  380:23 381:22 382:9 383:9
  384:2 385:10,13 386:2
  387:3 388:10,11,23 389:19
  389:24 390:7 391:8,10,12
  392:10 393:13 394:10,20,24

395:10 397:2,21,23 401:4,5
  403:5,9,12,20 404:4,5,9,19
  405:9 406:11,13,15,19
  409:9 410:21,23 419:17
  420:5 422:6,6 426:22 427:2
  427:3,10,16 428:2,14,18
  429:23 430:1,2,11,13,17
  433:1,2,15,16 434:1,14
  435:5,8 436:24 437:3,20
  438:6,23 439:12 444:22
  449:10,23 452:3 457:1
  461:16 467:10,24 471:21
  473:16 476:3,18,18,19
  480:9 481:12 487:5 489:22
  491:13,14 492:9 493:4,6
  494:18 495:24 496:11 499:8
  504:1
**knowing** 435:21,23
**knowledge** 287:8 290:9
  372:17 380:2 411:15 412:9
  414:12 415:6,9,13 417:13
  420:4 422:4 428:17 432:5
  457:11
**known** 418:7

## L

**label** 359:1
**labeled** 425:7,12
**lane** 279:13 281:3
**language** 296:9 424:20
**large** 344:14
**larry** 284:8,9,19 285:8,13
  369:11
**late** 383:14 385:19 389:10
**law** 279:2,9 280:7 283:2
  285:13 287:3,6,11,11
  320:14 340:22 342:17,18
  343:5,9,17 349:19,24 350:4
  365:10,14 373:16,18 383:8
  383:16 405:20 406:22
  409:17 410:5,5,17,20
  415:15 416:1,20,21 417:15
  417:21 441:12 445:19,19
  483:13 486:8 492:10
**lawn** 391:11
**lawsuit** 324:14,17 341:7,8,14
  359:24
**lawyer** 289:7,21 293:1
  295:21 296:3,7 395:11,14
  395:18 400:3 413:12,16
  454:5,6,8 457:15 474:9,10

**lawyers** 295:4 321:3,8 323:4
  323:11 336:15 363:13
  398:14 423:20 424:24 429:4
  471:13 472:10 478:16 480:8
  480:13
**lc** 283:3 364:14
**lead** 381:6 386:3 390:5,19
  394:22 433:7 436:10 454:6
  454:8 478:16
**learn** 284:13 352:4 471:19
**learned** 287:15 289:23
  334:17 362:11 380:23 381:1
  405:10 472:1,8
**learning** 284:14 442:17
  500:22
**leave** 305:5 331:3 363:13
  417:19 468:21
**led** 356:10 357:4 381:4,7
**left** 301:11 352:11 370:16
  378:17 385:20,21 392:2
  414:6 452:5
**legal** 362:24 364:17,20
  384:11 385:8,11,16 388:8
  395:3,4,5,8,9,17,18,21
  396:2,7,14,15 399:4 400:7
  400:12,13,14,19 401:11
  405:19 406:1,1 418:9
  443:10,13 446:13,13 455:13
  474:8 478:9 480:2 483:4,20
  483:22 484:2,2,4,5,6,6
  492:21
**length** 361:15 382:19
**lenora** 381:6
**letter** 282:11 295:2,13,14
  296:9 458:1,4,6,20,24 460:1
  460:6,9,22 461:4,4,6,14,16
  461:21 462:4
**letters** 400:23
**level** 355:11 358:9 387:24
  389:9 390:10,10 392:11
  456:22,22
**levin** 279:14 281:8,10 293:16
  294:4 295:5 296:11,17,23
  297:5 298:5 300:24 301:11
  305:19,23 319:13 333:20
  334:11 335:5,16 361:18,20
  362:8,15,17 365:8 367:23
  368:2 383:13 387:10 389:8
  389:12,14,14,16 390:2
  393:9,23 394:3,6,11,13

431:1 440:6 447:19 454:11
456:21 457:1 458:23 459:5
459:11,13,23 460:10,12,21
460:22 461:1 462:11 463:15
467:1,16 468:8,24 469:2,6
478:21 479:1,7 482:11,12
482:16 492:7,14
**levinlaw** 281:11
**levitan** 401:22 402:7
**library** 448:16 483:13
**license** 442:8
**licensed** 290:6,22 291:5
292:22 348:22 350:14 395:9
395:11,18
**life** 455:12
**liked** 357:13
**limit** 400:8
**limitation** 356:13 362:15
481:11 485:24
**limitations** 331:6,10 400:20
428:19 447:2,3 448:7,11
474:20 475:6,18 476:4,11
481:15 484:11,13 485:13
486:12,17
**limited** 306:1,14,20,21
397:23 398:21 415:14
417:12,14
**line** 357:18
**lines** 359:19
**link** 305:1 504:12
**linked** 291:12
**list** 299:21 380:8,12 399:22
411:24 462:11
**listed** 392:16 458:24 480:21
**listen** 284:13
**listing** 339:18 483:3 503:15
**litigate** 366:7 445:9
**litigation** 301:16 302:18,19
303:23 304:1 319:19 333:9
341:18 356:11 357:5 367:9
367:14 380:7 384:13 385:3
386:4,10,23 390:14 393:3,5
408:20 411:21 414:8 420:6
425:24 426:21 446:1,5
447:21 455:4,14 456:14
461:20 462:3 466:9 482:19
488:16,20,21 492:14 493:13
**litigations** 356:6 369:12
375:2 407:7 408:6 414:10
420:8

**little** 302:12 307:21 314:11
318:1 356:9 371:4 392:21
394:5 401:21 409:8 423:10
423:17 459:9 474:5,6
480:11 487:13,19 492:3
493:9 496:14 499:9 500:6
500:22 501:7 506:1
**live** 374:6
**lived** 348:1 359:15 360:9
**lives** 348:14 354:7 374:7,7
**living** 426:18
**local** 358:6,9 382:4 387:22,24
390:9,10 392:11 456:22
485:18
**locate** 373:10 388:17
**located** 283:5 387:19 446:22
**locating** 367:22 368:8 388:15
**lodge** 286:4
**long** 286:3 383:15 385:22
389:19 410:22 448:21
461:23
**longterm** 384:3
**look** 288:21 300:2 306:22
307:16 308:14 311:18 312:2
313:8 315:5 319:21 320:13
322:23 337:14 339:7 342:1
342:8 343:21 344:9 345:1
345:22 352:14 364:10 397:1
410:13 416:10 418:11,16
420:24 423:6,7 424:4 426:1
429:9,24 432:17 433:15
434:1 439:4 441:1,2,3,7
442:21 444:13,20 446:17
448:7 451:8 452:24 453:6
458:12 478:15 481:2 490:10
**looked** 371:7 404:8 416:9
419:17,18
**looking** 307:17 339:20 340:2
352:12 394:24 419:16
420:15 429:14 430:2 432:8
436:21 448:12 452:12 463:3
463:4,4 475:23 476:2
478:10 480:14 481:20
483:15,19 485:18,22 491:4
493:17 496:1,1 500:21
504:4
**looks** 308:16,19,21,24 309:2
312:8 342:16 423:16 456:1
495:9,13
**losing** 345:16

**lost** 321:6 367:11
**lot** 283:24 322:6 335:17
351:12 359:16 374:15,15
382:3 389:11 419:19 431:14
442:11 445:22 456:24 468:9
468:10 470:24 499:20 500:6
504:6
**lots** 474:13
**louisiana** 348:9
**lp** 365:13 451:19
**lunch** 449:14 464:24

## M

**macintosh** 504:15
**magistrate** 279:10
**mail** 440:23 441:13 442:3
498:20
**main** 280:5,19 281:6 476:8
**maintain** 467:20
**maintained** 366:13
**major** 304:6,7,10,11,15,22
305:2,2 340:21 342:17
353:16 366:9 368:10 373:6
373:8 380:18,21 382:14
384:3,16 385:1,24 386:2,22
387:17,20,24 390:14 398:17
454:5 455:11 476:10,10
494:22 503:16,17 504:9
**making** 295:22 374:10
385:13 389:20,21 406:17
408:13 444:8 449:1 459:23
473:16 491:2 494:2
**managing** 389:15
**manner** 459:19
**map** 429:18,24 498:1 499:11
499:11,13
**maps** 430:1,4 439:24 440:6
440:16,22 441:10,13 497:5
497:11,12,15,18 499:4,8
502:24
**march** 282:11 295:3 308:3
309:17 420:24 421:4,5
423:12 440:5,15 441:9
458:7,9,20 464:9 485:20
505:6
**marino** 280:7,8 282:5 283:16
287:16,18,21,23 294:22
296:24 299:7 302:24 303:4
303:10,16,20 305:11 307:18
311:17 319:9 320:5,10
325:5 332:3 336:20 337:1,5

343:20 350:17 368:12 369:16 370:16 378:17,18 380:6,7 390:13 411:9 414:15 453:11 457:24 471:14 474:5,19 475:4 505:3
**marinolawpllc** 280:8
**marinos** 458:19
**mark** 392:23 464:20,24 468:19 473:19 484:15
**marked** 287:17,20 294:21,23 299:6,9 319:8 325:4,6 336:19,21 343:19 451:20 484:17,19 494:3,5,11
**market** 406:8,12,18
**married** 465:24
**maryland** 374:8
**mason** 281:5 282:6 294:12 295:24 296:14,20 299:4 301:9 302:20 305:8,21 308:23 309:1,5 310:2,14,23 311:10,13 314:7,13 315:10 320:3,7 324:19 326:2,12 331:24 332:9 333:12,24 334:14,22 335:8,21,23 449:10 457:20 471:1,10 473:11,19,22 484:22 485:1 485:8,10 494:4,9,10 503:3,7 503:14 506:9
**masry** 288:14 343:10 413:2 425:17,23 426:13,24 444:24 485:21
**masters** 500:21,24
**match** 430:4 457:21
**materials** 304:16
**matter** 283:2 295:11 309:23 310:4 360:4 372:14 412:20 415:4 416:3 445:9 447:11 450:19 458:11
**matters** 375:1 376:12 401:4 468:11 487:3
**mccarthy** 280:17,18
**mcdougal** 289:13 293:21 294:3 313:15 398:11
**mcdougals** 293:14 313:14
**mcelwee** 280:4
**mcwilliams** 462:20 468:18
**mean** 285:18 293:22 294:15 300:18 306:7 308:6,11 312:23 313:4,24 314:21

322:12 331:2 338:15,24 340:7,9 345:9,11 346:8,24 350:1,5 353:21 355:11 359:1 374:12 378:24 380:2 380:20 383:2,12,15,24 384:2,22 389:22 391:2 394:15,22 397:13 398:13 405:20 406:20 408:16 409:1 412:20 426:11 430:24,24 437:19 461:11 466:9 484:7 491:5 498:13 506:1
**meaning** 329:1 435:13 479:21
**means** 388:10 402:23
**meant** 335:20,22 417:16 474:21
**measure** 405:12,16
**mediation** 453:4
**medical** 505:18
**medina** 298:11 300:9,16,23 301:10 302:7,9 330:15 331:17,20 332:15 333:4 334:4,10 335:4 390:6 396:24 399:20 421:1 434:12 438:6 446:22 447:9 448:14 452:20 453:18 456:12 467:3 467:18,24 468:20 478:17 481:13 482:10,12,18 487:4 487:10 504:8
**medinas** 467:9
**meet** 284:3 348:16 389:23 420:22 422:13
**meeting** 282:13 286:4,5 310:10 313:1,6 314:15,20 315:3 316:3,5,12,17 319:11 320:21 413:17 422:14,17 436:16 439:10 445:23 465:15 466:13 468:16
**meetings** 314:22,23,24,24 316:21,21 317:5,6,14,19 318:8,17 367:12,16 381:15
**melissa** 425:16 427:4
**member** 324:8 345:18 357:7 474:12
**members** 357:10
**memo** 282:9 401:3,3 404:16
**memorandum** 287:24 288:6 344:4 365:9,21
**memorialize** 314:6
**memorialized** 313:17,22

