IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GARY W. RICH and LAW OFFICE
OF GARY W. RICH, L.C.,

                    Plaintiffs/
                    Counter-Defendants/
                    Third-Party Plaintiffs,

v.                                    //   CIVIL ACTION NO. 1:12CV12
                                           (Judge Keeley)

JOSEPH SIMONI,

                    Defendant/
                    Counter-Claimant,

v.

COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.,

                    Third-Party Defendant/
                    Counter-Claimant,

v.

LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.,

                    Third-Party Defendant/
                    Counter-Claimant,

v.

BARON AND BUDD, P.C.,

                    Third-Party Defendant/
                    Counter-Claimant.


        MEMORANDUM OPINION AND ORDER DISMISSING WITH PREJUDICE
          COUNTS IV-VI OF COUNTERCLAIM [DKT. NO. 35]; ADOPTING
        THE RECOMMENDATION TO CERTIFY QUESTION [DKT. NO. 213];
         OVERRULING OBJECTIONS [DKT. NO. 216]; AND STAYING CASE

<u>**MEMORANDUM OPINION AND ORDER**</u>

---

Before the Court are the Proposed Findings of Fact and Recommendation for Disposition ("R&R") of the Honorable John S. Kaull, United States Magistrate Judge (dkt. no. 213). Also pending for consideration are cross-motions for summary judgment filed by (i) the plaintiffs, Gary W. Rich ("Rich") and the Law Office of Gary W. Rich, L.C. ("Rich Law") (collectively, the "Rich Parties") (dkt. no. 193); (ii) the defendant, Joseph Simoni, Ph. D. ("Simoni") (dkt. no. 194); and (iii) the third-party defendants, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A. ("Levin"), Cochran, Cherry, Givens, Smith, Lane & Taylor, P.C. ("Cochran"), and Baron & Budd, P.C. ("Baron") (dkt. no. 200).

The Rich Parties initiated this lawsuit in January 2012 by filing a complaint for declaratory judgment. Simoni responded by filing a counterclaim against the Rich Parties that since has become the focus of the litigation. The Rich Parties then sued the third-party defendant law firms.

Recognizing that several of the legal issues between Rich and Simoni could dispose of the entire litigation, the magistrate judge ordered the parties to file early summary judgment motions limited to the issues raised by Simoni's counterclaims against Rich. (Dkt. No. 187 at 3). The magistrate judge also bifurcated the issues between Rich and the third-party defendants from the issues

---

involving Rich and Simoni, and stayed further discovery with respect to the claims between Rich and the third-party defendants. Id. at 4.

As between Rich and Simoni, the parties briefed the following issues:

- Whether Simoni's claims against Rich are time-barred, either by the statute of limitations or laches;

- Whether any compensation agreement between Rich and Simoni is enforceable in light of the West Virginia Rules of Professional Conduct (the "WVPRC");

- Whether estoppel precludes Simoni's claims against Rich;

- Whether Simoni had a reasonable expectation to compensation from Rich; and

- Whether Simoni can maintain independent claims against Rich for negligent misrepresentation, conversion, and estoppel.

For the reasons discussed in this memorandum opinion, the Court **DISMISSES WITH PREJUDICE** Counts IV-VI of Simoni's counterclaim, **ADOPTS** the recommendation to certify a question to the West Virginia Supreme Court of Appeals, **OVERRULES** the third-

MEMORANDUM OPINION AND ORDER

---

party defendants' objections to the R&R, and **STAYS** the case pending resolution of the certified question.

## I. FACTUAL BACKGROUND

This case follows on a longstanding dispute between Rich, a lawyer, and Simoni, a former university professor and law school graduate who never passed the bar examination. Simoni alleges that Rich is obligated to compensate him for work he performed on two lawsuits filed in West Virginia. Although many of the facts involved in the case are hotly disputed, only those relevant to the issues addressed in the magistrate judge's R&R and the pending dispositive motions are discussed in this memorandum opinion.

### A. The Parties

Beginning in the 1990s and continuing until 2011, Rich practiced law in Morgantown, West Virginia.[1] For several years, his firm, Rich Law, focused on immigration issues. (Dkt. Nos. 1 at 1; 35 at 17). In 1999, however, Rich learned of a potential asbestos case involving West Virginia University ("WVU"), and a class of plaintiffs who claimed to have been exposed to asbestos fibers in buildings on the WVU campus (the "WVU Litigation"). (Dkt. No. 35 at 5). Aware that Rich lacked the experience and

---

[1] Upon information, Rich now resides in Saudi Arabia and no longer practices law.

resources to prosecute such a challenging case, his friend and fellow lawyer, Larry Harless, put him in contact with Simoni to provide assistance. (Dkt. Nos. 200-1 at 5; 210 at 2).

Simoni was a longtime professor of sociology and anthropology at WVU, and a well-known community organizer and activist in Morgantown. (Dkt. No. 1 at 2). Although a graduate of the WVU College of Law, Simoni never passed the bar exam, despite four attempts. (Dkt. Nos. 35 at 4; 193-1 at 3).

Teamed with Rich in the WVU Litigation, Simoni's responsibilities included recruiting plaintiffs for the class. According to Simoni, "[he] and a WVU faculty colleague were the driving force behind the organization of University employees and the investigation of asbestos exposure in many University buildings." (Dkt. No. 35 at 6).

As a consequence of their involvement in the WVU Litigation, as well as through Simoni's communications with the West Virginia Department of Environmental Protection, Rich and Simoni learned of other potential environmental and toxic tort mass actions, including the Fairmont and Spelter Litigations. Because Rich Law's experience and resources were inadequate to prosecute those cases alone, however, Rich and Simoni found it necessary to "associate with one or more out-of-state firms." Id. at 7. Simoni contends

that he "researched several out-of-state law firms, contacted the firms, organized and scheduled visits of the firms to Fairmont, West Virginia, and through a binder of documents that he alone prepared, provided to the firms information about the class of plaintiffs and their potential liability and damage claims." <u>Id.</u> at 8-9.

In 2002, Rich Law partnered with Baron, a Texas-based law firm, on the Fairmont Litigation. <u>Id.</u> at 10. In 2003, it partnered with Levin, a Florida-based law firm, and Cochran, an Alabama-based law firm, on the Spelter Litigation. <u>Id.</u> at 18.

**B.   The Fairmont Litigation**

The Fairmont Litigation involved lawsuits brought by former employees of the Philips/Westinghouse lighting plant in Fairmont, West Virginia, who allegedly suffered illnesses from contact with chemicals used at the plant. <u>Id.</u> at 7. These employees filed suits in 2001 and 2003 in the Circuit Court of Marion County, West Virginia. Their cases were later transferred to the Circuit Court of Monongalia County (dkt. no. 36 at 27), where, eventually, they settled in the plaintiffs' favor in 2007. The circuit court awarded attorneys' fees and expenses to the plaintiffs in January 2008. (Dkt. No. 1 at 3). The Rich Parties received 25% of the total fees awarded. (Dkt. No. 210 at 11).

Simoni claims that he played an important role in developing and coordinating the Fairmont Litigation. Allegedly, he engaged the lead plaintiffs, urged them to become involved in the litigation, investigated the factual basis for their claims, and arranged meetings between them and the lawyers. (Dkt. No. 35 at 6-8). He further claims to have played a critical role in brokering the partnership between Rich Law and Baron. Id. at 8-10.

## C.   **The Spelter Litigation**

The Spelter Litigation involved environmental contamination resulting from the long-term operation of a zinc-smelting plant in Spelter, West Virginia. (Dkt. No. 35 at 15). The plaintiffs, who resided in the area around the plant, filed a class action in 2004 in the Circuit Court of Harrison County, West Virginia, alleging harm and the need for medical monitoring as a consequence of the plant's decades-long negligent disposal of hazardous materials. (Dkt. No. 1 at 3-4). Although the case was tried to a successful conclusion before a jury in 2007, the West Virginia Supreme Court of Appeals later remanded the case to the circuit court for further proceedings regarding the proper calculation of punitive damages. (Dkt. No. 200-1 at 14). Following remand, the parties ultimately resolved the punitive damages issue in November 2010, and the trial court awarded the plaintiffs' attorneys compensation for fees and

___

expenses in early 2011. (Dkt. No. 1 at 4). The Rich Parties'
portion of the total fees awarded was 22.5%. (Dkt. No. 210 at 12).