314:4
**memory** 393:12 458:14
**memos** 400:23 401:19
**mention** 300:16 318:12 383:1
**mentioned** 285:8,9,22 286:8 297:16 322:15,19 324:1 384:8 388:15 399:8,9 404:9
**mere** 368:17,20
**meruit** 404:8,10,17 405:3,4,9 405:12,17,20 406:14,17,21 407:5,11,17 408:4,7,13,19 409:9,17 410:7,13,17
**met** 283:19 285:4,18 286:11 286:14,17,22 287:2 306:16 312:9,22,23 390:9 436:9 462:17,21 463:15 464:2,5 464:21,24 465:9,21 468:18
**metals** 391:24
**mexico** 347:22 348:1
**mic** 470:21
**middle** 315:23 343:14,14 351:19 425:11 429:10
**migrated** 352:1 353:15
**migration** 353:16,19,20
**mike** 322:23 464:1,5 468:19
**mileage** 469:17
**million** 296:13,18 297:11,22
**mind** 290:10 356:16 385:16 400:22 407:12 449:6,9 462:10
**mine** 325:10 389:11 463:23
**minimus** 469:12
**minute** 287:9 453:6
**minutes** 396:1 448:23 449:8 449:21 450:7 503:4
**misspells** 319:24
**mitchell** 279:14 281:8,10
**mixed** 427:6
**mixing** 406:20
**modeling** 390:18,21 504:13 504:14
**moment** 302:15 322:20 395:1 397:4 423:4 425:3 429:23 432:22 448:21 484:14
**money** 292:8,12,13 297:16,19 298:2 309:11 324:13,16,24 350:7 370:6,21,23 402:8 403:14,15 506:4
**monitoring** 491:15 505:19
**month** 418:20 423:18 424:9

**months** 361:13 418:24 419:3
  420:1,7 424:16 437:20
  438:11 443:5,23
**moore** 298:11 387:9,11,13
  388:11,12 390:6 394:21
  438:6 454:13 466:5,12
  467:3 468:20 478:17 482:13
  482:17 487:5,10
**moores** 388:3
**morgantown** 285:2 358:9,15
**morning** 283:17,18 297:8
  302:5 451:17 453:11 458:20
  471:15 474:6
**motion** 333:15 334:12 471:15
  471:20 472:2
**motions** 308:11 385:10
  505:15
**move** 364:23 365:1 369:1,10
  379:23 393:19 448:18
  462:14
**moved** 334:7 361:1,5
**mpre** 289:20
**multiplied** 328:1,2
**multiplier** 328:22
**myriad** 394:12

### N

**name** 283:4 285:21 319:24
  353:23 374:4 465:13 466:23
  500:5
**named** 297:2
**nancy** 302:8 454:22 485:21
  486:10,19
**narrowed** 471:1
**nathan** 466:3,4,10,16 468:20
  502:12
**naturalization** 373:24
**nature** 395:17
**near** 421:8 429:10
**necessary** 295:18 335:13
  385:2 461:11 462:7,10
  495:24
**ned** 462:20,24 468:18
**need** 337:2 403:15 404:6
  409:18 417:21 434:21
  439:18 497:10,12
**needed** 305:1 307:16 329:6
  350:13 382:5 386:15 389:4
  389:5 391:7,15 392:10,12
  392:13 434:18,24 445:12,13
  492:11 493:17,19 495:17

  497:15 504:11
**needing** 294:14
**needs** 390:8,9 394:12
**negotiated** 402:22
**neither** 507:10
**nephew** 322:6
**neutral** 455:16
**never** 287:7 293:12,15,15
  294:3 296:22 301:13 306:8
  309:10,12 319:7 321:2
  336:3,10 342:3 350:16
  358:10,10,11 361:20 363:18
  363:18 376:3 379:24 402:10
  402:17,21 403:1,21,23
  429:3,6,8 456:17,18 468:23
  469:2,4,5,10 470:1,6
**nevertheless** 379:23 404:16
  404:24 438:17
**new** 312:20 351:16 398:22
  482:21,24
**newspaper** 341:14
**nine** 337:13,14 342:1,12
  381:23 391:14 449:23
**nineties** 290:2
**nobodys** 364:11
**nods** 289:15,17 388:19
  490:17
**nonlawyer** 289:8,22 293:3
**nonlawyers** 288:24
**nontestifying** 332:22,24
  333:6,17,23 334:13 336:1
**north** 361:8
**northern** 279:1
**notary** 279:19 507:2,21
**note** 308:14 312:8,18 396:3
  400:17 413:6 439:15
**notes** 282:13 307:2,23 308:2
  312:4 314:9,15,16,17,22,23
  315:2 316:11 319:11 326:20
  371:8,14 396:8 404:19,24
  405:2 419:17 439:1,9
  485:16 490:7,9,10 491:24
  492:5,6,13 503:5 505:5,11
  505:12 507:7
**notice** 279:18 295:14 460:6,7
  472:24 473:3
**noticed** 460:13
**noticing** 461:5
**notified** 302:23
**notre** 351:20

**november** 282:9 288:1
  418:17 444:5 464:10
**number** 288:2 308:15 315:8
  315:19 316:20 320:5,9
  322:21 326:24 327:14 328:9
  329:10 340:4,19 342:9,14
  344:10 371:9 373:22 380:15
  380:17 392:22 412:6 415:2
  415:17 450:12 465:2 469:18
  489:7 505:14
**numbers** 413:19 499:11
**numerous** 344:18
**nw** 280:9

### O

**object** 290:24 294:12 295:24
  296:14,20,21 299:4 301:9
  302:20,22 305:8,9,21,22
  308:23 309:1,5,6,7 310:2,14
  310:23 311:10,13,14 314:7
  316:18 325:1 326:2,12
  331:23,24 332:1,9,10
  333:12,24 334:14,22 335:7
  335:8,21,23 336:13 347:8
  350:9 354:12 356:12 359:20
  361:23 364:9,10 367:24
  368:1,9,19,22 369:15 375:3
  376:7,8 377:5 378:11,12
  379:5,10,11 385:5 386:24
  395:20 403:10,11,18,19
  404:2,3 405:14,18 406:10
  406:19 407:15 408:15,22
  410:2 417:1 441:14 442:13
  443:11 457:4 459:16 463:24
  472:13 473:10 474:23
**objected** 333:4
**objection** 293:23 324:18,19
  334:23 336:7 346:21 362:23
  369:16 377:23 379:20
  403:22 409:6,11 450:3
  461:13
**obtain** 434:23 477:15 495:15
**obtained** 337:7 362:11 416:2
  423:21 440:3,12 477:5,11
  482:19 483:2,5 494:20
  496:22
**obtaining** 440:14 501:11
  502:23
**obtains** 295:18 461:10
**obviously** 283:19 427:11
**occasions** 451:1

**occur** 408:4 431:15
**occurred** 302:14 379:14
  381:13 410:21
**occurring** 472:21
**oclock** 297:8 302:5 411:8
**october** 361:12,14 418:17
  440:2
**offended** 456:2
**offer** 479:14,21
**offhand** 477:4
**office** 279:2,9 283:2 358:7,10
  372:3 445:24 464:6 467:9
  482:13 495:2 496:3 497:8
  497:15
**offices** 463:15 477:18
**oh** 285:20 287:9 305:15 307:8
  328:4 337:1 349:15 352:8
  358:13 363:22 383:2 426:14
  464:19 468:5 469:19 481:16
  482:14 485:2 501:24
**okay** 283:17,21,23 284:17,21
  285:15 286:19 287:5 288:8
  288:16,21 289:6 291:3,19
  292:9 293:13,24 294:9
  299:10 300:5 302:4 303:10
  303:19 305:15,15 306:11
  307:11,17,20 308:10,22
  309:3,10,10,17 312:2,22
  313:3 314:8 315:5 317:9,13
  319:10,21 320:23 322:14
  325:6,11 326:23 327:6,17
  328:11,20 330:10 331:1
  336:21 339:18,23 340:7
  341:9 342:7,13 343:16
  345:22 347:24 348:12
  350:13,17 351:3,6,17 352:4
  353:4 354:8 355:7,24 356:3
  358:6,24 360:12,15,20
  361:1,15 365:2,20 366:4
  369:2,5,8 371:4,15 372:22
  374:6,9,22 379:23 380:14
  382:17,24 383:4 384:15
  386:11,19 387:3,17,23
  389:22 390:12 391:20
  393:21 395:2,16 396:21
  399:2,11,11,17 400:5,7,14
  400:14,16 401:14,18 404:22
  405:11 406:3 408:24 409:14
  409:21 410:4 411:1,3,10
  415:19,19 417:7,9,12,20

418:5,11,15 419:15 420:5
  421:7,13 422:19 423:6
  424:15,19 425:5,10,15
  426:15 428:9,14 429:17
  432:15,23 433:8 435:17,21
  436:2,6,8,19 437:5,19
  438:14,24 439:17 441:6,22
  442:15 443:1,9 444:19
  446:11,20 447:5 449:22
  452:5,14,19,24 453:9,10,22
  457:5,12 458:8,19,22
  459:14 464:1,20 465:6,24
  466:2 468:4,6,12 470:13,15
  473:7 475:2 476:19 477:15
  481:14,17 482:6 483:1,8
  484:10 485:8 486:4,9
  487:13,19 488:24 489:9
  490:9 493:4 494:12,19
  495:10 497:22 498:11,23
  505:2,14 506:7
**okayed** 308:20 505:20 506:5
**once** 286:13 289:11 349:15
  371:21 387:1,6 407:8
  463:14 479:19 499:14 504:3
**ones** 419:22,23 423:17
  444:15 451:12,13,16
**ongoing** 360:19 383:11 420:6
**online** 448:16 483:14 495:3,4
**ontheground** 442:18
**operations** 437:7
**opinion** 377:3,16,20 400:23
**opinions** 376:15 484:2,4,6,7
**opportunity** 452:7
**opposed** 346:19
**oral** 279:18
**oranges** 406:21
**order** 307:12 403:8 407:6
  433:17 434:22 437:24 497:3
**ordered** 335:1
**organization** 304:10 380:18
  380:21 381:12 382:14,20,23
  382:24 383:19 384:6
**organize** 344:19
**orient** 453:1
**original** 337:10
**ought** 449:2
**outfit** 498:2
**outofstate** 320:14 342:17
  343:5,9,16 383:8
**outset** 369:10