Simoni alleges that his work on the Spelter Litigation was
crucial to its ultimate success. (Dkt. No. 35 at 16). He
emphasizes that it was only through his knowledge of the
longstanding environmental issues existing in Spelter that Rich was
able to identify and engage the lead plaintiff. Id. at 15. He
also emphasizes his strategic role in researching the factual
issues and brokering the partnership between Rich Law and Levin.
Id. at 17-18.

**D.    The Agreement**

At the center of the parties' dispute is their understanding
of the terms of a purported agreement between Rich and Simoni
concerning Simoni's compensation. At the time Rich and Simoni
first worked together in 1999 on the WVU Litigation, Simoni's
understanding was that they would "share the benefits half/half,
50/50." (Dkt. No. 213 at 1138). According to Simoni's deposition
testimony, his understanding of a 50/50 split continued until April
2002, when he and Rich met outside Rich's Morgantown office to
discuss their arrangement, and Rich informed Simoni that "he was
reducing [Simoni's] share from 50 percent to 20 percent." Id. at
1200-02. Simoni understood this reduction to apply to all cases in

---

which he was involved, including the Fairmont and Spelter Litigations. <u>Id.</u> at 1202. He also understood that his professional relationship with Rich was in the nature of a "joint venture." <u>Id.</u> at 1213.

Following this meeting, Simoni met with his nephew, an attorney, in New York to review his compensation arrangement with Rich. <u>Id.</u> at 1223. Simoni's notes reflect that, at the meeting, his nephew proposed several tactical ideas for Simoni to broach with Rich. <u>Id.</u> at 1223-24. He recommended that Rich re-negotiate his share of the fee award from the Fairmont Litigation to 20% or 30%, and pay taxes on that amount, and that Rich then split the after-tax amount of his fee award with Simoni as a "payoff for consulting, investigation, organizing, client rapport, et cetera, not for practice of law." <u>Id.</u> at 1224-25. Significantly, in his notes, Simoni underlined "<u>not for practice of law</u>." <u>Id.</u> Several months later, Rich allegedly agreed to reinstate the 50/50 split between Simoni and him. <u>Id.</u> at 133.

Simoni again discussed his compensation arrangement with Rich in December 2003, at a coffee shop in Waynesburg, Pennsylvania. <u>Id.</u> at 1250. As Simoni later recalled, "[Rich] raised the issue, and he said he was changing the agreement again from the 50/50 that we had gotten to, back to in late fall of 2002, that he was

---

changing it back to the 80/20." Id. at 1252. Simoni became

"visibly upset," and left the coffee shop in tears. Id. at 1253.

Simoni and Rich next discussed their arrangement in June 2005

at a picnic shelter along the Rail-Trail path in Morgantown. Id.

at 1254-55. At that meeting, Rich suggested that the two write

notes to one another, rather than communicate verbally. Id.

Simoni's notes from the meeting reflect that Rich confirmed his

intention to pay Simoni 20% of the total compensation Rich received

from the Fairmont and Spelter Litigations. Id. at 1255-56.

At his deposition, Simoni described his understanding of the

timing of his compensation:

> Q. So your understanding was that you would not be paid
> any compensation on the WVU case, the Fairmont case or
> the Spelter case until all three cases had resolved?
>
> A. Had resolved, and if they didn't resolve in favor of
> the plaintiffs, I would receive nothing. That was my
> expectation.
>
> Q. Did they all three have to resolve in favor of the
> plaintiff for you to be compensated?
>
> A. No, not all three of them, but any one that I had
> worked on. . . . But, you know, the understanding,
> agreement that I had with him was, with the changing
> percentages, whether it was 50/50, 80/20, you know,
> whatever time frame you want to look at, that that would
> be at the end when the cases settled and the benefits
> were received. . . . But whatever cases got resolved,
> what got settled, there wasn't any expectation of
> compensation until the settlements. . . . I believe that
> our understanding was that when one case settled out,

___

then there would be an expectation of sharing of benefits.

. . .

Q. So the basis of your 50/50 or later 80/20 deal was based on the contingency of whether there was any success in the case, correct?

A. Well, my compensation definitely would be -- my understanding would be based on whether there was success, meaning I wouldn't get anything if there wasn't success. I wasn't exactly sure how this was all going to -- I mean, if you just trace these communications through the years, I wasn't sure exactly how my compensation was going to come, but I had the understanding that I was making substantial contributions, and I had the hope and expectation that the value of my contributions would be taken into account, but only after these cases were settled. There was no expectation of anything before.

Q. And so you didn't have an expectation of being reasonably compensated if there were bad results in the case?

A. No. Get zero.

Id. at 1260-75.

During the summer of 2007, Simoni raised his expectation of compensation from the Spelter Litigation with an attorney from the Cochran firm. Id. at 1304. He recalls that he "shared with him that I was really feeling uncomfortable, that I was feeling like I was being left out, you know, the term left out to dry." Id. at 1305. He added, "I have this agreement, okay, and I'm concerned about whether I'm actually going to be -- whether the agreement's

going to be held up in two-thousand -- in summer of 2007." <u>Id.</u>
Simoni requested that the Cochran attorney notify him when the
Spelter Litigation concluded. <u>Id.</u> at 1309. Accordingly, that
attorney called Simoni in 2007 to advise him that the plaintiffs
had prevailed at trial. <u>Id.</u> at 1309-10.

Shortly thereafter, the Cochran law firm emailed Simoni to
"make sure you have submitted all final invoices to our office
concerning [the Spelter Litigation]." <u>Id.</u> at 1313. When asked
what response he provided, Simoni replied: "I didn't send any
invoices." <u>Id.</u> He further explained: "[S]ince my compensation, as
I understood, would come from the agreement that I had with Rich,
you know, not until the cases were settled and based on my
contributions and the value of my contributions, never had the
thought or expectation of having to keep hours of work or anything
like that." <u>Id.</u> at 1314.

Finally, concerning the nature of the compensation he expected
to receive from Rich, Simoni testified:

> Q. Well, I thought you were testifying yesterday that you
> thought the compensation was going to come as a portion
> of the fees that Gary Rich received. Is that not
> correct?
>
> A. That the -- well, that the compensation might come
> from that -- from that amount of money.

_____

> Q. Okay.  And so when you were talking about 20 percent,
> 80 percent, 50 percent, 50 percent, what were you talking
> about?  50 percent of what?
>
> A. Of the amount of money that he received.
>
> Q. And you understood the money he would be receiving
> would be fees, correct?
>
> A. Yes.
>
> Q. So was your -- what you were trying to tell us
> yesterday was that you expected to get a percentage of
> his fees, correct?
>
> A. Yes.
>
> Q. And you knew that, did you not, that ethically he
> could not share his fees with you if you were -- unless
> you were a licensed attorney?  You understood that, did
> you not?
>
> A. I had the general understanding of a lawyer not being
> able to split fees --

(Dkt. No. 193-4 at 40-41).  Simoni acknowledges that "[i]t is
undisputed that most, if not all, of the discussions regarding
compensation between Mr. Rich and Dr. Simoni were underscored by
the prospect of 'percentage split of attorney fees earned by
Rich.'"  (Dkt. No. 211 at 8).