**outside** 381:21 385:4,8
**outweighed** 388:3
**overly** 354:13 359:21
**owner** 498:7 499:17
**owners** 429:19 489:24

## P

**package** 495:6,6,7
**pad** 492:22
**page** 282:4,8 288:21 300:2
  315:19,23,24 326:23 339:7
  339:16 340:4 342:9,11
  344:9 415:18 418:13 420:11
  421:8,9 423:6 424:5 425:6
  429:10,12 432:6 436:4
  437:19 438:17 441:2,4,6
  442:24 444:13,17 446:15
  451:19 452:24 453:6,7,20
  461:8 485:2,6,23
**pages** 436:3
**paid** 309:4 324:2,12 325:15
  325:21 336:11 346:18 347:4
  375:11,12 377:7,17,24
  378:21 379:18 406:17 407:6
  501:8,9
**papantonio** 279:14 281:8,10
  293:17 294:4 295:5 296:11
  296:17 297:6 298:5 300:24
  301:12 305:19,24 319:13
  333:20 334:11 335:5,16
  361:18,20 362:8,15,17
  365:8 367:23 368:2 383:13
  387:10 389:9,12,14,14,16
  390:3 393:10,23 394:3,6,11
  394:13 431:1 440:6 447:19
  454:11 456:22 457:1 458:23
  459:6,11,13,24 460:11,13
  460:21,22 461:1 462:12
  463:15 464:1,5 467:1,16
  468:8,19,24 469:3,6 478:21
  479:10 482:13,17 492:7,14
**papantonios** 479:1
**papers** 326:20 400:18
**paragraph** 345:23
**paralegal** 395:13 416:9,11,13
  418:3,4,4 441:24,24 465:19
  467:8 468:8
**park** 371:9
**part** 294:3 319:22 339:21,24
  340:18 344:15 345:5,11
  347:2 354:19,24 357:12

366:9,12,17,24 367:6,7,19
367:19 368:7,24 376:21
381:8 382:16 391:20 392:4
393:19 410:18 426:10
427:10 428:12 434:6,9
435:2 440:13,13 441:23
445:15 448:24 452:21
465:11 477:13 483:23 491:3
493:18
**participate** 320:1,17 321:1
428:11
**particular** 355:8 358:12
371:1 406:24 420:1 422:23
430:5 465:3 486:18 490:4
495:6,7
**particularity** 415:6
**particularized** 415:5,9,13
417:13
**parties** 283:7 300:15 322:19
328:24 329:6 364:5 365:12
381:5 387:15,16 460:13
472:2 507:11,13
**partner** 297:5 300:24
**parts** 452:16
**party** 304:10,11,15 330:24
331:4 365:16 380:18,21
382:14 384:16 385:24
389:17 455:16
**pass** 376:5 379:9 396:3
**passed** 360:9
**path** 356:14
**patience** 470:20
**paushel** 436:12
**pay** 325:12,16,24 326:7 328:7
347:5,6 360:16 403:6
460:21,24 461:1 480:18
481:3
**paycheck** 468:23
**paying** 309:11 335:20 345:10
345:12 346:24
**payment** 336:5 372:15,18
378:6,8,15,19 379:3,4,18
380:1 443:16,22,24 462:4
506:5
**pending** 459:13
**pensacola** 281:12
**people** 295:4 303:7 306:2,3
316:22 317:7,23 318:8,12
318:16,19 322:15 344:16
349:20 350:1,2,11 352:12

358:17,21 359:13,14,14
360:8 366:14,19 367:4,9,12
381:3,3,7,12,12,18,21 382:1
382:2,5 387:19,22 389:2
401:5,6 415:23 423:18,21
424:23 426:18 430:5,6
431:10,15 434:5 435:8
442:6 446:3 454:14 458:7
462:12 465:2 467:8 468:14
468:17 475:13,24 478:15
488:10 495:2 496:2 497:14
502:15
**percent** 292:10,10,10,10,11
327:3,23 329:6,7 370:1
**percentage** 292:18
**perform** 298:12 447:12
484:12 486:16
**performance** 282:17 343:24
346:3
**performed** 295:9 388:22
403:8 416:21 419:10 426:10
426:13 443:22 460:3 485:12
504:15
**performing** 479:2,6
**perimeter** 390:23 391:1,2
493:23
**period** 299:23 347:11 357:12
372:23 373:21 383:15,19
384:19 387:1 422:1 430:6
437:6,8 466:15 485:20,21
500:1 501:5
**periodic** 367:16 381:15
**periodically** 298:12 389:23
**periods** 389:7
**permission** 488:4,17 490:5
490:14 495:14,21,23 496:23
497:4 502:14,16
**perrine** 381:6 436:9 437:9,15
438:19 439:2,6
**person** 373:13,15,22 381:4
385:1 386:3,3,22 387:20
388:1,22 406:17 422:20
427:13 455:19 462:15
468:18
**personal** 353:21 354:1
357:14,22 449:3 456:3
467:20 468:3
**personally** 362:21 363:8
371:17,22
**personnel** 344:7

**pertinent** 448:13
**ph** 279:18 282:2 360:7 417:6
496:4 506:15 507:4
**phase** 380:22 381:1 420:6
**phillips** 480:11
**phone** 314:15 352:13 374:12
421:1 429:18 430:7 434:12
467:10 499:21 501:6 502:18
502:21,22
**phrase** 370:19
**physically** 488:2 491:9
**pick** 442:6 454:10
**picked** 290:12
**picking** 409:7
**pieces** 424:22
**pin** 386:20
**pinpoint** 401:13 439:14
475:20,20
**pipeline** 398:18
**pittsburgh** 442:6 468:14
**place** 283:12 407:2 491:3,5
491:11,12 507:5
**placed** 408:1
**places** 316:23 491:7
**plaintiff** 324:7,10 375:14
377:18 381:6 436:10 480:21
481:4 505:19
**plaintiffs** 279:4,10 280:3
291:12,15 298:23 299:3
317:10 320:24 324:12,16
359:5 366:19 367:13 408:10
413:5,10 426:12 433:5,6
436:16 442:20 443:4,4,9,14
443:17,18 444:12 445:10
475:21 476:17 480:22 504:5
**plan** 421:14,23 422:2,10
434:13,14 435:5,6
**planned** 389:24
**planning** 303:6 353:9
**plans** 421:24
**plant** 358:14 359:3
**play** 390:17,23 391:21
**played** 304:22 305:2 390:14
454:3
**player** 331:2 387:17 474:19
475:4,11
**pleadings** 363:1,5 384:9
**please** 289:11 294:1 296:15
306:23 311:18 315:12
332:13 336:8 346:22 366:1

368:5 405:15 414:5 415:6
415:16 418:14 420:11 421:3
425:5 458:2 459:22 462:1
473:2 497:13
**pllc** 280:4,7,12
**plus** 454:16
**point** 301:14 308:4 310:18
319:22 320:3 332:10 337:15
338:19 364:3,4 397:24
427:22 435:22 438:1,11
439:10 454:1 464:9 468:1
483:19 487:6 499:10
**political** 358:7,8
**polluters** 344:20
**populations** 348:5
**portion** 289:3 291:14 292:5
**posed** 428:15
**position** 352:5,7 390:3
434:22 450:5 474:7 478:13
478:14 500:14
**possession** 420:3
**possibility** 291:7,7 292:2
322:9 381:9,10 475:14
**possible** 286:22 287:1,2,4
316:15,19 320:23 348:22
360:24 377:22 379:8,12
404:11 405:6 420:15 472:6
475:24 478:2,20
**possibly** 321:3,9 353:9
361:14 402:12 407:24
431:22 478:1,2
**postdeposition** 334:2
**postit** 371:8
**posttrial** 308:10 505:15
**potential** 316:21 320:24
366:19 442:20 443:4,9,14
443:17 461:5 463:6
**potentially** 407:6 478:11
**power** 358:14 359:3 449:11
**powering** 449:9
**practice** 348:22 349:18 350:4
**practicing** 349:1,24
**pre** 386:7
**preexisting** 326:7
**prefer** 449:15
**preference** 449:3
**prelevin** 479:10
**prep** 385:10
**preparation** 425:19 427:24
**prepared** 295:16 299:18

316:16 325:11 385:15 397:2
461:7,9
**preparing** 331:17
**presence** 285:24
**present** 281:14 310:8,20
479:9,23
**president** 355:1,3,4 356:7
357:6,11,21
**press** 460:16
**pressing** 460:10
**presumably** 338:7
**pretrial** 386:5
**pretty** 375:15 377:18
**previous** 286:21 311:8
317:23 329:19 348:24
**previously** 411:20 412:12
**price** 466:21
**primarily** 338:6,22
**primary** 346:3
**principal** 364:17
**print** 303:1,2
**prior** 285:3,6 315:3 332:15
378:9 386:12,13
**priority** 390:3
**privilege** 332:11 339:14
362:2,5
**probably** 315:4,7 374:18,21
381:22 448:22
**problem** 310:22 311:9,12
358:2 381:2 458:17 480:10
**problems** 357:23 404:1
426:17
**procedure** 279:19 388:24
389:1,2 450:5 455:14
476:20 502:1
**procedures** 357:16,24 358:3
476:24 483:20,22
**proceed** 318:5 417:10 422:1
433:17 434:15
**proceeding** 284:9,13 367:14
**proceedings** 507:7,12
**process** 408:1 445:13 455:14
492:3 493:10 496:17,23
497:3,23 499:3 504:14
**processed** 433:21
**proctor** 279:15 281:8,10
464:20,24 468:19
**procured** 487:16 488:16
**procuring** 486:18
**produce** 462:4

**produced** 299:15 319:13,14
419:17 452:8
**product** 332:11 396:8 401:10
432:13
**productivity** 282:16 337:9,19
339:4 340:1,15
**professional** 279:12 295:16
342:2 354:2 356:2 460:4
489:19
**professionally** 496:11
**professor** 285:24 318:9,11
337:18 338:2,5 345:13
471:11 473:16,17 485:11
486:7,13 494:13
**professors** 338:19
**progress** 413:7
**project** 501:10
**promise** 348:16 362:18 451:5
**promotion** 337:22
**proper** 382:2 491:3,5,11,17
**properly** 362:20
**properties** 488:17,18 489:12
489:21 498:7 499:17
**property** 298:16 360:9,10,11
391:7,9,12,15,18 392:3,4
402:4 429:18,19 430:3,4,18
430:19 431:7,13,16 433:17
434:7,20,23 435:3 466:14
487:16,24 488:4,6 489:14
489:20,23,24 490:4,16
492:23 497:24 498:3,7
499:13,14 501:12,12,16,22
502:16
**proposed** 346:6
**proposing** 346:2,8,16 347:1
**prosecute** 340:21 385:3
**prosecuting** 342:17
**prosecution** 295:10 392:17
**protection** 298:19
**provide** 295:14 301:14 302:7
302:10 422:2 426:23 454:19
454:24 455:3 460:6,7 472:4
472:24 473:4
**provided** 297:8 302:4 418:19
419:2 433:8,9 443:6 482:7,9
482:12,16 498:18
**providing** 443:10,13 474:8
**public** 279:19 344:15 358:11
477:7,8,11,12 495:20 507:3
507:21