Rich disputes this contention, arguing that any fee-splitting
agreement with Simoni was contingent on Simoni's becoming a
licensed attorney.  (Dkt. No. 193-10 at 7).  In fact, when Rich
realized that Simoni was not licensed, he sought advice about

_____

whether he could ethically compensate him from Sherri Goodwin ("Goodwin"), an attorney knowledgeable in the field of legal ethics. (Dkt. No. 200-3 at 17). Allegedly, Goodwin's opinion was that Simoni "might not be able to get paid ethically." Id. at 18-19. In one of his briefs, Rich summarizes his current position as follows:

> To be clear, Plaintiffs do not dispute that Dr. Simoni contributed to the Fairmont and Spelter litigations. How much he contributed and the value of that contribution are another matter, but we do not deny that he made some contribution. Nor do Plaintiffs object to Dr. Simoni being compensated, if there is an ethical and lawful way of doing so and the compensation is reasonable.

(Dkt. No. 204 at 2) (emphasis in original).

## II. PROCEDURAL BACKGROUND

### A. Pleadings

Rich preemptively initiated this litigation on January 13, 2012, seeking a declaratory judgment that Simoni is not entitled to compensation in connection with either the Fairmont or the Spelter Litigations, and that any sharing of legal fees with Simoni would violate West Virginia Rule of Professional Conduct ("WVRPC") 5.4. Simoni filed a counterclaim on April 16, 2012, which he later amended on October 5, 2012. In his amended counterclaim, Simoni alleges that Rich is obligated to compensate him for work related to the Fairmont and Spelter Litigations under theories of quantum

---

meruit ("Count I"), unjust enrichment ("Count II"), and breach of implied contract ("Count III").  He further asserts claims of negligent misrepresentation ("Count IV") and conversion ("Count V") with respect to the Spelter Litigation.  Finally, he alleges an independent cause of action based on estoppel ("Count VI"), and seeks the following declaratory relief:

- That the Rich Parties, jointly and severally, are required to pay Simoni such sum as the jury shall determine to fully and justly compensate him for his work in furtherance of the Fairmont and Spelter Litigations;

- That the Rich Parties are required to pay Simoni pre-judgment interest on all sums which have not been paid to Simoni; and

- That the Rich Parties must hold the attorneys' fees and expenses awarded or to be awarded to them by the courts in the Fairmont and Spelter Litigations in a constructive trust for the benefit of Simoni.

(Dkt. No. 35 at 29).

Rich answered the amended counterclaim and, based on purported indemnity agreements with each of the defendant law firms, also filed a third-party complaint against Levin, Cochran, and Baron for indemnity, contribution, and unjust enrichment.  The law firms, in

turn, counterclaimed against Rich on December 4, 2012.  Cochran alleged breach of contract, fraud, and unjust enrichment, and Levin and Baron alleged breach of contract, indemnity, and contribution.

## B.    Dispositive Motions

On summary judgment, the third-party defendants and the Rich Parties challenge Simoni's claim to compensation.[2]  Their legal arguments include the defenses of estoppel, statute of limitations, and laches, as well as violation of the WVRPC, lack of reasonable expectation, and duplication and abandonment of claims.

Simoni's summary judgment motion seeks dismissal of the Rich Parties' declaratory judgment action on the basis that they have conceded their willingness to compensate him in a lawful manner for his contributions to the Fairmont and Spelter Litigations, and that this concession should resolve any dispute of material fact.  He further contends that there should be no concern about the legality of his compensation arrangement with Rich.

---

[2] Although Simoni has filed no claims against the third-party defendants, under Fed. R. Civ. P. 14(a)(2)(C), third-party defendants "may assert against the plaintiff any defense that the third-party plaintiff has to the plaintiff's claim."  While technically the Rich Parties are the plaintiffs in this case, Simoni has prosecuted the claims relevant to the third-party defendants' summary judgment motion.  Therefore, Judge Kaull granted them leave to file a motion for summary judgment pursuant to Rule 14.  (Dkt. No. 201).

**MEMORANDUM OPINION AND ORDER**

---

**C.    Report and Recommendations of the Magistrate Judge**

In his R&R, Magistrate Judge Kaull first analyzed the statute

of limitations defense raised by the third-party defendants.  Under

applicable West Virginia law,

> [e]very action to recover money, which is founded upon an
> award, or on any contract other than a judgment or
> recognizance, shall be brought within the following
> number of years next after the right to bring the same
> shall have accrued, that is to say: . . . if it be upon
> any other contract, express or implied, within five
> years, unless it be an action by one party against his
> copartner for a settlement of the partnership accounts,
> . . . [in which case] the action may be brought until the
> expiration of five years from a cessation of the dealings
> in which they are interested together, but not after.

W. Va. Code § 55-2-6.

Before the magistrate judge, the parties disputed what event

triggered the five-year limitations period.  The third-party law

firms asserted that the date on which Simoni last rendered services

controlled; Simoni countered that, because he and Rich had formed

a joint venture, a type of partnership, the five-year time bar

began to run only after their dealings ceased.

After determining that joint ventures and partnerships are

sufficiently similar, Judge Kaull considered whether the

relationship between Rich and Simoni constituted a joint venture

under West Virginia law.  He observed that the primary

characteristic of a joint venture is an agreement to share in the

---

profits and losses of an enterprise.  He then focused on "whether such a joint venture, if it existed, is void as against public policy."  (Dkt. No. 213 at 22).  He observed that, under WVRPC 5.4(a), "[a] lawyer or law firm shall not share legal fees with a nonlawyer," unless one of four exceptions, all inapplicable here, applied.  Additionally, because WVRPC 5.4(b) explicitly prohibits lawyers from "form[ing] a partnership with a nonlawyer if any of the activities of the partnership consists of the practice of law," he concluded that any joint venture between Simoni and Rich violated WVRPC 5.4.

Because an agreement violative of public policy is unenforceable, see Syl. Pt. 3, Wellington Power Corp. v. CNA Sur. Corp., 614 S.E.2d 680, 682 (W. Va. 2005), Judge Kaull attempted to determine whether, under West Virginia law, the WVRPC constitute statements of public policy.  He noted that, if they do, any fee-splitting agreement between Rich and Simoni would be void.  After surveying a number of jurisdictions that do not enforce agreements violative of their Rules of Professional Conduct, see, e.g., Cruse v. O'Quinn, 273 S.W.3d 766, 776 (Tex. App. 2008) ("[A] court may deem these rules [of professional conduct] to be an expression of public policy, so that a contract violating them is unenforceable

---

as against public policy."), Judge Kaull concluded that West
Virginia has not resolved this issue.[3] (Dkt. No. 213 at 25-29).

Given the legal uncertainty of any joint venture agreement
between Rich and Simoni, Judge Kaull analyzed whether Simoni's
quantum meruit and unjust enrichment claims might, in any event, be
time-barred under West Virginia law. Because West Virginia has not
determined whether the discovery rule applies to claims of quantum
meruit and unjust enrichment, however, he was unable to decide
which of four potential dates -- (i) the date of the cessation of
dealings between Rich and Simoni, (ii) the date of Simoni's last
rendition of services, (iii) the date on which Simoni reasonably
should have known that Rich would not compensate him, or (iv) the
date on which Simoni actually knew Rich would not compensate him --
triggered the five-year limitations period.

Nevertheless, from the evidence in the record, he did conclude
that the following dates were undisputed:

- "[T]he 'cessation of dealings' between Rich and Simoni
  dates to January 27, 2011." Id. at 34.

---

[3] He did observe, however, that "[i]f the alleged joint venture
. . . is void as against public policy because it violates [WVRPC]
5.4(b), then the 'cessation of dealings' savings provision . . . is
inapplicable to Simoni's quantum meruit and unjust enrichment claims."
(Dkt. No. 213 at 29).

- "As to the Spelter case, Simoni[] . . . last rendered services on June 14, 2005." <u>Id.</u>

- "As to the [Fairmont] case, Simoni[] . . . last rendered services on July 27, 2005." <u>Id.</u>

- "[I]f the discovery rule applies to Simoni's quantum meruit and unjust enrichment claims, then the five-year limitations period began to run on June 27, 2007, the date when Simoni reasonably should have known that he would receive no compensation from Rich." <u>Id.</u> at 36.