**publication** 338:8 346:20
**publish** 346:11
**publishing** 338:16
**pull** 458:2 504:18,22
**purple** 457:21
**purports** 287:24 295:2
  299:13,21 319:11 337:8
  343:23
**purpose** 295:14 317:4,6,8
  338:4 348:13 453:17,24
  454:1
**purposes** 317:9 337:21 505:4
**pursuant** 279:18,18
**pursue** 295:17 394:10 461:7
  461:9,12 462:3
**pursuing** 353:3,18
**put** 293:4,7,10 301:7 307:8
  313:7 328:5 358:14,15
  359:1 360:11 373:4 374:12
  411:13 418:19 422:8 430:12
  434:5 441:12 445:22 448:19
  470:11 491:3 492:24 495:6
**putting** 412:2 421:24 428:3
  440:22,23

**Q**

**qualification** 397:13
**qualifications** 403:2 473:15
**qualified** 507:3
**qualify** 387:5
**quantum** 404:7,10,17 405:3
  405:4,9,12,16,20 406:13,17
  406:21 407:5,10,17 408:4,7
  408:13,19 409:9,16 410:7
  410:13,17
**question** 289:11 293:22
  294:20 303:15,18 321:7
  332:2,13 346:22 357:1
  362:3,10,13 365:6 367:11
  368:5 371:22 377:12,13,15
  377:19 380:24 393:13,15,22
  400:17 407:2,9 409:3
  412:17,23 414:9 419:1
  425:2,6 441:11 443:12
  446:10 449:18 450:17
  451:12,14 459:18,22 461:23
  462:1,2 475:1 476:11
  479:19 502:10 505:3
**questioning** 358:18 374:23
  394:6
**questionnaire** 425:18 427:9

  427:13,14,18 428:1,3,4,11
  428:13,14,18
**questionnaires** 427:11
**questions** 283:23 289:14
  293:14 303:13,17 313:14
  314:13 333:5,17 334:5,8
  335:2 351:8,12 365:4
  371:21 380:10 408:23
  409:24 420:18 439:22
  449:11 452:4 457:13 464:21
  465:6 470:14 471:12,14
  485:2 491:1 505:8
**quite** 285:2 348:17 361:15
  387:11 487:15
**quote** 369:9 375:9
**quoting** 409:16

**R**

**rafferty** 279:14 281:8,10
**raised** 450:3
**ramlaw** 280:5
**ran** 358:10
**random** 352:18
**rapport** 367:3,6 427:17
**rate** 328:6,10,12,13,14 418:7
  441:16
**reach** 445:14
**reaching** 482:7
**reaction** 455:7
**read** 289:3,5 310:16 369:3,4
  375:9 392:24 414:22 423:17
  426:17 439:19 440:10
  450:22 452:7 453:7 460:1
  505:17,22 506:10
**reading** 310:20 420:13
  422:20
**real** 402:11 403:2,5,8,16
**realize** 307:9
**really** 308:4 330:13 401:24
  402:10 409:15 413:4 416:20
  419:1 441:11
**reask** 351:11
**reason** 318:11 357:18 362:7
  362:14 373:8 376:5,10
  397:19 448:24 449:1,22
  454:10,15
**reasonable** 424:17
**reasons** 318:20 323:15,19
  345:12
**recall** 285:15 286:3,7 289:2
  290:19 293:19 302:16

  310:12 313:19,21 314:24
  322:20 324:11 351:8 360:1
  369:8 370:2 372:16 374:23
  375:5,7 376:23,24 390:17
  395:22 401:2,17 404:14
  453:5,14 455:4 456:10
  463:10 466:23 467:2 468:4
  471:17 472:23 473:3,21
  475:19 476:8 479:13,24
  484:9,14 486:16,21 494:19
  501:20,20 502:7
**receive** 370:14 372:14 396:2
  396:7 434:4 500:10
**received** 292:6,12 303:23
  325:8 376:17 379:7 412:18
  432:10 433:14 437:24
  459:21 472:23 473:3 474:14
  499:14
**receiving** 292:14 326:4
  345:20 434:17,19 438:9
  474:16
**recipient** 458:23
**recipients** 461:21 462:3
**recollect** 330:5 375:18 491:23
**recollection** 285:3,5,11 296:7
  300:21 301:24 302:11,12
  311:2 330:12 346:4 348:3
  349:17 386:14 396:22,24
  456:19 463:8 465:20 482:4
  482:24 485:12 505:23
**reconstruct** 419:19 423:2
**record** 283:1,8,21 313:23,24
  344:7 350:21,24 385:20
  411:5,8 412:21 414:13
  457:20 471:5,8 492:11
  503:9,13 505:4 507:8
**recording** 492:1
**records** 326:17,22,22 419:18
  430:3,4 473:23,24 474:1
  492:20 497:24 498:5,6,8
  499:13,15
**recovery** 291:12 370:12,13
  370:15 407:22 408:10
  410:14 444:10,12
**recruited** 500:18
**recruiting** 383:16
**reedsville** 463:5,6,7
**reexamination** 471:9
**refer** 343:5 370:5,5 394:4
  418:5

**reference** 300:11 316:2 341:5 395:23 396:11 421:1 422:7 453:13 495:4
**referenced** 494:15
**references** 300:8 312:18
**referencing** 451:1
**referral** 374:10
**referred** 290:17,18 383:17 387:2 505:24
**referring** 310:17 327:22,24 343:6 393:19 396:4 480:6
**refers** 312:11
**reflect** 414:2,14 416:4 417:24 427:5 433:23 436:15 440:8 457:20
**reflected** 415:21 416:8 417:24 441:20 473:23
**reflecting** 372:15 376:15 427:23
**reflects** 404:17 433:13 437:14 485:23
**refresh** 302:10 346:4 393:12 458:14 485:11 505:23
**refreshes** 302:12 506:1
**refused** 302:9,10
**regard** 474:20
**regarding** 348:5 374:23 380:18,21 382:14 385:24 434:13 439:9 467:17
**regards** 467:12
**region** 361:3
**regular** 467:9 469:10 472:21
**reimbursed** 469:8 470:5
**relate** 316:12 318:15 464:12 475:17
**related** 283:6 300:17,20 359:12 381:20 382:8 403:4 433:4 434:7,11 444:1 463:6 464:16,19,23 465:2,20 471:12 473:15 474:16 475:5 475:16 477:22,22 478:2 484:12 493:15 494:15 499:12 500:17 501:10,13 502:19 507:11
**relating** 414:3 466:18
**relationship** 353:7 402:11 456:21
**relationships** 366:13 467:20 504:7
**relative** 507:12

**relatives** 354:4
**release** 474:16
**relevance** 356:13 473:10,13
**relevant** 356:15 463:20 479:15
**relied** 415:12 416:18
**rely** 418:9 459:20
**remedies** 295:17 461:10,12
**remember** 284:5,22 285:12 285:14 286:2,17,18,20 289:4,4,5,13,16 294:18,18 294:19 298:11 302:3,14 306:9 310:17,19,24 311:1,2 311:5,5,11 312:12 314:2,3 319:20 320:22 321:16,18 322:7,12 323:10,23 325:2 328:15,19 329:4 331:22 332:5,14,19 333:3,18 340:3 343:12 347:15,20,22 348:10 349:16 358:15 365:18,19 369:13 371:6 374:13 376:16 376:19 389:18 394:23 396:10 401:7,15 427:23 433:3 438:3,12,16 440:10 447:8,14 448:2,3 453:13 463:3,5,19 465:10,15 466:12 470:7 476:13,18,23 481:10,18,19,21,22 483:7 483:14 487:6,7 490:6 491:1 492:8 493:22 495:5 499:9 500:2,5 502:11,11,11
**reminding** 492:4
**removed** 357:21 360:13
**rendered** 295:16 405:13
**rent** 360:16
**renting** 360:8,10
**repeat** 296:15 336:8 346:22 368:4 405:15 407:8 414:5 473:2 497:13
**repeatedly** 375:1
**rephrase** 289:12 475:2
**report** 282:16 337:9,19 339:3 339:4,8,22,24 340:1,15 345:2
**reported** 325:18 326:14 344:24
**reporter** 307:11,14 449:4,20 507:3
**reporting** 425:20
**reports** 493:2

**represent** 337:9 355:8,21 492:22
**representative** 355:5,6,18,20 355:22 375:13
**representatives** 506:6
**represented** 354:15,16,20,21
**representing** 355:3,10 460:3
**request** 293:18 298:9 388:24 456:2 499:7
**requests** 298:12 388:18,21
**require** 441:11 442:2 502:23
**required** 415:4,9 416:13,21 417:6 418:1 442:7
**research** 288:9,12 289:2 338:7,13 345:19 346:10,20 348:4 384:23 395:5,8,19 400:7,8,10,12,13,14,19,24 401:1,7,11 442:20 443:4 446:13 447:4,13,16 448:5,6 448:15 481:23 483:4 484:10 484:12 485:13,24 486:15,16
**researched** 446:21 480:3 481:22
**researching** 288:20 353:11 448:11 477:17 481:12
**resident** 427:18
**residents** 318:21 323:13 340:20 425:19 427:14 428:10 431:5 502:15
**resolved** 360:18 476:13,16
**respect** 293:18 294:20 303:21 304:10,11,15 315:16 330:15 335:16 401:3 475:14 480:8
**respects** 466:7
**respond** 303:12 311:16 361:24 362:9 457:13
**responded** 313:18
**responding** 410:24
**response** 293:13 314:13 334:12 392:19 394:5 414:20 455:5 456:4 460:24 469:15
**responses** 359:23 450:10
**responsible** 385:1 386:3,22 496:18
**restate** 366:1
**restatement** 503:20
**result** 287:14 291:21 359:14 400:24 401:1,10
**results** 425:19 504:4
**resume** 342:6,11 476:21

**retainer** 324:9

**retire** 338:1

**retirement** 347:11 473:8

**return** 372:8,9 476:20

**reveal** 459:20 461:23

**review** 380:10 399:3,6 433:16

**reviewed** 432:18,18 434:18

**reviewing** 385:12 434:4,9
435:2

**rich** 279:2,3,9,9 282:15 283:2
283:3 284:3 285:4,10
286:12 287:5 288:1 290:5
290:16,22 291:22 292:6
295:4 300:9 310:19 313:16
316:3,6,13,17 318:5 321:5
321:11,14 322:17 323:6
324:10,23 343:16 350:6
361:16 362:21 363:2,8,14
363:16 364:2,5,14,14,16,16
365:13,16,22 366:5 369:8
370:1 371:11,19 372:2,13
373:5 374:24 375:9 376:4
376:11 377:2,15 378:6,8,14
379:3,9,19,24 381:14
389:22 393:7,9,22 394:2,8
396:20 399:10,21 401:4
402:18,22 403:24 413:1,18
420:22 421:2 422:13 427:1
434:13 444:4 450:24 451:3
453:2 455:17 456:16,18
457:2 459:12 464:18 465:3
466:19 467:13,17 479:10,21

**richs** 310:9 363:3,9,17
365:10,24 369:2 371:5
374:22 402:4,14

**right** 284:8,11,15 285:3,23
286:11,22 287:19 289:22
290:1,4,11 293:2 297:9
298:9 303:13,19 304:2
305:4,7,17 307:13 308:17
308:19 309:4 310:8,11
312:20 313:7 316:2,20,23
322:8,23 323:3,14 327:18
328:12,21 329:8,11 330:2,6
332:24 333:10 334:8,16,21
335:2 336:3 339:7 340:8,13
341:5,11,18 343:22,23
344:23 347:1 348:15,23
350:17 359:22 369:6 373:3
380:14 387:18 394:18 397:3