Because issues of state law determinative of the parties' statute of limitations argument were unresolved, Judge Kaull recommended that the Court certify the following questions to the West Virginia Supreme Court of Appeals:

1. "Are the West Virginia Rules of Professional Conduct statements of public policy with the force of law equal to that given to statutes enacted by the West Virginia State Legislature?" (Dkt. No. 213 at 37).

2. "Do claims for quantum meruit and unjust enrichment accrue: (a) on the date that services are last rendered or (b) when the provider of services knew or reasonably should have known that he would not be receiving compensation?" <u>Id.</u>

**MEMORANDUM OPINION AND ORDER**

---

He further recommended that the Court stay the case until the state court answered these questions.

Although neither the Rich Parties nor Simoni objected to the R&R, the third-party law firms disputed Judge Kaull's finding that June 27, 2007 was the date by which Simoni reasonably should have known he would not receive any compensation from Rich.[4]  They also objected to Judge Kaull's findings that the cessation of dealings between Rich and Simoni occurred on January 27, 2011, and that Simoni last rendered services in the Fairmont Litigation on July 27, 2005.  (Dkt. No. 216).

### III. STANDARDS OF REVIEW

**A.    Report and Recommendations Standard**

The Court "shall make a de novo determination of <u>those portions</u> of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636 (emphasis added); <u>see also</u> <u>Farmer v. McBride</u>, 177 Fed. App'x 327,

---

[4] The third-party defendants also argued Judge Kaull should not have made such a finding since "we were unaware the magistrate judge would make a factual finding as to any specific notice date."  (Dkt. No. 216 at 3).  If the third-party defendants were not aware of this, they should have been.  Indeed, it was they who raised the statute of limitations argument, which, if the discovery rule does not apply, necessarily involves a notice date.  Thus, their failure either to discuss the notice date in their briefing, or to recognize that notice could be an issue with respect to the discovery rule, did not preclude Judge Kaull from making a factual finding as to the date based on the undisputed facts.

MEMORANDUM OPINION AND ORDER

---

330-31 (4th Cir. 2006) ("The district court is only required to review de novo those portions of the report to which specific objections have been made . . . ."). "As to those portions of a recommendation to which no objection is made, a magistrate judge's findings and recommendation will be upheld unless they are 'clearly erroneous.'" Clark v. United States, No. 5:05CV147, 2008 WL 2704514, at *3 (N.D.W. Va. July 3, 2008). Finally, "[t]he district judge may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3).

**B.    Summary Judgment Standard**

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of

---

whether genuine issues of triable fact exist.  <u>Anderson v. Liberty</u>
<u>Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the
Court of the basis for the motion and of establishing the
nonexistence of genuine issues of fact.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  Once the moving party has made the
necessary showing, the nonmoving party "must set forth specific
facts showing that there is a genuine issue for trial."  <u>Anderson</u>,
477 U.S. at 256 (internal quotation marks and citation omitted).
The "mere existence of a scintilla of evidence" favoring the
nonmoving party will not prevent the entry of summary judgment; the
evidence must be such that a rational trier of fact could
reasonably find for the nonmoving party.  <u>Id.</u> at 248–52.

### IV. LEGAL ANALYSIS

### A.   Simoni's Counts I-III: Quantum Meruit, Unjust Enrichment, and Breach of Implied Contract

Simoni asserts that his "claim to reasonable compensation in
this matter is primarily expressed . . . as a claim for quantum
meruit relief," as alleged in Count I of his counterclaim.  (Dkt.
No. 202 at 19).  Nevertheless, he also maintains that all of his
claims remain viable.  (Dkt. No. 211 at 16-18).  The third-party
defendants, on the other hand, contend that "Simoni's Counts II

23

---

through VI are not viable because they are duplicative, fail as a matter of law, or have been abandoned." (Dkt. No. 200-1 at 25).

There is widespread disagreement among the states regarding any legal distinctions involving claims of quantum meruit, unjust enrichment, and implied (or quasi) contract. See generally Candace Saari Kovacic-Fleischer, Quantum Meruit and The Restatement (Third) of Restitution and Unjust Enrichment, 27 Rev. Litig. 127 (2007). For example, under Illinois law, "[q]uasi-contract claims include unjust enrichment and quantum meruit actions." Hayes Mech., Inc. v. First Indus., L.P., 812 N.E.2d 419, 426 (Ill. App. Ct. 2004) (italics in original); see also Bennett v. Artus, 20 P.3d 560, 563 n.2 (Alaska 2001) ("Courts generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and quantum meruit as essentially the same.") (internal quotation marks and citations omitted) (italics in original). The Supreme Judicial Court of Maine, on the other hand, has held that

> the distinction between "unjust enrichment" and "quantum meruit" is legally significant. Quantum meruit involves recovery for services or materials provided under an implied contract. Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay. In an unjust enrichment case the court must decide what constitutes the inequitable retention of a benefit by the defendant. The

_____

damages analysis is based on principles of equity, not
contract.

Aladdin Elec. Assocs. v. Town of Old Orchard Beach, 645 A.2d 1142,

1145 (Me. 1994) (internal quotation marks and citation omitted).

West Virginia has never defined the legal distinctions, if

any, among claims of unjust enrichment, quantum meruit, and breach

of implied contract.  A review of the relevant case law, however,

suggests that all three causes of action sound in equity.  For

instance, the West Virginia Supreme Court of Appeals has explained

that "[t]he principle underlying quantum meruit recovery 'is a

contract implied in law . . . based on the equitable doctrine that

one will not be allowed to profit or enrich oneself unjustly at the

expense of another.'"  Copley v. Mingo Cnty. Bd. of Educ., 466

S.E.2d 139, 145 n.17 (W. Va. 1995) (quoting Associated Wrecking &

Salvage Co. v. Wiekhorst Bros. Excavating & Equip. Co., 424 N.W.2d

343, 348 (Neb. 1988)).  Moreover, "[a]n implied contract arises

from the principle of equity that one person may not enrich himself

unjustly at the expense of another."  Marshall v. Elmo Greer &

Sons, Inc., 456 S.E.2d 554, 557 (W. Va. 1995) (citing Lockard v.

City of Salem, 43 S.E.2d 239, 242 (W. Va. 1947)).

In the view of the third-party defendants, the significance of

grouping such claims lies in their "duplicativeness."  Simoni,

however, points out that recent case law does not support the notion that duplication of claims ought to result in their dismissal.

Although state law may conflate these claims to some extent, federal courts within West Virginia have applied different limitations principles to a claim for unjust enrichment, depending on its nature. In <u>HSBC Bank USA, Nat'l Ass'n v. Resh</u>, No. 3:12CV668, 2013 WL 312871, at *6 (S.D.W. Va. Jan. 25, 2013), the court held that "because the unjust enrichment claim is quasi-contractual, it is in fact subject to a five-year statute of limitations," pursuant to W. Va. Code § 55-2-6. Later, however, in another case, the court determined that, "as the unjust enrichment claim is an equitable claim, the doctrine of laches controls the timeliness of the action." <u>CUMIS Ins. Soc., Inc. v. Raines</u>, No. 3:12CV6277, 2013 WL 500305, at *2 (S.D.W. Va. Feb. 11, 2013).

Before the decisions in <u>HSBC Bank</u> and <u>CUMIS</u>, the West Virginia Supreme Court of Appeals addressed the nature of an unjust enrichment claim in determining the applicable limitations period. In <u>Absure, Inc. v. Huffman</u>, 584 S.E.2d 507, 511 (W. Va. 2003), the court held that the claim for unjust enrichment "was equitable in nature, and thus principles of laches rather than the Statute of Limitations govern the bringing of it."

**MEMORANDUM OPINION AND ORDER**

---

Here, the parties have argued both laches and the statute of limitations as defenses to Simoni's claims. The Rich Parties rely on the equitable doctrine of laches to bar Simoni's claims, while the third-party defendants assert that W. Va. Code § 55-2-6 provides the applicable limitations period. Simoni contends that, under either doctrine, his claims for breach of implied contract, quantum meruit, and unjust enrichment are not time-barred. Simoni has the better argument.