398:4 399:24 400:22 407:11
409:21 422:17 425:14
429:16 431:16 432:22
437:17 446:6 448:18 451:18
458:16 459:10 466:21 475:3
476:12 483:6 487:21 489:2
496:5 497:1,11 504:22
505:7

**rmr** 279:19 507:2,21

**robert** 282:9 288:17 321:12
321:19,21 466:21

**robinson** 280:4

**role** 304:22 305:2 331:22
332:8,17 387:14 389:15
390:14,18,23 391:21 454:3
487:14 503:18

**rossis** 282:10 288:17 289:3

**route** 483:21

**ruled** 472:4

**rules** 279:19 450:4 485:19

**run** 358:7 462:11

**runs** 383:20 437:19

**ryan** 280:4

### S

**sabbatical** 347:10,13,17,19
347:20 348:2,4,10 353:5,8
353:10

**salary** 345:20 473:7

**sample** 487:23 488:4,17
489:14 490:5 491:2,10
493:12,20 496:19

**sampled** 487:23 492:23

**samples** 431:16 432:2 435:14
489:16,18 490:22,23 491:14
491:16 492:1,11 504:3,14

**sampling** 304:23 390:15,24
391:1 392:13 431:15,19,20
434:13,14 435:5,6,9,11,13
466:11 487:14,21 488:3,6
488:11 489:12 490:3,20
491:21,22 501:23 502:2,6
503:18,24

**sass** 339:13

**sat** 284:13

**saturday** 424:12

**saturdays** 424:11,13

**saudi** 369:10

**save** 414:21 444:21 459:9

**saw** 302:6 319:20 365:21
369:5 371:13 376:19 485:9

**saying** 301:4 308:22 314:9
320:22 325:2 340:18 342:16
346:9 354:6 386:12 387:8
387:15,18 388:2,7 390:17
397:19 398:4,9 402:1 417:5
434:16 460:2,24 470:10,10
477:9 481:8 482:2,7 483:7
494:21

**says** 288:23,23 295:13 307:2
308:15 312:9,18,22 313:23
313:23 314:1,20 319:23
320:16 340:6 344:14,22
345:23 413:6 417:11 420:22
420:23 421:1,14 422:13
427:4 429:11 432:18 436:9
446:21 450:23 453:1 454:1
460:9 461:6 486:4 505:14
505:18

**scarbrough** 281:15 283:4

**schlichtman** 445:2

**school** 285:13 287:3,11
339:12 410:5,20 483:13
486:8

**scientific** 305:1 504:12

**scott** 312:9,11,14,14,17,22,23
312:23 313:2,6 404:8,9,16

**scotts** 312:16

**script** 317:13,16,18

**seal** 507:16

**search** 483:16

**second** 288:21 304:14 309:14
310:16 315:17 320:15
382:11,13 384:12 432:17
452:24 459:2 465:11 470:23
471:17,20 472:5 473:1,4

**secondly** 459:18

**secondtolast** 421:9

**secret** 305:6,16

**section** 423:7

**secured** 488:6

**see** 287:16 288:22,24 289:1
295:19 300:4,7,11 303:9
308:17,18 315:17,24 319:17
319:21,22 320:1,8,18,19
339:9,20 341:9 342:13,19
342:23 344:3 356:15 375:11
376:20 381:21 391:10,10
397:14,15 398:18 415:16
418:21 420:20 421:2 423:13
423:22 432:11 437:22

446:21 450:21 452:12 454:2
454:21 455:16 458:21 459:1
477:22 485:16 490:24
**seeing** 365:18 448:2
**seek** 320:13
**seeking** 340:21 341:21 366:5
366:10,22 367:2,5,17,22
368:7,10,16,16 412:1 418:6
418:10 423:3 460:18
**seen** 288:3 295:6 302:22
319:15,16,18 397:17,18
447:21,24 452:2,11,15
465:13 492:20
**segment** 310:16 428:5
**selection** 352:18 356:7 357:6
**send** 441:10
**sending** 434:10 440:16
441:17 442:2
**sensabaugh** 279:20 280:12
460:2,19
**sense** 300:19 301:23 308:9
478:10,12 498:13
**sent** 302:6 376:18 440:6
452:19 460:22 479:4 492:7
494:15
**sentence** 320:6,11,16,19
330:23
**series** 337:6 432:9 441:21
451:11 471:14 492:21
**serious** 394:17
**serve** 402:4
**served** 357:7,9
**service** 338:8,21,23 339:10
339:11,18 340:6,19 341:2,3
341:13 344:13,15 345:5,14
345:20 346:2,12 347:3
373:23 374:1 479:3
**services** 295:10,16 405:13
418:19 443:10,13 460:4
**serving** 474:8,10 500:11,15
**session** 465:1
**set** 311:22 317:13,16,18
358:4 363:6 365:5 420:10
420:14 439:17 444:14
**settlements** 320:1,17 321:1
**seven** 337:12,14 341:6,9
**shaffer** 468:4,21 492:8
**share** 287:22 292:21 479:16
493:7
**shared** 372:4 424:24 438:5

479:11 493:5
**sharing** 423:20
**sheet** 282:20,21 414:11
446:14
**sheets** 315:7
**sherri** 374:23,24 375:5,7,11
375:20
**shes** 297:5 395:14
**shift** 389:13 401:20 446:12
**shipment** 440:22
**shipping** 440:8
**short** 350:22 411:2,6 471:6
500:1 501:5 503:11
**shortcut** 467:11
**show** 294:23 302:24 319:10
325:6 336:21 385:20 392:24
393:11,16 412:3 414:9,22
423:8 432:10 439:2,18
442:22 450:9 453:12
**showed** 451:16 457:24
**showing** 287:19 299:8 341:12
**shows** 433:20 438:18
**sic** 332:6 437:8 466:4
**side** 332:16
**sidetracked** 496:14
**sign** 324:9 474:15 505:19
506:10
**significance** 398:17 408:2
**significant** 397:21 398:10
407:19,23 444:7 469:5
**signs** 308:21
**similar** 359:8 361:17 424:4
424:20
**simone** 319:24 320:16
**simoni** 279:6,18 282:2,18
283:3,14,17,20 285:20
288:2,2 295:15 303:6
312:19 319:23 321:23 322:2
322:14 337:6 344:14 345:23
350:18 351:3,4 353:22
360:6 369:2 386:20 393:7
397:5 410:4 411:10,16
413:8 415:10,20 416:17
440:7 449:13 450:23 452:11
461:7,9 464:18 465:3
466:19 467:13,17 471:11
474:4 494:11 506:13,15
507:4
**simple** 482:1,5
**simply** 301:23 357:23 360:11

385:12 459:12
**sir** 287:12,19 288:3 300:6
307:1,19 313:11 317:17
320:11 343:8 348:20 366:2
**sit** 394:16 427:17 476:12
**site** 322:23 445:23 477:23
487:16
**sitting** 307:6 376:9 401:13
404:12 464:9
**situation** 309:16 329:23
368:17 373:20 488:1
**situations** 359:11
**six** 338:12
**skill** 415:5,9 442:2,8
**skills** 415:13,22 416:5,14,19
417:13 418:2
**skip** 489:20
**slash** 327:1 418:19
**slevinski** 465:18 468:19
**small** 318:14,14 502:5
**smaller** 424:22
**smith** 279:13 281:3
**sociologist** 415:23
**sociology** 344:5 415:15
416:19,22 417:6,15,21
427:10 441:12 473:15,17
500:9
**soil** 304:22 390:15 431:20
432:2 487:14 502:2 503:18
503:23 504:3
**solve** 373:5
**somebody** 308:22 313:5
402:16 408:3 426:8 447:18
447:19 479:5
**somebodys** 391:9 403:3
**someones** 308:12 427:15
**somewhat** 331:21
**soon** 346:1
**sorry** 294:24 295:1 299:11
301:2 305:4 307:5,9,17
312:6 313:9 320:7 321:7
324:21 332:13 337:1,3
339:15,16 343:21 345:17
356:24 367:11 372:9 379:21
379:21 385:6 399:14 415:2
425:7 429:11,14 430:15
446:18 453:9 456:3 458:16
481:16 485:4,8
**sort** 316:22 346:17 359:17
410:23 428:5 463:5 478:6

478:22 479:2
source 370:23 371:1 494:22
sources 304:20
south 281:12
spare 458:3
speak 317:14,19 358:4
  398:14
speaks 453:22 459:16
special 415:22 495:14,17,18
  495:19,21,23
specialist 283:5
specialized 415:5,8,12 416:5
  416:19 418:2 442:2,8
specific 311:1 351:23 352:16
  352:19 376:10 377:13
  395:23 396:23 399:2 401:17
  441:1 444:15,21 480:20
  487:6
specifically 300:3 310:17
  318:24 322:12 406:15 433:3
  480:5
specification 437:1
specifics 322:7 481:10,19
  486:21
specified 507:5
specify 492:16
specprint 498:2,5,8,11,19
  499:7 503:1
speculate 404:6
speculation 404:4
spelter 282:13 296:19 298:6
  299:23 303:23 304:1 306:19
  317:2 318:13 319:11,15,17
  322:23 323:14 330:16
  331:15 333:15 336:5,10,11
  359:7 366:14 367:22 368:8
  368:11,18 380:7 381:3,4,20
  381:20,23,24 382:2 383:21
  391:15 393:6,8 399:13,15
  400:9,11,11 414:4,14 415:4
  418:13 421:14,23 424:10
  425:19,24 426:18 427:14
  428:2,20 430:21 437:8
  439:3 445:4 446:4 450:19
  458:11 463:4 465:22 466:9
  467:5 471:16 475:5,13,22
  476:5 477:3,6,12,23 480:3
  481:9 485:22 486:2,17,24
  500:17 502:6 503:17
spelters 502:5

spend 356:18 374:9
spent 366:6 427:8 428:2
split 288:14 289:8,21 290:5
  290:16,17,23 291:3 293:1
  300:10 321:14 323:21 329:3
  350:14 370:1
splitting 288:10 363:15
spoke 463:14
spoken 462:17,21 464:2,21
  465:9
spouse 436:10
stand 347:20 358:11,17 379:6
standard 406:1,21
standing 409:10
staple 485:9
star 371:9
start 369:24 497:3 499:2
started 496:15,22 500:19
state 279:20 355:11 366:14
  412:20 422:9 470:4 476:21
  507:1,3
stated 362:21 470:2
statement 303:7 340:5
states 279:1
statewide 354:16 355:14,16
  357:7
statute 331:6,9 400:19
  428:19 447:1,3 448:7,11
  474:20 475:5,17,21 476:4
  476:11,15 481:11,15 484:11
  484:13 485:13,23 486:12,17
staying 472:9
stemming 444:3
stenotype 507:7
step 497:22 499:18,19
steve 298:11 300:16,23
  301:10 302:7 390:6 396:24
  399:20 434:12 438:6 447:9
  453:17 455:10,18 456:12
  467:3,8,18,24 468:20
  478:17 481:13 482:10,11,17
  487:4,10 504:8
steven 452:20
stewart 504:15
stick 382:12
stipend 500:10
stole 360:13
stone 358:4
stop 382:11
storage 491:7

storing 491:6,11
storms 284:1
strange 389:1
street 279:21,22 280:5,9,14
  280:19 281:6,12 283:12
structure 322:2
struggled 331:21
struggling 332:5
student 500:4,7,8,11
studies 351:19 416:14
study 289:19 353:19 397:16
  410:7
stuff 418:4
sub 427:21 428:7
subject 338:11 360:4 449:3
  450:2
submit 327:16 337:18,21
  340:15 469:20
submitted 339:4 392:20
  469:2,5,10 470:3 472:3
substances 344:18
substantial 295:10 326:4
  460:4
substantially 424:19
substantiate 419:2 439:11
  455:22 456:13,15
substantiated 419:16 456:24
substantive 463:17 464:11,22
subterfuge 403:16
success 304:5,8 408:20
successful 295:10 304:2
  392:17
sue 362:8,15
sued 361:20
suffered 344:17 426:18
suffice 289:6 345:4
suggest 378:24 423:4
suggesting 370:20 384:1
  387:12 488:8
suggestion 385:14 425:3
suggests 448:10 461:5
suit 293:16 386:13 462:9
suite 280:5,9,19
sum 329:5
summary 282:12 299:14
  397:6,9,12 398:3,6,8,21
  399:1 400:1 411:11,13,17
  411:20,24 412:3,10 413:1
  413:22 414:4 415:12 416:4
  416:8 417:22,24 418:14,24