1.   **Laches**

"Laches is delay which operates prejudicially to another person's rights." Brand v. Lowther, 285 S.E.2d 474, 482 (W. Va. 1981) (citations omitted). "The equitable doctrine of laches is based upon the maxim that equity aids the vigilant and not those who slumber on their rights." Maynard v. Bd. of Educ., 357 S.E.2d 246, 253 (W. Va. 1987). Unlike a statute of limitations defense, "the controlling element of the equitable defense of laches is prejudice, rather than the amount of time which has elapsed without asserting a known right or claim." Id. Indeed, "laches is sustainable only on proof of two elements: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." West Virginia v. Abbot, 418 S.E.2d 575, 578 (W. Va. 1992) (citations omitted). "The burden of

27

___

proving unreasonable delay and prejudice is upon the litigant seeking relief." Province v. Province, 473 S.E.2d 894, 905 (W. Va. 1996).

In an effort to sustain their burden as to Simoni's lack of diligence, the Rich Parties point out that "Simoni waited to assert his claims for compensation until <u>after</u> both the Fairmont litigation and the Spelter litigation had concluded and <u>after</u> [the Rich Parties] and the other attorneys involved in the lawsuits had reached a settlement agreement." (Dkt. No. 193-1 at 12) (emphasis in original). Indeed, as the Rich Parties suggest, Simoni failed to file his counterclaim until April 2012 –- seventeen months after the Spelter Litigation settled in November 2010.

This, however, is consistent with Simoni's understanding of the timing within which he expected to receive compensation from Rich. He testified that he did not expect to be compensated until the conclusion of the litigations. (Dkt. No. 213 at 1260-75). "[T]here wasn't any expectation of compensation until the settlements." Id. at 1261. Moreover, although he never filed a counterclaim for payment until April 2012, Simoni did demand payment from the Rich Parties in March 2010, when his attorney sent a letter stating: "It is the purpose of this letter to provide notice that Dr. Simoni believes he has a claim for compensation for

professional services rendered [in the Spelter Litigation] and is prepared to pursue appropriate remedies to ensure that he obtains adequate compensation." (Dkt. No. 202-9 at 2). Thus, the Rich Parties cannot demonstrate lack of diligence by Simoni.

Even if Simoni was dilatory in asserting his claims, the Rich Parties still could not establish any prejudice as a result of such delay. Although they contend "Simoni's delay prejudiced [the Rich Parties] and the other attorneys by denying them knowledge of the expenses they would need to account for in settling the cases and/or preparing a fee petition" (dkt. no. 193-1 at 12), this argument makes little sense in light of the purported fee-splitting arrangement between Rich and Simoni, pursuant to which Simoni was to receive either 50% or 20% of Rich's fees. In other words, the amount of the Rich Parties' compensation in no way depended on the portion of fees claimed by Simoni. Moreover, the Rich Parties had actual notice months before the settlement of the Spelter Litigation that Simoni intended to pursue his claim for compensation. Their laches argument therefore fails.

**MEMORANDUM OPINION AND ORDER**

---

### 2.    Statute of Limitations

W. Va. Code § 55-2-6 provides a five-year limitations period

for the filing of a breach of implied contract claim.[5]  Judge Kaull

addressed the applicability of the statute and concluded that, when

the claim arises from a joint venture, the limitation period does

not expire until five years after the cessation of dealings between

the venturers.

#### a.

A lawful agreement between the parties is an essential element

of a joint venture.  See Cunningham v. Herbert J. Thomas Mem. Hosp.

Ass'n, 737 S.E.2d 270, 280-81 (W. Va. 2012); Armor v. Lantz, 535

S.E.2d 737, 743-44 (W. Va. 2000).    Indisputably, agreements

violative of West Virginia's public policy are unenforceable.  See

Syl. Pt. 3, Wellington Power Corp. v. CNA Sur. Corp., 614 S.E.2d

680, 682 (W. Va. 2005); see also Finch v. Inspectech, LLC, 727

S.E.2d 823, 835 (W. Va. 2012); Dalton v. Childress Svc. Corp., 432

S.E.2d 98, 102 (W. Va. 1993) ("'We are committed to the view that

parties may contract as they choose so long as what they agree to

is not forbidden by law or against public policy.'") (quoting

Chesapeake & Potomac Tel. v. Sisson & Ryan, 362 S.E.2d 723, 729

---

[5]  Judge Kaull applied § 55-2-6 to Simoni's claims for unjust
enrichment and quantum meruit.

---

(Va. 1987)).  Therefore, for an enforceable joint venture between Rich and Simoni to have existed as a matter of law, their fee-splitting agreement, which Judge Kaull determined to be violative of WVRPC 5.4, had to be lawful under West Virginia public policy. However, as Judge Kaull explained, West Virginia has not resolved whether WVRPC 5.4 expresses the public policy of the state.

Despite this unresolved question of state law, Judge Kaull did find, as an undisputed fact, that Rich and Simoni ceased their dealings on January 27, 2011.[6]  He based this finding on the fact that Rich collected his attorney's fee from the Spelter Litigation on that date.

Although the third-party defendants agree that January 27, 2011 is the date on which Rich received his fee, they dispute whether "the 'cessation of dealings' between Rich and Simoni also occurred on January 27, 2011, because there was no evidence of any dealings between Rich and Simoni that late in time." (Dkt. No. 216 at 10-11).  They contend that June 27, 2007 is the date on which Rich ceased dealing with Simoni, because that was "the last time

---

[6] Significantly, had the cessation of dealings between Rich and Simoni occurred more than five years prior to April 16, 2012, the date on which Simoni filed his initial counterclaim, the legality of the joint venture would be a moot point.

Simoni could say that he and Rich had any communications." Id. at 11.

This argument raises a legal question about whether a cessation of dealings in a joint venture occurs on the date when one of the venturers receives payment for the enterprise's efforts, or on the date when the venturers last communicated. West Virginia has answered this question, and the case law points to the former.

In Sandy v. Randall, 20 W. Va. 244, 247 (1882), the West Virginia Supreme Court of Appeals adopted the Commonwealth of Virginia's interpretation of "dealings" as "embrac[ing] an act done after the dissolution of the partnership in winding it up; such as the collection or payment of debts due to or by the firm." From there, the court concluded that, "in order to subject the suit to the bar of the statute, it must not only appear that there has been a dissolution of the partnership more than five years before the institution of the suit, but that there were no valid claims or debit or credit against or in favor of the firm, paid or received, or outstanding within that time." Id.

The court followed Sandy's reasoning in Barker v. Smith & Barker Oil & Gas Co., 294 S.E.2d 919, 925 (W. Va. 1982), where it concluded that the cessation of dealings between the parties had not occurred until 1971. It based this finding, in part, on the

fact that profits continued to be deposited into the corporate account and distributed to the partners until that time.  Id.

Applying similar reasoning here, if a joint venture did exist between Rich and Simoni, under West Virginia law their dealings ceased when Rich received his attorney's fee from the Spelter Litigation on January 27, 2011, not the last time he spoke with Simoni on June 27, 2007.  Accordingly, the Court overrules the third-party defendants' objection to the finding in the R&R that Rich and Simoni ceased their dealings on January 27, 2011.

### b.

Despite the legal uncertainty regarding the enforceability of a joint venture agreement between Rich and Simoni, the question remains whether a joint venture between them existed at all.  In Pownall v. Cearfoss, the West Virginia Supreme Court of Appeals outlined "the distinguishing elements or features" of a joint venture:

> As between the parties, a contract, written or verbal, is essential to create the relation of joint adventurers. To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character.  There must, however, be some contribution by each party of something promotive of the enterprise.  An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint

_____

> adventure, and it has been held that, at common law, in
> order to constitute a joint adventure, there must be an
> agreement to share in both the profits and the losses.
> It has also been held, however, that the sharing of
> losses is not essential, or at least that there need not
> be a specific agreement to share the losses, and that, if
> the nature of the undertaking is such that no losses,
> other than those of time and labor in carrying out the
> enterprise, are likely to occur, an agreement to divide
> the profits may suffice to make it a joint adventure,
> even in the absence of a provision to share the losses.