419:8 420:13 421:19 422:21
424:4 426:19 432:9 433:12
433:19 436:22 437:1,13,18
439:13,20 441:21 442:12
448:19 451:2
**summer** 309:19 383:14
386:14,14 389:10 394:21
438:15 474:12
**sunday** 424:12
**sundays** 424:11,13
**supplemental** 505:19
**supply** 498:2
**supplying** 392:9
**support** 296:19 298:6 299:23
301:15,23 341:11
**supposed** 493:1
**sure** 285:2,9,14 287:10
297:14 298:4 301:20 308:13
314:16 315:13 322:18
323:19 326:3,10 340:3,7
348:3 351:5 353:12 354:17
355:14 363:21 365:24
376:16 378:20,22 379:7
381:16,22 386:6 387:7
396:11 401:9 410:17 412:21
413:7 414:15,17 430:20,23
437:4 439:7,12 441:2,5
443:19 453:8 458:13,15,15
471:24 472:6,7 476:17
479:11 483:9 485:15,23
487:15 491:2 495:19 496:11
498:15,17
**surely** 405:4
**surprised** 369:20 375:23
**surveillance** 371:5
**survey** 282:21 425:18 426:16
426:16,20 493:16 494:1,16
494:21 495:2,12 496:3,16
502:8
**surveyed** 425:18
**sweeney** 321:12,20,21 324:1
324:10 325:8,12 328:24
378:4,14,18,21 379:1,2,8,17
474:15
**sweeneys** 326:22

**T**

**table** 394:16
**tabulated** 425:19
**take** 301:5 309:23 311:18
313:8 329:6 337:2 347:10

348:4,18 349:5,10 354:19
369:12 397:1 410:1,4,17
411:1 418:16 445:21 453:6
458:12 470:22 485:8 503:5
**taken** 279:18 286:12 349:12
350:22 360:20 411:6 471:6
483:21,22 492:6,12 503:11
507:4,7
**talk** 301:10 317:21,22 318:3
339:12 342:14,22 381:8,13
389:23 400:3 404:7 431:5
432:13 435:12 444:23
487:13 493:10
**talked** 286:4 290:16,17
307:21 309:15 311:7 321:12
321:17,23 322:6,8,9,11
359:16 381:7 466:22 474:4
474:6,13 487:19 501:7
**talking** 290:14 292:9,11
302:13 309:23 310:5 342:21
375:10 381:18,21 382:1,2
383:15,23 384:5,7,7,8,20
386:8 388:15 391:2 399:12
399:14,15 419:5 437:9
453:19 465:16,17 474:18
475:15 481:14 496:15
**taped** 371:5,18 372:3
**taping** 371:10,12,23
**task** 412:1,6,7 416:21 417:6
417:22 425:21 426:11 429:5
435:7 442:7
**tasks** 298:13 393:4,9 412:12
413:14 414:7 418:17 419:9
423:2 427:21 428:7 439:17
439:22 440:7
**tax** 372:7,9 473:23 474:1
**taylor** 279:13 281:3 306:4,7
306:10,17,20 310:11
**teaching** 338:7,23 345:19
346:2,13
**team** 437:16 488:16,20,21
492:14 493:13
**technically** 391:22
**telephone** 300:9,14 305:18
**tell** 285:16,23 287:5,10
292:17 297:20 300:13
303:18 305:13 312:23
314:17 318:19 319:1 320:23
321:4,9,21 322:15 323:4,17
323:20 325:8 330:23 337:16

340:4 347:18 349:23 350:13
352:23 354:9 357:4 360:3
361:5,22 363:5,23 369:17
371:11 372:7,18,24 373:19
374:19 375:20 376:11 377:2
377:19 389:5 394:1,2,3
396:3 397:14,17 401:9
418:12,23 420:16 421:22
427:19 432:21 434:24 435:1
436:19 437:2,17,23 438:4
448:15,17,17,21,22 449:18
455:18,20 456:20 460:12
462:14,23 468:6 476:12
477:24 487:15 490:10 492:3
492:19 496:11 506:3
**telling** 296:3,7,17 301:23
332:19 343:1 365:20 370:2
386:2 398:1 419:9,10,12,13
419:23 424:15
**tenure** 337:22 339:14
**teresa** 279:19 507:2,21
**term** 306:21 331:5 353:13
429:3,4,8 498:15
**termed** 493:23
**terms** 317:14 327:10 339:2
345:2 353:2 356:16 384:1
384:22 385:12 386:16
387:15 394:14 399:4 402:21
408:9 410:24 414:5 446:5
454:7,9,12 476:16 493:17
504:5
**testified** 306:1,14 310:10
361:15 363:24 364:15 394:4
431:11
**testify** 332:8
**testifying** 292:3 310:19
**testimony** 290:19 310:9,13
310:24 311:1 313:20 314:13
333:16 371:4 375:5,7,19
379:24 401:21 471:12,20
472:5 473:1,5 507:8
**text** 296:2
**thank** 307:9 337:4 350:18,19
458:16 470:16,18 492:4
**thats** 283:21 284:22 285:5
291:13 296:1 297:7 298:4
300:13 303:4,15 307:11
308:9,15 312:19 314:5
315:21 320:15 323:1 325:10
327:5,16,17 328:11 329:23

330:5,11 335:11,11 337:20
337:24 338:14,17 339:14
340:2,15 341:16,20 343:4
344:22,23,23 345:8 349:3
349:21 350:17 353:1 356:20
360:19 361:24 362:5 366:10
366:17 367:7 371:13 372:4
375:14 377:18 378:3 379:13
379:23 380:4,4 382:19
384:11 386:19 390:11 392:6
393:18 394:22 395:17 397:5
397:5 408:3 410:22 412:14
417:23 418:9 420:23 422:24
424:9 425:7,12 430:11
441:3 442:4,7,10 445:7
446:7,11 449:23 451:7,18
452:5 460:8 461:15 468:1
469:7,11,14 476:2 478:24
481:7 486:14 487:12 492:2
495:9,13 500:24 501:13
503:3 505:10,12 506:8,9
**thereabout** 444:20
**theres** 288:22 308:16 316:2
320:15 327:1,2 341:7 353:1
355:12,13 363:20 379:16
392:19 398:9,16 405:19
406:21 412:23 419:9 420:24
424:5 435:21,23 436:24
439:17 443:5 453:4 467:23
505:15
**thesis** 500:21,24
**theyre** 307:6 308:1,1 361:13
406:23 413:21 505:12
**thing** 302:9 341:18 352:24
353:2 384:15 385:14 390:1
390:12 427:16 431:10 458:6
467:9 476:10
**things** 284:2 318:4 322:6,10
337:23 341:20 358:8 360:14
368:13 373:4 380:8,11
382:9,18 388:16 389:23
390:7,8 394:18,23 397:14
398:2,5,7 409:23 413:1
442:2 460:14 466:7 469:9
474:13 475:16 491:17 492:9
493:14
**think** 284:3,6 285:1 287:13
287:13 290:8 291:19 294:17
299:11 300:20 312:9,10
313:4,5 314:8,21 315:6

322:5 330:14 335:17 337:11
347:14 348:11 349:9,12,20
350:11 356:19 359:22
370:18 371:9 373:24 374:7
375:10,14 376:5,9 377:2,8,9
377:19 378:9 379:8 383:14
383:24 386:21 388:23
394:17,18 397:20,21 398:13
398:18 405:8,16 406:16
407:2 409:2,12,19 410:11
410:18 416:10,23 417:2,15
418:4 423:1 431:11,23
435:23,24 438:1 439:1,18
440:12 441:19 442:4 447:17
447:17 449:11 453:22 456:6
457:5 459:9 460:8 462:16
462:24 463:1,12,14,22
464:14 465:13,14,19,21
466:16 468:22 470:13
471:24 473:12 474:11,18,24
475:3 476:9,16 477:4
478:24 480:1 483:4,18
486:14 493:8 495:3,13,17
495:23 496:7,7,16 499:10
500:5 501:5 502:18 503:3
506:2,4,8
**thinking** 294:14 349:24
353:18 379:17
**third** 288:18 319:22 320:6,11
382:12 384:15 386:18 459:2
**thirdly** 304:11
**thirdparty** 279:10,16 280:16
281:3,8
**thirty** 446:16
**thirtyone** 420:12
**thirtytwo** 432:7
**thomas** 279:14 281:8,10
**thought** 292:3,4 314:14
335:18,22,24 353:9 369:9
370:9 371:11,13 372:2
376:4 378:19 379:1,17
394:17 398:16 402:17,21
448:13 454:4 486:11
**thoughts** 348:11
**three** 308:15 320:5,9 338:7
339:5 375:1 392:23 414:3
421:18 439:22 446:23
447:12 480:2
**threeandahalf** 436:13 438:20
439:4,11

**tie** 457:21
**ties** 351:23 353:4 468:2
**time** 282:12 283:11 284:4,18
286:11,14,24 297:12 299:13
300:23 303:1,2 306:18,19
307:16 308:6 309:14 315:6
325:12 326:17,21,21,22
327:10 338:12,20,21 339:1
343:12 344:18 345:24
347:16 350:21,24 351:21
352:2 353:3 355:2,15 356:7
356:13,16,18,20 357:9
366:6 367:18 372:23 373:21
374:9,12,14,15,16 376:20
383:15,20,22 384:1,19
385:22 386:12,13,15,18
387:1 389:7,10 395:22
396:1,1,6,7,23,24 397:3,6,8
397:11 398:2,5,7,21,24
400:1 401:3,3 404:10,13,14
404:17 405:4 410:22 411:1
411:5,8,11,12,17,20,24
412:2,10,24 413:21 414:4
414:10,21 415:11 416:4,8
417:22,24 418:7,14,19,24
419:8,11 420:3,14 421:19
422:1,21 423:7 424:3,6,8
427:8,20,24 428:1,1,5,9
429:6,22 430:6,9,12 432:8
432:24 433:12,13,19 436:22
437:1,6,9,13,18 438:20
439:13,20 441:20 442:12
444:22 445:4,22 446:14
448:19 449:18 451:2 452:5
454:5 456:9 459:9 460:8
463:1,9 464:24 466:11,15
467:5,19 468:8,14 470:11
470:17 471:5,8,22 473:8
480:16 481:12 485:20,21
500:1,16,16,21 501:5
503:10,13 506:13 507:5
**times** 286:9 306:17 322:21
328:1,9 348:24 361:12
367:8 413:17,19 424:11
431:14 488:7 489:6,7
**title** 288:22 360:5
**today** 283:14 284:1 376:9
401:13 404:12 419:12
421:20,22 422:11,18 427:22
432:22 434:24 435:1 439:15