40 S.E.2d 886, 893-94 (W. Va. 1946) (internal citations omitted)

(cited by Cunningham, 737 S.E.2d at 281).

Here, it is undisputed that Simoni contributed his efforts, skill, and knowledge to many aspects of the Fairmont and Spelter Litigations. (Dkt. No. 204 at 2) ("To be clear, Plaintiffs do not dispute that Dr. Simoni contributed to the Fairmont and Spelter litigations."). As to the existence of an agreement, the Rich Parties have explained that "the only agreement that Gary Rich discussed with Dr. Simoni regarding fee-splitting was based upon the condition that Dr. Simoni become a licensed attorney." (Dkt. No. 193-1 at 13).

In his deposition, Rich testified that "we had talked about what might -- what might be as far as, you know, if money was made on these cases, if he became licensed, if he -- if he got something, a fee or maybe was compensated." (Dkt. No. 213 at 579). The following exchange also took place:

34

**MEMORANDUM OPINION AND ORDER**

---

Q. Was it -- was it your thought at that time that you would share the fees from those cases?

A. Share the fees with them?

Q. With Simoni.

A. If they became -- if he -- if he became a licensed attorney or if Harless became involved, yes.

. . .

Q. So all -- as to all the work you were going to do together in partnership you discussed splitting the fees?

A. Uh-huh.

Id. at 583-84, 587.

Based on the undisputed facts, Rich and Simoni clearly had an agreement to share the profits earned from the cases on which they both worked.  Although the parties hotly contest the agreement's terms (especially the alleged condition precedent that Simoni would become a licensed attorney), it is clear that there was an agreement, that Simoni contributed toward that agreement, and that Rich and Simoni were engaged in some form of a joint venture. Thus, because their dealings did not cease until Rich received his fee from the Spelter Litigation on January 27, 2011, and because Simoni filed his initial counterclaim in April 2012, Simoni's

claims are not barred by the five-year statute of limitations at W. Va. Code § 55-2-6.[7]

The Court therefore denies the third-party defendants' motion for summary judgment based on the defense of the statute of limitations, overrules their objections to the R&R regarding when Simoni reasonably should have known that he would not receive any compensation from Rich, as well as when he last rendered services in the Fairmont Litigation, and finds it unnecessary to determine whether the discovery rule applies to the accrual of Simoni's claims.

3.   **Violation of the WVRPC**

Recognizing that the viability of his compensation claim depends on a legally enforceable agreement, Simoni denies the agreement contemplated the sharing of legal fees earned by Rich. He asserts that all he seeks is "the reasonable and equitable compensation to which he is entitled by virtue of his substantial and valuable contributions." (Dkt. No. 194-1 at 12). According to Simoni, he has "no claim to any portion of a 'percentage fee

---

[7] The R&R concluded as a matter of law that, "[i]f Rich and Simoni did enter into a valid joint venture, the limitations period did not begin to run until the 'cessation of the dealings in which they are interested together.'" (Dkt. No. 213 at 34) (citing § 55-2-6). No party objected to that conclusion, and the Court finds no clear error.

split,' contingency fee, or similar agreement to share any legal fees." Id. at 11. The Rich Parties, on the other hand, contend that Simoni's claims "in effect seek to enforce what he claims was an unconditional agreement between him and Mr. Rich to split any attorney's fees received in the case." (Dkt. No. 193-1 at 13).

**a.**

The evidence adduced during discovery unequivocally establishes that the agreement described by Simoni contemplated that he would split the fees Rich earned from his work on the Fairmont and Spelter Litigations. During his deposition, Simoni was asked: "[W]hen you were talking about the 20 percent, 80 percent, 50 percent, 50 percent, what were you talking about? 50 percent of what?" (Dkt. No. 193-4 at 40). He responded: "Of the amount of money that [Rich] received." Id. The examiner then followed up: "And you understood the money he would be receiving would be fees, correct?" Id. Simoni responded: "Yes." Id. Then he was asked: "[Y]ou expected to get a percentage of his fees, correct?" Id. Simoni replied: "Yes." Id. Simoni concedes the same in one of his briefs: "It is undisputed that most, if not all, of the discussions regarding compensation between Mr. Rich and Dr. Simoni were underscored by the prospect of 'percentage split of attorney fees earned by Rich.'" (Dkt. No. 211 at 8).

---

Simoni also testified that he did not expect to be paid wages: "[S]ince my compensation, as I understood, would come from the agreement that I had with Rich, you know, not until the cases were settled and based on my contributions and the value of my contributions, never had the thought or expectation of having to keep hours of work or anything like that." (Dkt. No. 213 at 1314). Also, when Cochran requested a summary of the hours he worked on the Spelter Litigation, Simoni never sent one. <u>Id.</u> at 1313.

Simoni argues that the Court's June 20, 2012 Order, which dismissed as moot any claims "predicated on a fee-splitting agreement" based on Simoni's "disavowal" of any such claim, resolved this issue. (Dkt. No. 29 at 2). However, after entry of that Order, Simoni filed an amended counterclaim which again sought compensation based on the fee-splitting agreement. Moreover, the evidence adduced in discovery undercuts his argument and reinforces that his compensation claim remains based entirely on a fee-splitting agreement with Rich.

As an element of his primary claim, quantum meruit, Simoni must demonstrate a reasonable expectation to compensation. <u>See Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP</u>, 746 S.E.2d 568, 579 (W. Va. 2013). He alleges that he reasonably relied on his discussions with Rich concerning their "mutual

_____

understanding" of the fee-splitting agreement. (Dkt. No. 35 at

24). He also testified in his deposition that he expected to

"[g]et zero" if the lawsuits were unsuccessful. (Dkt. No. 213 at

1275). Furthermore, as to his theory of compensation, his brief

explains that

> [i]t is undisputed that most, if not all, of the
> discussions regarding compensation between Mr. Rich and
> Dr. Simoni were underscored by the prospect of
> "percentage split of attorney fees earned by [Mr.] Rich."
> . . . And, it is this understanding and expectation which
> forms the basis for Dr. Simoni's claims made in this
> matter.

(Dkt. No. 211 at 8) (internal citations omitted) (alteration in

original). From all this, the Court concludes that Simoni's

agreement with Rich contemplated sharing a portion of Rich's legal

fees from the Fairmont and Spelter Litigations.

**b.**

The overarching question in the case is whether the WVRPC's

ethical bar to the fee-splitting agreement between Rich and Simoni

also constitutes a legal bar to its enforceability. The case most

closely on point in West Virginia is <u>Gaddy Engineering</u>, which Judge

Kaull thoroughly analyzed in his R&R.

Gaddy Engineering Company ("Gaddy") had provided claim

evaluation services to the law firm of Bowles Rice McDavid Graff &

Love, LLP ("Bowles Rice") in connection with a lawsuit against an

oil and gas company ("Columbia") for underpayment of royalties. See Gaddy Engineering, 746 S.E.2d at 571. According to Gaddy, Bowles Rice had agreed to pay it "one third of any recovery [Bowles Rice] received for pursuing claims against Columbia." Id. at 572. After this agreement was reached, however, the plaintiffs in the underlying royalties case refused to opt out of an ongoing class action, which relegated Bowles Rice to the role of nominal counsel, in lieu of lead class counsel, in the Columbia litigation. Id.

Following the settlement of the class action, Gaddy submitted an invoice to Bowles Rice for $367,225, reflecting all the work Gaddy had performed from before the case was filed until it settled. Id. at 572-73. After receiving its attorneys' fees and expenses from the settlement, Bowles Rice only tendered $74,275 to Gaddy. Id. Gaddy rejected that amount and sued Bowles Rice for its portion of the fee, claiming breach of contract, various forms of negligence, fraud, conversion, promissory estoppel, unjust enrichment, and quantum meruit. Id.