439:16 448:1,9 458:1
**todays** 283:10
**told** 285:12 287:7 294:2
309:3,10 311:11 319:5
321:13 323:12,15,19 324:23
330:12 335:18 336:3,10
350:1 368:12 369:8 370:4
374:24 375:21 377:15
378:17,18 380:6,17 384:15
390:12 398:11 399:18,20
403:13 431:4 439:2 450:18
450:23 455:23 492:24
497:11
**tom** 486:7
**toolan** 300:9 440:4
**tools** 420:8
**top** 288:22 300:5 307:3
314:20
**topic** 500:21
**topics** 400:8,10 401:20
**toronto** 348:5,6,7,9,12,14
353:5,10
**total** 291:12 325:18 326:24
328:6,7,7,9 329:5,9 370:15
407:21 410:14,14 444:11
**totals** 328:20
**tours** 322:24
**towit** 507:1
**town** 322:22
**towns** 359:5 366:14,20
367:13
**toxic** 344:18
**transcribed** 507:8
**transcript** 310:20
**transportation** 470:11
**transported** 468:14
**travel** 469:19
**treatise** 288:17,17 289:3
**treatises** 484:2,5,6
**trial** 437:15 476:9,21,25
**tried** 397:15 398:18 487:20
496:16
**trigger** 475:24
**triggered** 475:22
**trips** 361:2
**trouble** 407:9
**true** 299:1 318:19 337:20
344:23 345:8 356:5 366:15
369:14 376:4 392:5,6
397:10 400:2 405:1 406:9

408:12 416:20 420:2 442:4
442:9,10 445:7 446:7,11
451:7 454:20 460:17 468:23
469:7,11,14 472:1 481:7
486:14 488:5 492:2 507:8
**trust** 379:9
**trustees** 355:16 357:8,12,15
**truth** 455:19,20,23 456:20
**try** 283:24 289:12 315:21,22
361:10,13 371:20 394:17
405:24 412:3
**trying** 292:16 294:2 316:10
327:6 329:20 338:21 343:12
346:23 348:16 356:22
358:20 359:9 364:7,23
365:5 384:10 390:9 407:1
409:22 430:6 434:8 437:6
438:7,8 444:21 448:7
457:14 475:19,20 491:1
496:23 499:9
**turn** 407:21 411:10 418:13
420:10 436:2 479:12 500:24
**turned** 381:5 426:3,6 457:21
**turning** 304:16,19 380:6
382:9
**twelve** 411:8
**twentyfive** 425:8
**twentyfour** 418:15 444:19
**twentythree** 443:1
**twice** 286:13 349:7,8,9
**two** 286:7 287:21 299:12
303:5 336:4,9 340:20 346:2
361:8 364:5 373:4,22
380:17 381:7 401:3 431:18
431:21,22,23,24,24 432:3,4
436:3 437:20 438:11 440:5
440:15,21 441:9 443:5,23
450:6 451:10 454:14 484:22
483:3 505:16
**twoandahalf** 432:23
**twopage** 307:1
**twothousand** 372:20
**type** 346:1 359:8 416:9
**types** 382:18 492:22

**U**

**uhhuh** 419:21 421:16 431:8
432:20 436:14 440:19 443:8
450:15 459:4 481:5 485:1
505:1
**ultimately** 364:21 375:13

426:3,4,4,20 428:15 445:5
445:11,17,22 492:7
**unable** 418:20 419:8,13
**underline** 393:18 486:5
**underlying** 399:12 464:16
**understand** 293:21 294:2
300:22 302:24 309:21
316:10 324:2,6 329:15
330:18 331:8,20 338:4
346:23 368:3 388:17 398:12
401:24 407:13 410:10,19
414:17 417:4 424:22 425:2
436:10 452:6 487:15 504:11
**understanding** 287:10
290:18 291:2,24 292:24
293:5,8 296:1,6 301:8
304:24 314:8 326:13 328:23
329:18,18 331:13 335:15
337:17 339:23 365:9 402:6
405:11 406:4 407:4 408:5,8
408:13,16,18 410:12,24
415:23 416:1 420:9 455:10
475:10 476:14 480:15
503:22,23
**understood** 289:19 290:5,21
292:13,23 295:21 300:18,23
301:4 303:22 310:4 314:12
331:14,18 333:2,13,14,20
354:20 410:18 455:9,12,15
**underway** 383:22
**unethical** 289:21
**union** 355:1,2,7 375:12
**unique** 388:20
**united** 279:1
**universities** 338:18
**university** 282:16 286:1
318:9,11 324:3 337:8,18
338:6 340:19 341:1,12
343:2 344:1 345:6,10,12,21
346:19,24 347:2,5 352:10
354:15,16,19,22 355:19
356:6 357:5,14 486:8
**unpaid** 332:21,22,24 333:17
333:22 334:13,19 335:6,15
335:19 336:1,16 500:14
**unsuccessful** 408:6
**update** 308:10 317:7 411:24
505:14
**updated** 282:12 299:14
**updates** 472:10

**upper** 441:24
**use** 299:12 353:14 454:19
**utilizing** 409:16

## V

**vacation** 474:11
**vague** 395:20 396:22,24
465:20
**valuation** 392:3,8
**value** 403:7 405:12 406:5,8
406:12,13,18 407:4,14
408:1,6,18 410:14 456:13
469:13
**valued** 410:13
**values** 392:4
**vanmeter** 279:19 507:2,21
**varied** 408:19 477:24
**various** 295:3 337:23 421:2
492:22
**vary** 406:24 477:23
**verifies** 485:15
**verify** 404:20 418:20 419:9
419:14 439:4,21
**versed** 373:12
**version** 412:24
**versions** 411:16 412:24
**versus** 360:6 363:8 464:18
465:3 466:19 467:13,17
**video** 279:17 283:4
**videographer** 281:15 283:1
350:20,23 411:4,7 449:4
471:4,7 503:9,12 506:12
**videotaped** 506:15 507:4
**viewed** 475:7
**views** 468:1
**virginia** 279:1,20,21,22
282:16 283:6,13 284:24
286:9 297:2 304:20 323:22
324:3,24 325:13 326:1,5
329:1 337:7 344:17 347:14
349:6 351:18,21,24 352:7
352:10,14,17,20,22 353:1
355:12 361:9,13 381:2
385:21 386:17 387:15,16,19
391:9 400:20 406:22 409:17
410:21 448:12 456:23
462:17,24 463:1,8 468:13
477:18 480:10 481:20 483:2
483:5,17,21 486:7 493:16
507:1
**visit** 348:12 361:3 445:23

463:11
**visits** 464:6 474:4
**vitae** 342:2 352:11
**vititoe** 288:14 343:10 425:17
425:23 426:13,24 444:24
485:21
**voice** 345:16
**volume** 279:18
**voluntarily** 461:19
**voluntary** 462:4

## W

**wait** 287:9 409:5 425:7
**wakefield** 280:12 290:24
295:3,13 296:21 302:21
303:12,17 305:13 307:6
309:7 311:14 313:24 315:9
316:18 332:1 335:10,12
336:23 337:4 347:8 350:9
354:12 356:12 359:20
361:23 362:4,9,23 363:4
364:9 365:1,3 367:24 368:9
368:19,22 369:15 375:3
376:8 377:11 378:11 379:11
383:5 385:5,7 386:8,11,24
393:16 395:20 399:6,11
403:11,19 404:3,18 405:14
405:18,24 406:10,19 407:15
408:15,22 409:1,5,7,12,15
409:19,22 412:16 414:13,16
415:1 417:1,11 441:14
442:13,23 443:11 446:10
448:20,24 449:7,17,22
451:10,16,21 452:2,6 457:4
457:8,12,18,21 458:2,6
459:15 461:13,22 463:24
470:22 471:3 472:13 473:9
473:18 474:23 476:6 484:20
484:23 485:5 494:7 503:6,8
506:10
**walk** 391:9
**want** 287:22 298:2 302:18
303:7,9,10,12,16 313:7,13
330:13 337:14 346:10,10
347:2 351:7 354:17 358:16
361:7 364:3 365:1 369:23
377:8,9 380:24 383:5,18
385:23 386:1,20 387:13
392:24 397:19,23 399:11
402:1 405:21 409:20,23
411:23 414:19 417:10

420:16 427:15 432:13
439:18,21,21 441:2 442:21
444:15 446:12 448:18
449:14 452:6 455:3 457:8
457:10,12 459:19 462:11
470:21 473:16 479:20 490:4
498:4
**wanted** 301:18 318:6,21
326:3,10 338:22 346:11,13
349:18 350:7 377:4,20
378:20,21 379:7 382:12
383:7 412:21 449:22 450:2
455:18,21 475:9 478:5,15
480:8,13,14 487:13 489:14
489:20 493:10,20 499:7
502:6,13,16
**wants** 345:24
**war** 353:15
**washington** 280:9 352:8
**wasnt** 291:22 313:1 327:11
327:13 330:6,8 360:20
373:14 374:15 385:15,15
389:19,19 395:9,10,10,11
413:4 478:13 482:1 487:8
488:1 490:13 500:15
**water** 345:17
**way** 284:22 290:13 353:14
357:17 377:17 384:23
385:19 390:11 402:7,12
403:13 404:11 405:6 408:9
412:5 416:6 419:10 423:1,5
424:21 425:4 427:19 429:21
433:23,23 435:21,23 436:19
448:16 466:1 471:2 479:11
502:8
**ways** 322:2,3
**wed** 352:21
**wednesday** 279:20
**week** 412:11
**welfare** 358:20
**went** 323:2 327:24 334:6
347:22 384:23 385:18 435:4
478:4 482:13 487:22 489:9
491:24 496:22 498:14
**west** 279:1,20,21 280:19
282:16 283:6,12 284:24
286:9 304:20 323:22 324:3
324:24 325:13 326:1,5
329:1 337:7 344:16 347:14
349:6 351:18,21,23 352:7,9