Bowles Rice moved to dismiss Gaddy's complaint, arguing that the doctrine of illegality barred the enforcement of the alleged fee-sharing agreement. Id. In ruling on the motion, the circuit court noted that the West Virginia Supreme Court of Appeals "had never addressed the precise question of whether the ethical

_____

violation that results from a fee-sharing agreement between a lawyer and a nonlawyer would render the agreement void and unenforceable as a matter of public policy." <u>Id.</u>  It denied the motion to dismiss based on "the hortative introductory language of the [WVRPC] and the lack of governing precedent." <u>Id.</u> Furthermore, as later recounted by Justice Loughry in his concurring opinion, the circuit court also observed that

> the <u>W. Va. Rules of Professional Conduct</u> do not amount to positive statements of the law or public policy sufficient to render the alleged fee-sharing agreement between Gaddy and Defendants void and unenforceable. In other words, these words do not define 'illegal conduct' but do define 'unethical conduct' for which an attorney may be disciplined or sanctioned by the Supreme Court of Appeals.

<u>Id.</u> at 580 (Loughry, J., concurring) (italics in original).

Rather than appeal the denial of its motion to dismiss, Bowles Rice moved for summary judgment on all of Gaddy's claims. <u>Id.</u> at 573.  The trial court granted the motion,[8] which Gaddy then appealed. <u>Id.</u>

On appeal, the West Virginia Supreme Court of Appeals affirmed the trial court's dismissal of Gaddy's claims.  But in doing so, it

_____

[8] As to Gaddy's breach of contract claim, the trial court granted summary judgment based on the doctrine of impracticability. <u>Id.</u>  As to the remaining counts, the grounds for the trial court's decision are not relevant here.

failed to decide whether a fee-sharing agreement violative of WVRPC 5.4 is contrary to the state's public policy.  Because of that, Justice Loughry, joined by Justice Davis, "fault[ed] the majority for its absolute failure to recognize the critical need . . . to address the illegality of a fee-sharing agreement between a lawyer and a nonlawyer."  <u>Id.</u> at 579 (Loughry, J., concurring).  Taking the point even further, he explained that, "[d]espite the clear invitation from the trial court to resolve this previously unaddressed issue, the majority opted not to decide that a fee-sharing agreement between a lawyer and a nonlawyer that is in violation of Rule 5.4 of the Rules of Professional Conduct is unenforceable as being contrary to public policy."  <u>Id.</u> at 579-80 (Loughry, J., concurring).

Justice Loughry noted that "[n]umerous other courts . . . have resoundingly determined that rules of professional conduct contain explicit declarations of a state's public policy."  <u>Id.</u> at 580 (Loughry, J., concurring) (collecting cases).  He also acknowledged that, in a number of cases, "'a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense.'"  <u>Id.</u> at 582-83 (Loughry, J., concurring) (quoting <u>O'Hara v. Ahlgren, Blumenfeld and Kempster</u>, 537 N.E.2d 730, 738 (Ill. 1989)).  Indeed, "[t]he fact that one party may

benefit from an illegal fee-sharing agreement does not tip the proverbial scales of justice in favor of enforcement." Id. at 582 (Loughry, J., concurring).

Justice Loughry's concurrence makes clear that the question of the enforceability of a fee-splitting agreement between an attorney and a non-attorney is unresolved under West Virginia law. This question, of course, lies at the heart of Simoni's claim for a portion of Rich's fee award. Since any claim to compensation by Simoni is based on a fee-splitting agreement, if the agreement was void ab initio because it violated West Virginia public policy, Simoni could not reasonably have relied on Rich's promise, and therefore could not have any reasonable expectation of receiving compensation, whether under a theory of unjust enrichment, quantum meruit, or breach of implied contract.

Because the answer to this issue will determine the outcome of these three claims, the Court adopts Judge Kaull's recommendation to certify to the West Virginia Supreme Court of Appeals the question whether the WVRPC expresses the public policy of West Virginia. Adopting the recommendation to certify, however, does not dispose of the remaining challenges to Simoni's counterclaim, to which the Court now turns.

**MEMORANDUM OPINION AND ORDER**

---

### 4.    Estoppel as a Bar to Compensation

The Rich Parties attack Simoni's compensation claim based on the doctrines of equitable and judicial estoppel.  They rely on his testimony in the Spelter Litigation, where they contend he disavowed any promise of compensation.  Accordingly, they urge the Court to apply estoppel as a bar to Simoni's counterclaim.

In his 2006 deposition in the Spelter Litigation, Simoni testified as follows:

> Q. Have you ever received any money or gift from any of the plaintiffs' firms in this litigation?
>
> A. No.
>
> Q. Have you ever received the promise of any money or gift from any of these plaintiffs' firms concerning this litigation?
>
> A. Well, as I'm understanding your question, that's an area that would involve communications with the law firms; and if I'm following this whole thing correctly, that would be part of my relationship -- working relationship, and, therefore, would be a privileged area. I mean, unless I'm mistaken about that; but I think that's correct.
>
> Q. Were there any promises of any money or gifts made to you concerning this litigation prior to the late summer of 2003?
>
> A. No.

(Dkt. No. 202-7 at 9).  According to the Rich Parties, "[b]ecause any [claims to compensation] are directly refuted by Dr. Simoni's

sworn testimony in a prior proceeding, he should be estopped from advancing those claims before this Court." (Dkt. No. 193-1 at 8).

Simoni disputes that he understood the phrase "plaintiffs' firms" to include Rich Law. He argues that, in responding "no" to the questions, he was merely stating that neither Levin nor Cochran (nor the firms of Kennedy & Madonna and West & Jones, for that matter) had promised to compensate him. (Dkt. No. 202 at 8).

In support of this interpretation, Simoni highlights the prior context of his deposition, where he had been asked specifically about the third-party defendant law firms, not including Rich Law. Simoni also underscores a later portion of the testimony, where he was asked, "Mr. Rich is a plaintiffs' lawyer, is he not?" (Dkt. No. 202-7 at 14). Simoni's reply was, "I wouldn't term Mr. Rich a plaintiffs' lawyer." Id.

Equitable estoppel requires "a false representation or a concealment of material facts." Syl Pt. 3, Cleaver v. Big Arm Bar & Grill, Inc., 502 S.E.2d 438, 438 (W. Va. 1998). Similarly, judicial estoppel requires that "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation." Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996). Here, application of either doctrine turns on whether Simoni testified at his deposition in 2006 that he was

never promised compensation.  This question clearly involves a material factual dispute that cannot be resolved on summary judgment.

### 5.    Lack of Reasonable Expectation to Compensation

The third-party law firms contend that "Simoni cannot have any reasonable expectation of compensation, and his claims should be barred as a matter of law."  (Dkt. No. 200-1 at 22).  More specifically, they assert that a claim for quantum meruit cannot lie where the claimant lacked "any reasonable expectation of receiving remuneration for his services." Id. (quoting Copley, 466 S.E.2d at 146).  They advance three bases for their argument.

First, they argue that the fee-splitting agreement between Rich and Simoni was illegal and unenforceable; Simoni always knew it was unenforceable, and  therefore he cannot now reasonably expect to be compensated pursuant to the agreement.  Plainly, this argument encompasses the question to be certified regarding the legality of the agreement between Rich and Simoni.

Second, they argue that Simoni lacked a reasonable expectation to payment because, as a consultant or service provider, he failed to document his hours worked.  (Dkt. No. 200-1 at 24).  This argument contains a faulty premise, namely, that Simoni was seeking hourly compensation.  Simoni has testified that he "never had the

___

thought or expectation of having to keep hours of work or anything like that." (Dkt. No. 213 at 1314).