352:14,17,20,22 353:1
355:12 361:9,13 381:2
385:21 386:17 387:15,16,19
391:8 400:20 406:22 409:17
410:21 448:12 456:22
462:24 463:1,8 468:13
477:18 480:9 481:20 483:2
483:5,17,20 486:7 493:16
507:1
**westinghouse** 341:7,8,14
480:11
**weve** 283:19 322:11 419:13
448:21 449:18
**whats** 287:19 294:23 299:8
325:6 327:21 336:21 360:3
377:13 397:22 398:21
410:21 421:3,18 443:6
473:10
**whos** 495:1
**wife** 321:4,9 371:13 431:11
431:12 500:1 501:8
**william** 281:11
**williams** 319:23
**willing** 449:24 455:3
**willis** 436:9 437:9,14 438:19
439:2,6
**wind** 351:18 426:20
**winnowed** 471:2
**winter** 504:3
**withdraw** 297:1 331:13
333:13 366:3
**witness** 283:14 311:15 331:9
356:17,21 409:3 449:4,24
451:13,14 507:9
**witnesses** 384:9
**woke** 302:5
**woman** 311:20
**wont** 450:16
**word** 297:23 342:3 440:12
**words** 309:24 345:11 383:18
461:17 479:3
**work** 298:5,8 306:9 319:2,6
324:3 325:24 326:4 329:22
329:23 332:11 336:5,11
341:1,3 345:6,14 346:1,12
346:18 347:2,3 364:21
366:9,10,23 378:22 381:18
382:4 385:8,11 386:16
387:9,20 388:14 389:4
390:21 394:1 395:3,4,9,11

396:2,7 397:11 401:10
403:7 406:18 413:7,9 416:9
416:11,13 419:2,10 421:15
421:23 422:2 423:19 426:10
426:12,19 427:6 429:18,18
429:24 431:13 432:13
433:18 434:7,9,20 435:3,9
435:11 440:21 445:8,10,24
454:12 473:14 496:12
500:17 501:9
**worked** 294:6 359:4,15
387:10 388:5 390:5 424:10
424:12,13,16 425:16,24
427:4,9,12 467:8 488:13
501:16
**working** 340:20 344:16 377:4
377:21 387:16 393:7 401:21
402:6,7 416:2 426:5 431:2
456:21 466:5 504:7
**works** 349:6
**workstudy** 500:7
**world** 353:15
**worth** 440:21
**wouldnt** 290:22 358:1 368:20
374:11 376:5 379:3,18
408:11 449:6,9
**write** 327:14 413:14 429:5
452:16
**writing** 293:5,8,11 327:4,5
376:14 403:17 429:5 453:5
453:14,17 456:12,14 459:6
**written** 308:20 376:24
401:10 412:13 458:10
**wrong** 315:8 343:22 396:6
440:7 462:17 498:15
**wrote** 311:6 371:8 378:19
380:14 405:3 455:2 456:1
458:2
**wv** 279:23 280:6,15,19
340:20 477:21
**wvsol** 446:22
**wvu** 354:8 355:20,21 375:12
377:17,21,24 414:4,16
416:3 440:1 473:8

---

**X**

---

**Y**

---

**yeah** 289:12 294:2 296:16,21
302:21 303:4,14 312:7
313:24 314:2 315:21,23

316:9 318:10 321:8 332:1
332:14 334:3 335:14 338:15
340:9 342:11 343:14 346:23
348:8 351:15 354:3,6 355:3
362:4 374:5 376:23 377:13
377:13 382:22 383:24
395:22 398:13 400:15
401:16 404:19 405:18 407:1
410:11 414:13 419:6 420:13
421:6 425:9,22 429:13
432:3,8 436:5 449:6 450:13
451:15 470:22 473:9 484:17
485:1 499:6 501:12
**year** 282:18 286:6 304:13,14
340:14 343:9,24 347:23
348:1,2 349:7,9 358:15
361:12 372:8,11,12 384:18
384:19,19 386:1,9 412:11
**years** 286:7 291:22 338:12
340:12 347:13 455:11
**yesterday** 284:6 286:8 289:13
289:18 290:14,19 292:4,17
293:13 306:1,15 307:5,16
307:22 312:10,12 313:11,20
314:21 369:23 370:7,19
398:12 431:12
**york** 312:20
**youd** 286:12 310:5 314:14
368:21 436:3 449:2,16
**youll** 339:7 345:22 418:13
439:19
**young** 311:20
**youre** 293:24 302:13 310:17
313:4 320:13 331:3,5
339:18 340:10,16,18 341:11
341:12,13,21 342:5,21
343:1 346:9,24 347:1,4,5,5
350:3 356:14 363:20 365:3
365:20,24 366:10 367:2,5
367:21 368:16 378:14 384:1
386:2 387:12,18 388:2
391:2 393:13 397:10 398:4
399:12 400:1,16 406:20
409:15,16,22 413:22 417:5
419:4,8,9,23 423:3,24
424:15 425:20 430:2 432:23
434:3 440:20 442:17 443:2
444:1 451:12,13 453:24
461:8 470:23 475:3 477:8
488:8 490:1,1

**youve** 293:14,15 294:3
308:20 322:15 330:2 343:3
359:18 362:10 372:7 411:13
419:15,18 420:7 423:9,11
424:3 425:1 427:21 429:6
431:4 442:5 445:3 456:8
468:22 471:12 486:9 489:1

**Z**

**zero** 408:7 412:7,13 413:15
414:6,11
**zeroed** 413:19,20

**0**

**0** 424:1,16
**00** 279:20 308:8
**000** 296:12,18 297:11 308:22
309:4 324:2 325:22 328:21
329:13,14,21 378:3 379:9
474:15 505:21,24
**01** 302:23
**02** 425:12,13 464:9,10 485:20
**03** 283:11 312:4,6,8 383:14
389:10,20 390:2 431:21
446:19,20 504:4
**04** 385:19 386:14,14 429:14
429:15 438:15 503:13
**040** 326:24
**05** 306:19 384:24 385:20,21
**0575** 288:2
**06** 360:10
**075** 328:2
**09** 506:14,16

**1**

**1** 279:8 296:12,13,18,18
297:11,11,22 302:23 312:8
342:11 372:13 373:1,2
471:5,8 503:10 507:15
**10** 308:8 313:9,10,18 314:4,6
314:12,18 322:11 350:21,24
395:24 419:5 450:1
**100** 443:3
**1099** 322:10 372:14
**10th** 421:1,4,5
**11** 282:9 288:1 311:18,23
313:8 316:6,7,8,12,16 411:5
415:2,17 419:5
**111** 281:6
**114** 328:2,21
**12** 279:20 315:15 316:1,1

419:5 429:11,11,14,15
446:19
**12cv12** 399:16
**12cv12imk** 279:8
**12th** 283:10 316:3,13
**13** 315:22,23 344:6 471:5
**132** 344:9,10
**13andahalf** 441:8
**13th** 420:19 422:12 453:1
**140** 280:5
**15** 339:7,16,17,21 340:4
420:22 422:13 441:7 446:19
**150** 325:16 327:1 328:1,12,13
**15th** 446:17,20
**16th** 440:5,15 441:9
**17** 350:21 429:11,14
**17th** 280:9
**18th** 421:9,12
**19** 306:23,24 307:17 450:11
450:12 471:8 504:22,23,24
505:4
**192** 342:9,10,14
**1970** 351:20
**1971** 351:22
**1990s** 284:5 373:22
**1995** 347:11 410:22
**1996** 286:21,21 349:13
**1999** 282:12 299:14 444:5

**2**

**2** 296:13,18 297:11,22 432:19
453:6,7 503:13 506:14,16
**20** 290:17 292:10 448:23
449:8 507:17
**200** 279:21 280:14 283:12
**2000** 342:16 372:8,10,11,12
372:19,20,21 477:2
**20006** 280:9
**2001** 282:14,18 319:12
320:21 343:24 344:13,15
381:16 383:12 418:17,17,17
419:5,5,5 442:19 443:2,2
**2002** 282:9 288:1 289:7 290:4
315:15 316:1,8,12,13 337:9
339:3,11,19 340:6 342:16
343:7,9,13,14 344:6 348:18
348:19 349:14,15,18,24
383:12 425:12,13 474:12
502:9
**2003** 300:4 383:21 394:21
446:17 448:9 501:3

**2004** 372:21 420:19 421:1,10
421:12 423:12,12,12,13
424:5 432:17 436:7,8,18
439:23 440:2 474:1
**2005** 347:12 361:6 440:5
441:7 444:5 466:12,15
474:1 477:2
**2006** 472:17
**2007** 309:19 310:11 472:10
472:16,19
**2008** 308:3 309:18 505:6
**2009** 282:12 299:14
**201** 280:19 419:5
**2010** 282:11 295:3 297:21
458:7,9,21
**2012** 411:20 453:1,15
**2013** 279:20 282:12 283:10
299:15
**202** 280:10
**2022** 507:15
**20th** 431:23
**21** 440:2
**21st** 431:23
**2238888** 280:10
**23** 312:4 429:11,15,19 442:24
**23andahalf** 430:9
**23rd** 436:7,8,18 438:2,3
**24** 312:8 418:13 434:11
444:18
**24th** 439:23
**25** 300:4 425:6
**25301** 279:23
**253383843** 280:15
**26** 282:9,11 287:16,17,20,24
294:24 315:6
**2609** 494:11
**2622** 494:11
**26301** 280:6
**26330** 280:19
**26th** 295:3 432:17 458:7,9,20
**27** 282:11 294:21,24 295:2
458:1
**28** 282:12 299:6,9,13 315:9
315:10,11 411:11
**283** 282:5
**287** 282:9
**29** 282:13 300:2 319:8,10
**294** 282:11
**299** 282:12

**3**

**3** 441:7
**30** 282:13,15 319:12 320:21
324:2 325:4,7,22 326:16
329:13,21 330:4,6,7 378:3
379:9 423:18 424:1,9,16
446:15 474:15
**300** 280:5
**304** 279:24 280:6,15,20
**3062** 451:19
**3063** 451:19
**31** 282:16 336:19,22 420:11
420:11 423:6
**316** 281:12
**319** 282:13
**31st** 308:3 309:17 411:20
505:6
**32** 282:17 343:19,21 421:9
432:6
**325** 282:15
**32502** 281:12
**3265318** 280:6
**33** 282:19 451:19,20,21,24
**334** 281:7
**336** 282:16
**34** 282:20 347:13 436:3,4
484:18,19
**343** 282:17
**3450200** 280:15
**3468340** 279:24
**35** 282:21 429:10,12 494:3,6
494:14
**351** 282:5
**36302** 281:6
**369** 469:17
**37** 441:2,4,6
**3843** 280:14

---
**4**
---

**4** 469:17
**40** 329:6,7
**41** 350:24
**43** 425:20 427:5,20
**4357059** 281:13
**445** 327:3,14 329:11 330:2
**451** 282:19
**471** 282:6
**48** 411:5
**484** 282:20
**494** 282:21

---
**5**
---

**5** 325:19 327:1,18 328:1
429:19 432:19 434:11
**50** 290:16,16 292:10,10,11
308:22 309:4 370:1,1,1
443:22 505:21,24
**500** 372:13 373:1,2
**50k** 308:21
**58** 449:21
**587** 288:3
**59** 503:10

---
**6**
---

**6** 282:12 328:2,21
**60** 327:3,23
**606** 279:22
**68** 327:3,14 329:11,14 330:2
**6th** 299:15 411:11

---
**7**
---

**7** 420:22 422:13
**75** 440:2
**760** 325:19,21 327:1,18 328:1
**7931555** 281:7

---
**8**
---

**80** 290:17 292:10
**800** 280:9 480:21
**82** 425:18
**8420460** 280:20
**850** 281:13

---
**9**
---

**9** 279:20 283:11
**901** 280:19
**910** 280:9
**95** 287:4 410:21