Finally, even if the agreement is enforceable, they argue that Rich's "pattern of volatile, erratic conduct" eroded any reasonable expectation to compensation Simoni might have had. (Dkt. No. 200-1 at 23). The record does in fact contain occasional instances of bizarre behavior by Rich. For example, Simoni testified that, when he met with Rich in April of 2002, they discussed their agreement outdoors because "Gary was concerned about his office area being under some kind of surveillance." (Dkt. No. 213 at 1200). Simoni further testified that, at the same meeting, Rich threatened to "come at me physically." Id. at 1199.

Despite these encounters, the Court cannot find as a matter of law that Simoni's expectation of compensation from Rich was unreasonable. While the record documents that he expressed doubts at times about whether or not Rich would pay him, id. at 1159 ("I got to thinking I don't know that I'm going to get anything."), he likewise "always believed" he would receive some compensation. Id. at 1428. Thus, there are material facts in dispute regarding the reasonableness of Simoni's expectation to compensation.

---

**B.    Simoni's Count IV: Negligent Misrepresentation**

The third-party law firms next argue that Simoni's negligent misrepresentation claim is "duplicative" of his breach of implied contract claim, and should be considered abandoned.  (Dkt. No. 200-1 at 25).  As discussed earlier, duplication alone is not a basis for dismissing a claim.  More importantly, a claim for negligent misrepresentation is legally distinct from a claim for breach of implied contract.  See, e.g., Dickens v. Sahley Realty Co., 756 S.E.2d 484, 487 (W. Va. 2014) (involving claims for both negligence and breach of implied contract).

Nevertheless, the third-party defendants' argument does prompt an analysis as to whether Simoni's allegations of negligent misrepresentation are legally sufficient; nowhere does he allege that Rich owed him any duty beyond the purported fee-split.  In Gaddy Engineering, the West Virginia Supreme Court of Appeals affirmed the circuit court's grant of summary judgment on the plaintiff's negligent misrepresentation claim based in part on "the lack of any duty owed."  746 S.E.2d at 578; see also Folio v. City of Clarksburg, 655 S.E.2d 143, 151 (W. Va. 2007) (reiterating that, for negligent misrepresentation to lie, the alleged tortfeasor must be "under a duty to give information to another"); Kidd v. Mull, 595 S.E.2d 308, 317 (W. Va. 2004) ("[A] successful claim for

48

negligent misrepresentation would require a finding that Ms. Markwas was a real estate broker and thereby maintained a special relationship or duty to the Appellants."). Because Simoni has not articulated any duty the Rich Parties owed him beyond the fee-splitting agreement, his claim of negligent misrepresentation fails as a matter of law.

**C.   Simoni's Count V: Conversion**

Simoni's counterclaim alleges that the Rich Parties' "exercise of purported ownership over the proceeds of the Spelter litigation constitutes a conversion thereof." (Dkt. No. 35 at 27). Under West Virginia law, "'[a]n action for conversion of personal property cannot be maintained by one without title or right of possession.'" Syl. Pt. 3, Thompson Dev., Inc. v. Kroger Co., 413 S.E.2d 137, 142 (W. Va. 1991) (quoting Syl., Kisner v. Commercial Credit Co., 174 S.E.2d 330, 330 (W. Va. 1934)).

With respect to the Spelter Litigation, Rich received his portion of the total attorneys' fees pursuant to an uncontested order of the Harrison County Circuit Court. (Dkt. No. 200-1 at 25). As Simoni never held title to or possession of the fees, he cannot maintain a claim for conversion under West Virginia law.

_____

**D.   Simoni's Count VI: Estoppel**

Finally, the third-party defendants urge that Simoni cannot plead estoppel as an independent cause of action. Id. An analysis of this issue, however, is not as clear-cut as their argument suggests. One federal district court in West Virginia dismissed a claim for estoppel for lack of case law supporting it as an independent claim, and because the plaintiffs pleaded it as an equitable defense. See Warden v. PHH Mortg. Corp., No. 3:10CV75, 2010 WL 3720128, at *7 (N.D.W. Va. Sept. 16, 2010). However, another district court determined that "[t]he Supreme Court of Appeals of West Virginia has treated equitable estoppel as a viable cause of action." Holtzapfel v. Wells Fargo Bank, N.A., No. 2:12CV937, 2013 WL 1337283, at *5 (S.D.W. Va. Mar. 29, 2013) (citing Folio, 655 S.E.2d at 148). Fully aware that its ruling conflicted with the holding in Warden, the court in Holtzapfel distinguished its decision on the ground that the estoppel claim in Warden had been pleaded as an equitable defense. Holtzapfel, 2013 WL 1337283, at *5 n.9.

Here, Simoni's estoppel claim is limited specifically to his failure to record hours worked:

> 145. In reliance on the discussions that occurred
> between the Counter-Defendants and Dr. Simoni regarding
> the arrangement under which he would be compensated, Dr.

**MEMORANDUM OPINION AND ORDER**

---

Simoni did not keep contemporaneous time records of his
substantial and valuable hourly contributions;

146. The Counter-Defendants are now estopped from
denying Dr. Simoni compensation for his work based on the
absence of contemporaneous time records or the inability
of Dr. Simoni to reconstruct, on a hourly basis, the
extent of his contributions[.]

(Dkt. No. 35 at 28). These allegations clearly amount to a
preemptive effort to rebut the Rich Parties' anticipated argument
that he is not entitled to compensation since he never recorded the
hours he worked. As such, they do not create an independent basis
for liability. Moreover, in his answer to the Rich Parties'
complaint, Simoni specifically pleaded estoppel as an affirmative
defense. Id. at 3. Thus, because Simoni's estoppel claim in
actuality is an equitable defense, it is comparable to the claim
dismissed in Warden, and does not survive as an independent cause
of action.

For the reasons discussed, the Court dismisses with prejudice
Counts IV-VI of Simoni's counterclaim, leaving only Counts I-III,
which depend entirely on whether the fee-splitting agreement
between Rich and Simoni is legally enforceable.

## V. CERTIFICATION

Under the West Virginia Uniform Certification of Questions of
Law Act ("UCQLA"), § 51-1A-1, et seq., federal courts may petition

---

the state's highest court for an answer to a question of state law so long as (i) it is "determinative of an issue in a pending cause in the certifying court," and (ii) "there is no controlling appellate decision, constitutional provision or statute of this state." § 51-1A-3. Fourth Circuit standards add no prerequisites beyond those in the statute. See, e.g., State Auto Prop. & Cas. Ins. Co. v. E. Data Sys., Inc., 587 F.3d 226, 227 (4th Cir. 2009) (finding it appropriate to certify a question through the UCQLA because the answer would be outcome-determinative and there was no controlling precedent, statute, or constitutional provision).

Here, whether an agreement that violates the WVRPC is legally enforceable will determine if Counts I-III of Simoni's counterclaim survive. Without the underlying agreement supporting Simoni's expectation of compensation in the form of a fee-split, his remaining claims for breach of implied contract, quantum meruit, and unjust enrichment would fail as a matter of law. Additionally, Gaddy Engineering makes clear that there is no controlling appellate decision, statute, or constitutional provision addressing this issue.

Therefore, the Court will certify the following question to the West Virginia Supreme Court of Appeals:

> Are the West Virginia Rules of Professional Conduct statements of public policy with the force of law equal

---

to that given to statutes enacted by the West Virginia
State Legislature?

(Dkt. No. 213 at 37).  It intends to enter a separate order of

certification.

## VI. CONCLUSION

In conclusion, the Court:

- **OVERRULES** the third-party defendants' objections to the R&R;

- **ADOPTS** the recommendation in the R&R to certify the question whether the WVRPC constitute statements of public policy;

- **DISMISSES WITH PREJUDICE** Counts IV-VI of Simoni's counterclaim;

- **STAYS** this case pending resolution of a certified question by the West Virginia Supreme Court of Appeals; and

- **DIRECTS** the parties to file a joint motion to lift the stay following receipt of the answer to the certified question.

It is so **ORDERED.**

**MEMORANDUM OPINION AND ORDER**

---

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: September 30, 2014.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE